IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ABBY B. CONLEY,
        Plaintiff


    v.                    CIVIL ACTION NO. 05-76 ERIE


COUNTY OF ERIE, et al.,
        Defendants



HEARING ON MOTIONS TO COMPEL



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, January 4, 2006.




APPEARANCES:
        TIMOTHY D. McNAIR, Esquire, appearing on behalf
        of the Plaintiff.

        ANTHONY ANGELONE, Esquire, appearing on behalf
        of the Plaintiff.

EDMOND R. JOYAL, JR., Esquire, appearing on
behalf of Defendants County of Erie, et al.

MARK R. LANE, Esquire, appearing on behalf of
Defendant John A. Onorato, Esquire.

Ronald J. Bench, RMR - Official Court Reporter

2

1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 9:33 a.m., on

4    Wednesday, January 4, 2006, in Courtroom C.)

5

6          THE COURT:  This is the time we set for argument on

7    various motions to compel.  We also set aside some time for a

8    settlement conference.  It seems to me it's going to take us

9    some time to resolve these motions, so it makes sense to do

10   this first.  Let's first take up the defendant John Onorato's

11   motion to compel discovery responses.  Mr. Lane, is that

12   correct?

13          MR. LANE:  Yes, your Honor.

14      THE COURT:  All right, do you want to come up to the

15  podium.  Would it be accurate to say that with respect to the

16  first several, your objection is really you're objecting to the

17  plaintiff incorporating by reference her deposition testimony?

18      MR. LANE:  That is accurate, your Honor.  In fact, I

19  cite the case of DiPietro_v._Jefferson_Bank for that
        _____ __ _____ ____

20  proposition.

21      THE COURT:  Let me just ask a practical question.

22  And I'm sure that case does stand for the proposition, as a

23  technical matter a party's supposed to write the answers down.

24  Is there anything that you didn't glean from her deposition

25  testimony relative to those particular responses?


3


1      MR. LANE:  Your Honor, in the interrogatories I

2  asked for names, addresses, telephone numbers and dates of

3  employment.  I marked some of the pages of the deposition

4  testimony yesterday that showed that she was guesstimating,

5  estimating and approximating and things like that.  So I'd like

6  to have specific dates of employment, addresses, the names of

7  her employers I'm not certain were accurate in the deposition.

8   In order to contact those employers in the event that the court

9   allows me to depose witnesses, if the records are produced and

10  we see something we want to talk to a former employer about,

11  I'd like to have the information about her former employment

12  and specific dates as well.

13       THE COURT:  All right.  I'm going to go through

14  these seriatim now, then I'm going to hear from Mr. McNair,

15  then I'm going to rule on them.  You ask at seven, "have you

16  ever been diagnosed with depression, schizophrenia, paranoia or

17  addiction?"

18       MR. LANE:  Yes.

19       THE COURT:  What's the relevance of that?

20       MR. LANE:  Your Honor, in paragraph 32 of the

21  complaint the plaintiff makes a very broad damage point.  That

22  specifically says as a result of her termination from

23  employment she had suffered damages, including but not limited

24  to loss of pay and benefits, loss of reputation, public

25  humiliation, embarrassment, mental anguish, inconvenience,

4

1   other non-pecuniary losses.  This is essentially an unlimited

2   damage claim.  I believe she is going to say she suffered from

3   depression.  And she does contend that she suffers from mental

4   anguish as a result of this termination.  I am attempting to

5   determine whether there's a pre-existing condition, if in fact

6   she did seek treatment.  If in fact she is claiming mental

7   anguish and depression as result of the termination, I think

8   the defendants are entitled to determine what pre-existing

9   condition existed that may have also contributed or contributed

10   solely to her current condition or claims.

11        THE COURT:  So it goes to her damages, it's not your

12   position that it -- I take it it isn't your position

13   substantively that someone who may have suffered from a mental

14   disorder can't be a whistleblower?

15        MR. LANE:  That's not my position substantively.

16   Although, I think her pre-existing condition does go to whether

17   she suffered from paranoia, schizophrenia, depression or

18   anything like that, that does go to the issue of whether this

19   is a good faith report of wrongdoing.

20        THE COURT:  How is that possibly so, what difference

21   would it make?

22        MR. LANE:  Well, in the e-mails that I think you've

23  seen by now, there are issues as to whether she was attempting

24  to undermine her employer.  In one of the e-mails someone

25  corresponded with her, stated that she wanted to see OCY go


                              5


1  down in flames.  Ms. Conley is contending --

2       THE COURT:  Not to interrupt you, how would the fact

3  and I'm not saying this is the case, but just hypothetically,

4  assume that the records were to reveal that she was suffering

5  from a depressive disorder.  How would the fact that someone is

6  suffering from a depressive disorder make a report more or less

7  good faith?

8       MR. LANE:  I don't think that someone suffering from

9  a depressive disorder would have that effect.  It would more be

10  along the lines of some sort of paranoia or something else that

11  might be diagnosed.  I don't know, but I don't think depression

12  would, I would agree with that.

13        THE COURT:  But, in any event, she wasn't

14  terminated -- she wasn't terminated by the employer as a result

15  of, from the employer's perspective, as a result of symptoms or

16  conduct allegedly triggered by paranoia problems or anything

17  like that, is that right?

18      MR. LANE:  That's exactly right.  The reason for

19  termination in part was a breach of confidentiality and

20  releasing information to a third party.  In looking at e-mails,

21  it appears that release of confidential information was

22  intended in part to undermine her employer's efforts to protect

23  an unborn child.  Ms. Conley contends, as well as the person

24  with whom she corresponded, that they were just joking about

25  this, that they really didn't want to see OCY go down in

6

1  flames.  Ms. Conley says in her response on my motion, even if

2  that was Deanna Cosby's attitude, it wasn't Conley's attitude.

3  I want to get a lot of the information I'm requesting here to

4  determine what was Ms. Conley's attitude.

5      THE COURT:  Number 15, you want her e-mail accounts

6  that she has held since January 1st of 1995, including the

7  identity and address of any service providers.  What is the

8  relevance of that?

9      MR. LANE:  Ms. Conley contends that she was not

10  releasing confidential information which led to her

11  termination.  I think we produced e-mails that show that she

12  was.  She has testified in her deposition that she was

13  e-mailing herself at home from her work computer and

14  vice-versa, I believe.  We believe that there are probably

15  e-mails from her home computer and from her e-mail accounts.

16  By the way, I think we already have some e-mails that were sent

17  from Ms. Conley from a private e-mail account, that will

18  demonstrate that she was in fact releasing confidential

19  information in attempting to undermine her employer.  Those

20  e-mails will also demonstrate her attitude in whether she did

21  want to see OCY "go down in flames."

22      THE COURT:  Mr. Lane, specifically, she could not

23  have been terminated as a result of conduct of which the

24  employer was unaware, is that right?

25      MR. LANE:  Absolutely.


7


1      THE COURT:  And just to refresh my recollection, she

2  was terminated as a result of two instances of misconduct, is

3  that correct, primarily?

4      MR. LANE:  I'm not sure I could characterize it as

5    two instances, there's a release of confidential information

6    related to a Vickie Wilson.

7          THE COURT:  And your investigation that you

8    conducted revealed that particular e-mail, is that correct, at

9    the time?

10         MR. LANE:  Yes.

11         THE COURT:  And then there was the matter about the

12   testimony in court, is that correct?

13         MR. LANE:  Well, the plaintiff contends that she was

14   terminated as a result of testimony in court.

15         THE COURT:  Excuse me, Mr. Joyal, I'll get to you in

16   one second.

17         MR. JOYAL:  Well, your Honor, not to interrupt, but

18   Mr. Lane only represents Mr. Onorato.  I represent the County

19   defendants.

20         THE COURT:  I'm not leaving you out of the loop.

21         MR. JOYAL:  I understand, I just wanted to make

22   sure --

23         THE COURT:  If you think your ox is being gored, you

24   can jump up at anytime.  Okay, let's get back here.  Was it

25   that e-mail then -- was that insofar as the County was

8

1   concerned or Mr. Onorato was concerned, the smoking gun that

2   led to her termination?

3       MR. LANE:  That's one of them.

4       THE COURT:  What else besides that?

5       MR. LANE:  Here's where Mr. Joyal comes in because

6   he represents the County.

7       THE COURT:  Let me swing over to Mr. Joyal, so I

8   don't lose my train of thought.  Do you want to complete that

9   thought, Mr. Joyal, I want to know specifically what she was

10  terminated for?

11      MR. JOYAL:  Your Honor, the reason that she was

12  called in for a discussion prior to the September 10th

13  resignation letter was that during the course of, we'll say

14  starting probably in May or June of 2004, there were concerns,

15  not that the County knew about e-mailing, but that the County

16  had started to be concerned about the fact that there were

17  cases that had a common thread.  They were the cases that

18  Deanna Cosby and Abby Conley had worked on during that period

19  of time.  For example, there were e-mails in meetings that were

20  held within the unit that both Abby Conley and these other

21   workers were involved in that had to do with these cases.  In

22   which supervisory staff from OCY was concerned that

23   confidential information about clients and about workers was

24   being disseminated to people that should not have it.  They

25   weren't sure how it came about, but they knew that was

9

1   happening based upon circumstances.

2         THE COURT:  How did they know that, what got the

3   investigation -- I'm trying to get the big picture here.  How

4   did they know that or what led them to believe that might be

5   happening, and whom did they conclude that Ms. Conley was

6   sharing confidential information with?

7         MR. JOYAL:  During that period of time there was a

8   report made concerning an alleged instance of child abuse by a

9   supervising, Ms. Conley describes her, a supervising social

10   worker on the case.  That had a commonality of the mother of

11   these children, and another case that she was being involved

12   with with an unborn child, that Mr. Lane talked about.  That

13   was a report that was made by Ms. Conley concerning an instance

14   of alleged abuse.

15        THE COURT:  Which triggered an internal

16    investigation?

17        MR. JOYAL:  Which started an internal investigation,

18    but because OCY felt it should not be done by OCY, it was then

19    given to the Western Regional Department of Public Welfare.

20    During that period of time, it became apparent to people at OCY

21    that information about that investigation had been transmitted

22    somehow to the mother of the children, number one.  But, also,

23    to the father of the unborn child, who was not related to the

24    child that was allegedly abused.  For example, there are

25    letters that were turned over to OCY and there was apparently a

10

1    conversation by -- I want to make sure I get everybody

2    straight -- the father of the unborn child in this case was an

3    individual named Robert Beers.  He apparently was serving time

4    in prison for bank robbery.  He was given information by his

5    paramour or fiance, who was pregnant with his child.  And Abby

6    Conley was involved in her case, as well as the other worker,

7    and Deanna Cosby, prior to her leaving OCY.  He was given

8    information by a letter from this woman about the child abuse

9  report as to the social worker.  He then contacted Ms. Conley's

10  supervisor, Susan Deveney, either by letter or by telephone, to

11  tell her that he knew about this information.  He then

12  apparently, and this is all prior, your Honor, I want to get

13  the time frame, of the July 28, 2004 testimony in Judge Kelly's

14  courtroom.  Which is one of the allegations in the complaint as

15  to why she was asked to resign.

16      THE COURT:  If I could just interrupt your narrative

17  for one second, since you brought it up.  With respect to her

18  court testimony, if I remember correctly, the contention is

19  that she testified in Judge Kelly's courtroom that a summary

20  that she had prepared as to the suitability of the parent had

21  been substantively altered?

22      MR. JOYAL:  That's what she alleges.

23      THE COURT:  Is that correct, and if not, why not?

24      MR. JOYAL:  The County's position is that the

25  substance of the summary, insofar as how the summary was to

11

1  read, was not altered.  Particularly, in this case.  And Ms.

2  Conley has testified during that appearance to a couple things

3   on cross-examination.

4          THE COURT:  Let me ask you this.  I presume, do I

5   have that document as part of my record, do you know?

6          MR. JOYAL:  The summary itself?

7          THE COURT:  Do I have -- does there exist her

8   original document, and then the document that eventually spun

9   out of that?

10         MR. JOYAL:  Yeah, I believe it does.  I don't know

11  whether it's been part of the record.  I know Mr. McNair has

12  seen it.

13         THE COURT:  I'm trying to get a handle on this.  Is

14  it inaccurate to say that the changes or deletions that were

15  made to her document were more than grammar?

16         MR. JOYAL:  It's not inaccurate to say that.

17         THE COURT:  Is it accurate to say that she

18  essentially, and I'm flying bind because I haven't seen it, but

19  she contends that the whole tenor of the document was changed

20  by deletion or omission, is that correct?

21         MR. JOYAL:  That's her contention.

22         THE COURT:  I know it is, but what do you say to

23  that?

24          MR. JOYAL:  We say no, your Honor.  Here's why the

25   document, the position of OCY at the time is that the document

                              12

1   was changed.  And this is somewhat corroborated during the

2   testimony that day.  Ms. Conley is a case aide worker, in other

3   words, she has no social work background, she has no training

4   in social work.

5          THE COURT:  Right.

6          MR. JOYAL:  Her job was to facilitate visits and to

7   make reports to the supervising social worker as to her

8   observations, not her opinions.

9          THE COURT:  In other words, working more in a

10   ministerial capacity, is that what you're saying?

11          MR. JOYAL:  Exactly.

12          THE COURT:  All right.

13          MR. JOYAL:  And what happened in the summary was

14   that she made -- she listed her observations and then put

15   things into it, such as Ms. X demonstrated excellent parenting

16   skills and things such as that.

17          THE COURT:  Would it be the County's position --

18  well, let me ask a factual question first.  Is it accurate to

19  say that that type of personal observation by Ms. Conley was

20  deleted by her supervisor on the basis that she was not

21  qualified to make the opinion, is that what you're telling me?

22          MR. JOYAL:  That's what I'm telling you.  And Ms.

23  Conley testified to that fact in effect by stating under

24  cross-examination by the County attorney at that point, that

25  this happened all the time.


13


1          THE COURT:  What was the line of demarcation then as

2  to what she was permitted to put in a document and what would

3  be considered by the County to be overstepping her appropriate

4  bounds?

5          MR. JOYAL:  Well, according to Ms. Conley's

6  testimony, and I believe the County's position is the summary

7  should include what she did, what she saw, what happened.  Not

8  whether or not a clinical observation or a clinical opinion, if

9  I could call it that, that she was not qualified to indicate in

10  such documents.

11          THE COURT:  Let's spin back so I can pick up with

12  Mr. Lane again.  So you indicated the genesis of this

13  investigation.  And that investigation eventually led to the

14  e-mail between -- the lady's name is escaping me?

15        MR. JOYAL:  Cosby.

16        THE COURT:  On the basis for the termination?

17        MR. JOYAL:  I don't know what e-mail you're talking

18  about, your Honor.  Basically, I think the e-mails themselves,

19  were not discovered until sometime after the County had started

20  piecing together the circumstances of what they knew and the

21  fact that, as I stated to you, that information was being

22  relayed to social workers from outside individuals that could

23  only be gotten by someone telling them that themselves.

24        THE COURT:  What date, forgive me, but what date was

25  she terminated on?


                              14


1        MR. JOYAL:  September 10, 2004.

2        THE COURT:  On September 10th, just one more time

3  down this road, tell me, and I'm not interested in things they

4  found out subsequent, I'm interested in what they knew then and

5  what they acted on.  As of September 10th, what was she told

6  was the reason for her termination?

7      MR. JOYAL:  She was told that there had been serious

8  breaches of confidentiality in client records and that they

9  believed that she had used the e-mail system for some of those.

10  And that they believed that that was a violation of their

11  confidentiality policy and placed clients at risk.

12      THE COURT:  When, just to get me back on the time

13  line, when, in relation to her termination, how much prior to

14  her termination was her testimony before Judge Kelly?

15      MR. JOYAL:  July 28th.  And part of that, too, your

16  Honor, the circumstances surrounding that testimony --

17      THE COURT:  Let me interrupt you, Mr. Joyal.  With

18  respect to her testimony before Judge Kelly, where I believe

19  she referenced the e-mail that had been changed, is that right?

20      MR. JOYAL:  It was a document.

21      THE COURT:  The document that had been changed, she

22  testified to that fact.  Did her testimony before Judge Kelly

23  form in part the decision to terminate her?

24      MR. JOYAL:  That's a difficult question to answer

25  because part of the testimony itself was based upon the fact

15

file:///A|/CONLEY14.TXT

1    that an attorney representing one of the family members had in

2    his possession the draft copy of the document, and the only way

3    he could have gotten the draft copy of the document would have

4    been to have had it provided to him from the case file, which

5    again would have been violating OCY policy and confidentiality.

6    So that's another sort of peg in this line of questioning,

7    which is how -- they're surprised because no one had ever, in

8    all the years that they've been there, had a lawyer had a draft

9    of a report prior to it having been submitted to the court.

10          THE COURT:  And then finally, though, with respect

11    to that testimony, do I take it it was the fact that the lawyer

12    had the document, more than the fact that she testified that

13    the document had been inappropriately altered, that attracted

14    the County's attention?

15          MR. JOYAL:  Absolutely.

16          THE COURT:  All right, do you want to have a seat,

17    thank you.  Let's keep moving here.  We talked about the

18    psychiatric records.  All right, I think I'm ready to hear from

19    Mr. McNair.  The rest of it is self-explanatory.

20          MR. LANE:  Thank you, your Honor.

21          THE COURT:  Let me see if we can make some headway

22  here.  I'm holding Onorato's motion to compel discovery

23  responses.

24          MR. McNAIR:  Yes, your Honor.

25          THE COURT:  Okay.  We'll just go through them here.


                              16


1  Interrogatory 4, names, addresses and telephone numbers for

2  each employer for whom you have worked since 1985.  You

3  incorporate by reference her testimony from her deposition.

4  Is it your position that you already answered, for instance,

5  that and other questions fully in her deposition and just don't

6  want to spend the time answering it in interrogatory form,

7  pretty much?

8          MR. McNAIR:  Your Honor, it's our position that to

9  the extent that this inquiry is relevant to the matters before

10  this court, it has been fully answered in the deposition and

11  that there is no need to repeat it.  Running the risk of

12  developing minor inconsistencies that could be magnified and

13  used as red herrings.

14          THE COURT:  That's always a risk.  These are the

15  easy ones.  With respect to four, any of the answers where you

16  incorporate by reference -- five, where you incorporate by

17  reference, answer those.  They're entitled to have a formal

18  answer in response to those interrogatories.

19          Six, identify the telephone numbers of each health

20  care provider, and there's a whole laundry list of various

21  types, from whom you have sought and/or obtained medical or

22  psychological treatment since 1985.  You say, you incorporate

23  by reference her testimony, but you also raise a relevancy or

24  privilege objection.  Did she testify, did she give a summary

25  of her previous health care at deposition?


17


1          MR. McNAIR:  Your Honor, under the Rules of Civil

2  Procedure, the only way a relevance issue can be raised in a

3  deposition is to interrupt the deposition and come to court.

4  We had spent more time than the rules called for.  So we wound

5  up spending more time than that.  That extended the deposition

6  by days.  That is why she answered those questions there.  That

7  is not a waiver of her objection to the relevance.  If that's

8  where you're going on that.

9          THE COURT:  I'm not sure where I'm going on it.

10   My question is more where are you going on it?

11        MR. McNAIR:  She answered the questions that were

12   asked, to the extent they did not involve privileged matters.

13   However, she reserves the right to object to their relevance.

14        THE COURT:  Here's my question, maybe this will move

15   it along.  As a result of her firing or termination, is she

16   seeking, in addition to economic loss, is she seeking as a

17   separate component of damages, damages for -- broad term mental

18   anguish?

19        MR. McNAIR:  Yes, your Honor.

20        THE COURT:  All right.  And since her termination

21   has she sought psychiatric care?

22        MR. McNAIR:  No.

23        THE COURT:  So she is not treating psychologically

24   or psychiatrically for any sequelae as a result of her

25   termination, is that correct?


18


1        MR. McNAIR:  She testified at deposition that her

2   family physician prescribed antidepressants, which she did not

3   take.  That's the total treatment involved in that.

4          THE COURT:  If, to that extent her psychological

5    condition has been put into issue by way of damages, why isn't

6    the defendant entitled to know what her complete psychological

7    or psychiatric picture had been?

8          MR. McNAIR:  Because it's not relevant.  Read the

9    interrogatory.  They want, going back 20 years, every provider.

10   They have not specified a provider for any particular

11   condition.  They have not specified what the nature of the

12   treatment is.  This is a fishing expedition.  There may be, I'm

13   not saying there are, there may be things in her medical

14   history that have no relevance, but could be embarrassing to

15   her.  It may be if they're revealed publicly.  Or could cause

16   her damage by being revealed.  Had nothing to do with the case.

17   If you look at the exhibit, I wrote to Mr. Lane on September

18   23rd and I told him to be specific.  We would answer specific

19   questions.  That's the whole problem with these interrogatories

20   is they are nothing more than a fishing expedition and it's

21   calculated to intimidate the plaintiff.

22          THE COURT:  Let's move on, I understand your point

23   on relevancy and breadth.  Now, the question about diagnosis of

24   depression, schizophrenia, paranoia, etc.  Once again, did she

25  testify to that at her deposition and describe if she had been


                                19


1  previously diagnosed with any of those conditions?

2        MR. McNAIR:  She did not testify that she had been

3  diagnosed with schizophrenia or paranoia or addiction.  She did

4  testify that she had remotely been diagnosed with depression

5  and, again, after this incident.  In both cases I believe it

6  was reactive depression.  And these symptoms cleared after a

7  brief period of treatment.  There is no evidence there was any

8  ongoing treatment.  There is no evidence that there was any

9  ongoing condition.

10        THE COURT:  Primarily, though, your objection there

11  is to relevance, is that correct -- or just privilege?

12        MR. McNAIR:  Privilege and relevance, it's over

13  broad.

14        THE COURT:  All right, I'm going to come back and

15  rule on those other ones.  But with respect to 12, where you

16  incorporate by reference, I'm going to direct that you answer

17  that.

18        Number 13, "please identify the name, address,

19  telephone number and employer of each member or representative

20  of the media, press, radio, television or otherwise, with whom

21  you have communicated and the dates of each communication with

22  each such individual since January 1, 2003."  What's wrong with

23  that?

24       MR. McNAIR:  It's over broad.  They're not entitled

25  to know -- your Honor, Ms. Conley has been a member of the

20

1  Pennsylvania State Democratic Committee.  She has been the

2  vice-chair of the City of Erie Human Relations Commission, City

3  Council appointed her, and elected vice-chair by other

4  committee members.  She has served on the Bicentennial

5  Commission for the City of Erie.  She was the chair of the time

6  capsule project of the Bicentennial Tower.  She has spoken

7  publicly on numerous issues, including utility rates,

8  Congressional pay raises, cuts in Medicaid and Medicare.

9  She has been involved in civic activities throughout her adult

10  life.  All of these activities involve her speaking with the

11  press.  They have no relevance to any issue that is pleaded in

12  this case.

13        THE COURT:  Excuse me, what was the date of her

14  termination?

15        MR. McNAIR:  September 10, 2004.

16        THE COURT:  Fourteen, what is your position on 14,

17  name and address of all Internet service providers since

18  January 1, 1995?

19        MR. McNAIR:  Well, your Honor, that is -- obviously,

20  the intent is that they're going to subpoena the Internet

21  service providers and try to get copies of her e-mails.  We

22  might as well face that issue now.  Ms. Conley and I

23  communicate by e-mail on a daily basis, as does Mr. Angelone.

24  She communicates with other people on matters that have

25  absolutely no relevance whatsoever to this case.  That is the


                          21


1  kind of discovery that it is just over broad.  We're going to

2  be back litigating a motion for protective order if those

3  subpoenas go out.  There is no reason to believe that that is

4  going to lead to the discovery of admissible evidence.

5        THE COURT:  All right, let's finish this up.

6  Actually, I think based upon the objections that have been

7  raised, the position of the defendant, I am in large measure

8  able to rule on this.  Is there anything else that you

9  specifically want to call to my attention?

10       MR. McNAIR:  Yes, your Honor, a couple of

11  misstatements made by Mr. Joyal.  We'll have to deal with some

12  of these when we go over our motion to compel.  But we've been

13  presented with no evidence that supports his assertion that

14  there was some common thread or whatever, with regard to Ms.

15  Conley telling a child's mother that Ms. Wozniak had taken her

16  child's face and had shaken her head, that is not confidential

17  or privileged.  That is if somebody did that to my kids, I

18  would want to know about it and I wouldn't want Children's

19  Services telling me that I can't know about it because it's

20  confidential because it's going to embarrass them.  That's the

21  only reason they want to call it confidential.  Mr. Joyal

22  stated to you, your Honor, that in the hearing before Judge

23  Kelly that the other attorney had a copy of the draft case

24  summary.  That is not true.  If Mr. Joyal had done any

25  investigation whatsoever, he would know that that's not true.

22

1    If Mr. Joyal had read the transcript, he would see in the

2    transcript where the judge, where the attorney says may I see

3    that, and the judge says I'll make copies for everyone, and

4    makes copies of the draft before it was altered.

5         THE COURT:  You're going to have a chance on your

6    motion to compel.

7         MR. McNAIR:  These misstatements are being bandied

8    about.  This e-mail that's been presented in these motions,

9    it's been edited to make it misleading.  And further there's

10   been no -- the defendant refuses to say whether or not it

11   actually had that e-mail in its possession on September 10th.

12        THE COURT:  We're shifting gears now.  Let's get

13   your motion to compel out.

14        MR. McNAIR:  Okay.  Oh, your Honor, with regard to

15   the DiPietro case --
     _____

16        THE COURT:  Who?

17        MR. McNAIR:  The DiPietro case that was discussed,
                       _____

18   that Mr. Lane cites for the proposition that it's improper to

19   incorporate deposition testimony.  The DiPietro case does not
                                           _____

20   say that.  The DiPietro case says if you're going to
                   _____

21   incorporate something into an answer to an interrogatory, it

22   has to be sworn.  In DiPietro the question that was set
                _____

23   forth --

24          THE COURT:  I've already gone there.  It may well

25   say that, but I've already ruled on that.  All right, let's go.


                              23


1   I think the best way to do this actually, Mr. McNair, I

2   apologize for having you pull that out, but it's better for me

3   to hear from the defendants first as to their objections, then

4   I'll come back to get your response, fair enough.

5          Mr. Joyal, if you want to come on up here.  Would

6   you turn to the motion, to the plaintiff's motion and your

7   response.  Defendants' response to plaintiff's request for

8   production of documents.  Starting with number 1, which I can't

9   read because there is something typed over it, can you read the

10   question for me?

11          MR. JOYAL:  Number 1?

12          THE COURT:  Yes.

13          MR. JOYAL:  Well, your Honor, I think the motion

14    starts with number 3.

15            THE COURT:  Oh, it does.

16            MR. JOYAL:  It goes back to a transcript of our

17    original status conference, which talks about an e-mail.

18            MR. McNAIR:  Your Honor, with respect to document

19    36, plaintiff's reply to defendants' response --

20            THE COURT:  I'm on the defendants' response now.

21            MR. McNAIR:  Your question was regarding the

22    paragraph where?

23            THE COURT:  Let me just ask a question, how hard did

24    you fellows try to work all this out before you ended up filing

25    these motions?


                              24


1            MR. JOYAL:  There were very few communications.

2    There were very few communications, your Honor.  As a matter of

3    fact, we got letters that were attached.  We had our office

4    calling back to Mr. McNair's office saying we would respond.

5    And my understanding from my paralegal to a female to his

6    office that we were trying to work on getting documents.  Part

7    of the problem here, your Honor, is pretty simple.  A lot of

8  this stuff, we produced a supplement which contains all of the

9  documents that were produced during the course of deposition.

10  Mr. McNair did not choose to purchase a transcript of Ms.

11  Conley's deposition where the documents and all those things we

12  had talked about were there.  Most of the documentation we

13  responded to, he was requesting had to do with, to use his own

14  words, a fishing expedition, were things for case files, which

15  he was asking for things that had nothing to do with the

16  termination of Abby Conley.  If you read our response, you will

17  see what they are.

18        THE COURT:  All right, that gives me a flavor for

19  what I assume was going on.  All right, with respect to request

20  number 3, you contend you already produced the e-mail, is that

21  correct?

22        MR. JOYAL:  We have given him --

23        THE COURT:  Just tell me, is that correct?

24        MR. JOYAL:  Yes, we have.

25        THE COURT:  Do you have the e-mail, Mr. McNair, in


                              25


1  response to number 3?

2        MR. McNAIR:  Your Honor, I may, I don't know.  The

3   question was not produce the e-mail, the question was identify

4   the e-mail.  The question is calculated to determine the

5   County's position on the evidentiary value of a particular

6   document.  I personally don't think there is any e-mail that he

7   describes.  I've got a bunch of e-mails, but I need to know

8   which one the County is talking about when he makes these broad

9   assertions.  So it's an identification issue.

10        THE COURT:  All right.  Have you identified for Mr.

11   McNair the e-mail that you were referring to and, if not, can

12   you identify it for him the e-mail now?

13        MR. JOYAL:  It is document number OCY-0001, which

14   was produced to him on December 23rd.  That is an e-mail that

15   was dated July 8, 2004, which was not sent to Ms. Conley, but

16   was an e-mail that went between Debbie Liebel and Colleen

17   Locke, from a Heather McConnell, which dealt with issues

18   concerning breaches of confidentiality --

19        THE COURT:  All right, that's probably more than he

20   needs to know.  Does that identify it for you, Mr. McNair?

21        MR. McNAIR:  Yes, your Honor, that's all I asked.

22        THE COURT:  Number 5, "please produce each document

23   you contend contains, refers or relates to any instance of

24   disclosure of confidential information by plaintiff."  Once

25   again, Mr. McNair, is this an identification problem, as


26


1   opposed to a production problem?

2        MR. McNAIR:  Yes, your Honor.

3        THE COURT:  Have you specifically identified those

4   e-mails upon which the County based its decision to terminate?

5        MR. JOYAL:  Well, your Honor, as I said earlier, the

6   e-mails, a lot of them were not in the County's possession at

7   the time of the termination.  However, today I will tell Mr.

8   McNair that there is a document that we produced at OCY-0009,

9   which is a couple of e-mails, July 9th of 2004, dealing with

10  confidentiality.

11       THE COURT:  All right.  Number 6, "please produce

12  all documents which refer, relate to or comprise any report of

13  findings of any investigation conducted by the Pennsylvania

14  Department of Public Welfare regarding allegations made by the

15  plaintiff that caseworker Patricia Wozniak improperly touched a

16  child, referred to by Edmond Joyal, Esquire," etc., etc.  And

17  there's a confidentiality, there's an objection under 23 Pa.

18  C.S.A., et seq., right?

19      MR. JOYAL:  Right.  However, what we did was, again,

20  after we had informed Mr. McNair I was going to take a look at

21  these, we produced to him a document dated July 2, 2004 and

22  August 30, 2004, they are OCY-0002 and 0003, both of which are

23  letters, one is to Patricia Wozniak and one is to Debbie Liebel

24  concerning that investigation.

25      THE COURT:  But that's not the investigative file?


                                    27


1      MR. JOYAL:  No, your Honor, the investigative file,

2  this is about Patricia Wozniak, it has nothing really to do

3  with, it has to do, again, it's confidential information

4  concerning children.

5      THE COURT:  It may well be.  This whole theme or

6  thread of confidentiality runs throughout a lot of your

7  objections here.  But my question is this.  With respect to

8  files that would be sensitive or confidential, isn't a

9  practical way of handling that to excise from the documents

10  identifying information, which happens all the time in a

11  lawsuit, and wouldn't that go a long way toward -- in other

12    words, you're not breaching a confidentiality if a child or a

13    parent's identity are not being revealed, are you?

14         MR. JOYAL:  Your Honor, in the normal course, as you

15    described it, of a lawsuit, in a normal course of a lawsuit I

16    would totally agree with you.

17         THE COURT:  What makes this one abnormal?

18         MR. JOYAL:  What makes it different is that there

19    has been no -- I mean a lot of these names appeared in the

20    newspaper.

21         THE COURT:  Well, the cat's already out of the bag,

22    isn't it?

23         MR. JOYAL:  I understand that, the fact of the

24    matter is, to echo what Mr. McNair says.  If Ms. Conley has not

25    shown to the County, and I would venture to say that if the


                                28


1    court looks at some of the e-mails and things she's done in

2    some of these stories, that confidentiality when she was

3    working was important.  We are very concerned and that's why we

4    would oppose his confidentiality order, only to the extent that

5    there's nothing that is going to be done to Ms. Conley about

6   this.  What Ms. Conley did, whether the District Attorney's

7   Office of Erie County chose at one point in time not to

8   prosecute, what she did was classified as a crime and is a

9   misdemeanor.  It is subject to punishment.

10      THE COURT:  What does that have to do with my

11   suggestion as a way of greasing the discovery skids,

12   recognizing your concerns about confidentiality, to provide

13   documentation that has been redacted to remove the confidential

14   identifying information?

15      MR. JOYAL:  Well, your Honor, that's not a problem.

16   I think part of it, though, is the determination, I understand

17   that during the course of time one can look at this and the

18   court can make a decision at the time of trial as to the

19   relevance of some of these things.  But part of what we have

20   here as well is the fact that built into these, and these

21   requests, you heard Mr. McNair talk about fishing expeditions,

22   these requests have nothing to do with people who were involved

23   in her termination.  These are requests --

24      THE COURT:  I have read both your production

25   requests, and your interrogatories, yours and Mr. McNair's and

29

1    Mr. Lane's.  And with all respect, you both are like two

2    fishermen, you got poles on either side, everybody is fishing

3    here.  They're all very broad.

4          MR. JOYAL:  And I don't disagree, your Honor.

5          THE COURT:  How can you --

6          MR. JOYAL:  I'm not more concerned at this point,

7    your Honor, in the sense there are documents there.  I can

8    redact them, I guess my question that comes from this, your

9    Honor, is going to be whether or not if we redact information

10   that we believe is confidential, which is identifying

11   concerning certain people, whether or not we're going to be

12   back here --

13         THE COURT:  I have no doubt you will be.

14         MR. JOYAL:  Saying our sense of what is acceptable

15   under the statutes is not what Mr. McNair's sense is.

16         THE COURT:  All right, let's get back to the

17   specifics then.  Number 7, excuse me -- number 8.  That's the

18   request that the defendants "produce a complete and unredacted

19   copy of plaintiff's personnel file," has that already been

20   produced?

21          MR. JOYAL:  We believe it has, your Honor.  If you

22  look at --

23          THE COURT:  Hang on a second.

24          MR. McNAIR:  We would withdraw that request, your

25  Honor.


                              30


1          THE COURT:  All right, that's done.

2          Number 9, requests that the County of Erie produce

3  all notes, etc., which relates to communications between and

4  among Debra Liebel, Michael Cauley, Susan Deveney, Patricia

5  Wozniak, John Onorato, Richard Schenker and/or Peter Callan

6  regarding the plaintiff, any case in which the plaintiff was

7  involved, or any investigation of the plaintiff between January

8  1, 2004 and September 10, 2004.  In a nutshell, what's your

9  position -- I take it, essentially, the plaintiff wants to know

10  what was being said about her among the decision-makers during

11  the time running up to her termination, is that right, Mr.

12  McNair?

13          MR. McNAIR:  Exactly, your Honor.

14          THE COURT:  All right, what about that?

15          MR. JOYAL:  Well, your Honor, at this point I think

16   again this raises issues of confidentiality.  As the court has

17   said we can look at those, if they indeed exist.  And I'm not

18   so sure that they do, to redact anything that has to do with

19   any communications that may have taken place by e-mail.

20          THE COURT:  I'm not being critical, I know what it's

21   like to have tons of documents and you make a preliminary

22   objection in the answers to interrogatories or requests for

23   production.  But in large measure a lot of your objections are

24   based on confidentiality.  At the same time you're telling me

25   today you don't even know if there are genuine confidentiality

31

1   concerns?

2          MR. JOYAL:  Well, I believe the way that this is

3   drafted there would be, if these documents exist.  For example,

4   they would have case names and people's names in them that they

5   dealt with.

6          THE COURT:  Assuming it can all be redacted, you're

7   not telling me that communications between the people who would

8   have fired her leading up to the time they actually fired her,

9      would not potentially be relevant?

10             MR. JOYAL:  I'm not suggesting that to you, your

11     Honor.  If I might just raise one other issue here, your Honor.

12             THE COURT:  Sure.

13             MR. JOYAL:  As I tried to put into the reply, this

14     is a case that has been going on in one forum or another since

15     September 10th of 2004.  There were hundreds, if not thousands

16     of documents.  It's my understanding, I'm only suggesting this

17     because it's my understanding, that they were produced by

18     counsel for the County during the administrative proceedings to

19     counsel, co-counsel in this case, Mr. Angelone.  And part of

20     it, too --

21             THE COURT:  You want to make sure this isn't

22     duplicative work?

23             MR. JOYAL:  Absolutely.

24             THE COURT:  All right.  Mr. Angelone, let me ask you

25     a question.


                                   32


1              MR. ANGELONE:  Yes, your Honor.

2              THE COURT:  You were the lawyer at the

3  administrative hearing, which never took place, and the run up

4  to it?

5        MR. ANGELONE:  Yes, your Honor.

6        THE COURT:  Have you and Mr. McNair sat down and

7  sort of compared notes, if you will, so he knows for sure what

8  you have and so that you know for sure that you are not asking

9  for things twice from the defendant; have you done that

10  exercise before you all came to court today?

11        MR. ANGELONE:  We did not physically sit down and

12  compare notes, your Honor, but --

13        THE COURT:  Could it be that a portion of what

14  you're fighting about here may already be mooted by the fact

15  that you have things in your file that Mr. McNair doesn't even

16  know about?

17        MR. ANGELONE:  We did actually sit in his office and

18  go through documents, I apologize.  Your Honor, the documents

19  that I received in the administrative hearing are comprised

20  mostly -- well, a substantial part of that was the personnel

21  file, which was about that thick, (indicating).  We did also

22  receive several e-mails, but those e-mails just represent the

23  e-mail -- that is the big smoking gun that they talk about.

24        THE COURT:  I apologize for interrupting you, let me

25  ask a sharper question.  Did you sit down, based upon what you

33

1  were given by, I assume Mr. Taft?

2       MR. ANGELONE:  Yes, your Honor.

3       THE COURT:  Did you sit down with the documentation

4  that you received from Mr. Taft and compare it as against the

5  request for production that you served in this lawsuit to

6  determine the extent to which you may have been asking for

7  things that you already had?

8       MR. ANGELONE:  Yes, your Honor.  And the basis of

9  these questions was based upon the review of documents that we

10  had, it was obvious there were things missing.

11       THE COURT:  I'm going to take a three minute break

12  here --

13       MR. ANGELONE:  Your Honor, if I might add, also,

14  briefly.

15       THE COURT:  Okay, go ahead.

16       MR. ANGELONE:  Mr. Taft also at the conclusion of

17  that proceeding asked that a substantial number of the

18  documents be returned because, as he stated at that time, they

19   were deemed confidential.  So I did also return a good portion

20   of those documents.

21          THE COURT:  And this is neither here nor there as to

22   how to resolve these things, which hopefully I'll do when I

23   come back out.  But that administrative action, there never was

24   a hearing, is that right?

25          MR. ANGELONE:  That's correct, your Honor.


                                    34


1          THE COURT:  What happened?

2          MR. ANGELONE:  In that action Ms. Conley, we had

3    discussions with Ms. Conley and at that point decided that the

4    better approach for Ms. Conley would be to go through with the

5    arbitration -- through the union, grievance, your Honor.  For

6    that reason we opted to go that route and ask for dismissal of

7    that.

8          MR. JOYAL:  Your Honor, if I might, my understanding

9    is that the grievance had already been dismissed as being

10   untimely.  This was a state Labor Relations Board hearing.

11   That the notification, as I understand it, that that hearing

12   was not to take place, was done the day before the hearing was

13   to take place and that the hearing examiner had come from

14   Harrisburg to Erie to do that.  That had been an ongoing thing.

15   Now, I'm not suggesting what Mr. Angelone is saying is

16   incorrect, but this thing was at the 11th hour that they made

17   that judgment that they weren't going forward.  At that point

18   in time there was no grievance pending.

19        THE COURT:  Before I take a short break, off the

20   record here.

21        (Discussion held off the record.)

22                    - - -

23        (Recess from 10:28 a.m.; until 10:36 a.m.)

24        THE COURT:  All right, let's see if we can finish up

25   this part of it.  Who was up here?


                            35


1        MR. JOYAL:  I was, your Honor.

2        THE COURT:  We're now on request 11, which requests

3   defendants to produce all versions of any e-mails from

4   plaintiff to Susan Deveney regarding any court summary prepared

5   for the Schuster-Casella case.  And you say these e-mails have

6   been provided both at deposition, as well as the supplemental

7  responses, is that right?

8        MR. JOYAL:  Yes, your Honor.

9        THE COURT:  Do you have those, Mr. McNair?

10        MR. McNAIR:  No.  Not as far as I know.  Your Honor,

11  the response was "objection, this request seeks information

12  protected from disclosure under state and federal statute,"

13  without identifying any state or federal statute," and is not

14  reasonably calculated to lead to the discovery of admissible

15  evidence."

16        THE COURT:  It says that notwithstanding, in any

17  event, you believe you produced them.  You have it with you

18  today, you're willing to produce it to him if you haven't

19  produced it, is that right?

20        MR. JOYAL:  Yes, your Honor.

21        THE COURT:  All right.  Then request number 14,

22  which is "produce all documents reflecting earnings of the

23  plaintiff from her employment with defendant, County of Erie,

24  from the date of said employment commenced through the date it

25  was terminated."  Don't you have those documents, Mr. McNair?

36

1          MR. McNAIR:  No, your Honor, we don't.  That is why

2   we asked for them.

3          THE COURT:  You just want her W-2 forms or

4   something?

5          MR. McNAIR:  Basically, yes.  She worked for the

6   County for 13 years.

7          THE COURT:  Give it to them, produce them.

8          MR. JOYAL:  We'll be happy to.

9          THE COURT:  Number 15, "all court orders entered in

10  the Vickie Wilson case."  Again, defendant reiterates --

11  there's an objection to relevance.  I apologize, I should be

12  able to keep these names straight, but which one was the Vickie

13  Wilson case?

14          MR. JOYAL:  Vickie Wilson, your Honor, I presume

15  that what they're talking about, is Vickie Wilson is the mother

16  of two separate sets of children, which two different fathers.

17  If they're talking about the Vickie Wilson case --

18          THE COURT:  Let me go to the horse's mouth.  Which

19  Vickie Wilson case are you talking about --

20          MR. McNAIR:  I didn't know there are two cases, your

21  Honor.  If there are two cases, then both.

22          THE COURT:  But which one do you think you were

23  talking about?

24          MR. McNAIR:  Both.

25          MR. JOYAL:  Your Honor, this is what we're faced


                                37


1  with here.

2          MR. McNAIR:  Your Honor, they're refusing to

3  identify --

4          THE COURT:  Hang on a second, don't talk over each

5  other.  Tell me what happened in at least one of the Vickie

6  Wilson cases and why it's relevant to your retaliation case,

7  Mr. McNair?

8          MR. McNAIR:  The Vickie Wilson case was a case that

9  the so called smoking gun e-mail referred to.  Where supposedly

10  Ms. Conley revealed the existence of some confidential order,

11  which I can represent to the court she had not seen and hadn't

12  seen, wasn't in any form by Children's Services that any such

13  order had been entered.  Vickie Wilson was the person who was

14  supposedly informed of this detention order.  We can prove that

15  she was informed of it by at least a half dozen other people as

16   well.

17       THE COURT:  Just to get this straight.  Is your

18   essential defense to their claim that she shared confidential

19   information with people that she shouldn't have shared it with,

20   is the defense (a), I didn't share it or (b), it wasn't

21   confidential because by the time I shared it, the person

22   already knew it from other sources, which is it?

23       MR. McNAIR:  Your Honor, with regard to this

24   particular allegation --

25       THE COURT:  Yes.


                              38


1        MR. McNAIR:  She didn't see any order.  Nobody told

2   her about the order.  In 156 or some other cases like this,

3   that order gets entered, it's a matter of routine.  Anybody who

4   has a child in placement who becomes pregnant, within a month

5   before their due date, Children's Services goes to court to get

6   this supposedly confidential order, dockets it and serves it on

7   all the hospitals in the area.  Anybody would assume, as Ms.

8   Wilson's attorney did, as several other people did, that that

9   had happened in this case.  So, number one, she didn't disclose

10   it to anybody, she presumed it.  Number two, it's common

11   knowledge, there is no secret about it.  Number three, she

12   didn't disclose the order, a docket copy of the order or

13   anything like that.  She just assumed that it had been entered.

14        THE COURT:  You don't even have to go through it --

15   let me ask the question even more broadly.  With respect to any

16   allegation of disclosure of confidential information made by

17   the County here, upon which they claim they based her

18   termination, is it your position, is it your client's position

19   that as a factual matter she never disclosed confidential

20   information, physically never did it?

21        MR. McNAIR:  Physically or otherwise.

22        THE COURT:  Well, it's the otherwise I'm interested

23   in, or is it that if she did disclose information that would

24   otherwise have been confidential, it was rendered

25   non-confidential because it was already in the public domain or


39


1   is it a combination of the two, I didn't do it in part, but if

2   I did do it, there was no confidentiality left because

3   everybody knew it; is that your position, in a nutshell?

4          MR. McNAIR:  Your Honor, my position would not fit

5     in a nutshell because it depends on each instance.  Now, we're

6     not and I think, I don't mean to be critical, I think we should

7     have approached the interrogatories first.  I regret putting

8     the responses first in my motion.  But the interrogatories have

9     asked the County to identify each instance in which they

10    contend that Ms. Conley released confidential information.  And

11    then we could respond to your question.  But we don't know what

12    they're talking about.  And we asked --

13          THE COURT:  Hang on a second.

14          MR. McNAIR:  I do want to point one thing out.

15          THE COURT:  Hang on a second, I'm trying to move

16    this along.  I get the feeling this is like mercury on a table,

17    this thing keeps moving in front of me, I can't seem to pin

18    this thing down.  Once again, for Mr. McNair's benefit, then I

19    can ask you a question, you'll be in a better position to know

20    how big, whatever the metaphor was the eggshell is.  Tell him

21    point by point the reasons that she was terminated, the

22    specific instances of breach of confidentiality, and then I'm

23    going to swing over and ask you, Mr. McNair, if the position is

24    it's not confidential or I didn't do it, what are they; just

25    one, two, three?

40

1        MR. JOYAL:  They are that beginning sometime in May

2   of 2004, it became clear to the department, to OCY, that

3   information concerning cases and social workers that Abby

4   Conley was involved with, was being disseminated to third

5   parties who had no right to know this.  That's where it

6   started.  For Mr. McNair --

7        THE COURT:  Don't editorialize it, with all respect.

8   But she wasn't terminated for that, she was terminated for a

9   very specific instance?

10       MR. JOYAL:  Right.  It was an ongoing process.  Mr.

11  McNair's position seems to be she was terminated for a specific

12  instance.  The termination and the discussion was from the

13  Wozniak case, the fact that she had given up information,

14  although she denies it, but it's in the e-mails.

15       THE COURT:   All right, there's one, the Wozniak

16  case.  What information was confidential did she reveal in the

17  Wozniak case?

18       MR. JOYAL:  She talked to people about an ongoing

19  child abuse investigation.  All of which is confidential, both

20  by policy and by statute.

21      THE COURT:  There's a concrete one for you.  What is

22  the factual position of the defendant, excuse me, of the

23  plaintiff on that point?

24      MR. McNAIR:  You're right, your Honor, the plaintiff

25  is being treated like a defendant here.


41


1      THE COURT:  Not by me.

2      MR. McNAIR:  No.

3      THE COURT:  I know who the parties are.  Go ahead.

4      MR. McNAIR:  I understand.  Your Honor, the facts

5  are this.

6      THE COURT:  What is her position, did she reveal it

7  or it never happened?

8      MR. McNAIR:  She didn't reveal the existence of the

9  investigation to anyone outside the agency.

10      THE COURT:  Either orally or by written

11  communication, is that right?

12      MR. McNAIR:  Right.  We're talking about the

13  investigation.  Shortly after the incident where Ms. Wozniak

14  grabbed a three-year-old by the face, shook her when she's

15  sitting in a car, she reported that to the case aide --

16        MR. JOYAL:  There's a reporter here, we're talking

17  about confidentiality -- there's a reporter here, he's talking

18  about these people's names.  That's my concern.

19        THE COURT:  What would you like me to do, ask Mr.

20  Palattella to leave?

21        MR. JOYAL:  Maybe what you can do is ask Mr. McNair

22  to stop revealing names of people.

23        THE COURT:  Well, these names, they're already in

24  the public domain.  They're already in the public domain.  All

25  right, finish your thought?


                              42


1         MR. McNAIR:  She said to a worker from Project First

2   Step to the effect, my goodness, this just happened.  It's a

3   very unusual occurrence to see a child get abused by a

4   caseworker.

5         THE COURT:  Without going into the merits --

6         MR. McNAIR:  She never went and said there's an

7   investigation.  She never violated that statute.  Plus which,

8  the statute only protects her identity.

9      THE COURT:  That's all I needed to know on that.

10  What else, then, forms the basis for her termination?

11      MR. JOYAL:  The information that was gleaned

12  concerning, although, again, Mr. McNair denies that it took

13  place, the information that became apparent both in an e-mail

14  of June 4th of 2004, from Ms. Conley to Ms. Cosby concerning

15  the detention order on a child, which then ended up in a letter

16  from the child's mother to the child's father, dated 6/5/04, in

17  which it said "hey -- I wish I could have told you to call me

18  again" --

19      THE COURT:  That's too fast.

20      MR. JOYAL:  "The reason Deanna called me is to warn

21  me that they're going to detain MacKenzie.  And they're trying

22  to put her in a foster home rather than with her mom.  She

23  actually suggested I leave town and have the baby, but if I

24  miss a visit on my kids," etc, etc., etc.  And, again, Deanna

25  said this, Deanna said that.  This was June the 5th.  This is a

43

1  letter from the mother naming the individual to whom the June

2   4th e-mail correspondence went, in which Ms. Conley said things

3   such as she doesn't know this is coming.  The response was she

4   will.  And the response back was God bless you.  And the

5   response from Ms. Cosby was for what.  And the response back

6   was you said she will.  And she did the next day.

7          THE COURT:  What about that, what's the plaintiff's

8   legal or factual position on that?

9          MR. McNAIR:  The fact of the matter is that Deanna

10  Cosby knew that that order would be entered.  How can you shake

11  your head, Mr. Joyal.  The fact is, your Honor --

12         THE COURT:  Hang on a second, don't do that.  All

13  right.  Go ahead.

14         MR. McNAIR:  The fact of the matter is that prior to

15  that call from Deanna, we're going to be able to produce

16  testimony from at least two, if not more people, that they had

17  also told this mother that her child, there was going to be an

18  order --

19         THE COURT:  Who had they told?

20         MR. McNAIR:  Other people, her attorney, for one.

21  And a Project First Step worker.

22         THE COURT:  At least with respect to this incident,

23  would it be accurate to say that your client's position is she

24  did not breach any -- she did not reveal any confidential

25  information because the recipient of the information already

44

1   knew it from other sources, is that fair?

2       MR. McNAIR:  That would be correct, yes.  She knew

3   it, she didn't accept it.

4       THE COURT:  Let me roll the tape back.  If the

5   recipient didn't know it from other sources, would that have

6   been a breach of the rules of OCY?

7       MR. McNAIR:  I don't believe so, your Honor.  And,

8   again, in the interrogatories we've asked the County to

9   identify the statute or rule that makes this confidential and

10  they refused to do it.

11      THE COURT:  We'll get to that in a second.  For the

12  benefit of both myself and the plaintiff, were there any other

13  reasons, besides what you've articulated for me, upon which the

14  County based its decision to terminate on September 10th?

15      MR. JOYAL:  I'm not aware of any.  It was an

16  ongoing --

17          THE COURT:  That was helpful.  All right, let's

18   finish up here.  Number 16, all court orders entered in the

19   Schuster case.  Do you have court orders entered in the

20   Schuster case?

21          MR. JOYAL:  I presume that there are many court

22   orders entered in that case, your Honor.  Again, one of the

23   things we asked for, it goes beyond confidentiality.  You asked

24   a questions earlier about what communications we had.  I asked

25   Mr. McNair to point out to me what relevance the court orders


                              45


1   had in this case.  His response was something to the effect of

2   we want to sort of put OCY on trial here so that we can show

3   that they didn't comply with court orders from the judge based

4   upon Abby Conley's feeling about that.  Again, the Schuster

5   case is the case which involved, no one involved in the

6   Schuster -- it's my understanding that the Schuster-Casella,

7   which was the July 28th testimony case, which is the one where

8   it was revealed during the course of that period of time that

9   the draft summary had been produced or talked about or

10   discussed with counsel for the parents.  That's the

11  Schuster-Casella case.  I don't know what the orders, whether

12  or not Judge Kelly or a judge of the Court of Common Pleas

13  turned around and suggested that the child remain with the

14  parents or the parents rights be terminated, has any relevance

15  whatsoever to this.

16      THE COURT:  What is the importance of the Schuster

17  case or the orders that Judge Kelly entered in the Schuster

18  case?

19      MR. McNAIR:  Your Honor, I would point out that all

20  of those orders were produced to Mr. Angelone in the course of

21  the Civil Service proceeding.  However, they were returned to

22  Mr. Taft at his request.

23      THE COURT:  I don't have a problem with that.

24  What's the relevance of Judge Kelly's orders, in the grand

25  scheme of things?


46


1       MR. McNAIR:  In this case Judge Kelly had entered an

2  order directing the caseworker who -- give me one second --

3  that's the case where the judge -- OCY had wanted to terminate

4  this parents rights, that's why they modified the court

5    summary, because the court summary was favorable to the

6    parents.  And the judge entered an order at the end of that

7    hearing that they were not going to terminate the parents

8    rights.  And did not change the goal and ordered them to work

9    towards reunification.  Essentially, your Honor, as background,

10   it's information that was produced before.  It gives some

11   context to the court summary and why the court summary was

12   changed by OCY before it was submitted to the judge.

13        MR. JOYAL:  Your Honor, if I might, I'm just going

14   to quote what Mr. McNair's motion says regarding this.

15   "Production of these documents is reasonably calculated to lead

16   to the discovery of admissible evidence in that said orders

17   will show the manner in which the Office of Children and Youth

18   handled these cases and will demonstrate the plaintiff's

19   complaints concerning these cases were made in good faith."

20   I don't know what that means, but it seems to me what he's

21   trying to do is take a case that has orders concerning whether

22   OCY wanted to modify a previous order of the court and turn it

23   into something else.

24        THE COURT:  All right.

25        MR. McNAIR:  That will be corroborated, your Honor.

47

1          THE COURT:  I'm going to rule on these motions.

2          MR. McNAIR:  Your Honor --

3          THE COURT:  Yes.  If you want to swing up here to

4   the podium briefly, Mr. McNair -- I think I've got the lay of

5   the land and the same objections, the same issues keep coming

6   up, you're welcome to tell me anything else you want to tell me

7   before I rule?

8          MR. McNAIR:  When Mr. Joyal approached the podium,

9   you told him that you thought that the effort to resolve both

10  of these motions was the same.

11          THE COURT:  I'm sorry, what was that?

12          MR. McNAIR:  The efforts that had been made to

13  resolve these motions were similar.  Between the motion Mr.

14  Lane filed and the motion I filed, before the motion was filed.

15  In the motion that Mr. Lane filed, we provided our responses,

16  we got one letter from Mr. Lane.  We wrote back to him

17  explaining our position and suggesting changes that could be

18  made.  We never heard anything again until the motion was

19  filed.  In the motion that I filed, we pursued Mr. Joyal like

20  Moby Dick, trying to get him to agree with us on something.

21   And a number of those e-mails and letters are attached as

22   exhibits to the motion.  But we made numerous attempts with Mr.

23   Joyal to agree, first we suggested a protective order.  Well,

24   that's no good, but provide it.  So we proposed a protective

25   order.  Well, we never got any response to that.  We offered to

48

1   narrow our responses.  In my letter you can see that it's clear

2   that we narrowed the focus of a lot of these requests to

3   eliminate, but everything is still confidential, for no reason.

4   I think we made an exceptional effort in this case to try to

5   resolve this before we filed a motion.  I wanted to disabuse

6   you of the notion that Mr. Lane's approach and my approach were

7   the same in that regard.

8         THE COURT:  I was possessed of no fixed notion on

9   either count.  But go ahead.

10         MR. McNAIR:  Number two, your Honor, this claim of

11   confidentiality.  And this is something that I personally

12   battled OCY with in the future, in the past, excuse me.  Maybe

13   I will have to in the future.  But I've never lost.  And I will

14   tell you why.  Because this stuff is nowhere near as

15  confidential as they claim.  There are two confidentiality

16  provisions that I know of.  Number one, is identity --

17      THE COURT:  I can probably speed this along for you

18  because --

19      MR. McNAIR:  And number two is the child protective

20  services law.

21      THE COURT:  This falls under the category of don't

22  look a gift horse in the mouth.  I've already concluded that

23  identifying information in these files with respect to children

24  and parents and that type of thing, that is confidential.  And

25  the way we're going to handle it is by redaction.  I think that

                                    49

1  takes care of it, that solves everybody's problem.  Perhaps

2  not.

3      MR. McNAIR:  And I don't want to look a gift horse

4  in the mouth, your Honor, but with regard to communications

5  among Children's Services administration, which began

6  admittedly after the report of the caseworker shaking the

7  child's face, we need to have those names to know what they're

8  talking about.  We need to know what cases they're talking

9   about, if they're talking about cases.  There is no law that

10  makes those confidential.  But I can understand, we would agree

11  that we would not disclose the names of any parents or children

12  involved in any of those cases.  But we need to know who they

13  are so we can figure out what case they're talking about.

14        THE COURT:  In the Wozniak case you allege the

15  caseworker shook, pulled the face of the child?

16        MR. McNAIR:  We have evidence that she did that on

17  other occasions as well from other independent witnesses.

18        MR. JOYAL:  Your Honor, may I object.  Again, this

19  is what I was talking about.  Again, he's making these

20  accusations against an individual where no reports apparently

21  have been filed.  Which now, depending on Mr. Palattella's

22  choice to use this, is going to end up in the newspaper.  We're

23  talking about someone, and he's talking about a protective

24  order, he hasn't yet not mentioned the name, and now he's doing

25  it again.


                              50


1         THE COURT:  I didn't get my question out, my

2   question was going to be this.  The internal investigation that

file:///A|/CONLEY14.TXT

3   was done, did they find the allegation to be unfounded?

4        MR. McNAIR:  That was the conclusion that was filed.

5   We have no idea how that was reached.  Approximately a week,

6   less than five business days before Ms. Conley was terminated,

7   they apparently requested an employee of the Department of

8   Public Welfare to write a letter about that investigation,

9   which they did provide to us.  Where she says oh, Ms. Conley is

10  not credible, she cries, she's emotional, blah, blah, just

11  really trashed her.  Obviously, that was in preparation for her

12  firing because it was two months after the termination.  Why

13  they're still writing about it, we don't know.  We're going to

14  take her deposition and find out.

15       THE COURT:  You've got one minute to tell me

16  anything else you want to?

17       MR. McNAIR:  I have nothing more to say, your Honor.

18       THE COURT:  All right, thank you.

19       MR. JOYAL:  Your Honor if I might.  You skipped over

20  one of the requests, which was number 13, which was Patricia

21  Wozniak's personnel file.

22       THE COURT:  Yes.  There's a confidentiality and

23  privilege objection there.  Why do you need Ms. Wozniak's

24  personnel file?

25        MR. McNAIR:  We believe that the personnel file will

51

1  reveal prior instances of similar misconduct, which will

2  corroborate Ms. Conley's allegations concerning her conduct and

3  that it may reveal evidence concerning her attendance and work

4  performance, which are at issue.

5        THE COURT:  I'm not so sure they are, what do you

6  want to say on this?

7        MR. JOYAL:  I just want to say, dealing with don't

8  look a gift horse in the mouth thing, if your Honor is inclined

9  to be going in that direction to grant that request, I have

10  some things that would bear on what I really truly believe are

11  the issues behind that request, which are based upon some

12  e-mails that were written by Ms. Conley to Ms. Cosby requesting

13  certain information.  Which had to do with a tragic incident

14  that happened in Ms. Wozniak's family.

15        THE COURT:  Fundamentally, was she fired in part --

16  was she fired in part for making the allegation that she made

17  against Ms. Wozniak?

18    MR. JOYAL:  No, your Honor, she was not.

19        THE COURT:  Then let me stop you there.  If that

20  doesn't form the basis allegedly of the termination, why isn't

21  that an irrelevant sideshow that we needn't explore any

22  further?

23        MR. McNAIR:  Your Honor, one of the two fundamental

24  premises of the plaintiff's case is that she was fired for

25  saying things about Ms. Wozniak.  It is crucial she be able to


52


1  corroborate it.

2        THE COURT:  I'm more than capable of making a

3  mistake and I just did.  That is one of the instances of

4  protected speech, is that correct?

5        MR. McNAIR:  That's correct, your Honor.

6        THE COURT:  All right.  That having been said,

7  whether it was true or not is irrelevant.  What is relevant is

8  your client's good faith belief, so why should you be able to

9  rummage through somebody's personnel file?

10        MR. McNAIR:  Your Honor, they're calling my client a

11  crazy woman.  And when they're saying that she made it up,

12  which is what they're apparently saying, the letter that they

13  did produce from DPW said that the claim is unfounded in part

14  because of what the DPW ally said was Ms. Wozniak's lack of

15  credibility or Ms. Conley's lack of credibility. They're

16  calling her a crazy woman. She's not crazy. This happened

17  before, it happened that time and it happened after that.

18  We're going to prove that. And this personnel file will show

19  that she was subjected to discipline for another similar

20  incident. And that's what we need. I mean you come in, we

21  come into court, they're going to be chanting that she's a

22  crazy woman and maybe these other people are crazy, too, let

23  them try to prove that. We need that to corroborate the truth

24  of the allegation. They're saying it was a false allegation,

25  therefore, it's not good faith.


53


1       MR. JOYAL: Your Honor, I don't think the court has

2  heard anything come out of my mouth that implicates that Ms.

3  Conley is a crazy person, number one. I resent the

4  implication. Number two, what I want to point out to the court

5  is this. Again, I know that since you asked the question of

6  Mr. McNair, he made a speech about this.  OCY shifted this

7  investigation to the Department of Public Welfare.  It was not

8  OCY that was involved in this investigation.  It was a

9  Department of Public Welfare person that did it and made the

10  unfounded claim.  Ms. Wozniak was given a letter of July 2nd of

11  2004 informing her that the investigation which began I believe

12  in May or June, found that it was not substantiated.  I just

13  want to quote to you from a document at Abby Conley's

14  deposition, number 10, another e-mail.  This will give you a

15  sense of why we're concerned about this.  You haven't gotten it

16  from Mr. McNair.  This is a string of e-mails that was June 28,

17  2004, which was a month before the testimony.  This was after,

18  just four days while the investigation is ongoing, Ms. Wozniak

19  and this report.  It was Abby Conley who wrote to Deanna Cosby,

20  on 6/28/04.  "I decided to write down the things I kept

21  forgetting to ask you.  One, what is the name of the client" --

22      THE COURT:  That's too fast for my reporter, slow

23  down.

24      MR. JOYAL:  "What is the name of the client of yours

25  that had mental health issues.  The guy got angry and caused a

54

1   lock down because of Patty.  Do you know how I get ahold of

2   him.  Two.  Would you be willing to speak to Western Region

3   about PW and SD," being Wozniak and her supervisor.  Three.

4   What was the name of the family you heard PW maligning.

5   Remember last year you said you heard her giving into a parent.

6   Four.  Do you know PW's ex-husband's name.  I know that the

7   attorney is Amy Jones."  And then there is a reply back.  And I

8   won't tell you the name of the first one.  The first reply is

9   number one, the Family name is blank, look at the record for

10  the address and number.  Two.  Yes.  Three.  I don't remember.

11  Four.  I don't know and it might not be relevant.  This is what

12  the flavor of what is going on here between Ms. Conley and

13  Deanna Cosby concerning her fellow workers and supervisors.

14  That's what she was looking for.  This has nothing to do with

15  termination.

16          THE COURT:  Finally, with respect to Ms. Wozniak's

17  personnel file, once again, presuming the appropriate

18  redactions could be made, why couldn't it, I'm not suggesting

19  this is the case at all, why couldn't it arguably be relevant

20  or do you contend that it would not be relevant if there were

21  instances in her personnel file of disciplinary action taken as

22  a result of conduct similar to that which the plaintiff

23  complains about; is that what you're looking for?

24      MR. McNAIR:  Yes, your Honor, and attendance.

25  Because the reason for this e-mail was that Ms. Wozniak simply


                                55


1  was not showing up for work.  She didn't go to work.

2      THE COURT:  With the request being tailored in that

3  respect, what's your position?

4      MR. JOYAL:  Your Honor, again, I don't see it as

5  having any relevance.  What we have told you is what

6  transpired.  The plaintiff's position could be that she was

7  asked to leave the agency because she told, you know, a

8  truthful story about aliens landing on the planet.  The point

9  of the matter was is that is we asked him, and Mr. Angelone

10  should know this because he was engaged in protracted

11  litigation about the reason for her termination, was that she

12  had been found to have violated the confidentiality policy

13  across the board.

14      THE COURT:  All right, we're not going there.  I'm

15  going to rule on this.

16          MR. McNAIR:  Point of clarification, your Honor.

17          THE COURT:  You can after I'm done ruling.  Unless

18  you think it's germane to my ruling?

19          MR. McNAIR:  I think it's germane.

20          THE COURT:  All right, quickly.

21          MR. McNAIR:  The sole reason given to Abby when she

22  was brought in, browbeaten and fired, was that she gave a

23  client's phone number to someone outside the agency to Deanna

24  Cosby.  She did not believe she had done that.  And, in fact,

25  the discovery we got since then reveals that is not the case.


                                56


1  There was no mention of any confidential detention order.

2  There was no mention of any of the other things that she was

3  accused of giving a client's phone number to Deanna Cosby.  The

4  documents produced indicate that she gave Amy Jones the phone

5  number of Deanna Cosby.  Amy Jones has a yellow page ad, so I

6  don't see how that is confidential.

7          THE COURT:  All right, that's it.  This is an order

8  on defendant John A. Onorato's motion to compel discovery

9  responses.

10          With respect to number 4, I'm going to direct that a

11  written response be provided.

12          With respect to number 5, I'm going to direct that a

13  written response be provided.

14          With respect to number 6, identify the name, address

15  and telephone number of each of the various health care

16  providers since June 1st of 1985.  I find that is overly broad.

17  However, I'm going to amend it to require that information be

18  provided from January 1st of 2002.

19          With respect to number 7, I'm going to direct that

20  that response be answered.

21          With respect to number 12, I'm going to direct that

22  that response be answered.

23          With respect to 13, the names, addresses, telephone

24  numbers and employers of each member or representative of the

25  media, press, radio, television or otherwise, with whom you

57

1  have communicated and the dates of each communication with each

2  such individual since January 1, 2003.  Just so I'm clear on

3  this, is your objection on this one relevancy or is it

file:///A|/CONLEY14.TXT

4    privilege or what is it, so I got this down, Mr. McNair.  I

5    presume they are looking for instances of alleged breaches of

6    confidentiality, I presume that's what they're looking for?

7          MR. McNAIR:  If that's what they're looking for,

8    that's what they should ask for.

9          THE COURT:  Is that what you're asking for?

10          MR. LANE:  In part, your Honor, there's also a

11    defamation claim here which has a public figure defense, and

12    Mr. McNair stood up here and told you about how Ms. Conley

13    repeatedly had communications with the press, which may go to

14    establish that she was a public figure for defamation purposes.

15    So it goes to both.

16          THE COURT:  Then with that clarification, then you

17    have no objection to answering the interrogatory, is that

18    right?

19          MR. McNAIR:  Yes, your Honor, we object, it's over

20    broad.

21          THE COURT:  I mean she might have had communications

22    with the press on a whole number of subjects?

23          MR. McNAIR:  That's correct.

24          THE COURT:  The net is a little wide, isn't it?

25    MR. LANE:  It is wide, if she's a public figure,

58

1  there is a defense to defamation in light of that.  And

2  communications with the press -- let me say this, originally,

3  his request was based upon part one.  When I heard Mr. McNair

4  stand up here and tell you about all the communications she had

5  with the press about all the other issues, I thought doesn't

6  that go to the public figure status.

7        THE COURT:  I don't understand, with all respect, I

8  don't understand what you're telling me about this public

9  figure.  As I understand it, part of her claim is a defamation

10  claim against Mr. Onorato, is that correct?

11        MR. McNAIR:  That's correct, your Honor.

12        THE COURT:  All right.  And your position is that

13  the plaintiff is a public figure, therefore, under the Supreme

14  Court case that actual malice would have to be demonstrated, is

15  that right?

16        MR. LANE:  Yes, your Honor.

17        THE COURT:  That may be true.  But how does that

18  relate, what does that have to do with who she talked to the

19  press about and when?

20      MR. LANE:  Well, if she communicated to the press on

21  a regular basis about a wide variety of issues because she was

22  a public figure, then I think it's relevant.  I think it's

23  relevant if she's communicating to the press as a Democratic

24  Committee woman, as Mr. McNair indicated to your Honor, on a

25  wide variety of issues, doesn't that make her a public figure.


                                59


1       THE COURT:  Well, if that is the basis for the

2  request, I don't see it as being relevant.  Whether she talked

3  to the newspapers or whoever, I just don't see it as being

4  relevant.  Her status as a public figure is quite independent,

5  her status as to whether she is a public figure within the

6  meaning of the New_York_Times_v._Sullivan, is quite independent
                    ___ ____ _____ __ _____

7  of who she talked to.  So if another one is drafted, I will

8  review it.  But I'm going to sustain the objection to that.

9       Identify the names and addresses, this is number 14,

10  of all Internet services to which you have subscribed since

11  January 1st of 1995.  For each service please provide the dates

12  you used the service.  My question is you already know the

13    basis upon which you terminated her.  Now you want to go back

14    and look at other information that might be within her

15    possession, how is that relevant?

16         MR. LANE:  Ms. Conley claimed during her deposition

17    that her employer misinterpreted her e-mails.  That she was

18    joking about certain things.  That she wasn't breaching

19    confidentiality, never breached confidentiality.  So we go to

20    disprove that, we see the e-mails that she sent to Deanna Cosby

21    from her home computer and from her private e-mail accounts, to

22    determine what she exactly did mean by the e-mails that she was

23    sending from work.  And as indicated earlier, she was e-mailing

24    things from her home computer to her work computer and

25    vice-versa.


60


1         THE COURT:  Well, in any event, your objection here,

2    is it to overbreadth primarily, Mr. McNair?

3         MR. McNAIR:  Yes, your Honor.

4         THE COURT:  I take it, then, if there were a more

5    temporally narrow timeframe, you would have no objection?

6         MR. McNAIR:  We would, your Honor.  Because,

7  obviously, it's calculated to lead to a subpoena to the ISP to

8  reconstruct e-mails which will reveal attorney-client

9  communications and work product.  And we're trying to nip this

10  in bud.

11        THE COURT:  I'll tell you what I'm going to do right

12  now.  The way this thing is drafted, I think it's over broad as

13  it is presently drafted.  And I also, at least for present

14  purposes, question the relevance of it.  To the extent -- the

15  point being she would have been terminated for the reasons she

16  was terminated at the time.  And you can't go back post hoc and

17  recreate another rationalization.

18        MR. JOYAL:  Your Honor, if I might.  My

19  understanding during the course of the deposition, and I'm not

20  suggesting, it was 492 pages long, I have it memorized.  My

21  understanding is that there is a question asked about whether

22  she had communication via the home computer to other

23  individuals concerning cases that she was working on.  She

24  denied that.  So for the purposes of overbreadth, I don't think

25  that we'd be going post hoc on that.  The question of whether

61

1  or not, if indeed she did it, it's an impeachment tool,

2  obviously, because she denied ever having done it.  If they are

3  there, we should be able to impeach her credibility based upon

4  the fact that those e-mails existed.

5      MR. McNAIR:  Your Honor, there's not been a shred of

6  evidence presented that Ms. Conley's answer to that question is

7  false.  This would reveal other personal e-mails which would be

8  a gross invasion of privacy, it would be a monumental invasion

9  of privacy.

10     THE COURT:  I'm going to deny the request at this

11  time, as I said, as being overly broad and of questionable

12  relevance.  It is an issue -- refresh my recollection, where on

13  the discovery road you are right now on the time line?

14     MR. LANE:   We've taken one deposition, two

15  depositions, Abby Conley and Deanna Cosby, that's it.

16     MR. McNAIR:  We have been stonewalled completely in

17  discovery.  As I pointed out in my motion, your Honor, we sent

18  the requests for production, that netted zero documents until

19  after we after filed the motion.  And then all we have gotten

20  is the deposition exhibits.  That's it.  We haven't gotten a

21  single answer to the interrogatories.

22        THE COURT:  I got myself sidetracked, let me keep

23   going.  Number 16, I'm going to sustain the objection.

24        These are requests for production.  Number 1,

25   complete set of all medical records, psychological records,


                            62


1   chiropractic records, etc.  What in goodness sake does

2   chiropractic records have to do with this?

3        MR. LANE:  I'll withdraw that.

4        THE COURT:  All right, then those records should be

5   produced as of January 1st of 1992.

6        Number 5, "copies of all medical bills related to

7   treatment received by the plaintiff for any health care

8   condition, including psychological conditions."  Anytime

9   since -- that will be January 1st of 1992.

10        With respect to number 6, copies of plaintiff's

11   state and federal income tax returns, including W-2s and/or

12   W-4s from January of '85 to the present.  She says she doesn't

13   have full copies of her tax returns.  And all of the relevant

14   earnings information is in the possession of the County of

15   Erie.  Wouldn't that be right, don't you have all of it?

16          MR. LANE:  Not subsequent to her employment there.

17  So the last year I would certainly need as well.  I think I can

18  get the W-2s from Mr. Joyal.

19          THE COURT:  Then you know what you paid her during

20  her period of employment?

21          MR. LANE:  I don't know, I represent Mr. Onorato, I

22  can get the information from Mr. Joyal.

23          THE COURT:  That takes care of that.

24          MR. LANE:  Since her employment, I'd like to get her

25  W-2 forms and tax returns to show what she made since then


                              63


1  because she's making a lost wage claim.

2          THE COURT:  All right, I'm going to sustain the

3  objection to number 8.

4          With respect to number 9, copies of all letters,

5  notes or other documents pertaining to any contact by a party,

6  their attorney, investigator or representative, with any

7  witness or potential witness to the alleged incidents.  There

8  is a work product privilege claim, which I think is well-taken,

9  at least given the way that request is drafted.

10          MR. LANE:  If in fact there were statements taken

11   that are privileged, I think it is the burden of the plaintiff

12   is to prepare a privilege log and identify what's privileged,

13   then I can then determine whether I need to make an application

14   to the court under special circumstances if I need the

15   information.

16          THE COURT:  Fair enough.  With respect to number 9,

17   to the extent there is information that would otherwise be

18   responsive to request number 9, but which you also feel falls

19   within the work product doctrine, prepare a privilege log.

20          MR. McNAIR:  Your Honor, the request exclusively is

21   for work product material.  There is nothing in that request

22   that is not work product.  You asked for documents prepared by

23   a party for use --

24          THE COURT:  Excuse me, Mr. McNair, as I go back and

25   look at the request, that's almost verbatim out of the


                                64


1   committee notes to the applicable Rules of Civil Procedure.

2   I'm going to sustain the objection there.  If you want to come

3   back with a more narrowly tailored request -- for goodness

4   sakes, an attorney, an investigator or representative, anything

5   they would acquire in the course of investigating a lawsuit

6   post suit, absent some extraordinary circumstance would be

7   privileged, wouldn't it?

8         MR. LANE:  Yes, but wouldn't I need to know what it

9   is.  In your privilege log -- in order to request the court to

10  allow me access under Rule 26 --

11        THE COURT:  The only way you get it under Rule 26,

12  if I remember correctly, is if you can show substantial and

13  compelling circumstances, is that right?

14        MR. LANE:  Substantial need, I can get it from other

15  sources.  How can I demonstrate that if I don't know what that

16  is.

17        THE COURT:  I think that's fair enough, prepare it.

18        MR. McNAIR:  Your Honor --

19        THE COURT:  I don't want to hear it.  This is the

20  ruling.  If there is such information there, I want you to

21  prepare a privilege log.  And then if for some reason they feel

22  they fit within that very limited exception, which permits you

23  to get that information, I'll take it up under appropriate

24  motion.  That issue is closed.

25        Copies of all -- number 10, "copies of all medical

file:///A|/CONLEY14.TXT

65

1   records and reports from each physician, health care

2   practitioner and/or health care facility identified in your

3   answers."  Isn't that redundant.  I've ruled on that.

4           Number 16, "copies of journals, logs and/or diaries,

5   including electronic, which is used, kept, maintained, made

6   entries in and/or possessed since January 1, 1995."  There's a

7   work product doctrine and attorney-client privilege.  Mr.

8   McNair, with the exception of work product or attorney-client

9   privilege, is it your position that it's relevant or not?

10          MR. McNAIR:  It's irrelevant.  To the extent it

11  might be relevant, it's over broad.  Obviously, it would reveal

12  much information that's none of the defendants' business, not

13  relevant in this case.  It's just intrusive and it's calculated

14  to intimidate --

15          THE COURT:  Well, when a plaintiff files a lawsuit,

16  sometimes when a plaintiff files a lawsuit, it permits

17  defendants to become more intrusive than they otherwise might

18  be.  But be that as it may.  This is my ruling on that.  I

19  think it's too long, it's overly broad.  January 1st of 2002 is

20   appropriate.  With the exception that the plaintiff is

21   permitted to be exempt from that, any work product, any

22   attorney-client communications.  With respect to --

23          MR. McNAIR:  Your Honor --

24          THE COURT:  Yes.

25          MR. McNAIR:  Is there a cutoff from September 10th

66

1   when she was terminated?

2          THE COURT:  Yes.  That's also true for the other

3   rulings as well.  January 1, 2002 to the date of her

4   termination.  Number 17 --

5          MR. LANE:  Your Honor, with respect to medical

6   records, if she's seeking medical treatment after termination?

7          THE COURT:  You're quite right, I stand corrected,

8   it would be to the present time on that.

9          Number 17, "copies of any written, digital or print

10  communications which you have had with anyone regarding your

11  employment for any of the defendants and/or regarding any

12  issues related to your employment and/or issues raised in your

13  complaint."  I think that is appropriate, with the exception of

14  any material that the plaintiff may claim to be privileged

15  under the work product doctrine or your attorney-client issue.

16  With respect to -- I think that's it, isn't it?

17          MR. McNAIR:  Your Honor, is there some temporal

18  restrictions on that?

19          THE COURT:  On which one?

20          MR. McNAIR:  Number 17.

21          THE COURT:  When is the date she was first employed?

22          MR. McNAIR:  By the County or by Children's

23  Services?

24          THE COURT:  By Children's Services?

25          MR. McNAIR:  September of 2000.


                                67


1           THE COURT:  What is the timeframe on this thing?

2           MR. LANE:  I think January 1, 2002 would be

3  appropriate for that one.

4           THE COURT:  January 1, 2002.  Same as I ruled

5  before.  Does that complete this issue?

6           MR. LANE:  I believe it does, your Honor.

7           THE COURT:  Then we have Mr. McNair's.  Which is the

8    first one in dispute here -- is it number 3, is that where we

9    start?

10         MR. McNAIR:  That's correct, your Honor.

11         THE COURT:  Okay.  With respect to number 3, it's my

12   recollection that that document has already been produced or

13   identified during the course of the argument today.  With

14   respect to --

15         MR. McNAIR:  Your Honor, it's conclusive then that

16   was the only document we're talking about?

17         THE COURT:  It's up to him to say.  What you tell me

18   here is going to bind the defendant in the case, is that the

19   document?

20         MR. JOYAL:  Your Honor, I have produced a document,

21   as I said at number one, we produced numerous other documents.

22   E-mails to the plaintiff subsequent, prior to that one, which

23   talks about confidentiality, gossip, etc.  They're all

24   contained from documents 0001 to --

25         THE COURT:  Let me make it easy.


                              68


1          MR. JOYAL:  Frankly, as I said in my response, your

file:///A|/CONLEY14.TXT

2    Honor, I don't have a copy of the transcript of the hearing to

3    which he's referring to.  So I don't know what I said.

4           THE COURT:  Put it this way.  Whatever it is or

5    isn't going to be, this timeframe is going to hold true for

6    supplemental responses on the defendants' motion to compel,

7    it's going to be the same on the plaintiff's motion to compel.

8    Getting back to the defendants' motion to compel, those

9    supplemental responses should be filed within 20 days.  The

10   same time frame is going to hold true with respect to the

11   plaintiff's motion to compel.  I'm going to direct that a

12   response be filed on number 3 within 20 days.

13          With respect to number 5, the request to produce

14   each document you contend refers or relates to any instance of

15   the disclosure of confidential information by the plaintiff.

16   Supply a detailed list within 20 days.

17          With respect to number 6, all documents which refer,

18   relate to or compromise any report, findings of any

19   investigation conducted by the Pennsylvania Department of

20   Welfare regarding the matter with Patricia Wozniak.  I'm going

21   to direct that information be produced, but it be redacted so

22   as to insure the confidentiality of any individual or

23  individuals.

24      With respect to number 8 --

25      MR. McNAIR:  Eight is withdrawn.


                            69


1      THE COURT:  Eight is withdrawn.  With respect to

2  number 9.  All notes, memoranda, e-mails or other documents

3  which refer or relate to or memorialize communications between

4  Liebel, Cauley, Wozniak, etc.  There was a confidentiality and

5  privilege objection.  I'm going to direct that information be

6  supplied.  But it appropriately be redacted so as to address

7  any of those concerns.

8      With respect to number 10.  A complete and

9  unredacted copy of the personnel files of Richard Schenker,

10  John Oronato, Peter Callan, Michael Cauley, Debra Liebel, Susan

11  Deveney, Patricia Wozniak and Deanna Cosby.  I'm going to

12  sustain that objection.  That is overly broad and in a large

13  measure irrelevant.

14      MR. McNAIR:  With regard to Patricia Wozniak, your

15  Honor --

16      THE COURT:  I was about to separate that out.  With

17   regard to Ms. Wozniak, I'm going to direct that any portion of

18   her personnel file appropriately be redacted, be turned over

19   which relates in any form or fashion to the complaints made by

20   Ms. Conley concerning the incident which was discussed more

21   fully here before or any other disciplinary action in her file.

22        Then request number 13.  Please produce any

23   appointment book maintained by Patricia Wozniak between January

24   1, 2004 and September 10th of 2004, or any similar document

25   which relates to her activities.  What does that have to do

70

1   with anything, how is that germane, her appointment book?

2        MR. McNAIR:  She wasn't going to work.

3        THE COURT:  Pardon me?

4        MR. McNAIR:  She wasn't going to work.

5        THE COURT:  Was that one of the things your client

6   complained about?

7        MR. McNAIR:  One of the things that my client made

8   the complaints that she did.

9        MR. JOYAL:  Your Honor, I don't know where this --

10       MR. McNAIR:  They also ask for information --

11         MR. JOYAL:  It's not in the complaint, number one.

12    I'm hearing these things now for the first time.  It's not in

13    the complaint, it was not part of the deposition.  Patricia

14    Wozniak, number one, is a supervising social worker in these

15    particular cases.  Number two, we don't have her appointment

16    book.  It is not something that we would maintain.  Should he

17    go out and try to subpoena her appointment book, that's fine.

18    But, again, this is the first time that we're hearing there was

19    a complaint that says she complained to a supervisor about

20    Patricia Wozniak not going to work.

21         THE COURT:  Does she still work for the County?

22         MR. JOYAL:  I'm not even sure of that.

23         THE COURT:  Do you know?

24         MR. LANE:  I do not know, your Honor.

25         THE COURT:  Do you know?


71


1         MR. McNAIR:  It's my understanding that for the time

2    being she does.

3         THE COURT:  Well, I don't see how someone's

4    appointment book either demonstrates or doesn't demonstrate

5    that they're going to work.

6         MR. McNAIR:  Your Honor, to the extent the County

7    intends to argue that the alterations made by Ms. Deveney in

8    Ms. Conley's court summary were justified, the only basis for

9    justification would be based on reports and information from

10   Ms. Wozniak.  This will demonstrate Ms. Wozniak had no basis to

11   challenge Ms. Conley's observations since she had attended only

12   part of I think two visitations -- in the preceding six months.

13        THE COURT:  I don't see it as being relevant, I'm

14   going to sustain the objection.

15        MR. McNAIR:  They ask for the same information for

16   Ms. Conley.

17        THE COURT:  I just sustained the objection.  Then

18   14, all documents reflecting earnings of the plaintiff from her

19   employment with the defendant.  You're going to produce those

20   W-2s.

21        MR. McNAIR:  You skipped 11.

22        THE COURT:  Number 11.  All versions of any e-mails

23   from plaintiff to Susan Deveney or from Susan Deveney to

24   plaintiff regarding any court summary prepared for the

25   Schuster-Casella case.  Produce that with redaction.

1   All right, we're almost there.  Then number 15 -- I can't read

2   15 somebody typed over it, what is 15?

3        MR. McNAIR:  Produce all court orders from the

4   Vickie Wilson case.

5        THE COURT:  Same thing, produce it with redactions.

6        Number 16.  Produce it with redactions.

7        Number 17 -- I can't read it, it's typed over, could

8   someone read the request to me.

9        MR. McNAIR:  Produce all documents which refer,

10  relate to or compromise any communications between and among

11  the Erie County Office of Children and Youth and Cheryl Beers.

12  Cheryl Beers is an individual --

13        THE COURT:  Who is she, I'm sorry?

14        MR. McNAIR:  She's the grandmother of a couple of

15  the children.  In the Vickie Wilson case.

16        THE COURT:  All right.  Produce it with the

17  redaction.  Finally, the last one, I can't read it again, would

18  you please tell me what 18 says?

19        MR. McNAIR:  That is produce documents, memoranda or

20  e-mails between and among the OCY management, Cauley, Deveney,

21  Wozniak, concerning the Schuster-Casella case and the Vickie

22  Wilson case, from June 1st through September 10th.

23      THE COURT:  Produce it with redaction.  And, once

24  again, all supplemental responses are due within 20 days.

25      One other dangling loose end.  Plaintiff filed a

73

1  motion for protective order.

2      MR. McNAIR:  Your Honor, we've also requested

3  responses to interrogatories.

4      THE COURT:  Did I miss those?

5      MR. McNAIR:  We haven't discussed those at all.

6      THE COURT:  Help me out here, Mr. McNair, I got so

7  much paper floating around up here, where are we?  I thought I

8  just ran through your motion to compel, where do you pick up

9  the interrogatory requests?

10      MR. McNAIR:  Paragraph 25 of the motion to compel.

11      THE COURT:  You're quite right.  All right, let's

12  take a look at that.  Number 1, please identify each e-mail to

13  or from plaintiff that was in the possession of Erie County

14  and/or the Office of Children and Youth at the meeting of

15  September 10th.  I'm going to direct that be answered with

16  appropriate redaction.

17        MR. JOYAL:  Your Honor, our objection was this

18  doesn't talk about, it's not temporally placed, nor is it

19  anything to do with her termination.  This says identify each

20  e-mail to or from the plaintiff that was in the possession of

21  Erie County Office of Children and Youth at the time of the

22  meeting of September 10, 2004.

23        MR. McNAIR:  Your Honor, if you refer to the

24  correspondence that was filed as exhibits in conjunction with

25  this motion, you would know that the plaintiff has already

74

1  narrowed that request, to e-mails that were considered by them

2  in their decision to terminate Ms. Conley.

3        THE COURT:  I would know that?

4        MR. McNAIR:  It's attached to, that was part of an

5  attempt in negotiations to resolve this without filing a

6  motion.

7        THE COURT:  With that clarification, produce it with

8  appropriate redaction if necessary.  The same with respect to

9   number 2.  Well, you've already answered number two.

10      MR. JOYAL:  If I might, can we just back up to

11  number 1?

12      THE COURT:  Yes.

13      MR. JOYAL:  Because Mr. McNair, again I will quote

14  from Mr. McNair's motion.  On page 15 he states "the defendant

15  objected as well on the grounds that the interrogatory as

16  written is not reasonably calculated to lead to the discovery

17  of admissible evidence.  Obviously, these e-mails are relevant

18  since plaintiff is accused of abusing the County's e-mail

19  system and that was offered as the sole reason for her

20  termination.  The point of the interrogatory is to demonstrate

21  that some of the e-mails upon which the County intends to rely

22  at trial were not discovered until after plaintiff was

23  terminated.  If they were available to the defendant as of

24  September 10th, they were not mentioned in the meeting where

25  plaintiff was terminated.  These interrogatories are again


75


1   susceptible to an appropriate protective order and are clearly

2   relevant to this case, as well as being reasonably calculated

3    to lead to the discovery of admissible evidence."   His own

4    motion suggests that he's not confining these, he's asking for

5    all e-mails.

6          THE COURT:  You know what, it was just refined.

7    Whatever you may think he was asking for, that's not what he's

8    asking for.  It was just restricted in a way that I just

9    indicated.

10          MR. JOYAL:  Thank you.

11          THE COURT:  So then three --

12          MR. McNAIR:  Six, your Honor.  Number 6 requests the

13   defendant to identify each document that was in the possession

14   of and actually considered by Erie County.

15          THE COURT:  Answer it.  He's asking for any

16   documents that were within your possession, which I presume

17   influenced or drove the decision to terminate, is that right?

18          MR. McNAIR:  That's correct, your Honor.

19          THE COURT:  All right, answer it.

20          MR. JOYAL:  The same thing with number one, it has

21   been narrowed, too.

22          THE COURT:  Answer it.  To the extent that it's not

23   duplicative.  If it is duplicative, you can indicate that.

24         Number 9, set forth the number of children whose

25   parental rights were terminated and who were adopted with the


76


1   participation of the Erie County Office of Children and Youth

2   between January 1, 2000 and the date of the answer to the

3   interrogatory.  There's a relevancy objection.  What is the

4   possible relevance of that?

5         MR. McNAIR:  Your Honor, there is a financial

6   incentive for the Office of Children and Youth to terminate

7   parental rights and recruit children for adoption.  There is a

8   state funding formula that grants a federal program, excuse me,

9   that grants the state, the last I knew, $4,000 for each

10   termination and adoption in excess of the ones that they did

11   the year before.

12         THE COURT:  How does that tie in to your client?

13         MR. McNAIR:  This has to do with the good faith

14   basis for my client's actions in the Schuster-Casella case.

15   They wanted to terminate and adopt those children with no

16   reason and we're trying to demonstrate that their actual

17   motivation was financial.

18          THE COURT:  I'm going to sustain the objection, to

19  me that is irrelevant.  What's the next one?

20          MR. JOYAL:  Eleven, your Honor.

21          THE COURT:  Number 11, please describe each instance

22  in which the plaintiff improperly disclosed confidential

23  information, etc.  And you say upon information and belief

24  plaintiff disclosed such information to Deanna Cosby, Vickie

25  Wilson, E. Palattella and other unknown persons.


                              77


1          MR. McNAIR:  We're trying to narrow the issue, your

2  Honor, that's all.

3          THE COURT:  Doesn't that tell you?

4          MR. McNAIR:  No.

5          THE COURT:  What more do you want to know?

6          MR. McNAIR:  What information and how is this

7  confidential.  The whole balance of the interrogatory is not

8  answered.  And it makes reference to unknown persons.  I want

9  to know how they know that she gave information to unknown

10  persons if I don't know who they are.

11          THE COURT:  That's a fair point only in this

12  respect.  You're not going to be able to come in and defend

13  this case on the basis of -- the only thing that is relevant in

14  terms of the defendants' mind set, is what the defendant acted

15  on at the time that the plaintiff was discharged.  Now, when

16  you say other unknown persons, presumably, if you don't know

17  who they are now, you didn't know who they were then, right?

18       MR. JOYAL:  Absolutely, your Honor.  But we have

19  given him, you've just narrowed the point and made a cogent

20  point.  It's who did we know at the time or did we believe that

21  she gave the information to.  We told them.  We told them about

22  Vickie Wilson.  We told them about Deanna Cosby.  And we

23  suggested Mr. Palattella based upon the fact that Mr.

24  Palattella out of the blue shows up at the Schuster-Casella

25  hearing to hear Abby Conley's testimony.


78


1        MR. McNAIR:  Mr. Palattella was not invited to that

2   hearing by Ms. Conley.  We know that, we can prove that.  And

3   we will prove that.

4        MR. JOYAL:  If you prove that, that's fine.

5        MR. McNAIR:  He asked us how --

6          THE COURT:  Gentlemen, I mean he's doing the best he

7  can, don't talk over each other.

8          MR. JOYAL:  Your Honor, here's part of the thing,

9  too, in terms of I should have maybe asked the court to be

10  heard on.  Mr. Lane's question about reports to the press.  We

11  subpoenaed Mr. Palattella for deposition.  We were advised by

12  his counsel by letter that Mr. Palattella would invoke the

13  First Amendment privilege.  Therefore, we would not, unless we

14  came to this court and the court ordered him to say who gave

15  him the information, we wouldn't get it.  So, now again, the

16  issue which we're talking about here is we have told him who we

17  know of based upon what we know right now.  We can't give him

18  anymore.  Because if we don't have access to her e-mails from

19  home, we wouldn't know that.  If we didn't have access to

20  e-mails --

21          THE COURT:  All right, this is the way this thing

22  can be cleared up.

23          MR. McNAIR:  Your Honor, if I can.

24          THE COURT:  Hang on just one second and maybe what I

25  say is going to moot what you're going to say, let's just see.

79

1    I hope, too.  It strikes me the request -- describe each

2    instance in which you allege plaintiff improperly disclosed

3    confidential information.  That has to relate, does it not, to

4    confidential information upon which the defendant relied in

5    terminating, isn't that right?

6         MR. JOYAL:  I believe it would, your Honor.

7         THE COURT:  Isn't that right?

8         MR. McNAIR:  Your Honor, if the defendant is not

9    going to raise after discovered evidence --

10        THE COURT:  Then that's all you need.

11        MR. McNAIR:  That's fine.  We can agree --

12        THE COURT:  So it's limited in that respect.  That

13   having been said, Mr. McNair, does that cause you to be more

14   sanguine with the response?

15        MR. McNAIR:  To the extent that it's limited as Mr.

16   Joyal indicated.  But still, I think I've said this before, we

17   have no indication from the defendant County what statute,

18   rule, regulation or policy it's relying on.

19        THE COURT:  Fair enough.

20        MR. McNAIR:  That's what we need, that's essential.

21        THE COURT:  Hang on a second.  You have now given

22  him the three or four instances of alleged breach of

23  confidentiality.  He wants to know -- without putting words in

24  the plaintiff's mouth, I presume she wants to know was her

25  breach of confidentiality, was her alleged breach of

80

1  confidentiality a violation of a state regulation or an

2  internal policy of the County or both?

3       MR. JOYAL:  Your Honor, it was based on three state

4  statutes and an internal policy.  And it's contained in --

5       THE COURT:  What are the three state statutes?

6       MR. JOYAL:  55 Pa. Code 3130.44(a).  55 Pa. Code

7  3490.242.  23 Pa. C.S.A. Section 6339.

8       MR. McNAIR:  Excuse me, what title?

9       MR. JOYAL:  23 Pa. C.S.A. 6339.  23 Pa. 6340.

10  What was marked at the Conley deposition as Exhibit No. 1,

11  which is the OCY policy on confidentiality.  And, your Honor, I

12  don't have them with me, but there are other statutes that were

13  referenced.

14       THE COURT:  In addition to those that you just

15  indicated for Mr. McNair, to the extent there are others,

16   supplement that response to the last interrogatory.

17          Now, finally, there is a motion for protective order

18   that you filed, Mr. McNair?

19          MR. McNAIR:  I believe that's mooted.

20          THE COURT:  It's mooted by my previous rulings.  All

21   right, I'll see you back here at 1 o'clock for the settlement

22   conference.

23          (Whereupon, at 11:50 a.m., the proceedings were

24   concluded.)

25                  - - -


                              81


1              C E R T I F I C A T E

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11  _____

12  Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25