## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABBY B. CONLEY,
      Plaintiff
      v.
COUNTY OF ERIE, ERIE COUNTY OFFICE
OF CHILDREN AND YOUTH, a/k/a ERIE
COUNTY CHILD WELFARE SERVICE,
RICHARD SCHENKER, individually and in his
capacity as County Executive of Erie County,
Pennsylvania, PETER CALLAN, individually
and in his capacity as Erie County Director of
Personnel, DEBRA LIEBEL, individually and in
her capacity as Executive Director, Erie County
Office of Children and Youth, a/k/a Erie Child
Welfare Service and JOHN A. ONORATO,
ESQUIRE, individually and in his capacity as
Erie County Solicitor,
      Defendants.

**JURY TRIAL DEMANDED**

CIVIL DIVISON

No.: 05-CV-76E

Honorable Judge Sean J. McLaughlin

## BRIEF IN SUPPORT OF JOHN A. ONORATO, ESQUIRE'S MOTION FOR SUMMARY JUDGMENT

AND NOW, comes Defendant John A. Onorato, Esquire, by and through his attorneys, Dell Moser Lane & Loughney, LLC and Mark R. Lane, Esquire and files the within Brief in Support of Motion for Summary Judgment, stating as follows:

## I. STATEMENT OF THE CASE

This action was filed on behalf of Abby Conley against Erie County, Erie County Office of Children and Youth, Richard Schenker, County Executive of Erie County, Peter Callan, Erie County Director of Personnel, Debra Liebel, Executive Director of the Erie County Office of Children and Youth, and John Onorato, Erie County Solicitor. Plaintiff alleges that her resignation was coerced in retaliation for the exercise of her rights secured by the First and Fourteenth Amendments to the Constitution of the United States for giving truthful testimony under oath in a court proceeding and for making a good faith report of violations of Agency policy and the criminal laws of the Commonwealth of Pennsylvania. Further, Plaintiff alleges

1

that she was subjected to defamatory statements, to the detriment of her good reputation, for reasons of personal animus. *See, Complaint*, ¶1.

The Complaint identifies violations of 42 U.S.C. §1983, conspiracy to violate 42 U.S.C. §1983, violation of the Whistleblower Law at 43 Pa. C.S. §1421 et. seq., and wrongful discharge. The Complaint further alleges claims against Mr. Onorato, in his individual capacity, for defamation and violation of 42. U.S.C. §1983. Plaintiff requests damages in excess of $75,000, together with prejudgment interest, attorneys' fees, costs, punitive and exemplary damages and other relief the Court deems just.

Defendant Onorato adopts his Concise Statement of Material Facts as though set forth at length herein.

## II. STANDARD OF REVIEW

This Honorable Court has summarized the appropriate standard of review in ruling upon Onorato's Motion for Summary Judgment as follows:

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving a motion for summary judgment, the Court must consider the evidence and draw all reasonable inferences arising therefrom in the light most favorable to the nonmovant and determine whether the evidence, so construed, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.ED.2d 202 (1986). There, as here, the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if admissible, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the nonmoving party must go beyond its pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue for trial. *Id*. at 324, 106 S.Ct. 2548.

*Vantassel v. Brooks*, 355 F.Supp.2d 788, 791 (W.D.Pa. 2005)

## III. ARGUMENT

**A.    PLAINTIFF'S FIRST AMENDMENT CLAIMS MUST BE DISMISSED.**

This Honorable Court has summarized the law applicable to a plaintiff's §1983 First Amendment retaliation claim as follows:

> The Supreme Court has recognized that public employees have a First Amendment interest in speaking freely on matters that are of public concern. *See, City of San Diego, California v. Roe*, ____ U.S. ____, 125 S.Ct. 521, 523, 160 L.Ed.2d 410 (2004); *Perry v. Sindermann*, 408 U.S. 594, 597, 92 S.Ct. 2694, 33 L.Ed.2d 470 (1972); *Pickering v. Board of Educ.*, 391 U.S. 563, 571-72, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That is because "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers" and, therefore, if public employees could not freely speak to such matters, "the community would be deprived of informed opinions on important public issues." *City of San Diego*, ____ U.S. at ____, 125 S.Ct. at 525 (citing *Pickering*, 391 U.S. at 572, 88 S.Ct. 1731). Thus, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.* At the same time, however, a government employer has a legitimate interest in promoting efficiency, integrity, and discipline among its workforce and, to that end, it may impose certain restraints upon the speech of its employees. *City of San Diego, supra*, at 523; *Connick v. Myers*, 461 U.S. 138, 146, 150-51, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering*, 391 U.S. at 468, 88 S.Ct. 1731.
>
> To accommodate these competing concerns, courts apply a three-step test when confronted with a public employee's claim that he was retaliated against for engaging in protected activity. *See, Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. First, the employee must establish the "protected" nature of his conduct by showing that the speech in question involves a matter of public concern and that the employee's interest in the speech outweighs the public employer's countervailing interest in providing efficient and effective services to the public. *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004) (citing *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir. 1996)); *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). Second, the employee must demonstrate that the protected speech was a "substantial or motivating factor in the alleged retaliatory action." *Curinga*, 357 F.3d at 310 (citing *Baldassare*, 250 F.3d at 194-95; *Green v. Philadelphia Housing Authority*, 105 F.2d 882, 885 (3d Cir. 1997)). If the employee can meet his burden at steps 1 and 2, the employer can nonetheless avoid liability by showing "that it would have taken the adverse action even if the employee had not engaged in protected conduct." *Id.* (citing *Pro*, 81 F.3d at 1288). The inquiry at step 1 is a question of law, but the inquiries at steps 2 and 3 involve questions of fact. *Id.*

*Vantassel v. Brooks*, 355 F.Supp.2d at 797.

Although the issue of whether the protected speech was a substantial or motivating factor for the alleged retaliatory action, and the issue of whether the employer would have taken the adverse action even if the employee had not engaged in the protected conduct, are generally questions of fact, those issues may be decided on summary judgment where the evidentiary materials of record would be insufficient to carry the nonmovant's burden of proof at trial. *See, Vantassel*, 355 F.Supp.2d at 791. In *Maestas v. Segura*, 416 F.3d 1182 (10th Cir. 2005), the United States 10th Circuit Court of Appeals held that to withstand summary judgment, an employee must produce evidence linking the employer's action to the employee's speech. *Maestas*, 416 F.3d at 1188. The Court stated:

> Speculation or hunches amidst rumor and innuendo will not suffice. See, *Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003). Nor can a plaintiff sustain his burden at step 3 "simply by showing that the elimination of the protected activity may have been welcomed by the defendants." *Wright v. Illinois Dept. of Children and Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994) (internal quotations omitted); *accord Collyer v. Darling*, 98 F.3d 211, 229 (6th Cir. 1996).

*Maestas*, 416 F.3d at 1189.

In the case at bar, Plaintiff's speech did not involve matters of public concern, and her interests in that speech were outweighed by the County's interests in providing efficient and effective services to the public. Furthermore, the Plaintiff cannot present any evidence that her claims against PW or her testimony of July 28, 2004 were substantial motivating factors for the alleged adverse employment activity.

1.    **Plaintiff's First Amendment Claims Must Be Dismissed, as Plaintiff Can Present Absolutely No Evidence That Her Reporting of PW or Her Testimony of July 28, 2004 Were Substantial Motivating Factors for Her Resignation.**

In order to recover in a First Amendment retaliation claim, an employee must demonstrate that her protected speech was a "substantial or motivating factor in the alleged retaliatory action." *Vantassel*, 355 F.2d at 797, citing *Curinga*, 359 F.3d at 310. In the case at

bar, the Plaintiff can present absolutely no evidence that her reporting of PW or her testimony of July 28, 2004 were substantial or motivating factors behind the County's request for her resignation. In fact, to the contrary, a letter from Michael Cauley, Esquire to John Onorato, Esquire dated August 20, 2004 specifically identified, prior to the Plaintiff's resignation, the reasons necessitating Plaintiff's separation from employment. Mr. Cauley specifically identified breach of confidentiality, improper disclosure of County work product/violation of computer usage policy and violations of employee work and conduct responsibilities as the reasons for concern regarding the Plaintiff's employment. The information set forth in Mr. Cauley's letter of August 20, 2004 evidenced the basis for Plaintiff's resignation.

Among the reasons for Plaintiff's necessitated separation identified in Mr. Cauley's letter of August 20, 2004 were the following:

> The employee was serving as the County's Social Services Aide in a case involving the mother VW. Several of the mother's children were in care and the mother was pregnant. Unbeknownst to the mother, the agency had obtained a "prognostic detention order" allowing placement of her newborn at the time of birth. According to Attorney Allgeier, the mother had made statements to the effect that she might flee the jurisdiction with this child at birth or shortly thereafter if the Agency was indicating it might place the child. On June 4, 2004, the employee sent an email to Deanna Cosby advising her of the existence of the "prognostic detention order," and stating, "V does not see this coming." Deanna Cosby replied, "she will." Prior emails from the employee to Deanna Cosby regarding VW indicated that the employee has provided Cosby with W's home phone number, as well as the name and phone number of Ms. W's Erie Attorney.

> The disclosure of the existence of this "prognostic detention order" to Ms. Cosby is a clear violation of Agency confidentiality policy. Copies of emails spanning the period May 27, 2004 to July 20, 2004, marked Exhibit "A," document this breach of confidentiality, as well as a continuing "conspiracy" wherein the employee on knowingly shared confidential information with Deanna Cosby regarding the W-case as well as the related matters pertaining to the investigation of Case Worker [PW].

*See, memorandum from Michael Cauley, Esquire to John Onorato, Esquire dated August 20, 2004, App. Ex. 9.*

On August 4, 2004, I interviewed Kim Peebles, a Supervisor of the Clerical Department at the Office of Children and Youth. She related being approached by the employee on August 2nd, 2004 with complaints about Supervisor Deveney and Case Worker [PW]. According to Peebles, the employee reiterated the untrue allegations against case worker [PW] and discussed the particulars of that case with Ms. Peebles. This particular breach of confidentiality was done clearly to impugn case worker [PW].

Ms. Peebles also related that during this same conversation, the employee similarly impugns Sue Deveney. She stated that Ms. Deveney was going to be criminally charged with obstruction of justice, there would be a newspaper on Friday (August 6, 2004), that she was going to be fired and that she would face jail time. She accused Supervisor Deveney of improprieties in editing/correcting Court Summaries or documents that she herself has prepared.

This contact with Ms. Peebles is inappropriate in that Ms. Peebles has no need to be aware of case specific information as related by the employee, Ms. Peebles has no supervisory authority over Case Worker [PW] or Supervisor Deveney, and Ms. Peebles does not occupy any position in the Agency that would make it necessary for her to have this type [sic] information brought to her attention.

*See, memorandum from Michael Cauley, Esquire to John Onorato, Esquire dated August 20, 2004, App. Ex. 9.*

With respect to the July 28, 2004 hearing, Mr. Cauley did not even reference the fact that Abby Conley testified regarding modifications to her Court Summary, but rather focused exclusively on the fact that she had apparently provided a copy of the draft Court Summary to Attorney Villella prior to the hearing, in order to undermine the efforts of OCY in the case. Mr. Cauley stated:

> She testified that the document had been prepared by her on her County computer and that it remained on her hard drive. Attorney Villella's possession of it remained unexplained, as it was not part of the official documentation furnished to the court and counsel for the parties in advance of the hearing.

> Review of the employee's emails reflects that, as she had testified in court, she sent the document to her supervisor Sue Deveney on April 19, 2004. It is also clear that she emailed the document from her County computer to an off-site computer (email address **abby@ilovejesus.net**) on May 4, 2004. A copy of the emails dated May 4, 2004, is attached as Exhibit "C." The clear inference is that the employee did this in order to furnish this document to opposing counsel in advance of the July 28th hearing. This activity would constitute a violation of the

6

County Computer Usage Policy Roman Numeral IV pertaining to County access and ownership of all data.

*See, memorandum from Michael Cauley, Esquire to John Onorato, Esquire dated August 20, 2004, App. Ex. 9.*

All of the grounds set forth in Michael Cauley's letter to John Onorato were legitimate and constitutionally valid grounds to take whatever adverse employment action the County felt necessary against Abby Conley. Plaintiff can present absolutely no evidence to demonstrate that her reporting of PW and testimony regarding modifications to her Court Summary, as alleged in her Complaint, formed any part of the basis for the County requesting her resignation.

In *Ambrose v. Township of Robinson*, 303 F.3d 488 (3rd Cir. 2002), the United States Third Circuit Court of Appeals held that the District Court erred by not entering judgment as a matter of law for Robinson Township where there was insufficient evidence to support a finding that the Plaintiff's "protected speech" was a substantial or motivating factor in his suspension. The Court held that where the Plaintiff offered no evidence to show that the Township was aware of his protected speech, the District Court erred by not entering judgment as a matter of law in favor of the Township at trial. *Ambrose*, 303 F.3d at 494. In the case at bar, although it is undisputed that the Defendants had knowledge of Plaintiff's reporting of PW and testimony of July 28, 2004, the Plaintiff has absolutely no evidence that this knowledge formed the basis of her necessitated resignation. Quite to the contrary, the letter from Michael Cauley, Esquire to John Onorato, Esquire specifically sets forth the absolutely legitimate bases of the County's actions. Furthermore, deposition testimony has revealed that neither instance alleged by the Plaintiff had anything to do with her resignation. *See, Deposition of Debra Liebel, pp. 117, 122-123, App. Ex. 7.*

In *Maestas, supra*, the United States Tenth Circuit Court of Appeals held that an employee must produce evidence linking the employer's action to the employee's protected

speech in order to survive summary judgment.  Holding that the Plaintiff failed to present

sufficient evidence for a reasonable jury to conclude that an improper motive played a substantial

part in the decision to transfer the Plaintiffs, the Court of Appeals held that the District Court had

appropriately granted summary judgment on behalf of the Defendants.  In so holding, the Court

of Appeals analyzed the requirement that the Plaintiff show that the protected speech played a

substantial part in the employer's decision, expressing its well-reasoned analysis as follows:

> Under the third factor, the employee has the initial burden of establishing
> causation – that is, to show the exercise of constitutionally protected speech was a
> substantial motivating factor in the employer's decision to adversely alter the
> employee's conditions of employment.  What constitutes a substantial motivating
> factor evades precise definition.  An employee "need not prove his speech was the
> sole reason for defendants' action." *Copp v. Unified Sch. Dist. No. 51*, 882 F.2d
> a547, 1554 (10th Cir.1989).  Nor is the employee required to show "but-for"
> causation; that is, to demonstrate but-for the employee's speech the subsequent
> employment action would not have occurred.  *See Spiegla v. Hull*, 371 F.3d 928,
> 941-43 (7th Cir.2004).  Rather, the employee must show the protected speech
> *played a substantial part* in the employer's decision to adversely alter the
> employee's conditions of employment.  *See Anderer v. Jones*, 385 F.3d 1043,
> 1052 n. 14 (7th Cir.2004); *Quinn v. Monroe County*, 330 F.3d 1320, 1329 n. 10
> (11th Cir.2003); *Ostad v. Oregon Health Sciences Univ.* 327 F.3d 876, 885 (9th
> Cir.2003); *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir.2003); *Suppan v. Dadonna*,
> 203 F.3d 228, 236 (3d Cir.2000).
>
> To withstand summary judgment at step three, therefore, an employee must
> produce evidence linking the employer's action to the employee's speech.  *See,
> Ramirez v. Oklahoma Dept. of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994)*,
> overruled in part on other grounds, Ellis v. University of Kansas Med. Ctr.*, 163
> F.3d 1186, 1194-98 (10th Cir.1998).  Speculation or hunches amidst rumor and
> innuendo will not suffice.  *See, Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir.2003).
> Nor can a plaintiff sustain his burden at step three "simply by showing that the
> elimination of the protected activity may have been welcomed by the
> defendants[.]" *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d
> 1492, 1500 (7th Cir. 1994) (internal quotations omitted); *accord Collyer v.
> Darling*, 98 F.3d 211, 229 (6th Cir.1996).

*Maestas*, 416 F.3d at 1188-1189 (footnotes omitted).

In the case at bar, Abby Conley was specifically warned on July 8, 2004, almost three

weeks prior to her testimony on July 28, 2004, that her breach of the confidentiality requirements

of OCY would result in sanctions. On July 9, 2004, Sue Deveney confirmed her conversation with the Plaintiff regarding confidentiality and the fact that Conley would be sanctioned for a breach. *See, e-mail from Sue Deveney to Abby Conley dated July 9, 2004, App. Ex. 20.* In fact, Abby Conley acknowledged that possible sanctions could be "launched" against her in the future. *See, e-mail from Abby Conley to Sue Deveney dated July 9, 2004, App. Ex. 20.* Three days later, Abby Conley acknowledged in an e-mail dated July 12, 2004 to Pam Biroscak that she was told about confidentiality by Sue Deveney when she stated, "Ms. Deveney said she was simply following the directive of Ms. Liebel. Then told me that I needed to keep things confidential (that was the only thing she said that was fair)." *See, e-mail from Abby Conley to Pam Biroscak dated July 12, 2004, App. Ex. 21.*

As early as June 12, 2004, before the Defendants even knew of the incident involving PW, Plaintiff was well aware that she was potentially in trouble for breaching confidentiality. In an e-mail from Abby Conley to Deanna Cosby dated June 11, 2004, Conley stated:

> I have had some problems. Sue called me into her office and said it came to her attention that someone from her unit had sent out client information over the email system to a secondary email outside of this office.

*See, series of e-mails between Abby Conley and Deanna Cosby dated June 11, 2004, App. Ex. 15.*

Interestingly, demonstrating distain for Sue Deveney, Deanna Cosby responded as follows:

> . . . She is a nosy, miserable, busy body, who could stand a hard slap in the face. Well both of them could. But I'm o k w/ the fact that life smacks them in the face daily. Tra La.

*See, series of e-mails between Abby Conley and Deanna Cosby dated June 11, 2004, App. Ex. 15.*

In fact, when Abby Conley realized on June 11, 2004 that someone may have discovered that she sent out confidential information over the e-mail system, she concocted fraudulent e-mails which she sent herself, from a fictitious attorney, Mike Fisher, attempting to dissuade co-

workers from looking at her e-mails for fear of legal reprisal. *See, Deposition of Abby Conley at pp. 231-238, App. Ex. 4, and e-mails between Attorney Mike Fisher and Abby Conley dated June 11, 2004, App. Ex. 18.*

Clearly, Sue Deveney and Abby Conley discussed the importance of confidentiality before Sue Deveney knew anything about Conley's allegations against PW. Undeniably, Ms. Deveney's reference to possible sanctions against Conley occurred well prior to Conley's testimony on July 28, 2004. Therefore, Plaintiff's allegedly protected speech could not possibly have formed the basis for the threatened sanctions. In fact, this Defendant believes that the opposite is true. Conley knew that she faced adverse employment action as a result of her clear and egregious breach of confidentiality. Therefore, she testified on July 28, 2004 that she feared adverse employment action as a result of her testimony. In short, Conley attempted to protect herself on July 28, 2004, because she knew that sanctions would follow when and if the County discovered her release of confidential information to Deanna Cosby. Fortunately, the County did discover Conley's improper disclosure of confidential information, acted appropriately on it and requested Conley's resignation. Plaintiff can present absolutely no evidence that her resignation was requested because of "protected speech" in relation to her reporting of PW or her testimony of July 28, 2004. Rather, the only evidence regarding the County's motive consists of a letter from Michael Cauley, Esquire to John Onorato, Esquire dated August 20, 2004 and the testimony of Mr. Cauley and Deborah Liebel, which all consistently reflect that Conley's resignation was necessitated by her egregious and undeniable breach of confidentiality. Accordingly, Plaintiff's First Amendment claims (First Claim, Second Claim, Third Claim and Fourth Claim) must be dismissed.

2.     **Plaintiff's Alleged Speech Did Not Involve Matters Of Public Concern and Her Interests in that Speech Were Outweighed by the County's Interests in Providing Efficient and Effective Services to the Public.**

In order to determine whether the Plaintiff engaged in "protected speech," the Court must first determine whether the speech in question involves a matter of public concern. *Vantassel*, 355 F.2d at 797, citing *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3rd Cir. 2004). With respect to the issue of whether the Plaintiff's speech is a matter of public concern, this Honorable Court has aptly stated:

> Speech is a matter of public concern "if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.'" *Baldassare, supra,* at 195 (quoting *Green*, 105 F.3d at 85-86). In applying this criterion, we focus on the content, form, and context of the activity in question. *Id.*

*Vantassel*, 355 F.Supp.2d at 797.

In the case at bar, the Plaintiff's claimed speech was not "protected speech," as it was not a matter of public concern, considering the content, form and context. Plaintiff alleges in her Complaint that the Defendants retaliated against her for engaging in allegedly protected speech on two occasions. The Plaintiff alleges that on or about June 9, 2004, she was transporting a three-year-old female child and her younger brother for visitation with their natural mother. The Plaintiff contends that when she arrived at the parking lot of the visitation site, her co-worker, PW, removed the three-year-old from her car seat. According to the Plaintiff, while the child was tugging on the car seat belt, PW forcibly grabbed the child's face with her left hand and shook her in a left to right motion yelling "no, no, no!" *See, Complaint* at ¶ 16. Plaintiff alleges that she attempted on several occasions to report the incident to her supervisor, Deveney, but that her supervisor would not accept or act upon her report. The Plaintiff alleges that she then made a report to another agency supervisor, who referred the Plaintiff to a director. *See, Complaint at ¶ 17.*

With respect to the second instance of Plaintiff's allegedly protected speech, the Plaintiff contends that during the course of a hearing before the Honorable Elizabeth Kelly in the Court of Common Pleas of Erie County on July 28, 2004, Plaintiff testified regarding the alteration of her Court Summary by her supervisor, Sue Deveney. Plaintiff alleges that her testimony regarding Deveney's alteration of her report somehow constitutes protected speech. However, neither Plaintiff's reporting of PW, nor her testimony on July 28, 2004 could possibly be considered protected speech, as neither involved a matter of public concern.

With respect to the incident involving PW, the Plaintiff testified during her deposition in this case that PW grabbed a child's face and that, although Plaintiff felt that it was inappropriate, she did not feel that it was child abuse. *See, Deposition of Abby Conley at p. 265, App. Ex. 4.* Furthermore, the Department of Public Welfare investigated the incident and determined Conley's charges to be unfounded. *See, Department of Public Welfare Reports, App. Ex. 2.* Although grabbing a child by the face would be inappropriate under many circumstances, assuming that the incident actually occurred, Plaintiff agreed that the incident did not constitute child abuse and that the child was not harmed. In fact, Plaintiff admitted that the child did not even cry. *See, Deposition of Shara Saveikis, pp. 73-74, App. Ex. 3.* Furthermore, Plaintiff's reporting of this isolated incident certainly was a matter of concern to OCY and would have been a matter of concern to the child's family, but the incident was not a matter of "public concern." Conley did not report an instance of widespread abuse, waste, corruption or breach of the public trust. She simply reported an isolated incident which she deemed inappropriate. Importantly, Conley must not have believed that the incident was important, as she failed to even mention it in the report she prepared regarding the June 9, 2004 visit involving the child and PW. *See, Dates of Contact/Safety Assessment and Plans, App. Ex. 5.*

Furthermore, First Amendment protection extends to a public employee's speech when she speaks as a citizen on a matter of public concern, but does not extend to speech made in the course of acting as a public employee. *Thomson v. Scheid*, 977 F.2d 1017, 1020 (6th Cir. 1992), citing *Connick v. Myers*, 461 U.S. 138, 147 (1983). "Not all matters discussed within a government office are a public concern, and thus internal office communication does not necessarily give rise to a constitutional claim." *Id.* In the case at bar, Plaintiff's reporting of her observations involving the minor child was a requirement of her public employment, not performed as a citizen speaking out on issues of public importance. She was simply reporting a co-worker, not the County government.

Plaintiff's testimony on July 28, 2004 also did not touch upon issues of public importance. Rather, her testimony addressed standard internal OCY policy which the Plaintiff agreed was appropriate. During her deposition in this case, the Plaintiff acknowledged testimony which she provided at the July 28, 2004 hearing, wherein she admitted that modification of her court summaries was standard practice and that she was not qualified to express opinions within those court summaries. The Plaintiff testified on July 28, 2004 as follows:

> Q.   Your supervisor, of course, has the right to supervise what actually goes to the court; is that right?
>
> A.   Yes, sir, and correct my court summary. That's the procedure.
>
> Q.   In terms of her ability to make an accurate alteration of your direct observations of the visitation, did Miss Deveney actually participate in visitation on any occasions?
>
> A.   No. There's been a couple instances where she's come in for maybe a minute or so to tell me something. But to actually sit down and observe, no, not in the nine months that I did the visits. She's come in and talked to me a couple times, but - -
>
> Q.   Did she give you any other policy directives regarding how your reports are to be written or how you are to assess?
>
> A.   I'm supposed to submit them in an attachment to e-mail. I have an original directive from Miss Deveney that I'm to send all court summaries

to her in word attachment so they can be corrected in the event that I'm not there.

Q.    Did she ever say anything to you about - - the nature of your opinions, whether they were accurate or whether she wanted them to be the agency's opinions?

A.    Well, essentially I think it was agreed upon that in my capacity I'm not really qualified.  I'm not educated in social services.  My education is through something else, and it's not really my role to issue opinions or judgments against the families that I work with…My job simply and humbly is to facilitate visits and to make documentations of the observations that I have.  So really my opinion in any case is - - really has no weight.  That's just the nature of my position at Children's Services.

Q.    How long have you been with Children's Services?

A.    It will be four years in September.

Q.    Have you prepared a lot of these reports and testified in a lot of hearings?

A.    I have - - yes, I have to submit reports for all my cases.

Q.    Have you rendered opinions regarding the quality of parenting in those reports and been permitted to testify and encouraged to testify to those?

A.    Yes, sir.

Q.    What was different about this case if you can tell?

A.    Well, just that I'm reminded of my position at OCY that I'm not qualified to have an opinion or to necessarily state those opinions.  It's my job to facilitate.

*See, Transcript of Hearing Testimony of Abby Conley dated July 28, 2004, pp. 79-81, App. Ex. 6. See also, Deposition of Abby Conley at pp. 255-256, App. Ex. 4.*

Plaintiff's testimony on July 28, 2004 certainly did not touch upon matters of public importance or bring to light actual or potential wrongdoing or breach of the public trust.  Plaintiff simply testified regarding standard OCY operating procedure and agreed that she was not qualified to render opinions, as she was not educated in social services.  She agreed that her job was merely to facilitate, not to render opinions.  Furthermore, the Plaintiff's testimony was delivered in the course of acting as a public employee, not as a citizen expressing her opinions on matters of public concern.  Undeniably, the conduct of OCY in editing Conley's reports was not unlawful, immoral, unethical or inappropriate, and absolutely no repercussions to OCY did or

14

could have occurred as a result of such conduct. Therefore, Plaintiff's speech was not protected by the First Amendment.

## B.    PLAINTIFF'S CLAIMS FOR VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW MUST BE DISMISSED.

### 1.    Plaintiff's Alleged Reporting Was Not Made in "Good Faith" as Required By the Pennsylvania Whistleblower Law.

In order for an employee to succeed on a claim under the Pennsylvania Whistleblower Law, she must show not only that she filed a good faith report of wrongdoing, but also must establish by concrete facts or surrounding circumstances that the report led to the termination of her employment. *Cipriani v. Lycoming Cty. Housing Auth.,* 177 F. Supp. 2d, 303, 329 (M.D. Pa. 2001). "The plain intent of the law is to protect from retaliation employees who make good-faith efforts to alert authorities to governmental waste and wrongdoing". *Rodgers v. Pa. Dept. of Corrections,* 659 A.2d 63, 66 (Pa. Commw. 1995). Evidence of animosity between the Plaintiff and the individual whom the Plaintiff reports compromises any finding that the Plaintiff's complaints were made in "good faith" under the Whistleblower Law. *See, Cipriani,* 177 F. Supp. 2d at 331.

In the case at bar, the numerous series of emails between Abby Conley and Deanna Cosby, as well as the Department of Public Welfare reports, clearly indicate that Abby Conley had complete disdain for her co-worker, PW, and for her supervisor, Sue Deveney. Her emails further reflect disdain for OCY in general. Plaintiff's emails of June 4, 2002, encouraging Cosby to release information regarding the prognostic detention order clearly indicate that Conley was attempting to undermine OCY. Her interaction with Deanna Cosby, who referred to Sue Deveney as a "nosey, miserable, busy body, who could stand a hard slap in the face," is further evidence of her disdain. Conley's participation in these communications and her continued feeding of information to Cosby, as well as her attempt to undermine the efforts of OCY with

respect to the prognostic detention order, absolutely indicate that Plaintiff did not express any information regarding Deveney or OCY in "good faith." Conley's email of July 12, 2004 to Pam Biroscak, clearly reflects her dislike of Sue Deveney. Also, during the investigation into Plaintiff's claims regarding PW, she referred to PW as a "sick person, that she maligns families, is demonic, inhumane and shows no dignity when working with these families...." *See, Deposition of Shara Saveikis, pp. 79, 101-102, App. Ex. 3.* If these comments do not demonstrate the absence of good faith, nothing does.

Conley's disdain for OCY is also reflected in Conley's e-mails to Deanna Cosby dated May 25, 2004, wherein Conley informed Cosby of the drowning death of a child, whom Conley believed to have been in the care of OCY. In the e-mail, Conley stated, "another one of our kids died." Although Conley was wrong, because the child was not in the care of OCY, she demonstrated a complete disregard for any confidentiality requirements and a complete callousness towards the death of the child. She then informed Cosby that she was told by Sue Deveney that no one was to find out about the "kid drowning." Cosby then indicated that she was calling the "times newspaper" about the incident. In response, Abby Conley indicated, "You made me laugh out loud." In response, Deanna Cosby stated, "i'm dead serious no pun intended." Finally, in response, Conley stated, "I double dog dare you. Ed Palattella is the reporter that has run all the stories." Cosby responded by stating "abby stop it you know i don't like ecocy an i would do **ANYTHING** to see it go down in flames!!!!!" (Emphasis added.) *See, emails dated May 24 and 25, 2004, App. Ex. 12.* Unquestionably, the evidence produced during discovery reflects that Abby Conley's reports regarding PW and Sue Deveney were not made in "good faith." Accordingly, Plaintiff's Whistleblower claims should be dismissed.

**2.**    **Plaintiff's Claim for Violation of the Pennsylvania Whistleblower Law Must Be Dismissed, as Plaintiff Cannot Demonstrate That Her Discharge Was Motivated By Her Claims Against PW or Testimony on July 28, 2004 and That the Activity She Reported Constituted "Wrongdoing."**

As set forth earlier in this Brief, the Plaintiff can produce absolutely no evidence that her reporting of PW or her testimony regarding the modification of her Court Summaries by Sue Deveney formed the basis of her requested resignation. Therefore, her Whistleblower claim must be dismissed. *See, Cipriani*, 177 F. Supp. 2d at 329.

Additionally, pursuant to 43 P.S. § 1422, "wrongdoing" is defined as follows:

A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer.

In *Riggio v. Burns*, 711 A.2d 497 (Pa. Super. 1998), the plaintiff alleged she was terminated due to her opposition to the absence of supervising surgeons during procedures in which residents were placing depth electrodes in or over epilepsy patients' brains. *Riggio*, 711 A.2d at 498. The plaintiff asserted a claim for violation of the Pennsylvania Whistleblower Law. In support of her argument, the plaintiff cited to two statutes which set forth minimum licensing standards for health care facilities and established licensing standards for medical practitioners.

The Pennsylvania Superior Court held that "the regulatory statutes cited by Appellants are entirely too general and vague to permit the conclusion that a violation had occurred amounting to "wrongdoing" under the Whistleblower Law." *Id.* at 501. Furthermore, the Court held that assuming that the physicians' activity constituted negligence or incompetence, the plaintiff was prohibited from seeking protection under the Whistleblower Law, as "wrongdoing" does not encompass "tort principles unless a statute, regulation or code of conduct or ethics is violated by the tortuous act or omission." *Id.* Although the plaintiff had validity in her argument that the licensing statutes provided proof that the physicians' conduct was violative of such

statutes, the licensing statutes at issue were of no assistance as they lacked specificity as to which acts were proscribed. *Id.* at 502. Accordingly, the Pennsylvania Superior Court dismissed the plaintiff's Whistleblower Law claim as she failed to prove "wrongdoing" as required by the statute. *Id.*

Here, Plaintiff filed a report with an OCY supervisor detailing her alleged observation that PW forcefully grabbed a child by the face, shaking it in a left to right motion. A Department of Public Welfare investigation determined that the allegations made by Plaintiff were unfounded. When questioned about the results of the investigation, Plaintiff indicated that the events surrounding the incident did not violate any federal or state statute or regulation, and acknowledged that the incident did not involve physical abuse. *See, Abby Conley Deposition Transcript pp. 344-347, 353-354, App. Ex. 4.*

Furthermore, the alteration of court summaries does not meet the standard for "wrongdoing" as defined by the statute. Internal policies relating to the information which is appropriately included in a court summary are not dictated by statute, regulation or code of conduct. There was nothing inappropriate about the revisions to Plaintiff's court summary. As such, Plaintiff cannot demonstrate that she reported "wrongdoing" to invoke the remedies of the Whistleblower Law, and her claims must be dismissed.

**C.    PLAINTIFF'S CLAIM FOR WRONGFUL DISCHARGE AGAINST ONORATO MUST BE DISMISSED, AS ONORATO WAS NOT HER EMPLOYER, DID NOT DISCHARGE HER, AND PLAINTIFF WAS A MEMBER OF A UNION PROTECTED BY A COLLECTIVE BARGAINING AGREEMENT.**

In *Geary v. United States Steel Corp.*, 319 A.2d 174 (1974), the Pennsylvania Supreme Court established an exception to the at-will employment doctrine, allowing a plaintiff to sue her employer where her discharge violates clear mandates of public policy. In *Phillips v. Babcock & Wilcox*, 503 A.2d 36 (Pa. Super. 1986), the Plaintiff attempted to extend the coverage of this

judicially created protection and declare the cause of action available to union employees who were otherwise protected from wrongful discharge by collective bargaining agreements. Analyzing the Supreme Court's decision in *Geary*, the Superior Court in *Phillips* held that the purpose of *Geary* was to provide a remedy for employees with no other recourse against wrongful discharge.  In holding that a union employee has no right to sue her employer for wrongful discharge, the Superior Court stated:

> Furthermore, we are not persuaded by appellant's argument that the wrongfully discharged at-will employee has greater remedies available in a civil action than does a union employee under a collective bargaining agreement since a civil court could award punitive damages.  While the at-will employee may be entitled to punitive damages in a civil action, he does not have the ability to obtain some of the remedies available to union members; such as reinstatement to his position, which is a commonly provided remedy in labor agreements.  Thus, we find that a difference in remedies is not enough to justify an extension of the coverage of the wrongful discharge action.

> Finally, in deciding not to extend the wrongful discharge action to employees who are otherwise protected by contract or statute, we must take into consideration the strong public policy which favors the right of parties to enter into contracts.  In the instant case, the union and appellee in their agreement decided the remedies that would be available, and provided that those remedies would be final and binding.  This intent is expressly set forth in the agreement and, therefore, the remedies available should be preclusive of any others.  *Aughenbaugh v. North American Refractories Co.*, 426 Pa. 211, 231 A.2d 173 (1967).

> Therefore, because the wrongful discharge action in Pennsylvania was judicially created to protect otherwise unprotected employees from indiscriminate discharge and to provide unorganized workers a legal redress against improper actions by their employers, we hold that an action for the tort of wrongful discharge is available only when the employment relationship is at-will.  *Geary, supra.*

*Phillips*, 503 A.2d at 37-38 (footnotes omitted).

In the case at bar, to the extent Abby Conley could have a potential wrongful discharge claim against her employer, she cannot maintain a wrongful discharge claim against John Onorato.   Mr. Onorato was not Conley's employer at the time of her separation from employment.  He was the Solicitor for Erie County.  Furthermore, Plaintiff is required to

demonstrate that her discharge from employment somehow violates public policy. *See, Geary, supra.* As set forth at length above, the Plaintiff cannot demonstrate that the reasons for her discharge violate public policy. Finally, Plaintiff was not an at-will employee, as she was a member of The American Federation of State, County and Municipal Employees, AFL-CIO, and has filed a union grievance. On the Grievance Form submitted on behalf of Abby Conley, the union indicated that her "constructive discharge" was a "clear violation of Article 22, Section 22.1" which states that the employer "shall not demote, suspend, discharge or take disciplinary action against any employee without just cause . . ." *See, Grievance Form dated September 24, 2004, App. Ex. 26.*

Accordingly, for the number of reasons identified above, Plaintiff's claims for wrongful discharge against Onorato must be dismissed.

**D.    JOHN ONORATO, ESQ. IS ABSOLUTELY IMMUNE FROM LIABLITY FOR PLAINTIFF'S CLAIMS OF DEFAMATION, AS HE IS A "HIGH PUBLIC OFFICIAL."**

Under Pennsylvania law, "the doctrine of high public official immunity is an unlimited privilege that exempts high public officials from lawsuits for defamation provided the statements made by the official are made in the course of his official duties and within the scope of his authority." *See, McErlean v. Borough of Darby*, 157 F.Supp. 2d 441, 446 (E.D. Pa. 2001). The doctrine of absolute immunity for high public officials "rests upon...the idea that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of the uncompensated harm to the plaintiff's reputation." *Lindner v. Mollan,* 677 A.2d 1194, 1195 (1996). Whether a person is a high public official depends on "the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions."

*Lindner,* 677 A.2d at 1198, citing, *Montgomery v. City of Philadelphia,* 140 A.2d 100, 102 (Pa. 1958).

In *Lindner*, the mayor stated to the councilman-plaintiff, "...and I'll say it right to your face; you're the village idiot...you've been dipping into the till. I know for a fact. And I know you know." *Lindner,* 677 A.2d. at 1195. A local television station was videotaping the meeting and members of the print media and general public were also in attendance at the council meeting. The Pennsylvania Supreme Court affirmed the Commonwealth Court's decision granting the mayor absolute immunity for the statements he made at the borough council meeting. *Id.* at 1199.

Importantly, County attorneys have been held to the status of "high public official." The Superior Court of Pennsylvania has held that a county district attorney was afforded the status of "high public official" when sued for statements he made to a local newspaper regarding a pending investigation. In *Mosley v. Observer Publishing Company, et.al.*, 619 A.2d 343 (Pa.Super. 1993), the Greene County district attorney was named in a defamation suit subsequent to the publication of two newspaper articles detailing investigations by the district attorney's office into alleged kickbacks from investment promoters to Greene County officials. The article indicated that one of the sources of information was the defendant district attorney.

The district attorney filed preliminary objections in the nature of a demurrer. The preliminary objections were granted and he was dismissed from the action. On appeal, the Superior Court agreed with the trial court that the district attorney was afforded immunity for the statements made to the press. The Court, quoting Judge Spaulding's opinion in *McCormick v. Specter*, 275 A.2d 688 (Pa.Super. 1971), stated:

> Absolute privilege, as its name implies, is unlimited, and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements on actions motivated by malice, *provided the statements*

*are made or the actions are taken in the course of the official's duties or powers
and within the scope of his authority or as it [is] sometimes expressed, within his
jurisdiction. . . Our Supreme Court has never enunciated any test or standard to
determine when a "high public official" is acting within the scope of his "official
duties." Here, we find that appellee's press conference was a proper undertaking
of that office on the basis that the responsible performance of the District
Attorney's office warrants his informing the public of matters pending in that
office.*

*Mosley*, 619 A.2d at 346 (citations omitted).

In the instant matter, John Onorato, as County Solicitor, is afforded the status of a "high

public official." The January 17, 2005, article published in the *Erie Times* discussed the

County's legal bills as they related to the costs associated with defending the County's interests

in the action initiated by Conley before the Civil Service Commission. Onorato is quoted in the

article as stating, "the county has 'mounted a vigorous defense' against Conley because of her

'egregious breach of confidentiality' regarding the court order." *See, Erie Times News article

dated January 17, 2005, App. Ex. 23.* The article continues, "'In essence,' Onorato said of the

$56,371 legal bill, 'the fee was being spent in the defense of children.'" *Id.*

Onorato's comments contained in the article were made in the course of his duties or

powers and within the scope of his authority. As the County Solicitor, Onorato was responsible

for and required to explain legal fees incurred during litigation. Without a doubt, the statements

made by Onorato were closely related to his official duties, and Onorato is entitled to absolute

immunity.

**E.   AS A PUBLIC FIGURE, PLAINTIFF CANNOT MEET THE BURDEN OF
PROVING ACTUAL MALICE TO SUSTAIN HER DEFAMATION CLAIM
AGAINST ONORATO, IN PART BECAUSE ONORATO'S STATEMENTS
WERE TRUE.**

A public figure has been defined as a person who voluntarily participates in resolution of

important public questions, seeking to influence the issues involved. *See, Gertz v. Robert Welch,

Inc.,* 418 U.S. 323, 345-346 (1974). The United States District Court for the Middle District of

Pennsylvania has defined a limited purpose public figure as "one who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Falls v. Sporting News Publishing Co.*, 714 F.Supp. 843, 845 (E.D.Mich. 1989); *Gertz, supra.* "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure." *McDowell v. Paiewonsky,* 769 F.2d 942, 949 (3rd Cir. 1985). Where an individual injects herself into the events that have become matters of public controversy, and attempts to influence the outcome of the controversy, she becomes a limited purpose public figure. *See, Medure v. New York Times Co., 60 F. Supp. 2d 477 (W.D.Pa. 1999).* In the case at bar, Plaintiff has run for public office on numerous occasions, has been a member of the Pennsylvania State Democratic Committee, the Vice Chair of the City of Erie Human Relations Commission, and has "spoken publicly on numerous issues, including utility rates, Congressional pay raises, cuts in Medicaid and Medicare" and has been involved in speaking with the press on numerous occasions throughout her adult life. *See, Concise Statement of Materials Facts in Support of Summary Judgment at ¶¶ 60-65.* Plaintiff is a public figure. She is at least a limited purpose public figure for purposes of this case. Her attorney commented on a number of occasions to the *Erie Times News* regarding the controversy concerning her employment, which was the topic of numerous news articles printed in 2004 and 2005. She was the specific subject of numerous articles, and authorized her attorney to comment to the press on her behalf. *Id.* As such, Plaintiff must prove actual malice on the part of John Onorato in order to pursue a defamation claim.

In *Manning v. WPXI, Inc.*, 886 A.2d 1137 (Pa. Super. 2005), the Superior Court of Pennsylvania recently addressed the requirement that a public figure prove actual malice in order to pursue a defamation claim. In holding that the actual malice standard is a vigorous, if not impossible, burden to meet in most circumstances, the Superior Court stated:

The actual malice standard is "a rigorous, if not impossible, burden to meet in most circumstances." *See Weaver v. Lancaster Newspapers In.*, 875 A.2d 1093, 1103 (Pa.Super.2005) (McCaffery, J., concurring). Indeed, the actual malice standard "goes so far as to forbid imposition of liability even in those instances where the defendant negligently publishes false, defamatory statements about a public figure or public official." *Norton v. Glenn*, 580 Pa. 212, 860 A.2d 48, 56 (2004).

The actual malice standard "is a constitutionally mandated safeguard, and, as such, must be proven by clear and convincing evidence, the highest standard of proof for civil claims." *Lewis*, 833 A.2d at 192. this standard requires evidence "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance of the truth of the precise facts in issue." *Matter of Braig*, 520 Pa. 409, 554 A.2d 493, 495 (1989). If the plaintiff in a defamation case fails to put forth evidence sufficient to support a finding of actual malice, the trial court may grant summary judgment in favor of the defendant. *See Weaver*, 875 A.2d at 1102.

To establish actual malice, there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Curran v. Philadelphia Newspapers, Inc.*, 376 Pa.Super. 508, 546 A.2d 639, 643 (1988) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). "Failure to investigate, without more, will not support a finding of actual malice, nor will ill will or a desire to increase profits." *Fitzpatrick v. Philadelphia Newspapers, Inc.*, 389 Pa.Super. 438, 567 A.2d 684, 688 (1989) (citing *St. Amant*, 390 U.S. 727, 88 S.Ct. 1323, 20L.Ed.2d 262). The fact that Appellees could have employed a higher degree of journalistic responsibility does not constitute actual malice. *Se, Lewis*, 833 A.2d at 192. "Mere negligence or carelessness is not evidence of actual malice or malice in fact." *Curran*, 546 A.2d at 645 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 283, n. 24, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

*Manning*, 86 A.2d at 1143-1144.

Clearly, Plaintiff cannot meet this "rigorous, if not impossible, burden" of proving actual malice against Onorato. The statements attributable to Onorato in Plaintiff's Complaint that Conley had committed "an egregious breach of confidentiality" and that the large bill was justified "in defense of the children" were absolutely true. The e-mails appended to Onorato's Motion for Summary Judgment undeniably reflect an egregious breach of confidentiality with respect to the VW case and that the breach of confidentiality absolutely posed a potential danger to an unborn child. The County's defense of Conley's civil service appeal was absolutely

justified "in defense of the children" because Conley posed a threat to children by breaching confidentiality. If the statements attributed to Onorato were true, he cannot be held liable for defamation, whether or not Conley is a public figure. On the other hand, even if the statements were false, the Plaintiff can present absolutely no evidence to permit the conclusion that Onorato entertained serious doubts as to the truth of his publication. Anyone who reviewed the e-mails exchanged between Abby Conley and Deanna Cosby would have come to the same conclusion as John Onorato in determining that Conley had committed an egregious breach of confidentiality and that defense of the civil service appeal was justified in defense of the children. As such, Plaintiff cannot prove actual malice by clear and convincing evidence, or by any less burdensome standard of proof for that matter. Accordingly, her claims for defamation must be dismissed.

## IV.  CONCLUSION

Defendant John A. Onorato, Esquire respectfully requests this Honorable Court to dismiss all claims against him and enter judgment in his favor and against Abby B. Conley.

Respectfully submitted,

DELL MOSER LANE & LOUGHNEY, LLC

By _____
Mark R. Lane, Esquire
Pa. I.D. No. 61923
Attorneys for John A. Onorato
525 William Penn Place; Suite 3700
Pittsburgh, PA  15219
412-471-1180

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within **Brief in Support of John A. Onorato, Esquire's Motion for Summary Judgment** have been served upon all counsel of record via Electronic Mail, this _7th_ day of April, 2006 as follows:

Anthony Angelone, Esquire
Vendetti & Vendetti
3820 Liberty Street
Erie, PA 16509
*Counsel for Plaintiff*

Timothy D. McNair, Esquire
Law office of Timothy D. McNair
821 State Street
Erie, PA 16501
*Counsel for Plaintiff*

Edmond Joyal, Esquire
The Law Office of Joseph S. Weimer
975 Two Chatham Center
Pittsburgh, PA 15219
*Counsel for Richard Schenker, Peter Callan and Debra Liebel*
*Individual Capacity Only*

Richard A. Lanzillo, Esquire
Knox, McLaughlin, Gornall & Sennett, P.C.
120 West 10th Street
Erie, PA 16501
*Counsel for County of Erie and*
*Richard Schenker, Peter Callan and Debra Liebel*
*Official Capacity Only*


Mark R. Lane, Esquire
Attorney for Defendant,
John A. Onorato, Esquire