9135

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ABBY B. CONLEY,

Plaintiff

v.

COUNTY OF ERIE, ERIE COUNTY OFFICE OF CHILDREN AND YOUTH, a/k/a ERIE COUNTY CHILD WELFARE SERVICE, RICHARD SCHENKER, individually and in his capacity as County Executive of Erie County, Pennsylvania, PETER CALLAN, individually and in his capacity as Erie County Director of Personnel, DEBRA LIEBEL, individually and in her capacity as Executive Director, Erie County Office of Children and Youth, a/k/a Erie Child Welfare Service and JOHN A. ONORATO, ESQUIRE, individually and in his capacity as Erie County Solicitor,

Defendants

**JURY TRIAL DEMANDED**

Civil Action No.: 05-76E

The Honorable Sean J. McLaughlin

**DEFENDANT JOHN A. ONORATO, ESQUIRE'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

AND NOW comes the Defendant, John A. Onorato, Esquire, by and through his attorneys, Dell, Moser, Lane & Loughney, LLC, and Mark R. Lane, Esquire, and files the within Concise Statement of Material Facts in Support of Summary Judgment:

1. This action was filed on behalf of Abby Conley against Erie County, Erie County Office of Children and Youth, Richard Schenker, County Executive of Erie County, Peter Callan, Erie County Director of Personnel, Debra Liebel, Executive Director of the Erie County Office of Children and Youth, and John Onorato, Erie County Solicitor.

2. Plaintiff alleges that her resignation was coerced in retaliation for the exercise of her rights secured by the First and Fourteenth Amendments to the Constitution of the United States for giving truthful testimony under oath in a court proceeding and for making a good faith

report of violations of Agency policy and the criminal laws of the Commonwealth of Pennsylvania.

3. Further, Plaintiff alleges that she was subjected to defamatory statements, to the detriment of her good reputation, for reasons of personal animus. *Complaint*, ¶1.

4. The Complaint identifies violations of 42 U.S.C. §1983, conspiracy to violate 42 U.S.C. §1983, violation of the Whistleblower Law at 43 Pa. C.S. §1421 et. seq., and wrongful discharge.

5. The Complaint further alleges claims against Mr. Onorato, in his individual capacity, for defamation and violation of 42. U.S.C. §1983.

6. Plaintiff contends that she was constructively discharged from employment and that the Defendants were motivated in discharging her by two events.

7. First, Plaintiff contends that she reported a co-worker, PW, for grabbing a child by the face with her hand, shaking the child's face and yelling "no, no, no." *Complaint at ¶15-19.*

8. Plaintiff further alleges that the County constructively discharged her in retaliation for her testimony on July 28, 2004 before the Honorable Elizabeth Kelly in the Court of Common Pleas of Erie County, wherein she testified that a Court Summary which she had prepared in relation to a court case had been altered by her supervisor, Sue Deveney. *Complaint at ¶21-24.*

9. On Friday, September 10, 2004, the County requested Plaintiff's resignation, and Plaintiff resigned from employment with the County on that date. *See, Plaintiff's resignation letter dated September 10, 2004, Appendix Exhibit 1.*

10. With respect to Plaintiff's allegations against her co-worker, PW, the allegations were investigated by the Commonwealth of Pennsylvania, Department of Public Welfare. Upon conclusion of its investigation, the Department of Public Welfare determined that the Plaintiff's claims were "unfounded," and expressed concerns with the demeanor and judgment of the Plaintiff. *See, Commonwealth of Pa., Dept. of Public Welfare letters dated July 2, 2004 and August 30, 2004, Appendix Exhibit 2.*

11. In a letter of August 30, 2004, Shara B. Saveikis, Regional Program Representative for the Department of Public Welfare, indicated that although the alleged maltreatment occurred on June 9, 2004, it was not reported by Ms. Conley until June 21, 2004. Ms. Saveikis stated that "during the interview with Ms. Conley, her explanation of the delay in reporting did not correspond with her expressed concern of the severity of maltreatment." *See, Commonwealth of Pa., Dept. of Public Welfare letters dated July 2, 2004 and August 30, 2004, Appendix Exhibit 2.*

12. During the Department of Public Welfare's investigation, Abby Conley referred to PW as a sick person, who maligns families, is "demonic," "inhumane" and shows no dignity when working with families. *See, Deposition of Shara Saveikis, pp. 79, 101-102, Appendix Exhibit 3.*

13. Conley further admitted that PW's conduct did not constitute abuse, and that the child suffered no injury and did not even cry. *See Deposition of Shara Saveikis, pp. 73-74, 76-77, Appendix Exhibit 3.*

14. The Plaintiff testified during her deposition in this case that although she felt that PW's grabbing the child's face was inappropriate, she did not feel that it was physical abuse. *See, Deposition of Abby Conley at p. 265, Appendix Exhibit 4.*

15. In the Dates of Contact/Safety Assessment and Plans Report dated June 9, 2004 regarding the visit involving the child and Plaintiff's co-worker, PW, the Plaintiff did not even mention the incident. *See, Dates of Contact/Safety Assessment and Plans, Appendix Exhibit 5.*

16. At the hearing of July 28, 2004, before the Honorable Elizabeth Kelly, the Plaintiff testified regarding modification of her Court Summaries, acknowledging that the modification of the Court Summaries was standard practice, and that she was not qualified to express opinions within those Court Summaries. *See, Deposition of Abby Conley dated July 28, 2004, Appendix Exhibit 4.*

The Plaintiff testified on July 28, 2004 as follows:

Q. Your supervisor, of course, has the right to supervise what actually goes to the court; is that right?

A. Yes, sir, and correct my court summary. That's the procedure.

Q. In terms of her ability to make an accurate alteration of your direct observations of the visitation, did Miss Deveney actually participate in visitation on any occasions?

A. No. There's been a couple instances where she's come in for maybe a minute or so to tell me something. But to actually sit down and observe,

9135

no, not in the nine months that I did the visits. She's come in and talked to me a couple times, but - -

Q. Did she give you any other policy directives regarding how your reports are to be written or how you are to assess?

A. I'm supposed to submit them in an attachment to e-mail. I have an original directive from Miss Deveney that I'm to send all court summaries to her in word attachment so they can be corrected in the event that I'm not there.

Q. Did she ever say anything to you about - - the nature of your opinions, whether they were accurate or whether she wanted them to be the agency's opinions?

A. Well, essentially I think it was agreed upon that in my capacity I'm not really qualified. I'm not educated in social services. My education is through something else, and it's not really my role to issue opinions or judgments against the families that I work with…My job simply and humbly is to facilitate visits and to make documentations of the observations that I have. So really my opinion in any case is - - really has no weight. That's just the nature of my position at Children's Services.

Q. How long have you been with Children's Services?

A. It will be four years in September.

Q. Have you prepared a lot of these reports and testified in a lot of hearings?

A. I have - - yes, I have to submit reports for all my cases.

Q. Have you rendered opinions regarding the quality of parenting in those reports and been permitted to testify and encouraged to testify to those?

A. Yes, sir.

Q. What was different about this case if you can tell?

A. Well, just that I'm reminded of my position at OCY that I'm not qualified to have an opinion or to necessarily state those opinions. It's my job to facilitate.

*See, Transcript of Hearing Testimony of Abby Conley dated July 28, 2004, pp. 78-81, Appendix Exhibit 6. See Also, Deposition of Abby Conley at pp. 255-256, Appendix Exhibit 4.*

17. Plaintiff's reporting of her co-worker, PW, was done in the course of acting as a public employee, not as a citizen expressing her opinions on matters of public concern.

18. Plaintiff's testimony of July 28, 2004, was delivered in the course of acting as a public employee, not as a citizen expressing her opinion on matters of public concern.

19. Plaintiff's reporting of PW to her superiors was not a report of conduct which was unlawful, corrupt, wasteful or abusive.

20. Plaintiff's testimony regarding modification of her draft court summaries did not present speech that in any way implicated the County as engaging in improper, unlawful or unethical conduct.

21. Debra Liebel, former executive director of the Office of Children and Youth, testified by deposition in this case, that in July, 2004, attorney Allgeier, had expressed concerns about Abby Conley breaching confidentiality by emailing a former employee. *See, Deposition of Debra Liebel, pp. 6, 31, Appendix Exhibit 7.* Additionally, attorney Michael Cauley, Solicitor for the Office of Children and Youth, also brought concerns to the attention of Debra Liebel regarding the release by Abby Conley of confidential information to an opposing attorney. *See, Transcript of Debra Liebel pp. 37-38, Appendix Exhibit 7.*

22. As a result of the concerns regarding confidentiality, an investigation was performed into emails transmitted to and from the computer of Abby Conley. The emails were retrieved by Matt Granger. *See deposition of Debra Liebel p. 46, Appendix Exhibit 7.*

23. As a result of the investigation, Michael Cauley learned that Abby Conley had emailed Deanna Cosby about the case of VW and indicated to Cosby that there was a prognostic

detention order that was in effect at all of the hospitals that VW was not aware of. She encouraged Deanne Cosby to inform VW of the existence of the prognostic detention order, significantly breaching confidentiality and placing a child at risk. *See, Deposition of Debra Liebel pp. 56-57, Appendix Exhibit 7.*

24. Furthermore, Conley engaged in a gleeful exchange with Cosby regarding the drowning death of a child, whom Conley believed to have been in OCY care at the time of his death. The email was misinformed, as the child was not in OCY care, but Conley breached confidentiality by releasing the information. She further encouraged the release of the information to Ed Palattella of the *Erie Times News* and showed no remorse about the incident whatsoever. *See, Deposition of Debra Liebel pp. 85-86, Appendix Exhibit 7.*

25. The main issue in requiring the Plaintiff's resignation was the breach of confidentiality and putting a child in danger. *See, Deposition of Debra Liebel p. 115, Appendix Exhibit 7.*

26. Plaintiff's reporting of the PW incident to Sue Deveney had nothing to do with Plaintiff's separation from employment. *See, Deposition of Debra Liebel p. 117, Appendix Exhibit 7.*

27. Plaintiff's testimony on July 28, 2004, before Judge Kelly also had nothing to do with her separation from employment. *See, Deposition of Debra Liebel pp. 122-123, Appendix Exhibit 7.*

28. In a memorandum from Michael Cauley, Esquire to John Onorato, Esquire, dated August 20, 2004, Attorney Cauley set forth a summary of major violations of the Confidentiality Policy, Computer Use Policy, and Employee Work and Conduct

Responsibilities as specifically outlined in the Erie County Government Employee Handbook, as committed by Abby Conley and determined by the County's investigation. *See, Deposition of Michael Cauley, p. 84, Appendix Exhibit 8, and August 20, 2004 memorandum from Michael Cauley, Esquire to John Onorato, Esquire, Appendix Exhibit 9.*

29. In his memorandum to Mr. Onorato, Michael Cauley cited and attached copies of the agency policies requiring confidentiality, prohibiting disruptive and discourteous conduct toward other employees, and prohibiting the reporting of false or derogatory information which may injure the name or reputation of another employee. *See, August 20, 2004 memorandum from Michael Cauley, Esquire to John Onorato, Esquire, Appendix Exhibit 9.*

30. Mr. Cauley also attached to his memorandum to Mr. Onorato a number of emails and other documentation demonstrating Plaintiff's egregious breach of confidentiality. *See, August 20, 2004 memorandum from Michael Cauley, Esquire to John Onorato, Esquire, Appendix Exhibit 9.*

31. During OCY's Investigation, a number of emails between Abby Conley and Deanna Cosby were uncovered, which revealed that Abby Conley had, in fact, been communicating confidential client and case information to Deanna Cosby of an extremely sensitive nature, jeopardizing the mission of OCY and the safety of the children it was attempting to protect. *See, Deposition of Debra Liebel, Appendix Exhibit 7, and Deposition of Michael Cauley, Appendix Exhibit 8.*

32. On May 4, 2004, Abby Conley emailed a copy of her draft Court Summary, which was the subject of the July 28, 2004 hearing, to her private email account at abby@ilovejesus.net. *See, emails from Abby Conley to herself dated May 4, 2004, Appendix Exhibit 10.*

33. On May 21, 2004, Abby Conley emailed Deanna Cosby stating that "one of our kids was beaten to death." She further proclaimed that "OCY is in trouble!" In response, Deanna Cosby indicated that she had read the article and that OCY was not implicated at all. However, she further stated that OCY "always passes the buck an [sic] even if they are not responsible i bet someone is preparing a lie just in case or have someone they could blame it on." Abby Conley then indicated that she was sending a copy of the story to Deanna Cosby. *See, email exchange between Abby Conley and Deanna Cosby dated May 21, 2004, Appendix Exhibit 11.*

34. In a series of emails dated May 24, 2004 and May 25, 2004, Abby Conley and Deanna Cosby callously discussed the drowning death of a child, and Abby Conley encouraged Deanna Cosby to call the *Erie Times* newspaper to inform them of information related to the event. In this series of emails, Deanna Cosby stated to Abby Conley "abby stop it you know i don't like ecocy an i would do ANYTHING to see it <u>go down in flames</u>!!!!!" *See, series of emails between Abby Conley and Deanna Cosby dated May 24, 2004 through May 25, 2004 (emphasis added), Appendix Exhibit 12.*

35. In an email dated May 27, 2004, Abby Conley advised Deanna Cosby as follows:

> Deanna, [V's] attorney wants you to call her the number is 814-868-8541. The attorney's name is Amy Jones. [V] asked me to ask if you would do this.

*See, email exchange between Abby Conley and Deanna Cosby dated May 27, 2004, Appendix Exhibit 13.*

36. In another series of emails dated June 4, 2004 through June 7, 2004, Abby Conley released information to Deanna Cosby, which was of a highly sensitive and confidential nature, which undermined OCY's mission and which potentially jeopardized the well being of an unborn child. Furthermore, the emails make it perfectly clear that Abby Conley was

intentionally attempting to undermine OCY. The exchange on June 4, 2004 and June 7, 2004 appears as follows:

From Deanna Cosby: "did you call my cell last night"

From Abby Conley: "Yes I did, I REALLY wanted to tell you something! I'll talk to you this weekend! I don't trust this email system (monitored).

From Deanna Cosby: "Can someone say ..... "paranoid"

From Abby Conley: "Paranoid!"

From Deanna Cosby: "w/justification"

From Abby Conley: "I have learned not to trust! Zin, the new girl is awesome. She is Christian, normal, and believes in empowerment. God sent her to this unit. I can tell she is going to be one of us!"

From Deanna Cosby: "I know Zin tell her I said hi. She goes to my old church Greater Calvery and she is also recently married. If she doesn't remember me tell her Rosy's niece Deanna said hi."

From Abby Conley: "Okay!"

From Deanna Cosby: "Is there anyone i don't know"

From Abby Conley: "No Miss ThanG!"

From Deanna Cosby: "Do you think i'm wrong for wanting to help vw?"

From Abby Conley: No, I want you to help her. I'm crushed by what is going to happen. Its just not right Deanna."

From Deanna Cosby: "I'm not if you personally think it's right or maybe i am but from a christian stand point"

From Abby Conley: "When you we're talking about Esther today, I though about what you said. I think too even though things look bad, and God can make things right, I often think sometimes God expects us to do what's right. Facts are this: **[PW] has severe mental health issues, Sue does not have the professional aptitude to make the call that she has on VW. In fact these two ladies are taking it upon them self to play god.** I sit on my hands, while I know what their doing is wrong. Who's sin is greater, theirs or mine?"

From Deanna Cosby: "You know I'm not in any position to judge who's sin is greater I don't even believe I can weigh it that way aren't all sins equal in the eyes of the Lord? What you're doing is not a sin because you did speak up, several times in vw's defense but what I'm asking is in your christian experience would I be wrong if i tried to help"

From Abby Conley: "Your in a better position then I!"

From Deanna Cosby: "there is a new kinship policy that was issued in 12/03 that i remember and might still have a copy of to forward it to the att. it states that the cw can do an "eyeball" check rather than the home study rather than place the baby in foster care but i remember when I tried to do that and had the documentation to back it up sue wouldn't let me so i'm going to tell vw's att about it."

From Abby Conley: **"I just spoke to Vickie last night, she was not in labor. Her attorney told Vickie that she has nothing to worry about when it comes to the unborn child. She told Vickie that we (OCY) cannot detain. Vickie is taking her attorney advice, she is due any day. [PW] has detention letters at all the local hospitals. Vickie does not see this coming."**

From Deanna Cosby: **"she will"**

From Abby Conley: **"God Bless you Deanna!** We are in the paper again today, and in the letter to the Editor."

From Deanna Cosby: **"thanks, but for what"**

From Abby Conley: **"You said (she will) VW"**

*See, Series of emails between Abby Conley and Deanna Cosby dated June 4, 2004 and June 7, 2004 (emphasis added), Appendix Exhibit 14.*

37. The series of emails identified above from June 4, 2004 and June 7, 2004, clearly indicates that Abby Conley encouraged Deanna Cosby to inform [VW's] attorney that detention letters had been issued to all the local hospitals. Abby's Conley contention that it was public knowledge that detention letters had been or would be issued is directly contradicted by her own email to Deanna Cosby indicating that [W's] attorney told her that OCY could not detain the baby and that Vickie "does not see this coming."

38. On June 11, 2004, Abby Conley advised Deanna Cosby that she "had some problems." Specifically, Abby Conley indicated to Deanna Cosby that Sue Deveney had called Ms. Conley into her office and told her that someone from Conley's unit had sent client information over the email system. Specifically, Abby Conley stated as follows:

> I have had some problems. Sue called me into her office and said it came to her attention that someone from her unit had sent out client information over the email system to a secondary email outside of this office.

*See, email from Abby Conley to Deanna Cosby dated June 11, 2004, Appendix Exhibit 15.*

39. In response to Plaintiff's advising Deanna Cosby of her discussion with Sue Deveney, Ms Cosby referred to Ms. Deveney as a "nosy, miserable, busy body, who could stand a hard slap in the face." Ms. Cosby further stated in her email "well both of them could. But I'm ok w/the fact that life smacks them in the face daily. Tra La." *See, series of emails between Abby Conley and Deanna Cosby dated June 11, 2004, Appendix Exhibit 15.*

40. In response to Deanna Cosby's literary assault on Sue Deveney, Abby Conley responded, "CALL ME!!!!" *See, series of emails between Abby Conley and Deanna Cosby dated June 11, 2004, attached hereto as Exhibit 15.*

41. In another email dated June 11, 2004 from Abby Conley to Deanna Cosby, Abby Conley acknowledged that her emails regarding VW's attorney were sensitive in nature when she stated:

> I knew she was not telling the truth, I noticed Michele Shetter looking at my email (it was opened to my deleted file) it shows just subject line and from information. I know she saw an email about WV's attorney.

*See, email from Abby Conley to Deanna Cosby dated June 11, 2004, Appendix Exhibit 16.*

42. Shortly after Deanna Cosby read Abby Conley's email referenced in the preceding paragraph, Cosby sent to Conley an email with a subject line that read "I have spoke to

an attorney re: you inquiry re: the email system a ecocy." *See, email from Deanna Cosby to Abby Conley dated June 11, 2004 (10:15 a.m.), Appendix Exhibit 17.*

43. Then, also on June 11, 2004, Abby Conley engaged in a fraudulent campaign of fake email exchanges with a fictitious individual in order to dissuade anyone from reviewing the emails she had been exchanging with Deanna Cosby. *Appendix Exhibit 18.*

44. In four (4) emails dated June 11, 2004, Abby Conley fraudulently made it appear as though she exchanged information with an attorney by the name of Mike Fisher. *See, Deposition of Abby Conley at pp. 231-238, Appendix Exhibit 4.*

45. Abby Conley acknowledged during her deposition that Mike Fisher was a figure of her imagination and that she was actually emailing herself at an address which she registered on the internet as an email address for the fictitious Mike Fisher. *See, Deposition of Abby Conley at pp. 231-233, Appendix Exhibit 4.*

46. In an email dated June 11, 2004, Abby Conley attempted to make it appear as though she received an email from an Attorney Mike Fisher regarding a co-worker reading her email. The text of the email message was "get back to me on last name." *See, emails dated June 11, 2004 between Attorney Mike Fisher and Abby Conley, Appendix Exhibit 18.*

47. In another email dated June 11, 2004, the fictitious Mike Fisher, who was actually Abby Conley emailing herself, stated "Reading your email – taking it out of context – false reporting is against the law. You know you can count on me! Lets take them to court! What is Michele's last name?" *See, emails dated June 11, 2004 between Attorney Mike Fisher and Abby Conley, Appendix Exhibit 18.*

48. In a third purported email from fictitious Attorney Mike Fisher to Abby Conley, the fictitious Attorney Fisher stated "Do not take your supervisors advice, she does not sound

very bright! OK, I'll call tonight! What is your home email?" *See, emails dated June 11, 2004 between Attorney Mike Fisher and Abby Conley, Appendix Exhibit 18.*

49. In the fourth email, Plaintiff's subject line from the fictitious Mike Fisher said, "What is Michele's last name?" *See, emails dated June 11, 2004 between Attorney Mike Fisher and Abby Conley, Appendix Exhibit 18.*

50. On June 28, 2004, Abby Conley exchanged emails again with Deanna Cosby. Demonstrating her attempt to smear PW and her supervisor, Sue Deveney, Conley requested that Deanna Cosby provide her with PW's ex-husband's name, and clients who could potentially speak badly of both PW and Sue Deveney. *See, email exchange between Abby Conley and Deanna Cosby dated June 28, 2004, Appendix Exhibit 19.*

51. On July 8, 2004, Abby Conley attended a meeting with her supervisor, Sue Deveney, regarding confidentiality. Sue Deveney specifically warned Abby Conley that she was required to keep agency information confidential. Sue Deveney summarized the meeting in an email dated July 9, 2004 as follows:

> Abby – This is to confirm what I said at our meeting yesterday regarding confidentiality. **It is expected that confidentiality will be maintained** regarding the recent incident in our unit. It is not to be discussed with professionals from other agencies, nor with the parents, foster parent, etc. According [sic] the directive I received from Administration, should this expectation not be followed, **sanctions will be given out accordingly.**
>
> The purpose of our meeting was to discuss this issue. I approached you because I am your Supervisor and it was my responsibility to remind you about confidentiality. As you recall, we also discussed a case you serviced in Tami Petrucelli's unit, the Casella case in great length, and my concerns about your emotional involvement at times.

*See, email from Sue Deveney to Abby Conley dated July 9, 2004 (emphasis added), Appendix Exhibit 20.*

52. On July 12, 2004, Abby Conley sent an email to Pam Biroscak, acknowledging that she had been told by Sue Deveney that she must maintain confidentiality. In the email, Abby Conley reflected her distain for both PW and Sue Deveney. She also acknowledged that she did not feel that PW "physically abused" the child. She further stated that "it is obvious to me that Ms. Deveney is doing anything in her power to find something to discredit, and harass me. I will NOT tolerate this..." *See, email from Abby Conley to Pam Biroscak dated July 12, 2004, Appendix Exhibit 21.*

53. Plaintiff's email to Pam Biroscak dated July 12, 2004, clearly demonstrates that Abby Conley's reporting of Sue Deveney on July 28, 2004, was not made in good faith.

54. On July 20, 2004, Abby Conley and Deanna Cosby engaged in another series of emails, wherein Abby Conley indicated that she had met with her supervisors for two hours. Abby Conley stated, "Oh what a mess! Wait till I tell you what they said." Abby Conley told Deanna Cosby to "Call me tonight!" The exchange of emails makes it clear that Abby Conley knew she was in trouble. *See, series of emails between Abby Conley and Deanna Cosby dated July 20, 2004, Appendix Exhibit 22.*

55. Eight days later, Abby Conley attempted to protect herself by testifying at a hearing before the Honorable Elizabeth Kelly that she was afraid of loosing her job for reporting that a draft Court Summary had been modified by her supervisor.

56. Abby Conley testified on July 28, 2004, that she feared she might lose her job as a result of her testimony, simply to protect herself, because she knew that the County would terminate her employment if and when it determined that she had committed the significant breaches of confidentiality, about which she had already been warned. *See, Transcript of Hearing Testimony of Abby Conley dated July28, 2004, Appendix Exhibit 6.*

57. In an article published in the *Erie Times News* on January 17, 2005, John Onorato was quoted as stating to the *Erie Times News* reporter that Ms. Conley had committed "an egregious breach of confidentiality" and that a large bill incurred by the County in relation to Plaintiff's Civil Service Commission Appeal was justified "in defense of the children." *Complaint at ¶¶ 58-64. See also, January 17, 2005 article "County's legal bills mount," Appendix Exhibit 23.*

58. Mr. Onorato's statements were true.

59. At all times relevant hereto, John A. Onorato, Esquire was the Solicitor for Erie County. *Complaint at ¶10.*

60. Abby Conley has been the subject of a number of articles published in the *Erie Times News.* Conley was the subject of articles published on September 17, 2004, October 4, 2004, November 23, 2004 and November 25, 2004. *See, Erie Times News articles, Appendix Exhibit 24.*

61. In two (2) articles published on September 17, 2004, Anthony Angelone, Plaintiff's attorney, was quoted as commenting regarding Conley's separation from employment. *See, Erie Times News articles, Appendix Exhibit 24.*

62. Conley was again the subject of an article published October 4, 2004, in the *Erie Times News*, wherein Conley specifically commented on her employment with OCY through her attorney, Anthony Angelone. *See, Erie Times News articles, Appendix Exhibit 24.*

63. Plaintiff ran for Erie City Counsel on six or seven occasions. *See, Deposition of Abby Conley, pp. 43-44, Appendix Exhibit 4.*

64. She was elected in 1994 to the Pennsylvania Democratic State Committee. *See, Deposition of Abby Conley, pp. 43-44, Appendix Exhibit 4.*

65. At a hearing on Motions to Compel in this case, Plaintiff's counsel, Timothy McNair, in successfully attempting to prevent the Defendants from compelling Plaintiff to produce her communications with the press, stated:

> Ms. Conley has been a member of the Pennsylvania State Democratic Committee. She has been the vice-chair of the City of Erie Human Relations Commission, City Council appointed her and elected vice-chair by other committee members. She has served on the Bicentennial Commission for the City of Erie. She was the chair for the Time Capsule Project of the Bicentennial Tower. **She has spoken publicly on numerous issues, including utility rates, Congressional pay raises, cuts in Medicaid and Medicare.** She has been involved in civic activities throughout her adult life. All of these activities involve her speaking with the press....

*See, Transcript of Hearing on Motions to Compel dated January 4, 2006, pp. 19-20, Appendix Exhibit 25.*

66. Plaintiff is a public figure.

67. On September 10, 2004, Plaintiff was an employee of the County of Erie. *Complaint at ¶11.*

68. At no time relevant hereto was Plaintiff an employee of John A. Onorato, Esquire.

69. On September 10, 2004, Abby Conley was a member of the American Federation of State, County and Municipal employees, AFL-CIO. She filed a union grievance as a result of her separation from employment on September 10, 2004. *See, Grievance Form dated September 24, 2004, Appendix Exhibit 26.*

70. On the Grievance Form submitted on behalf of Abby Conley, the union indicated that her "constructive discharge" was a "clear violation of Article 22, Section 22.1" which states that the employer "shall not demote, suspend, discharge or take disciplinary action against any employee without just cause..." *See, Grievance Form dated September 24, 2004, Appendix Exhibit 26.*

71. Plaintiff's employment was subject to a collective bargaining agreement between the American Federation of State, County and Municipal Employees, ALF-CIO, in the County of Erie.

Respectfully submitted,

DELL MOSER LANE & LOUGHNEY, LLC

By ______________________

Mark R. Lane, Esquire
Attorney for Defendant,
John A. Onorato, Esquire
PA ID No. 61923
525 William Penn Place
Suite 3700
Pittsburgh, PA 15219
412-471-1180 – Phone
412- 471-9012 - Fax

9135

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the within **Defendant John A. Onorato's Statement of Material Facts in Support of Summary Judgment** has been served upon all counsel of record by electronic mail, this 7th day of April, 2006 as follows:

Anthony Angelone, Esquire
Vendetti & Vendetti
3820 Liberty Street
Erie, PA 16509
*Counsel for Plaintiff*

Timothy D. McNair, Esquire
Law office of Timothy D. McNair
821 State Street
Erie, PA 16501
*Counsel for Plaintiff*

Edmond Joyal, Esquire
The Law Office of Joseph S. Weimer
975 Two Chatham Center
Pittsburgh, PA 15219
*Counsel for Richard Schenker, Peter Callan and Debra Liebel*
*Individual Capacity Only*

Richard A. Lanzillo, Esquire
Knox, McLaughlin, Gornall & Sennett, P.C.
120 West 10th Street
Erie, PA 16501
*Counsel for County of Erie and*
*Richard Schenker, Peter Callan and Debra Liebel*
*Official Capacity Only*

[signature]
Mark R. Lane, Esquire
Attorney for Defendant,
John A. Onorato, Esquire