**Appendix Exhibit 6**

1

| | |
|---|---|
| IN THE MATTER OF | : IN THE COURT OF COMMON PLEAS |
| J██████ C█████ and | : OF ERIE COUNTY, PENNSYLVANIA |
| J██████ C█████, minors | : JUVENILE DIVISION |
| | : Nos. 218 and 219 OF 2002 |

PERMANENCY HEARING

Proceedings held before the Honorable Elizabeth K. Kelly, in Courtroom , Erie County Courthouse, Erie, Pennsylvania, on Wednesday, July 28, 2004, commencing at 9:51 a.m.

COPY

APPEARANCES:

MICHAEL R. CAULEY, Esquire, appearing on behalf of the Office of Children and Youth.

DAMON C. HOPKINS, Esquire, appearing on behalf of the children.

JAMES E. LUCHT, Esquire, appearing on behalf of the father.

GERALD J. VILLELLA, Esquire, appearing on behalf of the mother.

Jeanne M. Sykes - Official Court Reporter

EXHIBIT

App. Ex. 6

2

INDEX OF WITNESSES

| NAME | DIRECT | CROSS |
|------|--------|-------|
| 1. M█████ S███████ | 5 (Cauley) | 9 (Hopkins)<br>22 (Villella)<br>35 (Lucht) |
| 2. L███ H██████ | 53 (Villella) | 57 (Cauley) |
| 3. ████████ W██████ | 66 (Villella) | 69 (Hopkins)<br>69 (Cauley) |
| 4. Abby Conley | 70 (Villella) | 86 (Hopkins)<br>93 (Lucht)<br>102 (Cauley) |
| 5. P██████ J███ M████████ | 113 (Villella) | 120 (Hopkins)<br>121 (Lucht)<br>122 (Cauley) |
| 6. M███ G███ S████████ | 125 (Villella) | 126 (Cauley) |
| 7. A████ M████ T████ | 128 (Villella) | 130 (Lucht) |
| 8. K█████ J. S███████ | 131 (Villella) | 136 (Hopkins)<br>137 (Lucht)<br>139 (Cauley) |
| 9. ████████ L██ S███████ | 141 (Villella) | 150 (Hopkins)<br>156 (Lucht)<br>159 (Cauley) |
| 10. T█████ U██████ | 163 (Lucht) | 178 (Hopkins)<br>184 (Villella)<br>186 (Cauley) |
| 11. J████ A███ C██████, Jr. | 195 (Lucht) | 206 (Hopkins)<br>208 (Cauley) |
| 12. J████ A███ C██████, Sr. | 213 (Lucht) | |
| 13. B█████ C██████<br>(Examination) | 215 (Court) | 219 (Hopkins)<br>221 (Cauley) |
| 14. M█████ O███████ | 225 (Cauley) | 229 (Villella) |

3

INDEX OF WITNESSES

(Continued)

NAME                          REDIRECT         RECROSS

1. M█████ S████████          44 (Cauley)

2. L████ H████               65 (Villella)

3. Abby Conley               112 (Villella)

4. T██████ U█████            193 (Lucht)

70

BY MR. CAULEY:

Q.    Miss ███, since the children went into foster care, as I take it, every time that you have seen the children interact with their mother it's been in a setting that's been supervised by some representative of the Office of Children and Youth?

A.    Behind a two-way mirror.

Q.    It's in a supervised setting?

A.    Yes.

Q.    And she's not been permitted, shall we say, unrestricted or unfettered or unsupervised access to the children?

A.    Right.

Q.    And of course when you were there, you were supervising her contact with the children, correct?

A.    Yes.

Q.    That's all.

THE COURT:  Thank you, Miss W███.

THE WITNESS:  Thank you.

THE COURT:  Attorney Villella?

MR. VILLELLA:  Abby Conley.

ABBY CONLEY, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VILLELLA:

71

1    Q.    Miss Conley, identify yourself please?

2    A.    My name is Abby Conley.

3    Q.    Where are you employed?

4    A.    I'm employed at the Office of Children and

5  Youth.

6    Q.    What has been your involvement in the case of

7  the C██████ twins?

8    A.    I am a parent aide or social service aide is my

9  job title.  I've been involved in the family for approxi-

10 mately nine months in which time I facilitated visits twice a

11 week at two-hour intervals for nine months.

12   Q.    Were you present with the parents at all the

13 visits or were there some that you were not during that time?

14   A.    At all visits.  I don't believe that we ever

15 missed one visit in that nine-month margin with an exception

16 I believe of a holiday.

17   Q.    You produced a report summary that was attached

18 to the court summary that was provided in April; is that

19 right?

20   A.    Yes.

21   Q.    Do you have a copy of that with you or do you

22 want --

23   A.    I have what I had on my hard drive at work.

24   Q.    Well, is that the same as what is attached to

25 the court summary?

72

1      A.      I'm sorry.  I don't understand.

2      Q.      Is that the same -- is the text of what's on

3   your hard drive at work, is that the same as what's in court

4   summary.

5      A.      I'm not really sure.  My supervisor had made

6   some changes to my court summary so I'm not really sure what

7   the final product was that was submitted.

8      Q.      First let me have you take a look at what has

9   been submitted by Mr. Cauley with his court summary.

10             MR. CAULEY:  As I understand it, what

11   Mr. Villella's referring to are reports dated April 16th and

12   April 19th?

13             MR. VILLELLA:  Yeah.

14             MR. CAULEY:  Signed by Miss Conley and signed

15   by the case supervisor Miss Deveney, which I think were

16   probably tendered to the court back in April.

17             THE COURT:  Any objections to those, Attorney

18   Hopkins?

19             MR. HOPKINS:  No.

20             THE COURT:  Attorney Lucht?

21             MR. LUCHT:  No.

22             THE COURT:  They are admitted.  You can

23   approach the witness on those reports.

24   BY MR. VILLELLA:

25      Q.      Look at what was submitted to the court

73

1    compared to what you have.

2        A.    Okay.

3        Q.    I am looking at the one regarding J██████

4    S██████ specifically.

5        A.    This is -- as you can see, this is what I took

6    off my hard drive.  It's dated for 4/19, 2004.  Here is my

7    second page, and there is your second page.

8        Q.    There appears to be additional text in yours

9    that is not present in the one you submitted to the court?

10       A.    Huh-uh.

11       Q.    You are telling us that --

12             MR. CAULEY:  Excuse me, is counsel testifying

13   or the witness?  I object to the leading nature.

14             MR. VILLELLA:  Take and look --

15             THE COURT:  Gentlemen, please.  Attorney

16   Villella, if you want to go ahead and rephrase your question,

17   that will be fine.

18   BY MR. VILLELLA:

19       Q.    Are there any differences between what you

20   finalized and presented to be attached to the court summary

21   and what actually was attached to the court summary?

22       A.    It appears so.  There are several paragraphs

23   deleted out of my original text.

24       Q.    Did you make those deletions?

25       A.    No, sir.  This is what I submitted to my

74

1  supervisor and signed.

2       Q.     Specifically -- well, let's see.  Have

3  Mr. Cauley take a look at this first, and if necessary we can

4  copy this.

5              THE COURT:  Why don't we make copies of it so

6  we can give it to everyone?

7              (Pause.)

8              THE COURT:  Go ahead, Attorney Villella, after

9  you have had an opportunity to review this.

10             MR. VILLELLA:  Now, Miss Conley, I'm going to

11 give you to read from the second page of the J███████

12 S███████ report dealing with the continued areas of need.

13             MR. CAULEY:  Just by way of clarification if I

14 might, Judge, since there appear to be two of these, I think

15 the record might better reflect which one we are dealing

16 with.

17             THE COURT:  This is the April 19th, 2004

18 report.

19             MR. CAULEY:  But there are two that appear to

20 be different dated the same date.

21             THE COURT:  Yes, my understanding is one is her

22 original report and the other one is the modified one based

23 on her supervisor's alterations.  That's fine.  If you want

24 to identify them for the record, Attorney Villella, so we're

25 clear as to which is which?

75

BY MR. VILLELLA:

    Q.    Let's say the shorter report in that the one attached to the court summary is slightly shorter and the longer report being Miss Conley's original.  Now, let's see, the first paragraph under new and continued areas of need from your report, would you read that into the record?

    A.    The one that I wrote?

    Q.    Yes.

    A.    This social service aide has no concerns or recommendations when it comes to parenting needs in the current or the future when it pertains to Miss ▇▇▇▇▇▇.  She clearly --

    THE COURT:  When you read, you have a natural tendency to speed up.  So my court reporter needs to take this testimony, so just read it slowly.

    THE WITNESS:  I understand.

    THE COURT:  Go ahead.

    THE WITNESS:  This social service aide has no concerns or recommendations when it comes to parenting needs in the current or the future when it pertains to Miss Schuster.  She clearly excels in her parenting abilities.

BY MR. VILLELLA:

    Q.    What is the first paragraph of the shorter report, the one attached, the agency prepared?

    A.    Miss S▇▇▇▇ displays appropriate parenting

76

1  skills during supervised visits, visitations at the agency.

2      Q.    Nothing about excelling or good parenting

3  skills at all?

4      A.    No, sir.

5      Q.    Did you change that language yourself?

6      A.    No, sir.  This was -- I had originally

7  submitted a court report on the 16th.  My supervisor has the

8  right to make corrections and changes, and she corrected my

9  original court summary, which is this one.  I retyped it from

10  the 16th date, and this is the one that I submitted.  I

11  signed it, the front page, and submitted it.

12      Q.    The second paragraph has a little bit more text

13  than your original one.  Longer one has a little bit more

14  text; is that correct?

15      A.    Yes, sir.

16      Q.    Is there anything significantly changed in the

17  second paragraph?  Appears to be a few more words but. . .

18      Q.    Same thing?

19      A.    Essentially, yeah.

20      Q.    Third paragraph also, they are structured

21  somewhat differently.  Anything significant in the third

22  paragraph changed?

23      A.    No, and the last paragraph is identical in the

24  first column.

25      Q.    Now, the impressions and observations, what was

77

1  submitted to the court, the shorter one has two paragraphs;
2  is that correct?
3      A.    Yes, sir.
4      Q.    And yours has three?
5      A.    Yes, sir.
6      Q.    Again, the first paragraph of yours, how does
7  that read, the longer one?
8      A.    Miss S███████ does exceptionally well parenting
9  and interacting with her children during visits.  She is
10  consistently involved with both her twin daughters and
11  equally divides herself between the two of them.
12      Q.    And the first paragraph of the one submitted to
13  the court?
14      A.    Miss S███████ does well parenting and
15  interacting with her children during visits.  She is
16  consistently involved with both her twin daughters and
17  equally divides herself between the two of them.
18      Q.    So some supportive language that you presented
19  --
20      MR. CAULEY:  Objection, Your Honor, to the
21  question, the leading nature of it and the characterization
22  of same.
23      THE COURT:  I will sustain it based on the
24  leading nature.  I have had an opportunity to listen to the
25  testimony of this which is indicating what her impressions

78

1   were and how it was modified by her supervisor.

2               MR. VILLELLA:  Judge, are you saying you don't

3   need any further testimony regarding the differences?

4               THE COURT:  No.  Differences are very clear to

5   me.

6   BY MR. VILLELLA:

7       Q.      Thank you very much.  I might have a few more

8   questions for her.  Miss Conley, are you still assigned to

9   this case?

10      A.      No, sir.

11      Q.      When did that happen?

12      A.      Several weeks ago.  I think it's been three

13  weeks now.

14      Q.      Was any particular reason given to you for your

15  removal from this case?

16      A.      Yes, sir.

17      Q.      What was that?

18      A.      I requested to be taken off the case.

19      Q.      For what particular reason?

20      A.      Because I really -- I didn't share the opinion

21  of my supervisor.  And it was apparent that she -- that my

22  opinion, professional involvement was different than her

23  professional opinion, and I just thought that it would be

24  best.  And I asked to not only be removed off the case but

25  off of the unit as well.

79

1    Q.    Now, the person you are talking about as your

2    supervisor is whom?

3    A.    Sue Deveney.  She was my supervisor.

4    Q.    She is -- would she be the one that would have

5    made the alterations?

6    A.    Yeah.  Just so it's understood that Sue has the

7    right to correct my court summaries.  I have -- my new

8    supervisor told me to take this information off my hard

9    drive, but I have an e-mail with a directive --

10    MR. CAULEY:  Excuse me.  That's way, way, way

11    unresponsive to the question.

12    MR. VILLELLA:  I agree with that.

13    THE COURT:  That's fine.

14    BY MR. VILLELLA:

15    Q.    Your supervisor of course has the right to

16    supervise what actually goes to the court; is that right?

17    A.    Yes, sir, and correct my court summary.  That's

18    the procedure.

19    Q.    In terms of her ability to make an accurate

20    alteration of your direct observations of the visitation, did

21    Miss Deveney actually participate in visitation on any

22    occasions?

23    A.    No.  There's been a couple instances where

24    she's come in for maybe a minute or so to tell me something.

25    But to actually sit down and observe, no, not in the nine

80

1  months that I did the visits.  She's come in and talked to me

2  a couple times, but --

3      Q.    Did she give you any other policy directives

4  regarding how your reports are to be written or how you are

5  to assess?

6      A.    I'm supposed to submit them in an attachment to

7  e-mail.  I have an original directive from Miss Deveney that

8  I'm to send all court summaries to her in word attachment so

9  they can be corrected in the event that I'm not there.

10      Q.    Did she ever say anything to you about -- the

11  nature of your opinions, whether they were accurate or

12  whether she wanted them to be the agency's opinions?

13      A.    Well, essentially I think it was agreed upon

14  that in my capacity I'm not really qualified.  I'm not

15  educated in social services.  My education is through

16  something else, and it's not really my role to issue opinions

17  or judgments against the families that I work with.

18          My job simply and humbly is to facilitate

19  visits and to make documentations of the observations that I

20  have.  So really my opinion in any case is -- really has no

21  weight.  That's just the nature of my position at Children's

22  Services.

23      Q.    How long have you been with Children's

24  Services?

25      A.    It will be four years in September.

1   Q. Have you prepared a lot of these reports and

2 testified in a lot of hearings?

3   A. I have -- yes, I have to submit reports for all

4 my cases.

5   Q. Have you rendered opinions regarding the

6 quality of parenting in those reports and been permitted to

7 testify and encouraged to testify to those?

8   A. Yes, sir.

9   Q. What was different about this case if you can

10 tell?

11   A. Well, just that I'm reminded of my position at

12 OCY, that I'm not qualified to have an opinion or to

13 necessarily state those opinions.  It's my job to facilitate.

14   Q. You're here under a subpoena; is that correct?

15   A. Yes, sir.

16   Q. When did you get that subpoena delivered to

17 you?

18   A. It was delivered to me yesterday by Jen.  She

19 had me paged at OCY and gave it to me.

20   Q. Why did that take place from what you are

21 aware, why the subpoena was delivered to you directed

22 directly by Jen?

23     MR. CAULEY:  Objection.  What's the relevance

24 of this?

25     MR. VILLELLA:  Find out the relevance very

82

1  quickly.

2          THE COURT:  I'll allow her to answer it.  And

3  if I think it's relevant, I'll allow it to stay in the

4  record.  If I think it's irrelevant, I'll strike it from the

5  record.  Go ahead.

6          THE WITNESS:  Why did she give me the subpoena?

7  Because I hadn't received mine.

8  BY MR. VILLELLA:

9      Q.    Had you heard anything about a subpoena being

10  on its way to you previously?

11     A.    Yes, sir.  Last Monday I had a meeting with two

12  supervisors in an unrelated meeting, and they told me at that

13  point they had questioned on -- I'm not really familiar with

14  the name of it, but it's a preliminary subpoena that supplies

15  definitions of why people are being subpoenaed.  They

16  informed me at that point that I was going to be subpoenaed

17  to this hearing.

18     Q.    Could that have been the pretrial narrative?

19     A.    Yes, sir, you're right.

20     Q.    When a subpoena was actual -- did you ever hear

21  anything further after that time about a subpoena coming to

22  you?

23     A.    Just by my new supervisor told me that if I

24  didn't receive a subpoena, that I was not supposed to attend

25  today's hearing.

83

1        Q.    Have you been subpoenaed to other proceedings

2  when you've been working for the agency?

3        A.    Yes.

4        Q.    How have those subpoenas normally been

5  delivered to you?  Who gives them to you?

6        MR. CAULEY:  I fail to see the --

7        THE COURT:  I think it's relevant, Mr. Cauley,

8  and I will allow her to testify.

9        THE WITNESS:  They usually put it in my bin,

10  and they say, Abby, you've been subpoenaed.

11  BY MR. VILLELLA:

12        Q.    They being who?

13        A.    Like supervisors or whoever the unit that I'm

14  working for.  They just tell me.

15        Q.    Were you given an impression in this, were you

16  told that that procedure was going to be different in this

17  case?

18        A.    I was simply just told if I didn't receive a

19  subpoena I was not allowed to attend today's hearing.

20        Q.    Given any other instructions about what contact

21  to have with the parties or with the attorneys?

22        A.    No.

23        Q.    At some point did an agency person give you the

24  original subpoena sent over from my office?

25        A.    Yeah.  Right after yesterday -- yesterday after

84

1  J███had submitted -- she had me called.  And right when I sat

2  down at my desk, about four minutes later I received a second

3  subpoena.  I don't know where it came from.  From Sue Deveney

4  I think.  I was on the phone when they delivered it, but it

5  was like about four minutes after Jen had given me hers.

6      Q.    Are there any instructions regarding whether

7  you are allowed to talk with an attorney if I were to call

8  you about the case or on any other case?

9      A.    I'm sorry.  I don't understand.

10      Q.    Are there any supervisory instructions to you

11  about whether or not you are allowed to talk with

12  He attorneys involved in these cases?

13      A.    No.

14      Q.    Did Miss S█████ ever make any comment to you

15  about Miss S██████'s quality of parenting or what should be

16  done regarding reunification?

17      A.    What do you mean?

18      Q.    Well, regarding what she -- her own viewpoint

19  of what should be done in this case, where the case should

20  go?

21      A.    At first she really felt that -- you know, that

22  the children belonged at home with, you know, their family,

23  but she's just changed.  I don't know.  That's not really my

24  department.  You know, she is a caseworker, and I'm a case

25  aide.

85

1                MR. VILLELLA:  Are you concerned about anything
2     sitting here testifying as you are today?
3                THE WITNESS:  I'm concerned.  Oh, yeah, a
4     little bit.
5                THE COURT:  What are you concerned about?
6                THE WITNESS:  That I'm going to get into
7     trouble.
8                THE COURT:  What kind of trouble?
9                THE WITNESS:  I'm going to lose my job.
10               THE COURT:  Why are you afraid of that?
11               THE WITNESS:  Because some of the things that
12    they've done is not appropriate, and I don't want to lie.
13               THE COURT:  You don't need to be afraid.
14               THE WITNESS:  Okay.
15               THE COURT:  And you are to never lie in this
16    courtroom.
17               THE WITNESS:  Yes, ma'am.
18               THE COURT:  And you are not going to lose your
19    job based on anything that occurred in this courtroom today.
20               THE WITNESS:  Okay.
21               THE COURT:  Could she have some Kleenex, Wilma?
22               MR. VILLELLA:  That's all I have for Miss
23    Conley on direct.
24               THE COURT:  Thank you.  Attorney Hopkins, any
25    questions?

86

1          MR. HOPKINS:  I'd like to know at this time if

2    the court would permit me to go into her observations of the

3    father's visits as well?  That is outside the scope of direct

4    of Mr. Villella.

5          THE COURT:  Yes.  Since we have this witness on

6    the stand, we'll do that at this point in time.  Just a

7    moment please, ma'am.  Go ahead, Attorney Hopkins.

8                    CROSS EXAMINATION

9    BY MR. HOPKINS:

10         Q.    Miss Conley, with regards to your report on

11   Miss ████████, you indicate in here that she has told you

12   that she was a victim of domestic violence with Mr. G██████?

13         A.    Yeah, she's -- I don't think she really knows.

14   She kind of dabbles back and forth.  She's not really sure.

15         Q.    She's not really sure whether or not she was

16   ever struck by Mr. ████████?

17         A.    She never told me that he hit her.  That was

18   not what she said.

19         Q.    What did she say?

20         A.    Just that she felt intimidated by him

21   sometimes.

22         Q.    So it may be verbal abuse or controlling

23   behavior, not necessarily physical abuse?

24         A.    Yeah.  She never said that.

25         Q.    You also put in your report -- and it is in

87

both of these reports, your original and the edited one --
that Miss S██████ seems to have times when she believes that
the injuries were caused by Mr. C██████, and at times she
thinks they were caused by bone disease or an accident,
correct?

          A.    I should define that a little bit more clearly,
is that she doesn't know.  It seems as if she's seeking to
find a reason.  She dabbles in all possibilities, and that's
what I attempted to present in that paragraph.

          Q.    Does she seem to be open to all of those
possibilities?

          A.    Yes.  You know, she seems to go back and forth,
not really knowing what to think.

          Q.    So she has not -- at least in conversation with
you she has not precluded the possibility that Mr. C██████ or
someone inflicted these injuries, correct?

          A.    She doesn't know.

          Q.    She hasn't precluded that, she hasn't ruled
that out?

          A.    I suppose I don't understand what preclude
means.  I'm sorry.

          Q.    She hasn't completely closed her mind to the
thought that Mr. C██████ or someone else did this?

          A.    She doesn't know.

          Q.    Mr. C██████'s report, do you have a copy of

88

1  that in front of you?

2       A.     Yes, sir.

3       Q.     How many pages is your copy?

4       A.     Three.

5       Q.     Is the copy you have in front of you signed by

6  Miss Deveney?

7       A.     You know what?  I have the wrong -- I have the

8  16th in front of me.

9            MR. CAULEY:  Judge, excuse me.  That's not

10 responsive to the question which was is her copy signed.

11           THE COURT:  Which copy are we referring to,

12 Attorney Hopkins?

13           MR. HOPKINS:  Your Honor, this is regarding

14 Mr. C████.

15           THE COURT:  All right.

16           MR. HOPKINS:  As I understand right now, we

17 only know of one copy.  That's sort of what I'm getting at.

18           THE COURT:  That's fine.

19           MR. HOPKINS:  Do you have that in front of you.

20           THE WITNESS:  No, sir.

21           THE COURT:  Attorney Hopkins, why don't you

22 approach the witness?

23 BY MR. HOPKINS:

24       Q.     Thank you, Your Honor.  Miss Conley, would you

25 look at this?  Is this the report that you submitted?

89

1       A.      No.  The one I would have submitted would have

2   been on the 19th, just like Miss S███████'s.

3       Q.      What I've handed you is dated the 16th?

4       A.      Yes, sir.

5       Q.      Do you have a copy of the report you actually

6   submitted?

7       A.      No, not with me.

8       Q.      If I give you a minute and the court allows us

9   to and you review this, will you know whether that's your

10  report or not?

11    ⚬ A.      This is the one that I submitted on the 16th.

12      Q.      Does it appear to have any edits like the ones

13  involving Miss S███████ did?

14      A.      See, the problem is that I submitted this on

15  the 16th.  This hard copy was corrected by Miss Deveney, was

16  handed back to me.  I went back into my program and made the

17  adjustments that she requested, and resubmitted the corrected

18  version hard copy for the 19th.  This is the 16th.  This is

19  my first one without corrections.  What the process is is I

20  write the court summary, I submit it to Mrs. Deveney by

21  e-mail.  She prints it out, makes the corrections, submits it

22  back to me, and I retype -- she'll take a red pen and

23  correct.

24      Q.      So the one we all have today is your

25  precorrected version?

90

1      A.      Yes, sir.

2      Q.      So this is truly your impression?

3      A.      That one.  The 19th I submitted another court

4  summary, a corrected version.

5      Q.      Then if I can, I just want to ask you some

6  questions based on the 16th version, which would be your

7  original impressions, correct?

8      A.      Yes, sir.

9      Q.      You indicated in that report that Mr. C███████

10  had marginal ability to supervise both the children at the

11  same time?

12      A.      At that time, yes.

13      Q.      Has that changed since the report of April

14  16th?

15      A.      We have had substantial changes within the last

16  four months with Mr. C██████.

17      Q.      What kind of changes?

18      A.      His demeanor, his relationship.  He just

19  appeared to me, you know, to be more relaxed, you know, easy

20  going.  It's been different.  I think through -- and I've

21  seen that through other parents as well.  You know, initially

22  everybody's kind of stressed out because of the circum-

23  stances, and then things kind of even out after time.  I did

24  resubmit another court summary July 15th with Mr. C██████.  I

25  guess didn't come to the courts.  It's for the file only.

91

1    Q.    Would you say that the beneficial changes for

2    Mr. C███ have occurred since the visits were separated so

3    that the mother and father are not both there at the same

4    time?

5    A.    That was before my involvement.  I do know that

6    originally they were -- their visits were together.  But in

7    the time that I was there with them, their visits had always

8    been separate.  I don't know what that was like.

9    Q.    In the April 16th summary that you put together

10   you indicated that there had been a couple problems with Mr.

11   C████ either not recognizing or stopping the children from

12   putting things in their mouth such as crayons?

13   A.    Yes.

14   Q.    Has that corrected itself?

15   A.    Yes.  One of the roles that I play is I speak

16   to parents.  If I see something inappropriate, dangerous, you

17   know, especially with young parents, first-time parents,

18   that's one of the capacities of my job, is that I role model

19   and give correction and direction.  And Mr. C█████

20   definitely seems to have stepped up to the plate as far as

21   parenting skills recently.

22   Q.    Has he done better with monitoring the

23   children's climbing and falling off the furniture?

24   A.    Yes, it comes and goes.  He still --

25   Q.    Still has some trouble?

92

1       A.      It's not perfect, but he's done considerably

2  well.

3       Q.      The last paragraph of that report indicates

4  that he does not essentially console or try to deal with the

5  children immediately upon something happening to them or

6  they're crying or they're fussy?

7       A.      There was one particular incident where he kind

8  of just stood back, and one of the kids were crying.  There

9  was maybe two or three altogether where they'll get into

10 trouble.  And I'm not sure if he doesn't know how to handle

11 them when they're crying or what the issue is.

12      Q.      Is he improving with that?

13      A.      Yes.  They get into things at every visit.

14 They're toddlers.

15      Q.      How would you say the children are responding

16 to their mother during the visits as you had seen them?

17      A.      Very well.

18      Q.      How would you say they're responding to their

19 father during their visits?

20      A.      Very well.

21      Q.      Do you see any difference between the

22 children's responses to their mom or to their dad?

23      A.      As in how?  I don't understand your question.

24      Q.      Are the children -- do they appear to be more

25 receptive to the visits when they're with mom as opposed to

93

visits with dad and vice versa?

A.    It's even I would say.  They're bonded to their parents.

Q.    Do you have any concerns or think that there are any additional services that need to be offered to the children and their parents to help continue this improvement?

A.    I'm -- I don't feel comfortable answering that because I'm genuinely not qualified.  My education is not in social service.

Q.    Aside from your qualifications, is there anything else you see these parents and these children needing based on what you see?

A.    As far as visits go, no.

Q.    That's all I have.

THE COURT:  Thank you.  Attorney Lucht?

CROSS EXAMINATION

BY MR. LUCHT:

Q.    Yes.  So it's your testimony that the father has vastly improved?

A.    Yes, sir.

Q.    When did you receive the subpoena?

A.    Yesterday morning around 10:00.  I'm not really sure what time it was.  It was after 10:00 o'clock.

Q.    You were served by J_____?

A.    Yes, sir.

94

1        Q.     You told the judge that you were afraid you
2  might lose your job?
3        A.     Yes, sir.
4        Q.     Who -- has anybody made a threat or indication
5  to you that you might lose your job?
6        A.     I have been having kind of some problems at
7  work as far as I've been --
8        MR. CAULEY:  Objection, Your Honor, not
9  responsive to the question.  I'd like to hear the answer to
10  that specific question.
11  BY MR. LUCHT:
12        Q.     Has anybody threatened you with a job loss?
13        A.     No.
14        Q.     You said you have been having some problems at
15  work.  What kind type of problems?
16        A.     Just being called into repetitive meetings.
17        Q.     Do they criticize you, or what happens at these
18  meetings?
19        A.     Just that they have concerns, concerns about,
20  you know, the information in my court summary.
21        Q.     On this case or on other cases also?
22        A.     This case.
23        Q.     This case in particular?
24        A.     Yes, sir.
25        Q.     And they have called you in because of what the

95

1   court summaries said?

2       A.      Well, yes.  Well, because there was a question

3   on the subpoena list about my supervisor correcting my court

4   summary, and I've been called in a couple times for that.

5       Q.      When were you first called in?

6       A.      Last Monday.

7       Q.      Are you talking the day before yesterday?

8       A.      No, sir.  July 19th.

9       Q.      So over a week ago --

10      A.      Yes, sir.

11      Q.      -- was the first time you were called in?

12      A.      Yes.

13      Q.      And it was about this case?

14      A.      Well, there was another meeting that was taking

15  place, and the question was presented.  They were wondering

16  why I was being subpoenaed to witness for this family and had

17  some concerns about a definition that was submitted on this

18  paper about the subpoena.

19      Q.      I believe what you're talking about is

20  Mr. Villella's pretrial summary.

21      A.      Yes.

22      Q.      And I think he had put on there something about

23  you were going to testify regarding this case.  So they

24  called you in.  Did they tell you not to testify?

25      A.      No.  They told me that a subpoena was pending,

96

1  and they questioned why -- what that meant, what that

2  particular sentence meant, what Mr. Villella meant.

3       Q.    Did you have any idea what that sentence meant?

4       A.    Yes, because I knew that my court summary had

5  probably been changed.

6       Q.    Now, you said you also submitted a court

7  summary dated July 15th?

8       A.    Yes, sir.

9       Q.    That was not presented today?

10      A.    No, sir.

11      Q.    Were you ever aware that there were subpoenas

12  at the Office of Children and Youth waiting to be served to

13  you?

14            MR. CAULEY:  Objection, Your Honor.  It assumes

15  facts not in evidence.

16            THE COURT:  She can answer it if she knew.

17            THE WITNESS:  I didn't have firsthand

18  knowledge, no, sir.  I just knew from Monday's meeting that a

19  subpoena was coming.  And then I was told on Friday, July

20  23rd, that if I did not receive the subpoena, that I was not

21  allowed to attend today's meeting -- or hearing.

22  BY MR. LUCHT:

23      Q.    But you were not aware that there may have

24  already been subpoenas at OCY?

25      A.    No.

97

1      Q.    What was the date on the subpoena that was

2  served on you, the second one?

3      A.    July 21st.

4      Q.    What about the first one?

5      A.    July 21st.

6      Q.    They're both dated the same date.  But J████fer

7  served you with one, and then you received the other one

8  yesterday also?

9      A.    Yes.

10     Q.    Yesterday was the 27th?

11     A.    Yes, sir.

12     Q.    Did anybody at OCY tell you that there were

13  other subpoenas that had never been served in other cases?

14     A.    Did anybody what?

15     Q.    Ever tell you that there had been subpoenas

16  served on OCY which had not been given to employees?

17          MR. CAULEY:  Objection, Your Honor.  Calls for

18  hearsay response.

19          THE COURT:  That does, Attorney Lucht.  You can

20  move on.

21          MR. LUCHT:  Are you still concerned about your

22  job?

23          MR. CAULEY:  Asked and answered, objection.

24          THE COURT:  Yes.  She's testified she's very

25  concerned about losing her job.  I note for the record that

98

1  when giving that answer, she started to cry.

2  BY MR. LUCHT:

3      Q.    On your court summary of July 15th, it has not

4  been made part of this record and submitted to counsel, did

5  it concern both the parents, both the mother and the father?

6      A.    They didn't know I don't think.

7      Q.    I mean, was it about the mother and the father?

8      A.    Yes, sir.

9      Q.    And was it basically what you testified to

10 today, that both have improved greatly?

11     A.    I've been asked to -- you know, by my old

12 supervisor, to tone down my court summaries as far as --

13            MR. CAULEY:  Objection, Your Honor.  Not

14 responsive to the question.

15 BY MR. LUCHT:

16     Q.    I will ask that question.  Has anybody told you

17 to change your summaries or change your outlook?

18     A.    That I need to stick with like observations,

19 not to have words that are broad.  I really concentrated on

20 that on my July 15th court summary.

21     Q.    What was the subject matter of the July 15th

22 summary?

23     A.    Just essentially -- it wasn't considered an

24 addendum, but just basically the last four months since the

25 last court hearing that was in April.

99

1     Q.     Your court summary, were you supportive of the

2 parents or not?

3     A.     I just basically described how the visits go.

4 I'm not qualified to recommend or place judgment or

5 recommendations or anything.  That's just not my capacity.

6     Q.     But the visits have been very good, correct?

7     A.     They've been appropriate.

8     Q.     Now, I believe you testified that you had

9 attended almost all if not all the visits?

10     A.     I did attend all of them.

11     Q.     All of them?

12     A.     I think with an exception, and I could be

13 wrong, there was one holiday within that nine-month time.

14 And I don't remember what holiday it was.  I want to say like

15 Flag Day or something.  It would have been a holiday that

16 fell on a Tuesday or a Friday.

17     Q.     The visitation room, is there more than one

18 room or how does it work?

19     A.     There is two visitation rooms on the first

20 level of OCY with an observation room behind each visitation

21 room.

22     Q.     Now, when the parents come, are the children in

23 the room or how does that work?

24     A.     I sit behind a mirrored glass, and the visit

25 takes place in a visitation room.

100

1      Q.     The children are in there?

2      A.     Yes, sir.

3      Q.     You enter the room itself with the parents and

4 the children?

5      A.     Yes, when -- especially when I have concerns

6 with something that's taking place.  Like if a child, for

7 instance, is chewing on a crayon or playing with something

8 that's inappropriate and the parent isn't catching it.

9 Because I'm essentially responsible for the welfare of those

10 children during that visitation.

11          And like I had stated before, I assist parents

12 in instruction.  If I see that they're not catching something

13 that one of the kids do, I'll go in and make a recommendation

14 or let them know your child's doing something, you got to pay

15 attention or whatever --

16      Q.     Is there a problem with the room being cleaned

17 or not so clean?

18      A.     We have a chronic problem, yes, sir.

19      Q.     Does that take away from visitations?

20      A.     I know that there's been times where we have

21 had to vacuum the visit room, you know.  It's been an ongoing

22 problem.

23      Q.     Do you remember a time when Mr. C██████ pointed

24 out the fact that there were exposed wires on the floor?

25      A.     Yeah, yeah.  They fixed it since then.

101

1       Q.     But this was during his visit?

2       A.     Yes, sir.

3       Q.     And there was exposed electrical wires?

4       A.     Yes, sir.  They put a cap on it.

5       Q.     I will show you a photograph.  May I approach

6 the witness?

7             THE COURT:  Yes, you may.

8             THE WITNESS:  Yeah, that's it.

9             MR. LUCHT:  That's it, that accurately depicts

10 the --

11             THE WITNESS:  Yeah, that's our visiting room,

12 yeah.  They fixed it since then, though.

13             THE COURT:  May I see that Attorney Lucht?

14             (Document handed to the court.).

15             THE WITNESS:  There was actually a man in the

16 process of repairing it when we came in that day.

17 BY MR. LUCHT:

18       Q.     This was taken by Mr. ████ during his visit,

19 correct?

20       A.     I don't remember him taking that picture, but

21 it could have been.  I don't know.

22       Q.     You stated you have been to all except one of

23 the visits.  Has the caseworker been at most or some of the

24 visits?

25       A.     No, she comes in -- she'll pop in from time to

102

1   time and sit in the observation room for -- it varies from,

2   you know, a couple minutes to 15 minutes and then --

3          Q.     Does she leave the area at all are you aware

4   of?

5          A.     When I'm doing visits, I'm responsible for

6   those visits, not -- that's -- essentially the capacity is

7   that I'm a support staff to Miss S███████.  When I'm doing

8   visits, I'm essentially responsible for those visits.

9          Q.     No further questions.

10                THE COURT:  Attorney Cauley?

11                     CROSS EXAMINATION

12  BY MR. CAULEY:

13         Q.     Miss Conley, would you have supervised the

14  visits for J█████ S████████ from, say, the beginning of this

15  year onward at the Office of Children and Youth?

16         A.     Yes, sir.

17         Q.     Were you supervising those visits at Christmas-

18  time last year also?

19         A.     Yes.

20         Q.     Would it be fair to say that during the period

21  between Christmas of last year and the time of our last court

22  hearing in this case, which was supposed to happen on April

23  28th but got continued, that you supervised J████████'s visits

24  during that period of time?

25         A.     Yes, sir.

103

1       Q.    Do you think you missed any of them?

2       A.    No, I don't except for like holidays or if I --

3 I could be wrong.  I'd have to go back and look.

4       Q.    Do you have your visitation log with you?

5       A.    No, sir.  I didn't have time to pull

6 everything.  My supervisor asked me to pull the specifics

7 that the subpoena definition requested.

8       Q.    Do you remember in that period of time ever

9 supervising a visit that occurred that also involved J███er

10 S██████'s mother and her grandmother?

11      A.    Her grandmother?

12      Q.    Yes.

13      A.    Yes.  They are allowed to visit once a month.

14      Q.    When?  A particular time during the month?

15      A.    Typically Fridays.  Whenever it's convenient.

16 Miss Schetter had advised me that we're to let that take

17 place once a month at the family's convenience.  And they

18 typically just will give me a heads-up when grandma's coming.

19 Now you're talking -- because it's both J██'s about

20 biological mother and her grandmother.

21      Q.    The great-grandmother of the children?

22      A.    Yes, M████ (phonetic spelling).

23      Q.    And those would be typically on Friday?

24      A.    Or Tuesday, whatever.  I would have to go back

25 and look at the dates of contact.

104

Q.    I'm just going to see if that's available here, if I may ask my worker?  Is that available for the record here?

MICHELE SCHETTER:  Yes.

MR. CAULEY:  Could we furnish her that, Judge?

THE COURT:  That will be fine.  Let's keep this moving.

BY MR. CAULEY:

Q.    These are the dates of contact in this case from the record.  Would you mind looking at the period between Christmas of last year and the last hearing April 28th?

A.    I don't see any November in here.

Q.    I'm not looking at November.

A.    I'm sorry, December.

Q.    Then start from January, from wherever it begins?

A.    It starts with July, June, May, April, March, February, January.  Okay.  I'm in December.

Q.    What I'm looking for is the period from Christmas of 2003 through April 28th of 2004.  Any visit reflected in that -- those dates of contact that included the people I mentioned before?

A.    You want me to look from December to April?

Q.    Yes, ma'am.

105

1          MR. LUCHT:  Your Honor, could I ask an offer of

2     proof?

3          THE COURT:  Yeah, Attorney Cauley.

4          MR. CAULEY:  We're going to find out if Miss

5     H████ was telling the truth or not about being in a

6     visitation that involved these people during that period of

7     time and who supervised it or who was present.

8          MR. VILLELLA:  I think it's a collateral matter

9     whether or not Miss Conley was there.

10          THE WITNESS:  That wouldn't have been my visit

11     anyway.

12          THE COURT:  I think that that is for me as a

13     judge in this matter to ascertain, whether or not I believe

14     that testimony.  I am going to allow this question.  But,

15     Attorney Cauley, I want you to move this along.

16          MR. CAULEY:  Yes, ma'am.  I understand.  Maybe

17     I can just do it this way.

18          THE COURT:  Maybe.

19     BY MR. CAULEY:

20          Q.     There's been testimony from a lady named Linda

21     Hines, I believe, who said she was at a visit at the agency

22     that was supervised by M███████ S████████ that involved the

23     grandmother, the great-grandmother and J████████ S████████.

24     Were there --

25          A.     That would have been -- see, I guess I should

106

1  back up.

2      Q.     That's not a question.  I am going to give you

3  the question.  Was there ever a visit that you supervised

4  that involved those people between December of '03 and April

5  of '04?

6      A.     Yes.

7      Q.     To your knowledge, was there ever an oppor-

8  tunity for Miss S██████ in that period of time to have

9  supervised a visit that involved those people?

10     A.     Yes.

11     Q.     How do you know that?

12     A.     Because how Miss S██████ and I arranged this

13 -- because I have other families that I need to service.  One

14 Friday a month I have a time committed solely for a family,

15 and it would have been within that -- within Miss S██████'s

16 capacity to facilitate a visit.  It was either her or I that

17 would facilitate a visit once a month.

18     Q.     Okay.  That's fine.  Now, when you were talking

19 to Mr. Villella I believe about the July 15th, '04, summary,

20 your work product, you said something to the effect that they

21 didn't know.  To whom were you referring?

22     A.     The question -- I forget how the question was,

23 but if it was about -- or what did they think about the court

24 summary, it was never submitted, this July 15th one.

25     Q.     Never submitted by whom to whom?

107

1    A.    It was never submitted by us.  From what I

2 understood, Miss Deveney had instructed me that we were

3 filing a copy for the record, that it was not -- I did not

4 have to do an addendum, and that it would be this -- court

5 summary would be submitted to a record within OCY.  I have

6 that e-mail if you'd like to see it.

7    Q.    You weren't preparing a court summary for this

8 particular hearing then, I take it?

9    A.    I was told to submit a court summary to kind of

10 fill in the blank between the last court hearing and today's

11 court hearing.  Well, the time that I was assigned.

12    Q.    Did you submit it to Miss Deveney in the normal

13 course of business?

14    A.    I submitted it through e-mail.  That's my

15 directive.

16    Q.    And what happened to it after that?

17    A.    I don't know, sir.  That's not -- it's not --

18 that's not my responsibility at OCY.

19    Q.    In looking at the report that you generated for

20 Miss Schuster, on page one of the report you have a section

21 called service objectives, correct?

22    A.    I don't have that copy.  I just gave it to Mr.

23 Villella that you guys went and copied.  I don't have it

24 anymore.

25    Q.    I'll show you.  Service objectives.

108

1          A.      Yes, sir.

2          Q.      Would it been a accurate statement for me to

3     make that this is what you are supposed to do, this is your

4     function as the county social service aide with respect to

5     this case and this person?

6          A.      Yes, sir.

7          Q.      It reads visits will occur two times a week for

8     one-hour duration, right?

9          A.      Yes, sir.

10         Q.      And you're also to transport children to

11    visits, observe visitation between both children and their

12    mother, correct?

13         A.      Yes, sir.

14                 THE COURT:  I'm sorry.  It said observe

15    interactions.  Which --

16    BY MR. CAULEY:

17         Q.      I was reading from the side, that's correct.

18    Observe interactions between both children and their mother;

19    is that right?

20         A.      Yes, sir.

21         Q.      That's your job in this case, correct?

22         A.      Yes, give or take.

23         Q.      What do you mean by that?

24         A.      With case aides, we do just about everything

25    from filling in for a parent if they have to go to the

109

1  bathroom to changing diapers.  You name it, we do it.  It's

2  kind of hard to fit it in a sentence, but that's essentially

3  what I am to do, is to facilitate those visits and to provide

4  written documentation of my observations during those visits.

5      Q.     Your role is different than that of a

6  caseworker, correct?

7      A.     Absolutely.

8      Q.     And your role is different than that of a case

9  work supervisor, correct?

10     A.     Yes, sir.

11     Q.     And, in fact, you've told us on several

12  occasions that by training and education you're not qualified

13  to do case work service or supervisor service, right?

14     A.     Yes, sir.

15     Q.     You're not particularly qualified as a

16  counselor of any kind, are you?

17     A.     No.

18     Q.     You indicated that you were not removed from

19  this case against your will, but rather you asked to be

20  relieved of the responsibility to continue to service the

21  case?

22     A.     Yes, sir.

23     Q.     Because, as I understand it, you had a

24  different opinion of the direction of the case than your

25  caseworker Miss S█████ and her supervisor Miss Deveney,

110

1  correct?

2       A.    Actually Miss S██████ and I never had that

3  conversation.  The conversation took place with Miss Deveney

4  and myself in her office.

5       Q.    But that was -- that's the basis for your

6  request to be removed from the case, correct?

7       A.    Essentially, yes.

8       Q.    You have a difference of opinion?

9       A.    Actually my take on it is that I'm not entitled

10 to an opinion.  That's not my capacity.  It's not what I do

11 at OCY.  I am not a judge, and I attempt not to judge people.

12            And my dispute essentially was that I didn't

13 know who did it.  That I really had no bearing on the outcome

14 of a hearing, my job is very simplistic.

15      Q.    You had indicated that you've been called in

16 and talked to by various people at the agency about this case

17 since the time of the last hearing?

18      A.    Yes.

19      Q.    And the impression that I'm getting from your

20 testimony is that you feel somewhat intimidated by that?

21      A.    Yes.

22      Q.    But no one has told you that you're in any

23 jeopardy of losing your employment as a result of this,

24 correct?

25      A.    No, sir.

111

1      Q.    And no one has told you to come in here and

2 tell anything other than the truth?  Isn't that also --

3      A.    Absolutely.

4      Q.    And no one has told you not to testify if

5 you're properly subpoenaed, have they?

6      A.    No.  In fact, they said if I did receive a

7 subpoena, that I was to attend.  If I didn't receive it, I

8 was not allowed.

9      Q.    You don't have any particular dispute with the

10 right of your employer to tell you I want you to keep working

11 somewhere else and not go to this court hearing unless you

12 are subpoenaed, do you?

13      A.    Absolutely not.

14      Q.    So there's nothing wrong with that in your

15 view, right?

16      A.    I do as I'm told.

17      Q.    Isn't it in fact correct that there's at least

18 one other matter at the agency which has -- you've been

19 involved in which has caused you to be in some difficulty

20 with your supervisors that are not related at all to this

21 case?

22      A.    Absolutely.

23      Q.    And you've been called in on that particular

24 matter as well?

25      MR. LUCHT:  Objection, far beyond the direct

112

1  testimony.

2              THE COURT:  I agree.  You can move on, Attorney

3  Cauley.

4              MR. CAULEY:  I think that's all, Judge.  Thank

5  you.

6              THE COURT:  Anything else?

7                    REDIRECT EXAMINATION

8  BY MR. VILLELLA:

9       Q.    Have you ever been questioned or corrected on

10 giving a negative opinion about parents in any of these other

11 cases?

12      A.    I'm sorry.  I don't understand your question.

13      Q.    Anytime you've -- you've written a number of

14 these reports in the time you have been working there; is

15 that right?

16      A.    Oh, absolutely.

17      Q.    Have you said negative things about parents

18 before?

19      A.    Yes.

20      Q.    Ever been stopped from doing that?

21      A.    No, no.

22      Q.    Ever been corrected by your supervisor for

23 doing that?

24      A.    My punctuation has always been corrected

25 because I make mistakes.

113

1        Q.      No one ever told you you couldn't render an
2   opinion on that, did they?
3        A.      No.
4        Q.      Thank you.
5                THE COURT:  You can step down.
6                THE WITNESS:  Am I -- I'm sorry to ask, but can
7   I go back to work?
8                THE COURT:  Yes, you can go back to work.
9   Thank you very much.
10               Counsel, let me see you all briefly at
11  side-bar.  We don't need this on the record.  At this point
12  in time we're going to reconvene at 1:30.
13               (Recess taken at 12:00 p.m., to reconvene at
14  1:38 p.m.)
15               MR. CAULEY:  Judge, may I reproach before we
16  start briefly?
17               THE COURT:  Sure.
18               (Side-bar off-the-record discussion.)
19               THE COURT:  Go ahead, Attorney Villella, you
20  can call your next witness.
21               MR. VILLELLA:  I will call P▮▮ M▮▮▮▮.
22                          P▮▮▮▮ J▮ M▮▮▮▮, having been
23      duly sworn, was examined and testified as follows:
24                     DIRECT EXAMINATION
25  BY MR. VILLELLA:

244

C E R T I F I C A T E

I hereby certify that the proceedings and evidence
are contained fully and accurately in the notes taken by me
on the hearing of the above cause, and that this copy is a
correct transcript of the same.

Jeanne M. Sykes
Official Court Reporter

The foregoing record of the proceedings upon the
hearing of the above cause is hereby approved, and directed
to be filed.

_____
Hon. Elizabeth K. Kelly