# Appendix Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABBY B. CONLEY, Plaintiff :
:
v. : Civil Action No. 05-76E
:
COUNTY OF ERIE, ERIE COUNTY OFFICE OF CHILDREN AND YOUTH, a/k/a ERIE COUNTY CHILD WELFARE SERVICE, RICHARD SCHENKER, individually and in his capacity as County Executive of Erie County, Pennsylvania, PETER CALLAN, individually and in his capacity as Erie County Director of Personnel, DEBRA LIEBEL, individually and in her capacity as Executive Director, Erie County Office of Children and Youth, a/k/a Erie County Child Welfare Service, and JOHN A. ONORATO, ESQUIRE, individually and in his capacity as Erie County Solicitor,
Defendants :

Deposition of DEBRA LIEBEL, taken before and by Janis L. Ferguson, Notary Public in and for the Commonwealth of Pennsylvania, on Wednesday, March 8, 2006, commencing at 9:00 a.m., at the offices of Timothy D. McNair, Esquire, 821 State Street, Erie, Pennsylvania 16501.

Reported by Janis L. Ferguson, RPR
Ferguson & Holdnack Reporting, Inc.

EXHIBIT
tabbies
App. Ex. 7

For the Plaintiff:
Timothy D. McNair, Esquire
821 State Street
Erie, PA 16501

Anthony Angelone, Esquire
Vendetti & Vendetti
3820 Liberty Street
Erie, PA 16509

For the County of Erie, Erie County Office of Children and Youth, a/k/a Erie County Child Welfare Service:
Richard A. Lanzillo, Esquire
Knox McLaughlin Gornall & Sennett, PC
120 West 10th Street
Erie, PA 16501

For the Defendants Richard Schenker, Peter Callan, and Debra Liebel:
Edmund R. Joyal, Jr., Esquire
Law Office of Joseph S. Weimer
975 Two Chatham Center
Pittsburgh, PA 15219

Also Present:
Wallace J. Knox, Esquire
Solicitor, County of Erie

I N D E X

TESTIMONY OF DEBRA LIEBEL

Direct examination by Mr. Angelone ......... 4
Cross-examination by Mr. Joyal ..........127

EXHIBITS:

Liebel Deposition Exhibit 1 - Page 67
Liebel Deposition Exhibit 2 - Page 67
Liebel Deposition Exhibit 3 - Page 100

D E B R A L I E B E L, first having been duly sworn, testified as follows:

MR. LANZILLO: Tim, before you begin, could I note for the record that Mark Lane isn't able to make it to the deposition today, due to an illness. And he has asked that my objections on behalf of the County, as well as Mr. Joyal's objections on behalf of individual Defendants be noted as his objections as well.
MR. McNAIR: That's fine with me.
MR. ANGELONE: Okay.
MR. LANZILLO: Thank you.

DIRECT EXAMINATION

BY MR. ANGELONE:

Q. Miss Liebel --
MR. LANZILLO: I apologize, Anthony. I didn't realize you were conducting the deposition.
MR. ANGELONE: Oh, okay.
MR. LANZILLO: I would have addressed you.
MR. ANGELONE: That's fine.
BY MR. ANGELONE:
Q. Miss Liebel, again, I introduced myself earlier.

Anthony Angelone. I think you know the purpose that we're here, is to take your deposition. We're going to be asking you some questions.
A couple of things -- I guess kind of ground rules. Have you done a deposition before?
A. No, actually, I have not.
Q. Okay. A couple of things. I'm going to be asking you some questions. If you don't understand the question that I'm asking you, please tell me. I'll rephrase it, if it's possible.
A. Um-hum.
Q. Or need be. Otherwise, we're going to assume you understood the question and the answer that you gave is the correct answer to that question. Okay?
A. Okay.
Q. So it's important, I guess, that you make sure you know the question and understand the question.
A. Okay.
Q. Another thing I'm going to ask you to do is make sure all your responses are verbal.
A. All right.
Q. Because the court reporter is taking everything down, and it's hard for her to get uh-huh or huh-uh or a head nod.
Preliminarily, too, are you under the influence of

Page 6

any kind of medication that would somehow impair your understanding of maybe the questions that we're asking or anything that's going on?
A. No.
Q. Okay. Well, with that in mind, I'm going to start off. Can you give your full name, please.
A. Sure. Debra Liebel. It's D-E-B-R-A L-I-E-B-E-L.
Q. Are you currently married?
A. No.
Q. You're not? Okay. You are employed with the County at this point?
A. No, I am not.
Q. Where are you employed, then?
A. I'm retired.
Q. When was your last employment?
A. June 29th, I believe it was. It was a Friday. July 29th.
Q. Of 2005, right?
A. Yes.
Q. And who was your last employer?
A. The County of Erie.
Q. And what was your position at the County of Erie at that time?
A. Executive director of the Office of Children and Youth.

Page 7

Q. Okay. How long were you at that position?
A. Since -- it was January of 2002 through July of 2005.
Q. Who hired you then for the -- in January 2002?
A. I was appointed by Rick Schenker, the current -- the then County Executive.
Q. Prior to that, were you employed at the County?
A. Yes.
Q. And what was your position at the County prior to that?
A. Assistant director of the Office of Children and Youth.
Q. How long did you have that position?
A. One year.
Q. So that takes us back to 2001, correct?
A. Correct.
Q. And then before that, you were employed at the County of Erie as well?
A. Yes.
Q. Was that with the Office of Children and Youth?
A. Yes.
Q. And what was your position there?
A. I was an administrator.
Q. So that we, I guess, have a time line here, you were administrator with the Office of Children and Youth for

Page 8

how long? And starting when, roughly?
A. If I go back -- I was employed by the County for 34 years, so this is a little --
Q. Okay.
A. I began in administration in 1989.
Q. With the Office of Children and Youth.
A. Yes.
Q. All right. Out of those 23 years, how many of those years were with the Office of Children and Youth?
A. 34.
Q. All 34?
A. Um-hum.
Q. At any point during that tenure were you also -- did you also hold the position of either a case aide or a supervisor?
A. Prior to '89, I was a supervisor for 13 years.
Q. Okay. And, now, going back to July 29th of 2005, I believe you indicated that you had retired from that --
A. Yes.
Q. -- position?
A. Yes.
Q. And as we sit here now, you have no other job prospects? Or is there anything lined up, in other words, that you're going to be getting into?
A. Well, I'm actually enjoying myself in retirement,

Page 9

but I'm also looking to do some consultant work eventually.
Q. Okay. There is no other position with the County that you're anticipating getting into as we sit here today, then?
A. No.
Q. As director with the Office of Children and Youth, can you give us a little idea of some of the responsibility and duties that are involved with that position.
A. Yes. Basically the Office of Children and Youth has three areas for which I was responsible.
Q. Okay.
A. Which was the child welfare program, the daycare program, and the Edmund L. Thomas Center.
Q. For the child welfare program, what type of oversight did you have?
A. It was a broader oversight, because there are -- there is an assistant director over the child welfare program that primarily has responsibility for that. Or was when I was there.
Q. Okay.
A. And there is administrators of record for the various programs. And supervisors.
Q. So you would be the top person, I guess you would say, in that -- in that program. Right?
A. Well, now I'm going to ask you -- I am not sure

Page 10

about what your question is.
Q. That's fine. What I'm trying to get an idea -- let me ask you this way: Is there some kind of organizational chart that shows the chain of command from top down?
A. Yes.
Q. Okay.
MR. McNAIR: There is?
Q. Is that something that you have -- or that's available at the Office of Children and Youth?
A. There should be -- it should be, but it would reflect the current administration; how that's set up.
Q. Okay. When you were there in 1995, July 29th, 1995, the last time you were there --
A. 2005.
Q. Or 2005. I'm sorry.
A. Um-hum.
Q. At that point in time there was some type of an organizational chart?
A. Yes.
Q. Now, your position as director of OCY as of July 29th, 2005 and before, if I understand correctly, in the child welfare program, there's someone underneath you.
A. That's correct.
Q. And that position would be called?

Page 11

A. The assistant director or the director of professional services. That's interchanged.
Q. Okay. And then underneath that position, the assistant director?
A. Would be administrators over the functions and programs, the various programs within the child welfare program.
Q. Where would, for example, the positions of, for example, the supervisors for investigating child abuse claims fall?
A. That would -- well, that would fall in our intake department and would also fall under the child welfare program. And there would be an administrator of the intake area and then the assistant director, as well as four supervisors, I believe, in the intake area.
Q. So, in other words, there's the assistant director, then there's administrators underneath that.
A. Right.
Q. Correct?
A. Correct.
Q. And under one of the administrators would be the intake department.
A. Exactly.
Q. So -- so that intake department has its own administrator.

Page 12

A. Exactly.
Q. Okay. Who would have been the administrator, then, at the time you were there, from 2002 to 2005, for the intake department?
A. Robin Adams.
Q. And am I correct, is there five administrators, then, under the assistant director? I don't want to misquote you. I thought that's what you said.
A. I didn't give a number.
Q. Okay.
A. But -- and I would have to figure that out as we go through programs here. But -- because there are some administrators that aren't in the child welfare program, that are in the other programs, um-hum.
Q. I guess I'm just sticking with the child welfare program.
A. Okay. Okay. That's fine. Do you want me to go through the administrators? I'm sorry. I'm sorry. I thought you were reading your notes.
Q. No. Just sticking with the child welfare --
A. There would be a director of foster care services. And that, when I left, was [redacted].
Q. Okay.
A. There would be a director of court services, slash, also had some clinical units, and that would be [redacted].

Page 13

Q. Okay.
A. There would be director of clinical services and special projects. That was Pam Biroscak.
Q. Okay.
A. A director of another clinical -- of a piece of the clinical program; training and personnel responsibilities. Char Kolupski.
Q. Okay.
A. I think that's -- and then the -- Mike Cauley, the attorney, reported to me also, and Colleen Locke, the assistant director, reported to me.
Q. The intake department, is that called director of intake then? Would that be the position --
A. Yes. And she has some other responsibilities; policy development and whatever.
Q. Okay. Who would that be?
A. Robin Adams.
Q. That's Robin Adams, okay. I thought Robin Adams was the administrator.
A. No. Robin Adams is the director of intake. Colleen Locke is the assistant administrator. Or was. She also retired.
Q. I got you. Okay.
MR. ANGELONE: I'm going to just make a request.

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 14

If there is an organizational chart -- I think we asked for it before. For the record, we're going to make a request that that be produced.

MR. LANZILLO: The organizational chart as it existed at the time she was executive director?

MR. ANGELONE: Yes.

MR. McNAIR: I think we were told that it doesn't exist or that there wasn't --

MR. LANZILLO: I don't think this witness has testified that it currently does exist. I think she said there was one at the time.

BY MR. ANGELONE:

Q. There was one at the time?

A. Yes.

Q. Okay. The circumstances around your retirement --

A. Yes.

Q. -- is this something that you had planned?

A. (Witness nods head.) Yes. Sorry.

Q. And were you approached in any way by anybody in the administration, the current County administration about -- or the prior administration about taking early retirement?

A. No.

Q. Anything to that effect?

A. No.

Page 15

Q. You're familiar with Abby Conley?

A. Yes.

Q. Okay. How long have you known Abby Conley?

A. Since she began working for the agency, which I believe she was at the agency around four years or so.

Q. Okay. So since she started with the agency?

A. Right. I didn't know her before.

Q. All right. And you also know who Sue Deveney is?

A. Yes.

Q. P[redacted] W[redacted]?

A. Yes.

Q. I apologize if I'm pronouncing their names wrong.

A. I think that's --

Q. Do you know roughly how long Miss Deveney was employed there?

A. Off the top of my head, I don't. Maybe close to 10 years, but I really -- I really don't know.

Q. And [redacted] W[redacted]?

A. She's been there quite a while. So she would be beyond the 10 years.

Q. Would it be safe to say that you knew both of those individuals for most of the time that you worked for the County?

A. I know of them. I mean, they are people that work in the agency.

Page 16

Q. Okay.

A. I wouldn't say I knew them well.

Q. My next question, then, is going to be how -- do you know either of those individuals on a personal level, outside the agency?

A. No.

Q. And at any time while they worked for the agency, did you know them at that level?

A. No. I don't believe I met any -- any of them until they came to the agency.

Q. Okay. And the entire time that you did know them, you knew them on a professional level, then, through work? Would that be a correct statement?

A. Yes.

Q. And we're talking about Sue Deveney and P[redacted] W[redacted].

A. Yes.

Q. And would that go for Abby Conley as well?

A. Yes.

Q. Do you know whether P[redacted] W[redacted] currently still works at the agency?

A. Yes.

Q. And does she?

A. Yes.

Q. Is she still with the -- I guess in the intake

Page 17

department?

A. She was never in the intake department.

Q. Okay. What department was she in at the time that you worked there?

A. She was in one of the clinical programs.

Q. Clinical programs?

A. Um-hum.

Q. Okay.

A. The last -- the last administrator she would be under, I believe, would be Pam Biroscak.

Q. That would be the director of clinical services, right?

A. Right. One of the directors of clinical services.

Q. All right. Is that the same, I guess, department that Abby Conley worked under?

A. Yes.

Q. And the same department that Sue Deveney worked under?

A. Yes. At one -- there -- there was some shifts, but.

Q. Okay. I'm looking at the time frame -- let's look at the year 2004, which was the year just prior to your retirement then.

A. Um-hum. Yes.

Q. Would it be safe to say that those three

Page 18

individuals were in that department?
A. Yes.
Q. Okay. Where is your office located in relation to this department?
A. My -- my office is on the fourth floor. And the staff is on the second and third floors.
Q. So when you say "staff", you mean individuals like Abby Conley and Sue Deveney and Miss W[redacted].
A. Yes.
Q. The administrators, those directors, are they also on the fourth floor?
A. No. The administrators are down on the second and third floor, depending on who it is.
Q. Okay. Would it be safe to say that they would be on the same floor as the staff of their departments, or no?
A. In some cases, yes. In other cases, they may not be. Of all their staff.
Q. How about Pam -- is it Pam Biroscak?
A. I -- I don't remember if she was on the same floor with the supervisor and with Abby. I can't remember.
Q. Okay. I'm going to go back now to 2004. Okay?
A. Um-hum.
Q. At some point during the year 2004, were you approached by someone regarding alleged misconduct by Abby Conley?

Page 19

A. Yes.
Q. Can you tell us who the first person was that approached you about that.
A. I'm just trying to get the -- there were -- I'm just trying to get this in my head before I respond to you.
Q. Okay.
A. I believe the first person that may have expressed -- that expressed some concerns to me was the western region representative.
Q. And what is a western region representative?
A. Western region is the Department of Public Welfare. And the Department of Public Welfare oversees the child welfare programs. And you are assigned to a region. And those regional officers come in periodically to do audits, to handle complaints, and also to conduct agent abuse allegations.
Q. Okay. And where is the western region, I guess, office?
A. In Pittsburgh.
Q. And who would that person have been, that western region representative that you're talking about?
A. Shara Saveikis. And I might not have that name correct; the last name.
Q. So from your recollection, this is the first you had heard about some alleged misconduct. It would have been

Page 20

from Shara Saveikis?
A. Shara Saveikis would have been, I believe, the first person to express some concerns.
Q. Okay. Do you remember when; what time frame in 2004?
A. Sometime in either -- probably early July.
Q. Early July of 2004?
A. Um-hum. I just want to state that this is also to the best of my recollection, um-hum.
Q. That's fine.
A. Um-hum.
Q. By the way, did you have an opportunity to review some of this prior to coming today, as far as notes or anything in order to help refresh your recollection?
A. I didn't actually have a lot of things that were home with me, because now that I'm not an employee of --
Q. That's fine.
A. Um-hum.
Q. Let me ask you this: In early July of 2004, then, is it Shara Saveikis that initiated a call to you, or did you initiate a call to her?
A. She initiated a call to me.
Q. From Pittsburgh?
A. Yes.
Q. Can you tell us a little bit about what it is she

Page 21

said or what her concerns were at that time.
A. She called, and I believe she also had her supervisor, John Austin --
Q. On the phone?
A. On the phone.
Q. So it was a conference call, you believe?
A. Yes.
Q. Okay.
A. And she indicated that she had been in the office and had spoken with Miss Conley about a situation that had occurred. And in doing so, she was very concerned about Miss Conley and her demeanor. She indicated that she -- throughout the time that she spoke with her -- and I honestly can't remember what -- how long that was; an hour, two hours, whatever it was -- that there were a lot of different emotions expressed going from crying to laughing. You know, just a lot of different kinds of things that were going on as she was talking to her. And that she was concerned for her and wanted us, you know, to be aware that she had -- that she had concerns about her emotional state.
Q. Okay. These concerns sound more like, from what you're describing, concerns about Miss Conley's emotional state, as you described it.
A. Right.
Q. Were there any inferences or any specifics with

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 22

misconduct that came up in that conversation?

A. No.

Q. Okay. You also indicated that the western region representative will do either periodic audits or investigate claims within the agency?

A. Sometimes client complaints and/or agent -- what they refer to as agent allegations of abuse.

Q. Well, was this particular discussion brought about because of just a periodic audit, or was there a specific instance that I guess inspired this telephone call from Shara?

A. There was a particular instance.

Q. Okay. So there was a particular incident that she was investigating?

A. Yes.

Q. Can you tell -- well, what was the incident that we're talking about, then?

A. It was an alleged incident of one of the employees grabbing a child's face.

Q. For doing what?

A. Grabbing a child's face.

Q. Grabbing a child's face. Would that individual be P.W.?

MR. JOYAL: I'm going to object. I think there's an outstanding protective order about

Page 23

confidentiality. That's one of the names.

MR. McNAIR: We'll instruct the court reporter to substitute her initials for her name when she does the transcript.

MR. JOYAL: We'll do that here.

MR. McNAIR: No, we're not going to refer to her by initials now. If you want to call the Judge, fine, but we're done talking about this.

MR. JOYAL: I'm going to advise you that there's a Court Order, since Mr. McNair didn't do that, that any names that are mentioned either within that --

MR. McNAIR: Two names. The name of [P.W.] has to appear in the transcript as P.W., and the name of [D.B.] has to appear in the transcript as D.B. The name -- I guess there's one more. [V.W.] That shall appear in the transcript as V.W.

MR. JOYAL: Well, there are others as well. I don't know where Mr. Angelone is going to go, but there's the [C.] family. There are other client names as well.

(Discussion held off the record.)

MR. LANZILLO: We had a conference off the record, and counsel has agreed that prior to the finalization of the transcript, one or more of us will undertake responsibility for reviewing the

Page 24

transcript and ensuring that all names that should be redacted or replaced with an initial designation, that that will occur prior to the finalization of the transcript. And at the same time we're making that review, to the extent there are any additional names that we haven't contemplated at this point, we can discuss among ourselves and make a designation of confidentiality as well.

(Discussion held off the record.)

MR. LANZILLO: If I may make a suggestion. Rather than dealing with the names -- every time a name coming up, trying to decide whether it's in the statute or not, I think the safer approach would be that if a witness concludes that there is a confidentiality concern, why don't we use initial designations now, and to the extent that we're overinclusive, that seems to me to be less of a problem than being underinclusive.

MR. McNAIR: As long as we know who she's referring to.

MR. LANZILLO: Right. And we will have to -- and if we have to go off the record and get a designation, if there's any confusion or ambiguity, we can do that.

Page 25

I don't presume to advise the witness as far as her rights and responsibilities. However, if, you know, you conclude that you have a legal obligation not to disclose certain information, you can state that for the record, and the attorneys will then try to work through it at that point.

MR. JOYAL: Well, with all due respect, Rich, I have the right to advise her, because I'm representing her as an individual. And I have raised the concern, and I'm asking --

MR. ANGELONE: I have no problem --

MR. JOYAL: And I agree with your -- I agree with what you're saying. I mean, I think Tony will know exactly -- Anthony will know what names he is talking about. They have been here. If there's a question, we can go off the record.

BY MR. ANGELONE:

Q. And, in fact, I have no problem that while I'm asking you a question, if you have some questions about that, that you can absolutely confer with your counsel, okay, and then we can go off the record and hammer that out. Okay?

A. I have a general concern. Can I state that, or not?

Page 26

Q. Sure. What is that?
A. The fact that if -- the fact that confidentiality under the state law is in several places, including the CPSL and regulations regarding, you know, releasing the names or any identifying information or any kind of information related to these individuals. And that I do feel very much a part of, you know, under that -- under that law. And there is penalties for that.
Q. Okay. What we're going to do is try to substitute initials for the identities of all these individuals.
A. Um-hum.
Q. If at any point you feel somehow uncomfortable or have a question about how to respond to an answer (sic) with respect to the identity of any of these individuals, you can ask Attorney Lanzillo or Attorney Joyal. I have no problem with that. Okay?
A. Okay.
Q. I'm trying to pick up where we left off here a while ago. I think some -- my last question to you was going to be, was that individual, P.W., and that would be the individual that was accused of grabbing a child's face.
A. Yes.
Q. And did Miss Saveikis, during her investigation -- at any point during her investigation or conversations that you had with her, tell you who had reported that incident?

Page 27

A. No. And under the law, she cannot.
Q. Do you have any knowledge as to when that was reported to the western region?
A. I believe the report came through Child Line, which is fine. And it was sometime -- maybe the third week in June.
Q. Okay.
A. Because then she was at the end of June.
Q. All right. She actually came up to the Office of Children and Youth at the end of June?
A. Yes.
Q. Did she come alone, or did she come with her supervisor?
A. That, I don't know. I -- I believe she was alone.
Q. Okay. Did she at any point interview or discuss this matter with you while she was up there?
A. No.
Q. Do you know who it was that she interviewed while she was up here?
A. Abby, P.W.
Q. Okay. Anyone else that you know of?
A. She observed, I believe, the child in her actions.
Q. Would that be the initials D.B.?
A. Yeah, I think so.
Q. Was she only up here for one day, that you know

Page 28

of?
A. I believe so.
Q. Did you, during your discussion with Miss Saveikis, ask her, for example, how long she interviewed these individuals?
A. No.
Q. You don't have any knowledge as far as how long the actual interview process took, then?
A. No.
Q. Was this the only conference call you had with Miss Saveikis in 2004?
A. No.
Q. Do you know how many times you did talk with her on the phone in 2004?
A. One -- I believe one other time.
Q. During this conversation in early July of 2004, did she indicate to you that the allegations were unfounded?
A. I don't recall.
Q. Okay. So as of the time of that discussion, do you know whether her investigation was complete or not?
A. She had -- she had completed the interviews. Whether or not she had done what she needed to do paperworkwise or supervisorwise at western region, I'm not -- I'm not clear on that at all.
Q. It was your understanding that she at least

Page 29

completed her interviews as of that discussion in early July of 2004.
A. Yes.
Q. The concerns that she expressed during her conversation with you in early July, 2004, did they lead you to do -- or take any steps?
A. Yes.
Q. What was the first thing that you did, then?
A. I talked with the assistant director.
Q. Who would that have been?
A. Colleen Locke.
Q. Okay.
A. And just made her aware of the conversation. And suggested that if -- if there was anything that we could do -- if someone would talk to Abby, and if there was anything we could do to assist her, there were -- if the concerns were valid and if there was anything we could do to assist her.
Q. Okay. And so what you told Colleen Locke was that you were concerned about Abby's emotional status?
A. I told -- I -- I relayed the conversation, probably, you know, in a summary kind of thing to -- to Colleen, just -- just to make her aware that the call had -- had come in and that there was some concerns expressed. And I thought that that was something that perhaps she and the

administrator or she and the supervisor or whatever may want to talk to Abby about.

Q. Part of the reason that we're here today is because there's been some allegations of misconduct against Miss Conley that have been made during the year 2004. Okay?

A. Right.

Q. What I guess I'm trying to decipher is whether or not during this conversation with Shara Saveikis in early 2004 revealed to you any type of mis -- anything that you would deem as misconduct on Miss Conley's part.

A. Not at that point. That wasn't the purpose of the call.

Q. Okay. At some point, though, during the year 2004 --

A. Um-hum.

Q. -- someone, I'm assuming, approached you and told you that there was some type of misconduct or alleged misconduct on Miss Conley's part. Would that be correct?

A. Yes.

Q. So it wasn't from Miss Saveikis, if I understand correctly.

A. Right.

Q. Who would have brought forth to your attention any type of alleged misconduct?

A. It would have been from Attorney Allgeier and

Attorney Cauley.

Q. Okay. Do you know which one approached you and told you first?

A. I think it would be Attorney Allgeier.

Q. Do you recall where you were when this conversation took place?

A. No. But usually I would have people come into my office if they wanted to --

Q. Okay. You don't specifically remember if this one took place in your office, though.

A. No.

Q. Do you remember the time frame?

A. It would have been in July; mid to late July.

Q. Mid to late July?

A. Yeah, I would think.

Q. It would have been after this discussion with Shara Saveikis, I assume.

A. Yes.

Q. And can you tell me, what specifically were some of the concerns expressed by Attorney Allgeier?

A. Attorney Allgeier had expressed that -- some concerns about confidentiality; that there was some concerns that Abby was e-mailing a former employee.

Q. Okay.

A. And that there may have been, you know, some case

information that would have been disseminated in that way. And also, I believe, by that time, in regards to P.W., there were some allegations that clients in that P.W. case were indicating that they had information -- personal information about P.W.; that they were aware and had facts around the alleged incident with P.W. that they wouldn't have had from anyone in a formal capacity as of yet.

Q. Okay. Let me ask you this: Going back to the expressed concerns of confidentiality and e-mails being sent, did you get into the details of that with Miss Allgeier at that time?

A. No. Not at -- not at that time. I know that she had been -- had spoken to the supervisor and --

Q. And who would that have been?

A. Sue Deveney.

Q. Okay.

A. And that she and P[redacted] were, you know, concerned about that, because of certain information that -- that may have been -- may have been given. Certain information that was out there that they were -- that they were concerned about.

Q. Okay. And I guess in your capacity as director, when something -- an allegation like this comes to you, aren't you -- or did you in this case delve into some of the specifics, like what are you talking about? You know, did

you try to extract that information from Miss Allgeier?

A. Yes. I mean, there -- but there were -- it's hard for me to remember exactly in that situation, you know, what occurred, because the next element -- all of this was happening very quickly in the month of July. It seemed like July was a time when --

Q. Okay.

A. -- I was getting concurrent concerns from various individuals.

Q. Okay.

A. Okay? So which then led up to an action later on.

Q. Do you know what confidential information was alleged to have been disseminated by Miss Conley that Miss Allgeier was talking about?

A. At that particular time, again, it was around the P.W. situation, and it was around, I believe, the attorney for the V.W. case, you know, needing to know what the address might be of D.C. None of us knew that. But the attorney seemed to have gotten that.

Q. You're talking about V.W.'s attorney?

A. Yes. I don't know who she is.

Q. Okay. Are we talking about an address or a phone number here?

A. This is an address for Deanna Cosby.

Q. So your understanding as of the time of this

Page 34

discussion with Attorney Allgeier was that the confidential information that was given had to do with the address of Miss Cosby.

A. Um-hum. And there was -- and there was some suspect there in that, so.

Q. And is that also what they are talking about -- or what Attorney Allgeier was talking about when she made reference to the e-mail? I mean, was it the e-mail that supposedly gave this information out through the e-mail system?

A. Right. Right.

Q. Was there any other aspects of -- I don't know; I guess alleged misconduct that was discussed at that time with Attorney Allgeier?

A. Not at that time, no.

Q. Then you also made reference to the -- let's see, the P.W. case; that some clients said that they knew stuff about this. When you make reference to clients, do you mean some of the family members --

A. Yes.

Q. -- involved in the V.W. case?

A. Yes.

Q. You don't mean clients outside of that family. I mean, other clients from other cases. That's not what you're talking about.

Page 35

A. No.

Q. And to the best of your recollection or knowledge, did anyone talk -- or ask these clients where they got this information from?

A. That, I don't know. I don't recall -- I should say I don't recall.

Q. So all you knew is that there was some concerns that the clients or family members within the V.W. case knew about this incident involving P.W.

MR. LANZILLO: Objection to form. Go ahead.

MR. McNAIR: What is your objection to the form?

MR. LANZILLO: It mischaracterizes the earlier testimony. She said she did not recall.

(Discussion held off the record.)

(The record was read back by the reporter.)

MR. LANZILLO: My recollection -- previously she was asked a similar, related question, and she said she did not recall, indicating that there may have been other information available to her at the time.

MR. McNAIR: That's why we're taking the deposition.

BY MR. ANGELONE:

Q. But as far as you knew, it was only related to the family members in the V.W. case that knew

Page 36

this information -- that knew this information about the face-grabbing incident; is that right?

A. Family members and, I believe, extended family members.

Q. And extended family members.

A. Um-hum.

Q. Okay. Now, when you learned of this from Attorney Allgeier, then, what was the next step?

A. The next step, was concurrently with that, other things started coming in.

Q. Which other thing?

A. Other concerns related to confidentiality.

Q. Okay. Are we talking about the month of July?

A. Yes.

Q. What other concerns?

A. The next concern that was --

Q. And if I can interrupt you. Can you give them to me in the order that they actually came to your attention.

A. I can try, but --

Q. Okay.

A. -- unfortunately, because of the short time frame they were coming in --

Q. Okay.

A. -- and some of them were pretty -- you know, were pretty concurrent or whatever.

Page 37

Q. Fair enough. Go ahead.

A. So I will -- I will try -- you know, I'll try to do that. I think the next situation was the fact that Mike Cauley had brought to my attention -- Attorney Mike Cauley, from the Office of Children and Youth, who was representing the C. case. And his concern at that time was that in a court hearing where Abby was testifying -- was one of the testifiers, that there appeared to be a document, an unauthorized document that was in the hands of, I believe, an attorney for a parent.

Q. Okay.

A. And that reference was made to that document, and no one at the office knew that the other attorney had that document.

Q. Okay. What other facts? I mean, that's one of them. I think you said there were several facts that were brought out during this time concurrently. You just mentioned one. Was there another one or more?

A. Um-hum, right. At that point, I think -- let me make sure I have this right now. Also at that point there was a request for e-mails to be looked at.

Q. Would that be after Attorney Cauley expressed this concern to you?

A. There were -- yeah, it was -- that was after that. It was -- it was after all of the concerns that sort of came

Page 38

up all related to the confidentiality issues, either of giving out information, allegedly giving out information on employees or family members and -- and e-mailing an unauthorized third party.

Q. Okay.

A. So they talked with me about the idea -- the seriousness of this and of -- the potential seriousness and asked if they could access the e-mails from Miss Conley.

Q. Who asked you for that permission?

A. When we -- when there was a meeting held -- I think it would be with Cathy Allgeier and Mike Cauley, Colleen Locke, and myself. At that time I thought that it was -- it was important that we bring the County into this.

Q. Okay. I'm going to backtrack a little bit. I just want to cover a couple of things; some of the answers you gave. You mentioned the C. case. There was a court hearing.

A. Um-hum.

Q. And it was brought to your attention by Attorney Cauley something to the effect that there was an unauthorized document, I think is what you called it --

A. Right.

Q. -- that was brought out in court.

A. Right.

Q. During this discussion with Attorney Cauley, did

Page 39

you discuss what Attorney Cauley did to investigate further to see what the source was of that information?

A. I believe he indicated that Attorney Villella was discussing that document in the courtroom. I don't -- I don't know if we discussed at that time any further investigation of that.

Q. Attorney Villella is the parents' attorney that you referred to --

A. One of the parents. I can't remember which one he was there for, but one of the parents.

Q. Am I correct that he allegedly had an unauthorized document during the court proceedings? Would that be correct?

A. He was asking questions from a document that had not gone out as part of the protocol that we utilized through the court staff to attorneys and the Court and whatever.

Q. Was it your understanding, then, that Attorney Villella had this document in his possession?

A. At that time Mike was saying he was referring to a document -- Attorney Cauley was saying he was referring to a document. Whether that was meaning that he actually had the document or not.

Q. Okay. And you don't know whether Attorney Cauley asked Attorney Villella where he got the document or got

Page 40

this information. You don't know --

A. I don't recall whether he had asked that or not.

Q. Okay. You then indicated that there was a meeting -- I think you said with Miss Locke, yourself, and Attorney Allgeier and Cauley at some point, right?

A. Right.

Q. And that would be -- is it safe to say that that would be after Attorney Cauley first came to you?

A. Yes.

Q. And who coordinated this meeting?

A. I think it would be me. I just said, we need to meet. As we were -- and at that meeting was when we -- we moved forward to the County.

Q. All right. When you say you moved forward to the County, did you contact someone specifically in the County to discuss this situation?

A. I asked that John Onorato be consulted.

Q. Who is John Onorato at this time?

A. John Onorato was the County solicitor at that time.

Q. So was he made part of this meeting, or no?

A. Not a part of this meeting.

Q. And during this meeting, if I understand correctly, then, this meeting would have happened after that particular hearing, correct?

Page 41

A. After the --

Q. The C. hearing.

A. Yes.

Q. My notes indicate the C. hearing was July 28th, 2004. It was towards the end of July.

A. Um-hum.

Q. You have no reason to dispute that, right?

A. Right.

Q. Could we be looking at early August, then?

A. Right.

Q. You don't know the date, though.

A. I believe it was around August 2nd.

Q. Okay. Fair enough. You had a meeting. And as of the time of this meeting, what were all of the concerns that were addressed with respect to alleged misconduct during that meeting?

A. When we talked, the main focus was that they -- they needed -- they wanted to access e-mails, which I felt was appropriate under these circumstances of the confidentiality, but I would not do so because the County has a computer policy, and because they wanted to take a serious action like that, I wanted to consult the County. And so that's when I directed that John Onorato needs to be talked to, to see if we can -- you know, to see if that's even a feasible thing to do at that time.

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 42

Q. As of the time of that meeting, from what I understand from what we have talked about here, is there was some concern about Miss Conley's emotional well-being that was brought about by Miss Savelkis. Is that right?
A. Um-hum.
Q. That's one. Is that right? You have to say yes.
A. Yes. Yes. I'm sorry, yes.
Q. Then the other was some concern about confidentiality in the form of e-mails, I guess, because the address of an attorney was given to a former employee.
MR. JOYAL: Objection. That's not what she said. That's mischaracterizing her testimony.
MR. ANGELONE: Okay.
MR. McNAIR: The record will disclose what was said.
Q. There was a second concern that had to do with confidentiality that came out during July, right?
A. Yes. Actually, all of this has to do with confidentiality.
Q. Fair enough. But you were approached by Attorney Allgeier in July.
A. Um-hum.
Q. About -- I thought you said about an address being given to a former employee.
A. An address of a former employee being given to an

Page 43

attorney.
Q. Okay. Right. So that's the second, I guess, area of confidentiality that was a concern at that time. Right?
A. Right.
Q. So there's two things, I think, that we have discussed so far. And then the third thing would be about the court document during the July hearing? Or some form of a document during the C. hearing.
A. Well, the other thing would be the confidentiality around the P.W. situation.
Q. Okay. And then there's a confidentiality around the P.W. situation.
A. Right.
Q. So as of the time of that meeting, those are really the four things that, I guess, were brought to your attention regarding Miss Conley?
A. And that there would be a broader concern that there could be some information going back and forth between Miss Conley and Deanna Cosby regarding -- regarding client situations.
Q. Okay. You didn't know about -- you didn't have any concrete -- anything concrete about that at that time, though. Do you know what I'm saying?
MR. LANZILLO: Objection to form.
Q. I'll rephrase that. At the time of this meeting,

Page 44

though, you didn't have any other concrete information, other -- about other e-mails that were going from Miss Conley to Miss Cosby.
A. I don't think so.
Q. Was the idea at this meeting, then, after you had this meeting about accessing the e-mails -- am I to understand that you then discussed this with Attorney Onorato?
A. No.
Q. How did that happen?
A. A meeting had been set up with him, of which I could not attend, as his availability was difficult. So --
Q. And this would be after August 2nd.
A. It would either be that same day or afterwards.
Q. Okay.
A. Or right afterwards.
Q. And who met with him, then?
A. It would be Attorney Cauley, Attorney Allgeier, Colleen Locke, John Onorato, Pete Callan.
Q. And who is Pete Callan at this time?
A. He was the human resources director.
Q. Okay.
A. For the County.
Q. Anyone else, that you know of?
A. Director of administration.

Page 45

Q. Who would that be?
A. Ann Bloxdorf.
Q. At this time -- you don't know what -- or do you know what happened at this meeting, or what the outcome of the meeting was?
A. I know what the outcome was.
Q. What was --
A. I would feel uncomfortable because I wasn't there back and forth with the -- the outcome was that there was an authorization to -- for the e-mails.
Q. Okay. Would that be authorization to allow -- I think the fellow's name is Matt Granger?
A. Yes. To allow actually the company and then Matt Granger.
Q. Who is that company?
A. The company back then may have been called BAC. It's slash ArriveTech right now.
Q. And Matt Granger was --
A. The individual.
Q. Was he an employee of BAC?
A. He was an employee of BAC. I believe he was in the management area of BAC.
Q. Did Matt Granger actually have an office within your building?
A. No, he did not.

Page 46

Q. Okay. Did he have a desk or computer terminal or anything that was his within the building?
A. Matt, no. Hum-um.
Q. No?
A. Hum-um.
Q. Who contacted, then, BAC?
A. That's something that I -- I really -- I can't recall if -- I know I was notified that it was okay -- by John Onorato and by Mike Cauley that it was okay to do that. And I can't remember if I was the one that called or Mike Cauley was. I know that Mike Cauley was to be the point person on this. He was asked by John Onorato to be the point person on this for all of the information to come to Mike.
Q. Okay. He was in charge of --
A. Yes.
Q. -- of this, then.
A. Um-hum.
Q. Okay. So if I understand correctly, then, Matt Granger is the person that retrieved the e-mails?
A. Yes.
Q. Would they be just the e-mails from Miss Conley's computer, or --
A. Yes.
Q. In other words, he didn't retrieve e-mails from

Page 47

any other employees there.
A. Not at that time, no.
Q. And it's also safe to assume that the retrieval of these e-mails occurred after August 2nd of 2004, right?
A. Right. Very -- you know, very shortly after. It began right away.
Q. You don't know specifically what day that was done, then.
A. No. And it may have been an ongoing thing, because there were a number of e-mails, I think, that were looked at.
Q. I'm assuming there was additional charges that would be incurred for doing this by BAC. Is that -- would that be correct, or no?
A. They worked on an hourly rate, yeah.
Q. They worked on an hourly rate?
A. Um-hum.
Q. They submitted invoices to the County, then? Is that how that works, do you know?
A. They would submit invoices to our office.
Q. Would they come to you, to your office, for example?
A. Yes.
Q. The mail would actually physically come to you with the invoices, then.

Page 48

A. The mail would physically come addressed to me, to my assistant, who would then --
Q. She would then take them and reroute them?
A. Yes.
Q. As an example, the invoice for this work, then, that came from BAC, that came to your office, where would that invoice then go from there?
A. To the fiscal department.
Q. To which department?
A. After I signed off on it, it would go to the fiscal office.
Q. Fiscal office?
A. Um-hum.
Q. And then it would get paid or whatever, right?
A. Yes.
Q. Who is Charles Barber?
A. He is the director of human services.
Q. And as far as this organizational chart, trying to kind of picture here, where would he be in relationship to you?
A. He would be over the entire department of human services.
Q. Okay.
A. Um-hum.
Q. Would he be, in essence, your supervisor?

Page 49

A. Yes. One of them.
Q. One of them?
A. Um-hum.
Q. All right. Well, who else would be a supervisor of yours?
A. The director of administration.
Q. Which would be who?
A. Ann Bloxdorf. And, to be honest, anybody that is under Rick Schenker's direction and up through Rick. I mean, the County solicitor, the human resource director, depending on the situation.
Q. As far as who you had to directly report to on anything, would that be Charles Barber or would it be Ann Bloxdorf?
A. Both.
Q. Both?
A. Um-hum.
Q. Okay. Prior to this August 2nd, 2004 meeting, okay, did you have any discussions with Sue Deveney regarding alleged misconduct of Abby Conley?
A. No.
Q. How about with P.W.?
A. No.
Q. I'm just focusing on prior to the August 2nd meeting, then.

Page 50

A. Right.
Q. Right? Okay. And --
A. I need to correct that.
Q. Okay. Go ahead.
A. I didn't have a discussion with Sue Deveney, but I had -- but I issued -- I don't issue directives, per se, but I issued something to her as a result of getting some information about the confidentiality issues around P.W. I asked her through another administrator if she would talk to Abby and indicate to her that if this was going on, she needed to be reminded of confidentiality of this situation, because it fell under the CPSL, and that if -- if it was, in fact, true, and it continued, that further action could be taken, because we couldn't tolerate that kind of breach of confidentiality.
Q. I'm sorry; did it have to do with P.W. or V.W.?
A. Had to do at that particular time with P.W.
Q. What prompted you to do this directive? What specifically then prompted you to do that type of directive to Sue Deveney?
A. I believe it was an e-mail that was sent to me.
Q. From who?
A. From the Union steward.
Q. Who would the Union steward have been?
A. Heather-Renee McConnell.

Page 51

Q. What were the concerns or the contents of the e-mail that brought this to your attention?
A. Again, around these -- these client issues that are -- I'm sorry, the P.W. issues, in terms of talking about the alleged incident, two clients; that it was creating havoc downstairs of people concerned about the personal information that was going out allegedly by Abby. And that at this particular time they understood that I could not or would not speak to anything that was being done or going on, but they had hoped that that would be taken care of.
Q. Okay. And I guess my next question is how would it even get to the Union steward, or how would it have been brought to the Union steward's attention, if you know?
A. I don't know, but I would -- well, I guess I think I do. From the e-mail, it would be P.W.
Q. All right. From your understanding, then, it's P.W. that talked to the Union steward, and then the Union steward e-mailed you.
A. Yes.
Q. Would that be the chain of how that might have happened?
A. Um-hum. And keep in mind, this is all while all this other was going on.
(Discussion held off the record.)
Q. And this, if I understand correctly, would be

Page 52

before the C. hearing during the month of July.
A. Be, yeah, mid -- mid to -- mid July sometime.
Q. Okay. This e-mail that you got from the Union steward, what were the specific concerns?
A. The specific concerns that I remember was that a father in prison had specific information about the allegation that some things were being said about -- personal things about P[redacted] and her personal life that were not true. But even if they had been true, it would not be something that should be being discussed with a client.
Q. The father in prison, would that be the father of --
A. D.B.
Q. D.B.
A. Um-hum.
Q. And was one of the concerns expressed by the father the grabbing incident?
A. Right.
Q. Okay. During the course of these things being reported to you in July and August of 2004, did you take -- or keep any notes at work about this stuff?
A. I may have written down things here and there, but I don't -- I don't recall.
Q. Okay. If you did, would they still be in the County's possession, or would you have taken them with you

Page 53

when you retired?
A. I would have -- those would have probably gone with me, because they wouldn't be a part of anything -- you know, wouldn't be a part of the personnel record or anything like that.
Q. And as we sit here, do you know if you have any of those types of notes or records?
A. I don't know that I have any notes of -- of what -- of what has gone on.
Q. Okay. Let me ask you this: The things that you took with you when you did retire --
A. Um-hum.
Q. -- you didn't destroy anything up to this point, did you?
A. No.
Q. Do you have them in storage somewhere or at home or something?
A. Right.
Q. So you might have some, you just don't know? Would that be correct?
A. I might -- I don't know that I have any -- that I have any notes. The one thing that -- that may -- anything that contained clients' names and things like that, I would have been really cautious about taking with me.
Q. So then going back to where we are in this time

Page 54

line, I think Mr. Granger now is retrieving e-mails that had to do with Miss Conley prior to, I guess, August of 2004. Would that be right?
A. Right.
Q. Okay. How long did that take? Do you know, roughly?
A. A few days.
Q. And when he completed that, did he then come to you, or is it my understanding he went to Attorney Cauley?
A. He went to Attorney Cauley.
Q. Then after that, did Attorney Cauley come to you?
A. Yes.
Q. Do you know when that would have been?
A. We got back together probably mid August.
Q. And what was -- who was in that meeting?
A. That would be -- I believe the same people. Would be like myself, Colleen Locke, Mike Cauley, Cathy Allgeier.
Q. And what was discussed at that meeting then?
A. Well, at that time, then, Mike was putting together a report for -- for John Onorato.
Q. Okay.
A. Of what he learned in looking at these e-mails and if, in fact, there was any breach of confidentiality that could be verified within the e-mails. And at that -- at that time what was verified was extremely disturbing.

Page 55

Q. Was Mr. Granger there at that meeting?
A. No. Mr. Granger's only role was to obtain those e-mails. He was not to be a part of any of that.
Q. The e-mails that were retrieved by Mr. Cauley -- or, I'm sorry, by Mr. Granger, would it be safe to say they were reviewed by Mr. Cauley, if you know?
A. Yes, they were.
Q. Was he the only one that reviewed all of these e-mails, as far as you know?
A. He reviewed them and did a report. And I also looked through some of them. And I believe with his report that went to John Onorato, the e-mails were attached. Or pertinent e-mails. I don't know if a whole -- the whole thing went to them, or pertinent e-mails.
Q. Okay. As far as you know, for example, the e-mails that were retrieved by Mr. Granger --
A. Um-hum.
Q. -- were not given to you entirely.
A. (No response.)
Q. I mean, you don't know if you actually saw all the e-mails that were retrieved by Mr. Granger; is that right?
A. I may not have seen them all. I saw a good portion of them, um-hum.
Q. The portion that you were -- that you saw was selected by Attorney Cauley?

Page 56

A. They were selected by Attorney Cauley as a result of specific direction of looking if there was a breach of confidentiality.
Q. Based on that meeting, what happened?
A. As that was happening, Mr. Cauley was going, you know, through the e-mails or whatever, he and I -- I talked with him at one point, and then we met with those individuals and discussed the outcome of what he had found. And what he had learned and was verified in the e-mails was that Abby Conley had, in fact, e-mailed Deanna Cosby and had talked about the case of V.W. And at one point indicated to her that there was a prognostic detention order that was in effect at all of the hospitals, and that V.W. was not aware of that. And in that, Deanna Cosby replied that she -- she will be aware. And Abby said something like, bless you, or thank God, and Deanna Cosby said something back like, what do you mean, and she said, because you said she will. And that was extremely, extremely concerning to me.
At that time I -- I can't tell you the -- how I felt in terms of -- that that type of breach of confidentiality that would put -- place a child in risk would occur by a person that worked at our office that was entrusted to protect children.
Q. Did you actually -- you actually reviewed the e-mail yourself then?

Page 57

A. Yes, I did.
Q. Are you aware of whether or not V.W. knew of the existence of that order prior to the time of that e-mail?
A. That she was -- the order or the e-mail? She was aware of the e-mail.
Q. The order.
A. The order. It would be highly unlikely she would be aware of a prognostic detention order, because of the nature of what they are.
Q. Was that term, prognostic detention order, specifically used in that e-mail?
A. I can't recall if she used detention order or prognostic detention order, but she said that it was at the hospitals and that [P.] -- [P.] had had these orders put out. Which technically was true, but.
Q. Were there any other e-mails that were discussed during that meeting?
A. Was -- it was mostly around -- and the idea that, you know, case information was -- was going back and forth between this third party that was not a party to the situation, nor by law or by agency policy should have had this information.
Q. And this third party would be Deanna Cosby?
A. Yes.
Q. She's a former employee; is that correct?

Page 58

A. Yes, she is.
Q. Okay. Let me ask you this: Do people from the agency discuss matters with former employees at any time?
A. Only if authorized to do so and if it would be something -- like the employee was coming back to testify at a hearing, and so the employee was -- the caseworker, the supervisor, whomever, the attorney would need to prepare and talk with that individual or ask that individual to come back.
(Discussion held off the record.)
Q. In a situation where you have a -- such as V.W.'s case -- okay?
A. Um-hum. Yes.
Q. -- would it be safe to say that V.W. would have that same right, to contact a former employee to have them come in and testify?
A. That would be up to their attorney.
Q. Okay. So if information is given out with respect to the address of an attorney for possible purposes of testifying, would you consider that to be, I guess, confidential?
A. The address of --
Q. Of an attorney or of a former employee to a client's attorney.
A. Yes. Or not confidential/private. We don't give

Page 59

phone numbers and addresses out at the agency at all, of employees.
Q. But if an attorney needed to get in touch with a former employee, it's not necessarily a breach of the confidentiality rules that are in place in the agency; would that be correct?
A. On the -- on another employee?
Q. Yes.
A. Again, that's a privacy matter.
Q. Okay. Assuming that the other employee gave that permission, would that be okay?
MR. JOYAL: I'll object. You can answer. That's just a hypothetical situation. If you feel comfortable answering it.
A. Yes, except my question would be why would the attorney be going through the individuals? I mean, the attorney should be -- there should be -- you know, there should be conversations between our attorney, their attorney, the supervisor, the admin. You know, this -- this went way out of role in terms of Miss Conley's role.
Q. But it's not necessarily what you would deem confidential information.
MR. LANZILLO: Objection. I mean, she's identified it as private information.
MR. ANGELONE: That's different than -- I'm using

Page 60

it -- confidential --
MR. LANZILLO: Confidential -- let me make my objection.
MR. ANGELONE: I understand.
MR. LANZILLO: It's vague and ambiguous. Are you using the term "confidential" within a particular statutory sense?
MR. ANGELONE: I'm using the term "confidential" in the -- I guess in the aspect of a policy -- the way it's used in the policies of OCY, as part of the OCY policy, as well as the statute. There are relevant statutes that deal with the Office of Children and Youth.
A. I don't know that there's a policy that states not giving out, but it is -- you know, it's the practice, and only certain people have the home phone numbers of employees --
Q. Right.
A. -- on a need-to-know basis. That isn't given out to every -- that staff log is not given out to everybody.
Q. Right. But I guess my point is, the term "confidential information" has a specific meaning with OCY.
A. Um-hum.
Q. And so when we try to define that, that type of information doesn't fall under that category of confidential

Page 61

information, as that term is used with OCY under their policies.
MR. JOYAL: Objection.
A. In terms of the policies -- what I would say, if a person was asked for a phone number of an employee or former employee, an address or whatever, that person should be going to their supervisor and saying, I have been asked for this, because I -- you know, I know that we don't give out these numbers, and I have been asked for that, and I need some direction as to whether or not I should give this.
Q. Okay. Well, again, I'm asking you to assume that the former employee said it's okay to give that information out to this individual.
A. But, again, that would have never occurred had there not been an unauthorized e-mailing back and forth about this case in the first place.
(Discussion held off the record.)
Q. What part of -- what part of the e-mails were unauthorized? You just said it wouldn't have happened if there wasn't this unauthorized communication. What are you talking about there?
A. Well, first of all, there shouldn't be -- there shouldn't be any e-mailings -- you know, private e-mailing according to the County policy. But the e-mailing I'm referring to that is the most concern to me is the e-mailing

Page 62

back and forth between Abby Conley and Deanna Cosby regarding the V.W. case.

Q. Okay. After you had this meeting then in mid August, what was the conclusion that was reached following this meeting, after the e-mails were reviewed with you from Attorney Cauley?

A. Because of the -- the seriousness and the potential danger to the child by this breach of confidentiality and the pattern, we decided that we needed to go back, involve the County in discussing what the next steps would be.

Q. Okay. Involving the County meant what?

A. In particular, Mike Cauley would have drafted the memo to John Onorato with a c.c. to me, which would have included the breaches in confidentiality and some other issues that -- that he researched while he was looking -- looking through the e-mails. And he would have also supplied Mr. Onorato with the e-mails to refer to. That was what he was directed to do at the earlier meeting. Once it was completed, he was to put that into a memo form.

Q. And he was directed to do that by Mr. Onorato; is that right?

A. Attorney Onorato, yes.

Q. And he did do that for Mr. Onorato. He put it in a letter?

Page 63

A. Yes, he did.

Q. At some point, though -- and we talked about this briefly a while back -- you had a meeting with Shara Saveikis, okay -- or, I'm sorry, it was a phone conference you had with Shara Saveikis sometime in early July.

A. Right.

Q. And we talked about that already.

A. Right.

Q. And I think you said you had another phone conference after that.

A. Oh, yes.

Q. I thought you said that there were two of them.

A. You are correct. You asked me if there was another one, and I said yes.

Q. Would that have been -- well, when would that have been, if you remember?

A. August -- early August. I -- for some reason, August 3rd sticks in my mind, but it may not be the date.

Q. Okay. And I just want to ask you -- we have been given some information here. I want to show you a copy of some -- they look like hand notes.

A. Those aren't mine.

Q. Are those yours? Do you know --

A. No.

Q. Would you know whose they were?

Page 64

A. No. The only thing I could think of is -- well, I shouldn't -- I guess I shouldn't speculate.

Q. They are dated August 3rd.

A. I mean, Mike Kazmer and Saveikis here were not in the room. Cathy Allgeier is the only other one that was there.

Q. The date on it is August 3, 2004.

A. Oh, right, um-hum.

Q. Is that what it's dated?

A. That's right, um-hum.

Q. Could that have been the phone conference that you are talking about?

MR. LANZILLO: Are you asking whether she recalls that was the date of the call or whether it relates to this?

Q. That's right.

A. Whether these relate to this?

MR. LANZILLO: Objection to form.

Q. Well, does it -- I think you already indicated before that it sticks in your head August 3rd, 2004 --

A. Right.

Q. -- was the date.

A. Right.

Q. And what is listed here, it says, "Telephone interview, Shara Saveikis."

Page 65

A. Um-hum.

Q. Then there are some names in the other right-hand corner. It says D. Liebel.

A. Um-hum.

Q. M. -- is that Kazman?

A. Kazmer.

Q. Kazmer?

A. I would believe.

Q. S. Saveikis, and P. Berchtold. Is that right?

A. Right.

Q. Do you recall those individuals being with you during the time of this telephone -- the telephone interview that you are talking about of August 3rd, 2004?

A. Well, again, Kazmer and Saveikis would have been on the phone.

Q. Okay.

A. And then myself and Cathy Allgeier. And I believe Cathy called Patrice into that meeting --

Q. Is that Patrice Berchtold?

A. Yes.

Q. Do you recall, was Patrice Berchtold with you during that?

A. Yes.

Q. And the other person that was with you was Attorney Allgeier?

Page 66

A. Yes.
Q. But these are not your handwritten notes.
A. No.
Q. There is --
A. We -- we actually had Patrice in there to -- to, I guess -- what would you say? Take shorthand.
Q. Okay. What is her position? What --
A. She is a personnel analyst.
Q. Personnel analyst?
A. Yes.
Q. What is that?
A. Analyst. She works in the personnel department. She reports -- she reported to me. She was involved -- she -- and because of the nature of her work, you know, is very confidential in what she does, so she was -- she was asked to come in.
Q. She works for OCY, right?
A. Office of Children and Youth, yeah.
Q. Right?
A. Um-hum.
Q. Okay. And so she -- well, she was called in to take some shorthand or take some notes? Was that what her role was?
A. She was -- yes.
Q. Okay.

Page 67

A. These aren't hers, though, because she takes shorthand.
Q. She takes shorthand. Did she ultimately, then, take the information she had and type it out, for example?
A. Yes.
Q. I'm going to show you another document that we have received --
(Discussion held off the record.)
MR. ANGELONE: I'm going to mark the first document that we're referring to as -- I guess we can call it Leibel Exhibit 1. The one I just handed you, we can call Exhibit 2; refer to it as Exhibit 2.
(Liebel Deposition Exhibits 1 and 2 marked for identification.)
Q. Do you recognize this document?
A. This document (indicating)?
Q. Yes.
A. Yes. I believe this was the one that Patrice typed up for Attorney Allgeier as a result of her being brought into the meeting.
Q. Okay. It's three pages long.
A. I haven't seen this one for a while, but --
Q. It looks familiar to you? You have seen it before?

Page 68

A. Yeah.
Q. And did you have the benefit of this document at the time you had a meeting with Mike Cauley in mid August?
A. I don't know if -- there is no date on this, the end of this, when she transcribed it.
Q. No.
A. Okay.
Q. If you know.
A. I don't know.
Q. Can you tell me what prompted this phone conference on August 3rd, 2004.
A. When I indicated that there had been concerns expressed by Shara regarding Abby, and because there were these -- this information that was out there regarding P.W. and what had occurred or -- or allegedly occurred in terms of her with that -- with the child, so Cathy Allgeier wanted to speak with Shara. I believe that there was going to be an upcoming hearing on this particular case, the V.W. case.
Q. The V.W. case?
A. Yes, the V.W. case. So there may -- may have been something that would come out in that hearing. You know, there was just a lot of issues that way, that Cathy had said maybe we should get on the phone and talk with Shara about exactly what had transpired.
Q. So --

Page 69

A. We did.
Q. -- if I understand correctly, it was at the request of Cathy Allgeier?
A. Yes.
Q. And would this have -- when did she come to you? Let me ask you that. When did Cathy -- Miss Allgeier come to you and make this request to have this phone conference?
A. I don't know. Like I said, I believe there was an upcoming hearing --
Q. Right.
A. -- plus there was a lot of things, and so we just -- we --
Q. It wouldn't have been on that same day, would it?
A. It could have been.
Q. It could have been? You don't know for sure?
A. No, I don't, but it could have been. Because we could have called just to see if she was in, and she happened to be in.
Q. Okay. In looking at the very bottom line of the third page, there is a reference there that says, "It was noted that just because you have an unfounded report does not mean the incident didn't occur." Do you see that?
A. Right.
Q. Do you recall that part of the discussion with Miss Saveikis?

A. No, I don't. Because for all intents and purposes, under the CPSL, when you make a -- when you make a report of child abuse, it's indicated founded or unfounded. When it's unfounded, it's like it's never happened, and it's expunged within a year.
Q. Well, who would have said that?
A. I don't know. P. -- okay, this is P.W. That's why this is --
Q. Right. She was taking -- I mean, she was taking shorthand, and then she transcribed these; is that correct?
A. That's -- yes.
Q. So would it be fair to say that it did come up during this conversation on the 3rd at some point?
A. It may have.
Q. Why else would she put something like that in?
A. Right. That's what I mean. But why I'm saying it may have is I don't recall it.
Q. Okay. That's fine.
(Discussion held off the record.)
(Recess held from 10:49 a.m. till 11:02 a.m.)
Q. Okay. You want to --
A. Yeah, I need to go back. It was my mistake, because I don't -- all of the players and the families I don't have, since I don't have a list of them before me. You asked me if the man in prison was D.B.'s father. He's

not.
Q. Okay.
A. And I think I said, yes, it was D.B.'s father. It was R.B.
Q. R.B. is who?
A. [R.B.]
Q. Is the -- oh, he's the father of R.B. [sic].
MR. McNAIR: Yeah, that name should be redacted.
A. Right. It's just R.B.
Q. R.B.
A. So it was R.B., but he's not [D.B.]'s father.
Q. He's not D.B.'s father.
A. Right.
Q. He's R.B.'s father.
A. No, he's --
Q. Oh, he is R.B.
A. He is R.B.
(Discussion held off the record.)
Q. Okay. I want to -- I don't think I will be too much longer, just so you know.
Going back to that meeting, after had you that meeting that we're talking about in mid August with -- I think you said Attorney Cauley --
A. The mid August one would --
Q. With the e-mails.

A. The e-mails. Well, it would be with everyone again.
Q. Okay.
A. Um-hum.
Q. Right.
A. Um-hum.
Q. After that --
A. Including -- I think at that point it was including John Onorato.
Q. Okay. Attorney Onorato was there as well.
A. Um-hum.
Q. All right. You know what, let me backtrack. I'm sorry. I wanted to -- since we were on this, I just want to finish up with this. And I'm going back to that conference call on August 3, 2004.
A. Correct.
Q. Okay? As I was looking at that, I think the last thing I asked you was about that last line on Page 3.
A. Right.
Q. You know, going up, the second paragraph in that same page, Page 3 --
A. Um-hum. Where it starts with the name of the -- Shara?
Q. Yeah. "Shara stated concern regarding Abby's continued employment and the fact that she was removed from

another unit for problems."
Why was there a concern at that point about Abby Conley's employment? Where did that come from?
A. Concern about her continued employment, you mean.
Q. Right.
A. Possibly because of the concerns that she shared early on with me.
Q. About her emotional state?
A. Yeah.
Q. That that somehow was a concern about her employment with the agency?
A. It may have been from her.
Q. From who?
A. From Shara.
Q. It appears that Shara --
(Discussion held off the record.)
Q. Do you recall -- because I'm trying to understand why -- or what concerns Shara had about Miss Conley's employment at that point in time. Why there were concerns about her continued employment.
A. I don't -- I don't recall that or remember what the statements were around -- were around that. That would actually be an unusual statement, you know, for western region to make. So I don't -- I don't know.
Q. Would you agree that that's -- based on your

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 74

experience, that that's out of the scope of what they are supposed to be doing?

A. Yes and no. As an oversight body of us, if they -- you know, if they have some concerns about how someone's conducting themselves in the workplace or if there's concerns about, you know, their emotional state or whatever, they may -- you know, they may share that in a very informal way. This -- you know, again, you know, I don't know that this was meant to be a formal document, but they may -- it doesn't mean that they would have impact on that or that they would presume to say, you know, that this person should or should not be employed. That would not be their role.

Q. But if I do understand, her scope and her purpose from the beginning was to investigate -- was only to investigate an allegation that was sent in through Child Line.

A. Right.

Q. Would that be right?

A. Right.

Q. Then the page before that, Page 2 --

A. Um-hum.

Q. -- I'm looking at the third paragraph, and I'm looking at the second line in the third paragraph. It makes reference there that she -- and I think it's referring to

Page 75

P.W., because that's who it was referring to in the first sentence. Says -- do you see where I'm talking about?

A. Um-hum.

Q. It says, "She did know that Abby was stating that she grabbed D.'s face." It seems at this -- at least at this point in time that P.W. believed that Miss Conley made the allegation to Child Line. That's what I'm gathering from looking at all this. Would that be a safe -- do you know if that's true?

A. She may have. She may have thought that. But, again, I can only reiterate that that would have never been revealed.

Q. Okay.

A. I mean, I don't know who the referral source was on that particular --

Q. That's my next question. Do you know --

A. No.

Q. -- as we sit here today who that referral source was?

A. No. I -- I know -- I know that Abby talked with her -- you know, with her supervisor about this particular incident, so -- you know, so I know Abby was concerned about this incident. I do not know whether or not Abby was the referral source.

Q. When Miss Saveikis came in -- I think late June to

Page 76

investigate, okay --

A. Um-hum.

Q. -- she interviewed P.W.

A. Um-hum.

Q. Right?

A. Um-hum.

Q. She also --

A. Yes.

Q. Okay. And she also interviewed Miss Conley?

A. Yes.

Q. Do you know that?

A. Yes.

Q. Do you have any idea why she would interview Miss Conley if the allegation was made against P.W.?

A. Because, then, Miss Conley would have been the only witness to the alleged incident, because she then also made her supervisor aware that she had witnessed this occurring. So witnesses to this, I guess, would be included in --

Q. Okay. You don't know how Miss Saveikis knows that Miss Conley was a witness to it.

A. My guess is when she came in and talked to the supervisor, we would be obligated to say that we have a witness to this.

Q. And the supervisor would be Miss Deveney?

Page 77

A. Yes. Supervisor or she -- because I believe that she also talked to Miss Biroscak, who is the administrator, and -- and that. So she -- we would be under obligation -- that would be like hiding the fact that we knew that there was someone who had actually been there.

Q. I guess Miss Saveikis would know best as to what led her to that investigation in that form, right?

A. Yes.

Q. Well, let me ask you this: Do you know whether Miss Deveney felt that Miss Conley was the one that reported this to Child Line?

A. I don't know. And, honestly, if I was hearing people speculate to that, I would tell them to stop it. Because, you know, there is no way -- again, we're under the confidentiality law; that there should be -- you know, no way a referral source should be revealed, so don't try to go there and figure out who it is. You know?

Q. So then as a last question on that, you don't know of anyone that was working there in June and July of 2004 that told you that they suspected that it was Miss Conley that made that report to Child Line.

A. I don't believe anyone -- anyone told me that. I don't believe.

Q. Okay. Did you hear otherwise; that it was suspected that it was Miss Conley, through talk or anything

Page 78

in the agency?

A. I believe that because Miss Conley was talking about it herself to other people in the agency; that there then could be -- you know, that there then could be speculation on that.

Q. How about Attorney Cauley or Allgeier? Did they indicate to you that they felt it was Miss Conley that made that report?

MR. LANZILLO: The Child Line report, you're talking about?

A. Child Line report?

Q. Child Line report, yes.

A. That's sort of a -- I don't recall that. I don't recall that depth of the discussion. Because we are supposed to be very separated from the investigation of any agent abuse. That's why they bring in western region. We're not supposed to be involved in anything that goes on or -- until after the fact. Except for possibly making sure that the child is safe or something. But, you know.

Q. Okay. You mentioned that you knew that Miss Conley was telling this to other people in the agency; that she witnessed this. Do you know who these other people were that she -- that she told?

A. I know one person, yes. Kim Peebles.

Q. Peebles?

Page 79

A. Um-hum.

Q. Anyone else?

A. Just -- just the -- the e-mail that was sent by the Union steward was that there was all this discussion in the halls from, you know, Miss Conley to -- and the staff was concerned about confidentiality, the staff was concerned about personal privacy, that kind of thing.

Q. Okay. If I understand, it's the same e-mail that -- that came about because of the complaint from P.W. to the Union steward, right?

A. Yes. And -- yes.

Q. At the time of this August 3rd, 2004 phone conference, okay, was there any discussion between you and anyone else in the agency at that point in time about the future of Miss Conley's employment with the agency?

A. No. This would be on the 3rd?

Q. Right.

A. We had just -- we had just been authorized on the 2nd to go into the e-mails.

Q. And as of the 3rd, you didn't have these e-mails yet. Would that be correct?

A. I -- I didn't. I didn't have them. Mike may have had some of them that he was beginning to look at.

Q. All right. So as of this time, you had no discussions with anyone in the agency regarding letting

Page 80

Miss Conley go or reprimands or anything to that effect?

A. Other than the -- the ones I have stated, which was just to ask her to stop talking about --

Q. And that, you said, was an e-mail to her supervisor?

A. I didn't e-mail her. I talked -- I talked -- there was an administrator that was in my office that was covering for the -- I had -- my assistant director and the administrative director were on leave, and so I talked with her and said, you know --

Q. You talked to Sue Deveney.

A. I talked to Robin Adams, who spoke with Sue Deveney.

Q. And that was the chain. It went to Robin Adams, and then to --

A. Right. She was -- yeah. I don't think I ever e-mailed.

Q. Okay.

(Discussion held off the record.)

Q. There was actually a hearing that was coming up --

A. Right.

Q. -- in the P.W. case on August 6th. And I think --

A. V.W., you mean?

Q. V.W., I'm sorry.

A. V.W., um-hum.

Page 81

Q. And I think you testified that that prompted this call by Attorney Allgeier, or at Attorney Allgeier's request; this conference of 8/3/04?

A. Right.

Q. With Shara Saveikis.

A. As I recall, that -- you know, she was -- she was concerned about all this information and wanted to have a better understanding about this.

Q. Okay. Do you know whether P.W. was involved in the V.W. case?

A. P.W. was involved in the --

Q. Did she have a role in the V.W. case? Was she the caseworker in that case?

A. Off the top of my head, I can't -- I can't remember.

Q. You don't remember that?

A. Not that I -- hum-um.

Q. So you have no knowledge as to -- or do you have any knowledge as to whether or not P.W. was removed from the V.W. case in August of 2004?

A. I'm getting the two cases mixed up, the C. and the -- I mean, if you have reference to that, then I'd be happy to look at it.

Q. You don't know -- I mean, it's -- to the best of your recollection, I guess.

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 82

A. There was -- there was discussion that I believe she wasn't removed, I think -- I mean, removed -- she was asked -- I think she asked to be removed.
Q. Okay. From that --
A. Yeah. Because I'm getting the C. case and the -- it's starting to --
Q. Right. And we're talking about the V.W. --
A. It's starting to mesh. So another case -- you're correct. Another caseworker was assigned to that case as a result. I think there were a number of things that happened at that point. I think, you know, that Abby moved to another unit, cases were moved around; different things of that nature.
Q. Okay. And it's your understanding that she asked to be removed from that one?
A. I believe, um-hum. I think, you know, with all the -- to be -- it was a very awkward situation, with all the information that was going -- somehow getting to the clients. That she -- and allegedly through Abby, that these kinds of things were going on about her personal life and all of that, that I think it was just -- became something that she couldn't effectively deal with that case.
Q. Well, do you know if there was any investigation to find out how these clients got this information? Did anybody ask the clients where they got the information from?

Page 83

A. You know, I really -- I really don't recall that one. I really don't. You know, whether or not --
Q. With respect to P.W. --
A. P.W., okay.
Q. -- I understand that she has been employed there for -- with the agency for more than 10 years. Would that be correct?
A. I would think, yeah. It's been a while.
Q. In the time that you were involved there, did you know of any other incidents that she was reprimanded in any manner for inappropriately touching a child?
A. I don't recall that.
Q. Okay. Are you aware of any other complaints of that similar nature?
A. Do you have -- I mean, is there a specific thing that you are trying to get at?
Q. I'm just wondering if she was ever reprimanded in the past.
A. I'm just saying, that might -- that might jog my memory. But I don't recall of any. But I wouldn't be directly over -- you know, I would not be directly over her, if there was an incident that occurred that --
Q. Who would be in a better position to know that information, then, besides her?
A. Individual supervisor, program director.

Page 84

Q. Such as Sue Deveney?
A. Right.
Q. That type -- that position, right?
A. Right.
Q. I'm going to go back to these notes. These are the handwritten notes, okay?
A. Okay, um-hum.
Q. I noticed in those notes there's reference to another incident that P.W. was -- where P.W. had allegedly grabbed the arm on July 30th. And the pages are not numbered. But I'm looking at the third page from the last. So the third page from the back. It says at the top there, looks like July 30, "Shara talked to V." Looks like -- can't make it out.
A. To V.?
Q. "W. grabbed D. arm and shook her two times." Then there's other initials; L.B. "L. saw one time."
A. Well, since these aren't my notes.
Q. I'm just -- you were there for that discussion. I guess my question is, do you remember -- do you remember a discussion about any other allegations involving P.W. grabbing the arm of a child, or allegedly grabbing the arm of a child?
A. I -- I don't remember this discussion.
Q. Okay.

Page 85

(Discussion held off the record.)
Q. You testified you have been there since 2002, I believe.
A. Right.
Q. Were you aware of any other alleged misconduct by Abby Conley prior to June of 2004?
A. No.
Q. After your meeting with Attorney Cauley in August, mid August of 2004, okay, where he showed you some of the e-mails, I believe -- right?
A. Yeah. The e-mails were attached.
Q. There were other individuals there, correct?
A. Right.
Q. What was the, I guess, planned course of action after that meeting?
A. Well, you know, in -- now that we're back at the e-mails, it brings up something in my mind. Is it okay if I bring -- it was in response to --
Q. Absolutely.
A. -- a question you had asked.
Q. Sure.
A. You had asked what other kinds of things that might -- other than the breach of confidentiality, about the prognostic detention order. Other -- other -- another thing that was apparent in those e-mails was that -- seemed that

Page 86

there was rather a gleeful exchange about the fact that C&Y was in the paper again. And there was some reference again to a client -- an alleged client situation; a drowning of a child. And it was alleged that the agency, you know, wanted to keep it quiet, but, you know, wouldn't Ed Palattella or something like to -- like to know that. So -- and, again, there would be another, you know, breach of confidentiality there.

However, that was a pretty misinformed situation, because the child that drowned was a client of the juvenile probation department, and his brother was the client of ours. So it was a misinformed e-mail to begin with, but it also was a breach of confidentiality in terms of --

And something to the effect that, you know, [M.H.], who was the -- M.H. -- put M.H -- who was the caseworker, you know, was not -- you know, did not show, you know, any kind of remorse about that or whatever.

Q. What part of all that is confidential?

A. Pretty much all of it. Shouldn't be discussing, you know --

Q. The fact that OCY is in the paper is not confidential, because they are in the paper, right?

A. No. But the talking about, again, the case, the -- you know, the client, I mean, there's just -- there's just -- it's just an impropriety that --

Page 87

Q. Did it have to do with a child that drowned that was not in the system at OCY, that was not related to OCY?

A. Well, in terms of Abby thought she was reporting on a case that was -- that was involved with the agency.

Q. But the child wasn't, in fact, involved with the agency.

A. Right.

Q. Right?

A. Right.

Q. Okay. That takes me back to the allegations that were made with respect to B.W.'s [sic] child and D.B., okay?

A. V.W.'s child.

Q. V.W.'s child. Okay?

A. Um-hum.

Q. Is it the policy of OCY that the parent should be informed of that type of allegation, or not?

A. That would not be ours to inform at that point. Again, western region does that evaluation.

Q. Okay.

A. So everything is in their realm to discuss.

Q. So OCY does not take a position as to whether or not that type of information should be disseminated to the parent?

A. That type of information should be discussed with the parent by the appropriate person.

Page 88

Q. And who would be the appropriate person?

A. It would either be western region, since they are doing the evaluation, or whomever is conducting the evaluation at our office or their supervisor.

There is also kind of a form letter that goes out from when the investigation is completed, just saying the -- that it's been completed and, you know, what -- and what the disposition is. So -- so, yes, there would be, but in this case, it would -- in no case would it be a social services aide's responsibility to do that. And in this case it would be in conjunction with western region, as to how they wanted to handle that. And most likely they would be the people that would be sending out the letter and discussing anything.

Q. After the meeting with Attorney Cauley in mid August, did you have any discussions with Abby Conley?

A. No.

Q. Do you know if Attorney Cauley or Attorney Allgeier had any discussions with Abby Conley?

A. Around this situation?

Q. After -- after the --

A. No. No.

Q. After that meeting that you had where you were shown these e-mails --

A. Right. No.

Page 89

Q. -- are you aware of whether Sue Deveney or anyone else in the agency had a discussion with Abby Conley?

A. No, I don't believe. I'm not aware of them, if they --

Q. All right. Did you discuss this situation with anybody higher up in the administration, other than Attorney Onorato?

A. The director of human resources, and, of course, Ann Bloxdorf had been in the initial meeting, but she turned that over to Attorney Onorato.

Q. So after the mid-August meeting, you didn't personally discuss the situation with Ann Bloxdorf or Charles Barber.

A. No.

Q. Are you aware of whether anyone else did?

A. No. That would be the County's discretion.

Q. Okay. There was also a meeting on September 10, 2004, which Miss Conley was asked to come to the -- asked to come in. Do you remember that?

A. Yes.

Q. That was a Friday, I believe. Do you recall --

A. Yes, it was a Friday.

Q. When was the decision made to have that meeting?

A. That afternoon.

Q. That same afternoon?

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 90

A. Yes.
Q. Who initiated that?
A. Who initiated the meeting?
Q. Yes.
A. The County.
Q. Who specifically?
A. It was a joint initiation by Mr. Callan and Attorney Onorato.
Q. Who called you, for example, and said we're going to have this meeting?
A. Both of them. Both of them. It was Pete Callan who called me.
Q. Okay.
A. And I believe John Onorato was in the room.
Q. Okay. What did he tell you this meeting was for?
A. To proceed with the termination of Miss Conley.
Q. Okay. This would be in the afternoon of the 10th of September. Would that be right?
A. Correct.
Q. In fact, it was towards the end of the day. Do you recall that?
A. It was -- it was mid afternoon, I think, at least. Mid to late afternoon.
Q. Okay. Did -- well, who called Miss Conley? Do you know who made that call to have her come in?

Page 91

A. Well, I asked -- at that point I think I asked Colleen Locke or Char Kolupsky, one of the two of them, to try to locate Miss Conley, because I didn't even know if she was -- if she was in the building or if she was out doing client work. I believe she was in the building or coming into the building.
Q. And so when you got the call, you understood that the purpose was to terminate her employment with the agency. Is that right?
A. Right.
Q. Did they get into specifics at that point in time as to why?
A. Well, the specifics that we had discussed was the fact that -- the breach of confidentiality, in terms of notifying the parent of the prognostic detention order, which placed the child in danger and subsequently was a violation of the agency policy, the regulations, Child Protective Services Law, the Juvenile Act, whatever. You know, so that was -- that was the main -- that was the main reason.
(Discussion held off the record.)
Q. You had just mentioned a number of different violations.
A. Um-hum.
Q. Laws, I guess you referred to.

Page 92

A. Um-hum.
Q. Can you, I guess, explain how that specifically violated those -- those policies and laws that you cited.
A. Yes. I mean, there -- there should be no release of any kind of information related to the case, related to the name of the person, related to anything that's going on, you know, at the agency to anyone outside of the agency or anyone that doesn't have a professional need to know or a designated person in that law.
Q. Including the parent in this case.
A. Including the parent in this case.
Q. Okay.
A. Um-hum.
Q. Now, what specific violation is there -- how did the dissemination of that information specifically violate those -- those laws that you cited?
A. The information that was transferred via e-mail to Deanna Cosby was a violation of that.
Q. How is that? I mean, that's what I'm trying to find out.
A. She's a third party. She has no -- she has no right to any information related to -- to this case. There was no reason for her to have that information. It's a clear violation.
Q. Well, you say a "clear violation", and that's what

Page 93

I am trying to get to. What specific statute --
A. The Child Protective Services Law.
Q. What does it say that says that that is a violation; that that specific information that she disseminated is a violation?
A. It says that no information -- there's only specific people that the information can be transferred to. This -- and this clearly does not fall under that in terms of an outside party of any kind having any information about a case.
Q. Do you know the specific language of that statute that says that that type of information cannot be disseminated?
MR. JOYAL: I'm going to object. If you have the statute, give her the statute. She's not --
MR. McNAIR: Well, I don't have the statute, because we don't know what statute she's talking about.
MR. JOYAL: How many more statutes do you need to have laid out to you there?
MR. McNAIR: I just need -- look, I've got the books, Buddy.
MR. JOYAL: Then go look at the books. Look at the books.
MR. McNAIR: No. I need to apply the facts to the

Page 94

law. I have been asking you this for a year, and you can't tell me, so I don't see why you expect me to tell your witness.

MR. JOYAL: Mr. Angelone, she's not going to answer a question --

MR. McNAIR: Are you directing her not to answer? If you are, I'm going to ask that you specify the privilege you're intending to protect.

MR. JOYAL: What I'm suggesting to you, Mr. Angelone, is if you have -- you're asking her for specific language. She -- unless you give her the statute, I think it's an unfair question.

MR. McNAIR: We're asking her what statute --

MR. JOYAL: Are you Mr. Angelone, Mr. McNair? You're not conducting the deposition. He is. You gave him the opportunity to ask the questions. Okay? If you have got statutes with your exhibition [sic] exhibits that are sitting there, hand them to her, and maybe she can tell you what the language is. But other than that, Mr. Angelone, she has a right to know what you're asking.

(Discussion held off the record.)

BY MR. ANGELONE:

Q. Who made the decision to do this?

Page 95

A. I'm sorry?

Q. To terminate Miss Conley. Who actually made that determination?

A. It was a joint decision.

Q. When you say it's a joint decision, did you actually have -- well, when did you have that discussion to make that joint decision?

MR. LANZILLO: Objection to form. Go ahead.

A. That would have been after reviewing the e-mails, after the report was submitted to -- to Attorney Onorato and after we met to discuss that.

Q. After you met in mid August.

A. Right.

Q. Okay. You had another meeting, then?

A. That -- that was that meeting.

Q. The meeting that you're talking about where Attorney -- Attorney Cauley showed you the e-mails, okay, in mid August, okay --

A. Yes.

Q. Was it during that meeting that the determination was made that she be terminated?

A. (No response.)

Q. You said it was a joint decision.

A. Right. Right.

Q. Okay. So you actually discussed that at that

Page 96

point in time?

A. Yes. As a result of the e-mails.

Q. And who said, well, then she has to be terminated? Did anybody just come out and say that? Is that something that you said?

A. I think the evidence that was collected via the e-mails. Whatever led to the decision that she needed to be terminated.

Q. Who was the first person at that meeting to suggest that that be done? Do you remember?

A. No.

Q. Okay.

A. No, I don't, really.

Q. And based on that, then -- am I correct, you don't remember when that meeting was?

A. Would be -- it would be mid -- it would be mid August that we had the meeting.

Q. Okay.

A. And we just -- let me backtrack on this --

Q. That's fine.

A. -- because this is getting confusing for me, without any references here. We had the meeting where we discussed what was in -- what was found in the e-mail. I don't believe the report, as I correct myself, was written up at that point.

Page 97

Q. The report that Attorney Cauley was to make to Attorney Onorato?

A. Right. I think. Because the report is dated August 20th. Okay?

Q. Okay.

A. So it was in the process, I think -- you know, that the e-mails had been looked at. The discussion was being held on what was found in the e-mails. And I believe at that time, due to the seriousness of the breach of the confidentiality, we looked at, you know, the -- that once this was all put together, that termination was possible.

Then on -- on August 20th, Mr. -- Attorney Cauley completed his report -- was dated and was complete, and he brought that over to Attorney Onorato's office.

Q. Okay.

A. I was in another meeting and was contacted by my assistant director that the County would be -- would be terminating her.

Q. Okay. And so that would be around August 20th, right?

A. Yes.

Q. During that meeting, prior to August 20th, you said that termination might be a possibility. Was there also a discussion of a possible lesser sanction or reprimand instead of that?

Page 98

A. Due to the seriousness of this, no.
Q. You learned of the County's decision to terminate her on about August 20th --
A. Yes.
Q. -- I think you said?
A. Yes.
Q. About 20 days went by before the actual termination.
A. Yes.
Q. Any idea why --
A. Yes.
Q. -- so much time? Can you explain that.
A. Um-hum. At that meeting --
Q. Which meeting?
A. Well, I mean, at the meeting. At -- when we had talked on August 16th or thereabouts --
Q. Okay. Prior to the August 20th --
A. Prior to August 20th. We -- and I think it was me who brought this up; that -- that we wanted -- I wanted to make sure that people were aware of this and that Rick Schenker should be talked to. Okay? So I asked if that was -- that was a possibility, and we made an appointment with Rick to talk to him about this. And then he had to cancel, and then we had a meeting on the 9th.
Q. So you had a meeting with Rick Schenker on the 9th of September?
A. Um-hum.
Q. Okay. You and who else? Who was present at that meeting?
A. John Onorato, Pete Callan, Ann Bloxdorf, I believe.
Q. At any point in time prior to the meeting on the 10th of September, was there any concern from anyone in the administration or the office that Miss Conley was being terminated because of how she testified at a hearing in July?
A. When you say -- when you say concern by the administration, that wasn't really an issue.
Q. Okay. Was it ever brought up that -- was the term whistle-blower ever mentioned -- ever mentioned prior to September 10th, 2004, as it relates to Miss Conley?
A. No. But -- I'm trying to think about that -- that testimony [sic]. No, there wasn't any. There wasn't any talk about a whistle-blower. That didn't --
Q. You have heard of the term before, I imagine --
A. Yes. I know -- I know -- I mean, I understand the term, but I don't believe that that was discussed.
Q. Up to September 10th of 2004, you never heard anyone throw that word out at any point in time?
A. I don't -- I don't believe so, no.

Page 99

Page 100

Q. Okay. Is it possible it could have; you just don't remember? Is that what I'm getting?
MR. LANZILLO: Objection to form. Calls for speculation.
Q. Well, I'm just -- you can answer. I'm just trying to understand --
THE WITNESS: Oh, I can answer?
MR. LANZILLO: You can answer, yes.
Q. What I'm trying to understand is if it's definitely that you didn't hear that, or it might have come out; you just don't recall whether or not it did? I'm trying to understand -- that's what I'm trying to --
A. By anyone in administration?
MR. LANZILLO: Same objection. Go ahead.
Q. As it relates to Abby Conley.
A. No, I didn't hear that.
Q. I also have a document.
MR. ANGELONE: I would like to label that as Liebel Deposition Exhibit 3. And that's going to be a letter of August 30th, 2004.
(Liebel Deposition Exhibit 3 marked for identification.)
Q. That's addressed to you; is that correct?
A. Yes.
Q. And this is a letter from -- I think it's Shara Saveikis; is that correct?
A. Um-hum.
Q. I assume this was done at your request?
A. I believe Attorney Allgeier's request.
Q. Attorney Allgeier requested it?
A. Yeah. I mean, I was in the meeting when she did that. I was in the conference.
Q. If she was the one that requested it, why wouldn't it be addressed to her?
A. Well, what I'm saying is I believe Attorney Allgeier requested that she put in writing what her concerns were that she expressed to me in that phone call. I think Attorney Allgeier was advising me that we should have these in writing.
Q. Okay. Why did you need this letter? What was the purpose of this letter?
A. I wanted to have documentation that there was concern expressed by western region.
Q. Okay.
A. And to what extent that was; the concerns were.
Q. I'm noting in the second paragraph of this letter, it discusses that this maltreatment was reported by Miss Conley on June 21, 2004. Isn't that information that should be confidential?
A. No. She reported that that was when she talked to

Page 101

her supervisor. That has nothing to do with the report that went to Child Line.

Q. So it's only reports that are made to Child Line that are deemed confidential within the agency?

A. I'm not sure what you're talking about. The -- when western region has the right -- western region is the investigator in this situation. They have the right to have all information related to this. So there's no confidentiality between Children and Youth and western region. We report to them.

Q. Okay. But it seems -- this -- at least from this information, that it's telling you that Miss Conley reported this alleged maltreatment, where earlier you testified that you wouldn't know who reported it.

MR. LANZILLO: Objection.

A. I didn't testify to that.

MR. LANZILLO: No, you're mischaracterizing her testimony. To the Child Line. I mean, this --

A. I would not know to the Child Line.

Q. So it's only with respect to Child Line, you don't know who reported that.

A. Right. Any allegations of abuse that were reported to the agency or to Child Line, we can never reveal the referral source. In addition to whomever, you know, reported it to Child Line, Miss Conley also went to her

supervisor and said these allegations to the supervisor.

Q. Okay. The supervisor --

A. But the report was already --

(Discussion held off the record.)

Q. So the supervisor, Miss Deveney, you are talking about.

A. (No response.)

Q. You're talking about Miss Deveney, right?

A. Right.

Q. She's a part of the agency, obviously. So reports to the agency are not considered confidential or are considered confidential?

A. Only if we're -- the receiving of a Child -- a Child Line report was already made. This is totally separate from the Child Line report. So this is Miss Conley talking about this with her supervisor and that. But no one knows -- nor if it was -- or if Miss Conley would have said to somebody at the agency, I was the person to report to Child Line, we would have validated that for --

Q. Okay. If I understand correctly, then, reports made within the agency -- I'm not talking about Child Line, but reports made within the agency about alleged -- as it says here, maltreatment, okay, regarding another agency worker, are not -- do not fall under that confidentiality policy that the agency has. Would that be -- would that be

correct?

MR. LANZILLO: Objection.

MR. JOYAL: Objection to form.

MR. LANZILLO: Can I tell you what --

MR. McNAIR: No, this is -- I don't want you suggesting answers --

MR. JOYAL: You are not taking the deposition. You don't have a right to say anything. Mr. Angelone, if you want to say something as to questioning --

MR. ANGELONE: Yeah, I do. Yes.

MR. McNAIR: Let her answer the question.

MR. LANZILLO: No, no, I can state my objection.

MR. ANGELONE: You can state a reason, as long as you don't insert any information that would be part of the answer.

MR. LANZILLO: The question is vague and ambiguous. When you say "confidential", are you talking about within the confines -- I mean -- you know where I'm going here.

MR. JOYAL: I know exactly what you're saying. I think just rephrase the question and ask her if she believes -- ask her what the procedure would be --

MR. ANGELONE: I'll rephrase the question.

MR. JOYAL: -- if a report was made to her agency supervisor about --

MR. ANGELONE: That's not what my question --

MR. McNAIR: Oh, now, that's suggestive. Knock it off. Read Rule 30.

MR. JOYAL: Well, what, then, is your question --

MR. ANGELONE: Hold it. Let me rephrase it. Just let me rephrase it.

BY MR. ANGELONE:

Q. The agency, obviously, has some confidentiality policies; is that right?

A. Correct.

Q. Okay. And my question is this: When there is a report made within the agency, okay, regarding alleged maltreatment of another person in the agency --

A. Hum.

Q. -- okay, such as the situation here, all right, it's my understanding that that reporting within the agency is not confidential. Or tell me if it is. Or is it confidential?

MR. LANZILLO: I'm going to lodge the --

THE WITNESS: I'm really --

MR. LANZILLO: Would you feel better -- let me ask you, Mr. Angelone. Would you feel better if the witness stepped out of the room so I could tell

you what my problem is with the question, so you won't have to worry about whether I'm suggesting a response? I mean, I just want to be fair to you.

MR. ANGELONE: Yeah, that's fine.

MR. LANZILLO: Why don't you step out, and I can explain why I am having the problem here and what I think might solve it. And that way you don't have to worry about me suggesting a response.

(Witness leaves deposition room.)

MR. LANZILLO: I'll tell you where I'm confused and what I would suggest might help. If you're talking about what happens within the agency, is the active reporting within the agency a breach of confidentiality, that's one question.

However, if the question is, is the information confidential, such that if it were to be released out of the agency it would be a breach of confidentiality, that's what is confusing me. Is that --

MR. JOYAL: It's confusing me as well.

MR. LANZILLO: Yes. That's where I'm having a problem with the question.

MR. ANGELONE: That's fine.

MR. LANZILLO: You know, in other words --

MR. ANGELONE: I know what you're saying.

MR. LANZILLO: Do you know where I'm going?

MR. ANGELONE: I know what you're saying.

MR. LANZILLO: In other words, the fact that it's reported within the agency --

MR. McNAIR: I guess the question is does 23 PaC.S. 6340(c) apply to reports made within the agency.

MR. LANZILLO: Well, I express no opinion on that at this point. But my --

MR. McNAIR: That's entitled Protecting the Identity of Person Making Report. And it says the identity of a person making a report should be protected.

MR. LANZILLO: Well --

MR. JOYAL: So are you suggesting, then -- and the question is -- the suggestion to me is the person not protecting the identity is due to be here to be deposed later on, and so you can ask her. You're asking Debi Liebel a question --

If you want to get the answer to the question, which is does the statute that you suggested apply if a report is made by Abby Conley to her supervisor, the answer -- you can ask that question. That's what I'm --

MR. ANGELONE: I'm really not trying to limit it

just to that statute.

MR. JOYAL: Well, then I don't know what you're trying to get at. You're not being fair to her. You're asking is there a policy --

MR. ANGELONE: The OCY has a confidentiality policy that is -- that they harp on, and it's published. I mean, it --

MR. JOYAL: Right. And it's for people not within the agency. So ask her -- you know, I mean, I think that what we have here, she said to you -- that her answer was, this was when she went to her supervisor; after the report had been made, after the investigation.

(Discussion held off the record.)

MR. LANZILLO: I'm going to bring the witness back in. You know, I'm going to continue to object to the question in that form. I didn't want to prolong this, so I figured I'd tell you exactly where I'm coming from in a context that would not concern you about instructing the witness.

MR. McNAIR: Off the record.

(Discussion held off the record.)

(Witness returns to room.)

BY MR. ANGELONE:

Q. Let me try this: To what extent does the identity

of a person who reports maltreatment within the agency, okay, such as the situation that we're talking about, to what extent does the confidentiality policy of OCY apply with respect to the identity of that person?

A. If a person requests to be -- remain anonymous, we could -- referral sources oftentimes request to remain anonymous.

Q. Okay.

A. Whether they are inside or outside the agency. If they request that, then we -- we would honor that, although in this situation it would have been, you know -- I mean, would have been difficult, because she was the witness. But, you know, if she would have -- it would have been difficult to evaluate. But if she would have requested --

Q. Okay. So it would be upon request by the -- by the person.

A. Right. Because at this point, when she's talking to her supervisor, she's not making -- she's not making the referral for child abuse, per se. She's already made that. She's made --

Q. How do you know that she made that?

A. Well, she's -- somebody has made it already to the -- you know, to the -- but she hasn't made it -- she isn't making a -- she's telling about an incident between a child and -- I don't -- I don't know if she was saying that

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 110

that was child abuse or not.

(Discussion held off the record.)

A. I think I'm confused by this line of questioning, to be perfectly honest with you. I'm not sure what -- and, again, I don't know where Miss Saveikis also got this information.

Q. So this letter, August 30th, 2004, was sent to you, as you understand, at the request of Attorney Allgeier. Is that --

A. On behalf of the agency.

Q. On behalf of the agency.

A. Um-hum.

Q. Okay. Would this have been requested at the time you had that conference in early August?

A. No. In late -- in the late-August conference.

Q. I'm talking about the --

A. No, the early-August. You're right.

Q. The early August conference. During that time?

A. Well, I never spoke to Miss -- I don't believe I spoke to her again after the conference -- the --

Q. Miss Saveikis.

A. Before this -- before this letter came out.

Q. You mean Miss Saveikis.

A. Right.

Q. Okay. When you had your meeting with Rick

Page 111

Schenker --

A. Um-hum.

Q. -- right?

A. Um-hum.

Q. This would be on September 9th.

A. Um-hum.

Q. Correct?

A. Right.

Q. What was discussed at that meeting?

A. What we had learned in terms of the -- in terms of the investigation, what our actions -- or what our actions were going to be -- or what we were recommending, you know, at that point.

Q. And "what we were recommending", meaning what you -- what you were recommending, or what -- what do you mean by "what we were recommending", I guess?

A. Well, at that particular time, there had been a decision to terminate on the 20th, if you -- on the 20th of August, if you remember. I said there was a decision to terminate.

Q. The decision to terminate happened at the meeting before August 20th, right?

A. No.

Q. Okay.

A. The information that was involved in the report

Page 112

was discussed on the -- on August 16th or thereabout.

Q. Okay.

A. Certainly was leaning in the direction from what was being discussed. But when the report came to the total -- in its totality to Attorney Onorato, then that's when -- at that point all of it was laid out, and it was -- and it was decided to terminate her.

Q. Do you recall whether you were waiting for this letter also before making that decision?

A. No.

Q. This just happened to come in that time frame?

A. Yeah. This -- this had -- this -- yeah. Had nothing to do with it.

Q. So it's your testimony this letter and the contents of it had nothing to do with the reasons for her termination?

A. No.

Q. Okay. Then you had this meeting on September 9th --

A. Right.

Q. -- or September 10th, 2004, with Miss Conley?

A. Right, um-hum.

Q. And do you recall who was present at that meeting?

A. Oh, it was -- oh, it was -- I was called over, so it was me, Attorney Onorato, Pete Callan, Miss Conley, and

Page 113

then Karen Dorich joined us from -- she was the AFSCME Union person.

Q. At whose request did she show up at?

A. Pete Callan offered Miss Conley Union representation, and she accepted it.

Q. And was anything discussed with Miss Conley before Miss Dorich got there, with respect to the purpose of the meeting?

A. We -- we started to discuss -- there was some -- you know, some initial discussion on it, and at some point Pete stopped the meeting and said that he needed to offer -- it was real early on that he stopped the meeting and said he needed to offer her Union representation before he went too far into this.

Q. Were there any specific allegations made prior to Miss Dorich being there?

A. Yes. I think at the -- we started to talk about the document, and I think we started to talk about the breach in the confidentiality around --

Q. What document?

A. The Mike Cauley document.

Q. The Mike Cauley document?

A. Um-hum.

Q. But you didn't get into -- or did you get into specific allegations of the breach before Miss Dorich got

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 114

there?

A. I might have said a line or two, but it didn't go very far, because then Pete said we need to offer Miss Conley, you know, Union representation.

Q. So then Miss Dorich appears.

A. Yes.

Q. Right? And she was present at that meeting, from that point on?

A. Yes.

Q. And do you recall what specifically was told Miss Conley and who told her about the reason that they were there for that meeting?

A. At that time Attorney Onorato took over the discussion and started with the reason for the termination, which was the breach in the confidentiality on the prognostic detention order and the seriousness of that.

Q. Do you recall, did he actually say "prognostic detention order"?

A. Yes. Because what I recall is, is he was concerned that there was someone in the room, Karen Dorich, that did not understand, and he backed up and explained what a prognostic detention order was so that she would understand what he was referring to.

Q. Were there any other reasons given?

A. That was -- that was basically -- and the use of

Page 115

the computer to transfer this confidential -- you know, confidential information.

Q. And why is the use of the computer -- how is that a violation of policy?

A. There is a computer policy that the County has that -- that -- well, first of all, she used the computer to do the confidentiality [sic], but also the fact that she would be using it to just go back and forth with folks.

Q. For personal reasons?

A. It was -- the breach in the computer usage was around the confidentiality issue; that she would also use that as a vehicle to transfer confidential issues. I think the -- that -- that was absolutely the main issue. The main issue was the fact that there was this breach of confidentiality that put this child in danger. That was it from the beginning. It continues -- and it continued to be it. It was a very sad situation. It was a very upsetting situation.

Q. Did Abby Conley's involvement with the P.W. situation in July and August have anything to do with the termination?

A. When you say "involvement" --

Q. Well, her reporting of the situation of P.W., okay, did that have anything to do with the termination?

MR. JOYAL: Well, I'm going to object to the

Page 116

question, because at this point you have just put facts in that were not in evidence, that have been denied; that she was the reporter. Are you suggesting --

MR. ANGELONE: No. No, no.

MR. McNAIR: It's in Miss Saveikis' --

MR. JOYAL: Don't even speak. You're not conducting --

MR. McNAIR: Don't tell me not to speak.

MR. JOYAL: Do not --

MR. McNAIR: If I want to speak, I'll speak. Why don't you not speak. Don't speak.

MR. JOYAL: You're not conducting --

MR. McNAIR: Don't speak.

MR. JOYAL: Mr. Angelone, apparently if you're referring to the letter and what the report is -- are you talking -- I'm confused about your question, because you said was her allegations, you know --

MR. McNAIR: Quiet down for a second. Okay?

MR. ANGELONE: Let me explain. I think she testified that it was reported to her supervisor.

MR. JOYAL: Right. But you didn't specify --

MR. ANGELONE: That Miss Conley reported the P.W. incident to her supervisor, Miss Deveney. Okay?

Page 117

A. And you're asking me if that had anything to do with the termination? Is that what you're asking me?

Q. That's my question.

A. Okay.

Q. Did her reporting the P.W. incident to Miss Deveney have anything to do with her termination?

A. Absolutely not. I mean, these people that work for the Office of Children and Youth are people that are required to report if they think they saw anything. We would encourage that.

Q. Was there any aspect about Abby Conley's alleged discussions about the P.W. incident during the months of July or August that were a reason for her termination?

A. Those would be considered further breaches of confidentiality. But the issue at hand was the breach in confidentiality around the prognostic detention order.

Q. Okay. And that was the reason that was given on that date. Is that -- is that right?

A. That's what Mr. Onorato -- Attorney Onorato, you know, indicated when he started to talk about it.

Q. Okay. Was there any mention about giving out a telephone number, do you recall, during that discussion; that giving out a telephone number of an attorney or of a client to a third party was also breached? Do you recall that?

Page 118

A. I don't recall that in the discussion.
Q. Did --
A. I was kind of focused on the main reason.
Q. That is the main reason, from what I'm getting from you, right?
MR. JOYAL: What is the main reason?
A. What is the main reason?
Q. What you just said --
A. The prognostic.
Q. The prognostic detention order.
A. Right. I was focused on that reason, you know, for my agreement with the termination.
Q. Okay. Were there any other reasons given at that time to Miss Conley, that you recall?
A. I don't know that we -- we got there. I mean, I don't know that there was anything else that was said. I think that -- I think we talked -- we talked about that. I think Miss Conley herself, if I remember correctly, went to other types of things that she thought that this might be about.
Q. Okay.
A. And I think, then, it was reiterated that this, in fact, was not about that and was about --
Q. You were a part of this decision -- you were a part of this decision process, right?

Page 119

A. Yes.
Q. Okay. If not for this detention order, would I be correct in saying that she may not have been terminated?
A. She may not have.
Q. Okay. If the documents that Attorney Onorato had at that time -- you said he had some documents at that meeting. Is that right?
A. He had the report that -- you know, that Mike Cauley did.
Q. Those weren't given to Miss Conley to look at. Or that report wasn't, right?
A. No.
Q. Did she ask for that?
A. No.
Q. Do you recall if Miss Dorich asked for that; to look at that?
A. No, I don't believe she did.
Q. Would there be any reason why that wouldn't -- or should not have been given to her at the time of that meeting?
A. You know, that, I -- that was a broad-based report. And I think, again, trying to focus on the key issue.
Q. Okay. Do you recall Miss Dorich and Miss Conley asking for the weekend -- strike that. Let me take a step

Page 120

back.
A. Okay.
Q. Was there a resignation letter prepared for Miss Conley at the time of that meeting?
A. There was not a resignation letter prepared for her at the time of the meeting. What happened was, is -- and, again, I'm unclear on this, but in my recollection --
Q. Okay.
A. But it -- the idea of resignation came up at that meeting. Allowing her to resign came up at this meeting. And Mr. -- I want to keep calling him --
THE WITNESS: I'm sorry, John; I should call you Attorney.
A. Attorney Onorato left the room, then, after getting agreement that that would be something that Miss Conley and Miss Dorich would consider and went out and drew up a letter of resignation, but there was not one that was prepared.
Q. Well, at the meeting, then, she was told pretty much, you have a choice; you can either resign, or you're going to be fired. I mean, is that the bottom line of what she was told?
A. I think we were -- you know, I don't know if you can call it nicer, but I think we were -- you know, we weren't quite that direct.

Page 121

Q. The language might have been different.
A. Right, um-hum.
Q. But that's the idea, right?
A. Um-hum. Right, um-hum.
Q. Do you recall her or Miss Dorich asking for the weekend to think about that or maybe to discuss it with counsel?
A. Yes.
Q. Okay. And what was the response?
A. Attorney Onorato indicated that this was on the table for today and that a decision should be made.
Q. Okay. So the answer was no.
A. I guess that --
Q. Well, I mean, is it? I mean, the option would not be open after the weekend? Would that be a correct way of saying it?
A. I think that's what I -- I think that's what I would interpret it as. That the day we were talking about this, they had -- but to back up a bit, when the original letter was prepared by Attorney Onorato and brought back in, the only concern that Miss Conley or Mr. Dorich expressed at that time was the misspelling of her name. So we had to go back out.
So I think in his mind he thought and we all thought that there was agreement about the resignation. And

Page 122

then when he came back in and they had had the opportunity to talk, whatever, then put it -- then I think that was when the -- she asked if -- or Karen asked if there would be time for the weekend or a consultation or whatever the language was.

Q. Would you agree that she was pretty upset about this; Miss Conley?

A. I honestly couldn't tell at that meeting, because she -- as I recall at the end, there was a whole lot of amicability. Her saying now I can run for office, shaking our hands and leaving. I had no doubt that, you know, certainly people -- someone would be upset about that. But I did not sense that at the meeting.

Q. At that time, during that meeting, when the allegation about the detention order was brought out, did she explain or was she able to explain?

A. In my recollection, she didn't go there. She went -- that's when she went to other things that she was talking about, like, you know, the communication with Deanna, the -- I think there was something in a hearing or something like that. And we -- we redirected that. That was here's the -- here's the --

Q. Okay. And so the decision to terminate her, if I'm correct -- let me ask you this way: Did the decision to terminate her have anything to do with her testimony on

Page 123

July 28 at the C. hearing?

A. Absolutely not.

Q. Okay. At this meeting on September 10th of 2004, was there any mention or insinuation that there might be criminal charges brought against Miss Conley if she didn't sign the resignation letter?

A. As I recall, at some point when Miss Conley was going -- getting off the focus and into what you just asked me, did the testimony at the hearing have any impact, and I said, no, absolutely not, when she went into that, she indicated that she had gone to a Larry somebody -- I don't remember the last name -- at the D.A.'s Office to -- and she intimated to report the S.D. situation.

At that point in time is when -- well, I guess that's -- that's -- I mean, she brought that issue up first. That -- so -- so maybe at that point there was some element of her getting a little bit, you know, concerned. She brought it up that she had gone and consulted the D.A.'s Office on the agency or on -- or on her supervisor or something. And that. So that's how the D.A.'s Office originally came up, is via Miss Conley.

Q. What is the S.D. situation?

A. Well, the situation you referred to in -- where you said she testified in a hearing and that.

Q. Okay.

Page 124

A. And that. So that was -- she was going back into the -- you know, those -- that situation. Reported that she had consulted with someone in the D.A.'s Office. Whether that was about the agency or that particular individual, I honestly can't remember.

Q. Do you remember Miss Dorich at any point during the meeting asking Mr. Onorato or Mr. Callan whether their statements were in any way inferring the possibility of criminal charges against Miss Conley? Do you remember that; Miss Dorich asking a question similar to that?

A. No, I don't remember Miss Dorich asking that.

Q. Do you remember Miss Conley asking that question?

A. No.

Q. As you mentioned the S.D. situation, okay, my question to you is, at the time that you were the director at OCY --

A. Um-hum, yes.

Q. -- what was the policy there with respect to changing case summaries prepared by a case aide?

A. The -- the practice was what it had always been, which is that the supervisor reviews all of the documents prepared to go the court by the caseworker and employees of the agency that they are responsible for.

Q. Right.

A. And the case that they are responsible for. And

Page 125

they review it for a number of reasons. Some of it is even writing skills and grammatical kinds of things. Others are sometimes people go outside of -- I'm giving you examples -- outside of the scope of their role. Somebody, you know -- that might make an inference that was outside of their role or whatever. And they go over how all of that meshes together.

And if, in fact, there are changes to be made, the normal procedure is that either there would be some kind of communication back and forth between the individual and the supervisor, either -- in this day and age, I suppose it could be done via the computer and/or a sit-down and that. And if -- and the supervisor may have changes that she's requesting be made.

Q. Is the supervisor the one that makes the changes, or does -- is it the normal policy that the supervisor would tell the case aide, for example, you've got to change X, Y, and Z? Okay?

A. Well, she could make the changes and send it back or sit down and talk with the person. I don't -- you know, I've never -- I don't think in the history of the agency we ever prescribed how it -- you know, exactly how it's done that you can do that. But then you talk with the person.

If, in fact, the person does not agree and does not want to sign the report, then that could either -- that

0d248f3a-4f76-4c2d-895d-ff3461867a2e

Page 126

could be brought to their administrators or the attorney of record to try to, you know, mesh what -- what the problems are.

If, in fact, there's a total disagreement, it's okay for whomever disagrees to write an addendum to the report.

Q. Okay. From what I understand, though, if certain changes are made to a court summary, whatever they might be, by a supervisor, that before it's signed by the case aide, the case aide would review those changes. I mean, it's kind of an obvious question, I guess. But is that what you're saying?

A. Well, because she would be -- she or he would be signing it.

Q. Okay.

A. So, I mean -- because they have to sign the reports.

Q. And that's what would get submitted to the Court.

A. Right. Right.

(Discussion held off the record.)

MR. ANGELONE: Thank you. I don't have anything else.

MR. LANZILLO: I don't have any questions.

MR. JOYAL: I just have one question, Debbie.

Page 127

CROSS-EXAMINATION

BY MR. JOYAL:

Q. During the course of the meeting on September 10th, did Abby Conley ever deny sending the e-mails to Deanna Cosby --

A. No.

Q. -- talking about the V.W. case?

A. No. I think she mentioned that her supervisor had talked to her about -- about e-mails going back and forth between --

Q. But she never denied that she had sent them.

A. No.

Q. And to try to clarify something about this letter, confidentiality policies, if someone leaves the agency, are they considered by the agency, in terms of your interpretation of the statute and your experience, to be someone who would be entitled to be given information about a case that they were no longer involved in?

A. Absolutely not.

Q. Would they be someone who would be entitled to -- well, strike that. Let me phrase the question this way: Would a caseworker or an aide be entitled to discuss information that might be used in the investigation of a child abuse report with someone outside the agency?

Page 128

A. No. Again, the only way that would be is if the person was going to be designated as a witness and was brought in -- you know, subpoenaed, brought in by the agency. And then at that point the appropriate people, like the attorney of record, most likely, in conjunction with some other people, would be discussing what they wanted out of the testimony and where we were at with the case.

Q. Okay. Now, let's get to the P.W. incident.

A. Um-hum.

Q. Is it your understanding that the only person -- there were only three people at that site that day; those people being P.W., Abby Conley, and the child?

A. That was my understanding, uh-huh.

Q. And in order to do -- based on your experience, in order to conduct an appropriate investigation, who would the investigator need to speak with?

A. The investigator might ask if there was any witnesses to --

Q. Okay.

A. It wouldn't necessarily be the -- necessarily be the person who reported it, but there might be witnesses.

Q. And in this situation, with your knowledge, Miss Saveikis would have, without the witness' testimony, she would be confined to asking the alleged perpetrator or a two-year-old child what happened.

Page 129

A. Right. In this situation, correct, yeah.

Q. So a valid investigation without evidence of injury -- which I believe was the case here --

A. Right.

Q. -- probably could not be conducted without the testimony of a witness. Is that right?

A. Correct. They would have to have -- they would do what they could, but, obviously, with that young a child, it would be --

Q. Now, I want to get back to this August 30th letter. I think it's been marked here as an exhibit. I want you to go back -- this may be Exhibit No. 2, but this was the typewritten thing. Let's go to -- let's go to Page 3 and see if we can get your understanding of this letter.

A. This letter here (indicating)?

Q. The letter from Miss Saveikis of August 30th.

MR. McNAIR: That's one page, isn't it?

(Discussion held off the record.)

Q. Go to 2, last page of two, halfway down. It talks about Shara's concern regarding continued employment.

A. Um-hum.

Q. Okay? And you go down two paragraphs. It says, "Cathy Allgeier asked Shara if she could put in writing her concerns." Correct?

A. Right.

Page 130

Q. Is it your recollection of that meeting that Cathy's request was concerning Miss Saveikis' concerns concerning Abby Conley's continued employment with the agency?
A. No. I would -- I think she was asking her to -- some of the things that she said within this document, she was asking her -- and said to me on the phone, she was asking her to hone it down to what -- put something in writing as to what her concerns were.
Q. All right. That's your recollection.
A. That's what I -- my recollection is.
Q. Okay.
A. Um-hum.
Q. What does the -- go to Exhibit No. 3. Again, I know you didn't write this letter. But the last sentence of the first paragraph, what does it say?
A. "This assessment revealed the following concerns with the demeanor and judgment of one of your employees, Abby Conley, social service aide."
Q. This doesn't talk about the investigation. The letter talks about an interview with Abby Conley and how, in some of the questions that were asked, about her demeanor. Correct?
A. Correct.
Q. And as a matter of fact, in the next-to-last

Page 131

paragraph, there are -- Ms. Saveikis talks -- uses psychological and social work terms, does she not? About affect --
A. Social -- yeah, social work terms, primarily. Well, she's a --
Q. And things such as that?
A. Um-hum.
Q. And I'll ask you, do you think this letter had something to do with the concerns of Miss Saveikis in terms of Abby Conley's continued employment, based upon what she wrote in that letter?
A. What she wrote in this --
Q. Yeah.
A. Do I think that -- would you restate --
Q. Well, reread the letter.
A. But I guess I'm not clear on the question.
Q. Okay. Well, you reread the letter, and then I'll ask the question again.
A. (Witness complies.)
Q. Are you done?
A. Yeah.
Q. Okay. Focus on the middle two paragraphs of the letter.
A. Um-hum.
Q. Would you agree with me that those two middle

Page 132

paragraphs of the letter dealt more with Abby Conley's demeanor, appearance, and the way she answered questions and her responses than it did with the investigation itself?
MR. ANGELONE: I'm going to place an objection. It's argumentative and it's speculation.
MR. JOYAL: It's not argumentative. I asked the question whether or not she agreed that that's what it said. It's not an argument.
BY MR. JOYAL:
Q. Do you agree that that's what it focused on?
A. That's -- I mean, that's what the purpose of this letter was.
Q. Okay. So focus on her demeanor and what she --
A. What she had witnessed.
MR. ANGELONE: Same objection.
Q. Okay. So, again, does it look to you that this expressed the concerns that had been discussed on the telephone about her continued employment --
MR. ANGELONE: Same objection. It's argumentative. And speculative.
Q. Do you agree?
A. I don't think it was to do with --
Q. Okay.
A. -- the concern about the continued employment.
Q. All right. What was her concern about the

Page 133

continued employment?
A. Well, her -- her concern about the continued employment was -- what she stated; what -- the fact that she was removed from other units for problems, but that nothing was documented.
Q. Okay.
A. But there's --
Q. What about on the first page, when she describes the interview?
A. Again, you know, at this particular time, you know, she's talking about -- the first few sentences, she's talking about Miss Conley's demeanor, her -- her different emotions that she went back and forth on in the interview that she had with her.
Q. Well, she goes through and talks --
A. And then she went into the allegations.
Q. Isn't the whole first page of it -- have a lot of conversation about how Abby acted; what she said, how her answers were --
A. Yes.
Q. -- some of the things she said? Saying that P.W. was --
MR. ANGELONE: I'm going to place an objection again. Argumentative. And the questions are all leading on top of it, so.

Page 134

MR. JOYAL: Let me rephrase the question this way:
Q. I'm going to read to you something that is an exhibit, and tell me if I read this correctly. "Abby described P. as a sick person; that she maligns families, is demonic, inhumane, and shows no dignity when working with these families, and provided Shara with a written document." Did I read that correctly?
A. Yes.
Q. "Abby also stated that P. had other personnel issues not related to this incident." Did I read that correctly?
A. Yes.
Q. Okay. Again, Miss Saveikis said that she told her about other things that were personnel issues that had nothing to do with the incident.
A. Correct.
Q. Would that have been a violation of policy?
A. Yes.
Q. "When describing the incident, Abby displayed an urgency, yet failed to act immediately or in an urgent way with regard to reporting to the proper chain of command. Abby stated that she wasn't sure that it was abusive, just inappropriate, and felt that the child was safe because P. wasn't going to see the child until the 23rd."
Did I read that correctly?

Page 135

A. Yes.
Q. Between the middle of August and September 10th of 2004, would it have been -- was it your belief, in conversation with other people from the County, that there was overwhelming evidence to indicate that the source of -- and I'll use the term -- leaks of information had come from Abby Conley?
MR. McNAIR: Objection. Leading. Lack of foundation as well.
MR. JOYAL: Whatever. She can answer.
A. Do I answer?
Q. Yeah.
A. Leaks related to the --
Q. To clients.
A. Clients, yes.
Q. Let me ask you a procedural question, policy question. If a worker at OCY is subject to discipline, is there a policy that you know of that would have been in effect in 2004 concerning what -- how long that letter of reprimand or evidence of discipline would remain in someone's personnel file?
A. Yes.
Q. How long was that?
A. It's to remain in the personnel file for a year.
Q. Okay. And is that a policy, or do you know

Page 136

whether or not that was something that was negotiated with the Union?
A. I believe that's a policy, but also it's in Union contracts.
Q. Okay. So for all Union employees bargained by the Union, those things would be taken out after a year.
A. Right.
Q. And then under that bargained contract and the policy, would they be considered to, in effect, have been expunged?
A. Yes.
Q. If there was information given about information such as that to anyone -- for example, Miss Saveikis, the grandfather of D.B., or anyone else -- would that have been a violation of policy, in terms of what might be considered confidential information?
A. To Miss -- to Miss Saveikis?
Q. Yeah.
A. I don't know that that would be a violation of confidentiality, but it would be a violation of a policy; that, in fact, this -- this disciplinary action was removed from the file and had been satisfied in terms of no further disciplinary action happened in that period of time and, therefore, wouldn't be -- wouldn't be able to be used.
Q. What do you think the appropriateness was of

Page 137

Ms. Conley discussing with Miss Saveikis information concerning P.W. that had nothing to do with the incident that was being investigated? Personal stuff about her own children, things such as that.
A. It was clearly inappropriate.
Q. Was one of the things that the Union steward, Miss McConnell, was raising was that there appeared to be information concerning P.W.'s personal life that was being divulged by Miss Conley?
A. Say the first part again.
Q. Was one of the concerns by Miss McConnell -- remember you were talking about the e-mail?
A. Yes.
Q. Was one of those concerns that she believed that Abby Conley was releasing information about P.W. that concerned her personal life and her family?
A. Yes.
Q. Did you come to see an e-mail that went to Ms. Cosby from Miss Conley asking Miss Cosby for information concerning P.W.'s former husband?
A. Yes, there was an e-mail.
Q. And was there also in that same e-mail a request from Miss Cosby for information concerning another family that Miss Cosby -- I mean, Miss Cosby was associated with and that P.W. had serviced?



A. Yes. I remember now; it was in the visiting room. She wanted to know the name of the --
Q. And were these e-mails all done, if you can recall, during the course -- or these requests being made during the course of the investigation into the allegation of abuse by P.W.?
A. The e-mails to --
Q. To Cosby --
A. -- Deanna Cosby.
Q. -- asking for that information.
A. I don't remember the dates on the e-mails.
Q. Okay. Presuming that they -- let's assume that they were done after the fact.
A. Um-hum.
Q. Would that have been a violation by both parties of confidentiality?
A. (No response.)
Q. Let me back it this way --
A. At any point -- again, we're talking client information.
Q. If Deanna Cosby, even though she was no longer associated with the agency, had provided client information, even confirming that something had taken place with a client, even though it was to Abby Conley, would that have been a violation of policy and statute?

A. Yes.
Q. And if Abby Conley was making a request of someone for that information, do you believe that would have been inappropriate and a violation of policy and statute?
A. Yes.
MR. JOYAL: I don't have any other questions.
THE WITNESS: Could I have a minute to confer on something?
MR. ANGELONE: Sure.
MR. LANZILLO: We'll take a short break.
(Recess held from 12:40 p.m. till 12:51 p.m.)
MR. ANGELONE: I'm done.
MR. LANZILLO: You have the right to review your transcript before it's finalized or to sign off and make any corrections that you deem necessary. I suggest that you exercise that right. You have to right to waive it, but I would suggest you read it.
THE WITNESS: No, I would want to.
MR. LANZILLO: She'll read.

(Deposition concluded at 12:51 p.m., and signature of the deponent was not waived.)

0d248f3a-4f76-4c2d-895d-ff3461867a2e

A

**Abby** 1:3 15:1,3 16:18 17:15 18:8,20,24 27:20 29:15 30:2 31:23 37:7 49:20 50:10 51:7 56:10,15 62:1 68:13 73:2 75:4 75:20,22,23 82:11,19 85:6 87:3 88:16,19 89:2 100:15 107:22 115:19 117:11 127:5 128:12 130:3,19,21 131:10 132:1 133:18 134:3,9,19,22 135:7 137:15 138:24 139:2
**Abby's** 29:20 72:24
**able** 4:5 122:16 136:24
**about** 10:1 14:20,21 16:15 18:18 19:3,21 19:25 20:25 21:10,11 21:20,22 22:8,17,25 23:8 25:16,20 26:13 29:20 30:2 31:22 32:5,18,21,25 33:14 33:20,22 34:6,7,18 34:25 35:9 36:1,13 38:6 42:2,3,4,8,23,23 43:6,21,22 44:2,6 49:22 50:8 51:4,6 52:6,7,8,21 53:24 56:11 61:16,21 63:2 63:7 64:12 65:13 68:23 71:22 72:18 73:2,4,8,10,18,20 74:4,6 75:2,21,22 78:3,6,10 79:6,7,9,14 80:3 81:7,8 82:7,20 84:21 85:23 86:1,17 86:23 93:9,18 95:16 98:3,7,23 99:17,19 102:5 103:6,8,16,21 103:22 104:19 105:2 106:2,8,12 108:20 109:2,24 110:16 113:17,18 114:11 116:17 117:11,12,20 117:21 118:17,20,23 118:23 121:6,18,25 122:6,12,15,19 124:4 127:8,10,10,14,18 129:20 130:20,21,22 131:2 132:18,24,25 133:2,8,11,12,18 134:14 136:12 137:3 137:12,15
**absolutely** 25:21 85:19 115:13 117:7 123:2 123:10 127:20
**abuse** 11:9 19:16 22:7 70:3 78:16 102:22 109:19 110:1 127:25 138:6
**abusive** 134:22
**accepted** 113:5
**access** 38:8 41:18
**accessing** 44:6
**according** 61:24
**accused** 26:21
**act** 91:18 134:20
**acted** 133:18
**action** 1:4 33:11 41:22 50:13 85:14 136:21 136:23
**actions** 27:22 111:11 111:11
**active** 106:13
**actual** 28:8 98:7
**actually** 5:6 8:25 20:15 27:9 36:18 39:22 42:18 45:13,23 47:24 55:20 56:24,24 66:5 73:23 77:5 80:20 95:2,6,25 114:17
**Adams** 12:5 13:18,19 13:19,21 80:12,14
**addendum** 126:5
**addition** 102:24
**additional** 24:6 47:12
**address** 33:18,22,24 34:2 42:10,23,25 58:19,22 61:6
**addressed** 4:22 41:15 48:1 100:23 101:9
**addresses** 59:1
**admin** 59:19
**administration** 8:5 10:12 14:20,20,21 44:25 49:6 89:6 99:9 99:13 100:13
**administrative** 80:9
**administrator** 7:23,25 11:13,25 12:2 13:20 13:22 17:9 30:1 50:9 77:2 80:7
**administrators** 9:21 11:5,17,21 12:6,13 12:18 18:10,12 126:1
**advise** 23:9 25:1,9
**advising** 101:13
**affect** 131:3
**AFSCME** 113:1
**after** 31:16 37:22,24,25 40:8,24 41:1 44:5,13 47:4,5 48:10 54:11 62:3,5 63:10 71:21 72:7 78:18 85:8,15 88:15,21,21,23 89:11 95:9,10,11,12 108:12 108:12 110:20 120:14 121:15 136:6 138:13
**afternoon** 89:24,25 90:17,22,23
**afterwards** 44:14,16
**again** 4:25 33:15 51:3 59:9 61:11,14 65:14 72:2 74:8 75:11 77:14 86:2,2,6,23 87:18 110:5,20 119:22 120:7 128:1 130:14 131:18 132:16 133:10,24 134:13 137:10 138:19
**against** 30:4 76:14 123:5 124:9
**age** 125:11
**agency** 15:4,5,6,25 16:5,7,10,21 22:5 57:21 58:3 59:1,5 73:11 78:1,3,21 79:14,15,25 83:6 86:4 87:4,6 89:2 91:8 91:17 92:7,7 102:4 102:23 103:10,11,18 103:21,22,23,25 105:1,10,14,15,18 106:12,13,17 107:4,7 108:9 109:1,9 110:10 110:11 123:19 124:4 124:23 125:21 127:15,16,25 128:4 130:4 138:22
**agent** 19:15 22:6,7 78:16
**ago** 26:19
**agree** 25:13,13 73:25 122:6 125:24 131:25 132:10,21
**agreed** 23:23 132:7
**agreement** 118:12 120:15 121:25
**ahead** 35:10 37:1 50:4 95:8 100:14
**aide** 8:14 124:19 125:17 126:9,10 127:23 130:19
**aide's** 88:10
**allegation** 32:23 52:7 74:16 75:7 76:14 87:16 122:15 138:5
**allegations** 19:16 22:7 28:17 30:4 32:3 84:21 87:10 102:22 103:1 113:15,25 116:18 133:16
**alleged** 18:24 19:25 22:18 30:17,24 32:6 33:13 34:13 41:15 49:20 51:5 76:16 85:5 86:3,4 102:13 103:22 105:14 117:11 128:24
**allegedly** 38:2 39:11 51:7 68:15 82:19 84:9,22
**Allgeier** 30:25 31:4,20 31:21 32:11 33:1,14 34:1,7,14 36:8 38:11 40:5 42:21 44:18 54:17 64:5 65:17,25 67:20 68:16 69:3,6 78:6 81:2 88:19 101:5,11,13 110:8 129:23
**Allgeier's** 81:2 101:4
**allow** 45:11,13
**Allowing** 120:10
**alone** 27:12,14
**already** 63:7 64:19 103:3,14 109:19,22
**although** 109:10
**always** 124:20
**ambiguity** 24:25
**ambiguous** 60:5 104:18
**amicability** 122:10
**among** 24:7
**analyst** 66:8,9,12
**and/or** 22:6 125:12
**Angelone** 2:3 3:4 4:12 4:16,21,23,24 5:1 13:25 14:6,12 23:18 25:12,18 35:23 42:13 59:25 60:4,8 67:9 94:4,10,14,21,24 100:18 104:9,11,14 104:25 105:3,7,9,24 106:4,23,25 107:2,25 108:5,24 116:5,15,21 116:24 126:21 132:4 132:15,19 133:23 139:9,12
**Ann** 45:2 49:8,13 89:9 89:12 99:5
**anonymous** 109:5,7
**another** 5:19 13:6 37:18 50:9 59:7 63:9 63:14 67:6 73:1 82:8 82:9,12 84:9 85:24 86:7 95:14 97:16 103:23 105:15 137:23
**answer** 5:13,14 26:13 59:12 94:5,6 100:5,7 100:8 104:12,16 107:20,23 108:11 121:12 135:10,11
**answered** 132:2
**answering** 59:14
**answers** 38:15 104:6 133:19
**Anthony** 2:3 4:19 5:1 25:15
**anticipating** 9:3
**anybody** 14:19 49:8 82:25 89:6 96:4
**anyone** 27:21 32:7 35:3 44:24 77:19,22,22 79:2,14,25 89:1,15 92:7,8 99:8,24 100:13 136:13,14
**anything** 6:3 8:23 14:24 20:14 29:14,16 29:17 30:9 43:22 46:2 49:13 51:9 53:3 53:4,13,22 77:25 78:17 80:1 88:14 92:6 104:8 113:6 115:20,24 117:1,6,9 118:16 122:25 126:21
**apologize** 4:19 15:12
**apparent** 85:25
**apparently** 116:15
**appear** 23:13,14,16
**appearance** 132:2
**appeared** 37:8 137:7
**appears** 73:15 114:5
**apply** 93:25 107:6,22 109:3
**appointed** 7:5
**appointment** 98:22
**approach** 24:14
**approached** 14:19 18:24 19:3 30:16 31:2 42:20
**appropriate** 41:19 87:25 88:1 128:4,15
**appropriateness** 136:25
**area** 11:14,15 43:2 45:22
**areas** 9:10
**argument** 132:8
**argumentative** 132:5,6 132:20 133:24
**arm** 84:10,16,22,22
**around** 14:15 15:5 32:5 33:15,16 41:12 43:10 43:11 50:8 51:3 57:18 73:22,22 82:12 88:20 97:19 113:19 115:11 117:16
**ArriveTech** 45:17
**asked** 4:7 14:2 35:17 38:8,9 39:25 40:2,17 46:12 50:9 61:5,7,9 63:13 66:16 70:25 72:18 82:3,3,14

85:20,22 89:18,18 91:1,1 98:21 119:15 122:3,3 123:8 129:23 130:22 132:6
**asking** 5:2,7,9 6:2 25:11,20 39:14 61:11 64:13 94:1,10,13,22 107:19 108:4 117:1,2 119:25 121:5 124:7 124:10,11,12 128:24 130:5,7,8 137:19 138:10
**aspect** 60:9 117:11
**aspects** 34:12
**assessment** 130:17
**assigned** 19:13 82:9
**assist** 29:16,18
**assistant** 7:11 9:17 11:1,4,14,16 12:7 13:12,22 29:9 48:2 80:8 97:17
**associated** 137:24 138:22
**assume** 5:12 31:17 47:3 61:11 101:3 138:12
**assuming** 30:16 47:12 59:10
**attached** 55:12 85:11
**attend** 44:12
**attention** 30:23 36:18 37:4 38:19 43:16 51:2,13
**attorney** 13:11 26:15 26:15 30:25 31:1,4 31:20,21 33:16,19,20 34:1,7,14 36:7 37:4 37:10,13,22 38:19,25 39:1,3,7,7,18,21,24 39:25 40:5,8 42:10 42:20 43:1 44:7,18 44:18 54:9,10,11 55:25 56:1 58:7,17 58:19,23,24 59:3,16 59:17,18,19 62:6,23 65:25 67:20 71:23 72:10 78:6 81:2,2 85:8 88:15,18,18 89:6,10 90:8 95:10 95:17,17 97:1,2,12 97:14 101:4,5,10,13 110:8 112:5,25 114:13 117:19,23 119:5 120:13,14 121:10,20 126:1 128:5
**attorneys** 25:6 39:16
**audit** 22:9
**audits** 19:15 22:4
**August** 41:9,12 44:13 47:4 49:18,24 52:20 54:2,14 62:4 63:17 63:17,18 64:3,7,20 65:13 68:3,11 71:22 71:24 72:15 79:12 80:22 81:20 85:8,9 88:16 95:12,18 96:17 97:4,12,19,22 98:3 98:16,17,18 100:20 110:7,14,18 111:19 111:22 112:1 115:20 117:13 129:10,16 135:2
**Austin** 21:3
**authorization** 45:10,11
**authorized** 58:4 79:18
**availability** 44:12
**available** 10:10 35:19
**aware** 21:19 29:13,23 32:5 56:13,15 57:2,5 57:8 76:17 83:13 85:5 89:1,3,15 98:20
**away** 47:6
**awkward** 82:17
**a.m** 1:21 70:20,20
**a/k/a** 1:6,12 2:6

**B**

**B** 1:3 4:1,1
**BAC** 45:16,20,21,22 46:6 47:13 48:6
**back** 7:15 8:2,17 18:21 32:8 35:15 43:18 45:9,16 53:25 54:14 56:16 57:19 58:5,9 61:15 62:1,10 63:3 70:22 71:21 72:14 84:5,12 85:16 87:10 108:15 115:8 120:1 121:19,20,23 122:1 124:1 125:10,19 127:10 129:10,12 133:13 138:18
**backed** 114:21
**backtrack** 38:14 72:12 96:19
**Barber** 48:16 49:13 89:13
**bargained** 136:5,8
**based** 56:4 73:25 96:14 128:14 131:10
**basically** 9:9 114:25
**basis** 60:19
**became** 82:21
**Becky** 12:25
**before** 1:18 4:4 5:5 7:17 10:22 14:2 15:7 19:5 52:1 64:20 67:25 70:24 74:21 98:7 99:20 110:22,22 111:22 112:9 113:6 113:13,25 126:9 139:14
**began** 8:5 15:4 47:6
**begin** 4:4 86:12
**beginning** 74:15 79:23 115:16
**behalf** 4:7,9 110:10,11
**being** 24:19 32:9 42:23 42:25 51:9 52:7,10 52:19 65:11 67:20 97:8 99:9 108:3 112:4 113:16 128:12 137:3,8 138:4
**belief** 135:3
**believe** 6:16 8:18 11:15 15:5 16:9 17:10 19:7 20:2 21:2,6 27:4,14 27:22 28:2,15 32:2 33:16 36:3 37:9 39:3 41:12 45:21 50:21 54:16 55:11 65:8,17 67:19 68:17 69:8 77:1,22,23 78:2 82:1 82:16 85:3,10 89:3 89:21 90:14 91:5 96:24 97:8 99:6,22 99:25 101:4,10 110:19 119:17 129:3 136:3 139:3
**believed** 75:6 137:14
**believes** 104:23
**benefit** 68:2
**Berchtold** 65:9,19,21
**besides** 83:24
**best** 20:9 35:2 77:6 81:24
**better** 81:8 83:23 105:23,24
**between** 43:18 57:20 59:18 62:1 79:13 102:9 109:24 125:10 127:11 135:2
**beyond** 15:20
**Biroscak** 13:4 17:10 18:18 77:2
**bit** 20:25 38:14 121:19 123:17
**bless** 56:15
**Bloxdorf** 45:2 49:8,14 89:9,12 99:5
**body** 74:3
**books** 93:22,23,24
**both** 15:21 49:15,16 90:11,11 138:15
**bottom** 69:19 120:21
**breach** 50:14 54:23 56:2,20 59:4 62:8 85:23 86:7,13 91:14 97:9 106:13,17 113:19,25 114:15 115:10,14 117:15
**breached** 117:24
**breaches** 62:15 117:14
**break** 139:10
**briefly** 63:3
**bring** 38:13 78:16 85:18 108:15
**brings** 85:17
**broader** 9:16 43:17
**broad-based** 119:21
**brother** 86:11
**brought** 22:8 30:23 37:4,17 38:19,23 42:4 43:15 51:2,13 67:21 97:14 98:19 99:14 121:20 122:15 123:5,15,18 126:1 128:3,3
**Buddy** 93:22
**building** 45:24 46:2 91:4,5,6
**B.W** 87:11

**C**

**C** 23:19 37:6 38:16 41:2,4 43:8 52:1 81:21 82:5 123:1
**call** 20:20,21,22 21:6 22:10 23:7 28:10 29:23 30:12 64:14 67:11,12 72:15 81:2 90:25 91:7 101:12 120:12,24
**Callan** 1:9 2:9 44:19,20 90:7,11 99:5 112:25 113:4 124:7
**called** 10:25 13:13 21:2 38:21 45:16 46:10 65:18 66:21 69:17 90:9,12,24 112:24
**calling** 120:11
**Calls** 100:3
**came** 16:10 22:1 27:4,9 36:18 37:25 40:8 42:17 48:6,6 75:25 76:22 79:9 110:22 112:4 120:9,10 122:1 123:21
**cancel** 98:24
**capacity** 1:8,10,11,14 32:7,22
**care** 12:21 51:10
**Carla** 12:22
**case** 8:14 31:25 32:3,24 33:17 34:17,21 35:8 35:25 37:6 38:16 56:11 57:19 58:12 61:16 62:2 68:18,18 68:19,20 80:22 81:10 81:12,13,20 82:5,8,9 82:22 86:23 87:4 88:9,9,10 92:5,10,11 92:22 93:10 124:19 124:19,25 125:17 126:9,10 127:8,19 128:7 129:3
**cases** 18:16,16 34:24 81:21 82:12
**caseworker** 58:6 81:13 82:9 86:16 124:22 127:23
**category** 60:25
**Cathy** 38:11 54:17 64:5 65:17,18 68:16,22 69:3,6 129:23
**Cathy's** 130:2
**Cauley** 13:10 31:1 37:4 37:4,22 38:11,20,25 39:1,21,24 40:5,8 44:18 46:9,11,11 54:9,10,11,17 55:4,6 55:25 56:1,5 62:6,13 68:3 71:23 78:6 85:8 88:15,18 95:17 97:1 97:12 113:21,22 119:9
**cautious** 53:24
**Center** 2:11 9:13
**certain** 25:4 32:18,19 60:16 126:7
**certainly** 112:3 122:12
**chain** 10:4 51:20 80:14 134:21
**change** 125:17
**changes** 125:8,13,15,19 126:8,10
**changing** 124:19
**Char** 13:8 91:2
**charge** 46:15
**charges** 47:12 123:5 124:9
**Charles** 48:16 49:13 89:13
**chart** 10:4,19 14:1,4 48:18
**Chatham** 2:11
**child** 1:6,13 2:6 9:12,14 9:17 10:23 11:6,9,12 12:13,15,20 19:13 27:4,22 56:21 62:8 68:16 70:3 74:16 75:7 77:11,21 78:9 78:11,12,19 83:11 84:22,23 86:4,10 87:1,5,11,12,13 91:16,17 93:2 102:2 102:3,18,19,20,23,25 103:13,14,15,19,21 109:19,25 110:1 115:15 127:25

128:12,25 129:8 134:23,24
**children** 1:6,12 2:6 6:24 7:11,20,25 8:6,9 9:6,9 10:10 27:10 37:5 56:23 60:13 66:18 102:9 117:8 137:4
**child's** 22:19,21,22 26:21
**choice** 120:20
**circumstances** 14:15 41:19
**cited** 92:3,16
**Civil** 1:4
**claims** 11:10 22:5
**clarify** 127:14
**clear** 28:24 92:24,25 131:16
**clearly** 93:8 137:5
**client** 22:6 23:19 43:19 51:3 52:10 86:3,3,10 86:11,24 91:5 117:24 138:19,22,24
**clients** 32:3 34:17,18 34:23,24 35:3,8 51:5 53:23 82:19,24,25 135:14,15
**client's** 58:24
**clinical** 12:25 13:3,6,7 17:5,6,11,13
**close** 15:16
**collected** 96:6
**Colleen** 13:11,22 29:11 29:19,23 38:12 44:19 54:17 91:2
**come** 19:14 27:12,12 29:24 31:7 46:13 47:21,24 48:1 54:8 54:11 58:8,16 66:16 68:21 69:5,6 70:12 73:3 89:18,19 90:25 96:4 100:10 112:11 135:6 137:18
**comes** 32:23
**comfortable** 59:14
**coming** 20:13 24:13 36:10,22 58:5 80:20 91:5 108:19
**command** 10:4 134:21
**commencing** 1:21
**Commonwealth** 1:20
**communication** 61:20 122:19 125:10
**company** 45:13,15,16
**complaint** 79:9
**complaints** 19:15 22:6 83:13
**complete** 28:20 97:13
**completed** 28:21 29:1
54:8 62:20 88:6,7 97:13
**complies** 131:19
**computer** 41:21 46:1 46:23 115:1,3,5,6,10 125:12
**concern** 24:16 25:11,24 36:16 37:6,23 42:3,8 42:16 43:3,17 61:25 72:24 73:2,4,10 99:8 99:12 101:18 108:20 121:21 129:20 132:24,25 133:2
**concerned** 21:11,19 29:20 32:17,20 51:6 75:22 79:6,6 81:7 114:20 123:17 137:16
**concerning** 56:18 130:2,3 135:19 137:2 137:8,20,23
**concerns** 19:8 20:3 21:1,20,21,22 29:4 29:17,24 31:20,22,22 32:9 33:8 35:7 36:12 36:15 37:25 41:14 51:1 52:4,5,16 68:12 73:6,18,19 74:4,6 101:11,20 129:24 130:2,9,17 131:9 132:17 137:11,14
**conclude** 25:3
**concluded** 139:22
**concludes** 24:15
**conclusion** 62:4
**concrete** 43:22,22 44:1
**concurrent** 33:8 36:25
**concurrently** 36:9 37:17
**conduct** 19:15 128:15
**conducted** 129:5
**conducting** 4:20 74:5 88:3 94:15 116:8,13
**confer** 25:21 139:7
**conference** 21:6 23:22 28:10 63:4,10 64:11 68:11 69:7 72:14 79:13 81:3 101:7 110:14,15,18,20
**confidential** 33:12 34:1 58:21 59:22 60:1,2,6 60:8,22,25 66:15 86:18,22 101:24 102:4 103:11,12 104:18 105:19,20 106:16 115:1,2,12 136:16
**confidentiality** 23:1 24:9,16 26:2 31:22 32:9 36:12 38:1
41:20 42:9,17,19 43:3,9,11 50:8,11,15 54:23 56:3,21 59:5 62:9,15 77:15 79:6 85:23 86:7,13 91:14 97:10 102:9 103:24 105:10 106:14,18 108:5 109:3 113:19 114:15 115:7,11,15 117:15,16 127:15 136:20 138:16
**confidential/private** 58:25
**confined** 128:24
**confines** 104:19
**confirming** 138:23
**confused** 106:10 110:3 116:17
**confusing** 96:21 106:18 106:20
**confusion** 24:24
**conjunction** 88:11 128:5
**Conley** 1:3 15:1,3 16:18 17:15 18:8,25 21:10,12 30:5 33:13 38:8 43:16,19 44:3 49:20 54:2 56:10 62:1 75:6 76:9,14,15 76:21 77:10,20,25 78:2,7,21 79:5 80:1 85:6 88:16,19 89:2 89:18 90:16,24 91:3 95:2 99:9,16 100:15 101:23 102:12,25 103:15,17 107:22 112:21,25 113:4,6 114:4,11 116:24 118:14,18 119:10,24 120:4,16 121:21 122:7 123:5,7,21 124:9,12 127:5 128:12 130:19,21 135:7 137:1,9,15,19 138:24 139:2
**Conley's** 21:22 30:10 30:18 42:3 46:22 59:20 73:3,18 79:15 115:19 117:11 130:3 131:10 132:1 133:12
**consider** 58:20 120:16
**considered** 103:11,12 117:14 127:16 136:9 136:15
**consult** 41:22
**consultant** 9:1
**consultation** 122:4
**consulted** 40:17 123:18 124:3
**contact** 40:15 58:15
**contacted** 46:6 97:16
**contained** 53:23
**contemplated** 24:7
**contents** 51:1 112:15
**context** 108:19
**continue** 108:16
**continued** 50:13 72:25 73:4,20 115:16 129:20 130:3 131:10 132:18,24 133:1,2
**continues** 115:16
**contract** 136:8
**contracts** 136:4
**conversation** 22:1 28:16 29:5,13,21 30:8 31:6 70:13 133:18 135:4
**conversations** 26:24 59:18
**coordinated** 40:10
**copy** 63:20
**corner** 65:3
**correct** 5:14 7:15,16 10:24 11:19,20 12:6 16:13 19:23 30:18 39:11,13 40:25 47:14 50:3 53:20 57:25 59:6 63:13 70:10 72:16 79:21 82:9 83:7 85:12 90:19 96:14,24 100:23 101:1 104:1 105:12 111:7 119:3 121:15 122:24 129:1,7,24 130:23,24 134:16
**corrections** 139:15
**correctly** 10:22 30:21 40:24 46:19 51:25 69:2 103:20 118:18 134:3,7,11,25
**Cosby** 33:24 34:3 43:19 44:3 56:10,14 56:16 57:23 62:1 92:18 127:6 137:19 137:19,23,24,24 138:8,9,21
**counsel** 23:23 25:21 121:7
**County** 1:5,5,6,8,8,10 1:12,13,14 2:6,6,6,14 4:8 6:11,21,22 7:6,7 7:9,18 8:2 9:2 14:20 15:23 38:13 40:13,15 40:15,19 41:20,22 44:23 47:18 49:10 61:24 62:10,12 90:5 97:17 115:5 135:4
**County's** 52:25 89:16 98:2
**couple** 5:4,7 38:15
**course** 52:19 85:14 89:8 127:4 138:4,5
**court** 1:1 5:22 12:24 23:2,10 37:7 38:16 38:23 39:12,16,16 43:7 124:22 126:8,18
**courtroom** 39:4
**cover** 38:15
**covering** 80:8
**CPSL** 26:3 50:12 70:2
**creating** 51:5
**criminal** 123:5 124:9
**Cross-examination** 3:5 127:1
**crying** 21:16
**current** 7:5 10:12 14:20
**currently** 6:8 14:10 16:20
**C&Y** 86:1
**c.c** 62:14

**D**

**D** 1:22 2:1 3:1 4:1 65:3 75:5 84:16
**danger** 62:8 91:16 115:15
**date** 41:11 63:18 64:7 64:14,22 68:4 117:18
**dated** 64:3,9 97:3,13
**dates** 138:11
**day** 27:25 44:14 47:7 69:13 90:20 121:18 125:11 128:11
**daycare** 9:12
**days** 54:7 98:7
**deal** 60:12 82:22
**dealing** 24:12
**dealt** 132:1
**Deanna** 33:24 43:19 56:10,14,16 57:23 62:1 92:18 122:20 127:6 138:9,21
**Debbie** 126:24
**Debi** 107:19
**Debra** 1:10,18 2:9 3:3 6:7
**decide** 24:13
**decided** 62:9 112:7
**decipher** 30:7
**decision** 89:23 94:25 95:4,5,7,23 96:7 98:2 111:18,19,21 112:9 118:24,25 121:11 122:23,24
**deem** 30:10 59:21 139:15
**deemed** 102:4
**Defendants** 1:15 2:9 4:9

**define** 60:24
**definitely** 100:10
**delve** 32:24
**demeanor** 21:12 130:18,22 132:2,13 133:12
**demonic** 134:5
**denied** 116:3 127:12
**deny** 127:5
**department** 11:12,22 11:24 12:4 13:13 17:1,2,3,14,17 18:1,4 19:11,12 48:8,9,21 66:12 86:11
**departments** 18:15
**depending** 18:13 49:11
**deponent** 139:23
**deposed** 107:18
**deposition** 1:18 3:10,11 3:12 4:6,20 5:2,5 35:22 67:14 94:15 100:19,21 104:7 106:9 139:22
**depth** 78:14
**described** 21:23 134:4
**describes** 133:8
**describing** 21:22 134:19
**designated** 92:9 128:2
**designation** 24:3,8,24
**designations** 24:17
**desk** 46:1
**destroy** 53:13
**details** 32:10
**detention** 56:12 57:8 57:10,12,13 85:24 91:15 114:16,18,22 117:16 118:10 119:2 122:15
**determination** 95:3,20
**development** 13:16
**Deveney** 15:8,14 16:15 17:17 18:8 32:15 49:19 50:5,20 76:25 77:10 80:11,13 84:1 89:1 103:5,8 116:25 117:6
**different** 21:16,17 59:25 82:12 91:22 121:1 133:12
**difficult** 44:12 109:12 109:14
**dignity** 134:5
**direct** 3:4 4:15 120:25
**directed** 41:23 62:19 62:21
**directing** 94:6
**direction** 49:9 56:2 61:10 112:3
**directive** 50:18,19
**directives** 50:6
**directly** 49:12 83:21,21
**director** 1:10,12 6:24 7:11 9:6,17 10:21 11:1,1,4,14,17 12:7 12:21,24 13:3,6,12 13:13,21 14:5 17:11 29:9 32:22 44:21,25 48:17 49:6,10 80:8,9 83:25 89:8 97:17 124:15
**directors** 17:13 18:10
**disagreement** 126:4
**disagrees** 126:5
**disciplinary** 136:21,23
**discipline** 135:17,20
**disclose** 25:4 42:14
**discretion** 89:16
**discuss** 24:7 27:15 39:1 40:16 58:3 87:20 89:5,12 95:11 113:9 121:6 127:23
**discussed** 34:13 39:5 43:6 44:7 52:10 54:18 56:8 57:16 87:24 91:13 95:25 96:23 99:22 111:9 112:1,4 113:6 132:17
**discusses** 101:22
**discussing** 39:4 62:10 86:19 88:13 128:6 137:1
**discussion** 22:8 23:21 24:10 28:3,19 29:1 31:16 34:1 35:14 38:25 50:5 51:24 58:10 61:17 67:8 69:24 70:19 71:18 73:16 78:14 79:4,13 80:19 82:1 84:19,21 84:24 85:1 89:2 91:21 94:23 95:6 97:7,24 103:4 108:14 108:22 110:2 113:10 114:14 117:22 118:1 126:20 129:18
**discussions** 49:19 79:25 88:16,19 117:12
**displayed** 134:19
**disposition** 88:8
**dispute** 41:7
**disseminated** 32:1 33:13 87:22 93:5,13
**dissemination** 92:15
**DISTRICT** 1:1,1
**disturbing** 54:25
**divulged** 137:9
**document** 37:8,9,12,14 38:21 39:4,12,14,19 39:21,22,23,25 43:7 43:8 67:6,10,16,17 68:2 74:9 100:17 113:18,20,21,22 130:6 134:6
**documentation** 101:17
**documented** 133:5
**documents** 119:5,6 124:21
**doing** 21:11 22:20 47:13 74:2 88:3 91:4
**done** 5:5 23:8 28:22 47:8 51:9 96:10 101:3 125:12,22 131:20 138:3,13 139:12
**Dorich** 113:1,7,16,25 114:5,20 119:15,24 120:16 121:5,21 124:6,10,11
**doubt** 122:11
**down** 5:23 10:5 18:12 52:22 116:20 125:20 129:19,22 130:8
**downstairs** 51:6
**drafted** 62:13
**drew** 120:17
**drowned** 86:10 87:1
**drowning** 86:3
**due** 4:6 25:8 97:9 98:1 107:17
**duly** 4:2
**during** 8:13 18:23 26:23,24 28:3,16 29:4 30:5,8,13 37:17 38:25 39:12 40:23 41:15 42:17 43:7,8 52:1,19 57:17 65:12 65:22 70:13 95:20 97:22 110:18 117:12 117:22 122:14 124:6 127:4 138:4,5
**duties** 9:8
**Dwyer** 13:1
**D-E-B-R-A** 6:7
**D.A** 123:12,18,20 124:3
**D.B** 23:14,14 27:23 52:13,14 70:25 71:3 71:11,12 87:11 136:14
**D.C** 33:18

**E**

**E** 3:1 4:1,1,1
**earlier** 4:25 35:12 62:19 102:13
**early** 14:21 20:6,7,19 28:16 29:1,5 30:8 41:9 63:5,17 73:7 110:14,18 113:12
**early-August** 110:17
**Ed** 86:5
**Edmund** 2:10 9:13
**effect** 14:24 38:20 56:13 80:1 86:14 135:19 136:9
**effectively** 82:22
**either** 8:14 16:4 20:6 22:4 23:11 38:1 44:14 88:2 120:20 125:9,11,25
**element** 33:4 123:16
**emotional** 21:20,22 29:20 42:3 73:8 74:6
**emotions** 21:16 133:13
**employed** 6:10,13 7:7 7:17 8:2 15:15 74:12 83:5
**employee** 20:16 31:23 42:10,24,25 45:20,21 57:25 58:5,6,15,23 59:4,7,10 61:5,6,12
**employees** 22:18 38:3 47:1 58:3 59:2 60:17 124:22 130:18 136:5
**employer** 6:20
**employment** 6:15 72:25 73:3,4,11,19 73:20 79:15 91:8 129:20 130:3 131:10 132:18,24 133:1,3
**encourage** 117:10
**end** 27:8,10 41:5 68:5 90:20 122:9
**enjoying** 8:25
**enough** 37:1 41:13 42:20
**ensuring** 24:1
**entire** 16:11 48:21
**entirely** 55:18
**entitled** 107:10 127:18 127:21,23
**entrusted** 56:23
**Erie** 1:5,5,6,8,10,12,13 1:14,23 2:2,5,6,6,6,8 2:14 6:21,22 7:18
**Esquire** 1:14,22 2:1,3,7 2:10,13
**essence** 48:25
**evaluate** 109:14
**evaluation** 87:18 88:3 88:4
**even** 41:25 51:12 52:9 91:3 116:7 125:1 138:21,23,24
**eventually** 9:1
**ever** 80:16 83:17 99:14 99:15,15 125:22 127:5
**every** 24:12 60:20
**everybody** 60:20
**everyone** 72:1
**everything** 5:22 87:20
**evidence** 96:6 116:2 129:2 135:5,20
**exactly** 11:23 12:1 25:15 33:3 68:24 104:21 108:18 125:22
**examination** 3:4 4:15
**example** 11:8,9 28:4 47:22 48:5 55:15 67:4 90:9 125:17 136:13
**examples** 125:3
**except** 59:15 78:18
**exchange** 86:1
**executive** 1:8,11 6:24 7:6 14:5
**exercise** 139:16
**exhibit** 3:10,11,12 67:11,12,13 100:19 100:21 129:11,12 130:14 134:3
**exhibition** 94:18
**exhibits** 3:9 67:14 94:18
**exist** 14:8,10
**existed** 14:5
**existence** 57:3
**expect** 94:2
**experience** 74:1 127:17 128:14
**explain** 92:2 98:12 106:6 116:21 122:16 122:16
**explained** 114:21
**express** 20:3 107:8
**expressed** 19:8,8 21:16 29:4,24 31:20,21 32:9 37:22 52:16 68:13 101:12,18 121:21 132:17
**expunged** 70:5 136:10
**extended** 36:3,5
**extent** 24:5,17 101:20 108:25 109:3
**extract** 33:1
**extremely** 54:25 56:18 56:18
**e-mail** 34:8,8,9 50:21 51:2,15 52:3 56:25 57:3,4,5,11 79:3,8 80:4,6 86:12 92:17 96:23 137:12,18,21 137:22
**e-mailed** 51:18 56:10 80:17
**e-mailing** 31:23 38:3

61:15,23,24,25
**e-mailings** 61:23
**e-mails** 32:9 37:21 38:8 41:18 42:9 44:2,6 45:10 46:20,22,25 47:4,10 54:1,22,24 55:3,4,9,12,13,14,16 55:21 56:6,9 57:16 61:18 62:5,17,18 71:25 72:1 79:19,20 85:10,11,17,25 88:24 95:9,17 96:2,7 97:7,8 127:6,10 138:3,7,11

**F**

**face** 22:19,21,22 26:21 75:5
**face-grabbing** 36:2
**fact** 25:19 26:2,2 37:3 50:13 54:23 56:10 72:25 77:4 78:18 86:1,21 87:5 90:20 91:14 107:3 115:7,14 118:23 125:8,24 126:4 130:25 133:3 136:21 138:13
**facts** 32:5 37:15,16 93:25 116:2
**failed** 134:20
**fair** 37:1 41:13 42:20 70:12 106:3 108:3
**fall** 11:10,11,12 60:25 93:8 103:24
**familiar** 15:1 67:24
**families** 70:23 134:4,6
**family** 23:19 34:19,23 35:8,25 36:3,3,5 38:3 137:16,23
**far** 20:13 25:1 28:7 35:24 43:6 48:18 49:12 55:9,15 113:14 114:3
**father** 52:6,11,11,17 70:25 71:3,7,11,12 71:14
**feasible** 41:25
**feel** 26:6,12 45:8 59:13 105:23,24
**fell** 50:12
**fellow's** 45:12
**felt** 41:18 56:20 77:10 78:7 134:23
**Ferguson** 1:19,24,25
**few** 54:7 133:11
**figure** 12:11 77:17
**figured** 108:18
**file** 135:21,24 136:22
**finalization** 23:24 24:4
**finalized** 139:14
**find** 82:24 92:20
**fine** 4:11,23 10:2 12:17 20:10,17 23:8 27:5 70:18 96:20 106:4,23
**finish** 72:14
**fired** 120:21
**first** 4:1 19:2,7,24 20:3 29:8 31:3 40:8 61:16 61:22 67:9 75:1 96:9 115:6 123:15 130:16 133:8,11,17 137:10
**fiscal** 48:8,11,12
**five** 12:6
**floor** 18:5,11,13,15,19
**floors** 18:6
**focus** 41:17 119:22 123:8 131:22 132:13
**focused** 118:3,11 132:10
**focusing** 49:24
**folks** 115:8
**following** 62:4 130:17
**follows** 4:2
**form** 35:10,11 42:9 43:7,24 62:20 64:18 77:7 88:5 95:8 100:3 104:3 108:17
**formal** 32:7 74:9
**former** 31:23 42:10,24 42:25 57:25 58:3,15 58:23 59:4 61:5,12 137:20
**forth** 30:23 43:18 45:9 57:19 61:15 62:1 115:8 125:10 127:10 133:13
**forward** 40:13,14
**foster** 12:21
**found** 56:8 96:23 97:8
**foundation** 135:9
**founded** 70:3
**four** 11:14 15:5 43:15
**fourth** 18:5,11
**frame** 17:21 20:4 31:12 36:21 112:11
**Friday** 6:16 89:21,22
**from** 8:18 10:4 12:3 19:24 20:1,23 21:16 21:21 22:10 30:20,25 32:6 33:1,8 34:24 35:4 36:7 37:5 38:8 39:14 42:1,2 44:2 46:22,25 48:6,7 50:22,23 51:15,16 52:3 58:2 62:5 70:20 72:25 73:3,12,13,14 74:15 75:8 78:15 79:5,9 81:19 82:4,15 82:25 84:11,12 88:6 99:8 100:25 102:11 103:15 108:19 112:3
113:1 114:7 115:16 118:4,5 126:7 129:16 133:4 135:4,6 136:22 137:19,23 139:11
**full** 6:6
**functions** 11:5
**further** 39:1,5 50:13 117:14 136:22
**future** 79:15

**G**

**gathering** 75:7
**gave** 5:13 34:9 38:16 59:10 94:16
**general** 25:24
**getting** 8:24 9:3 33:8 50:7 81:21 82:5,18 96:21 100:2 118:4 120:15 123:8,17
**give** 6:6 9:7 12:9 36:17 58:25 61:8,10,12 93:15 94:11
**given** 32:19 34:2 42:10 42:24,25 55:18 58:18 60:19,20 63:20 114:24 117:17 118:13 119:10,19 127:18 136:12
**giving** 38:2,2 60:15 117:21,23 125:3
**gleeful** 86:1
**go** 8:2 12:12,17 16:18 18:21 23:18 24:23 25:17,22 35:10 37:1 48:7,10 50:4 62:10 70:22 77:16 79:19 80:1 84:5 93:23 95:8 100:14 114:2 115:8 121:22 122:17 124:22 125:3,6 129:12,13,13,19,22 130:14
**God** 56:16
**goes** 78:17 88:5 133:15
**going** 5:2,7,12,19 6:3,5 8:17,24 9:25 13:25 14:2 16:3 18:21 21:16,18 22:24 23:6 23:9,18 26:9,20 32:8 38:14 43:18 44:2 50:10 51:7,9,23 53:25 56:5 57:19 59:16 61:7 67:6,9 68:17 71:21 72:14,20 82:18,20 84:5 90:9 92:6 93:14 94:4,7 100:19 104:20 105:21 107:1 108:15 108:16 111:12 115:25 120:21 123:8
124:1 127:10 128:2 132:4 133:23 134:2 134:24
**gone** 39:15 53:2,9 123:11,18
**good** 55:22
**Gornall** 2:7
**gotten** 33:19
**grabbed** 75:5 84:10,16
**grabbing** 22:19,21,22 26:21 52:17 84:22,22
**grammatical** 125:2
**grandfather** 136:14
**Granger** 45:12,14,18 45:23 46:20 54:1 55:1,5,16,21
**Granger's** 55:2
**ground** 5:4
**guess** 5:4,16 7:24 9:23 12:15 16:25 17:14 19:17 22:10 23:15 30:7 32:22 34:13 42:9 43:2,15 51:11 51:14 54:2 58:20 60:9,21 64:2 66:6 67:10 76:18,22 77:6 81:25 84:20 85:14 91:25 92:2 107:5 111:16 121:13 123:14 126:11 131:16

**H**

**halfway** 129:19
**halls** 79:5
**hammer** 25:22
**hand** 63:21 94:19 117:15
**handed** 67:12
**handle** 19:15 88:12
**hands** 37:9 122:11
**handwritten** 66:2 84:6
**happen** 44:10
**happened** 40:24 45:4 51:21 56:4 61:19 69:18 70:4 82:10 111:21 112:11 120:6 128:25 136:23
**happening** 33:5 56:5
**happens** 106:12
**happy** 81:23
**hard** 5:23 33:2
**harp** 108:6
**having** 4:1 93:9 106:6 106:21
**havoc** 51:6
**head** 5:24 14:18 15:16 19:5 64:20 81:14
**hear** 77:24 100:10,16
**heard** 19:25 99:20,23
**hearing** 37:7 38:17 40:25 41:2,4 43:7,8 52:1 58:6 68:18,21 69:9 77:12 80:20 99:10 122:20 123:1,9 123:24
**Heather-Renee** 50:25
**held** 23:21 24:10 35:14 38:10 51:24 58:10 61:17 67:8 70:19,20 71:18 73:16 80:19 85:1 91:21 94:23 97:8 103:4 108:14,22 110:2 126:20 129:18 139:11
**help** 20:14 106:11
**her** 1:11 5:23 15:7 20:21 21:1,2,12,13 21:18,19,20 23:3,3,6 25:2,9,10 26:23,24 26:25 27:12,22 28:4 28:13,20 29:1,4,13 29:16,18,23 35:19 42:12 50:7,9,10 52:8 56:12 66:7,14,22 67:20 68:16 73:4,8 73:10,12,20 74:14,14 75:21,21 76:17 77:7 80:3,4,6,10 82:20 83:21,24 84:16 90:25 91:8 92:23 93:15 94:6,10,11,13,19 97:18 98:3 101:9,11 102:1,17,25 103:16 104:12,22,23 105:1 107:18,23 108:3,9,11 108:11 109:18 110:20 112:7,15 113:13 114:11 115:23 116:18,22,25 117:5,6,13 119:19 120:6,10 121:5,22 122:10,23,25,25 123:17,19 127:9,10 129:23 130:5,7,8,9 130:22 132:3,13,18 132:25 133:2,2,12,12 133:14,18 134:13 137:3,16,16
**herself** 78:3 118:18
**hiding** 77:4
**higher** 89:6
**highly** 57:7
**him** 44:11,17 56:7 94:16 98:23 120:11
**hired** 7:4
**history** 125:21
**hold** 8:14 105:7
**Holdnack** 1:25
**home** 20:16 53:16

60:16
**hone** 130:8
**honest** 49:8 110:4
**honestly** 21:14 77:12 122:8 124:5
**honor** 109:10
**hoped** 51:10
**hospitals** 56:13 57:14
**hour** 21:14
**hourly** 47:15,16
**hours** 21:15
**huh-uh** 5:23
**Hum** 105:16
**human** 44:21 48:17,21 49:10 89:8
**hum-um** 46:3,5 81:17
**husband** 137:20
**hypothetical** 59:13

**I**

**idea** 9:7 10:2 38:6 44:5 57:18 76:13 98:10 120:9 121:3
**identification** 67:15 100:22
**identified** 59:24
**identifying** 26:5
**identities** 26:10
**identity** 26:14 107:11 107:12,17 108:25 109:4
**illness** 4:6
**imagine** 99:20
**immediately** 134:20
**impact** 74:10 123:9
**impair** 6:1
**important** 5:16 38:13
**impropriety** 86:25
**inappropriate** 134:23 137:5 139:4
**inappropriately** 83:11
**Inc** 1:25
**incident** 22:13,16,18 26:25 32:6 35:9 36:2 51:5 52:17 69:22 75:22,23 76:16 83:22 84:9 109:24 116:25 117:5,12 128:8 134:10,15,19 137:2
**incidents** 83:10
**included** 62:15 76:18
**including** 26:3 72:8,9 92:10,11
**incurred** 47:13
**indicate** 28:17 41:4 50:10 78:7 135:5
**indicated** 8:18 21:9,12 22:3 39:3 40:3 56:11 64:19 68:12 70:3 117:20 121:10
123:11
**indicating** 32:4 35:18 67:17 129:15
**individual** 4:9 22:22 25:10 26:20,21 45:19 58:8,8 61:13 83:25 124:4 125:10
**individually** 1:7,9,11 1:14
**individuals** 15:22 16:4 18:1,7 26:6,10,14 28:5 33:9 56:8 59:16 65:11 85:12
**inference** 125:5
**inferences** 21:25
**inferring** 124:8
**influence** 5:25
**inform** 87:17
**informal** 74:8
**information** 25:4 26:5 26:5 32:1,4,4,18,19 33:1,12 34:2,9 35:4 35:19 36:1,1 38:2,2 39:2 40:1 43:18 44:1 46:13 50:8 51:7 52:6 57:19,22 58:18 59:22 59:24 60:22,25 61:1 61:12 63:20 67:4 68:14 81:7 82:18,24 82:25 83:24 87:22,24 92:5,15,17,22,23 93:4,6,7,9,12 101:23 102:8,12 104:15 106:16 110:6 111:25 115:2 127:18,24 135:6 136:12,12,16 137:1,8,15,19,23 138:10,20,22 139:3
**informed** 87:16
**inhumane** 134:5
**initial** 24:2,16 89:9 113:10
**initials** 23:3,7 26:10 27:23 84:17
**initiate** 20:21
**initiated** 20:20,22 90:2 90:3
**initiation** 90:7
**injury** 129:3
**insert** 104:15
**inside** 109:9
**insinuation** 123:4
**inspired** 22:10
**instance** 22:10,12
**instead** 97:25
**instruct** 23:2
**instructing** 108:20
**intake** 11:11,13,15,22 11:24 12:4 13:13,14 13:21 16:25 17:2
**intending** 94:8
**intents** 70:1
**interchanged** 11:2
**interpret** 121:18
**interpretation** 127:17
**interrupt** 36:17
**interview** 27:15 28:8 64:25 65:12 76:13 130:21 133:9,13
**interviewed** 27:18 28:5 76:3,9
**interviews** 28:21 29:1
**intimated** 123:13
**introduced** 4:25
**investigate** 22:4 39:1 74:15,16 76:1
**investigated** 137:3
**investigating** 11:9 22:14
**investigation** 26:23,24 28:20 39:6 77:7 78:15 82:23 88:6 108:13 111:11 127:24 128:15 129:2 130:20 132:3 138:5
**investigator** 102:7 128:16,17
**invoice** 48:5,7
**invoices** 47:18,20,25
**involve** 62:10
**involved** 9:8 34:21 66:13 78:17 81:9,11 83:9 87:4,5 111:25 127:19
**involvement** 115:19,22
**involving** 35:9 62:12 84:21
**issue** 50:6 99:13 115:11 115:13,14 117:15 119:23 123:15
**issued** 50:6,7
**issues** 38:1 50:8 51:3,4 62:16 68:22 115:12 134:10,14

**J**

**J** 2:13
**Janis** 1:19,24
**January** 7:2,4
**job** 8:22
**jog** 83:19
**John** 1:13 21:3 40:17 40:18,19 41:23 44:19 46:9,12 54:20 55:12 62:14 72:9 90:14 99:5 120:12
**joined** 113:1
**joint** 90:7 95:4,5,7,23
**Joseph** 2:11
**Joyal** 2:10 3:5 22:24 23:5,9,17 25:8,13 26:15 42:11 59:12 61:3 93:14,19,23 94:4,9,14 104:3,7,21 105:1,6 106:20 107:15 108:2,8 115:25 116:7,10,13 116:15,23 118:6 126:24 127:2 132:6,9 134:1 135:10 139:6
**Joyal's** 4:8
**Jr** 2:10
**Judge** 23:7
**judgment** 130:18
**July** 6:17 7:2 8:17 10:13,22 20:6,7,19 28:16 29:1,5 31:13 31:13,14 33:5,6 36:13 41:4,5 42:17 42:21 43:7 52:1,2,20 63:5 77:19 84:10,13 99:11 115:20 117:13 123:1
**June** 6:16 27:6,8,10 75:25 77:19 85:6 101:23
**just** 12:15,20 13:25 17:22 19:4,5 20:8 21:17 22:9 29:13,23 29:23 37:17 38:15 40:11 46:22 49:24 53:19 59:13 61:19 63:19 67:11 68:22 69:12,17,21 71:9,20 72:13 79:3,3,18,18 80:3 82:21 83:17,19 84:19 86:24,25,25 88:6 91:22 93:21 96:4,19 100:1,5,5,11 104:22 105:7 106:3 108:1 112:11 115:8 116:1 118:8 123:8 126:24 134:22
**juvenile** 86:10 91:18

**K**

**Karen** 113:1 114:20 122:3
**Kazman** 65:5
**Kazmer** 64:4 65:6,7,14
**keep** 51:22 52:21 86:5 120:11
**key** 119:22
**Kim** 78:24
**kind** 5:4 6:1 10:3 26:5 29:22 48:19 50:14 79:7 86:17 88:5 92:5 93:9 118:3 125:9 126:10
**kinds** 21:17 82:20
85:22 125:2
**knew** 15:21 16:2,12 33:18 34:17 35:7,8 35:24,25 36:1 37:13 57:2 77:4 78:20
**Knock** 105:4
**know** 5:1,17 15:7,8,14 15:17,24 16:4,8,11 16:20 21:17,19 23:18 24:20 25:3,15,15 26:4,7 27:14,18,21 27:25 28:13,20 29:22 31:2,25 32:12,17,25 33:3,12,17,17,21 34:12 35:5 36:24 37:2 39:5,24 40:1 41:11,24 43:21,23 44:24 45:3,4,6 46:8 46:11 47:5,7,19 51:13,14 53:4,6,8,19 53:21 54:5,13 55:6,9 55:13,15,20 56:6 57:19 59:17,19 60:14 60:15 61:8,8,23 63:23,25 66:14 68:4 68:8,9,21 69:8,15 70:7 71:20 72:12,20 73:23,24 74:4,6,7,8,8 74:9,11 75:4,9,14,16 75:20,20,21,22,22,23 76:11,20 77:6,9,12 77:14,15,17,18 78:4 78:19,22,24 79:5 80:10 81:6,9,24 82:11,16,23 83:1,2 83:10,21,23 85:16 86:4,5,6,7,14,16,16 86:17,20,24 88:7,18 90:25 91:3,19 92:7,8 93:11,17 94:21 97:6 97:10 99:21,21 102:14,19,21,24 104:20,21 106:24,25 107:1,2 108:2,9,16 109:11,13,21,23,25 110:5 111:12 113:10 114:4 115:1 116:19 117:20 118:11,15,16 119:8,21 120:23,23 120:24 122:11,19 123:17 124:2 125:4 125:20,22 126:2 128:3 130:15 133:10 133:11 135:18,25 136:19 138:2
**knowledge** 27:2 28:7 35:2 81:18,19 128:22
**known** 15:3
**knows** 76:20 103:17
**Knox** 2:7,13

**Kolupski** 13:8
**Kolupsky** 91:2
**Krott** 12:22

L

**L** 1:19,24 4:1,1 9:13 84:17
**label** 100:18
**Lack** 135:8
**laid** 93:20 112:6
**Lane** 4:5
**language** 93:11 94:11 94:20 121:1 122:4
**Lanzillo** 2:7 4:4,13,19 4:22 14:4,9 23:22 24:11,22 26:15 35:10 35:12,16 43:24 59:23 60:2,5 64:13,18 78:9 95:8 100:3,8,14 102:15,17 104:2,4,13 104:17 105:21,23 106:5,10,21,24 107:1 107:3,8,14 108:15 126:23 139:10,13,20
**Larry** 123:11
**last** 6:15,20 10:14 17:9 17:9 19:23 26:19 72:17,18 77:18 84:11 123:12 129:19 130:15
**late** 31:13,14 75:25 90:23 110:15
**later** 33:11 107:18
**late-August** 110:15
**laughing** 21:16
**law** 2:11 26:3,7 27:1 57:21 77:15 91:18 92:9 93:2 94:1
**laws** 91:25 92:3,16
**lead** 29:5
**leading** 133:25 135:8
**leaks** 135:6,13
**leaning** 112:3
**learned** 36:7 54:22 56:9 98:2 111:10
**least** 28:25 75:5 90:22 102:11
**leave** 80:9
**leaves** 106:9 127:15
**leaving** 122:11
**led** 33:11 77:7 96:7
**left** 12:22 26:18 120:14
**legal** 25:3
**Leibel** 67:11
**less** 24:18
**lesser** 97:24
**let** 10:3 20:19 32:8 37:19 53:10 58:2 60:2 69:6 72:12 77:9 96:19 104:12 105:7,8 105:23 108:25 116:21 119:25 122:24 127:22 134:1 135:16 138:18
**letter** 62:25 88:5,13 100:20,25 101:15,16 101:21 110:7,22 112:9,14 116:16 120:3,5,17 121:20 123:6 127:14 129:11 129:14,15,16 130:15 130:21 131:8,11,15 131:17,23 132:1,12 135:19
**letting** 79:25
**let's** 17:21 34:16 128:8 129:13,13 138:12
**level** 16:4,8,12
**Liberty** 2:4
**Liebel** 1:11,18 2:10 3:3 3:10,11,12 4:18,25 6:7 65:3 67:14 100:19,21 107:19
**life** 52:8 82:20 137:8,16
**like** 18:7 21:21 32:23 32:25 33:5 41:22 53:5,23 54:17 56:15 56:16 58:5 63:21 69:8 70:4,15 77:4 84:13,13 86:6,6 100:18 122:19,21 128:4
**likely** 88:12 128:5
**limit** 107:25
**line** 7:24 27:4 54:1 69:19 72:18 74:17,24 75:7 77:11,21 78:9 78:11,12 102:2,3,18 102:19,20,23,25 103:14,15,19,21 110:3 114:2 120:21
**lined** 8:23
**list** 70:24
**listed** 64:24
**little** 8:3 9:7 20:25 38:14 123:17
**locate** 91:3
**located** 18:3
**Locke** 13:11,22 29:11 29:19 38:12 40:4 44:19 54:17 91:2
**lodge** 105:21
**log** 60:20
**long** 7:1,13 8:1 15:3,14 21:14 24:20 28:4,7 54:5 67:22 104:14 135:19,23
**longer** 71:20 127:19 138:21
**look** 17:21 63:21 79:23 81:23 93:21,23,23 119:10,16 132:16
**looked** 37:21 47:11 55:11 97:7,10
**looking** 9:1 17:21 41:9 54:22 56:2 62:16,17 69:19 72:17 74:23,24 75:8 84:11
**looks** 67:24 84:13,13
**lot** 20:15 21:15,17 68:22 69:11 122:9 133:17
**L-I-E-B-E-L** 6:7
**L.B** 84:17

M

**M** 65:5
**made** 29:13 30:5 34:7 34:16 37:12 40:21 75:6 76:14,17 77:21 78:7 87:11 89:23 90:25 94:25 95:2,21 98:22 102:3 103:14 103:21,22 105:1,14 107:6,22 108:12 109:19,20,21,22,23 113:15 121:11 125:8 125:14 126:8 138:4
**mail** 47:24 48:1
**main** 41:17 91:19,19 115:13,13 118:3,4,6 118:7
**make** 4:5 5:16,19 13:25 14:3 24:8,11 29:23 34:18 37:20 60:2 69:7 70:2,2 73:24 84:14 95:7 97:1 98:20 125:5,19 139:15
**makes** 74:24 125:15
**making** 24:5 78:18 107:11,12 109:18,18 109:24 112:9 139:2
**maligns** 134:4
**maltreatment** 101:22 102:13 103:23 105:15 109:1
**man** 70:25
**management** 45:22
**manner** 83:11
**many** 8:8 28:13 93:19
**March** 1:20
**mark** 4:5 67:9
**marked** 67:15 100:22 129:11
**married** 6:8
**Matt** 45:12,13,18,23 46:3,19
**matter** 27:16 59:9 130:25
**matters** 58:3
**may** 18:16 19:7 24:11 30:1 31:25 32:18,19 35:18 45:16 47:9 52:22 53:22 55:22 63:18 68:20,20 70:14 70:17 73:12 74:7,7 74:10 75:10,10 79:22 119:3,4 125:13 129:12
**maybe** 6:2 15:16 27:5 68:23 94:19 121:6 123:16
**McConnell** 50:25 137:7,11
**McLaughlin** 2:7
**McNair** 1:22 2:1 4:11 10:8 14:7 23:2,6,10 23:12 24:20 35:11,21 42:14 71:8 93:16,21 93:25 94:6,13,14 104:5,12 105:4 107:5 107:10 108:21 116:6 116:9,11,14,20 129:17 135:8
**mean** 15:24 18:7 25:14 33:2 34:8,18,23,24 37:15 49:10 55:20 56:17 59:16,23 64:4 69:22 70:9,16 73:4 74:10 75:14 80:23 81:22,24 82:2 83:15 86:24 92:4,19 98:15 99:21 101:6 102:18 104:19 106:3 108:7,9 109:11 110:23 111:16 117:7 118:15 120:21 121:14,14 123:15 126:10,16 132:11 137:24
**meaning** 39:22 60:22 111:14
**meant** 62:12 74:9
**medication** 6:1
**meet** 40:12
**meeting** 38:10 40:4,10 40:12,21,22,23,24 41:13,14,16 42:1 43:14,25 44:5,6,11 45:4,5 49:18,25 54:15,18 55:1 56:4 57:17 62:3,5,19 63:3 65:18 67:21 68:3 71:21,22 85:8,15 88:15,23 89:9,11,17 89:23 90:3,10,15 95:14,15,16,20 96:9 96:15,17,22 97:16,22 98:13,14,15,24,25 99:4,7 101:6 110:25 111:9,21 112:18,23 113:8,11,12 114:7,12 119:7,20 120:4,6,10 120:10,19 122:8,13 122:14 123:3 124:7 127:4 130:1
**members** 34:19 35:8,25 36:3,4,5 38:3
**memo** 62:14,20
**memory** 83:20
**mention** 117:21 123:4
**mentioned** 23:11 37:18 38:16 78:20 91:22 99:15,15 124:14 127:9
**mesh** 82:8 126:2
**meshes** 125:6
**met** 16:9 44:17 56:7 95:11,12
**mid** 31:13,14 52:2,2,2 54:14 62:3 68:3 71:22,24 85:9 88:15 90:22,23 95:12,18 96:16,16
**middle** 131:22,25 135:2
**mid-August** 89:11
**might** 19:22 33:18 51:20 53:19,21 83:19 83:19 85:23 97:23 100:10 106:7,11 114:2 118:19 121:1 123:4 125:5 126:8 127:24 128:17,21 136:15
**Mike** 13:10 37:3,4 38:11 39:20 46:9,10 46:11,14 54:17,19 62:13 64:4 68:3 79:22 113:21,22 119:8
**mind** 6:5 51:22 63:18 85:17 121:24
**mine** 63:22
**minute** 139:7
**mis** 30:9
**mischaracterizes** 35:12
**mischaracterizing** 42:12 102:17
**misconduct** 18:24 19:25 22:1 30:4,10 30:17,18,24 34:13 41:15 49:20 85:5
**misinformed** 86:9,12
**misquote** 12:8
**Miss** 4:18,25 15:14 18:8 21:10,12,22 26:23 28:4,11 30:5 30:10,18,20 32:11 33:1,13,13 34:3 38:8 40:4 42:3,4 43:16,19

44:3,3 46:22 54:2 59:20 69:6,25 73:18 75:6,25 76:9,14,15 76:20,21,25 77:2,6 77:10,10,20,25 78:2 78:7,21 79:5,15 80:1 89:18 90:16,24 91:3 95:2 99:9,16 101:23 102:12,25 103:5,8,15 103:17 110:5,19,21 110:23 112:21,25 113:4,6,7,16,25 114:4,5,11 116:6,24 116:25 117:6 118:14 118:18 119:10,15,24 119:24 120:4,16,16 121:5,21 122:7 123:5 123:7,21 124:6,9,10 124:11,12 128:23 129:16 130:2 131:9 133:12 134:13 136:13,17,17 137:1,7 137:9,11,19,19,23,24 137:24

**misspelling** 121:22
**mistake** 70:22
**mixed** 81:21
**month** 33:5 36:13 52:1
**months** 117:12
**more** 21:21 23:15,24 37:18 83:6 93:19 132:1
**most** 15:22 61:25 88:12 128:5
**mostly** 57:18
**moved** 40:13,14 82:11 82:12
**much** 26:6 71:20 86:19 98:12 120:20
**myself** 4:25 8:25 38:12 54:17 65:17 96:24
**M.H** 86:15,15,15

**N**

**N** 3:1
**name** 6:6 19:22,23 23:3 23:12,13,15 24:12 45:12 71:8 72:22 92:6 121:22 123:12 138:2
**names** 15:12 23:1,11 23:12,20 24:1,6,12 25:15 26:4 53:23 65:2
**nature** 57:9 66:14 82:13 83:14
**necessarily** 59:4,21 128:20,20
**necessary** 139:15
**need** 5:12 40:11 50:3 58:7 61:9 70:22 92:8 93:19,21,25 101:15 114:3 128:16
**needed** 28:22 41:18 50:11 59:3 62:9 96:7 113:11,13
**needing** 33:17
**needs** 41:23
**need-to-know** 60:19
**negotiated** 136:1
**never** 17:2 61:14 70:4 75:11 99:23 102:23 110:19 125:21 127:12
**next** 16:3 33:4 36:8,9 36:16 37:3 51:11 62:10 75:16
**next-to-last** 130:25
**nicer** 120:24
**nod** 5:24
**nods** 14:18
**None** 33:18
**normal** 125:9,16
**Notary** 1:19
**note** 4:4
**noted** 4:9 69:21
**notes** 12:19 20:13 41:4 52:21 53:7,8,22 63:21 66:2,22 84:5,6 84:8,18
**nothing** 102:1 112:13 112:15 133:4 134:15 137:2
**noticed** 84:8
**notified** 46:8
**notifying** 91:15
**noting** 101:21
**number** 12:9 33:23 47:10 61:5 82:10 91:22 117:22,23 125:1
**numbered** 84:11
**numbers** 59:1 60:16 61:9

**O**

**object** 22:24 59:12 93:14 108:16 115:25
**objection** 35:10,11 42:11 43:24 59:23 60:3 61:3 64:18 95:8 100:3,14 102:15 104:2,3,13 132:4,15 132:19 133:23 135:8
**objections** 4:7,8,10
**obligated** 76:23
**obligation** 25:4 77:3
**observed** 27:22
**obtain** 55:2
**obvious** 126:11
**obviously** 103:10 105:10 129:8
**occur** 24:3 56:22 69:22
**occurred** 21:11 33:4 47:4 61:14 68:15,15 83:22
**occurring** 76:18
**OCY** 10:21 60:10,11 60:22 61:1 66:17 86:21 87:2,2,15,21 108:5 109:3 124:16 135:17
**off** 6:6 15:16 23:21,22 24:10,23 25:17,22 26:18 35:14 48:10 51:24 58:10 61:17 67:8 70:19 71:18 73:16 80:19 81:14 85:1 91:21 94:23 103:4 105:5 108:14 108:21,22 110:2 123:8 126:20 129:18 139:14
**offer** 113:11,13 114:3
**offered** 113:4
**office** 1:6,12 2:6,11 6:24 7:11,20,25 8:6,9 9:6,9 10:10 18:3,5 19:18 21:9 27:9 31:8 31:10 37:5,13 45:23 47:20,21 48:6,11,12 56:22 60:12 66:18 80:7 88:4 97:14 99:9 117:8 122:10 123:12 123:19,20 124:3
**officers** 19:14
**offices** 1:21
**oftentimes** 109:6
**oh** 4:21 63:11 64:8 71:7 71:16 100:7 105:4 112:24,24
**okay** 4:12,21 5:7,14,15 5:18 6:5,10 7:1 8:4 8:17 9:2,11,20 10:7 10:13 11:3 12:2,10 12:17,17,23 13:2,5,9 13:17,19,24 14:15 15:3,6 16:1,11 17:3,8 17:21 18:3,14,21,21 19:6,17 20:4 21:8,21 22:3,13 25:22,23 26:9,16,17 27:7,15 27:21 28:19 29:12,19 30:5,13 31:2,9,24 32:8,16,22 33:7,10 33:11,22 36:7,13,20 36:23 37:11,15 38:5 38:14 39:24 40:3 41:13 42:13 43:2,11 43:21 44:15,22 45:11 46:1,8,9,15,19 48:23 49:18,19 50:2,4 51:11 52:3,19,24 53:10 54:5,21 55:15 58:2,12,18 59:10,11 61:11,12 62:3,12 63:4,19 65:16 66:7 66:21,25 67:22 68:7 69:19 70:7,18,21 71:2,19 72:3,10,17 75:13 76:1,9,20 77:24 78:20 79:8,13 80:18 81:9 82:4,14 83:4,13 84:6,7,25 85:9,17 87:10,11,13 87:19 89:17 90:13,15 90:17,24 92:12 94:17 95:14,17,18,25 96:12 96:18 97:4,5,15,19 98:17,21 99:3,14 100:1 101:15,19 102:11 103:2,20,23 105:13,14,17 109:2,8 109:15 110:13,25 111:24 112:2,18 115:24 116:20,25 117:4,17,21 118:13 118:21 119:2,5,24 120:2,8 121:9,12 122:23 123:3,25 124:14 125:18 126:5 126:7,15 128:8,19 129:22 130:12 131:17,22 132:13,16 132:23 133:6 134:13 135:25 136:5 138:12
**once** 62:19 97:10
**one** 7:14 11:21 14:11 14:13 17:5,13,19 22:18 23:1,15,24 27:25 28:15,15 31:2 31:9 37:7,13,15,18 37:18 39:9,9,10 42:6 46:10 49:1,2 52:16 53:22 55:8 56:7,11 63:14 64:5 67:11,19 67:23 71:24 77:10 78:24 82:15 83:2 84:17 91:2 101:8 103:16 106:14 120:17 125:15 126:24 129:17 130:18 137:6,11,14
**ones** 80:2
**ongoing** 47:9
**only** 27:25 28:10 35:24 55:2,8 58:4 60:16 64:1,5 74:15 75:11 76:16 93:6 102:3,20 103:13 121:21 128:1 128:10,11
**Onorato** 1:13 40:17,18 40:19 41:23 44:8,19 46:9,12 54:20 55:12 62:14,18,21,23,24 72:9,10 89:7,10 90:8 90:14 95:10 97:2 99:5 112:5,25 114:13 117:19,19 119:5 120:14 121:10,20 124:7
**Onorato's** 97:14
**open** 121:15
**opinion** 107:8
**opportunity** 20:12 94:16 122:1
**option** 121:14
**order** 20:14 22:25 23:10 36:18 56:12 57:3,4,6,7,8,10,12,13 85:24 91:15 114:16 114:18,22 117:16 118:10 119:2 122:15 128:14,15
**orders** 57:14
**organizational** 10:4,19 14:1,4 48:18
**original** 121:19
**originally** 123:21
**other** 8:22,23 9:2 11:16 12:14 13:15 18:16 23:19 28:15 34:12,24 34:24 35:19 36:9,11 36:12,15 37:13,15 42:8 43:9 44:1,2,2 46:25 47:1 51:23 57:16 59:10 62:15 64:5 65:2,24 78:3,21 78:22 80:2 83:10,13 84:17,21 85:5,12,22 85:23,24,24 89:6 94:20 106:24 107:3 114:24 118:13,19 122:18 128:6 133:4 134:9,14 135:4 139:6
**others** 23:17 125:2
**otherwise** 5:12 77:24
**ourselves** 24:8
**out** 8:8 12:11 25:22 32:20 34:9 37:17 38:2,2,23 39:15 42:17 51:7 57:15 58:18 59:1,20 60:15 60:19,20 61:8,13 67:4 68:14,21 74:1 77:17 82:24 84:14 88:5,13 91:4 92:20 93:20 96:4 99:24 100:11 105:25 106:5 106:17 110:22 112:6

117:21,23 120:16 121:23 122:15 128:6 136:6
**outcome** 45:4,6,9 56:8
**outside** 16:5 34:23 92:7 93:9 109:9 125:3,4,5 127:25
**outstanding** 22:25
**over** 9:17 11:5 48:21 83:21,21 89:10 97:14 112:24 114:13 125:6
**overinclusive** 24:18
**oversees** 19:12
**oversight** 9:15,16 74:3
**overwhelming** 135:5
**own** 11:24 137:3

**P**

**P** 57:14,14 65:9 70:7 134:4,9,23
**PA** 2:2,5,8,12
**PaC.S** 107:6
**page** 3:10,11,12 69:20 72:18,21,21 74:21,21 84:11,12 129:13,17 129:19 133:8,17
**pages** 67:22 84:10
**paid** 48:14
**Palattella** 86:5
**Pam** 13:4 17:10 18:18 18:18
**paper** 86:2,21,22
**paperworkwise** 28:23
**paragraph** 72:20 74:23 74:24 101:21 130:16 131:1
**paragraphs** 129:22 131:22 132:1
**parent** 37:10 87:15,23 87:25 91:15 92:10,11
**parents** 39:7,9,10
**part** 26:7 30:3,10,18 39:15 40:21,22 53:3 53:4 55:3 60:10 61:18,18 69:24 86:18 103:10 104:16 118:24,25 137:10
**particular** 22:8,12,13 33:15 40:25 50:17 51:8 60:6 62:13 68:18 75:15,21 111:17 124:4 133:10
**parties** 138:15
**party** 38:4 57:20,20,23 92:21 93:9 117:24
**past** 83:18
**Patrice** 65:18,19,21 66:5 67:19
**Patricia** 15:10,18 16:15 16:20
**pattern** 62:9
**Patty** 32:17 52:8
**PC** 2:7
**Peebles** 78:24,25
**penalties** 26:8
**Pennsylvania** 1:1,9,20 1:23
**people** 15:24 31:7 51:6 54:16 58:2 60:16 77:13 78:3,21,22 88:12 93:7 98:20 108:8 117:7,8 122:12 125:3 128:4,6,11,12 135:4
**per** 50:6 109:19
**perfectly** 110:4
**perhaps** 29:25
**period** 136:23
**periodic** 22:4,9
**periodically** 19:14
**permission** 38:9 59:11
**perpetrator** 128:24
**person** 9:23 19:2,7,20 20:3 46:12,13,20 56:22 61:5,6 65:24 74:12 78:24 87:25 88:1 92:6,9 96:9 103:18 105:15 107:11,12,16 109:1,4 109:5,16 113:2 125:20,23,24 128:2 128:10,21 134:4
**personal** 16:4 32:4 51:6 52:8,8 79:7 82:20 115:9 137:3,8 137:16
**personally** 89:12
**personnel** 1:10 13:7 53:4 66:8,9,12 134:9 134:14 135:21,24
**pertinent** 55:13,14
**Pete** 44:19,20 90:11 99:5 112:25 113:4,11 114:3
**Peter** 1:9 2:9
**phone** 21:4,5 28:14 33:22 59:1 60:16 61:5 63:4,9 64:11 65:15 68:10,23 69:7 79:12 101:12 130:7
**phrase** 127:22
**physically** 47:24 48:1
**pick** 26:18
**picture** 48:19
**piece** 13:6
**Pittsburgh** 2:12 19:19 20:23
**place** 31:6,10 56:21 59:5 61:16 132:4 133:23 138:23
**placed** 91:16
**places** 26:3
**Plaintiff** 1:3 2:1
**planned** 14:17 85:14
**players** 70:23
**please** 5:9 6:6
**plus** 69:11
**point** 6:11 8:13 10:18 18:23 24:7 25:7 26:12,24 27:15 30:11 30:13 37:19,20 40:5 46:11,13 53:13 56:7 56:11 60:21 63:2 70:13 72:8 73:2,19 75:6 79:14 82:11 87:17 91:1,11 96:1 96:25 99:7,24 107:9 109:17 111:13 112:6 113:10 114:8 116:1 123:7,14,16 124:6 128:4 138:19
**policies** 60:10 61:2,4 92:3 105:11 127:15
**policy** 13:16 41:21 57:21 60:9,11,14 61:24 87:15 91:17 103:25 108:4,6 109:3 115:4,5 124:18 125:16 134:17 135:16,18,25 136:3,9 136:15,20 138:25 139:4
**portion** 55:23,24
**position** 6:22 7:1,9,13 7:22 8:14,20 9:2,8 10:21,25 11:3 13:14 66:7 83:23 84:3 87:21
**positions** 11:8
**possession** 39:19 52:25
**possibility** 97:23 98:22 124:8
**possible** 5:10 58:19 97:11,24 100:1
**possibly** 73:6 78:18
**potential** 38:7 62:8
**practice** 60:15 124:20
**Preliminarily** 5:25
**prepare** 58:7
**prepared** 120:3,5,18 121:20 124:19,22
**prescribed** 125:22
**present** 2:13 99:3 112:23 114:7
**presume** 25:1 74:11
**Presuming** 138:12
**pretty** 36:24,25 86:9,19 120:19 122:6
**previously** 35:16
**primarily** 9:18 131:4
**prior** 7:7,9 8:16 14:21 17:22 20:13 23:23 24:3 49:18,24 54:2 57:3 85:6 97:22 98:17,18 99:7,15 113:15
**prison** 52:6,11 70:25
**privacy** 59:9 79:7
**private** 59:24 61:23
**privilege** 94:8
**probably** 20:6 29:22 53:2 54:14 129:5
**probation** 86:11
**problem** 24:19 25:12 25:19 26:15 106:1,6 106:22
**problems** 73:1 126:2 133:4
**procedural** 135:16
**procedure** 104:23 125:9
**proceed** 90:16
**proceedings** 39:12
**process** 28:8 97:6 118:25
**produced** 14:3
**professional** 11:2 16:12 92:8
**prognostic** 56:12 57:8 57:10,13 85:24 91:15 114:16,17,22 117:16 118:9,10
**program** 9:12,13,14,18 9:24 10:23 11:7,13 12:13,16 13:7 83:25
**programs** 9:22 11:6,6 12:12,14 17:5,6 19:13
**projects** 13:4
**prolong** 108:18
**prompted** 50:18,19 68:10 81:1
**pronouncing** 15:12
**proper** 134:21
**prospects** 8:23
**protect** 56:23 94:8
**protected** 107:13
**protecting** 107:10,17
**protective** 22:25 91:18 93:2
**protocol** 39:15
**provided** 134:6 138:22
**psychological** 131:2
**Public** 1:19 19:11,12
**published** 108:7
**purpose** 5:1 30:11 74:14 91:8 101:16 113:7 132:11
**purposes** 58:19 70:2
**put** 56:21 57:14 62:20 62:24 70:15 86:15 97:11 101:11 115:15 116:1 122:2 129:23 130:8
**putting** 54:19
**p.m** 139:11,11,22
**P.W** 22:23 23:12,13 26:20 27:20 32:2,3,5 32:6 33:16 34:17 35:9 43:10,12 49:22 50:8,16,17 51:4,15 51:17 68:14 70:7 75:1,6 76:3,14 79:9 80:22 81:9,11,19 83:3,4 84:9,9,21 115:19,23 116:24 117:5,12 128:8,12 133:21 137:2,8,15,20 137:25 138:6

**Q**

**question** 5:8,13,14,17 5:17 10:1 16:3 25:17 25:20 26:13,19 35:17 51:11 59:15 75:16 77:18 84:20 85:20 94:5,12 104:12,17,22 104:25 105:3,6,13 106:1,14,15,22 107:5 107:16,19,21,24 108:17 116:1,18 117:3 124:10,12,15 126:11,24 127:22 131:16,18 132:7 134:1 135:16,17
**questioning** 104:10 110:3
**questions** 5:3,8 6:2 25:20 39:14 94:16 126:23 130:22 132:2 133:24 139:6
**quickly** 33:5
**quiet** 86:5 116:20
**quite** 15:19 120:25

**R**

**R** 2:10 4:1
**raised** 25:11
**raising** 137:7
**rate** 47:15,16
**rather** 24:11 86:1
**reached** 62:4
**read** 35:15 105:5 134:2 134:3,7,10,25 139:17 139:20
**reading** 12:19
**real** 113:12
**realize** 4:20
**really** 15:17,17 43:15 46:7 53:24 83:1,1,2

96:13 99:13 105:22 107:25
**realm** 87:20
**reason** 30:3 41:7 63:17 91:20 92:23 104:14 114:11,14 117:13,17 118:3,4,6,7,11 119:18
**reasons** 112:15 114:24 115:9 118:13 125:1
**recall** 28:18 31:5 35:5,6 35:13,18 40:2 46:8 52:23 57:12 65:11,21 69:24 70:17 73:17,21 78:13,14 81:6 83:1 83:12,20 89:21 90:21 100:11 112:8,23 114:10,17,19 117:22 117:24 118:1,14 119:15,24 121:5 122:9 123:7 138:4
**recalls** 64:13
**received** 67:7
**receiving** 103:13
**Recess** 70:20 139:11
**recognize** 67:16
**recollection** 19:24 20:9 20:14 35:2,16 81:25 120:7 122:17 130:1 130:10,11
**recommending** 111:12 111:14,15,16
**record** 4:5 9:21 14:2 23:21,22 24:10,23 25:5,17,22 35:14,15 42:14 51:24 53:4 58:10 61:17 67:8 70:19 71:18 73:16 80:19 85:1 91:21 94:23 103:4 108:14 108:21,22 110:2 126:2,20 128:5 129:18
**records** 53:7
**redacted** 24:2 71:8
**redirected** 122:21
**refer** 22:7 23:6 62:18 67:12
**reference** 34:8,16,18 37:12 69:20 74:25 81:22 84:8 86:2
**references** 96:22
**referral** 75:14,18,24 77:16 102:24 109:6 109:19
**referred** 39:8 91:25 123:23
**referring** 24:21 39:20 39:21 61:25 67:10 74:25 75:1 114:23
116:16
**reflect** 10:12
**refresh** 20:14
**regard** 134:21
**regarding** 18:24 26:4 43:16,19,19 49:20 62:2 68:13,14 72:24 79:25 103:23 105:14 129:20
**regards** 32:2
**region** 19:9,10,11,13 19:17,21 22:3 27:3 28:23 73:24 78:16 87:18 88:2,11 101:18 102:6,6,10
**regional** 19:14
**regulations** 26:4 91:17
**reiterate** 75:11
**reiterated** 118:22
**relate** 64:17
**related** 26:6 35:17,24 36:12 38:1 87:2 92:5 92:5,6,22 102:8 134:10 135:13
**relates** 64:15 99:16 100:15
**relation** 18:3
**relationship** 48:19
**relayed** 29:21
**release** 92:4
**released** 106:17
**releasing** 26:4 137:15
**relevant** 60:12
**remain** 109:5,6 135:20 135:24
**remember** 18:19,20 20:4 21:14 31:9,12 33:3 39:9 46:10 52:5 63:16 73:21 81:15,16 84:20,20,24 89:19 96:10,15 100:2 111:19 118:18 123:12 124:5,6,9,11 124:12 137:12 138:1 138:11
**reminded** 50:11
**remorse** 86:17
**removed** 72:25 81:19 82:2,2,3,15 133:4 136:21
**rephrase** 5:9 43:25 104:22,25 105:7,8 134:1
**replaced** 24:2
**replied** 56:14
**report** 27:4 49:12 54:20 55:10,11 69:21 70:3 77:21 78:8,9,11 78:12 95:10 96:24 97:1,3,13 102:1,10
103:3,14,15,18 105:1 105:14 107:11,12,22 108:12 111:25 112:4 116:16 117:9 119:8 119:11,22 123:13 125:25 126:6 127:25
**reported** 1:24 13:11,12 26:25 27:3 52:20 66:13 77:10 101:22 101:25 102:12,14,21 102:23,25 107:4 116:22,24 124:2 128:21
**reporter** 5:22 23:2 35:15 116:3
**reporting** 1:25 87:3 105:18 106:13 115:23 117:5 134:21
**reports** 66:13 102:3 103:10,20,22 107:6 109:1 126:17
**representation** 113:5 113:13 114:4
**representative** 19:9,10 19:21 22:4
**representing** 25:10 37:5
**reprimand** 97:24 135:20
**reprimanded** 83:10,17
**reprimands** 80:1
**request** 13:25 14:3 37:21 69:3,7 81:3 101:3,4 109:6,10,15 110:8 113:3 130:2 137:22 139:2
**requested** 101:5,8,11 109:14 110:13
**requesting** 125:14
**requests** 109:5 138:4
**required** 117:9
**reread** 131:15,17
**reroute** 48:3
**researched** 62:16
**resign** 120:10,20
**resignation** 120:3,5,9 120:17 121:25 123:6
**resource** 49:10
**resources** 44:21 89:8
**respect** 25:8 26:14 41:15 58:18 83:3 87:11 102:20 109:4 113:7 124:18
**respond** 19:5 26:13
**response** 55:19 85:18 95:22 103:7 106:3,8 121:9 138:17
**responses** 5:20 132:3
**responsibilities** 13:8,15 25:2
**responsibility** 9:7,18 23:25 88:10
**responsible** 9:10 124:23,25
**restate** 131:14
**result** 50:7 56:1 67:20 82:10 96:2
**retire** 53:11
**retired** 6:14 8:18 13:23 53:1
**retirement** 8:25 14:15 14:22 17:23
**retrieval** 47:3
**retrieve** 46:25
**retrieved** 46:20 55:4,16 55:21
**retrieving** 54:1
**returns** 108:23
**reveal** 102:23
**revealed** 30:9 75:12 77:16 130:17
**review** 20:12 24:5 125:1 126:10 139:13
**reviewed** 55:6,8,10 56:24 62:5
**reviewing** 23:25 95:9
**reviews** 124:21
**Rich** 25:8
**Richard** 1:7 2:7,9
**Rick** 7:5 49:9,9 98:20 98:23,25 110:25
**right** 5:21 6:18 8:8 9:24 11:18 15:7,8 17:12 17:13,14 21:24 24:22 25:9 27:9 30:6,22 34:11,11 36:2 37:19 37:20 38:22,24 40:5 40:6,14 41:7,8,10 42:4,6,17 43:2,3,4,13 44:16 45:17 47:4,5,6 48:14 49:4 50:1,2 51:16 52:18 53:18 54:3,4 55:21 58:15 60:18,21 62:22 63:6 63:8 64:8,10,16,21 64:23 65:9,10 66:17 66:19 69:10,23 70:9 70:16 71:9,13 72:5 72:12,19 73:5 74:18 74:19,20 76:5 77:7 79:10,17,24 80:16,21 81:4 82:7 84:2,3,4 85:4,10,13 86:22 87:7,8,9 88:25 89:5 90:18 91:9,10 92:22 94:21 95:13,24,24 97:3,20 102:6,7,22 103:8,9 104:8 105:11 105:17 108:8 109:17 110:17,24 111:3,8,22
112:20,22 114:7 116:23 117:18 118:5 118:11,25 119:7,11 121:2,3,4 124:24 126:19,19 129:1,4,6 129:25 130:10 132:25 136:7 139:13 139:16,17
**rights** 25:2
**right-hand** 65:2
**risk** 56:21
**Robin** 12:5 13:18,19,19 13:21 80:12,14
**role** 55:2 59:20,20 66:23 74:13 81:12 125:4,5
**room** 64:5 90:14 105:25 106:9 108:23 114:20 120:14 138:1
**roughly** 8:1 15:14 54:6
**RPR** 1:24
**Rule** 105:5
**rules** 5:5 59:5
**run** 122:10
**R.B** 71:4,5,6,7,9,10,11 71:14,16,17

S

**s** 2:11 33:20 58:11 65:9 70:25 71:3,11,12,14 75:5 87:11,12,13 123:12,18,20 124:3 137:8,20
**sad** 115:17
**safe** 15:21 17:25 18:14 40:7 47:3 55:5 58:14 75:8 78:19 134:23
**safer** 24:14
**same** 17:14,17 18:15,19 24:4 44:14 54:16 58:15 69:13 72:21 79:8 89:25 100:14 132:15,19 137:22
**sanction** 97:24
**satisfied** 136:22
**Saveikis** 19:22 20:1,2 20:20 26:23 28:4,11 30:8,20 31:17 42:4 63:4,5 64:4,25 65:9 65:14 69:25 75:25 76:20 77:6 81:5 101:1 110:5,21,23 116:6 128:23 129:16 130:2 131:1,9 134:13 136:13,17 137:1
**saw** 55:20,22,24 84:17 117:9
**saying** 25:14 39:20,21 43:23 61:7 70:16 83:19 88:6 101:10

104:21 106:25 107:2 109:25 119:3 121:16 122:10 126:12 133:21
**says** 64:24 65:3 69:20 75:2,4 84:12 93:3,6 93:12 103:23 107:11 129:22
**Schenker** 1:7 2:9 7:5 98:21,25 111:1
**Schenker's** 49:9
**scope** 74:1,14 125:4
**se** 50:6 109:19
**second** 18:6,12 42:16 43:2 72:20 74:24 101:21 116:20
**see** 34:16 39:2 41:24,24 69:17,22 75:2 94:2 129:14 134:24 137:18
**seemed** 33:5,19 85:25
**seems** 24:18 75:5 102:11
**seen** 55:22 67:23,24
**selected** 55:25 56:1
**send** 125:19
**sending** 88:13 127:5
**Sennett** 2:7
**sense** 60:7 122:13
**sent** 32:10 50:21 74:16 79:3 110:7 127:12
**sentence** 75:2 130:15
**sentences** 133:11
**separate** 103:15
**separated** 78:15
**September** 89:17 90:18 99:1,8,16,23 111:5 112:18,21 123:3 127:5 135:2
**serious** 41:22
**seriousness** 38:7,7 62:7 97:9 98:1 114:16
**service** 1:7,13 2:6 130:19
**serviced** 137:25
**services** 11:2 12:21,24 13:3 17:11,13 48:17 48:22 88:9 91:18 93:2
**set** 10:12 44:11
**several** 26:3 37:16
**shaking** 122:10
**Shara** 19:22 20:1,2,20 22:11 30:8 31:17 63:3,5 64:25 68:13 68:17,23 72:23,24 73:14,15,18 81:5 84:13 100:25 129:23 134:6
**Shara's** 129:20
**share** 74:7
**shared** 73:6
**She'll** 139:20
**shifts** 17:19
**shook** 84:16
**short** 36:21 139:10
**shorthand** 66:6,22 67:2 67:3 70:10
**shortly** 47:5
**show** 63:20 67:6 86:16 113:3
**showed** 85:9 95:17
**shown** 88:24
**shows** 10:4 134:5
**sic** 26:13 71:7 87:11 94:18 99:18 115:7
**sick** 134:4
**sign** 123:6 125:25 126:16 139:14
**signature** 139:22
**signed** 48:10 126:9
**signing** 126:14
**similar** 35:17 83:14 124:10
**since** 7:2 15:4,6 23:10 70:24 72:13 84:18 85:2 88:2
**sit** 8:22 9:3 53:6 75:18 125:20
**site** 128:11
**sitting** 94:18
**situation** 21:10 33:3,16 37:3 40:16 43:10,12 49:11 50:11 57:21 58:11 59:13 82:17 86:3,9 88:20 89:5,12 102:7 105:17 109:2 109:11 115:17,18,20 115:23 123:13,22,23 124:2,14 128:22 129:1
**situations** 43:20
**sit-down** 125:12
**skills** 125:2
**slash** 12:25 45:17
**social** 88:9 130:19 131:2,4,4
**solicitor** 1:15 2:14 40:19 49:10
**solve** 106:7
**some** 5:3,8 9:1,7 10:3 10:18 12:12,25 13:15 17:19 18:16,23 19:8 19:25 20:3,13 25:20 26:19 29:24 30:4,13 30:17 31:19,21,22,25 32:3,24 34:4,17,19 35:7 36:24 38:15 40:5 42:3,8 43:7,18 50:7 52:7 53:19
55:11 61:10 62:15 63:2,17,20,21 65:2 66:22,22 70:13 74:4 79:23 85:9 86:2 105:10 113:9,10,10 119:6 123:7,16 125:1 125:9 128:6 130:6,22 133:21
**somebody** 103:18 109:22 123:11 125:4
**somehow** 6:1 26:12 73:10 82:18
**someone** 10:23 18:24 29:15 30:16 40:15 77:5 114:20 122:12 124:3 127:15,18,21 127:25 139:2
**someone's** 74:5 135:21
**something** 10:9 14:17 29:25 32:23 38:20 46:7 50:7 52:10 53:17 56:15,16 58:5 68:21 70:15 78:19 82:21 85:17 86:6,14 96:4 104:9 120:15 122:20,21 123:20 127:14 130:8 131:9 134:2 136:1 138:23 139:8
**sometime** 20:6 27:5 52:2 63:5
**sometimes** 22:6 125:3
**somewhere** 53:16
**sorry** 10:16 12:18,18 14:18 42:7 50:16 51:4 55:5 63:4 72:13 80:24 95:1 120:12
**sort** 37:25 78:13
**sound** 21:21
**source** 39:2 75:14,18 75:24 77:16 102:24 135:5
**sources** 109:6
**speak** 51:9 68:17 116:7 116:9,11,11,12,12,14 128:16
**special** 13:4
**specific** 22:9 52:4,5,6 56:2 60:22 83:15 92:14 93:1,4,7,11 94:11 113:15,25
**specifically** 31:9,19 40:15 47:7 50:19 57:11 90:6 92:2,15 114:10
**specifics** 21:25 32:25 91:11,13
**specify** 94:7 116:23
**speculate** 64:2 77:13
**speculation** 78:5 100:4
132:5
**speculative** 132:20
**spoke** 21:13 80:12 110:19,20
**spoken** 21:10 32:13
**staff** 18:6,7,15,17 39:16 60:20 79:5,6
**start** 6:5
**started** 15:6 36:10 113:9,17,18 114:14 117:20
**starting** 8:1 82:6,8
**starts** 72:22
**state** 1:22 2:2 20:8 21:20,23 25:5,24 26:3 73:8 74:6 104:13,14
**stated** 72:24 80:2 133:3 134:9,22
**statement** 16:13 73:23
**statements** 73:22 124:8
**states** 1:1 60:14
**stating** 75:4
**status** 29:20
**statute** 24:14 60:11 93:1,11,15,15,16,17 94:12,13 107:21 108:1 127:17 138:25 139:4
**statutes** 60:12 93:19 94:17
**statutory** 60:7
**step** 36:8,9 106:5 119:25
**stepped** 105:25
**steps** 29:6 62:11
**steward** 50:23,24 51:12 51:17,18 52:4 79:4 79:10 137:6
**steward's** 51:13
**sticking** 12:15,20
**sticks** 63:18 64:20
**still** 16:21,25 52:24
**stop** 77:13 80:3
**stopped** 113:11,12
**storage** 53:16
**Street** 1:22 2:2,4,8
**strike** 119:25 127:22
**stuff** 34:17 52:21 137:3
**subject** 135:17
**submit** 47:20
**submitted** 47:18 95:10 126:18
**subpoenaed** 128:3
**subsequently** 91:16
**substitute** 23:3 26:9
**Sue** 15:8 16:15 17:17 18:8 32:15 49:19 50:5,20 80:11,12 84:1 89:1
**suggest** 96:10 106:11 139:16,17
**suggested** 29:14 107:22
**suggesting** 94:9 104:6 106:2,8 107:15 116:4
**suggestion** 24:11 107:16
**suggestive** 105:4
**summaries** 124:19
**summary** 29:22 126:8
**supervisor** 8:15,16 18:20 21:3 27:13 30:1 32:13 48:25 49:4 58:7 59:19 61:7 75:21 76:17,23,25 77:1 80:5 83:25 88:4 102:1 103:1,1,2,5,16 105:2 107:23 108:12 109:18 116:22,25 123:19 124:21 125:11,13,15,16 126:9 127:9
**supervisors** 9:22 11:9 11:15
**supervisorwise** 28:23
**supplied** 62:18
**suppose** 125:11
**supposed** 74:2 78:15,17
**supposedly** 34:9
**sure** 5:16,20 6:7 9:25 26:1 37:20 69:15 78:18 85:21 98:20 102:5 110:4 134:22 139:9
**suspect** 34:5
**suspected** 77:20,25
**sworn** 4:2
**system** 34:10 87:2
**S.D** 123:13,22 124:14

**T**

**table** 121:11
**take** 5:2 29:6 41:21 48:3 52:20 54:5 66:6 66:22,22 67:4 87:21 119:25 139:10
**taken** 1:18 50:14 51:10 52:25 136:6 138:23
**takes** 7:15 67:1,3 87:10
**taking** 5:22 14:21 35:21 53:24 70:9,9 104:7
**talk** 28:13 29:15 30:2 35:3 50:9 58:8 68:23 77:25 98:23 99:19 113:17,18 117:20 122:2 125:20,23 130:20
**talked** 29:9 38:6 41:17 41:24 42:2 51:17

56:6,11 63:2,7 75:20 76:22 77:2 80:6,6,9 80:11,12 84:13 98:16 98:21 101:25 118:17 118:17 127:10
**talking** 16:15 19:21 21:18 22:17 23:8 25:16 32:25 33:14,20 33:22 34:6,7,25 36:13 51:4 61:21 64:12 65:13 71:22 75:2 78:2,10 80:3 82:7 86:23 93:17 95:16 102:5 103:5,8 103:16,21 104:19 106:12 109:2,17 110:16 116:17 121:18 122:19 127:8 133:11,12 137:12 138:19
**talks** 129:19 130:21 131:1 133:15
**technically** 57:15
**telephone** 22:10 64:24 65:12,12 117:22,23 132:18
**tell** 5:9 19:2 20:25 22:16 26:25 31:19 56:19 68:10 77:13 90:15 94:2,3,19 104:4 105:19,25 106:10 108:18 116:9 122:8 125:17 134:3
**telling** 78:21 102:12 109:24
**tenure** 8:13
**term** 57:10 60:6,8,21 61:1 99:14,20,22 135:6
**terminal** 46:1
**terminate** 91:8 95:2 98:2 111:18,20,21 112:7 122:23,25
**terminated** 95:21 96:3 96:8 99:10 119:3
**terminating** 97:18
**termination** 90:16 97:11,23 98:8 112:16 114:14 115:21,24 117:2,6,13 118:12
**terms** 51:4 56:20 59:20 61:4 68:15 86:13 87:3 91:14 93:8 111:10,10 127:16 131:2,4,9 136:15,22
**testified** 4:2 14:10 81:1 85:2 99:10 102:13 116:22 123:24
**testifiers** 37:8
**testify** 58:5,16 102:16
**testifying** 37:7 58:20
**testimony** 3:3 35:13 42:12 99:18 102:18 112:14 122:25 123:9 128:7,23 129:6
**thank** 4:13 56:16 126:21
**their** 15:12 18:15,17 58:17 59:18 61:1,7 74:6,13 87:20 88:4 124:7 125:4,5 126:1
**themselves** 74:5
**thereabout** 112:1
**thereabouts** 98:16
**thing** 5:19 29:8,22 36:11 41:25 43:6,9 47:9 53:22 55:14 64:1 72:18 79:7 83:15 85:24 129:13
**things** 5:4,7 20:15 21:17 36:10 38:15 43:5,15 52:7,8,19,22 53:10,23 69:11 82:10 82:12,20 85:22 118:19 122:18 125:2 130:6 131:6 133:21 134:14 136:6 137:4,6
**think** 5:1 13:10 14:1,7 14:9,10 15:13 22:24 24:14 25:14 26:19 27:24 31:4,15 37:3 37:16,19 38:11,21 40:4,11 43:5 44:4 45:12 47:10 51:14 54:1 63:9 64:1,19 71:3,19,23 72:8,17 74:25 75:25 80:16,22 81:1 82:2,3,10,11,16 82:21 83:8 90:22 91:1 94:12 96:6 97:3 97:6 98:5,18 99:17 100:25 101:12 104:22 106:7 108:10 110:3 113:17,18 115:12 116:21 117:9 118:17,17,18,22 119:22 120:23,24 121:6,17,17,24 122:2 122:20 125:21 127:9 129:11 130:5 131:8 131:14 132:22 136:25
**third** 18:6,13 27:5 38:4 43:6 57:20,23 69:20 74:23,24 84:11,12 92:21 117:24
**Thomas** 9:13
**though** 30:13 31:10 41:11 43:23 44:1 63:2 67:1 126:7
138:21,24
**thought** 12:8,19 13:19 29:25 38:12 42:23 63:12 75:10 87:3 118:19 121:24,25
**three** 9:10 17:25 67:22 128:11
**through** 7:2 12:12,18 16:12 25:6 27:4 34:9 39:16 49:9 50:9 55:11 56:6 59:16 62:17 74:16 77:25 82:19 133:15
**throughout** 21:13
**throw** 99:24
**till** 70:20 139:11
**Tim** 4:4
**time** 6:23 7:24 10:14,18 12:3 14:5,11,13 15:22 16:7,11 17:3 17:21 20:4 21:1,13 24:5,12 28:15,19 31:12 32:2,11,12 33:6,15,25 34:13,15 35:20 36:21 37:6,17 38:12 39:5,20 40:18 40:20 41:14,25 42:1 43:3,14,22,25 44:20 45:3 47:2 50:17 51:8 53:25 54:19,25 56:19 57:3 58:3 65:12 68:3 73:19 75:6 79:12,14 79:24 83:9 84:17 91:11 96:1 97:9 98:12 99:7,24 110:13 110:18 111:17 112:11 114:13 118:14 119:6,19 120:4,6 121:22 122:3 122:14 123:14 124:15 133:10 136:23
**times** 28:13 84:16
**Timothy** 1:22 2:1
**today** 4:6 9:3 20:13 30:3 75:18 121:11
**together** 54:14,20 97:11 125:7
**told** 14:7 29:19,21 30:16 31:3 77:20,22 78:23 114:10,11 120:19,22 134:13
**tolerate** 50:14
**Tony** 25:14
**top** 9:23 10:5 15:16 81:14 84:12 133:25
**total** 112:5 126:4
**totality** 112:5
**totally** 103:14
**touch** 59:3
**touching** 83:11
**towards** 41:5 90:20
**training** 13:7
**transcribed** 68:5 70:10
**transcript** 23:4,13,14 23:16,24 24:1,4 139:14
**transfer** 115:1,12
**transferred** 92:17 93:7
**transpired** 68:24
**true** 50:13 52:9,9 57:15 75:9
**try** 25:6 26:9 33:1 36:19 37:2,2 60:24 77:16 91:3 108:25 126:2 127:14
**trying** 10:2 19:4,5 24:13 26:18 30:7 48:18 73:17 83:16 92:19 93:1 99:17 100:5,9,12,12 107:25 108:3 119:22
**turned** 89:9
**two** 2:11 21:15 23:12 43:5 51:5 63:12 81:21 84:16 91:2 114:2 129:19,22 131:22,25
**two-year-old** 128:25
**type** 9:14 10:18 30:9,17 30:24 50:19 56:20 60:24 67:4 84:3 87:16,22,24 93:12
**typed** 67:20
**types** 53:7 118:19
**typewritten** 129:13

U

**uh-huh** 5:23 128:13
**ultimately** 67:3
**um-hum** 5:11 8:12 10:17 12:14 17:7,24 18:22 20:8,9,11,18 26:11 30:15 34:4 36:6 37:19 38:18 41:6 42:5,22 46:18 47:17 48:13,24 49:3 49:17 51:22 52:15 53:12 55:17,23 58:13 60:23 64:8,10 65:1,4 66:20 72:4,6,11,22 74:22 75:3 76:2,4,6 79:1 80:25 82:16 84:7 87:14 91:24 92:1,13 98:13 99:2 101:2 110:12 111:2,4 111:6 112:22 113:23 121:2,4,4 124:17 128:9 129:21 130:13 131:7,24 138:14
**unauthorized** 37:9 38:4,21 39:11 61:15 61:19,20
**unclear** 120:7
**uncomfortable** 26:12 45:8
**under** 5:25 11:12,21 12:7 17:10,15,18 26:3,7,7 27:1 41:19 49:9 50:12 60:25 61:1 70:2 77:3,14 93:8 103:24 136:8
**underinclusive** 24:19
**underneath** 10:23 11:3 11:17
**understand** 5:8,17 10:22 30:20 40:23 42:2 44:7 46:19 51:25 60:4 69:2 73:17 74:14 79:8 83:5 99:21 100:6,9 100:12 103:20 110:8 114:21,23 126:7
**understanding** 6:2 28:25 33:25 39:18 51:16 54:9 81:8 82:14 105:18 128:10 128:13 129:14
**understood** 5:13 51:8 91:7
**undertake** 23:25
**unfair** 94:12
**unfortunately** 36:21
**unfounded** 28:17 69:21 70:3,4
**Union** 50:23,24 51:12 51:13,17,17 52:3 79:4,10 113:1,4,13 114:4 136:2,3,5,6 137:6
**unit** 73:1 82:12
**UNITED** 1:1
**units** 12:25 133:4
**unless** 94:11
**unlikely** 57:7
**until** 16:10 78:18 134:24
**unusual** 73:23
**upcoming** 68:18 69:9
**upset** 122:6,12
**upsetting** 115:17
**urgency** 134:20
**urgent** 134:20
**usage** 115:10
**use** 24:16 114:25 115:3 115:11 135:6
**used** 57:11,12 60:10 61:1 115:6 127:24 136:24
**uses** 131:1

**using** 59:25 60:6,8 115:8
**usually** 31:7
**utilized** 39:15

V

**v** 1:4 84:13,15
**vague** 60:5 104:17
**valid** 29:17 129:2
**validated** 103:19
**various** 9:22 11:6 33:8
**vehicle** 115:12
**Vendetti** 2:4,4
**verbal** 5:20
**verified** 54:24,25 56:9
**very** 21:11 26:6 33:5 47:5,5 66:15 69:19 74:8 78:15 82:17 114:3 115:17,17
**via** 92:17 96:6 123:21 125:12
**Villella** 39:3,7,19,25
**violate** 92:15
**violated** 92:3
**violation** 91:17 92:14 92:18,24,25 93:4,5 115:4 134:17 136:15 136:19,20 138:15,25 139:4
**violations** 91:23
**visiting** 138:1
**V.W** 23:15,16 33:17,20 34:21 35:8,25 50:16 56:11,13 57:2 58:11 58:14 62:2 68:18,19 68:20 80:23,24,25 81:10,12,20 82:7 87:12,13 127:8

W

**W** 84:16
**waiting** 112:8
**waive** 139:17
**waived** 139:23
**Wallace** 2:13
**want** 12:7,17 20:8 23:7 30:1 38:15 63:19,20 70:21 71:19 72:13 104:5,9 106:3 107:20 108:17 116:11 120:11 125:25 129:10,12 139:19
**wanted** 21:19 31:8 41:18,21,22 68:16 72:13 81:7 86:4 88:11 98:19,19 101:17 128:6 138:2
**wasn't** 14:8 30:11,20 45:8 61:20 82:2 87:5 99:13,18,18 119:11 134:22,24
**way** 10:3 14:19 20:12 32:1 59:20 60:10 68:22 74:8 77:14,16 106:7 121:15 122:24 124:8 127:22 128:1 132:2 134:1,20 138:18
**Wednesday** 1:20
**week** 27:5
**weekend** 119:25 121:6 121:15 122:4
**Weimer** 2:11
**welfare** 1:7,13 2:6 9:12 9:14,17 10:23 11:6 11:12 12:13,15,20 19:12,12,13
**well** 4:8,10 6:5 7:18 8:25 9:25 11:11,14 16:2,18 22:8,16 23:17,17,20 24:9 25:8 43:9 49:4 51:14 54:19 60:11 61:11,22 63:15 64:1,19 65:14 66:21 70:6 72:1,10 77:9 82:23 84:18 85:16 87:3 90:24 91:1,13 92:25 93:16 95:6 96:3 98:15 100:5 101:10 105:6 106:20 107:8,14 108:2 109:22 110:19 111:17 115:6,23,25 120:19 121:14 123:14,23 125:19 126:13 127:22 131:5 131:15,17 133:2,15 135:9
**well-being** 42:3
**went** 54:9,10 55:12,14 59:20 80:14 98:7 102:2,25 108:11 113:13 118:18 120:16 122:18,18 123:10 133:13,16 137:18
**were** 4:20 7:1,7,17,25 8:9,13 10:13,14 12:3 12:19 14:7,19 18:1 18:23 19:4 20:15 21:1,15,17,25 28:17 29:16,17,20 31:5,19 32:3,3,5,17,20,20 33:2 36:22,24,24 37:16,16,24 40:12 41:14,15 42:20 43:15 44:2 47:10,10 51:1 52:4,7,8 55:4,6,7,12 55:16,18,21,24 56:1 57:16,16 61:18 62:5 63:12,25 64:4 68:13 72:13 73:19,22,22 78:23 80:9 82:10,12 82:20 83:9 84:19 85:5,11,12 87:11 88:23 98:20 101:12 101:20 102:22 106:16 111:12,12,14 111:15,16 112:8 113:15 114:11,24 116:2 117:13 118:13 118:24,24 120:23,24 121:18 124:8,15 127:19 128:7,11 130:9,22 133:19 134:14 137:12 138:3 138:13
**weren't** 119:10 120:25
**West** 2:8
**western** 1:1 19:9,10,11 19:17,20 22:3 27:3 28:23 73:23 78:16 87:18 88:2,11 101:18 102:6,6,9
**We'll** 23:2,5 139:10
**we're** 5:1,2,12 6:2 14:2 16:15 22:17 23:6,8 24:5,17 26:9 30:3 35:21 67:10 71:22 77:14 78:17 82:7 85:16 90:9 94:13 103:13 109:2 138:19
**while** 15:19 16:7 25:19 26:19 27:16,18 51:22 62:16 63:3 67:23 83:8
**whistle-blower** 99:15 99:19
**whole** 55:13,13 122:9 133:17
**witness** 14:9,18 24:15 25:1 76:16,21,24 94:3 100:7 105:22,25 106:9 108:15,20,23 109:12 120:12 128:2 128:23 129:6 131:19 139:7,19
**witnessed** 76:17 78:22 132:14
**witnesses** 76:18 128:18 128:21
**wondering** 83:17
**word** 99:24
**words** 8:23 11:16 46:25 106:24 107:3
**work** 9:1 15:24 16:12 25:6 48:5 52:21 66:14 91:5 117:7 131:2,4
**worked** 15:22 16:7 17:4,15,17 47:15,16 56:22
**worker** 103:24 135:17
**working** 15:4 77:19 134:5
**workplace** 74:5
**works** 16:21 47:19 66:12,17
**worry** 106:2,8
**wouldn't** 16:2 32:6 53:3,4 61:19 69:13 83:20 86:5 101:8 102:14 119:18 128:20 136:24,24
**Wozniak** 15:10,18 16:16,20 18:8
**write** 126:5 130:15
**writing** 101:11,14 125:2 129:23 130:9
**written** 52:22 96:24 134:6
**wrong** 15:12
**wrote** 131:11,12

X

**X** 3:1 125:17

Y

**Y** 125:17
**yeah** 27:24 31:15 37:24 47:15 52:2 66:18 68:1 70:22 71:8 72:24 73:9 80:16 82:5 83:8 85:11 101:6 104:11 106:4 112:12,12 129:1 131:4,13,21 135:12 136:18
**year** 7:14 17:22,22 18:23 30:5,13 70:5 94:1 135:24 136:6
**years** 8:3,8,9,16 15:5 15:17,20 83:6
**young** 129:8
**Youth** 1:6,12 2:6 6:25 7:12,20,25 8:6,9 9:6 9:9 10:10 27:10 37:5 60:13 66:18 102:9 117:8

Z

**Z** 125:18

0

**05-76E** 1:4

1

**1** 3:10 67:11,14
**10** 15:17,20 83:6 89:17
**10th** 2:8 90:17 99:8,16 99:23 112:21 123:3 127:5 135:2
**10:49** 70:20
**100** 3:12
**11:02** 70:20
**12:40** 139:11
**12:51** 139:11,22
**120** 2:8
**127** 3:5
**13** 8:16
**15219** 2:12
**16th** 98:16 112:1
**16501** 1:23 2:2,8
**16509** 2:5
**1989** 8:5
**1995** 10:13,14

2

**2** 3:11 67:12,13,14 74:21 129:12,19
**2nd** 41:12 44:13 47:4 49:18,24 79:19
**20** 98:7
**20th** 97:4,12,19,22 98:3 98:17,18 111:18,18 111:22
**2001** 7:15
**2002** 7:2,4 12:3 85:2
**2004** 17:22 18:21,23 20:5,7,19 28:11,14 28:16 29:2,5 30:5,9 30:14 41:5 47:4 49:18 52:20 54:2 64:7,20 65:13 68:11 72:15 77:19 79:12 81:20 85:6,9 89:18 99:16,23 100:20 101:23 110:7 112:21 123:3 135:3,19
**2005** 6:18 7:3 8:17 10:15,16,22 12:3
**2006** 1:21
**21** 101:23
**23** 8:8 107:5
**23rd** 134:24
**28** 123:1
**28th** 41:4
**29th** 6:16,17 8:17 10:13,22

3

**3** 3:12 64:7 72:15,18,21 100:19,21 129:14 130:14
**3rd** 63:18 64:3,20 65:13 68:11 70:13 79:12,16,20
**30** 84:13 105:5
**30th** 84:10 100:20 110:7 129:10,16

**34** 8:3,10,11
**3820** 2:4

**4**

**4** 3:4

**6**

**6th** 80:22
**6340(c)** 107:6
**67** 3:10,11

**8**

**8** 1:21
**8/3/04** 81:3
**821** 1:22 2:2
**89** 8:16

**9**

**9th** 98:24,25 111:5 112:19
**9:00** 1:21
**975** 2:11