**Appendix Exhibit 8**

1 (Pages 1 to 4)

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABBY B. CONLEY,
    Plaintiff     :
                  :
    v.            :   Civil Action No. 05-76E
                  :
COUNTY OF ERIE, ERIE COUNTY :
OFFICE OF CHILDREN AND YOUTH, :
a/k/a ERIE COUNTY CHILD    :
WELFARE SERVICE, RICHARD    :
SCHENKER, individually and  :
in his capacity as a County :
Executive of Erie County,  :
PETER CALLAN,           :
Pennsylvania, individually  :
and in his            :
capacity as Erie County   :
Director of Personnel, DEBRA :
LIEBEL, individually and in :
her capacity as Executive  :
Director, Erie County Office :
of Children and Youth, a/k/a :
Erie County Child Welfare  :
Service, and JOHN A. ONORATO,:
ESQUIRE, individually and in :
his capacity as Erie County :
Solicitor,            :
    Defendants    :

    Deposition of MICHAEL CAULEY, taken before and
by Carol A. Holdnack, RPR, Notary Public in and for the
Commonwealth of Pennsylvania, on Thursday, March 9,
2006, commencing at 9:53 a.m., at the offices
of Timothy D. McNair, Esquire, 821 State Street,
Erie, Pennsylvania 16501.

    Reported by Carol A. Holdnack, RPR
    Ferguson & Holdnack Reporting, Inc.

**2**

1  For the Plaintiff:
2    Timothy D. McNair, Esquire
      821 State Street
3    Erie, PA 16501
4    Anthony Angelone, Esquire
      Vendetti & Vendetti
5    3820 Liberty Street
      Erie, PA 16509
6
7  For the County of Erie, Erie County Office of Children and
    Youth, a/k/a Erie County Child Welfare Service:
8
    Richard A. Lanzillo, Esquire
9    Knox McLaughlin Gornall & Sennett, PC
      120 West 10th Street
10   Erie, PA 16501
11
    For the Defendants Richard Schenker, Peter Callan, and Debra
12  Liebel:
13   Edmund R. Joyal, Jr., Esquire
      Law Office of Joseph S. Weimer
14   975 Two Chatham Center
      Pittsburgh, PA 15219
15
16  For John A. Onorato, Esquire, individually and in his
    capacity as Erie County Solicitor:
17
    Mark R. Lane, Esquire
18   Dell Moser Lane & Laughney, LLC
      525 William Penn Place, Suite 3700
19   Pittsburgh, PA 15219
20
    Also Present:
21   Wallace J. Knox, Esquire
      Solicitor, County of Erie
22
23
24
25

**3**

1               I N D E X
2
3  TESTIMONY OF MICHAEL CAULEY
4    Direct Examination by Mr. McNair . . . . . . . .  4
5    Cross-Examination by Mr. Joyal . . . . . . . . 146
6    Cross-Examination by Mr. Lane . . . . . . . . 178
7    Redirect Examination by Mr. McNair . . . . . . . 182
8    Recross-Examination by Mr. Joyal . . . . . . . 198
9    Further Redirect Examination by Mr. McNair . . . 202
10
11
    EXHIBITS:
12
    Cauley Deposition Exhibit 1 . . . . . . . . . . 84
13
    Cauley Deposition Exhibit 2 . . . . . . . . . . 84
14
    Cauley Deposition Exhibit 3 . . . . . . . . . 192
15
16
17
18
19
20
21
22
23
24
25

**4**

1    M I C H A E L  C A U L E Y, first having
2  been duly sworn, testified as follows:
3
4          DIRECT EXAMINATION
5  BY MR. McNAIR:
6
7    Q.  Would you state your name and address, please.
8    A.  Sure.  My name is Michael R. Cauley.  My address
9  is 8215 Millfair Road, McKean, Pennsylvania 16426.
10   Q.  And, Mr. Cauley, are you currently employed?
11   A.  No, I'm retired.
12   Q.  And when was the last time you worked and who did
13  you work for?
14   A.  I worked for the County of Erie.  And the last
15  time that I worked was the 31st of December, I believe, of
16  last year.
17   Q.  And what was your job title?
18   A.  I was the Solicitor for the Erie County Office of
19  Children and Youth.
20   Q.  How long were you with the Office of Children and
21  Youth?
22   A.  I was the full-time Solicitor for about three and
23  a half years.  I believe I started in April of 2002.  And
24  before that, I had worked for them on an independent
25  contract basis part-time since approximately mid 1988.



EXHIBIT

App. Ex. 8

5

1    Q.  Okay.  Let me just jump back and just ask you
2  about your education.  Where did you go to college?
3    A.  I went to Gannon College.  Graduated in 1971.
4    Q.  And then you went to law school.
5    A.  Went to Duquesne University Law School in
6  Pittsburgh and graduated in 1974.
7    Q.  And what did you do after you got out of Duquesne?
8    A.  I came back to Erie.  I went to work in private
9  practice in association with Warren Bentz, and I worked with
10  him probably for about two and a half years as an associate.
11  I worked for a time as a part-time assistant public
12  defender.  Then for a time as a full-time assistant public
13  defender, until January of 1980.
14       January of 1980 I was appointed the first
15  assistant district attorney of Erie County under Mike
16  Veshecco, who was the district attorney.  And I worked with
17  him in that capacity until the end of December of 1987, at
18  which point I went into private practice in association with
19  the Yochim Law Office here in town.
20    Q.  Do you still maintain an association with the
21  Yochim Law Office?
22    A.  No.
23    Q.  And you're not practicing --
24    A.  Correct.
25    Q.  -- at all, right?

6

1    A.  Correct.
2    Q.  Now, when you say you were the full-time Solicitor
3  for the Office of Children and Youth, how many solicitors
4  did they employ?
5    A.  Well, the Office of Children and Youth employed as
6  County employees only one Solicitor.  There were three other
7  people who were independently contracted to perform work for
8  the Office by the County.
9    Q.  And did they work under your supervision?
10    A.  Yeah, pretty much, um-hum.
11    Q.  Okay.  Was there an organization chart that
12  reflected your position and your supervisor and your
13  subordinates?
14    A.  Yeah.
15    Q.  Okay.  Do you know if that chart still exists?
16    A.  I can't speak to what exists over there since I
17  left in January --
18    Q.  Right.
19    A.  -- given the change in administrations over there.
20  I presume that an organizational chart of some sort exists.
21    Q.  Okay.  And who was your supervisor?
22    A.  My direct report was to Debi Liebel, who was the
23  director.
24    Q.  And then did the contract solicitors report to you
25  or did they report to Ms. Liebel, or?

7

1    A.  It was a little bit of each, sort of depending on
2  the need.  It wasn't really formalized in that sense.  I
3  mean, if you were to look at the chart it showed, as I
4  recall, that Attorneys Beveridge, Allgeier and Zack were --
5  were listed in the legal department under me.  But, you
6  know, as a practical matter, if she wanted to talk to them
7  about, you know, a particular case, that was, you know, that
8  was fine.
9    Q.  What, in general, were your duties as the
10  full-time Solicitor for Office of Children and Youth?
11    A.  Well, I represented the Agency in court
12  proceedings that involved hearings before Common Pleas Court
13  Judges and the Juvenile Court Master, litigation involving
14  dependent child petitions that the Agency filed to have
15  children adjudicated dependent.
16       I represented the Agency in hearings before Common
17  Pleas Court Judges where children who had been placed under
18  Court order would be subject to periodic Court reviews.  I
19  represented the Agency in Orphans' Court proceedings
20  involving adoptions, termination of parental rights cases,
21  voluntary and involuntary termination proceedings, other
22  adoption-related proceedings.
23       I represented the Agency in certain administrative
24  law proceedings.  My primary areas in those situations were
25  in connection with adoption subsidy appeals, for example.  I

8

1  was involved in handling needs-based budget appeals that
2  were working their way through the Bureau of Hearings and
3  Appeals arising out of complaints that the County had
4  regarding what we felt were improper budget allocations made
5  by the Department of Public Welfare and/or the Governor's
6  office for about three separate years.
7       I wasn't specifically involved in handling child
8  abuse expunction proceedings before the Bureau of Hearings
9  and Appeals.  A couple of the other lawyers did those only
10  because I didn't have time to do them.  So, technically, I,
11  you know, was responsible to do them, but I didn't actually
12  do them.
13       I worked in the office, you know, 8:30 to 5:00
14  every day.  I would advise caseworkers/supervisors about
15  legal issues regarding ongoing cases that would come up.  I
16  would consult with caseworkers about the propriety of taking
17  certain legal actions in court or instituting dependency
18  litigation, that sort of thing.
19    Q.  That's a fairly broad spectrum.  You mentioned
20  adoption subsidy appeals.  Who's the beneficiary of an
21  adoption subsidy?
22    A.  The child who is adopted.
23    Q.  And what is the subsidy?
24    A.  A subsidy is a monetary amount that is paid to the
25  adoptive parent for the benefit of the child, on a monthly

9

1  basis, that the child may or may not be eligible for
2  depending on whether or not it meets certain criteria
3  specified in the Pennsylvania Administrative Code.
4      Q.  Okay.
5      A.  In other words, certain children whose parental
6  rights have been involuntarily terminated, who are otherwise
7  eligible, for example, 4E funding that would be provided by
8  the federal government who have special needs of some
9  sort -- and there were five categories; I don't necessarily
10  remember them all off the top of my head -- that may or may
11  not qualify for an adoption subsidy, that would then be paid
12  by the County to the parent of the child until the child is
13  18 or the child, for one other reason, may not be eligible
14  for the subsidy any longer.  Those monies are reimbursed to
15  the County under the Social Security Act Title 40
16  Provisions.
17      Q.  Okay.
18      A.  And there are various levels of subsidy payments·
19  depending on the level of need of the child.
20      Q.  And you mentioned budget appeals.  Were you
21  yourself involved in the budget submissions for OCY?
22      A.  No, not in my capacity as the Solicitor.  For a
23  very short period of time after Ms. Liebel resigned, or
24  retired, as I recall, I was asked to fill the position of
25  the interim director, which I did between August 1st and

10

1  October 31st.  And I had a little bit of -- or a little bit
2  of peripheral involvement in the budget process at that
3  point.
4      And that's not the needs-based budget that was
5  submitted to the legislature and -- ultimately, the
6  legislature, but through the Department of Public Welfare,
7  but it was with the County budget for the next fiscal year.
8  So I had a little bit of involvement in that.  But in terms
9  of the needs-based budget plan, no.
10      Q.  Okay.  Did you have any administrative or
11  supervisory duties over any of the employees of OCY other
12  than the contract attorneys?
13      A.  No.
14      Q.  Did you ever exercise administrative control over
15  any other employees?
16      A.  No.
17      Q.  I want to ask you a couple questions about
18  something that was referred to as a prognostic detention
19  order.  Are you familiar with that?
20      A.  Sure.
21      Q.  What is a prognostic detention order?
22      A.  Well, prognostic detention order is an order of
23  Court that is issued by a Judge authorizing the Agency to
24  remove a child from the care of its parent or parents and
25  place the child into, shall we say, a safer environment.

11

1  You know, that might be in foster care; that might be in a
2  hospital setting; that might be with a fit and willing
3  relative resource.
4      It would be based on information that the Agency
5  would have and present to the Court in support of a request
6  to place the child, in order to ensure that the child would
7  be safe.  Because the information would demonstrate that the
8  child would not be safe in the care of the parent from whom
9  the child was being removed.
10      Typically, when you're talking -- when we talk
11  about a prognostic detention order, we're talking about
12  removing a child from the care of a parent, usually the
13  mother, who is, at the time of the order is sought, pregnant
14  with the child and due to deliver the child at some point
15  down the road.
16      Q.  Okay.  Are prognostic detention orders issued with
17  regard to children who are already existing?
18      A.  They --
19      Q.  For example, if one child is removed, is there an
20  order that would remove the other child even in the absence
21  of any actual abuse or neglect finding, or is that another
22  procedure?
23      A.  That's a different -- that's kind of a different
24  animal, Mr. McNair.  When I talk about a prognostic
25  detention order, I'm talking about an order that is designed

12

1  to remove an unborn child from the parents at the time the
2  child is born.
3      Q.  All right.  And --
4      A.  It's kind of like getting the order in place
5  before the child is born --
6      Q.  Right.
7      A.  -- so that the child's safety can be immediately
8  ensured at the time of birth.
9      Q.  All right.  And what kind of notice is given to
10  the expectant mother that this order is going to be
11  requested or entered?
12      A.  There's no notice given in advance of the birth of
13  the child.  When the child is detained, the parent is
14  notified that the Court has issued the order and the
15  detention has been effected.
16      Q.  And is there a provision of the Child Protective
17  Services Act or the Rules of Court that authorizes this
18  particular procedure?
19      A.  There's no -- there's no specific statutory or
20  regulatory authority that you can find that says that there
21  is such a thing as a prognostic detention order that can be
22  issued.  To the extent that the Juvenile Act authorizes the
23  Agency to take a child into custody for the protection of
24  that child, that's the authority upon which we rely to seek
25  that protection for a child that is yet to be born.

13

1    Q.   That would be the same provision that would permit
2   you to take into custody a child who has been subjected to
3   physical abuse or neglect.
4    A.   Sure.
5    Q.   And is there a statutory or provisional rule of
6   Court that authorizes this to be done ex parte in the
7   absence of an actual threat to the child?
8        MR. JOYAL:   I'm going to object to the form of the
9   question.
10   A.   I think the -- to the extent that I can answer
11  that question, my answer to the question would be we
12  wouldn't -- it wouldn't be done in the absence of a threat
13  to the child.
14   Q.   Okay.   And that would be based on -- what would
15  that be based on other than the opinion or conclusion of OCY
16  staff?
17   A.   It would be based on an assessment of the level of
18  risk that a parent would present to a child based on what
19  the parent has demonstrated by his or her behavior in the
20  past on that issue.
21   Q.   There are provisions of the Child Protective
22  Services Law and the Juvenile Act that permit parents and
23  their counsel to review the contents of their file.  Are you
24  aware of those provisions?
25       MR. JOYAL:   Objection to form.

14

1    A.   Well, the question is -- the question is pretty
2   broad in the sense that it sort of depends on what you're
3   talking about.  There are provisions of the Pennsylvania
4   Code that allow a parent or a child to review certain
5   portions of what's referred to as the family record.  There
6   are provisions in the Juvenile Act that authorize parents or
7   their children to have access to documentation that's
8   submitted to the Court, for example.
9        So the general answer to your question is yes, but
10  it's not a -- it's not a complete across-the-board yes
11  because there are certain -- there are exceptions, I guess,
12  and/or limitations depending on what you're talking about.
13   Q.   Is there a statutory provision or rule of Court,
14  either state or local, that issues a blanket seal on orders
15  issued by the Court in a dependency case preventing the
16  parents from having access to those petitions and orders?
17   A.   Can we take those one at a time.
18   Q.   Sure.
19   A.   Would you mind just going back through that again.
20   Q.   Okay.
21   A.   Ask your question again one at a time in terms of
22  regulation statutory authority, rule of Court, state, local,
23  whichever.  You know, because there are different interests
24  in that.
25   Q.   Is there a blanket seal on orders issued by the

15

1   Juvenile Court?  Start that way, and then we can work back
2   and see with -- where it comes from.
3    A.   Well, it depends on what you mean by the word --
4   by the term "seal."  And I'm not trying to give you a hard
5   time here.  But, you know, Courts seal proceedings
6   periodically.  And I don't recall the Dependency Court ever
7   sealing dependency proceedings as I understand that term to
8   mean it.
9    Q.   Okay.
10   A.   Whereas, the Juvenile Act talks in terms of the
11  confidentiality of proceedings that occur pursuant to it.
12  And restricts the access of people to Court documents that
13  are filed in connection with it.  There are statutory
14  provisions that cover that, yes.
15   Q.   And do those statutory provisions preclude the
16  parties or their counsel from reviewing any of those
17  documents, absent a special order?
18   A.   It depends what you mean by "any of those
19  documents."
20   Q.   Documents filed with the Court.
21   A.   In some areas, yeah.  The parties may not be able
22  to review, for example, psychological material that's filed
23  with the Court and made a part of the Court record that
24  pertains in certain cases to themselves, or certainly in
25  other cases to other parties who are also involved in the

16

1   proceedings.  So, you know, again, there's no
2   across-the-board kind of arrangement.  By and large, parties
3   are entitled to be able to access the documents that are
4   filed with the Court.
5    Q.   Okay.  Is there any prohibition on a party
6   accessing a prognostic detention order?
7    A.   At what point in time?
8    Q.   At the point in time where it is entered, signed
9   by a Judge and entered on the docket.
10   A.   Is there any prohibition.  I don't think that
11  there's any prohibition, that there's no way that they would
12  know about it.
13   Q.   If they were to check the docket.  Right?  Go into
14  the clerk's office, look at the docket.
15   A.   You know, I can't speak to the clerk's practice on
16  that, Mr. McNair.  I don't know that if a prognostic
17  detention order were filed of record in the clerk's office,
18  that if somebody showed up there and said, I want to see any
19  prognostic detention order that you have on baby -- you
20  know, pick a last name.
21   Q.   Okay.
22   A.   Whether the clerk would allow that.  You know, I
23  don't know.  I would be surprised if they would.
24   Q.   And I'm just asking what would be the legal
25  authority to deny that.

5 (Pages 17 to 20)

**17**

1    A. Well, you're asking me to speculate about what the
2  clerk might or might not do. There would be no way for the
3  clerk to know that the person had entitlement to see it, I
4  think would probably be the answer to that question. How
5  would the clerk know that this person had a right to see
6  this.
7    Q. I would think if their name was on it.
8    A. Their name wouldn't be on it. It would be in the
9  interest of baby boy.
10    Q. Well, unborn child. You don't necessarily know if
11  it's a boy, do you? I mean.
12    A. Or baby girl or whatever.
13    Q. Okay.
14    A. Unborn baby something.
15    Q. All right.
16    A. However it would be. I would be surprised if the
17  clerk would do that.
18    Q. But as far as you are aware, there's no specific
19  statute precluding an expectant mother from knowing that
20  there is a prognostic detention order entered that will
21  result in her child being taken upon birth.
22    A. No, there's no statute that says that.
23    Q. And is there any rule of Court?
24    A. There are no dependency rules of Court, so.
25    Q. All right. What is the reason those orders are

**18**

1  presented ex parte?
2    A. Well, you don't want the parent to know that you
3  are seeking permission to remove the child at birth to
4  ensure the child's safety. Because if you tip them off in
5  advance and allow them the opportunity to abscond with the
6  child, you, therefore, have defeated your entire purpose of
7  protecting the child.
8    Q. And are you saying that in every case where a
9  prognostic detention order is requested ex parte there is
10  evidence that it is likely that the parent will abscond or,
11  is the mere possibility sufficient in your mind to justify
12  presenting that ex parte?
13    A. Well, I'm not necessarily talking about
14  absconding. I'm talking about, you know, behaving in a way
15  that somehow would enhance the risks of a child. Absconding
16  is one part of it. You know, having the child at home as
17  opposed to a hospital is another part of it. That has --
18  you know, that happens. I think every case gets looked at
19  individually in terms of evaluating the level of risk that
20  is presented as to the child.
21    Q. If the child is born at home, the order would
22  still apply, correct?
23    A. Correct. Correct.
24    Q. And the child would be taken once its existence
25  was known.

**19**

1    A. Correct.
2    Q. So there's no analysis that's performed prior to
3  presenting this order to determine whether or not this
4  particular parent represents a risk that they're going to
5  abscond or have the baby at home or bear the child under
6  some circumstances that would be particularly dangerous?
7    A. Yes, there most certainly would be.
8    Q. In every case?
9    A. There would be an -- well, that would be a factor
10  that would be considered.
11    Q. Okay. And is that a prerequisite to a prognostic
12  detention order?
13    A. In every case, I wouldn't say necessarily, no.
14  But it would be -- it would be a factor that would be looked
15  at by the caseworker and/or the casework supervisor and/or
16  the Court, I would suspect, in determining the level of risk
17  to the child and the propriety of entering the order.
18    Q. Is there a policy at the Erie County Office of
19  Children and Youth regarding the seeking of a prognostic
20  detention order in cases where a mother has one or more
21  children already in placement and becomes pregnant?
22    A. Regarding whether to seek an order?
23    Q. Um-hum.
24    A. I wouldn't say there's a policy, per se.
25    Q. Is there a practice?

**20**

1    A. Well, the practice is that if a parent who already
2  has children who have been determined to be dependent, and
3  they cannot be safely in the care of that parent, for
4  whatever reason, if the parent then is pregnant, the
5  practice would be to evaluate the level of risk to the
6  unborn child that that parent either presents currently, for
7  example, because of maybe ongoing drug or alcohol abuse, or,
8  you know, in the future at the time of birth. And the
9  practice is just an evaluation of that circumstance.
10    Q. In what percentage of cases under those
11  circumstances I described where a woman has a child in
12  placement and becomes pregnant is a prognostic detention
13  order sought, in your experience?
14    A. You know, I don't think I can tell you a
15  percentage, Mr. McNair. I think it would be just
16  speculation entirely on my part. What I can tell you is
17  that the practice would be that the ongoing caseworker where
18  the caseworker was aware that the -- and we're talking here
19  the mother would be pregnant, you know, would be assessing
20  how her circumstances might impact the safety of the child
21  at birth.
22    Q. So that's a decision that would be made by the
23  caseworker on a case-by-case basis?
24    A. Well, initially by the caseworker. And then, you
25  know, ultimately by the caseworker and the supervisor. And

21

1  then possibly, you know, depending on what they determine,
2  some input from the legal department.
3      Q. Okay.
4      A. Or at least advice from the legal department.
5      Q. If there were a perception that it is the practice
6  of the Office of Children and Youth to seek a prognostic
7  detention order in every case where a pregnant woman already
8  has a child in placement, would that perception be
9  inaccurate, grossly inaccurate, or accurate?
10     A. You're asking me to answer a question based on an
11  assumption that I would know about every case where a woman
12  who was pregnant had kids in care and what evaluations
13  caseworkers and supervisors made about every one of those
14  cases. I don't think I can do that. You know, the idea
15  that in every case --
16     Q. So you can't dispute the accuracy of that
17  perception, right?
18         MR. JOYAL: I'm going to object to the form of the
19         question.
20         MR. McNAIR: What's the problem with the form of
21         that question?
22         MR. JOYAL: It's argumentative.
23         MR. McNAIR: No, it's not.
24         MR. JOYAL: Whose perception are you talking
25         about? Hers? Or are you talking about generally

22

1  in the legal community? Or in social workers? Or
2  within the world?
3         MR. McNAIR: Okay. I understand.
4         MR. JOYAL: Why don't you stop arguing with him
5         and give him a foundation for the question.
6         MR. McNAIR: Thank you. Your objection is stated.
7         MR. JOYAL: Thank you.
8  BY MR. McNAIR:
9      Q. You are telling me, then, that you don't have any
10  basis to tell me whether such a perception would be accurate
11  or inaccurate.
12     A. Well, I can tell you what my perception is. And
13  my perception is that, as far as I know, there's not an
14  across-the-board rule or practice that this happens in every
15  case. That these cases get evaluated case by case. And
16  that these detention orders are sought from the Court when
17  it's felt to be appropriate to do it. You know, whatever
18  the percentage may be.
19         You know, I can't -- and I wouldn't speak to
20  anybody else's perception about it. I'm just telling you
21  what my experience of, I don't know, 17 or 18 years' worth
22  of work in there taught me.
23     Q. And in those 17 or 18 years, how many cases are
24  you aware of where a woman under those circumstances has not
25  had a prognostic detention order issued for the child?

23

1      A. You know, I couldn't tell you. Because I don't
2  know how many times caseworkers and casework supervisors
3  made a determination not to come to a lawyer and say, we
4  want a prognostic detention order. So I don't know.
5  There's no way for me to answer that.
6      Q. Well, how about this. In every case where there
7  is an order of dependency entered and there's been a
8  dispositional hearing and a child has been placed, there are
9  thereafter periodic review hearings with the Court.
10     A. Um-hum.
11     Q. And at those review hearings, the Court is advised
12  of any changes in the circumstances of the case. And it is
13  true, is it not, that if a woman is expecting, that that
14  fact would be made known to the Court at any review hearing
15  that occurred prior to her delivering that child, any review
16  hearing relative to another child.
17     A. Yeah, more likely than not that would be true.
18     Q. That would be a fact that would affect that
19  mother's ability to care for children in some regard.
20     A. Sure.
21     Q. Okay. And the fact that the mother had given
22  birth to another child would also be a fact that would be
23  presented at a review hearing on a petition involving any of
24  her other children.
25     A. Sure.

24

1      Q. Do you recall any cases in those 18 years where
2  the Court was informed that the mother gave birth to another
3  child, has custody of that child, at the review hearing for
4  another child who was in placement?
5      A. Sure.
6      Q. How many times did that happen?
7      A. Oh, I couldn't tell you. Numerous. You know,
8  there may be a lot of reasons why a mother can't care for a
9  particular child who is in placement that doesn't have
10  anything -- that wouldn't have anything to do with her
11  ability to care for a newborn.
12     Q. So the determination, then, is made based on the
13  mother's ability to care for a newborn rather than her
14  pattern of being abusive or neglectful to other children.
15     A. No. No. The determination about seeking a
16  prognostic detention order is made on the basis of whether
17  or not the mother has demonstrated by her behavior that she
18  presents a level of risk to the child that is simply not
19  acceptable, wouldn't be safe to keep the child with the
20  mother.
21     Q. Did you represent the Agency in a case in which
22  Abby Conley was a case aide involving a pair of twins, a boy
23  and a girl?
24     A. Yeah.
25     Q. Do you recall the case?

25

1   A.   Not a boy and a girl. They were two girls.
2   Q.   Two girls, okay. But you recall the case, then?
3   A.   Yes, sir.
4   Q.   All right. And you represented the Agency at a
5   hearing on a petition that was -- the Agency filed to change
6   the goal of the placement; is that correct?
7   A.   Yeah, that's true.
8   Q.   And the change of goal was to change it from
9   reuniting the family to terminating the parental rights of
10  the parents.
11  A.   Correct.
12  Q.   And who was the caseworker that made that
13  determination, that requested you to file that petition?
14  A.   Well, there wasn't -- I want to be technical here
15  with you for a minute. There wasn't really a petition
16  filed. There was a -- there was a hearing held, which was a
17  periodic review hearing, at which the Agency indicated in
18  its court filings, which is not a petition, but it was
19  in the casework summary that was prepared, that the Agency
20  wanted to change the goal from reunification with parents to
21  adoption. And the caseworker who was assigned to the case
22  during that period of time was a lady named Michelle
23  Schetter, S-C-H-E-T-T-E-R.
24  Q.   And do you know if she is still with the Agency?
25  A.   I think so, but I can't swear to it, because I

26

1   haven't been there for a couple months. As far as I know,
2   she is.
3   Q.   And who was her supervisor?
4   A.   Susan Deveney.
5   Q.   And Abby Conley was the case aide?
6   A.   That's my understanding.
7   Q.   Is there normally just one case aide assigned to a
8   case?
9   A.   I think normally. Sometimes there are --
10  sometimes there are two, depending on the circumstances of
11  the case and the amount of service that's involved. But I
12  think in this case there was only the one, as I remember.
13  Q.   Now, you talked about a summary, a submission that
14  was submitted to the Court in advance of this review
15  hearing; is that correct?
16  A.   It's submitted to the Court, and it's submitted to
17  counsel for the Agency, counsel for the parents, counsel for
18  the child or children.
19  Q.   Okay. And do the other parties likewise file a
20  pretrial statement or a summary indicating what evidence
21  they want to present at this particular hearing?
22  A.   Any party has the right to be able to do that.
23  Some do, some don't. It depends on the case.
24  Q.   If you want to present evidence or request some
25  relief from the Court of a substantive nature, are you

27

1   required to submit in advance a statement of what it is
2   you're seeking and why you're seeking it?
3   A.   There's no requirement. Again, as I mentioned to
4   you before, there are no rules, Mr. McNair, that govern
5   dependency practice. You know, there aren't any Court rules
6   like the Rules of Criminal Procedure. They're in the
7   process of promulgating them through the Supreme Court now,
8   but there's basically just a practice. What we've done
9   historically for years in Erie County.
10  Q.   In this particular case, had any parties other
11  than the Agency submitted a pretrial or prehearing
12  statement?
13  A.   I believe so. I can't specifically recall who,
14  but I believe that some folks had. I think Attorney
15  Villella had on behalf of the mother. I don't know whether
16  any of the other parties had, to be honest with you. I
17  can't remember.
18  Q.   Do you recall that Villella submitted such a
19  statement?
20  A.   Yeah.
21  Q.   Do you recall what relief he was seeking in that
22  hearing; what he wanted to accomplish at that review hearing
23  for his particular client?
24  A.   Well, not -- I don't recall specifically. I mean,
25  I haven't -- I haven't probably looked at that document in

28

1   almost two years, a year and a half, anyway, I would think.
2   I would -- I would assume that he was objecting to the
3   Agency's request to change the goal from reunification.
4   Q.   And what kind of evidence do you have to submit to
5   the Court to convince the Court to enter an order changing
6   the goal and starting the termination of parental rights
7   proceedings?
8        MR. LANZILLO:  Objection to form.
9        MR. LANE:  Join in that.
10       MR. McNAIR:  What's your objection to the form?
11       MR. LANZILLO:  First, I don't know whether you're
12  talking about now or then. And if you're asking
13  him essentially for the offer of proof, that would
14  have been made at the time of the hearing. It's
15  just unclear what you're looking for from him
16  here.
17       MR. LANE:  Mine is that the question is overly
18  broad.
19  BY MR. McNAIR:
20  Q.   What I'm asking is, in general, is there some case
21  law or statute that sets forth the nature of proof or the
22  ultimate facts that have to be found by a Court to change
23  the goal of a placement?
24  A.   Well, there's a couple different ways to answer
25  that. First, there's a very specific statutory provision

29

1    that governs the direction that a dependency case has to go
2    in.
3        When the federal government enacted the Adoption
4    and Safe Families Act that was ultimately enacted in our
5    Juvenile Law in 1999, states were required to put provisions
6    in their law that said that if a child had been adjudicated
7    dependent and placed in foster care, and had remained in
8    foster care for 15 out of the last 22 consecutive months,
9    and the Agency was unable to document a compelling reason
10   not to seek termination of parental rights, the Agency was
11   required to file a petition to terminate parental rights in
12   order to ensure a safe, permanent arrangement for the child
13   or children.
14       So that's the ASFA provision that was overlaid on
15   our Juvenile Act that would have required the Agency to take
16   that action in this particular case.
17       Q.   I don't mean to interrupt you. But you're saying
18   that in the case that we're speaking of, that the two twin
19   girls had been in placement for 15 out of the previous 22
20   months.
21       A.   Correct.
22       Q.   Okay.
23       A.   And the Agency had no compelling reason that it
24   could advance to the Court to do otherwise than what the
25   statute mandated. So you have that piece of it. Then to

30

1    further answer your question, you would have to convince the
2    Court essentially that the parents were not -- had not
3    sufficiently progressed to the point where they remedied the
4    conditions that gave rise to the placement in the first
5    case.
6        Q.   So those were the issues that were going to be
7    presented at this particular review/change of goal hearing,
8    then.
9        A.   Well, that was the -- those were the -- those were
10   the underlying factors.
11       Q.   Who would have the burden of proof on this
12   compelling reason issue, the Agency or the parent?
13       A.   Can you be more specific.
14       Q.   Well, does the statute set forth who bears the
15   burden of proving a compelling reason not to terminate?
16       A.   What the statute says is that if the Agency cannot
17   document a compelling reason when the child has been in
18   placement more than 15 out of the last 22 months.
19       Q.   Okay.
20       A.   Then it has to file to terminate parental rights.
21       Q.   Does the Agency have a choice of what it documents
22   in a file?
23       MR. LANZILLO: Objection to form. Overbroad.
24       A.   I'm going to second the objection.
25       Q.   Okay. If you can't answer --

31

1        A.   You know, I could answer that question the rest of
2    the day, you know, or I could try.
3        Q.   I'll withdraw that particular question.
4        A.   Thanks. Let's try another one. I'll try to help
5    you.
6        Q.   Okay. Going into that hearing, it was your
7    intention to demonstrate to the Court that one or both or
8    that both of the parents had not made progress toward
9    remedying the conditions that led to the placement; is that
10   correct?
11       A.   In part. The Agency's position was that they had
12   not sufficiently demonstrated that they would be able to
13   provide a safe environment for the children. So in the
14   sense that they may have done certain things and attended
15   certain classes and so forth, that was one thing. But the
16   gist of the Agency's concern was that there hadn't been
17   sufficient progress that would allow us to say that we had a
18   compelling reason not to seek termination of parental
19   rights.
20       Q.   Now, when you say "the Agency's concern," how is
21   the Agency's concern determined?
22       A.   The Agency's concern from the outset in this case
23   was that these children, who were about 2 months of age --
24       Q.   Wait a minute. I apologize. I don't mean to
25   interrupt you. But I'm not sure you understood my question.

32

1        A.   All right.
2        Q.   Let me restate it. When you refer to the Agency's
3    concern, who was the Agency? The Office of Children and
4    Youth.
5        A.   Sure.
6        Q.   Which is inanimate and doesn't have any corporeal
7    existence. So how does it form this determination?
8        A.   You're talking about the people who are employed
9    by the Agency who make the judgments about what's going on
10   with the case. And in this case, you're talking about
11   the -- first and foremost the caseworker, to include the
12   casework supervisor, to include the program director who
13   would be the supervisor's supervisor. That's pretty much as
14   far as it goes on the issue of changing a goal from
15   reunification to termination of parental rights.
16       Q.   All right. And do they typically seek a legal
17   opinion in connection with that determination?
18       A.   Sure.
19       Q.   To determine whether the evidence is sufficient?
20       A.   Sure. The practice is that there is a clinical
21   review that's done by those people that I talked to you
22   about, those three, to assess the case from a clinical
23   standpoint, to determine whether or not there's anything
24   else that can be done or should be done to try to assist the
25   family to remedy the conditions which caused the placement

33

1    in the first instance.
2        And if the determination is made at that point
3    that there's -- you know, there's no progress being made and
4    that the child needs permanency, as opposed to lingering in
5    foster care, which was going on with these children. Once
6    that determination is made clinically, then a legal opinion
7    would be sought to determine if there were adequate legal
8    grounds to proceed.
9    Q.    All right.
10    A.    That's the protocol that we set up to assess these
11    cases.
12    Q.    Okay. Thank you. That answers the question. I
13    apologize for the previous confusion.
14    A.    That's all right.
15    Q.    And then once that determination is made after
16    those two steps, that becomes the Agency's position.
17    A.    Right. That would be the position that would
18    be -- would be offered on behalf of the Agency as the party.
19    The Agency is the Erie County Office of Children and Youth
20    as the moving party, yeah.
21    Q.    And that was done in this case.
22    A.    Sure.
23    Q.    And who provided the legal opinion in this case,
24    if you know?
25    A.    That would be me.

34

1    Q.    Did you provide that legal opinion after reviewing
2    the documents that were considered in connection with the
3    clinical determination? And by that I mean the summaries
4    that were prepared by the caseworker and the other people
5    involved in the case.
6    A.    Probably not, to be honest with you. Typically,
7    the legal opinion is sought in advance of the preparation of
8    the summary.
9    Q.    Okay.
10    A.    Because it is the summary which then contains the
11    ultimate recommendation. So the summary is -- the work
12    product that's generated there is predicated on the fact
13    that there's been the clinical review, and there's been the
14    legal evaluation made of the case. Which is not to say that
15    I wouldn't have been made aware of what was going on as a
16    predicate for the legal opinion.
17    Q.    And how would you be made aware of that? Through
18    oral conversation with the caseworker --
19    A.    Sure.
20    Q.    -- or supervisor?
21    A.    Right.
22    Q.    And would you typically review documents in
23    conjunction with that review?
24    A.    Possibly. Typically, I don't know typically. But
25    possibly, for sure.

35

1    Q.    Did you in the case that we're speaking of?
2    A.    I really can't recall whether I reviewed documents
3    or not. I may have.
4    Q.    Do you review the case file itself?
5    A.    Not normally.
6    Q.    Do you review the -- you don't review, then, the
7    caseworker's notes that are in the file or the aide's notes
8    or the supervisor's notes?
9    A.    No. No. I would look at past Court summaries,
10    for example, reports that might have been generated maybe
11    between the time of the last hearing and this next scheduled
12    proceeding at which this recommendation might or might not
13    be made.
14    Q.    All right. Now, okay. And, nonetheless, in this
15    case, that determination was made to proceed with the
16    request to the Court to change the goal. And the Court
17    summary was prepared, Court summaries were prepared; is that
18    correct?
19    A.    Yeah, I believe so. And, you know, without
20    looking at -- and it's been a long time since I've seen
21    these, Mr. McNair. My recollection is there was a hearing
22    that was scheduled on this case in April of '04, at which we
23    may or may not have recommended a goal change. I can't
24    remember.
25        And I think the case was put off at that point

36

1    because the mother had a re-argument petition or an
2    allocatur petition pending in the appellate courts from her
3    dependency case, and the Judge didn't want to address it at
4    that point. And we came back after the appellate
5    proceedings had run its course, and that's when the hearing
6    happened at the end of July of '04.
7    Q.    Okay.
8    A.    And so -- this is just by recollection. So don't
9    hold me to when the goal change recommendation was
10    formalized in a summary, because I can't -- I don't want to
11    say for sure.
12    Q.    All right.
13    A.    It might have been April. It probably was July.
14    If it wasn't April, it might have been both. I just don't
15    recall.
16    Q.    Was a new Court summary prepared, do you know,
17    after the April one, the one that was prepared for the April
18    hearing? Was there a new one prepared for the July 28th
19    hearing?
20    A.    I don't think so. I think there might have been
21    an addendum done to it, which would have been kind of
22    standard fare. I can't specifically recall.
23    Q.    All right. And did you review the summary that
24    was submitted by the case aide Abby Conley for the hearing,
25    the April hearing?

37

1    A.  Yeah, I probably — I probably did.  Because it
2  would have come to me in the packet of information that I
3  would get in advance of that hearing.  That was the
4  practice.
5    Q.  Okay.
6    A.  If there was something that went to the other
7  parties, I would get what they got.
8    Q.  And do you recall whether or not the information
9  in the case aide's summary was consistent with or at
10  variance with the position of the Agency?
11    A.  I don't -- you know, I don't really know how to
12  answer that.  I mean, she was the case aide.  She wrote
13  about what her observations were at visits, which I think is
14  what her function was, to supervise visitation.  I don't
15  recall that she took a position one way or the other --
16    Q.  Right.
17    A.  -- on the recommendation that the Agency made to
18  change the goal.
19    Q.  Right.  And I didn't ask you if she had a
20  position.  I asked you if the information she submitted was
21  consistent with the Agency's position or not.
22        MR. JOYAL:  How is he going to answer that?
23    Q.  Well, whether there was any dissonance between the
24  facts that she stated and the facts that the other Agency
25  people were stating.

38

1    A.  I can't recall one way or the other.  You know, I
2  mean without --
3    Q.  All right.  That's fair.
4    A.  If there's something in particular that you had in
5  mind that you want me to speak to, that would be fine, I
6  would try, but, you know.
7    Q.  Did you at any point request that the case aide's
8  summary be resubmitted to the case aide for revision?
9    A.  No.  No, I would never do that.  It wasn't my
10  function.
11    Q.  Do you know whether either the supervisor or the
12  caseworker requested the case aide to revise the summary?
13    A.  Do I now, as we sit here today?
14    Q.  Do you now know?
15    A.  I'm aware that there was some discussion
16  apparently between the supervisor and the case aide that
17  revisions should be made.
18    Q.  Okay.  And when did you learn that?
19    A.  I think probably either during the course of the
20  hearing on the 28th of July or right afterwards.
21    Q.  What was your understanding of that discussion?
22    A.  Well, I — you know, I heard what Ms. Conley
23  testified to during the course of the hearing.  And then I
24  spoke to Ms. Deveney about it.  And, you know, she basically
25  told me the scenario.  I don't specifically recall it, but

39

1  it was, you know, she had reviewed the summary and she had
2  asked Abby to make some changes in it.  And Abby had made
3  some changes in it, and then turned in, you know, the final
4  product.  I mean, that would be -- that's not uncommon.
5    Q.  Okay.
6    A.  You know.
7    Q.  All right.  And —
8    A.  But, you know, in terms of the particulars of it,
9  I didn't get into it with her.
10    Q.  Do you know whether the summary that was submitted
11  and signed by Ms. Conley was subsequently modified?
12    A.  Do I know?
13    Q.  Yes.
14    A.  From my own personal knowledge?
15    Q.  Do you have any basis to know?
16    A.  I mean, not from my own personal knowledge but
17  from —
18    Q.  I assume you didn't participate in it.
19    A.  But from what I've learned, I'm given to
20  understand that the summary that Ms. Conley -- the second
21  summary, if you will, the corrected version that she
22  prepared, and signed, and that Ms. Deveney signed, was not
23  changed after that by Ms. Deveney.
24    Q.  And what's the basis of that understanding?
25    A.  After Ms. Conley's resignation and in connection

40

1  with her civil service appeal, the County retained counsel
2  to represent the County on that issue.  And that was
3  Mr. Taft.  And as I understand it, he reconstructed the
4  chain of documentation between Ms. Conley and Ms. Deveney
5  and their respective computers, and was able to demonstrate
6  that that's how it went down.
7        In other words, that Ms. Deveney did not, after
8  the fact of signature by Ms. Conley, alter anything.  Now,
9  I've never sat down and looked at that, but that's what I've
10  understood to be the case.
11    Q.  That there's some forensic computer evidence
12  indicating this.
13    A.  I'm not going to characterize it.  I'm just
14  telling you what I was told.
15        MR. LANZILLO:  I would like to caution Attorney
16        Cauley that to the extent there was consultation
17        involving Attorney Taft in your capacity as
18        Solicitor and Attorney Taft representing the
19        County for purposes of the civil service
20        proceeding, to be cautious regarding work product
21        privilege and attorney/client privilege in
22        disclosing --
23        MR. McNAIR:  There's no work product privilege in
24        the civil service proceeding.  There's no state
25        work product privilege.

41

1    MR. LANZILLO: My objection stands. And to the
2    extent that you're going to -- you perceive that
3    the question calls for disclosure of those
4    consultations, I would ask that you alert me to
5    that before answering so that I can make a
6    determination as to whether it's appropriate to
7    disclose the information.
8    THE WITNESS: Okay.
9    Q.  Did Ms. Deveney tell you that she had not altered
10   the Court summary, but that Abby is the one that made the
11   changes to the Court summary, the ones that were discussed
12   at that July 28th hearing?
13   A.  That's a two-part question. The first -- the
14   answer to the first part of the question is she told me she
15   did not alter the summary. The second part of the
16   question -- would you mind reading that back.
17   (Record read by reporter.)
18   A.  I don't think we -- I don't think I had the second
19   part of that discussion with Ms. Deveney in the way you
20   phrased the question.
21   Q.  So you don't know who -- I withdraw that. At that
22   hearing there was basically two versions of the case aide's
23   summary that were submitted and compared, correct?
24   A.  Two versions surfaced, yes.
25   Q.  Okay.

42

1    A.  The Agency had offered the one that went to the
2    Court and all the parties as part of its standard packet of
3    materials. And then there was another version that
4    Mr. Villella produced.
5    Q.  Mr. Villella produced that?
6    A.  That's my recollection.
7    Q.  Where did he produce it from?
8    A.  He had it.
9    Q.  He had it?
10   A.  Yes, sir.
11   Q.  Did he offer it as an exhibit?
12   A.  He showed it to Ms. Conley when she was on the
13   stand. And I believe that he did offer it as an exhibit.
14   Q.  Have you reviewed the transcript of that hearing?
15   A.  Not in a long time.
16   Q.  All right.
17   A.  That's just my recollection, Mr. McNair. I
18   believe -- my recollection, as I sit here, is that -- is
19   that he had it in his possession, and he brought it up to
20   Ms. Conley and showed it to her. That's my recollection.
21   Q.  All right. Did you object at that time to the
22   authenticity of that document?
23   A.  No.
24   Q.  Your opposing counsel produces a document at a
25   hearing claiming it's a document generated by your client.

43

1    Your client is denying it.
2    A.  Wait a minute.
3    Q.  And you don't object to the authenticity?
4    MR. LANZILLO: Objection to form.
5    MR. JOYAL: Argumentative.
6    MR. LANZILLO: And lack of foundation.
7    MR. McNAIR: You're right.
8    A.  He showed it to her, to Ms. Conley.
9    Q.  Ms. Conley authenticated it?
10   A.  She identified it as something that she had
11   produced.
12   Q.  Did she identify it as the Court summary that she
13   had signed and submitted to Ms. Deveney?
14   A.  I don't specifically recall how she characterized
15   it. She said that she had produced it, but I -- you know, I
16   think the transcript would answer that more specifically
17   than I could from my recollection. It's been over a year
18   since I even read that, Mr. McNair.
19   Q.  Okay. And did Ms. Deveney testify at that hearing
20   that the summary submitted to the Court was the same one
21   that Ms. Conley had prepared and signed?
22   A.  You know, I don't remember exactly what she said.
23   You know, the transcript is probably the best answer to
24   that. The gist of her testimony was that the summary that
25   was submitted to the Court and the parties in advance of the

44

1    hearing was the summary that had been prepared by herself
2    and Ms. Conley, you know, as the supervisor and the -- and
3    the case aide.
4    I believe Ms. Deveney may have explained that she
5    had asked Ms. Conley to revise the summary, or maybe
6    Ms. Conley admitted that that had happened. Now that I
7    think about it, I think Ms. Conley acknowledged that she had
8    made some changes at Ms. Deveney's request, that that was
9    customary, and that she had no problem with that, something
10   to that effect.
11   But, again, Mr. McNair, that's my recollection.
12   And, you know, the transcript would answer your question
13   more specifically about what Sue said.
14   Q.  Do you recall whether or not that issue had any
15   bearing on the outcome of the hearing?
16   A.  I think you've got to ask Judge Kelly that.
17   Q.  I'm asking you from your position as an attorney
18   representing a litigant. In your mind, do you think that
19   had an impact on the outcome of the hearing? Well, first of
20   all, what was the outcome of the hearing? Change of goal,
21   or?
22   A.  No. The Agency was directed to continue the
23   service plan of reunification for the children.
24   Q.  Okay. And did this document, these varying
25   documents that were produced, in your mind, were they a

45

1  factor that influenced the Court to rule that way?
2     A.  I have no idea what prompted Judge Kelly to make
3  the determination that she made in that case.  So to be able
4  to say yes, no, or maybe, I'm not -- I can't go there with
5  you, Mr. McNair.
6     Q.  Did the Judge not make a statement of the reasons
7  for her rule?
8     A.  You know, I really don't recall.  If she did, they
9  would be a matter of record.  And I don't recall that she
10  did or didn't.
11     Q.  Well, do you recall after that hearing having a
12  discussion with the Judge?
13     A.  Well, I talked to her a lot after the hearing
14  about many things.
15     Q.  Immediately after that hearing did you have a chat
16  with the Judge about the Agency altering documents that had
17  been signed and submitted by other workers?
18     A.  Oh, no, not that I recall.  I don't believe so.
19     Q.  Do you recall the Judge telling you that in her
20  opinion she felt that that was an obstruction of justice
21  subject to possible criminal penalties?
22     A.  Oh, if Judge Kelly had ever told me that, I would
23  remember that, Mr. McNair.  That never happened.
24     Q.  I think you would.  Never happened.
25     A.  Not that I recall.

46

1     Q.  Well, you said you would recall it if it had
2  happened.
3     A.  Oh, I would have to think I would.
4     Q.  Do you know whether she had a similar discussion
5  with any of the Agency personnel?
6     A.  No, I don't have any idea.
7     Q.  None of the Agency personnel reported to you later
8  that the Judge had --
9     A.  No.  I never heard --
10     Q.  -- talked to them in that vein?
11     A.  I never heard that.
12     Q.  Now, when did you discuss the question of the
13  alteration of the Court summary with Ms. Deveney for the
14  first time after that hearing?
15     A.  You know, I don't specifically recall.  Probably
16  within the next -- within the next couple of days, I would
17  think.
18     Q.  Do you recall where that discussion took place?
19     A.  Not specifically.  I could speculate.  But it
20  would have been at the Agency someplace, possibly in my
21  office, maybe in the hallway.  You know, it's hard to say.
22     Q.  And what did she tell you in the course of that
23  discussion?
24     A.  I really don't recall.
25     Q.  Did she tell you that she had not altered the

47

1  document as was alleged by the case aide?
2     A.  She has told me that.  I don't know if it was in
3  that -- in the first meeting I ever had with her.  I would
4  have to -- you know, I could speculate.  But, you know, I
5  really can't recall.
6     Q.  What is the first time that you recall that she
7  told you that she did not make the alterations as Ms. Conley
8  alleged?
9     A.  To put a specific time line or date on it, you
10  know, I really couldn't say.  I don't know.
11     Q.  Was it within days --
12     A.  Oh, yeah.
13     Q.  -- weeks, months?
14     A.  It would have been within days, I'm sure.
15     Q.  Was there any documentation or memorandum made of
16  that conversation?
17     A.  Not by me.
18     Q.  Was there an e-mail back and forth between you and
19  Ms. Deveney about that issue?
20     A.  Not that I recall.
21     Q.  Was there any report submitted to management about
22  this issue?
23     A.  Define "management."
24     Q.  The program director or supervisor --
25     A.  No.

48

1     Q.  -- up the line from Ms. Deveney.
2     A.  No.
3     Q.  Were the supervisors and management of OCY
4  generally aware of this occurrence?  Was it a topic of
5  conversation?
6     A.  What occurrence?
7     Q.  Where you had a case aide disputing the
8  authenticity of a document submitted to Court.
9        MR. LANE:  Objection to form.
10     A.  I think the way to answer that is that there was
11  discussion about the circumstance of the hearing itself with
12  the supervisor, program director, maybe.  Don't hold me to
13  that.  Ms. Biroszak may or may not have been involved in
14  that.  I can't specifically recall.  And at some point with
15  the director of the Agency also, about the overall
16  circumstances of that hearing.  Which would have included,
17  at least in part, what Ms. Conley had said.
18     Q.  Okay.
19     A.  That within days probably of the hearing.
20     Q.  Sometime in the first week of August, then?
21     A.  Oh, yeah, if not sooner.
22     Q.  And discussions prompted by the circumstances of
23  that hearing.
24     A.  Correct.
25     Q.  And was any action planned or contemplated?  Did

49

1 the Agency plan on making any changes in its procedures,
2 personnel policies, whatever, as a result of the events of
3 that hearing?
4           MR. LANZILLO:  Objection to form.  Vague and
5           ambiguous, overly broad.
6     A.  Yeah, that would be a hard one for me to try to
7 nail down.  If you could be more specific.
8     Q.  Well, I think it's a fair question.  Did the
9 Agency decide to change anything it was doing as a result of
10 this -- the events of that hearing and the circumstances?
11          MR. LANZILLO:  I'm still going to object to the
12          form, particularly the reference to events of that
13          hearing.
14          MR. McNAIR:  The witness referred to the
15          circumstances of the hearing.  Allow me to
16          rephrase the question.
17    Q.  Did the Agency decide to change any of its
18 policies or personnel or procedures as a result of the
19 circumstances of the July 28th hearing?
20          MR. JOYAL:  I'm going to object.  It's a compound
21          question and not set up in time.  You've got
22          policies, procedures, personnel, without a time
23          frame or who you're talking about.  I'm going to
24          object.
25    Q.  Ever at any time after July 28th.

50

1     A.  Well, there were a number of things that we talked
2 about as a result of the quote/unquote circumstances of that
3 hearing.  The circumstances of that hearing involved more
4 than simply Ms. Conley's testimony around that, the issue of
5 that document.
6     Q.  Okay.  What were the other circumstances out of
7 that hearing that were notable and worthy of discussion at
8 the highest levels of the Agency?
9     A.  Well, the presence for the first time in recorded
10 history in a dependency case of a media representative who
11 was permitted to stay over the objection of the Agency, for
12 example.
13    Q.  And who was that?
14    A.  That was a fellow named Palattella from the local
15 newspaper.
16    Q.  Okay.
17    A.  The demeanor of the Trial Court which --
18    Q.  What was of concern?
19    A.  That the Trial Court appeared overtly hostile to
20 the Agency's position from the outset of the case, in my
21 opinion.  The testimony of another witness.  And I don't
22 remember the precise particulars of it.  About some
23 encounter in the visitation section.  The lady's name was
24 Hines.  And I had evidence that I wanted to offer to rebut
25 that testimony, and I wasn't permitted to do so.

51

1           The transcript speaks more clearly to that than my
2 recollection could at this point.  So those -- those things
3 around the circumstances of that hearing were discussed
4 within the Agency after that hearing.
5     Q.  Okay.
6     A.  And other things.
7     Q.  Was any conclusion reached as to what accounted
8 for the demeanor of the Judge at that hearing?
9     A.  No.
10    Q.  You have no idea why the Judge was hostile to the
11 Agency's position?
12    A.  No.
13    Q.  It was a complete, unexplained surprise to you.
14          MR. JOYAL:  Objection.
15          MR. LANZILLO:  Objection.
16          MR. LANE:  Objection.
17          MR. JOYAL:  Asked and answered.
18    A.  I'm as bewildered about it today as I was then.
19    Q.  Okay.
20          THE WITNESS:  Would you mind if I took a restroom
21          break.
22          MR. McNAIR:  No, that's fine.
23          THE WITNESS:  Thank you very much.
24          MR. McNAIR:  Take five.
25          (Recess held from 11:08 a.m. to 11:21 a.m.)

52

1     Q.  Mr. Cauley, before the break, you mentioned that
2 this was the first time in history that a media
3 representative had been present at a dependency review
4 hearing.
5     A.  As far as I knew of.
6     Q.  And that was over your objection.
7     A.  Correct.
8     Q.  And do you know whether or not at about that time
9 or shortly prior to that date there had been some litigation
10 between the Times-News and OCY concerning their right to
11 attend hearings?
12    A.  Not that I was aware of.
13    Q.  You did not participate in that litigation?
14    A.  I don't believe there was any litigation.
15    Q.  Were you aware that Judge Cunningham had issued an
16 order on behalf of the Times-News permitting representatives
17 to attend hearings on certain conditions?
18    A.  I was aware that he had issued something.  It was
19 not an order.  It was a memorandum of some sort.
20    Q.  Okay.
21    A.  That allowed access to the dependency Courts, per
22 the holdings of a couple of recent Superior Court cases that
23 talked about open Courts.  There was -- as far as I know,
24 there was no litigation.  And he may have -- he may have
25 indicated it was in response to a request from the Times,

53

1   but I can't say for certain that that was what prompted it.
2   I may be right or wrong about that. I don't specifically
3   recall.
4       Q.  Okay. So your recollection is that there was not
5   formal litigation, but that the Times may have requested,
6   and Judge Cunningham definitely did issue a memorandum
7   authorizing the entry of media personnel to dependency
8   hearings.
9       A.  Yeah.
10      Q.  Okay. And you were aware of that prior to the
11  commencement of this hearing, weren't you?
12      A.  Yeah.
13      Q.  In fact, that was a matter of some concern in the
14  Agency, wasn't it?
15      A.  Yes.
16      Q.  And you conducted a seminar on that for the
17  employees, didn't you?
18      A.  I don't think so, no.
19      Q.  You did not meet with the employees and instruct
20  them on media issues?
21      A.  There was -- there were discussions in the Agency
22  between the legal department and maybe the casework staff --
23  I can't specifically recall -- to address how we might
24  comply with what we felt were the requirements of the
25  Juvenile Act that these proceedings be confidential, as

54

1   against the holding of the Superior Court that in certain
2   circumstances they could be open to the public and under
3   what particular parameters and guidelines.
4       I know that we revised our pleadings to include
5   language that would allow us the predicate upon which to
6   assert that the proceedings should remain closed. We did
7   that in response to Judge Cunningham's memorandum or
8   directive. And I know we had discussions in-house about how
9   we might address the requests from the media to attend what
10  we felt by the Juvenile Act were still confidential
11  proceedings. So I hope that answers your question.
12      Q.  All right. You said you revised the pleadings?
13      A.  Um-hum.
14      Q.  To allow -- to give the predicate to allow
15  assertions that the proceedings should remain closed?
16      A.  Um-hum.
17      Q.  When you say revised the pleadings, is that a form
18  that was used in every pleading?
19      A.  Um-hum.
20      Q.  So, henceforth, every pleading filed by the Agency
21  would contain a request that its particular circumstances
22  required it to be closed.
23      A.  Correct.
24      Q.  I take it the Agency did not acquiesce in the
25  Superior Court rulings and intended to continue to fight

55

1   those rulings?
2       A.  Two-part question. Okay. We didn't acquiesce in
3   the ruling. In fact, pretty much statewide among OCY
4   solicitors we felt that the Superior Court decision was --
5   was not correct and hadn't taken account of the precise
6   statutory language in the Juvenile Act that made those
7   proceedings confidential.
8       We didn't fight the Superior Court rulings because
9   we never litigated in Common Pleas Court after
10  Judge Cunningham provided the memorandum saying that Courts
11  could be opened in certain circumstances.
12      Q.  But it was going to be the Agency's position that
13  no case it went to Court with would ever be within those
14  circumstances.
15      A.  Pretty much, yeah, um-hum.
16      Q.  And this was done out of a concern for the privacy
17  of the litigants?
18      A.  In part. Also because the Juvenile Act, in our
19  view, required it. The Juvenile Act said proceedings under
20  this Act are confidential. Plain meaning of the statute
21  indicated that. And also because of the privacy rights of
22  the parties involved. And also because of the information
23  that is potentially disclosable in those hearings to include
24  things like protected information under HIPAA, drug and
25  alcohol information, psychiatric and psychological

56

1   information, child abuse information. You know, and a
2   myriad of other statutory protections that are put in place
3   to keep people secure from disclosure of certain kinds of
4   personal information.
5       Q.  All right. It's fair to say, is it not, that at
6   that time the Agency was coming under some public scrutiny?
7       A.  At what time?
8       Q.  At the time of July 28th, 2004.
9       A.  What are you referring to?
10      Q.  Brittany Legler. Wasn't there a lot of publicity
11  about the Brittany Legler case at that time?
12      A.  I'm trying to remember when she passed away. And
13  I want to say it was May of '04. So probably there was
14  some. However, you know, if you characterize it as a lot, I
15  don't know. And how much it was directed at the Agency, I
16  don't specifically recall. But that was an issue that was
17  out there, sure.
18      Q.  Right. The Agency felt that it was being
19  subjected to more scrutiny by the media, particularly the
20  local newspaper, than it had been in the past.
21      A.  I'm not going to speak on behalf of the Agency
22  about that. I mean, are you asking me --
23      Q.  What did you think?
24      A.  What did I think? I thought that the -- I thought
25  that the media was certainly more interested in what

57

1 happened in that case. Yeah, sure.
2     Q. And was there not more media scrutiny of other
3 aspects of OCY at that time, in your opinion?
4     A. Not that I knew of.
5     Q. All right. Now, with regard to Ed Palattella
6 attending this hearing, were you -- was your objection to
7 his presence at that hearing based on the fact that you were
8 going to be presenting material that was statutorily
9 privileged, such as HIPAA material, drug and alcohol
10 information, that type of thing? Aside from -- privileged
11 aside from the Juvenile Act.
12     A. In part. There was -- those hearings,
13 particularly a goal change hearing, tend to be more wide
14 open. And more information can be disseminated than, you
15 know, you might find in a standard, just ordinary six-month
16 review hearing. So I wasn't exactly sure how wide open it
17 was going to be, how much information the Judge would allow
18 to be publicly disseminated. So, in part, I was concerned
19 about that. I was concerned about the disclosure of child
20 abuse information and the status of the child abuse
21 investigation that was done vis-à-vis the parents in that
22 case.
23     Q. Did the parents or their counsel object to
24 Mr. Palattella's presence?
25     A. I don't recall that they ever got the opportunity

58

1 to voice an opinion.
2     Q. The Judge just shut it down?
3     A. I believe that that's what happened, if I'm not
4 mistaken.
5     Q. So Judge Kelly you don't believe would have
6 entertained an objection by the parents, in light of the
7 fact that there's going to be child abuse information
8 revealed at this hearing?
9     A. You're going to have to ask her that. I don't
10 know.
11     Q. I'm asking you what your opinion was or what you
12 believe.
13        MR. LANZILLO: Objection to form. It calls for
14     speculation.
15     A. Yeah, I don't know -- I don't know what she would
16 have done, Mr. McNair.
17     Q. Did you ask the parents if they objected?
18     A. I don't recall that I did. I don't think I ever
19 got that far. I think I made my objection, and the Judge
20 looked down at me from the bench and said, the objection is
21 overruled, proceed. I think that's pretty much how it went
22 down. Or request denied, proceed. It was very short.
23     Q. What was Mr. Palattella's interest in the case?
24     A. You have to ask him.
25     Q. He didn't express to you?

59

1     A. Never talked to him about it.
2     Q. You didn't ask him --
3     A. No.
4     Q. -- Ed, what are you doing. You know Ed
5 Palattella, right?
6     A. Sure. Yeah, I know Ed.
7     Q. Been in town 30 years.
8     A. Yeah. I was there to do this case. I was sitting
9 in the -- at counsel table with my witnesses. And there he
10 was in the front row in the back. I mean, I was prepared to
11 do my case.
12     Q. Okay. Do you have any knowledge as to who
13 informed Mr. Palattella that this hearing was going to occur
14 or asked him to attend?
15     A. No.
16     Q. Do you have any suspicion about that?
17     A. Well, yeah, probably.
18     Q. Who do you suspect invited Mr. Palattella?
19     A. I think probably your client did.
20     Q. You think?
21     A. Yeah.
22     Q. And what is that based on?
23     A. The e-mails of hers that I reviewed, that invited
24 Ms. Cosby to disclose confidential information to him, at
25 least in part.

60

1     Q. We'll get to that later. Okay. What else?
2     A. Just references in those e-mails to the -- to
3 phone conversations between your client and Ms. Cosby about
4 Mr. Palattella and the Times and the -- and I don't know,
5 there may have been other things. But I just -- you know,
6 that's my sense of it.
7     Q. Okay. And I guess you reviewed a lot of e-mails.
8 How many e-mails out of -- I think you said there were 2000
9 e-mails that you reviewed, correct?
10     A. That was an estimate. There was a lot of them.
11     Q. And you're satisfied, based on the representations
12 of Mr. Granger, that that was all of them?
13     A. That's what he -- well, what we asked him to --
14 what we asked him to get us -- I specifically asked him, as
15 I recall it, was the e-mails between January 1st of '04
16 through -- initially, I believe it was approximately
17 August 10th or 12th of '04. And then ultimately through the
18 time of your client's resignation.
19     Q. Okay.
20     A. He looked at those. That was the window of time,
21 just because there were so many.
22     Q. How many e-mails did Mr. Granger produce to you
23 originating from Abby Conley going to Mr. Palattella?
24     A. Oh, none that I saw, that I -- I don't think there
25 were any that way.

61

1   Q.  Okay.  How many e-mails did you see from
2   Mr. Palattella to Ms. Conley?
3   A.  None.
4   Q.  So as far as you know, Ms. Conley didn't e-mail
5   Mr. Palattella from her County computer and ask him to
6   attend the hearing.
7   A.  Not that I recall seeing, no.
8   Q.  And it would be fair to say if you saw --
9   A.  Oh, I would --
10  Q.  -- such a thing, you would remember it.
11  A.  -- notice that Mr. McNair, yeah.
12  Q.  Okay.  It's not as if you might have seen it and
13  forgotten about it.
14  A.  I wouldn't have forgotten that, no, sir.
15  Q.  I didn't think so.  Okay.  So we're at the hearing
16  on July 28th.  And Ms. Conley is called to testify.  Who
17  calls her to testify?
18  A.  I believe Mr. Villella.
19  Q.  And at that point there's some discussion over
20  this Court summary and some differences between the two
21  Court summaries; is that correct?
22  A.  Yeah, there was testimony about that.
23  Q.  And was there any substantive difference, in your
24  mind, between the Court summary that Ms. Conley claimed was
25  the original one and the one that was submitted to the

62

1   Court?
2   A.  You know, it's been a long time since I've looked
3   at that stuff.  I wouldn't say there was a huge difference.
4   No, I don't.
5   Q.  Okay.  So any change between the two would not
6   affect the quantum of proof that the Agency was presenting
7   to the Court?
8       MR. LANZILLO:  Objection, calls for --
9   Q.  In your opinion as an attorney of 30 years in
10  practice.
11  A.  Well --
12      MR. LANZILLO:  Calls for legal conclusion.
13  A.  -- it --
14      MR. McNAIR:  Right.  Yes, it does.
15  A.  Either way they were written, from my standpoint
16  as the lawyer, the summaries that she provided were
17  irrelevant.
18  Q.  So it didn't make any difference to you?
19  A.  The fact that the mother was a good parent in her
20  interaction with the children or a superb parent in her
21  supervised interaction with the children was really
22  irrelevant in the narrow context in which your client dealt
23  with this family.
24  Q.  Right.  It wasn't her call to make, was it,
25  whether -- you know, what the outcome of the case should be.

63

1   A.  She performed a -- you know, a partial function
2   of -- that was pretty limited in terms --
3   Q.  Right.
4   A.  -- of the role of the Agency in this case.
5   Q.  All right.  So would it be fair to say that you
6   were not concerned with this issue at the time of the
7   hearing?
8   A.  Oh, no, I was very concerned.
9   Q.  What were you concerned about?
10  A.  I was concerned that your client came before the
11  Court and essentially accused the casework supervisor of
12  manipulating or altering her work product.
13  Q.  Um-hum.  And you were concerned because that made
14  my client bad.
15  A.  No.
16  Q.  Were you concerned that Ms. Deveney had, in fact,
17  made those alterations?
18  A.  I was concerned because the finder of fact upon
19  whom I was relying to make a fair and informed judgment
20  about the validity of the Agency's position was being told
21  something by your client that had a negative impact on the
22  Agency's supervisor of this case and her credibility as a
23  result.
24  Q.  What if she deserved it?  Did you consider that?
25  A.  Well, any good lawyer is going to consider both

64

1   sides.
2   Q.  Right.
3   A.  Um-hum.
4   Q.  So did you consider perhaps Ms. Deveney did do
5   what Ms. Conley indicated and altered the Court's summary
6   after she had signed it?
7       MR. LANZILLO:  Objection to form.  Lack of
8   foundation.
9   A.  Did the -- shall I answer?  I mean, I can try to
10  answer it.
11      MR. LANZILLO:  Sure, you can answer over my
12  objection.
13  A.  Did the thought cross my mind that it could have
14  happened as your client indicated?
15  Q.  Did you seriously consider that as a possibility?
16  A.  I considered it.  I don't know how seriously I
17  considered it.  Because I had worked with Ms. Deveney for
18  years.  I didn't have very much experience with your client,
19  frankly, in her capacity professionally or otherwise.  And I
20  had never had any reason to suspect that Ms. Deveney would
21  have done anything untoward in that regard.
22  Q.  Okay.  So based on Ms. Deveney's character --
23  A.  Well.
24  Q.  -- and your knowledge of her.  The fact that you
25  had worked with her for years.

65

1  A.  Yeah, my inclination would have been to think
2  that, you know, this did not happen the way your client
3  indicated.  And Ms. Deveney indicated to me that, you know,
4  that that had not happened that way.
5  Q.  And so at this point, and this was -- when was
6  this that you went through this consideration process and
7  came to these conclusions that Ms. Conley was being
8  untruthful in her testimony under oath to the Court?
9  MR. LANZILLO:  Objection to form.
10  A.  You know, I never said she was being untruthful.
11  I mean, I was -- I didn't understand really what the -- what
12  the complaint was.
13  Q.  Okay.  Let me just put some boundaries on this.
14  Ms. Conley claimed that the Court summary that she authored
15  and submitted was altered after she submitted it without her
16  knowledge.  Are you aware that she made that allegation?
17  MR. LANZILLO:  Let me enter an objection.  To the
18  extent that you're going to be characterizing --
19  MR. McNAIR:  I'm not characterizing anything.  I'm
20  stating fact.
21  MR. LANZILLO:  Let me finish my objection, please.
22  MR. JOYAL:  No, you're not stating a fact.
23  MR. LANZILLO:  No, and --
24  MR. McNAIR:  Wait until he's done before you start
25  yammering, will you.

66

1  THE WITNESS:  Just come on, gentlemen, please --
2  MR. LANZILLO:  My objection simply is that I don't
3  believe that is an accurate representation of her
4  testimony at the hearing and, therefore, I object
5  on foundational grounds.
6  MR. McNAIR:  Okay.
7  A.  You know, we kind of went round and round and
8  round with her about the documents, and when they were
9  produced, and when they were reviewed, you know.  And it
10  appears -- the gist of it may have been that there had been
11  an alteration or some change made in it at some point in
12  time, but I wasn't really clear.
13  I don't think she ever precisely came out and
14  said, after I signed it, Ms. Deveney changed it and
15  submitted it that way.  You know, that -- it was -- it was
16  unclear, you know.  And, frankly, I wasn't as concerned
17  about that part of what was going on as I was with your
18  client's -- I don't know, I'll be fair here, performance
19  about the fear that she had for some sort of retaliation at
20  her job, and the apparent impact that had on Judge Kelly.
21  That was more troubling to me.  That was more what
22  I was concerned about, than, you know, the mechanics of how
23  this document got changed and whether it was done, you know,
24  inside or outside the normal course of business.
25  Because Ms. Conley had talked about the fact that

67

1  there had been changes suggested and/or made and that she
2  had made them, as I recall.  So there was a lot of stuff
3  going on in this hearing, Mr. McNair, than just this
4  particular issue.  And this was not as big a focus for me as
5  some of the other things.
6  Q.  Well, so, then, it would be inaccurate to say that
7  you accepted Ms. Deveney's word in contrast to Ms. Conley's
8  word.
9  A.  Oh, no, that would be very accurate.
10  Q.  Ms. Deveney was telling the truth; Ms. Conley was
11  not telling the truth.
12  MR. LANZILLO:  Objection.  Vague and ambiguous.
13  MR. JOYAL:  How about --
14  MR. McNAIR:  About the particular issue we've been
15  discussing.  I don't need a speech.
16  MR. JOYAL:  Then why don't we go to the transcript
17  of what your client said.
18  MR. McNAIR:  You can do that.  You'll have your
19  opportunity.
20  MR. JOYAL:  Well, don't --
21  MR. McNAIR:  Don't tell me how to conduct my
22  examination.
23  MR. JOYAL:  Conduct it for the rest of your life,
24  Mr. McNair.
25  MR. McNAIR:  Good, I will.

68

1  MR. JOYAL:  What I'm trying to tell you, is it
2  will come out in the transcript today.  Okay?  So
3  instead of asking questions that are argumentative
4  and objectionable and irrelevant, and will
5  probably be sustained as objections, why don't you
6  ask a straight-out question and either give the
7  witness the opportunity to read the transcript,
8  because he's going to have the opportunity to do
9  it anyway.
10  MR. McNAIR:  Thank you for the practice seminar.
11  BY MR. McNAIR:
12  Q.  Mr. Cauley, you concluded that with regard to the
13  alteration of this case aide summary, Ms. Deveney was
14  telling the truth and Ms. Conley was not; is that fair?
15  MR. LANE:  Objection to form.
16  A.  I believed Ms. Deveney when she told me that she
17  did not falsify the document that was submitted to the Court
18  by altering it after Ms. Conley signed it.  I believed it
19  when she told me, I believe it today.
20  Q.  Now, I think you testified before that as the
21  result of the events of this hearing and those factors that
22  you discussed, there was a meeting of the supervisor or the
23  Agency director and you and some other people?
24  A.  Um-hum.
25  Q.  Do you recall when that meeting occurred, what day

69

1  of the week it was?
2      A.  No.  You know, I couldn't tell you what day of the
3  week.  Let me tell you what happened, okay.
4      Q.  Okay.
5      A.  I remember it was either lunchtime during the
6  course of the hearing or at the end of the day of that
7  hearing, that I was in my office.  And this situation had
8  transpired.  And I had a conversation with Attorney Allgeier
9  about the very unusual circumstances, at least in my
10  opinion, of that hearing.  And that I was troubled by the
11  fact that Mr. Villella had in his possession what appeared
12  to me to be Agency work product that had been obviously
13  inappropriately disseminated to him, at least in my view.
14          And in the course of those discussions,
15  Ms. Allgeier brought to my attention concerns that she was
16  aware of, that I was not, about Ms. Conley's activities in
17  another case or maybe cases, I can't recall for sure,
18  wherein she was suspected of having maybe disseminated
19  confidential information to people not entitled to it.  And
20  we had some discussions about those concerns and how they
21  might be investigated.
22      Q.  Who else participated in that discussion?
23      A.  That was initially just me and Attorney Allgeier,
24  as I recall it.  And I think I was having lunch.  And then
25  based on -- based on the situations that she was involved

70

1  in, that I was unaware of, and the circumstance that I was
2  then involved in with this -- the case dealing with the
3  twins, we spoke to Ms. Liebel.
4      Q.  When was that?
5      A.  It would have been -- the hearing was the 28th of
6  July.  It would have been within a day or so.
7      Q.  The hearing was a Friday.
8      A.  Pardon me?
9      Q.  July 28th was a Friday.
10      A.  Okay.
11      Q.  Is that correct?
12      A.  I think you're right about that, as I remember,
13  yeah.  But it would have been the very first part of next
14  week, probably.
15      Q.  Okay.
16      A.  You know, within a couple of days of the beginning
17  of the week.
18      Q.  Monday, Tuesday, Wednesday?
19      A.  Yeah.  Yeah, I think.
20      Q.  Who spoke to Ms. Liebel?  Did you and Ms. Allgeier
21  both?
22      A.  We may have.  I can't specifically tell you.  You
23  know, I mean, I know that we -- I know that we discussed
24  that with her.  And I know that in the interim she had
25  gotten a letter from Judge Kelly that was very troubling,

71

1  and we talked about that.  And it had to do with your
2  client's, as I characterized it before, performance.  The
3  so-called fear thing that she did there about losing her
4  employment.  And the Judge's letter asking Ms. Liebel to be
5  understanding or sensitive or something.  I can't
6  remember -- I don't remember how she worded it.
7          But I know that there were concerns about the
8  overall impact of this case and how this case went down
9  during that hearing, and the impact that it might have on
10  the Agency and the Court's relationship with the Agency.
11  The whole situation was very troubling.  And we had
12  discussions around that.  And then also around the apparent
13  dissemination of information by your client that she
14  shouldn't have been disseminating.
15      Q.  What information was that?
16      A.  Well, the work product, for example, that found
17  its way into Mr. Villella's hand.  And then the other
18  information that Attorney Allgeier was telling me about in
19  the other case that your client was involved in.  And, you
20  know, I'm reluctant to talk --
21      Q.  What's your understanding of what this information
22  was that Ms. Conley revealed?
23      A.  It was information that was being communicated to
24  Ms. Cosby, something to the effect that either Ms. Schetter
25  or Ms. Deveney had seen some e-mail on your client's desktop

72

1  computer either from or to Ms. Cosby after Ms. Cosby had
2  left the Agency.
3          And I'm not sure of all the particulars of that.
4  Ms. Allgeier knows much more about it than I do.  But other
5  information that was coming to people in another case.  And
6  I don't want to use the name because, again, I feel
7  constrained by the confidentiality provisions of the law
8  that I think still apply to me.  But it was -- you know, you
9  know which case I'm talking about.
10      Q.  I believe that would be the -- we could call that
11  the VW case.
12      A.  That could be the one, yeah.
13      Q.  Okay.
14      A.  You know, the -- that people were getting access
15  to information about that case and allegations against Ms. W
16  that they wouldn't have otherwise been privy to had your
17  client not disseminated it.  At least that was the way it
18  was looking.
19          So we had some discussions around those things.
20  And then made some determinations to advise the County and
21  to, consistent with the County's computer usage policy,
22  access your client's e-mails.  That happened in early
23  August.  Maybe the 1st, 2nd, 3rd or 4th of August, sometime
24  in there.
25          MR. LANZILLO:  Tim, I'm sorry, before you ask your

73

1  next question, can we go off the record for a
2  moment?
3  MR. McNAIR: Sure.
4  (Discussion held off the record.)
5  MR. LANZILLO: On the short break, I asked for
6  Counsels' professional courtesy of allowing me to
7  excuse myself from the deposition due to an
8  irreconcilable conflict. All Counsel agreed that
9  Attorney Joyal and Attorney Lane could object on
10  my behalf to any question, and that any objections
11  they should lodge would be deemed to be on my
12  behalf as well. And I appreciate that
13  accommodation from everyone.
14  MR. McNAIR: I'm in agreement with that.
15  MR. LANZILLO: Thank you.
16  MR. ONORATO: You may want to add about redirect.
17  MR. LANZILLO: Right. If there would be
18  something -- in the unlikely event there would be
19  something that I felt was necessary to inquire
20  into on behalf of the County, I reserve the right
21  to briefly reconvene the deposition at a
22  mutually-convenient time, mutually convenient, of
23  course, for the witness and for counsel. I don't
24  anticipate that, but I would like to reserve that
25  right.

74

1  MR. McNAIR: I will agree to do that
2  notwithstanding the discovery deadline.
3  MR. LANZILLO: Thank you.
4  MR. McNAIR: As long as everybody else is in
5  agreement. If they have an objection, they should
6  say so.
7  MR. JOYAL: I have no objection.
8  MR. LANE: No objection.
9  MR. LANZILLO: Thank you.
10  BY MR. McNAIR:
11  Q. The concern -- the issue that concerned
12  Ms. Allgeier was an allegation by Ms. Conley that a
13  caseworker, who we'll refer to as PW, roughly treated a
14  child that she was the caseworker for and that there was
15  subsequently a DPW investigation of that incident. Is that
16  a fair statement?
17  A. No.
18  Q. It's not?
19  A. No. Ms. Allgeier's concern wasn't that. Her
20  concern was that apparently your client may have been
21  furnishing information about that matter to people that were
22  not entitled to know about it, in violation of the Child
23  Protective Services Law.
24  Q. And do you have any idea who those people were?
25  A. No, not off -- not offhand. People associated

75

1  with the VW case.
2  Q. Okay.
3  A. But, again, I wasn't involved in that case.
4  Q. All right. I'm just --
5  A. You know, she was. She was working that case.
6  Q. So it was Allgeier's concern, to your
7  understanding, was that Abby may have said something to
8  people who were not entitled to information about her
9  allegations regarding PW.
10  A. Correct.
11  Q. Okay. And is it an Agency policy that the parent
12  of a child who is under Agency jurisdiction is not entitled
13  to know if a worker has observed a coworker treating that
14  child roughly, that the parent shouldn't be told about that?
15  A. No.
16  Q. That's not your -- you don't agree with that?
17  A. It's not our policy. It wasn't the Agency's
18  policy that that would be the situation.
19  Q. Okay. Well, that was a concern, wasn't it? You
20  thought that Abby had told the mother of that child about
21  what had happened.
22  MR. JOYAL: Objection to form.
23  MR. LANE: Join in.
24  A. I told you before, I don't know who --
25  MR. JOYAL: Excuse me. Excuse me. It's not

76

1  cross. He's not a party. He hasn't been
2  determined to be a hostile witness. He's your
3  witness. It is not cross.
4  MR. McNAIR: What's the problem with the form?
5  MR. JOYAL: Objection to form. It's a leading
6  question.
7  MR. McNAIR: I'm permitted, under Rule 30, to ask
8  leading questions.
9  MR. JOYAL: Of whom?
10  MR. McNAIR: Read it. Of anybody. Read it.
11  MR. JOYAL: I don't believe so, Mr. McNair.
12  MR. McNAIR: Well, I believe you're wrong. And if
13  you want to take a break --
14  MR. JOYAL: Well, I'm objecting to form --
15  MR. McNAIR: -- you can read Rule 30. You're in
16  federal court. Do you understand that?
17  MR. JOYAL: Mr. McNair --
18  MR. McNAIR: We have a federal rule.
19  MR. JOYAL: -- I've objected to this question.
20  The Judge will --
21  MR. McNAIR: Well, it's a baseless objection. It
22  doesn't make any sense, and it's calculated to
23  disrupt my examination of the witness.
24  MR. JOYAL: I've made my objection. The Judge
25  will rule.

77

1    MR. McNAIR: And it's suggestive.
2    MR. JOYAL: It's suggestive? You suggested the
3    answer to the question. He gave you a no. Then
4    you asked him a leading question again. You want
5    to read the questions back?
6    MR. McNAIR: Do you want to let me conduct the
7    deposition?
8    MR. JOYAL: The question was, it wasn't your
9    concern, it was your concern.
10   MR. McNAIR: Okay.
11   BY MR. McNAIR:
12   Q. Was the concern that Abby had told the mother
13   about the incident that she alleged to have observed that
14   led to the DPW investigation?
15   A. The concern, as I understood it, was that there
16   were other people, and by that I mean in addition to the
17   mother, who learned of this information that were not
18   entitled to it. I don't believe there was any concern that
19   Ms. Conley had had conversation with the mother about it. I
20   mean, that's not coming back to me at all. We're talking
21   about other people that would not have been entitled to know
22   that this allegation of abuse had been reported and was
23   being investigated.
24   Q. And do you know who these other people were?
25   A. Not off -- no, I don't recall. I wasn't involved

78

1    in the case. There were people that were players in the VW
2    case that Ms. Allgeier would have known about that I
3    wouldn't have known about.
4    Q. All right. Were there any other concerns that
5    were raised concerning Ms. Conley in this meeting? Or let
6    me withdraw that. Initially, there was a meeting about the
7    events of the July 28th hearing. Am I correct that that
8    meeting turned into a meeting about Ms. Conley specifically
9    as opposed to the other concerns that you listed?
10   A. No. No.
11   Q. What action was taken with regard to the other
12   concerns as a result of that meeting aside from deciding to
13   snoop through Ms. Conley's e-mail?
14   MR. JOYAL: Objection.
15   MR. LANE: Objection to form.
16   MR. McNAIR: What's wrong with the form?
17   MR. LANE: I don't like the word snoop.
18   MR. McNAIR: You don't like the word snoop.
19   There's a lot of words I don't like that other
20   lawyers use them.
21   MR. LANE: I can still object to it if I don't
22   like it. Don't ask me what the basis of my
23   objection is if you don't want to hear it.
24   MR. McNAIR: Fine.
25   A. I wouldn't characterize what transpired there as

79

1    snooping, you know, so.
2    Q. I'm not going to argue with you about that.
3    A. Okay.
4    Q. Okay.
5    A. What other --
6    Q. What action was taken other than to decide to root
7    through Abby's e-mails or regarding investigating
8    Ms. Conley?
9    MR. JOYAL: Objection to form.
10   Q. Was there action taken with regard to these other
11   concerns about the press attending the hearing, about the
12   Judge being hostile?
13   A. Well, we had some discussions about, you know, why
14   the Judge reacting -- was reacting the way she was reacting.
15   We had some discussions about the Judge's perception, as she
16   outlined it in the letter that she sent to Ms. Liebel about
17   how to best address that.
18   I think Ms. Liebel made a determination that she
19   wanted to speak to Judge Kelly about that. And at some
20   point down the road I believe that she did. I wasn't privy
21   to that. So I don't -- I wasn't there. I believe that
22   maybe there was a discussion. I don't know.
23   You know, we were concerned, obviously, since
24   Judge Kelly was hearing all of our cases, that, you know,
25   this just -- it was not a good thing for her to be

80

1    thinking of the Agency in the terms that were being
2    proffered by your client. So, yeah, I mean, those things
3    were looked at.
4    Q. Okay.
5    A. And then we made the decision to advise
6    representatives of the County that we wanted to do further
7    review to see if we could document whether or not there was
8    improper dissemination coming out of your client's office.
9    So we spoke to Mr. Onorato, I believe Ms. Bloxdorf was
10   involved at some point early on in those discussions.
11   I think Ms. Liebel; Attorney Allgeier; myself;
12   Colleen Locke, who was the deputy director. Charlene
13   Kolupski, who was a program director who oversaw our
14   personnel functions in-house, was involved in some of that
15   also. And we suggested to the County that we should look at
16   the e-mails consistent with the computer usage policy. And
17   that was approved --
18   Q. Okay.
19   A. -- by Mr. Onorato. And then we asked Mr. Granger
20   to pull the e-mails, which he did.
21   Q. What e-mails were you aware of prior to this
22   meeting in the first week of August? What had you been told
23   about e-mails from Ms. Conley? What was it specifically
24   that led you to look to e-mails?
25   A. Attorney Allgeier recounted to me that she had

81

1  been told by somebody, and I want to say maybe Ms. Schetter
2  or maybe Ms. Deveney, that they had seen some sort of e-mail
3  transmission on Ms. Conley's computer screen at her work
4  station between -- between Ms. Conley and Ms. Cosby.
5          And there was also some other -- some other piece
6  of that information about somehow Ms. Cosby's phone number
7  being made available to Ms. -- to VW's lawyer. I don't
8  remember how that all pulled together. You know, I'm doing
9  the best I can from memory here. That was part of it in
10 terms of is she leaking information out of here that she's
11 not supposed to be getting.
12     Q.  What was it that led you to be concerned that she
13 was leaking information?
14     A.  What I've already told you.
15     Q.  Villella having the Court summary.
16     A.  We have that. We have this contact with
17 Ms. Cosby. Something about the phone number to VW's lawyer.
18 And then other people associated or not associated with her
19 entitled to the information about the abuse allegations
20 against PW, getting that information, that they were still
21 associated with the VW case.
22     Q.  And did -- never mind. Okay. Was there any
23 discussion at that meeting, in light of Judge Kelly's
24 letter, about Ms. Conley's continued employment with the
25 Agency?

82

1      A.  At the first meetings in August, you mean?
2      Q.  Yeah.
3      A.  No.
4      Q.  No thought of terminating Ms. Conley's employment
5  at that time?
6      A.  No.
7      Q.  What was the point of the investigation, then?
8      A.  We wanted to see if she had been -- if it could be
9  documented that she had been disclosing confidential
10 information to people that were not entitled to it. It
11 appeared that maybe that is what was going on.
12     Q.  Do you know whether that matter had been discussed
13 between Ms. Conley and her supervisor earlier that year?
14         MR. JOYAL:  What matter is that?
15         MR. McNAIR:  E-mail, disclosing information
16 through e-mail.
17     Q.  Do you know if she had a discussion with
18 Ms. Deveney on July 8th or so?
19     A.  Well, I didn't know then.
20     Q.  Ms. Deveney didn't tell you, oh, I've already
21 talked to Abby about that?
22     A.  No.
23     Q.  Don't worry, she knows?
24     A.  No. I didn't know any of that in August of
25 '04.

83

1      Q.  You later learned, did you not, that Ms. Deveney
2  had spoken to Ms. Conley about that issue early in July, did
3  you not?
4      A.  I later learned that Ms. Deveney, and I think also
5  Ms. Biroscak, who was Ms. Deveney's supervisor, pretty sure,
6  had had some discussions with Ms. Conley about maintaining
7  confidentiality of information and not disseminating it. I
8  don't know that it was specific to e-mail as opposed to
9  dissemination in any other form.
10         But I was aware that in -- in June and maybe --
11 maybe June and in July of '04 that those conversations had
12 happened. You know, I wasn't aware of the particulars of
13 them. I didn't learn about that until, you know, frankly,
14 probably -- I probably didn't learn about that until after
15 your client resigned.
16     Q.  So you weren't aware of that prior to August 20th?
17     A.  I don't recall that I was, Mr. McNair. It seems
18 to me that I didn't learn about that until after your client
19 resigned and then appealed to the Civil Service Commission.
20 And I think in connection with looking at that stuff, that's
21 when I first learned about that.
22     Q.  All right.
23     A.  That's recollection. That's my best answer.
24     Q.  So the e-mail from Ms. Deveney to Ms. Conley
25 wasn't provided to you by Mr. Granger, the e-mail of

84

1  July 9th; is that correct? Mr. Granger missed that one?
2      A.  Well, you know, maybe it was. Probably was.
3  Yeah. Yeah, you know, it probably -- yeah, it was, I
4  remember that now. I would have looked at that during the
5  month of August when I looked at all those other e-mails.
6  I'm sorry, I wasn't focusing on that.
7          (Cauley Deposition Exhibits 1 and 2 marked for
8  identification.)
9      Q.  Anyway, you submitted a report under date of
10 August 20th, '04. And I've handed you a document that I've
11 marked as Cauley Deposition Exhibit 1, which has a letter
12 addressed to John Onorato, Esquire on top, dated
13 August 2004. And I can represent to you that this is --
14 been represented to me to be some, but not all, of the
15 information that you submitted with that letter. That is,
16 there's other information that I was provided that I didn't
17 include in the exhibit. Are you familiar with that
18 document?
19     A.  Yeah, the letter is clearly mine. I'm just
20 looking at the attachments, Mr. McNair, particularly in view
21 of what you -- what you just said. And I'm not sure what
22 you're referring to. But I --
23     Q.  I have the entire document here, if you want to
24 look at it --
25     A.  Well, that's --

81

1  been told by somebody, and I want to say maybe Ms. Schetter
2  or maybe Ms. Deveney, that they had seen some sort of e-mail
3  transmission on Ms. Conley's computer screen at her work
4  station between -- between Ms. Conley and Ms. Cosby.
5       And there was also some other -- some other piece
6  of that information about somehow Ms. Cosby's phone number
7  being made available to Ms. -- to VW's lawyer. I don't
8  remember how that all pulled together. You know, I'm doing
9  the best I can from memory here. That was part of it in
10 terms of is she leaking information out of here that she's
11 not supposed to be getting.
12      Q.  What was it that led you to be concerned that she
13 was leaking information?
14      A.  What I've already told you.
15      Q.  Villella having the Court summary.
16      A.  We have that. We have this contact with
17 Ms. Cosby. Something about the phone number to VW's lawyer.
18 And then other people associated or not associated with her
19 entitled to the information about the abuse allegations
20 against PW, getting that information, that they were still
21 associated with the VW case.
22      Q.  And did -- never mind. Okay. Was there any
23 discussion at that meeting, in light of Judge Kelly's
24 letter, about Ms. Conley's continued employment with the
25 Agency?

82

1       A.  At the first meetings in August, you mean?
2       Q.  Yeah.
3       A.  No.
4       Q.  No thought of terminating Ms. Conley's employment
5  at that time?
6       A.  No.
7       Q.  What was the point of the investigation, then?
8       A.  We wanted to see if she had been -- if it could be
9  documented that she had been disclosing confidential
10 information to people that were not entitled to it. It
11 appeared that maybe that is what was going on.
12      Q.  Do you know whether that matter had been discussed
13 between Ms. Conley and her supervisor earlier that year?
14      MR. JOYAL:  What matter is that?
15      MR. McNAIR:  E-mail, disclosing information
16         through e-mail.
17      Q.  Do you know if she had a discussion with
18 Ms. Deveney on July 8th or so?
19      A.  Well, I didn't know then.
20      Q.  Ms. Deveney didn't tell you, oh, I've already
21 talked to Abby about that?
22      A.  No.
23      Q.  Don't worry, she knows?
24      A.  No. I didn't know about any of that in August of
25 '04.

83

1       Q.  You later learned, did you not, that Ms. Deveney
2  had spoken to Ms. Conley about that issue early in July, did
3  you not?
4       A.  I later learned that Ms. Deveney, and I think also
5  Ms. Biroscak, who was Ms. Deveney's supervisor, pretty sure,
6  had had some discussions with Ms. Conley about maintaining
7  confidentiality of information and not disseminating it. I
8  don't know that it was specific to e-mail as opposed to
9  dissemination in any other form.
10      But I was aware that in -- in June and maybe --
11 maybe June and in July of '04 that those conversations had
12 happened. You know, I wasn't aware of the particulars of
13 them. I didn't learn about that until, you know, frankly,
14 probably -- I probably didn't learn about that until after
15 your client resigned.
16      Q.  So you weren't aware of that prior to August 20th?
17      A.  I don't recall that I was, Mr. McNair. It seems
18 to me that I didn't learn about that until after your client
19 resigned and then appealed to the Civil Service Commission.
20 And I think in connection with looking at that stuff, that's
21 when I first learned about that.
22      Q.  All right.
23      A.  That's recollection. That's my best answer.
24      Q.  So the e-mail from Ms. Deveney to Ms. Conley
25 wasn't provided to you by Mr. Granger, the e-mail of

84

1  July 9th; is that correct? Mr. Granger missed that one?
2       A.  Well, you know, maybe it was. Probably was.
3  Yeah. Yeah, you know, it probably -- yeah, it was, I
4  remember that now. I would have looked at that during the
5  month of August when I looked at all those other e-mails.
6  I'm sorry, I wasn't focusing on that.
7       (Cauley Deposition Exhibits 1 and 2 marked for
8         identification.)
9       Q.  Anyway, you submitted a report under date of
10 August 20th, '04. And I've handed you a document that I've
11 marked as Cauley Deposition Exhibit 1, which has a letter
12 addressed to John Onorato, Esquire on top, dated
13 August 2004. And I can represent to you that this is --
14 been represented to me to be some, but not all, of the
15 information that you submitted with that letter. That is,
16 there's other information that I was provided that I didn't
17 include in the exhibit. Are you familiar with that
18 document?
19      A.  Yeah, the letter is clearly mine. I'm just
20 looking at the attachments, Mr. McNair, particularly in view
21 of what you -- what you just said. And I'm not sure what
22 you're referring to. But I --
23      Q.  I have the entire document here, if you want to
24 look at it --
25      A.  Well, that's --

85

1    Q.   -- to refer to it.  What I've omitted are some
2    term papers that Abby had on her -- stored on her hard
3    drive, basically.
4    A.   Okay.  Yeah, I remember that part of it.  And then
5    there's all this other stuff.  Okay.
6    Q.   Okay.
7    A.   Yeah, this appears to be --
8    Q.   So this was the product of the investigation that
9    was launched at that meeting in early August; is that fair?
10   A.   Yes.
11   Q.   To your knowledge, did Ms. Allgeier conduct any
12   investigation of her own or submit any report of any such
13   investigation?
14   A.   To Mr. Onorato?
15   Q.   To anyone.
16   A.   I think that she prepared a memorandum for
17   Mr. Taft in connection with the Civil Service appeal.  You
18   know, I'm pretty sure.
19   Q.   Okay.  Because I can represent to you that no such
20   document has been identified to us or noted to be privileged
21   in any way.
22        MR. JOYAL:  What document?  I was reading this.  I
23   didn't listen.
24        MR. McNAIR:  Reports of investigation.
25        MR. JOYAL:  From who?  Allgeier?

86

1    A.   I don't know -- I don't know that she did --
2    Q.   I'm just saying.
3    A.   -- an investigation, per se.  I think she did a
4    summary of what she -- what happened with her case.
5    Q.   And what was her case that you're referring to?
6    A.   The VW situation.
7    Q.   Okay.  All right.  To what extent did Mr. Onorato
8    directly participate in your investigation?
9    A.   He participated in the meetings that -- there were
10   a couple meetings, as I recall.  One in early August, maybe
11   around the 2nd, that I told you about when --
12   Q.   You met with the County officials.
13   A.   When we met with the County officials and
14   expressed our concerns about, you know, what was going on.
15   You know, as far as the hearing had been and as far as these
16   other concerns about possible disclosure of information.
17   And then he indicated it would be appropriate to review the
18   e-mails, which we did.  And then having done that, we got
19   back together, again, I believe a couple of days before
20   this, of August 20th.  And we sat down again, and I laid out
21   for him --
22        MR. LANE:  Can I put something on the record here,
23        because Mr. Lanzillo is not here, and I'm just a
24        little uncomfortable at this point.  I can't
25        instruct this witness not to answer questions

87

1    because he's not my client.  Mr. Lanzillo's not
2    here and it's kind of not fair to him.
3         But I want to at least put on the record that
4    we're getting into areas now where there are
5    meetings with the County Solicitor potentially
6    seeking legal advice which could be protected by
7    the attorney/client privilege.
8         Mr. Lanzillo is not here to protect the
9    County's interest and preserve the attorney/client
10   privilege.  It's not my client's privilege to
11   protect, so I can't protect the attorney/client
12   privilege, it's the County's --
13        MR. McNAIR:  Well, let me just go this way.  I'm
14   not trying to be tough or tricky.  If you think --
15   you know, I'll give you standing to object to any
16   privilege that the County may have.  That applies
17   to you, Mr. Lane.
18        So if you think there's a privilege problem,
19   I would appreciate it if you would raise it,
20   because it's certainly not my intention to take
21   advantage of my friend Rich's absence from this
22   proceeding.  And if that's what I'm doing, thank
23   you for bringing it to my attention.  I consider
24   that very serious.  And if that's what I'm doing,
25   I want to know.  I don't want to do that.  Okay?

88

1         MR. LANE:  Yeah, and I'm not accusing you of doing
2    anything.
3         MR. McNAIR:  No.
4         MR. LANE:  I know the witness is trying to be
5    helpful, and I want to lay it out there that
6    communications --
7         MR. McNAIR:  Right.
8         MR. LANE:  -- between the County employees and
9    Mr. Onorato are protected by privilege.
10        MR. McNAIR:  Well, I'm not sure who is the lawyer
11   in that situation.  But I think either side has
12   the right to raise the privilege.
13        MR. JOYAL:  Well, to the extent, as well, that
14   there may be conversations between Mr. Taft and
15   employees of the County regarding that and
16   Mr. Taft --
17        MR. McNAIR:  And I haven't asked about any
18   conversations with Mr. Taft.
19        MR. JOYAL:  I'm just raising it so that it doesn't
20   come up.
21        MR. McNAIR:  I know, and that's why I gave
22   Mr. Lane -- I said I would agree to his stating.
23   I don't think you have standing to raise that
24   objection, and I would appreciate you keeping your
25   yap shut.

89

1    MR. JOYAL: Well, I think, Mr. McNair, if we go
2    back on the record, you gave --
3    MR. McNAIR: We're on the record.
4    MR. JOYAL: -- both of us standing on behalf of
5    Mr. Lanzillo's --
6    MR. McNAIR: I think that I limited that to
7    Mr. Lane.
8    MR. JOYAL: I mean, it doesn't matter, Mr. McNair.
9    You can do whatever you want.
10   MR. LANE: Anyway, raising an objection and
11   instructing the witness not to answer are two
12   different things. You know, I don't --
13   MR. McNAIR: I would hope that we would not get to
14   that point, okay.
15   MR. LANE: Where I have to instruct him not to
16   answer --
17   MR. McNAIR: If you would feel that it would be
18   appropriate for Mr. Lanzillo to make such an
19   instruction, let me know, because I don't want to
20   cross that line.
21   MR. LANE: Then I would simply think that
22   Mr. Lanzillo would instruct the witness not to
23   reveal --
24   MR. McNAIR: And I think that the witness has kind
25   of gone beyond my question. So why don't we just

90

1    end the response to that question right there.
2    MR. LANE: That's fine.
3    MR. McNAIR: Let me ask another one, and we'll see
4    if we can get this done.
5    BY MR. McNAIR:
6    Q.  I had asked you about Mr. Onorato's direct
7    participation in the investigation. I know that you did a
8    lot of the legwork here. You read through 2000 e-mails or
9    so and you made this report and put these documents
10   together. Do you know whether or not Mr. Onorato reviewed
11   all those e-mails?
12   A.  I believe that he did not.
13   Q.  Okay. And do you know whether or not Mr. Onorato
14   talked to any of the witnesses to any of these events in
15   connection with this investigation?
16   A.  To the extent that you're asking me if he
17   conducted the investigation, my understanding, my belief is
18   that he did not. He received the results of what I did.
19   Q.  Okay.
20   A.  Okay.
21   Q.  And for purposes of Mr. Onorato's decision-making
22   or actions thereafter, would it be fair to say that
23   Mr. Onorato did not independently verify the information
24   that you provided in your report but relied upon the -- your
25   conclusions and findings in your report?

91

1    MR. LANE: Objection to form. Requires
2    speculation.
3    A.  Yeah, I wouldn't know the answer to that. He may
4    have or he may not have.
5    Q.  To your knowledge, he didn't, though, right? Or
6    did he?
7    A.  Not as far as I know.
8    Q.  I'm just asking you what you know.
9    A.  Not as far as I know. I have no reason to believe
10   that he did another investigation after I did.
11   Q.  You state that, "BAC reproduced the entire
12   employees received and deleted e-mails for the period 1/1/04
13   to 8/12/04."
14   A.  Yeah.
15   Q.  And is that based on the representation of BAC
16   that those were all of those e-mails?
17   A.  Right. That's what I asked them to do and that's
18   what they told me they had done.
19   Q.  Okay.
20   A.  The e-mails and some Word documents also.
21   Q.  Were any other documents on the hard drive copied?
22   A.  Other than?
23   Q.  Word documents. Were there other -- I don't know.
24   A.  That's what I was told. You know, I don't know,
25   Mr. McNair, to the best I can answer.

92

1    Q.  Get to -- you concluded, general review. What do
2    you mean by "general review"?
3    A.  What are you referring to?
4    Q.  Page 2, second full paragraph, first sentence.
5    A.  Having gone through essentially, Mr. McNair, what
6    was a file drawer, probably about this long (indicating) of
7    e-mails, that's what I meant by a general review.
8    Q.  There's that many e-mails?
9    A.  That's what was printed out for me.
10   Q.  I mean, we requested those to be produced, and
11   they weren't. Once again.
12   A.  I'm just --
13   Q.  No, I'm just, I'm sorry --
14   A.  -- telling you what I read, sir.
15   Q.  You know, we've had some difficulty in getting
16   some discovery in this case, and it just keeps going on.
17   A.  But it was a review of --
18   Q.  2000 e-mails, give or take.
19   A.  Probably a couple thousand e-mails, yeah.
20   Q.  And you said there was a pattern of improper use
21   of the computer; first, using it as an instant messenger to
22   maintain discussions with Deanna Cosby. Business related --
23   second, business-related discussions. And data storage. Is
24   it safe to say those are three violations of the computer
25   usage policy that you identified as a result of your

93

1 examination of e-mails?
2    A. Yeah, I said -- you know, it was -- it was sort of
3 an instant messenger type. I mean, not a pure instant
4 message arrangement with Ms. Cosby, but they went back and
5 forth, you know, several times during the day.
6    Q. I think I know what you mean. Ed and I do that.
7    A. So business-related as opposed to not
8 employment-related discussions. And she used her County
9 computer to store some of her educational stuff and/or to
10 work on it or whatever, it was there. So, I mean, that
11 was -- that was the computer usage policy which frankly was,
12 you know, not a big deal in the overall scheme of things,
13 but.
14    Q. Okay.
15    A. This was generated -- this was generated for
16 Mr. Onorato to summarize, if you will, the areas of concern,
17 you know, some obviously more serious than others.
18    Q. Now, there's a heading called Item No. 1, breach
19 of confidentiality. And you state, "Unbeknownst to the
20 mother, the Agency had obtained a prognostic detention
21 order allowing placement of her newborn at the time of
22 birth."
23    A. Um-hum.
24    Q. How do you know that the mother didn't know about
25 that?

94

1    A. Your client said she didn't know.
2    Q. How do you know my client knew whether or not she
3 knew?
4    A. I'm just taking her at what she said. She told
5 Ms. Cosby that the mother didn't see it coming.
6    Q. I understand.
7    A. So I'm just taking her at what she said.
8    Q. Did you take any other steps other than relying on
9 my client's good word to determine whether that statement
10 was true?
11    A. I didn't.
12    Q. For example, did you talk to the mother?
13    A. No.
14    Q. Did you talk to the mother's attorney?
15    A. No.
16    Q. Did you talk to the children's attorney?
17    A. No.
18    Q. Did you talk to anybody to determine whether or
19 not the mother actually knew about that?
20    A. No.
21    Q. Did you review the case file involved of VW?
22    A. No. Let me --
23    Q. Do you know --
24    A. Let me be as precise as I can about the answer to
25 that question. I never reviewed the quote/unquote case

95

1 file.
2    Q. Okay.
3    A. In the VW case. I looked at some of the documents
4 from the Court record, the prognostic detention order, the
5 letter requesting it, some of the pleadings, the initial
6 pleadings in the case, you know, at some point in time. I
7 don't know whether before or after this document was
8 generated. So I -- you know, I want to be as precise as I
9 can when I answer your question.
10    Q. All right. But your review of whatever documents
11 you reviewed in the case files involving VW didn't give to
12 you any idea that VW knew that her unborn child was going to
13 be detained at birth?
14    A. No, I wouldn't -- no, I had no reason to look at
15 that. On June 4th, your client sent an e-mail to Ms. Cosby
16 telling her that the mother essentially did not know it.
17    Q. And --
18    A. So. No, I didn't go beyond that at all.
19    Q. I mean, are you willing to stipulate that my
20 client is omniscient? Okay. You didn't go beyond that?
21    A. I don't know. I don't think I am, no.
22    Q. Okay, I didn't think you would be. Okay. So
23 when you make this statement, "Unbeknownst to the mother,"
24 that really should say according to Ms. Conley, unbeknownst
25 to the mother.

96

1    A. No. No. Your client said that. And the normal
2 course of business that we follow at the Agency in obtaining
3 a prognostic detention order would have been to do it ex
4 parte without notice.
5    Q. Would anybody be surprised that you got that order
6 in this particular case?
7       MR. LANE: Objection to form.
8    A. I have no idea. I don't have to answer that.
9    Q. Would it be unfair to say that in virtually every
10 case similar to the VW case, the Agency would move for a
11 detention hearing?
12    A. You can't say that.
13    Q. Okay.
14    A. Every case is not the same. You know.
15    Q. I understand.
16    A. You do it case by case.
17    Q. All right. And what was it in your review of the
18 e-mail that led you to believe that Ms. Conley had seen a
19 copy of that order?
20    A. There was nothing in the e-mail that led me to
21 specifically believe that she had seen a copy of the order.
22 What she said was that the caseworker had obtained the
23 prognostic detention order and that she had disseminated it
24 to all the local hospitals, which would have been our
25 practice, and that VW did not see it coming. Whether she

**97**

1  actually saw the order or not was irrelevant to me.  She was
2  disclosing the existence of it.
3      Q.  The --
4      A.  And the fact that it had been disseminated to the
5  hospitals, and as Ms. Cosby would well know, in an effort to
6  ensure that if the child were born at a local hospital, the
7  child would be removed from the care of the mother at that
8  time.
9      Q.  Right.  And that's something that the Agency has
10  done in hundreds of cases over the past years, several
11  years.
12      A.  I don't know as I would say hundreds.  Many.
13  Dozens, at least.
14      Q.  Do you recall any instance -- do you recall any
15  instance where a Court has denied an Agency request for such
16  an ex parte prognostic detention order?
17      A.  No.
18      Q.  Never -- there's never been one denied, has there?
19      A.  I'm not aware that there ever has been.
20      Q.  And you don't believe it's over 100 cases that
21  this has been done in over the last ten years; maybe a dozen
22  or so?
23      A.  Over the last ten years, over 100?
24      Q.  Yeah.
25      A.  Oh, yeah, I would say probably.

**98**

1      Q.  Okay.
2      A.  That may be low.  I mean, I really don't know,
3  Mr. McNair.
4      Q.  Okay.
5      A.  There's a lot of them.  I'm not going to say that
6  there's not.
7      Q.  And what is it that makes you believe that VW
8  wouldn't know that this order is going to be entered in her
9  case?
10      (Discussion held off the record.)
11      A.  The only thing that I can specifically point to in
12  this case, other than what I've already told you, which is
13  that we didn't give her any notice and didn't give her
14  lawyer any notice, and that we wouldn't normally tell her,
15  is that according to your client, in her e-mail to
16  Ms. Cosby, VW was advised by her counsel that the Agency
17  couldn't and wouldn't get a detention order.  So that also.
18      Q.  Okay.  And you know who VW's attorney was --
19      A.  Sure.
20      Q.  -- at the time.  Amy Jones.
21      A.  Yes.
22      Q.  And do you know whether there has been any other
23  cases where Amy Jones has been representing a parent where
24  there's been such an order entered?
25      A.  I don't know one way or the other.  I don't

**99**

1  recall.
2      Q.  All right.  And was Ms. Jones a neophyte in this
3  business?
4      A.  No.
5      Q.  She was experienced, had handled numerous cases.
6      A.  I don't know as I would characterize it as
7  numerous.  Her experience was more in the termination area.
8  She had done some dependency cases in my experience, not a
9  whole lot of them.  She had done a lot more work in
10  termination trials representing children and parents.  But
11  in that context would have become well familiar with the
12  procedure.
13      Q.  And is that the kind of advice that you would have
14  expected Ms. Jones to give to her client?
15      A.  I don't know.
16      Q.  In light of your experience?
17      A.  I don't know.  I mean --
18      Q.  Okay.  So you believed --
19      A.  I don't know -- I don't know -- Mr. McNair, I
20  don't know enough about the facts of the VW -- I'm sorry,
21  the VW case to be able to tell you whether the prognostic
22  detention order -- whether I would have agreed that it was
23  suitably sought.  I don't -- you know, I didn't know.  I
24  wasn't involved in it.  I don't know.  And I still don't.
25      Q.  Do you recall a case where a woman has two

**100**

1  children in placement and becomes pregnant where you did not
2  seek a prognostic detention order that you were involved in?
3      A.  To give you a name, not specifically, no.  But I
4  know that there have been cases where we have not, sure.
5      Q.  All right.
6      MR. JOYAL:  Without trying to limit Mr. McNair or
7      Mr. Angelone's examination of this witness, it's
8      20 minutes of 1:00.  Mr. Onorato is scheduled to
9      be deposed at 1:00.  I don't know how much longer
10      you guys have with him.  But I'm going to
11      represent to you that I'm going to have at least
12      an hour and a half with him.
13      So my suggestion is that if this is going to
14      go on much longer and there's going to be
15      redirect, that either a decision be made as to
16      whether Mr. Onorato sticks around here or whether
17      we bring in dinner, because we may be here all
18      night.
19      MR. LANE:  Well, here's the catch.  Mr. Onorato
20      has to leave at 4:20.  His depo was scheduled for
21      1:00.  And there was another depo scheduled for
22      3:00 so I think -- or 3:30, it was reasonable for
23      him to presume that he could make his appointment
24      at 4:30.  So that's the other catch.
25      (Discussion held off the record.)

101

1     (Recess held from 12:40 p.m. to 1:30 p.m.)
2     MR. JOYAL: I'm going to put on the record that
3   Mr. Knox came in. He's the County Solicitor.
4   BY MR. McNAIR:
5     Q.  Before the break we were talking about your
6   August 20th letter to John Onorato, your investigation of
7   the allegations against Ms. Conley. In that first paragraph
8   under the heading, Item No. 1, breach of confidentiality,
9   you say, "According to Attorney Allgeier, the mother had
10  made statements to the effect that she might flee the
11  jurisdiction with this child at birth or shortly thereafter
12  if the Agency was indicating it might place the child." Do
13  you see that in there?
14    A.  Um-hum.
15    Q.  Did you have any other source of that information
16  than Attorney Allgeier?
17    A.  At some point in time, and I don't know whether it
18  was when this memo was written or after that, I believe
19  there was actually an e-mail that referenced that, that your
20  client made. That's by recollection. That's the best I can
21  tell you, but I think that there's -- or maybe -- maybe
22  not -- no. Maybe not an e-mail. Maybe something in the
23  case record that Mrs. Conley had prepared as part of her
24  duties as a case aide. Somewhere. There was something in
25  writing. And I can't remember which, Mr. McNair.

102

1     Q.  Okay. And did you ever ask VW whether or not that
2   was her intention?
3     A.  I never spoke to VW.
4     Q.  Is there a reason why?
5     A.  Yeah. She was a party in a case to which we were
6   adverse to her, and she was represented by counsel.
7     Q.  Okay. And you didn't speak to VW's counsel or ask
8   her to let you talk to her client about this particular
9   issue.
10    A.  I did not.
11    Q.  Do you know whether or not VW's telephone number
12  was listed?
13    A.  No.
14    Q.  Do you know whether or not VW's Erie attorney's
15  telephone number was listed?
16    A.  I would presume that Ms. Jones had a phone listing
17  that would be available to the public, but I never checked.
18    Q.  Now, you state that, "The disclosure of the
19  existence of the prognostic detention order is a clear
20  violation of Agency confidentiality policy." Can you
21  indicate to me where in the confidentiality policy makes
22  that releasing information concerning matters of record to
23  be a violation.
24    A.  Well, the confidentiality policy of the Agency,
25  which is -- which, you know, there are a couple of them

103

1   attached, speaks to the obligation of staff to keep
2   confidential those things that are going on within the
3   confines of the Agency generally. That was what I was
4   referring to.
5     Q.  Can you refer me to the part of the policy that
6   you believe was violated.
7     A.  I think the entire policy was violated by the
8   disclosure of a confidential Court order that an Agency
9   employee knew full well was confidential and that she
10  disclosed in a way to completely undermine the efforts of
11  the Agency to keep that child safe.
12    Q.  So the answer is then you cannot identify a
13  particular provision of the confidentiality policy you
14  allege Ms. Conley violated.
15    A.  She violated the Agency's policy of keeping
16  confidential those things that are set in place to protect
17  the safety of children with whom we are charged to protect
18  their safety.
19    Q.  Okay. And, I'm sorry, but that didn't really seem
20  responsive to my question. And the question is, what is --
21    A.  Go ahead.
22    Q.  You say it's a clear violation. Is this of the
23  confidentiality policy?
24    A.  It says of Agency confidentiality policy.
25    Q.  All right. Are you referring by that to a written

104

1   policy?
2     A.  I am referring to the written policies and the
3   general policy that the Agency has regarding not disclosing
4   information that is treated and to be treated
5   confidentially.
6     Q.  Okay. And I asked you, and I'll ask you again,
7   then, which provision of the written policy in particular
8   was violated?
9     A.  There is no specific written subparagraph in any
10  of those policies that says to a worker you are not
11  permitted to disclose the existence of a prognostic
12  detention order. Nonetheless, staff members who work for
13  the Erie County Office of Children and Youth, by virtue of
14  their training around the issue of confidentiality and the
15  work that we do, would know that the disclosure of this type
16  of information to a parent who is being kept from getting it
17  in the first place would be, in effect, the cardinal sin, if
18  you will, of a violation of confidentiality. It is
19  probably --
20    Q.  I'm sorry, I don't mean to interrupt you, but
21  that's not really responsive to my question. Okay. I was
22  asking you if there's a particular written provision, and my
23  understanding is that you cannot identify a particular
24  written provision.
25    A.  I said that.

105

1    Q.   Okay.  So this is just a general something you
2    should know if you work for Children Services.
3    A.   Sure.
4    Q.   Okay.  And is there any particular training that
5    is given to employees to instruct them in confidentiality,
6    or are they just supposed to know that?
7    A.   Well, employees ongoingly are reminded of their
8    obligation to keep confidential information that they obtain
9    in the course of their employment, and to not disseminate it
10   in a way that would subvert the obligations that they have
11   as employees and in a way that would not subvert the
12   function of the Agency, which is to protect the safety of
13   children.  That is basic.  That is a rudimentary principle
14   of operation of any child welfare agency in my experience.
15   Q.   Okay.  And now, you attached some e-mails to this
16   report.  I think I have all of them attached to the exhibit.
17   If I don't, correct me.  From --
18   A.   Well, I'm going to accept your representation that
19   you did, and that the only thing that's not attached is the
20   Tripp Bible stuff.  So I'll operate on that theory, if
21   that's all right with you.
22   Q.   That's fine.
23   A.   Okay.
24   Q.   They run from May 27th to August 20th.  Or
25   July 20th, I'm sorry.  Is that correct?

106

1    A.   Well, if you say so.  I mean, I didn't --
2    Q.   Well, that's what you say in your report.
3    A.   Okay.
4    Q.   May 27, 2004 to July 20, 2004.
5    A.   Okay.
6    Q.   Now, among those e-mails is an e-mail exchange
7    between Abby Conley and Sue Deveney on July 9th, 2004.  Are
8    you -- can you find that in there?
9    A.   Maybe if you can just give me a -- these things
10   are not paginated, you know, numerically, so.  July 9th of
11   2004 from Abby to Sue; is that --
12   Q.   Right.  And then Sue's response.
13   A.   And then Sue's response.
14   Q.   Okay.
15   A.   Okay.
16   Q.   And that e-mail from Abby, you would agree with me
17   is a request for instruction or clarification of the
18   confidentiality policy, correct?
19   A.   Let me see here.  You asked me if Ms. Conley's
20   e-mail to Ms. Deveney is a request for clarification of the
21   confidentiality policy?
22   Q.   Let me withdraw that.  You would agree that her
23   initial -- her e-mail to Ms. Deveney is requesting
24   clarification of instructions given to her by Deveney
25   regarding confidentiality.  Or not?

107

1    MR. JOYAL:  I'm going to object.  The document
2    speaks for itself.  The words confidentiality or
3    anything such as that are not even included in her
4    e-mail to Deveney.
5    A.   Yeah.  I'm not sure I can read it that way.  I
6    don't know exactly what she's asking for, Tim, to be honest
7    with you.
8    Q.   Well, did you read Ms. Deveney's response?
9    A.   Yeah.
10   MR. JOYAL:  Which is where?
11   A.   That's on top of this page?
12   Q.   Right.
13   A.   At July 9th, 2004, 12:53 p.m.
14   Q.   That would be correct.
15   A.   Yeah, I'm reading it now.  Yes.  Okay.
16   Q.   And it says that, "Various concerns about
17   confidentiality were discussed, including a case in Tammy
18   Petrucelli's unit, the C case at great length, and concerns
19   about emotional involvement."  But above that it says, "It
20   is expected that confidentiality will be maintained
21   regarding the recent incident in our unit."  Do you know
22   what recent incident she's referring to?
23   A.   I believe that that had to do with the PW
24   situation.
25   Q.   Okay.

108

1    A.   That's my belief.  I mean, it doesn't say that
2    here, but that -- time line wise, that would probably be
3    what we're talking about here.
4    Q.   And that paragraph ends, "Should this expectation
5    not be followed, sanctions will be given out accordingly."
6    A.   It reads, "According to the directive I received
7    from administration --"
8    Q.   Okay.
9    A.   "-- should this expectation not be followed,
10   sanctions will be given out accordingly."
11   Q.   So do you take that to mean that Ms. Deveney was
12   instructed by administration to give Ms. Conley a warning
13   about confidentiality and tell her that there would be
14   sanctions if there were further violations in the future?
15   MR. LANE:  Objection to form.
16   Q.   Is that how you would understand that?
17   A.   I don't understand it in any way other than the
18   way that it's written.  You know, there are specific
19   provisions under the Disciplinary Code of the Pennsylvania
20   Social Services Union to which Ms. Conley belonged that talk
21   about how sanctions are meted out and what warnings are
22   given and in what formats they're given.  So I don't
23   interpret this as a warning or a directive -- you know, an
24   indication of Ms. Conley that she was receiving a warning.
25   This is -- it says what it says, and I wouldn't want to

Ferguson & Holdnack Reporting, Inc.
814-452-4556

## 109

1  characterize it beyond that.
2     Q.  So you wouldn't interpret that as a warning.
3     A.  I wouldn't -- no, I wouldn't -- no, a warning -- a
4  warning is -- a warning is a formal thing that happens
5  within the confines of the PSSU disciplinary proceeding.
6     Q.  I'm not saying that it's a warning with the terms
7  of the Collective Bargaining Agreement. I think that you
8  and I can agree that, as far as you know, Ms. Conley was
9  never given any warning under the Collective Bargaining
10  Agreement or the County Progressive Discipline Policy before
11  she was terminated, was she?
12     MR. LANE:  Objection to form.
13     MR. JOYAL:  Argumentative.
14     A.  Do I answer that? As far as I know?
15     Q.  I would appreciate it.
16     A.  As far as I know, she was not.
17     Q.  Right. Okay. But in the general sense of telling
18  somebody not to do something, and warning them that there
19  are going to be consequences, you would agree with me that
20  this is a warning.
21     A.  You know, I would treat it more as a stern
22  reminder to maintain the confidentiality of what's going on
23  the way you are supposed to.
24     Q.  And what further breaches of confidentiality did
25  you discover Ms. Conley to commit after July 9th, 2004?

## 110

1     MR. LANE:  Objection to the form.
2     MR. McNAIR:  Excuse me?
3     MR. LANE:  Objection to form.
4     MR. McNAIR:  What's the matter with the form?
5     MR. LANE:  You used the word "further". Further
6     than what? Further than the --
7     MR. McNAIR:  Further than the ones alleged in the
8     e-mail of July 9th.
9     MR. LANE:  I'm sorry. Further than PW? Further
10     than beyond July 9th that were committed beyond
11     July 9th? Or further prior to July 9th that were
12     discovered following July 9th? That's my
13     objection.
14     MR. McNAIR:  Okay. Well, let me see if I can make
15     it a little more clear.
16  BY MR. McNAIR:
17     Q.  To your knowledge, did Ms. Conley commit any
18  breaches of confidentiality after this July 9th e-mail
19  exchange?
20     A.  Oh, you bet she did.
21     Q.  What were those?
22     A.  She had a discussion with Kim Peebles.
23     Q.  Who is Kim Peebles?
24     A.  Kim Peebles is a supervisor over the clerical unit
25  at the Office of Children and Youth.

## 111

1     Q.  And where do you refer to that in your report?
2     A.  Item 5. That discussion --
3     Q.  Okay. We'll get to that. What others?
4     MR. JOYAL:  Well, wait a minute. He wants to
5     answer the question. You asked him what he had.
6     He has a right to answer your question.
7     MR. McNAIR:  I don't need him to elaborate on it;
8     I need him to identify it. Will you please not
9     interrupt. Let me ask the questions.
10     MR. JOYAL:  Mr. Cauley, you can answer the
11     question any way you want.
12     MR. McNAIR:  He's answered the question.
13  BY MR. McNAIR:
14     Q.  What others beyond discussion with Kim Peebles?
15     A.  Okay, guys, whose rules am I playing by?
16     Q.  The rules of the Federal Court.
17     A.  No, no, no, no. Just somebody tell me what I'm
18  supposed to do here.
19     Q.  Answer the question, please.
20     MR. JOYAL:  Whichever way you feel appropriate
21     under the rules of the Federal Court.
22     A.  Okay. She committed a violation of the
23  confidentiality policy that she was specifically advised by
24  Ms. Deveney on July 9th of 2004 not to do again, when she
25  had conversations on August 2nd, 2004 with Kim Peebles again

## 112

1  about the PW situation.
2     Q.  Okay.
3     A.  She also -- well, that would be the essence --
4  that would be the essence of that. There was more in that
5  conversation, but it wasn't as much of a confidentiality --
6     Q.  Like I said, we'll get to that. I'm trying to
7  develop a list here.
8     A.  Okay.
9     Q.  What else?
10     A.  After July 9th?
11     Q.  After she was warned on July 9th, what did she do
12  wrong, beside talk to Ms. Peebles?
13     A.  On July 20th she sent an e-mail to Deanna Cosby
14  indicating, "I forgot to tell you. I met with Char and Pam
15  for two hours yesterday. Oh, what a mess. Wait till I tell
16  you what they said."
17     Q.  Okay.
18     A.  Which would certainly not be an appropriate thing
19  for her to be discussing with someone who was not employed
20  at the Agency.
21     Q.  What was she discussing?
22     A.  Apparently, the contents of the conversation she
23  had with her supervisor and her program director.
24     Q.  And what were the contents of that conversation
25  that she disclosed?

113

1    A.    Something I would presume would be job-related.
2    Q.    I'm not asking for your presumption; I'm asking
3    you for your knowledge.
4    A.    That's what I'm telling you.
5    Q.    With all due respect.  You don't have any
6    knowledge, do you?
7    A.    Only what I've told you, sir.
8    Q.    You don't know that any confidential information
9    was released as a result of that e-mail.
10    A.    Only what I've told you, sir.
11    Q.    And you've told me, if I understand you correctly,
12    that you don't know of any confidential information
13    released --
14    A.    I don't know the subject of the conversation, no,
15    sir.
16    Q.    How do you know it was confidential, then?
17    A.    Because it was related to the scope and terms of
18    her employment by which she indicated the terms of her
19    conversations with her supervisor and her program director.
20    Q.    There is a rule at OCY if you get yelled at by
21    your boss, you're not allowed to talk to anybody about it;
22    is that what you're saying?
23    A.    No.
24    Q.    Okay.  I don't understand then how you conclude
25    that this implicates the confidentiality policy.

114

1    A.    Well, I think when you look at the overall
2    willingness of your client to --   .
3    Q.    I'm not asking you about that, sir, with all due
4    respect.
5    A.    No, I'm --
6    Q.    I'm asking you with regard to this particular
7    e-mail exchange, you were simply making a presumption based
8    on other things that you think you know; is that fair?
9        MR. JOYAL:  Objection to form.  Argumentative.
10    A.    I'm making a conclusion based on other things that
11    I do know.
12    Q.    Okay.  But as far as you know, there was no
13    disclosure of any confidential information between Abby
14    Conley and Deanna Cosby on or about July 20th --
15    A.    True.
16    Q.    -- 2004.  Okay.  And what did Char and Pam tell
17    you was the subject of that discussion on July 19th with
18    Ms. Conley?
19    A.    I don't recall that I had any discussions with
20    them about that.
21    Q.    All right.  So you have what you think is evidence
22    of a breach of confidentiality and a violation of Agency
23    policy that names two witnesses under your control.  And, if
24    I understand you correctly, you didn't speak to either of
25    them, did you?

115

1    A.    What are you talking about?
2    Q.    Char and Pam.  Witnesses that are always available
3    to you without any impediment whatsoever.  And you didn't
4    talk to them, did you?
5        MR. LANE:  Object to the form.
6    A.    Not about that conversation.
7        MR. McNAIR:  What's wrong with the form?
8        MR. LANE:  Lots of things.  Under your control was
9    one thing.  I don't know what that means.
10        MR. McNAIR:  Available to you, excuse me.  What
11    else?
12        MR. LANE:  I think that's probably it.
13        MR. McNAIR:  Okay.
14    BY MR. McNAIR:
15    Q.    Char and Pam were always available to you.  And
16    you could have asked them any time about that when you saw
17    this e-mail, and you didn't do that; is that correct?
18    A.    I don't recall that I did.  I don't believe that I
19    did, no.
20    Q.    If you did, you didn't put it in your report.
21    A.    True.
22    Q.    What other breaches of confidentiality do you
23    maintain that Ms. Conley committed after July 9th, 2004?
24    A.    Nothing that's reflected here.
25    Q.    Is there anything reflected anywhere or any

116

1    evidence that you are aware of that Ms. Conley made any
2    other breaches of confidentiality after July 9th, 2004?
3    A.    Yeah.
4    Q.    What evidence is that?
5    A.    I had a conversation with a foster mother in the
6    summer of 2005, who called me and told me that Ms. Conley
7    had been in communication with her and was telling her
8    things that she shouldn't be telling her about cases that
9    she was involved with or had known about.  And give me a
10    second and I'll try to come up with a name.
11        MR. JOYAL:  Well, be careful about giving a name.
12        THE WITNESS:  Okay.
13    Q.    You can give it to me off the record.
14    A.    She -- I won't give you the name, but she --
15    Q.    Well, then forget about it, because if you're not
16    going to identify her --
17    A.    No, no, no, no.
18    Q.    And --
19    A.    Just let me finish, please, Mr. McNair.  I'm not
20    telling you that I won't give you the name.  But for
21    purposes of my discussion right now, number one, it's on the
22    tip of my tongue and I can't come up with it.  But she is
23    married to a minister.  And I may be able to come up with
24    it.  I think it begins with a B.  And I can furnish it to
25    you at some point if you would like me to do that, if I can

## 117

1  remember it or I can probably find it out.
2        I don't think that she and her husband still live
3  in the area. I believe that they stopped being foster
4  parents maybe toward the end of the year and have moved out
5  of the area. But she called me; I didn't call her. She
6  called me because she was concerned that she was continuing
7  to have this contact and that Ms. Conley was telling her
8  things that she shouldn't be telling her about cases.
9     Q.  Okay.
10    A.  Now, that was after all of this was said and done.
11    Q.  And did you make any memorandum of that or report
12  it?
13    A.  I made -- I think I made some notes of it, and I
14  may still have them someplace.
15    Q.  Would you produce those?
16    A.  If I can find them. I'll look for them.
17    Q.  Other than that incident, are there any other
18  instances?
19    A.  There may be, but I can't specifically recall
20  right now, to be honest. There may well be.
21    Q.  All right. But as far as you can tell us right
22  now, you're not aware of any.
23    A.  Hum-um. Not that come to mind at the moment.
24    Q.  Now, with regard to that July 20th e-mail
25  exchange, would you agree with me that that was initiated by

## 118

1  Deanna Cosby on July 20th at 2:26 p.m.?
2     A.  Let me just make sure we're on the same page here,
3  okay, Mr. McNair. Would you be good enough to show me what
4  you're looking at there in your pile. The problem with
5  these e-mails is they're duplicitous in some -- they're
6  duplicative --
7     Q.  Right.
8     A.  -- in some respects.
9     Q.  And I'm indicating the bottom of the page. It's
10  numbered 3 at the bottom.
11    A.  Well, that's where it begins on the page. Okay.
12  Whether it was actually initiated by Ms. Cosby or is in
13  response to something, I don't think you can tell from this.
14  But it starts -- the subject is hey, and it starts hey, so.
15  I see where you are.
16    Q.  And then the next message would be the one at
17  3:09:06 p.m. from Abby to Deanna, and the subject is --
18  well, wait a minute. At 3:05 she asks about a baseball
19  game, Abby does. Is that a violation of confidentiality
20  policy?
21    A.  I wouldn't think so.
22    Q.  Okay.
23    A.  Not confidentiality.
24    Q.  Violation of the computer usage policy.
25    A.  If you want to get hyper-technical, I suppose it

## 119

1  would be.
2     Q.  As a practical matter, that wouldn't be the kind
3  of violation that you would be concerned about it, would it?
4     A.  Not in a million years.
5     Q.  Because, in fact, violations such as that are
6  commonplace.
7     A.  Well --
8     Q.  At OCY.
9     A.  Well, I could speculate to give you an answer to
10  that. I don't know. I would like to think that people do
11  what they're supposed to do, but.
12    Q.  Do you receive personal e-mails, or did you
13  receive personal e-mails from people outside the Agency
14  while you worked there --
15    A.  Sure.
16    Q.  -- on your Agency e-mail?
17    A.  Sure.
18    Q.  And did you reply to them?
19    A.  Occasionally.
20    Q.  Now, you also talk about Item No. 2 where the
21  employee discloses information regarding the drowning death
22  of a child under OCY supervision whose caseworker is M███
23  H████.
24    A.  Right. That's the way the e-mails read. It turns
25  out that that child was not our kid. That child belonged to

## 120

1  Juvenile Probation. In reality, but it --
2     Q.  It reflects that the employee's supervisor told
3  Ms. Conley that that was the case, though, doesn't it?
4     A.  Let me look at the e-mail, if I may, Mr. McNair,
5  so that I can be clear on who is saying what about what.
6  This is the May 25th series of e-mails. It looks like it
7  starts on a page numbered 2. Does that square with where
8  you are, Mr. McNair?
9     Q.  To me, it appears as if it starts on Page No. 5.
10    A.  If you would, just show me what you're referring
11  to, maybe I can find the same page. I want to be as --
12    Q.  It appears to be quoting a letter to the editor
13  that was published.
14    A.  Let me see if I can find the page that looks like
15  that. Yeah, this -- okay, May 24th, 2004, 8:51 a.m. It
16  appears that -- that your client -- she is forwarding this
17  letter that was in the paper from a foster mother to
18  Ms. Cosby. That's the way I read this. "ECOCY is in the
19  paper again. I read part of the story online. They are
20  really hammering OCY. Here is a letter that is from the
21  foster mom who had the little girl in her home. She is
22  sending this to the paper."
23        I don't know whether she got that from the paper
24  or whether she had the letter and was sending it, or what
25  the deal is. But that's -- I see where you are. So, okay.

121

1  And it's been a while, I apologize. What was the question?
2      Q.  The question was, does that appear to be the
3  initial e-mail in that exchange?
4      A.  Well, yeah. It looks like it's the first of a
5  series that continue with the subject line, "We were in the
6  paper again today," that goes probably about four or five
7  pages.
8      Q.  Right.
9      A.  Okay. I see where you are. Thank you.
10     Q.  Now, with respect to that page numbered 5, is
11 there any part of that, that in your opinion, violates the
12 OCY confidentiality policy?
13     A.  No.
14     Q.  And then if you go to Page 4, there's a response
15 from Deanna Cosby, 9:23 a.m. on May 24th. And that's
16 followed by a response from Abby on May 24th at 10:33:43
17 a.m. where she says, "You're coming home, oh, goody, when?
18 You can't write anonymous letters to the paper, they won't
19 print them." No part of that exchange violates the policy
20 of confidentiality, does it?
21     A.  Well, I would be a little bit concerned about the
22 discussion about whether or not the author of the letter is
23 or is not currently a foster parent. I don't really think
24 that that's, you know, appropriate.
25     Q.  Now, that wasn't Abby, was it? That was Deanna

122

1  Cosby making those statements.
2      A.  Well, you asked me if any part of this violated
3  the confidentiality policy. And if your client is
4  participating in a conversation wherein that topic is the
5  subject of discussion, I would say that -- I mean, is it a
6  huge problem, like the disclosure of a prognostic detention
7  order. It's not anywhere near the same category, but it's
8  arguably getting there.
9      Q.  All right. And then on May 25th, it's on the
10 bottom of Page 2, at 1:48:55, Abby writes, "Another one of
11 our kids died." Now --
12     A.  Now --
13     Q.  -- is that, in your opinion, a violation of
14 confidentiality?
15     A.  Yes.
16     Q.  In what way?
17     A.  It's tantamount to a disclosure that the child who
18 has been referenced here was under the jurisdiction of the
19 Juvenile Court and was a dependent child.
20     Q.  Okay.
21     A.  Which would be a violation of the policy and the
22 statute, as far as I would believe, that you don't disclose
23 that.
24     Q.  Okay. And that confidentiality extends, then,
25 beyond death.

123

1      A.  You bet.
2      Q.  Ms. Conley stated that she was given instructions
3  that no one is to find out about this kid drowning.
4      A.  Where is that?
5      Q.  2:03:01, there's a check mark next to it.
6      A.  I see. Yeah, it reads, "She gave me looks to
7  kill, then told me no one is to find out about this kid
8  drowning." That's not even a complete sentence. That's
9  what it says. You know, to whom she is referring or what
10 that means beyond that, you know, I don't know.
11     Q.  Now, you state -- and I think this is on the
12 second -- third page of your report under Item No. 2. "Abby
13 was explicitly encouraging Deanna Cosby to contact Ed
14 Palattella at the Erie Times."
15     A.  Um-hum.
16     Q.  And could you point to the message from Ms. Conley
17 to Ms. Cosby where she explicitly encourages that.
18     A.  Sure.
19     Q.  Where is that?
20     A.  If you go back to where we left off with the
21 phrase, and start reading up from there, Ms. Cosby writes to
22 her May 25th, 2004, 2:00 p.m. Quote, "I calling the Times
23 newspaper," close quote. Abby writes back, "Why." Deanna
24 responds, 2:02 p.m., "To tell them about the child dying."
25 Response. "You made me laugh out loud." Ms. Cosby's

124

1  response to Abby. "I'm dead serious, no pun intended."
2  That's at 2:05 p.m. Response back to Deanna -- or to Deanna
3  from Abby, quote, "I double-dog dare you. Ed Palattella is
4  the reporter that has run all the stories," close quote.
5  Deanna's response back. "Okay, it's done."
6          Then further up on that same page when they're
7  talking about phone conversations and phone contact,
8  Ms. Conley writes to Ms. Cosby, quote, "Okay, go ahead, tell
9  Ed everything. 870-1600, press 0 for the operator," close
10 quote.
11     Q.  Okay. And your reading of that led you to believe
12 that Ms. Conley seriously was encouraging Ms. Cosby to call
13 the newspaper.
14     A.  Yes.
15     Q.  You read that as a conspiracy to disclose
16 information that the Agency was covering up about a child
17 dying.
18         MR. JOYAL: Object to the form.
19     A.  Yeah, I object to the characterization "covering
20 up," sir.
21     Q.  Would not the death of a child under Agency
22 protection be something that would be of public concern?
23         MR. JOYAL: I'm going to object, because I think
24 it was made clear yesterday twice that the child
25 who died was not under Agency protection, was a --

125

1    MR. McNAIR: Did I say he was?
2    MR. JOYAL: You just did. You were talking about
3    this child. And you said covering the death of
4    a child under Agency protection. That's what you
5    just said.
6    MR. LANE: And I join in that objection because
7    that was what you said.
8 BY MR. McNAIR:
9    Q. Would that be something that would be a matter of
10 public concern?
11   MR. LANE: Objection to form.
12   A. I think any time a child dies, you know, in an
13 accidental drowning, it's a matter of public concern.
14   Q. Why do you think Ms. Conley was advised by her
15 supervisor to keep it a secret?
16   A. I don't know that she was.
17   Q. Well, I thought you believed everything that Abby
18 says.
19   A. I don't believe anything your client says.
20   Q. Yet you believe her when she says she wants Deanna
21 Cosby to call Ed Palattella; you believe that, right?
22   A. I'm only reading what she's written to Deanna
23 Cosby.
24   Q. And you interpret that as encouragement. So you
25 believe that that's what she meant.

126

1    MR. LANE: Objection to form. Argumentative.
2    A. Mr. McNair, if there's some other way to read
3 this, you know, I would be open to your suggestion. But the
4 way I read it, it is clearly an encouragement to
5 Mr. Palattella to tell -- or to Ms. Cosby to tell Ed
6 Palattella quote/unquote everything, premised on her belief,
7 as it's stated here, that this child was, in fact, a child
8 under our care. Her belief, mistaken, but she didn't
9 indicate that.
10    And, presumably, to tell Mr. Palattella everything
11 that is contained at least in this series of e-mails about
12 this incident. So, yeah, I would consider that to be
13 encouragement of someone who had no business knowing this
14 information because it's confidential, at least she believed
15 it to be, to a newspaper reporter. I don't know any other
16 way to read it.
17   Q. Yet you don't believe that she was told by a
18 supervisor that a child had died and she was not to tell
19 anyone.
20    MR. JOYAL: Objection.
21   Q. You don't believe that.
22    MR. JOYAL: Argumentative.
23   A. I don't know whether she was or whether she
24 wasn't. I don't know what she was told by Ms. Deveney, or
25 any supervisor.

127

1    Q. Well --
2    A. About this.
3    Q. -- let me ask you this. If she is making it up,
4 how is that confidential information belonging to the
5 Agency?
6    A. Whether it -- whether it is or whether it isn't,
7 according to this, in her mind, it was. She believed it to
8 be so, according to this. And with that belief in mind, she
9 disclosed it to someone who was not entitled to have it,
10 one. And encouraged that person to further disclose it to a
11 newspaper reporter.
12   Q. Okay.
13   A. If she was mistaken, it doesn't minimize or
14 deflect from the reality of what she was attempting to do in
15 her own mind.
16   Q. What did Ms. Deveney say when you asked her in the
17 course of this investigation whether or not she did, in
18 fact, give Abby Conley that instruction on May 25th?
19   A. I never had that discussion with Ms. Deveney.
20   Q. So there's another witness with knowledge directly
21 implicated in your investigation that you didn't bother to
22 speak to.
23   A. I've already told you that I didn't discuss this
24 particular situation with Ms. Deveney.
25   Q. You could have.

128

1    A. Sure.
2    Q. I mean, you worked in the same office.
3    A. Sure.
4    Q. Full-time. You're both there all day, five days a
5 week at least.
6    A. Well, I was there more than she was. She was out
7 more than I was, but, yeah.
8    Q. Okay.
9    A. She was available. I could have discussed it with
10 her. I didn't.
11   Q. Okay. Now, this next Item No. 3, "Improper
12 disclosure of County work product, violation of computer
13 usage policy."
14   A. Which one are we at?
15   Q. Number 3.
16   A. Yes, sir.
17   Q. This involves, I guess, the JS hearing.
18   A. Um-hum.
19   Q. Before Judge Kelly. Now, did you review the
20 transcript of that hearing in conjunction with this
21 investigation to determine whether the sequence of events
22 you cite is accurate, that Mr. Villella produced a document
23 and handed it to Ms. Conley?
24   A. I'm trying to remember in the course of time here
25 when that transcript was produced vis-à-vis the date of this

129

1  report, which was August 20th. I can't honestly sit here
2  and tell you that we had that transcript by this time.
3      Q.  Okay.
4      A.  There was some -- I know there was some delay in
5  its production. And I don't know, frankly, whether I
6  reviewed it before I wrote this or not.
7      Q.  All right.
8      A.  If that transcript were available and there's a
9  way to tell from a time stamp on it when it was filed, I
10  could maybe tell you that.
11     Q.  Okay. I'll accept that. Is it your recollection
12  that Attorney Villella brought the document in with him and
13  handed it to Abby?
14     A.  I can't tell you when he was given it. Okay.
15  What I can tell you is only what I recall. I'm at counsel
16  table. We're in Judge Kelly's courtroom. Your client is on
17  the witness stand. She's been called by Mr. Villella. He's
18  at counsel table down here. He approaches her with a
19  document and hands it to her. And essentially says, can you
20  identify this, or whatever the transcript reflects.
21         Now, that was -- that was what I remember. And I
22  remember thinking to myself, where did he get that, where
23  did this come from. Now, I don't -- I've never talked to
24  Mr. Villella about when and where he got that.
25     Q.  I was going to ask you that. Why not?

130

1      A.  Well, probably for the same reason I never talked
2  to your client about it, because I thought about doing it.
3      Q.  I'll ask you that too.
4      A.  It was pretty much water under the bridge at that
5  point, in terms of the way that case was going. And it
6  really didn't make a lot of difference to the outcome of
7  that case.
8      Q.  Did it make any difference to the outcome of your
9  investigation and its impact on Abby and her career with
10  Erie County?
11     A.  No. Not -- not to me. In the first place,
12  whether or not her career was impacted at Erie County wasn't
13  my decision. Okay. All I did was provide the information
14  that I was asked to gather. My understanding of the
15  rationale for her being asked to leave was that she
16  disclosed the existence of the order in the VW case.
17     Q.  I understand that's the party line at this point.
18  You include this --
19     A.  Well, excuse me.
20         MR. JOYAL:  Objection.
21     Q.  -- in your report. Why, if it's not significant?
22         MR. LANE:  Objection to the question and move to
23  strike the preamble.
24     A.  I was asked by the County Solicitor to provide him
25  with the results of any and all confidentiality breaches at

131

1  the investigation that he asked me to do would reveal. So I
2  attempted to do that.
3      Part of the reason for including this information
4  is that this was -- this was the situation that prompted me
5  to have the initial conversation with Attorney Allgeier on
6  the 28th of July about what was happening in that hearing.
7  Which then prompted her to say to me, oh, you didn't know
8  this, but there are other concerns about Ms. Conley maybe
9  disseminating information to other people. And it was as a
10  result of that collaboration that decisions were made to
11  then look further.
12     So, you know, in terms of this being here, it's
13  here because, number one, she did something she shouldn't
14  have done, in my view. And, number two, I wanted to put it
15  in there to establish why we did what we did.
16     Q.  Okay. So this was the actual impetus for your
17  investigation, was that hearing in the JS case.
18     A.  Well, this -- the impetus for my investigation
19  really was the request of the County Solicitor that I go
20  back and do all of this. We -- these concerns --
21     Q.  I thought you requested the permission from the
22  County Solicitor to do this.
23     A.  No, no.
24     Q.  Did he call you up and say, Mike, here's some news
25  for you, I want you to do this?

132

1      A.  The concerns that came together at the end of July
2  and beginning of August about your client's behavior as an
3  employee of the Office of Children and Youth prompted us to
4  say to the County, we think we need to look more closely at
5  what she may have been doing to see if there is anything
6  here to document these concerns that we have.
7      Q.  Did you share the concerns of the folks that had
8  the meeting the same day, where they were disappointed that
9  there was not enough evidence to terminate Ms. Conley at
10  that point --
11         MR. JOYAL:  Objection.
12     Q.  -- on August 30?
13         MR. JOYAL:  Lack of foundation. What are you
14  talking about?
15         MR. LANE:  I join in that.
16         MR. McNAIR:  Join away.
17     A.  Can you rephrase that for me. I'm not sure what
18  you're trying to ask me.
19     Q.  The point of this investigation was to try to
20  develop evidence to justify terminating Ms. Conley, wasn't
21  it?
22     A.  No. The point of the investigation was to find
23  out if Ms. Conley had been doing things improperly in terms
24  of disclosing information to people that had no right to it.
25     Q.  Was this investigation prompted by a concern over

---

**133**

1  the -- or an alleged disclosure of a Court order in the VW
2  case?
3      A.  No.  We didn't know that until we read the
4  e-mails.
5      Q.  Right.  You didn't have -- but that was the reason
6  she was terminated; is that what you're saying?
7      A.  That's my understanding.  I didn't make the
8  termination decision, okay.  But my understanding is the
9  reason that she was terminated by the County, or terminated
10 or resigned or whatever, however that worked out, I wasn't
11 involved in that, was because she had disclosed that -- the
12 existence of that document.
13     Q.  Who told you that?
14     A.  I was told that by Mr. Onorato.  I was told that
15 by Ms. Liebel.  I believe by Pete Callan.
16     Q.  Okay.
17     A.  The people that were involved in making the
18 decision.
19     Q.  So they told you that this JS case had nothing to
20 do with it.
21     A.  I don't think anybody ever said that to me one way
22 or the other.
23     Q.  Item No. 5, violations of employee work and
24 conduct responsibilities.  The second sentence of that first
25 paragraph you state, "As you are aware, the employee has

---

**134**

1  made baseless and untrue allocations to the Department of
2  Public Welfare against caseworker PW."  Is that what you
3  wrote?
4      A.  That's what I was given to understand; that's what
5  I wrote.
6      Q.  Okay.  And by allocations you meant allegations,
7  correct?  Is that a typo?
8      A.  It certainly is.  Sorry about that.
9      Q.  What investigation did you undertake to determine
10 whether or not those allegations were, in fact, baseless and
11 untrue?
12     A.  I was advised by -- I'm not sure whom.  Maybe
13 Ms. Liebel.  Maybe Attorney Allgeier.  That a DPW
14 investigation had been made of those allegations, and they
15 were determined to be, you know, without foundation.  And
16 the matter was unfounded.
17     Q.  So an allegation of child abuse that is determined
18 to be unfounded is, by definition, baseless and untrue?
19     A.  That was the gist of what I was led to believe.
20     Q.  I'm asking you in general.  You participated in
21 more than one child abuse investigation leading to a
22 dependency proceeding, have you not?
23     A.  Sure.
24     Q.  Probably more than a dozen.
25     A.  Sure.

---

**135**

1      Q.  And are there cases where because of a lack of
2  evidence or not meeting criteria, an incident which happened
3  is determined to be unfounded?
4      A.  Sure.  You can have a situation where, for
5  example, a child is struck by a caretaker, perhaps a mark is
6  left on the child, but because the child -- because the
7  injury doesn't rise to the level of severe pain as defined
8  in the statute, it would not qualify as quote/unquote child
9  abuse.
10     Q.  And under those circumstances, would that
11 allegation be baseless and untrue?
12     A.  If it actually happened, the existence of the fact
13 would not be, no.
14     Q.  Okay.
15     A.  But in this situation, as I understand it, and as
16 I understood it, the investigating person from DPW, whose
17 name I can't pronounce, had indicated that she had
18 significant concerns about the credibility of the
19 information that your client was supplying.
20     Q.  And that rendered it baseless and untrue?
21     A.  Well, I think you can make that argument, sure.
22     Q.  You can make that argument?  You're supposed to be
23 doing an impartial investigation, aren't you?
24     A.  I was doing an investigation based on what I
25 was -- what I was determining.

---

**136**

1      Q.  You weren't defending PW from an unjustified and
2  vicious attack by Ms. Conley?
3      A.  I hadn't made the decision.  All I knew is what
4  the Department of Public Welfare had done.
5      Q.  Were you aware that it was the DPW investigator's
6  conclusion that just because it's unfounded doesn't mean it
7  didn't happen?
8      A.  No.
9      Q.  Nobody made you aware that she made that statement
10 to numerous people?
11     A.  No.  I mean, I never talked to her.
12     Q.  Right.  I was going to ask you that too.
13     A.  From what I -- from what I understood, she had
14 serious problems with the credibility of the information
15 that your client was conveying to her.  And unfounded the
16 case, at least in part, for that reason.  I mean, that's
17 what I was told, Mr. McNair.
18     Q.  Who told you that?
19     A.  I think Attorney Allgeier told me that.  I want to
20 say maybe -- maybe Ms. Liebel told me that.
21     Q.  Okay.  So because they told you that, you accepted
22 that as gospel.  You didn't investigate the truth of that
23 allegation in any way, did you?
24     A.  No.
25     Q.  So your assertion that the baseless -- that the

---

137

1  allegation was baseless and untrue is based exclusively on
2  what you were told by employees of OCY.
3      A.  No.
4      Q.  What else is it based on?
5      A.  It's based on what this Shara Saveikis person
6  reported to them.
7      Q.  I think it's based on what you were told she
8  reported, isn't it?  You didn't talk to her.
9          MR. JOYAL:  Objection.  Argumentative.
10     A.  You know, we can call it hearsay on hearsay.  But,
11  I mean, that's the basis of my conclusion, Mr. McNair.
12     Q.  And I said that -- okay.  If she made the
13  statement to Ms. Liebel and others that just because it
14  didn't -- just because it's unfounded doesn't mean it didn't
15  occur, and they neglected to convey that to you, would that
16  statement have made any difference in your assertion that
17  this allegation was baseless and untrue?
18     A.  If she was saying that not in a generic sense, but
19  specific as to this particular investigation, I might have
20  worded it a little bit differently.  Maybe.  But I didn't
21  hear that.
22     Q.  Okay.  Now, you state that you interviewed Kim
23  Peebles on August 4th, 2004.
24     A.  Right.
25     Q.  What prompted you to interview Kim Peebles?

138

1      A.  Somebody, and I don't remember who, told me that
2  Kim had been upset by something that had been related to her
3  by your client centering on the PW situation.  And, you
4  know, as I'm sitting here thinking about it, I want to say
5  too that maybe -- and this could well be.  That Sue Deveney
6  came to me and said that Kim had come to her, or she had
7  heard that Kim had said that there was an allegation that
8  she was going to be charged with obstruction of justice.
9  That's the best I can recall about why I asked to talk to
10  Kim.
11     Q.  Okay.  And according to you, Ms. Conley approached
12  Kim Peebles.
13     A.  This is according to Ms. Peebles.  I sat down with
14  her in my office on August 4th.
15     Q.  And she told you that she was approached by Abby
16  Conley, that she did not initiate a conversation with her.
17     A.  Yes.  That's the way I wrote it.  That's the way
18  she would have told me.
19     Q.  What were the circumstances under which Ms. Conley
20  approached her?
21     A.  I don't specifically recall.  I have some notes of
22  that conversation someplace that might answer that.  I know
23  that -- I know that Ms. Peebles was uncomfortable with it.
24  She told me that she was.  That Ms. Conley came to her and
25  talked -- said things about PW that, you know, she didn't

139

1  feel like she wanted to hear.
2          You know, that she had had kids taken away from
3  her, that her son had committed suicide.  That, you know,
4  she had -- she had hurt this child or done something to this
5  VW child, whatever it was.  And, you know, Ms. Peebles was
6  very uncomfortable getting that information because she had
7  no reason to be talking with Ms. Conley about it.  I mean,
8  that was the gist of it.  But she didn't solicit it;
9  Ms. Conley brought it to her.
10     Q.  Why would Ms. Conley approach Ms. Peebles?
11     A.  You have to ask Ms. Conley.  I don't know the
12  answer to that.
13     Q.  Did Ms. Peebles tell you what Ms. Conley said her
14  reason for approaching her was?
15     A.  I don't believe that she said anything about why
16  it happened.  I think it was just -- it was just she came up
17  to her and started conversing with her.
18     Q.  Okay.
19     A.  And it was -- you know, it was the same -- it was
20  during that same conversation that she made these comments
21  about Ms. Deveney, and this would have been right after the
22  July 28th hearing.
23     Q.  Where Judge Connelly laced her out after the
24  hearing, threatening her with obstruction of justice
25  charges?

140

1      A.  That never happened in my presence, sir.
2      Q.  Are you saying it never happened?
3      A.  Not as far as I know.
4      Q.  If I understand correctly, Ms. Peebles is the only
5  witness that you interviewed throughout the course of your
6  investigation.
7      A.  You know, it kind of depends on how you want to
8  characterize the term "interviewed."  You know, I talked
9  to -- I talked to a lot of people about this case, this
10  whole situation, ongoingly.  And I don't know that I would
11  necessarily characterize the conversations I had with them
12  as interviews or not.
13         You know, I'm sure I talked to Ms. Deveney.  I'm
14  sure I talked to Ms. Schetter about the July 28th hearing.
15  You know, in the sense of a formal sit-down kind of thing
16  where I actually sat down and took notes about what I --
17  what I obtained from Ms. Peebles, she was the only one that
18  I recall doing that with.
19     Q.  Did you call Ms. Cosby in the course of this
20  investigation?
21     A.  No.
22     Q.  Why not?
23     A.  I didn't see the need to do that.  The paper trail
24  that your client left in her e-mails made it pretty clear
25  what she was doing.  I didn't need Ms Cosby to confirm or

141

1  deny that this had happened. It was pretty obvious what was
2  going on.
3      Q.  Did you ever call Ms. Cosby for any other purpose
4  after she left the Agency?
5      A.  Not directly. I had Ms. Schetter call her on
6  another occasion on a couple -- for a couple of times, I
7  believe, to talk to her about giving testimony in a totally
8  unrelated Orphans' Court matter that she had been previously
9  involved with. It turned out we didn't need her testimony
10 because the matter settled.
11     Q.  Now, I think we talked earlier about the JS case
12 and that hearing.
13     A.  This is the twins case, right?
14     Q.  Yeah.
15     A.  Okay.
16     Q.  You were notified in advance of that hearing that
17 Mr. Villella had concerns over Ms. Conley's Court summary
18 being altered, weren't you?
19     A.  No. I got a pretrial narrative from him in
20 advance.
21     Q.  And it stated that he was calling Abby Conley
22 because -- relative to alteration of documents.
23     A.  No, I don't believe it said that. If you have it,
24 we can look at it and we can discuss exactly what it said.
25 What I think it -- the gist of it was that Ms. Conley may

142

1  have had some disagreement with either the worker or the
2  supervisor about the direction the case was taking, or
3  something to that effect.
4      Q.  Okay.
5      A.  But I would rely on what the pretrial narrative
6  itself said. But nothing about alteration of documents, to
7  my recollection.
8      Q.  So it was a complete surprise to you when that
9  issue popped up at the hearing.
10     A.  What issue?
11     Q.  That her Court summary had been altered.
12     A.  Yeah, I didn't expect anything like that. You
13 know, I can tell you that it -- it's not uncommon in these
14 cases that we did for people who were involved with them to
15 not necessarily be all on the same page about everything
16 that's going on with the case or the direction that a case
17 is going in. That happens.
18        You know, reasonable minds sometimes can differ
19 about how families are to be serviced, you know, the
20 direction that cases go in. And, you know, we had a system
21 in place that basically allowed that kind of discussion and
22 dissension, if you want to characterize it that way, to be
23 brought before the Court, so that the Court would get the
24 benefit of folks' thinking before the Court made a
25 determination about which way things should go.

143

1      Q.  So you encouraged people to, if they had a
2  disagreement with the caseworker, the supervisor, to go to
3  the hearing and tell the Judge what they thought as opposed
4  to what the caseworker thought?
5      A.  Well, you know, our practice was to attempt to get
6  folks to understand each other's point of view and come to a
7  consensus, if at all possible. So that the Agency position
8  that would be presented to the Court would be, you know, the
9  best one that could be presented for the benefit of the
10 family and the children.
11        And if everybody could resolve their differences,
12 if they had them, in advance of the preparation of those
13 documents and get that together in a way that would make the
14 hearing go smoothly and give a united front to the Court,
15 that was our preference.
16        You know, in situations, and there were some,
17 albeit they were rare, where we had significant
18 disagreements, people were encouraged to come to the hearing
19 and offer their other point of view. Or in the alternative,
20 if they wanted -- and this typically was between
21 caseworkers, supervisors and program directors.
22        They could offer a written addendum, if you will,
23 to the summary indicating what their perspective was and the
24 rationale for it. And then that would be submitted to the
25 Court and all the other parties in advance of the hearing.

144

1      Q.  If a case aide or foster parent was listed on a
2  parent's or respondent's pretrial narrative as a witness,
3  was there a policy regarding the requirement that that
4  person be subpoenaed to the hearing?
5      A.  Yeah. Our practice for our employees was if
6  somebody wanted one of our employees to appear and testify
7  at a hearing, that they were to subpoena the employee.
8      Q.  Okay.
9      A.  In a dependency case, in a custody case, in a
10 child abuse case, in a PFA hearing, whatever. Okay. Foster
11 parents, a little different animal, because they're not
12 employed by us. You know, if they were asked to come and
13 they wanted to come, they could come without a subpoena.
14 And if they wanted a subpoena, they were entitled to ask for
15 one. Does that answer your question?
16     Q.  Okay. Was there any policy that an employee could
17 not attend a hearing at the request of a respondent unless
18 they actually had a subpoena that had properly been served
19 on them under the Court rules?
20     A.  Yes.
21     Q.  Has there ever been an instance where -- that
22 you're aware of, where someone has alleged that a subpoena
23 has been intercepted by the Agency and not delivered to the
24 individual?
25     A.  Other than in this case? Not that I know of. And

## 145

1  I'm talking the twins case. And I know Mr. Villella made
2  that allegation, but that's not what happened.
3    Q.  You were never asked to investigate anything
4  regarding Abby Conley prior to that July 28th, 2004 hearing,
5  were you?
6    A.  No.
7    Q.  Did you have any reason to investigate Ms. Conley
8  prior to that July 28th, '04 hearing?
9    A.  No.
10   Q.  And it wasn't until after that July 28th hearing
11  that Ms. Allgeier brings up concerns about Abby Conley to
12  you.
13   A.  That's the first time that I heard anything at all
14  about there being a problem with her handling of that VW
15  situation, yeah.
16   Q.  Which had occurred a month before.
17   A.  Evidently.
18   Q.  Okay.
19   A.  Yeah, according --
20   Q.  And you see Ms. Allgeier every day.
21   A.  No. No. I would go sometimes days and -- you
22  know, days at a time, you know, a week, ten days sometimes
23  at a time without seeing her or talking to her.
24   (Brief recess held.)
25   MR. McNAIR:  That's all the questions I have at

## 146

1    this time.
2    (Recess held from 2:46 p.m. to 3:00 p.m.)
3
4    CROSS-EXAMINATION
5  BY MR. JOYAL:
6
7    Q.  Mr. Cauley, I'm going to just ask you some
8  questions in follow-up to see if we can't clear up some of
9  the things that were -- might be ambiguous in terms of your
10  other testimony. I want to go to the July 28th hearing.
11  We have part of the transcript. And if I look at
12  this transcript, it looks like that there's a list and index
13  of witnesses.
14   A.  Um-hum.
15   Q.  With page numbers on here.
16   A.  Um-hum.
17   Q.  225, 229. I presume that that would be all the
18  people that would have been included in a rather voluminous
19  transcript of that hearing. Would you agree?
20   A.  Yeah. It says Page 2, index of witnesses, it goes
21  over onto Page 3. There's however many there are.
22   Q.  Four more names.
23   A.  Okay.
24   Q.  Redirect, recross.
25   A.  Right.

## 147

1    Q.  Okay. Take a look at the index. Would that have
2  been -- and tell me if Sue Deveney's name is on that index
3  for the day of that hearing.
4    A.  No.
5    Q.  From anyone; is that correct?
6    A.  I don't see it.
7    Q.  Okay. So do you have a recollection, as you sit
8  here today, as to whether or not Mr. McNair's statement to
9  you that Judge Kelly in some manner informed Ms. Deveney
10  that she could have been obstructing justice happened during
11  that day?
12   MR. McNAIR:  Objection. Argumentative. Lack of
13  foundation. Are you saying because she didn't
14  testify, she wasn't there?
15   MR. JOYAL:  I'm asking him -- you made a statement
16  without foundation, and it said she had been told
17  by a Judge -- I don't remember the exact phrase --
18   MR. McNAIR:  I didn't make a statement. I asked
19  the question.
20   MR. JOYAL:  No, you said. You made a statement
21  and we can go back and see it, which was that she
22  was told that day that she --
23   MR. McNAIR:  Objection. Foundation.
24   MR. JOYAL:  -- was obstructing justice.
25   MR. McNAIR:  Argumentative.

## 148

1  BY MR. JOYAL:
2    Q.  Does that refresh your recollection as to whether
3  or not Mr. McNair's version of events, that she was told by
4  the Judge on that day after the hearing --
5    MR. McNAIR:  Objection. Relevance.
6    Q.  -- is true or not?
7    A.  At no time when I was in the presence of Judge
8  Kelly that day or any other day did I ever hear her have a
9  communication, verbal or otherwise, with Sue Deveney to that
10  effect.
11   Q.  Now, there was also a question asked of you
12  concerning whether or not your recollection as to whether
13  Mr. Villella may have had a copy of the document --
14   A.  Um-hum.
15   Q.  -- prior to Abby Conley taking the witness stand.
16  Do you remember that?
17   A.  Yeah.
18   Q.  Let's go to page -- I believe your answer was
19  you're really not clear on that at this point.
20   A.  Well, what my answer was and what my recollection
21  still is, is that she was on the witness stand, and he was
22  down in the pit, so to speak, by counsel table, and he
23  carried it up to her and showed it to her.
24   Q.  I want you to take a look, if you would, on Page
25  71 of the transcript, starting at Line 17.

149

1    A. Um-hum.
2    Q. And if you would read it out loud, the questions
3  and the answers, all the way down to the end of the page at
4  Line 25 for the record, if you would.
5    A. Starting at Line 17. Question: You produced a
6  report summary that was attached to the Court summary that
7  was provided in April; is that right? Answer: Yes.
8  Question: Do you have a copy of that with you or do you
9  want -- Answer: I have what I had on my hard drive at work.
10  Question: Well, is that the same as what is attached to the
11  Court summary?
12    Q. We can stop there. Based on the transcript, is
13  your recollection that there was a question asked of her
14  whether she had a copy of it with her or did she want to
15  have, and she interrupted and said that she indeed did have
16  something with her?
17        MR. McNAIR: Objection. The transcript speaks for
18        itself.
19        MR. JOYAL: I'm asking him his impression.
20        MR. McNAIR: His impression is irrelevant.
21        MR. JOYAL: I'm asking him his recollection.
22    A. My recollection is that when she was sitting on
23  the witness stand, she did not have in front of her at that
24  point a copy of the document that she claimed had been
25  changed, and that Mr. Villella delivered it to her. That's

150

1  the way it went down. That's what I remember.
2    Q. But the question is from Villella, "Do you have a
3  copy of that with you or do you want -- " And her answer
4  was, "I have what I had on my hard drive at work."
5    A. I see that.
6    Q. Okay. So it's possible, then, that you are
7  correct that Villella had a copy, but that she may have
8  already had a copy with her on the witness stand. Is that a
9  fair statement?
10    A. I don't know what she had with her on the witness
11  stand. I don't have a particular recollection about that.
12  I remember Mr. Villella walking up to her and giving her the
13  document.
14    Q. Let me ask another question concerning the work
15  product concern that you have. Did you know or do you know
16  that Abby Conley called Mr. Villella's client to inform him,
17  he or she, of the fact that such a document existed?
18        MR. McNAIR: Objection. Foundation.
19        MR. JOYAL: All right. I'll lay the foundation.
20        I'm going to make a representation --
21        MR. McNAIR: I'm sure you will.
22        MR. JOYAL: -- to all counsel here that I spoke
23        with Mr. Villella on two occasions, the last of
24        which was yesterday afternoon as we left this
25        deposition.

151

1        Mr. Villella has informed me that he will
2        testify, if called, that he received two phone
3        calls prior to that hearing. One phone call was
4        from his client saying that Abby Conley had called
5        her -- or him to tell them --
6        THE WITNESS: It would have been a her.
7        MR. JOYAL: Or her. That such a copy of a report
8        existed. And that the second was a phone
9        conversation with Mr. Villella in which she
10        confirmed that that report existed. Did you know
11        that, sir?
12        MR. McNAIR: Objection. Foundation.
13        MR. JOYAL: I just made a representation. You can
14        object all you want. That's what the testimony is
15        going to be.
16  BY MR. JOYAL:
17    Q. Did you know that?
18    A. I didn't know that until you told me that you had
19  gotten that information from Mr. Villella, no.
20    Q. And for the purposes of the hearing that day,
21  you've already gone through what the procedure was, correct?
22    A. Sure.
23    Q. In terms of a disagreement. Did Abby Conley need
24  to produce a copy of a report to show to the Judge, or could
25  she have testified as to what her disagreement was with the

152

1  contents of the Court summary?
2    A. If she had been called by any party, she was free
3  to tell the Judge whatever she was asked, as long as she was
4  telling the truth.
5    Q. And during the course of direct and
6  cross-examination, Ms. Conley testified that, indeed, this
7  was occurrences that had happened on more than one occasion
8  in terms of reports being changed. And that she as a social
9  services aide did not have the training to be able to give
10  an opinion as to what should happen to children; is that
11  correct?
12        MR. McNAIR: Objection. Argumentative. This
13        whole line of questioning is argumentative. If
14        you'll give me a standing objection.
15        MR. JOYAL: That's fine. Hold onto it.
16        MR. McNAIR: You mean you're giving me a standing
17        objection to the argumentative nature of this line
18        of questioning.
19        MR. JOYAL: Well, I think the objection is not
20        founded properly.
21        MR. McNAIR: I understand that.
22        MR. JOYAL: It's not argumentative. But whatever
23        one you want to use.
24  BY MR. JOYAL:
25    Q. Let me try Page 81. See if this refreshes your

153

1  recollection in terms of the question. Just read from Line
2  5 down to Line 13.
3      A.  This is a question to Mrs. Conley.
4      Q.  Yeah, you don't -- just read it to yourself.
5      A.  Not out loud?
6      Q.  Well --
7      A.  That's fine. Whatever --
8      Q.  Just read it to yourself.
9      A.  I just want to make sure. (Witness complies.)
10  Okay, I see that.
11      Q.  Did Ms. Conley under questioning from someone
12  other than yourself say that she wasn't qualified to have an
13  opinion or to necessarily state those opinions?
14          MR. McNAIR:  Objection. The transcript speaks for
15      itself.
16          MR. JOYAL:  Well, then, we'll read it.
17      A.  What she said was, "Well, just that I'm reminded
18  of my position at OCY that I'm not qualified to have an
19  opinion or to necessarily state those opinions. It's my job
20  to facilitate," is what she said.
21      Q.  Okay. That was in the context of written reports;
22  is that right?
23      A.  Yes.
24      Q.  I want you to read for me, if you would, the
25  transcript at Page 89, starting at Line 8. And I will

154

1  represent that according to the index -- strike that. That
2  these are -- starting on Page 79, these are Mr. Villella's
3  questions. Start at Page 8.
4      A.  Line 8?
5      Q.  Start at the question. Line 8.
6      A.  To myself or aloud?
7      Q.  Read it aloud slowly for the record. This is
8  Mr. Villella's questioning of Ms. Conley.
9      A.  "Question: If I give you a minute and the Court
10  allows us to, can you review this. Will you know whether
11  that's your report or not? Answer: This is the one that I
12  submitted on the 16th. Question: Does it appear to have
13  any edits like the ones involving Ms. S did?"
14  Parenthetically, Ms. S would be Mr. Villella's client, the
15  mother of the children.
16      Q.  Okay. And the answer was?
17      A.  "Answer: See, the problem is that I submitted
18  this on the 16th. This hard copy was corrected by
19  Ms. Deveney, was handed back to me. I went back into my
20  program and made the adjustments that she requested and
21  resubmitted the corrected version hard copy for the 19th.
22  This is the 16th. This is the first one without
23  corrections. What the process is, is I write the Court
24  summary, I submit it to Ms. Deveney by e-mail. She prints
25  it out, makes the corrections, submits it back to me, and I

155

1  retype. She'll take a red pen and correct."
2      Q.  Okay. So that was Ms. Conley's testimony that --
3  of the procedure that took place.
4      A.  That was -- yeah, of her -- of the way her
5  supervisor supervised her work product, which would be
6  consistent with Agency practice.
7      Q.  Going to Page 98. This is questioning by
8  Mr. Lucht again of Abby Conley. Start at 16, read 16
9  through 20, question and answer, if you would.
10      A.  "Question: I will ask that question. Has anybody
11  told you to change your summaries or change your outlook?
12  Answer: That I need to stick with like observations, not to
13  have words that are broad. I really concentrated on that on
14  my July 15th Court summary."
15      Q.  Okay. Again, Ms. Conley testified as to what
16  the -- what she was told to do?
17      A.  That's my -- correct. That's my recollection.
18      Q.  Not to use broad words.
19      A.  Yes.
20      Q.  Take a look at Page 99. Start at the top line,
21  Line 1, and read down to Line 5, again, questions of
22  Ms. Conley.
23      A.  "Question: Your Court summary, were you
24  supportive of the parents or not? Answer: I just basically
25  described how the visits go. I'm not qualified to recommend

156

1  or place judgment or recommendations or anything. That's
2  just not my capacity."
3      Q.  Okay. Now, during that period of time, would that
4  have indicated to you that Ms. Conley agreed and admitted
5  under questioning from other counsel that she didn't have
6  the qualifications to make opinion judgments?
7          MR. McNAIR:  Objection.
8      Q.  Did that?
9      A.  That's what her answer seemed to reflect.
10          MR. McNAIR:  And, again, the transcript speaks for
11      itself.
12      A.  That's how I took --
13          MR. McNAIR:  And I don't think this witness's
14      interpretation of it has any relevance whatsoever.
15          MR. JOYAL:  Your objection is noted.
16          MR. McNAIR:  Okay.
17  BY MR. JOYAL:
18      Q.  I want to go through some of these e-mails, and
19  we'll just try to get some time frames here. And I'm going
20  to do that in preparation for asking you -- you had been
21  asked a question by Mr. McNair about why Ed Palattella was
22  there. So I just want to let you know that these questions
23  and these time frames are going to go into this, and we'll
24  ask you a question afterwards.
25          You know that Abby Conley was involved either as a

157

1  reporter or as a witness in the PW matter; is that correct?
2      A.  Yes.
3      Q.  And yesterday during the course of depositions of
4  Ms. Liebel and Ms. Saveikis there were certain documents
5  placed into evidence, one of which was, and I'll show you,
6  which had been marked as Liebel 3.  Okay.  And I
7  particularly want to have you read the first two paragraphs
8  just for the purpose of the dates.
9      A.  To myself?
10      Q.  Yeah.
11      A.  Okay.  (Witness complies.)  All right.  I've done
12  that.
13      Q.  All right.  Now, it appears from that letter that
14  the operative dates are June 9th, which was supposedly the
15  date of the incident.
16      A.  Correct.
17      Q.  June 21, when the incident was reported, correct?
18      A.  By Ms. Conley, according to this letter.
19      Q.  Yeah.
20      A.  All right.
21      Q.  And June 29, which was the date that Ms. Saveikis
22  came in and conducted interviews, correct?
23      A.  According to this, that's the way it reads, yes,
24  sir.
25      Q.  Okay.  Now, besides Agency confidentiality

158

1  policies, there are also statutes, state statutes, under the
2  Child Protective Services Law which deal with
3  confidentiality as well; is that correct?
4      A.  True.
5      Q.  And some of them deal with reports of child abuse
6  investigations; is that correct?
7      A.  Yes.
8      Q.  And without citing chapter and verse, unless you
9  can, they indicate that those -- all reports, both of the
10  perpetrator, the victim, the reporter, and facts during
11  course of an investigation are to remain confidential; is
12  that correct?
13      A.  Absolutely.
14      Q.  I'm going to show you an e-mail that was attached
15  as part of the exhibit that Mr. McNair gave to you.  It's
16  one, two, three, four, five pages from the back.  Are you
17  with me here?  It's dated June 24.  It says Matt Granger on
18  the top of it.
19      A.  Okay.
20      Q.  And then there are two e-mails.
21      A.  Yes.
22      Q.  One is from Abby Conley to Nzinga Cates or
23  N-Z-I-N-G-A Cates.  Do you know how to pronounce her first
24  name?
25      A.  No, sir.

159

1      Q.  And it doesn't give any extensions of e-mail
2  addresses; is that correct?
3      A.  No, sir.
4      Q.  Okay.  So --
5      A.  I mean, that is correct.
6      Q.  Right.  So what I presume -- am I correct in
7  presuming that that means it's an internal e-mail within
8  OCY?
9          MR. McNAIR:  Objection.  Foundation.
10      A.  Well, I -- yeah, I would have to say so.  Number
11  one, because that's the way the e-mail system worked, but
12  this person was an employee or a student or something at
13  that time.
14      Q.  And one would also -- Matt Granger had pulled this
15  off the hard drive because it has his name on it as well,
16  correct?  Was that the way that those documents that
17  Mr. Granger had taken off came back, with his name on them
18  as well?
19      A.  Yeah, because he was the source.
20      Q.  At 3:24 or 3:14 p.m. on that date there is an
21  e-mail that says from Abby Conley to Mrs. Cates that says,
22  "You and I need to talk.  Call me at home," period.  Do you
23  see that?
24      A.  Yes, sir.
25      Q.  And then it says "ABC."  Right?

160

1      A.  It does.
2      Q.  Abby B. Conley.  Below that is the original
3  message.  So this is a reply to an original message which
4  came in at 1:26 p.m. to Abby Conley from Ms. Cates.  Do you see
5  that?
6      A.  I see that.
7      Q.  Do you want to read for the record what that
8  e-mail says on June 24th.
9      A.  "Just wanted to let you know that the meeting went
10  well.  They did ask me about the incident with P and the
11  child, parenthesis, if I knew anything, close parenthesis.
12  I played completely dumb.  She did smooth things over, but I
13  didn't let her get away from the point.  I made it clear
14  that I was going to be respected.  She said that she talked
15  to P, and if I had another problem, that I should make sure
16  I tell her to her face and let her know that what she said
17  was inappropriate.  She most likely did talk to her because
18  P has been overwhelmingly nice to me lately.  She did tell
19  me that she didn't really want me to go out on visits with
20  you because she wanted me to see, quote, 'the social
21  worker's point of view and the paperwork that gets done,'
22  close quote.  You better not tell her I told you that.  I'll
23  call you soon.  Zin."
24      Q.  Now, this would have been based on the dates that
25  we talked about in terms of the PW incident report three

161

1    days after it had been reported, correct?
2        A.    It fits into that time line that way, yes, sir.
3        Q.    And there is a reference by this student/intern or
4    whatever that, "A meeting went well and they did ask me
5    about the incident with P and the child, parentheses, if I
6    knew anything.  I played completely dumb."  Correct?
7        A.    It says that.
8        Q.    If, indeed, Ms. Cates knew anything about that
9    incident, and it had been reported to her by Ms. Conley,
10   would that have been a violation above Agency policy and
11   CPLS law?
12           MR. McNAIR:  Objection.  Argumentative.  Calls for
13       speculation.
14       Q.    You can answer.
15       A.    Most definitely a violation of both, in my
16   opinion.
17       Q.    Okay.  And let's go -- I'm going to try to find it
18   here.  There's -- okay.  I'm going to go -- and just to show
19   it to you, because this is also within there.  Just to make
20   things easy.
21       A.    Um-hum.
22       Q.    This is an e-mail.  And these are during the
23   string of e-mails from the 4th of June, 2004.
24       A.    Um-hum.
25       Q.    Okay.  Deanna Cosby -- I'm on Page 3.  It starts

162

1    at Page 3 and the bottom line says, "Did you call my cell
2    last night?"  And it goes up.  And the one above it says,
3    6/4 of 2004, 11:28:57.  "Yes, I did.  I really wanted to
4    tell you something.  I'll talk to you this weekend.  I don't
5    trust this e-mail system monitor."
6           And then next one from Deanna Cosby at 12:09 said,
7    "Can someone say paranoid."  The one above that is a reply,
8    saying, "Paranoid," with an exclamation mark.  That's from
9    Mrs. Conley, correct?
10       A.    Right.  That's that back-and-forth conversation.
11       Q.    Right.  And then Ms. Cosby says, "With
12   justification."  Correct?
13       A.    Correct.
14       Q.    And then the next one above that says, "I have
15   not -- I've learned not to trust.  Zin, the new girl, is
16   awesome.  She is Christian, normal, and believes in
17   empowerment.  God sent her to this unit.  I can tell that
18   she is going to be one of us," exclamation point.
19       A.    It says that.
20       Q.    This Zin being the same Zin that it appears that
21   Ms. Conley told about the PW incident?
22       A.    20 days later.
23       A.    Yeah.
24       A.    Yes.
25       Q.    Let's go to another e-mail that was attached to

163

1    that exhibit, which is from June 4th, another one of the
2    string of e-mails on June 4th.  It says Page 1 at the
3    bottom.  You were discussing that with Mr. McNair.  I want
4    to talk about the one that is in the middle that has the
5    redactions.
6        A.    Sure, I see that.  I have it.
7        Q.    Okay.  Now, Mr. McNair asked you whether or not, I
8    believe, you had any knowledge as to whether Ms. W knew
9    about the order.  Do you remember that?
10       A.    That was this morning.  It was a while ago, but I
11   do.
12       Q.    Well, I want you to take a look at this e-mail,
13   and I want you to read Abby's e-mail to Ms. Cosby, which was
14   6/4/2004 at 2:29:53.
15           MR. McNAIR:  Just for the record, I object to your
16       mischaracterization of my question.  I asked him
17       whether Ms. Conley had seen an order.
18           MR. JOYAL:  No, that wasn't what you asked him,
19       but we can go back in the transcript.
20           MR. McNAIR:  Well, the record will bear that out.
21           MR. JOYAL:  Absolutely.
22   BY MR. JOYAL:
23       Q.    Read the e-mail without the redactions in it --
24   with the redactions in it.
25       A.    "I just spoke to" -- I can fill this in, if it's

164

1    permissible.
2        Q.    Well, put V in.
3        A.    -- "VW last night.  She was not in labor.  Her
4    attorney told VW that she has nothing to worry about when it
5    comes to the unborn child.  She told VW that we,
6    parenthesis, OCY, close parenthesis, cannot detain.  VW is
7    taking her attorney's advice.  She is due any day.  P has
8    detention letters at all the local hospitals.  VW does not
9    see this coming."
10       Q.    Okay.  To you, as a reasonable person, does that
11   e-mail indicate to you that -- number one, that VW's
12   attorney was incorrect if, indeed, she did tell VW that OCY
13   couldn't detain?
14       A.    Clearly.  I mean, because we had the authority to
15   do that --
16       Q.    And did so.
17       A.    -- and, in fact, had done so.
18       Q.    Okay.
19       A.    That order -- in fact, that order was issued, I
20   want to say, a month before this date.
21       Q.    And it says further that, "VW is taking her
22   attorney's advice."  We don't know what that advice is, do
23   we?
24       A.    We don't.  Ms. Conley evidently did, but we can't
25   tell from this.

165

1  Q.  And one would presume that an officer of the Court
2  that dealt with these cases all the time would -- if a
3  client suggested leaving the jurisdiction with their unborn
4  child, would have advised that client not to do so.  Would
5  you presume that?
6  A.  I think that's a reasonable presumption.
7  Q.  So making that presumption that you call
8  reasonable, when you go to the next couple sentences, what
9  would that indicate to you that Ms. Conley believed?
10  A.  That Ms. W was going to stay.  That she was going
11  to have her baby.  And that she had no knowledge that the
12  Agency had undertaken to detain the child and would do so at
13  the time of birth.
14  Q.  And if Ms. Cosby who said she will, and then above
15  that said, "God bless you, Deanna," believed that, do you
16  think that maybe what would then happen is if Ms. Cosby had
17  made a comment to her saying that her attorney was
18  incorrect, that it would be possible that Ms. W would have
19  made a different choice and maybe left the jurisdiction?
20  MR. McNAIR:  Objection.  Are you done?  Objection.
21  Argumentative.  Lack of foundation.  Calls for
22  speculation.
23  MR. JOYAL:  Well, it will be tied up in the next
24  question.
25  MR. McNAIR:  And relevance.

166

1  MR. JOYAL:  It will be tied up in the next
2  question.
3  BY MR. JOYAL:
4  Q.  Do you think she may have thought about leaving
5  the jurisdiction?
6  MR. McNAIR:  Objection.  Relevance.  Speculation.
7  A.  Well, if she had been advised that her attorney's
8  advice was incorrect and that, in fact, there were detention
9  letters, which I interpret to mean an order at all of the
10  local hospitals, and she was made aware of that before she
11  went there to deliver her child, sure.
12  Q.  And that would probably or most likely be contrary
13  to Mr. McNair's question to you that if you were in this
14  business long enough, you would know that there would be
15  detention letters everywhere?
16  MR. McNAIR:  Objection.  Argumentative.
17  Q.  Correct?  Would you agree?
18  MR. McNAIR:  Relevance.
19  A.  I think that's fair.
20  Q.  Okay.  So apparently Ms. Conley to Ms. Cosby was
21  asking Ms. Cosby to tell Ms. W that her lawyer was wrong.
22  MR. McNAIR:  Objection.  Argumentative.
23  Speculation.
24  Q.  Do you agree?
25  MR. McNAIR:  Foundation.

167

1  A.  Not only that her lawyer was wrong, but that, in
2  fact, it is coming.  She says to her, "She does not see this
3  coming."  And the response is, "She's going to see this
4  coming."  "She will see this coming."
5  MR. McNAIR:  Objection.  That's not what it says.
6  Q.  What does it say?
7  A.  She will.
8  Q.  And sometime subsequent to the separation of
9  Ms. Conley from OCY, did you -- or were you able to see some
10  letters that had been written around this time frame
11  allegedly by Ms. W to Mr. B, who was the father of the
12  child?
13  MR. McNAIR:  Objection.  Relevance.
14  A.  I most definitely did.
15  Q.  And in some of those letters around this time
16  frame did you see that there was contemplation by Ms. W,
17  after her conversation with Ms. Cosby, that she might leave
18  to go to either Florida or Canada to have her child?
19  A.  Yes.
20  Q.  And was there also reference to the fact that she
21  chose not to do that because her lawyer told her that that
22  would not be wise, if you can recall?
23  A.  Yeah.
24  MR. McNAIR:  Objection.  Foundation.
25  A.  I believe -- I believe so.  My recollection is

168

1  that the letter was written by VW to Mr. B, the father of
2  the child the day after this e-mail, that is, on June 5th of
3  2004, indicating to Mr. B that, in fact, Deanna Cosby had
4  communicated to her, VW, precisely what Ms. Conley had asked
5  her to do.
6  Q.  Had you been made aware of any letters subsequent
7  to the termination of the separation that Mr. B had written
8  concerning his knowledge of PW's alleged mistreatment of
9  VW's daughter?
10  A.  Vaguely.  I remember -- I remember some of that.
11  That was more of what Attorney Allgeier looked at than what
12  I did.
13  Q.  Okay.
14  A.  But I believe that that's correct.
15  Q.  Mr. McNair, during the course of his questioning
16  of you concerning the prognostic detention order and these
17  e-mails, asked you about whether or not Ms. Jones, who I
18  believe is in Mr. Angelone's office, her number was listed
19  in the phone book.
20  A.  Yeah, I remember that.
21  Q.  And I want to show you -- take a look at the
22  e-mail that is above that.  This is from Ms. Conley, May
23  27th, 2004, to Deanna Cosby.
24  A.  Um-hum.
25  Q.  Would you read that for the record.

169

1    A.  That e-mail reads, "Deanna.  VW's attorney wants
2  you to call her.  The number is (814) 868-8541.  The
3  attorney's name is Amy Jones.  VW asked me to ask if you
4  would do this."  And there is a scripted signature, Abby B.
5  Conley.
6    Q.  Okay.  And this was -- again, appears to have come
7  from her work computer.
8    A.  It does.
9    Q.  Would that seem to indicate to you that at least
10  Ms. Cosby had no knowledge as to who the attorney was?
11        MR. McNAIR:  Objection.  Argumentative.
12    A.  Well, it -- it appears that the attorney's name is
13  being furnished her.  I think you could reasonably conclude
14  that.
15    Q.  So without Ms. Cosby having knowledge, apparently,
16  of who the attorney was, it would be somewhat difficult,
17  would you not agree, for her to be able to look her name up
18  in the phone book?
19        MR. McNAIR:  Objection.  Argumentative.
20    Q.  Is that right?
21        MR. McNAIR:  Are you out just to waste our time,
22        or do you have a point here?
23    Q.  Is that right?
24    A.  I think it would be harder if you didn't know who
25  you were looking for.

170

1    Q.  Your conversation that you had during the course
2  of your interviewing individuals with Ms. Peebles, Mr.
3  McNair asked you whether or not -- who initiated the
4  conversation between Ms. Conley and Ms. Peebles.  Do you
5  remember that?
6    A.  Sure.
7    Q.  And it was your recollection that it was
8  Ms. Conley that approached Ms. Peebles, not the other way
9  around.
10    A.  I believe --
11        MR. McNAIR:  Objection to his recollection as what
12        he was told.  He recalls that's what he was told,
13        but he certainly didn't witness it.
14    A.  That's correct.
15    Q.  All right.  Did you have any doubt during the
16  course of the questioning that -- did you believe or was it
17  your impression that maybe your recollection was incorrect
18  and that, indeed, Ms. Peebles had approached Ms. Conley?
19    A.  No, I have no reason to believe it happened that
20  way.
21    Q.  Okay.  But did you think when Mr. McNair asked the
22  question the way he did that maybe that was what he was
23  alleging took place?
24        MR. McNAIR:  Objection.  Relevance.  Stupidity.
25    A.  I would never --

171

1        MR. JOYAL:  Excuse me?  Did you say stupidity?
2        MR. McNAIR:  Yeah.  Waste of time.
3        MR. JOYAL:  Okay.  Mr. McNair --
4        MR. McNAIR:  I'll withdraw stupidity, and I'll
5        just stick with waste of time.
6        MR. JOYAL:  Whatever you want to do, Mr. McNair,
7        that's fine.
8    A.  I wouldn't have any idea what might prompt
9  Mr. McNair to ask the given questions.
10    Q.  Well, let me ask the question this way.  Presuming
11  either way that it happened.  Let's presume that if
12  Ms. Conley were to testify that she was approached by
13  Mrs. Peebles and asked about PW's case, should she -- or
14  would it have been a violation of either CPL -- CPSL
15  statutes or Agency policy to have even responded?
16        MR. McNAIR:  Objection.  Calls for legal
17        conclusion.
18        MR. JOYAL:  He's a lawyer.
19        MR. McNAIR:  And foundation.  That's certainly not
20        what the CPSL law says.
21        MR. JOYAL:  Well, then, if it doesn't, sir, then
22        you can bring it out and show it to me.  Okay.
23        And until you do that, I'll take my interpretation
24        and his over yours.
25  BY MR. JOYAL:

172

1    Q.  Would that have been a violation?
2    A.  Ms. Peebles was the supervisor of the clerical
3  pool.  She would have had no reason to have any information
4  pertaining to this.  There would have been no appropriate
5  rationale to discuss this case with her in any way, shape or
6  form.  So whether she approached Ms. Conley or whether
7  Ms. Conley approached her, if Ms. Conley shared CPSL
8  information with her, which my understanding is this was,
9  that would have been inappropriate.  It would have been a
10  breach of Agency confidentiality policy, and it would have
11  been at least an arguable violation of the Child Protective
12  Services Law.
13    Q.  So is it your -- do I understand your answer to
14  say that if she had been approached by Ms. Peebles, that she
15  should have said, I don't know anything about this or I
16  can't talk about this and walked away?
17    A.  I think the appropriate answer would have been,
18  I'm not able to discuss this with you.
19    Q.  And Ms. Peebles was, in your opinion, credible
20  when she suggested that there was a discussion of this?
21        MR. McNAIR:  Objection.  Relevance.
22        MR. JOYAL:  You tried to attack his investigation
23        and what he put in here.
24        MR. McNAIR:  I --
25        MR. JOYAL:  Or you can answer the question.  You

173

1      made your objection.
2          MR. McNAIR: I did attack his investigation.
3      A.  I thought she was -- she was -- she was forthright
4  about what I wanted to ask her. But she was -- she was
5  hesitant, she was nervous. She -- you know, she didn't
6  really want to kind of be involved in maybe getting
7  Ms. Conley in trouble. I think that's the way she was
8  conveying it. But she was -- you know, she answered my
9  questions and, you know, was uncomfortable having to do it,
10  I think.
11      Q.  All right. And then the second issue was the
12  issue of the newspaper article and the accusation from
13  Ms. Conley that Ms. Deveney was going to be charged with
14  obstruction of justice and fired, and she would face jail
15  time.
16      A.  That's what Ms. Peebles told me she had been told
17  by Ms. Conley.
18      Q.  You wrote in Item 5 that you believe that this was
19  conduct violative of Sections A9, B6 and 8, C7 and 11. And
20  I presume that's with the County policy, County Employment
21  Policy?
22      A.  Yeah, it's the --
23      Q.  No. 5.
24      A.  Right. It would be the Employee Work and Conduct
25  Responsibilities from the -- this is from the County.

174

1  Employee's handbook, I believe.
2      Q.  And those were attached, correct?
3      A.  Correct.
4      Q.  And A9 is being disruptive or discourteous with
5  other employees, correct?
6      A.  Correct.
7      Q.  B6 is relating false or derogatory information
8  which may injure the name or representation of another
9  employee. That would be a five-day suspension, up to,
10  correct?
11      A.  Correct.
12      Q.  And C -- B8 is misconduct, conduct which is
13  inappropriate or unreasonable in light of circumstances
14  involved. And it goes on to talk about Section B,
15  suspensions. But we get to C, which is subject of
16  termination. And you said C7, conduct during work or
17  non-work hours which would cause a reasonable person to have
18  an unsavory opinion about County employees or County
19  operations. And 11, misconduct or conduct which is
20  inappropriate in light of circumstances involved and is
21  comparable to the failures referenced in this Section C.
22          Now that's a termination offense, if proven,
23  correct?
24          MR. McNAIR: Objection. The policy speaks for
25      itself.

175

1      Q.  Your interpretation, sir. Termination offense?
2      A.  Well, that's where it falls under the --
3      Q.  C7.
4      A.  -- under Section C, yes.
5      Q.  So if you tell someone that a fellow employee is
6  going to be charged with obstruction of justice, fired and
7  put in jail, is there any doubt in your mind, as you were
8  writing this and wrote it up, that that would have been a
9  violation of C7?
10      A.  None whatsoever.
11      Q.  Now, I know that you weren't involved in the
12  termination decisions or the decisions surrounding that.
13  But would you say that just that piece could lead a
14  reasonable person within the County to decide that
15  Ms. Conley was subject to termination without any other
16  evidence contained in the e-mail?
17          MR. McNAIR: Objection. As this witness
18      testified, his opinion is not relevant, was not a
19      consideration of the County --
20          MR. JOYAL: That's fine.
21          MR. McNAIR: -- in making its decision. So you're
22      just wasting our time.
23          MR. JOYAL: You objected.
24  BY MR. JOYAL:
25      Q.  Do you believe that?

176

1      A.  I would have had no problem, in my professional
2  capacity as the Solicitor for the Office of Children and
3  Youth, suggesting to the County that Ms. Conley be
4  terminated for that reason alone. You know, to falsely
5  accuse someone of criminal conduct, you know, is not only a
6  violation of these policies and procedures. But if my law
7  school training, which was a long time ago, is of any value
8  to me, it's, per se, slanderous.
9      Q.  And this would have had -- this had nothing to do
10  with the PW case and the e-mails to Deanna Cosby. This was
11  direct information that you had received directly from
12  another worker.
13      A.  A supervisor. Yes, correct.
14      Q.  Another person employed at OCY.
15      A.  Correct.
16      Q.  Saying that Abby Conley told her these things.
17      A.  Correct.
18      Q.  Were you made aware that at some point in time
19  during the course of the PW investigation and its immediate
20  aftermath, that there had been an e-mail sent to the
21  administration at OCY from the union steward expressing
22  concerns about Abby Conley's conduct and discussions that
23  she may have been having about PW?
24          MR. McNAIR: Objection. Foundation. I'm not
25      aware of any such e-mail.

177

1    MR. JOYAL: You're not aware of it?
2    MR. McNAIR: No.
3    MR. JOYAL: You ought to look through all this
4    stuff --
5    MR. McNAIR: Do you want to produce it?
6    MR. JOYAL: We did produce it. You may --
7    MR. McNAIR: Produce it. You want to show it to
8    the witness --
9    MR. JOYAL: Yeah.
10    MR. McNAIR: -- because there's no e-mail that
11    says that.
12    MR. JOYAL: You don't think so. Okay. I don't
13    have to show it to the witness. I asked --
14    MR. McNAIR: Okay. You're calling for
15    speculation, then.
16    MR. JOYAL: That's fine. Object away, Tim.
17 BY MR. JOYAL:
18    Q. Were you aware of that?
19    A. I'm aware that a lady named Heather McConnell,
20 which I think was her name at that time, she's since been
21 married. She was the union steward. At some point brought
22 to the concern of the administration of the Office of
23 Children and Youth the fact that Ms. Conley was making
24 disparaging remarks about Ms. PW to other employees.
25        I didn't learn that until, I'm sure, probably

178

1 after -- even after I prepared this deposition exhibit,
2 Cauley 1, in August. But I was made aware of that at some
3 point, possibly in connection with the time when we were
4 preparing the Civil Service appeal that Ms. Conley
5 subsequently withdrew.
6    Q. And at that point in time, were you aware as well
7 that the union steward on behalf of PW as well as other
8 union employees was asking that action be taken to stop it?
9    A. That was what I was advised.
10    MR. JOYAL: I don't have any other questions.
11
12        CROSS-EXAMINATION
13 BY MR. LANE:
14
15    Q. Mr. Cauley, you had mentioned --
16    A. We're not done yet.
17    Q. I just have a couple questions.
18    A. Okay.
19    MR. McNAIR: Not by a long shot.
20    Q. You had mentioned a system that was established to
21 have OCY employees express a contrary point of view. Do you
22 remember talking about that?
23    A. Sure.
24    Q. I think you mentioned it briefly, but you never
25 explained what the system was. Can you explain what that

179

1 was.
2    A. Well, the cases that caseworkers and people in the
3 Agency would handle -- this is kind of a preference, just
4 bear with me -- present some very, very difficult and trying
5 circumstances in terms of attempting to provide services to
6 families that are hurting and dysfunctional for one reason
7 or another. Trying to keep children safe in environments
8 and hopefully with their families if they can be, and, if
9 not, in other environments, and then hopefully reunited
10 safely with their families.
11        The cases are complex. The issues that have to be
12 confronted sometimes are very complicated and difficult.
13 And people's points of view about how to address those in a
14 way that best serves the needs of the family and the
15 children sometimes don't come together.
16        And the people that work with these families are
17 experienced, for the most part, and well-trained
18 professionals. The people that work with the children, the
19 same. And I used to say to folks, you know, look, you're
20 all reasonable people, your opinions can vary, reasonable
21 minds, about how these cases need to be serviced can differ,
22 and that's fine.
23        So there would be times when you might have a
24 caseworker who would want to move a case of children who had
25 been in care for a period of time away from reunification

180

1 toward adoption. And a supervisor who disagreed, or a
2 program director who disagreed with the supervisor and a
3 caseworker who were of that mind. And that would be based
4 on their different assessments, their training, their
5 philosophical approach, you know, what their understanding
6 of the legal requirements might be. So, you know, when
7 people would not be on the same page about those kinds of
8 decisions.
9        And we were coming up to Court hearings where an
10 Agency -- the Agency had to go in and state a position to
11 the Court about what's in the best interest of this child at
12 this time, which way should we go. We would attempt to iron
13 that out administratively in-house, and sit down with folks
14 and meet with folks and talk about those issues, and why
15 people wanted to go in a particular way. And if we could
16 get consensus, then fine, we could present, then, a
17 consensus approach to the Court. Which we felt would be in
18 the best interest of everybody.
19        In those cases where after that process had run
20 its course people still were at loggerheads, and there were
21 some, about which way should we go. Recognizing that it
22 wasn't the Agency's decision about what ultimately happens
23 to a child that controls, it's the Court's, we wanted to
24 make sure that the Court would get the benefit of
25 everybody's point of view. The professionals that were

181

1 involved with the family, and the child. And then hear from
2 the parents, child's counsel, Court-appointed special
3 advocate if there was one involved in the case, whoever.
4       So we would at a hearing invite that caseworker or
5 whoever, you know, had a different point of view, to testify
6 and state their position and their rationale for it. Or to
7 submit a written statement with a rationale and a position
8 as part of the regular submissions to the -- to the Court.
9 So that the Court would have the benefit of that thinking.
10      Now, it didn't happen all that often, you know.
11 But there were cases, and sometimes there's strong feelings
12 on both sides of those kinds of difficult issues. But that
13 was something that was in place as long as I was around.
14      Q.   You mentioned the best interests of the child.
15 Would the best interest of the child, generally speaking, be
16 a paramount concern of OCY?
17      A.   Sure.
18      Q.   And when OCY would issue a prognostic detention
19 order, that would be issued in the best interest of the
20 unborn child that was going to be born; is that fair to say?
21      A.   Right. The order was issued not by us. It was
22 issued at our request, but by the Judge, based on
23 information supplied to the Judge that justified its
24 issuance. So, yeah, but, I mean, it was always, you know,
25 what's -- what's for the best interest of this child at this

182

1 time.
2       MR. LANE: That's all I have for you.
3       MR. McNAIR: Just a couple.
4
5           REDIRECT EXAMINATION
6 BY MR. McNAIR:
7
8       Q.   Did VW leave the jurisdiction or do anything that
9 endangered her unborn child as of June '04? Or May '04.
10      A.   Aside from some suspected drug use while she was
11 pregnant, I don't think so. But I don't know for sure
12 because I wasn't involved in the case.
13      Q.   VW was a drug user, in your opinion?
14      A.   Oh, yeah.
15      Q.   To your knowledge?
16      A.   Oh, yeah.
17      Q.   Oh, yeah? Okay. But, in fact, VW went up to
18 Saint Vincent, had her baby knowing that it was going to be
19 detained by Children Services, correct?
20      A.   I don't believe that's correct.
21      Q.   No?
22      A.   Not from any information that's ever been provided
23 to me.
24      Q.   She didn't have the baby?
25      A.   Oh, I'm sorry. It's been a long day. From what

183

1 we know here, she was told on or about June 5th by Deanna
2 Cosby, at your client's request, that the detention order
3 had been issued and was available at the local hospitals.
4 So when she went to the hospital subsequent to that to have
5 the child, yes.
6       Q.   Okay. And when she learned of that, she didn't do
7 anything untoward or do anything that endangered the child,
8 specifically, she didn't go to Canada.
9       A.   Well, she had the child here. I don't know what
10 she did between June 5th and the time she had the child in,
11 I believe, July.
12      Q.   Now, there was discussion in that e-mail between
13 Abby Conley and VW about kinship placement rather than
14 foster placement. Do you recall that?
15      A.   Yeah. Let me refer to it, Mr. McNair, so that I
16 know what you're -- what you're looking at. Just please
17 bear with me a second. Yeah, I see that.
18      Q.   Okay.
19      A.   Yeah, it's on June 4th.
20      Q.   And kinship placement is where an infant is placed
21 with a relative such as a grandparent, correct?
22      A.   Yeah, that would qualify.
23      Q.   But Abby knew, as of the date of this e-mail, that
24 the order was for foster care detention rather than kinship
25 detention, correct? Because she had read the order. She saw

184

1 the order.
2       A.   I don't know -- I don't know that she actually saw
3 the order, Mr. McNair. I don't have any evidence that she
4 saw it. What I -- all I can take from this is that she was
5 aware of its existence. So for me to be able to say that
6 see knew precisely what the order provided, I don't think I
7 can tell you that.
8       Q.   How do you know she was aware of the existence of
9 the order?
10      A.   Because she told VW on June 4th.
11      Q.   How do you believe she learned about the order?
12      A.   I don't know. She may have been told by the
13 worker. She may have been told by the supervisor or the
14 program director. She may have seen it in the case record
15 if she accessed the case record. I mean, I don't know.
16      Q.   And how do you know she didn't simply assume that
17 such an order had been entered?
18      A.   Because she writes to Abby Conley, "P has
19 detention letters at all the local hospitals."
20      Q.   Okay. And that was standard procedure when an
21 order is entered, isn't it?
22      A.   Yeah, the order would be transmitted to the local
23 hospitals, that's correct.
24      Q.   Right. And that was -- okay. You never saw any
25 letters between VW and her boyfriend until sometime well

185

1  after Ms. Conley was terminated by the County.
2      A.  That's right.
3      Q.  And, again, you never questioned VW or her
4  boyfriend to authenticate or validate the contents of those
5  letters.
6      A.  I did not.
7      Q.  Did anybody?
8      A.  I believe so.
9      Q.  Who did?
10      A.  I would only be guessing.  Attorney Allgeier would
11  know for sure, more likely than I.  And I don't want to
12  guess, Mr. McNair.
13      Q.  You believe somebody spoke to VW about those
14  letters?
15      A.  I don't know about VW.  But I'm pretty sure that
16  the father, Mr. B, was talked to, and also his mother, who's
17  name I have no idea what that is.
18      Q.  Who was neither an author or recipient of any of
19  those letters.
20          MR. JOYAL:  Objection.  Is that a question or is
21      that a statement?
22          MR. McNAIR:  It's a question.
23      A.  She wasn't -- she wasn't the author, as far as I
24  know.  And I don't know if she might not have had them in
25  her possession at some point.  I don't know.

186

1      Q.  That was my next question.  How did OCY acquire
2  those letters?
3      A.  I don't have personal knowledge of that.  Attorney
4  Allgeier knows that better than I do.  But I'm given to -- I
5  believe, with all those caveats in place, and I'll try the
6  best I can do that to tell you what I know, is that Mr. B's
7  mother had the letters.  And somehow he wanted us to get
8  them.  I don't know how or why.  That's the best I can tell
9  you.
10      Q.  He carbon copied his mother on his letters to his
11  girlfriend from jail.
12      A.  No, no, no.
13      Q.  How did she have copies of the letters that he
14  wrote from jail to VW?
15      A.  No, no.
16          MR. JOYAL:  Let him answer the question.
17      A.  I'm talking in particular.  I'm talking
18  about a single letter dated June 5th of 2004 authored by VW
19  addressed to Mr. B.
20      Q.  Okay.
21      A.  In which she recounts having the conversation with
22  Deanna Cosby at the behest of your client about the
23  disclosure of the prognostic detention order.
24      Q.  The letter states that it was at my client's
25  behest.  Is that your testimony?

187

1      A.  Essentially.  I think you have the letter.  I've
2  been told you have the letter.  That's my recollection of
3  how it -- essentially what it was -- was done.  It was your
4  client --
5      Q.  The letter states that that --
6      A.  Your client had told her this information.  And
7  she was conveying it to VW.
8      Q.  If I witness an incident of child abuse and report
9  it, I understand, based on your interpretation of the law, I
10  am prohibited by the CPSL from mentioning that to anyone,
11  including a parent or relative of the child.  Is that -- am
12  I correct?
13      A.  No, you can --
14          MR. JOYAL:  I'm going to object.
15      A.  -- you can tell whoever you want.  You're not an
16  employee of Child Protective Services Agency.
17      Q.  Now, you stated that accusing a fellow employee of
18  engaging in criminal conduct and child abuse is, I guess, a
19  lot of different bad things.  Is that fair?
20          MR. JOYAL:  How about picking one bad thing.
21      A.  The comment that I made had nothing to --
22      Q.  It was in response to some huge question that --
23  argument lobbed by Mr. Joyal, so if you recall that.
24          MR. JOYAL:  Objection.  Move to strike.
25      A.  The comment that I made was in response to a

188

1  question about an accusation only of criminal conduct of
2  obstruction of justice as it was made against Ms. Deveney.
3      Q.  What if Ms. Deveney did, indeed, engage in
4  obstruction of justice?
5          MR. LANE:  Objection to form.
6          MR. JOYAL:  Lack of foundation.
7      A.  Well, I would have expected that she would have
8  been charged by now.
9      Q.  You would expect that, would you.
10      A.  Maybe.
11      Q.  Okay.  What if facts exist that would support a
12  violation of the Obstruction of Justice Statute by virtue of
13  altering documents that are going to be submitted to a Court
14  for adjudicative purposes?
15          MR. LANE:  Object to form.
16          MR. JOYAL:  I'm going to object to the form and
17          lack of foundation.
18          MR. McNAIR:  Well, there's plenty of foundation.
19      A.  You know, I guess it would depend on, you know,
20  who your district attorney is, what his assessment of it
21  would be, and whether or not he would want to prosecute a
22  case like that.
23      Q.  Well, I'm talking in terms of the discipline
24  policy.  Are you saying that if you know that a coworker has
25  engaged in criminal conduct, and you say something about it,

**189**

1 that that is a terminable offense even though there's no
2 disciplinary action taken against the coworker? Is that --
3 am I correct in my understanding?
4     MR. JOYAL: Objection. What's the question?
5     MR. LANE: Objection. Overly broad.
6     MR. JOYAL: Are you suggesting that if -- is the
7     question that if your client accuses someone that
8     has not been charged with a crime and so she's
9     going to jail and is going to be fired, is
10     different if the person wasn't disciplined?
11  Q. Let me ask my question.
12     MR. JOYAL: Well, try to make it one that's
13     comprehensible, because I'm sure he doesn't
14     understand it, because I don't.
15  A. I'll take another wing at it, Mr. McNair, if you
16 want to try -- I'll attempt to answer it, if you like.
17  Q. Would it be a violation of the policy for an OCY
18 employee who witnessed or had knowledge of a crime committed
19 by a fellow employee to say something about that?
20  A. It depends.
21     MR. JOYAL: I'm going to object.
22  A. Depends on to whom the person said it, under what
23 circumstances, and for what purpose. I think. If you're
24 asking me in this case if there's any legitimate basis upon
25 which your client could make that statement to Ms. Peebles,

**190**

1 that she made, I would say I don't see how. Because she
2 said to her not I believe this woman committed this offense,
3 but she is going to be charged with obstruction of justice
4 and she is going to jail.
5  Q. Where were you when you overheard this
6 conversation?
7  A. This is what Ms. Peebles told me was reported to
8 her. And that, on the issue of Section C responsibility,
9 clearly falls into the category of the type of conduct that
10 would cause a reasonable person, Ms. Peebles, to have an
11 unsavory opinion, at least, about Ms. Deveney.
12  Q. Now, you're -- you talked about a policy that OCY
13 has that encourages people who disagree with their coworkers
14 to bring those concerns out, right?
15  A. In the context in which I was discussing it, yes.
16  Q. When was that policy placed in force or into
17 effect?
18  A. That's been something that we've attempted to do
19 since the days that Judge Anthony was the Juvenile Court
20 Judge. It goes back years.
21  Q. Where is that policy codified?
22  A. I don't know that it's written anywhere.
23  Q. How is that policy communicated to the employees?
24  A. By Agency administration and by the legal
25 department, in the context of just discussions that we've

**191**

1 had with employees, whether it be staff meetings or
2 individual sit-down sessions with employees.
3  Q. So you're telling me there is some formal method
4 or some established method of communicating this policy to
5 employees.
6  A. I wouldn't say formal. It was an understanding
7 that we continued to reinforce to people in situations
8 where, if there were disagreement, that it would be resolved
9 according to that format.
10  Q. Now, I think you testified earlier that after you
11 were the interim director that Gary Lucht was appointed as
12 OCY director.
13     MR. JOYAL: He never testified to that. He said
14     he was the director until sometime in October.
15  Q. Did Gary Lucht -- was Gary Lucht appointed OCY
16 director?
17  A. Yeah, I think he started first part of November.
18  Q. Okay. All right. And do you know whether or not
19 Mr. Lucht claimed to be changing any OCY policies?
20  A. You know, I didn't really have all that much
21 contact with Mr. Lucht. So I'm not really sure whether I
22 could answer that question.
23  Q. Do you read the paper?
24  A. No, not if I can help it.
25  Q. Okay. Were you aware that Mr. Lucht issued a

**192**

1 memorandum to employees regarding alteration of documents
2 and calling for a redefinition of the Agency?
3  A. Yeah, I think there was something that came out
4 maybe shortly before I left along those lines. I'm not
5 sure, but I believe so.
6     (Cauley Deposition Exhibit 3 marked for
7     identification.)
8  Q. Let me show you what we've marked as No. 3. Do
9 you recognize that?
10     MR. JOYAL: I'll place an objection. It appears
11     that your client ended up getting it at her home
12     e-mail from someone, and is not identified as
13     being sent to Mr. Cauley.
14  A. No. You know, no, I don't -- I've not seen this
15 particular document before, Mr. McNair.
16  Q. You did not receive an e-mail from Mr. Lucht at
17 the end of November?
18  A. I believe that I may have. But to be able to sit
19 here and tell you that this is the e-mail I got from Gary
20 Lucht, I can't do that. You know, there's no way for me to
21 be able to say that for sure. Might be. But, you know, I
22 don't know.
23  Q. Okay. This document states -- I'm not going to
24 stop asking you about it just because you're not going to
25 authenticate it.

193

1    A.  Oh, come on, I'm really tired.
2    Q.  I'll authenticate it another way.  I don't think
3  there's any question that this is the document.
4    A.  Okay.
5    Q.  This document sets forth "Under no circumstances
6  will anyone interfere with, alter or fail to present
7  information because there's disagreement in desired
8  outcome."  Does that represent a change in Agency policy, to
9  your understanding?
10    A.  I don't think so.
11    Q.  Okay.  The bottom of that first page, it says,
12  "Therefore, all case-specific communications will go forward
13  without any alteration whatever."  Is that a change in
14  Agency policy?
15    MR. LANE:  I'm going to object to the form of the
16    question.
17    MR. McNAIR:  What's the problem with the form of
18    the question?
19    MR. LANE:  Because it requires him to interpret
20    what that means, and he didn't write it.  I'm
21    sorry, you rolled your eyes because of what?
22    MR. McNAIR:  Nothing.
23    MR. JOYAL:  Well, I want to know too.  I mean,
24    I've already objected to the lack of
25    authentication of it.  I want you to tell me how

194

1    you're going to authenticate the document today.
2    MR. McNAIR:  I'm probably not going to
3    authenticate it today.
4    MR. JOYAL:  Well, then I don't think he needs to
5    answer questions --
6    MR. McNAIR:  We'll authenticate it some other
7    time, but I'm going to ask him questions about it.
8    MR. JOYAL:  Well, I think under the rules, he
9    doesn't have to answer any questions regarding a
10    document he says he never saw.
11    MR. McNAIR:  I think if you tell the witness not
12    to answer questions --
13    MR. JOYAL:  I'm not.
14    MR. McNAIR:  -- except to preserve a privilege,
15    you could wind up in some significant more
16    difficulty with our Judge in this case.
17    MR. JOYAL:  Mr. McNair, do me a favor, will you,
18    okay, don't give me a lecture.  All right.  I
19    didn't advise --
20    MR. McNAIR:  I got to sit here and take your
21    lectures and I can't lecture you.
22    MR. JOYAL:  I didn't advise the witness as to
23    anything.
24    MR. McNAIR:  Be fair, Mr. Joyal.
25    MR. JOYAL:  I think that what we said, although

195

1    you seemed to disagree many hours ago, was that we
2    could raise objections on behalf of Mr. Lanzillo.
3    And if Mr. Lane believed that Mr. Cauley, in your
4    opinion, since you think that I was not part of
5    that, could advise Mr. Cauley not to answer a
6    question, he can do so.  Because you granted him
7    that ability.
8    Now, I believe that I was given that ability
9    as well.  I'm not advising him one way or the
10    other.  I asked you how you're going to
11    authenticate a document that apparently is no
12    longer attorney/client privilege that came from
13    your client at her ilovejesus.net address which
14    says, better read this, but doesn't suggest at all
15    that this is a forwarded document or anything at
16    all.  It just is a typed document.  So how he's
17    going to testify that that is an accurate
18    representation of that document is beyond me.
19    MR. McNAIR:  I'm not asking him if it's an
20    accurate representation.
21    MR. JOYAL:  You did.  You just asked him --
22    MR. McNAIR:  I did, and he couldn't answer the
23    question.
24    MR. JOYAL:  You just asked him if --
25    MR. McNAIR:  Just --

196

1    MR. JOYAL:  -- that was a change in Agency policy.
2    MR. McNAIR:  Do you want me to call the Judge?
3    MR. JOYAL:  You can call anybody you want.
4    MR. McNAIR:  Dummy up.  Let me ask my questions.
5    MR. JOYAL:  Why don't you call Mr. Lucht and ask
6    him about it.
7    MR. McNAIR:  If I have to, I will.
8    MR. JOYAL:  Well, then, do it.
9  BY MR. McNAIR:
10    Q.  But I'm asking you to assume that this is a true
11  copy of Mr. Lucht's memo from the end of November 2005
12  regarding redefinition of the Agency and new policies.  And
13  I'm asking you if his statement that, "Therefore, all
14  case-specific communications will go forward without any
15  alteration whatever," states a new policy or if that is the
16  policy that was in effect previously.
17    MR. McNAIR:  Okay.  I'm going to object to it being
18    even put as an exhibit to this deposition without
19    any authentication of the document.
20    MR. LANE:  And I simply renew my objection to the
21    form.
22    Q.  You may answer the question.
23    A.  I'm going to try and answer this the best way I
24  can, Mr. McNair.  And, that is, I don't know what this
25  means.  All case-specific communications will go forward.

197

1  Go forward where. From whom to whom. In what format.
2  Without any alteration whatever. I don't know what that
3  means. You know, so I can't answer the -- I'm not going to
4  speculate about what that means.
5      Q.  Do you think that this memo was issued in response
6  to the incident where Susan Deveney altered the Court
7  summary submitted by Ms. Conley?
8      A.  I don't think Susan Deveney altered the Court's --
9  the Court's summary.
10     Q.  I know you don't think that. Do you think this is
11 in response to that?
12         MR. JOYAL: Objection. Argumentative.
13         MR. LANE: Objection to form.
14         MR. JOYAL: Speculative.
15     A.  I can't answer that because I don't know who the
16 author of this is other than your client. And maybe she
17 issued it. I don't know. I can't tell you for sure that
18 this is what Mr. Lucht generated.
19     Q.  And you don't read the papers?
20     A.  Well, not if I can help it, Mr. McNair, no.
21     Q.  Because the papers have bad things to say about
22 OCY?
23         MR. JOYAL: Objection. Move to strike.
24     A.  No.
25     Q.  I read the paper every day. I don't know why you

198

1  wouldn't.
2      A.  Go ahead.
3      Q.  Why don't you read the paper?
4          MR. LANE: Is that a question?
5      A.  Personal preference. Thank you.
6          MR. LANE: I don't read it either.
7      Q.  Have you had the opportunity to review the report
8  issued by the Child Welfare League?
9      A.  No.
10     Q.  Have you reviewed any summaries of it?
11     A.  No.
12     Q.  No interest in that.
13     A.  Not anymore.
14         MR. McNAIR: That's all I have.
15         MR. JOYAL: I just want to follow up on questions
16         here especially regarding this document that I've
17         objected to.
18
19             RECROSS-EXAMINATION
20 BY MR. JOYAL:
21
22     Q.  When did you leave the Agency?
23     A.  Whatever the last business day of 2005 was,
24 whatever that --
25     Q.  Sometime in December.

199

1      A.  Yeah.
2      Q.  In October you were -- you were the interim
3  director until October 31st?
4      A.  Right.
5      Q.  In the month of November, were you the Solicitor
6  still?
7      A.  Sure. I was the Solicitor even when I was the
8  interim director.
9      Q.  Were you approached by Mr. Lucht at any point in
10 time and asked for your input discussion concerning any
11 policy statements that he was changing, especially one that
12 may have concerned alteration of documents?
13     A.  Never.
14     Q.  Do you know whether or not the County Solicitor,
15 who I believe was Mr. Onorato at the time, was ever
16 approached by Mr. Lucht regarding any change in OCY policy?
17     A.  Not to my knowledge.
18     Q.  Do you know whether or not Mr. Lucht had a
19 conversation with the former director of OCY or any other
20 former employee in the administration of OCY concerning any
21 change in OCY policy?
22     A.  Not to my knowledge.
23     Q.  Did Mr. Lucht talk to you at all during the period
24 of time from November 1 until December 31st?
25     A.  Very little. I made several attempts to see if we

200

1  could sit down with him as the legal department to see if --
2  to let him know what we did. And to make sure that, as I
3  put it to him in an e-mail, I believe, that we were all on
4  the same page about how we wanted things handled legally.
5      Q.  Did he meet with you?
6      A.  I got no response.
7      Q.  Okay. How many days was it between the time that
8  Mr. Lucht took his appointment and the new election took
9  place for the new County Executive?
10     A.  I would have to guess it was about a week.
11     Q.  Okay. And at some point in time, did
12 Mr. DiVecchio -- was he elected to be the Executive?
13     A.  At some point.
14     Q.  And upon Mr. DiVecchio's election, did you believe
15 that your career at OCY was over?
16     A.  Oh, pretty much.
17     Q.  And did you understand that many of the other
18 people at OCY may have had their careers ended as well?
19     A.  Well, that, in fact, turned out to be the case.
20     Q.  And what about other department heads, were they
21 replaced?
22     A.  Some were.
23     Q.  But you were there for almost two months, trying
24 to do your job as Solicitor, and couldn't get any response
25 from the person who was your boss?

201

1    A.  Pretty much.  The only -- really, the only contact
2    of any -- of any meaningful discussion was when people would
3    complain about things that were happening in their cases.
4    And they would complain to him.  He would ask me to look
5    into it and provide him some response to what was going on
6    with the case.
7    Q.  All right.  So for the sake of this document, this
8    alleged document that Ms. Conley sent to our lawyers, you
9    had no -- you were not contacted or nothing was discussed
10   with you, even as you were the Solicitor.
11   A.  Nothing about any policy change of anything that
12   might even remotely resemble what is in that document, no.
13   Q.  And do you know whether or not Abby Conley ever
14   made any phone calls to either Mark DiVecchio or Gary Lucht
15   concerning your position or asking for her job back at OCY
16   after the election?
17   A.  I would have no way of knowing that.
18   Q.  Did you ever see any photographs of Ms. Conley
19   with Mr. DiVecchio?
20   A.  No.  I'm sorry, I didn't.
21        MR. McNAIR:  How does this relate to an issue
22   pleaded?
23        MR. JOYAL:  I have no other questions.
24        MR. LANE:  I have no other questions.
25

202

1              FURTHER REDIRECT EXAMINATION
2    BY MR. McNAIR:
3
4    Q.  Is it your belief that -- well, first of all, did
5    you leave OCY voluntarily or were you terminated?
6    A.  I was terminated.
7    Q.  Were you terminated for cause?
8    A.  No.
9    Q.  How did that come about, then?  Were you an
10   at-will employee under the direction of the County
11   Executive?
12   A.  That appears to be -- to have been my situation.
13   How it came about was I got a letter in my interoffice mail
14   on the 15th of December, over Mr. DiVecchio's signature,
15   indicating that after he took office my services there would
16   no longer be required.
17   Q.  Okay.  So you got a letter from Mark DiVecchio --
18   A.  Correct.
19   Q.  -- on December 15th.
20   A.  Correct.  And then I got a subsequent piece of
21   correspondence from Mr. Lucht confirming what's called an
22   involuntary retirement under the County Personnel Code.
23   That was in late December.
24   Q.  Do you believe that your employment was terminated
25   for political reasons?

203

1    A.  You want my personal opinion?
2    Q.  I'm asking you whether or not it's your --
3    A.  Yeah, I can't imagine why else it would have
4    happened.
5    Q.  Did you support another candidate in the election?
6    A.  I supported no candidates.  I do not involve
7    myself in the politics at all around here.
8    Q.  Are you registered to vote?
9    A.  Yeah.
10   Q.  As a Republican --
11   A.  Correct.
12   Q.  -- or a Democrat?  Okay.  And you believe it was
13   because of partisan differences that you were replaced?
14   A.  Well, it's -- I think it's more complicated than
15   that.  We don't have enough time to go into it, I don't
16   think, Mr. McNair.
17        MR. McNAIR:  That's all the questions I have.  Oh,
18   one more.
19   Q.  Do you believe that you were terminated because
20   Abby Conley called for your termination, because she called
21   up Mark DiVecchio and said fire Mike Cauley?
22   A.  Could be part of it.  I don't know.  I wouldn't be
23   surprised.
24   Q.  If she said it or if it worked?
25   A.  Both.

204

1        MR. McNAIR:  Okay.  Thanks.  That's all I have.
2        MR. JOYAL:  Mike, you have the right to read the
3        deposition, make any corrections you choose to, or
4        you can waive signature and do whatever.
5        THE WITNESS:  I think I would like to.  I'm
6        retired now.
7        MR. JOYAL:  Why don't you make arrangements --
8        since I don't represent him.  You should make
9        arrangements with the court reporter to get her to
10       send you the transcript directly.
11
12       (Deposition concluded at 4:24 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

| A | abuse 8:8 11:21 | 12:22 13:22 | 8:20,21 9:11 | 42:1 44:22 |
|---|---|---|---|---|

**A**

**Abby** 1:3 24:22
26:5 36:24
39:2,2 41:10
60:23 75:7,20
77:12 82:21
85:2 106:7,11
106:16 114:13
118:17,19
121:16,25
122:10 123:12
123:23 124:1,3
125:17 127:18
129:13 130:9
138:15 141:21
145:4,11
.148:15 150:16
151:4,23 155:8
156:25 158:22
159:21 160:2,4
169:4 176:16
176:22 183:13
183:23 184:18
201:13 203:20
**Abby's** 79:7
163:13
**ABC** 159:25
**ability** 23:19
24:11,13 195:7
195:8
**able** 15:21 16:3
26:22 31:12
40:5 45:3
99:21 116:23
152:9 167:9
169:17 172:18
184:5 192:18
192:21
**abscond** 18:5,10
19:5
**absconding**
18:14,15
**absence** 11:20
13:7,12 87:21
**absent** 15:17
**Absolutely**
158:13 163:21

**abuse** 8:8 11:21
13:3 20:7 56:1
57:20,20 58:7
77:22 81:19
134:17,21
135:9 144:10
158:5 187:8,18
**abusive** 24:14
**accept** 105:18
129:11
**acceptable** 24:19
**accepted** 67:7
136:21
**access** 14:7,16
15:12 16:3
52:21 72:14,22
**accessed** 184:15
**accessing** 16:6
**accidental**
125:13
**accommodation**
73:13
**accomplish**
27:22
**account** 55:5
**accounted** 51:7
**accuracy** 21:16
**accurate** 21:9
22:10 66:3
67:9 128:22
195:17,20
**accusation**
173:12 188:1
**accuse** 176:5
**accused** 63:11
**accuses** 189:7
**accusing** 88:1
187:17
**acknowledged**
44:7
**acquiesce** 54:24
55:2
**acquire** 186:1
**across-the-boa...**
14:10 16:2
22:14
**Act** 9:15 12:17

**12:22** 13:22
14:6 15:10
29:4,15 53:25
54:10 55:6,18
55:19,20 57:11
**action** 1:4 29:16
48:25 78:11
79:6,10 178:8
189:2
**actions** 8:17
90:22
**activities** 69:16
**actual** 11:21
13:7 131:16
**add** 73:16
**addendum**
36:21 143:22
**addition** 77:16
**address** 4:7,8
36:3 53:23
54:9 79:17
179:13 195:13
**addressed** 84:12
186:19
**addresses** 159:2
**adequate** 33:7
**adjudicated**
7:15 29:6
**adjudicative**
188:14
**adjustments**
154:20
**administration**
108:7,12
176:21 177:22
190:24 199:20
**administrations**
6:19
**administrative**
7:23 9:3 10:10
10:14
**administrative...**
180:13
**admitted** 44:6
156:4
**adopted** 8:22
**adoption** 7:25

**8:20,21** 9:11
25:21 29:3
180:1
**adoptions** 7:20
**adoption-relat...**
7:22
**adoptive** 8:25
**advance** 12:12
18:5 26:14
27:1 29:24
34:7 37:3
43:25 141:16
141:20 143:12
143:25
**advantage** 87:21
**adverse** 102:6
**advice** 21:4 87:6
99:13 164:7,22
164:22 166:8
**advise** 8:14
72:20 80:5
194:19,22
195:5
**advised** 23:11
98:16 111:23
125:14 134:12
165:4 166:7
178:9
**advising** 195:9
**advocate** 181:3
**affect** 23:18 62:6
**aftermath**
176:20
**afternoon**
150:24
**age** 31:23
**agency** 7:11,14
7:16,19,23
10:23 11:4
12:23 24:21
25:4,5,17,19
25:24 26:17
27:11 29:9,10
29:15,23 30:12
30:16,21 32:3
32:9 33:18,19
37:10,17,24

**42:1** 44:22
45:16 46:5,7
46:20 48:15
49:1,9,17 50:8
50:11 51:4
53:14,21 54:20
54:24 56:6,15
56:18,21 62:6
63:4 68:23
69:12 71:10,10
72:2 75:11,12
80:1 81:25
93:20 96:2,10
97:9,15 98:16
101:12 102:20
102:24 103:3,8
103:11,24
104:3 105:12
105:14 112:20
114:22 119:13
119:16 124:16
124:21,25
125:4 127:5
141:4 143:7
144:23 155:6
157:25 161:10
165:12 171:15
172:10 179:3
180:10,10
187:16 190:24
192:2 193:8,14
196:1,12
198:22
**Agency's** 28:3
31:11,16,20,21
31:22 32:2
33:16 37:21
50:20 51:11
55:12 63:20,22
75:17 103:15
180:22
**ago** 163:10
176:7 195:1
**agree** 74:1 75:16
88:22 106:16
106:22 109:8
109:19 117:25

146:19 166:17
166:24 169:17
**agreed** 73:8
99:22 156:4
**agreement** 73:14
74:5 109:7,10
**ahead** 103:21
124:8 198:2
**aide** 24:22 26:5
26:7 36:24
37:12 38:8,12
38:16 44:3
47:1 48:7
68:13 101:24
144:1 152:9
**aide's** 35:7 37:9
38:7 41:22
**albeit** 143:17
**alcohol** 20:7
55:25 57:9
**alert** 41:4
**allegation** 65:16
74:12 77:22
134:17 135:11
136:23 137:1
137:17 138:7
145:2
**allegations**
72:15 75:9
81:19 101:7
134:6,10,14
**allege** 103:14
**alleged** 47:1,8
77:13 110:7
133:1 144:22
168:8 201:8
**allegedly** 167:11
**alleging** 170:23
**Allgeier** 7:4 69:8
69:15,23 70:20
71:18 72:4
74:12 78:2
80:11,25 85:11
85:25 101:9,16
131:5 134:13
136:19 145:11
145:20 168:11

185:10 186:4
**Allgeier's** 74:19
75:6
**allegations** 8:4
134:1,6
**allocatur** 36:2
**allow** 14:4 16:22
18:5 31:17
49:15 54:5,14
54:14 57:17
**allowed** 52:21
113:21 142:21
**allowing** 73:6
93:21
**allows** 154:10
**aloud** 154:6,7
**alter** 40:8 41:15
193:6
**alteration** 46:13
66:11 68:13
141:22 142:6
192:1 193:13
196:15 197:2
199:12
**alterations** 47:7
63:17
**altered** 41:9
46:25 64:5
65:15 141:18
142:11 197:6,8
**altering** 45:16
63:12 68:18
188:13
**alternative**
143:19
**ambiguous** 49:5
67:12 146:9
**amount** 8:24
26:11
**Amy** 98:20,23
169:3
**analysis** 19:2
**and/or** 8:5 14:12
19:15,15 67:1
93:9
**Angelone** 2:4
**Angelone's**

100:7 168:18
**animal** 11:24
144:11
**anonymous**
121:18
**answer** 13:10,11
14:9 17:4
21:10 23:5
28:24 30:1,25
31:1 37:12,22
41:14 43:16,23
44:12 48:10
64:9,10,11
77:3 83:23
86:25 89:11,16
91:3,25 94:24
95:9 96:8
103:12 109:14
111:5,6,10,19
119:9 138:22
139:12 144:15
148:18,20
149:7,9 150:3
154:11,16,17
155:9,12,24
156:9 161:14
172:13,17,25
186:16 189:16
191:22 194:5,9
194:12 195:5
195:22 196:22
196:23 197:3
197:15
**answered** 51:17
111:12 173:8
**answering** 41:5
**answers** 33:12
54:11 149:3
**Anthony** 2:4
190:19
**anticipate** 73:24
**anybody** 22:20
76:10 94:18
96:5 113:21
133:21 155:10
185:7 196:3
**anymore** 198:13

**anyway** 28:1
68:9 84:9
89:10
**apologize** 31:24
33:13 121:1
**apparent** 66:20
71:12
**apparently**
38:16 74:20
112:22 166:20
169:15 195:11
**appeal** 40:1
85:17 178:4
**appealed** 83:19
**appeals** 7:25 8:1
8:3,9,20 9:20
**appear** 121:2
144:6 154:12
**appeared** 50:19
69:11 82:11
**appears** 66:10
85:7 120:9,12
120:16 157:13
162:20 169:6
169:12 192:10
202:12
**appellate** 36:2,4
**applies** 87:16
**apply** 18:22 72:8
**appointed** 5:14
191:11,15
**appointment**
100:23 200:8
**appreciate** 73:12
87:19 88:24
109:15
**approach**
139:10 180:5
180:17
**approached**
138:11,15,20
170:8,18
171:12 172:6,7
172:14 199:9
199:16
**approaches**
129:18

**approaching**
139:14
**appropriate**
22:17 41:6
86:17 89:18
111:20 112:18
121:24 172:4
172:17
**approved** 80:17
**approximately**
4:25 60:16
**April** 4:23 35:22
36:13,14,17,17
36:25 149:7
**area** 99:7 117:3
117:5
**areas** 7:24 15:21
87:4 93:16
**arguable** 172:11
**arguably** 122:8
**argue** 79:2
**arguing** 22:4
**argument**
135:21,22
187:23
**argumentative**
21:22 43:5
68:3 109:13
114:9 126:1,22
137:9 147:12
147:25 152:12
152:13,17,22
161:12 165:21
166:16,22
169:11,19
197:12
**arising** 8:3
**arrangement**
16:2 29:12
93:4
**arrangements**
204:7,9
**article** 173:12
**ASFA** 29:14
**aside** 57:10,11
78:12 182:10
**asked** 9:24 37:20

39:2 44:5
51:17 59:14
60:13,14,14
73:5 77:4
80:19 88:17
90:6 91:17
104:6 106:19
111:5 115:16
122:2 127:16
130:14,15,24
131:1 138:9
144:12 145:3
147:18 148:11
149:13 152:3
156:21 163:7
163:16,18
168:4,17 169:3
170:3,21
171:13 177:13
195:10,21,24
199:10
**asking** 16:24
17:1 21:10
28:12,20 44:17
56:22 58:11
68:3 71:4
90:16 91:8
104:22 107:6
113:2,2 114:3
114:6 134:20
147:15 149:19
149:21 156:20
166:21 178:8
189:24 192:24
195:19 196:10
196:13 201:15
203:2
**asks** 118:18
**aspects** 57:3
**assert** 54:6
**assertion** 136:25
137:16
**assertions** 54:15
**assess** 32:22
33:10
**assessing** 20:19
**assessment**

13:17 188:20
**assessments**
180:4
**assigned** 25:21
26:7
**assist** 32:24
**assistant** 5:11,12
5:15
**associate** 5:10
**associated** 74:25
81:18,18,21
**association** 5:9
5:18,20
**assume** 28:2
39:18 184:16
196:10
**assumption**
21:11
**attached** 103:1
105:15,16,19
149:6,10
158:14 162:25
174:2
**attachments**
84:20
**attack** 136:2
172:22 173:2
**attempt** 143:5
180:12 189:16
**attempted** 131:2
190:18
**attempting**
127:14 179:5
**attempts** 199:25
**attend** 52:11,17
54:9 59:14
61:6 144:17
**attended** 31:14
**attending** 57:6
79:11
**attention** 69:15
87:23
**attorney** 5:15,16
27:14 40:15,17
40:18 44:17
62:9 69:8,23
71:18 73:9,9

80:11,25 94:14
94:16 98:18
101:9,16
129:12 131:5
134:13 136:19
164:4,12
165:17 168:11
169:1,10,16
185:10 186:3
188:20
**attorneys** 7:4
10:12
**attorney's**
102:14 164:7
164:22 166:7
169:3,12
**attorney/client**
40:21 87:7,9
87:11 195:12
**at-will** 202:10
**August** 9:25
48:20 60:17
72:23,23 80:22
82:1,24 83:16
84:5,10,13
85:9 86:10,20
101:6 105:24
111:25 129:1
132:2,12
137:23 138:14
178:2
**authenticate**
185:4 192:25
193:2 194:1,3
194:6 195:11
**authenticated**
43:9
**authentication**
193:25 196:19
**authenticity**
42:22 43:3
48:8
**author** 121:22
185:18,23
197:16
**authored** 65:14
186:18

**authority** 12:20
12:24 14:22
16:25 164:14
**authorize** 14:6
**authorizes** 12:17
12:22 13:6
**authorizing**
10:23 53:7
**available** 81:7
102:17 115:2
115:10,15
128:9 129:8
183:3
**aware** 13:24
17:18 20:18
22:24 34:15,17
38:15 48:4
52:12,15,18
53:10 65:16
69:16 80:21
83:10,12,16
97:19 116:1
117:22 133:25
136:5,9 144:22
166:10 168:6
176:18,25
177:1,18,19
178:2,6 184:5
184:8 191:25
**awesome** 162:16
**a.m** 1:21 51:25
51:25 120:15
121:15,17
**a/k/a** 1:6,12 2:7
**A9** 173:19 174:4
_____
**B**
**B** 1:3 116:24
160:2 167:11
168:1,3,7
169:4 174:14
185:16 186:19
**baby** 16:19 17:9
17:12,14 19:5
165:11 182:18
182:24
**BAC** 91:11,15
**back** 5:1,8 14:19

15:1 36:4
41:16 47:18
59:10 77:5,20
86:19 89:2
93:4 123:20,23
124:2,5 131:20
147:21 154:19
154:19,25
158:16 159:17
163:19 190:20
201:15
**back-and-forth**
162:10
**bad** 63:14
187:19,20
197:21
**Bargaining**
109:7,9
**baseball** 118:18
**based** 11:4 13:14
13:15,17,18
21:10 24:12
57:7 59:22
60:11 64:22
69:25,25 91:15
114:7,10
135:24 137:1,4
137:5,7 149:12
160:24 180:3
181:22 187:9
**baseless** 76:21
134:1,10,18
135:11,20
136:25 137:1
137:17
**basic** 105:13
**basically** 27:8
38:24 41:22
85:3 142:21
155:24
**basis** 4:25 9:1
20:23 22:10
24:16 39:15,24
78:22 137:11
189:24
**bear** 19:5 163:20
179:4 183:17

bearing 44:15
bears 30:14
beginning 70:16
132:2
begins 116:24
118:11
behalf 27:15
33:18 52:16
56:21 73:10,12
73:20 89:4
178:7 195:2
behaving 18:14
behavior 13:19
24:17 132:2
behest 186:22,25
belief 90:17
108:1 126:6,8
127:8 202:4
believe 4:15,23
27:13,14 35:19
42:13,18 44:4
45:18 52:14
58:3,5,12
60:16 61:18
66:3 68:19
72:10 76:11,12
77:18 79:20,21
80:9 86:19
90:12 91:9
96:18,21 97:20
98:7 101:18
103:6 107:23
115:18 117:3
122:22 124:11
125:19,20,21
125:25 126:17
126:21 133:15
134:19 139:15
141:7,23
148:18 163:8
167:25,25
168:14,18
170:10,16,19
173:18 174:1
175:25 182:20
183:11 184:11
185:8,13 186:5

190:2 192:5,18
195:8 199:15
200:3,14
202:24 203:12
203:19
believed 68:16
68:18 99:18
125:17 126:14
127:7 165:9,15
195:3
believes 162:16
belonged 108:20
119:25
belonging 127:4
bench 58:20
beneficiary 8:20
benefit 8:25
142:24 143:9
180:24 181:9
Bentz 5:9
best 43:23 79:17
81:9 83:23
91:25 101:20
138:9 143:9
179:14 180:11
180:18 181:14
181:15,19,25
186:6,8 196:23
bet 110:20 123:1
better 160:22
186:4 195:14
Beveridge 7:4
bewildered
51:18
beyond 89:25
95:18,20 109:1
110:10,10
111:14 122:25
123:10 195:18
Bible 105:20
big 67:4 93:12
Biroscak 83:5
Biroscak 48:13
birth 12:8,12
17:21 18:3
20:8,21 23:22
24:2 93:22

95:13 101:11
165:13
bit 7:1 10:1,1,8
121:21 137:20
blanket 14:14,25
bless 165:15
Bloxdorf 80:9
book 168:19
169:18
born 12:2,5,25
18:21 97:6
181:20
boss 113:21
200:25
bother 127:21
bottom 118:9,10
122:10 162:1
163:3 193:11
boundaries
65:13
boy 17:9,11
24:22 25:1
boyfriend
184:25 185:4
breach 93:18
101:8 114:22
172:10
breaches 109:24
110:18 115:22
116:2 130:25
break 51:21
52:1 73:5
76:13 101:5
bridge 130:4
Brief 145:24
briefly 73:21
178:24
bring 100:17
171:22 190:14
bringing 87:23
brings 145:11
Brittany 56:10
56:11
broad 8:19 14:2
28:18 49:5
155:13,18
189:5

brought 42:19
69:15 129:12
139:9 142:23
177:21
budget 8:1,4
9:20,21 10:2,4
10:7,9
burden 30:11,15
Bureau 8:2,8
business 66:24
92:22 96:2
99:3 126:13
166:14 198:23
business-related
92:23 93:7
B's 186:6
B6 173:19 174:7
B8 174:12

_____
C
_____
C 4:1,1 107:18
174:12,15,21
175:4 190:8
calculated 76:22
call 62:24 72:10
117:5 124:12
125:21 131:24
137:10 140:19
141:3,5 151:3
159:22 160:23
162:1 165:7
169:2 196:2,3
196:5
Callan 1:9 2:11
133:15
called 61:16
93:18 116:6
117:5,6 129:17
150:16 151:2,4
152:2 202:21
203:20,20
calling 123:22
141:21 177:14
192:2
calls 41:3 58:13
61:17 62:8,12
151:3 161:12
165:21 171:16

201:14
Canada 167:18
183:8
candidate 203:5
candidates
203:6
capacity 1:8,10
1:11,12 2:16
5:17 9:22
40:17 64:19
156:2 176:2
carbon 186:10
cardinal 104:17
care 10:24 11:1
11:8,12 20:3
21:12 23:19
24:8,11,13
29:7,8 33:5
97:7 126:8
179:25 183:24
career 130:9,12
200:15
careers 200:18
careful 116:11
caretaker 135:5
Carol 1:19,24
carried 148:23
case 7:7 14:15
18:8,18 19:8
19:13 21:7,11
21:15 22:15,15
22:15 23:6,12
24:21,22,25
25:2,21 26:5,7
26:8,11,12,23
27:10 28:20
29:1,16,18
30:5 31:22
32:10,10,22
33:21,23 34:5
34:14 35:1,4
35:15,22,25
36:3,24 37:9
37:12 38:7,8
38:12,16 40:10
41:22 44:3
45:3 47:1 48:7

50:10,20 55:13
56:11 57:1,22
58:23 59:8,11
62:25 63:4,22
68:13 69:17
70:2 71:8,8,19
72:5,9,11,15
75:1,3,5 78:1,2
81:21 86:4,5
92:16 94:21,25
95:3,6,11 96:6
96:10,10,14,16
96:16 98:9,12
99:21,25
101:23,24
102:5 107:17
107:18 120:3
130:5,7,16
131:17 133:2
133:19 136:16
140:9 141:11
141:13 142:2
142:16,16
144:1,9,9,10
144:25 145:1
171:13 172:5
176:10 179:24
181:3 182:12
184:14,15
188:22 189:24
194:16 200:19
201:6
**cases** 7:20 8:15
  15:24,25 19:20
  20:10 21:14
  22:15,23 24:1
  33:11 52:22
  69:17 79:24
  97:10,20 98:23
  99:5,8 100:4
  116:8 117:8
  135:1 142:14
  142:20 165:2
  179:2,11,21
  180:19 181:11
  201:3
**casework** 19:15

23:2 25:19
32:12 53:22
63:11
**caseworker**
  19:15 20:17,18
  20:23,24,25
  25:12,21 32:11
  34:4,18 38:12
  74:13,14 96:22
  119:22 134:2
  143:2,4 179:24
  180:3 181:4
**caseworkers**
  8:16 21:13
  23:2 143:21
  179:2
**caseworkers/s...**
  8:14
**caseworker's**
  35:7
**case-by-case**
  20:23
**case-specific**
  193:12 196:14
  196:25
**catch** 100:19,24
**categories** 9:9
**category** 122:7
  190:9
**Cates** 158:22,23
  159:21 160:4
  161:8
**Cauley** 1:18 3:3
  3:12,13,14 4:8
  4:10 40:16
  52:1 68:12
  84:7,11 111:10
  146:7 178:2,15
  192:6,13 195:3
  195:5 203:21
**cause** 174:17
  190:10 202:7
**caused** 32:25
**caution** 40:15
**cautious** 40:20
**caveats** 186:5
**cell** 162:1

**Center** 2:14
**centering** 138:3
**certain** 7:23
  8:17 9:2,5 14:4
  14:11 15:24
  31:14,15 52:17
  53:1 54:1
  55:11 56:3
  157:4
**certainly** 15:24
  19:7 56:25
  87:20 112:18
  134:8 170:13
  171:19
**chain** 40:4
**change** 6:19
  25:5,8,8,20
  28:3,22 35:16
  35:23 36:9
  37:18 44:20
  49:9,17 57:13
  62:5 66:11
  155:11,11
  193:8,13 196:1
  199:16,21
  201:11
**changed** 39:23
  66:14,23
  149:25 152:8
**changes** 23:12
  39:2,3 41:11
  44:8 49:1 67:1
**changing** 28:5
  32:14 191:19
  199:11
**chapter** 158:8
**Char** 112:14
  114:16 115:2
  115:15
**character** 64:22
**characterizati...**
  124:19
**characterize**
  40:13 56:14
  78:25 99:6
  109:1 140:8,11
  142:22

**characterized**
  43:14 71:2
**characterizing**
  65:18,19
**charged** 103:17
  138:8 173:13
  175:6 188:8
  189:8 190:3
**charges** 139:25
**Charlene** 80:12
**chart** 6:11,15,20
  7:3
**chat** 45:15
**Chatham** 2:14
**check** 16:13
  123:5
**checked** 102:17
**child** 1:6,13 2:7
  7:14 8:7,22,25
  9:1,12,12,13
  9:19 10:24,25
  11:6,6,8,9,12
  11:14,14,19,20
  12:1,2,5,13,13
  12:16,23,24,25
  13:2,7,13,18
  13:21 14:4
  17:10,21 18:3
  18:6,7,15,16
  18:20,21,24
  19:5,17 20:6
  20:11,20 21:8
  22:25 23:8,15
  23:16,22 24:3
  24:3,4,9,18,19
  26:18 29:6,12
  30:17 33:4
  56:1 57:19,20
  58:7 74:14,22
  75:12,14,20
  95:12 97:6,7
  101:11,12
  103:11 105:14
  119:22,25,25
  122:17,19
  123:24 124:16
  124:21,24

125:3,4,12
126:7,7,18
134:17,21
135:5,6,6,8
139:4,5 144:10
158:2,5 160:11
161:5 164:5
165:4,12
166:11 167:12
167:18 168:2
172:11 180:11
180:23 181:1
181:14,15,20
181:25 182:9
183:5,7,9,10
187:8,11,16,18
198:8
**children** 1:6,12
  2:7 4:19,20 6:3
  6:5 7:10,15,17
  9:5 11:17 14:7
  19:19,21 20:2
  21:6 23:19,24
  24:14 26:18
  29:13 31:13,23
  32:3 33:5,19
  44:23 62:20,21
  99:10 100:1
  103:17 104:13
  105:2,13
  110:25 132:3
  143:10 152:10
  154:15 176:2
  177:23 179:7
  179:15,18,24
  182:19
**children's** 94:16
**child's** 12:7 18:4
  181:2
**choice** 30:21
  165:19
**choose** 204:3
**chose** 167:21
**Christian**
  162:16
**circumstance**
  20:9 48:11

70:1
circumstances
19:6 20:11,20
22:24 23:12
26:10 48:16,22
49:10,15,19
50:2,3,6 51:3
54:2,21 55:11
55:14 69:9
135:10 138:19
174:13,20
179:5 189:23
193:5
cite 128:22
citing 158:8
civil 1:4 40:1,19
40:24 83:19
85:17 178:4
claimed 61:24
65:14 149:24
191:19
claiming 42:25
clarification
106:17,20,24
classes 31:15
clear 66:12
102:19 103:22
110:15 120:5
124:24 140:24
146:8 148:19
160:13
clearly 51:1
84:19 126:4
164:14 190:9
clerical 110:24
172:2
clerk 16:22 17:2
17:3,5,17
clerk's 16:14,15
16:17
client 27:23
42:25 43:1
59:19 60:3
62:22 63:10,14
63:21 64:14,18
65:2 67:17
71:13,19 72:17

74:20 80:2
83:15,18 87:1
94:1,2 95:15
95:20 96:1
98:15 99:14
101:20 102:8
114:2 120:16
122:3 125:19
129:16 130:2
135:19 136:15
138:3 140:24
150:16 151:4
154:14 165:3,4
186:22 187:4,6
189:7,25
192:11 195:13
197:16
client's 60:18
66:18 71:2,25
72:22 80:8
87:10 94:9
132:2 183:2
186:24
clinical 32:20,22
34:3,13
clinically 33:6
close 123:23
124:4,9 160:11
160:22 164:6
closed 54:6,15
54:22
closely 132:4
Code 9:3 14:4
108:19 202:22
codified 190:21
collaboration
131:10
Collective 109:7
109:9
Colleen 80:12
college 5:2,3
come 8:15 23:3
37:2 66:1 68:2
88:20 116:10
116:22,23
117:23 129:23
138:6 143:6,18

144:12,13,13
169:6 179:15
193:1 202:9
comes 15:2
164:5
coming 56:6
72:5 77:20
80:8 94:5
96:25 121:17
164:9 167:2,3
167:4,4 180:9
commencement
53:11
commencing
1:21
comment 165:17
187:21,25
comments
139:20
Commission
83:19
commit 109:25
110:17
committed
110:10 111:22
115:23 139:3
189:18 190:2
Common 7:12
7:16 55:9
commonplace
119:6
Commonwealth
1:20
communicated
71:23 168:4
190:23
communicating
191:4
communication
116:7 148:9
communicatio...
88:6 193:12
196:14,25
community 22:1
comparable
174:21
compared 41:23

compelling 29:9
29:23 30:12,15
30:17 31:18
complain 201:3
201:4
complaint 65:12
complaints 8:3
complete 14:10
51:13 123:8
142:8
completely
103:10 160:12
161:6
complex 179:11
complicated
179:12 203:14
complies 153:9
157:11
comply 53:24
compound 49:20
comprehensible
189:13
computer 40:11
61:5 72:1,21
80:16 81:3
92:21,24 93:9
93:11 118:24
128:12 169:7
computers 40:5
concentrated
155:13
concern 31:16
31:20,21,22
32:3 50:18
53:13 55:16
74:11,19,20
75:6,19 77:9,9
77:12,15,18
93:16 124:22
125:10,13
132:25 150:15
177:22 181:16
concerned 57:18
57:19 63:6,8,9
63:10,13,16,18
66:16,22 74:11
79:23 81:12

117:6 119:3
121:21 199:12
concerning
52:10 78:5
102:22 148:12
150:14 168:8
168:16 199:10
199:20 201:15
concerns 69:15
69:20 71:7
78:4,9,12
79:11 86:14,16
107:16,18
131:8,20 132:1
132:6,7 135:18
141:17 145:11
176:22 190:14
conclude 113:24
169:13
concluded 68:12
92:1 204:12
conclusion
13:15 51:7
62:12 114:10
136:6 137:11
171:17
conclusions 65:7
90:25
conditions 30:4
31:9 32:25
52:17
conduct 67:21
67:23 77:6
85:11 133:24
173:19,24
174:12,16,19
176:5,22
187:18 188:1
188:25 190:9
conducted 53:16
90:17 157:22
confidential
53:25 54:10
55:7,20 59:24
69:19 82:9
103:2,8,9,16
105:8 113:8,12

113:16 114:13
126:14 127:4
158:11
**confidentiality**
15:11 72:7
83:7 93:19
101:8 102:20
102:21,24
103:13,23,24
104:14,18
105:5 106:18
106:21,25
107:2,17,20
108:13 109:22
109:24 110:18
111:23 112:5
113:25 114:22
115:22 116:2
118:19,23
121:12,20
122:3,14,24
130:25 157:25
158:3 172:10
**confidentially**
104:5
**confines** 103:3
109:5
**confirm** 140:25
**confirmed**
151:10
**confirming**
202:21
**conflict** 73:8
**confronted**
179:12
**confusion** 33:13
**conjunction**
34:23 128:20
**Conley** 1:3
24:22 26:5
36:24 38:22
39:11,20 40:4
40:8 42:12,20
43:8,9,21 44:2
44:5,6,7 47:7
48:17 60:23
61:2,4,16,24

64:5 65:7,14
66:25 67:10
68:14,18 71:22
74:12 77:19
78:5,8 79:8
80:23 81:4
82:13 83:2,6
83:24 95:24
96:18 101:7,23
103:14 106:7
108:12,20,24
109:8,25
110:17 114:14
114:18 115:23
116:1,6 117:7
120:3 123:2,16
124:8,12
125:14 127:18
128:23 131:8
132:9,20,23
136:2 138:11
138:16,19,24
139:7,9,10,11
139:13 141:21
141:25 145:4,7
145:11 148:15
150:16 151:4
151:23 152:6
153:3,11 154:8
155:8,15,22
156:4,25
157:18 158:22
159:21 160:2,4
161:9 162:9,21
163:17 164:24
165:9 166:20
167:9 168:4,22
169:5 170:4,8
170:18 171:12
172:6,7,7
173:7,13,17
175:15 176:3
176:16 177:23
178:4 183:13
184:18 185:1
197:7 201:8,13
201:18 203:20

**Conley's** 39:25
50:4 67:7
69:16 78:13
81:3,24 82:4
106:19 141:17
155:2 176:22
**connection** 7:25
15:13 32:17
34:2 39:25
83:20 85:17
90:15 178:3
**Connelly** 139:23
**consecutive** 29:8
**consensus** 143:7
180:16,17
**consequences**
109:19
**consider** 63:24
63:25 64:4,15
87:23 126:12
**consideration**
65:6 175:19
**considered**
19:10 34:2
64:16,17
**consistent** 37:9
37:21 72:21
80:16 155:6
**conspiracy**
124:15
**constrained** 72:7
**consult** 8:16
**consultation**
40:16
**consultations**
41:4
**contact** 81:16
117:7 123:13
124:7 191:21
201:1
**contacted** 201:9
**contain** 54:21
**contained**
126:11 175:16
**contains** 34:10
**contemplated**
48:25

**contemplation**
167:16
**contents** 13:23
112:22,24
152:1 185:4
**context** 62:22
99:11 153:21
190:15,25
**continue** 44:22
54:25 121:5
**continued** 81:24
191:7
**continuing**
117:6
**contract** 4:25
6:24 10:12
**contracted** 6:7
**contrary** 166:12
178:21
**contrast** 67:7
**control** 10:14
114:23 115:8
**controls** 180:23
**convenient**
73:22
**conversation**
34:18 47:16
48:5 69:8
77:19 112:5,22
112:24 113:14
115:6 116:5
122:4 131:5
138:16,22
139:20 151:9
162:10 167:17
170:1,4 186:21
190:6 199:19
**conversations**
60:3 83:11
88:14,18
111:25 113:19
124:7 140:11
**conversing**
139:17
**convey** 137:15
**conveying**
136:15 173:8

187:7
**convince** 28:5
30:1
**copied** 91:21
186:10
**copies** 186:13
**copy** 96:19,21
148:13 149:8
149:14,24
150:3,7,8
151:7,24
154:18,21
196:11
**corporeal** 32:6
**correct** 5:24 6:1
18:22,23,23
19:1 25:6,11
26:15 29:21
31:10 35:18
41:23 48:24
52:7 54:23
55:5 60:9
61:21 70:11
75:10 78:7
84:1 105:17,25
106:18 107:14
115:17 134:7
147:5 150:7
151:21 152:11
155:1,17 157:1
157:16,17,22
158:3,6,12
159:2,5,6,16
161:1,6 162:9
162:12,13
166:17 168:14
170:14 174:2,3
174:5,6,10,11
174:23 176:13
176:15,17
182:19,20
183:21,25
184:23 187:12
189:3 202:18
202:20 203:11
**corrected** 39:21
154:18,21

**corrections**
154:23,25
204:3
**correctly** 113:11
114:24 140:4
**correspondence**
202:21
**Cosby** 59:24
60:3 71:24
72:1,1 81:4,17
92:22 93:4
94:5 95:15
97:5 98:16
112:13 114:14
118:1,12
120:18 121:15
122:1 123:13
123:17,21
124:8,12
125:21,23
126:5 140:19
140:25 141:3
161:25 162:6
162:11 163:13
165:14,16
166:20,21
167:17 168:3
168:23 169:10
169:15 176:10
183:2 186:22
**Cosby's** 81:6
123:25
**counsel** 13:23
15:16 26:17,17
26:17 40:1
42:24 57:23
59:9 73:8,23
98:16 102:6,7
129:15,18
148:22 150:22
156:5 181:2
**Counsels** 73:6
**County** 1:5,5,6,8
1:8,10,12,13
1:14 2:7,7,7,16
2:21 4:14,18
5:15 6:6,8 8:3

9:12,15 10:7
19:18 27:9
33:19 40:1,2
40:19 61:5
72:20 73:20
80:6,15 86:12
86:13 87:5,16
88:8,15 93:8
101:3 104:13
109:10 128:12
130:10,12,24
131:19,22
132:4 133:9
173:20,20,25
174:18,18
175:14,19
176:3 185:1
199:14 200:9
202:10,22
**County's** 72:21
87:9,12
**couple** 8:9 10:17
26:1 28:24
46:16 52:22
70:16 86:10,19
92:19 102:25
141:6,6 165:8
178:17 182:3
**course** 36:5
38:19,23 46:22
66:24 69:6,14
73:23 96:2
105:9 127:17
128:24 140:5
140:19 152:5
157:3 158:11
168:15 170:1
170:16 176:19
180:20
**court** 1:1 7:11
7:12,13,17,18
7:18,19 8:17
10:23 11:5
12:14,17 13:6
14:8,13,15,22
15:1,6,12,20
15:23,23 16:4

17:23,24 19:16
22:16 23:9,11
23:14 24:2
25:18 26:14,16
26:25 27:5,7
28:5,5,22
29:24 30:2
31:7 35:9,16
35:16,17 36:16
41:10,11 42:2
43:12,20,25
45:1 46:13
48:8 50:17,19
52:22 54:1,25
55:4,8,9,13
61:20,21,24
62:1,7 63:11
65:8,14 68:17
76:16 81:15
95:4 97:15
103:8 111:16
111:21 122:19
133:1 141:8,17
142:11,23,23
142:24 143:8
143:14,25
144:19 149:6
149:11 152:1
154:9,23
155:14,23
165:1 180:9,11
180:17,24
181:8,9 188:13
190:19 197:6
204:9
**courtesy** 73:6
**courtroom**
129:16
**courts** 15:5 36:2
52:21,23 55:10
**Court's** 64:5
71:10 180:23
197:8,9
**Court-appoint...**
181:2
**cover** 15:14
**covering** 124:16

124:19 125:3
**coworker** 75:13
188:24 189:2
**coworkers**
190:13
**CPL** 171:14
**CPLS** 161:11
**CPSL** 171:14,20
172:7 187:10
**credibility** 63:22
135:18 136:14
**credible** 172:19
**crime** 189:8,18
**criminal** 27:6
45:21 176:5
187:18 188:1
188:25
**criteria** 9:2
135:2
**cross** 64:13 76:1
76:3 89:20
**cross-examina...**
3:5,6 146:4
152:6 178:12
**Cunningham**
52:15 53:6
55:10
**Cunningham's**
54:7
**currently** 4:10
20:6 121:23
**custody** 12:23
13:2 24:3
144:9
**customary** 44:9
**C7** 173:19
174:16 175:3,9

———————
**D**
**D** 1:22 2:2 3:1
**dangerous** 19:6
**dare** 124:3
**data** 92:23
**date** 47:9 52:9
84:9 128:25
157:15,21
159:20 164:20
183:23

**dated** 84:12
158:17 186:18
**dates** 157:8,14
160:24
**daughter** 168:9
**day** 8:14 31:2
68:25 69:2,6
70:6 93:5
128:4 132:8
145:20 147:3
147:11,22
148:4,8,8
151:20 164:7
168:2 182:25
197:25 198:23
**days** 46:16 47:11
47:14 48:19
70:16 86:19
128:4 145:21
145:22,22
161:1 162:22
190:19 200:7
**dead** 124:1
**deadline** 74:2
**deal** 93:12
120:25 158:2,5
**dealing** 70:2
**dealt** 62:22
165:2
**Deanna** 92:22
112:13 114:14
118:1,17
121:15,25
123:13,23
124:2,2 125:20
125:22 161:25
162:6 165:15
168:3,23 169:1
176:10 183:1
186:22
**Deanna's** 124:5
**death** 119:21
122:25 124:21
125:3
**Debi** 6:22
**Debra** 1:10 2:11
**December** 4:15

5:17 198:25
199:24 202:14
202:19,23
decide 49:9,17
79:6 175:14
deciding 78:12
decision 20:22
55:4 80:5
100:15 130:13
133:8,18 136:3
175:21 180:22
decisions 131:10
175:12,12
180:8
decision-maki...
90:21
deemed 73:11
defeated 18:6
Defendants 1:15
2:11
defender 5:12
5:13
defending 136:1
Define 47:23
defined 135:7
definitely 53:6
161:15 167:14
definition
134:18
deflect 127:14
delay 129:4
deleted 91:12
deliver 11:14
166:11
delivered 144:23
149:25
delivering 23:15
Dell 2:18
demeanor 50:17
51:8
Democrat
203:12
demonstrate
11:7 31:7 40:5
demonstrated
13:19 24:17
31:12

denied 58:22
97:15,18
deny 16:25
141:1
denying 43:1
department 7:5
8:5 10:6 21:2,4
53:22 134:1
136:4 190:25
200:1,20
depend 188:19
dependency
8:17 14:15
15:6,7 17:24
23:7 27:5 29:1
36:3 50:10
52:3,21 53:7
99:8 134:22
144:9
dependent 7:14
7:15 20:2 29:7
122:19
depending 7:1
9:2,19 14:12
21:1 26:10
depends 14:2
15:3,18 26:23
140:7 189:20
189:22
depo 100:20,21
deposed 100:9
deposition 1:18
3:12,13,14
73:7,21 77:7
84:7,11 150:25
178:1 192:6
196:18 204:3
204:12
depositions
157:3
deputy 80:12
derogatory
174:7
described 20:11
155:25
deserved 63:24
designed 11:25

desired 193:7
desktop 71:25
detain 164:6,13
165:12
detained 12:13
95:13 182:19
detention 10:18
10:21,22 11:11
11:16,25 12:15
12:21 16:6,17
16:19 17:20
18:9 19:12,20
20:12 21:7
22:16,25 23:4
24:16 93:20
95:4 96:3,11
96:23 97:16
98:17 99:22
100:2 102:19
104:12 122:6
164:8 166:8,15
168:16 181:18
183:2,24,25
184:19 186:23
determination
23:3 24:12,15
25:13 32:7,17
33:2,6,15 34:3
35:15 41:6
45:3 79:18
142:25
determinations
72:20
determine 19:3
21:1 32:19,23
33:7 94:9,18
128:21 134:9
determined 20:2
31:21 76:2
134:15,17
135:3
determining
19:16 135:25
develop 112:7
132:20
Deveney 26:4
38:24 39:22,23

40:4,7 41:9,19
43:13,19 44:4
46:13 47:19
48:1 63:16
64:4,17,20
65:3 66:14
67:10 68:13,16
71:25 81:2
82:18,20 83:1
83:4,24 106:7
106:20,23,24
107:4 108:11
111:24 126:24
127:16,19,24
138:5 139:21
140:13 147:9
148:9 154:19
154:24 173:13
188:2,3 190:11
197:6,8
Deveney's 44:8
64:22 67:7
83:5 107:8
147:2
died 122:11
124:25 126:18
dies 125:12
differ 142:18
179:21
difference 61:23
62:3,18 130:6
130:8 137:16
differences
61:20 143:11
203:13
different 11:23
11:23 14:23
28:24 89:12
144:11 165:19
180:4 181:5
187:19 189:10
differently
137:20
difficult 169:16
179:4,12
181:12
difficulty 92:15

194:16
dinner 100:17
direct 3:4 4:4
6:22 90:6
152:5 176:11
directed 44:22
56:15
direction 29:1
142:2,16,20
202:10
directive 54:8
108:6,23
directly 86:8
127:20 141:5
176:11 204:10
director 1:10,12
6:23 9:25
32:12 47:24
48:12,15 68:23
80:12,13
112:23 113:19
180:2 184:14
191:11,12,14
191:16 199:3,8
199:19
directors 143:21
disagree 190:13
195:1
disagreed 180:1
180:2
disagreement
142:1 143:2
151:23,25
191:8 193:7
disagreements
143:18
disappointed
132:8
disciplinary
108:19 109:5
189:2
discipline
109:10 188:23
disciplined
189:10
disclosable
55:23

disclose 41:7
59:24 104:11
122:22 124:15
127:10
disclosed 103:10
112:25 127:9
130:16 133:11
discloses 119:21
disclosing 40:22
82:9,15 97:2
104:3 132:24
disclosure 41:3
56:3 57:19
86:16 102:18
103:8 104:15
114:13 122:6
122:17 128:12
133:1 186:23
discourteous
174:4
discover 109:25
discovered
110:12
discovery 74:2
92:16
discuss 46:12
127:23 141:24
172:5,18
discussed 41:11
51:3 68:22
70:23 82:12
107:17 128:9
201:9
discussing 67:15
112:19,21
163:3 190:15
discussion 38:15
38:21 41:19
45:12 46:4,18
46:23 48:11
50:7 61:19
69:22 73:4
79:22 81:23
82:17 98:10
100:25 110:22
111:2,14
114:17 116:21

121:22 122:5
127:19 142:21
172:20 183:12
199:10 201:2
discussions
48:22 53:21
54:8 69:14,20
71:12 72:19
79:13,15 80:10
83:6 92:22,23
93:8 114:19
176:22 190:25
disparaging
177:24
dispositional
23:8
dispute 21:16
disputing 48:7
disrupt 76:23
disruptive 174:4
disseminate
105:9
disseminated
57:14,18 69:13
69:18 72:17
96:23 97:4
disseminating
71:14 83:7
131:9
dissemination
71:13 80:8
83:9
dissension
142:22
dissonance
37:23
district 1:1,1
5:15,16 188:20
DiVecchio
200:12 201:14
201:19 202:17
203:21
DiVecchio's
200:14 202:14
docket 16:9,13
16:14
document 27:25

29:9 30:17
42:22,24,25
44:24 47:1
48:8 50:5
66:23 68:17
80:7 84:10,18
84:23 85:20,22
95:7 107:1
128:22 129:12
129:19 132:6
133:12 148:13
149:24 150:13
150:17 192:15
192:23 193:3,5
194:1,10
195:11,15,16
195:18 196:19
198:16 201:7,8
201:12
documentation
14:7 40:4
47:15
documented
82:9
documents
15:12,17,19,20
16:3 30:21
34:2,22 35:2
44:25 45:16
66:8 90:9
91:20,21,23
95:3,10 141:22
142:6 143:13
157:4 159:16
188:13 192:1
199:12
doing 49:9 59:4
81:8 87:22,24
88:1 130:2
132:5,23
135:23,24
140:18,25
double-dog
124:3
doubt 170:15
175:7
dozen 97:21

134:24
Dozens 97:13
DPW 74:15
77:14 134:13
135:16 136:5
drawer 92:6
drive 85:3 91:21
149:9 150:4
159:15
drowning
119:21 123:3,8
125:13
drug 20:7 55:24
57:9 182:10,13
due 11:14 73:7
113:5 114:3
164:7
duly 4:2
dumb 160:12
161:6
Dummy 196:4
duplicative
118:6
duplicitous
118:5
Duquesne 5:5,7
duties 7:9 10:11
101:24
dying 123:24
124:17
dysfunctional
179:6

_____ E _____
E 3:1 4:1,1
earlier 82:13
141:11 191:10
early 72:22
80:10 83:2
85:9 86:10
easy 161:20
ECOCY 120:18
Ed 57:5 59:4,4,6
93:6 123:13
124:3,9 125:21
126:5 156:21
editor 120:12
edits 154:13

Edmund 2:13
education 5:2
educational 93:9
effect 44:10
71:24 101:10
104:17 142:3
148:10 190:17
196:16
effected 12:15
effort 97:5
efforts 103:10
either 14:14
20:6 38:11,19
62:15 68:6
69:5 71:24
72:1 88:11
100:15 114:24
142:1 156:25
167:18 171:11
171:14 198:6
201:14
elaborate 111:7
elected 200:12
election 200:8
200:14 201:16
203:5
eligible 9:1,7,13
else's 22:20
emotional
107:19
employ 6:4
employed 4:10
6:5 32:8
112:19 144:12
176:14
employee 103:9
119:21 132:3
133:23,25
144:7,16
159:12 173:24
174:9 175:5
187:16,17
189:18,19
199:20 202:10
employees 6:6
10:11,15 53:17
53:19 88:8,15

| | | | |
|---|---|---|---|
| 91:12 105:5,7 | entering 19:17 | 21:12 | 75:25,25 110:2 | expressed 86:14 |
| 105:11 137:2 | entertained 58:6 | event 73:18 | 115:10 130:19 | expressing |
| 144:5,6 174:5 | entire 18:6 | events 49:2,10 | 171:1 | 176:21 |
| 174:18 177:24 | 84:23 91:11 | 49:12 68:21 | Executive 1:8,11 | expunction 8:8 |
| 178:8,21 | 103:7 | 78:7 90:14 | 200:9,12 | extends 122:24 |
| 190:23 191:1,2 | entirely 20:16 | 128:21 148:3 | 202:11 | extensions 159:1 |
| 191:5 192:1 | entitled 16:3 | everybody 74:4 | exercise 10:14 | extent 12:22 |
| employee's | 69:19 74:22 | 143:11 180:18 | exhibit 3:12,13 | 13:10 40:16 |
| 120:2 174:1 | 75:8,12 77:18 | everybody's | 3:14 42:11,13 | 41:2 65:18 |
| employment | 77:21 81:19 | 180:25 | 84:11,17 | 86:7 88:13 |
| 71:4 81:24 | 82:10 127:9 | evidence 18:10 | 105:16 158:15 | 90:16 |
| 82:4 105:9 | 144:14 | 26:20,24 28:4 | 163:1 178:1 | eyes 193:21 |
| 113:18 173:20 | entitlement 17:3 | 32:19 40:11 | 192:6 196:18 | e-mail 47:18 |
| 202:24 | entry 53:7 | 50:24 114:21 | Exhibits 3:11 | 61:4 71:25 |
| employment-r... | environment | 116:1,4 132:9 | 84:7 | 78:13 81:2 |
| 93:8 | 10:25 31:13 | 132:20 135:2 | exist 188:11 | 82:15,16 83:8 |
| empowerment | environments | 157:5 175:16 | existed 150:17 | 83:24,25 95:15 |
| 162:17 | 179:7,9 | 184:3 | 151:8,10 | 96:18,20 98:15 |
| enacted 29:3,4 | Erie 1:5,5,6,8,10 | evidently 145:17 | existence 18:24 | 101:19,22 |
| encounter 50:23 | 1:12,13,14,23 | 164:24 | 32:7 97:2 | 106:6,16,20,23 |
| encouraged | 2:3,5,7,7,7,10 | ex 13:6 18:1,9,12 | 102:19 104:11 | 107:4 110:8,18 |
| 127:10 143:1 | 2:16,21 4:14 | 96:3 97:16 | 130:16 133:12 | 112:13 113:9 |
| 143:18 | 4:18 5:8,15 | exact 147:17 | 135:12 184:5,8 | 114:7 115:17 |
| encouragement | 19:18 27:9 | exactly 43:22 | existing 11:17 | 117:24 119:16 |
| 125:24 126:4 | 33:19 102:14 | 57:16 107:6 | exists 6:15,16,20 | 120:4 121:3 |
| 126:13 | 104:13 123:14 | 141:24 | expect 142:12 | 154:24 158:14 |
| encourages | 130:10,12 | examination 3:4 | 188:9 | 159:1,7,11,21 |
| 123:17 190:13 | especially | 3:7,9 4:4 67:22 | expectant 12:10 | 160:8 161:22 |
| encouraging | 198:16 199:11 | 76:23 93:1 | 17:19 | 162:5,25 |
| 123:13 124:12 | Esquire 1:14,22 | 100:7 182:5 | expectation | 163:12,13,23 |
| endangered | 2:2,4,8,13,16 | 202:1 | 108:4,9 | 164:11 168:2 |
| 182:9 183:7 | 2:17,21 84:12 | example 7:25 | expected 99:14 | 168:22 169:1 |
| ended 192:11 | essence 112:3,4 | 9:7 11:19 14:8 | 107:20 188:7 | 175:16 176:20 |
| 200:18 | essentially 28:13 | 15:22 20:7 | expecting 23:13 | 176:25 177:10 |
| ends 108:4 | 30:2 63:11 | 35:10 50:12 | experience | 183:12,23 |
| engage 188:3 | 92:5 95:16 | 71:16 94:12 | 20:13 22:21 | 192:12,16,19 |
| engaged 188:25 | 129:19 187:1,3 | 135:5 | 64:18 99:7,8 | 200:3 |
| engaging 187:18 | establish 131:15 | exceptions 14:11 | 99:16 105:14 | e-mails 59:23 |
| enhance 18:15 | established | exchange 106:6 | experienced | 60:2,7,8,9,15 |
| ensure 11:6 18:4 | 178:20 191:4 | 110:19 114:7 | 99:5 179:17 | 60:22 61:1 |
| 29:12 97:6 | estimate 60:10 | 117:25 121:3 | explain 178:25 | 72:22 79:7 |
| ensured 12:8 | evaluate 20:5 | 121:19 | explained 44:4 | 80:16,20,21,23 |
| enter 28:5 65:17 | evaluated 22:15 | exclamation | 178:25 | 80:24 84:5 |
| entered 12:11 | evaluating 18:19 | 162:8,18 | explicitly 123:13 | 86:18 90:8,11 |
| 16:8,9 17:20 | evaluation 20:9 | exclusively | 123:17 | 91:12,16,20 |
| 23:7 98:8,24 | 34:14 | 137:1 | express 58:25 | 92:7,8,18,19 |
| 184:17,21 | evaluations | excuse 73:7 | 178:21 | 93:1 105:15 |

106:6 118:5
119:12,13,24
120:6 126:11
133:4 140:24
156:18 158:20
161:23 163:2
168:17 176:10

**F**

**face** 160:16
  173:14
**facilitate** 153:20
**fact** 23:14,18,21
  23:22 34:12
  40:8 53:13
  55:3 57:7 58:7
  62:19 63:16,18
  64:24 65:20,22
  66:25 69:11
  97:4 119:5
  126:7 127:18
  134:10 135:12
  150:17 164:17
  164:19 166:8
  167:2,20 168:3
  177:23 182:17
  200:19
**factor** 19:9,14
  45:1
**factors** 30:10
  68:21
**facts** 28:22
  37:24,24 99:20
  158:10 188:11
**fail** 193:6
**failures** 174:21
**fair** 38:3 49:8
  56:5 61:8 63:5
  63:19 66:18
  68:14 74:16
  85:9 87:2
  90:22 114:8
  150:9 166:19
  181:20 187:19
  194:24
**fairly** 8:19
**falls** 175:2 190:9
**false** 174:7

**falsely** 176:4
**falsify** 68:17
**familiar** 10:19
  84:17 99:11
**families** 29:4
  142:19 179:6,8
  179:10,16
**family** 14:5 25:9
  32:25 62:23
  143:10 179:14
  181:1
**far** 17:18 22:13
  26:1 32:14
  52:5,23 58:19
  61:4 86:15,15
  91:7,9 109:8
  109:14,16
  114:12 117:21
  122:22 140:3
  185:23
**fare** 36:22
**father** 167:11
  168:1 185:16
**favor** 194:17
**fear** 66:19 71:3
**federal** 9:8 29:3
  76:16,18
  111:16,21
**feel** 72:6 89:17
  111:20 139:1
**feelings** 181:11
**fellow** 50:14
  175:5 187:17
  189:19
**felt** 8:4 22:17
  45:20 53:24
  54:10 55:4
  56:18 73:19
  180:17
**Ferguson** 1:25
**fight** 54:25 55:8
**file** 13:23 25:13
  26:19 29:11
  30:20,22 35:4
  35:7 92:6
  94:21 95:1
**filed** 7:14 15:13

15:20,22 16:4
16:17 25:5,16
54:20 129:9
**files** 95:11
**filings** 25:18
**fill** 9:24 163:25
**final** 39:3
**find** 12:20 57:15
  106:8 117:1,16
  120:11,14
  123:3,7 132:22
  161:17
**finder** 63:18
**finding** 11:21
**findings** 90:25
**fine** 7:8 38:5
  51:22 78:24
  90:2 105:22
  152:15 153:7
  171:7 175:20
  177:16 179:22
  180:16
**finish** 65:21
  116:19
**fire** 203:21
**fired** 173:14
  175:6 189:9
**first** 4:1 5:14
  28:11,25 30:4
  32:11 33:1
  41:13,14 44:19
  46:14 47:3,6
  48:20 50:9
  52:2 70:13
  80:22 82:1
  83:21 92:4,21
  101:7 104:17
  121:4 130:11
  133:24 145:13
  154:22 157:7
  158:23 191:17
  193:11 202:4
**fiscal** 10:7
**fit** 11:2
**fits** 161:2
**five** 9:9 51:24
  121:6 128:4

158:16
**five-day** 174:9
**flee** 101:10
**Florida** 167:18
**focus** 67:4
**focusing** 84:6
**folks** 27:14
  132:7 142:24
  143:6 179:19
  180:13,14
**follow** 96:2
  198:15
**followed** 108:5,9
  121:16
**following** 110:12
**follows** 4:2
**follow-up** 146:8
**force** 190:16
**foremost** 32:11
**forensic** 40:11
**forget** 116:15
**forgot** 112:14
**forgotten** 61:13
  61:14
**form** 13:8,25
  21:18,20 28:8
  28:10 30:23
  32:7 43:4 48:9
  49:4,12 54:17
  58:13 64:7
  65:9 68:15
  75:22 76:4,5
  76:14 78:15,16
  79:9 83:9 91:1
  96:7 108:15
  109:12 110:1,3
  110:4 114:9
  115:5,7 124:18
  125:11 126:1
  172:6 188:5,15
  188:16 193:15
  193:17 196:21
  197:13
**formal** 53:5
  109:4 140:15
  191:3,6
**formalized** 7:2

36:10
**format** 191:9
  197:1
**formats** 108:22
**former** 199:19
  199:20
**forth** 28:21
  30:14 31:15
  47:18 93:5
  193:5
**forthright** 173:3
**forward** 193:12
  196:14,25
  197:1
**forwarded**
  195:15
**forwarding**
  120:16
**foster** 11:1 29:7
  29:8 33:5
  116:5 117:3
  120:17,21
  121:23 144:1
  144:10 183:14
  183:24
**found** 28:22
  71:16
**foundation** 22:5
  43:6 64:8
  132:13 134:15
  147:13,16,23
  150:18,19
  151:12 159:9
  165:21 166:25
  167:24 171:19
  176:24 188:6
  188:17,18
**foundational**
  66:5
**founded** 152:20
**four** 121:6
  146:22 158:16
**frame** 49:23
  167:10,16
**frames** 156:19
  156:23
**frankly** 64:19

66:16 83:13
93:11 129:5
free 152:2
Friday 70:7,9
friend 87:21
front 59:10
143:14 149:23
full 92:4 103:9
full-time 4:22
5:12 6:2 7:10
128:4
function 37:14
38:10 63:1
105:12
functions 80:14
funding 9:7
furnish 116:24
furnished
169:13
furnishing 74:21
further 3:9 30:1
80:6 108:14
109:24 110:5,5
110:6,7,9,9,11
124:6 127:10
131:11 164:21
202:1
future 20:8
108:14

**G**
game 118:19
Gannon 5:3
Gary 191:11,15
191:15 192:19
201:14
gather 130:14
general 7:9 14:9
28:20 92:1,2,7
104:3 105:1
109:17 134:20
generally 21:25
48:4 103:3
181:15
generated 34:12
35:10 42:25
93:15,15 95:8
197:18

generic 137:18
gentlemen 66:1
getting 12:4
72:14 81:11,20
87:4 92:15
104:16 122:8
139:6 173:6
192:11
girl 17:12 24:23
25:1 120:21
162:15
girlfriend
186:11
girls 25:1,2
29:19
gist 31:16 43:24
66:10 134:19
139:8 141:25
give 15:4 22:5
54:14 68:6
87:15 92:18
95:11 98:13,13
99:14 100:3
106:9 108:12
116:9,13,14,20
119:9 127:18
143:14 152:9
152:14 154:9
159:1 194:18
given 6:19 12:9
12:12 23:21
39:19 105:5
106:24 108:5
108:10,22,22
109:9 123:2
129:14 134:4
171:9 186:4
195:8
giving 116:11
141:7 150:12
152:16
go 5:2 16:13
29:1 45:4
67:16 73:1
87:13 89:1
95:18,20
100:14 103:21

121:14 123:20
124:8 131:19
142:20,25
143:2,14
145:21 146:10
147:21 148:18
155:25 156:18
156:23 160:19
161:17,18
162:25 163:19
165:8 167:18
180:10,12,15
180:21 183:8
193:12 196:14
196:25 197:1
198:2 203:15
goal 25:6,8,20
28:3,6,23 30:7
32:14 35:16,23
36:9 37:18
44:20 57:13
God 162:17
165:15
goes 32:14 121:6
146:20 162:2
174:14 190:20
going 12:10 13:8
14:19 19:4
21:18 30:6,24
31:6 32:9 33:5
34:15 37:22
40:13 41:2
49:11,20,23
55:12 56:21
57:8,17 58:7,9
59:13 60:23
63:25 65:18
66:17 67:3
68:8 79:2
82:11 86:14
92:16 95:12
98:5,8 100:10
100:11,13,14
101:2 103:2
105:18 107:1
109:19,22
116:16 124:23

129:25 130:5
136:12 138:8
141:2 142:16
142:17 146:7
150:20 151:15
155:7 156:19
156:23 158:14
160:14 161:17
161:18 162:18
165:10,10
167:3 173:13
175:6 181:20
182:18 187:14
188:13,16
189:9,9,21
190:3,4 192:23
192:24 193:15
194:1,2,7
195:10,17
196:17,23
197:3 201:5
good 62:19
63:25 67:25
79:25 94:9
118:3
goody 121:17
Gornall 2:9
gospel 136:22
gotten 70:25
151:19
govern 27:4
government 9:8
29:3
Governor's 8:5
governs 29:1
graduated 5:3,6
grandparent
183:21
Granger 60:12
60:22 80:19
83:25 84:1
158:17 159:14
159:17
granted 195:6
great 107:18
grossly 21:9
grounds 33:8

66:5
guess 14:11 60:7
128:17 185:12
187:18 188:19
200:10
guessing 185:10
guidelines 54:3
guys 100:10
111:15

**H**
H 4:1
half 4:23 5:10
28:1 100:12
hallway 46:21
hammering
120:20
hand 71:17
handbook 174:1
handed 84:10
128:23 129:13
154:19
handle 179:3
handled 99:5
200:4
handling 8:1,7
145:14
hands 129:19
happen 24:6
65:2 136:7
152:10 165:16
181:10
happened 36:6
44:6 45:23,24
46:2 57:1 58:3
64:14 65:4
69:3 72:22
75:21 83:12
86:4 135:2,12
139:16 140:1,2
141:1 145:2
147:10 152:7
170:19 171:11
203:4
happening
131:6 201:3
happens 18:18
22:14 109:4

142:17 180:22
**hard** 15:4 46:21
  49:6 85:2
  91:21 149:9
  150:4 154:18
  154:21 159:15
**harder** 169:24
**head** 9:10
**heading** 93:18
  101:8
**heads** 200:20
**hear** 78:23
  137:21 139:1
  148:8 181:1
**heard** 38:22
  46:9,11 138:7
  145:13
**hearing** 23:8,14
  23:16,23 24:3
  25:5,16,17
  26:15,21 27:22
  27:22 28:14
  30:7 31:6
  35:11,21 36:5
  36:18,19,24,25
  37:3 38:20,23
  41:12,22 42:14
  42:25 43:19
  44:1,15,19,20
  45:11,13,15
  46:14 48:11,16
  48:19,23 49:3
  49:10,13,15,19
  50:3,3,7 51:3,4
  51:8 52:4
  53:11 57:6,7
  57:13,16 58:8
  59:13 61:6,15
  63:7 66:4 67:3
  68:21 69:6,7
  69:10 70:5,7
  71:9 78:7
  79:11,24 86:15
  96:11 128:17
  128:20 131:6
  131:17 139:22
  139:24 140:14

141:12,16
142:9 143:3,14
143:18,25
144:4,7,10,17
145:4,8,10
146:10,19
147:3 148:4
151:3,20 181:4
**hearings** 7:12,16
  8:2,8 23:9,11
  52:11,17 53:8
  55:23 57:12
  180:9
**hearsay** 137:10
  137:10
**Heather** 177:19
**held** 25:16 51:25
  73:4 98:10
  100:25 101:1
  145:24 146:2
**help** 31:4 191:24
  197:20
**helpful** 88:5
**henceforth**
  54:20
**hesitant** 173:5
**hey** 118:14,14
**highest** 50:8
**Hines** 50:24
**HIPAA** 55:24
  57:9
**historically** 27:9
**history** 50:10
  52:2
**hold** 36:9 48:12
  152:15
**holding** 54:1
**holdings** 52:22
**Holdnack** 1:19
  1:24,25
**home** 18:16,21
  19:5 120:21
  121:17 159:22
  192:11
**honest** 27:16
  34:6 107:6
  117:20

**honestly** 129:1
**hope** 54:11
  89:13
**hopefully** 179:8
  179:9
**hospital** 11:2
  18:17 97:6
  183:4
**hospitals** 96:24
  97:5 164:8
  166:10 183:3
  184:19,23
**hostile** 50:19
  51:10 76:2
  79:12
**hour** 100:12
**hours** 112:15
  174:17 195:1
**huge** 62:3 122:6
  187:22
**Hughes** 119:23
**Hum-um** 117:23
**hundreds** 97:10
  97:12
**hurt** 139:4
**hurting** 179:6
**husband** 117:2
**hyper-technical**
  118:25

### I

**idea** 21:14 45:2
  46:6 51:10
  74:24 95:12
  96:8 171:8
  185:17
**identification**
  84:8 192:7
**identified** 43:10
  85:20 92:25
  192:12
**identify** 43:12
  103:12 104:23
  111:8 116:16
  129:20
**ilovejesus.net**
  195:13
**imagine** 203:3

**immediate**
  176:19
**immediately**
  12:7 45:15
**impact** 20:20
  44:19 63:21
  66:20 71:8,9
  130:9
**impacted** 130:12
**impartial** 135:23
**impediment**
  115:3
**impetus** 131:16
  131:18
**implicated**
  127:21
**implicates**
  113:25
**impression**
  149:19,20
  170:17
**improper** 8:4
  80:8 92:20
  128:11
**improperly**
  132:23
**inaccurate** 21:9
  21:9 22:11
  67:6
**inanimate** 32:6
**inappropriate**
  160:17 172:9
  174:13,20
**inappropriately**
  69:13
**incident** 74:15
  77:13 107:21
  107:22 117:17
  126:12 135:2
  157:15,17
  160:10,25
  161:5,9 162:21
  187:8 197:6
**inclination** 65:1
**include** 32:11,12
  54:4 55:23
  84:17 130:18

**included** 48:16
  107:3 146:18
**including**
  107:17 131:3
  187:11
**incorrect** 164:12
  165:18 166:8
  170:17
**independent**
  4:24
**independently**
  6:7 90:23
**index** 146:12,20
  147:1,2 154:1
**indicate** 102:21
  126:9 158:9
  164:11 165:9
  169:9
**indicated** 25:17
  52:25 55:21
  64:5,14 65:3,3
  86:17 113:18
  135:17 156:4
**indicating** 26:20
  40:12 92:6
  101:12 112:14
  118:9 143:23
  168:3 202:15
**indication**
  108:24
**individual**
  144:24 191:2
**individually** 1:7
  1:9,11,14 2:16
  18:19
**individuals**
  170:2
**infant** 183:20
**influenced** 45:1
**inform** 150:10
**information**
  11:4,7 37:2,8
  37:20 41:7
  55:22,24,25
  56:1,1,4 57:10
  57:14,17,20
  58:7 59:24

69:19 71:13,15
71:18,21,23
72:5,15 74:21
75:8 77:17
81:6,10,13,19
81:20 82:10,15
83:7 84:15,16
86:16 90:23
101:15 102:22
104:4,16 105:8
113:8,12
114:13 119:21
124:16 126:14
127:4 130:13
131:3,9 132:24
135:19 136:14
139:6 151:19
172:3,8 174:7
176:11 181:23
182:22 187:6
193:7
**informed** 24:2
59:13 63:19
147:9 151:1
**initial** 95:5
106:23 121:3
131:5
**initially** 20:24
60:16 69:23
78:6
**initiate** 138:16
**initiated** 117:25
118:12 170:3
**injure** 174:8
**injury** 135:7
**input** 21:2
199:10
**inquire** 73:19
**inside** 66:24
**instance** 33:1
97:14,15
144:21
**instances** 117:18
**instant** 92:21
93:3,3
**instituting** 8:17
**instruct** 53:19

86:25 89:15,22
105:5
**instructed**
108:12
**instructing**
89:11
**instruction**
89:19 106:17
127:18
**instructions**
106:24 123:2
**intended** 54:25
124:1
**intention** 31:7
87:20 102:2
**interaction**
62:20,21
**intercepted**
144:23
**interest** 17:9
58:23 87:9
180:11,18
181:15,19,25
198:12
**interested** 56:25
**interests** 14:23
181:14
**interfere** 193:6
**interim** 9:25
70:24 191:11
199:2,8
**internal** 159:7
**interoffice**
202:13
**interpret** 108:23
**interpretation**
156:14 171:23
175:1 187:9
**interrupt** 29:17
31:25 104:20
111:9
**interrupted**
149:15
**interview** 137:25
**interviewed**

137:22 140:5,8
**interviewing**
170:2
**interviews**
140:12 157:22
**investigate**
136:22 145:3,7
**investigated**
69:21 77:23
**investigating**
79:7 135:16
**investigation**
57:21 74:15
77:14 82:7
85:8,12,13,24
86:3,8 90:7,15
90:17 91:10
101:6 127:17
127:21 128:21
130:9 131:1,17
131:18 132:19
132:22,25
134:9,14,21
135:23,24
137:19 140:6
140:20 158:11
172:22 173:2
176:19
**investigations**
158:6
**investigator's**
136:5
**invite** 181:4
**invited** 59:18,23
**involuntarily**
9:6
**involuntary**
7:21 202:22
**involve** 203:6
**involved** 7:12
8:1,7 9:21
15:25 26:11
34:5 48:13
50:3 55:22
69:25 70:2
71:19 75:3
77:25 80:10,14

94:21 99:24
100:2 116:9
133:11,17
141:9 142:14
156:25 173:6
174:14,20
175:11 181:1,3
182:12
**involvement**
10:2,8 107:19
**involves** 128:17
**involving** 7:13
7:20 23:23
24:22 40:17
95:11 154:13
**in-house** 54:8
80:14 180:13
**iron** 180:12
**irreconcilable**
73:8
**irrelevant** 62:17
62:22 68:4
97:1 149:20
**issuance** 181:24
**issue** 13:20
30:12 32:14
40:2 44:14
47:19,22 50:4
53:6 55:9
56:16 63:6
67:4,14 74:11
83:2 102:9
104:14 142:9
142:10 173:11
173:12 181:18
190:8 201:21
**issued** 10:23
11:16 12:14,22
14:15,25 22:25
52:15,18
164:19 181:19
181:21,22
183:3 191:25
197:5,17 198:8
**issues** 8:15 14:14
30:6 53:20
179:11 180:14

181:12
**Item** 93:18
101:8 111:2
119:20 123:12
128:11 133:23
173:18

___

**J**

**J** 2:21
**jail** 173:14 175:7
186:11,14
189:9 190:4
**January** 5:13,14
6:17 60:15
**job** 4:17 66:20
153:19 200:24
201:15
**job-related**
113:1
**John** 1:13 2:16
84:12 101:6
**join** 28:9 75:23
125:6 132:15
132:16
**Jones** 98:20,23
99:2,14 102:16
168:17 169:3
**Joseph** 2:13
**Joyal** 2:13 3:5,8
13:8,25 21:18
21:22,24 22:4
22:7 37:22
43:5 49:20
51:14,17 65:22
67:13,16,20,23
68:1 73:9 74:7
75:22,25 76:5
76:9,11,14,17
76:19,24 77:2
77:8 78:14
79:9 82:14
85:22,25 88:13
88:19 89:1,4,8
100:6 101:2
107:1,10
109:13 111:4
111:10,20
114:9 116:11

124:18,23
125:2 126:20
126:22 130:20
132:11,13
137:9 146:5
147:15,20,24
148:1 149:19
149:21 150:19
150:22 151:7
151:13,16
152:15,19,22
152:24 153:16
156:15,17
163:18,21,22
165:23 166:1,3
171:1,3,6,18
171:21,25
172:22,25
175:20,23,24
177:1,3,6,9,12
177:16,17
178:10 185:20
186:16 187:14
187:20,23,24
188:6,16 189:4
189:6,12,21
191:13 192:10
193:23 194:4,8
194:13,17,22
194:24,25
195:21,24
196:1,3,5,8,17
197:12,14,23
198:15,20
201:23 204:2,7
**Jr** 2:13
**JS** 128:17
  131:17 133:19
  141:11
**Judge** 10:23
  16:9 36:3
  44:16 45:2,6
  45:12,16,19,22
  46:8 51:8,10
  52:15 53:6
  54:7 55:10
  57:17 58:2,5

58:19 66:20
70:25 76:20,24
79:12,14,19,24
81:23 128:19
129:16 139:23
143:3 147:9,17
148:4,7 151:24
152:3 181:22
181:23 190:19
190:20 194:16
196:2
**Judges** 7:13,17
**Judge's** 71:4
  79:15
**judgment** 63:19
  156:1
**judgments** 32:9
  156:6
**July** 36:6,13,18
  38:20 41:12
  49:19,25 56:8
  61:16 70:6,9
  78:7 82:18
  83:2,11 84:1
  105:25 106:4,7
  106:10 107:13
  109:25 110:8
  110:10,11,11
  110:12,18
  111:24 112:10
  112:11,13
  114:14,17
  115:23 116:2
  117:24 118:1
  131:6 132:1
  139:22 140:14
  145:4,8,10
  146:10 155:14
  183:11
**jump** 5:1
**June** 83:10,11
  95:15 157:14
  157:17,21
  158:17 160:8
  161:23 163:1,2
  168:2 182:9
  183:1,10,19

184:10 186:18
**jurisdiction**
  75:12 101:11
  122:18 165:3
  165:19 166:5
  182:8
**justice** 45:20
  138:8 139:24
  147:10,24
  173:14 175:6
  188:2,4,12
  190:3
**justification**
  162:12
**justified** 181:23
**justify** 18:11
  132:20
**Juvenile** 7:13
  12:22 13:22
  14:6 15:1,10
  29:5,15 53:25
  54:10 55:6,18
  55:19 57:11
  120:1 122:19
  190:19

---
**K**
**keep** 24:19 56:3
  103:1,11 105:8
  125:15 179:7
**keeping** 88:24
  103:15
**keeps** 92:16
**Kelly** 44:16 45:2
  45:22 58:5
  66:20 70:25
  79:19,24
  128:19 147:9
  148:8
**Kelly's** 81:23
  129:16
**kept** 104:16
**kid** 119:25 123:3
  123:7
**kids** 21:12
  122:11 139:2
**kill** 123:7
**Kim** 110:22,23

110:24 111:14
111:25 137:22
137:25 138:2,6
138:7,10,12
**kind** 11:23 12:4
  12:9 16:2 28:4
  36:21 66:7
  87:2 89:24
  99:13 119:2
  140:7,15
  142:21 173:6
  179:3
**kinds** 56:3 180:7
  181:12
**kinship** 183:13
  183:20,24
**knew** 52:5 57:4
  94:2,3,19
  95:12 103:9
  136:3 160:11
  161:6,8 163:8
  183:23 184:6
**know** 6:15 7:6,7
  7:7 8:11,13
  11:1 14:23
  15:5 16:1,12
  16:15,16,20,22
  16:23 17:3,5
  17:10 18:2,14
  18:16,18 20:8
  20:14,19,25
  21:1,11,14
  22:13,17,19,21
  23:1,2,4 24:7
  25:24 26:1
  27:5,15 28:11
  31:1,2 33:3,24
  34:24 35:19
  36:16 37:11,11
  38:1,6,11,14
  38:22,24 39:1
  39:3,6,8,10,12
  39:15 41:21
  43:15,22,23
  44:2,12 45:8
  46:4,15,21
  47:2,4,4,10,10

52:8,23 54:4,8
56:1,14,15
57:15 58:10,15
58:15 59:4,6
60:4,5 61:4
62:2,25 63:1
64:16 65:2,3
65:10 66:7,9
66:15,16,18,22
66:23 69:2
70:16,23,23,23
70:24 71:7,20
72:8,9,14
74:22 75:5,13
75:24 77:21,24
79:1,13,22,23
79:24 81:8
82:12,17,19,24
83:8,12,13
84:2,3 85:18
86:1,1,14,15
87:15,25 88:4
88:21 89:12,19
90:7,10,13
91:3,7,8,9,23
91:24,24 92:15
93:2,5,6,12,17
93:24,24 94:1
94:2,23 95:6,7
95:8,16,21
96:14 97:5,12
98:2,8,18,22
98:25 99:6,15
99:17,19,19,20
99:23,23,24
100:4,9 101:17
102:11,14,25
104:15 105:2,6
106:10 107:6
107:21 108:18
108:23 109:8
109:14,16,21
113:8,12,14,16
114:8,11,12
115:9 119:10
120:23 121:24
123:9,10,10

125:12,16
126:3,15,23,24
129:4,5 131:7
131:12 133:3
134:15 137:10
138:4,22,23,25
139:2,3,5,11
139:19 140:3,7
140:8,10,13,15
142:13,18,19
142:20 143:5,8
143:16 144:12
144:25 145:1
145:22,22
150:10,15,15
151:10,17,18
154:10 156:22
156:25 158:23
160:9,16
164:22 166:14
169:24 172:15
173:5,8,9
175:11 176:4,5
179:19 180:5,6
181:5,10,24
182:11 183:1,9
183:16 184:2,2
184:8,12,15,16
185:11,15,24
185:24,25
186:6,8 188:19
188:19,24
190:22 191:18
191:20 192:14
192:20,21,22
193:23 196:24
197:2,3,10,15
197:17,25
199:14,18
200:2 201:13
203:22
**knowing** 17:19
126:13 182:18
201:17
**knowledge**
39:14,16 59:12
64:24 65:16

85:11 91:5
110:17 113:3,6
127:20 163:8
165:11 168:8
169:10,15
182:15 186:3
189:18 199:17
199:22
**known** 18:25
23:14 78:2,3
116:9
**knows** 72:4
82:23 186:4
**Knox** 2:9,21
101:3
**Kolupski** 80:13

———— L ————
**L** 4:1,1
**labor** 164:3
**laced** 139:23
**lack** 43:6 64:7
132:13 135:1
147:12 165:21
188:6,17
193:24
**lady** 25:22
177:19
**lady's** 50:23
**laid** 86:20
**Lane** 2:17,18 3:6
28:9,17 48:9
51:16 68:15
73:9 74:8
75:23 78:15,17
78:21 86:22
87:17 88:1,4,8
88:22 89:7,10
89:15,21 90:2
91:1 96:7
100:19 108:15
109:12 110:1,3
110:5,9 115:5
115:8,12 125:6
125:11 126:1
130:22 132:15
178:13 182:2
188:5,15 189:5

193:15,19
195:3 196:20
197:13 198:4,6
201:24
**language** 54:5
55:6
**Lanzillo** 2:8
28:8,11 30:23
40:15 41:1
43:4,6 49:4,11
51:15 58:13
62:8,12 64:7
64:11 65:9,17
65:21,23 66:2
67:12 72:15
73:5,15,17
74:3,9 86:23
87:8 89:18,22
195:2
**Lanzillo's** 87:1
89:5
**large** 16:2
**late** 202:23
**lately** 160:18
**laugh** 123:25
**Laughney** 2:18
**launched** 85:9
**law** 2:13 5:4,5
5:19,21 7:24
13:22 28:21
29:5,6 72:7
74:23 158:2
161:11 171:20
172:12 176:6
187:9
**lawyer** 23:3
62:16 63:25
81:7,17 88:10
98:14 166:21
167:1,21
171:18
**lawyers** 8:9
78:20 201:8
**lay** 88:5 150:19
**lead** 175:13
**leading** 76:5,8
77:4 134:21

**League** 198:8
**leaking** 81:10,13
**learn** 38:18
83:13,14,18
177:25
**learned** 39:19
77:17 83:1,4
83:21 162:15
183:6 184:11
**leave** 100:20
130:15 167:17
182:8 198:22
202:5
**leaving** 165:3
166:4
**lecture** 194:18
194:21
**lectures** 194:21
**led** 31:9 77:14
80:24 81:12
96:18,20
124:11 134:19
**left** 6:17 72:2
123:20 135:6
140:24 141:4
150:24 165:19
192:4
**legal** 7:5 8:15,17
16:24 21:2,4
22:1 32:16
33:6,7,23 34:1
34:7,14,16
53:22 62:12
87:6 171:16
180:6 190:24
200:1
**legally** 200:4
**legislature** 10:5
10:6
**legitimate**
189:24
**Legler** 56:10,11
**legwork** 90:8
**length** 107:18
**letter** 70:25 71:4
79:16 81:24
84:11,15,19

95:5 101:6
120:12,17,20
120:24 121:22
157:13,18
168:1 186:18
186:24 187:1,2
187:5 202:13
202:17
**letters** 121:18
164:8 166:9,15
167:10,15
168:6 184:19
184:25 185:5
185:14,19
186:2,7,10,13
**let's** 31:4 148:18
161:17 162:25
171:11
**level** 9:19 13:17
18:19 19:16
20:5 24:18
135:7
**levels** 9:18 50:8
**Liberty** 2:5
**Liebel** 1:11 2:12
6:22,25 9:23
70:3,20 71:4
79:16,18 80:11
133:15 134:13
136:20 137:13
157:4,6
**life** 67:23
**light** 58:6 81:23
99:16 174:13
174:20
**likewise** 26:19
**limit** 100:6
**limitations**
14:12
**limited** 63:2
89:6
**line** 47:9 48:1
89:20 108:2
121:5 130:17
148:25 149:4,5
152:13,17
153:1,2,25

154:4,5 155:20
155:21,21
161:2 162:1
**lines** 192:4
**lingering** 33:4
**list** 112:7 146:12
**listed** 7:5 78:9
102:12,15
144:1 168:18
**listen** 85:23
**listing** 102:16
**litigant** 44:18
**litigants** 55:17
**litigated** 55:9
**litigation** 7:13
8:18 52:9,13
52:14,24 53:5
**little** 7:1 10:1,1,8
86:24 110:15
120:21 121:21
137:20 144:11
199:25
**live** 117:2
**LLC** 2:18
**lobbed** 187:23
**local** 14:14,22
50:14 56:20
96:24 97:6
164:8 166:10
183:3 184:19
184:22
**Locke** 80:12
**lodge** 73:11
**loggerheads**
180:20
**long** 4:20 35:20
42:15 62:2
74:4 92:6
152:3 166:14
176:7 178:19
181:13 182:25
**longer** 9:14
100:9,14
195:12 202:16
**look** 7:3 16:14
35:9 80:15,24
84:24 95:14

114:1 117:16
120:4 131:11
132:4 141:24
146:11 147:1
148:24 155:20
163:12 168:21
169:17 177:3
179:19 201:4
**looked** 18:18
19:14 27:25
40:9 58:20
60:20 62:2
80:3 84:4,5
95:3 168:11
**looking** 28:15
35:20 72:18
83:20 84:20
118:4 169:25
183:16
**looks** 120:6,14
121:4 123:6
146:12
**losing** 71:3
**lot** 24:8 45:13
56:10,14 60:7
60:10 67:2
78:19 90:8
98:5 99:9,9
130:6 140:9
187:19
**Lots** 115:8
**loud** 123:25
149:2 153:5
**low** 98:2
**Lucht** 155:8
191:11,15,15
191:19,21,25
192:16,20
196:5 197:18
199:9,16,18,23
200:8 201:14
202:21
**Lucht's** 196:11
**lunch** 69:24
**lunchtime** 69:5

—————
**M**
—————
**M** 4:1

**mail** 202:13
**maintain** 5:20
92:22 109:22
115:23
**maintained**
107:20
**maintaining**
83:6
**making** 49:1
114:7,10 122:1
127:3 133:17
165:7 175:21
177:23
**management**
47:21,23 48:3
**mandated** 29:25
**manipulating**
63:12
**manner** 147:9
**March** 1:20
**mark** 2:17 123:5
135:5 162:8
201:14 202:17
203:21
**marked** 84:7,11
157:6 192:6,8
**married** 116:23
177:21
**Master** 7:13
**material** 15:22
57:8,9
**materials** 42:3
**Matt** 158:17
159:14
**matter** 7:6 45:9
53:13 74:21
82:12,14 89:8
110:4 119:2
125:9,13
134:16 141:8
141:10 157:1
**matters** 102:22
**McConnell**
177:19
**McKean** 4:9
**McLaughlin** 2:9
**McNair** 1:22 2:2

3:4,7,9 4:5
11:24 16:16
20:15 21:20,23
22:3,6,8 27:4
28:10,19 35:21
40:23 42:17
43:7,18 44:11
45:5,23 49:14
51:22,24 58:16
61:11 62:14
65:19,24 66:6
67:3,14,18,21
67:24,25 68:10
68:11 73:3,14
74:1,4,10 76:4
76:7,10,11,12
76:15,17,18,21
77:1,6,10,11
78:16,18,24
82:15 83:17
84:20 85:24
87:13 88:3,7
88:10,17,21
89:1,3,6,8,13
89:17,24 90:3
90:5 91:25
92:5 98:3
99:19 100:6
101:4,25 110:2
110:4,7,14,16
111:7,12,13
115:7,10,13,14
116:19 118:3
120:4,8 125:1
125:8 126:2
132:16 136:17
137:11 145:25
147:12,18,23
147:25 148:5
149:17,20
150:18,21
151:12 152:12
152:16,21
153:14 156:7
156:10,13,16
156:21 158:15
159:9 161:12

163:3,7,15,20
165:20,25
166:6,16,18,22
166:25 167:5
167:13,24
168:15 169:11
169:19,21
170:3,11,21,24
171:2,3,4,6,9
171:16,19
172:21,24
173:2 174:24
175:17,21
176:24 177:2,5
177:7,10,14
178:19 182:3,6
183:15 184:3
185:12,22
188:18 189:15
192:15 193:17
193:22 194:2,6
194:11,14,17
194:20,24
195:19,22,25
196:2,4,7,9,24
197:20 198:14
201:21 202:2
203:16,17
204:1
**McNair's** 147:8
148:3 166:13
**mean** 7:3 15:3,8
15:18 17:11
27:24 29:17
31:24 34:3
37:12 38:2
39:4,16 56:22
59:10 64:9
65:11 70:23
77:16,20 80:2
82:1 89:8 92:2
92:10 93:3,6
93:10 95:19
98:2 99:17
104:20 106:1
108:1,11 122:5
128:2 136:6,11

| | | | |
|---|---|---|---|
| 136:16 137:11 | 187:10 | 126:8 127:13 | **N** 3:1 |
| 137:14 139:7 | **mere** 18:11 | **mistreatment** | **nail** 49:7 |
| 152:16 159:5 | **mess** 112:15 | 168:8 | **name** 4:7,8 |
| 164:14 166:9 | **message** 93:4 | **modified** 39:11 | 16:20 17:7,8 |
| 181:24 184:15 | 118:16 123:16 | **mom** 120:21 | 50:23 72:6 |
| 193:23 | 160:3,3 | **moment** 73:2 | 100:3 116:10 |
| **meaning** 55:20 | **messenger** 92:21 | 117:23 | 116:11,14,20 |
| **meaningful** | 93:3 | **Monday** 70:18 | 135:17 147:2 |
| 201:2 | **met** 86:12,13 | **monetary** 8:24 | 158:24 159:15 |
| **means** 115:9 | 112:14 | **monies** 9:14 | 159:17 169:3 |
| 123:10 159:7 | **meted** 108:21 | **monitor** 162:5 | 169:12,17 |
| 193:20 196:25 | **method** 191:3,4 | **month** 84:5 | 174:8 177:20 |
| 197:3,4 | **Michael** 1:18 3:3 | 145:16 164:20 | 185:17 |
| **meant** 92:7 | 4:8 | 199:5 | **named** 25:22 |
| 125:25 134:6 | **Michelle** 25:22 | **monthly** 8:25 | 50:14 177:19 |
| **mechanics** 66:22 | **mid** 4:25 | **months** 26:1 | **names** 114:23 |
| **media** 50:10 | **middle** 163:4 | 29:8,20 30:18 | 146:22 |
| 52:2 53:7,20 | **Mike** 5:15 | 31:23 47:13 | **narrative** 141:19 |
| 54:9 56:19,25 | 119:22 131:24 | 200:23 | 142:5 144:2 |
| 57:2 | 203:21 204:2 | **morning** 163:10 | **narrow** 62:22 |
| **meet** 53:19 | **Millfair** 4:9 | **Moser** 2:18 | **nature** 26:25 |
| 180:14 200:5 | **million** 119:4 | **mother** 11:13 | 28:21 152:17 |
| **meeting** 47:3 | **mind** 14:19 | 12:10 17:19 | **near** 122:7 |
| 68:22,25 78:5 | 18:11 38:5 | 19:20 20:19 | **necessarily** 9:9 |
| 78:6,8,8,12 | 41:16 44:18,25 | 23:21 24:2,8 | 17:10 18:13 |
| 80:22 81:23 | 51:20 61:24 | 24:17,20 27:15 | 19:13 140:11 |
| 85:9 132:8 | 64:13 81:22 | 36:1 62:19 | 142:15 153:13 |
| 135:2 160:9 | 117:23 127:7,8 | 75:20 77:12,17 | 153:19 |
| 161:4 | 127:15 175:7 | 77:19 93:20,24 | **necessary** 73:19 |
| **meetings** 82:1 | 180:3 | 94:5,12,19 | **need** 7:2 9:19 |
| 86:9,10 87:5 | **minds** 142:18 | 95:16,23,25 | 67:15 111:7,8 |
| 191:1 | 179:21 | 97:7 101:9 | 132:4 140:23 |
| **meets** 9:2 | **mine** 28:17 | 116:5 120:17 | 140:25 141:9 |
| **members** 104:12 | 84:19 | 154:15 185:16 | 151:23 155:12 |
| **memo** 101:18 | **minimize** 127:13 | 186:7,10 | 159:22 179:21 |
| 196:11 197:5 | **minister** 116:23 | **mother's** 23:19 | **needs** 9:8 33:4 |
| **memorandum** | **minute** 25:15 | 24:13 94:14 | 179:14 194:4 |
| 47:15 52:19 | 31:24 43:2 | **move** 96:10 | **needs-based** 8:1 |
| 53:6 54:7 | 111:4 118:18 | 130:22 179:24 | 10:4,9 |
| 55:10 85:16 | 154:9 | 187:24 197:23 | **negative** 63:21 |
| 117:11 192:1 | **minutes** 100:8 | **moved** 117:4 | **neglect** 11:21 |
| **memory** 81:9 | **mischaracteri...** | **moving** 33:20 | 13:3 |
| **mentioned** 8:19 | 163:16 | **mutually** 73:22 | **neglected** 137:15 |
| 9:20 27:3 52:1 | **misconduct** | **mutually-conv...** | **neglectful** 24:14 |
| 178:15,20,24 | 174:12,19 | 73:22 | **neither** 185:18 |
| 181:14 | **missed** 84:1 | **myriad** 56:2 | **neophyte** 99:2 |
| **mentioning** | **mistaken** 58:4 | | **nervous** 173:5 |
| | | **N** | |

never 38:9 40:9
45:23,24 46:9
46:11 55:9
59:1 64:20
65:10 81:22
94:25 97:18,18
102:3,17 109:9
127:19 129:23
130:1 136:11
140:1,2 145:3
170:25 178:24
184:24 185:3
191:13 194:10
199:13
**new** 36:16,18
162:15 196:12
196:15 200:8,9
**newborn** 24:11
24:13 93:21
**news** 131:24
**newspaper**
50:15 56:20
123:23 124:13
126:15 127:11
173:12
**nice** 160:18
**night** 100:18
162:2 164:3
**non-work**
174:17
**normal** 66:24
96:1 162:16
**normally** 26:7,9
35:5 98:14
**notable** 50:7
**Notary** 1:19
**noted** 85:20
156:15
**notes** 35:7,7,8
117:13 138:21
140:16
**notice** 12:9,12
61:11 96:4
98:13,14
**notified** 12:14
141:16
**notwithstandi...**

74:2
**November**
191:17 192:17
196:11 199:5
199:24
**number** 50:1
81:6,17 102:11
102:15 116:21
128:15 131:13
131:14 159:10
164:11 168:18
169:2
**numbered**
118:10 120:7
121:10
**numbers** 146:15
**numerically**
106:10
**numerous** 24:7
99:5,7 136:10
**Nzinga** 158:22
**N-Z-I-N-G-A**
158:23

**O**

**oath** 65:8
**object** 13:8
21:18 42:21
43:3 49:11,20
49:24 57:23
66:4 73:9
78:21 87:15
107:1 115:5
124:18,19,23
151:14 163:15
177:16 187:14
188:15,16
189:21 193:15
196:17
**objected** 58:17
76:19 175:23
193:24 198:17
**objecting** 28:2
76:14
**objection** 13:25
22:6 28:8,10
30:23,24 41:1
43:4 48:9 49:4

50:11 51:14,15
51:16 52:6
57:6 58:6,13
58:19,20 62:8
64:7,12 65:9
65:17,21 66:2
67:12 68:15
74:5,7,8 75:22
76:5,21,24
78:14,15,23
79:9 88:24
89:10 91:1
96:7 108:15
109:12 110:1,3
110:13 114:9
125:6,11 126:1
126:20 130:20
130:22 132:11
137:9 147:12
147:23 148:5
149:17 150:18
151:12 152:12
152:14,17,19
153:14 156:7
156:15 159:9
161:12 165:20
165:20 166:6
166:16,22
167:5,13,24
169:11,19
170:11,24
171:16 172:21
173:1 174:24
175:17 176:24
185:20 187:24
188:5 189:4,5
192:10 196:20
197:12,13,23
**objectionable**
68:4
**objections** 68:5
73:10 195:2
**obligation** 103:1
105:8
**obligations**
105:10
**observations**

37:13 155:12
**observed** 75:13
77:13
**obstructing**
147:10,24
**obstruction**
45:20 138:8
139:24 173:14
175:6 188:2,4
188:12 190:3
**obtain** 105:8
**obtained** 93:20
96:22 140:17
**obtaining** 96:2
**obvious** 141:1
**obviously** 69:12
79:23 93:17
**occasion** 141:6
152:7
**Occasionally**
119:19
**occasions** 150:23
**occur** 15:11
59:13 137:15
**occurred** 23:15
68:25 145:16
**occurrence** 48:4
48:6
**occurrences**
152:7
**October** 10:1
191:14 199:2,3
**OCY** 9:21 10:11
13:15 48:3
52:10 55:3
57:3 113:20
119:8,22
120:20 121:12
137:2 153:18
159:8 164:6,12
167:9 176:14
176:21 178:21
181:16,18
186:1 189:17
190:12 191:12
191:15,19
197:22 199:16

199:19,20,21
200:15,18
201:15 202:5
**offense** 174:22
175:1 189:1
190:2
**offer** 28:13
42:11,13 50:24
143:19,22
**offered** 33:18
42:1
**offhand** 74:25
**office** 1:6,12 2:7
2:13 4:18,20
5:19,21 6:3,5,8
7:10 8:6,13
16:14,17 19:18
21:6 32:3
33:19 46:21
69:7 80:8
104:13 110:25
128:2 132:3
138:14 168:18
176:2 177:22
202:15
**officer** 165:1
**offices** 1:21
**officials** 86:12
86:13
**oh** 24:7 45:18,22
46:3 47:12
48:21 60:24
61:9 63:8 67:9
82:20 97:25
110:20 112:15
121:17 131:7
182:14,16,17
182:25 193:1
200:16 203:17
**okay** 5:1 6:11,15
6:21 9:4,17
10:10 11:16
13:14 14:20
15:9 16:5,21
17:13 19:11
21:3 22:3
23:21 25:2

26:19 29:22
30:19,25 31:6
33:12 34:9
35:14 36:7
37:5 38:18
39:5 41:8,25
43:19 44:24
48:18 50:6,16
51:5,19 52:20
53:4,10 55:2
59:12 60:1,7
60:19 61:1,12
61:15 62:5
64:22 65:13
66:6 68:21 69:3
69:4 70:10,15
72:13 75:2,11
75:19 77:10
79:3,4 80:4,18
81:22 85:4,5,6
85:19 86:7
87:25 89:14
90:13,19,20
91:19 93:14
95:2,20,22,22
96:13 98:1,4
98:18 99:18
102:1,7 103:19
104:6,21 105:1
105:4,15,23
106:3,5,14,15
107:15,25
108:8 109:17
110:14 111:3
111:15,22
112:2,8,17
113:24 114:12
114:16 115:13
116:12 117:9
118:3,11,22
120:15,25
121:9 122:20
122:24 124:5,8
124:11 127:12
128:8,11 129:3
129:11,14
130:13 131:16

135:14 136:21
137:12,22
138:11 139:18
141:15 142:4
144:8,10,16
145:18 146:23
147:1,7 150:6
153:10,21
154:16 155:2
155:15 156:3
156:16 157:6
157:11,25
158:19 159:4
161:17,18,25
163:7 164:10
164:18 166:20
168:13 169:6
170:21 171:3
171:22 177:12
177:14 178:18
182:17 183:6
183:18 184:20
184:24 186:20
188:11 191:18
191:25 192:23
193:4,11
194:18 196:17
200:7,11
202:17 203:12
204:1
**omitted** 85:1
**omniscient**
95:20
**once** 18:24 33:5
33:15 92:11
**ones** 41:11 110:7
154:13
**ongoing** 8:15
20:7,17
**ongoingly** 105:7
140:10
**online** 120:19
**Onorato** 1:13
2:16 73:16
80:9,19 84:12
85:14 86:7
88:9 90:10,13

90:23 93:16
100:8,16,19
101:6 133:14
199:15
**Onorato's** 90:6
90:21
**open** 52:23 54:2
57:14,16 126:3
**opened** 55:11
**operate** 105:20
**operation**
105:14
**operations**
174:19
**operative** 157:14
**operator** 124:9
**opinion** 13:15
32:17 33:6,23
34:1,7,16
45:20 50:21
57:3 58:1,11
62:9 69:10
121:11 122:13
152:10 153:13
153:19 156:6
161:16 172:19
174:18 175:18
182:13 190:11
195:4 203:1
**opinions** 153:13
153:19 179:20
**opportunity**
18:5 57:25
67:19 68:7,8
198:7
**opposed** 18:17
33:4 78:9 83:8
93:7 143:3
**opposing** 42:24
**oral** 34:18
**order** 7:18 10:19
10:21,22,22
11:6,11,13,20
11:25,25 12:4
12:10,14,21
15:17 16:6,17
16:19 17:20

18:9,21 19:3
19:12,17,20,22
20:13 21:7
22:25 23:4,7
24:16 28:5
29:12 52:16,19
93:21 95:4
96:3,5,19,21
96:23 97:1,16
98:8,17,24
99:22 100:2
102:19 103:8
104:12 122:7
130:16 133:1
163:9,17
164:19,19
166:9 168:16
181:19,21
183:2,24,25
184:1,3,6,9,11
184:17,21,22
186:23
**orders** 11:16
14:14,16,25
17:25 22:16
**ordinary** 57:15
**organization**
6:11
**organizational**
6:20
**original** 61:25
160:2,3
**originating**
60:23
**Orphans** 7:19
141:8
**other's** 143:6
**ought** 177:3
**outcome** 44:15
44:19,20 62:25
130:6,8 193:8
**outlined** 79:16
**outlook** 155:11
**outset** 31:22
50:20
**outside** 66:24
119:13

**overall** 48:15
71:8 93:12
114:1
**Overbroad**
30:23
**overheard** 190:5
**overlaid** 29:14
**overly** 28:17
49:5 189:5
**overruled** 58:21
**oversaw** 80:13
**overtly** 50:19
**overwhelmingly**
160:18

_____

**P**

**P** 160:10,15,18
161:5 164:7
184:18
**PA** 2:3,5,10,14
2:19
**packet** 37:2 42:2
**page** 92:4
107:11 118:2,9
118:11 120:7,9
120:11,14
121:10,14
122:10 123:12
124:6 142:15
146:15,20,21
148:18,24
149:3 152:25
153:25 154:2,3
155:7,20
161:25 162:1
163:2 180:7
193:11 200:4
**pages** 121:7
158:16
**paginated**
106:10
**paid** 8:24 9:11
**pain** 135:7
**pair** 24:22
**Palattella** 50:14
57:5 59:5,13
59:18 60:4,23
61:2,5 123:14

124:3 125:21
126:5,6,10
156:21
**Palattella's**
57:24 58:23
**Pam** 112:14
114:16 115:2
115:15
**paper** 120:17,19
120:22,23
121:6,18
140:23 191:23
197:25 198:3
**papers** 85:2
197:19,21
**paperwork**
160:21
**paragraph** 92:4
101:7 108:4
133:25
**paragraphs**
157:7
**parameters** 54:3
**paramount**
181:16
**paranoid** 162:7
162:8
**Pardon** 70:8
**parent** 8:25 9:12
10:24 11:8,12
12:13 13:18,19
14:4 18:2,10
19:4 20:1,3,4,6
30:12 62:19,20
75:11,14 98:23
104:16 121:23
144:1 187:11
**parental** 7:20
9:5 25:9 28:6
29:10,11 30:20
31:18 32:15
**parentheses**
161:5
**parenthesis**
160:11,11
164:6,6
**Parenthetically**

154:14
**parents** 10:24
　12:1 13:22
　14:6,16 25:10
　25:20 26:17
　30:2 31:8
　57:21,23 58:6
　58:17 99:10
　117:4 144:11
　155:24 181:2
**parent's** 144:2
**part** 15:23 18:16
　18:17 20:16
　31:11 41:14,15
　41:19 42:2
　48:17 55:18
　57:12,18 59:25
　66:17 70:13
　81:9 85:4
　101:23 103:5
　120:19 121:11
　121:19 122:2
　131:3 136:16
　146:11 158:15
　179:17 181:8
　191:17 195:4
　203:22
**parte** 13:6 18:1
　18:9,12 96:4
　97:16
**partial** 63:1
**participate**
　39:18 52:13
　86:8
**participated**
　69:22 86:9
　134:20
**participating**
　122:4
**participation**
　90:7
**particular** 7:7
　12:18 19:4
　24:9 26:21
　27:10,23 29:16
　30:7 31:3 38:4
　54:3,21 67:4

67:14 96:6
　102:8 103:13
　104:7,22,23
　105:4 114:6
　127:24 137:19
　150:11 180:15
　186:17 192:15
**particularly**
　19:6 49:12
　56:19 57:13
　84:20 157:7
**particulars** 39:8
　50:22 72:3
　83:12
**parties** 15:16,21
　15:25 16:2
　26:19 27:10,16
　37:7 42:2
　43:25 55:22
　143:25
**partisan** 203:13
**party** 16:5 26:22
　33:18,20 76:1
　102:5 130:17
　152:2
**part-time** 4:25
　5:11
**passed** 56:12
**pattern** 24:14
　92:20
**payments** 9:18
**PC** 2:9
**Peebles** 110:22
　110:23,24
　111:14,25
　112:12 137:23
　137:25 138:12
　138:13,23
　139:5,10,13
　140:4,17 170:2
　170:4,8,18
　171:13 172:2
　172:14,19
　173:16 189:25
　190:7,10
**pen** 155:1
**penalties** 45:21

**pending** 36:2
**Penn** 2:18
**Pennsylvania**
　1:1,9,20,23 4:9
　9:3 14:3
　108:19
**people** 6:7 15:12
　32:8,21 34:4
　37:25 56:3
　68:23 69:19
　72:5,14 74:21
　74:24,25 75:8
　77:16,21,24
　78:1 81:18
　82:10 119:10
　119:13 131:9
　132:24 133:17
　136:10 140:9
　142:14 143:1
　143:18 146:18
　179:2,16,18,20
　180:7,15,20
　190:13 191:7
　200:18 201:2
**people's** 179:13
**perceive** 41:2
**percentage**
　20:10,15 22:18
**perception** 21:5
　21:8,17,24
　22:10,12,13,20
　79:15
**perform** 6:7
**performance**
　66:18 71:2
**performed** 19:2
　63:1
**period** 9:23
　25:22 91:12
　156:3 159:22
　179:25 199:23
**periodic** 7:18
　23:9 25:17
**periodically**
　15:6
**peripheral** 10:2
**permanency**

33:4
**permanent**
　29:12
**permissible**
　164:1
**permission** 18:3
　131:21
**permit** 13:1,22
**permitted** 50:11
　50:25 76:7
　104:11
**permitting**
　52:16
**perpetrator**
　158:10
**person** 17:3,5
　127:10 135:16
　137:5 144:4
　159:12 164:10
　174:17 175:14
　176:14 189:10
　189:22 190:10
　200:25
**personal** 39:14
　39:16 56:4
　119:12,13
　186:3 198:5
　203:1
**personnel** 1:10
　46:5,7 49:2,18
　49:22 53:7
　80:14 202:22
**perspective**
　143:23
**pertaining** 172:4
**pertains** 15:24
**Pete** 133:15
**Peter** 1:9 2:11
**petition** 23:23
　25:5,13,15,18
　29:11 36:1,2
**petitions** 7:14
　14:16
**Petrucelli's**
　107:18
**PFA** 144:10
**philosophical**

180:5
**phone** 60:3 81:6
　81:17 102:16
　124:7,7 151:2
　151:3,8 168:19
　169:18 201:14
**photographs**
　201:18
**phrase** 123:21
　147:17
**phrased** 41:20
**physical** 13:3
**pick** 16:20
**picking** 187:20
**piece** 29:25 81:5
　175:13 202:20
**pile** 118:4
**pit** 148:22
**Pittsburgh** 2:14
　2:19 5:6
**place** 2:18 10:25
　11:6 12:4
　46:18 56:2
　101:12 103:16
　104:17 130:11
　142:21 155:3
　156:1 170:23
　181:13 186:5
　190:12 200:9
**placed** 7:17 23:8
　29:7 157:5
　183:20 190:16
**placement** 19:21
　20:12 21:8
　24:4,9 25:6
　28:23 29:19
　30:4,18 31:9
　32:25 93:21
　100:1 183:13
　183:14,20
**Plain** 55:20
**Plaintiff** 1:3 2:1
**plan** 10:9 44:23
　49:1
**planned** 48:25
**played** 160:12
　161:6

playing 111:15
pleaded 201:22
pleading 54:18
  54:20
pleadings 54:4
  54:12,17 95:5
  95:6
Pleas 7:12,17
  55:9
please 4:7 65:21
  66:1 111:8,19
  116:19 183:16
plenty 188:18
point 5:18 10:3
  11:14 16:7,8
  30:3 33:2
  35:25 36:4
  38:7 48:14
  51:2 61:19
  65:5 66:11
  79:20 80:10
  82:7 86:24
  89:14 95:6
  98:11 101:17
  116:25 123:16
  130:5,17
  132:10,19,22
  143:6,19
  148:19 149:24
  160:13,21
  162:18 169:22
  176:18 177:21
  178:3,6,21
  180:25 181:5
  185:25 199:9
  200:11,13
points 179:13
policies 49:2,18
  49:22 104:2,10
  158:1 176:6
  191:19 196:12
policy 19:18,24
  72:21 75:11,17
  75:18 80:16
  92:25 93:11
  102:20,21,24
  103:5,7,13,15

103:23,24
104:1,3,7
106:18,21
109:10 111:23
113:25 114:23
118:20,24
121:12,19
122:3,21
128:13 144:3
144:16 161:10
171:15 172:10
173:20,21
174:24 188:24
189:17 190:12
190:16,21,23
191:4 193:8,14
196:1,15,16
199:11,16,21
201:11
political 202:25
politics 203:7
pool 172:3
popped 142:9
portions 14:5
position 6:12
  9:24 31:11
  33:16,17 37:10
  37:15,20,21
  44:17 50:20
  51:11 55:12
  63:20 143:7
  153:18 180:10
  181:6,7 201:15
possession 42:19
  69:11 185:25
possibility 18:11
  64:15
possible 45:21
  86:16 143:7
  150:6 165:18
possibly 21:1
  34:24,25 46:20
  178:3
potentially
  55:23 87:5
practical 7:6
  119:2

practice 5:9,18
  16:15 19:25
  20:1,5,9,17
  21:5 22:14
  27:5,8 32:20
  37:4 62:10
  68:10 96:25
  143:5 144:5
  155:6
practicing 5:23
preamble
  130:23
precise 50:22
  55:5 94:24
  95:8
precisely 66:13
  168:4 184:6
preclude 15:15
precluding
  17:19
predicate 34:16
  54:5,14
predicated
  34:12
preference
  143:15 179:3
  198:5
pregnant 11:13
  19:21 20:4,12
  20:19 21:7,12
  100:1 182:11
prehearing
  27:11
premised 126:6
preparation
  34:7 143:12
  156:20
prepared 25:19
  34:4 35:17,17
  36:16,17,18
  39:22 43:21
  44:1 59:10
  85:16 101:23
  178:1
preparing 178:4
prerequisite
  19:11

presence 50:9
  57:7,24 140:1
  148:7
present 2:20
  11:5 13:18
  26:21,24 52:3
  179:4 180:16
  193:6
presented 18:1
  18:20 23:23
  30:7 143:8,9
presenting 18:12
  19:3 57:8 62:6
presents 20:6
  24:18
preserve 87:9
  194:14
press 79:11
  124:9
presumably
  126:10
presume 6:20
  100:23 102:16
  113:1 146:17
  159:6 165:1,5
  171:11 173:20
presuming
  159:7 171:10
presumption
  113:2 114:7
  165:6,7
pretrial 26:20
  27:11 141:19
  142:5 144:2
pretty 6:10 14:1
  32:13 55:3,15
  58:21 63:2
  83:5 85:18
  130:4 140:24
  141:1 185:15
  200:16 201:1
preventing
  14:15
previous 29:19
  33:13
previously 141:8
  196:16

primary 7:24
principle 105:13
print 121:19
printed 92:9
prints 154:24
prior 19:2 23:15
  52:9 53:10
  80:21 83:16
  110:11 145:4,8
  148:15 151:3
privacy 55:16,21
private 5:8,18
privilege 40:21
  40:21,23,25
  87:7,10,10,12
  87:16,18 88:9
  88:12 194:14
  195:12
privileged 57:9
  57:10 85:20
privy 72:16
  79:20
probably 5:10
  17:4 27:25
  34:6 36:13
  37:1,1 38:19
  43:23 46:15
  48:19 56:13
  59:17,19 68:5
  70:14 83:14,14
  84:2,3 92:6,19
  97:25 104:19
  108:2 115:12
  117:1 121:6
  130:1 134:24
  166:12 177:25
  194:2
Probation 120:1
problem 21:20
  44:9 76:4
  87:18 118:4
  122:6 145:14
  154:17 160:15
  176:1 193:17
problems 136:14
procedure 11:22
  12:18 27:6

99:12 151:21
155:3 184:20
**procedures** 49:1
49:18,22 176:6
**proceed** 33:8
35:15 58:21,22
**proceeding**
35:12 40:20,24
87:22 109:5
134:22
**proceedings**
7:12,19,21,22
7:24 8:8 15:5,7
15:11 16:1
28:7 36:5
53:25 54:6,11
54:15 55:7,19
**process** 10:2
27:7 65:6
154:23 180:19
**produce** 42:7
60:22 117:15
151:24 177:5,6
177:7
**produced** 42:4,5
43:11,15 44:25
66:9 92:10
128:22,25
149:5
**produces** 42:24
**product** 34:12
39:4 40:20,23
40:25 63:12
69:12 71:16
85:8 128:12
150:15 155:5
**production**
129:5
**professional**
73:6 176:1
**professionally**
64:19
**professionals**
179:18 180:25
**proffered** 80:2
**prognostic** 10:18
10:21,22 11:11

11:16,24 12:21
16:6,16,19
17:20 18:9
19:11,19 20:12
21:6 22:25
23:4 24:16
93:20 95:4
96:3,23 97:16
99:21 100:2
102:19 104:11
122:6 168:16
181:18 186:23
**program** 32:12
47:24 48:12
80:13 112:23
113:19 143:21
154:20 180:2
184:14
**progress** 31:8,17
33:3
**progressed** 30:3
**Progressive**
109:10
**prohibited**
187:10
**prohibition** 16:5
16:10,11
**prompt** 171:8
**prompted** 45:2
48:22 53:1
131:4,7 132:3
132:25 137:25
**promulgating**
27:7
**pronounce**
135:17 158:23
**proof** 28:13,21
30:11 62:6
**properly** 144:18
152:20
**propriety** 8:16
19:17
**prosecute**
188:21
**protect** 87:8,11
87:11 103:16
103:17 105:12

**protected** 55:24
87:6 88:9
**protecting** 18:7
**protection** 12:23
12:25 124:22
124:25 125:4
**protections** 56:2
**Protective** 12:16
13:21 74:23
158:2 172:11
187:16
**protocol** 33:10
**proven** 174:22
**provide** 31:13
34:1 130:13,24
179:5 201:5
**provided** 9:7
33:23 53:16
62:16 83:25
84:16 90:24
149:7 182:22
184:6
**proving** 30:15
**provision** 12:16
13:1 14:13
28:25 29:14
103:13 104:7
104:22,24
**provisional** 13:5
**provisions** 9:16
13:21,24 14:3
14:6 15:14,15
29:5 72:7
108:19
**PSSU** 109:5
**psychiatric**
55:25
**psychological**
15:22 55:25
**public** 1:19 5:11
5:12 8:5 10:6
54:2 56:6
102:17 124:22
125:10,13
134:2 136:4
**publicity** 56:10
**publicly** 57:18

**published**
120:13
**pull** 80:20
**pulled** 81:8
159:14
**pun** 124:1
**pure** 93:3
**purpose** 18:6
141:3 157:8
189:23
**purposes** 40:19
90:21 116:21
151:20 188:14
**pursuant** 15:11
**put** 29:5 35:25
47:9 56:2
65:13 86:22
87:3 90:9
101:2 115:20
131:14 164:2
172:23 175:7
196:18 200:3
**PW** 74:13 75:9
81:20 107:23
110:9 112:1
134:2 136:1
138:3,25 157:1
160:25 162:21
176:10,19,23
177:24 178:7
**PW's** 168:8
171:13
**p.m** 101:1,1
107:13 118:1
118:17 123:22
123:24 124:2
146:2,2 159:20
160:4 204:12

---
**Q**
---

**qualifications**
156:6
**qualified** 153:12
153:18 155:25
**qualify** 9:11
135:8 183:22
**quantum** 62:6
**question** 13:9,11

13:11 14:1,1,9
14:21 17:4
21:10,19,21
22:5 28:17
30:1 31:1,3,25
33:12 41:3,13
41:14,16,20
44:12 46:12
49:8,16,21
54:11 55:2
68:6 73:1,10
76:6,19 77:3,4
77:8 89:25
90:1 94:25
95:9 103:20,20
104:21 111:5,6
111:11,12,19
121:1,2 130:22
144:15 147:19
148:11 149:5,8
149:10,13
150:2,14 153:1
153:3 154:5,9
154:12 155:9
155:10,10,23
156:21,24
163:16 165:24
166:2,13
170:22 171:10
172:25 185:20
185:22 186:1
186:16 187:22
188:1 189:4,7
189:11 191:22
193:3,16,18
195:6,23
196:22 198:4
**questioned**
185:3
**questioning**
152:13,18
153:11 154:8
155:7 156:5
168:15 170:16
**questions** 10:17
68:3 76:8 77:5
86:25 111:9

145:25 146:8
149:2 154:3
155:21 156:22
171:9 173:9
178:10,17
194:5,7,9,12
196:4 198:15
201:23,24
203:17
**quote** 123:22,23
124:3,4,8,10
160:20,22
**quote/unquote**
50:2 94:25
126:6 135:8
**quoting** 120:12

_____

**R**
**R** 2:13,17 4:8
**raise** 87:19
88:12,23 195:2
**raised** 78:5
**raising** 88:19
89:10
**rare** 143:17
**rationale** 130:15
143:24 172:5
181:6,7
**reached** 51:7
**reacting** 79:14
79:14,14
**read** 41:17 43:18
68:7 76:10,10
76:15 77:5
90:8 92:14
107:5,8 119:24
120:18,19
124:15 126:2,4
126:16 133:3
149:2 153:1,4
153:8,16,24
154:7 155:8,21
157:7 160:7
163:13,23
168:25 183:25
191:23 195:14
197:19,25
198:3,6 204:2

**reading** 41:16
85:22 107:15
123:21 124:11
125:22
**reads** 108:6
123:6 157:23
169:1
**reality** 120:1
127:14
**really** 7:2 25:15
35:2 37:11
45:8 46:24
47:5,10 62:21
65:11 66:12
95:24 98:2
103:19 104:21
120:20 121:23
130:6 131:19
148:19 155:13
160:19 162:3
173:6 191:20
191:21 193:1
201:1
**reason** 9:13
17:25 20:4
29:9,23 30:12
30:15,17 31:18
64:20 91:9
95:14 102:4
130:1 131:3
133:5,9 136:16
139:7,14 145:7
170:19 172:3
176:4 179:6
**reasonable**
100:22 142:18
164:10 165:6,8
174:17 175:14
179:20,20
190:10
**reasonably**
169:13
**reasons** 24:8
45:6 202:25
**rebut** 50:24
**recall** 7:4 9:24
15:6 24:1,25

25:2 27:13,18
27:21,24 35:2
36:15,22 37:8
37:15 38:1,25
43:14 44:14
45:8,9,11,18
45:19,25 46:1
46:15,18,24
47:5,6,20
48:14 53:3,23
56:16 57:25
58:18 60:15
61:7 67:2
68:25 69:17,24
77:25 83:17
86:10 97:14,14
99:1,25 114:19
115:18 117:19
129:15 138:9
138:21 140:18
167:22 183:14
187:23
**recalls** 170:12
**receive** 119:12
119:13 192:16
**received** 90:18
91:12 108:6
151:2 176:11
**receiving** 108:24
**recess** 51:25
101:1 145:24
146:2
**recipient** 185:18
**recognize** 192:9
**Recognizing**
180:21
**recollection**
35:21 36:8
42:6,17,18,20
43:17 44:11
51:2 53:4
83:23 101:20
129:11 142:7
147:7 148:2,12
148:20 149:13
149:21,22
150:11 153:1

155:17 167:25
170:7,11,17
187:2
**recommend**
155:25
**recommendati...**
34:11 35:12
36:9 37:17
**recommendati...**
156:1
**recommended**
35:23
**reconstructed**
40:3
**reconvene** 73:21
**record** 14:5
15:23 16:17
41:17 45:9
73:1,4 86:22
87:3 89:2,3
95:4 98:10
100:25 101:2
101:23 102:22
116:13 149:4
154:7 160:7
163:15,20
168:25 184:14
184:15
**recorded** 50:9
**recounted** 80:25
**recounts** 186:21
**recross** 146:24
**Recross-Exam...**
3:8 198:19
**red** 155:1
**redactions** 163:5
163:23,24
**redefinition**
192:2 196:12
**redirect** 3:7,9
73:16 100:15
146:24 182:5
202:1
**refer** 32:2 74:13
85:1 103:5
111:1 183:15
**reference** 49:12

161:3 167:20
**referenced**
101:19 122:18
174:21
**references** 60:2
**referred** 10:18
14:5 49:14
**referring** 56:9
84:22 86:5
92:3 103:4,25
104:2 107:22
120:10 123:9
**reflect** 156:9
**reflected** 6:12
115:24,25
**reflects** 120:2
129:20
**refresh** 148:2
**refreshes** 152:25
**regard** 11:17
23:19 57:5
64:21 68:12
78:11 79:10
114:6 117:24
**regarding** 8:4,15
19:19,22 40:20
75:9 79:7
88:15 104:3
106:25 107:21
119:21 144:3
145:4 192:1
194:9 196:12
198:16 199:16
**registered** 203:8
**regular** 181:8
**regulation** 14:22
**regulatory** 12:20
**reimbursed** 9:14
**reinforce** 191:7
**relate** 201:21
**related** 92:22
113:17 138:2
**relating** 174:7
**relationship**
71:10
**relative** 11:3
23:16 141:22

183:21 187:11
released 113:9
  113:13
releasing 102:22
relevance 148:5
  156:14 165:25
  166:6,18
  167:13 170:24
  172:21
relevant 175:18
relied 90:24
relief 26:25
  27:21
reluctant 71:20
rely 12:24 142:5
relying 63:19
  94:8
remain 54:6,15
  158:11
remained 29:7
remarks 177:24
remedied 30:3
remedy 32:25
remedying 31:9
remember 9:10
  26:12 27:17
  35:24 43:22
  45:23 50:22
  56:12 61:10
  69:5 70:12
  71:6,6 81:8
  84:4 85:4
  101:25 117:1
  128:24 129:21
  129:22 138:1
  147:17 148:16
  150:1,12 163:9
  168:10,10,20
  170:5 178:22
reminded 105:7
  153:17
reminder 109:22
remotely 201:12
remove 10:24
  11:20 12:1
  18:3
removed 11:9,19

97:7
removing 11:12
rendered 135:20
renew 196:20
rephrase 49:16
  132:17
replaced 200:21
  203:13
reply 119:18
  160:3 162:7
report 6:22,24
  6:25 47:21
  84:9 85:12
  90:9,24,25
  105:16 106:2
  111:1 115:20
  117:11 123:12
  129:1 130:21
  149:6 151:7,10
  151:24 154:11
  160:25 187:8
  198:7
reported 1:24
  46:7 77:22
  137:6,8 157:17
  161:1,9 190:7
reporter 41:17
  124:4 126:15
  127:11 157:1
  158:10 204:9
Reporting 1:25
reports 35:10
  85:24 152:8
  153:21 158:5,9
represent 24:21
  40:2 84:13
  85:19 100:11
  154:1 193:8
  204:8
representation
  66:3 91:15
  105:18 150:20
  151:13 174:8
  195:18,20
representations
  60:11
representative

50:10 52:3
representatives
  52:16 80:6
represented
  7:11,16,19,23
  25:4 84:14
  102:6
representing
  40:18 44:18
  98:23 99:10
represents 19:4
reproduced
  91:11
Republican
  203:10
request 11:5
  26:24 28:3
  35:16 38:7
  44:8 52:25
  54:21 58:22
  97:15 106:17
  106:20 131:19
  144:17 181:22
  183:2
requested 12:11
  18:9 25:13
  38:12 53:5
  92:10 131:21
  154:20
requesting 95:5
  106:23
requests 54:9
required 27:1
  29:5,11,15
  54:22 55:19
  202:16
requirement
  27:3 144:3
requirements
  53:24 180:6
requires 91:1
  193:19
resemble 201:12
reserve 73:20,24
resignation
  39:25 60:18
resigned 9:23

83:15,19
  133:10
resolve 143:11
resolved 191:8
resource 11:3
respect 113:5
  114:4 121:10
respected
  160:14
respective 40:5
respects 118:8
responded
  171:15
respondent
  144:17
respondent's
  144:2
responds 123:24
response 52:25
  54:7 90:1
  106:12,13
  107:8 118:13
  121:14,16
  123:25 124:1,2
  124:5 167:3
  187:22,25
  197:5,11 200:6
  200:24 201:5
responsibilities
  133:24 173:25
responsibility
  190:8
responsible 8:11
responsive
  103:20 104:21
rest 31:1 67:23
restate 32:2
restricts 15:12
restroom 51:20
resubmitted
  38:8 154:21
result 17:21 49:2
  49:9,18 50:2
  63:23 68:21
  78:12 92:25
  113:9 131:10
results 90:18

130:25
retained 40:1
retaliation 66:19
retired 4:11 9:24
  204:6
retirement
  202:22
retype 155:1
reunification
  25:20 28:3
  32:15 44:23
  179:25
reunited 179:9
reuniting 25:9
reveal 89:23
  131:1
revealed 58:8
  71:22
review 13:23
  14:4 15:22
  23:9,11,14,15
  23:23 24:3
  25:17 26:14
  27:22 32:21
  34:13,22,23
  35:4,6,6 36:23
  52:3 57:16
  80:7 86:17
  92:1,2,7,17
  94:21 95:10
  96:17 128:19
  154:10 198:7
reviewed 35:2
  39:1 42:14
  59:23 60:7,9
  66:9 90:10
  94:25 95:11
  129:6 198:10
reviewing 15:16
  34:1
reviews 7:18
review/change
  30:7
revise 38:12
  44:5
revised 54:4,12
  54:17

revision 38:8
revisions 38:17
re-argument
 36:1
Richard 1:7 2:8
 2:11
Rich's 87:21
right 5:25 6:18
 12:3,6,9 16:13
 17:5,15,25
 21:17 25:4
 26:22 32:1,16
 33:9,14,17
 34:21 35:14
 36:12,23 37:16
 37:19 38:3,20
 39:7 42:16,21
 43:7 52:10
 53:2 54:12
 56:5,18 57:5
 59:5 62:14,24
 63:3,5 64:2
 70:12 73:17,20
 73:25 75:4
 78:4 83:22
 86:7 88:7,12
 90:1 91:5,17
 95:10 96:17
 97:9 99:2
 100:5 103:25
 105:21 106:12
 107:12 109:17
 111:6 114:21
 116:21 117:20
 117:21,21
 118:7 119:24
 121:8 122:9
 125:21 129:7
 132:24 133:5
 136:12 137:24
 139:21 141:13
 146:25 149:7
 150:19 153:22
 157:11,13,20
 159:6,25
 162:10,11
 169:20,23

170:15 173:11
173:24 181:21
184:24 185:2
190:14 191:18
194:18 199:4
201:7 204:2
rights 7:20 9:6
 25:9 28:6
 29:10,11 30:20
 31:19 32:15
 55:21
rise 30:4 135:7
risk 13:18 18:19
 19:4,16 20:5
 24:18
risks 18:15
road 4:9 11:15
 79:20
role 63:4
rolled 193:21
root 79:6
roughly 74:13
 75:14
round 66:7,7,8
row 59:10
RPR 1:19,24
rudimentary
 105:13
rule 13:5 14:13
 14:22 17:23
 22:14 45:1,7
 76:7,15,18,25
 113:20
rules 12:17
 17:24 27:4,5,6
 111:15,16,21
 144:19 194:8
ruling 55:3
rulings 54:25
 55:1,8
run 36:5 105:24
 124:4 180:19
_____
        S
S 2:13 154:13,14
safe 11:7,8 24:19
 29:4,12 31:13
 92:24 103:11

179:7
safely 20:3
 179:10
safer 10:25
safety 12:7 18:4
 20:20 103:17
 103:18 105:12
Saint 182:18
sake 201:7
sanctions 108:5
 108:10,14,21
sat 40:9 86:20
 138:13 140:16
satisfied 60:11
Saveikis 137:5
 157:4,21
saw 60:24 61:8
 97:1 115:16
 183:25 184:2,4
 184:24 194:10
saying 18:8
 29:17 55:10
 86:2 109:6
 113:22 120:5
 133:6 137:18
 140:2 147:13
 151:4 162:8
 165:17 176:16
 188:24
says 12:20 17:22
 30:16 103:24
 104:10 107:16
 107:19 108:25
 108:25 121:17
 123:9 125:18
 125:19,20
 129:19 146:20
 158:17 159:21
 159:21,25
 160:8 161:7
 162:1,2,11,14
 162:19 163:2
 164:21 167:2,5
 171:20 177:11
 193:11 194:10
 195:14
scenario 38:25

scheduled 35:11
 35:22 100:8,20
 100:21
scheme 93:12
Schenker 1:7
 2:11
Schetter 25:23
 71:24 81:1
 140:14 141:5
school 5:4,5
 176:7
scope 113:17
screen 81:3
scripted 169:4
scrutiny 56:6,19
 57:2
se 19:24 86:3
 176:8
seal 14:14,25
 15:4,5
sealing 15:7
second 30:24
 39:20 41:15,18
 92:4,23 116:10
 123:12 133:24
 151:8 173:11
 183:17
secret 125:15
section 50:23
 174:14,21
 175:4 190:8
Sections 173:19
secure 56:3
Security 9:15
see 15:2 16:18
 17:3,5 61:1
 80:7 82:8 90:3
 94:5 96:25
 101:13 106:19
 110:14 118:15
 120:14,25
 121:9 123:6
 132:5 140:23
 145:20 146:8
 147:6,21 150:5
 152:25 153:10
 154:17 159:23

160:4,6,20
163:6 164:9
167:2,3,4,9,16
183:17 184:6
190:1 199:25
200:1 201:18
seeing 61:7
 145:23
seek 12:24 19:22
 21:6 29:10
 31:18 32:16
 100:2
seeking 18:3
 19:19 24:15
 27:2,2,21 87:6
seen 35:20 61:12
 71:25 81:2
 96:18,21
 163:17 184:14
 192:14
seminar 53:16
 68:10
send 204:10
sending 120:22
 120:24
Sennett 2:9
sense 7:2 14:2
 31:14 60:6
 76:22 109:17
 137:18 140:15
sensitive 71:5
sent 79:16 95:15
 112:13 162:17
 176:20 192:13
 201:8
sentence 92:4
 123:8 133:24
sentences 165:8
separate 8:6
separation 167:8
 168:7
sequence 128:21
series 120:6
 121:5 126:11
serious 87:24
 93:17 124:1
 136:14

| | | | | |
|---|---|---|---|---|
| seriously 64:15 | 181:12 | 191:2 | 20:13 22:16 | 197:14 |
| 64:16 124:12 | signature 40:8 | six-month 57:15 | 33:7 34:7 | speech 67:15 |
| served 144:18 | 169:4 202:14 | slanderous | 99:23 | spoke 38:24 70:3 |
| serves 179:14 | 204:4 | 176:8 | source 101:15 | 70:20 80:9 |
| service 1:7,13 | signed 16:8 | slowly 154:7 | 159:19 | 102:3 150:22 |
| 2:7 26:11 40:1 | 39:11,22,22 | smooth 160:12 | so-called 71:3 | 163:25 185:13 |
| 40:19,24 44:23 | 43:13,21 45:17 | smoothly 143:14 | speak 6:16 16:15 | spoken 83:2 |
| 83:19 85:17 | 64:6 66:14 | snoop 78:13,17 | 22:19 38:5 | square 120:7 |
| 178:4 | 68:18 | 78:18 | 56:21 79:19 | staff 13:16 53:22 |
| serviced 142:19 | significant | snooping 79:1 | 102:7 114:24 | 103:1 104:12 |
| 179:21 | 130:21 135:18 | social 9:15 22:1 | 127:22 148:22 | 191:1 |
| services 12:17 | 143:17 194:15 | 108:20 152:8 | speaking 29:18 | stamp 129:9 |
| 13:22 74:23 | similar 46:4 | 160:20 | 35:1 181:15 | stand 42:13 |
| 105:2 108:20 | 96:10 | solicit 139:8 | speaks 51:1 | 129:17 148:15 |
| 152:9 158:2 | simply 24:18 | Solicitor 1:15 | 103:1 107:2 | 148:21 149:23 |
| 172:12 179:5 | 50:4 66:2 | 2:16,21 4:18 | 149:17 153:14 | 150:8,11 |
| 182:19 187:16 | 89:21 114:7 | 4:22 6:2,6 7:10 | 156:10 174:24 | standard 36:22 |
| 202:15 | 184:16 196:20 | 9:22 40:18 | 181:2 | 42:2 57:15 |
| sessions 191:2 | sin 104:17 | 87:5 101:3 | specific 12:19 | 184:20 |
| set 30:14 33:10 | single 186:18 | 130:24 131:19 | 17:18 28:25 | standing 87:15 |
| 49:21 103:16 | sir 25:3 42:10 | 131:22 176:2 | 30:13 47:9 | 88:23 89:4 |
| sets 28:21 193:5 | 61:14 92:14 | 199:5,7,14 | 49:7 83:8 | 152:14,16 |
| setting 11:2 | 113:7,10,15 | 200:24 201:10 | 104:9 108:18 | standpoint |
| settled 141:10 | 114:3 124:20 | solicitors 6:3,24 | 137:19 | 32:23 62:15 |
| severe 135:7 | 128:16 140:1 | 55:4 | specifically 8:7 | stands 41:1 |
| shape 172:5 | 151:11 157:24 | somebody 16:18 | 27:13,24 36:22 | start 15:1 65:24 |
| Shara 137:5 | 158:25 159:3 | 81:1 109:18 | 38:25 43:14,16 | 123:21 154:3,5 |
| share 132:7 | 159:24 161:2 | 111:17 138:1 | 44:13 46:15,19 | 155:8,20 |
| shared 172:7 | 171:21 175:1 | 144:6 185:13 | 48:14 53:2,23 | started 4:23 |
| She'll 155:1 | sit 38:13 42:18 | someplace 46:20 | 56:16 60:14 | 139:17 191:17 |
| short 9:23 58:22 | 129:1 147:7 | 117:14 138:22 | 70:22 78:8 | starting 28:6 |
| 73:5 | 180:13 192:18 | somewhat | 80:23 96:21 | 148:25 149:5 |
| shortly 52:9 | 194:20 200:1 | 169:16 | 98:11 100:3 | 153:25 154:2 |
| 101:11 192:4 | sitting 59:8 | son 139:3 | 111:23 117:19 | starts 118:14,14 |
| shot 178:19 | 138:4 149:22 | soon 160:23 | 138:21 183:8 | 120:7,9 161:25 |
| show 118:3 | situation 69:7 | sooner 48:21 | specified 9:3 | state 1:22 2:2 |
| 120:10 151:24 | 71:11 75:18 | sorry 72:25 84:6 | spectrum 8:19 | 4:7 14:14,22 |
| 157:5 158:14 | 86:6 88:11 | 92:13 99:20 | speculate 17:1 | 40:24 91:11 |
| 161:18 168:21 | 107:24 112:1 | 103:19 104:20 | 46:19 47:4 | 93:19 102:18 |
| 171:22 177:7 | 127:24 131:4 | 105:25 110:9 | 119:9 197:4 | 123:11 133:25 |
| 177:13 192:8 | 135:4,15 138:3 | 134:8 182:25 | speculation | 137:22 153:13 |
| showed 7:3 | 140:10 145:15 | 193:21 201:20 | 20:16 58:14 | 153:19 158:1 |
| 16:18 42:12,20 | 202:12 | sort 6:20 7:1 | 91:2 161:13 | 180:10 181:6 |
| 43:8 148:23 | situations 7:24 | 8:18 9:9 14:2 | 165:22 166:6 | stated 22:6 |
| shut 58:2 88:25 | 69:25 143:16 | 52:19 66:19 | 166:23 177:15 | 37:24 123:2 |
| side 88:11 | 191:7 | 81:2 93:2 | Speculative | 126:7 141:21 |
| sides 64:1 | sit-down 140:15 | sought 11:13 | | 187:17 |

statement 26:20
   27:1,12,19
   45:6 74:16
   94:9 95:23
   136:9 137:13
   137:16 147:8
   147:15,18,20
   150:9 181:7
   185:21 189:25
   196:13
statements
   101:10 122:1
   199:11
states 1:1 29:5
   186:24 187:5
   192:23 196:15
statewide 55:3
stating 37:25
   65:20,22 88:22
station 81:4
status 57:20
statute 17:19,22
   28:21 29:25
   30:14,16 55:20
   122:22 135:8
   188:12
statutes 158:1,1
   171:15
statutorily 57:8
statutory 12:19
   13:5 14:13,22
   15:13,15 28:25
   55:6 56:2
stay 50:11
   165:10 171:1
steps 33:16 94:8
stern 109:21
steward 176:21
   177:21 178:7
stick 155:12
   171:5
sticks 100:16
stipulate 95:19
stop 22:4 149:12
   178:8 192:24
stopped 117:3
storage 92:23

store 93:9
stored 85:2
stories 124:4
story 120:19
straight-out
   68:6
Street 1:22 2:2,5
   2:9
strike 130:23
   154:1 187:24
   197:23
string 161:23
   163:2
strong 181:11
struck 135:5
student 159:12
student/intern
   161:3
stuff 62:3 67:2
   83:20 85:5
   93:9 105:20
   177:4
stupidity 170:24
   171:1,4
subject 7:18
   45:21 113:14
   114:17 118:14
   118:17 121:5
   122:5 174:15
   175:15
subjected 13:2
   56:19
submission
   26:13
submissions
   9:21 181:8
submit 27:1 28:4
   85:12 154:24
   181:7
submits 154:25
submitted 10:5
   14:8 26:14,16
   26:16 27:11,18
   36:24 37:20
   39:10 41:23
   43:13,20,25
   45:17 47:21

48:8 61:25
   65:15,15 66:15
   68:17 84:9,15
   143:24 154:12
   154:17 188:13
   197:7
subordinates
   6:13
subparagraph
   104:9
subpoena 144:7
   144:13,14,18
   144:22
subpoenaed
   144:4
subsequent
   167:8 168:6
subsequently
   39:11 74:15
   178:5
subsidy 7:25
   8:20,21,23,24
   9:11,14,18
substantive
   26:25 61:23
subvert 105:10
   105:11
Sue 44:13 106:7
   106:11 138:5
   147:2 148:9
Sue's 106:12,13
sufficient 18:11
   31:17 32:19
sufficiently 30:3
   31:12
suggest 195:14
suggested 67:1
   77:2 80:15
   165:3 172:20
suggesting 176:3
   189:6
suggestion
   100:13 126:3
suggestive 77:1
   77:2
suicide 139:3

suitably 99:23
Suite 2:18
summaries 34:3
   35:9,17 61:21
   62:16 155:11
   198:10
summarize
   93:16
summary 25:19
   26:13,20 34:8
   34:10,11 35:17
   36:10,16,23
   37:9 38:8,12
   39:1,10,20,21
   41:10,11,15,23
   43:12,20,24
   44:1,5 46:13
   61:20,24 64:5
   65:14 68:13
   81:15 86:4
   141:17 142:11
   143:23 149:6,6
   149:11 152:1
   154:24 155:14
   155:23 197:7,9
summer 116:6
superb 62:20
Superior 52:22
   54:1,25 55:4,8
supervise 37:14
supervised
   62:21 155:5
supervision 6:9
   119:22
supervisor 6:12
   6:21 19:15
   20:25 26:3
   32:12,13 34:20
   38:11,16 44:2
   47:24 48:12
   63:11,22 68:22
   82:13 83:5
   110:24 112:23
   113:19 120:2
   125:15 126:18
   126:25 142:2
   143:2 155:5

172:2 176:13
   180:1,2 184:13
supervisors
   21:13 23:2
   48:3 143:21
supervisory
   10:11
supervisor's
   32:13 35:8
supplied 181:23
supplying
   135:19
support 11:5
   188:11 203:5
supported 203:6
supportive
   155:24
suppose 118:25
supposed 81:11
   105:6 109:23
   111:18 119:11
   135:22
supposedly
   157:14
Supreme 27:7
sure 4:8 10:20
   13:4 14:18
   23:20,25 24:5
   31:25 32:5,18
   32:20 33:22
   34:19,25 36:11
   47:14 56:17
   57:1,16 59:6
   64:11 69:17
   72:3 73:3 83:5
   84:21 85:18
   88:10 98:19
   100:4 105:3
   107:5 118:2
   119:15,17
   123:18 128:1,3
   132:17 134:12
   134:23,25
   135:4,21
   140:13,14
   150:21 151:22
   153:9 160:15

163:6 166:11
170:6 177:25
178:23 180:24
181:17 182:11
185:11,15
189:13 191:21
192:5,21
197:17 199:7
200:2
**surfaced** 41:24
**surprise** 51:13
142:8
**surprised** 16:23
17:16 96:5
203:23
**surrounding**
175:12
**Susan** 26:4
197:6,8
**suspect** 19:16
59:18 64:20
**suspected** 69:18
182:10
**suspension**
174:9
**suspensions**
174:15
**suspicion** 59:16
**sustained** 68:5
**swear** 25:25
**sworn** 4:2
**system** 142:20
159:11 162:5
178:20,25
**S-C-H-E-T-T-...**
25:23

----
**T**
----
**table** 59:9
129:16,18
148:22
**Taft** 40:3,17,18
85:17 88:14,16
88:18
**take** 12:23 13:2
14:17 29:15
51:24 54:24
76:13 87:20

92:18 94:8
108:11 147:1
148:24 155:1
155:20 163:12
168:21 171:23
184:4 189:15
194:20
**taken** 1:18 17:21
18:24 55:5
78:11 79:6,10
139:2 159:17
178:8 189:2
**talk** 7:6 11:10,24
71:20 94:12,14
94:16,18 102:8
108:20 112:12
113:21 115:4
119:20 137:8
138:9 141:7
159:22 160:17
162:4 163:4
172:16 174:14
180:14 199:23
**talked** 26:13
32:21 45:13
46:10 50:1
52:23 59:1
66:25 71:1
82:21 90:14
129:23 130:1
136:11 138:25
140:8,9,13,14
141:11 160:14
160:25 185:16
190:12
**talking** 11:10,11
11:25 14:3,12
18:13,14 20:18
21:24,25 28:12
32:8,10 49:23
72:9 77:20
101:5 108:3
115:1 124:7
125:2 132:14
139:7 145:1,23
178:22 186:17
186:17 188:23

**talks** 15:10
**Tammy** 107:17
**tantamount**
122:17
**taught** 22:22
**technical** 25:14
**technically** 8:10
**telephone**
102:11,15
**tell** 20:14,16
22:10,12 23:1
24:7 41:9
46:22,25 67:21
68:1 69:2,3
70:22 82:20
98:14 99:21
101:21 108:13
111:17 112:14
112:15 114:16
117:21 118:13
123:24 124:8
126:5,5,10,18
129:2,9,10,14
129:15 139:13
142:13 143:3
147:2 151:5
152:3 160:16
160:18,22
162:4,17
164:12,25
166:21 175:5
184:7 186:6,8
187:15 192:19
193:25 194:11
197:17
**telling** 22:9,20
40:14 45:19
67:10,11 68:14
71:18 92:14
95:16 109:17
113:4 116:7,8
116:20 117:7,8
152:4 191:3
**ten** 97:21,23
145:22
**tend** 57:13
**term** 15:4,7 85:2

140:8
**terminable**
189:1
**terminate** 29:11
30:15,20 132:9
**terminated** 9:6
109:11 133:6,9
133:9 176:4
185:1 202:5,6
202:7,24
203:19
**terminating**
25:9 82:4
132:20
**termination**
7:20,21 28:6
29:10 31:18
32:15 99:7,10
133:8 168:7
174:16,22
175:1,12,15
203:20
**terms** 10:8 14:21
15:10 18:19
39:8 63:2 80:1
81:10 109:6
113:17,18
130:5 131:12
132:23 146:9
151:23 152:8
153:1 160:25
179:5 188:23
**testified** 4:2
38:23 68:20
151:25 152:6
155:15 175:18
191:10,13
**testify** 43:19
61:16,17 144:6
147:14 151:2
171:12 181:5
195:17
**testimony** 3:3
43:24 50:4,21
50:25 61:22
65:8 66:4
141:7,9 146:10

151:14 155:2
186:25
**thank** 22:6,7
33:12 51:23
68:10 73:15
74:3,9 87:22
121:9 198:5
**Thanks** 31:4
204:1
**theory** 105:20
**thing** 8:18 12:21
31:15 57:10
61:10 71:3
79:25 98:11
105:19 109:4
112:18 115:9
140:15 187:20
**things** 31:14
45:14 50:1
51:2,6 55:24
60:5 67:5
72:19 80:2
89:12 93:12
103:2,16 106:9
114:8,10 115:8
116:8 117:8
132:23 138:25
142:25 146:9
160:12 161:20
176:16 187:19
197:21 200:4
201:3
**think** 13:10
16:10 17:4,7
18:18 20:14,15
21:14 25:25
26:9,12 27:14
28:1 35:25
36:20,20 37:13
38:19 41:18,18
43:16 44:7,7
44:16,18 45:24
46:3,17 48:10
49:8 53:18
56:23,24 58:18
58:19,21 59:19
59:20 60:8,24

61:15 65:1
66:13 68:20
69:24 70:12,19
72:8 79:18
80:11 83:4,20
85:16 86:3
87:14,18 88:11
88:23 89:1,6
89:21,24 93:6
95:21,22
100:22 101:21
103:7 105:16
109:7 114:1,8
114:21 115:12
116:24 117:2
117:13 118:13
118:21 119:10
121:23 123:11
124:23 125:12
125:14 132:4
133:21 135:21
136:19 137:7
139:16 141:11
141:25 152:19
156:13 165:6
165:16 166:4
166:19 169:13
169:24 170:21
172:17 173:7
173:10 177:12
177:20 178:24
182:11 184:6
187:1 189:23
191:10,17
192:3 193:2,10
194:4,8,11,25
195:4 197:5,8
197:10,10
203:14,16
204:5
**thinking** 80:1
129:22 138:4
142:24 181:9
**third** 123:12
**thought** 56:24
56:24 64:13
75:20 82:4

125:17 130:2
131:21 143:3,4
166:4 173:3
**thousand** 92:19
**threat** 13:7,12
**threatening**
139:24
**three** 4:22 6:6
8:6 32:22
92:24 158:16
160:25
**Thursday** 1:20
**tied** 165:23
166:1
**till** 112:15
**Tim** 72:25 107:6
177:16
**time** 4:12,15
5:11,12 8:10
9:23 11:13
12:1,8 14:17
14:21 15:5
16:7,8 20:8
25:22 28:14
35:11,20 42:15
42:21 46:14
47:6,9 49:21
49:22,25 50:9
52:2,8 56:6,7,8
56:11 57:3
60:18,20 62:2
63:6 66:12
73:22 82:5
93:21 95:6
97:8 98:20
101:17 108:2
115:16 125:12
128:24 129:2,9
145:13,22,23
146:1 148:7
156:3,19,23
159:13 161:2
165:2,13
167:10,15
169:21 171:2,5
173:15 175:22
176:7,18

177:20 178:3,6
179:25 180:12
182:1 183:10
194:7 199:10
199:15,24
200:7,11
203:15
**times** 23:2 24:6
52:25 53:5
60:4 93:5
123:14,22
141:6 179:23
**Times-News**
52:10,16
**Timothy** 1:22
2:2
**tip** 18:4 116:22
**tired** 193:1
**title** 4:17 9:15
**today** 38:13
51:18 68:2,19
121:6 147:8
194:1,3
**told** 38:25 40:14
41:14 45:22
47:2,7 63:20
68:16,19 75:14
75:20,24 77:12
80:22 81:1,14
86:11 91:18,24
94:4 98:12
113:7,10,11
116:6 120:2
123:7 126:17
126:24 127:23
133:13,14,14
133:19 136:17
136:18,19,20
136:21 137:2,7
138:1,15,18,24
147:16,22
148:3 151:18
155:11,16
160:22 162:21
164:4,5 167:21
170:12,12
173:16,16

176:16 183:1
184:10,12,13
187:2,6 190:7
**tongue** 116:22
**top** 9:10 84:12
107:11 155:20
158:18
**topic** 48:4 122:4
**totally** 141:7
**tough** 87:14
**town** 5:19 59:7
**trail** 140:23
**training** 104:14
105:4 152:9
176:7 180:4
**transcript** 42:14
43:16,23 44:12
51:1 67:16
68:2,7 128:20
128:25 129:2,8
129:20 146:11
146:12,19
148:25 149:12
149:17 153:14
153:25 156:10
163:19 204:10
**transmission**
81:3
**transmitted**
184:22
**transpired** 69:8
78:25
**treat** 109:21
**treated** 74:13
104:4,4
**treating** 75:13
**Trial** 50:17,19
**trials** 99:10
**tricky** 87:14
**tried** 172:22
**Tripp** 105:20
**trouble** 173:7
**troubled** 69:1
**troubling** 66:21
70:25 71:11
**true** 23:13,17
25:7 94:10

114:15 115:21
148:6 158:4
196:10
**trust** 162:5,15
**truth** 67:10,11
68:14 136:22
152:4
**try** 31:2,4,4
32:24 38:6
49:6 64:9
116:10 132:19
152:25 156:19
161:17 186:5
189:12,16
196:23
**trying** 15:4
56:12 68:1
87:14 88:4
100:6 112:6
128:24 132:18
179:4,7 200:23
**Tuesday** 70:18
**turned** 39:3 78:8
141:9 200:19
**turns** 119:24
**twice** 124:24
**twin** 29:18
**twins** 24:22 70:3
141:13 145:1
**two** 2:14 5:10
25:1,2 26:10
28:1 29:18
33:16 41:22,24
61:20 62:5
89:11 99:25
112:15 114:23
131:14 150:23
151:2 157:7
158:16,20
200:23
**two-part** 41:13
55:2
**type** 57:10 93:3
104:15 190:9
**typed** 195:16
**typically** 11:10
32:16 34:6,22

34:24,24
143:20
**typo** 134:7

___

**U**

**U** 4:1
**ultimate** 28:22
    34:11
**ultimately** 10:5
    20:25 29:4
    60:17 180:22
**um-hum** 6:10
    19:23 23:10
    54:13,16,19
    55:15 63:13
    64:3 68:24
    93:23 101:14
    123:15 128:18
    146:14,16
    148:14 149:1
    161:21,24
    168:24
**unable** 29:9
**unaware** 70:1
**unbeknownst**
    93:19 95:23,24
**unborn** 12:1
    17:10,14 20:6
    95:12 164:5
    165:3 181:20
    182:9
**unclear** 28:15
    66:16
**uncomfortable**
    86:24 138:23
    139:6 173:9
**uncommon** 39:4
    142:13
**underlying**
    30:10
**undermine**
    103:10
**understand** 15:7
    22:3 39:20
    40:3 65:11
    76:16 94:6
    96:15 108:16
    108:17 113:11

113:24 114:24
130:17 134:4
135:15 140:4
143:6 152:21
172:13 187:9
189:14 200:17
**understanding**
    26:6 38:21
    39:24 71:5,21
    75:7 90:17
    104:23 130:14
    133:7,8 172:8
    180:5 189:3
    191:6 193:9
**understood**
    31:25 40:10
    77:15 135:16
    136:13
**undertake** 134:9
**undertaken**
    165:12
**unexplained**
    51:13
**unfair** 96:9
**unfounded**
    134:16,18
    135:3 136:6,15
    137:14
**union** 108:20
    176:21 177:21
    178:7,8
**unit** 107:18,21
    110:24 162:17
**united** 1:1
    143:14
**University** 5:5
**unjustified**
    136:1
**unreasonable**
    174:13
**unrelated** 141:8
**unsavory** 174:18
    190:11
**untoward** 64:21
    183:7
**untrue** 134:1,11
    134:18 135:11

135:20 137:1
137:17
**untruthful** 65:8
    65:10
**unusual** 69:9
**upset** 138:2
**usage** 72:21
    80:16 92:25
    93:11 118:24
    128:13
**use** 72:6 78:20
    92:20 152:23
    155:18 182:10
**user** 182:13
**usually** 11:12

___

**V**

**v** 1:4 164:2
**Vague** 49:4
    67:12
**Vaguely** 168:10
**validate** 185:4
**validity** 63:20
**value** 176:7
**variance** 37:10
**various** 9:18
    107:16
**vary** 179:20
**varying** 44:24
**vein** 46:10
**Vendetti** 2:4,4
**verbal** 148:9
**verify** 90:23
**verse** 158:8
**version** 39:21
    42:3 148:3
    154:21
**versions** 41:22
    41:24
**Veshecco** 5:16
**vicious** 136:2
**victim** 158:10
**view** 55:19 69:13
    84:20 131:14
    143:6,19
    160:21 178:21
    179:13 180:25
    181:5

**Villella** 27:15,18
    42:4,5 61:18
    69:11 81:15
    128:22 129:12
    129:17,24
    141:17 145:1
    148:13 149:25
    150:2,7,12,23
    151:1,9,19
**Villella's** 71:17
    150:16 154:2,8
    154:14
**Vincent** 182:18
**violated** 103:6,7
    103:14,15
    104:8 122:2
**violates** 121:11
    121:19
**violation** 74:22
    102:20,23
    103:22 104:18
    111:22 114:22
    118:19,24
    119:3 122:13
    122:21 128:12
    161:10,15
    171:14 172:1
    172:11 175:9
    176:6 188:12
    189:17
**violations** 92:24
    108:14 119:5
    133:23
**violative** 173:19
**virtually** 96:9
**virtue** 104:13
    188:12
**visitation** 37:14
    50:23
**visits** 37:13
    155:25 160:19
**vis-à-vis** 57:21
    128:25
**voice** 58:1
**voluminous**
    146:18
**voluntarily**

202:5
**voluntary** 7:21
**vote** 203:8
**VW** 72:11 75:1
    78:1 81:21
    86:6 94:21
    95:3,11,12
    96:10,25 98:7
    98:16 99:20,21
    102:1,3 130:16
    133:1 139:5
    145:14 164:3,4
    164:5,6,8,12
    164:21 168:1,4
    169:3 182:8,13
    182:17 183:13
    184:10,25
    185:3,13,15
    186:14,18
    187:7
**VW's** 81:7,17
    98:18 102:7,11
    102:14 164:11
    168:9 169:1

___

**W**

**W** 72:15 163:8
    165:10,18
    166:21 167:11
    167:16
**wait** 31:24 43:2
    65:24 111:4
    112:15 118:18
**waive** 204:4
**walked** 172:16
**walking** 150:12
**Wallace** 2:21
**want** 10:17
    16:18 18:2
    23:4 25:14
    26:21,24 36:3
    36:10 38:5
    56:13 72:6
    73:16 76:13
    77:4,6 78:23
    81:1 84:23
    87:3,25,25
    88:5 89:9,19

95:8 108:25 111:11 118:25 120:11 131:25 136:19 138:4 140:7 142:22 146:10 148:24 149:9,14 150:3 151:14 152:23 153:9,24 156:18,22 157:7 160:7,19 163:3,12,13 164:20 168:21 171:6 173:6 177:5,7 179:24 185:11 187:15 188:21 189:16 193:23,25 196:2,3 198:15 203:1
**wanted** 7:6 25:20 27:22 50:24 79:19 80:6 82:8 131:14 139:1 143:20 144:6 144:13,14 160:9,20 162:3 173:4 180:15 180:23 186:7 200:4
**wants** 111:4 125:20 169:1
**warned** 112:11
**warning** 108:12 108:23,24 109:2,3,4,4,6,9 109:18,20
**warnings** 108:21
**Warren** 5:9
**wasn't** 7:2 8:7 25:14,15 36:14 38:9 50:25 53:14 56:10 57:16 62:24 66:12,16 74:19 75:3,17,19 77:8,25 79:20 79:21 83:12,25 84:6 99:24 112:5 121:25 126:24 130:12 132:20 133:10 145:10 147:14 153:12 163:18 180:22 182:12 185:23,23 189:10
**waste** 169:21 171:2,5
**wasting** 175:22
**water** 130:4
**way** 8:2 15:1 16:11 17:2 18:14 23:5 37:15 38:1 41:19 45:1 48:10 60:25 62:15 65:2,4 66:15 71:17 72:17 79:14 85:21 87:13 98:25 103:10 105:10,11 107:5 108:17 108:18 109:23 111:11,20 119:24 120:18 122:16 126:2,4 126:16 129:9 130:5 133:21 136:23 138:17 138:17 142:22 142:25 143:13 149:3 150:1 155:4 157:23 159:11,16 161:2 170:8,20 170:22 171:10 171:11 172:5 173:7 179:14 180:12,15,21 192:20 193:2 195:9 196:23 201:17
**ways** 28:24
**Wednesday** 70:18
**week** 48:20 69:1 69:3 70:14,17 80:22 128:5 145:22 200:10
**weekend** 162:4
**weeks** 47:13
**Weimer** 2:13
**welfare** 1:7,13 2:7 8:5 10:6 105:14 134:2 136:4 198:8
**well-trained** 179:17
**went** 5:3,4,5,8 5:18 37:6 40:6 42:1 55:13 58:21 65:6 66:7 71:8 93:4 150:1 154:19 160:9 161:4 166:11 182:17 183:4
**weren't** 53:11 83:16 92:11 136:1 141:18 175:11
**West** 2:9
**WESTERN** 1:1
**we'll** 60:1 74:13 90:3 111:3 112:6 153:16 156:19,23 194:6
**we're** 11:11 20:18 29:18 35:1 61:15 77:20 87:4 89:3 108:3 118:2 129:16 178:16
**we've** 27:8 67:14 92:15 190:18 190:25 192:8
**whatsoever** 115:3 156:14 175:10
**whichever** 14:23 111:20
**wide** 57:13,16
**William** 2:18
**willing** 11:2 95:19
**willingness** 114:2
**wind** 194:15
**window** 60:20
**wing** 189:15
**wise** 108:2 167:22
**withdraw** 31:3 41:21 78:6 106:22 171:4
**withdrew** 178:5
**witness** 41:8 49:14 50:21 51:20,23 66:1 68:7 73:23 76:2,3,23 86:25 88:4 89:11,22,24 100:7 116:12 127:20 129:17 140:5 144:2 148:15,21 149:23 150:8 150:10 151:6 153:9 157:1,11 170:13 175:17 177:8,13 187:8 194:11,22 204:5
**witnessed** 189:18
**witnesses** 59:9 90:14 114:23 115:2 146:13 146:20
**witness's** 156:13
**woman** 20:11 21:7,11 22:24 23:13 99:25 190:2
**word** 15:3 67:7 67:8 78:17,18 91:20,23 94:9 110:5
**worded** 71:6 137:20
**words** 9:5 40:7 78:19 107:2 155:13,18
**work** 4:13 5:8 6:7,9 15:1 22:22 34:11 40:20,23,25 63:12 69:12 71:16 81:3 93:10 99:9 104:12,15 105:2 128:12 133:23 149:9 150:4,14 155:5 169:7 173:24 174:16 179:16 179:18
**worked** 4:12,14 4:15,24 5:9,11 5:16 8:13 64:17,25 119:14 128:2 133:10 159:11 203:24
**worker** 75:13 104:10 142:1 176:12 184:13
**workers** 22:1 45:17
**worker's** 160:21
**working** 8:2 75:5
**world** 22:2
**worry** 82:23 164:4
**worth** 22:21
**worthy** 50:7
**wouldn't** 13:12 13:12 17:8

19:13,24 22:19
24:10,19 34:15
61:14 62:3
72:16 78:3,25
91:3 95:14
98:8,14,17
108:25 109:2,3
109:3 118:21
119:2 171:8
191:6 198:1
203:22
**write** 121:18
154:23 193:20
**writes** 122:10
123:21,23
124:8 184:18
**writing** 101:25
175:8
**written** 62:15
101:18 103:25
104:2,7,9,22
104:24 108:18
125:22 143:22
153:21 167:10
168:1,7 181:7
190:22
**wrong** 53:2
76:12 78:16
112:12 115:7
166:21 167:1
**wrote** 37:12
129:6 134:3,5
138:17 173:18
175:8 186:14

_____ **X** _____

**X** 3:1

_____ **Y** _____

**Y** 4:1
**yammering**
65:25
**yap** 88:25
**yeah** 6:10,14
15:21 23:17
24:24 25:7
27:20 33:20
35:19 37:1

47:12 48:21
49:6 53:9,12
55:15 57:1
58:15 59:6,8
59:17,21 61:11
61:22 65:1
70:13,19,19
72:12 80:2
82:2 84:3,3,3
84:19 85:4,7
88:1 91:3,14
92:19 93:2
97:24,25 102:5
107:5,9,15
116:3 120:15
121:4 123:6
124:19 126:12
128:7 141:14
142:12 144:5
145:15,19
146:20 148:17
153:4 155:4
157:10,19
159:10,19
162:23 167:23
168:20 171:2
173:22 177:9
181:24 182:14
182:16,17
183:15,17,19
183:22 184:22
191:17 192:3
199:1 203:3,9
**year** 4:16 10:7
28:1 43:17
82:13 117:4
**years** 4:23 5:10
8:6 22:21,23
24:1 27:9 28:1
59:7 62:9
64:18,25 97:10
97:11,21,23
119:4 190:20
**yelled** 113:20
**yesterday**
112:15 124:24
150:24 157:3

**Yochim** 5:19,21
**Youth** 1:6,12 2:7
4:19,21 6:3,5
7:10 19:19
21:6 32:4
33:19 104:13
110:25 132:3
176:3 177:23

_____ **Z** _____

**Zack** 7:4
**Zin** 160:23
162:15,20,20

_____ **0** _____

**0** 124:9
**04** 35:22 36:6
56:13 60:15,17
82:25 83:11
84:10 145:8
182:9,9
**05-76E** 1:4

_____ **1** _____

**1** 3:12 84:7,11
93:18 101:8
155:21 163:2
178:2 199:24
**1st** 9:25 60:15
72:23
**1/1/04** 91:12
**1:00** 100:8,9,21
**1:26** 160:4
**1:30** 101:1
**1:48:55** 122:10
**10th** 2:9 60:17
**10:33:43** 121:16
**100** 97:20,23
**11** 173:19
174:19
**11:08** 51:25
**11:21** 51:25
**11:28:57** 162:3
**12th** 60:17
**12:09** 162:6
**12:40** 101:1
**12:53** 107:13
**120** 2:9

**13** 153:2
**146** 3:5
**15** 29:8,19 30:18
**15th** 155:14
202:14,19
**15219** 2:14,19
**16** 155:8,8
**16th** 154:12,18
154:22
**16426** 4:9
**16501** 1:23 2:3
2:10
**16509** 2:5
**17** 22:21,23
148:25 149:5
**178** 3:6
**18** 9:13 22:21,23
24:1
**182** 3:7
**19th** 114:17
154:21
**192** 3:14
**1971** 5:3
**1974** 5:6
**198** 3:8
**1980** 5:13,14
**1987** 5:17
**1988** 4:25
**1999** 29:5

_____ **2** _____

**2** 3:13 31:23
84:7 92:4
119:20 120:7
122:10 123:12
146:20
**2nd** 72:23 86:11
111:25
**2:00** 123:22
**2:02** 123:24
**2:03:01** 123:5
**2:05** 124:2
**2:26** 118:1
**2:29:53** 163:14
**2:46** 146:2
**20** 100:8 106:4
155:9 162:22
**20th** 83:16 84:10

**86**:20 101:6
105:24,25
112:13 114:14
117:24 118:1
129:1
**2000** 60:8 90:8
92:18
**2002** 4:23
**2004** 56:8 84:13
106:4,4,7,11
107:13 109:25
111:24,25
114:16 115:23
116:2 120:15
123:22 137:23
145:4 161:23
162:3 168:3,23
186:18
**2005** 116:6
196:11 198:23
**2006** 1:21
**202** 3:9
**21** 157:17
**22** 29:8,19 30:18
**225** 146:17
**229** 146:17
**24** 158:17
**24th** 120:15
121:15,16
160:8
**25** 149:4
**25th** 120:6 122:9
123:22 127:18
**27** 106:4
**27th** 105:24
168:23
**28th** 36:18 38:20
41:12 49:19,25
56:8 61:16
70:5,9 78:7
131:6 139:22
140:14 145:4,8
145:10 146:10
**29** 157:21

_____ **3** _____

**3** 3:14 118:10
128:11,15

| | |
|---|---|
| 146:21 157:6 | **8** |
| 161:25 162:1 | **8** 153:25 154:3,4 |
| 192:6,8 | 154:5 173:19 |
| **3rd** 72:23 | **8th** 82:18 |
| **3:00** 100:22 | **8/12/04** 91:13 |
| 146:2 | **8:30** 8:13 |
| **3:05** 118:18 | **8:51** 120:15 |
| **3:09:06** 118:17 | **81** 152:25 |
| **3:14** 159:20 | **814** 169:2 |
| **3:24** 159:20 | **821** 1:22 2:2 |
| **3:30** 100:22 | **8215** 4:9 |
| **30** 59:7 62:9 | **84** 3:12,13 |
| 76:7,15 132:12 | **868-8541** 169:2 |
| **31st** 4:15 10:1 | **870-1600** 124:9 |
| 199:3,24 | **89** 153:25 |
| **3700** 2:18 | |
| **3820** 2:5 | **9** |
| | **9** 1:20 |
| **4** | **9th** 84:1 106:7 |
| **4** 3:4 121:14 | 106:10 107:13 |
| **4E** 9:7 | 109:25 110:8 |
| **4th** 72:23 95:15 | 110:10,11,11 |
| 137:23 138:14 | 110:12,18 |
| 161:23 163:1,2 | 111:24 112:10 |
| 183:19 184:10 | 112:11 115:23 |
| **4:20** 100:20 | 116:2 157:14 |
| **4:24** 204:12 | **9:23** 121:15 |
| **4:30** 100:24 | **9:53** 1:21 |
| **40** 9:15 | **975** 2:14 |
| | **98** 155:7 |
| **5** | **99** 155:20 |
| **5** 111:2 120:9 | |
| 121:10 133:23 | |
| 153:2 155:21 | |
| 173:18,23 | |
| **5th** 168:2 183:1 | |
| 183:10 186:18 | |
| **5:00** 8:13 | |
| **525** 2:18 | |
| | |
| **6** | |
| **6/4** 162:3 | |
| **6/4/2004** 163:14 | |
| | |
| **7** | |
| **71** 148:25 | |
| **79** 154:2 | |