IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| ABBY B. CONLEY, | ) Docket No. 05-76E |
| | ) (SEAN J. MCLAUGHLIN) |
| Plaintiff, | ) |
| | ) ELECTRONICALLY FILED PLEADING |
| vs. | ) |
| | ) JURY TRIAL DEMANDED |
| COUNTY OF ERIE, ERIE COUNTY | ) |
| OFFICE OF CHILDREN AND YOUTH, | ) MEMORANDUM OF DEFENDANT |
| a/k/a ERIE COUNTY CHILD WELFARE | ) COUNTY OF ERIE IN SUPPORT OF |
| SERVICE, RICHARD SCHENKER, | ) MOTION FOR SUMMARY JUDGMENT |
| individually and in his capacity as County | ) |
| Executive of Erie County, Pennsylvania, | ) Counsel of record for this party: |
| PETER CALLAN, individually and in his | ) |
| capacity as Erie County Director of | ) Richard A. Lanzillo, Esq. |
| Personnel, DEBRA LIEBEL, individually | ) Knox McLaughlin Gornall |
| and in her capacity as Executive Director, | ) & Sennett, P.C. |
| Erie County Office of Children and Youth, | ) 120 West 10th Street |
| a/k/a Erie County Child Welfare Service | ) Erie, PA 16501 |
| and JOHN A. ONORATO, ESQUIRE, | ) Telephone (814) 459-2800 |
| individually and in his capacity as Erie | ) Facsimile (814) 453-4530 |
| County Solicitor, | ) Email rlanzillo@kmgslaw.com |
| | ) PA53811 |
| Defendants | ) |

## MEMORANDUM OF DEFENDANT COUNTY OF ERIE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

While employed as a case aide for the Erie County Office of Children and Youth

("OCY"), plaintiff, Abby Conley ("Conley"), secretly and repeatedly communicated confidential

information concerning pending cases to various third parties in violation of OCY policy and

state law. The recipients of Conley's improper and illegal communications included a

disgruntled former OCY employee who had advised Conley of her willingness to "do

ANYTHING to see [OCY] go down in flames," as well as attorneys representing parties who

opposed actions proposed by OCY. Conley surreptitiously passed case-related information to persons outside the agency without the knowledge or consent of her superiors or co-workers at OCY. Conley employed various means to deliver the information, including use of her office email and covert meetings with attorneys and parties who had adopted positions adverse to the positions of OCY. Conley's unauthorized and illegal communications were calculated to aid third parties and their attorneys in their efforts to oppose or overcome actions proposed or taken by OCY for the protection of children assigned to its care.

After an internal review of Conley's deleted email messages revealed her outrageous breaches of policy, ethics and state law, OCY properly gave Conley the choice of resignation or termination. Conley opted to resign her position.

Conley later commenced this action alleging that OCY's employment action was in retaliation for testimony she gave in a court hearing and a complaint she anonymously lodged against a co-worker. Conley's claims against the County of Erie fail as a matter of law on multiple grounds, including (1) the insufficiency of evidence to attribute any retaliatory action to a policy or custom adopted by a final policymaker of the County under §1983, (2) the insufficiency of the evidence to support a finding that the employment action at issue was in retaliation for any protected activity and to overcome the overwhelming and undisputed evidence of Conley's repeated violations of OCY policy and state law, (3) the insufficiency of the evidence to support a finding of a "good faith report "of "wrongdoing" within the meaning of the Pennsylvania Whistleblower Law, and (4) the insufficiency of the evidence to support the stringent causation requirement adopted under the Pennsylvania Whistleblower Law, particularly in light of the undisputed evidence of wrongdoing on the part of Conley that led the decision makers to offer her the choice of resignation or termination.

## II.     MATERIAL FACTS

### A.     Conley's Background and Confidentiality Obligations

Prior to her tenure at OCY, Conley moved from job to job in various departments of the County of Erie.  In 2000, after taking a leave of absence, Conley used her seniority rights under her Union contract to bid into a position as a "social service aide" or "case aide" for OCY. (Conley Deposition, pp 52-70, App. Ex. 4).  The position of case aide is a non-professional position requiring no education or training in social work or mental health.  The basic responsibilities of a case aide are to assist case workers in supervising and documenting visits between children and their natural parents or guardians.  (Conley Deposition, pp 79-86, App. Ex. 4).

Like all employees of OCY, especially those employees whose responsibilities involve interaction with and documentation regarding at-risk children, case-aides are required to comply with OCY policies and applicable laws regarding confidentiality.  The critical importance of confidentiality is pervasive throughout OCY's policies, including in the following policy statements:

- "Confidentiality of client information is a most important requirement to be followed by all agency staff.  Staff members must maintain confidentiality under agency policy, Department of Public Welfare Regulations, and Child Protective Services Law (Act 124)."

- "Information on clients is confidential and is not to be discussed with friends or others outside the agency."

(OCY Confidentiality Policy, Conley Deposition Exhibit 1).

Pennsylvania Department of Public Welfare Regulations, which OCY's policy expressly incorporates, provide the following guidance to county agency staff members regarding confidentiality:

>Information that may be used to identify the child or the parents by name or address, and information contained in the case record, is confidential.  A staff person may not disclose or make use of information concerning the child or the parents other than in the course of performance of his duties.

55 Pa. Code §3130.44(a).

The regulations further articulate the limited circumstances under which confidential information can be released:

>Information obtained by the county agency or Department in connection with general protective services may only be released as follows:
>
>(1)     Under §3130.44 (relating to confidentiality of family case records).
>(2)     To another county agency.
>(3)     To an official of an agency of another state that performs general protective services analogous to those services performed by county agencies or the Department in the course of the official's duties.

55 Pa. Code §3490.242.

Pennsylvania's Child Protective Services Law (Act 124) also addresses the importance of confidentiality.

>Except as otherwise provided in this subchapter, reports made pursuant to this chapter, including, but not limited to, report summaries of child abuse and written reports made pursuant to section 6313(b) and (c) (relating to reporting procedure) concerning alleged instances of child abuse in the possession of the department or a county agency shall be confidential.

23 Pa. C.S.A. §6339.

**B.**    **Conley's funneling of confidential information to third parties and their attorneys**

    **i.**    **Deanna Cosby and the VW case**

In July, 2004, Attorney Catherine A. Allgeier contacted Debra Liebel, the former executive director of OCY, and expressed concerns about Conley breaching confidentiality by emailing information to a former employee.  (Deposition of Debra Liebel, pp. 6, 31, App. Ex. 7). In addition, Michael Cauley, the Solicitor for OCY, also brought concerns to the attention of Debra Liebel regarding the release by Conley of confidential information to an opposing attorney.  (Deposition of Debra Liebel, pp. 37-38, App. Ex. 7).

These concerns prompted OCY to commission a forensic review of Conley's computer email.  Although Conley had attempted to conceal her activities by deleting emails from her computer, an outside computer expert successfully retrieved a vast cache of her illegal and improper communications.  These emails included dozens of messages containing confidential client and case information transmitted by Conley to Deanna Cosby, a former case worker who had left OCY several months earlier.  Cosby's agenda regarding OCY was unambiguously stated in the following email she sent to Conley on May 25, 2004:

> …[I] don't like ecocy [OCY] an[d] would do
> ANYTHING to see it go down in flames!!!!!

(Series of emails between Conley and Cosby dated May 24-25, 2004, App. Ex. 12 (emphasis in original)).

Many of Conley's emails related to VW, a woman who already had two children under the supervision of OCY, and who was pregnant with her third child.[1]  Conley was the case

---

[1]    VW had a history of suspected drug use.  (Deposition of PW, pp .82-83, App. Ex. 31).  She is currently facing criminal charges relating to her alleged involvement with a methamphetamine lab.  At all relevant times, RB, the father of VW's unborn child, has been incarcerated for multiple bank robberies and is presently serving a lengthy prison sentence for those crimes.  (Deposition of VW, p. 7 App. Ex. 32).

aide assigned to VW. Cosby previously acted as the case worker for VW and her children. However, any legitimate involvement on the part of Cosby in VW's case had ended months earlier when, in February, 2004, Cosby left OCY and moved to North Carolina. (Conley Deposition, p. 134, App. Ex. 4). As of her departure from OCY, Cosby had no right to receive information concerning VW's case or OCY's plans for handling that case. (Deposition of Shara Saveikis, Pa. Dept. of Public Welfare, pp. 104-105, 128-129, App. Ex. 3; Deposition of Debra Liebel, pp. 57-58, App. Ex. 7).

For the protection of VW's unborn child, OCY had obtained from the Court of Common Pleas of Erie County, Pennsylvania an ex parte Order commonly known as a "Prognostic Detention Order." A Prognostic Detention Order directs area hospitals to immediately detain and surrender a child to "the protective and physical custody of the Erie County Office of Children and Youth" immediately upon the birth of the child. The Prognostic Detention Order for VW's unborn child was issued on May 27, 2004. (Order of Court dated May 27, 2004, App. Ex. 27). Once issued, an ex parte Prognostic Detention Order is delivered to area hospitals to ensure the detention of the baby, but such an Order is rarely disclosed to the mother of the unborn child until after the birth of the child. The existence of the Order is generally withheld from the mother prior to the birth of the child because disclosure may prompt the mother to leave the jurisdiction or even harm the unborn child prior to birth. (Liebel Deposition, pp. 57, 91, App. Ex. 7; Deposition of Michael Cauley, pp.12, 18-19, App. Ex. 8; Deposition of PW, p.79, App.Ex. 31). Only where the Unit Supervisor and the other members of the staff assigned to the case agree that there is no risk of flight or harm to the unborn child will OCY disclose the existence of the order to the mother. (Affidavit of Mary Jo Cline Szewczyk, ¶¶2-4, App. Ex. 29).

In a series of email messages Conley sent to Cosby immediately after the issuance of the Prognostic Detention Order regarding VW's unborn child, Conley and Cosby secretly conspired to pass information to VW and her attorney as a means to undermine the position and objectives of OCY regarding VW's case.

In an email dated May 27, 2004, Conley advised Cosby as follows:

> Deanna, [VW's] attorney wants you to call her[.]  the number is
> 814-868-8541.  The attorney's name is Amy Jones.  [VW]asked me
> to ask if you would do this.

(Email exchange between Conley and Cosby dated May 27, 2004, App. Exhibit 13).

Conley's desire to avoid detection of her communications to persons outside of OCY is reflected in the following exchange of email messages between Conley and Cosby on June 4, 2004:

| | |
|---|---|
| <u>Cosby</u>: | did you call my cell phone last night |
| <u>Conley</u>: | Yes I did, I REALLY wanted to tell you something!  I don't trust this email system (monitored). |
| <u>Cosby</u>: | Can someone say …."paranoid" |
| <u>Conley</u>: | Paranoid! |
| <u>Cosby</u>: | w/justification |
| <u>Conley</u>: | I have learned not to trust!  Zin, the new girl is awesome. She is Christian, normal, and believes in empowerment. God sent her to this unit.  I can tell she is going to be one of us.! |

(Email exchange between Conley and Cosby commencing on June 4, 2004, App. Exhibit 14).

As part of the same exchange of email messages, Conley and Cosby then discussed one of the means whereby Conley would pass information to VW and her lawyer:

| | |
|---|---|
| <u>Cosby</u>: | Do you think I'm wrong for wanting to help VW? |

| | |
|---|---|
| <u>Conley</u>: | No. I want you to help her. I'm crushed by what is going to happen. Its just not right Deanna. |
| <u>Cosby</u>: | I'm not if you personally think it's right or maybe i am but from a christian standpoint. |
| <u>Conley</u>: | When you we're talking about Esther today, I though about what you said. I think too even though things look bad, and God can make things right, I often think sometimes God expects us to do what's right. **Facts are this: [PW, the case worker assigned to VW's case] has severe mental health issues, Sue [Conley's Unit supervisor] does not have the professional aptitude to make the call that she has on VW. In fact these two ladies are taking it upon them self to play god.** I sit on my hands, while I know what their doing is wrong. Who's sin is greater, theirs or mine? |
| <u>Cosby</u>: | You know I'm not in a position to judge who's sin is greater I don't even believe I can weigh it that way aren't all sins equal in the eyes of the Lord? What you're doing is not a sin because you did speak up, several times in vw's defense but what I'm asking is in your christian experience would I be wrong if I tried to help |
| <u>Conley</u>: | Your in a better position than I! |
| <u>Cosby</u>: | there is a new kinship policy that was issued in 12/03 that I remember and might still have a copy of to forward it to the att. It states that the cw can do an "eyeball" check rather than the home study rather than place the baby in foster care but I remember when I tried to do that and had the documentation to back it up sue wouldn't let me so I'm going to tell vw's att. about it. |
| <u>Conley</u>: | **I just spoke to [VW] last night, she was not in labor. Her attorney told [VW] that she has nothing to worry about when it comes to the unborn child. She told [VW] that we (OCY) cannot detain. [VW] is taking her attorney advice, she is due any day. [PW, the case worker assigned to VW's case] has detention letters at all the local hospitals. [VW] does not see this coming.** |
| <u>Cosby</u>: | **she will** |

> Conley:  **God Bless you Deanna!**  We are in the paper again today and in the letter to the Editor.
>
> Cosby:  **thanks, but for what**
>
> Conley:  **You said (she will) VW**

(Email exchange between Conley and Cosby dated June 4 & 7, 2004 (emphasis supplied), App. Ex. 14).

This exchange of email establishes the following facts:  (1) Conley was acting as a conduit to funnel information regarding VW's case to Cosby, VW and VW's attorney; (2) Conley believed that VW was unaware of the Prognostic Detention Order, or, in Conley's words, VW "does not see this coming"; (3) Conley received Cosby's assurance that "she [VW] will" be told of the Order; (4) In response to Cosby's assurance, Conley immediately replied, "God Bless you Deanna!"  Having analyzed the situation from a "Christian standpoint," Conley concluded that PW, the case worker assigned to VW "ha[d] severe mental health issues," and that Sue, the Unit Supervisor responsible for VW's case, "d[id] not have the professional aptitude to make the call that she has on VW."  Based on this analysis, Conley elected to overrule her superior's positions regarding VW's case.[2]

### ii.    VW's confirmation that Conley and Cosby followed-through on their plan.

Conley has attempted to characterize her exchange of information with Cosby as appropriate and consistent with policy and state law.  While this argument is unsustainable based on the content of the emails themselves, it is also completely debunked by the evidence that

---

[2]    The record is unclear regarding how Conley came to such a palpable sense of self-righteous moral superiority that she, as a case aide with no education or training in social work or psychology, concluded that her judgments regarding VW and her unborn child were more appropriate than those of OCY.  However, this unanswered question is not material to the disposition of this case.  What matters is that, regardless of how Conley attempts to spin her email exchange with Cosby, it cannot be interpreted as anything other than a knowing and, as the Court will soon see, ultimately successful, effort to pass information to unauthorized third parties and to undermine the objectives of her employer.

defendants recently obtained through the depositions of VW and her former attorney, Amy

Jones, Esquire.

   In contemporaneous correspondence and in her deposition, VW confirmed the

final link in the chain of unauthorized, illegal and unethical communications that began with

Conley's email messages to Cosby and ended with Conley's intended recipient, VW.  On June 5,

2004, *a mere one day after Conley told Cosby that "[VW] does not see [the Detention Order]*

*coming," and Conley blessed Cosby for agreeing to warn her*, VW wrote a letter to RB, her

incarcerated boyfriend and father of her unborn child, which stated:

> The reason Deanna [Cosby] called me is <u>to warn me
> that they are going to detain [M, VW's unborn
> child] and they are trying to put her in a foster home
> rather than with your mom</u>.  <u>She actually suggested
> that I leave town and have the baby</u>.  But if I miss a
> visit with my kids, [PW] will use that as
> abandonment, so I wouldn't even know where to go
> or how to time it.

(Deposition of VW, pp. 27-28 and VW Deposition Ex. 2 (emphasis supplied), App. Ex. 32).

   VW also confirmed that Conley's indirect passage of confidential information

through Cosby was actually part of a much broader pattern of illegal communications that

completely destroys Conley's claim of good faith.  VW testified that, on June 3, 2004, Conley

advised her that "[PW, her case worker,] and Sue [the OCY Unit Supervisor] had a meeting

about [VW] and that she's mad because they are working against [VW] instead of for [VW]."

(Deposition of VW, pp. 21-22, App. Ex. 32).  Conley also told VW that PW and Sue "are going

to put up a fight against [VW] and that [PW] will probably be at most of my visits from now

on…."  (Deposition of VW, p. 23, App. Ex. 32).  VW also acknowledged that she "wrote a three

page letter to [her] attorney telling her what [Conley] and Leslie [a non-OCY employee] had

said."  (Deposition of VW, pp. 23-24, App. Ex. 32).  VW memorialized these communications

from Conley in a letter dated June 3, 2004, to RB, the incarcerated father of her unborn child. (Deposition of VW, pp. 21-22 and VW Deposition Ex. 1, App. Ex. 32). Thus, VW supplied uncontroverted evidence that Conley systematically leaked information to her and her attorney in an obvious effort to undermine the efforts of the OCY personnel assigned to her case.

### iii. Conley's private meetings with VW and her attorney to assist them in opposing OCY.

In her deposition, VW's former counsel, Attorney Amy Jones, admitted that during this same May-June 2004 timeframe, Conley met with her privately at her law office to assist her in her representation of VW against OCY. (Deposition of Amy Jones, pp. 22-23, 41, App. Ex. 34). Attorney Jones refused to disclose the substance of the information that Conley shared with her. Attorney Jones based this refusal on a claim of privilege. However, Attorney Jones did acknowledge that the information she obtained from Conley was utilized in connection with her representation of VW. (Deposition of Amy Jones, pp. 45-46, App. Ex. 34). Attorney Jones testified that she has never represented Conley as her counsel, but she did acknowledge that she referred Conley to one of the lawyers currently representing her in this case. (Deposition of Amy Jones, pp. 22, 26, App. Ex. 34).

### C. Conley's calculated effort to undermine OCY's position in the C Case by passing information to counsel for an adverse party.

Conley was assigned as the case aide in a matter involving the detention of twin infant girls who were born on September 12, 2002. For purposes of this brief, this case is referred to as the "C Case." Soon after their birth, both infant girls were adjudicated dependent as each had broken bones and displayed other signs of possible child abuse. (Affidavit of Gerald J. Villella, ¶2, App. Ex. 33). The pleadings filed by OCY in the C Case asserted that the

parents of the twins could not be ruled out as perpetrators of the suspected abuse. (See Deposition of Richard A. Vendetti, Esq., Deposition Ex. 1, App. Ex. 30).

On July 28, 2004, Conley appeared as a witness in a hearing in the C Case. Unbeknownst to OCY, Conley had contacted Attorney Gerald Villella, the attorney representing the mother of the children in the C Case, and advised Attorney Villella that she had information that could be useful to his client's position. Specifically, Conley told Attorney Villella that she possessed an original draft of a court summary that she had prepared for the C Case and that the version in her possession was more favorable to his client's position than the final court summary that had been submitted by to the Court OCY. Conley offered to provide Attorney Villella with the original draft of the summary. (Affidavit of Gerald J. Villella, ¶¶ 4-6, App. Ex. 33).

Immediately prior to the July 28, 2004 hearing in the C Case, Conley physically delivered her draft summary to Attorney Villella. Attorney Villella proceeded to call Conley as a witness in support of the mother and examined her regarding the differences between the original draft and the final version of her summary. (Affidavit of Gerald J. Villella, ¶¶ 7-8, App. Ex. 33). However, during her hearing testimony, Conley admitted that revisions to such summaries before they are finalized are neither unusual nor improper, that Conley's supervisor had specifically discussed the revisions at issue with her, and that her supervisor had reminded Conley that she was not to include opinions in her summaries that were beyond her expertise.[3] (Transcript of Hearing Testimony of Abby Conley dated July 28, 2004, pp.76-81, App. Ex. 6).

---

[3]    As of the July 28, 2004 hearing, Conley was aware that OCY had been the subject of intense public and press scrutiny arising largely out of the tragic death of Britney Legler while that child was under the auspices of OCY. Indeed, Conley's exchange of email with Cosby included references to coverage of OCY in the local paper and, while the record is silent concerning who may have tipped the reporter to attend the July 28, 2004 hearing in the C case, it is undisputed that the reporter who had been covering the Legler tragedy and other OCY matters was present for that hearing.

**D.    OCY's discovery of Conley's email activities and decision to offer Conley the option of resignation or termination.**

In July, 2004, Attorney Catherine A. Allgeier, a member of the OCY legal staff, contacted Debra Liebel, the former executive director of OCY, and expressed concerns about Conley's apparent breach of confidentiality by emailing information to a former employee. (Deposition of Debra Liebel, pp. 6, 31, App. Ex. 7). In addition, after the July 28, 2004 hearing, OCY Solicitor Michael Cauley advised Liebel of his concerns regarding Conley's release of confidential information to an opposing attorney. (Deposition of Debra Liebel, pp. 37-38, App. Ex. 7).

Based upon these concerns, OCY promptly retained an outside expert to examine Conley's computer and attempt to retrieve her deleted email messages. Shortly before August 20, 2004, OCY received the results of the expert's investigation, which revealed the exchange of email messages detailed above. (Deposition of John Onorato, pp. 60, App. Ex. 35; Liebel Deposition, pp. 97, App. Ex. 7).

On or about August 20, 2004, Debra Liebel, the director of OCY, Michael Cauley, OCY Solicitor, John Onorato, Erie County Solicitor, Peter Callan, County Personnel Director, and Ann Bloxdorf, the Director of Administration met to discuss the results of the expert investigation and determine what, if any, employment action should be taken against Conley. After reviewing the email messages retrieved by the expert, the participants in the meeting agreed that Conley's outrageous breaches of confidentiality warranted her dismissal as an employee of OCY and the County. (Deposition of John Onorato, pp. 62-68, App. Ex. 35; Liebel Deposition, pp. 95-97, App. Ex. 7).

Some of the participants recognized that this decision would undoubtedly draw the attention of the local press. The participants also recognized that the ability of OCY to defend its action in the press was severely limited by the confidentiality that it maintains regarding personnel matters and that, while the facts clearly warranted Conley's termination, the decision would likely prompt significant political fallout and further negative press coverage. (Deposition of Richard Schenker, pp. 11-12, App. Ex. 36; Deposition of Debra Liebel, pp. 95-97, App. Ex. 7; Deposition of John Onorato, pp. 67-68, App. Ex. 35).

Based upon these concerns, Onorato, Liebel and Callan met with County Executive Rick Schenker to advise him of the decision and forewarn him of the press coverage and potential political fallout that were likely to follow the decision. Onorato, Liebel and Callan informed Schenker that they had determined that Conley had engaged in serious breaches of confidentiality that they concluded warranted termination, but acknowledged that the press would likely misconstrue the decision as motivated by other factors. Schenker advised Onorato, Liebel and Callan to "do the right thing" according to OCY policy and state law regarding confidentiality without regard to the political fallout that the decision might prompt or any misinterpretation that the press might attach to the decision. (Deposition of Richard Schenker, pp. 15, 22, App. Ex. 36; Liebel Deposition, pp. 98-99, App. Ex. 7).

On September 10, 2004, Onorato, Callan, and Liebel met with Conley and a Union representative for Conley and informed Conley of the discovery of her breaches of confidentiality. (Deposition of John Onorato, pp. 74-75, App. Ex. 35). Conley was offered the opportunity either to resign her employment, in which case, the County would not oppose her claim for unemployment compensation benefits, or, if Conley declined the resignation option, the County would proceed with termination. (Deposition of Debra Liebel, p. 20, App. Ex 7).

14

Conley opted for resignation and signed a resignation letter confirming that decision.  (See Conley's resignation letter dated September 10, 2004, App. Ex. 1).

      **E.**      **The Pennsylvania DPW investigation of Conley's unfounded claim of child abuse against PW.**

Conley claims that the decision to give her the option of resignation or termination was in retaliation for an anonymous complaint of child abuse that Conley had lodged against PW, an OCY case worker, through the Department of Public Welfare's "Childline." Conley made her report to Childline on June 21, 2004, almost two weeks after she allegedly observed PW grab a child by the face and shake her from side to side.  (Commonwealth of Pa., Dept. of Public Welfare letter dated August 30, 2004, App. Ex. 2).

This report prompted an investigation by the Pennsylvania Department of Public Welfare, the Commonwealth agency with regulatory and licensing authority over OCY and other county child social service agencies.  (Deposition of Shara B. Saveikis, pp. 66-77, App. Ex. 3). After investigating the report and interviewing Conley and PW, and observing the child's interaction with each, Shara B. Saveikis, Regional Program Representative for the Department of Public Welfare, determined that Conley's report was "unfounded."[4]  (Commonwealth of Pa, Dept. of Public Welfare letters dated July 2, 2004 and August 30, 2004, App. Ex. 2; Deposition of Shara B. Saveikis, pp.78-79, App. Ex. 3).

After interviewing Conley, Saveikis also advised OCY that Conley's statements, behavior and affect raised serious concerns regarding her credibility and her suitability to serve

---

[4]      In her deposition, Saveikis also emphasized the critical importance of confidentiality and the serious breach of confidentiality that would result if an OCY employee were to communicate information regarding a pending case to a third party as Conley did regarding the VW case.  (Deposition of Shara B. Saveikis, pp. 82-83, 123-124, App. Ex. 3).

as a case aide.  (Deposition of Shara B. Saveikis, pp. 75-82, App. Ex. 3).  Among other things, Saveikis specifically observed:

> Throughout an approximate 30 minute interview, Ms. Conley's affect appeared to be labile.  Her demeanor vacillated from speaking in a childlike manner, to that of an articulate, knowledgeable professional, to bouts of crying, laughter and angry tones.  This vast repertoire of behavior recurred several times during the course of this interview.

(Commonwealth of Pa, Dept. of Public Welfare letter dated August 30, 2004, App. Ex. 2).

The record is devoid of any evidence that Conley's report to Childline or her testimony in the C Case played any role in the decision to offer her the choice of resignation or termination.

## III.    ARGUMENT

### A.    CONLEY'S FIRST AMENDMENT CLAIMS AGAINST THE COUNTY MUST BE DISMISSED.

#### i.    Conley Can Produce No Evidence That The Request For Her Resignation Was Made Pursuant To Any Actionable County Policy or Practice.

Conley's First Amendment retaliation claim against the County and the individual defendants in their official capacities is premised upon 42 U.S.C. §1983.[5]  In Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-2038, 56 L.Ed.2d 611 (1978), the Supreme Court held that a local government can be liable under §1983 for its policies that cause constitutional torts.  These policies may be set by the government's lawmakers, "or by

---

[5]    This motion is filed on behalf of the County of Erie, including it Office of Children and Youth, and the individual defendants in their official capacities.  A suit against a governmental officer "in his official capacity" is the same as a suit "'against [the] entity of which [the] officer is an agent,'"  Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) quoting Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035-2036, n. 55, 56 L.Ed.2d 611 (1978).

those whose edicts or acts may fairly be said to represent official policy." Id.  A court's task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue."  Jett v. Dallas Independent School Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989).

"[W]hether a particular official has final policymaking authority is a question of state law."  Jett, 491 U.S. at 737, quoting Praprotnik, 485 U.S. at 123.  "In order to ascertain who is a policymaker, 'a court must determine which official has final, unreviewable discretion to make a decision or take action.'"  Kneipp v. Tedder, 95 F.3d 1199, 1213 (3rd Cir. 1996) quoting Andrews v.City of Philadelphia, 895 F.2d 1469, 1481 (3rd Cir. 1990).

In the present case, the final policymaker relative to personnel matters is the County Executive.  The Erie County Home Rule Charter, as codified in the Pennsylvania Code, provides that the County Executive shall have the power to "[a]ppoint, suspend or remove any County employe…."  325 Pa. Code §1-3.5(D).  The evidence is undisputed that, while Schenker was advised of the decision, his sole directive was for his subordinates to "do the right thing." Such a directive cannot be construed as an act of retaliation or as the adoption of any policy or custom condoning retaliation.

At all times relevant to this action, the County of Erie has maintained two distinct, but harmonious policies.  As discussed in detail above, OCY maintained an important policy regarding the confidentiality of case-related information.  At the same time, the County also maintained a policy of encouraging "whistleblower" activity.  (Deposition of Rick Schenker, pp. 18-19, App. Ex. 36).

Conley contends that the stated reason for the decision to request her resignation was not the true reason for that action and that, despite the absence of any evidence to support her claim, the County employees who made the decision were actually acting in retaliation for her complaint against PW and her testimony in the C Case.  For purposes of this discussion, even if one were to adopt Conley's unsupported allegations, Conley's claim against the County would still fail because the decision makers who allegedly acted in retaliation against Conley were not final policymakers and therefore their alleged improper motive cannot support liability against the County.

The Supreme Court has explained that municipal liability under <u>Monell</u> is not determined based upon the alleged departures of subordinates from municipal policy, but by the policies of the municipality itself:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision *and the basis for it*, their ratification would be chargeable to the municipality because their decision is final.

<u>City of St. Louis vs. Praprotnik</u>, 485 U.S. 112, 127, 108 S.Ct. 915, 926 (1988)(emphasis added).

To support §1983 liability, it is not enough to show that a policymaker was informed of the challenged decision.  As the Supreme Court has explained:

> <u>Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.</u>  It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them.

City of St. Louis vs. Praprotnik, 485 U.S. at 130, 108 S.Ct. at 927 (emphasis supplied).

Based upon media and political concerns, members of his administration met with County Executive Rick Schenker to advise him of the decision regarding Conley and to forewarn him of the press coverage and potential political fallout that were likely to follow the decision. These individuals informed Schenker that they had determined that Conley had engaged in serious breaches of confidentiality that warranted termination, but acknowledged that the press would likely misconstrue the decision as motivated by other factors. Schenker's only instruction to his subordinates was to "do the right thing" according to OCY policy and state law regarding confidentiality without regard to the political fallout that the decision might prompt or any misinterpretation that the press might attach to the decision.

There is not one shred of evidence that Schenker took any action against Conley in retaliation for her alleged "protected" activities. Therefore, Conley's §1983 claim against the County of Erie and the individuals defendants in their official capacities must be dismissed.

> **ii.    Conley Can Produce No Evidence That Her Childline Report Or Her Testimony During The Hearing On July 28, 2004 Were Substantial Or Motivating Factors For The Request For Her Resignation.**

In determining whether the evidence can sustain a public employee's claim of First Amendment retaliation by her employer, the courts employ a three-step test. Vantassel v. Brooks, 355 F.Supp.2d 788, 797 (W.D. Pa. 2005), citing Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). "First, the employee must establish the 'protected' nature of [her] conduct by showing that the speech in question involves a matter of public concern and that the employee's interest in the speech outweighs the public employer's countervailing interest in providing efficient and effective services to the public." Vantassel, 355 F.Supp.2d at 797, citing Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004). "Second, the employee must

demonstrate that the protected speech was a 'substantial or motivating factor in the alleged retaliatory action.'"  Id.  "If the employee can meet his burden at steps 1 and 2, the employer can nonetheless avoid liability by showing 'that it would have taken the adverse action even if the employee had not engaged in protected conduct.'"  Id.

Conley alleges that she was asked to resign in retaliation for two instances of speech: (1) her testimony at the July 28, 2004 hearing in the C Case, and (2) her Childline report regarding PW.

Conley's First Amendment retaliation claims fail as a matter of law because she cannot produce *any* evidence to support a finding that her Childline report or her testimony in the C Case was a substantial or motivating factor underlying the request for her resignation. Standing alone, this gaping hole in Conley's case requires the entry of summary judgment for the County and the other defendants.  However, Conley's claim is not only negated by the absence of evidence to support a necessary element of her claim.  This evidentiary void is exacerbated and highlighted by the uncontroverted and overwhelming evidence that Conley was asked to resign solely because of her documented and admitted breaches of confidentiality – *breaches that the County learned of only after Conley's Childline report and her testimony in the C Case*.

In order to survive summary judgment with respect on this prong of a First Amendment retaliation claim, a plaintiff must come forward with evidence showing that his or her speech was a substantial or motivating factor in the adverse employment action.  Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2005); see Vantassell, 335 F.Supp.2d at 791.  Although the issue of whether protected speech was a substantial or motivating factor for the alleged retaliatory action, and the issue of whether the employer would have taken the adverse action even if the employee had not engaged in the protected conduct, are generally questions of fact,

those issues may be decided on summary judgment where the evidentiary materials of record

would be insufficient to carry the nonmovant's burden of proof at trial.  See Vantassel, 335

F.Supp.2d at 791.  To withstand summary judgment, the plaintiff-employee must produce

evidence linking the employer's action to the employee's speech;

> Speculation and hunches amidst rumor and innuendo will
> not suffice.  See Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir.
> 2003).  Nor can a plaintiff sustain his burden at step 3
> "simply by showing the elimination of the protected
> activity may have been welcome by the defendants."
> Wright v. Illinois Dept. of Children and Family Servs., 40
> F.3d 1492, 1500 (7th Cir. 1994)(internal quotations
> omitted); accord Collyer v. Darling, 98 F.3d 211, 229 (6th
> Cir. 1996).

Maestas v. Segura, 416 F.3d at1188-89.

Even in cases where a plaintiff can come forward with evidence of some

relationship between his or her speech and an adverse employment action, "evidence of

intervening events . . . tend to undermine any inference of retaliatory motive and weaken the

causal link."  Maestas, 416 F.3d at 1189 citing Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir.

1998).

In Gubitosi, a female police officer brought a § 1983 claim against her municipal

employer alleging that she was discharged in retaliation for submitting criticisms of police

procedures.  Gubitosi, 154 F.3d at 33.  She claimed that the "short period of time between the

date she submitted her criticisms . . . and the date she was terminated constitute[d] evidence of

retaliation."  Id.  Addressing this temporal proximity argument, the Second Circuit held that "it is

simply impossible to miss the significant intervening events between [the date of her criticisms

and her termination]."  Id.  Those intervening events were the plaintiff's refusal to perform a

mandated strip search of three female detainees and her conduct in proceedings after and related

to this refusal.  It was these intervening events that led to plaintiff's termination and, the fact that they occurred between the plaintiffs "speech" and her termination broke any causal link that existed between those events.  Id.

Similarly, in Martin v. Bd. or Ed. of Knott County Kentucky, No. Civ. A. 03-210, 2005 WL 2902412, *1 (E.D. Ky 2005), a public school employee alleged that she was demoted in retaliation for her political associations.  In support of her claim, she presented evidence that the superintendent recommended her demotion based on constitutionally impermissible animus. Id.  The Court, however, found that intervening events broke any causal link between the plaintiff's political association and her demotion.  Id. at *11.  Prior to her demotion, the school board, the ultimate policymaker for the defendant, decided to demote the plaintiff "on the basis of independent, intervening factors . . . and, thus, there was no line of causation between any impermissible motives of the superintendent and the [demotion]." Id. at * 11.

In the present case, Conley can produce no evidence to support a finding that her Childline report or her testimony in the C Case was a substantial or motivating factor underlying the request for her resignation.  At most, Conley has come forward with nothing more than "speculation and hunches amidst rumor and innuendo."  Juxtaposed with the complete absence of any evidence to support Conley's claim of retaliation is the mountain of written and testimonial evidence that Conley was asked to resign for a single reason – her serial violations of confidentiality.  It was only after the County unearthed proof that Conley had been covertly transmitting confidential information to third parties in violation of OCY policy and state law that County Solicitor Onorato, OCY Solicitor Cauley and OCY Director Liebel decided to request Conley's resignation.  The discovery of Conley's email messages is a substantial

intervening event between Conley's "speech" and her resignation. As in <u>Gubitosi</u> and <u>Martin</u>, this intervening event breaks any causal link between that speech and her resignation.

Conley's complete lack of evidence to support her assertion that the Childline report and her testimony in the C Case were substantial or motivating factors underlying the request for her resignation is fatal to her retaliation claim. This evidentiary flaw coupled with the uncontroverted intervening events immediately prior to her resignation entitles the County to summary judgment on Conley's retaliation claim

### ii. Conley's Act of Passing Information to Opposing Counsel in The C Case Did Not Constitute Protected Activity.

Not all speech is protected under the Constitution; nor is every utterance by a public employee afforded constitutional protection even where that employee holds a public position and deals with matters of public concern. Instead, speech is protected only when it involves a matter of public concern and the employee's interest in the speech outweighs the public employer's countervailing interest in providing efficient and effective services to the public. Thus, speech engaged in by public employees within the course of their employment is generally not protected. <u>Thomson v. Scheid</u>, 977 F.2d 1017, 1020 (6th Cir. 1992).

Conley's unauthorized actions in contacting Attorney Villella and providing him with information and a draft copy of her case summary in the C Case are not "protected activity." Such actions certainly are not constitutionally protected speech. They are simply calculated and self-serving acts of insubordination and manipulation.

Conley simply has no legitimate interest in the unauthorized passing of information to an attorney representing a party adverse to OCY or the manipulation of information as a calculated means to harm her employer or to divert attention away from her own misconduct. Accordingly, Conley's "interest" in this co-called "speech" cannot outweigh her

public employer's countervailing interest in providing efficient and effective services to the public.  See Dennison v. Pa. Dept. of Corrections, 268 F.Supp.2d 387, 398 (M.D. Pa. 2003)(holding that public employee's "interest in distributing inmate psychological records in an effort to reveal racial discrimination in parole determination does not outweigh SCI-Mahonoy's interest in keeping such records confidential").

While Conley asserts that the request for her resignation was prompted by her testimony at the hearing on July 28, 2004, there simply is no evidence to support such a finding. In fact, Conley herself admitted in her hearing testimony that revisions to court summaries before they are finalized are neither unusual nor improper, that Conley's supervisor had discussed the revisions at issue with her, and that her supervisor had reminded Conley that she was not to include opinions in her summaries that were beyond her expertise.  Thus, as evidenced by her own admissions, the actions that Conley has attempted to portray at the July 28, 2004 hearing as improper were in fact benign and known to Conley as such.  While Conley feigned fear of reprisal for her testimony, there was nothing about her testimony that could be construed as a report of wrongdoing against OCY or her supervisor.  The only wrongdoing in any way related to the July 28, 2004 hearing was Conley unilaterally initiated contact with opposing counsel to undermine the position of her employer.

**B.      CONLEY'S "WHISTLEBLOWER" CLAIMS MUST BE DISMISSED.**

**Conley has failed to present sufficient facts to make out a prima facie case under the Whistleblower Law.**

Pennsylvania's Whistleblower Law, 43 P.S. § 1421, et seq., requires a plaintiff to satisfy two clear, and stringent, tests in order to present a prima facie case of actionable termination.  First, the plaintiff must establish that he or she made a good faith report of wrongdoing prior to his or her termination.  43 P.S. § 1423(a).  Second, the plaintiff must show,

with concrete facts, that his or her good faith report of wrongdoing led to the termination.

Golaschevsky v. Dept. of Env. Prot., 720 A.2d 757, 759 (Pa. 1998). Despite Conley's desire to

don the moniker of "whistleblower," she has fallen woefully short of meeting her evidentiary and

factual burden.

 Conley has characterized two of her utterances as "reports of wrongdoing" in an

attempt to support her Whistleblower claim. The first of these was her testimony at the July 28,

2004 hearing; the second was her anonymous, and unfounded, complaint against PW. Each of

these "reports" fails to support her Whistleblower claim.

 **i. Conley's July 28, 2004 testimony was not a report of "wrongdoing" within the meaning of the Whistleblower Law.**

 Wrongdoing is a defined term in Pennsylvania's Whistleblower law:

> **"Wrongdoing."** A violation which is not of a merely technical or minimal nature of *a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics* designed to protect the interest of the public or the employer

43 P.S. § 1422 (emphasis supplied).

 Violations of internal policies, unwritten directives, or tort-like activities are not

"wrongdoing" under the Whistleblower law. Connor v. Clinton County Prison, 963 F.Supp. 442,

451 (M.D. Pa. 1997); Riggio v. Burns, 711 A.2d 497, 502 (Pa. Super. Ct. 1998). The

Whistleblower law is "inapposite" to reports of this type of conduct. Connor, 963 F.Supp at 451.

Thus, a prison employee's report that prisoners were released without the appropriate paperwork

being filled out was, at most, a report of the violation of an internal policy. Id. Such a violation

does not trigger protection under the Whistleblower law. Id.

In her July 28, 2004 testimony, Conley testified that a report she prepared in the C Case was changed by her supervisor. In her complaint, and throughout this action, Conley has claimed that this testimony was a report of wrongdoing under the Whistleblower Law. However, Conley's own testimony, and the uncontroverted testimony of all relevant witnesses in this matter, establish that Conley's testimony did not report any "wrongdoing." Conley admitted, both at the July 28, 2004 hearing and during her deposition in this case, that the "alterations" made to her C Case court summary were not wrongful. Conley's court summary was reviewed by her supervisor and, after a collaborative discussion between Conley and that supervisor, Conley made various changes to her court summary. This "edited" court summary was then submitted to Court. This procedure is entirely appropriate and, certainly, does not violate any "Federal or State statute or regulation . . . political subdivision ordinance or regulation or . . . code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. §1422.

By her own admission, Conley's testimony in the C Case did not involve the report of any "wrongdoing" within the meaning of the Whistleblower Law. Therefore, that testimony cannot support Conley's Whistleblower claim.

ii.   **Conley's complaint against PW did not lead to the request for Conley's resignation.**

Conley also claims that her Childline complaint against PW was a report of wrongdoing that led to the request for her resignation. Even if the PW complaint is construed as a complaint of "wrongdoing" within the meaning of the Whistleblower Law, Conley has failed to show any causal connection between that complaint and her termination.

Under the Whistleblower Law, a plaintiff must show that his or her good faith report of wrongdoing "led to [his or her] dismissal." 43 P.S. § 1424(b). This causal requirement

is more stringent than the requirement under a First Amendment retaliatory discharge claim.

Cavicchia v. Philadelphia Housing Authority,  No. Civ. A. 03-0116, 2003 WL 22595210, *15

(E.D.Pa. 2003), affirmed by, Cavicchia v. Philadelphia Housing Authority, 137 Fed. Appx. 495

(3d Cir. 2005).  The Pennsylvania Supreme Court has succinctly stated the heavy burden faced

by plaintiffs in satisfying the causal element under the Whistleblower Law as follows:

> [T]o make out a prima facie case of retaliatory
> termination pursuant to the Whistleblower Law, a
> plaintiff must "show by concrete facts or
> surrounding circumstances that the report [of
> wrongdoing or waste] led to [the plaintiff's]
> dismissal, such as that there was specific direction
> or information received not to file the report or
> [that] there would be adverse consequences because
> the report was filed."

Golaschevsky v. Dept. of Env. Prot., 720 A.2d 757, 759 (Pa. 1998) quoting Gray v. Hafer, 651

A.2d 221, 225 (Pa. Cmwlth. Ct. 1994).  The stringent nature of the Law's causation requirement

is illustrated by the fact that evidence of spoken animus, changes in work assignments and

substantial changes in performance evaluations shortly after a report of wrongdoing are

insufficient to satisfy this causal element.  See Golaschevsky, 720 A.2d at 761-62 (Nigro

concurring).

In this case, Conley has not presented even a scintilla of evidence, or a single fact,

to link her anonymous, and unfounded, complaint against PW to her termination.  Conley has not

even come forward with the type of "vague or inconclusive circumstantial evidence" that is

insufficient under the Whistleblower Law.  Golaschevsky, 720 A.2d at 759.  Because Conley has

failed to present a single piece of evidence showing that her PW complaint led to the request for

her resignation, that complaint is also insufficient to support her Whistleblower claim.

IV.    **CONCLUSION**

For the reasons set forth above and in the motions for summary judgment and supporting papers filed on behalf of the co-defendants, which motions and papers are hereby incorporated by reference, the County of Erie and the individual defendants in their official capacities respectfully request that the Court enter summary judgment in their favor and against the plaintiff on all claims of the Complaint.  No genuine issue of material fact remains for trial and these defendants are entitled to judgment as a matter of law.

RESPECTFULLY SUBMITTED,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.


BY: /s/  Richard A. Lanzillo, Esq.
　　　　Richard A. Lanzillo, Esquire
　　　　Neal R. Devlin
　　　　120 West Tenth Street
　　　　Erie, PA  16501
　　　　Telephone (814) 459-2800
　　　　Facsimile (814) 453-4530
　　　　Email rlanzillo@kmgslaw.com
　　　　PA53811

# 665430