IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| ABBY B. CONLEY, | ) Docket No. 05-76E |
| | ) (SEAN J. MCLAUGHLIN) |
| Plaintiff, | ) |
| | ) ELECTRONICALLY FILED PLEADING |
| vs. | ) |
| | ) JURY TRIAL DEMANDED |
| COUNTY OF ERIE, ERIE COUNTY | ) |
| OFFICE OF CHILDREN AND YOUTH, | ) CONCISE STATEMENT OF MATERIAL |
| a/k/a ERIE COUNTY CHILD WELFARE | ) FACTS OF DEFENDANT COUNTY OF ERIE |
| SERVICE, RICHARD SCHENKER, | ) IN SUPPORT OF MOTION FOR SUMMARY |
| individually and in his capacity as County | ) JUDGMENT |
| Executive of Erie County, Pennsylvania, | ) |
| PETER CALLAN, individually and in his | ) Counsel of record for this party: |
| capacity as Erie County Director of | ) |
| Personnel, DEBRA LIEBEL, individually | ) Richard A. Lanzillo, Esq. |
| and in her capacity as Executive Director, | ) Knox McLaughlin Gornall |
| Erie County Office of Children and Youth, | ) & Sennett, P.C. |
| a/k/a Erie County Child Welfare Service | ) 120 West 10th Street |
| and JOHN A. ONORATO, ESQUIRE, | ) Erie, PA 16501 |
| individually and in his capacity as Erie | ) Telephone (814) 459-2800 |
| County Solicitor, | ) Facsimile (814) 453-4530 |
| | ) Email rlanzillo@kmgslaw.com |
| Defendants | ) PA53811 |

**CONCISE STATEMENT OF MATERIAL FACTS OF DEFENDANT
COUNTY OF ERIE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants, the County of Erie, Office of Children and Youth, and individual defendants Richard Schenker, Peter Callan, and Debra Liebel, in their official capacities, through their counsel, Knox McLaughlin Gornall & Sennett, P.C., file the following as the Concise Statement of Material Facts in support of their Motion for Summary Judgment:

A. **Conley's Background and Confidentiality Obligations**

1       Prior to her tenure at OCY, plaintiff, Abby Conley ("Conley") moved from job to job in various departments of the County of Erie. In 2000, after taking a leave of absence, Conley used her seniority rights under her Union contract to bid into a position as a "social service aide" or "case aide" for the Erie County Office of Children and Youth ("OCY"). (Conley Deposition, pp 52-70, App. Ex. 4).

2.      The position of case aide is a non-professional position requiring no education or training in social work or mental health. The basic responsibilities of a case aide are to assist case workers in supervising and documenting visits between children and their natural parents or guardians. (Conley Deposition, pp 79-86, App. Ex. 4).

3.      Like all employees of OCY, especially those employees whose responsibilities involve interaction with and documentation regarding at-risk children, case-aides are required to comply with OCY policies and applicable laws regarding confidentiality. The critical importance of confidentiality is pervasive throughout OCY's policies, including in the following policy statements:

- "Confidentiality of client information is a most important requirement to be followed by all agency staff. Staff members must maintain confidentiality under agency policy, Department of Public Welfare Regulations, and Child Protective Services Law (Act 124)."

- "Information on clients is confidential and is not to be discussed with friends or others outside the agency."

(OCY Confidentiality Policy, Conley Deposition Exhibit 1).

4.      Pennsylvania Department of Public Welfare Regulations, which OCY's policy expressly incorporates, provide the following guidance to county agency staff members regarding confidentiality:

2

> Information that may be used to identify the child or the parents by name or address, and information contained in the case record, is confidential. A staff person may not disclose or make use of information concerning the child or the parents other than in the course of performance of his duties.

55 Pa. Code §3130.44(a).

5. The regulations further articulate the limited circumstances under which confidential information can be released:

> Information obtained by the county agency or Department in connection with general protective services may only be released as follows:
>
> (1) Under §3130.44 (relating to confidentiality of family case records).
> (2) To another county agency.
> (3) To an official of an agency of another state that performs general protective services analogous to those services performed by county agencies or the Department in the course of the official's duties.

55 Pa. Code §3490.242.

6. Pennsylvania's Child Protective Services Law (Act 124) also addresses the importance of confidentiality.

> Except as otherwise provided in this subchapter, reports made pursuant to this chapter, including, but not limited to, report summaries of child abuse and written reports made pursuant to section 6313(b) and (c) (relating to reporting procedure) concerning alleged instances of child abuse in the possession of the department or a county agency shall be confidential.

23 Pa. C.S.A. §6339.

**B.     Conley's funneling of confidential information to third parties and their attorneys**

    **i.     Deanna Cosby and the VW case**

7.     In July, 2004, Attorney Catherine A. Allgeier contacted Debra Liebel, the former executive director of OCY, and expressed concerns about Conley breaching confidentiality by emailing information to a former employee. (Deposition of Debra Liebel, pp. 6, 31, App. Ex. 7).

8.     In addition, Michael Cauley, the Solicitor for OCY, also brought concerns to the attention of Debra Liebel regarding the release by Conley of confidential information to an opposing attorney. (Deposition of Debra Liebel, pp. 37-38, App. Ex. 7).

9.     These concerns prompted OCY to commission a forensic review of Conley's computer email. Although Conley had attempted to conceal her activities by deleting emails from her computer, an outside computer expert successfully retrieved a vast cache of her illegal and improper communications. These emails included dozens of messages containing confidential client and case information transmitted by Conley to Deanna Cosby, a former case worker who had left OCY several months earlier. Cosby's agenda regarding OCY was unambiguously stated in the following email she sent to Conley on May 25, 2004:

> …[I] don't like ecocy [OCY] an[d] would do
> ANYTHING to see it go down in flames!!!!!

(Series of emails between Conley and Cosby dated May 24-25, 2004, App. Ex. 12 (emphasis in original)).

10.     Many of Conley's emails related to VW, a woman who already had two children under the supervision of OCY, and who was pregnant with her third child. Conley was the case aide assigned to VW. Cosby previously acted as the case worker for VW and her

4

children. However, any legitimate involvement on the part of Cosby in VW's case had ended months earlier when, in February, 2004, Cosby left OCY and moved to North Carolina. (Conley Deposition, p. 134, App. Ex. 4).

11. As of her departure from OCY, Cosby had no right to receive information concerning VW's case or OCY's plans for handling that case. (Deposition of Shara Saveikis, Pa. Dept. of Public Welfare, pp. 104-105, 128-129, App. Ex. 3; Deposition of Debra Liebel, pp. 57-58, App. Ex. 7).

12. For the protection of VW's unborn child, OCY had obtained from the Court of Common Pleas of Erie County, Pennsylvania an ex parte Order commonly known as a "Prognostic Detention Order." A Prognostic Detention Order directs area hospitals to immediately detain and surrender a child to "the protective and physical custody of the Erie County Office of Children and Youth" immediately upon the birth of the child. The Prognostic Detention Order for VW's unborn child was issued on May 27, 2004. (Order of Court dated May 27, 2004, App. Ex. 27).

13. Once issued, an ex parte Prognostic Detention Order is delivered to area hospitals to ensure the detention of the baby, but such an Order is rarely disclosed to the mother of the unborn child until after the birth of the child. The existence of the Order is generally withheld from the mother prior to the birth of the child because disclosure may prompt the mother to leave the jurisdiction or even harm the unborn child prior to birth. (Liebel Deposition, pp. 57, 91, App. Ex. 7; Deposition of Michael Cauley, pp.12, 18-19, App. Ex. 8; Deposition of PW, p.79, App.Ex. 31).

14. Only where the Unit Supervisor and the other members of the staff assigned to the case agree that there is no risk of flight or harm to the unborn child will OCY

disclose the existence of the order to the mother. (Affidavit of Mary Jo Cline Szewczyk, ¶¶2-4, App. Ex. 29).

        15.       In an email dated May 27, 2004, Conley advised Cosby as follows:

> Deanna, [VW's] attorney wants you to call her[.] the number is 814-868-8541. The attorney's name is Amy Jones. [VW] asked me to ask if you would do this.

(Email exchange between Conley and Cosby dated May 27, 2004, App. Exhibit 13).

        16.       Conley's desire to avoid detection of her communications to persons outside of OCY is reflected in the following exchange of email messages between Conley and Cosby on June 4, 2004:

| | |
|---|---|
| Cosby: | did you call my cell phone last night |
| Conley: | Yes I did, I REALLY wanted to tell you something! I don't trust this email system (monitored). |
| Cosby: | Can someone say …."paranoid" |
| Conley: | Paranoid! |
| Cosby: | w/justification |
| Conley: | I have learned not to trust! Zin, the new girl is awesome. She is Christian, normal, and believes in empowerment. God sent her to this unit. I can tell she is going to be one of us.! |

(Email exchange between Conley and Cosby commencing on June 4, 2004, App. Exhibit 14).

        17.       As part of the same exchange of email messages, Conley and Cosby then discussed one of the means whereby Conley would pass information to VW and her lawyer:

| | |
|---|---|
| Cosby: | Do you think I'm wrong for wanting to help VW? |
| Conley: | No. I want you to help her. I'm crushed by what is going to happen. Its just not right Deanna. |

6

Cosby: I'm not if you personally think it's right or maybe i am but from a christian standpoint.

Conley: When you we're talking about Esther today, I though about what you said. I think too even though things look bad, and God can make things right, I often think sometimes God expects us to do what's right. **Facts are this: [PW, the case worker assigned to VW's case] has severe mental health issues, Sue [Conley's Unit supervisor] does not have the professional aptitude to make the call that she has on VW. In fact these two ladies are taking it upon them self to play god.** I sit on my hands, while I know what their doing is wrong. Who's sin is greater, theirs or mine?

Cosby: You know I'm not in a position to judge who's sin is greater I don't even believe I can weigh it that way aren't all sins equal in the eyes of the Lord? What you're doing is not a sin because you did speak up, several times in vw's defense but what I'm asking is in your christian experience would I be wrong if I tried to help

Conley: Your in a better position than I!

Cosby: there is a new kinship policy that was issued in 12/03 that I remember and might still have a copy of to forward it to the att. It states that the cw can do an "eyeball" check rather than the home study rather than place the baby in foster care but I remember when I tried to do that and had the documentation to back it up sue wouldn't let me so I'm going to tell vw's att. about it.

Conley: **I just spoke to [VW] last night, she was not in labor. Her attorney told [VW] that she has nothing to worry about when it comes to the unborn child. She told [VW] that we (OCY) cannot detain. [VW] is taking her attorney advice, she is due any day. [PW, the case worker assigned to VW's case] has detention letters at all the local hospitals. [VW] does not see this coming.**

Cosby: **she will**

Conley: **God Bless you Deanna!** We are in the paper again today and in the letter to the Editor.

Cosby: **thanks, but for what**

7

<u>Conley</u>:        **You said (she will) VW**

(Email exchange between Conley and Cosby dated June 4 & 7, 2004 (emphasis supplied), App. Ex. 14).

18.     This exchange of email establishes the following facts:  (1) Conley was acting as a conduit to funnel information regarding VW's case to Cosby, VW and VW's attorney; (2) Conley believed that VW was unaware of the Prognostic Detention Order, or, in Conley's words, VW "does not see this coming"; (3) Conley received Cosby's assurance that "she [VW] will" be told of the Order; (4) In response to Cosby's assurance, Conley immediately replied, "God Bless you Deanna!"  Having analyzed the situation from a "Christian standpoint," Conley concluded that PW, the case worker assigned to VW "ha[d] severe mental health issues," and that Sue, the Unit Supervisor responsible for VW's case, "d[id] not have the professional aptitude to make the call that she has on VW."  Based on this analysis, Conley elected to overrule her superior's positions regarding VW's case.

> **ii.     VW's confirmation that Conley and Cosby followed-through on their plan.**

19.     In contemporaneous correspondence and in her deposition, VW confirmed the final link in the chain of unauthorized, illegal and unethical communications that began with Conley's email messages to Cosby and ended with Conley's intended recipient, VW.  On June 5, 2004, *a mere one day after Conley told Cosby that "[VW] does not see [the Detention Order] coming," and Conley blessed Cosby for agreeing to warn her*, VW wrote a letter to RB, her incarcerated boyfriend and father of her unborn child, which stated:

> The reason Deanna [Cosby] called me is <u>to warn me that they are going to detain [M, VW's unborn child] and they are trying to put her in a foster home rather than with your mom.  She actually suggested</u>

8

<u>that I leave town and have the baby</u>. But if I miss a visit with my kids, [PW] will use that as abandonment, so I wouldn't even know where to go or how to time it.

(Deposition of VW, pp. 27-28 and VW Deposition Ex. 2 (emphasis supplied), App. Ex. 32).

20.     VW also confirmed that Conley's indirect passage of confidential information through Cosby was actually part of a much broader pattern of illegal communications that completely destroys Conley's claim of good faith. VW testified that, on June 3, 2004, Conley advised her that "[PW, her case worker,] and Sue [the OCY Unit Supervisor] had a meeting about [VW] and that she's mad because they are working against [VW] instead of for [VW]." (Deposition of VW, pp. 21-22, App. Ex. 32).

21.     Conley also told VW that PW and Sue "are going to put up a fight against [VW] and that [PW] will probably be at most of my visits from now on…." (Deposition of VW, p. 23, App. Ex. 32). VW also acknowledged that she "wrote a three page letter to [her] attorney telling her what [Conley] and Leslie [a non-OCY employee] had said." (Deposition of VW, pp. 23-24, App. Ex. 32).

22.     VW memorialized these communications from Conley in a letter dated June 3, 2004, to RB, the incarcerated father of her unborn child. (Deposition of VW, pp. 21-22 and VW Deposition Ex. 1, App. Ex. 32).

23.     The foregoing establishes that Conley systematically leaked information to VW and her attorney in an effort to undermine the efforts of the OCY personnel assigned to her case.

      **iii.    Conley's private meetings with VW and her attorney to assist them in opposing OCY.**

24.    In her deposition, VW's former counsel, Attorney Amy Jones, admitted that during this same May-June 2004 timeframe, Conley met with her privately at her law office to assist her in her representation of VW against OCY. (Deposition of Amy Jones, pp. 22-23, 41, App. Ex. 34).

25.    Attorney Jones refused to disclose the substance of the information that Conley shared with her. Attorney Jones based this refusal on a claim of privilege. However, Attorney Jones did acknowledge that the information she obtained from Conley was utilized in connection with her representation of VW. (Deposition of Amy Jones, pp. 45-46, App. Ex. 34).

26.    Attorney Jones testified that she has never represented Conley as her counsel, but she did acknowledge that she referred Conley to one of the lawyers currently representing her in this case. (Deposition of Amy Jones, pp. 22, 26, App. Ex. 34).

**C.    Conley's calculated effort to undermine OCY's position in the C Case by passing information to counsel for an adverse party.**

27.    Conley was assigned as the case aide in a matter involving the detention of twin infant girls who were born on September 12, 2002. For purposes of this brief, this case is referred to as the "C Case." Soon after their birth, both infant girls were adjudicated dependent as each had broken bones and displayed other signs of possible child abuse. (Affidavit of Gerald J. Villella, ¶2, App. Ex. 33).

28.    The pleadings filed by OCY in the C Case asserted that the parents of the twins could not be ruled out as perpetrators of the suspected abuse. (See Deposition of Richard A. Vendetti, Esq., Deposition Ex. 1, App. Ex. 30).

10

29. On July 28, 2004, Conley appeared as a witness in a hearing in the C Case. Unbeknownst to OCY, Conley had contacted Attorney Gerald Villella, the attorney representing the mother of the children in the C Case, and advised Attorney Villella that she had information that could be useful to his client's position. Specifically, Conley told Attorney Villella that she possessed an original draft of a court summary that she had prepared for the C Case and that the version in her possession was more favorable to his client's position than the final court summary that had been submitted by to the Court OCY. Conley offered to provide Attorney Villella with the original draft of the summary. (Affidavit of Gerald J. Villella, ¶¶ 4-6, App. Ex. 33).

30. Immediately prior to the July 28, 2004 hearing in the C Case, Conley physically delivered her draft summary to Attorney Villella. Attorney Villella proceeded to call Conley as a witness in support of the mother and examined her regarding the differences between the original draft and the final version of her summary. (Affidavit of Gerald J. Villella, ¶¶ 7-8, App. Ex. 33).

31. However, during her hearing testimony, Conley admitted that revisions to such summaries before they are finalized are neither unusual nor improper, that Conley's supervisor had specifically discussed the revisions at issue with her, and that her supervisor had reminded Conley that she was not to include opinions in her summaries that were beyond her expertise. (Transcript of Hearing Testimony of Abby Conley dated July 28, 2004, pp.76-81, App. Ex. 6).

### D. OCY's discovery of Conley's email activities and decision to offer Conley the option of resignation or termination.

32. In July, 2004, Attorney Catherine A. Allgeier, a member of the OCY legal staff, contacted Debra Liebel, the former executive director of OCY, and expressed concerns about Conley's apparent breach of confidentiality by emailing information to a former employee. (Deposition of Debra Liebel, pp. 6, 31, App. Ex. 7).

33. In addition, after the July 28, 2004 hearing, OCY Solicitor Michael Cauley advised Liebel of his concerns regarding Conley's release of confidential information to an opposing attorney. (Deposition of Debra Liebel, pp. 37-38, App. Ex. 7).

34. Based upon these concerns, OCY promptly retained an outside expert to examine Conley's computer and attempt to retrieve her deleted email messages. Shortly before August 20, 2004, OCY received the results of the expert's investigation, which revealed the exchange of email messages detailed above. (Deposition of John Onorato, pp. 60, App. Ex. 35; Liebel Deposition, pp. 97, App. Ex. 7).

35. On or about August 20, 2004, Debra Liebel, the director of OCY, Michael Cauley, OCY Solicitor, John Onorato, Erie County Solicitor, Peter Callan, County Personnel Director, and Ann Bloxdorf, the Director of Administration met to discuss the results of the expert investigation and determine what, if any, employment action should be taken against Conley. After reviewing the email messages retrieved by the expert, the participants in the meeting agreed that Conley's outrageous breaches of confidentiality warranted her dismissal as an employee of OCY and the County. (Deposition of John Onorato, pp. 62-68, App. Ex. 35; Liebel Deposition, pp. 95-97, App. Ex. 7).

36. Some of the participants recognized that this decision would undoubtedly draw the attention of the local press. The participants also recognized that the ability of OCY to defend its action in the press was severely limited by the confidentiality that it maintains regarding personnel matters and that, while the facts clearly warranted Conley's termination, the decision would likely prompt significant political fallout and further negative press coverage. (Deposition of Richard Schenker, pp. 11-12, App. Ex. 36; Deposition of Debra Liebel, pp. 95-97, App. Ex. 7; Deposition of John Onorato, pp. 67-68, App. Ex. 35).

37. Based upon these concerns, Onorato, Liebel and Callan met with County Executive Rick Schenker to advise him of the decision and forewarn him of the press coverage and potential political fallout that were likely to follow the decision. Onorato, Liebel and Callan informed Schenker that they had determined that Conley had engaged in serious breaches of confidentiality that they concluded warranted termination, but acknowledged that the press would likely misconstrue the decision as motivated by other factors. Schenker advised Onorato, Liebel and Callan to "do the right thing" according to OCY policy and state law regarding confidentiality without regard to the political fallout that the decision might prompt or any misinterpretation that the press might attach to the decision. (Deposition of Richard Schenker, pp. 15, 22, App. Ex. 36; Liebel Deposition, pp. 98-99, App. Ex. 7).

38. On September 10, 2004, Onorato, Callan, and Liebel met with Conley and a Union representative for Conley and informed Conley of the discovery of her breaches of confidentiality. (Deposition of John Onorato, pp. 74-75, App. Ex. 35).

39. Conley was offered the opportunity either to resign her employment, in which case, the County would not oppose her claim for unemployment compensation benefits,

13

or, if Conley declined the resignation option, the County would proceed with termination. (Deposition of Debra Liebel, p. 20, App. Ex 7).

      40.    Conley opted for resignation and signed a resignation letter confirming that decision. (See Conley's resignation letter dated September 10, 2004, App. Ex. 1).

    **E.**    **The Pennsylvania DPW investigation of Conley's unfounded claim of child abuse against PW.**

      41.    Conley claims that the decision to give her the option of resignation or termination was in retaliation for an anonymous complaint of child abuse that Conley had lodged against PW, an OCY case worker, through the Department of Public Welfare's "Childline." Conley made her report to Childline on June 21, 2004, almost two weeks after she allegedly observed PW grab a child by the face and shake her from side to side. (Commonwealth of Pa., Dept. of Public Welfare letter dated August 30, 2004, App. Ex. 2).

      42.    This report prompted an investigation by the Pennsylvania Department of Public Welfare, the Commonwealth agency with regulatory and licensing authority over OCY and other county child social service agencies. (Deposition of Shara B. Saveikis, pp. 66-77, App. Ex. 3).

      43.    After investigating the report and interviewing Conley and PW, and observing the child's interaction with each, Shara B. Saveikis, Regional Program Representative for the Department of Public Welfare, determined that Conley's report was "unfounded."[1] (Commonwealth of Pa, Dept. of Public Welfare letters dated July 2, 2004 and August 30, 2004, App. Ex. 2; Deposition of Shara B. Saveikis, pp.78-79, App. Ex. 3).

---

[1] In her deposition, Saveikis also emphasized the critical importance of confidentiality and the serious breach of confidentiality that would result if an OCY employee were to communicate information regarding a pending case to a third party as Conley did regarding the VW case. (Deposition of Shara B. Saveikis, pp. 82-83, 123-124, App. Ex. 3).

44. After interviewing Conley, Saveikis also advised OCY that Conley's statements, behavior and affect raised serious concerns regarding her credibility and her suitability to serve as a case aide. (Deposition of Shara B. Saveikis, pp. 75-82, App. Ex. 3).

45. Among other things, Saveikis specifically observed:

> Throughout an approximate 30 minute interview, Ms. Conley's affect appeared to be labile. Her demeanor vacillated from speaking in a childlike manner, to that of an articulate, knowledgeable professional, to bouts of crying, laughter and angry tones. This vast repertoire of behavior recurred several times during the course of this interview.

(Commonwealth of Pa, Dept. of Public Welfare letter dated August 30, 2004, App. Ex. 2).

46. The record is devoid of any evidence that Conley's report to Childline or her testimony in the C Case played any role in the decision to offer her the choice of resignation or termination.

47. At all times relevant to this action, the County of Erie has maintained two distinct, but harmonious policies. As discussed in detail above, OCY maintained an important policy regarding the confidentiality of case-related information. At the same time, the County also maintained a policy of encouraging "whistleblower" activity. (Deposition of Rick Schenker, pp. 18-19, App. Ex. 36).

48. The Erie County Home Rule Charter, as codified in the Pennsylvania Code, provides that the County Executive shall have the power to "[a]ppoint, suspend or remove any County employe…." 325 Pa. Code §1-3.5(D).

        RESPECTFULLY SUBMITTED,

        KNOX McLAUGHLIN GORNALL &
        SENNETT, P.C.


BY: /s/ Richard A. Lanzillo, Esq.
      Richard A. Lanzillo, Esquire
      Neal R. Devlin
      120 West Tenth Street
      Erie, PA  16501
      Telephone (814) 459-2800
      Facsimile (814) 453-4530
      Email rlanzillo@kmgslaw.com
      PA53811

# 666310