Appendix Exhibit 28

```
                                                                    Page 1
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   ABBY B. CONLEY,                  :
            Plaintiff                 :
 4                                    :
         v.                           :   Civil Action No. 05-76E
 5                                    :
     COUNTY OF ERIE, ERIE COUNTY      :
 6   OFFICE OF CHILDREN AND YOUTH,    :
     a/k/a ERIE COUNTY CHILD          :
 7   WELFARE SERVICE, RICHARD         :
     SCHENKER, individually and       :
 8   in his capacity as County        :
     Executive of Erie County,        :
 9   Pennsylvania, PETER CALLAN,      :
     individually and in his          :
10   capacity as Erie County          :
     Director of Personnel, DEBRA     :
11   LIEBEL, individually and in      :
     her capacity as Executive        :
12   Director, Erie County Office     :
     of Children and Youth, a/k/a     :
13   Erie County Child Welfare        :
     Service, and JOHN A. ONORATO,    :
14   ESQUIRE, individually and in     :
     his capacity as Erie County      :
15   Solicitor,                       :
            Defendants                :
16

17

18         Deposition of MARY JO CLINE, taken before and

19    by Janis L. Ferguson, Notary Public in and for the

20    Commonwealth of Pennsylvania, on Thursday, April

21    6, 2006, commencing at 1:39 p.m., at the offices

22    of Timothy D. McNair, Esquire, 821 State Street,

23    Erie, Pennsylvania 16501.

24
                    Reported by Janis L. Ferguson, RPR
25                  Ferguson & Holdnack Reporting, Inc.
```

Page 2

1  For the Plaintiff:
      Timothy D. McNair, Esquire
2     821 State Street
      Erie, PA 16501
3
      Anthony Angelone, Esquire
4     Vendetti & Vendetti
      3820 Liberty Street
5     Erie, PA 16509
6  For the County of Erie, Erie County Office of Children and
   Youth, a/k/a Erie County Child Welfare Service:
7     Neal Devlin, Esquire
      Knox McLaughlin Gornall & Sennett, PC
8     120 West 10th Street
      Erie, PA 16501
9
   For the Defendants Richard Schenker, Peter Callan, and Debra
10 Liebel:
      Edmund R. Joyal, Jr., Esquire
11    Law Office of Joseph S. Weimer
      975 Two Chatham Center
12    Pittsburgh, PA 15219
13 For the Defendant John A. Onorato, Esquire:
      Sara E. Baugh, Esquire
14    Dell Moser Lane & Loughney, LLC
      525 William Penn Place
15    Suite 3700
      Pittsburgh, PA 15219
16
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X
2
3  TESTIMONY OF MARY JO CLINE
4     Direct examination by Mr. Angelone ........ 4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    MARY JO CLINE SZEWCZYK, first
2  having been duly sworn, testified as follows:
3
4              DIRECT EXAMINATION
5  BY MR. ANGELONE:
6
7     Q.  Please state your name for the record.
8     A.  Mary Jo Cline Szewczyk, S-Z-E-W-C-Z-Y-K.
9     Q.  Married name?
10    A.  Yes.  I go by my maiden name at work.
11    Q.  All right.  And I already introduced myself prior
12 to this.
13    A.  Um-hum.
14    Q.  I'm going to be asking you some questions.  I'm
15 not sure if you have ever done a deposition before.
16    A.  I have.
17    Q.  So you're somewhat familiar with it then?
18    A.  Yes.
19    Q.  I'm going to be asking you some questions.  And
20 one thing I'm going to ask you, first of all, is that you
21 please state your answers verbally so the court reporter can
22 take down everything that you say.  Sometimes we have a
23 tendency to nod with our head or -- in responding to a
24 question, and, obviously, she can't really take that down.
25 So if you can make sure all your responses are verbal.  And

Page 5

1  then also if for some reason you don't understand the
2  question I'm asking you, please tell me or ask me to restate
3  it.  Otherwise, I'm going to assume -- if you do answer, I'm
4  going to assume that you did understand the question and
5  that your answer is responsive to that question.  Okay?
6     A.  Okay.
7     Q.  All right.  Let's start off with your employment.
8  Where are you currently working?
9     A.  Erie County Office of Children and Youth.
10    Q.  What is your capacity?  In what capacity do you
11 work?
12    A.  I'm a casework supervisor.
13    Q.  How long have you worked with the Office of
14 Children and Youth?
15    A.  I did an internship in September 1983 and was
16 hired in August of '84.
17    Q.  You have been there since 1984 -- or 1983?
18    A.  Yes.
19    Q.  Okay.  When did you become a supervisor?
20    A.  1995.
21    Q.  And the position that you had in 1995 is the same
22 position that you have today?
23    A.  Basically.
24    Q.  What has changed in that?
25    A.  After being a supervisor eight years, you become a

Page 6

1  senior supervisor. And then through practice areas, I
2  became a clinician as a supervisor. So it's just a little
3  bit elevated.
4    Q.  All right. For practical purposes do you still
5  perform the same functions as you did in 1995?
6    A.  Yes.
7    Q.  The positions that you described -- or the
8  elevated positions that you described, do they have more to
9  do with, I guess, pay structure?
10   A.  Pay structure, and the clinician also has a
11 specialty that I'm in charge of staff retention. And don't
12 say anything about the current state of things. It's not my
13 fault.
14   Q.  The staff -- that position, when did you become
15 elevated to that -- clinician?
16   A.  The summer of '05.
17   Q.  I'm sure you're familiar with why you're here
18 today.
19   A.  Yes.
20   Q.  It has to do with a case -- Attorney McNair and
21 myself represent Abby Conley relative to the circumstances
22 surrounding her termination --
23   A.  Correct.
24   Q.  -- from the Office of Children and Youth.
25   A.  Yes.

Page 7

1    Q.  In your capacity as a supervisor, did you have the
2  opportunity to work with Abby Conley?
3    A.  Yes. I wasn't her direct supervisor, but I -- I
4  knew who she was, yes.
5    Q.  At any point in time did you act in the capacity
6  as her direct supervisor?
7    A.  Through the structure of the agency, there's a
8  covering supervisor, so if her direct supervisor would have
9  been out and she needed something, she would come to the
10 covering supervisor, which could have been me, yes.
11   Q.  Okay. Well, in your capacity as supervisor, and
12 with your familiarity with Abby Conley at work, were you
13 able to at any time, I guess, observe her work performance?
14   A.  Not directly. I mean, she would come if she had a
15 question that particular day. But I would not have read any
16 of her documents or gotten case reports from her, no.
17   Q.  Did you ever have the opportunity to work with
18 [P.W.]?
19   A.  Yes.
20   Q.  I think we have agreed for purposes of the
21 deposition that I'm going to refer to her by initial,
22 because that's how it's going to be typed out. Okay?
23       MR. DEVLIN: Do you understand?
24       THE WITNESS: P.W.?
25       MR. ANGELONE: P.W., yes.

Page 8

1    Q.  I guess from what I understand in the Office of
2  Children and Youth, it's broken down into units?
3    A.  That's correct.
4    Q.  And would P.W. ever have been in the same unit
5  that you were in?
6    A.  Yes.
7    Q.  And if I understand correctly, then, that would
8  have made you her direct supervisor?
9    A.  Originally we were in the same unit as
10 caseworkers, and then I was promoted, and then I became her
11 supervisor, yes.
12   Q.  And do you recall for how long a period of time
13 you were her supervisor?
14   A.  I became her supervisor in December of '95. And I
15 think it was until 2001, maybe, 2002. I'm not positive.
16   Q.  Okay. What happened in 2001 or 2002 that changed
17 that?
18   A.  She transferred into a different department.
19   Q.  A different department or a different unit?
20   A.  Different unit.
21   Q.  Okay. But still doing the same type of job that
22 she was doing while she was under your supervision?
23   A.  Well, the reason I said different department is at
24 that time we had a little bit of a different structure, and
25 that was the placement department. So she transferred to

Page 9

1  that unit because it's a different kind of case that you're
2  involved in. It's not quite as stressful.
3    Q.  Okay. And so the unit -- or department that you
4  were in, then, would have been for what?
5    A.  It's called in-home protective services.
6    Q.  Is it that she transferred because she wanted to
7  be transferred to a different unit?
8        MR. DEVLIN: Object to form. You can answer.
9    A.  She chose that on her own.
10   Q.  And in your capacity as her supervisor, you were
11 able to become familiar with her work performance?
12   A.  Yes.
13   Q.  With respect to P.W., during the time that you
14 were her supervisor, did you at any time become aware of any
15 complaints about her from any third parties outside the
16 agency?
17   A.  Yes.
18   Q.  And did any of these complaints have to do with
19 her conduct?
20   A.  Yes.
21   Q.  Would these complaints -- who would these
22 complaints have come from?
23   A.  One was from -- I believe it was a foster parent,
24 and one was from another service provider.
25   Q.  There were only two?

Page 10

1  A. That I can recall.
2  Q. That you can recall?
3  A. That I can specifically recall, yes.
4  Q. Okay. And, now, if I understand correctly, this
5  is during the time frame between 1995, when she first worked
6  under your unit --
7  A. Yes.
8  Q. -- through 2001 or '2 when she left?
9  A. That's correct.
10  Q. Can you tell me or describe for me what the
11  complaint was from the foster parent.
12  A. When a foster child returned to the foster home,
13  he had stated some concerns that he had with the caseworker,
14  and so the foster mother was calling to report that.
15  Q. Okay. What were the concerns?
16  A. He said that [P.] slapped him in the face.
17  Q. How old was this child?
18  A. I really don't remember. I believe nine or 10,
19  but I can't swear to it.
20  Q. Okay. And was this incident reported to anyone
21  else?
22  A. Yes.
23  Q. Who would that have been reported to?
24  A. My direct supervisor.
25  Q. Who would that have been at the time?

Page 11

1  A. Cheryl Bates.
2  Q. She's no longer there?
3  A. That's correct.
4  Q. Was there any type of an investigation done about
5  that?
6  A. I did an investigation.
7  Q. And what did that consist of?
8  A. I spoke to the alleged victim, his siblings, and
9  his mother, because this allegedly occurred during
10  visitation.
11  Q. Okay. Did anyone witness that?
12  A. The people that I --
13      MR. DEVLIN: Object. Object to form. Go ahead.
14  Q. Well, let me ask you this way: What did the
15  investigation turn out?
16  A. I'm not sure what you're asking.
17  Q. Well, you said you investigated by speaking to the
18  various individuals.
19  A. Yes.
20  Q. And I'm just wondering what it is that you learned
21  in the course of investigating and speaking with these
22  people.
23  A. The family was consistent in stating that P.W.
24  removed the child from the visitation room -- you know, took
25  him by the arm, took him out of the room, and had grabbed

Page 12

1  him by the face and slapped him on the face.
2  Q. Did anyone witness that; grabbing by the face and
3  slapping the face?
4  A. The mother and the siblings and the child. That's
5  why I spoke to them.
6  Q. Okay. And after you did your investigation --
7  well, did you report it to your supervisor before or after
8  you did that investigation?
9  A. I reported it immediately when I got the phone
10  call.
11  Q. And then did you report also the findings from
12  your investigation to your supervisor?
13  A. Yes, I did.
14  Q. And do you know, was there any other action that
15  was taken? Or what action was taken, I guess, to P.W. as a
16  result of this?
17  A. She was given a letter of reprimand.
18  Q. Was she suspended or anything?
19  A. She was not suspended.
20  Q. Was the Department of Public Welfare notified of
21  this?
22  A. There was no injury, and, therefore, they were not
23  notified. They are notified when there's an injury.
24  Q. Am I correct that if there is a letter of
25  reprimand that's put in a worker's file, that it eventually

Page 13

1  becomes expunged?
2  A. When a worker is given a letter of reprimand, it
3  goes in the file for one year. If there's no repeat offense
4  of that letter, you know, the reason for that letter, then,
5  yes, it's expunged from the personnel file.
6  Q. And do you recall the time frame that this
7  happened a little bit more specifically than -- I don't
8  know, than between 1995 and 2001?
9  A. I believe -- I think it would have been about
10  1998, '99, somewhere in there.
11  Q. Did you discuss the incident with P.W.?
12  A. Yes.
13  Q. And were you the one that gave her the written
14  reprimand?
15  A. Yes.
16  Q. You also indicated, I believe, that there was a
17  service provider?
18  A. That's correct.
19  Q. That also had a complaint?
20  A. Yes.
21  Q. And do you remember the time frame that that
22  complaint came in?
23  A. That was after the first, so '99, 2000.
24  Q. Going back to the slapping incident that you
25  described, did the victim at any point recant that that

Page 14

1  happened?
2      A.  No.
3      Q.  Was she eventually taken off of that unit that she
4  was working at with that family?
5          MR. DEVLIN:  Object --
6          MR. ANGELONE:  Yeah, let me rephrase that, because
7      it didn't come out right.
8      Q.  Was she taken off of that family or that child --
9  that particular case after that happened?
10     A.  To the best of my recollection, she was.
11     Q.  Okay.  Now, going to this other service provider
12 you indicated, which provider would it have been?
13     A.  Sarah Reed.
14     Q.  And what was the nature of that complaint?
15     A.  They had a child that was at their school with a
16 hand print, and when they questioned the mother regarding
17 that, she stated that she had notified P.W. the previous
18 night or the day before saying that she had slapped the
19 child and left this mark and that P.W. told her to put ice
20 on it and don't send the child to school the next day.
21     Q.  Do you remember roughly how old the child was?
22     A.  I'm guessing five or six.  I wouldn't swear to it,
23 but around that age.
24     Q.  And did you investigate that?
25     A.  It wasn't -- I mean, I talked to P.W. about it to

Page 15

1  see if that actually -- yes.
2      Q.  When you talked to her about it, did she deny that
3  it happened?
4      A.  No.
5      Q.  Did she admit that it happened?
6      A.  She admitted that it happened, but she did not
7  feel that she was a mandated reporter at that time, because
8  it wasn't an active case for her and because it was during
9  the evening.
10     Q.  Let me ask -- I'm just not sure I understand what
11 the allegation was.  You heard from Sarah Reed or --
12     A.  Um-hum.
13     Q.  -- someone from Sarah Reed, correct --
14     A.  Um-hum.
15     Q.  -- that a mother contacted Sarah Reed?
16     A.  Sarah Reed contacted the mother.
17     Q.  Okay.  The mother.  Because the child had an
18 imprint?
19     A.  A hand print, yes.
20     Q.  A hand print on his or her face?
21     A.  Yes.
22     Q.  So Sarah Reed contacted the mother to question
23 where the hand print came from?
24     A.  Right.
25     Q.  And the mother -- what was the response from the

Page 16

1  mother?
2      A.  The mother told the agency that she had contacted
3  P.W.
4      Q.  Right.
5      A.  And when they asked what she was told, they
6  said -- she said that P.W. told her to put ice on the injury
7  and not to send the child to school the next day.
8      Q.  Okay.  Did the mother imply that P.W. did that?
9      A.  No.
10     Q.  Was there any indication as to where -- or what
11 caused the hand print?  Was it from the mother?
12     A.  From the mother.  Absolutely.
13     Q.  All right.  And so you discussed this with P.W.
14 because she did not report it?
15     A.  Absolutely.  Yes, that's it.
16     Q.  So I'm trying to understand, though, what's the
17 nature of the complaint from Sarah Reed with respect to
18 P.W.'s conduct?
19     A.  Violation of the mandated reporter law.
20     Q.  Okay.  Going back to the incident with the foster
21 parent and the child that was slapped --
22     A.  Yes.
23     Q.  -- did she admit doing that when you talked to
24 her?
25     A.  She said that she may have grabbed his face to get

Page 17

1  his attention and might have just lightly tapped him to get
2  his attention (indicating).
3      Q.  But when you investigated it, you didn't
4  understand it to be a light tap, did you?
5          MR. DEVLIN:  Object to form.  You can answer.
6      A.  There was no injury.
7      Q.  Well, was the injury described to you by, for
8  example, the foster parent?
9      A.  Not by the foster parent.  She wasn't there.
10     Q.  Then by other witnesses.
11     A.  Everyone consistently said she grabbed him by the
12 face and slapped him.
13     Q.  Slapped him on both sides?
14     A.  See -- well, she said, I may have slapped him to
15 get his attention (indicating).  The other kid just said the
16 one side.  The child said one side.
17     Q.  And there was no mark or no injury.
18     A.  That's correct.
19     Q.  Now, taking you out of this time frame between
20 1999 and 2001 or 2002 when you were her direct supervisor --
21     A.  Yes.
22     Q.  -- were you aware of any other incidents or any
23 other complaints about P.W. while she was employed with OCY?
24     A.  The only other complaints that came directly to me
25 were by the Court for her attire.  That's the only thing

Page 18

1  that I can say that came directly to me.
2  Q. Okay. But other complaints indirectly to you?
3  You've heard of other complaints, haven't you?
4     MR. DEVLIN: Object to form. You can answer.
5  A. About her attitude.
6  Q. Okay. And would I be correct in saying that
7  complaints about her attitude would have been pretty
8  consistent throughout the time that she worked with OCY?
9  A. I would say that they escalated after the time of
10 her son's death.
11 Q. Do you know what time frame that was that that
12 happened?
13 A. It was November 6th of '01 or '02. I'm not
14 positive. It's been five or six years.
15 Q. With respect to her not reporting the incident
16 with Sarah Reed that you described --
17 A. Yes.
18 Q. -- was she reprimanded for that in any way?
19 A. Yes.
20 Q. What was the nature of that reprimand?
21 A. It was a verbal -- or written reprimand. I'm
22 sorry.
23 Q. Okay. No suspension involved with that, right?
24 A. Right.
25 Q. Now, have you heard either directly or indirectly

Page 19

1  of any other allegations about P.W. striking or hitting a
2  child or improperly grabbing a child?
3  A. I read it in the paper.
4  Q. Okay. What did you read in the paper?
5  A. That Miss Conley made allegations that Miss [W.]
6  slapped a child.
7  Q. You didn't hear anything about it when you were in
8  the agency, like through work, through discussions with
9  anyone?
10 A. Not really.
11 Q. First time you heard it, then, would be when it
12 was in the paper?
13 A. To the -- to the best of my recollection.
14 Q. During the time that you were her supervisor, you
15 were also familiar with her attendance at work. Would that
16 be right?
17 A. Yes.
18 Q. Did she have good attendance at work?
19 A. I believe so.
20 Q. Were there ever any complaints about her
21 attendance for visitations or supervised visitations?
22 Anything to that effect?
23 A. Not that I recall. Nothing that sticks out.
24 Q. Okay. There's no complaints that she didn't show
25 up for visits or that -- say that; didn't show up for visits

Page 20

1  for her clients?
2  A. Not while I supervised her.
3  Q. Okay. Did you hear of any such complaints after
4  you supervised her, when you were no longer supervising her?
5  A. I mean, there was always talk about things that
6  were going on, but nobody called me directly, no.
7  Q. Okay. And I understand. I mean, through that
8  talk, though, did you hear that there were complaints about
9  her not attending visits on a regular basis, for example?
10 A. I don't know specifically about whether it was
11 visits, but mostly her attitude had definitely changed.
12 Q. What about her attitude?
13 A. She was shorter. She --
14 Q. You mean a short fuse, for lack of a better --
15 A. Yeah. Not as patient. It was more of a job at
16 that point than a commitment to Children and Youth. That's
17 just my opinion.
18 Q. That's what you saw or what you -- you felt, I
19 guess.
20 A. Yes.
21 Q. How about with respect to her keeping notes? For
22 example, logging in things that have to do with her visits,
23 for example, or client contacts.
24 A. She kept them while she was under me.
25 Q. She did?

Page 21

1  A. Yes.
2  Q. Did that change at any point after that?
3  A. I wouldn't know.
4  Q. Did you talk to P.W. even after you were no longer
5  her supervisor from time to time?
6  A. Yes.
7  Q. And at any time during those discussions, after
8  you were no longer her supervisor, did she discuss with you
9  or mention Abby Conley?
10 A. I believe maybe once or twice.
11 Q. Okay. What was the nature of those discussions?
12 A. That Miss Conley was out to get her.
13 Q. And that's what P.W. told you, that Miss Conley
14 was out --
15 A. My summation of it, yeah, basically.
16 Q. On both of those occasions?
17 A. Yes.
18 Q. Okay. Did she tell you why she felt that or where
19 she was getting that --
20 A. That was after it was in the paper.
21 Q. That's after it was in the paper?
22 A. Yes.
23 Q. Okay. Would that be after Miss Conley was fired?
24 A. I think that's when it came out in the paper,
25 where P.W.'s name -- I think it was after Abby's

Page 22

1  termination.
2  Q. Okay. Did you at any time also supervise Deanna
3  Cosby?
4  A. Not directly.
5  Q. Not directly?
6  A. No.
7  Q. Were you familiar with Deanna Cosby's work
8  performance?
9  A. Again, only as the covering supervisor capacity.
10  Q. And based on that, to the best of your knowledge,
11  how would you describe her work?
12  A. Again, that would be very brief, like interludes.
13  Maybe she needed something signed, maybe I would look over a
14  letter, something. But I can't really judge her performance
15  on that.
16  Q. Going back to Miss Conley, are you aware of any
17  reports that would -- that were made about her work
18  performance that were negative?
19  A. Prior to her termination, no.
20  Q. Did you hear of, I guess, any compliments or
21  anything of that nature about Miss Conley's work performance
22  prior to termination?
23  A. Well, I thanked her for helping me on fundraisers
24  and whatnot. She was helpful to me. I don't know if there
25  were other specifics or not.

Page 23

1  Q. Prior to June of 2004, okay -- try to remember
2  this time frame. And I'll kind of lay it out for you.
3  Miss Conley was terminated on September 10, 2004. Okay?
4  A. Yes.
5  Q. So do you recall any discussions within the agency
6  about concerns about Abby Conley or her work -- in her work
7  performance or in any manner prior to her termination?
8  A. No. Maybe not. I just thought of something.
9  Q. Okay.
10  A. When she was switching supervisors, there had been
11  some concern --
12  Q. Which supervisors? Do you remember?
13  A. I -- I think she went from Tony DeJohn to
14  Miss Deveney.
15  Q. Miss Deveney?
16  A. Yeah.
17  Q. Okay. So you heard some concerns surrounding
18  that?
19  A. Yeah, but I can't even say specifically. I just
20  know that there was talk around that time, and that she
21  needed to be moved and who would take her kind of thing.
22  Q. Do you remember at whose request that move was, or
23  anything?
24  A. I think it may have been mutual, but I know that
25  Miss Conley was having some problems there as well.

Page 24

1  Q. Okay. You don't know the nature of the problems,
2  or do you?
3  A. I can't recall specifically. I think that she
4  even talked to me about them at one point, that she had some
5  concerns.
6  Q. Okay. Prior to termination on September 10, 2004,
7  did you hear anyone in the agency talk about terminating
8  her?
9  A. Just the day of -- of -- the day that she
10  resigned. They said -- they called an emergency meeting,
11  all supervisors and admins. in the building were to attend,
12  and we were told that she was given the option at that
13  particular moment that we were meeting to either resign or
14  she would be terminated. And I believe it was a Friday. I
15  can't recall with certainty. But they wanted us to know
16  that because it would probably hit the papers.
17  Q. Okay. So if I understand correctly, the same time
18  that she was being terminated, there was a supervisors'
19  meeting pretty much at the same time on that Friday?
20  A. Supervisors and administrators, yes.
21  Q. And administrators. Who were the administrators
22  present at that meeting?
23  A. I think Debi Liebel called it. I think Colleen
24  Locke was there.
25  Q. Did they give you any indication why they thought

Page 25

1  it would hit the papers?
2  A. If they did, I don't recall. I just remember, you
3  know, being called up there and them saying that Abby was on
4  her way to the courthouse or was at the courthouse being
5  given an option to resign or she would be terminated.
6  Q. Did they during that meeting indicate why this was
7  happening?
8  A. I don't think they did.
9  (Discussion held off the record.)
10  Q. And I guess in the same vein, nobody asked why is
11  she being terminated or given that option to resign? That
12  didn't come up in the meeting?
13  A. It was more of an informed -- informational thing.
14  They came in and said blah, blah, blah, blah, blah, and
15  you're free to go.
16  Q. Okay. Who ran the meeting?
17  A. I believe it was Debi.
18  Q. You believe it was Deb Liebel?
19  A. I believe so.
20  Q. Okay. You think it was a Friday. Then after that
21  happened, okay, did anyone from the agency come to you and
22  ask you about -- any information about Abby Conley?
23  A. Did anyone from the agency ask me specifically
24  information about Abby?
25  Q. Yes.

Page 26

1  A. No.
2  Q. Okay. And I'm including with that the solicitors;
3  Mike Cauley, Attorney Allgeier.
4  A. Right. I mean, there was gossip, but nobody came
5  and asked me directly anything, no.
6  Q. Do you recall a supervisors' meeting sometime in
7  that time frame where Pete Callan was also present?
8  A. He -- he did attend one or two of the meetings. I
9  believe it was after that date, though.
10 Q. Right. After the 10th of November, 2004.
11 A. Yes.
12 Q. Do you remember a remark being made by him;
13 something to the effect that they got her, that they got
14 Abby, that they finally got Abby?
15 A. Not that I recall.
16 Q. You don't remember him making any kind of a remark
17 like that?
18 A. I truly -- I don't.
19 Q. Okay. I'm going to backtrack just a little bit
20 here. When we talked about Abby Conley leaving Tony -- I
21 think it's Tony DeJohn's unit.
22 A. Yes.
23 Q. Do you remember whether Miss Conley was
24 complaining that the caseworkers -- she was having trouble
25 because the caseworkers were not servicing their cases? Do

Page 27

1  you remember that being one of the complaints that she had?
2  A. I -- I believe it was.
3  Q. Do you recall at any point in time Miss Conley
4  complaining that P.W. wasn't servicing some of the cases
5  that she was working on in 2004?
6  A. I -- I don't recall that.
7  Q. Okay. Did Miss Conley ever talk to you about
8  P.W.?
9  A. I really don't remember.
10 Q. Do you recall ever being asked for notes that you
11 may have kept regarding Miss Conley?
12 A. I never kept any notes regarding Miss Conley, so
13 there would have been nothing to ask for.
14 Q. Okay. Do you remember being asked if you had
15 any -- any types of notes or anything regarding Miss Conley?
16 A. No.
17 Q. Prior to her termination on September 10, 2004, do
18 you recall any discussion in the agency about Miss Conley's
19 testimony at a hearing that occurred in July of 2004?
20 A. Yes.
21 Q. And what was it that you had heard?
22 A. That she was at a hearing, that -- I believe it
23 was the first hearing. That someone from the press had been
24 there. And that out of nowhere, she started crying, was
25 holding the Bible, and saying she was afraid she was going

Page 28

1  to lose her job. And that the Judge instructed her to say
2  whatever she needed to say and assured her she wouldn't lose
3  her job. That's what I heard.
4  Q. Okay. Who did you hear that from?
5  A. I don't even know for sure. I mean, it was just
6  going.
7  Q. All right. Do you recall what she testified
8  about?
9  A. I don't know if that's the point where the kid got
10 slapped or not. I'm not sure. Oh, no, wait. No, I do
11 know. That Miss Deveney changed her court summary from
12 something favorable to nonfavorable.
13 Q. Okay. And you recall hearing that from other
14 people in the agency?
15 A. Yes.
16 Q. Let me ask you this with respect to court
17 summaries: If a caseworker working under you would prepare
18 a court summary --
19 A. Yes.
20 Q. -- would you review that?
21 A. Yes.
22 Q. Is that part of your job?
23 A. Yes.
24 Q. Would it also be your job to review case aides'
25 court summaries as well?

Page 29

1  A. Yes.
2  Q. When you did receive a court summary prepared by a
3  case aide on a particular case --
4  A. Yes.
5  Q. -- at that time, let's say 2004, did you have the
6  authority to make changes to those?
7  A. Yes.
8  Q. What is your understanding about the changes that
9  you were permitted to make to these court summaries?
10 A. Well, I would make changes so that they looked
11 more professional as far as structure, grammar, spelling,
12 punctuation, that kind of stuff.
13 Q. Okay. Did you understand that you also had the
14 ability to delete or remove opinions or observations that
15 were made by the case aide?
16     MR. DEVLIN: You're asking both opinions --
17 Q. Let's take opinions first.
18 A. If the caseworker and I did not have the same
19 opinion, we would discuss it and decide how to proceed from
20 there.
21 Q. Okay. I'm talking about the case aide. You say
22 the caseworker.
23 A. Same -- same thing. I'm sorry.
24 Q. I just want to make sure that we're using that
25 interchangeably.

Page 30

1  A. Yes.
2  Q. So if you didn't agree with an opinion a case aide
3  or a caseworker made, you would discuss it with that person?
4  A. That is correct.
5  Q. And then based on that discussion, hopefully you
6  would come with a resolution with respect to how that end
7  product would be.
8  A. Right.
9  Q. Right? Would you ever -- would you ever simply
10 take it upon yourself to remove information such as opinions
11 without discussing it with the caseworker?
12 A. No.
13 Q. Did you feel that that would be appropriate or
14 inappropriate?
15 A. It would be inappropriate.
16 Q. It's inappropriate?
17 A. Yes.
18 Q. Are you aware of the allegations that Miss Conley
19 made that Miss Deveney made changes to her court summary?
20 A. Yes, I'm sure.
21 Q. Where did you -- I mean, where did you first hear
22 of that type of allegation?
23 A. In the hallway, I'm sure. Just office gossip.
24 Q. Did you ever discuss that with Miss Deveney?
25 A. She -- she denies it.

Page 31

1  Q. That did come up in discussion between you and
2  her?
3  A. She was discussing what was happening and said
4  that she didn't do it, yes.
5  Q. So she denies that it happened?
6  A. Yes.
7  Q. Okay. As part of the practice also in obtaining
8  and reviewing summaries from a case aide or caseworker, how
9  would they do that? Strike that. Was it common practice
10 that the case aide or caseworker would e-mail the summary to
11 you?
12 A. Not in my unit. My workers don't type their own.
13 Q. So then someone else types them?
14 A. Yes.
15 Q. In other words, they are dictated by the workers?
16 A. Dictated either through a Dictaphone or
17 handwritten and typed by the secretary.
18 Q. So then you would actually get a hard copy.
19 A. Yes.
20 Q. They would not be sent to you through the
21 computer?
22 A. Generally not, no.
23 Q. You say "generally not". Are there exceptions to
24 that?
25 A. I'm the Corry supervisor, and I have one worker in

Page 32

1  Corry, so she will e-mail me her things.
2  Q. But as far as here locally, you don't do that?
3  A. Depends on -- like I said, a few people will type
4  their own things. I have gotten one or two electronically
5  if I was on supervisor coverage.
6  Q. So you would get those through e-mail?
7  A. Occasionally.
8  Q. You wouldn't specifically request it be done that
9  way.
10 A. Oh, no. I did read one of Abby's court summaries,
11 now that I recall. I did read one. You asked me that
12 question earlier, and I do recall doing it.
13 Q. Okay.
14 A. I mean, I made a lot of corrections, but they
15 were, like I said, spelling or just changing the wording to
16 make the sentence run more --
17 Q. Sounds to me that that would be typical, I guess,
18 with the types of changes you would make with any court
19 summary.
20 A. That's correct.
21 Q. Did P.W. ever express to you that she did not want
22 to work with Miss Conley?
23 A. Only after the allegations were made that she had
24 hit someone by Miss Conley.
25 Q. Did P.W. ever discuss that allegation with you?

Page 33

1  A. Not specifically.
2  Q. Not specifically?
3  A. Maybe just, you know, that she was making
4  allegations. She never told me specifically what they were.
5  Q. Did P.W. ever tell you that she -- that it ever
6  happened?
7  A. I don't recall whether she did or not.
8  Q. She didn't tell you -- she didn't admit to you
9  that it did happen? Would that be --
10 A. No.
11 Q. If, hypothetically speaking -- I'm going to pose a
12 hypothetical here. If a caseworker informed you that she
13 learned that a case aide may have told a third party about a
14 prognostic detention order, okay, what would you do with
15 that information?
16    MR. DEVLIN: Object to form. Calls for
17    speculation. You can answer.
18 A. It depends on the basis for the prognostic -- it
19 would go case by case, because sometimes I inform the
20 clients that we have a prognostic detention order; we're
21 taking your child when the baby is born. I will inform them
22 if I can. The only time I wouldn't inform them is if I was
23 afraid they were going to abscond, and that would put the
24 child at risk. So I guess it would have been whether or not
25 that child was at risk, if the parents were informed.

Page 34

1  Q. Okay. So if I understand correctly, then, the
2  prognostic detention orders --
3  A. Yes.
4  Q. -- are not always confidential.
5     MR. DEVLIN: Object to form. You can answer.
6  A. Correct.
7  Q. As I understand, there are times that you actually
8  do tell parents that the prognostic detention order is going
9  to be issued.
10 A. Yes.
11 Q. Would I -- I guess my question is, aren't these
12 orders issued because you fear that there is a danger to the
13 child?
14    MR. DEVLIN: Object to form. Go ahead.
15 A. It depends whether the danger is that they are
16 going to abscond and take off and have this child somewhere
17 elsewhere where we're not going to be able to know where the
18 child is -- I mean, I just told somebody, you know, recently
19 that we're going to take your child at birth because you're
20 still doing drugs and you won't stop taking them, and she
21 refuses to, so she knows when she has this baby, that we're
22 taking it.
23 Q. Do you know if that is generally the practice in
24 the agency?
25    MR. DEVLIN: Object to form. Go ahead.

Page 35

1  A. I don't know. I would hope that it would be. In
2  my unit, it is.
3  Q. If I understand correctly, I mean, I think what
4  you're saying is that parents do have the right to know
5  about the detention orders at times.
6     MR. DEVLIN: Object to form. You can answer, if
7     you can.
8  A. Correct.
9  Q. Are you familiar with an order for kinship
10 placement?
11 A. Yeah.
12 Q. What does that mean?
13 A. A kinship placement?
14 Q. Um-hum.
15 A. I guess it depends on if it's an emergency kinship
16 placement or not. If it's an emergency kinship placement,
17 we can go out to a home, do a walk-through, make sure it's
18 clean and appropriate, no safety hazards, do a criminal
19 check and a Child Line check on all adult members of the
20 household. If they come back clean, we can place the child
21 in that home that day with the Court's approval, pending a
22 completed kinship study, which can take up to 60 days to
23 complete.
24 Q. And kinship meaning a relative?
25 A. Doesn't necessarily have to be a relative. It

Page 36

1  could be a family friend, somebody that the child is
2  familiar with.
3  Q. Familiar with, okay. Is that part of the -- a
4  detention order or is that a separate type of a --
5  A. Well, we can detain into a kinship home if we know
6  that there would be one available.
7  Q. Okay. When you do have an order for kinship
8  placement, are those secret or confidential?
9  A. Generally not.
10 Q. Is it something that the parent would be made
11 aware of?
12    MR. DEVLIN: Object to form. Go ahead.
13 A. Usually. That's why we use kinship, so that they
14 can maintain a relationship with their natural family.
15 Q. Okay. Are you familiar with Carla Crott?
16 A. Yes.
17 Q. Who would she be?
18 A. Administrator of foster care and placement
19 services.
20 Q. Okay. Is she an employee in OCY?
21 A. Yes.
22 Q. Do you recall at any point whether she asked you
23 if you had any notes, if you kept any notes regarding
24 Miss Conley about a conflict that you had with her in 2001?
25 A. Not that I recall.

Page 37

1  Q. You don't recall being asked that by her?
2  A. No.
3  Q. Did -- and I may have asked this already. But
4  after Miss Conley was terminated, were you asked by anyone
5  in the agency, including the solicitors, whether or not you
6  had any information with respect to anything that
7  Miss Conley did at work? Anything at all?
8     MR. DEVLIN: Object to form. You can answer.
9  A. I was not asked.
10 Q. You weren't approached by anyone.
11 A. No.
12 Q. I understand that there's a new director there
13 currently. Is that right?
14 A. That's right.
15 Q. That would be Mr. Lucht?
16 A. Yes.
17 Q. Do you recall having any meetings with Mr. Lucht,
18 either you -- just you or in conjunction with other
19 supervisors regarding changes to court summaries?
20 A. I -- I don't know if it was -- I don't believe it
21 was a meeting. We got a policy that we are to make no
22 changes.
23 Q. You got a written policy --
24 A. Yes.
25 Q. -- sent to you by Mr. Lucht?

10 (Pages 34 to 37)

Page 38

1  A. Yes.
2  Q. He indicated that you were to make no changes to
3  court summaries?
4  A. That's correct.
5  Q. Do you know what prompted that policy change?
6  A. Well, the speculation was that it was over
7  Miss Conley's case, but we don't know that for -- I don't
8  know that for sure.
9  Q. Okay. Was there any discussion with other people
10 in the agency about why that might have happened?
11 A. Well, that was the -- that was the speculation on
12 why it happened.
13 Q. Okay. Do you know if Mr. Lucht conducted any kind
14 of an investigation to find out whether or not there were
15 changes made to that court summary?
16     MR. DEVLIN: You're asking specifically with
17     respect to the court summary that --
18     MR. ANGELONE: Miss Conley's.
19 A. Not that I'm aware.
20 Q. You're not aware of any investigation that
21 Mr. Lucht conducted, I guess within the agency, with respect
22 to changes in court summaries that would be made by
23 supervisors in general?
24 A. I think he may have asked me what my practice was.
25 And my practice is that we both have to live with ourselves,

Page 39

1  so if we don't have the same opinion, I write one, they
2  write one, and both go over.
3  Q. Okay. P.W. no longer works with OCY; is that
4  correct?
5  A. That's correct.
6  Q. Do you have any knowledge or understanding as to
7  why she's not there anymore?
8  A. She applied for a new position and obtained it.
9  Q. And that's all you know about?
10 A. I don't --
11 Q. The circumstances surrounding her leaving OCY.
12 A. I know that she was frustrated with the agency and
13 casework in general and needed a change, according to her.
14 Q. Is that something she told you?
15 A. Yes.
16 Q. As far as you know, she was not asked to leave the
17 agency?
18 A. As far as I know.
19 Q. Were there any other acts or any other conduct by
20 P.W. during the time that you knew her in the agency that,
21 in your opinion, would be inappropriate?
22     MR. DEVLIN: Object to form. You can answer.
23 A. I don't recall them. I do -- like I said, I do
24 recall those two specific instances where I disciplined her,
25 and I do recall two phone calls from the Judge saying she

Page 40

1  dressed inappropriately for court, but those are the ones
2  that stick out.
3  Q. And besides those, you're not aware of any other
4  complaints that have come in about P.W. from anyone outside
5  the agency?
6  A. Not first-hand knowledge. We hear the rumor
7  mills, but I don't have first-hand knowledge of that.
8  Q. Okay. You say through rumor. You mean through
9  other employees that work there?
10 A. That's correct.
11 Q. Give me an idea of what types of rumors these
12 might be.
13 A. That foster parents were complaining about her.
14 Q. And do you know what the nature of the complaints
15 were?
16     MR. DEVLIN: Object to form. You can answer.
17 A. The only one that I can remember specifically is
18 about her being rude.
19 Q. And that's the only one you can remember
20 specifically.
21 A. Specifically.
22 Q. Okay. Any complaints from outside agencies?
23 A. Probably the same; that she's -- she was rude.
24 Unprofessional.
25     (Discussion held off the record.)

Page 41

1      (Recess held from 2:35 p.m. till 2:41 p.m.)
2  Q. I want to ask you a few questions on the computer
3  usage at OCY.
4  A. Um-hum.
5  Q. Are you familiar with the e-mail system there?
6  A. Yes.
7  Q. Do you use it yourself?
8  A. Yes.
9  Q. Would I be correct in saying that -- that workers
10 there from time to time do use the e-mail system for
11 personal use?
12 A. We did, yes.
13 Q. When you say "we did", what do you mean by that?
14 A. We have a new policy.
15 Q. Is that a new policy that came into effect when
16 Mr. Lucht came in?
17 A. Sometime after that, yes.
18 Q. Prior to that, though, would I be correct in
19 saying that it was not uncommon that e-mails would be sent
20 outside the agency from workers?
21 A. Yes.
22 Q. Okay. Would they include e-mails to, for example,
23 sell furniture? If they --
24 A. Within the agency.
25 Q. Within the agency. If they had something for

Page 42

1  sale?
2     A.  Yes.
3     Q.  Would the workers also perhaps receive e-mails
4  from friends or other people regarding material that had
5  nothing to do with -- with work?
6     A.  Um-hum, yes.
7     Q.  That's not the policy anymore?
8        MR. DEVLIN: I'm going to object. She didn't say
9        it was the policy before. She said it occurred.
10    Q.  Occurred. But you said it was a change in
11 policy -- or that that changed after Mr. Lucht came in?
12    A.  In regards to Internet stuff, yes.
13    Q.  The policy was always there, if I'm correct,
14 right? There was always a written policy about the use of
15 the computer system for --
16    A.  There's a County -- yes.
17    Q.  Okay. But that wasn't always strictly adhered to
18 prior to Mr. Lucht. Would that be correct?
19       MR. DEVLIN: Object to form. You can answer.
20    A.  Yes.
21    Q.  Do you remember making a statement that --
22 something to the effect about the worst thing that P. did?
23    A.  Do I remember making that?
24    Q.  Yes. I guess that the agency doesn't know the
25 worst thing that she did.

Page 43

1     A.  I don't recall. I mean, anything that she did
2  that I was aware of, I would report to my direct supervisor.
3     Q.  Okay. Are you familiar with an incident at K-Mart
4  where P. -- or an allegation that P. slapped a child in
5  K-Mart during visitation or anything like that?
6     A.  No.
7     Q.  Doesn't ring a bell?
8     A.  You're not ringing a bell.
9     Q.  Okay.
10       (Discussion held off the record.)
11       MR. ANGELONE: That's all I have.
12       MS. BAUGH: I don't have any questions.
13       MR. DEVLIN: No questions. We'll read.
14
15       (Testimony concluded at 2:44 p.m.)

Ferguson & Holdnack Reporting, Inc.

231e525e-97fe-4734-b414-cc7ed4b09f7a

## A

**Abby** 1:3 6:21 7:2,12 21:9 23:6 25:3,22,24 26:14,14,20
**Abby's** 21:25 32:10
**ability** 29:14
**able** 7:13 9:11 34:17
**about** 6:12 9:15 11:4 13:9 14:25 15:2 17:23 18:5,7 19:1,7 19:20 20:5,8,10,12 20:21 22:17,21 23:6 23:6 24:4,7 25:22,22 25:24 26:20 27:7,18 28:8 29:8,21 33:13 35:5 36:24 38:10 39:9 40:4,13,18 42:14,22
**abscond** 33:23 34:16
**Absolutely** 16:12,15
**according** 39:13
**act** 7:5
**action** 1:4 12:14,15
**active** 15:8
**acts** 39:19
**actually** 15:1 31:18 34:7
**adhered** 42:17
**Administrator** 36:18
**administrators** 24:20 24:21,21
**admins** 24:11
**admit** 15:5 16:23 33:8
**admitted** 15:6
**adult** 35:19
**afraid** 27:25 33:23
**after** 5:25 12:6,7 13:23 14:9 18:9 20:3 21:2,4 21:7,20,21,23,25 25:20 26:9,10 32:23 37:4 41:17 42:11
**Again** 22:9,12
**age** 14:23
**agencies** 40:22
**agency** 7:7 9:16 16:2 19:8 23:5 24:7 25:21 25:23 27:18 28:14 34:24 37:5 38:10,21 39:12,17,20 40:5 41:20,24,25 42:24
**agree** 30:2
**agreed** 7:20
**ahead** 11:13 34:14,25 36:12
**aide** 29:3,15,21 30:2 31:8,10 33:13
**aides** 28:24
**allegation** 15:11 30:22 32:25 43:4
**allegations** 19:1,5 30:18 32:23 33:4
**alleged** 11:8
**allegedly** 11:9
**Allgeier** 26:3
**already** 4:11 37:3
**always** 20:5 34:4 42:13 42:14,17
**Angelone** 2:3 3:4 4:5 7:25 14:6 38:18 43:11
**another** 9:24
**answer** 5:3,5 9:8 17:5 18:4 33:17 34:5 35:6 37:8 39:22 40:16 42:19
**answers** 4:21
**Anthony** 2:3
**anymore** 39:7 42:7
**anyone** 10:20 11:11 12:2 19:9 24:7 25:21 25:23 37:4,10 40:4
**anything** 6:12 12:18 19:7,22 22:21 23:23 26:5 27:15 37:6,7 43:1,5
**applied** 39:8
**approached** 37:10
**appropriate** 30:13 35:18
**approval** 35:21
**April** 1:20
**areas** 6:1
**arm** 11:25
**around** 14:23 23:20
**asked** 16:5 25:10 26:5 27:10,14 32:11 36:22 37:1,3,4,9 38:24 39:16
**asking** 4:14,19 5:2 11:16 29:16 38:16
**assume** 5:3,4
**assured** 28:2
**attend** 24:11 26:8
**attendance** 19:15,18,21
**attending** 20:9
**attention** 17:1,2,15
**attire** 17:25
**attitude** 18:5,7 20:11 20:12
**Attorney** 6:20 26:3
**August** 5:16
**authority** 29:6
**available** 36:6
**aware** 9:14 17:22 22:16 30:18 36:11 38:19,20 40:3 43:2
**a/k/a** 1:6,12 2:6

## B

**B** 1:3
**baby** 33:21 34:21
**back** 13:24 16:20 22:16 35:20
**backtrack** 26:19
**based** 22:10 30:5
**basically** 5:23 21:15
**basis** 20:9 33:18
**Bates** 11:1
**Baugh** 2:13 43:12
**became** 6:2 8:10,14
**become** 5:19,25 6:14 9:11,14
**becomes** 13:1
**before** 1:18 4:15 12:7 14:18 42:9
**being** 5:25 24:18 25:3,4 25:11 26:12 27:1,10 27:14 37:1 40:18
**believe** 9:23 10:18 13:9 13:16 19:19 21:10 24:14 25:17,18,19 26:9 27:2,22 37:20
**bell** 43:7,8
**besides** 40:3
**best** 14:10 19:13 22:10
**better** 20:14
**between** 10:5 13:8 17:19 31:1
**Bible** 27:25
**birth** 34:19
**bit** 6:3 8:24 13:7 26:19
**blah** 25:14,14,14,14,14
**born** 33:21
**both** 17:13 21:16 29:16 38:25 39:2
**brief** 22:12
**broken** 8:2
**building** 24:11

## C

**C** 4:1,1
**call** 12:10
**Callan** 1:9 2:9 26:7
**called** 9:5 20:6 24:10 24:23 25:3
**calling** 10:14
**calls** 33:16 39:25
**came** 13:22 15:23 17:24 18:1 21:24 25:14 26:4 41:15,16 42:11
**capacity** 1:8,10,11,14 5:10,10 7:1,5,11 9:10 22:9
**care** 36:18
**Carla** 36:15
**case** 6:20 7:16 9:1 14:9 15:8 28:24 29:3,3,15 29:21 30:2 31:8,10
**cases** 26:25 27:4
**casework** 5:12 39:13
**caseworker** 10:13 28:17 29:18,22 30:3 30:11 31:8,10 33:12
**caseworkers** 8:10 26:24,25
**Cauley** 26:3
**caused** 16:11
**Center** 2:11
**certainty** 24:15
**change** 21:2 38:5 39:13 42:10
**changed** 5:24 8:16 20:11 28:11 42:11
**changes** 29:6,8,10 30:19 32:18 37:19,22 38:2,15,22
**changing** 32:15
**charge** 6:11
**Chatham** 2:11
**check** 35:19,19
**Cheryl** 11:1
**child** 1:6,13 2:6 10:12 10:17 11:24 12:4 14:8,15,19,20,21 15:17 16:7,21 17:16 19:2,2,6 33:21,24,25 34:13,16,18,19 35:19 35:20 36:1 43:4
**Children** 1:6,12 2:6 5:9 5:14 6:24 8:2 20:16
**chose** 9:9
**circumstances** 6:21 39:11
**Civil** 1:4
**clean** 35:18,20
**client** 20:23
**clients** 20:1 33:20
**Cline** 1:18 3:3 4:8
**clinician** 6:2,10,15
**Colleen** 24:23
**come** 7:9,14 9:22 14:7 25:12,21 30:6 31:1 35:20 40:4
**commencing** 1:21
**commitment** 20:16
**common** 31:9
**Commonwealth** 1:20
**complaining** 26:24 27:4 40:13
**complaint** 10:11 13:19 13:22 14:14 16:17
**complaints** 9:15,18,21 9:22 17:23,24 18:2,3 18:7 19:20,24 20:3,8 27:1 40:4,14,22
**complete** 35:23
**completed** 35:22
**compliments** 22:20
**computer** 31:21 41:2 42:15
**concern** 23:11
**concerns** 10:13,15 23:6 23:17 24:5
**concluded** 43:15
**conduct** 9:19 16:18 39:19
**conducted** 38:13,21
**confidential** 34:4 36:8
**conflict** 36:24
**conjunction** 37:18
**Conley** 1:3 6:21 7:2,12 19:5 21:9,12,13,23 22:16 23:3,6,25 25:22 26:20,23 27:3 27:7,11,12,15 30:18 32:22,24 36:24 37:4 37:7
**Conley's** 22:21 27:18 38:7,18
**consist** 11:7
**consistent** 11:23 18:8
**consistently** 17:11
**contacted** 15:15,16,22 16:2
**contacts** 20:23
**copy** 31:18
**correct** 6:23 8:3 10:9 11:3 12:24 13:18 15:13 17:18 18:6 30:4 32:20 34:6 35:8 38:4 39:4,5 40:10 41:9,18 42:13,18
**corrections** 32:14
**correctly** 8:7 10:4 24:17 34:1 35:3
**Corry** 31:25 32:1
**Cosby** 22:3
**Cosby's** 22:7
**County** 1:5,5,6,8,8,10 1:12,13,14 2:6,6,6 5:9 42:16
**course** 11:21
**court** 1:1 4:21 17:25 28:11,16,18,25 29:2 29:9 30:19 32:10,18 37:19 38:3,15,17,22 40:1
**courthouse** 25:4,4
**Court's** 35:21
**coverage** 32:5
**covering** 7:8,10 22:9
**criminal** 35:18
**Crott** 36:15
**crying** 27:24
**current** 6:12
**currently** 5:8 37:13

Case 1:05-cv-00076-SJM   Document 70-3   Filed 04/12/2006   Page 15 of 18

Page 2

**D**
D 1:22 2:1 3:1
danger 34:12,15
date 26:9
day 7:15 14:18,20 16:7 24:9,9 35:21
days 35:22
Deanna 22:2,7
death 18:10
Deb 25:18
Debi 24:23 25:17
Debra 1:10 2:9
December 8:14
decide 29:19
Defendant 2:13
Defendants 1:15 2:9
definitely 20:11
DeJohn 23:13
DeJohn's 26:21
delete 29:14
Dell 2:14
denies 30:25 31:5
deny 15:2
department 8:18,19,23 8:25 9:3 12:20
depends 32:3 33:18 34:15 35:15
deposition 1:18 4:15 7:21
describe 10:10 22:11
described 6:7,8 13:25 17:7 18:16
detain 36:5
detention 33:14,20 34:2,8 35:5 36:4
Deveney 23:14,15 28:11 30:19,24
Devlin 2:7 7:23 9:8 11:13 14:5 17:5 18:4 29:16 33:16 34:5,14 34:25 35:6 36:12 37:8 38:16 39:22 40:16 42:8,19 43:13
Dictaphone 31:16
dictated 31:15,16
different 8:18,19,19,20 8:23,24 9:1,7
direct 3:4 4:4 7:3,6,8 8:8 10:24 17:20 43:2
directly 7:14 17:24 18:1,25 20:6 22:4,5 26:5
director 1:10,12 37:12
disciplined 39:24
discuss 13:11 21:8 29:19 30:3,24 32:25
discussed 16:13
discussing 30:11 31:3
discussion 25:9 27:18
  30:5 31:1 38:9 40:25 43:10
discussions 19:8 21:7 21:11 23:5
DISTRICT 1:1,1
documents 7:16
doing 8:21,22 16:23 32:12 34:20
done 4:15 11:4 32:8
down 4:22,24 8:2
dressed 40:1
drugs 34:20
duly 4:2
during 9:13 10:5 11:9 15:8 19:14 21:7 25:6 39:20 43:5

**E**
E 2:13 3:1 4:1,1
earlier 32:12
Edmund 2:10
effect 19:22 26:13 41:15 42:22
eight 5:25
either 18:25 24:13 31:16 37:18
electronically 32:4
elevated 6:3,8,15
elsewhere 34:17
emergency 24:10 35:15 35:16
employed 17:23
employee 36:20
employees 40:9
employment 5:7
end 30:6
Erie 1:5,5,6,8,10,12,13 1:14,23 2:2,5,6,6,6,8 5:9
escalated 18:9
Esquire 1:14,22 2:1,3,7 2:10,13,13
even 21:4 23:19 24:4 28:5
evening 15:9
eventually 12:25 14:3
ever 4:15 7:17 8:4 19:20 27:7,10 30:9,9 30:24 32:21,25 33:5 33:5
Everyone 17:11
everything 4:22
examination 3:4 4:4
example 17:8 20:9,22 20:23 41:22
exceptions 31:23
Executive 1:8,11
express 32:21
expunged 13:1,5
e-mail 31:10 32:1,6
  41:5,10
e-mails 41:19,22 42:3

**F**
face 10:16 12:1,1,2,3 15:20 16:25 17:12
familiar 4:17 6:17 9:11 19:15 22:7 35:9 36:2 36:3,15 41:5 43:3
familiarity 7:12
family 11:23 14:4,8 36:1,14
far 29:11 32:2 39:16,18
fault 6:13
favorable 28:12
fear 34:12
feel 15:7 30:13
felt 20:18 21:18
Ferguson 1:19,24,25
few 32:3 41:2
file 12:25 13:3,5
finally 26:14
find 38:14
findings 12:11
fired 21:23
first 4:1,20 10:5 13:23 19:11 27:23 29:17 30:21
first-hand 40:6,7
five 14:22 18:14
follows 4:2
form 9:8 11:13 17:5 18:4 33:16 34:5,14 34:25 35:6 36:12 37:8 39:22 40:16 42:19
foster 9:23 10:11,12,12 10:14 16:20 17:8,9 36:18 40:13
frame 10:5 13:6,21 17:19 18:11 23:2 26:7
free 25:15
Friday 24:14,19 25:20
friend 36:1
friends 42:4
from 6:24 7:16 8:1 9:15 9:22,23,24 10:11 11:24 12:11 13:5 15:11,13,23,25 16:11 16:12,17 21:5 23:13 25:21,23 27:23 28:4 28:11,13 29:19 31:8 39:25 40:4,22 41:1 41:10,20 42:4
frustrated 39:12
functions 6:5
fundraisers 22:23
furniture 41:23
fuse 20:14

**G**
gave 13:13
general 38:23 39:13
generally 31:22,23 34:23 36:9
getting 21:19
give 24:25 40:11
given 12:17 13:2 24:12 25:5,11
go 4:10 11:13 25:15 33:19 34:14,25 35:17 36:12 39:2
goes 13:3
going 4:14,19,20 5:3,4 7:21,22 13:24 14:11 16:20 20:6 22:16 26:19 27:25 28:6 33:11,23 34:8,16,17 34:19 42:8
good 19:18
Gornall 2:7
gossip 26:4 30:23
gotten 7:16 32:4
grabbed 11:25 16:25 17:11
grabbing 12:2 19:2
grammar 29:11
guess 6:9 7:13 8:1 12:15 20:19 22:20 25:10 32:17 33:24 34:11 35:15 38:21 42:24
guessing 14:22

**H**
hallway 30:23
hand 14:16 15:19,20,23 16:11
handwritten 31:17
happen 33:9
happened 8:16 13:7 14:1,9 15:3,5,6 18:12 25:21 31:5 33:6 38:10,12
happening 25:7 31:3
hard 31:18
having 4:2 23:25 26:24 37:17
hazards 35:18
head 4:23
hear 19:7 20:3,8 22:20 24:7 28:4 30:21 40:6
heard 15:11 18:3,25 19:11 23:17 27:21 28:3
hearing 27:19,22,23 28:13
held 25:9 40:25 41:1 43:10

helpful 22:24
helping 22:23
her 1:11 6:22 7:3,6,8 7:13,16,16,21 8:8,10 8:13,14 9:9,10,11,14 9:15,19 13:13 14:19 15:2,8,20 16:6,24 17:20,25 18:5,7,10 18:15 19:14,15,20 20:1,2,4,4,9,11,12,21 20:22 21:5,8,12 22:11,14,17,19,23 23:6,6,7,21 24:8 25:4 26:13 27:17 28:1,1,2 28:3,11 30:19 31:2 32:1 36:24 37:1 39:11,13,20,24 40:13 40:18
him 10:16 11:25,25 12:1,1 17:1,11,12,13 17:14 26:12,16
hired 5:16
hit 24:16 25:1 32:24
hitting 19:1
holding 27:25
Holdnack 1:25
home 10:12 35:17,21 36:5
hope 35:1
hopefully 30:5
household 35:20
hypothetical 33:12
hypothetically 33:11

**I**
ice 14:19 16:6
idea 40:11
immediately 12:9
imply 16:8
imprint 15:18
improperly 19:2
inappropriate 30:14,15 30:16 39:21
inappropriately 40:1
Inc 1:25
incident 10:20 13:11 13:24 16:20 18:15 43:3
incidents 17:22
include 41:22
including 26:2 37:5
indicate 25:6
indicated 13:16 14:12 38:2
indicating 17:2,15
indication 16:10 24:25
indirectly 18:2,25
individually 1:7,9,11 1:14
individuals 11:18

inform 33:19,21,22
information 25:22,24
 30:10 33:15 37:6
informational 25:13
informed 25:13 33:12
 33:25
initial 7:21
injury 12:22,23 16:6
 17:6,7,17
instances 39:24
instructed 28:1
interchangeably 29:25
interludes 22:12
Internet 42:12
internship 5:15
introduced 4:11
investigate 14:24
investigated 11:17 17:3
investigating 11:21
investigation 11:4,6,15
 12:6,8,12 38:14,20
involved 9:2 18:23
in-home 9:5
issued 34:9,12

_____ J _____
J 4:1
Janis 1:19,24
Jo 1:18 3:3 4:8
job 8:21 20:15 28:1,3
 28:22,24
John 1:13 2:13
Joseph 2:11
Joyal 2:10
Jr 2:10
judge 22:14 28:1 39:25
July 27:19
June 23:1
just 6:2 11:20 15:10
 17:1,15 20:17 23:8
 23:19 24:9 25:2
 26:19 28:5 29:24
 30:23 32:15 33:3
 34:18 37:18

_____ K _____
K 4:1
keeping 20:21
kept 20:24 27:11,12
 36:23
kid 17:15 28:9
kind 9:1 23:2,21 26:16
 29:12 38:13
kinship 35:9,13,15,16
 35:22,24 36:5,7,13
knew 7:4 39:20
know 11:24 12:14 13:4
 13:8 18:11 20:10
 21:3 22:24 23:20,24
 24:1,15 25:3 28:5,9

 28:11 33:3 34:17,18
 34:23 35:1,4 36:5
 37:20 38:5,7,8,13
 39:9,12,16,18 40:14
 42:24
knowledge 22:10 39:6
 40:6,7
knows 34:21
Knox 2:7
K-Mart 43:3,5

_____ L _____
L 1:19,24 4:1
lack 20:14
Lane 2:14
law 2:11 16:19
lay 23:2
learned 11:20 33:13
leave 39:16
leaving 26:20 39:11
left 10:8 14:19
let 11:14 14:6 15:10
 28:16
letter 12:17,24 13:2,4,4
 22:14
let's 5:7 29:5,17
Liberty 2:4
Liebel 1:11 2:10 24:23
 25:18
light 17:4
lightly 17:1
like 19:8 22:12 26:17
 32:3,15 39:23 43:5
Line 35:19
little 6:2 8:24 13:7
 26:19
live 38:25
LLC 2:14
locally 32:2
Locke 24:24
logging 20:22
long 5:13 8:12
longer 11:2 20:4 21:4,8
 39:3
look 22:13
looked 29:10
lose 28:1,2
lot 32:14
Loughney 2:14
Lucht 37:15,17,25
 38:13,21 41:16 42:11
 42:18

_____ M _____
M 4:1
made 8:8 19:5 22:17
 26:12 29:15 30:3,19
 30:19 32:14,23 36:10
 38:15,22
maiden 4:10

maintain 36:14
make 4:25 29:6,9,10,24
 32:16,18 35:17 37:21
 38:2
making 26:16 33:3
 42:21,23
mandated 15:7 16:19
manner 23:7
mark 14:19 17:17
Married 4:9
Mary 1:18 3:3 4:8
material 42:4
may 16:25 17:14 23:24
 27:11 33:13 37:3
 38:24
maybe 8:15 21:10
 22:13,13 23:8 33:3
McLaughlin 2:7
McNair 1:22 2:1 6:20
mean 7:14 14:25 20:5,7
 20:14 26:4 28:5
 30:21 32:14 34:18
 35:3,12 40:8 41:13
 43:1
meaning 35:24
meeting 24:10,13,19,22
 25:6,12,16 26:6
 37:21
meetings 26:8 37:17
members 35:19
mention 21:9
might 17:1 38:10 40:12
Mike 26:3
mills 40:7
Miss 19:5,5 21:12,13
 21:23 22:16,21 23:3
 23:14,15,25 26:23
 27:3,7,11,12,15,18
 28:11 30:18,19,24
 32:22,24 36:24 37:4
 37:7 38:7,18
moment 24:13
more 6:8 13:7 20:15
 25:13 29:11 32:16
Moser 2:14
mostly 20:11
mother 10:14 11:9 12:4
 14:16 15:15,16,17,22
 15:25 16:1,2,8,11,12
move 23:22
moved 23:21
much 24:19
mutual 23:24
myself 4:11 6:21

_____ N _____
N 3:1 4:1
name 4:7,9,10 21:25
natural 36:14
nature 14:14 16:17

 18:20 21:11 22:21
 24:1 40:14
Neal 2:7
necessarily 35:25
needed 7:9 22:13 23:21
 28:2 39:13
negative 22:18
never 27:12 33:4
new 37:12 39:8 41:14
 41:15
next 14:20 16:7
night 14:18
nine 10:18
nobody 20:6 25:10
 26:4
nod 4:23
nonfavorable 28:12
Notary 1:19
notes 20:21 27:10,12
 27:15 36:23,23
nothing 19:23 27:13
 42:5
notified 12:20,23 23:23
 14:17
November 18:13 26:10
nowhere 27:24

_____ O _____
O 4:1
object 9:8 11:13,13
 14:5 17:5 18:4 33:16
 34:5,14,25 35:6
 36:12 37:8 39:22
 40:16 42:8,19
observations 29:14
observe 7:13
obtained 39:8
obtaining 31:7
obviously 4:24
Occasionally 32:7
occasions 21:16
occurred 11:9 27:19
 42:9,10
OCY 17:23 18:8 36:20
 39:3,11 41:3
off 5:7 14:3,8 25:9
 34:16 40:25 43:10
offense 13:3
office 1:6,12 2:6,11 5:9
 5:13 6:24 8:1 30:23
offices 1:21
Oh 28:10 32:10
okay 5:5,6,19 7:11,22
 8:16,21 9:3 10:4,15
 10:20 11:11 12:6
 14:11 15:17 16:8,20
 18:2,6,23 19:4,24
 20:3,7 21:11,18,23
 22:2 23:1,3,9,17 24:1
 24:6,17 25:16,20,21

 26:2,19 27:7,14 28:4
 28:13 29:13,21 31:7
 32:13 33:14 34:1
 36:3,7,15,20 38:9,13
 39:3 40:8,22 41:22
 42:17 43:3,9
old 10:17 14:21
once 21:10
one 4:20 9:23,24 13:3
 13:13 17:16,16 24:4
 26:8 27:1 31:25 32:4
 32:10,11 36:6 39:1,2
 40:17,19
ones 40:1
only 9:25 17:24,25 22:9
 32:23 33:22 40:17,19
Onorato 1:13 2:13
opinion 20:17 29:19
 30:2 39:1,21
opinions 29:14,16,17
 30:10
opportunity 7:2,17
option 24:12 25:5,11
order 33:14,20 34:8
 35:9 36:4,7
orders 34:2,12 35:5
Originally 8:9
other 12:14 14:11
 17:10,15,22,23,24
 18:2,3 19:1 22:25
 28:13 31:15 37:18
 38:9 39:19,19 40:3,9
 42:4
Otherwise 5:3
ourselves 38:25
out 7:9,22 11:15,25
 14:7 17:19 19:23
 21:12,14,24 23:2
 27:24 35:17 38:14
 40:2
outside 9:15 40:4,22
 41:20
over 22:13 38:6 39:2
own 9:9 31:12 32:4

_____ P _____
P 10:16 42:22 43:4,4
PA 2:2,5,8,12,15
paper 19:3,4,12 21:20
 21:21,24
papers 24:16 25:1
parent 9:23 10:11
 16:21 17:8,9 36:10
parents 33:25 34:8
 35:4 40:13
part 28:22 31:7 36:3
particular 7:15 14:9
 24:13 29:3
parties 9:15
party 33:13

Case 1:05-cv-00076-SJM   Document 70-3   Filed 04/12/2006   Page 17 of 18

Page 4

patient 20:15
pay 6:9,10
PC 2:7
pending 35:21
Penn 2:14
Pennsylvania 1:1,9,20 1:23
people 11:12,22 28:14 32:3 38:9 42:4
perform 6:5
performance 7:13 9:11 22:8,14,18,21 23:7
perhaps 42:3
period 8:12
permitted 29:9
person 30:3
personal 41:11
personnel 1:10 13:5
Pete 26:7
Peter 1:9 2:9
phone 12:9 39:25
Pittsburgh 2:12,15
place 2:14 35:20
placement 8:25 35:10 35:13,16,16 36:8,18
Plaintiff 1:3 2:1
please 4:7,21 5:2
point 7:5 13:25 20:16 21:2 24:4 27:3 28:9 36:22
policy 37:21,23 38:5 41:14,15 42:7,9,11 42:13,14
pose 33:11
position 5:21,22 6:14 39:8
positions 6:7,8
positive 8:15 18:14
practical 6:4
practice 6:1 31:7,9 34:23 38:24,25
prepare 28:17
prepared 29:2
present 24:22 26:7
press 27:23
pretty 18:7 24:19
previous 14:17
print 14:16 15:19,20,23 16:11
prior 4:11 22:19,22 23:1,7 24:6 27:17 41:18 42:18
probably 24:16 40:23
problems 23:25 24:1
proceed 29:19
product 30:7
professional 29:11
prognostic 33:14,18,20 34:2,8
promoted 8:10

prompted 38:5
protective 9:5
provider 9:24 13:17 14:11,12
Public 1:19 12:20
punctuation 29:12
purposes 6:4 7:20
put 12:25 14:19 16:6 33:23
p.m 1:21 41:1,1 43:15
P.W 7:18,24,25 8:4 9:13 11:23 12:15 13:11 14:17,19,25 16:3,6,8,13,18 17:23 19:1 21:4,13,25 27:4 27:8 32:21,25 33:5 39:3,20 40:4

————— Q —————
question 4:24 5:2,4,5 7:15 15:22 32:12 34:11
questioned 14:16
questions 4:14,19 41:2 43:12,13
quite 9:2

————— R —————
R 2:10 4:1
ran 25:16
read 7:15 19:3,4 32:10 32:11 43:13
really 4:24 10:18 19:10 22:14 27:9
reason 5:1 8:23 13:4
recall 8:12 10:1,2,3 13:6 19:23 23:5 24:3 24:15 25:2 26:6,15 27:3,6,10,18 28:7,13 32:11,12 33:7 36:22 36:25 37:1,17 39:23 39:24,25 43:1
recant 13:25
receive 29:2 42:3
recently 34:18
Recess 41:1
recollection 14:10 19:13
record 4:7 25:9 40:25 43:10
Reed 14:13 15:11,13,15 15:16,22 16:17 18:16
refer 7:21
refuses 34:21
regarding 14:16 27:11 27:12,15 36:23 37:19 42:4
regards 42:12
regular 20:9
relationship 36:14

relative 6:21 35:24,25
remark 26:12,16
remember 10:18 13:21 14:21 23:1,12,22 25:2 26:12,16,23 27:1,9,14 40:17,19 42:21,23
remove 29:14 30:10
removed 11:24
repeat 13:3
rephrase 14:6
report 10:14 12:7,11 16:14 43:2
reported 1:24 10:20,23 12:9
reporter 4:21 15:7 16:19
reporting 1:25 18:15
reports 7:16 22:17
represent 6:21
reprimand 12:17,25 13:2,14 18:20,21
reprimanded 18:18
request 23:22 32:8
resign 24:13 25:5,11
resigned 24:10
resolution 30:6
respect 9:13 16:17 18:15 20:21 28:16 30:6 37:6 38:17,21
responding 4:23
response 15:25
responses 4:25
responsive 5:5
restate 5:2
result 12:16
retention 6:11
returned 10:12
review 28:20,24
reviewing 31:8
Richard 1:7 2:9
right 4:11 5:7 6:4 14:7 15:24 16:4,13 18:23 18:24 19:16 26:4,10 28:7 30:8,9 35:4 37:13,14 42:14
ring 43:7
ringing 43:8
risk 33:24,25
room 11:24,25
roughly 14:21
RPR 1:24
rude 40:18,23
rumor 40:6,8
rumors 40:11
run 32:16

————— S —————
s 2:11 4:1 16:18 21:25
safety 35:18

sale 42:1
same 5:21 6:5 8:4,9,21 24:17,19 25:10 29:18 29:23,23 39:1 40:23
Sara 2:13
Sarah 14:13 15:11,13 15:15,16,22 16:17 18:16
saw 20:18
saying 14:18 18:6 25:3 27:25 35:4 39:25 41:9,19
Schenker 1:7 2:9
school 14:15,20 16:7
secret 36:8
secretary 31:17
see 15:1 17:14
sell 41:23
send 14:20 16:7
senior 6:1
Sennett 2:7
sent 31:20 37:25 41:19
sentence 32:16
separate 36:4
September 5:15 23:3 24:6 27:17
service 1:7,13 2:6 9:24 13:17 14:11
services 9:5 36:19
servicing 26:25 27:4
short 20:14
shorter 20:13
show 19:24,25
siblings 11:8 12:4
side 17:16,16
sides 17:13
signed 22:13
simply 30:9
since 5:17
six 14:22 18:14
slapped 10:16 12:1 14:18 16:21 17:12,13 17:14 19:6 28:10 43:4
slapping 12:3 13:24
Solicitor 1:15
solicitors 26:2 37:5
some 4:14,19 5:1 10:13 23:11,17,25 24:4 27:4
somebody 34:18 36:1
someone 15:13 27:23 31:13 32:24
something 7:9 22:13,14 23:8 26:13 28:12 36:10 39:14 41:25 42:22
sometime 26:6 41:17
sometimes 4:22 33:19
somewhat 4:17

somewhere 13:10 34:16
son's 18:10
sorry 18:22 29:23
Sounds 32:17
speaking 11:17,21 33:11
specialty 6:11
specific 39:24
specifically 10:3 13:7 20:10 23:19 24:3 25:23 32:8 33:1,2,4 38:16 40:17,20,21
specifics 22:25
speculation 33:17 38:6 38:11
spelling 29:11 32:15
spoke 11:8 12:5
staff 6:11,14
start 5:7
started 27:24
state 1:22 2:2 4:7,21 6:12
stated 10:13 14:17
statement 42:21
STATES 1:1
stating 11:23
stick 40:2
sticks 19:23
still 6:4 8:21 34:20
stop 34:20
Street 1:22 2:2,4,8
stressful 9:2
strictly 42:17
Strike 31:9
striking 19:1
structure 6:9,10 7:7 8:24 29:11
study 35:22
stuff 29:12 42:12
Suite 2:15
summaries 28:17,25 29:9 31:8 32:10 37:19 38:3,22
summary 28:11,18 29:2 30:19 31:10 32:19 38:15,17
summation 21:15
summer 6:16
supervise 22:2
supervised 19:21 20:2 20:4
supervising 20:4
supervision 8:22
supervisor 5:12,19,25 6:1,2 7:1,3,6,8,8,10 7:11 8:8,11,13,14 9:10,14 10:24 12:7 12:12 17:20 19:14 21:5,8 22:9 31:25

| | | | | |
|---|---|---|---|---|
| 32:5 43:2 | through 6:1 7:7 10:8 | 42:14 | wondering 11:20 | **2** |
| **supervisors** 23:10,12 | 19:8,8 20:7 31:16,20 | **using** 29:24 | **wording** 32:15 | **2** 10:8 |
| 24:11,18,20 26:6 | 32:6 40:8,8 | **Usually** 36:13 | **words** 31:15 | **2:35** 41:1 |
| 37:19 38:23 | **throughout** 18:8 | | **work** 4:10 5:11 7:2,12 | **2:41** 41:1 |
| **sure** 4:15,25 6:17 11:16 | **Thursday** 1:20 | **V** | 7:13,17 9:11 19:8,15 | **2:44** 43:15 |
| 15:10 28:5,10 29:24 | **till** 41:1 | **v** 1:4 | 19:18 22:7,11,17,21 | **2000** 13:23 |
| 30:20,23 35:17 38:8 | **time** 7:5,13 8:12,24 | **various** 11:18 | 23:6,6 32:22 37:7 | **2001** 8:15,16 10:8 13:8 |
| **surrounding** 6:22 | 9:13,14 10:5,25 13:6 | **vein** 25:10 | 40:9 42:5 | 17:20 36:24 |
| 23:17 39:11 | 13:21 15:7 17:19 | **Vendetti** 2:4,4 | **worked** 5:13 10:5 18:8 | **2002** 8:15,16 17:20 |
| **suspended** 12:18,19 | 18:8,9,11 19:11,14 | **verbal** 4:25 18:21 | **worker** 13:2 31:25 | **2004** 23:1,3 24:6 26:10 |
| **suspension** 18:23 | 21:5,5,7 22:2 23:2,20 | **verbally** 4:21 | **workers** 31:12,15 41:9 | 27:5,17,19 29:5 |
| **swear** 10:19 14:22 | 24:17,19 26:7 27:3 | **very** 22:12 | 41:20 42:3 | **2006** 1:21 |
| **switching** 23:10 | 29:5 33:22 39:20 | **victim** 11:8 13:25 | **worker's** 12:25 | |
| **sworn** 4:2 | 41:10,10 | **Violation** 16:19 | **working** 5:8 14:4 27:5 | **3** |
| **system** 41:5,10 42:15 | **times** 34:7 35:5 | **visitation** 11:10,24 | 28:17 | **3700** 2:15 |
| **Szewczyk** 4:8 | **Timothy** 1:22 2:1 | 43:5 | **works** 39:3 | **3820** 2:4 |
| **S-Z-E-W-C-Z-Y-K** 4:8 | **today** 5:22 6:18 | **visitations** 19:21,21 | **worst** 42:22,25 | |
| | **told** 14:19 16:2,5,6 | **visits** 19:25,25 20:9,11 | **wouldn't** 14:22 21:3 | **4** |
| **T** | 21:13 24:12 33:4,13 | 20:22 | 28:2 32:8 33:22 | **4** 3:4 |
| **take** 4:22,24 23:21 | 34:18 39:14 | | **write** 39:1,2 | |
| 29:17 30:10 34:16,19 | **Tony** 23:13 26:20,21 | **W** | **written** 13:13 18:21 | **5** |
| 35:22 | **transferred** 8:18,25 9:6 | **W** 4:1 19:5 | 37:23 42:14 | **525** 2:14 |
| **taken** 1:18 12:15,15 | 9:7 | **wait** 28:10 | | |
| 14:3,8 | **trouble** 26:24 | **walk-through** 35:17 | **X** | **6** |
| **taking** 17:19 33:21 | **truly** 26:18 | **want** 29:24 32:21 41:2 | **X** 3:1 | **6** 1:21 |
| 34:20,22 | **try** 23:1 | **wanted** 9:6 24:15 | | **6th** 18:13 |
| **talk** 20:5,8 21:4 23:20 | **trying** 16:16 | **wasn't** 7:3 14:25 15:8 | **Y** | **60** 35:22 |
| 24:7 27:7 | **turn** 11:15 | 17:9 27:4 42:17 | **Y** 4:1,1 | |
| **talked** 14:25 15:2 | **twice** 21:10 | **way** 11:14 18:18 25:4 | **yeah** 14:6 20:15 21:15 | **8** |
| 16:23 24:4 26:20 | **two** 2:11 9:25 26:8 32:4 | 32:9 | 23:16,19 35:11 | **821** 1:22 2:2 |
| **talking** 29:21 | 39:24,25 | **Weimer** 2:11 | **year** 13:3 | **84** 5:16 |
| **tap** 17:4 | **type** 8:21 11:4 30:22 | **Welfare** 1:7,13 2:6 | **years** 5:25 18:14 | |
| **tapped** 17:1 | 31:12 32:3 36:4 | 12:20 | **Youth** 1:6,12 2:6 5:9 | **9** |
| **tell** 5:2 10:10 21:18 | **typed** 7:22 31:17 | **well** 7:11 8:23 11:14,17 | 5:14 6:24 8:2 20:16 | **95** 8:14 |
| 33:5,8 34:8 | **types** 27:15 31:13 | 12:7 17:7,14 22:23 | | **975** 2:11 |
| **tendency** 4:23 | 32:18 40:11 | 23:25 28:25 29:10 | **Z** | **99** 13:10,23 |
| **terminated** 23:3 24:14 | **typical** 32:17 | 36:5 38:6,11 | **Z** 4:1,1 | |
| 24:18 25:5,11 37:4 | | **went** 23:13 | | |
| **terminating** 24:7 | **U** | **were** 7:12 8:5,9,13 9:4 | **0** | |
| **termination** 6:22 22:1 | **Um-hum** 4:13 15:12,14 | 9:10,14,25 10:15 | **01** 18:13 | |
| 22:19,22 23:7 24:6 | 35:14 41:4 42:6 | 12:22 13:13 17:20,22 | **02** 18:13 | |
| 27:17 | **uncommon** 41:19 | 17:25 19:7,14,15,20 | **05** 6:16 | |
| **testified** 4:2 28:7 | **under** 8:22 10:6 20:24 | 20:4,6,8 21:4,8 22:7 | **05-76E** 1:4 | |
| **testimony** 3:3 27:19 | 28:17 | 22:17,18,25 24:11,12 | | |
| 43:15 | **understand** 5:1,4 7:23 | 24:13,21 26:25 29:9 | **1** | |
| **thanked** 22:23 | 8:1,7 10:4 15:10 | 29:15 32:15,23 33:4 | **1:39** 1:21 | |
| **their** 14:15 26:25 31:12 | 16:16 17:4 20:7 | 33:23,25 37:4 38:2 | **10** 10:18 23:3 24:6 | |
| 32:4 36:14 | 24:17 29:13 34:1,7 | 38:14 39:19 40:13,15 | 27:17 | |
| **thing** 4:20 17:25 23:21 | 35:3 37:12 | **weren't** 37:10 | **10th** 2:8 26:10 | |
| 25:13 29:23 42:22,25 | **understanding** 29:8 | **West** 2:8 | **120** 2:8 | |
| **things** 6:12 20:5,22 | 39:6 | **WESTERN** 1:1 | **15219** 2:12,15 | |
| 32:1,4 | **unit** 8:4,9,19,20 9:1,3,7 | **We'll** 43:13 | **16501** 1:23 2:2,8 | |
| **think** 7:20 8:15 13:9 | 10:6 14:3 26:21 | **we're** 29:24 33:20 | **16509** 2:5 | |
| 21:24,25 23:13,24 | 31:12 35:2 | 34:17,19,21 | **1983** 5:15,17 | |
| 24:3,23,23 25:8,20 | **UNITED** 1:1 | **whatnot** 22:24 | **1984** 5:17 | |
| 26:21 35:3 38:24 | **units** 8:2 | **while** 8:22 17:23 20:2 | **1995** 5:20,21 6:5 10:5 | |
| **third** 9:15 33:13 | **Unprofessional** 40:24 | 20:24 | 13:8 | |
| **though** 16:16 20:8 26:9 | **until** 8:15 | **William** 2:14 | **1998** 13:10 | |
| 41:18 | **usage** 41:3 | **witness** 7:24 11:11 12:2 | **1999** 17:20 | |
| **thought** 23:8 24:25 | **use** 36:13 41:7,10,11 | **witnesses** 17:10 | | |