Appendix Exhibit 30

```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABBY B. CONLEY,              :
       Plaintiff             :
                             :
     v.                      :   Civil Action No. 05-76E
                             :
COUNTY OF ERIE, ERIE COUNTY  :
OFFICE OF CHILDREN AND YOUTH,:
a/k/a ERIE COUNTY CHILD      :
WELFARE SERVICE, RICHARD     :
SCHENKER, individually and   :
in his capacity as County    :
Executive of Erie County,    :
Pennsylvania, PETER CALLAN,  :
individually and in his      :
capacity as Erie County      :
Director of Personnel, DEBRA :
LIEBEL, individually and in  :
her capacity as Executive    :
Director, Erie County Office :
of Children and Youth, a/k/a :
Erie County Child Welfare    :
Service, and JOHN A. ONORATO,:
ESQUIRE, individually and in :
his capacity as Erie County  :
Solicitor,                   :
       Defendants            :
```

     Deposition of RICHARD A. VENDETTI, taken before
and by Janis L. Ferguson, Notary Public in and for
the Commonwealth of Pennsylvania, on Wednesday, March
20, 2006, commencing at 11:29 a.m., at the offices
of Knox McLaughlin Gornall & Sennett, PC, 120 West
10th Street, Erie, Pennsylvania 16501.

          Reported by Janis L. Ferguson, RPR
          Ferguson & Holdnack Reporting, Inc.

---

For the Plaintiff:
    Timothy D. McNair, Esquire
    821 State Street
    Erie, PA 16501

    Anthony Angelone, Esquire
    Vendetti & Vendetti
    3820 Liberty Street
    Erie, PA 16509

For the County of Erie, Erie County Office of Children and
Youth, a/k/a Erie County Child Welfare Service:
    Richard A. Lanzillo, Esquire
    Knox McLaughlin Gornall & Sennett, PC
    120 West 10th Street
    Erie, PA 16501

For the Defendants Richard Schenker, Peter Callan, and Debra
Liebel:
    Edmund R. Joyal, Jr., Esquire
    Law Office of Joseph S. Weimer
    975 Two Chatham Center
    Pittsburgh, PA 15219

For the Defendant John A. Onorato, Esquire:
    Sara E. Baugh, Esquire
    Dell Moser Lane & Loughney, LLC
    525 William Penn Place
    Suite 3700
    Pittsburgh, PA 15219

---

                    I N D E X

TESTIMONY OF RICHARD A. VENDETTI

    Direct examination by Mr. Lanzillo  . . . . . . . . 4

    Cross-examination by Mr. Joyal  . . . . . . . . . 11


EXHIBITS:

    Vendetti Deposition Exhibit 1 - Page 5

---

          MR. McNAIR:  Before we begin the deposition, I'd
     like to place an objection on the record.
          On behalf of the Plaintiff, Abby B. Conley,
     we object to this deposition, in that there -- it
     has not been demonstrated that this witness has
     any discoverable knowledge of any facts relating
     to any issue properly pleaded in the case.
          It is further our position that this
     deposition is being taken merely to intimidate,
     harass, and annoy both Mr. Vendetti and counsel
     for the Plaintiff.  And we do intend to seek
     appropriate sanctions in the event that
     discoverable evidence is not obtained through this
     deposition.  Thank you.


     R I C H A R D  A.  V E N D E T T I, first having
     been duly sworn, testified as follows:


                    DIRECT EXAMINATION
BY MR. LANZILLO:


     Q.  Mr. Vendetti, thank you for appearing today
pursuant to subpoena.  Would you start by giving us your
full name for the record.
     A.  Richard A. Vendetti.  Business address, 3820

### Page 5

```
 1  Liberty Street, Erie, PA 16509.  Phone number, 814-868-8541.
 2      Q.  And, Mr. Vendetti, am I correct that you are here
 3  today pursuant to a written subpoena that was served upon
 4  you at your office?
 5      A.  That's correct.
 6      Q.  And as part of that subpoena, there was a request
 7  for documents, specifically any and all correspondence with
 8  attachments from yourself to Judge Elizabeth Kelly,
 9  including, but not limited to the correspondence to the
10  Judge dated July 26th, 2004, concerning [J.C.] and [J.C.].
11      A.  That's correct.
12      Q.  And my question is, do you have documents
13  responsive to that request?
14      A.  I have one document; my letter to Judge Kelly
15  dated July 26th, 2004.
16          MR. LANZILLO:  May I make a copy of that for all
17          counsel?
18          (Discussion held off the record.)
19          (Attorney Angelone enters deposition.)
20          (Vendetti Deposition Exhibit 1
21           marked for identification.)
22      Q.  Mr. Vendetti, we have now marked as Exhibit 1 to
23  your deposition a letter dated July 26th, 2004 from yourself
24  to the Honorable Judge Elizabeth K. Kelly.  Is that correct?
25      A.  That's correct.
```

### Page 6

```
 1      Q.  Is this the only document that was responsive to
 2  the duces tecum that was part of the subpoena that was
 3  served upon you?
 4      A.  There was a second document, which I cannot
 5  locate, and that is a reply document from the Judge.
 6      Q.  Do you recall the substance of that reply?
 7      A.  Probably dated within a week of my July 26th
 8  letter.  I recall it being a short paragraph, consisting of
 9  two or three sentences, the subject of which was, I have
10  received your letter, I consider this an ex parte
11  communication, and I am sending it back to you.  And she --
12  she sent -- she probably sent the letter back to me.  And
13  then I did not put it in the file.  I simply placed my
14  original letter that I had sent to her, along with her
15  responsive letter, in a stack, and I have -- I probably
16  discarded it some -- sometime later, after the matter was
17  resolved.
18      Q.  Did you transmit any other correspondence or
19  documents to Judge Kelly concerning the [C.] proceeding,
20  other than Exhibit 1?
21      A.  No.
22      Q.  In what capacity did you author Exhibit 1?
23      A.  A friend of the Court and also in prior
24  representation of Mr. and Mrs. [C.]  When I refer to Mr. and
25  Mrs. [C.], I'm referring to the parents of young James [C.].
```

### Page (next)

```
 1      Q.  And just for the record, would you state the names
 2  of those two parents.
 3      A.  That would have been James [C.] -- I believe it's
 4  Senior, and Patricia [C.], his wife.
 5      Q.  And were you actively representing James [C.],
 6  Senior, and Patricia [C.] as of July 26th, 2004?
 7      A.  In other matters.
 8      Q.  But were you representing them in any respect to
 9  the possible dependency proceedings at issue in this letter?
10      A.  Just to give him advice as a friend.  But I was
11  not representing him in court proceedings.
12      Q.  Who was representing Mr. and Mrs. [C.] in these
13  proceedings?
14      A.  I believe Attorney Gerald Villella.
15      Q.  Do you know or have you ever represented Abby
16  Conley?
17      A.  No.
18      Q.  How did you become aware of the dependency
19  proceedings that are discussed in your letter of July 26th,
20  2004?
21      A.  Mr. [C.] informed me of that.
22      Q.  Did you discuss these proceedings with anyone
23  other than Mr. and Mrs. [C.]?
24          MR. McNAIR:  Are you asking for his work product?
25          MR. LANZILLO:  I'm asking if he discussed these
```

### Page (next)

```
 1          proceedings with anyone other than Mr. and
 2          Mrs. [C.].
 3      A.  Probably.
 4          MR. McNAIR:  Okay.  To the extent that your
 5          question calls for disclosure of work product or
 6          confidential communications, I would object.
 7      A.  Probably.
 8      Q.  With whom did you discuss this matter?
 9      A.  I can't go back that far.  Probably they were
10  seeking representation.  I was not doing custody work
11  anymore at that time.  And I had been in that field for many
12  years, grew tired of it after a while.  Probably Amy Jones
13  in our office, who declined to represent them.  We knew this
14  was going to be a very exacerbated, difficult issue.  Amy
15  Jones would have been one.  She declined to represent them.
16  Substantively, that would have been the only person I
17  probably talked to about this foster placement of the
18  children.
19      Q.  Did you discuss this matter with Attorney Anthony
20  Angelone at or about the time of this letter?
21      A.  Probably not.
22      Q.  You have no recollection of doing so?
23      A.  No.
24      Q.  Have you ever met Abby Conley?
25      A.  No.
```

```
 1    Q.   Did you discuss this matter with Attorney Jerry
 2 Villella?
 3    A.   Yes.
 4    Q.   When did that discussion occur?
 5    A.   I cannot recall.
 6    Q.   What do you recall in terms of the substance of
 7 that discussion?
 8    A.   Probably requested an update.  This was a very
 9 protracted proceeding and continued for over a two-year
10 period.  He would discuss various stages of the appeal with
11 me.  I really can't recall that far back.  A lot of it was
12 in the paper, so a lot of it was common knowledge.
13    Q.   Did you supply any documentation to Attorney
14 Villella?
15    A.   No.
16    Q.   Did you ever have in your possession any
17 memorandum authored by Abby Conley or any other employee of
18 the Office of Children and Youth regarding the [C.]
19 children?
20    A.   I may have.
21    Q.   When you say you may have, what are you thinking
22 that you may have had in your possession?
23    A.   A memorandum; court proceeding.
24    Q.   And do you recall the substance of that
25 memorandum?
```

9

```
 1    A.   It was a case summary.
 2    Q.   And do you recall the author of the case summary?
 3    A.   No.
 4    Q.   Do you know whether it was Abby Conley?
 5    A.   It was not Abby Conley.
 6    Q.   Who provided the case summary to you?
 7    A.   Mr. [C.].
 8    Q.   Did he tell you where he received it; how he
 9 obtained it?
10    A.   Probably from his son.
11         MR. McNAIR:  It's privileged.
12    Q.   You said probably from his son?
13    A.   (Witness nods head.)
14    Q.   Do you have any knowledge concerning how Mr. --
15 how the son obtained a copy of that memo?
16    A.   No.
17         MR. McNAIR:  Again, it's privileged.
18         Mr. Lanzillo, do you believe you have any
19         questions that relate to any issue that's been
20         pleaded in this case?
21         MR. LANZILLO:  Every --
22         MR. McNAIR:  I would ask you to get to those
23         questions, rather than the [C.] case, which is not
24         at issue in this court at this time.
25         MR. LANZILLO:  And my practice is not to respond
```

10

```
 1         to those types of comments.  So I'm going to ask
 2         the questions I see fit to ask.
 3         Those are all the questions that I have.
 4         MR. JOYAL:  I have some questions, Mr. Vendetti.
 5         THE WITNESS:  Um-hum.
 6
 7                       CROSS-EXAMINATION
 8 BY MR. JOYAL:
 9
10    Q.   In your letter, you speak of Attorney Cauley from
11 OCY, and you allege statements or things made by him.  I
12 presume these were made -- you know, these statements were
13 obtained in the course of the court --
14    A.   The court proceeding.  Yeah, um-hum.
15    Q.   You got that information.  Did you get that as
16 well from Mr. [C.], Senior?
17         MR. McNAIR:  Objection.  Privileged and relevance.
18    A.   Mr. [C.] attended most of the dependency hearings
19 in front of the Judge.
20    Q.   How many --
21    A.   And those assertions must have been made in court.
22    Q.   How many years prior to July 26th of 2004 had you
23 been an active member of the bar in Pennsylvania?
24         MR. McNAIR:  Objection.  Relevance.
25    A.   Well, I'm admitted in March of '71.  So that would
```

```
 1 have been a 33-year practitioner.
 2    Q.   33 years.  And you said that you had experience in
 3 the past in child-welfare-type laws.  Is that correct?
 4    A.   You have to speak up.
 5    Q.   Represented families in dependency proceedings --
 6    A.   Did a lot of domestic.
 7    Q.   -- and terminations?
 8    A.   Um-hum.
 9    Q.   Can you tell me, off the top of your head, how
10 many times you would have written a letter such as this to a
11 Judge, when you weren't actively participating in a case.
12    A.   Well, I can't think of another one.  Probably I
13 may have written one or two letters, but I can't remember
14 what case.
15    Q.   And do you have any idea as to whether or not
16 Judge Kelly read your letter?
17    A.   I assume she read it, because she responded to it.
18 But --
19    Q.   By sending it back.
20    A.   Yeah, by sending it back.  So maybe she did not
21 read it.
22    Q.   Okay.  Would it be fair to say that you did not
23 have a very high opinion of Mr. Cauley?
24    A.   I did prior to this hearing.  I feel he was a very
25 well-respected attorney and a good attorney and a good
```

```
 1  advocate, until this proceeding.  And then my view of Mr.
 2  Cauley changed.
 3      Q.   And that was based on information that had been
 4  transmitted to you by one of your former clients?
 5      A.   The newspaper, the former client, other attorneys.
 6      Q.   Well, what was in the newspaper about this case
 7  prior to July 28th of 2004 that you can recall would have --
 8      A.   I can't.  But I -- I -- I think it was in the
 9  newspaper.
10      Q.   Well, would it not be normal prior to a certain
11  order being issued by the Court that there would not be
12  newspaper reporters in dependency hearings?  Those were
13  closed, were they not, under the --
14      A.   They are all closed.
15      Q.   So how would this information have been in the
16  newspaper prior to July 28th, 2004?
17      A.   Maybe it was not in the newspaper.
18      Q.   So that would have been information that was
19  transmitted to you through other sources.
20      A.   Through Mr. [C.].
21      Q.   All right.  And you say Mr. Villella gave you --
22  apparently spoke with you prior -- was it prior to your
23  writing this letter or afterwards?
24      A.   Boy, I can't recall.
25      Q.   Did he tell you or transmit any information
```

                                                                    13

```
 1  concerning conversations that he may have had with Abby
 2  Conley about documents that she had authored?
 3      A.   No.
 4      Q.   And when you say you saw this case summary that
 5  had been provided by the younger Mr. [C.], did you see a
 6  signature on it?
 7      A.   See whose signature?
 8      Q.   Any signature.
 9      A.   I saw a signature on the bottom, I recall, of Sue
10  Deveney, which I believe was the director.
11      Q.   Do you know whether it was a case summary of
12  visits?
13      A.   Whether it was a what?
14      Q.   Case summary that included visits.
15      A.   Yes.
16      Q.   Okay.  Did you see any other signature on that --
17      A.   Yes.
18      Q.   -- such as Abby Conley's?
19      A.   No, I didn't see Abby Conley's.
20      Q.   Who else did you see?
21      A.   I can't tell you.  I can't recall.
22      Q.   You didn't keep the document?
23      A.   I did keep the document.
24      Q.   Okay.  Where is the document?
25      A.   I don't have it with me.
```

                                                                    14



```
 1      Q.   Was that attached to the --
 2      A.   Letter to Judge Kelly?
 3      Q.   -- letter to the Judge?
 4      A.   Not at all.
 5      Q.   But you do have a copy of the document in your
 6  office?
 7      A.   I do.
 8      Q.   Okay.  Did you keep the document at the request of
 9  Mr. [C.], Junior?
10      A.   I -- I just kept the document because it was
11  handed to me and it was pertinent to the case.
12      Q.   I see.  You had never -- you said you had maybe
13  written one letter such as this before in your practice?
14      A.   I may have, I may not have.
15      Q.   This is not something you would normally do, would
16  you?  Communicate with the Court about an ongoing
17  matter that you -- if you were representing someone, you
18  certainly wouldn't do it without copies to counsel; is that
19  correct?
20      A.   Correct.
21      Q.   What is it that prompted you to do it in this
22  case?
23      A.   Because Mr. [C.] was concerned about the
24  possibility of losing his grandchildren to an IVT.
25      Q.   I see.  Did Mr. [C.] tell you that this was -- the
```

```
 1  hearing that was being held on the 28th was a change in plan
 2  hearing; that it was a hearing to see whether or not OCY
 3  could change their plan from family reunification to IVT?
 4      A.   There's nothing in here that refers to the 28th.
 5      Q.   Well, the hearing was held -- I will tell you that
 6  the hearing was held on the 28th of July, which was the date
 7  of Judge Kelly's letter back to you returning this stuff.
 8      A.   Okay.
 9      Q.   Did you know that this was a hearing just for OCY
10  to go into the court and get permission to change the plan
11  for the children from --
12      A.   I believe I did.
13      Q.   And where did you get that information from?
14      A.   Probably from Mr. [C.].
15      Q.   Would you be kind enough to get that document for
16  us and provide it to Mr. Lanzillo so that we can check to
17  see if Abby Conley's signature may be on it?
18      A.   No.
19      Q.   And are you going to assert a privilege in that?
20      A.   Um-hum.
21      Q.   I think we'll probably just reserve our rights,
22  considering what you told us earlier, that you were not
23  representing Mr. [C.] at that point and had declined
24  representation.
25      A.   I can tell you that Abby Conley did not sign it.
```

Q. Okay. Can you tell me what the document said. Did it have any -- do you recall whether or not it said that Mr. [C.], Junior or Miss [S.] demonstrated exceptional parenting skills?

A. It did not.

Q. Did it say anything negative about either one of the parents?

A. It said they were immature parents, was the conclusion.

Q. That was the end of the report?

A. The -- somewhere in the report. It's maybe on the -- one of the last pages. And then it recommends that the plan be shifted to an involuntary termination of parental rights.

Q. And was there anything in the report that you know of that related to observations of visiting by both parents?

A. Probably five or six pages or more of supervised visitation rights.

Q. And do you know who was the person that supervised the visits or helped supervise the visits?

A. I do not. There's various caseworkers involved, and Abby Conley is mentioned in two paragraphs.

Q. All right.

A. As supervising visitation with the natural -- the biological mother and biological father.

17

Q. As you sit here today, do you have any recollection of either seeing or being told of a draft Court summary that had been prepared by Abby Conley and allegedly changed?

A. No.

Q. Would you think, based upon your many years of experience in this type of law, that someone having a copy of the Court summary would have gotten that from somewhere other than the Court?

A. I think it was probably made available to the parents.

Q. Do you know that for sure?

A. I do not.

MR. JOYAL: I want to suspend at this point, Rich, just for the purpose of making sure that Mr. Vendetti -- and maybe he can have it faxed over.

Mr. Vendetti, I want to give you the opportunity to take a look at that document to make sure that Abby Conley's signature is not on it and to get a date for me.

MR. McNAIR: I think that's an unfair imposition. You can get that document from your client.

MR. JOYAL: I don't know what document he has, Mr. McNair, and I don't know what objection you're

18

raising, since you don't represent him.

MR. McNAIR: Again --

MR. JOYAL: I'm not trying to be unfair --

MR. McNAIR: Again --

MR. JOYAL: There is a document --

MR. McNAIR: -- there has yet to be a single question that has anything but the most tangential relevance to the issues in this case. Again, this is simply harassment and intimidation. It's a waste of our time, and it's a waste of the Plaintiff's resources.

BY MR. JOYAL:

Q. Mr. Vendetti, would you do that for us?

A. I am willing to fax to you the signature page. I am willing to fax to you the page containing the supervised visitation at which Abby Conley was present. And those are the only two pages that are probably pertinent. If you're concerned about who signed it, I can fax the signature page to you.

Q. Well, let me tell you that one of the issues, if you don't know it, in this case is an allegation that Abby Conley was retaliated against because she made a report during the July 28th, 2004 hearing that her document had been altered. There has also been testimony and there will be testimony, should the case go to trial, that that

document, which was confidential, had been provided by Abby Conley to a client of hers and to Mr. Villella. And so we don't know at this point --

A. I don't have that document.

Q. Okay.

MR. LANZILLO: Could I interject for just a moment. In terms of the concern of privilege, Mr. Vendetti, I have not seen the document, but it sounds to me that it was reviewed and executed by members of OCY. And I would respectfully submit to you that the privilege, even if there had been an attorney/client relationship -- which I understand did not exist at the time. But even if there had been one, I don't believe the privilege would attach to that document. It's a third-party document that's already been discussed here.

I think what we are trying to do, what Mr. Joyal and I are trying to ascertain, is exactly what document we're talking about. Chances are we have seen it before, but we would sure like to confirm that and ascertain not only who signed it, but also the substance of it, so we can match it up with issues in the case.

MR. JOYAL: As well, and I'd like to find out the date that it would have been made available to

**Page 21**

```
 1       someone, because I would believe that depending
 2       upon when it got there -- and not to you,
 3       Mr. Vendetti --
 4   THE WITNESS:  I don't know what date it was
 5       disseminated.  I have the date of the document.
 6   MR. JOYAL:  Well, that's what we would -- I mean,
 7       we could presume that --
 8   MR. LANZILLO:  Could we make that request?  Do you
 9       mind?  And certainly give you an opportunity to
10       look at it before you distributed it to anyone.
11   THE WITNESS:  I'm still talking about Pages 1,
12       probably 7 or 8, and the last page.
13   MR. LANZILLO:  Could I ask you to have the entire
14       document faxed here to your attention, so at least
15       if there were some follow-up questions, we could
16       at least discuss whether the other pages are
17       appropriate for production?  In other words, I'm
18       not going to grab it off the fax machine.  You're
19       going to be the first person to touch it.
20   THE WITNESS:  That was one concern.  But my
21       secretary is probably gone to lunch now, so.
22       (Discussion held off the record.)
23       (Recess held from 11:59 a.m. till 12:15 p.m.)
24   BY MR. JOYAL:
25   Q.  Have you reviewed the document, sir?
```

**Page 22**

```
 1   A.  Um-hum.
 2   Q.  And are you willing to show us the document today?
 3   A.  Didn't hear you, sir.
 4   Q.  Are you willing to show us the document today?
 5   A.  I am willing to show you the pertinent parts of
 6       the document.
 7   Q.  Would you please tell us what the privilege that
 8       you're asserting is.
 9   A.  Mr. [C.] was my client.  Now, I was not
10       representing him in court, but he was still my client, and
11       he would confide -- we would confer, and we would confide in
12       me quite often through this entire proceeding.  More than a
13       client.  A friend.  So he trusted me.  I consider him my
14       client, even though I was not representing him in court
15       proceedings.  And I still think that the -- our disclosures
16       to each other are still confidential in that regard.
17   Q.  Okay.  I'm not asking you, sir, to tell me what he
18       talked to you about or you talked to him about.  You are
19       holding what, I presume, is a document authored by the
20       Office of Children and Youth.  Is that correct?
21   A.  Correct.
22   Q.  So the reality would be, I presume you would
23       agree, that that's an OCY document.  That's not a document
24       that was authored by your client to you, nor was it a
25       document authored by you to your client.  Is that correct?
```

**Page 23**

```
 1   A.  That's correct, sir.
 2   Q.  So then, again, I want you to tell me what
 3       privilege holds with that document.
 4   A.  I don't mean to ask you a question in return.  I
 5       know that's not the purpose here.  But do I understand you
 6       do not have this document?
 7   Q.  I don't know what the document is, sir, so why
 8       don't you give me the date of the document.
 9   A.  It's dated April 26th.  It's a Court summary
10       concerning [J.C.] and [J.C.].  I gave you the date.
11       Concerning a Court summary -- a permanency hearing summary.
12   Q.  That's dated April 26th, 2004?
13   A.  That's correct.
14   Q.  Okay.  And you told us earlier that Abby Conley
15       was mentioned in two paragraphs.
16   A.  I believe so.
17   Q.  Okay.  Do you have any knowledge as to when you
18       got that document?
19   A.  I do not know exactly when I got the document,
20       except it would have been sometime -- sometime prior to my
21       letter of July 26th.
22   Q.  Do you know whether or not there was ever a
23       hearing held between April 26th and July 28th in this case?
24   A.  I do not.
25   Q.  Do you know whether there was a hearing held
```

**Page 24**

```
 1       between April 26th and July 24th in this case?
 2   A.  I do not.
 3   Q.  Based upon your experience, would it be fair to
 4       say that Court summaries are not submitted until the date of
 5       the hearing or shortly before the hearing?
 6   A.  That's probably correct.
 7   Q.  I'm going to represent to you, sir, that there was
 8       not a hearing between April 19th and July 28th in this case.
 9       If that document was in the possession of your client, would
10       you believe that it had been given to him by someone other
11       than his counsel?
12       MR. McNAIR:  Objection.  Argumentative.  Calls for
13           speculation.
14   Q.  Do you understand my --
15   A.  I don't know that.
16   Q.  You don't know it.  In your experience doing this
17       type of domestic work, had you ever received Court summaries
18       directly from OCY?
19   A.  Yes, I have.
20   Q.  And were they always provided to you shortly
21       before your hearings?
22   A.  Generally.
23   Q.  Did you ever get one from a social worker, as
24       opposed to the lawyer that was representing OCY in the case?
25   A.  I can't -- I truthfully can't recall.
```

```
 1          MR. McNAIR:  Are you representing that the lawyer
 2          sends those out?
 3          MR. JOYAL:  I'm not representing anything, Mr.
 4          McNair.  If you have an objection, put it on the
 5          record.
 6          MR. McNAIR:  I just don't understand your
 7          question, that's all.
 8   BY MR. JOYAL:
 9     Q.   Did you speak to any of the other lawyers that
10   were representing any of the parties in this case prior to
11   July 26th of 2004?
12     A.   Probably only Jerry Villella.
13     Q.   Do you have a recollection as to whether or not
14   Mr. Villella told you that he had spoken directly with Abby
15   Conley in this case?
16     A.   No.
17     Q.   In your letter to Judge Kelly, on the second page,
18   third paragraph down, you say, "I can vouch for the family
19   stability of James and Patricia [C.].  I can state with
20   certainty that they had nothing to do with the allegations
21   of abuse and the actual perpetration of abuse.  I believe
22   testimony revealed one child was not abused at all.  The
23   other infant was probably injured by the numerous young
24   teenage caregivers that were handling her within the first
25   three months of birth."
```

25

```
 1          Could you share with me how you came to the
 2   conclusion stated in that last sentence, that the other
 3   infant was probably injured by?
 4     A.   When -- when the children were first declared
 5   dependent, I represented Mr. [C.] at the initial hearing
 6   that would have been within two months of birth, which I
 7   think is when this occurred.  And I want to say it was
 8   November or December.  And, again, my memory doesn't serve
 9   me well, but I'll do the best I can.
10          And I was with him, with Mr. and Mrs. [C.] and the
11   son, James, Junior, and the mother at the very initial -- I
12   want to call it an intake hearing, but I don't think it's
13   called an intake hearing.  It's probably called a dependency
14   hearing.  It may have been sometime in December of '02,
15   which is when this began.  And there was a lot of discussion
16   as to how this occurred, as to how the alleged fracture of
17   the humerus -- if it was the humerus -- occurred.  And I
18   remember the mother, which would have been Miss [S.] and the
19   father, young -- the young [C.] boy talking about the
20   various young teenage caregivers that were in the house.
21   Having twins, of course, the job is daunting.  And there was
22   discussion as to the babies would go from one caregiver to
23   another teenager to another teenager.  And very frankly, the
24   young children were being handled or mishandled by a lot of
25   young adults; 18, 19 years of age, that probably had no
```

26

```
 1   knowledge as to how to really care for a baby.  And this was
 2   a general discussion.  And this was very early on in the
 3   case.
 4          And I went that far, and I knew it was -- and I
 5   was getting very busy at the time, and I said -- and I was,
 6   very frankly, too close to James, Junior to do all this
 7   work.  That's when I had talked about it with Amy Jones.
 8          That's why that substance is in that paragraph,
 9   because we discussed it at the intake hearing.
10     Q.   Fair enough.  Fair enough.  This letter that you
11   wrote to Judge Kelly on July 26th was, in your view, I
12   presume, a letter to educate her, as opposed to a letter to
13   try to influence her?
14     A.   It was a letter -- the letter speaks for itself --
15   simply to tell her that rather than opt for an IVT or a
16   termination hearing, that there was an alternative, and that
17   the -- the paternal grandparents were very loving, caring,
18   substantive individuals that could care for their
19   grandchildren.  And a letter to inform her that she should
20   not take the harsh measures of terminating parental rights,
21   which OCY had done liberally in the past, and I was fearful
22   of that.
23     Q.   But you would agree with me, would you not, that
24   although OCY would petition for involuntary termination, it
25   was the Court that ultimately made the decision as to
```

```
 1   whether those rights were terminated?
 2     A.   That's correct.
 3     Q.   And you do know that subsequent to July 28th,
 4   Judge Kelly did not allow for the change of plan for these
 5   children; is that correct?
 6     A.   (No response.)
 7     Q.   Did you know that Judge Kelly did not --
 8     A.   Mr. Joyal, was that the hearing date -- is that
 9   the --
10     Q.   July 28th, sir.  Two days after this letter was
11   written.  You do know that Judge Kelly did not grant the
12   change of plan petition; is that correct?
13     A.   No, I don't know.  I don't know when she granted
14   the change of plan.  She did -- she did change OCY's
15   proposed plan.
16     Q.   Well, what is your understanding of the change of
17   plan?
18     A.   The plan, as proposed by OCY, was that the
19   children were immature, the -- let me correct that.  The
20   parents were immature and that the plan should be one of
21   termination of parental rights.  At some point Judge Kelly
22   changed that and ordered a reunification between parents and
23   children.
24     Q.   Okay.  Now, you --
25     A.   I don't know when that was.
```

```
 1    Q.  You knew that from reviewing that April 26th
 2 report.
 3    A.  No, not at all.  I didn't know that.
 4    Q.  Well, when did you know that the OCY plan was for
 5 involuntary termination?
 6    A.  Oh, from this (indicating).
 7    Q.  From that.  That's what I meant.  The April 26th
 8 memorandum --
 9    A.  Yes.
10    Q.  -- to the Court.  The Court summary.
11    A.  Yes.
12    Q.  And did you know, in reviewing that Court summary,
13 that the original plan had been for family reunification?
14    A.  Probably I was told by Mr. [C.].
15    Q.  Okay.  And that that -- that was in support of OCY
16 going in to ask the Court to change that reunification plan
17 to one for adoption.  Did you know that?
18    A.  Correct.
19    Q.  So in reality, sir, you may have misspoken when
20 you said that Judge Kelly changed the plan from IVT.  Judge
21 Kelly never changed the plan.  She just refused to allow the
22 plan for involuntary termination to go forward.
23    A.  That's correct.
24         MR. McNAIR:  Objection.  Argumentative.
25    Q.  This will be my last question for you, sir,
```

29

```
 1 because I know you have someplace you need to go, and I
 2 appreciate you accommodating us on such short notice.
 3    A.  You're welcome.
 4    Q.  It is fair to say, then, that the information you
 5 received from your client, Mr. [C.], Senior, that was
 6 contained in that report was one of the things that prompted
 7 you to write this letter to Judge Kelly suggesting that IVT
 8 was not an appropriate --
 9    A.  Resolution.
10    Q.  -- disposition or resolution; is that right?
11    A.  Disposition.  That's correct.
12         MR. JOYAL:  I don't have anything else.  Thank
13    you, sir.
14         MR. LANZILLO:  Nothing further.
15         MR. McNAIR:  I have no further questions.
16         THE WITNESS:  To give you the name of the person
17    who signed the report, it's Michelle Schetter,
18    S-C-H-E-T-T-E-R, caseworker.
19         MR. JOYAL:  All right.
20         MR. LANZILLO:  Mr. Vendetti, actually, let me --
21    for record purposes, what is the length of that
22    document?  How many pages?
23         THE WITNESS:  The document is 23 pages.  It's
24    reviewed and affirmed by Sue Deveney two years ago
25    to the day; 4/20/04.  I'm sorry, this is 3/20.
```

30

```
 1    4/20/04.
 2         MR. LANZILLO:  Are there any fax transmittal lines
 3    on that document?  Does it show -- indicate that
 4    it was faxed to anyone?
 5         MR. JOYAL:  Except for today.
 6         THE WITNESS:  Oh, faxed to anyone?
 7         MR. LANZILLO:  Except for today, of course.
 8         THE WITNESS:  No.  No, hum-um.
 9         MR. LANZILLO:  Are there any handwritten notes on
10    the document?
11         THE WITNESS:  Mine.
12         MR. LANZILLO:  When would you have made the notes
13    on the document?
14         THE WITNESS:  Probably in my review of the
15    document, just my own comments.
16         MR. LANZILLO:  Thank you.
17         MR. McNAIR:  Mr. Lanzillo, will you be kind enough
18    to provide me with the April 26th Court summary as
19    it was originally filed?
20         MR. LANZILLO:  Sure.
21         (Discussion held off the record.)
22         MR. LANZILLO:  I would just renew the request for
23    the document.  Frankly, I don't see any claim of
24    privilege here, and it may actually save us time
25    and trouble if we could simply review the
```

```
 1    document.
 2         THE WITNESS:  How about if I -- how about if I
 3    read you the paragraph involving Abby Conley?  Or
 4    give it to you?
 5         MR. LANZILLO:  Unfortunately, that -- I can't
 6    decide whether -- determine whether that would be
 7    adequate or not unless I see the substance of the
 8    entire document.
 9         MR. McNAIR:  Why don't we do this:  Why don't you
10    show him the file document that you have and ask
11    him if apart from his handwritten notes there's
12    any changes.  I think that his handwritten notes
13    would constitute his work product, which would not
14    be subject to disclosure.  And I think that's
15    probably the basis of his objection.
16         MR. JOYAL:  Well, that wouldn't satisfy me.
17         MR. McNAIR:  I know.  I don't intend to satisfy
18    you, Mr. Joyal.
19         MR. JOYAL:  Well, you don't, Mr. McNair.
20         MR. McNAIR:  I'm merely proposing a workable
21    solution.
22         MR. LANZILLO:  It's a moot point for me.
23    Unfortunately, as everyone knows, I'm relatively
24    new to the case, and if I were to put my hand on
25    that document, I simply couldn't do it in any
```

| | |
|---|---|
| 1 | reasonable time frame. |
| 2 | (Discussion held off the record.) |
| 3 | THE WITNESS: For my purposes, this is all moot. |
| 4 | I know this involves Abby Conley, but for my |
| 5 | purposes, you know, the reunification order was -- |
| 6 | the reunification plan was implemented by Judge |
| 7 | Kelly, so this -- |
| 8 | MR. McNAIR: Apparently they are still mad about |
| 9 | it. |
| 10 | MR. LANZILLO: For the record, Mr. Vendetti has |
| 11 | declined to provide us with a copy of the |
| 12 | document. We have reserved our rights. |
| 13 | Mr. Vendetti, thank you for coming in. |
| 14 | |
| 15 | (Deposition concluded at 12:32 p.m., and signature |
| 16 | of the deponent was waived.) |

33

C E R T I F I C A T I O N

I, Janis L. Ferguson, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes in the above-captioned matter.

*[signature: Janis L. Ferguson]*
Registered Professional Reporter

Dated: 3-27-06

Commonwealth of Pennsylvania
NOTARIAL SEAL
JANIS L. FERGUSON, Notary Public
City of Erie, County of Erie
My Commission Expires January 19, 2010

Page 1

**A**
Abby 1:3 4:3 7:15 8:24 9:17 10:4,5 14:1,18 14:19 16:17,25 17:22 18:3,20 19:16,21 20:1 23:14 25:14 32:3 33:4
about 8:17,20 13:6 14:2 15:16,23 17:6 19:18 20:19 21:11 22:18,18 26:19 27:7 32:2,2 33:8
abuse 25:21,21
abused 25:22
accommodating 30:2
Action 1:4
active 11:23
actively 7:5 12:11
actual 25:21
actually 30:20 31:24
address 4:25
adequate 32:7
admitted 11:25
adoption 29:17
adults 26:25
advice 7:10
advocate 13:1
affirmed 30:24
after 6:16 8:12 28:10
afterwards 13:23
again 10:17 19:2,4,8 23:2 26:8
against 19:22
age 26:25
ago 30:24
agree 22:23 27:23
allegation 19:21
allegations 25:20
allege 11:11
alleged 26:16
allegedly 18:3
allow 28:4 29:21
along 6:14
already 20:16
altered 19:24
alternative 27:16
although 27:24
always 24:20
Amy 8:12,14 27:7
Angelone 2:3 5:19 8:20
annoy 4:10
another 12:12 26:23,23
Anthony 2:3 8:19
anymore 8:11
anyone 7:22 8:1 21:10 31:4,6
anything 17:6,15 19:7 25:3 30:12
apart 32:11

apparently 13:22 33:8
appeal 9:10
appearing 4:22
appropriate 4:12 21:17 30:8
April 23:9,12,23 24:1,8 29:1,7 31:18
Argumentative 24:12 25:24
ascertain 20:18,21
asking 7:24,25 22:17
assert 16:19
asserting 22:8
assertions 11:21
assume 12:17
attach 20:15
attached 15:1
attachments 5:8
attempted 21:14
attorney 5:19 7:14 8:19 9:1,13 11:10 12:25 12:25
attorneys 13:5
attorney/client 20:12
author 6:22 10:2
authored 9:17 14:2 22:19,24,25
available 18:10 20:25
aware 7:18
a.m 1:21 21:2
a/k/a 1:6,12 2:6

**B**
B 1:3 4:3
babies 26:22
baby 27:1
back 6:11,12 8:9 9:11 12:19,20 16:7
bar 11:23
based 13:3 18:6 24:3
basis 32:15
Baugh 2:13
become 7:18
before 1:18 4:1 15:13 20:20 21:10 24:5,21
began 26:15
begin 4:1
behalf 4:3
being 4:9 6:8 13:11 16:1 18:2 26:24
believe 7:3,14 10:18 14:10 16:12 20:14 21:1 23:16 24:10
best 26:9
between 23:23 24:1,8 28:22
biological 17:25,25

birth 25:25 26:6
both 4:10 17:16
bottom 14:9
boy 13:24 26:19
Business 4:25
busy 27:5

**C**
C 4:16 6:19,24,25,25 7:3,4,5,6,12,21,23 8:2 9:18 10:7,23 11:16,18 13:20 14:5 15:9,23,25 16:14,23 17:3 22:9 25:19 26:5 26:10,19 29:14 30:5
call 26:12
Callan 1:9 2:9
called 26:13,13
calls 8:5 24:12
came 26:1
capacity 1:8,10,11,14 6:22
care 27:1,18
caregiver 26:22
caregivers 25:24 26:20
caring 27:5
case 4:7 10:1,2,6,20,23 12:11,14 13:6 14:4 14:11,14 15:11,22 19:8,21,25 20:23 23:23 24:1,8,24 25:10,15 27:3 32:24
caseworker 30:18
caseworkers 17:21
Cauley 11:10 12:23 13:2
Center 2:11
certain 13:10
certainly 15:18 21:9
certainty 25:20
Chances 20:20
change 16:1,3,10 28:4 28:12,14,14,16 29:6
changed 13:2 18:4 28:22 29:20,21
changes 32:12
Chatham 2:11
check 16:16
child 1:6,13 2:6 25:22
children 1:6,12 2:6 8:18 9:18,19 16:11 22:20 26:4,24 28:5 28:19,23
child-welfare-type 12:3
Civil 1:4
claim 31:23
client 8:13,23 20:2 22:9,10,13,14,24,25 24:7 25:10 29:10,10 29:12 31:18

clients 13:4
close 27:6
closed 13:13,14
coming 33:13
commencing 1:21
comments 11:1 31:15
common 9:12
Commonwealth 1:20
Communicate 15:16
communication 6:11
communications 8:6
concern 20:7 21:20
concerned 15:23 19:18
concerning 5:10 6:19 10:14 14:1 23:10,11
concluded 33:15
conclusion 17:9 26:2
confer 22:11
confide 22:11,11
confidential 8:6 20:1 22:16
confirm 20:21
Conley 1:6 4:3 7:16 8:24 9:17 10:4,5 14:2 16:25 17:22 18:3 19:16,22 20:2 23:14 25:15 32:3 33:4
Conley's 14:18,19 16:17 18:20
consider 6:10 22:13
considering 16:22
consisting 6:8
constitute 32:13
contained 30:6
containing 19:15
continued 9:7
conversations 14:1
copies 15:18
copy 5:16 10:15 15:5 18:7 33:11
correct 5:2,5,11,24,25 12:3 15:19,20 22:20 22:21,25 23:1,13 24:6 28:2,5,12,19 29:18,23 30:1
correspondence 5:7,9 6:18
counsel 4:10 5:17 15:18 24:11
County 1:5,5,6,8,8,10 1:12,13,14 2:6,6,6 21:21 33:2
course 1:13 26:21 31:7
court 1:1 4:7 11 9:23 10:24 11:13,14 11:21 13:15 17:1 16:10 18:2,8,9 20:5 22:14 21:14 24:4 24:17,23 29:10,10 29:12 31:18

Cross-examination 3:5 11:7
custody 8:10

**D**
D 2:1 3:1 4:16,16
date 16:6 18:21 20:25 21:4,5 23:8,10 24:4 28:8
dated 5:10,15,23 6:7 23:9,12
daunting 26:21
day 30:25
days 28:10
Debra 1:10 2:9
December 26:8,14
decide 32:6
decision 27:25
declared 26:4
declined 8:13,15 16:23 33:11
Defendant 2:13
Defendants 1:15 2:9
Dell 2:14
demonstrated 4:5 17:3
dependency 7:9,18 11:18 12:5 13:12 26:13
dependent 26:5
depending 21:1
deponent 33:16
deposition 1:18 3:10 4:1,4,9,14 5:19,20,23 33:15
determine 32:6
Deveney 14:10 30:24
difficult 8:14
Direct 3:4 4:19
directly 24:18 25:14
director 1:10,12 14:10
discarded 6:16
disclosure 8:5 32:14
disclosures 22:15
discoverable 4:6,13
discuss 7:22 8:8,19 9:1 9:10 21:16
discussed 7:19,25 20:16 27:9
discussion 5:18 9:4,7 21:24 26:15,22 27:2 21:21 33:2
disposition 30:10,11
disseminated 21:5
distributed 21:10
DISTRICT 1:1,1
document 5:14 6:1,4,5 14:22,23 15:5,8 16:10 18:2,8,9 20:5 22:14 24:17,23 29:10,10 29:12 31:18

exist 20:13
experience 12:2 18:7 24:3,16
extent 8:4

Page 2

21:5,14,25 22:2,4,6 22:19,23,25 23:3 23:6,7,8,18,19 24:9 30:22,23 31:3,10,13 31:15,23 32:1,8,10 32:25 33:12
documentation 9:13
documents 5:7,12 6:19 14:2
doing 8:10,22 24:16
domestic 12:6 24:17
done 27:21
down 25:18
draft 18:2
duces 6:2
duly 4:17
during 19:23

**E**
E 2:13 3:1 4:16,16
each 22:16
earlier 16:22 23:14
early 27:2
Edmund 2:10
educate 27:12
either 17:6 18:2
Elizabeth 5:8,24
employee 9:17
end 17:10
enough 16:15 27:10,10 31:17
enters 5:19
entire 21:13 22:12 32:8
Erie 1:5,5,6,8,10,12,13 1:14,22 2:5,6,6,6,8 5:1
Esquire 1:14 2:1,3,7,10 2:13,13
even 20:11,13 22:14
event 4:12
ever 7:15 8:24 9:16 23:22 24:17,23
Every 22:10
everyone 32:23
evidence 4:13
ex 6:10
exacerbated 8:14
exactly 20:19 23:19
examination 3:4 4:19
except 23:20 31:5,7
exceptional 17:3
executed 20:9
Executive 1:8,11
Exhibit 3:10 5:20,22 6:20,22

**F**
facts 4:6
fair 12:22 24:3 27:10 27:10 30:4
families 12:5
family 16:3 25:18 29:13
far 8:9 9:11 27:4
father 17:25 26:19
fax 19:14,15,18 21:18 31:2
faxed 18:16 21:14 31:4 31:6
fearful 27:21
feel 12:24
Ferguson 1:19,24,25
field 8:11
file 6:13 32:10
filed 31:19
find 20:24
first 4:16 21:19 25:24 26:4
fit 11:2
five 17:17
follows 4:17
follow-up 21:15
former 13:4,5
forward 29:22
foster 8:17
fracture 26:16
frame 33:1
frankly 26:23 27:6 31:23
friend 6:23 7:10 22:13
from 5:8,23 6:5 10:10 10:12 11:10,16 16:3 16:11,13,14 18:8,23 21:23 24:18,23 26:22 29:1,6,7,20 30:5 32:11
front 11:19
full 4:24
further 4:8 30:14,15

**G**
gave 13:21 23:10
general 27:2
Generally 24:22
Gerald 7:14
getting 27:5
give 7:10 18:18 21:9 23:8 30:16 32:4
giving 4:23
go 8:9 16:10 19:25 26:22 29:22 30:1
going 8:14 11:1 16:19 21:18,19 24:7 29:16
gone 21:21

good 12:25,25
Gornall 1:22 2:7
gotten 18:8
grab 21:18
grandchildren 15:24 27:19
grandparents 27:17
grant 28:11
granted 28:13
grew 8:12

**H**
H 4:16
hand 32:24
handed 15:11
handled 26:24
handling 25:24
handwritten 31:9 32:11,12
harass 4:10
harassment 19:9
harsh 27:20
having 4:16 18:7 26:21
head 10:13 12:9
hear 22:3
hearing 12:24 16:1,2,2 16:5,6,9 19:23 23:11 23:23,25 24:5,5,8 26:5,12,13,14 27:9 27:16 28:8
hearings 11:18 13:12 24:21
held 5:18 16:1,5,6 21:22,23 23:23,25 31:21 33:2
helped 17:20
her 1:11 6:14,14 19:23 25:24 27:12,13,15,19 high 12:23
him 7:10,11 11:11 19:1 22:10,13,14,18 24:10 26:10 32:10,11
holding 22:3
Holdnack 1:25
holds 25:3
Honorable 5:24
house 26:20
humerus 26:17,17
hum-um 31:8

**I**
idea 12:15
identification 5:21
immature 17:8 28:19 28:20
implemented 33:6
imposition 18:22
Inc 1:25
included 14:14
including 5:9

indicate 31:3
indicating 29:6
individually 1:7,9,11 1:14
individuals 27:18
infant 25:23 26:3
influence 27:13
inform 27:19
information 11:15 13:3 13:15,18,25 16:13 30:4
informed 7:21
initial 26:5,11
injured 25:23 26:3
intake 26:12,13 27:9
intend 4:11 32:17
interject 20:6
intimate 4:9
intimidation 19:9
involuntary 17:13 27:24 29:5,22
involved 17:21
involves 33:4
involving 32:3
issue 4:7 7:9 8:14 10:19 10:24
issued 13:11
issues 19:8,20 20:23
IVT 15:24 16:3 27:15 29:20 30:7

**J**
James 6:25 7:3,5 25:19 26:11 27:6
Janis 1:19,24
Jerry 1:25:12
job 26:21
John 1:13 2:13
Jones 8:12,15 27:7
Joseph 2:11
Joyal 2:10 3:5 11:4,8 18:14,24 19:3,5,12 20:18,24 21:6,24 25:3,8 28:8 30:12,19 31:5 32:16,18,19
Jr 2:10
Judge 5:8,10,14,24 6:5 6:19 11:19 12:11,16 15:2,3 16:7 17:25 27:11 28:4,7,11,21 29:20,20 30:7 33:6
July 5:10,15,23 6:7 7:19 5:10,15,23 6:7 13:16 16:6 19:23 23:21 24:1,8 25:11 27:11 28:3,20 30:7 33:6
Junior 15:9 17:3 26:11 27:6
just 7:1,10 15:10 16:9 16:21 18:15 20:6

25:6 29:21 31:15,22
J.C 5:10,10 23:10,10

**K**
K 5:24
keep 14:22,23 15:8
Kelly 5:8,14,24 6:19 27:11 28:4,7,11,21 29:20,21 30:7 33:7
Kelly's 16:7
kept 15:10
kind 16:15 31:17
knew 8:13 27:4 29:1
know 7:15 10:4 11:12 14:11 16:9 17:15,19 18:12,24,25 19:21 20:3 21:4 23:5,7,19 23:22,25 24:15,16 28:3,7,11,13,13,25 29:3,4,12,17 30:1 32:17 33:4,5
knowledge 4:6 9:12 10:14 23:17 27:1
knows 32:23
Knox 1:22 2:7

**L**
L 1:19,24
Lane 2:14
Lanzillo 2:7 3:4 4:20 5:16 7:25 10:18,21 10:25 16:16 20:6 21:8,13 30:14,20 31:2,7,9,12,16,17,20 31:22 32:2,5,23 33:10
last 17:12 21:12 26:2 29:25
later 6:16
law 2:11 18:7
laws 12:3
lawyer 24:24 25:1
lawyers 25:9
least 21:14,16
length 30:21
let 19:20 28:19 30:20
letter 5:23 6:8,10,12 6:14,15 7:9,9 8:20 11:10 12:10,16 13:21 15:2,3,13 16:7 29:20,20 30:7 33:6
letters 12:13
liberally 27:21
Liberty 2:4 5:1
Liebel 1:11 2:10
like 4:2 20:21,24
limited 5:9
lines 31:2
LLC 2:14

locate 6:5
look 18:19 21:10
losing 15:24
lot 9:11,12 12:6 26:15
 26:24
Loughney 21:14
loving 27:17
lunch 21:21

**M**
machine 21:18
mad 33:8
made 11:11,12,21
 18:10 19:22 20:25
 27:25 31:12
make 5:16 18:20 21:8
making 18:15
many 8:11 11:20,22
 12:10 18:6 30:22
March 1:20 11:25
marked 5:21,22
match 20:23
matter 6:16 8:8,19 9:1
 15:17
matters 7:7
may 5:16 9:20,21,22
 12:13 14:1 15:14,14
 16:17 26:14 29:19
 31:24
maybe 12:20 13:17
 15:12 17:11 18:16
McLaughlin 1:22 2:7
McNair 2:1 4:1 7:24
 8:4 10:11,17,22
 11:17,24 18:22,25
 19:2,4,6 24:12 25:1,4
 25:6 29:24 30:15
 31:17 32:9,17,19,20
 33:8
mean 21:6 23:4
meant 29:7
measures 27:20
member 11:23
members 20:10
memo 10:15
memorandum 9:17,23
 9:25 29:8
memory 26:8
mentioned 17:22 23:15
merely 4:9 32:20
met 8:24
Michelle 30:17
mind 21:9
Mine 31:11
mishandled 26:24
Miss 17:3 26:18
misspoken 29:19
moment 20:7
months 25:25 26:6
moot 32:22 33:3

more 17:17 22:12
Moser 2:14
most 11:18 19:7
mother 17:25 26:11,18
must 11:21

**N**
N 3:1 4:16
name 4:24 30:16
names 7:1
natural 17:24
need 30:1
negative 17:6
never 15:12 29:21
new 32:24
newspaper 13:5,6,9,12
nods 10:13
normal 15:11
normally 15:15
Notary 1:19
notes 31:9,12 32:11,12
 30:14
nothing 16:4 25:20
notice 30:2
November 26:8
number 5:1
numerous 25:23

**O**
object 4:4 8:6
objection 4:2 11:17,24
 18:25 24:12 25:4
 29:24 32:15
observations 17:16
obtained 4:13 10:9,15
 11:13
occur 9:4
occurred 26:7,16,17
OCY 11:11 16:2,9
 20:10 22:23 24:18,24
 27:21,24 28:18 29:4
 29:15
OCY's 28:14
off 5:18 12:9 21:18,22
 31:21 33:2
office 1:6,12 2:6,11 5:4
 8:13 9:18 15:6 22:20
offices 1:21
often 22:12
Oh 29:6 31:6
Okay 8:4 12:22 14:16
 14:24 15:8 16:8 17:1
 20:5 22:17 23:14,17
 28:24 29:15
one 5:14 8:15 12:12,13
 13:4 15:13 17:6,12
 19:20 20:14 21:20
 24:23 25:22 26:22
 28:20 29:17 30:6

ongoing 15:16
only 6:1 8:16 19:17
 20:21 25:12
Onorato 1:13 2:13
opinion 12:23
opportunity 18:19 21:9
opposed 24:24 27:12
opt 27:15
order 13:11 33:5
ordered 28:22
original 6:14 29:13
originally 31:19
other 6:18,20 7:7,23
 8:1 9:17 13:5,19
 14:16 18:9 21:16,17
 22:16 24:10 25:9,23
 26:2
out 20:24 25:2
over 9:9 18:17
own 31:15

**P**
PA 2:2,5,8,12,15 5:1
page 3:10 19:14,15,18
 21:12 25:17
pages 17:12,17 19:17
 21:11,16 30:22,23
paper 9:12
paragraph 6:8 25:18
 27:8 32:5
paragraphs 17:22
 23:15
parental 17:14 27:20
 28:21
parenting 17:4
parents 6:25 7:2 17:7,8
 17:16 18:11 28:20,22
part 5:6 6:2
parte 6:10
participating 12:11
parties 25:10
parts 22:5
past 12:3 27:21
paternal 27:17
Patricia 7:4,6 25:19
PC 1:22 2:7
Penn 2:14
Pennsylvania 1:1,9,20
 1:23 11:23
period 9:10
permanency 23:11
permission 16:10
perpetration 25:21
person 8:16 17:19
 21:19 30:16
Personnel 1:19
pertinent 15:11 19:17
 22:5
Peter 1:9 2:9
petition 27:24 28:12

Phone 5:1
Pittsburgh 2:12,15
place 2:14 4:2
placed 6:13
placement 8:17
Plaintiff 1:3 2:1 4:3,11
Plaintiff's 19:11
plan 16:1,3,10 17:13
 28:4,12,14,15,17,18
 28:20 29:4,13,16,20
 29:21,22 33:6
pleaded 4:7 10:20
please 22:7
point 16:23 18:14 20:3
 28:21 32:22
position 4:8
possession 9:16,22 24:9
possibility 15:24
possible 7:9
practice 10:25 15:13
practitioner 12:1
prepared 18:3
present 19:16
presume 11:12 21:7
 22:19,22 27:12
prior 6:23 11:22 12:24
 13:7,10,16,22,22
 23:20 25:10
privilege 16:19 20:7,11
 20:14 22:7 23:3
 31:24
privileged 10:11,17
 11:17
probably 6:7,12,15 8:3
 8:7,9,12,17,21 9:8
 10:10,12 12:12 16:14
 16:21 17:17 18:10
 19:17 21:12,21 24:6
 25:12,23 26:3,13,25
 29:14 31:14 32:15
proceeding 6:19 9:9,23
 11:14 13:1 22:12
proceedings 7:9,11,13
 7:19,22 8:1 12:5
 22:15
product 7:24 8:5 32:13
production 21:17
prompted 15:21 30:6
properly 4:7
proposed 28:15,18
proposing 32:20
protracted 9:9
provide 16:16 31:18
 33:11
provided 10:6 14:5
 20:1 24:20
Public 1:19
purpose 18:15 23:5
purposes 30:21 33:3,5
pursuant 4:23 5:3

put 6:13 25:4 32:24
p.m 21:23 33:15

**Q**
question 5:12 8:5 19:7
 23:4 25:7 29:25
questions 10:19,23
 11:2,3,4 21:15 30:15
quite 22:12

**R**
R 2:10 4:16,16
raising 19:1
rather 10:23 27:15
read 12:16,17,21 32:3
reality 22:22 29:19
really 9:11 27:1
reasonable 33:1
recall 6:6,8 9:5,6,11,24
 10:2 13:7,24 14:9,21
 17:2 24:25
received 6:10 10:8
 24:17 30:5
Recess 21:23
recollection 8:22 18:2
 25:13
recommends 17:12
record 4:2,24 5:18 7:1
 21:22 25:5 30:21
 31:21 33:2,10
refer 6:24
referring 6:25
refers 16:4
refused 29:21
regard 22:16
regarding 9:18
related 17:16
relate 10:19
relating 4:6
relationship 20:12
relatively 32:23
relevance 11:17,24
 19:8
remember 12:13 26:18
renew 31:22
reply 6:5,6
report 17:10,11,15
 19:22 29:2 30:6,17
Reported 1:24
reporters 13:12
Reporting 1:25
represent 8:13,15 19:1
 24:7
representation 6:24
 8:10 16:24
represented 7:15 12:5
 26:5
representing 7:5,8,11
 7:12 15:17 16:23
 22:10,14 24:24 25:1

25:3,10
request 5:6,13 15:8
 21:8 31:22
requested 9:8
reserve 16:21
reserved 33:12
resolution 30:9,10
resolved 6:17
resources 19:11
respect 7:8
respectfully 20:10
respond 10:25
responded 12:17
response 28:6
responsive 5:13 6:1,15
retaliated 19:22
return 23:4
returning 16:7
reunification 16:3
 28:22 29:13,16 33:5
 33:6
revealed 25:22
review 31:14,25
reviewed 20:9 21:25
 30:24
reviewing 29:1,12
Rich 18:14
Richard 1:7,18 2:7,9
 3:3 4:25
right 13:21 17:23 30:10
 30:19
rights 16:21 17:14,18
 27:20 28:1,21 33:12
RPR 1:24

**S**
S 2:11 17:3 26:18
sanctions 4:12
Sara 2:13
satisfy 32:16,17
save 31:24
saw 14:4,9
Schenker 1:7 2:9
Schetter 30:17
second 6:4 25:17
secretary 21:21
see 11:2 14:5,7,16,19
 14:20 15:12,25 16:2
 16:17 31:23 32:7
seeing 18:2
seek 4:11
seeking 8:10
seen 20:8,20
sending 6:11 12:19,20
sends 25:2
Senior 7:4,6 11:16 30:5
Sennett 1:22 2:7
sent 6:12,12,14
sentence 26:2
sentences 6:9

serve 26:8
served 5:3 6:3
Service 1:7,13 2:6
share 26:1
shifted 17:13
short 6:8 30:2
shortly 24:5,20
show 22:2,4,5 31:3
 32:10
sign 16:25
signature 14:6,7,8,9,16
 16:17 18:20 19:14,18
 33:15
signed 19:18 20:22
 30:17
simply 6:13 19:9 27:15
 31:25 32:25
since 19:1
single 19:6
sir 21:25 22:3,17 23:1,7
 24:7 28:10 29:19,25
 30:13
sit 18:1
six 17:17
skills 17:4
social 24:23
Solicitor 1:15
solution 32:21
some 6:16 11:4 21:15
 28:21
someone 15:17 18:7
 21:1 24:10
someplace 30:1
something 15:15
sometime 6:16 23:20
 23:20 26:14
somewhere 17:11 18:8
son 10:10,12,15 26:11
sorry 30:25
sounds 20:9
sources 13:19
speak 11:10 12:4 25:9
speaks 27:14
specifically 5:7
speculation 24:13
spoke 13:22
spoken 25:14
stability 25:19
stack 6:15
stages 9:10
start 4:23
state 2:2 7:1 25:19
stated 26:2
statements 11:11,12
STATES 1:1
still 21:11 22:10,15,16
 33:8
Street 1:23 2:2,4,8 5:1
stuff 16:7
subject 6:9 32:14

submit 20:10
submitted 24:4
subpoena 4:23 5:3,6
 6:2
subsequent 28:3
substance 6:6 9:6,24
 20:22 27:8 32:7
substantive 27:18
Substantively 8:16
Sue 14:9 30:24
suggesting 30:7
Suite 2:15
summaries 24:4,17
summary 10:1,2,6 14:4
 14:11,14 18:3,8 23:9
 23:11,11 29:10,12
 31:25 32:25
supervise 17:20
supervising 17:17,19
 19:15
supervising 17:24
supply 9:13
support 29:15
sure 18:12,15,20 20:21
 31:20
suspend 18:14
sworn 4:17
S-C-H-E-T-T-E-R
 30:18

**T**
T 4:16,16
take 18:19 27:20
taken 1:18 4:9
talked 8:17 22:18,18
 27:7
talking 20:19 21:11
 26:6 28:10 30:24
tangential 19:7
tecum 6:2
teenage 25:24 26:20
teenager 26:23,23
tell 10:8 12:9 13:25
 14:21 15:25 16:5,25
 17:1 19:20 22:7,17
 23:2 27:15
terminated 28:1
terminating 27:20
termination 17:13
 27:16,24 28:21 29:5
 29:22
terminations 12:7
terms 9:6 20:7
testified 4:17
testimony 3:3 19:24,25
 25:22
thank 4:14,22 30:12
 31:16 33:13
their 16:7 27:18
things 11:11 30:6

think 12:12 13:8 16:21
 18:6,10,22 20:17
 22:15 26:7,12 32:12
 32:14
thinking 9:21
third 25:18
third-party 20:15
though 22:14
three 6:9 25:25
through 4:13 13:19,20
 22:12
till 21:23
time 8:11,20 10:24
 19:10 20:13 27:5
 31:24 33:1
Timothy 2:1
tired 8:12
today 4:22 5:3 18:1
 22:2,4 31:5,7
told 16:22 18:2 23:14
 25:14 29:14
top 12:9
touch 21:19
transmit 6:18 13:25
transmittal 31:2
transmitted 13:4,19
trial 19:25
trouble 31:25
trusted 2:17
truthfully 24:25
try 27:13
trying 19:3 20:17,18
twins 26:21
two 2:11 6:9 7:2 12:13
 17:22 19:17 23:15
 26:6 28:10 30:24
two-year 9:9
type 18:7 24:17
types 11:1

**U**
ultimately 27:25
um-hum 11:5,14 12:8
 16:20 22:1
under 13:13
understand 20:13 23:5
 24:14 25:6
understanding 28:16
unfair 18:22 19:3
Unfortunately 32:5,23
UNITED 1:1
unless 32:7
until 13:1 24:4
update 9:8

**V**
v 1:4 4:16
various 9:10 17:21
 26:20

Vendetti 1:18 2:4,4 3:3
 3:10 4:10,22,25 5:2
 5:20,22 11:4 18:16
 18:18 19:13 20:8
 21:3 30:20 33:10,13
very 8:14 9:8 12:23,24
 26:11,23 27:2,5,6,17
view 13:1 27:11
Vilella 7:14 9:2,14
 13:21 20:2 25:12,14
visitation 17:18,24
 19:16
visiting 17:16
visits 14:12,14 17:20,20
vouch 25:18

**W**
waived 33:16
want 18:14,18 23:2
 26:7,12
waste 19:10,10
Wednesday 1:20
week 6:7
welcome 30:3
well 11:16,25 12:12
 13:6,10 16:5 19:20
 20:24 21:6 26:9
 28:16 29:4 32:16,19
well-respected 12:25
went 27:4
were 7:5,8 8:9 11:12,12
 13:12,13 15:17 16:22
 17:8 21:15 24:20
 25:10,24 26:4,20,24
 27:17 28:1,19,20
 32:24
weren't 12:11
West 1:22 2:8
WESTERN 1:1
we'll 16:21
we're 20:19
while 8:12
wife 7:4
William 2:14
willing 19:14,15 22:2,4
 22:5
witness 4:5 10:13 11:5
 21:4,11,20 30:16,23
 31:6,8,11,14 32:2
 33:3
words 21:17
work 7:24 8:5,10 24:17
 27:7 32:13
workable 32:20
worker 24:23
wouldn't 15:18 32:16
write 30:7
writing 13:23

written 5:3 12:10,13
 15:13 28:11
wrote 27:11

**X**
X 3:1

**Y**
Yeah 11:14 12:20
years 8:12 11:22 12:2
 18:6 26:25 30:24
young 6:25 25:23 26:19
 26:19,20,24,25
younger 14:5
Youth 1:6,12 2:6 9:18
 22:20

**0**
02 26:14
05-76E 1:4

**1**
1 3:10 5:20,22 6:20,22
 21:11
10th 1:23 2:8
11 3:5
11:29 1:21
11:59 21:23
12:15 21:23
12:32 33:15
120 1:22 2:8
15219 2:12,15
16501 1:23 2:2,8
16509 2:5 5:1
18 26:25
19 26:25
19th 24:8

**2**
20 1:21
2004 5:10,15,23 7:6,20
 11:22 13:7,16 19:23
 23:12 25:11
2006 1:21
23 30:23
24th 24:1
26th 5:10,15,23 6:7 7:6
 7:19 11:22 23:9,12
 23:21,23 24:1 25:11
 27:11 29:1,7 31:18
28th 13:7,16 16:1,4,6
 19:23 23:23 24:8
 28:3,10

**3**
3
3/20 30:25
33 12:2
33-year 12:1
3700 2:15
3820 2:4 4:25

**4**
4 3:4
4/20/04 30:25 31:1

**5**
5 3:10
525 2:14

**7**
7 21:12
71 11:25

**8**
8 21:12
814-868-8541 5:1
821 2:2

**9**
975 2:11

# VENDETTI & VENDETTI
ATTORNEYS AND COUNSELORS AT LAW
3820 LIBERTY STREET
ERIE, PENNSYLVANIA 16509
TELEPHONE: 814 / 868-8541
FAX: 814 / 868-0626
INDIVIDUAL ATTORNEYS • NOT A PARTNERSHIP

CHESTER J. VENDETTI
RICHARD A. VENDETTI
LAWRENCE L. KINTER
ANDREW J. SISINNI
ANTHONY ANGELONE
JOSEPH B. SPERO

AMY E. JONES
W. ATCHLEY HOLMES
KENNETH A. BICKEL

FRANK J. ZAPPALA, SR.
(1897 - 1988)

July 26, 2004

Honorable Judge Elizabeth K. Kelly
Erie County Courthouse, Room 215
140 West Sixth Street
Erie, PA 16501

Re:   J████a C█████
      J████ C█████

Dear Judge Kelley:

I am writing to you as a friend of the court. This letter concerns the matter of the detention and disposition of the two grandchildren of J███ A. and Pa███ L. C███ who currently reside at 1735 Emery Drive. The twins, J███a and J███ C███ were born on September 12, 2002, I believe prematurely, to J█████ and J███ C███, both young adults. You have much information in front of you concerning the charges of child abuse, in which the court adjudicated the children dependent, and the children were subsequently placed in foster care in early 2003.

There have been numerous appeals filed by Attorneys James Lucht and Jerry Villella representing both the biological parents and J███ and P████a Casella, and I believe the matter is now in front of you for disposition.

I am writing as a friend of the Court because I have known J████ C█████ for over forty years, and have also been acquainted with his wife for approximately 25 years. Attorney Michael Cauley has made extensive allegations of abuse against the paternal grandparents, including among other things, that they could not be ruled out as possible abusers of the two infants. Pleadings have become extensive in this matter.

In the past I have done extensive IVT work involving placement of minor children, termination of parental rights on the part of fathers, which ultimately lead to many adoption hearings in front of Judges Nygaard, Dwyer, and Fischer. It appears the course of these two young children is now heading toward a similar disastrous fate of being abused (perpetrators unknown), being adjudicated dependant, being placed in foster care for over a year, and ultimately being in your Court for a dispositional hearing which could very well result in a termination of parental rights. I feel that would be a harsh and unjust remedy in the instant case.



DEPOSITION EXHIBIT
Vendetti #1

Attorney Michael Cauley, Counsel for OCY has eluded and inferred that the paternal grandparents could not be ruled out as possible abusers. That inference and allegation is quite frankly preposterous. I understand J████ and P████ C████ have corresponded with you requesting kinship care for their granddaughters, and it would appear this is a proper, logical, legal, and fair resolution to the disposition of this case. I have known J████ for forty years and he has raised two children, and his wife has also raised two children with a total of five grandchildren. He is employed as the Assistant Director for the City of Erie Public Works Department, and has been a supervisor and engineer in the Engineering Department of the City of Erie for 25 years. I have been acquainted with J████ and P████ for dozens of social engagements, and to allege that he cannot be ruled out as a possible abuser and therefore should be denied kinship care of his grandchildren is ridiculous.

The Court is well aware that young mothers and fathers ages 20 or 21 often times struggle in caring for a child born out of wedlock because of their immaturity. The Court and the legal profession are also well aware that grandparents often times make better parents than their own children who are the biological parents. There is simply more love on the part of the grandparents, and more emotional and financial maturity that young biological parents simply do not possess because of their age.

I can vouch for the family stability of J████ and P████ Casella, and can state with certainty they had nothing to do with the allegations of abuse and the actual perpetration of abuse. I believe testimony revealed one child was not abused at all. The other infant was probably injured by the numerous young teenage care givers that were handling her within the first three months of birth.

A hearing for the involuntary termination of parental rights by OCY is a drastic measure whereby all ties between the infant twins and the biological parents and grandparents is suddenly severed, with no further right or recourse on the part of the grandparents. Said grandparents thereby loose the love and affection they can bestow upon their own biological grandchildren in the future. In the past, I believe OCY has been too quick and harsh in ordering IVT's for many parents who do not deserve to lose their children. The C████s have offered to accept the children in their home as if they were their own children, and I would suggest and plead that the Court consider and approve the grandparents request for kinship care. Mr and Mrs C████ would welcome the opportunity to bestow love and affection upon their own grandchildren and would strictly comply with any Order the Court may impose in mandating supervised visitation with the biological parents while the grandchildren are in their custodial care. I trust the court will give serious consideration to this request for kinship care by Mr and Mrs C████ who dearly love and cherish their twin granddaughters. Thanking you, I remain

Respectfully yours,

VENDETTI & VENDETTI

_____
Richard A. Vendetti, Esq.

RAV/klg