Appendix Exhibit 31

Case 1:05-cv-00076-SJM    Document 70-6    Filed 04/12/2006    Page 2 of 38

Conley v. County of Erie, et al.                                    PW

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABBY B. CONLEY,                    :
          Plaintiff               :
                                   :
     v.                            :    Civil Action No. 05-76E
                                   :
COUNTY OF ERIE, ERIE COUNTY        :
OFFICE OF CHILDREN AND YOUTH,      :
a/k/a ERIE COUNTY CHILD            :
WELFARE SERVICE, RICHARD           :
SCHENKER, individually and         :
in his capacity as County          :
Executive of Erie County,          :
Pennsylvania, PETER CALLAN,        :
individually and in his            :
capacity as Erie County            :
Director of Personnel, DEBRA       :
LIEBEL, individually and in        :
her capacity as Executive          :
Director, Erie County Office       :
of Children and Youth, a/k/a       :
Erie County Child Welfare          :
Service, and JOHN A. ONORATO,      :
ESQUIRE, individually and in       :
his capacity as Erie County        :
Solicitor,                         :
          Defendants              :


          Deposition of PW, taken before and

     by Carol A. Holdnack, Notary Public in and for the

     Commonwealth of Pennsylvania, on Monday, April 3,

     2006, commencing at 2:59 p.m., at the offices

     of Timothy D. McNair, Esquire, 821 State Street,

     Erie, Pennsylvania 16501.


          Reported by Carol A. Holdnack, RPR
          Ferguson & Holdnack Reporting, Inc.

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                    PW

---

Page 2

1  For the Plaintiff:
2      Timothy D. McNair, Esquire
       821 State Street
3      Erie, PA 16501
4      Anthony Angelone, Esquire
       Vendetti & Vendetti
5      3820 Liberty Street
       Erie, PA 16509
6
     For the County of Erie, Erie County Office of Children and
7    Youth, a/k/a Erie County Child Welfare Service:
       Neal R. Devlin, Esquire
8      Knox McLaughlin Gornall & Sennett, PC
       120 West 10th Street
9      Erie, PA 16501
10   For the Defendants Richard Schenker, Peter Callan, and Debra
     Liebel:
11     Edmund R. Joyal, Jr., Esquire
       Law Office of Joseph S. Weimer
12     975 Two Chatham Center
       Pittsburgh, PA 15219
13
14   For the Defendant John A. Onorato, Esquire:
       Mark R. Lane, Esquire
15     Dell Moser Lane & Loughney, LLC
       525 William Penn Place
16     Suite 3700
       Pittsburgh, PA 15219
17
18   Also Present:
       Wallace J. Knox, Esquire
19     Solicitor, County of Erie
20
21
22
23
24
25

---

Page 3

1              I N D E X
2
3  TESTIMONY OF PW
4      Direct Examination by Mr. Angelone . . . . . 4
5      Cross-Examination by Mr. Lane . . . . . . . 75
6      Cross-Examination by Mr. Joyal . . . . . . . 77
7      Cross-Examination by Mr. Devlin . . . . . . 84
8      Redirect Examination by Mr. Angelone . . . . 85
9      Recross-Examination by Mr. Joyal . . . . . . 94
10
11
12  EXHIBITS:
13      PW Deposition Exhibit 1 . . . . . . . . . . 21
14      PW Deposition Exhibit 2 . . . . . . . . . . 24
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1      PW, first having been duly
2  sworn, testified as follows:
3
4          DIRECT EXAMINATION
5  BY MR. ANGELONE:
6
7      Q.  Ma'am, my name is Anthony Angelone.  I'm an
8  attorney.  I'm representing Abby Conley in this case.  And
9  I'm going to be asking you some questions here as part of a
10 deposition.  I'm assuming you've been deposed, or am I
11 incorrect?
12     A.  You're incorrect.
13     Q.  You've never done a deposition?
14     A.  Never.
15     Q.  You've testified in trial before --
16     A.  Yes.
17     Q.  -- would that be correct?  Well, I'm going to be
18 asking you a series of questions during this deposition.
19 And the one thing I'm going to ask you is that, first of
20 all, please make all your answers verbal so the court
21 reporter can take everything down.  Okay?
22     A.  Okay.
23     Q.  And the other thing is, if there's a question that
24 I ask you that you don't understand, please ask me to
25 rephrase it.  If you do answer the question, then everybody

---

Page 5

1  is going to assume you understood the question, and that
2  answer, then, is going to be your answer to that question.
3  Okay?
4      A.  Yes.  Got it.
5      Q.  Let's start off with your name.
6      A.  PW.
7      Q.  And you've gone by other names in the past, last
8  names; would that be correct?
9      A.  One other, yes.
10     Q.  What would that one be?
11     A.  K.
12     Q.  All right.  Is there also -- I've run across the
13 name -- is it G?
14     A.  G.
15     Q.  G.
16     A.  G.
17     Q.  How is that spelled?
18     A.  (Witness spells.)
19     Q.  Was that your last name also, at one time?
20     A.  Yes.
21     Q.  So there was three, three names that you've gone
22 by?
23     A.  Yes.
24     Q.  Is that correct?  Any others?
25     A.  No.

---

Ferguson & Holdnack Reporting, Inc.
814-452-4556

577feba1-fae2-4550-b633-b661eb7ebc68

Case 1:05-cv-00076-SJM    Document 70-6    Filed 04/12/2006    Page 4 of 38

Conley v. County of Erie, et al.                                    PW

Page 6

1    Q.  You're a resident of Erie County; is that correct?
2    A.  Yes.
3    Q.  And can you tell us -- tell me, what's your age?
4    A.  43.
5    Q.  Okay.  And can I get a little bit about your
6    educational background, please.
7    A.  I have a bachelor's of social work from Edinboro.
8    Q.  Okay.  When was that?
9    A.  '85.  1985.
10   Q.  All right.  Is that a two-year?
11   A.  Four-year.
12   Q.  It was a four-year program.  You said that's 1985?
13   A.  Yes.
14   Q.  And at some point in time after that you did begin
15   work with the County of Erie?
16   A.  Yes.
17   Q.  What capacity was your first position with the
18   County?
19   A.  I was a caseworker.
20   Q.  When would that have been that you got that job?
21   A.  March of 1990.
22   Q.  And you were hired as a caseworker?
23   A.  Yes.
24   Q.  Who was the director at the time, do you know?
25   A.  No.  I'm not sure at that exact time who it was.

Page 7

1    It may have been John Petulla.  Because he was, and then he
2    wasn't.
3    Q.  Okay.  And can you tell me, has the job
4    description or requirements for a caseworker changed since
5    1990, at any point in time since 1990?
6        MR. DEVLIN:  To today; is that your question?
7        MR. ANGELONE:  Yeah.
8    A.  They've changed, yes, a little bit.  But, I mean,
9    basically, the job has been the same.
10   Q.  Can you describe for me a little bit of the basic
11   job requirements.
12   A.  That depends on what department you're in at
13   Children's Services.
14   Q.  So as a caseworker you could be in one of
15   different departments, then?
16   A.  Yes.
17   Q.  Which departments would they be?
18   A.  There's GPS, general protective services.
19   Truancy.
20   Q.  Okay.
21   A.  CPS, child protective services.
22   Q.  Okay.
23   A.  There's like foster care.  There's placement.  And
24   then there's specialized jobs also.
25   Q.  And since 1990 in what particular department were

Page 8

1    you associated with?
2    A.  I initially started out in general protective
3    services.
4    Q.  Okay.
5    A.  Then I went to a specialized area.  I worked in
6    the Corry area as a general protective services worker.
7    Q.  Okay.
8    A.  Then I went to placement.
9    Q.  Then into placement.
10   A.  Yes.
11   Q.  And what's the last position that you -- or last
12   department that you were working in with the Office of
13   Children and Youth?
14   A.  Placement.
15   Q.  How long were you in that position or department?
16   A.  Approximately six years.
17   Q.  So I'm just going to actually focus on your job
18   duties as a caseworker in the placement department, then.
19   A.  Okay.
20   Q.  Can you just give me a little bit of a background
21   of the essentials of the job that you do as a caseworker,
22   what you're required to do.
23   A.  Document, you know, seeing family, interactions
24   with the family.  Making referrals to service providers.
25   Attending meetings to obtain services.  Supervising visits.

Page 9

1    Scheduling visits.  Doing court summaries.  Court hearings.
2    Plus whatever else.  I mean, you know, in doing -- there was
3    some investigation, making appropriate referrals that needed
4    to be made.
5    Q.  Okay.
6    A.  So just working with the families to either keep
7    the children in their homes.  Because placement cases are
8    mainly court cases.
9    Q.  Okay.
10   A.  So.
11   Q.  Meaning that the child has been detained?
12   A.  Detained or -- well, not necessarily detained.
13   Maybe just adjudicated.  They could be adjudicated in the
14   home.
15   Q.  Okay.
16   A.  So compliant with the court orders and stuff like
17   that.
18   Q.  You mentioned a couple of things.  And I just want
19   to hit on a couple of these.  You do testify in court on
20   occasion as part of that; is that right?
21   A.  Yes.
22   Q.  But not on every case.
23   A.  That's correct.
24   Q.  And you do prepare court summaries as well?
25   A.  Yes.

3 (Pages 6 to 9)

Conley v. County of Erie, et al.                                              PW

---

Page 10

1   Q.   And you mentioned supervising visits.  What does
2   that mean?  I mean, do you actually supervise every visit
3   that takes place between, for example, a parent and a child?
4   A.   On my caseload?
5   Q.   Yeah.
6   A.   Pretty much so, yes.
7   Q.   And as part of that too, you said documents,
8   preparing documents.  Do you prepare documents in relation
9   to those visits?
10  A.   Yes.
11  Q.   Okay.
12  A.   And other documents too, but.
13  Q.   All right.  And I just want to get a distinction.
14  A case aide does something that's different than the
15  caseworker.
16  A.   Definitely.
17  Q.   What's the case aide's role, then, as far as being
18  a part of the visits between parent and child?
19  A.   One more time, please.
20  Q.   Okay.  Well, I think you --
21  A.   I just want to make sure.
22  Q.   That's fine.  I think you said that you supervise
23  visits, you actually attend the visits between parents and
24  child.
25  A.   Um-hum.

Page 11

1   Q.   That's part of your requirements, right?
2   A.   Yes.
3   Q.   What is the case aide's responsibilities in
4   relation to that visit; is there any?
5   A.   It depends on if there's -- not all cases have
6   case aides.  Out of my caseload, very rarely did I have
7   anyone else doing my visits.
8   Q.   But if you do have case aides, they take the place
9   of you in doing those visits?
10  A.   Caseworkers are expected to do at least one visit
11  a month if they have a case aide.  Working with the family.
12  Q.   Okay.
13  A.   But those documentation -- the same documentation
14  needs to be done, but it goes then -- it should go to the
15  caseworker, then to the supervisor.
16  Q.   Okay.  Are you still currently working with the
17  Office of Children and Youth?
18  A.   No.
19  Q.   When was your last day of employment there?
20  A.   End of January of this year.
21  Q.   Of this year?
22  A.   Yes.
23  Q.   And you do still work for the County, though?
24  A.   Yes.
25  Q.   What capacity is that?

Page 12

1   A.   I work at Edmond L. Thomas Detention Center.  I'm
2   a juvenile counselor.
3   Q.   Okay.  In your capacity as a caseworker, can you
4   give me a general idea of how many cases you would have at
5   any one particular time, on average?
6   A.   On average?  Around 20.
7   Q.   Pardon me?
8   A.   Approximately 20.
9   Q.   Okay.  And on average now, out of the 20 cases,
10  how many would involve you having a case aide assigned to
11  those cases?
12  A.   On an average?
13  Q.   Just on the average.
14  A.   Less than two.
15  Q.   In your capacity as a caseworker, how many hours a
16  week would you work, would that require?
17  A.   We're scheduled 37.5.  But frequently there was
18  additional hours.  I frequently worked through lunch.
19  Q.   Okay.
20  A.   Five days a week.
21  Q.   It's a full-time position.
22  A.   Yes.
23  Q.   Is that something that you would clock in when you
24  came in and left, or is it just --
25  A.   No.

Page 13

1   Q.   Would you have any kind of time sheets to keep
2   track of that, or was it more on an honor system, as far as
3   coming in and out of work?
4   A.   We had to submit weekly schedules to our
5   supervisor.
6   Q.   And when you had visitations or when you
7   supervised visits between parents and children, you were
8   required to document those?
9   A.   Yes.
10  Q.   Is that on computer?
11  A.   Not necessarily, no.  I didn't do mine on a
12  computer.
13  Q.   Would that be written?
14  A.   Yes.
15  Q.   Some other type of a log?
16  A.   They were written and then put into the family
17  record.
18  Q.   Okay.  So then they would be part of the file for
19  that family file; is that how that worked?
20  A.   Yes.
21  Q.   Would those written documents be reviewed by your
22  supervisor?
23  A.   Yes.
24  Q.   And who would your supervisor have been, let's
25  say, at the end of January 2006 before you left?

                                    4 (Pages 10 to 13)

577feba1-fae2-4550-b633-b661eb7ebc68

Page 14

```
1      A.  Sue Deveney.
2      Q.  How long had Sue Deveney been your supervisor?
3      A.  Approximately six years.
4      Q.  Okay.  Was she your supervisor pretty much the
5   entire time that you were in the placement department, then?
6      A.  Yes.
7      Q.  When you were in the prior department, you had a
8   different supervisor then; would that be correct?
9      A.  Yes.
10     Q.  Who would that have been?
11     A.  I had two.
12     Q.  Okay.  Who would they have been, then?
13     A.  Mary Jo Cline and Mike Tellers.
14     Q.  Were you also required to have meetings with case
15  aides on those cases where you were assigned a case aide?
16  Do you want me to rephrase that?
17     A.  Please.
18     Q.  The approximate two cases where you would have the
19  assistance of a case aide, okay, my question is, were you
20  required as part of your job to periodically discuss those
21  cases with the case aides?
22     MR. DEVLIN:  Object to form.  You can answer.
23     A.  It's not an easy question to answer.  Ideally, we
24  were supposed to -- I meet with my supervisor once a week.
25  If that case is -- if a case that the case aide is assigned
```

Page 15

```
1   to is available during that time, they could then meet --
2   they're more than welcome to meet then.  When I did have a
3   case aide on my very few cases, I met with them pretty
4   regularly to go over the visitation observation, to go over
5   the scheduling of the visits.  I worked very closely with my
6   parent aides.  So it really wasn't a formal meeting.  I
7   mean, they were welcome to the supervisal meeting if there
8   was a problem then.  But, basically, it was kind of an
9   informal meeting.
10     Q.  Would it be safe to say that you would try to
11  communicate with the case aides at least once a week, then?
12     A.  Minimal, yes.
13     Q.  And they would be informal.
14     A.  Yes.
15     Q.  Pretty much.  In other words, you would go to
16  their cubicle or whatever, discuss the case with them, as an
17  example, something like that?
18     A.  Yeah, something.
19     Q.  During the time that you worked for the County,
20  the Office of Children and Youth, were you given reviews on
21  a regular basis?
22     A.  Yes.
23     Q.  Okay.  Was that done with all employees that you
24  know of; was that just standard?
25     A.  I believe it is, yes.
```

Page 16

```
1      Q.  And were yours done on an annual basis?
2      A.  They were supposed to be, yes.
3      Q.  Who does those?
4      MR. DEVLIN:  Are you asking now or then?
5      Q.  At the time that you worked there, who was
6   responsible for doing your reviews?
7      A.  It would have been the supervisor that I was
8   working under.
9      Q.  So for the six years prior to the date that you
10  left there, it would have been Sue Deveney that would have
11  done your reviews?
12     A.  Yes.
13     Q.  And as part of those reviews, it would also impact
14  your salary in some way; would that be correct, or no?
15     A.  No.
16     Q.  Was there a set time of the year that you had your
17  reviews done?
18     A.  There was supposed to be, yes.
19     Q.  What was it supposed to be?
20     A.  In March.
21     Q.  So every March you were supposed to have a review.
22     A.  Yes.
23     Q.  Was that based upon when you were hired, or is
24  everybody's review generally supposed to be done in March of
25  the year?
```

Page 17

```
1      A.  When the individual is usually hired.
2      Q.  So one-year anniversary, pretty much?
3      A.  Yes.  At least for me.
4      Q.  Okay.
5      A.  I don't know about everybody else.
6      Q.  And during the six years that you were working
7   under Sue Deveney's supervision, who was the director of the
8   Office of Children and Youth, do you recall, for all those
9   six years?
10     A.  Debi Liebel was some.  John Petulla, I believe was
11  some of the time.  And then Mike Cauley did for a brief
12  period of time.
13     Q.  Okay.  And -- is it Mr. Petulla?
14     A.  John Petulla.
15     Q.  He was before Deb Liebel; would that be right?
16     A.  Yes, you're right.
17     Q.  And as of the time that you left the Office of
18  Children and Youth, Mrs. Liebel was not the director
19  anymore; is that right?
20     A.  That's correct.
21     Q.  So it would be Mr. Lucht.
22     A.  Yes.
23     Q.  Okay.  So you worked for a short period of time
24  under Mr. Lucht.
25     A.  Very short time, yes.
```

5  (Pages 14 to 17)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                    PW

Page 18

1    Q.  You indicated that you are now in a new position
2  with the County, at the -- I think you said as a counselor?
3    A.  Yes.
4    Q.  How is it that you left the Office of Children and
5  Youth and went to that position?
6        MR. DEVLIN:  Object to form.  You can answer.
7    Q.  If you understand the question.
8    A.  I'm not sure if I understand.
9    Q.  You said you left the Office of Children and Youth
10  at the end of January 2006, right?
11    A.  Yes.
12    Q.  Did you, in essence, quit that job?
13    A.  No.
14    Q.  Did you bid on this other position?
15    A.  Yes, I did.
16    Q.  When did you bid on that position?
17    A.  November of 2005.
18    Q.  Of 2005?
19    A.  Yes.
20    Q.  And between November of 2005 and the time you left
21  in January of 2006, were you still working with the Office
22  of Children and Youth?
23    A.  Yes.
24    Q.  Were you still there full-time?
25    A.  Yes.

Page 19

1    Q.  And doing your regular caseload?
2    A.  Yes.
3    Q.  What prompted you to bid on this other position?
4    A.  I had been doing casework for 16 years.  And I had
5  changed from GPS to placement.  And I was ready for a
6  change.
7    Q.  Okay.  Did this other position pay a salary that's
8  the same as the salary that you were getting in your
9  position at Office of Children and Youth?
10    A.  It was a lateral move, yes.
11    Q.  It was a lateral move.
12    A.  Yes.
13    Q.  So salary is identical.
14    A.  (Witness nods head.)
15        MR. DEVLIN:  That was a yes?
16    A.  Yes.  Well, I was thinking about that.  They're
17  not exactly identical.  Because I'm actually working 40
18  hours a week.  So it's those couple extra hours.  I believe
19  I'm also getting a shift differential pay because it's
20  second shift I'm working rather than first.  So, I mean --
21    Q.  But it's based on an hourly rate?
22    A.  Yes.
23    Q.  And the hourly rate is the same?
24    A.  Yes.
25    Q.  Before and after?

Page 20

1    A.  Yes.
2    Q.  Except that you're working more hours.
3    A.  A little bit more hours.  And I'm not certain, but
4  there may be a like five, ten cent differential because it's
5  second shift.  But, basically, it's the same.  Do you
6  understand?
7    Q.  Yeah.  When was it, if you recall, that Mr. Lucht
8  came or took over the position as director?  Roughly.
9    A.  Roughly.  It was before -- it was probably just
10  before I was hired for the other job but didn't start.  So
11  it was like November.  Before November.
12    Q.  Okay.  It was before you bid on the other job;
13  would that be correct?
14    A.  Right around the -- I want to say right around the
15  same time, give or take a little bit.  I know we were in
16  transition at that time, so.  I needed his approval to move,
17  so.
18    Q.  So you did get -- you went to him for approval to
19  move, and he gave you that approval.
20    A.  Yes.
21    Q.  All right.  Did you actually have a meeting with
22  Mr. Lucht prior to -- prior to him giving you approval?
23    A.  No.
24    Q.  Did your decision to make this move, was that in
25  any way prompted by Mr. Lucht?

Page 21

1    A.  No.
2    Q.  Did you have any meetings with Sue Deveney, your
3  supervisor, regarding you making this move?
4    A.  No.  She wasn't aware that I bid for the job until
5  I received it.
6    Q.  All right.  So you weren't asked to leave the
7  Office of Children and Youth for any reason.
8    A.  They didn't want me to leave.  They wanted to keep
9  me for like six months.  And I'm like, I need a change.
10    Q.  Who told you that they wanted to keep you?  Who is
11  the one that said stay, for example?
12    A.  Pam Biroscak is the one that was kind of the
13  middle person.
14    Q.  What's her position?
15    A.  She is the unit director, I guess.  I don't know
16  if that's her exact title, but more or less.  She is Sue
17  Deveney's boss.
18    Q.  So she would be one up above Sue Deveney.
19    A.  Yes.
20    Q.  This didn't come from Mr. Lucht, though.
21    A.  No.
22        (W Deposition Exhibit 1 marked for
23         identification.)
24    Q.  I'm going to show you briefly what's been marked
25  as W Exhibit 1.  Do you recognize that document by looking

6 (Pages 18 to 21)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                      PW

---

Page 22

1  at it? And you can flip through it. It's about four pages
2  long. Do you recognize that?
3      A. Yes.
4      Q. My question to you is this. It looks to be a job
5  review that you had done in 2005; would that be correct?
6      A. Yes.
7      Q. And that was done by Ms. Deveney?
8      A. Yes.
9      Q. Okay. And I guess the reviewer's signature is --
10  would that be Pamela Biroscak?
11      A. Biroscak.
12      Q. That would be the unit supervisor you were talking
13  about.
14      A. Yes.
15      Q. Okay. The question I have is this. I notice that
16  in the employee comments section, you indicated you
17  disagreed with the rating.
18      A. Yes.
19      Q. And correct me if I'm wrong. I looked at some of
20  your other reviews, and you had not made that kind of
21  indication in the past. Would that be accurate, if you
22  remember?
23      A. I believe there may have been one or two that I
24  may not have agreed with.
25      Q. Okay.

---

Page 23

1      A. Prior. I'm not exactly sure.
2      Q. Okay. But this one, you specifically said, I
3  disagree with this rating.
4      A. Yes.
5      Q. Can you give me an idea why?
6      A. Yes. A foster home had said that I had not seen a
7  child on a regular basis. And that had been addressed
8  previously. And also some of my ratings, I didn't feel
9  were -- compared to the other ones, that I had dropped down,
10  and I didn't feel that that was appropriate.
11      Q. If there were complaints about your job
12  performance, would you have -- would you have heard of them?
13      A. Yes.
14      Q. Do you know if there were any other complaints of
15  your job performance from any other parents or foster
16  parents, say, in 2004 or 2005?
17      MR. DEVLIN: Object to form. You can answer.
18      A. Can you ask the question one more time.
19      Q. Sure. Are you aware of any other complaints about
20  you specifically in your job from any other parents or
21  foster parents?
22      A. I'm sure that there were some on, you know, not
23  returning phone calls in a timely manner, not knowing about
24  certain hearings, being disappointed with the way the court
25  order had gone or court recommendations had gone.

---

Page 24

1  Misunderstandings that they may have had. But nothing, I
2  guess --
3      Q. How about not showing up for visits on a regular
4  basis; anything to that effect, in 2004 or 2005?
5      A. Showing up for visits. What kind of visits?
6      Q. Visits, for example, between parent and child.
7      A. No, that was not a --
8      Q. Not an issue.
9      A. No. The only reason I asked you to clarify that,
10  the only reason, the foster parent said I wasn't making the
11  monthly visits to her house.
12      Q. Is that the only foster parent that had that kind
13  of complaint?
14      A. I believe so.
15      (W Deposition Exhibit 2 marked for
16          identification.)
17      Q. Now, about that same time frame, I'm going to show
18  you another exhibit. I'm going to mark it as Exhibit No. 2.
19  Do you recognize that?
20      A. Yes.
21      Q. This appears to be right in about the same time
22  frame as the evaluation that I just had marked as Exhibit 1,
23  within a few weeks of that evaluation. Would that be
24  correct?
25      A. Yes.

---

Page 25

1      Q. Okay. And was this a -- I guess there's two pages
2  to it. The second page is an actual letter addressed to
3  you; is that right?
4      A. Yes.
5      Q. And it says there it's a verbal and written
6  reprimand; is that correct?
7      A. Yes.
8      Q. And then it names two infractions in that. And
9  the first one is the -- it says progressive deterioration in
10  work performance; is that right?
11      MR. DEVLIN: You're asking if that's what it says,
12      what the document says?
13      A. What paragraph?
14      Q. The second line.
15      A. Okay. Sorry.
16      MR. DEVLIN: Go ahead and read the whole thing, if
17      you would like.
18      A. Go ahead. All right. Yes.
19      Q. All right. And then No. 2 is, "Failure to adhere
20  to rules, agency policies and procedures;" is that right?
21      A. Yes.
22      Q. Did someone actually discuss these infractions
23  with you?
24      A. This is all a result of a case being closed and
25  being reopened. Documents were missing.

---

7 (Pages 22 to 25)

577feba1-fae2-4550-b633-b661eb7ebc68

Case 1:05-cv-00076-SJM    Document 70-6    Filed 04/12/2006    Page 9 of 38

Conley v. County of Erie, et al.                                      PW

Page 26

1    Q.   This is all because of one case, then?
2    A.   Yes.
3    Q.   Do I understand correctly that when you have a
4  written reprimand such as the one that I've showed you, that
5  that only stays in your personnel file for a one-year period?
6    A.   I believe it should only be, yes.
7    Q.   Okay.  This one, I guess, got a copy of your
8  personnel file, was the only reprimand that was in it.
9  Okay.  Written one.  Okay.  And that's why I was wondering,
10  if you're aware of a policy where it only stays in your file
11  for a one-year period and then it's taken out.
12    A.   It should be out after a year, yes.
13    Q.   That's your understanding, right?
14    A.   That is what is supposed to happen.  But these --
15  I mean, they're supposed to be expunged.  I don't know who
16  pulls them.
17    Q.   Okay.  Would I be correct in saying that this may
18  not have been the only reprimand that you've gotten, written
19  reprimand that you've gotten while you worked for the Office
20  of Children and Youth?
21    A.   One more time, please.
22    Q.   Okay.  Are you aware of any other reprimands that
23  you had gotten while you worked at the Office of Children
24  and Youth?
25    A.   No.

Page 27

1    Q.   So is this the only reprimand that you're aware
2  of, written reprimand that you're aware of, that you've ever
3  gotten while you worked for the Office of Children and
4  Youth?
5    A.   Yes.
6    Q.   Are there times when you would be given a verbal
7  reprimand or a warning?
8       MR. DEVLIN:  Object to form.  You can answer.
9    A.   I don't recall any other times.
10    Q.   Okay.  Prior to 2005, then, you do not recall any
11  other verbal reprimands or warnings that you received while
12  you were working at the Office of Children and Youth?
13    A.   Correct.
14    Q.   Was there ever a time when you were suspended for
15  any reason, for any period of time while you worked for the
16  Office of Children and Youth?
17    A.   No.
18    Q.   I want to go back just real quick where you
19  indicated that you in some cases, in very few cases, I
20  guess, you actually have the assistance of a case aide.
21  Okay?
22    A.   Okay.
23    Q.   And my question is, to what extent in those
24  situations do you rely on the case aide for information of
25  how visits went between the parent and the child?

Page 28

1    A.   In cases where the parent aide is doing visits?
2    Q.   Yeah.
3    A.   I typically try to stop in during those visits.
4  If they were done at the agency, I would make it a point to
5  say hello to the children, say hello to the parents.  Just
6  kind of check in.  See if the parent needed a break or
7  something.  Frequently, I would transport one way or the
8  other, so I would have some connection with the children.
9  In rare cases where I wasn't at some part of the visit, I
10  would touch base with the case aide as to the written
11  documentation as to how the visit went.
12    Q.   The case aide would also prepare a log or notes
13  regarding how the visits had gone; would that be correct?
14    A.   Observation log, yes.
15    Q.   Observation log; is that what you said?
16    A.   Yeah, observation report.  Visitation,
17  observation.  I don't know the exact name of it.
18    Q.   Is that supposed to be done, I guess, with each
19  visit that the case aide does?
20    A.   Yes.
21    Q.   And is that something that would then be on a
22  computer, or is it something that is actual paper that gets
23  filed in the file?
24    A.   Both.
25    Q.   Both?

Page 29

1    A.   Could be both.
2    Q.   Okay.  Is it something that you're required to
3  review?
4    A.   Yes, my signature.  In the handwritten part mine
5  was -- my signature was necessary, along with the
6  supervisors.  I didn't use the computer a whole lot, so they
7  were written out, basically.
8    Q.   But you would review those periodically as the
9  case aide would complete those; would that be a correct
10  statement?
11    A.   Not periodically.  I would always review them.
12    Q.   Okay.  All right.  Would you do it on a daily
13  basis, I mean, every day?  At the end of the day, would you
14  go back and review those entries, or is that something that
15  you might do every week?
16    A.   Visits were typically once a week.  So when the
17  visit was happening, you know, whenever the visit was, I
18  would either check within a day or two, just to kind of get
19  a background.
20    Q.   You're familiar with Abby Conley.
21    A.   Yes.
22    Q.   How long have you known Ms. Conley?
23    A.   I don't know.  I don't actually remember when she
24  started at the agency.
25    Q.   Would you have known her since the time that she

Ferguson & Holdnack Reporting, Inc.
814-452-4556

## Page 30

1 did start, do you recall?
2     A.  Right around that time, yeah.
3     Q.  Had she always worked in the same department that
4 you did?
5     A.  No.
6     Q.  Okay.  Was she also in -- well, let's say the last
7 six years, you said that you were in the -- what department?
8     A.  Placement.
9     Q.  Placement.  Was she in placement during the last
10 two years of her employment, do you know?
11     A.  I just know that she was involved in cases.  I
12 don't know her direct supervisor -- who she reported to.  I
13 just knew, when I had to -- interactions I had with her on
14 cases that I had.
15     Q.  And how many cases did you have, actually have
16 with her, that you recall?
17     A.  I want to think maybe only one.  I can't think of
18 any other.  I mean, I don't remember her being on a whole
19 lot of cases.  I don't usually have a whole lot of parent
20 aide involvement.
21     Q.  There's really only one that you recall, though,
22 at this time?
23     A.  I believe so, yes.
24     Q.  All right.  We've been using initials up to this
25 point in time.  Would the initials of the mother be VW on

## Page 31

1 that particular case?
2     A.  Yes.  I have to write that down.
3     MR. DEVLIN:  Actually, while we're on that, and I
4 don't mean to interrupt.  With respect to this
5 deposition, is it going to be deposition of PW; is
6 that how we're agreeing to do it?  I mean, she has
7 been PW in every other deposition.  I'm just
8 wondering, on the caption it would seem to be
9 logical that it would be PW throughout this
10 deposition.
11     MR. ANGELONE:  That's fine.  I have no -- I don't
12 have any problem with that.
13     MR. DEVLIN:  Okay.
14     (Discussion held off the record.)
15     Q.  Now, on this particular case, the VW case, do you
16 recall when you first started on that case yourself?  When
17 were you assigned to that case?
18     A.  I don't know.  I mean, I don't remember the date.
19     Q.  All right.  Was there a previous caseworker that
20 was assigned to that case?
21     A.  Yes.
22     Q.  And was Abby Conley a case aide on that case?
23     A.  Yes.
24     Q.  Prior to your assignment to that case?
25     A.  Yes.

## Page 32

1     Q.  So she was already part of that case when you got
2 assigned to it.
3     A.  Yes.
4     Q.  Did the other caseworker leave the agency?
5     A.  Yes.
6     Q.  And that's why you took that case over?
7     A.  Yes.
8     Q.  Did you ever discuss that particular case, or any
9 part of that case, with the previous caseworker?
10     A.  The previous caseworker?
11     Q.  Yeah.  To get background or anything to that
12 effect.
13     A.  There was brief communications, but not a whole
14 lot.  At the time that I got that case, a lot was happening
15 with it.
16     Q.  Okay.
17     A.  There were charges, and the FBI was involved.  So
18 she just brought me up to speed on that situation.
19     Q.  Okay.  So you did talk to her to at least
20 familiarize yourself with the case.
21     A.  Yes.
22     Q.  Did those communications take place while she was
23 still at the agency, or was she already gone?
24     A.  No, definitely at the agency.  Once she is gone,
25 it's a breach of confidentiality to have communications --

## Page 33

1 with me having communications with her.
2     Q.  So she was still working there at the time.
3     A.  Yes.
4     Q.  So you were assigned this case while she was still
5 there, then.
6     A.  Yes, there was a brief overlap.
7     Q.  Okay.  So after she left, then, you had no
8 decisions with her from that point on.
9     A.  That's correct.
10     Q.  Did she discuss with you what the agency's goal
11 was on that -- at that time?
12     MR. DEVLIN:  Object to form.  Go ahead.
13     A.  I believe I read that in the court summary.
14 Because when I got the case, I reviewed the previous
15 information.
16     Q.  Okay.
17     A.  To familiarize myself with the case, and what the
18 goals were, what the court order was, to make sure that we
19 were complying with that.
20     Q.  So when you first got the case, what was your
21 understanding of the goal, the agency goal?
22     A.  We were looking at -- it was concurrent planning.
23     Q.  Okay.  What's that mean?
24     A.  Both looking at reunification and also looking at
25 possible family resources or other resources.

Conley v. County of Erie, et al.

PW

---

Page 34

```
 1      Q.  Okay.  Go ahead.
 2      A.  We were also -- we were trying to assess also the
 3  father of the two children that were involved, what his
 4  involvement was.
 5      Q.  All right.  Am I correct the father was
 6  incarcerated at the time?
 7      A.  At the time I got the case, we had no contact with
 8  the father.
 9      Q.  I'm not sure.
10      A.  We had no idea where he was at.
11      Q.  So the father was not a potential resource at the
12  time?
13      A.  No.  We were actually looking at aggravated
14  circumstances in regards to him, because he had not had
15  contact for a period of time.
16      Q.  Okay.  What's aggravated circumstances mean, then?
17      A.  It is where we go to court showing that the parent
18  has -- there's different criteria.  But this criteria was
19  that he basically abandoned the child.  The child had been
20  in placement for a period of time.  He had not maintained
21  contact or a -- I can't even think of the exact words.  A
22  parent parental relationship with these children for a
23  period of time.
24      Q.  At this time, when you took over the file, though,
25  there were not aggravating -- I guess aggravating
```

---

Page 35

```
 1  circumstances with respect to the mother?
 2      A.  No.
 3      Q.  So if I also understand, at this time you took
 4  over this file, it was still up in the air whether or not
 5  there was going to be a -- I guess a termination of parental
 6  rights versus reunification; would that be correct?
 7      A.  Yes.
 8      Q.  Okay.
 9      A.  The case also changed a little bit too because of
10  the criminal stuff that was happening.
11      Q.  Well, you say it changed.  When did that change
12  take place?
13      A.  Just prior to me getting -- I mean, when I got the
14  case, the changes were taking place.
15      Q.  Okay.  What are the circumstances?  Criminal, you
16  said criminal?
17      A.  Mom's paramour, VW's paramour, was being charged
18  with burglary or armed -- robbery of a bank, bank robbery.
19      Q.  Okay.
20      A.  So the visits went from being semi-supervised to
21  being supervised and monitored, more closely monitored.
22      Q.  And you said semi-supervised.  What does that
23  mean?
24      A.  The previous worker, previous caseworker, that's
25  how she documented; semi-supervised, monitored.
```

---

Page 36

```
 1      Q.  Does that mean that the caseworker would not be
 2  there?  Or she would have one foot in the door and the other
 3  one out?  How does that work?
 4          MR. DEVLIN:  Object to form.  If you know.
 5      A.  I don't know.  I mean --
 6      Q.  That's not a term that's used within the agency,
 7  then?
 8      A.  Not in this situation it wouldn't have been, no.
 9      Q.  As far as you know, though, was the case aide
10  present for all the visits, or you don't know that?
11      A.  Prior to my involvement?
12      Q.  Yes.
13      A.  I don't know that.
14      Q.  All right.  After your involvement?
15      A.  Yes.  I mean, all -- she was involved for all the
16  case -- all of the visits that she was assigned to do.
17      Q.  Okay.  Do you recall, as we sit here, how many
18  visits there were in that particular case?
19      A.  No.
20      Q.  Is that something that would be set out by a court
21  order?
22      A.  Yes.
23      Q.  So that the judge would actually make that
24  decision, as to how many visits?
25      A.  Yes.
```

---

Page 37

```
 1      Q.  Per week, for example?
 2      A.  Yes.
 3      Q.  Could it be that in that particular case there
 4  were two visits per week?
 5          MR. DEVLIN:  If you know.
 6      Q.  If you know.
 7      A.  At some point during my involvement visits were
 8  increased, so I'm not sure if that -- at what point you're
 9  talking.
10      Q.  But at some point -- would I be correct in saying
11  at some point after you took over that case, that the visits
12  did occur twice a week?
13      A.  They did.
14      Q.  They did?
15      A.  Yes.
16      Q.  Did that go on for a month or two, or do you
17  recall?
18      A.  I don't recall.
19      Q.  Okay.  If I understand correctly, these visits
20  that would happen every week or every two weeks -- or, I'm
21  sorry, every week or twice a week in this case, with the
22  case aide, right?
23      A.  No.
24      Q.  They weren't?
25      A.  No.
```

---

10  (Pages 34 to 37)

577feba1-fae2-4550-b633-b661eb7ebc68

Page 38

1    Q.  Who would -- who, then, would monitor those
2  visits?
3    A.  The visits were done by both myself and the parent
4  aide.
5    Q.  The parent aide.  When you say parent aide, you
6  mean the case --
7    A.  Case aide.
8    Q.  I say case aide.  We're talking about the same
9  thing.
10   A.  Yes.
11   Q.  And in this case, it would be Abby Conley?
12   A.  Yes.
13   Q.  Okay.  Was Abby Conley there for every one of
14  those visits?
15   A.  No.
16   MR. DEVLIN:  Object to form.  Go ahead.
17   Q.  So it would be either Abby Conley or you, or both,
18  would that be right?
19   A.  Yes.
20   Q.  There wouldn't be anyone else that would be
21  involved in that, then?  I'm sorry, let me ask it another
22  way.  There wouldn't be anyone else that would be in charge
23  of the supervision part beside yourself or Abby Conley;
24  would that be right?
25   A.  Correct.  Yes.

Page 39

1    Q.  And during that period of time, was the amount of
2  time also increased, if you recall, for those visits?
3    A.  Yes.  During -- I mean, I'm not sure if we're
4  talking like -- I mean, I had the case for a period of time.
5  During some of the time, the visits were increased and also
6  time was increased.
7    Q.  Okay.  Are these visits usually for like an hour
8  or two?
9    A.  Yes.  And I believe they were increased from like
10  an hour to hour and a half to like two hours.  It was a
11  gradual increase.
12   Q.  It was a gradual increase.
13   A.  Yes.
14   Q.  And I think, if I'm correct, you testified before
15  that you tried to get to all those visits yourself as part
16  of your job too.
17   A.  Yes.
18   Q.  And if you recall, did you also do that in this
19  particular case?
20   A.  Yes.
21   Q.  So you didn't treat or handle this case any
22  different than any other case that you had.
23   A.  Correct.
24   Q.  Would that be correct?
25   A.  Yes.

Page 40

1    Q.  All right.  Now, if I understand correctly -- let
2  me ask you this way.  The VW case, is that still an
3  ongoing -- an open file, as far as you know?
4    A.  I don't know.
5    Q.  Was it at the time that you were with the agency,
6  Office of Children and Youth, in January?
7    A.  I don't know.
8    Q.  Was there a point in time that you were taken off
9  that case, then?
10   A.  Yes.
11   Q.  When would that have been?
12   A.  I want to say in November of 2004, on or around
13  that time.  Maybe earlier than that.
14   Q.  Okay.
15   A.  The fall of 2004.
16   Q.  It's not because the case was concluded, then;
17  would that be right?
18   A.  That's correct.
19   Q.  And was Ms. Deveney also removed from that case at
20  the same time?
21   A.  I don't know.  Once I stopped working on the case,
22  I stopped working on the case.
23   Q.  Is it typical that the caseworker does not follow
24  through on a case to its conclusion?
25   A.  Yes.

Page 41

1    Q.  In this particular case, do you know why you were
2  taken off this case?
3    A.  Yes.
4    Q.  Did someone actually give you a reason?
5    A.  Yes.
6    Q.  Who would that have been?
7    A.  Administration.
8    Q.  A certain person in administration?
9    A.  It was an administrative decision.  I don't know
10  who exactly was the one who made the decision.
11   Q.  Okay.  But someone actually told you, you're going
12  to be taken off this case, right?
13   A.  Yes.
14   Q.  Who was that, that actually told you that?
15   A.  I believe it was Sue Deveney.
16   Q.  And she probably told you why.
17   A.  Yes.
18   Q.  And what reason did she give you?
19   A.  Because the problems that were happening on the
20  case.
21   Q.  Did you know what she meant by that?
22   A.  Yes.
23   Q.  And what was your interpretation of what she meant
24  by that, problems on that case?
25   A.  The mother was having some -- making some

11 (Pages 38 to 41)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                            PW

---

Page 42

1  allegations towards myself. And VW had another child. And
2  the goal had changed.
3     Q.  So once a goal changes, the policy is to change
4  caseworkers?
5     A.  At that particular time on this case, a lot was
6  happening. Okay. So, I mean, the dynamics of the case.
7  And that she had another child. And it just -- the parents
8  had threatened me also. So, I mean, for my safety and for
9  the continual relationship with the family, I agreed to
10  not be involved.
11    Q.  Well, is it something that they asked you if you
12  wanted to do, or is it something that was mandatory, you
13  said you were not going to be involved in this case anymore?
14    A.  It was kind of a mutual agreement type of a thing.
15  They had asked me if I felt comfortable on this case. And I
16  said no, not with the new events that had occurred, I didn't
17  feel comfortable.
18    Q.  So you still had a choice to stay on that case if
19  you wanted to; is that what you're saying?
20    A.  I could have, yes.
21    Q.  It was your choice.
22    A.  It was my choice, yes.
23    Q.  You said one of the things, the mother was making
24  allegations.
25    A.  Yes.

---

Page 43

1     Q.  What kinds of allegations?
2     A.  That she wasn't treated fairly, that her kids were
3  being -- they're mainly allegations for the agency. That
4  the kids weren't being treated fairly. She had concerns
5  about the kids. She had concerns about the relationship
6  between myself and her.
7     Q.  You get those kind of complaints all the time,
8  though, I would imagine.
9     A.  The agency does.
10    Q.  Would that be correct?
11    A.  Yes.
12    Q.  That doesn't usually justify changing a
13  caseworker, though.
14    A.  Her paramour had made threats to bodily harm me.
15  So, I mean, I --
16    Q.  This paramour, was he incarcerated at that time?
17    A.  Yes.
18    Q.  And what kinds of threats was he making?
19    A.  To find someone to take me out. And I don't mean
20  out on a date. I mean to do me in, kill me.
21    Q.  Why would he -- do you have any idea what would
22  prompt him to make those types of threats?
23    A.  Yes. He said that Abby had said that I had shook
24  one of VW's kids and slapped her.
25    Q.  And that's the only reason that you know of?

---

Page 44

1     A.  Yes.
2     Q.  Did anyone else besides Ms. Deveney discuss with
3  you why you were being taken off that case?
4     A.  I don't believe so. We discussed it. Pam
5  Biroscak may have been part of the administrative decision.
6  I don't know if Pam was even the director then of that. I
7  mean administrative decision. Sue was just kind of
8  reporting what the administration had said. And I agreed
9  that, fine, I didn't want the case anymore.
10    Q.  Okay. I guess my question, then, is, you
11  understand it to be administrative decision. Who in the
12  administration would you believe would be in that decision
13  process?
14    A.  I'm not sure. I'm not certain. I mean --
15    Q.  Do you mean like Debra Liebel?
16    A.  I don't know if it went that far. It may have
17  been just middle management that made the decision.
18    Q.  Okay. Middle management, Pam Biroscak?
19    A.  And Char Kolupski. You know, those middle
20  management, people that were above the supervisors.
21    Q.  Okay. Do you know if Attorneys Cauley or Allgeier
22  had anything to do with that?
23    A.  No, they wouldn't have.
24    Q.  All right.
25       MR. DEVLIN:  No, you don't know; is that your

---

Page 45

1     answer?
2     A.  No, I don't believe they had any -- in normal
3  situations, they would not be involved in that. That is not
4  a court decision; that is a clinical decision. They
5  wouldn't have -- I don't believe they would have been
6  consulted.
7     Q.  In this particular case, you don't know that they
8  had any involvement in that, then.
9     A.  No, I wouldn't -- I don't think that they did.
10    Q.  Okay. Do you know who took over that case, then?
11    A.  Let me think. It was briefly assigned to another
12  caseworker in Sue Deveney's unit. And then it went outside
13  the unit to another supervisor and caseworker.
14    Q.  So it ultimately did leave Sue Deveney's unit as
15  well.
16    A.  Yes.
17    Q.  Was it shortly after you were taken off the
18  case?
19    A.  Shortly being how long?
20    Q.  Was it in the same year, 2004?
21    A.  I would say maybe two, three months after, it may
22  have been transferred.
23    Q.  Okay.
24    A.  Which may be January of 2005.
25    Q.  Okay.

12 (Pages 42 to 45)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                    PW

---

Page 46

1       MR. DEVLIN: Just your best estimate.
2       Q.   That's fine.  You made mention of an allegation
3   that was made by Abby Conley with respect to your treatment
4   of one of VW's children.
5       A.   Yes.
6       Q.   For purposes of the deposition, I believe the
7   initial for the child -- first name would be a D.  Was it DW
8   or is it DB? DB; does that sound familiar to you?
9       A.   It could be.  I mean, I know the last name is B.
10      Q.   You don't remember the first name?  If you do.
11      A.   No, not really.  I mean --
12      Q.   I'm not trying to trick you.  I just want to know
13  what you remembered.  Do you recall roughly how old she was
14  in the year 2004 when you were handling this case?
15      A.   Preschool age.
16      Q.   Okay.  And you said that you think that Ms. Conley
17  made an allegation about you.  Do you know what the
18  allegation was?
19      A.   Yes.  That I had slapped and shook this child.
20      Q.   Okay.  That you had slapped the child?
21      A.   And shook the child.
22      Q.   And shook the child.
23      A.   Yes.
24      Q.   On the same occasion?
25      A.   Yes.

Page 47

1       Q.   So there was a complaint of only the one occasion
2   that you --
3       A.   Yes.
4       Q.   Was there an investigation conducted because of
5   that incident?
6       A.   Yes.
7       Q.   And do you recall who conducted that
8   investigation?
9       A.   DPW.
10      Q.   Someone from Pittsburgh?
11      A.   Yeah.
12      Q.   Shara Saveikis; does that sound familiar to you?
13      A.   First name does, yeah.
14      Q.   Am I correct that she came to Erie to investigate
15  that?
16      A.   Yes.
17      Q.   All right.  Do you recall, was it in the summer of
18  2004?
19      A.   I can't really tell you.  Don't know.
20      Q.   All right.  When did you first learn of the
21  allegation?
22      A.   I want to say approximately two weeks after it
23  allegedly happened.
24      Q.   And who was it that told you about the allegation?
25      A.   Probably DPW.

Page 48

1       Q.   Did anybody in the unit tell you that this
2   allegation was made against you?
3       A.   I don't believe so.
4       Q.   Didn't Sue Deveney tell you about the allegation
5   before DPW got involved?
6       A.   She said there was allegations about me regarding
7   a child, my caseload.
8       Q.   She didn't tell you which child?
9       A.   She asked what happened at a certain visit.
10      Q.   For this particular child.
11      A.   Well, at the time, I didn't know for what child.
12  And then asked me about this particular child.  And I had
13  told her what I -- my account of what happened.  And she
14  said, okay, well, DPW wants to talk to you about that visit.
15      Q.   What was your account of what had happened?
16      A.   I had arrived early at Lovell Place for the visit.
17  It was a visit that Abby was going to be doing.  I had to
18  talk to mom about something, and I don't remember even what.
19      Q.   Mom, you mean VW?
20      A.   Pardon?
21      Q.   You said you had to talk to mom.  You mean VW?
22      A.   Yes.  The mom of the visit that was going to take
23  place.
24      Q.   Okay.
25      A.   VW was pregnant.  And it was -- it may have been

Page 49

1   summer because it was a hot day.  And I had gone outside to
2   help Abby bring the children in.  When I got to the car --
3   we had just concluded seat belt training for car seats.  And
4   the seat belt was very, very loose on the child, the female
5   child.
6            And I pulled it, and it went over a couple
7   fingers.  And I said, this is way too loose, Abby, you've
8   got to make sure you tighten this up.  And, hey, if you
9   want, why don't you go get lunch or something.  And she
10  said, oh, that would be great, I started early, I could use
11  a break.  So I said, just come back at the end of the visit.
12  She wanted to go check her messages and stuff.
13           I took the kids in.  They had a good visit.  Abby
14  came back with food from some fast food restaurant.  I do
15  recall telling Abby that this was mom's visit and, you know,
16  please, I want to see how mom interacts, please try to not
17  interact too much.  The visit ended, and Abby took the kids
18  home.
19      Q.   Okay.  There was an allegation that you had
20  actually, I think, perhaps grabbed DB's face and shook it?
21  Do you deny that that ever happened --
22      A.   Yes.
23      Q.   -- during this visit?
24      MR. DEVLIN:  You're asking her if she denied the
25      fact, not whether the allegation was made.

13 (Pages 46 to 49)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                    PW

| Page 50 |
|---|

1    Q. Thank you. Do you deny that that incident ever
2  happened?
3    A. Yes.
4    Q. Based on your recollection of the story, you never
5  touched the child. Is that your testimony, then, on this
6  particular day?
7    A. Well, I held her hand to cross the street, but, I
8  mean, nothing --
9    Q. Okay.
10   A. Not anything without normal care getting her
11 across the street, across the parking lot to the visit.
12   Q. At any time prior to this visit or following this
13 visit, while you were involved in this case, did you ever
14 grab the child in a forceful manner?
15   A. No.
16   Q. Never grabbed her by the arm?
17   A. No.
18   Q. That you recall?
19   A. No.
20   Q. Was this the only complaint that was made about
21 the way you interacted with that child?
22   A. Yes.
23   Q. Had you ever been reprimanded or warned in the
24 past about your handling or the way you handle children that
25 are in the agency?

| Page 51 |
|---|

1    MR. DEVLIN: Object to form. You can answer.
2    A. Not that I recall, no.
3    Q. There wouldn't have been any other reprimands that
4  were written as part of your personnel file that had been
5  expunged about either slapping a child or forcibly grabbing
6  the child or anything to that effect?
7    MR. DEVLIN: Object to form. You can answer.
8    A. No, not that I recall.
9    Q. Was that particular visit the first time that you
10 had a visit between parent and child?
11   A. No.
12   Q. When was the first time that you learned that Abby
13 had made the allegation?
14   A. Allegations are anonymous.
15   Q. Okay. But you knew she made the allegation.
16   A. Well, during when DPW was there, I kind of figured
17 out who had made that allegation.
18   Q. Prior to that time, you had no idea who made that
19 allegation?
20   A. I suspected it was Abby. She was the only one
21 that was there.
22   Q. And no one else had told you that it was Abby that
23 made the allegation prior to that?
24   A. No. No one else -- I mean, I don't know how -- no
25 one else would know, because it's anonymous. I mean --

| Page 52 |
|---|

1    Q. Okay.
2    A. By the way the law is written.
3    Q. Fair enough. Did you discuss this particular case
4  with Sue Deveney as well? And I mean as far as the
5  management of the VW case and how things were going, how
6  things were progressing?
7    A. Yes.
8    Q. Okay. You would do that on a regular basis, from
9  what I understand, right?
10   A. Yes.
11   Q. And at any time during those discussions, I guess
12 in the two or three months when you first got the case, did
13 you have any impression as to what, I guess, Sue Deveney's
14 intentions were or what she felt the goal should be in this
15 particular case?
16   A. I don't know if I understand your question.
17   Q. In the first two, three months when you came to be
18 caseworker on this case, did she express to you her feelings
19 or impressions on what the goals should be?
20   A. No. She just came back on information as to what
21 had happened on the case.
22   Q. Okay. I think you already stated this. But you
23 pretty much handled this case the same way you would handle
24 any other case that you had.
25   A. Yes.

| Page 53 |
|---|

1    Q. As far as the visits or the number of visits that
2  you would attend and things of that nature?
3    A. Yes.
4    Q. When did you first learn that Abby Conley was
5  going to be terminated?
6    A. I think a day or two after it had happened.
7    Q. So you didn't know anything prior to it happening.
8    A. No.
9    Q. Did either Mike Cauley or Attorney Allgeier
10 question you or ask you about any complaints about Abby
11 Conley?
12   A. No.
13   Q. Did anybody prior to her termination come to
14 discuss Abby Conley's conduct in the agency in any way?
15   MR. DEVLIN: With her?
16   Q. With her. With you.
17   A. Yes.
18   Q. Okay. Who would that have been?
19   A. People within our unit.
20   Q. Such as who?
21   A. Other caseworkers in the unit.
22   Q. Other caseworkers?
23   A. Yes.
24   Q. Can you give me any names or any examples?
25   A. Examples of what was talked about?

14 (Pages 50 to 53)

577feba1-fae2-4550-b633-b661eb7ebc68

Case 1:05-cv-00076-SJM    Document 70-6    Filed 04/12/2006    Page 16 of 38

Conley v. County of Erie, et al.                                    PW

Page 54

1    Q. Well, who was it that would have said something to
2  you, first of all?
3    A. There was conversation within our unit. So other
4  caseworkers who have been at the agency. Are we using names
5  or are we using initials?
6      MR. DEVLIN: It depends on the person.
7    Q. I think you can use names for this.
8    A. They're caseworkers. Michele Schetter. Mike
9  Hughes.
10    Q. And they would come to you?
11    A. Well, no. We had -- we had peer group. And other
12  times we would just be talking informally. Abby's behavior
13  started to get peculiar.
14    Q. What do you mean by that?
15    A. She -- I don't know how to describe it. She just
16  was always kind of real paranoid, almost. I hate to use
17  that word. But paranoid, people were out to get her. She
18  started talking a lot more about her life, you know. Before
19  she was hired, you know, I heard that she was telling people
20  that she was the niece of Judy Lynch.
21      The Christmas towards the end of her employment at
22  the agency, she sent everyone out a typed letter stating
23  about her life story. You know, that she lived in a box,
24  that she was homeless. She didn't want to do secret Santas.
25  She didn't want to do our Christmas party. She didn't feel

Page 55

1  worthy of doing these things.
2      And kind of a -- she wasn't -- she didn't deserve
3  these things. I don't know. Just -- I mean, just -- which
4  was troublesome to us. Because she was, you know, telling
5  everybody about her personal life, telling clients, telling
6  people at the agency.
7    Q. Okay. Let me ask you this. Did she say anything
8  to you or ever discuss with you that particular incident,
9  the alleged abuse to DB?
10      MR. DEVLIN: You're asking if Abby ever said
11  anything to her.
12    Q. If Abby ever said anything to you about that.
13    A. I don't recall her ever saying anything.
14    Q. You never discussed that, that you recall?
15    A. I avoided Abby from that point on.
16    Q. From what point on?
17    A. From the point of that investigation on. I mean,
18  I was friendly and stuff to her, but I didn't seek her out.
19  When I saw her, I was pleasant and stuff like that. She was
20  still in our unit, so we still interacted with her. But I
21  didn't --
22    Q. Okay. Did you ever recall telling anyone else
23  that you worked with that you didn't like -- that you didn't
24  like Abby Conley personally?
25    A. I never said I didn't like Abby.

Page 56

1    Q. Did you ever say -- tell anyone else at OCY that
2  you didn't want to work with her?
3    A. I didn't want to work with her on any more cases,
4  yes.
5    Q. You did make that known.
6    A. Yes. I told that to Pam Biroscak and Sue Deveney,
7  that I didn't want her on any more of my cases.
8    Q. And that was the only case that you worked on with
9  her; would that be right?
10    A. Yes, I believe so.
11    Q. There was also a document that I had seen about an
12  incident that happened at a Christmas party the year before
13  that where she wrote you a letter. Do you recall that?
14    A. Wrote me a letter or everybody in the unit?
15    Q. No, I think she addressed it to you, perhaps.
16  Something that she felt that you said some inappropriate
17  things to a parent. Do you recall anything like that?
18    A. No.
19      (Recess held from 4:12 p.m. to 4:21 p.m.)
20    Q. If I understand correctly, I looked at my notes, I
21  think you said that you had figured it out yourself, that
22  Abby was the one that made the allegations about you.
23    A. More or less, yes.
24    Q. More or less. What's the more part?
25    A. I had asked the DPW worker who had made the

Page 57

1  allegation. And she said she couldn't share who made the
2  allegations, but she would be interviewing people that were
3  at the visit, including Abby and the child.
4    Q. Okay.
5    A. So.
6    Q. So no one else actually came out and told you that
7  it was Abby that made those allegations.
8    A. Yes. Correct. I mean --
9    Q. Okay.
10    A. I mean, I suspect it was her.
11    Q. All right. As we sit here today, did anybody tell
12  you that it was Abby?
13    A. I think everyone -- I think people at the agency
14  now all assume it was Abby.
15    Q. Okay. So there were other people at the agency
16  that made assumption as well?
17    A. Yes. I believe so. I mean, I don't know if they
18  assume, but yeah.
19    Q. Do you know an individual by the name of -- last
20  name of Peebles?
21    A. Yes.
22    Q. Would the first name be Kim?
23    A. Yes.
24    Q. Who would she be?
25    A. She is --

15 (Pages 54 to 57)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                          PW

---

Page 58

1    Q.  As it relates to the agency.
2    A.  She is like in charge of all the secretaries.
3    Q.  She has her own desk?
4    A.  We pretty much all have our own desks.
5    Q.  Her own office?
6    A.  Yes.
7    Q.  Was it in close proximity to you or your station?
8    A.  At one point it was, yeah.
9    Q.  Do you recall ever having any discussion with her
10   regarding the allegations that you understood were made by
11   Abby?
12   A.  Yes.
13   Q.  You did?
14   A.  I believe I did.  I'm not certain, but I most
15   likely did.  I did talk to her.
16   Q.  Was this just on one occasion or more than one?
17   A.  I don't know.
18   Q.  At least one occasion that you think you did?
19   A.  Yes.
20   Q.  Do you remember what the discussion was about?
21   A.  I wanted my cube moved, my space.  I didn't want
22   to sit that close to Abby.
23   Q.  Okay.  Is this still at the time when you were
24   both on the VW case together?
25   A.  It was around that time.  I don't know if I was

---

Page 59

1    still on the case or off the case.  But I wanted my area
2    moved.  Actually, I wanted Abby's moved.
3    Q.  Okay.  Did you explain why you wanted it moved?
4    A.  I didn't want to work by her.  She was making my
5    work experience -- my work very difficult.
6    Q.  Okay.  So if I understand correctly, then, you
7    didn't just want to not work with her on cases, you didn't
8    want to work anywhere near her.
9    A.  Abby, when she was on the phone, was very loud.
10   And I was -- I just wanted to avoid being that close to her.
11   I mean, she probably is right now as close as her desk was
12   to mine.
13   Q.  Okay.  You had something separating your desks,
14   though, would that be right?
15   A.  Yes.
16   Q.  Would that be like a partition?
17   A.  Yes.
18   Q.  How high up did the partition go?
19   A.  I don't know.  5, 6 feet.
20   Q.  Okay.  And yet you could still hear the person on
21   the other side?
22   A.  Oh, very well.
23   Q.  Okay.  Did you also know a person by the name of
24   Kathy Walczak?
25   A.  Yes.  She is an employee at the agency.

---

Page 60

1    Q.  Okay.  What's her position at the agency?
2    A.  She is a caseworker.  I'm not sure what level.
3    Q.  Do you remember at any time ever telling
4    Ms. Walczak that -- that you understood Abby made the
5    allegation that we're talking about?
6    A.  I'm not certain if I did.  I was telling people --
7    I probably -- I may have told her, because I knew she was
8    part of the union people, and I wanted my cube moved.
9    Q.  So she's a union rep as well?
10   A.  Her husband is or -- I mean, she is part -- I
11   don't know if she is a rep, but she's like an assistant rep.
12   And I wanted my cubicle moved.
13   Q.  Did your cubicle get moved eventually?
14   A.  Yes, eventually.
15   Q.  It did?
16   A.  Eventually.  I mean, I had to go to
17   administration, several administrators, to get it moved.
18   Q.  Prior to the allegation being made, did you have
19   any reason to believe that my client disliked you?
20   A.  No.
21   Q.  Did you give any indication to her that you
22   disliked her in any way?
23   A.  No.  Not even afterwards.
24   Q.  Okay.
25   A.  I mean, I was upset, I wanted my cube moved.  But

---

Page 61

1    I just didn't want to work in that same general area.  I
2    still was civil to her.  I had given her even things for her
3    home.
4    Q.  Assuming that she made these allegations, then,
5    would I be correct in saying that you would characterize
6    those as lies?
7         MR. JOYAL:  What?  Characterize what as lies?
8         MR. ANGELONE:  The allegations.
9    A.  They were -- DPW came and found that they were
10   unsubstantial report.  So due to the investigation being
11   unfounded and being no evidence for that, I think that very
12   strongly states that they were lies.
13   Q.  Okay.  Do you have any idea why she would -- what
14   would cause her to lie about something like that?
15        MR. DEVLIN:  Objection.  Calls for speculation.
16        You can answer.
17        MR. LANE:  I join in that.
18   Q.  If you know.  If you have any idea what may have
19   brought that on.
20   A.  No.
21   Q.  So you don't know what kind of motivation would be
22   involved in saying a lie such as that.
23        MR. DEVLIN:  Same objection.
24   A.  I don't know what Abby thinks or says or does.  I
25   mean, I also testified earlier that -- or stated earlier

---

16 (Pages 58 to 61)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                    PW

---

Page 62

1  that Abby's behavior changed.
2      Q.  You're familiar with case summaries; is that
3  right?
4      A.  Yes.
5      Q.  Do you have to prepare those for cases that are
6  going to hearing?
7      A.  Court summaries, yes.
8      Q.  Court summary, yes.  Are they the same in format
9  that the case aide has to prepare?
10     A.  No, definitely not.
11     Q.  And for every case that you're involved in, am I
12  correct that you have to prepare a court summary if it's
13  going to be going to a hearing?
14     A.  Yes.
15     Q.  It's standard practice; is that right?
16     A.  Yes.
17     Q.  Does anybody review your court summaries before
18  they're submitted?
19     A.  Did they; yes.
20     Q.  Who is responsible for reviewing your court
21  summaries?
22     A.  What time?  At the time that -- what are we
23  talking about?  Because right now I do court summaries.
24     Q.  Okay.  I apologize.  At the time when you were
25  working under Ms. Deveney, okay, who would review your court

---

Page 63

1  summaries when you were working in that department for OCY?
2      A.  Usually, Ms. Deveney or whoever was the covering
3  supervisor.
4      Q.  Was it your understanding that Ms. Deveney had the
5  authority to make modifications to those court summaries
6  before they were submitted?
7      A.  She made modifications in punctuation.  Actually,
8  what she did for mine is put more information that I
9  neglected to put in.  She never changed the meaning of my
10  summaries.
11     Q.  Okay.  Do you know if she would at any time
12  actually delete sentences from your summaries or entire
13  sections of your summaries?
14     A.  If they were incorrect or repeated.  She cleaned
15  my summaries up.
16     Q.  Okay.  And that was part of policy at that time.
17     A.  At that time.
18     Q.  Did that policy change?
19     A.  Unfortunately, yes.
20     Q.  And would that be under the new director,
21  Mr. Lucht?
22     A.  Yes.
23     Q.  Do you know whether it was just Ms. Deveney that
24  would make changes to court summaries or other supervisors
25  that had that ability as well?

---

Page 64

1      MR. DEVLIN:  Are you asking with respect to her
2  court summaries only?
3      MR. ANGELONE:  No, I'm asking her just in general,
4  if she has any knowledge whether other supervisors
5  had the ability to make modifications to court
6  summaries.
7      A.  All supervisors did.  I mean, I worked there for
8  16 years.  Basically, if it asked for a certain thing, I
9  neglected to put it in there, they would add it, they delete
10  it, you know, irrelevant information, too wordy.  That's why
11  supervisors were signing it, stating that they had reviewed
12  it.
13     Q.  And if I understand correctly, that policy
14  subsequently changed when Mr. Lucht took over?
15     A.  Yes.
16     Q.  And if I understand correctly also, he circulated
17  a memo to everyone to that effect; would that be right?
18     A.  Yes.
19     Q.  Were you in any way involved in another case that
20  was going on in 2004 around this same time?  And I'm going
21  to refer to it as the case where Abby Conley testified on
22  July 28th, 2004 where she testified that Ms. Deveney made
23  changes to her court summary.  Are you familiar with that?
24     A.  No.  I heard about it, but I'm not familiar with
25  it at all.

---

Page 65

1      Q.  Ms. Deveney never discussed that particular
2  hearing with you afterwards?
3      A.  No.  I mean, not any more than we could discuss --
4  I mean, it wasn't -- no.
5      Q.  And you weren't involved in that particular case;
6  is that right?
7      A.  Correct.
8      Q.  The court summaries that we're talking about, how
9  would you submit those to your supervisor?
10     A.  My court summaries?
11     Q.  Yeah.
12     A.  I would write them out, my secretary would type
13  them.  And then after I reviewed them, they would go to
14  Ms. Deveney.
15     Q.  So Ms. Deveney got a hard copy --
16     A.  Yes.
17     Q.  -- in other words, right?  Wasn't it ever
18  practiced that you would just send it to her or your
19  secretary would just send it to her by e-mail?
20     A.  Never.
21     Q.  And you had never been asked to do it that way in
22  the past?
23     A.  No.
24     Q.  Are you aware of anyone else that is or was asked
25  to submit a court summary to their supervisor in that

17 (Pages 62 to 65)

577feba1-fae2-4550-b633-b661eb7ebc68

Page 66

1  manner?
2      A.  I only know what I do.  I don't know what, I mean,
3  all the other employees do.
4      Q.  That's fine.  I'm just asking if you're aware of
5  any others.
6      A.  No.
7      Q.  Okay.  Can you tell me -- you seemed somewhat, I
8  guess, disappointed in some way that Mr. Lucht had issued
9  that new policy with respect to changes.  Can you tell me
10  why.
11      A.  The interpretation of it from different people.
12  They can't even -- I mean, they can't even change -- if you
13  write an abbreviation, you're supposed to write it out.
14  Commas.  I mean, some people are -- secretaries are not even
15  changing commas and punctuation.  You know, grammar errors
16  and past tense.  Everyone is afraid to change anything.  And
17  I think it's ridiculous.  It slows down the process of
18  getting information out, in my opinion.
19      Q.  Okay.  If I understand correctly, prior to Abby
20  Conley's termination, no one from the agency discussed with
21  you your thoughts or feelings about her losing her job?
22      A.  No.  I had my opinion, but no.
23      Q.  Okay.  And did you ever express that opinion to
24  anyone?
25      A.  Probably to Kim Peebles.

Page 67

1      Q.  Okay.  What did you tell Kim Peebles?  What was
2  your opinion?
3      A.  I felt that Abby had broken policy if she knew
4  of -- she is a mandated reporter.  If she knew of an abuse,
5  that she was supposed to report it immediately.  She
6  didn't -- I mean, if it was Abby.  My thing was, if it was
7  Abby, she didn't report it immediately.  If I'm at risk to
8  this child, why did she leave me with the child.  I had my
9  own questions that I would have loved to have asked Abby.
10      But that was one of the reasons I wanted my desk
11  moved, because I was very upset that I was put through the
12  whole investigation, when I felt she had broken policy by
13  not being the mandated reporter if she did report it.
14  Reporting it in a timely manner, and leaving the child.
15      Q.  But no one has actually come to you and confirmed
16  that she is the one that made the allegation, to this day.
17      A.  That's correct.
18      Q.  I want to go back, a couple more areas I want to
19  hit.  The VW case, okay, do you recall Abby telling you at
20  any time that VW knew or was aware that her baby was going
21  to be detained?
22      A.  Excuse me?
23      Q.  In the VW case that you handled, were you aware
24  that there was a detention order issued in that case?
25      A.  Yes.

Page 68

1      Q.  Prior to the issuance of the detention order, did
2  Ms. Conley ever make you aware that VW knew that her baby or
3  her -- had a good idea that her baby was going to be
4  detained?
5      MR. LANE:  Objection to form.
6      MR. DEVLIN:  Do you understand the question?
7      THE WITNESS:  No.
8      Q.  Okay.  Did Abby ever tell you that VW thinks her
9  baby is going to be detained, prior to the issuance of that
10  order?
11      A.  Abby telling me?  No.  I know V had told me.
12      Q.  Okay.  So V had told you prior to the issuance of
13  that order that she felt her baby was going to be detained?
14      A.  Yes, she was leaving town.
15      Q.  She told you she was going to leave town?
16      A.  Um-hum.
17      Q.  And go where?
18      A.  Canada.  Or out West somewhere, where the agency
19  wouldn't find her.
20      Q.  Did she tell you how she knew her baby was going
21  to be detained?
22      A.  At what point?
23      Q.  Pardon me?
24      A.  When?
25      Q.  During this discussion, when she told you she was

Page 69

1  going to leave town.
2      A.  There were several discussions.
3      Q.  During any of those discussions that you had with
4  her, did she make aware to you her feeling that her baby was
5  going to be detained?
6      A.  VW?
7      Q.  Yes.
8      A.  Yes.
9      Q.  Okay.  Did she give you any indication as to how
10  she came up with that idea?
11      A.  Prior to the baby being born, it was never
12  confirmed or denied to her, by me.
13      Q.  Did she ask you, is my baby going to be detained?
14  Did she ever ask you that?
15      A.  And I said it was up to the Court to make a
16  decision.
17      Q.  Did she ask you if that was going to be a
18  possibility?
19      A.  I told her --
20      MR. DEVLIN:  He asked you if she asked you that
21  question.
22      A.  No.
23      Q.  Did you bother asking her at any point in time,
24  where did you get that information from?
25      A.  Yes.

18 (Pages 66 to 69)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                    PW

Page 70

1    Q.  And what did she tell you?
2    A.  She told me that Deanna Cosby had told her,
3  because Abby had told Deanna.
4    Q.  So she told you that Deanna Cosby told her, and
5  because Abby told her that.  Now, this is before the order
6  was actually issued?
7    A.  No, after the order was issued.
8    Q.  This is after the order was issued.  So is it your
9  understanding that she knew about the order before her child
10  was born?
11    A.  She knew about the order -- yes.
12    Q.  And to the best of my understanding, she did not
13  leave town then.  Would that be right?
14    A.  Yes.
15    Q.  Yes, she did not?
16    A.  Yes, she did not leave town.
17    Q.  Okay.  And upon you receiving this information,
18  did you report it to anyone?
19    A.  Yes.
20    Q.  To who?
21    A.  To Sue Deveney.  And also -- I don't recall who
22  else at this time.  Let me think.  I can't remember who
23  else, but I know it was Sue Deveney.
24    Q.  Verbally, or did you do this in writing?
25    A.  Verbally.

Page 71

1    Q.  Would this be in any of the client contact, I
2  guess, reports that you're required to do?
3    A.  No.
4    Q.  So it's not in writing anywhere in her file
5  either.
6    A.  In whose file?
7    Q.  In VW's file.
8    A.  I'm not certain.  I'm not certain..  I'm not
9  certain if it was written.  I'm not certain if it's in her
10  file.
11    Q.  And based upon that, was any action taken?
12    A.  Based upon what?
13    Q.  Based upon you learning this information and
14  reporting it to Sue Deveney, okay.  Are you aware of any
15  action that was taken at that time against Ms. Conley?
16    A.  No.
17    MR. LANE:  Objection to form.
18    Q.  Now, you indicated that VW told you this, about
19  where she learned this information, right?
20    A.  Yes.
21    Q.  Would this conversation where she told you that be
22  before or after her child was born?
23    A.  After.
24    Q.  Do you recall how soon after the child was born?
25  I mean, was it within a few days or a few weeks?

Page 72

1    A.  A few hours, maybe.  Hours to a day.
2    Q.  Okay.  So what did she tell you?  I mean,
3  specifically, what did VW say to you?
4    A.  Specifically, I don't know specifically.  But she
5  was very angry and said that, yeah, Deanna told me that Abby
6  called her and told her that you were going to take my baby.
7    Q.  And that's the exact --
8    A.  Not the exact, but in a nutshell.
9    Q.  It happened in the hospital.
10    A.  Yes.
11    Q.  Do you recall prior to that whether Abby told you
12  that VW knew her baby was going to be detained, or felt that
13  her baby was going to be detained?
14    MR. DEVLIN:  I'm sorry, could you read that
15    question back.
16    Q.  Let me rephrase it.  Prior to this discussion that
17  VW had with you in the hospital, did Abby Conley bring to
18  your attention that VW suspected her baby was going to be
19  detained?
20    A.  Prior to what?
21    Q.  Prior to this discussion with VW in the hospital.
22    A.  I'm trying to think.  I'm not certain.  She may
23  have told me during the short time before mom had delivered.
24  When we were reviewing cases, she may have said.  Because we
25  all had known that she had made allegations to move.  And

Page 73

1  Abby, I believe, had said she also acknowledged to her that
2  she continued to -- Abby -- VW continued to say that if they
3  were going to take her baby, she was leaving.  So everyone
4  was on kind of heightened alert.
5    Q.  So did Abby Conley then bring to your attention or
6  the agency's attention that VW made an allegation that she
7  was going to move to Canada?
8    A.  I don't know if she told Abby that or if she told
9  me that.  I mean, it was told to the agency.
10    Q.  Okay.  But do you remember if Abby actually told
11  you or the agency?
12    A.  No, I don't recall.
13    Q.  All right.  Do you remember Abby ever telling you
14  that VW suspects that her baby is going to be detained and
15  that she should talk to you about it, or any words to that
16  effect?
17    A.  No.
18    MR. ANGELONE:  Can we take about a two-minute
19    break.
20    (Recess held from 4:46 p.m. to 4:47 p.m.)
21    Q.  You, I think, testified that you had an interview
22  with Shara Saveikis --
23    A.  Yes.
24    Q.  -- where she investigated the allegations made
25  against you.

19 (Pages 70 to 73)

577feba1-fae2-4550-b633-b661eb7ebc68

Case 1:05-cv-00076-SJM    Document 70-6    Filed 04/12/2006    Page 21 of 38

Conley v. County of Erie, et al.                                    PW

Page 74

1     A. Yes.
2     Q. Was that the only time that you had seen her or
3  met with her, on one occasion?
4     A. Yes.
5     Q. Okay. Following that, did you then get a letter
6  of correspondence from her indicating that the allegations
7  were unfounded?
8     A. Yes.
9     Q. Did you ever hear from her again after that?
10    A. I contacted her one other time.
11    Q. Would that have been in that same year, 2004?
12    A. I'm not sure when exactly it was.
13    Q. If I tell you that, just a general time frame,
14  June/July of 2004 is what we're talking about here when this
15  happened and the investigation happened, would it be in that
16  same year, 2004?
17    A. I contacted her for a copy of the letter, because
18  I misplaced the letter. So I'm not sure. That's why I
19  contacted her.
20    Q. And that would be the only other contact you had
21  with her.
22    A. Yes.
23    MR. ANGELONE: I don't have anything else right
24  now.
25

Page 75

1
2                CROSS-EXAMINATION
3  BY MR. LANE:
4
5     Q. Ms. W, my name is Mark Lane. I introduced myself
6  to you moments ago. I represent John Onorato in this case.
7  And I just have a few follow-up questions. Mr. Onorato, by
8  the way, is the former Solicitor for the County.
9     A. Thank you.
10    Q. In case you were wondering. It looked like maybe
11  you didn't know. Do you know when VW gave birth to the
12  child she was pregnant with?
13    A. No. During the summer; I know that. Midsummer,
14  but I'm not sure. I can't remember.
15    Q. Would it have been after, say, June 7th of 2004?
16    A. I believe it was early part of July. I think it
17  was end of June, end of July. I want to say 30th, maybe.
18  I'm not certain. But I know it was middle of the summer,
19  not early June.
20    Q. I'm going to show you an e-mail that was attached
21  to Cauley Exhibit No -- a letter dated August 20th, 2004
22  attached to Mike Cauley's deposition. And that is an
23  e-mail, a series of e-mails. And they're dated June 4th to,
24  it appears, June 7th of 2004 between Abby Conley and Deanna
25  Cosby. Actually, the ones you're looking at on the front

Page 76

1  page there are the later in time. The earlier in time
2  e-mails are on the next page. It kind of goes backwards in
3  chronological order.
4     A. Okay.
5     Q. And if you could just skim through those. These
6  are -- I'll just let you take a look at them real quick
7  here. Just those two pages you have in your left hand.
8     A. Okay. All right.
9     Q. In those e-mails there's a discussion about the
10  order for detention of the baby. Do you see that?
11    A. Yes.
12    Q. And I believe that discussion occurred between
13  June 4th and June 7th?
14    A. Um-hum. Yes.
15    Q. Is it fair to say that it was after June 7th, 2004
16  that VW would have told you for the first time that she was
17  aware that there was going to be an attempt to detain the
18  baby?
19    A. One more time. I'm sorry, I was looking at this.
20    Q. Would it be fair to say that it was after June 7th
21  of 2004 that VW told you for the first time that she was
22  aware that there was going to be an attempt to detain the
23  baby?
24    A. Yes.
25    MR. LANE: That's all I have for you.

Page 77

1
2                CROSS-EXAMINATION
3  BY MR. JOYAL:
4
5     Q. Ma'am, have you had any -- has anyone ever told
6  you about the conversation that Abby Conley had with Shara
7  Saveikis during the course of the investigation of this
8  allegation?
9     A. I don't know. I mean, I know that they mentioned
10  that they talked to her. But I don't remember the details
11  of the conversation.
12    Q. Well, has anyone ever told you that Abby Conley
13  called you demonic and inhuman during that investigation?
14    A. No, I didn't know that.
15    Q. Were you aware of the fact that during the course
16  of that investigation or shortly after it was reported that
17  Abby Conley had contacted Deanna Cosby seeking information
18  about your former husband and some of your former cases?
19    A. No.
20    Q. Do you know someone named Nzinga Cates?
21    A. Yes.
22    Q. Who is she?
23    A. She was an intern at the agency for a brief period
24  of time.
25    Q. Do you know whether or not she and Abby Conley

20 (Pages 74 to 77)

Conley v. County of Erie, et al.                                    PW

---

Page 78

1  were friends?
2      A.  I believe they were, yes.
3      Q.  Has anyone told you that Ms. Cates spoke about
4  this to someone in the agency or anyone in the agency about
5  the allegations concerning?
6      A.  I wasn't aware.
7      Q.  Do you know whether or not there was an allegation
8  made that a CASA worker had, indeed, witnessed what had
9  happened on that date, allegedly?
10     A.  No.
11     Q.  The date of --
12     A.  No.
13        MR. McNAIR:  Objection.  Foundation.
14     Q.  There was no CASA worker there that day, was
15  there?
16     A.  No.
17     Q.  Let me ask you a question which is hypothetical.
18  Presuming that VW had said to you prior to June 4th, 5th,
19  6th or 7th of 2004 that she suspected that they were going
20  to take her baby when it was born, based upon your training
21  as a social worker as well as an employee of OCY, if a
22  fellow employee of OCY confirmed information concerning that
23  to someone outside the agency, would that have been a
24  violation of confidentiality policy?
25     A.  Oh, yes.

---

Page 79

1      Q.  Do you know whether it would have been a violation
2  of Child Protective Services law?
3      A.  No, I don't know that.
4      Q.  Do you think Judge Kelly would have been happy
5  with someone talking about one of her prognostic ex parte
6  orders?
7        MR. ANGELONE:  Objection.
8      Q.  If you know.
9      A.  I'm not certain.  But I know that we get those
10  because we have grave concerns or concerns for the child.
11  That is why they're very strictly confidential.
12     Q.  And the Judge grants those orders.
13     A.  Yes.
14     Q.  And the Judge doesn't call for hearings and ask
15  the parents to come in to argue against such an order; is
16  that correct?
17     A.  No.
18     Q.  It's a policy that has been developed in the
19  Juvenile Court hearing; is that correct?
20     A.  Yes, to protect the child.
21     Q.  And it's been ongoing for a long period of time,
22  hasn't it?
23     A.  As long as I've known.
24     Q.  15, 16 years?
25     A.  Yes.

---

Page 80

1      Q.  Has anyone ever told you that Abby Conley, in
2  effect, admitted that she was the person that made the
3  report about you?
4        MR. McNAIR:  Objection.  Relevance.
5        MR. JOYAL:  Your co-counsel opened the door by
6  asking her if she ever knew that Abby Conley was
7  the reporter.  You can answer the question.
8        MR. McNAIR:  I'm just objecting to the relevance
9  Of this.  It doesn't have anything to do with any
10  of the issues in the case.
11       MR. JOYAL:  I'm trying to figure out how this
12  whole deposition has had anything to do with the
13  issues in this case, but be that as it may.  You
14  can answer the question.
15       MR. McNAIR:  You'll figure it out eventually.
16     A.  What was the question again?
17     Q.  Has anyone ever told you that Abby Conley, in
18  effect, has admitted that she was the one that reported you
19  to the hotline?
20     A.  Yes.
21     Q.  Who was that?
22     A.  When I was speaking with the woman from DPW, she
23  had stated that she had spoke with Abby, and Abby had
24  basically admitted that she had called.  Basically admitted.
25     Q.  Did you ever hear from anyone that Abby had

---

Page 81

1  written a letter or told someone at OCY that she really
2  didn't accuse you of child abuse but only of inappropriate
3  behavior?
4      A.  I tried to avoid Abby after that situation and the
5  things that she was doing, so I wasn't aware of that, no.
6      Q.  You wanted to move your cubicle because you didn't
7  want to be near someone who you believed and had been told
8  to you had reported you as a child abuser.
9      A.  That's right.
10     Q.  And if you had known that Abby Conley had
11  contacted Deanna Cosby during the course of that
12  investigation to get more information about you or your
13  family, you most certainly wouldn't have wanted to be around
14  her, would you?
15     A.  No.  I probably would have -- I don't know what
16  I -- I am very upset by that.
17     Q.  Did anyone in the agency have any concerns about
18  Abby Conley's mental health?
19     A.  Yes.
20     Q.  And was this based upon her, what you call her
21  behavior in writing a letter about living in a box and
22  things such as that?
23     A.  Yes.
24     Q.  Did you know whether or not Abby Conley had been
25  moved from a unit prior to the one she was in with you?

---

21 (Pages 78 to 81)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.

PW

---

Page 82

1    A.  I knew that she had moved, yes.
2    Q.  Was there any talk around the agency as to why
3  that was?
4    A.  I learned after the fact that she had caused
5  problems within that unit.
6    Q.  Did Abby Conley have a reputation within OCY as a
7  person who thought she knew more than the social workers?
8    A.  Yes.
9    Q.  And as one who thought she knew more than the
10  administration of the agency?
11    A.  Yes.
12    Q.  Did fellow workers, if you know, have concerns
13  about Abby Conley acting inappropriately with people in her
14  care, in other words, getting too close to them?
15    A.  Yes.
16    Q.  That had been going on for some period of time?
17    A.  Yes.
18    Q.  Now, do you read the newspapers, watch television
19  around here?
20    A.  Yes.
21    Q.  Do you know whether or not the case that Abby and
22  you were involved with, the mother has been charged with any
23  types of crimes in the past year?
24    A.  Yes.
25    Q.  What type of crime was the mother charged with?

Page 83

1    A.  Drug crimes.  Meth amphetamine.
2    Q.  Had there been any concern during the course of
3  time during that case while you were working on it that the
4  mother had a drug problem?
5    A.  Yes.
6    MR. ANGELONE:  I'm going to object to the
7  relevance.
8    MR. JOYAL:  You can object.
9    MR. ANGELONE:  I did.
10    Q.  Was there any concern that the mother was dealing
11  drugs?
12    MR. ANGELONE:  Same objection.
13    A.  There were concerns.  That is one of the reasons
14  we got the detention order.
15    Q.  And what about the placement of the other two
16  children; was that based upon concerns with the mother or
17  concerns with the father?
18    A.  The mother.
19    Q.  Similar concerns?
20    A.  I believe so, yes.
21    MR. JOYAL:  I don't have any other questions.
22    MR. DEVLIN:  I'm going to have one, if you want to
23  go.
24    MR. ANGELONE:  No, go ahead.
25

Page 84

1
2                CROSS-EXAMINATION
3  BY MR. DEVLIN:
4
5    Q.  You were previously asked a pretty broad
6  question -- not a broad question, but a question about
7  whether there were any written reprimands or anything in
8  your file, regardless of whether or not it had been
9  expunged.  And I just want to broaden that a little bit.
10    Are you aware of any allegations made at any time
11  while you were working for OCY, written or otherwise, that
12  would have appeared in your file at any time?
13    A.  Yes.
14    Q.  Okay.  Can you just describe for me what you
15  recall about that or those.
16    A.  There was a couple in there about just my
17  assertiveness with clients.  One in particular -- I don't
18  even remember.  It was early on in my career at the agency.
19  There was allegations made -- I'm trying to think how they
20  went.  The situation was a kid was -- during a visit, he was
21  being unruly, disrespectful to mom.  I took him out of the
22  room, told him he needed to settle down.  And I like touched
23  him, like, look at me, come on, you need to settle down.
24  And there was concerns.  The mom had called in.  It was not
25  substantiated or anything.  The kid later stated that it did

Page 85

1  not happen.  He was just --
2    Q.  Okay.
3    A.  -- excitable that day, he said.
4    MR. DEVLIN:  That's all the questions I have.
5    MR. ANGELONE:  I have a few follow-up, please.
6
7                REDIRECT EXAMINATION
8  BY MR. ANGELONE:
9
10    Q.  Do I understand that you just testified that
11  someone had told you that Abby had called in the allegation
12  that you had touched the child, DB, the initials?
13    A.  They had stated that she basically had admitted
14  it.
15    Q.  I think you said Shara Saveikis told you that.
16    A.  She pretty much admitted that she called in.
17    Q.  And you talked about some discussion about the
18  detention orders and the policy regarding detention orders
19  being issued.  Would I be correct in saying that
20  detention -- requests for detention orders were commonplace
21  in cases that you had handled at OCY?
22    MR. DEVLIN:  Object to form.
23    MR. LANE:  Objection to form.
24    MR. DEVLIN:  If you understand the question, you
25  can answer it.

22  (Pages 82 to 85)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.                                    PW

---

Page 86

1     A.  One more time.  I think I understand it, but not
2  quite sure.
3     Q.  When are detention orders issued, under what
4  situations?
5     A.  Allegations of abuse, neglect.  If we feel --
6  sometimes we get them on prognostic, which is the one that
7  VW was gotten on, prognostic, and the situation at the time.
8     Q.  Okay.  So once a mother is -- lack of a better
9  term, in the system, okay, and you find out that she is
10  pregnant, okay, and you feel that there's some fear that
11  there could be danger to the child, that would prompt you or
12  prompt the agency to get a detention order?
13     A.  One of the reasons, yes.
14     Q.  And in the cases that you've handled, okay, where
15  you know of a mother that's about to have a baby, okay,
16  who's already in that system, would I be correct in saying
17  that most of the time the agency will try to get a detention
18  order?
19     A.  I think it's a situation.  It's caseworker by
20  caseworker, family by family.
21     Q.  In the cases that you've handled, and just dealing
22  with the cases you've handled in your experience, would it
23  be a correct statement that in a majority of those cases,
24  that the agency would get a detention order or attempt to
25  get a detention order?

---

Page 87

1     MR. DEVLIN:  Just so I'm clear.  When you say
2     "those cases," do you mean those cases in which
3     the mother is in the system and is pregnant?
4     MR. ANGELONE:  Yes.
5     A.  I don't know if I can say most generally.  It
6  depends on the situation.  I mean, if the mother is using
7  drugs or suspected drugs, if -- it depends on where she is
8  at in the system.  In the 16 years I've been there, I cannot
9  tell you, you know, 40 percent.  I don't know how many
10  overall that I've gotten prognostic or court orders to
11  detain children while the mother was pregnant and in the
12  system.
13     Q.  If there is such an order that's been issued on a
14  case that you're in charge of, would you be aware of it?
15     A.  Yes.
16     Q.  Would case aides at any time be aware of that?
17     A.  Most likely, yes.
18     Q.  It's not uncommon that a case aide would know
19  about it, then, is it?
20     A.  No.
21     Q.  Okay.  You also indicated in this particular case
22  VW -- the VW case, that you had evidence that the mother was
23  doing drugs, something to that effect.  Would that be a
24  correct statement?
25     A.  We had suspected that she had.

---

Page 88

1     Q.  Okay.
2     A.  Been involved with drug trafficking or drug
3  involvement.
4     Q.  Okay.  Would this be during the period of time
5  that you had the case?
6     A.  Yes.
7     Q.  What did you base that on?  What kind of evidence
8  did you have?
9     A.  She had money.
10     Q.  Okay.
11     A.  And was not working.  She had -- I mean, she was
12  living beyond her financial means.  She couldn't verify her
13  employment.  She stated that she was working at a massage
14  parlor, which is not one of the reputable ones in Erie, not
15  a legal --
16     Q.  Okay.
17     A.  You know what I'm saying.  She was working in
18  inappropriate employment, doing sexual favors for
19  individuals.
20     Q.  And you knew that?  You had a witness that she was
21  doing sexual favors?
22     A.  We highly suspected that.  We didn't know.  But
23  she had been seen in and out of this establishment which is
24  known to have that kind of activity occurring.
25     Q.  Okay.  She had a job, though, would that be

---

Page 89

1  correct?  I mean, simple, she did have a job, didn't she?
2     MR. LANE:  Objection to the form.
3     MR. JOYAL:  Come on.
4     Q.  As far as you know, she had a job.
5     MR. LANE:  What do you mean by job?
6     MR. JOYAL:  What do you mean by job?  Was it a
7     legal job or an illegal job?  Which job do you
8     want; drug dealing or the prostitution?
9     Q.  Was she working somewhere?
10     MR. JOYAL:  Prostitution is employment?
11     MR. McNAIR:  Okay, you magpies, knock it off.
12     We're tying to take a deposition here.
13     MR. LANE:  I object to that.  What do you mean by
14     magpies?
15     MR. McNAIR:  I mean people who just make noise
16     without making any sense.
17     MR. LANE:  Thank you.
18     MR. McNAIR:  Thank you guys.
19     MR. LANE:  I object to that statement and move to
20     strike.
21     MR. McNAIR:  I object to that statement.
22     MR. LANE:  And direct it right back at you.
23     MR. McNAIR:  I'm rubber, you're glue.
24     Q.  According to her, she was working somewhere,
25  right?

---

23 (Pages 86 to 89)

577feba1-fae2-4550-b633-b661eb7ebc68

Case 1:05-cv-00076-SJM    Document 70-6    Filed 04/12/2006    Page 25 of 38

Conley v. County of Erie, et al.                                          PW

Page 90

1    A.  From the beginning part of her pregnancy, not
2  throughout her whole pregnancy.
3    Q.  Albeit --
4    A.  Yeah.
5    Q.  -- you didn't think it was a very appropriate
6  place -- or the agency didn't, right?
7    A.  Not always, no.
8    Q.  Okay.  And you didn't have any hard proof that she
9  was doing anything inappropriate there.  It is more or less
10  speculation on the agency's part.
11      MR. DEVLIN:  Object to form.  You can answer.
12    A.  According to the risk matrix that we do, okay, her
13  unborn child was at very high risk of being abused or
14  neglected if remained in her care.  Due to the situation,
15  due to where she was at with complying with the court order
16  treatment plan.
17    Q.  Was she not complying with the court order?
18    A.  Not fully.  And the plan at that particular time
19  for this child was just to detain the child briefly to get
20  supports in place.
21    Q.  Okay.  And part of your job is to make sure that
22  these -- that the supports are put in place, or that she is
23  assisted in getting the supports in place, right?
24    A.  Yes.
25    Q.  And in this particular case, what effort did you

Page 91

1  make, then, to help make sure that these supports were in
2  place?
3    A.  For this baby.  Okay.  We wanted her to go to a
4  supportive living facility where she could take the baby
5  with her.  She refused to do that.  We wanted her to verify
6  some of the stuff she was doing.  She refused to do so.
7    Q.  Verify what stuff she was doing?
8    A.  Drug and alcohol treatment, employment.  Where she
9  was getting her money from.  Her connections to drug
10  trafficking.  Because the child -- the unborn child's --
11  baby's father was very involved in the drug system.  There
12  was allegations that she had told me that these drug buyers
13  were out to get her, and they were going to do her harm, and
14  she was fearful for herself.  And for her child.
15    Q.  Okay.  So you wanted her to verify that
16  information?
17    A.  And we wanted to assure the safety of the child at
18  that time.
19    Q.  So assuming she would have verified that
20  information to you, you would have not attempted to
21  terminate her rights?
22      MR. DEVLIN:  Object to form.  It calls for
23      speculation.
24    A.  We didn't terminate rights.
25      MR. JOYAL:  They didn't terminate her rights.

Page 92

1    Q.  Yeah, because she didn't admit that she was doing
2  this stuff that they wanted her to admit to.
3      MR. DEVLIN:  That's not a question.
4      MR. ANGELONE:  That's not a question.
5      MR. JOYAL:  Right, it's not a question.  It was a
6      misstatement of fact.
7      MR. ANGELONE:  No, not really.
8      MR. McNAIR:  Don't respond to the guy.  It just
9      keeps him going.
10      MR. JOYAL:  Listen to daddy, Anthony.
11    Q.  Along those lines, you don't know any specific
12  statements or any concrete evidence that she was involved in
13  drug -- involved in selling drugs or anything to that
14  effect, do you?
15      MR. DEVLIN:  Object to form.  You can answer.
16    A.  When?
17    Q.  Now, currently.  Or at any time in the past two
18  years.
19      MR. DEVLIN:  Same objection.  You can answer.
20    A.  I didn't have the case.
21    Q.  During the time you had the case, do you know --
22  you don't have any specific evidence?  Was it more or less
23  speculation on the part of the agency?
24      MR. DEVLIN:  Same objection.
25      MR. LANE:  Objection to form.

Page 93

1      MR. DEVLIN:  You can answer.
2    A.  I wish you would ask more specific.
3    Q.  Well --
4    A.  Yes.  We were concerned that there was drug
5  trafficking going on.
6    Q.  Okay.  And, specifically, was it based upon what
7  you've said before, the amount of income she had, that she
8  was living above her -- what seemed to be above her means,
9  and that she didn't have a job?  Were those the reasons, or
10  was it more than --
11    A.  And who she was associating with.
12    Q.  And who she was associating with.  Was there
13  anything else beside those?
14    A.  And concerns that the agency had received from
15  outside resources about her behavior.
16    Q.  Okay.  Meaning?
17    A.  We had gotten calls.
18    Q.  Gotten calls from other individuals?
19    A.  Yes.
20    Q.  Okay.  Who would that be from?
21    A.  Anonymous people calling in with concerns about
22  her well-being, care that she -- how she was taking care of
23  herself and of the unborn child.
24      MR. ANGELONE:  That's all I have.
25

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.

PW

| Page 94 | Page 96 |

**Page 94**

```
 1                 RECROSS-EXAMINATION
 2    BY MR. JOYAL:
 3
 4
 5      Q.  In your experience, case aides have knowledge of
 6    these orders because they would be in the case file,
 7    correct?
 8      A.  Yes.
 9      Q.  Any case aide that you know of that's ever
10    divulged the existence of an order?
11      A.  They're highly confidential.
12      Q.  Has anyone that you know of ever divulged the
13    existence of an order to anyone?
14      A.  Other than Abby Conley, no.
15      Q.  Yes.
16      A.  Other than Abby, no.
17      Q.  Now, Mr. Angelone, one of his last questions to
18    you about VW concerned hard evidence of what she was doing.
19    Am I correct in assuming, am I not, or presuming that she
20    was indicted by the Federal Grand Jury on drug-related
21    charges?
22      A.  I believe she was, yes.
23      Q.  She was arraigned in Federal Court.  You saw her
24    on television walking in a line with other people?
25      A.  Yes, I did.
```

**Page 95**

```
 1      Q.  Do you have any idea, did you read the newspaper
 2    about this?
 3      A.  I saw it on TV.
 4      Q.  Did they say how long the investigation had been
 5    ongoing between the City, County and Federal authorities?
 6      A.  No, but I believe it was a great period of time.
 7      Q.  Over a year?
 8      A.  Yes.
 9      Q.  Which would have been about the time that you were
10    involved in the case, the VW case, where you had the
11    concerns about drug trafficking and things like that; is
12    that right?
13      A.  Yes.
14      Q.  Did she ever have to take drug tests?
15      A.  Us?
16      Q.  Not you.
17      A.  Her.
18      Q.  Did VW have to take drug tests?
19      A.  I don't really recall.  I believe at one point she
20    was supposed to.
21      Q.  Do you recall whether she did?
22      A.  I believe the prior caseworker ceased doing those,
23    which was Deanna Cosby.
24      Q.  Was there anything that you found out when you
25    reviewed Ms. Cosby's records as to whether or not she had
```

**Page 96**

```
 1    allowed VW unsupervised visits with her children in
 2    violation of court order?
 3      A.  I learned that from the foster mom, that it was
 4    frequent that Deanna Cosby picked the children up in the
 5    morning and bring them back in the evening, and the children
 6    would be spending time with their mother.  VW also admitted
 7    that, and had a problem with that when I took the case over.
 8      Q.  Had a problem with that?
 9      A.  A problem with me not allowing that.
10      Q.  Not allowing that.  And that would have been --
11    was there an order from the Court that those visits were
12    always supposed to be supervised?
13      A.  Yes.
14      Q.  So Ms. Cosby would have been violating court
15    orders by doing that; is that correct?
16      A.  Yes.
17         MR. JOYAL:  No other questions.
18         MR. DEVLIN:  I have no questions.
19         MR. LANE:  No questions.
20         MR. ANGELONE:  No.
21         MR. DEVLIN:  We'll read.
22
23         (Deposition concluded at 5:18 p.m.)
24
25
```

25 (Pages 94 to 96)

577feba1-fae2-4550-b633-b661eb7ebc68

Conley v. County of Erie, et al.

**A**

abandoned 34:19
abbreviation 66:13
Abby 1:3 4:8 29:20
    31:22 38:11,13,17
    38:23 43:23 46:3
    48:17 49:2,7,13
    49:15,17 51:12,20
    51:22 53:4,10,14
    55:10,12,15,24,25
    56:22 57:3,7,12
    57:14 58:11,22
    59:9 60:4 61:24
    64:21 66:19 67:3
    67:6,7,9,19 68:8
    68:11 70:3,5 72:5
    72:11,17 73:1,2,5
    73:8,10,13 75:24
    77:6,12,17,25
    80:1,6,17,23,23
    80:25 81:4,10,18
    81:24 82:6,13,21
    85:11 94:14,16
Abby's 54:12 59:2
    62:1
ability 63:25 64:5
abuse 55:9 67:4
    81:2 86:5
abused 90:13
abuser 81:8
account 48:13,15
accurate 22:21
accuse 81:2
acknowledged 73:1
acting 82:13
action 1:4 71:11,15
activity 88:24
actual 25:2 28:22
add 64:9
additional 12:18
addressed 23:7
    25:2 56:15
adhere 25:19
adjudicated 9:13
    9:13
administration

41:7,8 44:8,12
    60:17 82:10
administrative
    41:9 44:5,7,11
administrators
    60:17
admit 92:1,2
admitted 80:2,18
    80:24,24 85:13,16
    96:6
afraid 66:16
age 6:3 46:15
agency 25:20 28:4
    29:24 32:4,23,24
    33:21 36:6 40:5
    43:3,9 50:25
    53:14 54:4,22
    55:6 57:13,15
    58:1 59:25 60:1
    66:20 68:18 73:9
    73:11 77:23 78:4
    78:4,23 81:17
    82:2,10 84:18
    86:12,17,24 90:6
    92:23 93:14
agency's 33:10 73:6
    90:10
aggravated 34:13
    34:16
aggravating 34:25
    34:25
ago 75:6
agreed 22:24 42:9
    44:8
agreeing 31:6
agreement 42:14
ahead 25:16,18
    33:12 34:1 38:16
    83:24
aide 10:14 11:11
    12:10 14:15,19,25
    15:3 27:20,24
    28:1,10,12,19
    29:9 30:20 31:22
    36:9 37:22 38:4,5
    38:5,7,8 62:9

87:18 94:9
aides 11:6,8 14:15
    14:21 15:6,11
    87:16 94:5
aide's 10:17 11:3
air 35:4
Albeit 90:3
alcohol 91:8
alert 73:4
allegation 46:2,17
    46:18 47:21,24
    48:2,4 49:19,25
    51:13,15,17,19,23
    57:1 60:5,18
    67:16 73:6 77:8
    78:7 85:11
allegations 42:1,24
    43:1,3 48:6 51:14
    56:22 57:2,7
    58:10 61:4,8
    72:25 73:24 74:6
    78:5 84:10,19
    86:5 91:12
alleged 55:9
allegedly 47:23
    78:9
Allgeier 44:21 53:9
allowed 96:1
allowing 96:9,10
amount 39:1 93:7
amphetamine 83:1
Angelone 2:4 3:4,8
    4:5,7 7:7 31:11
    61:8 64:3 73:18
    74:23 79:7 83:6,9
    83:12,24 85:5,8
    87:4 92:4,7 93:24
    94:17 96:20
angry 72:5
anniversary 17:2
annual 16:1
anonymous 51:14
    51:25 93:21
answer 4:25 5:2,2
    14:22,23 18:6
    23:17 27:8 45:1

51:1,7 61:16 80:7
    80:14 85:25 90:11
    92:15,19 93:1
answers 4:20
Anthony 2:4 4:7
    92:10
anybody 48:1
    53:13 57:11 62:17
anymore 17:19
    42:13 44:9
apologize 62:24
appeared 84:12
appears 24:21
    75:24
appropriate 9:3
    23:10 90:5
approval 20:16,18
    20:19,22
approximate 14:18
approximately
    8:16 12:8 14:3
    47:22
April 1:20
area 8:5,6 59:1
    61:1
areas 67:18
argue 79:15
arm 50:16
armed 35:18
arraigned 94:23
arrived 48:16
asked 21:6 24:9
    42:11,15 48:9,12
    56:25 64:8 65:21
    65:24 67:9 69:20
    69:20 84:5
asking 4:9,18 16:4
    25:11 49:24 55:10
    64:1,3 66:4 69:23
    80:6
assertiveness 84:17
assess 34:2
assigned 12:10
    14:15,25 31:17,20
    32:2 33:4 36:16
    45:11

assignment 31:24
assistance 14:19
    27:20
assistant 60:11
assisted 90:23
associated 8:1
associating 93:11
    93:12
assume 5:1 57:14
    57:18
assuming 4:10 61:4
    91:19 94:19
assumption 57:16
assure 91:17
attached 75:20,22
attempt 76:17,22
    86:24
attempted 91:20
attend 10:23 53:2
Attending 8:25
attention 72:18
    73:5,6
attorney 4:8 53:9
Attorneys 44:21
August 75:21
authorities 95:5
authority 63:5
available 15:1
average 12:5,6,9,12
    12:13
avoid 59:10 81:4
avoided 55:15
aware 21:4 23:19
    26:10,22 27:1,2
    65:24 66:4 67:20
    67:23 68:2 69:4
    71:14 76:17,22
    77:15 78:6 81:5
    84:10 87:14,16
a/k/a 1:6,12 2:7

**B**

B 1:3 46:9
baby 67:20 68:2,3,9
    68:13,20 69:4,11
    69:13 72:6,12,13
    72:18 73:3,14

Conley v. County of Erie, et al.

PW
Page 2

76:10,18,23 78:20
86:15 91:3,4
**baby's** 91:11
**bachelor's** 6:7
**back** 27:18 29:14
49:11,14 52:20
67:18 72:15 89:22
96:5
**background** 6:6
8:20 29:19 32:11
**backwards** 76:2
**bank** 35:18,18
**base** 28:10 88:7
**based** 16:23 19:21
50:4 71:11,12,13
78:20 81:20 83:16
93:6
**basic** 7:10
**basically** 7:9 15:8
20:5 29:7 34:19
64:8 80:24,24
85:13
**basis** 15:21 16:1
23:7 24:4 29:13
52:8
**beginning** 90:1
**behavior** 54:12
62:1 81:3,21
93:15
**believe** 15:25 17:10
19:18 22:23 24:14
26:6 30:23 33:13
39:9 41:15 44:4
44:12 45:2,5 46:6
48:3 56:10 57:17
58:14 60:19 73:1
75:16 76:12 78:2
83:20 94:22 95:6
95:19,22
**believed** 81:7
**belt** 49:3,4
**best** 46:1 70:12
**better** 86:8
**beyond** 88:12
**bid** 18:14,16 19:3
20:12 21:4

**Biroscak** 21:12
22:10,11 44:5,18
56:6
**birth** 75:11
**bit** 6:5 7:8,10 8:20
20:3,15 35:9 84:9
**bodily** 43:14
**born** 69:11 70:10
71:22,24 78:20
**boss** 21:17
**bother** 69:23
**box** 54:23 81:21
**breach** 32:25
**break** 28:6 49:11
73:19
**brief** 17:11 32:13
33:6 77:23
**briefly** 21:24 45:11
90:19
**bring** 49:2 72:17
73:5 96:5
**broad** 84:5,6
**broaden** 84:9
**broken** 67:3,12
**brought** 32:18
61:19
**burglary** 35:18
**buyers** 91:12

### C
**call** 79:14 81:20
**Callan** 1:9 2:10
**called** 72:6 77:13
80:24 84:24 85:11
85:16
**calling** 93:21
**calls** 23:23 61:15
91:22 93:17,18
**Canada** 68:18 73:7
**capacity** 1:8,10,11
1:14 6:17 11:25
12:3,15
**caption** 31:8
**car** 49:2,3
**care** 7:23 50:10
82:14 90:14 93:22
93:22

**career** 84:18
**Carol** 1:19,24
**CASA** 78:8,14
**case** 4:8 9:22 10:14
10:17 11:3,6,8,11
12:10 14:14,15,19
14:21,25,25,25
15:3,11,16 25:24
26:1 27:20,24
28:10,12,19 29:9
31:1,15,15,16,17
31:20,22,22,24
32:1,6,8,9,14,20
33:4,14,17,20
34:7 35:9,14 36:9
36:16,18 37:3,11
37:21,22 38:6,7,8
38:11 39:4,19,21
39:22 40:2,9,16
40:19,21,22,24
41:1,2,12,20,24
42:5,6,13,15,18
44:3,9 45:7,10,18
46:14 50:13 52:3
52:5,12,15,18,21
52:23,24 56:8
58:24 59:1,1 62:2
62:9,11 64:19,21
65:5 67:19,23,24
75:6,10 80:10,13
82:21 83:3 87:14
87:16,18,21,22
88:5 90:25 92:20
92:21 94:5,6,9
95:10,10 96:7
**caseload** 10:4 11:6
19:1 48:7
**cases** 9:7,8 11:5
12:4,9,11 14:15
14:18,21 15:3
27:19,19 28:1,9
30:11,14,15,19
56:3,7 59:7 62:5
72:24 77:18 85:21
86:14,21,22,23
87:2,2

**casework** 19:4
**caseworker** 6:19,22
7:4,14 8:18,21
10:15 11:15 12:3
12:15 31:19 32:4
32:9,10 35:24
36:1 40:23 43:13
45:12,13 52:18
60:2 86:19,20
95:22
**caseworkers** 11:10
42:4 53:21,22
54:4,8
**Cates** 77:20 78:3
**Cauley** 17:11 44:21
53:9 75:21
**Cauley's** 75:22
**cause** 61:14
**caused** 82:4
**ceased** 95:22
**cent** 20:4
**Center** 2:12 12:1
**certain** 20:3 23:24
41:8 44:14 48:9
58:14 60:6 64:8
71:8,8,9,9 72:22
75:18 79:9
**certainly** 81:13
**change** 19:6 21:9
35:11 42:3 63:18
66:12,16
**changed** 7:4,8 19:5
35:9,11 42:2 62:1
63:9 64:14
**changes** 35:14 42:3
63:24 64:23 66:9
**changing** 43:12
66:15
**Char** 44:19
**characterize** 61:5,7
**charge** 38:22 58:2
87:14
**charged** 35:17
82:22,25
**charges** 32:17
94:21

**Chatham** 2:12
**check** 28:6 29:18
49:12
**child** 1:6,13 2:7
7:21 9:11 10:3,18
10:24 23:7 24:6
27:25 34:19,19
42:1,7 46:7,19,20
46:21,22 48:7,8
48:10,11,12 49:4
49:5 50:5,14,21
51:5,6,10 57:3
67:8,8,14 70:9
71:22,24 75:12
79:2,10,20 81:2,8
85:12 86:11 90:13
90:19,19 91:10,14
91:17 93:23
**children** 1:6,12 2:6
8:13 9:7 11:17
13:7 15:20 17:8
17:18 18:4,9,22
19:9 21:7 26:20
26:23 27:3,12,16
28:5,8 34:3,22
40:6 46:4 49:2
50:24 83:16 87:11
96:1,4,5
**Children's** 7:13
**child's** 91:10
**choice** 42:18,21,22
**Christmas** 54:21
**chronological** 76:3
**circulated** 64:16
**circumstances**
34:14,16 35:1,15
**City** 95:5
**civil** 1:4 61:2
**clarify** 24:9
**cleaned** 63:14
**clear** 87:1
**client** 60:19 71:1
**clients** 55:5 84:17
**Cline** 14:13
**clinical** 45:4

Conley v. County of Erie, et al.

clock 12:23
close 58:7,22 59:10
  59:11 82:14
closed 25:24
closely 15:5 35:21
come 21:20 49:11
  53:13 54:10 67:15
  79:15 84:23 89:3
comfortable 42:15
  42:17
coming 13:3
commas 66:14,15
commencing 1:21
comments 22:16
commonplace
  85:20
Commonwealth
  1:20
communicate
  15:11
communications
  32:13,22,25 33:1
compared 23:9
complaint 24:13
  47:1 50:20
complaints 23:11
  23:14,19 43:7
  53:10
complete 29:9
compliant 9:16
complying 33:19
  90:15,17
computer 13:10,12
  28:22 29:6
concern 83:2,10
concerned 93:4
  94:18
concerning 78:5,22
concerns 43:4,5
  79:10,10 81:17
  82:12 83:13,16,17
  83:19 84:24 93:14
  93:21 95:11
concluded 40:16
  49:3 96:23
conclusion 40:24

concrete 92:12
concurrent 33:22
conduct 53:14
conducted 47:4,7
confidential 79:11
  94:11
confidentiality
  32:25 78:24
confirmed 67:15
  69:12 78:22
Conley 1:3 4:8
  29:20,22 31:22
  38:11,13,17,23
  46:3,16 53:4,11
  55:24 64:21 68:2
  71:15 72:17 73:5
  75:24 77:6,12,17
  77:25 80:1,6,17
  81:10,24 82:6,13
  94:14
Conley's 53:14
  66:20 81:18
connection 28:8
connections 91:9
consulted 45:6
contact 34:7,15,21
  71:1 74:20
contacted 74:10,17
  74:19 77:17 81:11
continual 42:9
continued 73:2,2
conversation 54:3
  71:21 77:6,11
copy 26:7 65:15
  74:17
correct 4:17 5:8,24
  6:1 9:23 14:8
  16:14 17:20 20:13
  22:5,19 24:24
  25:6 26:17 27:13
  28:13 29:9 33:9
  34:5 35:6 37:10
  38:25 39:14,23,24
  40:18 43:10 47:14
  57:8 61:5 62:12
  65:7 67:17 79:16

79:19 85:19 86:16
  86:23 87:24 89:1
  94:7,19 96:15
correctly 26:3
  37:19 40:1 56:20
  59:6 64:13,16
  66:19
correspondence
  74:6
Corry 8:6
Cosby 70:2,4 75:25
  77:17 81:11 95:23
  96:4,14
Cosby's 95:25
counselor 12:2 18:2
County 1:5,5,6,8,8
  1:10,12,13,14 2:6
  2:6,7,19 6:1,15,18
  11:23 15:19 18:2
  75:8 95:5
couple 9:18,19
  19:18 49:6 67:18
  84:16
course 77:7,15
  81:11 83:2
court 1:1 4:20 9:1,1
  9:8,16,19,24
  23:24,25 33:13,18
  34:17 36:20 45:4
  62:7,8,12,17,20
  62:23,25 63:5,24
  64:2,5,23 65:8,10
  65:25 69:15 79:19
  87:10 90:15,17
  94:23 96:2,11,14
covering 63:2
co-counsel 80:5
CPS 7:21
crime 82:25
crimes 82:23 83:1
criminal 35:10,15
  35:16
criteria 34:18,18
cross 50:7
Cross-Examinati...
  3:5,6,7 75:2 77:2

84:2
cube 58:21 60:8,25
cubicle 15:16 60:12
  60:13 81:6
currently 11:16
  92:17

_____

D

D 1:22 2:2 3:1 46:7
daddy 92:10
daily 29:12
danger 86:11
date 16:9 31:18
  43:20 78:9,11
dated 75:21,23
day 11:19 29:13,13
  29:18 49:1 50:6
  53:6 67:16 72:1
  78:14 85:3
days 12:20 71:25
DB 46:8,8 55:9
  85:12
DB's 49:20
dealing 83:10 86:21
  89:8
Deanna 70:2,3,4
  72:5 75:24 77:17
  81:11 95:23 96:4
Deb 17:15
Debi 17:10
Debra 1:10 2:10
  44:15
decision 20:24
  36:24 41:9,10
  44:5,7,11,12,17
  45:4,4 69:16
decisions 33:8
Defendant 2:14
Defendants 1:15
  2:10
definitely 10:16
  32:24 62:10
delete 63:12 64:9
delivered 72:23
Dell 2:15
demonic 77:13
denied 49:24 69:12

deny 49:21 50:1
department 7:12
  7:25 8:12,15,18
  14:5,7 30:3,7 63:1
departments 7:15
  7:17
depends 7:12 11:5
  54:6 87:6,7
deposed 4:10
deposition 1:18
  3:13,14 4:10,13
  4:18 21:22 24:15
  31:5,5,7,10 46:6
  75:22 80:12 89:12
  96:23
describe 7:10 54:15
  84:14
description 7:4
deserve 55:2
desk 58:3 59:11
  67:10
desks 58:4 59:13
details 77:10
detain 76:17,22
  87:11 90:19
detained 9:11,12
  9:12 67:21 68:4,9
  68:13,21 69:5,13
  72:12,13,19 73:14
detention 12:1
  67:24 68:1 76:10
  83:14 85:18,18,20
  85:20 86:3,12,17
  86:24,25
deterioration 25:9
developed 79:18
Deveney 14:1,2
  16:10 21:2,18
  22:7 40:19 41:15
  44:2 48:4 52:4
  56:6 62:25 63:2,4
  63:23 64:22 65:1
  65:14,15 70:21,23
  71:14
Deveney's 17:7
  21:17 45:12,14

Conley v. County of Erie, et al.

52:13
**Devlin** 2:7 3:7 7:6
  14:22 16:4 18:6
  19:15 23:17 25:11
  25:16 27:8 31:3
  31:13 33:12 36:4
  37:5 38:16 44:25
  46:1 49:24 51:1,7
  53:15 54:6 55:10
  61:15,23 64:1
  68:6 69:20 72:14
  83:22 84:3 85:4
  85:22,24 87:1
  90:11 91:22 92:3
  92:15,19,24 93:1
  96:18,21
**different** 7:15
  10:14 14:8 34:18
  39:22 66:11
**differential** 19:19
  20:4
**difficult** 59:5
**direct** 3:4 4:4 30:12
  89:22
**director** 1:10,12
  6:24 17:7,18 20:8
  21:15 44:6 63:20
**disagree** 23:3
**disagreed** 22:17
**disappointed** 23:24
  66:8
**discuss** 14:20 15:16
  25:22 32:8 33:10
  44:2 52:3 53:14
  55:8 65:3
**discussed** 44:4
  55:14 65:1 66:20
**discussion** 31:14
  58:9,20 68:25
  72:16,21 76:9,12
  85:17
**discussions** 52:11
  69:2,3
**disliked** 60:19,22
**disrespectful** 84:21
**distinction** 10:13

**DISTRICT** 1:1,1
**divulged** 94:10,12
**document** 8:23
  13:8 21:25 25:12
  56:11
**documentation**
  11:13,13 28:11
**documented** 35:25
**documents** 10:7,8,8
  10:12 13:21 25:25
**doing** 9:1,2 11:7,9
  16:6 19:1,4 28:1
  48:17 55:1 81:5
  87:23 88:18,21
  90:9 91:6,7 92:1
  94:18 95:22 96:15
**door** 36:2 80:5
**DPW** 47:9,25 48:5
  48:14 51:16 56:25
  61:9 80:22
**dropped** 23:9
**drug** 83:1,4 88:2,2
  89:8 91:8,9,11,12
  92:13 93:4 95:11
  95:14,18
**drugs** 83:11 87:7,7
  87:23 92:13
**drug-related** 94:20
**due** 61:10 90:14,15
**duly** 4:1
**duties** 8:18
**DW** 46:7
**dynamics** 42:6

**E**

**E** 3:1
**earlier** 40:13 61:25
  61:25 76:1
**early** 48:16 49:10
  75:16,19 84:18
**easy** 14:23
**Edinboro** 6:7
**Edmond** 12:1
**Edmund** 2:11
**educational** 6:6
**effect** 24:4 32:12
  51:6 64:17 73:16

80:2,18 87:23
  92:14
**effort** 90:25
**either** 9:6 29:18
  38:17 51:5 53:9
  71:5
**employee** 22:16
  59:25 78:21,22
**employees** 15:23
  66:3
**employment** 11:19
  30:10 54:21 88:13
  88:18 89:10 91:8
**ended** 49:17
**entire** 14:5 63:12
**entries** 29:14
**Erie** 1:5,5,6,8,10,12
  1:13,14,23 2:3,5,6
  2:6,7,9,19 6:1,15
  47:14 88:14
**errors** 66:15
**Esquire** 1:14,22 2:2
  2:4,7,11,14,14,18
**essence** 18:12
**essentials** 8:21
**establishment**
  88:23
**estimate** 46:1
**evaluation** 24:22
  24:23
**evening** 96:5
**events** 42:16
**eventually** 60:13,14
  60:16 80:15
**everybody** 4:25
  17:5 55:5 56:14
**everybody's** 16:24
**evidence** 61:11
  87:22 88:7 92:12
  92:22 94:18
**ex** 79:5
**exact** 6:25 21:16
  28:17 34:21 72:7
  72:8
**exactly** 19:17 23:1
  41:10 74:12

**Examination** 3:4,8
  4:4 85:7
**example** 10:3 15:17
  21:11 24:6 37:1
**examples** 53:24,25
**excitable** 85:3
**Excuse** 67:22
**Executive** 1:8,11
**exhibit** 3:13,14
  21:22,25 24:15,18
  24:18,22 75:21
**EXHIBITS** 3:12
**existence** 94:10,13
**expected** 11:10
**experience** 59:5
  86:22 94:5
**explain** 59:3
**express** 52:18
  66:23
**expunged** 26:15
  51:5 84:9
**extent** 27:23
**extra** 19:18
**e-mail** 65:19 75:20
  75:23
**e-mails** 75:23 76:2
  76:9

**F**

**face** 49:20
**facility** 91:4
**fact** 49:25 77:15
  82:4 92:6
**Failure** 25:19
**fair** 52:3 76:15,20
**fairly** 43:2,4
**fall** 40:15
**familiar** 29:20 46:8
  47:12 62:2 64:23
  64:24
**familiarize** 32:20
  33:17
**families** 9:6
**family** 8:23,24
  11:11 13:16,19
  33:25 42:9 81:13
  86:20,20

**far** 10:17 13:2 36:9
  40:3 44:16 52:4
  53:1 89:4
**fast** 49:14
**father** 34:3,5,8,11
  83:17 91:11
**favors** 88:18,21
**FBI** 32:17
**fear** 86:10
**fearful** 91:14
**Federal** 94:20,23
  95:5
**feel** 23:8,10 42:17
  54:25 86:5,10
**feeling** 69:4
**feelings** 52:18
  66:21
**feet** 59:19
**fellow** 78:22 82:12
**felt** 42:15 52:14
  56:16 67:3,12
  68:13 72:12
**female** 49:4
**Ferguson** 1:25
**figure** 80:11,15
**figured** 51:16 56:21
**file** 13:18,19 26:5,8
  26:10 28:23 34:24
  35:4 40:3 51:4
  71:4,6,7,10 84:8
  84:12 94:6
**filed** 28:23
**financial** 88:12
**find** 43:19 68:19
  86:9
**fine** 10:22 31:11
  44:9 46:2 66:4
**fingers** 49:7
**first** 4:1,19 6:17
  19:20 25:9 31:16
  33:20 46:7,10
  47:13,20 51:9,12
  52:12,17 53:4
  54:2 57:22 76:16
  76:21
**five** 12:20 20:4

Conley v. County of Erie, et al.

flip 22:1
focus 8:17
follow 40:23
following 50:12
74:5
follows 4:2
follow-up 75:7 85:5
food 49:14,14
foot 36:2
forceful 50:14
forcibly 51:5
form 14:22 18:6
23:17 27:8 33:12
36:4 38:16 51:1,7
68:5 71:17 85:22
85:23 89:2 90:11
91:22 92:15,25
formal 15:6
format 62:8
former 75:8 77:18
77:18
foster 7:23 23:6,15
23:21 24:10,12
96:3
found 61:9 95:24
Foundation 78:13
four 22:1
four-year 6:11,12
frame 24:17,22
74:13
frequent 96:4
frequently 12:17
12:18 28:7
friendly 55:18
friends 78:1
front 75:25
fully 90:18
full-time 12:21
18:24

G

G 5:13,14,15,16
general 7:18 8:2,6
12:4 61:1 64:3
74:13
generally 16:24
87:5

getting 19:8,19
35:13 50:10 66:18
82:14 90:23 91:9
give 8:20 12:4
20:15 23:5 41:4
41:18 53:24 60:21
69:9
given 15:20 27:6
61:2
giving 20:22
glue 89:23
go 11:14 15:4,4,15
25:16,18 27:18
29:14 33:12 34:1
34:17 37:16 38:16
49:9,12 59:18
60:16 65:13 67:18
68:17 83:23,24
91:3
goal 33:10,21,21
42:2,3 52:14
goals 33:18 52:19
goes 11:14 76:2
going 4:9,17,19 5:1
5:2 8:17 21:24
24:17,18 31:5
35:5 41:11 42:13
48:17,22 52:5
53:5 62:6,13,13
64:20,20 67:20
68:3,9,13,15,20
69:1,5,13,17 72:6
72:12,13,18 73:3
73:7,14 75:20
76:17,22 78:19
82:16 83:6,22
91:13 92:9 93:5
good 49:13 68:3
Gornall 2:8
gotten 26:18,19,23
27:3 86:7 87:10
93:17,18
GPS 7:18 19:5
grab 50:14
grabbed 49:20
50:16

grabbing 51:5
gradual 39:11,12
grammar 66:15
Grand 94:20
grants 79:12
grave 79:10
great 49:10 95:6
group 54:11
guess 21:15 22:9
24:2 25:1 26:7
27:20 28:18 34:25
35:5 44:10 52:11
52:13 66:8 71:2
guy 92:8
guys 89:18

H

half 39:10
hand 50:7 76:7
handle 39:21 50:24
52:23
handled 52:23
67:23 85:21 86:14
86:21,22
handling 46:14
50:24
handwritten 29:4
happen 26:14
37:20 85:1
happened 47:23
48:9,13,15 49:21
50:2 52:21 53:6
56:12 72:9 74:15
74:15 78:9
happening 29:17
32:14 35:10 41:19
42:6 53:7
happy 79:4
hard 65:15 90:8
94:18
harm 43:14 91:13
hate 54:16
head 19:14
health 81:18
hear 59:20 74:9
80:25
heard 23:12 54:19

64:24
hearing 62:6,13
65:2 79:19
hearings 9:1 23:24
79:14
heightened 73:4
held 31:14 50:7
56:19 73:20
hello 28:5,5
help 49:2 91:1
hey 49:8
high 59:18 90:13
highly 88:22 94:11
hired 6:22 16:23
17:1 20:10 54:19
hit 9:19 67:19
Holdnack 1:19,24
1:25
home 9:14 23:6
49:18 61:3
homeless 54:24
homes 9:7
honor 13:2
hospital 72:9,17,21
hot 49:1
hotline 80:19
hour 39:7,10,10
hourly 19:21,23
hours 12:15,18
19:18,18 20:2,3
39:10 72:1,1
house 24:11
Hughes 54:9
husband 60:10
77:18
hypothetical 78:17

I

idea 12:4 23:5
34:10 43:21 51:18
61:13,18 68:3
69:10 95:1
Ideally 14:23
identical 19:13,17
identification
21:23 24:16
illegal 89:7

imagine 43:8
immediately 67:5,7
impact 16:13
impression 52:13
impressions 52:19
inappropriate
56:16 81:2 88:18
90:9
inappropriately
82:13
incarcerated 34:6
43:16
incident 47:5 50:1
55:8 56:12
including 57:3
income 93:7
incorrect 4:11,12
63:14
increase 39:11,12
increased 37:8 39:2
39:5,6,9
indicated 18:1
22:16 27:19 71:18
87:21
indicating 74:6
indication 22:21
60:21 69:9
indicted 94:20
individual 17:1
57:19
individually 1:7,9
1:11,14
individuals 88:19
93:18
informal 15:9,13
informally 54:12
information 27:24
33:15 52:20 63:8
64:10 66:18 69:24
70:17 71:3,19
77:17 78:22 81:12
91:16,20
infractions 25:8,22
inhuman 77:13
initial 46:7
initially 8:2

Conley v. County of Erie, et al.

**initials** 30:24,25
  54:5 85:12
**intentions** 52:14
**interact** 49:17
**interacted** 50:21
  55:20
**interactions** 8:23
  30:13
**interacts** 49:16
**intern** 77:23
**interpretation**
  41:23 66:11
**interrupt** 31:4
**interview** 73:21
**interviewing** 57:2
**introduced** 75:5
**investigate** 47:14
**investigated** 73:24
**investigation** 9:3
  47:4,8 55:17
  61:10 67:12 74:15
  77:7,13,16 81:12
  95:4
**involve** 12:10
**involved** 30:11
  32:17 34:3 36:15
  38:21 42:10,13
  45:3 48:5 50:13
  61:22 62:11 64:19
  65:5 82:22 88:2
  91:11 92:12,13
  95:10
**involvement** 30:20
  34:4 36:11,14
  37:7 45:8 88:3
**irrelevant** 64:10
**issuance** 61:1,9,12
**issue** 24:8
**issued** 66:8 67:24
  70:6,7,8 85:19
  86:3 87:13
**issues** 80:10,13

**J**

**J** 2:18
**January** 11:20
  13:25 18:10,21

40:6 45:24
**Jo** 14:13
**job** 6:20 7:3,9,11
  8:17,21 14:20
  18:12 20:10,12
  21:4 22:4 23:11
  23:15,20 39:16
  66:21 88:25 89:1
  89:4,5,6,7,7,7
  90:21 93:9
**jobs** 7:24
**John** 1:13 2:14 7:1
  17:10,14 75:6
**join** 61:17
**Joseph** 2:11
**Joyal** 2:11 3:6,9
  61:7 77:3 80:5,11
  83:8,21 89:3,6,10
  91:25 92:5,10
  94:3 96:17
**Jr** 2:11
**judge** 36:23 79:4
  79:12,14
**Judy** 54:20
**July** 64:22 75:16,17
**June** 75:15,17,19
  75:23,24 76:13,13
  76:15,20 78:18
**June/July** 74:14
**Jury** 94:20
**justify** 43:12
**juvenile** 12:2 79:19

**K**

**K** 5:11
**Kathy** 59:24
**keep** 9:6 13:1 21:8
  21:10
**keeps** 92:9
**Kelly** 79:4
**kid** 84:20,25
**kids** 43:2,4,5,24
  49:13,17
**kill** 43:20
**Kim** 57:22 66:25
  67:1
**kind** 13:1 15:8

21:12 22:20 24:5
24:12 28:6 29:18
42:14 43:7 44:7
51:16 54:16 55:2
61:21 73:4 76:2
88:7,24
**kinds** 43:1,18
**knew** 30:13 51:15
  60:7 67:3,4,20
  68:2,20 70:9,11
  72:12 80:6 82:1,7
  82:9 88:20
**knock** 89:11
**know** 6:24 8:23 9:2
  15:24 17:5 20:15
  21:15 23:14,22
  26:15 28:17 29:17
  29:23 30:10,11,12
  31:18 36:4,5,9,10
  36:13 37:5,6 40:3
  40:4,7,21 41:1,9
  41:21 43:25 44:6
  44:16,19,21,25
  45:7,10 46:9,12
  46:17 47:19 48:11
  49:15 51:24,25
  52:16 53:7 54:15
  54:18,19,23 55:3
  55:4 57:17,19
  58:17,25 59:19,23
  60:11 61:18,21,24
  63:11,23 64:10
  66:2,2,15 68:11
  70:23 72:4 73:8
  75:11,11,13,18
  77:9,9,14,20,25
  78:7 79:1,3,8,9
  81:15,24 82:12,21
  86:15 87:5,9,9,18
  88:17,22 89:4
  92:11,21 94:9,12
**knowing** 23:23
**knowledge** 64:4
  94:5
**known** 29:22,25
  56:5 72:25 79:23

81:10 88:24
**Knox** 2:8,18
**Kolupski** 44:19

**L**

**L** 12:1
**lack** 86:8
**Lane** 2:14,15 3:5
  61:17 68:5 71:17
  75:3,5 76:25
  85:23 89:2,5,13
  89:17,19,22 92:25
  96:19
**lateral** 19:10,11
**law** 2:11 52:2 79:2
**learn** 47:20 53:4
**learned** 51:12
  71:19 82:4 96:3
**learning** 71:13
**leave** 21:6,8 32:4
  45:14 67:8 68:15
  69:1 70:13,16
**leaving** 67:14 68:14
  73:3
**left** 12:24 13:25
  16:10 17:17 18:4
  18:9,20 33:7 76:7
**legal** 88:15 89:7
**letter** 25:2 54:22
  56:13,14 74:5,17
  74:18 75:21 81:1
  81:21
**let's** 5:5 13:24 30:6
**level** 60:2
**Liberty** 2:5
**lie** 61:14,22
**Liebel** 1:11 2:10
  17:10,15,18 44:15
**lies** 61:6,7,12
**life** 54:18,23 55:5
**line** 25:14 94:24
**lines** 92:11
**Listen** 92:10
**little** 6:5 7:8,10
  8:20 20:3,15 35:9
  84:9
**lived** 54:23

**living** 81:21 88:12
  91:4 93:8
**LLC** 2:15
**log** 13:15 28:12,14
  28:15
**logical** 31:9
**long** 8:15 14:2 22:2
  29:22 45:19 79:21
  79:23 95:4
**look** 76:6 84:23
**looked** 22:19 56:20
  75:10
**looking** 21:25
  33:22,24,24 34:13
  75:25 76:19
**looks** 22:4
**loose** 49:4,7
**losing** 66:21
**lot** 29:6 30:19,19
  32:14,14 42:5
  50:11 54:18
**loud** 59:9
**Loughney** 2:15
**loved** 67:9
**Lovell** 48:16
**Lucht** 17:21,24
  20:7,22,25 21:20
  63:21 64:14 66:8
**lunch** 12:18 49:9
**Lynch** 54:20

**M**

**magpies** 89:11,14
**maintained** 34:20
**majority** 86:23
**making** 8:24 9:3
  21:3 24:10 41:25
  42:23 43:18 59:4
  89:16
**management** 44:17
  44:18,20 52:5
**mandated** 67:4,13
**mandatory** 42:12
**manner** 23:23
  50:14 66:1 67:14
**March** 6:21 16:20
  16:21,24

Conley v. County of Erie, et al.

mark 2:14 24:18
  75:5
marked 21:22,24
  24:15,22
Mary 14:13
massage 88:13
matrix 90:12
Ma'am 4:7 77:5
McLaughlin 2:8
McNair 1:22 2:2
  78:13 80:4,8,15
  89:11,15,18,21,23
  92:8
mean 7:8 9:2 10:2,2
  15:7 19:20 26:15
  29:13 30:18 31:4
  31:6,18 33:23
  34:16 35:13,23
  36:1,5,15 38:6
  39:3,4 42:6,8
  43:15,19,20 44:7
  44:14,15 46:9,11
  48:19,21 50:8
  51:24,25 52:4
  54:14 55:3,17
  57:8,10,17 59:11
  60:10,16,25 61:25
  64:7 65:3,4 66:2
  66:12,14 67:6
  71:25 72:2 73:9
  77:9 87:2,6 88:11
  89:1,5,6,13,15
meaning 9:11 63:9
  93:16
means 88:12 93:8
meant 41:21,23
meet 14:24 15:1,2
meeting 15:6,7,9
  20:21
meetings 8:25
  14:14 21:2
memo 64:17
mental 81:18
mention 46:2
mentioned 9:18
  10:1 77:9

messages 49:12
met 15:3 74:3
Meth 83:1
Michele 54:8
middle 21:13 44:17
  44:18,19 75:18
Midsummer 75:13
Mike 14:13 17:11
  53:9 54:8 75:22
mine 13:11 29:4
  59:12 63:8
Minimal 15:12
misplaced 74:18
missing 25:25
misstatement 92:6
Misunderstandin...
  24:1
modifications 63:5
  63:7 64:5
mom 48:18,19,21
  48:22 49:16 72:23
  84:21,24 96:3
moments 75:6
mom's 35:17 49:15
Monday 1:20
money 88:9 91:9
monitor 38:1
monitored 35:21
  35:21,25
month 11:11 37:16
monthly 24:11
months 21:9 45:21
  52:12,17
morning 96:5
Moser 2:15
mother 30:25 35:1
  41:25 42:23 82:22
  82:25 83:4,10,16
  83:18 86:8,15
  87:3,6,11,22 96:6
motivation 61:21
move 19:10,11
  20:16,19,24 21:3
  72:25 73:7 81:6
  89:19
moved 58:21 59:2,2

59:3 60:8,12,13
60:17,25 67:11
81:25 82:1
mutual 42:14

N

N 3:1
name 4:7 5:5,13,19
  28:17 46:7,9,10
  47:13 57:19,20,22
  59:23 75:5
named 77:20
names 5:7,8,21
  25:8 53:24 54:4,7
nature 53:2
Neal 2:7
near 59:8 81:7
necessarily 9:12
  13:11
necessary 29:5
need 21:9 84:23
needed 9:3 20:16
  28:6 84:22
needs 11:14
neglect 86:5
neglected 63:9 64:9
  90:14
never 4:13,14 50:4
  50:16 55:14,25
  63:9 65:1,20,21
  69:11
new 18:1 42:16
  63:20 66:9
newspaper 95:1
newspapers 82:18
niece 54:20
nods 19:14
noise 89:15
normal 45:2 50:10
Notary 1:19
notes 28:12 56:20
notice 22:15
November 18:17
  18:20 20:11,11
  40:12
number 53:1
nutshell 72:8

Nzinga 77:20

O

object 14:22 18:6
  23:17 27:8 33:12
  36:4 38:16 51:1,7
  83:6,8 85:22
  89:13,19,21 90:11
  91:22 92:15
objecting 80:8
objection 61:15,23
  68:5 71:17 78:13
  79:7 80:4 83:12
  85:23 89:2 92:19
  92:24,25
observation 15:4
  28:14,15,16,17
obtain 8:25
occasion 9:20 46:24
  47:1 58:16,18
  74:3
occur 37:12
occurred 42:16
  76:12
occurring 88:24
OCY 56:1 63:1
  78:21,22 81:1
  82:6 84:11 85:21
office 1:6,12 2:6,11
  8:12 11:17 15:20
  17:8,17 18:4,9,21
  19:9 21:7 26:19
  26:23 27:3,12,16
  40:6 58:5
offices 1:21
oh 49:10 59:22
  78:25
okay 4:21,22 5:3
  6:5,8 7:3,20,22
  8:4,7,19 9:5,9,15
  10:11,20 11:12,16
  12:3,9,19 13:18
  14:4,12,19 15:23
  17:4,13,23 19:7
  20:12 22:9,15,25
  23:2 25:1,15 26:7
  26:9,9,17,22

27:10,21,22 29:2
29:12 30:6 31:13
32:16,19 33:7,16
33:23 34:1,16
35:8,15,19 36:17
37:19 38:13 39:7
40:14 41:11 42:6
44:10,18,21 45:10
45:23,25 46:16,20
48:14,24 49:19
50:9 51:15 52:1,8
52:22 53:18 55:7
55:22 57:4,9,15
58:23 59:3,6,13
59:20,23 60:1,24
61:13 62:24,25
63:11,16 66:7,19
66:23 67:1,19
68:8,12 69:9
70:17 71:14 72:2
73:10 74:5 76:4,8
84:14 85:2 86:8,9
86:10,14,15 87:21
88:1,4,10,16,25
89:11 90:8,12,21
91:3,15 93:6,16
93:20
old 46:13
once 14:24 15:11
  29:16 32:24 40:21
  42:3 86:8
ones 23:9 75:25
  88:14
one-year 17:2
  26:11
ongoing 40:3 79:21
  95:5
Onorato 1:13 2:14
  75:6,7
open 40:3
opened 80:5
opinion 66:18,22
  66:23 67:2
order 23:25 33:18
  36:21 67:24 68:1
  68:10,13 70:5,7,8

Conley v. County of Erie, et al.

70:9,11 76:3,10
79:15 83:14 86:12
86:18,24,25 87:13
90:15,17 94:10,13
96:2,11
orders 9:16 79:6,12
85:18,18,20 86:3
87:10 94:6 96:15
outside 45:12 49:1
78:23 93:15
overall 87:10
overlap 33:6

**P**
PA 2:3,5,9,12,16
page 25:2 76:1,2
pages 22:1 25:1
76:7
Pam 21:12 44:4,6
44:18 56:6
Pamela 22:10
paper 28:22
paragraph 25:13
paramour 35:17,17
43:14,16
paranoid 54:16,17
Pardon 12:7 48:20
68:23
parent 10:3,18 15:6
24:6,10,12 27:25
28:1,6 30:19
34:17,22 38:3,5,5
51:10 56:17
parental 34:22 35:5
parents 10:23 13:7
23:15,16,20,21
28:5 42:7 79:15
parking 50:11
parlor 88:14
part 4:9 9:20 10:7
10:18 11:1 13:18
14:20 16:13 28:9
29:4 32:1,9 38:23
39:15 44:5 51:4
56:24 60:8,10
63:16 75:16 90:1
90:10,21 92:23

parte 79:5
particular 7:25
12:5 31:1,15 32:8
36:18 37:3 39:19
41:1 42:5 45:7
48:10,12 50:6
51:9 52:3,15 55:8
65:1,5 84:17
87:21 90:18,25
partition 59:16,18
party 54:25 56:12
pay 19:7,19
PC 2:8
peculiar 54:13
Peebles 57:20
66:25 67:1
peer 54:11
Penn 2:15
Pennsylvania 1:1,9
1:20,23
people 44:20 53:19
54:17,19 55:6
57:2,13,15 60:6,8
66:11,14 82:13
89:15 93:21 94:24
percent 87:9
performance 23:12
23:15 25:10
period 17:12,23
26:11 27:15 34:15
34:20,23 39:1,4
77:23 79:21 82:16
88:4 95:6
periodically 14:20
29:8,11
person 21:13 41:8
54:6 59:20,23
80:2 82:7
personal 55:5
personally 55:24
personnel 1:10
26:8 51:4
Peter 1:9 2:10
Petulla 7:1 17:10
17:13,14
phone 23:23 59:9

picked 96:4
Pittsburgh 2:12,16
47:10
place 2:15 10:3
11:8 32:22 35:12
35:14 48:16,23
90:6,20,22,23
91:2
placement 7:23 8:8
8:9,14,18 9:7 14:5
19:5 30:8,9,9
34:20 83:15
Plaintiff 1:3 2:1
plan 90:16,18
planning 33:22
pleasant 55:19
please 4:20,24 6:6
10:19 14:17 26:21
49:16,16 85:5
Plus 9:2
point 6:14 7:5 28:4
30:25 33:8 37:7,8
37:10,11 40:8
55:15,16,17 58:8
68:22 69:23 95:19
policies 25:20
policy 26:10 42:3
63:16,18 64:13
66:9 67:3,12
78:24 79:18 85:18
position 6:17 8:11
8:15 12:21 18:1,5
18:14,16 19:3,7,9
20:8 21:14 60:1
possibility 69:18
possible 33:25
potential 34:11
practice 62:15
practiced 65:18
pregnancy 90:1,2
pregnant 48:25
75:12 86:10 87:3
87:11
prepare 9:24 10:8
28:12 62:5,9,12
preparing 10:8

Preschool 46:15
present 2:18 36:10
presuming 78:18
94:19
pretty 10:6 14:4
15:3,15 17:2
52:23 58:4 84:5
85:16
previous 31:19
32:9,10 33:14
35:24,24
previously 23:8
84:5
prior 14:7 16:9
20:22,22 23:1
27:10 31:24 35:13
36:11 50:12 51:18
51:23 53:7,13
60:18 66:19 68:1
68:9,12 69:11
72:11,16,20,21
78:18 81:25 95:22
probably 20:9
41:16 47:25 59:11
60:7 66:25 81:15
problem 15:8 31:12
83:4 96:7,8,9
problems 41:19,24
82:5
procedures 25:20
process 44:13
66:17
prognostic 79:5
86:6,7 87:10
program 6:12
progressing 52:6
progressive 25:9
prompt 43:22
86:11,12
prompted 19:3
20:25
proof 90:8
prostitution 89:8
89:10
protect 79:20
protective 7:18,21

8:2,6 79:2
providers 8:24
proximity 58:7
Public 1:19
pulled 49:6
pulls 26:16
punctuation 63:7
66:15
purposes 46:6
put 13:16 63:8,9
64:9 67:11 90:22
PW 1:18 3:3,13,14
4:1 5:6 31:5,7,9
p.m 1:21 56:19,19
73:20,20 96:23

**Q**
question 4:23,25
5:1,2 7:6 14:19,23
18:7 22:4,15
23:18 27:23 44:10
52:16 53:12 68:6
69:21 72:15 78:17
80:7,14,16 84:6,6
84:6 85:24 92:3,4
92:5
questions 4:9,18
67:9 75:7 83:21
85:4 94:17 96:17
96:18,19
quick 27:18 76:6
quit 18:12
quite 86:2

**R**
R 2:7,11,14
rare 28:9
rarely 11:6
rate 19:21,23
rating 22:17 23:3
ratings 23:8
read 25:16 33:13
72:14 82:18 95:1
96:21
ready 19:5
real 27:18 54:16
76:6

Conley v. County of Erie, et al.

**really** 15:6 30:21
46:11 47:19 81:1
92:7 95:19
**reason** 21:7 24:9,10
27:15 41:4,18
43:25 60:19
**reasons** 67:10
83:13 86:13 93:9
**recall** 17:8 20:7
27:9,10 30:1,16
30:21 31:16 36:17
37:17,18 39:2,18
46:13 47:7,17
49:15 50:18 51:2
51:8 55:13,14,22
56:13,17 58:9
67:19 70:21 71:24
72:11 73:12 84:15
95:19,21
**received** 21:5 27:11
93:14
**receiving** 70:17
**Recess** 56:19 73:20
**recognize** 21:25
22:2 24:19
**recollection** 50:4
**recommendations**
23:25
**record** 13:17 31:14
**records** 95:25
**Recross-Examin...**
3:9 94:2
**Redirect** 3:8 85:7
**refer** 64:21
**referrals** 8:24 9:3
**refused** 91:5,6
**regarding** 21:3
28:13 48:6 58:10
85:18
**regardless** 84:8
**regards** 34:14
**regular** 15:21 19:1
23:7 24:3 52:8
**regularly** 15:4
**relates** 58:1
**relation** 10:8 11:4

**relationship** 34:22
42:9 43:5
**relevance** 80:4,8
83:7
**rely** 27:24
**remained** 90:14
**remember** 22:22
29:23 30:18 31:18
46:10 48:18 58:20
60:3 70:22 73:10
73:13 75:14 77:10
84:18
**remembered** 46:13
**removed** 40:19
**reopened** 25:25
**rep** 60:9,11,11
**repeated** 63:14
**rephrase** 4:25
14:16 72:16
**report** 28:16 61:10
67:5,7,13 70:18
80:3
**reported** 1:24
30:12 77:16 80:18
81:8
**reporter** 4:21 67:4
67:13 80:7
**reporting** 1:25 44:8
67:14 71:14
**reports** 71:2
**represent** 75:6
**representing** 4:8
**reprimand** 25:6
26:4,8,18,19 27:1
27:2,7
**reprimanded** 50:23
**reprimands** 26:22
27:11 51:3 84:7
**reputable** 88:14
**reputation** 82:6
**requests** 85:20
**require** 12:16
**required** 8:22 13:8
14:14,20 29:2
71:2
**requirements** 7:4

7:11 11:1
**resident** 6:1
**resource** 34:11
**resources** 33:25,25
93:15
**respect** 31:4 35:1
46:3 64:1 66:9
**respond** 92:8
**responsibilities**
11:3
**responsible** 16:6
62:20
**restaurant** 49:14
**result** 25:24
**returning** 23:23
**reunification** 33:24
35:6
**review** 16:21,24
22:5 29:3,8,11,14
62:17,25
**reviewed** 13:21
33:14 64:11 65:13
95:25
**reviewer's** 22:9
**reviewing** 62:20
72:24
**reviews** 15:20 16:6
16:11,13,17 22:20
**Richard** 1:7 2:10
**ridiculous** 66:17
**right** 5:12 6:10
9:20 10:13 11:1
17:15,16,19 18:10
20:14,14,21 21:6
24:21 25:3,10,18
25:19,20 26:13
29:12 30:2,24
31:19 34:5 36:14
37:22 38:18,24
40:1,17 41:12
44:24 47:17,20
52:9 56:9 57:11
59:11,14 62:3,15
62:23 64:17 65:6
65:17 70:13 71:19
73:13 74:23 76:8

81:9 89:22,25
90:6,23 92:5
95:12
**rights** 35:6 91:21
91:24,25
**risk** 67:7 90:12,13
**robbery** 35:18,18
**role** 10:17
**room** 84:22
**roughly** 20:8,9
46:13
**RPR** 1:24
**rubber** 89:23
**rules** 25:20
**run** 5:12

**S**

**S** 2:11
**safe** 15:10
**safety** 42:8 91:17
**salary** 16:14 19:7,8
19:13
**Santas** 54:24
**Saveikis** 47:12
73:22 77:7 85:15
**saw** 55:19 94:23
95:3
**saying** 26:17 37:10
42:19 55:13 61:5
61:22 85:19 86:16
88:17
**says** 25:5,9,11,12
61:24
**scheduled** 12:17
**schedules** 13:4
**scheduling** 9:1 15:5
**Schenker** 1:7 2:10
**Schetter** 54:8
**seat** 49:3,4
**seats** 49:3
**second** 19:20 20:5
25:2,14
**secret** 54:24
**secretaries** 58:2
66:14
**secretary** 65:12,19
**section** 22:16

**sections** 63:13
**see** 28:6 49:16
76:10
**seeing** 8:23
**seek** 55:18
**seeking** 77:17
**seen** 23:6 56:11
74:2 88:23
**selling** 92:13
**semi-supervised**
35:20,22,25
**send** 65:18,19
**Sennett** 2:8
**sense** 89:16
**sent** 54:22
**sentences** 63:12
**separating** 59:11
**series** 4:18 75:23
**service** 1:7,13 2:7
8:24
**services** 7:13,18,21
8:3,6,25 79:2
**set** 16:16 36:20
**settle** 84:22,23
**sexual** 88:18,21
**Shara** 47:12 73:22
77:6 85:15
**share** 57:1
**sheets** 13:1
**shift** 19:19,20 20:5
**shook** 43:23 46:19
46:21,22 49:20
**short** 17:23,25
72:23
**shortly** 45:17,19
77:16
**show** 21:24 24:17
75:20
**showed** 26:4
**showing** 24:3,5
34:17
**side** 59:21
**signature** 22:9 29:4
29:5
**signing** 64:11
**Similar** 83:19

Conley v. County of Erie, et al.

| | | | | |
|---|---|---|---|---|
| **simple** 89:1 | **stated** 52:22 61:25 | 75:13,18 | 73:3,18 76:6 | **things** 9:18 42:23 |
| **sit** 36:17 57:11 | 80:23 84:25 85:13 | **supervisal** 15:7 | 78:20 89:12 91:4 | 52:5,6 53:2 55:1,3 |
| 58:22 | 88:13 | **supervise** 10:2,22 | 95:14,18 | 56:17 61:2 81:5 |
| **situation** 32:18 | **statement** 29:10 | **supervised** 13:7 | **taken** 1:18 26:11 | 81:22 95:11 |
| 36:8 81:4 84:20 | 86:23 87:24 89:19 | 35:21 96:12 | 40:8 41:2,12 44:3 | **think** 10:20,22 18:2 |
| 86:7,19 87:6 | 89:21 | **supervising** 8:25 | 45:17 71:11,15 | 30:17,17 34:21 |
| 90:14 | **statements** 92:12 | 10:1 | **takes** 10:3 | 39:14 45:9,11 |
| **situations** 27:24 | **states** 1:1 61:12 | **supervision** 17:7 | **talk** 32:19 48:14,18 | 46:16 49:20 52:22 |
| 45:3 86:4 | **stating** 54:22 64:11 | 38:23 | 48:21 58:15 73:15 | 53:6 54:7 56:15 |
| **six** 8:16 14:3 16:9 | **station** 58:7 | **supervisor** 11:15 | 82:2 | 56:21 57:13,13 |
| 17:6,9 21:9 30:7 | **stay** 21:11 42:18 | 13:5,22,24 14:2,4 | **talked** 53:25 77:10 | 58:18 61:11 66:17 |
| **skim** 76:5 | **stays** 26:5,10 | 14:8,24 16:7 21:3 | 85:17 | 70:22 72:22 73:21 |
| **slapped** 43:24 | **stop** 28:3 | 22:12 30:12 45:13 | **talking** 22:12 37:9 | 75:16 79:4 84:19 |
| 46:19,20 | **stopped** 40:21,22 | 63:3 65:9,25 | 38:8 39:4 54:12 | 85:15 86:1,19 |
| **slapping** 51:5 | **story** 50:4 54:23 | **supervisors** 29:6 | 54:18 60:5 62:23 | 90:5 |
| **slows** 66:17 | **street** 1:22 2:2,5,8 | 44:20 63:24 64:4 | 65:8 74:14 79:5 | **thinking** 19:16 |
| **social** 6:7 78:21 | 50:7,11 | 64:7,11 | **television** 82:18 | **thinks** 61:24 68:8 |
| 82:7 | **strictly** 79:11 | **supportive** 91:4 | 94:24 | **Thomas** 12:1 |
| **Solicitor** 1:15 2:19 | **strike** 89:20 | **supports** 90:20,22 | **tell** 6:3,3 7:3 47:19 | **thought** 82:7,9 |
| 75:8 | **strongly** 61:12 | 90:23 91:1 | 48:1,4,8 56:1 | **thoughts** 66:21 |
| **somewhat** 66:7 | **stuff** 9:16 35:10 | **supposed** 14:24 | 57:11 66:7,9 67:1 | **threatened** 42:8 |
| **soon** 71:24 | 49:12 55:18,19 | 16:2,18,19,21,24 | 68:8,20 70:1 72:2 | **threats** 43:14,18,22 |
| **sorry** 25:15 37:21 | 91:6,7 92:2 | 26:14,15 28:18 | 74:13 87:9 | **three** 5:21,21 45:21 |
| 38:21 72:14 76:19 | **submit** 13:4 65:9 | 66:13 67:5 95:20 | **Tellers** 14:13 | 52:12,17 |
| **sound** 46:8 47:12 | 65:25 | 96:12 | **telling** 49:15 54:19 | **tighten** 49:8 |
| **space** 58:21 | **submitted** 62:18 | **sure** 6:25 10:21 | 55:4,5,5,22 60:3,6 | **time** 5:19 6:14,24 |
| **speaking** 80:22 | 63:6 | 18:8 23:1,19,22 | 67:19 68:11 73:13 | 6:25 7:5 10:19 |
| **specialized** 7:24 8:5 | **subsequently** 64:14 | 33:18 34:9 37:8 | **ten** 20:4 | 12:5 13:1 14:5 |
| **specific** 92:11,22 | **substantiated** | 39:3 44:14 49:8 | **tense** 66:16 | 15:1,19 16:5,16 |
| 93:2 | 84:25 | 60:2 74:12,18 | **term** 36:6 86:9 | 17:11,12,17,23,25 |
| **specifically** 23:2,20 | **Sue** 14:1,2 16:10 | 75:14 86:2 90:21 | **terminate** 91:21,24 | 18:20 20:15,16 |
| 72:3,4,4 93:6 | 17:7 21:2,16,18 | 91:1 | 91:25 | 23:18 24:17,21 |
| **speculation** 61:15 | 41:15 44:7 45:12 | **suspect** 57:10 | **terminated** 53:5 | 26:21 27:14,15 |
| 90:10 91:23 92:23 | 45:14 48:4 52:4 | **suspected** 51:20 | **termination** 35:5 | 29:25 30:2,22,25 |
| **speed** 32:18 | 52:13 56:6 70:21 | 72:18 78:19 87:7 | 53:13 66:20 | 32:14 33:2,11 |
| **spelled** 5:17 | 70:23 71:14 | 87:25 88:22 | **testified** 4:2,15 | 34:6,7,12,15,20 |
| **spells** 5:18 | **Suite** 2:16 | **suspects** 73:14 | 39:14 61:25 64:21 | 34:23,24 35:3 |
| **spending** 96:6 | **summaries** 9:1,24 | **suspended** 27:14 | 64:22 73:21 85:10 | 39:1,2,4,5,6 40:5 |
| **spoke** 78:3 80:23 | 62:2,7,17,21,23 | **sworn** 4:2 | **testify** 9:19 | 40:8,13,20 42:5 |
| **standard** 15:24 | 63:1,5,10,12,13 | **system** 13:2 86:9 | **testimony** 3:3 50:5 | 43:7,16 48:11 |
| 62:15 | 63:15,24 64:2,6 | 86:16 87:3,8,12 | **tests** 95:14,18 | 50:12 51:9,12,18 |
| **start** 5:5 20:10 30:1 | 65:8,10 | 91:11 | **Thank** 50:1 75:9 | 52:11 58:23,25 |
| **started** 8:2 29:24 | **summary** 33:13 | | 89:17,18 | 60:3 62:22,22,24 |
| 31:16 49:10 54:13 | 62:8,12 64:23 | **T** | **thing** 4:19,23 25:16 | 63:11,16,17 64:20 |
| 54:18 | 65:25 | **take** 4:21 11:8 | 38:9 42:14 64:8 | 67:20 69:23 70:22 |
| **State** 1:22 2:2 | **summer** 47:17 49:1 | 20:15 32:22 35:12 | 67:6 | 71:15 72:23 74:2 |
| | | 43:19 48:22 72:6 | | |

Conley v. County of Erie, et al.

74:10,13 76:1,1
76:16,19,21 77:24
79:21 82:16 83:3
84:10,12 86:1,7
86:17 87:16 88:4
90:18 91:18 92:17
92:21 95:6,9 96:6
**timely** 23:23 67:14
**times** 27:6,9 54:12
**Timothy** 1:22 2:2
**title** 21:16
**today** 7:6 57:11
**told** 21:10 41:11,14
41:16 47:24 48:13
51:22 56:6 57:6
60:7 68:11,12,15
68:25 69:19 70:2
70:2,3,4,4,5 71:18
71:21 72:5,6,11
72:23 73:8,8,9,10
76:16,21 77:5,12
78:3 80:1,17 81:1
81:7 84:22 85:11
85:15 91:12
**touch** 28:10
**touched** 50:5 84:22
85:12
**town** 68:14,15 69:1
70:13,16
**track** 13:2
**trafficking** 88:2
91:10 93:5 95:11
**training** 49:3 78:20
**transferred** 45:22
**transition** 20:16
**transport** 28:7
**treat** 39:21
**treated** 43:2,4
**treatment** 46:3
90:16 91:8
**trial** 4:15
**trick** 46:12
**tried** 39:15 81:4
**troublesome** 55:4
**Truancy** 7:19
**try** 15:10 28:3

49:16 86:17
**trying** 34:2 46:12
72:22 80:11 84:19
**TV** 95:3
**twice** 37:12,21
**two** 2:12 12:14
14:11,18 22:23
25:1,8 29:18
30:10 34:3 37:4
37:16,20 39:8,10
45:21 47:22 52:12
52:17 53:6 76:7
83:15 92:17
**two-minute** 73:18
**two-year** 6:10
**tying** 89:12
**type** 13:15 42:14
65:12 82:25
**typed** 54:22
**types** 43:22 82:23
**typical** 40:23
**typically** 28:3
29:16

**U**

**ultimately** 45:14
**Um-hum** 10:25
68:16 76:14
**unborn** 90:13
91:10 93:23
**uncommon** 87:18
**understand** 4:24
18:7,8 20:6 26:3
35:3 37:19 40:1
44:11 52:9,16
56:20 59:6 64:13
64:16 66:19 68:6
85:10,24 86:1
**understanding**
26:13 33:21 63:4
70:9,12
**understood** 5:1
58:10 60:4
**Unfortunately**
63:19
**unfounded** 61:11
74:7

**union** 60:8,9
**unit** 21:15 22:12
45:12,13,14 48:1
53:19,21 54:3
55:20 56:14 81:25
82:5
**UNITED** 1:1
**unruly** 84:21
**unsubstantial**
61:10
**unsupervised** 96:1
**upset** 60:25 67:11
81:16
**use** 29:6 49:10 54:7
54:16
**usually** 17:1 30:19
39:7 43:12 63:2

**V**

**v** 1:4 68:11,12
**Vendetti** 2:4,4
**verbal** 4:20 25:5
27:6,11
**Verbally** 70:24,25
**verified** 91:19
**verify** 88:12 91:5,7
91:15
**versus** 35:6
**violating** 96:14
**violation** 78:24
79:1 96:2
**visit** 10:2 11:4,10
28:9,11,19 29:17
29:17 48:9,14,16
48:17,22 49:11,13
49:15,17,23 50:11
50:12,13 51:9,10
57:3 84:20
**visitation** 15:4
28:16
**visitations** 13:6
**visits** 8:25 9:1 10:1
10:9,18,23,23
11:7,9 13:7 15:5
24:3,5,5,6,11
27:25 28:1,3,13
29:16 35:20 36:10

36:16,18,24 37:4
37:7,11,19 38:2,3
38:14 39:2,5,7,15
53:1,1 96:1,11
**VW** 30:25 31:15
40:2 42:1 48:19
48:21,25 52:5
58:24 67:19,20,23
68:2,8 69:6 71:18
72:3,12,17,18,21
73:2,6,14 75:11
76:16,21 78:18
86:7 87:22,22
94:18 95:10,18
96:1,6
**VW's** 35:17 43:24
46:4 71:7

**W**

**W** 21:22,25 24:15
75:5
**Walczak** 59:24
60:4
**walking** 94:24
**Wallace** 2:18
**want** 9:18 10:13,21
14:16 20:14 21:8
27:18 30:17 40:12
44:9 46:12 47:22
49:9,16 54:24,25
56:2,3,7 58:21
59:4,7,8 61:1
67:18,18 75:17
81:7 83:22 84:9
89:8
**wanted** 21:8,10
42:12,19 49:12
58:21 59:1,2,3,10
60:8,12,25 67:10
81:6,13 91:3,5,15
91:17 92:2
**wants** 48:14
**warned** 50:23
**warning** 27:7
**warnings** 27:11
**wasn't** 7:2 15:6
21:4 24:10 28:9

43:2 55:2 65:4,17
78:6 81:5
**watch** 82:18
**way** 16:14 20:25
23:24 28:7 38:22
40:2 49:7 50:21
50:24 52:2,23
53:14 60:22 64:19
65:21 66:8 75:8
**week** 12:16,20
14:24 15:11 19:18
29:15,16 37:1,4
37:12,20,21,21
**weekly** 13:4
**weeks** 24:23 37:20
47:22 71:25
**Weimer** 2:11
**welcome** 15:2,7
**Welfare** 1:7,13 2:7
**well-being** 93:22
**went** 8:5,8 18:5
20:18 27:25 28:11
35:20 44:16 45:12
49:6 84:20
**weren't** 21:6 37:24
43:4 65:5
**West** 2:8 68:18
**WESTERN** 1:1
**We'll** 96:21
**we're** 12:17 31:3,6
38:8 39:3 60:5
65:8 74:14 89:12
**We've** 30:24
**William** 2:15
**wish** 93:2
**witness** 5:18 19:14
68:7 88:20
**witnessed** 78:8
**woman** 80:22
**wondering** 26:9
31:8 75:10
**word** 54:17
**words** 15:15 34:21
65:17 73:15 82:14
**wordy** 64:10
**work** 6:7,15 11:23

Conley v. County of Erie, et al.

12:1,16 13:3
25:10 36:3 56:2,3
59:4,5,5,7,8 61:1
**worked** 8:5 12:18
13:19 15:5,19
16:5 17:23 26:19
26:23 27:3,15
30:3 55:23 56:8
64:7
**worker** 8:6 35:24
56:25 78:8,14,21
**workers** 82:7,12
**working** 8:12 9:6
11:11,16 16:8
17:6 18:21 19:17
19:20 20:2 27:12
33:2 40:21,22
62:25 63:1 83:3
84:11 88:11,13,17
89:9,24
**worthy** 55:1
**wouldn't** 36:8
38:20,22 44:23
45:5,9 51:3 68:19
81:13
**write** 31:2 65:12
66:13,13
**writing** 70:24 71:4
81:21
**written** 13:13,16,21
25:5 26:4,9,18
27:2 28:10 29:7
51:4 52:2 71:9
81:1 84:7,11
**wrong** 22:19
**wrote** 56:13,14

---

**X**

**X** 3:1

---

**Y**

**yeah** 7:7 10:5 15:18
20:7 28:2,16 30:2
32:11 47:11,13
57:18 58:8 65:11
72:5 90:4 92:1
**year** 11:20,21

16:16,25 26:5,12
45:20 46:14 56:12
74:11,16 82:23
95:7
**years** 8:16 14:3
16:9 17:6,9 19:4
30:7,10 64:8
79:24 87:8 92:18
**Youth** 1:6,12 2:7
8:13 11:17 15:20
17:8,18 18:5,9,22
19:9 21:7 26:20
26:24 27:4,12,16
40:6

---

**0**

**05-76E** 1:4

---

**1**

**1** 3:13 21:22,25
24:22
**10th** 2:8
**120** 2:8
**15** 79:24
**15219** 2:12,16
**16** 19:4 64:8 79:24
87:8
**16501** 1:23 2:3,9
**16509** 2:5
**1985** 6:9,12
**1990** 6:21 7:5,5,25

---

**2**

**2** 3:14 24:15,18
25:19
**2:59** 1:21
**20** 12:6,8,9
**20th** 75:21
**2004** 23:16 24:4
40:12,15 45:20
46:14 47:18 64:20
64:22 74:11,14,16
75:15,21,24 76:15
76:21 78:19
**2005** 18:17,18,20
22:5 23:16 24:4
27:10 45:24

**2006** 1:21 13:25
18:10,21
**21** 3:13
**24** 3:14
**28th** 64:22

---

**3**

**3** 1:20
**30th** 75:17
**37.5** 12:17
**3700** 2:16
**3820** 2:5

---

**4**

**4** 3:4
**4th** 75:23 76:13
78:18
**4:12** 56:19
**4:21** 56:19
**4:46** 73:20
**4:47** 73:20
**40** 19:17 87:9
**43** 6:4

---

**5**

**5** 59:19
**5th** 78:18
**5:18** 96:23
**525** 2:15

---

**6**

**6** 59:19
**6th** 78:19

---

**7**

**7th** 75:15,24 76:13
76:15,20 78:19
**75** 3:5
**77** 3:6

---

**8**

**821** 1:22 2:2
**84** 3:7
**85** 3:8 6:9

---

**9**

**94** 3:9
**975** 2:12