Appendix Exhibit 32

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    ABBY B. CONLEY,                  :
                    Plaintiff         :
4                                     :
           v.                         :    Civil Action No. 05-76E
5                                     :
     COUNTY OF ERIE, ERIE COUNTY      :
6    OFFICE OF CHILDREN AND YOUTH,    :
     a/k/a ERIE COUNTY CHILD          :
7    WELFARE SERVICE, RICHARD         :
     SCHENKER, individually and       :
8    in his capacity as County        :
     Executive of Erie County,        :
9    Pennsylvania, PETER CALLAN,      :
     individually and in his          :
10   capacity as Erie County          :
     Director of Personnel, DEBRA     :
11   LIEBEL, individually and in      :
     her capacity as Executive        :
12   Director, Erie County Office     :
     of Children and Youth, a/k/a     :
13   Erie County Child Welfare        :
     Service, and JOHN A. ONORATO,    :
14   ESQUIRE, individually and in     :
     his capacity as Erie County      :
15   Solicitor,                       :
                    Defendants        :
16

17

18           Deposition of [V.W.], taken before and by

19      Janis L. Ferguson, Notary Public in and for the

20      Commonwealth of Pennsylvania, on Thursday, April

21      6, 2006, commencing at 9:49 a.m., at the offices

22      of Knox McLaughlin Gornall & Sennett, PC, 120 West

23      10th Street, Erie, Pennsylvania 16501.

24
                    Reported by Janis L. Ferguson, RPR
25                  Ferguson & Holdnack Reporting, Inc.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 2

1   For the Plaintiff:
2       Timothy D. McNair, Esquire
        821 State Street
        Erie, PA 16501
3
        Anthony Angelone, Esquire
4       Vendetti & Vendetti
        3820 Liberty Street
5       Erie, PA 16509
6   For the County of Erie, Erie County Office of Children and
    Youth, a/k/a Erie County Child Welfare Service:
7       Richard A. Lanzillo, Esquire
        Knox McLaughlin Gornall & Sennett, PC
8       120 West 10th Street
        Erie, PA 16501
9
    For the Defendants Richard Schenker, Peter Callan, and Debra
10  Liebel:
        Edmund R. Joyal, Jr., Esquire
11      Law Office of Joseph S. Weimer
        975 Two Chatham Center
12      Pittsburgh, PA 15219
13  For the Defendant John Onorato, Esquire:
        Sara E. Baugh, Esquire
14      Dell Moser Lane & Loughney, LLC
        525 William Penn Place
15      Suite 3700
        Pittsburgh, PA 15219
16
17
18
19
20
21
22
23
24
25

Page 3

1               I N D E X
2
3   TESTIMONY OF [V.W.]
4       Direct examination by Mr. Joyal  . . . . . . . . 4
5       Cross-examination by Mr. Lanzillo  . . . . . . .59
6       Cross-examination by Mr. McNair  . . . . . . . .82
7       Redirect examination by Mr. Joyal  . . . . . . .92
8       Recross-examination by Mr. Lanzillo  . . . . . .102
9       Recross-examination by Mr. McNair  . . . . . . .107
10      Further redirect examination by Mr. Joyal  . . .108
11
12  EXHIBITS:
13      V.W. Exhibit 1 - Page 20
14      V.W. Exhibit 2 - Page 27
15      V.W. Exhibit 3 - Page 33
16      V.W. Exhibit 4 - Page 36
17      V.W. Exhibit 5 - Page 40
18      V.W. Exhibit 6 - Page 46
19
20
21
22
23
24
25

Page 4

1       [V.W.], first having been duly
2   sworn, testified as follows:
3
4               DIRECT EXAMINATION
5   BY MR. JOYAL:
6
7       Q.   State your name for the record, please.
8       A.   [V.W.]
9       Q.   Where do you live?
10      A.   1706 West 8th Street.
11      Q.   How old are you?
12      A.   24.
13      Q.   When were you born?
14      A.   9/14/81.
15      Q.   You're here today pursuant to a subpoena; is that
16  correct?
17      A.   Yes.
18      Q.   That was issued by Mr. Lanzillo?
19      A.   (Witness nods head.)
20      Q.   Do you know that?
21      A.   No, I didn't know that.
22      Q.   This (indicating) is Mr. Lanzillo.  He represents
23  now the County of Erie.  My name is Ed Joyal.  I represent
24  Pete Callan, Debi Liebel, Rick Schenker.  Who else?
25          MR. JOYAL:  That's it, right?

Page 5

1       Q.   I can't think of my clients in this lawsuit.
2       You're not party to the lawsuit between Abby
3   Conley and OCY, are you?
4       A.   Party?
5       Q.   A party.  Yeah, you're not a Plaintiff in this
6   case.
7       A.   No.
8       Q.   No, okay.  And you're being represented today by
9   counsel?
10      A.   Yes.
11      Q.   And what is your lawyer's name?
12      A.   Alison Scarpitti.
13      Q.   I'm going to ask you some questions today.  This
14  should be fairly short, Miss [W.].  And these are just
15  questions that are going to be posed by me.  If you don't
16  understand one of my questions, please tell me.  If you want
17  to speak to Ms. Scarpitti, if you think there are some
18  issues surrounding some legal requirements of yours or
19  things that may impact you in any other proceeding, you can
20  just let me know that, and you can talk to Miss Scarpitti
21  out in the hallway, if you want.
22          What I'm going to tell you, though, is this is a
23  Federal Court case, so the Federal Rules of Procedure apply
24  in this case.  I'm sure your lawyer knows about them.  So
25  although there may be some objections from counsel, she can

Ferguson & Holdnack Reporting, Inc.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 6

1 object to the extent that she believes that some of these
2 things either involve privilege between the two of you,
3 maybe privilege with another attorney, or if there's some
4 things that might impact on any future legal proceedings
5 that you might have that might have to do with placing you
6 at risk or self-incrimination. Other than that, she's not
7 going to be able to object or to tell you not to answer a
8 question. That's going to be confined to the other lawyers
9 that have appearances in this case.
10 Do you understand?
11 A. Yeah.
12 Q. Is there any reason why either through the taking
13 of medication or something else that you believe you might
14 not be able to conduct this deposition today?
15 A. No.
16 Q. Are there any medications that you're on that may
17 affect your memory?
18 A. Just Tylenol and Robitussin.
19 Q. Now, I see that you're pregnant.
20 A. Yes.
21 Q. If because of your pregnancy you need to leave to
22 do anything, please let us know. We'll be happy to
23 accommodate you. Okay?
24 A. Okay.
25 Q. Also, what we're going to do here is there are

Page 7

1 going to be questions asked. Your name is not going to
2 appear in the transcript. It's just going to be initials.
3 Any references to any of your children will also be
4 initials. Okay? And that's to protect both your privacy,
5 as well as the privacy of the kids.
6 A. Okay.
7 Q. Okay? And, finally, if you don't understand one
8 of my questions, please tell me.
9 A. Okay.
10 Q. Okay? Do you know Abby Conley?
11 A. Yes.
12 Q. Do you know Deanna Cosby?
13 A. Yes.
14 Q. How long have you known Abby Conley?
15 A. Since June of 2003, I believe.
16 Q. June of 2003?
17 A. I believe so.
18 Q. How did you come to know Abby Conley?
19 A. She was the case aide who transported the kids for
20 my visits. And then later on, after my visits became
21 supervised, she supervised most of them.
22 Q. Okay. And did you have a good relationship with
23 her?
24 A. Um, yeah.
25 Q. Do you believe that she had your best interests at

Page 8

1 heart during the course of the time that you knew her?
2 A. Yeah.
3 Q. And she would talk to you about things and give
4 you information about certain things?
5 A. We didn't talk much in the beginning.
6 Q. Okay. Well, what about in -- let's say, from late
7 2003 into 2004.
8 A. Yeah.
9 Q. Did she become more actively involved in your
10 cases?
11 A. I don't know about more actively involved, but we
12 talked more.
13 Q. You talked more?
14 A. Yes.
15 Q. Would she call you on the telephone, talk to you?
16 A. No. We talked at my visits.
17 Q. At your visits. Now, you have, I believe, three
18 children?
19 A. Yes.
20 Q. Tell us their first names, if you would.
21 A. [D.], [J.], and [M.].
22 Q. And it's my understanding that two of the children
23 are twins.
24 A. No.
25 Q. No? They are not. You have two by one father?

Page 9

1 A. Yes.
2 Q. Okay. And then one by another?
3 A. Yes.
4 Q. Okay. And your daughter [M.]'s father is [R.B.];
5 is that correct?
6 A. Yes.
7 Q. Is Mr. [B.] still incarcerated, do you know?
8 A. Yes.
9 Q. Do you know when his release date is?
10 A. 14 and a half to 17 years from now.
11 Q. Okay. That's how long he's in prison.
12 A. (Witness nods head.)
13 Q. Where does your daughter [M.] now reside?
14 A. She resides with his mother.
15 Q. Is that [C.B.]?
16 A. Yes.
17 Q. And has there been any petitions filed to
18 terminate your parental rights?
19 A. Yes.
20 Q. As to all the children?
21 A. Yes.
22 Q. You're being represented -- are you being
23 represented by Miss Scarpitti in those proceedings?
24 A. Yes.
25 Q. How about in the criminal proceedings? Is

3 (Pages 6 to 9)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 10

1  Miss Scarpitti your lawyer as well?
2      A.  No.
3      Q.  You have another lawyer?
4      A.  Yes.
5      Q.  I have some documents here that have been
6  previously marked in other depositions, and I'm going to
7  show them to you and ask if you can identify them for me.
8  Okay?  These are all documents.  One purports to be a letter
9  written to someone named [R.], signed by someone named [V].
10  It was marked as Conley Exhibit No. 13.  Why don't you take
11  a look at that and tell me if you recognize the handwriting
12  in that letter.
13      A.  Yes, that's my handwriting.
14      Q.  Okay.  And is that your signature at the back?
15      A.  Yeah.
16      Q.  And there's a date on that of 5/21.
17      A.  (Witness nods head.)
18      Q.  Do you know whether that was 2004?  It references
19  some hearings, I believe.
20      A.  It was most likely 2004, then.
21      Q.  Would have been May 21st, 2004?
22      A.  Yeah.
23      Q.  And is that a summary to Mr. [B.] of a hearing
24  that took place regarding your [D.] and the other child?
25      A.  Yes.

Page 11

1      Q.  I mean, there are quotes in there from court
2  summaries and things such as that.
3      A.  Yeah.
4      Q.  And there's -- one of the summaries that's quoted
5  in there is Abby Conley's summary; is that right?
6      A.  (No response.)
7      Q.  I think it's within the first couple pages.
8      A.  Yeah.
9      Q.  And you wrote that letter just to give a report to
10  [R.] about what had happened?
11      A.  Yes.
12      Q.  Do you know whether or not the hearing had already
13  taken place when you wrote that letter, or is that before
14  the hearing?
15      A.  I don't know for sure, but it must have been.
16  It's -- more than likely it was afterwards.
17      Q.  Okay.  How did you get copies of the summaries?
18      MS. SCARPITTI:  Objection.  I think that's going
19      to go to attorney/client privilege.
20      MR. JOYAL:  Why?  Were you her lawyer at that
21      time?
22      MS. SCARPITTI:  No, but she was represented by
23      counsel at that time.
24      MR. JOYAL:  All right.  And what's the privilege?
25      MS. SCARPITTI:  I think anything that she may have

Page 12

1  discussed with her lawyer --
2      MR. JOYAL:  I didn't ask her --
3      MS. SCARPITTI:  -- and anything that was given to
4      her by her lawyer --
5      MR. JOYAL:  Let me ask it this way, then:
6      Q.  Did you have a copy of the summaries before the
7  hearing?
8      (Discussion held off the record.)
9      Q.  Would you have gotten them before the hearing?
10      A.  I believe I did.
11      Q.  You believe you got them before the hearing.  Did
12  you get any of them from Abby Conley directly?
13      A.  Not directly from her.
14      Q.  And your recollection is, is that -- would it have
15  been, then, from your lawyer?  Your lawyer had gave you the
16  summaries before the hearing?
17      A.  Yeah.
18      Q.  Before the hearing that you were talking about
19  there, did you have any conversations with Abby Conley?
20      A.  Probably.
21      Q.  Did she tell you about what she was -- what was
22  contained in her summary?
23      A.  No.  Maybe after I got the summary.  Maybe I
24  asked -- would have asked her about it.
25      Q.  Oh, okay.  So your recollection may be that you

Page 13

1  would have gotten the summaries before the hearing, and then
2  you would have spoken with Abby Conley about what was in the
3  summaries?
4      A.  That's possible.  I definitely got the summaries
5  before the hearing, though.
6      Q.  Okay.  But you're not sure whether or not they
7  came from your lawyer or they came from -- through Abby.  Is
8  that right?
9      A.  Oh, yeah, they came from my lawyer.
10      Q.  Okay.  But you are somewhat sure that before the
11  date of the hearing, you and Abby Conley had a conversation
12  about what was contained in the summaries.
13      A.  Before the hearing?
14      Q.  Before the hearing.
15      A.  Not that I remember specifically.  It was a long
16  time ago.
17      Q.  I understand.  Okay.  So I just want to make sure,
18  because I thought you told me that you thought that you
19  would have probably had a conversation with her about the
20  summaries before the hearing.
21      A.  It seems likely, but I'm not even sure that I seen
22  her after I got the summaries and before my hearing.
23      Q.  During the course of time -- you said you met her
24  starting in 2003?
25      A.  Yes.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 14

1    Q.  Sometime in late 2003.  Do you have any
2  recollection during that period of time, before May 21st of
3  2004, of Abby Conley discussing with you things that may
4  have been contained in agency records concerning you, like
5  summaries and like plans?
6    A.  No.
7    Q.  No?  You don't have a recollection?
8    A.  (Witness shakes head.)
9    Q.  Okay.  I'm going to show you another document.
10  This one was marked as Conley Exhibit No. 15.  Tell me if
11  you recognize the handwriting on that.
12    A.  That's also my writing.
13    Q.  Okay.  And is that directed to the same
14  individual?
15    A.  Yes.
16    Q.  And your signature on the back page?
17    MR. McNAIR:  Are you going to offer the document?
18    MR. JOYAL:  I just did.  It's Conley Exhibit No.
19    15.
20    A.  Yes.
21    Q.  Okay.  That's your handwriting and that's your
22  signature?
23    A.  Yes.
24    Q.  And this was a letter you wrote to [R.B.]?
25    A.  Yes.

Page 15

1    Q.  Okay.  May I see that, please.  Okay.
2    (Discussion held off the record.)
3    Q.  Miss [W.], I'm going to show you something that
4  I've highlighted from the May 21st, 2004 letter, and I want
5  you to read -- if you would, read it out loud into the
6  record.  This is something you wrote to Mr. [B.]; is that
7  right?
8    A.  Yes.
9    Q.  Okay.  Do you want to read that out loud?
10    A.  "[P.] got a lot of nerve to talk about my
11  supervision.  Where was her supervision when her 10-year-old
12  hung himself?"
13    Q.  Where did you get the information in reference to
14  [P.] about her 10-year-old hanging himself?
15    THE WITNESS:  Can I ask --
16    MS. SCARPITTI:  Sure.
17    (Discussion held off the record.)
18    MS. SCARPITTI:  I'm going to object to the
19    question on the grounds of attorney/client
20    privilege.  I understand that that information
21    came from her previous attorney.
22    Q.  Your understanding is -- was your previous
23  attorney Amy Jones?
24    A.  Yeah.
25    Q.  Amy Jones told you that [P.W.]'s son had hung

Page 16

1  himself?
2    MS. SCARPITTI:  Objection.  Goes to
3    attorney/client privilege.  Anything that Amy
4    Jones would have told her.
5    Q.  Did Abby Conley tell you that?
6    A.  No.
7    Q.  Do you know how Amy Jones would have known about
8  that?
9    MS. SCARPITTI:  Again, objection.  Goes to
10    attorney/client privilege.
11    Q.  Do you know why Amy Jones would have even spoken
12  about a social worker's personal life to you?
13    MS. SCARPITTI:  Objection.  Goes to
14    attorney/client privilege.
15    MR. JOYAL:  Okay.  I'm going to reserve our rights
16    to -- you understand, Ms. Scarpitti, that this has
17    to do with whether or not confidential information
18    contained in an OCY case file was given to your
19    client.
20    MS. SCARPITTI:  Yes.
21    MR. JOYAL:  And what you're telling me now, I
22    believe, is that you believe that that has no
23    value to this case in terms of whether or not Abby
24    Conley may have given that information in
25    violation of OCY policy and/or Child Protective

Page 17

1  Services Law to Miss Jones.
2    MS. SCARPITTI:  What I'm saying is that my client
3    stated that Abby did not give it to her.  Whether
4    or not Abby did give it to Amy, the only way
5    Ms. [W.] would know about that was if Amy said
6    that Abby gave it to her, in which case that would
7    be attorney/client privilege.  I would suggest
8    that if you want to find out where her lawyer got
9    it from, you would ask her attorney.
10    MR. JOYAL:  Well, if you were here yesterday,
11    you'd would know the answer.
12  BY MR. JOYAL:
13    Q.  So you did not get this information from Abby
14  Conley.
15    A.  No.
16    Q.  You did not get this information independently of
17  the case that you were involved in with Ms. Jones; is that
18  correct?  Do you understand my question?
19    A.  No, I don't.
20    Q.  You didn't get it from Abby, you say.
21    A.  Right.
22    Q.  You didn't get it from [P.], I presume.
23    A.  No.
24    Q.  You didn't get it from [R.].
25    A.  No.

Ferguson & Holdnack Reporting, Inc.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 18

1  Q. You didn't get it from your mother?
2  A. No.
3  Q. Didn't get it from your father?
4  A. No. But I also did get it from my -- the kids'
5  paternal grandmother.
6  Q. The kids' paternal grandmother gave it to you.
7  Where did she get the information?
8  A. I'm not sure. But it was after Amy gave it to me.
9  Q. It was after Amy gave it to you.
10  A. Yes.
11  Q. So why was that? Do you know? Do you have any
12  idea why Amy Jones would have been talking to you about your
13  social worker's personal life?
14      MS. SCARPITTI: Objection. It goes to
15      attorney/client privilege.
16      MR. JOYAL: No. I asked her --
17      MR. McNAIR: I object on grounds of relevancy.
18      MR. JOYAL: That's fine. I asked her if she
19      knew -- which is what you suggested to me, Miss
20      Scarpitti -- is if she knew why or has any
21      understanding as to why, independent of her
22      conversation with her lawyer.
23          Excuse me, Mr. McNair, you don't represent
24      her, so I would suggest that you please not coach
25      Miss Scarpitti in terms of what you want her to

Page 19

1      tell about her client.
2      MS. SCARPITTI: Well, first of all, what I
3      suggested was that she not -- that [V.] not be
4      asked how Amy or why Amy gave it to her. What I
5      suggested was that you ask Amy herself.
6  BY MR. JOYAL:
7  Q. Well, I'm going to ask the question this way:
8  When Amy told you that, did it ever occur to you to think of
9  why she would have told that to you? In order to help your
10  case?
11  A. Not so much in order to help my case.
12  Q. Just to talk about the worker.
13  A. Right. Because I always talked about the worker,
14  because her and I didn't get along.
15  Q. I see. So Amy was giving you information that was
16  sort of negative about the worker too.
17  A. She said it was --
18      MR. McNAIR: Object to the form.
19  A. -- public information.
20      MR. ANGELONE: Irrelevant.
21  Q. She said it was public information?
22      MS. SCARPITTI: Objection. Goes to
23      attorney/client privilege. Anything that Amy said
24      to her is privileged.
25      MR. JOYAL: Well, excuse me. She just answered

Page 20

1      the question, so she just waived the privilege.
2      MR. ANGELONE: Object to relevance.
3      MR. JOYAL: Okay? She answered the question. And
4      she's waived the privilege twice by saying that
5      Amy told her.
6      MS. SCARPITTI: No, she has not waived the
7      privilege.
8      MR. JOYAL: Oh, I -- I disagree, Miss Scarpitti.
9      MR. McNAIR: Then take it up with the Judge. Quit
10      wasting our time with arguing and bickering with
11      lawyers across the table. I've had it.
12  Q. You had information given to you from Miss Jones
13  about the social worker's personal life; is that right?
14  A. Yes.
15      (V.W. Deposition Exhibit 1
16      marked for identification.)
17      (Discussion held off the record.)
18  Q. Take a look at Exhibit No. 1. Is that your
19  handwriting?
20  A. Yes.
21  Q. What is the date of that letter?
22  A. June 3rd, 2004.
23  Q. Again, written to [R.B.]
24  A. Yes.
25  Q. Your signature on the back of it, the last page?

Page 21

1  A. Yes.
2  Q. Okay. I've highlighted some portion of that
3  letter. Okay? Would you read for me the first highlighted
4  part. I think it's the first sentence.
5  A. "I talked to Abby for a while --"
6      (Witness asked for clarification by the reporter.)
7  Q. Okay, let's start from the beginning. I think it
8  says, "Hey Sweetie."
9  A. "Sorry about tonight. I talked to Abby for a
10  while. Then talked to Leslie."
11  Q. Okay. What does it say after that?
12  A. "I actually didn't even get to work on time. I
13  didn't get off with Leslie until almost 10:30."
14  Q. Who is Leslie?
15  A. That is the court-appointed special advocate for
16  my case.
17  Q. Now, I want you to go back down to where I started
18  highlighting that says "anyway".
19  A. "Anyway, Abby said that [P.] and Sue had a meeting
20  about me and that she's mad because they are working against
21  me instead of for me."
22      MR. ANGELONE: I'm going to object as to
23      relevancy.
24      MR. JOYAL: Your objection is noted.
25  Q. Okay, go ahead.

Ferguson & Holdnack Reporting, Inc.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 22

1    MR. ANGELONE: In fact, I'm going to object to
2  anything that's read from this letter as to
3  relevance.
4    MR. JOYAL: That's fine.
5    Q. Go ahead. Do you know where you stopped? Why
6  don't you start over again. Start with the "anyway".
7    A. "Anyway, Abby said that [P.] and Sue had a meeting
8  about me and that she's mad because they are working against
9  me instead of for me, and they are gonna put up a fight
10  against me, and that [P.] will probably be at most of my
11  visits from now on, so that sucks."
12    Q. Okay. Keep going. "Sorry".
13    A. "Sorry my writing is messy, but I just wrote a
14  three-page letter to my attorney telling her --"
15    MS. SCARPITTI: Objection. Attorney/client
16  privilege.
17    MR. JOYAL: Sorry, no. It's not -- it talks about
18  what she did, not what she said.
19    Q. Go ahead.
20    A. "-- telling her what Abby --" I don't know what
21  that says.
22    Q. Does that say -- is there another name?
23    A. Looks like it.
24    Q. "And Leslie said." And what else does it say?
25    A. "And I told her I wanted to buy a copy of the

Page 23

1  court transcript."
2    Q. Okay. Either on June 3rd of 2004 or before
3  June 3rd of 2004, Abby Conley had told you the things that
4  you wrote to [R.B.]?
5    A. Yeah.
6    Q. She told you about meetings that were being held,
7  she told you about what the strategy was, she told you about
8  [P.W.] was going to be at most of your visits?
9    MR. McNAIR: Objection. Lack of foundation.
10  That's a complete misstatement.
11    Q. Let me see -- I'll quote it, then, just so Mr.
12  McNair is happy. You wrote, "Anyway, Abby said that [P.]
13  and Sue had a meeting about me and she was mad because they
14  are working against me instead of for me." Is that what
15  Abby Conley told you?
16    A. Yes.
17    Q. That she was mad about what they were doing.
18  Correct?
19    A. Right.
20    Q. Okay. And that -- did she also tell you, "And
21  they are gonna put up a fight against me and that [P.] will
22  probably be at most of my visits from now on, so that
23  sucks."?
24    A. Yes.
25    Q. Then you also wrote to [R.], "Sorry my writing is

Page 24

1  messy, but I just wrote a three-page letter to my attorney
2  telling her what Abby," blank, "and Leslie had said."?
3    A. Yeah.
4    Q. Okay. So you gave information to your lawyer
5  about what Ms. Conley had told you.
6    A. Yeah.
7    MS. SCARPITTI: Objection.
8    MR. JOYAL: Too late.
9    MR. McNAIR: You're so clever, Ed. I really
10  admire you.
11    MR. JOYAL: Tim, I wish I could say the same.
12    MR. McNAIR: You have -- you have a way to ask
13  questions that you know are objectionable and try
14  to get the witness to answer --
15    MR. JOYAL: Tim --
16    MR. McNAIR: -- before the attorney has a chance
17  to object.
18    MR. JOYAL: Tim --
19    MR. McNAIR: I admire that. It's very clever.
20    MR. JOYAL: I think that what we need to
21  understand is that she doesn't represent you or
22  anyone on your team, and that you've been telling
23  her what you don't want her client to answer in
24  order to avoid what was there. We know they are
25  in the letters, we know that they have been

Page 25

1  authenticated as of right now. Okay?
2    MS. SCARPITTI: I would object to the
3  characterization that either Attorney McNair or
4  Attorney Angelone has been telling me what to do
5  here.
6    MR. JOYAL: Okay.
7    MS. SCARPITTI: I'm here to protect [V.] and her
8  attorney/client privilege --
9    MR. JOYAL: Okay, that's fine.
10    MS. SCARPITTI: -- which you seem bent on
11  destroying at this.
12    MR. JOYAL: Miss Scarpitti, what we are bent on
13  doing here is getting information that has
14  independent legal significance to this case.
15    MR. ANGELONE: Which is irrelevant to the case.
16    MR. JOYAL: It is, Mr. --
17    MR. ANGELONE: Yeah.
18    MR. JOYAL: Well, you can argue that at the time
19  of trial, Mr. Angelone.
20    MR. ANGELONE: Love to. And I'd love to before
21  that.
22    MR. McNAIR: We'll argue it before that.
23    MR. JOYAL: You can argue it whenever you want.
24  The point is that you know that one of the reasons
25  that your client was asked to leave the agency was

7 (Pages 22 to 25)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 26

1    for violating confidentiality.
2    MR. ANGELONE:  Not from any of these letters.  I'm
3    going to -- put that objection in the record.
4    MR. JOYAL:  Really?  Not from these letters?
5    Well, she's just testified --
6    MR. McNAIR:  There has been no foundation that the
7    agency knew anything about these --
8    (Proceedings interrupted by the reporter.)
9    MR. McNAIR:  There is no evidence that the agency
10   knew anything about these letters before Miss
11   Conley was terminated.
12   MR. JOYAL:  That's right, but they knew about them
13   afterwards.  But what we now know is that your
14   client gave --
15   MR. ANGELONE:  And that's the basis for the
16   relevancy objection.
17   MR. JOYAL:  -- gave evidence and information
18   orally to this witness.
19   MR. McNAIR:  And that's the way -- that's the way
20   it works.
21   MR. JOYAL:  Which means she should have been
22   fired.
23   MR. McNAIR:  No.
24   MR. JOYAL:  Okay.
25   MR. McNAIR:  You think?

Page 27

1    MR. JOYAL:  I absolutely think, Mr. McNair.
2    MR. McNAIR:  Well, okay.
3    MR. JOYAL:  Let's go on a little bit further.
4    Let's mark this one as No. 2.
5    (V.W. Deposition Exhibit 2
6    marked for identification.)
7    BY MR. JOYAL:
8    Q.  [V.W.] No. 2, is that your handwriting?
9    A.  Yes.
10   Q.  Is that a letter that you sent to [R.B.] on
11   June 5th of 2004?
12   A.  Yeah.
13   Q.  Is that your signature on the back of it?
14   A.  Yes.
15   Q.  Is this a letter -- would I be correct in
16   characterizing this as a letter you wrote to [R.] to tell
17   him certain things about your case, your children, as well
18   as your and his unborn child?
19       MR. ANGELONE:  Same objection as to relevancy;
20       anything contained in that letter.
21       MR. JOYAL:  That's fine.
22   Q.  Is that true?
23   A.  Yes.
24   Q.  I highlighted, again, some portions of this.
25   Would you read them for me.  And it starts with "the

Page 28

1    reason".
2    A.  "The reason Deanna called me is to warn me that
3    they are going to detain [M.] and they are trying to put her
4    in a foster home rather than with your mom.  She actually
5    suggested I leave town and have the baby."
6    Q.  "But if --"
7    A.  "But if I miss a visit with my kids, [P.] will use
8    that as abandonment, so I wouldn't even know where to go or
9    how to time it."
10   Q.  Let's stop right there.  Okay?  Deanna Cosby
11   called you on the telephone?
12   A.  Yes.
13   Q.  To tell you all this stuff?
14   A.  Yes.
15   Q.  Before Deanna called you, did you know about the
16   order?
17   A.  I never knew there was an order until I had the
18   baby.
19   Q.  But did you know that there was going to be an
20   attempt to take the baby before Deanna called you?
21   A.  I never really knew.
22   Q.  Okay.  Did Deanna tell you who asked her to call
23   you?
24   A.  Who asked her to call me?
25   Q.  Yeah.

Page 29

1    A.  I did.
2    Q.  Who did you tell -- well, did you have Deanna's
3    phone number?
4    A.  Yes.
5    Q.  Where did you get it from?
6    A.  She was my caseworker.  When she moved to North
7    Carolina, she still had the same cell phone number.
8    Q.  She told it to you.  Did she tell you that she got
9    that information from Abby?
10   A.  What information?
11   Q.  The information you say, "Deanna called me to warn
12   me that they are going to detain [M.]."
13   A.  No.  She told me based on who my caseworker was.
14   Who my new caseworker was.
15   Q.  Did you know or did you become aware that she had
16   exchanged e-mails with Ms. Conley on the 4th of June in
17   which Miss Conley was asking her to call you to warn you
18   about the plan?
19   A.  No.
20       MR. McNAIR:  Objection to your characterization of
21       those e-mails.  That's not what it says.
22   Q.  Okay.  But Deanna Cosby's call back to you came on
23   the 5th of June, correct?
24   A.  I don't know for sure, but, I mean, it looks like
25   it.

8 (Pages 26 to 29)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 30

1  Q.  Well, it could have come the 4th of June?
2  A.  Yeah.
3  Q.  And is it true that Deanna Cosby suggested to you
4  that you leave the jurisdiction to have the child?
5  A.  She said if I were her, or something to the matter
6  of that's the only way that I'm going to avoid it.
7  Q.  So she was advising you to leave.  In effect.
8  A.  Well, she also said that she knew I couldn't
9  because of my other kids --
10  Q.  Other kids.
11  A.  -- that I'm fighting for.  So she wasn't advising
12  me.  She was more or less using a way with words.
13  Q.  Well, let me explore that with you.  Did she say,
14  if I were you, I would leave, because that's the only way
15  you're going to avoid, you know, losing your child?
16  A.  I don't remember what her exact words were, but my
17  impression was that she wasn't being too serious about it,
18  because she knew that I wanted my other kids.
19  Q.  All right.  But she did mention -- I mean, you say
20  here, "She actually suggested I leave town and have the
21  baby."
22  A.  Yeah.
23  Q.  That doesn't -- you know, why would you have told
24  that to Mr. [B.] if you didn't believe that she was being
25  somewhat serious?

Page 31

1  A.  It may have just been the way I worded it to him.
2  I didn't put much thought in these letters, because I never
3  thought I would have to come back to them.
4  Q.  But you do recall the conversation with Deanna
5  Cosby about the prognostic detention order.
6  A.  Yes.
7  Q.  At some point in time, by the way, after you had
8  the baby, did you tell [P.W.] that Abby had told you about
9  the order?
10  A.  No.
11  Q.  Do you remember having a conversation with her in
12  the hospital, telling her that you knew about the order?
13  A.  No.
14  Q.  You just don't have a recollection of that as you
15  sit here today?
16  MR. McNAIR:  Objection to the form.
17  A.  I can't picture having a conversation with her.
18  Q.  Okay.
19  A.  I didn't talk to her too much.
20  Q.  Well, did you ever tell her that they were going
21  to take the child?
22  A.  No.  She had actually told me a list of things to
23  do in order for them not to take the child.
24  Q.  And this was before the child --
25  MR. McNAIR:  Would you please let her finish her

Page 32

1  answer.
2  MR. JOYAL:  She did, I believe.
3  MR. McNAIR:  No, she didn't.
4  Q.  Okay.  Had you finished your answer before I
5  cut --
6  A.  Somewhat.  I was just going to say that the
7  detention order was signed anyway, before she even asked me
8  to do those things.
9  Q.  Do you have a recollection at any time of Abby
10  Conley telling you that [P.W.] had assaulted one of your
11  children?
12  A.  Of Abby Conley telling me that --
13  Q.  [P.W.] had --
14  A.  -- assaulted one of my children.
15  Q.  -- assaulted one of your children or been rough
16  with one of your children?
17  A.  I remember talking about it.
18  Q.  With Abby?
19  A.  Yeah.
20  Q.  When did she tell you that?
21  A.  I have no idea.
22  Q.  Did she tell you that she had filed a report
23  against [P.W.] of child abuse?
24  MR. McNAIR:  Objection.  Foundation.
25  Q.  You can answer.

Page 33

1  A.  No, I don't believe so.
2  Q.  You don't believe so.  But you do recall her
3  telling you what had happened.
4  A.  Yes.
5  Q.  Did you relay that information to Mr. [B.]?
6  A.  I -- yeah, probably.
7  Q.  Did you know what he was going to do with that
8  information?
9  A.  No.
10  Q.  Did you ask him to do anything with that
11  information?
12  A.  I don't remember.
13  (V.W. Deposition Exhibit 3
14  marked for identification.)
15  Q.  Take a look at what's been marked as Exhibit No.
16  3.  Do you recognize the handwriting on that letter?
17  A.  Yeah, it's my writing.
18  Q.  And your signature on the back?
19  A.  Yes.
20  Q.  All right.  And this is another letter to
21  Mr. [B.], similar to the previous two, right?
22  A.  Yeah.
23  Q.  All right.  I highlighted something on the second
24  page, and I'd ask you if you'd read that into the record,
25  please.

9 (Pages 30 to 33)

Page 34

1    A. "Hey, I came up with a good idea. You know what
2    I'd love to do? Steal [P.]'s case aide Abby from her and
3    have her be my babysitter. If I had all three kids, I could
4    pay her about $500 a week. That's probably more than she
5    makes and maybe more than [P.] makes. I would love for her
6    to make more than Patty. She's real good with kids too. My
7    kids like her."
8    Q. Okay. What were you doing for a living at that
9    time?
10    A. I believe I was working at the Jockey and at
11   Valerio's.
12    Q. And what was your salary?
13    A. About a thousand dollars a week at the Jockey and
14   hardly anything at Valerio's.
15    MR. McNAIR: And what?
16    MR. JOYAL: Hardly anything.
17    A. Maybe like a hundred a week there.
18    Q. What's Valerio's?
19    A. It's an Italian restaurant.
20    Q. Were you a waitress?
21    A. Yes.
22    Q. I'm not familiar with the Jockey.
23    A. It's a health club.
24    Q. Health club. So you were making a thousand
25   dollars a week at a health club, a hundred dollars a week as

Page 35

1    a waitress. What were your expenses?
2    A. I had to pay 250 for rent.
3    Q. That's a month, right?
4    A. Yes.
5    Q. Okay.
6    A. And probably a hundred dollars a month for car
7    insurance.
8    Q. So that's 350 a month. And then food for
9    yourself?
10    A. I'm not sure. I may have got food stamps.
11    Q. You may have gotten food stamps? So you were --
12    A. I don't know.
13    Q. Did you work full -- I mean, I don't want to
14   say -- I don't know about the Jockey. Was this like a
15   full-time job for you?
16    A. Um-hum.
17    Q. So you were making approximately, if you worked
18   all year, and let's say you took a couple weeks vacation,
19   you were making about 50,000 a year?
20    A. Yeah.
21    Q. And you were on food stamps?
22    A. I was for a while.
23    Q. While you were working there?
24    A. I don't remember exactly.
25    Q. So you had -- you believe that you, if you could

Page 36

1    have taken your idea or your fantasy forward, that you could
2    have paid Abby Conley $500 a week?
3    A. Yes.
4    Q. And still been able to live and do what you needed
5    to do.
6    A. Yes.
7    Q. Were you paying Amy Jones?
8    A. Yes.
9    Q. Had you given her a retainer?
10    MS. SCARPITTI: Objection. Attorney/client
11       privilege. It's also irrelevant.
12    MR. JOYAL: To what? You're not a party.
13    MR. McNAIR: She's objecting on privilege --
14    MR. JOYAL: You can't object to relevance,
15   Miss Scarpitti.
16    MR. ANGELONE: I am objecting to relevance.
17    MR. JOYAL: You can object.
18    MR. McNAIR: Thank you for letting us object, Ed.
19       That's so kind of you.
20   BY MR. JOYAL:
21    Q. So you were paying Miss Jones. She wasn't doing
22   your case for free, right?
23    A. Correct.
24       (V.W. Deposition Exhibit 4
25       marked for identification.)

Page 37

1    Q. Okay, Ms. [W.], would you take a look at Exhibit
2    No. 4 and tell me if that's your handwriting.
3    A. Yes.
4    Q. Is that your signature on the back?
5    A. Yes.
6    Q. Okay.
7       (Discussion held off the record.)
8    Q. All right.
9       MR. JOYAL: I'll give Mr. McNair an opportunity to
10       look at the document.
11    Q. I'm going to ask you to turn to the last page of
12   the letter where I've highlighted.
13    A. (Witness complies.)
14    Q. Would you read for me -- start at the second
15   sentence. It says "I", all the way down to where I finished
16   highlighting.
17    A. "I really like Abby. She's nice. She said she
18   was happy I saw [P.] grab [D.] too."
19    Q. Can I stop you there. Does that say happy or
20   hoping?
21    A. Maybe hoping.
22    Q. Okay. "Hoping I saw [P.] grab [D.] too."?
23    A. "Too."
24    Q. Okay, continue.
25    A. "So she wasn't the only witness. I told her I'm

10 (Pages 34 to 37)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 38

1 lucky I didn't --"
2    Q.  Does that say "see that shit"?
3    A.  Yeah, "see that shit, or I'd be incarcerated for
4 assault. I'm really glad Abby filed the complaint."
5    Q.  Now, I didn't highlight the next part, but does
6 the next part say, "After this is all over with, I'm going
7 to get something nice for Abby, Deanna, and Lisa."?
8    A.  Yes.
9    Q.  So before June 22nd of 2004 -- or on June 22nd,
10 2004, Abby Conley told you she had filed a complaint against
11 [P.W.] for grabbing [D.]; is that right?
12    A.  I'm not sure. I don't remember.
13    Q.  Well, how did you know that Abby Conley had filed
14 a complaint, if she didn't tell you?
15    A.  I'm not sure. I don't remember how I knew it was
16 her. But I knew there was a complaint, because I got a
17 letter in the mail.
18    Q.  Do you know what the date of the complaint was and
19 the date of the letter?
20    A.  No, I don't.
21    Q.  Well, I will represent to you that DPW says -- or
22 that the complaint was filed on the 21st of June. Okay?
23 Did you get a letter on the 22nd?
24    A.  I don't remember when I got the letter.
25    Q.  But -- you don't remember. But as you sit here

Page 39

1 today, could it have been that Abby Conley told you that?
2    MR. McNAIR: Objection. Calls for speculation.
3    Q.  Well, let me ask it this way: Your letter to [R.]
4 says, "She said she was hoping I saw [P.] grab [D.] so that
5 she would not be the only witness."
6    A.  (Witness nods head.)
7    Q.  Am I correct in presuming that the "she" that
8 you're referring to is Abby?
9    A.  Yes.
10    Q.  So she had a conversation with you sometime before
11 you wrote this letter on June 22nd saying to you that she
12 wished you had seen it too so she wouldn't be the only
13 witness. Right?
14    A.  Yeah, I guess.
15    Q.  And then you said, "I'm really glad Abby filed the
16 complaint," but as you sit here today, you're not sure
17 whether she told you she filed the complaint or whether you
18 heard that from DPW. You're not sure, right?
19    A.  No, I'm not positive, no.
20    Q.  Okay. And has anyone told you that under Child
21 Protective Services Law, the identity of a reporter is
22 confidential?
23    A.  No.
24    Q.  No. Well, under law, the letter from DPW would
25 not have said Abby Conley filed a complaint, because her

Page 40

1 name would have been confidential. Okay?
2    A.  Yeah.
3    Q.  So knowing that, does that help refresh your
4 recollection as to whether Ms. Conley told you that she,
5 indeed, had filed a complaint?
6    MR. ANGELONE: Objection. Relevance.
7    MR. McNAIR: He's not going to stop until he
8       browbeats her into saying what he wants.
9    Q.  Would that refresh your recollection, based upon
10 what I just told you, that the letter would not have
11 identified the reporter; that Abby Conley, indeed, had told
12 you that she had filed the complaint?
13    MR. McNAIR: Objection. Asked and answered.
14    Q.  You can answer it, ma'am.
15    A.  I don't remember specifically, but I guess that's
16 what it says.
17    Q.  Okay. It says that you were glad that Abby filed
18 the complaint.
19    A.  Yeah.
20    (V.W. Deposition Exhibit 5
21     marked for identification.)
22    Q.  Okay, Ms. [W.], take a look, if you would, at the
23 next exhibit and tell me if that is a letter that you wrote.
24    A.  (Witness complies.)
25    MR. McNAIR: Is this marked?

Page 41

1    MR. JOYAL: It's been marked as Exhibit No. 5.
2    MR. McNAIR: Thank you.
3    MR. JOYAL: You're welcome.
4    A.  Yes.
5    Q.  Okay. And you signed it?
6    A.  Yes.
7    Q.  And this was written on July 15th of 2004; is that
8 correct?
9    A.  Yes.
10    Q.  When was [M.] born?
11    A.  July 6th.
12    Q.  So this was about nine days after her birth?
13    A.  Yes.
14    Q.  All right. I want you to -- I highlighted, again,
15 some portions of that letter, and I'm going to ask you to
16 read them for me, and I'm going to ask you some questions
17 about them.
18    The first one starts with -- toward the end of the
19 first paragraph in the middle, it says "Abby said".
20    A.  "Abby said I have a nice-sized Army. She called
21 me yesterday."
22    Q.  What was the conversation that you and Abby Conley
23 had? With the exception of the quote "nice-sized Army",
24 what were you talking about?
25    A.  Sounds like the court battle.

11 (Pages 38 to 41)

Ferguson & Holdnack Reporting, Inc.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 42

1    Q.   The court battle.  Was she again giving you
2  information and advice as to what you needed to do?
3    A.   I don't think so.
4    Q.   Okay.  Let's go to the end of the page.  And what
5  I'm going to ask you to do is read that.  And it carries
6  over to the next page.  What does that say?
7    A.   "I'm just nervous about it, but they couldn't even
8  get aggravated circumstances on Chris.  I can't wait to talk
9  to Ed Palattella either."
10   Q.   Let me ask you about that.  Was Chris the father
11 of the other two children?
12   A.   Yes.
13   Q.   Now, in the context of this, were you talking
14 about a termination hearing or something regarding those two
15 children?
16   A.   They filed aggravated circumstances on Chris and
17 lost.
18   Q.   Which means -- well, in what context?  Under
19 what -- I mean, what type of proceedings was it?
20   A.   It was a court hearing.
21   Q.   Was it for involuntary termination of rights or
22 just a dependency hearing?
23   A.   Just a dependency hearing.
24   Q.   And then you said, "I can't wait to talk to Ed
25 Palattella about this."

Page 43

1    A.   Yeah.
2    Q.   What were you going to talk to him about?
3    A.   I have talked to him about my whole case.
4    Q.   Have you?
5    A.   Yes.
6    Q.   Giving him what type of information?
7    A.   Everything that happens.
8    Q.   Even things that Abby Conley would have told you
9  about your cases?
10   A.   Possibly.
11   Q.   Possibly.  What were you hoping to accomplish by
12 that?
13   A.   I was hoping to get public attention about how I
14 was -- how wrong I was done by the agency.
15   Q.   Oh, I see.  Okay.  And so would some of the
16 information that you were giving him about how the agency
17 was doing you wrong have come from Abby Conley?
18   A.   I don't remember specifically what I gave him.
19   Q.   Okay.
20   A.   So.
21   Q.   Were there ever any newspaper stories written by
22 Ed Palattella about your specific case?
23   A.   Yes.
24   Q.   Did they ever mention Miss Conley's name in them?
25   A.   I don't remember.

Page 44

1    Q.   Did they identify anything that was contained in
2  your case files that you had seen, that you may have given
3  to him?
4    A.   I don't think so.
5    Q.   Okay.  Go to the next thing that I have got
6  highlighted.  I think it says "I'm glad".
7    A.   "I'm glad these people are really helping me.
8  They certainly don't have to do it, but they are.  Abby,
9  Deanna, and Lisa especially.  Especially Abby, who she's
10 putting her job on the line.  After all this is over, I'll
11 have to do something nice for the three of them."
12   Q.   Okay.  So you were talking about three people;
13 Deanna Cosby, Abby Conley, and someone named Lisa.
14   A.   Yes.
15   Q.   Now, Lisa, I think, is a CASA worker; is that
16 right?
17   A.   No, she's a Project First worker.
18   Q.   And Abby Conley at that time was still employed by
19 OCY?
20   A.   I believe so, yes.
21   Q.   And you characterized Abby Conley and Deanna Cosby
22 as trying to help you.
23   A.   Yes.
24   Q.   Now, what were you trying to -- what type of help
25 were they giving you?

Page 45

1    A.   Just -- I guess I just felt like as being
2  witnesses in my hearings, they would have had positive
3  feedback, as opposed to everybody else that was being so
4  negative.
5    Q.   And Abby had already been giving you information
6  about what was contained in your case file and meetings that
7  were being held within the agency, correct?
8           MR. ANGELONE:  Objection.  I think that's a
9       mischaracterization.
10          MR. JOYAL:  I believe she testified earlier, based
11      on what --
12          MR. McNAIR:  I believe she hasn't testified to
13      that at all.
14   Q.   Okay, let's go back to the letter.  Okay?  Let's
15 go back to the first letter which was 6/3.  Did we mark that
16 one yet?  Has that been marked or not?  Or did we just read
17 into the record from 6/3?
18          MS. SCARPITTI:  It's been marked as 1, I believe.
19          MR. JOYAL:  Okay.
20   Q.   Exhibit No. 1, you read into the record, "Anyway,
21 Abby said that [P.] and Sue had a meeting about me and that
22 she was mad because they are working against me instead of
23 for me and they are going to put up a fight against me and
24 that [P.] will probably be at most of my visits from now on,
25 so that sucks."  Right?

Ferguson & Holdnack Reporting, Inc.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 46

1    A.  Yes.
2    Q.  Abby Conley had been giving you information prior
3  to writing this letter on June 3rd about meetings being held
4  at OCY, correct?
5    A.  Yeah.
6    Q.  And that was one of the types of help that Abby
7  Conley was giving you, right?
8    A.  Yeah.
9        (V.W. Deposition Exhibit 6
10         marked for identification.)
11   Q.  Do you see that?  Have you ever seen that letter
12  before?
13   A.  Yes.
14   Q.  Do you recognize the handwriting?
15   A.  Yes.  It's [R.]'s.
16   Q.  It's [R.]'s.
17   A.  Yes.
18   Q.  I want to go -- and this is a letter dated
19  July 9th, 2004 to Sue Deveney; is that right?
20   A.  Yes.
21   Q.  Do you know who Sue Deveney is?
22   A.  It is -- it was [P.W.]'s supervisor and Deanna
23  Cosby's supervisor.
24   Q.  Okay.  Take a look, if you would, on the second
25  page.

Page 47

1    A.  (Witness complies.)
2    Q.  There is -- the second full paragraph on the
3  second page starts, "I --"  Do you see this?  "I was also".
4  Do you see that?
5    A.  Yes.
6    Q.  Would you read it out loud, if you would.
7    A.  "I was also informed that [P.] was investigated
8  for grabbing, shaking, and yelling at [D.], though your
9  agency stated these allegations could not be proven, given
10  her personal history and other incidents I have been made
11  aware of.  I trust you and your agency will do all that you
12  can to ensure that [P.] is not a threat to [M.] in any way.
13  I would like another person to be present with [P.] anytime
14  that she is alone with my daughter.  I will pursue all legal
15  avenues against her, you, and OCY if [M.] is harmed in any
16  way while in [P.]'s care or if I suspect she has been harmed
17  in any way.  Given what happened to her child, I'm very
18  confused as to how she is allowed to hold the position that
19  she has now."
20   Q.  Okay, I'll stop there.  [R.B.] is not [D.]'s
21  father; is that correct?
22   A.  Right.
23   Q.  Did you give [R.B.] the information about [P.W.]
24  that you just read that he wrote to Sue Deveney?
25   A.  Yes.

Page 48

1    Q.  Did you get that information from Abby Conley?
2    A.  No.
3    Q.  Did you get part of that information from Abby
4  Conley?
5    A.  The information about her son?
6    Q.  Yeah.
7    A.  No.
8    Q.  Okay.  Did you get the information -- did you give
9  him the information about the investigation and the finality
10  of the investigation?
11   A.  Yes.
12   Q.  Would I be correct that at no time had you ever
13  been told by anyone from the Department of Public Welfare
14  that the alleged perpetrator was [P.W.]?
15   A.  No.
16   Q.  I'm not correct?
17   A.  Yes, you are.
18   Q.  I am correct.  So that the only person that you
19  got the information about as to who this perpetrator was,
20  was Abby Conley.  Is that right?
21   A.  No.  Actually, I had seen her do something to my
22  child also.  And another witness had seen her do something
23  to my child.
24   Q.  When?
25   A.  Around that same time.

Page 49

1    Q.  What was it that you saw?
2    A.  I saw her grab my daughter by her arm and pick her
3  up by her arm and shake her and yell at her.
4    Q.  Okay.  And did you file a complaint?
5    A.  Yes.
6    Q.  Of child abuse?  Who did you file it with?
7    A.  I tried to file it with Sue Deveney.  She ignored
8  me.
9    Q.  Did you call the Child Abuse Hotline and file a
10  complaint?
11   A.  I think so, yes.
12   Q.  Do you know whether or not the complaint was ever
13  investigated by DPW?
14   A.  Yes.  I --
15   Q.  It was?
16   A.  No.  Actually, no.
17   Q.  Okay.  You don't know?
18   A.  I don't know.
19   Q.  Are you sure you filed the complaint?
20   A.  Yes.  I filed it with Sue Deveney, Ann Biroscak,
21  and Michael Kazmer.
22   Q.  And what date was this?
23   A.  I have no idea of the date.
24   Q.  Did you keep a note of it?
25   A.  No.  But it would have been shortly after [M.] was

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 50

1 born.
2     Q.  Where was it?  Where did it happen?
3     A.  At Lovell Place.
4     Q.  Where was [P.]?
5     A.  She was there.
6     Q.  Was Abby there?
7     A.  No.
8     Q.  Who else was there?
9     A.  I believe [C.], [M.]'s grandmother was there, and
10 also my two other kids.
11         MR. ANGELONE:  I'm sorry; I didn't hear that.
12         MR. JOYAL:  [C.], [M.]'s grandmother, and her
13             other two kids.
14     Q.  Did you identify [C.B.] as a witness?
15     A.  I'm not even positive she was there.
16     Q.  Oh, okay.
17     A.  I'm just assuming she was.
18     Q.  What about the Project First Step person?  Was she
19 there?
20     A.  I don't think so.  Not that I remember.
21     Q.  So what you're telling me, then, I think, is that
22 if [C.B.] was not there, with the exception of the two other
23 kids -- well, [M.] wouldn't have been there, would she?  Or
24 was she brought there?
25     A.  [M.] was there.

Page 51

1     Q.  So [M.] was what?  This was the 9th of July that
2 [R.] wrote this letter, and the baby was born on the 3rd?
3     A.  The baby was born on the 6th.
4     Q.  6th of July.  So three days -- within three days
5 or two days [M.] had been released from the hospital and was
6 attending a visit with you at Lovell Place, being brought
7 there by her grandmother?
8     A.  No, probably not.
9     Q.  Highly unlikely, isn't it?
10     A.  Yes.
11         MR. McNAIR:  Objection.  Argumentative.
12     Q.  But it's highly unlikely.
13         MR. McNAIR:  Objection.  Argumentative.
14     Q.  That she would have been there.
15     A.  Yes.
16     Q.  So, therefore, the only other person, unless there
17 was a Project First Step person there or Abby Conley, the
18 only other person that would have been there was you.
19     A.  Well, it was because of [M.], the reason why she
20 grabbed [D.] and yelled at her.  Because I was feeding [M.],
21 so.
22     Q.  Well, you just told me, though, that that was a
23 couple of days after the birth.
24     A.  I don't remember when that happened, but I know
25 [M.] was there, because I was feeding her.

Page 52

1     Q.  Well, let's just try to go through this.  Okay?
2 The baby was born on the 6th, right?
3     A.  Yes.
4     Q.  The baby had been the subject of a detention order
5 signed by a Judge?
6     A.  Yes.
7     Q.  When was the baby released from the hospital?
8     A.  Probably the 7th or 8th.
9     Q.  Okay.  So if it was the 8th, when were you
10 released from the hospital?
11     A.  I was released the next day, because I had to go
12 to the detention hearing.  I was released on the --
13     Q.  The 7th?
14     A.  The 7th.
15     Q.  And the baby was then released the next day on the
16 8th to [C.B.]'s custody.
17     A.  To [J.H.]'s custody.
18     Q.  Oh, a foster parent?
19     A.  [C.]'s cousin.
20     Q.  Was [J.H.] there when you were feeding [M.] on the
21 8th?
22     A.  I don't think so.
23     Q.  So if I understand what you just told me, she's
24 born on the 6th, she's released from the hospital on the
25 8th.  You're at Lovell Place for a visit with your other two

Page 53

1 children.  What time did your visits normally occur?
2     A.  I think around 1:00.
3     Q.  Around 1:00.  So do you know what time the baby
4 would have been released from the hospital?
5     A.  No, I don't.
6     Q.  So you don't even know whether the baby had been
7 released at that point in time or not, right?
8     A.  No, I don't remember.
9     Q.  And if, indeed, you had been feeding [M.], then
10 what would have happened was they would have released the
11 baby and brought her directly to Lovell Place so that you
12 could feed her?
13     A.  Yeah.  It doesn't make sense.
14     Q.  Doesn't make sense, does it?
15     A.  I'm guessing maybe [R.] might have put the wrong
16 date on here.
17     Q.  No, [R.] didn't put a date on here.  [R.] put a
18 date on the letter.
19     A.  That's what I mean.
20     Q.  Right.
21     A.  I don't know.  It was because of [M.].
22     Q.  And this says, "I was also informed that [P.] was
23 investigated for grabbing, shaking, and yelling at [D.]."
24 Which means that he would have been talking about the
25 original complaint, not the one that you say you saw.

14 (Pages 50 to 53)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 54

1    A.  Yes.
2    Q.  Right?
3    A.  Yeah.
4    Q.  Because there's nothing in here that says, and
5  yesterday or today or whatever, [V.] tells me that she also
6  witnessed this happening, does it?
7    A.  No, I guess not.
8    Q.  So this is all about -- this is all about the
9  information that you had been given by Abby Conley
10  concerning [P.W.] that you gave to [R.].
11        MR. McNAIR:  Objection.  Foundation.
12    Q.  Correct?
13        MR. McNAIR:  Misleads the record, as usual.
14    Q.  Correct?
15    A.  Could you repeat the question.
16    Q.  [R.]'s information that he was giving to Sue
17  Deveney was just the stuff that you had given him about the
18  complaint that had been filed by Abby Conley against [P.W.],
19  right?  Not anything about what you saw.
20    A.  Right.
21    Q.  Right?  Since July 9th of 2004, have you had any
22  conversations with Abby Conley?
23    A.  Yes.
24    Q.  When was the last time you spoke to Abby Conley
25  before today?

Page 55

1    A.  I have no idea.
2    Q.  Was it a week ago?  Two weeks ago?  A month ago?
3    A.  Maybe -- maybe two weeks.
4    Q.  Did you talk about -- did she call you --
5    A.  Yes.
6    Q.  -- or did you call her?
7    A.  I believe she called me.
8    Q.  And did you talk about her case?
9    A.  Not really.  She gave me Mr. McNair's phone
10  number.
11    Q.  And asked you to contact Mr. McNair?
12    A.  Yes.
13    Q.  Did you contact Mr. McNair?
14    A.  Yes.
15    Q.  Did you speak to him about your deposition
16  testimony?
17    A.  Yes.
18    Q.  What did you and he talk about?
19    A.  He just asked me some of the similar questions
20  that you asked me.
21    Q.  And did you give him similar answers?
22    A.  Yes.
23    Q.  You and Mr. McNair were not -- you didn't retain
24  Mr. McNair to represent you in anything ongoing, did you?
25    A.  No.

Page 56

1    Q.  You did not go to Mr. McNair seeking legal advice,
2  did you?
3    A.  No.
4    Q.  Did Mr. McNair ever tell you that you might not
5  have to answer these questions because they were privileged
6  between you and your lawyer?
7    A.  No.
8    Q.  No?  Did you ever meet with Mr. Angelone?
9    A.  No.
10    Q.  Do you have a recollection of having spoken with
11  Abby Conley about her case before the meeting that you had
12  with her a couple weeks ago?
13    A.  No.
14    Q.  No?  After she left OCY, did you and she have any
15  conversation about her maybe trying to help you in getting
16  back your children?
17    A.  I knew that she would be a -- she was going to be
18  a witness for me.
19    Q.  Did she ever tell you that she didn't like [P.W.]
20  or Sue Deveney?
21    A.  I got that impression.  I don't think she ever
22  came out and said it.
23    Q.  How did you get that impression?
24    A.  Because of -- I don't remember.  I'm trying to
25  think of exact facts, but I can't remember.

Page 57

1    Q.  Did Deanna Cosby ever tell you that she didn't
2  like any of these folks?
3    A.  No.
4    Q.  When Deanna Cosby was the worker on your case, did
5  she ever drop your children off and leave?
6    A.  Yes.
7    Q.  So that you could have unsupervised visitation
8  with them?
9    A.  Yes.
10    Q.  During that period of time, all your visitation
11  with the children was supposed to be supervised; is that
12  right?
13    A.  I didn't think it was.
14    Q.  Well, did you ever see the order?
15    A.  Not saying my visits were to be supervised, no.
16    Q.  Were they with the foster family?
17    A.  Yes.
18    Q.  And she picked them up from the foster home and
19  would bring them to you and drop them off and then leave?
20    A.  Yes.
21    Q.  During that period of time, were there ever any
22  visits that you had that Deanna Cosby attended while at the
23  foster home?
24    A.  Yes.
25    Q.  She was there?

15 (Pages 54 to 57)

Page 58

1    A.  She -- when I had a visit -- a couple, two, I
2  think maybe three at the OCY office, and she was on the
3  other side of a one-way mirror.
4    Q.  Watching.
5    A.  Or two-way mirror.  Yes.
6    Q.  Okay.  And did you ever hear of the foster mother
7  calling OCY to say that Deanna Cosby was violating the plan
8  by picking the children up and taking them to you?
9    A.  Hum-um.
10    Q.  Did Deanna Cosby ever tell you that?
11    A.  No.  Actually, I think that -- I think there was a
12  Court Order that said one per month is supposed to be
13  supervised or something.
14    Q.  And you were getting how many?
15    A.  I was getting --
16    Q.  Every weekend?
17    A.  One a week, I believe.
18    Q.  She would pick the kids up on a weekend?
19    A.  No, on a weekday.
20    Q.  On a weekday, and drop them off.
21    A.  Yes.
22    (Discussion held off the record.)
23    MR. JOYAL:  I don't have any other questions.
24    Thanks, Miss [W.].  Mr. Lanzillo or Mr. McNair may
25    have a few questions for you.

Page 59

1    CROSS-EXAMINATION
2  BY MR. LANZILLO:
3
4    Q.  I have a few follow-up.  My name is Rich Lanzillo,
5  and I represent the County of Erie.
6    In response to Mr. Joyal's questions, he had shown
7  you an exhibit which I believe he marked as Exhibit 4, which
8  is one of your letters.  I believe it's also Conley Exhibit
9  17.  If you have that, that would be helpful, but if not, I
10  think I can summarize it.
11    That's the letter where you recited that Abby
12  Conley told you that she was hoping you saw [P.] grab [D.]
13  so that she would not be the only witness.  Do you see that
14  in the highlighted portion of the letter?
15    A.  Yes.
16    Q.  And you go on to say that you were glad that Abby
17  had filed a complaint.
18    A.  Yes.
19    Q.  All right.  And you understood that to be a
20  complaint to the Department of Public Welfare through the
21  Child Line?
22    A.  Yes.
23    Q.  Okay.  And you now understand, I think, that the
24  letter that you would have received from DPW would not have
25  identified the complainant as Abby Conley or anyone else,

Page 60

1  correct?
2    A.  Yes.
3    Q.  Other than Abby Conley, can you think of any other
4  person who would have identified who made the complaint
5  regarding [P.W.]?
6    A.  What do you mean, who would have identified?
7    Q.  Can you think of any person who would have told
8  you, as of the date that you authored Exhibit 4, your
9  letter, any other source of information whereby you would
10  have come to know that it was, in fact, Abby Conley who had
11  filed the complaint, other than Abby herself?
12    A.  No.
13    Q.  I mean, in your mind, there simply is no one other
14  than Abby Conley who could have provided you with that
15  information, is there?
16    MR. McNAIR:  It's argumentative.
17    A.  Not that I can remember, no.
18    Q.  And as I understand your testimony -- and please
19  correct me if I'm wrong.  But you do recall that Deanna
20  Cosby told you that your child was going to be detained upon
21  her birth.  Is that correct?
22    A.  Yes.
23    Q.  All right.  And did Ms. Cosby tell you how she
24  knew that?
25    A.  I guess she didn't know for sure, because the rest

Page 61

1  of her information wasn't accurate.
2    Q.  Well --
3    A.  She told me the baby was going to be detained and
4  put into a foster home.  It was detained, but it wasn't put
5  into a foster home.
6    Q.  Did she tell you that she wanted you to know that?
7    A.  That she wanted me to know that?
8    Q.  Um-hum.
9    A.  No.  She just told me.  So she must have wanted me
10  to know.
11    Q.  Okay.  And, again, did she call you, or did you
12  call her?
13    A.  Deanna?
14    Q.  Yes.
15    A.  I think originally I called her, but she called me
16  back.  I talked to her a couple times.
17    Q.  And how did you get Deanna's number?
18    A.  She was my caseworker.  So when she moved, she
19  kept her same cell phone number.
20    Q.  Is that how you contacted her, via her cell phone?
21    A.  Yes.
22    Q.  And during your conversations with Deanna Cosby,
23  did she talk about Abby Conley?
24    A.  I don't remember any specific conversations about
25  Abby.

Page 62

1   Q. Did you have any understanding at the time
2  concerning the extent to which Abby Conley and Ms. Cosby
3  were communicating? I mean, you were aware, were you not,
4  that they were communicating?
5   A. Yes.
6   Q. Okay. And am I correct that you knew that based
7  upon what Abby had been telling you and based upon what
8  Ms. Cosby had been telling you?
9   A. Yeah, I believe so.
10  Q. Okay. Now, Mr. Joyal asked you some questions
11 regarding statements that Amy Jones had made to you,
12 specifically regarding the death of [P.W.]'s son.
13  A. (Witness nods head.)
14  Q. Do you recall that?
15  A. What was the first part of your question?
16  Q. Sure. You recall Mr. Joyal -- he asked you some
17 questions.
18  A. Yeah.
19  Q. And in response to your questions, you had
20 identified Amy Jones as the source of the information
21 recited in one of your letters regarding the death of
22 [P.W.]'s son.
23  A. Yes.
24  Q. Do you recall that?
25  A. (Witness nods head.)

Page 63

1   Q. All right. And you told us that the statement
2  regarding the death of [P.W.]'s son did not relate to
3  Ms. Jones' preparation of your case, the matter she was
4  working on for you. Is that right?
5   A. Not directly. Not very much.
6   Q. It was extraneous to whatever was going on in your
7  case. Is that a fair statement?
8   A. Yeah.
9   Q. Did Amy Jones tell you the source of that
10 information, as far as where she -- how she came to know
11 about [P.W.] -- the death of [P.W.]'s son?
12      MS. SCARPITTI: Objection. Attorney/client
13      privilege.
14      MR. LANZILLO: As I understand the witness'
15      testimony, this didn't relate to the
16      representation.
17      MS. SCARPITTI: But her source may have.
18      MR. LANZILLO: Are you instructing her not to
19      answer?
20      MS. SCARPITTI: Yes, I'm instructing her not to
21      answer.
22 BY MR. LANZILLO:
23  Q. How often, in the time frame of, let's say, May
24 and June of 2004, how often did you have contact with Abby
25 Conley?

Page 64

1   A. If she was still supervising my visits, then
2  probably twice a week.
3   Q. Outside of the scheduled contacts, did you have
4  any other interaction with her?
5   A. I don't know if it was during that time, but I
6  talked to her on the phone a few times.
7   Q. How often did you talk to Abby Conley on the
8  phone?
9   A. Maybe three times, four times.
10  Q. And would she talk to you from her office at OCY,
11 from home, on her cell phone?
12  A. I don't know where she talked to me from.
13  Q. Did you have a contact number to reach her, like
14 you had for Deanna Cosby?
15  A. I think so. I'm not sure.
16  Q. How often -- or on how many occasions did you have
17 conversations with Deanna Cosby after she left OCY?
18  A. Probably -- I would say maybe like twice as many
19 as with Abby. Maybe once or twice a week.
20  Q. And when did those start?
21  A. I don't know. I think I talked to her the whole
22 time, ever since she left my case, because my new caseworker
23 I got wasn't servicing me, so I had no caseworker, you might
24 as well say, so I just kept talking to her, even though she
25 was out of town.

Page 65

1   Q. Do you recall telling Abby Conley that you
2  wanted -- you wanted Deanna Cosby to call you?
3   A. No. I told Abby Conley that I wanted Deanna to
4  call my lawyer, and I gave her my lawyer's card. But I had
5  Deanna's number, so I would have phoned her myself.
6   Q. What was your phone number back in May of 2004?
7   A. I have no idea.
8   Q. The phone number 814-868-8541, do you recognize
9  that number?
10  A. That's Amy Jones' number.
11  Q. Is that Amy Jones'?
12  A. (Witness nods head.)
13  Q. And why did you want Deanna Cosby to call Amy
14 Jones?
15      MS. SCARPITTI: Objection. Those are
16      attorney/client privilege, and I'm instructing her
17      not to answer.
18      MR. LANZILLO: Well, wait a minute. Let me just
19      follow up here.
20  Q. I mean, this is a communication you made to Abby
21 Conley, right? You told Abby Conley that you wanted Deanna
22 Cosby to call Amy Jones.
23  A. That my attorney wanted -- my attorney wanted
24 Deanna to call her.
25  Q. I guess I'm trying to understand why it is that

17 (Pages 62 to 65)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 66

1  you are conveying this information through Abby Conley, if
2  you had Deanna's telephone number and presumably could have
3  forwarded it to your attorney? There's no reason you could
4  not have given that number to your counsel, was there?
5      A.  No. I think just because my counsel wanted them
6  to call her.
7      Q.  And why is it that you didn't call Deanna and ask
8  her to call your lawyer?
9      A.  Because I think I probably assumed that Abby would
10  be talking to her anyway. Also, I wanted to give Abby the
11  card.
12      Q.  You wanted to what?
13      A.  I wanted Abby to have her number. Because my
14  lawyer wanted to speak with Abby too.
15      Q.  So your lawyer wanted to speak with Abby as well.
16      A.  Yes.
17      Q.  And did you ask Abby to speak with your lawyer?
18      MS. SCARPITTI: Objection. Attorney/client
19      privilege, and I'm instructing her not to answer.
20      MR. LANZILLO: I would encourage you to reconsider
21      that. I'm asking what she told Abby Conley.
22      Q.  Did you tell Abby Conley that you would like her
23  to call your lawyer?
24      A.  That, I don't remember. At the time it was mainly
25  she wanted to talk to Deanna. But I know she wanted to talk

Page 67

1  to Abby too.
2      Q.  Did Abby tell you that she would talk to your
3  lawyer?
4      A.  Maybe not come out and exactly say it, but I got
5  that impression.
6      Q.  You understood that she was willing to do that.
7      A.  Yeah.
8      Q.  Did Abby ever tell you that she spoke with your
9  lawyer?
10      A.  No. Not until the one time I knew for sure that
11  she did.
12      Q.  What did Abby tell you about that?
13      A.  Well, my lawyer called her in for a -- like an
14  interview kind of thing, and I was there. So she didn't
15  have to tell me.
16      Q.  You were present for that.
17      A.  Yeah.
18      Q.  What was said during that meeting?
19      MS. SCARPITTI: Objection. Goes to
20      attorney/client privilege. It's attorney work
21      product.
22      MR. LANZILLO: That's not -- no. You know, I have
23      been thinking about this work product privilege,
24      and statements made by third parties are not work
25      product. They are not evidence.

Page 68

1      You know, I am not asking for any attorney
2  mental impressions or memos or anyone else. But
3  you cannot shield the underlying information with
4  a work product privilege.
5      MR. ANGELONE: Attorney/client privilege.
6      MR. LANZILLO: That exploded the minute that
7  Miss Conley stepped into the room.
8      MR. McNAIR: Absolutely not.
9      MR. JOYAL: Yes, it did.
10      MS. SCARPITTI: No, it didn't.
11      MR. LANZILLO: Let me inquire. Was Ms. Conley
12  Attorney Jones' client?
13      MS. SCARPITTI: No, but Attorney Jones was talking
14  to Miss Conley in order to prepare for her
15  client's case. Unless Miss Conley then
16  subsequently testified, her testimony would be
17  admissible, but anything that she had told Miss
18  Jones in regards to Miss Jones' representation of
19  [V.] is attorney/client privilege and
20  attorney/client work product.
21      MR. LANZILLO: As soon as counsel allows a third
22  party in the room with a client, the
23  attorney/client privilege is gone. I don't want
24  to be argumentative, but I think every lawyer in
25  the room knows that. I can guarantee you that

Page 69

1  Judge McLaughlin knows that. Do you really want
2  to press that position? I will back off if you
3  tell me you do, but I don't believe you can hold
4  that information in good faith. I'll ask the
5  question again.
6  BY MR. LANZILLO:
7      Q.  What was said during that meeting where Abby
8  Conley was present with you and Amy Jones?
9      MS. SCARPITTI: I'm going to object again and
10  instruct her not to answer.
11      MR. LANZILLO: Based on the attorney/client
12  privilege?
13      MS. SCARPITTI: Yes.
14      MR. JOYAL: Let's call him now, Rich, because we
15  need to get this done today, based on the
16  deadlines for summary judgment. And
17  Miss Scarpitti can make her argument to the Court.
18  (Discussion held off the record.)
19  (The following discussion was held on the record
20  with Judge McLaughlin:)
21      THE COURT: All right. This is the Judge. What's
22  going on?
23      MR. LANZILLO: Judge, this is Rich Lanzillo
24  calling in the Abby Conley case. I'm representing
25  the County of Erie. Counsel for all of the

18 (Pages 66 to 69)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

| | Page 70 |
|---|---|
| 1 | parties are present in my conference room for the |
| 2 | deposition of [V.W.]. Ms. [W.] is separately |
| 3 | represented by Alison Scarpitti, and we have an |
| 4 | objection and an instruction not to answer a |
| 5 | series of questions based upon the attorney/client |
| 6 | privilege. |
| 7 | THE COURT: Who is [V.W.]? |
| 8 | MR. LANZILLO: She was a client of OCY. In a |
| 9 | nutshell, Judge, she's important, very important |
| 10 | to the defense of the case because this -- she's |
| 11 | the witness who closes the loop whereby we will |
| 12 | establish that Ms. Conley repeatedly leaked |
| 13 | confidential information regarding confidential |
| 14 | cases and pending cases through other third |
| 15 | parties, with the intention that that information |
| 16 | get back to opposing parties and their counsel. |
| 17 | Ms. [W.] is the witness who closes that loop for |
| 18 | us. |
| 19 | The questions I am asking relate to a meeting |
| 20 | between -- or among the Plaintiff, Abby Conley, |
| 21 | and Ms. [W.] and her then attorney, Amy Jones. |
| 22 | Ms. Scarpitti has invoked the attorney/client |
| 23 | privilege, saying that the information that |
| 24 | Ms. Conley was providing to Ms. [W.] in connection |
| 25 | with pending OCY cases is somehow protected by the |

| | Page 71 |
|---|---|
| 1 | attorney/client privilege. I take the position -- |
| 2 | THE COURT: Well, there's a third -- how can that |
| 3 | be if there's a third party there? |
| 4 | MR. LANZILLO: That's my -- that's my point, Your |
| 5 | Honor. And I don't want to speak for |
| 6 | Ms. Scarpitti. Maybe she could explain her |
| 7 | position. |
| 8 | THE COURT: What's your position, Ms. Scarpitti? |
| 9 | MS. SCARPITTI: Your Honor, my position is that |
| 10 | because at the time it appears that Attorney Jones |
| 11 | was interviewing Miss Conley with regard to her |
| 12 | being a potential witness in the case, that that's |
| 13 | attorney work product and that that would be |
| 14 | confidential. We're not claiming that statements |
| 15 | made -- that all statements made to Miss [W.] from |
| 16 | Abby Conley are confidential; simply those that |
| 17 | were stated while she was being interviewed by |
| 18 | Ms. [W.]'s then attorney. |
| 19 | THE COURT: You're going to have to set the stage |
| 20 | for me a little more clearly here. What |
| 21 | litigation was Ms. Jones involved in that |
| 22 | necessitated -- or anticipated litigation that |
| 23 | necessitated these interviews? |
| 24 | MS. SCARPITTI: Your Honor, at the time -- and, |
| 25 | actually, this is an ongoing case. We have |

| | Page 72 |
|---|---|
| 1 | another hearing scheduled on it next week. |
| 2 | Ms. [W.] was involved with OCY. She's now in the |
| 3 | middle of involuntary termination procedures. |
| 4 | Ms. Jones represented her up through that during |
| 5 | the permanency hearings, the detention orders, all |
| 6 | of that. So it's my understanding that at that |
| 7 | time they were, I believe, given the time period, |
| 8 | preparing for either the -- another permanency |
| 9 | hearing, or they were preparing for the change of |
| 10 | goal hearing. |
| 11 | THE COURT: All right. Well, in any event, here |
| 12 | is my ruling: Just so we have the procedural cart |
| 13 | behind the horse here, I take it, then, |
| 14 | Miss Scarpitti, that -- well, Mr. Lanzillo, this |
| 15 | is coming on by way of motion to compel testimony? |
| 16 | Is that it? |
| 17 | MR. LANZILLO: Well, yes, Your Honor. We're |
| 18 | raising it here in the deposition so as not to |
| 19 | have to trouble the Court with a paper motion. |
| 20 | THE COURT: All right. The motion is granted. |
| 21 | Number one, I see no attorney/client privilege, |
| 22 | given the circumstances surrounding the interview. |
| 23 | Number two, I see no violation of work product |
| 24 | doctrine because -- for the simple reason that |
| 25 | Miss Jones' attorney's notes, documents, mental |

| | Page 73 |
|---|---|
| 1 | impressions, et cetera, are not being requested or |
| 2 | asked to be divulged here. Rather, it's the |
| 3 | independent testimony of this witness. So the |
| 4 | motion to compel is granted, and I find the basis |
| 5 | for directing the client not to answer not |
| 6 | well-founded. |
| 7 | Anything else? |
| 8 | MR. LANZILLO: Yes, Judge, if we may -- and this |
| 9 | will likely save a paper motion in a couple of |
| 10 | days. The precise same objections were raised and |
| 11 | instructions given during the deposition of Amy |
| 12 | Jones concerning the same topics. If counsel is |
| 13 | agreeable, I would like to raise that with the |
| 14 | Court now. We had contemplated getting a |
| 15 | transcript from that deposition and forwarding to |
| 16 | the Court, but perhaps we can resolve it here. I |
| 17 | don't believe there is any difference in the |
| 18 | objections raised in that deposition. |
| 19 | MR. McNAIR: Well, I don't know. But, |
| 20 | Miss Scarpitti, is there -- is there a difference? |
| 21 | MS. SCARPITTI: Your Honor, I'm not sure. I was |
| 22 | not at that deposition. And I understand that now |
| 23 | Miss Jones -- she isn't here today, obviously, and |
| 24 | she does have counsel. I would -- |
| 25 | THE COURT: Who is her counsel? |

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 74

1  MS. SCARPITTI: Phil Friedman, Your Honor.
2  THE COURT: Well, I can't resolve that today, Mr.
3  Lanzillo, in the absence of Mr. Friedman. I
4  presume he was the one who raised the objection.
5  MR. LANZILLO: He wasn't present, Your Honor, but
6  I understand. We'll raise that by other means.
7  THE COURT: At another time when everybody who
8  needs to be around the table is there. All right.
9  MR. LANZILLO: Thank you, Judge.
10  MS. SCARPITTI: Thank you, Judge.
11  (End of discussion with Judge McLaughlin.)
12  BY MR. LANZILLO:
13  Q. Let me go back to my last line of questioning,
14  Ms. [W.] and ask you, first of all, why was Ms. Conley
15  sitting in an interview with you and your lawyer? What is
16  your understanding?
17  A. It was in preparation for a trial that I had
18  coming up.
19  Q. Which trial?
20  A. Probably a permanency hearing. I'm not positive.
21  Q. And did you understand that Ms. Conley -- or was
22  it your belief that Ms. Conley had information that you and
23  your attorney could use to further or improve your position
24  in that trial?
25  A. Yeah, by her testimony.

Page 75

1  Q. All right. And that that meeting was in part to
2  prepare Ms. Conley for her deposition -- I mean, for her
3  testimony at trial?
4  A. Yes.
5  Q. All right. And to obtain from her whatever
6  information she might have that would be useful to you and
7  your attorney. Correct?
8  A. Yes.
9  Q. And so you sat down with Attorney Jones and
10  Ms. Conley, and she provided you with information. Can you
11  tell me what she told you and Ms. Jones.
12  A. She was just asked questions by my attorney, such
13  as how the visits went, if -- basically like if I was good
14  with my kids, things like that.
15  Q. All right. And what did Ms. Conley say?
16  A. She was very positive and said I was good with my
17  kids.
18  Q. Did she express any views concerning OCY's
19  objectives, their -- their belief -- its belief -- the
20  belief of the agency that it was necessary that the agency
21  proceed with the dependency proceedings with respect to your
22  children?
23  A. No.
24  Q. She didn't tell you that she disagreed with the
25  agency?

Page 76

1  A. Yes. Yes.
2  Q. Okay. She did tell you that. She told your
3  attorney that too, did she not?
4  A. She told my attorney.
5  Q. And did you talk about the detention of your
6  unborn child upon -- the anticipated detention of your
7  unborn child?
8  A. Not that I recall. I talked to my lawyer about
9  it, but I don't think with her there. I don't think with
10  Abby there.
11  Q. Do you remember how long your meeting with your
12  lawyer and Ms. Conley went?
13  A. Probably about 45 minutes to an hour.
14  Q. Did you talk about [P.W.]?
15  A. Probably. At least indirectly, because she was my
16  caseworker at the time.
17  Q. Did Miss Conley make any comments about Ms. [W.]?
18  A. I don't think so. Not that I recall.
19  Q. Did Ms. Conley ever make any statement to you at
20  any time, not just during that meeting, regarding her views
21  of Ms. [W.] in terms of her -- you know, her spirituality or
22  her religion?
23  A. No.
24  Q. Did she ever characterize her as satanic or
25  anything like that?

Page 77

1  A. No.
2  MR. McNAIR: Objection. There is's no foundation
3  for that.
4  Q. Demonic?
5  MR. McNAIR: There you go.
6  MR. LANZILLO: Is that better?
7  MR. McNAIR: It's just not accurate.
8  A. I don't think so. It may have been something I
9  would have said. I don't remember her saying anything like
10  that or hearing anything like that.
11  Q. Now, the death of Ms. [W.]'s son, did that come up
12  during the meeting?
13  A. Not that I remember. I don't think so.
14  Q. Do you remember when you learned about that?
15  A. No. All that I remember is it was while I had
16  retained Amy for an attorney.
17  Q. So you're in this meeting for 45 minutes,
18  approximately. What else was discussed?
19  A. I don't remember. It was pretty much the same
20  questions that were asked in court, that would have been
21  asked in court. Like just in preparation for the hearing.
22  Q. Did you talk about the case reports that
23  Ms. Conley had? The summaries?
24  A. Yeah, I think -- yes.
25  Q. Did you go over those?

Ferguson & Holdnack Reporting, Inc.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 78

1    A.  Yes.

2    Q.  Did Ms. Conley tell you whether she was meeting

3  with your counsel with -- with permission from the Office of

4  Children and Youth?

5        MR. McNAIR:  Objection.  Irrelevant.

6    A.  No.  She didn't tell me.

7    Q.  She didn't mention that.  Was there any discussion

8  by Ms. Jones concerning whether this represented an ex parte

9  communication?  You don't know what that is, do you?

10    A.  No.

11    Q.  That's not fair.  Was there any discussion with

12  Ms. Jones regarding whether it was permissible or

13  appropriate for this meeting to be taking place?

14    A.  Huh-uh.

15    Q.  That didn't come up?

16    A.  No.  Something was brought up about stolen

17  subpoenas or something like that.

18    Q.  What was that?  Who brought that up?

19    A.  I mean, I don't know.  It was brought up --

20  something about that Office of Children and Youth been

21  known to steal subpoenas.

22    Q.  And did Ms. Conley tell you that?

23    A.  Yeah.  I don't think it was to me.  It was -- it

24  was to my lawyer.

25    Q.  Miss Conley told you --

Page 79

1    A.  I don't remember much about the details.

2    Q.  But you do remember Ms. Conley telling your lawyer

3  that there had been a problem with subpoenas being stolen by

4  or at OCY?

5    A.  I don't -- yeah.  I don't remember if it was --

6  who was telling who.  But I remember that was an issue.

7    Q.  Do you have an understanding as to how your lawyer

8  came to understand Attorney Conley's views concerning your

9  case?

10        MR. McNAIR:  Who is Attorney Conley?

11    Q.  I'm sorry.  How Abby Conley -- strike that.  I'll

12  start over.

13        Do you have any understanding as to how your

14  attorney, Amy Jones, came to understand Ms. Conley's views

15  regarding the case?

16    A.  Probably just by talking with her or being with

17  her.  I'm not sure.

18    Q.  Did your attorney, Ms. Jones, meet with anyone

19  else from OCY, other than Ms. Conley?

20    A.  She spoke with Deanna over the phone.  That was

21  because it was after she moved.  I believe she met with --

22  oh, she met with Lisa Kopycinski from Project First.  And I

23  believe she met with Lisa Babo from CVS.

24    Q.  But no other OCY personnel other than Ms. Conley.

25  Is that right?

Page 80

1    A.  Right.

2    Q.  Give me your best recollection as to what

3  Ms. Conley said about these stolen subpoenas.

4        MR. ANGELONE:  I'm going to object.  I think it's

5        mischaracterizing what she said.

6        MR. LANZILLO:  Well, she can correct --

7        MR. ANGELONE:  She just remembers it coming up, I

8        thought she had said.  She doesn't remember who.

9    A.  Yeah, I don't remember if it was --

10        MR. LANZILLO:  See, that's the problem I have with

11        speaking objections.

12        MR. ANGELONE:  I apologize.

13        MR. McNAIR:  We'll be happy to talk about stolen

14        subpoenas.

15        MR. LANZILLO:  Yeah.  Actually, I'd like to hear

16        it from the witness.  I'm asking -- I understood

17        her testimony earlier to have been that Ms. Conley

18        told her lawyer about -- in her presence, told her

19        lawyer about subpoenas being stolen by OCY, is

20        what I understood.  And, you know, when the

21        objection phrased as it was, the testimony is

22        changing a little bit, but I'm going to ask the

23        question again.

24  BY MR. LANZILLO:

25    Q.  What do you remember Ms. Conley saying about these

Page 81

1  stolen subpoenas?

2    A.  I don't remember Abby saying anything about the

3  stolen subpoenas.  I remember that it involved her like it

4  was one of her subpoenas that had been stolen, or something

5  to that effect.

6    Q.  Well, but Abby was talking -- Abby was the one who

7  was sharing the information, wasn't she?

8    A.  I think so.  I don't remember exactly.  I remember

9  my lawyer had to -- said something to me about having to

10  mail Abby's subpoena to her house or somewhere else, because

11  before it's happened that her supervisor has stolen a

12  subpoena.

13    Q.  Did you have e-mail at the time?

14    A.  No.

15    Q.  Did you ever call Deanna Cosby's cell phone to

16  talk to her?

17    A.  Yes.

18    Q.  And she would call you as well, correct?

19    A.  Yes.

20    Q.  And when you would call Deanna Cosby, from where

21  would you call her?

22    A.  From my -- I believe my cell phone.  I don't

23  believe I had a house phone at the time.

24    Q.  Do you still have that same cell phone?

25    A.  No.

21 (Pages 78 to 81)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 82

1    Q.  Who was your cell service at the time?
2    A.  I think Cellular One.  It was -- no, T-Mobile.
3    Q.  T-Mobile?
4    A.  Yes.
5    Q.  And was the cell account in your name?
6    A.  Yes.
7    Q.  Did you call Abby Conley from that phone?
8    A.  Yes.  That's if I didn't have a house phone at the
9    time.  I don't think I did.  I could be mistaken.
10    Q.  And is that the number that Deanna Cosby and
11   Miss Conley would use to contact you as well?
12    A.  Yeah.
13    Q.  That seems logical, if you didn't have a house
14   phone at the time.
15    A.  Yes.
16    MR. LANZILLO:  Thank you, Miss [W.].
17
18    CROSS-EXAMINATION
19   BY MR. McNAIR:
20
21    Q.  Ms. [W.], first of all, you said that you received
22   some information from Deanna Cosby about a detention order.
23    A.  Yes.
24    Q.  Was that information accurate?
25    A.  No.

Page 83

1    Q.  Was the information that she related to you the
2    same information that was on the detention order?
3    A.  No.
4    Q.  What did the detention order say when you finally
5    saw it?
6    A.  It was dated way back to before [P.W.] even told
7    me to do certain things to prevent it.  And it was that the
8    custody was going to go to the grandmother.  Deanna said it
9    would go to a foster parent.
10    Q.  To [R.]'s mother?
11    A.  Yes.
12    Q.  And did you agree to have the baby go to [R.]'s
13   mother?
14    A.  Yes.
15    Q.  Okay.  And had you told that to [P.]?
16    A.  Yes.
17    Q.  And had you told that to anybody else at OCY?
18    A.  I think [P.] was the only one I ever directly
19   spoke with.
20    Q.  Okay.  Did you ever threaten to leave town to have
21   your baby because of a detention order that would place your
22   daughter with her grandmother?
23    A.  No.
24    Q.  Did you ever authorize the Office of Children and
25   Youth to snoop through your personal correspondence with

Page 84

1    [R.]?
2    A.  No.
3    MR. JOYAL:  Objection.
4    Q.  Do you know how the Office of Children and Youth
5    came into possession of the letters that Mr. Joyal has shown
6    you today?
7    A.  No.  They must have asked him for them, and he
8    must have just sent them.
9    Q.  Did you talk to [R.]?
10    A.  No.
11    Q.  Okay.  So you haven't talked to [R.]?
12    A.  No.
13    Q.  Did you yourself -- well, first of all, there was
14   some discussion between you and Abby about an incident Abby
15   witnessed where [P.W.] grabbed your daughter [D.] by the
16   face and shook it and yelled at her.
17    A.  Yes.
18    Q.  Okay.  And you didn't -- did you witness that
19   incident?
20    A.  Not that incident, no.
21    Q.  Did you ever witness an incident where [P.W.]
22   inappropriately handled your daughter?
23    A.  Yes.
24    Q.  Okay.  And do you recall about when that was?
25    A.  Right after -- sometime in July of '04.

Page 85

1    Q.  After [M.] was born.
2    A.  Yes.
3    Q.  Okay.  And what did you see [P.W.] do?
4    A.  I saw her grab my daughter by the arm and lift her
5    up real -- real fast and roughly and yell at her in her face
6    and make her cry.
7    Q.  And your daughter started crying?
8    A.  Yes.
9    Q.  And did your daughter ever appear to be scared of
10   Miss [W.]?
11    A.  Yes.
12    Q.  Before that incident or after?
13    A.  Before.  Always.
14    Q.  She was always scared of Miss [W.]?
15    A.  Even the foster mother told me that.
16    Q.  Do you know if anybody else ever witnessed [P.W.]
17   inappropriately handling one of your children?
18    A.  Lisa Babo from CVS witnessed it also.
19    Q.  She didn't witness the incident that you
20   described, with the yanking of the arm and the shaking and
21   yelling.  What did Lisa Babo tell you that she saw?
22    A.  She saw her grab her by the face and shake her.
23    Q.  Where did Lisa say that happened?
24    A.  I'm not positive.  I'm guessing it was at Lovell
25   Place, but I'm not positive.

22 (Pages 82 to 85)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 86

1    Q.   Do you know if Lisa reported that?
2    A.   I don't know.
3    Q.   Now, after you saw this incident where Ms. [W.]
4  grabbed your daughter by the arm and would shake her, I
5  think you said you tried to report that to Miss Deveney?
6    A.   Yes.
7    Q.   How did you try to make that report?
8    A.   I called her several times. I could never get
9  through, so eventually I just left a voicemail.
10   Q.   You didn't leave a voicemail the first time you
11  called?
12   A.   I called her and asked her to please call me back
13  several times; that it was important.
14   Q.   Do you recall about how many times you called?
15   A.   About three or four times.
16   Q.   Okay. And then ultimately you did leave a
17  voicemail?
18   A.   Explaining the whole situation.
19   Q.   Explaining what you had seen?
20   A.   Yes.
21   Q.   And did she respond to that?
22   A.   No.
23   Q.   All right. You also said you reported it to Pam
24  Biroscak?
25   A.   Yes.

Page 87

1    Q.   And who is Pam Biroscak?
2    A.   It is, I believe, Sue Deveney's supervisor.
3    Q.   How did you make that report to Pam Biroscak?
4    A.   I called her.
5    Q.   Did she take your call?
6    A.   Yes.
7    Q.   Did you explain to her what you saw?
8    A.   Yes.
9    Q.   What did Miss Biroscak tell you?
10   A.   I don't remember, but she was very rude, and she
11  didn't believe me. She said basically it's not like a
12  caseworker would do something like that.
13   Q.   Okay. So she knew that [P.W.] would never roughly
14  handle a child?
15   A.   That's what she -- the impression I got.
16   Q.   So she dismissed your complaint --
17   A.   Yes.
18   Q.   -- because she simply didn't believe you?
19   A.   Yes.
20   Q.   Do you know whether she asked [P.W.] about that
21  incident?
22   A.   No.
23   Q.   Do you know if anybody ever asked [P.W.] about
24  that incident?
25   A.   No.

Page 88

1    Q.   You also said you talked to a Mike Kazmer?
2    A.   Yes.
3    Q.   And who is he?
4    A.   He, I believe, is from the DPW, maybe.
5    Q.   Okay.
6    A.   The head of an organization like that.
7    Q.   Okay. And how did you get to talk to him?
8    A.   Deanna gave me the contact information.
9    Q.   And what did Mr. Kazmer say when you told him what
10  you had witnessed?
11   A.   He said that he would -- he was much more friendly
12  than the first two and said he would do an investigation
13  about it.
14   Q.   Okay. Did you ever receive anything from the DPW
15  saying that an investigation was done with regard to that
16  incident?
17   A.   (No response.)
18   Q.   A notice letter like you got with the first one?
19   A.   No. I only got one about the other incident.
20   Q.   Did Mr. Kazmer ever advise you of the results of
21  his investigation?
22   A.   I don't believe so.
23   Q.   Do you know if he talked to [P.W.]?
24   A.   I'm not sure.
25   Q.   Is that case file that OCY keeps on your case

Page 89

1  secret, or are you allowed to see that?
2    A.   I'm supposed to be allowed to see it, but I
3  requested it three months ago and never heard anything back
4  yet.
5    Q.   Okay. Did you ever have a copy of your case file?
6    A.   Not the entire file.
7    Q.   Not the entire file. Part of it?
8    A.   Just court summaries and psychological
9  evaluations, bonding assessments, things like that.
10   Q.   Okay. Now, I think you made a comment that
11  Ms. [W.] was not servicing you.
12   A.   Yes.
13   Q.   What do you mean by that?
14   A.   When Deanna left my case, I got [P.W.] as a new
15  caseworker, but it took, I believe, maybe six weeks for her
16  to contact me, and I didn't see my kids --
17   Q.   So you were without any contact with a caseworker
18  for about six weeks.
19   A.   Yeah. Other than I was -- talked to Deanna a few
20  times in that period. But she wasn't my caseworker anymore.
21   Q.   Okay. And was Deanna trying to help you with your
22  case?
23   A.   Yes.
24   Q.   Answering the questions that you would have asked
25  her had she still been your caseworker?

23 (Pages 86 to 89)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 90

1  A. Yes.
2  Q. Okay. How many times did Ms. [W.] visit you?
3  A. Twice.
4  Q. Twice?
5  A. (Witness nods head.)
6  Q. And when did she start? In January or February?
7  A. February, I believe.
8  Q. Okay. And between February and -- when did she
9  stop being your caseworker?
10  A. I don't remember.
11  Q. Okay. So she came and visited you at home twice.
12  A. Yes.
13  Q. And on how many occasions did she visit -- did she
14  observe you visiting with your children?
15  A. Twice also.
16  Q. Okay. Did she stay for the entire visit?
17  A. No. She never did.
18  Q. How long would she stay when she visited you in
19  your home?
20  A. In my home?
21  Q. Yeah.
22  A. I think once was like a half an hour, once was
23  like 20 minutes, maybe.
24  Q. Was there a schedule that was set by the Court for
25  you to receive services from the Office of Children and

Page 91

1  Youth?
2  A. I'm not sure.
3  Q. Okay. Do you recall whether or not there was ever
4  a hearing where the Judge indicated that she wanted more
5  attention paid to your case?
6  A. Yes.
7  Q. And who was that Judge?
8  A. I believe it was Elizabeth Kelly.
9  Q. And when was that hearing?
10  A. That, I'm not sure. It was around the time of the
11  birth of [M.].
12  Q. Okay. And when Deanna was your caseworker, how
13  often would she come to your house?
14  A. I think once a week.
15  Q. Okay. And how often would she observe you with
16  your children?
17  A. Once a month.
18  (Discussion held off the record.)
19  Q. Did Lisa Kopycinski ever tell you about any
20  incident involving [P.W.] and your daughter [D.]?
21  A. No. Oh. Yes, actually, she did. She told me
22  about Abby; the one Abby witnessed.
23  Q. Okay. She told you about the incident that Abby
24  witnessed and reported.
25  A. Yes.

Page 92

1  Q. Okay. So was that the first time you had heard
2  about that?
3  A. Yes.
4  Q. So Abby hadn't told you that before Lisa did?
5  A. No. Lisa was the first one to tell me that.
6  Q. Did you ever discuss that incident with Abby after
7  that?
8  A. I think so.
9  Q. But just so we're clear, the first time you heard
10  of an incident of [P.W.] roughly handling your child was
11  from Lisa Kopycinski.
12  A. Yes.
13  MR. McNAIR: That's all I have.
14  MR. JOYAL: Ms. [W.], I want to do some follow-up.
15
16  REDIRECT EXAMINATION
17  BY MR. JOYAL:
18
19  Q. Do you know, other than the meeting that you were
20  present at between Amy Jones, yourself, and Abby Conley, do
21  you know whether there were any other meetings between Amy
22  Jones and Abby Conley that you weren't present at?
23  A. I don't believe so.
24  Q. Okay. During the course of the meeting that you
25  had, that you said took about 45 minutes, did Abby Conley

Page 93

1  divulge in response to any questions from Ms. Jones the
2  content of any meetings that had been held that she told you
3  about, that are set forth in the letter, the meetings
4  between Sue Deveney and [P.W.] and whoever about your case?
5  A. I don't remember.
6  Q. You don't remember that.
7  A. Hum-um.
8  Q. You don't like [P.W.]; is that right?
9  A. Hum-um.
10  Q. And you have never liked [P.W.]; is that right?
11  A. No.
12  Q. Right? You called her a "fucking bitch" in one of
13  the letters, didn't you?
14  A. Yes.
15  Q. Who is Lisa Kopycinski?
16  A. She is from Project First Step.
17  Q. Project First Step. Now, you say that Lisa
18  Kopycinski told you that she saw the incident that Abby
19  Conley reported about [P.W.].
20  A. No. She didn't tell me she saw it.
21  Q. Oh. What did she tell you?
22  A. She told me that there was an incident.
23  Q. And how did she know about it if she didn't see
24  it?
25  A. I don't know.

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 94

1  Q.  You don't know.  Would it have come from the only
2  witness to it, Miss Conley?
3  A.  It seems likely, but I don't know for sure.
4  Q.  Most likely.  Now, tell me about Lisa -- what is
5  her name?  Babel?
6  A.  Babo.
7  Q.  Babo.  Who does Lisa work for?
8  A.  CVS, through Family Ties.
9  Q.  I'm sorry?
10  A.  CVS, through Family Ties.
11  Q.  What kind of an organization is CVS?
12  A.  They supervise visits.
13  Q.  They are sort of social worker types?
14  A.  Yes.
15  Q.  Do you know under the law that such a person would
16  be a mandated reporter to report evidence, incidents of
17  child abuse?
18  A.  No, I didn't know.
19  Q.  You didn't.  Well, I'm going to tell you that it
20  would be.  And that there was no report made by Lisa Babo
21  pursuant to statute, under statutory requirement, to anyone
22  concerning any incident involving [P.W.].
23       With that information, would that change your
24  recollection as to whether Lisa Babo ever told you about
25  such an incident?

Page 95

1  A.  No, she definitely told me about an incident.
2  Q.  Do you know Lisa Babo denied ever having given any
3  type of information like that to anyone; denied that such an
4  incident took place?
5       MR. McNAIR:  Objection.  Foundation.
6  Q.  Did anybody ever tell you that there's a note in
7  OCY files stating that she denied ever seeing such an
8  incident?
9  A.  No.
10  Q.  Has Mr. McNair or Mr. Angelone or Miss Conley ever
11  told you that they spoke to Lisa Babo, and Lisa Babo said
12  that she had seen the incident?
13  A.  No.
14  Q.  Okay.  All of this stuff that happened that you
15  say you saw with [P.W.] occurred after the birth of your
16  child; is that right?
17  A.  (No response.)
18  Q.  Correct?
19       MR. McNAIR:  All of what stuff are you talking
20       about?
21  Q.  This alleged incident where you saw her grab your
22  daughter by the arm.
23  A.  Yes.
24  Q.  That was only witnessed by you.
25  A.  Yes.

Page 96

1  Q.  Happened after the incident.
2       MR. McNAIR:  After what incident?
3  Q.  Happened after the birth of your child.
4  A.  Yes.
5  Q.  Happened after you had been told by Abby Conley
6  about the plans that OCY had for your case, right?
7  A.  She never told me about the plans.
8  Q.  Well, she did.  You said she told you in one of
9  the letters we talked about, about the meetings that were
10  being held.
11  A.  Yeah.
12  Q.  Okay.  After she had told you all this stuff about
13  what OCY had planned on doing, this is when the incident
14  that you say that you were the only person that saw
15  happened.
16  A.  Yes.
17  Q.  This was after you had written the letters to [R.]
18  talking about what you would have done to [P.W.] if you had
19  been there on the date that she allegedly grabbed [D.] by
20  the face.
21  A.  Yes.
22  Q.  Right?
23  A.  Yes.
24  Q.  You didn't like her at all.
25  A.  No.

Page 97

1  Q.  Deanna Cosby didn't like her, did she?
2  A.  I don't think so.
3  Q.  Okay.  And Abby Conley didn't like her.
4  A.  Didn't seem like it.
5  Q.  Right.  And these are all people -- and they were
6  doing things and got you involved in them to try to do
7  anything to help you get your kids back; is that right?
8       MR. McNAIR:  Objection.
9  A.  I guess -- can you be more clear?
10  Q.  Well, were all these things being done to try to
11  help you get your kids back?
12  A.  All what things being done?
13  Q.  The conversations, the information being given to
14  you about [P.W.].
15  A.  I guess so, yes.
16  Q.  You guess so.  This had nothing -- [P.W.] -- and
17  by the way -- strike that.  Let me ask this question:  You
18  said that this incident occurred after [M.]'s birth.  Do you
19  know when it was that [P.W.] was asked to be taken off of
20  your case and not to supervise any visits?
21       MR. McNAIR:  Objection.  Foundation.
22  Q.  Do you?
23  A.  No.
24       MR. McNAIR:  There's no foundation that [P.W.]
25       asked to be taken off the case.

25 (Pages 94 to 97)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 98

1    MR. JOYAL:  Well, I think that if you remember her
2        deposition, I think it was a mutual agreement that
3        neither one of them work together, and that that
4        happened.
5  BY MR. JOYAL:
6        Q.   She was taken off your case.  Do you know whether
7   that happened before the birth of your child or after?
8        A.   After.
9        Q.   Okay.  You said that Deanna Cosby gave you Mike
10  Kazmer's information.
11       A.   Yes.
12       Q.   How to contact him.  Did you approach her to ask
13  that question, or did you call -- well, let me break it down
14  this way:  Before she gave you that information, did she
15  call you to ask you about this alleged incident after [M.]'s
16  birth?
17       A.   No.  I called her and told her.
18       Q.   You called her and told her about it?
19       A.   Yes.
20       Q.   And you still can't tell me what the date of this
21  was supposedly, right?
22       A.   No.
23       Q.   Do you remember after [M.] was born, being in the
24  Erie County Courthouse during some dependency hearing or
25  some status conference where -- well, strike that.  Let me

Page 99

1  ask the question this way:  Did Abby Conley ever tell you
2  that [C.B.] had some concerns about your interaction with
3  your newborn at a visit?
4        MR. McNAIR:  Object to the relevance.
5        A.   No.
6        Q.   No?
7        A.   No.
8        Q.   Do you remember, did anyone ever tell you that the
9  paternal grandmother of [M.] had some concerns about the way
10  that you were interacting with her during a visit?
11       A.   Yes.  My attorney did after a while.
12       Q.   Your attorney did.  And do you know whether or not
13  your attorney told you about that?
14       A.   Yes.
15       Q.   And did you change that behavior the next time you
16  visited with your child?
17       A.   No.  My impression was that she wanted custody of
18  the child, so she made those up.
19       Q.   Oh, okay.  You have no -- as you sit here today,
20  your testimony is that at no time did Abby Conley give you
21  any information concerning a conversation that was held
22  between the social worker, [C.B.], and Abby Conley about
23  your interaction with [M.].
24       A.   No.  I never knew of the two of them having a
25  conversation.

Page 100

1        Q.   Well, we're talking about the three of them.
2        A.   I mean, I never knew of [C.] and Abby having a
3  conversation.
4        Q.   Okay.  How about [C.] having a conversation with
5  the worker on the case?  Who was the worker that was
6  assigned to the case after [P.W.]?
7        A.   Michelle Schetter.
8        Q.   Do you have any recollection of any conversations
9  between Michelle Schetter and [C.B.] concerning --
10       A.   No.
11       Q.   Did Abby Conley ever tell you that she had
12  contacted Deanna Cosby to ask her to help you?
13       A.   No.
14       Q.   Did Deanna Cosby ever tell you that Abby Conley
15  had contacted her and asked her to help you?
16       A.   No.
17       Q.   Okay.  Now, you say that T-Mobile was your cell
18  phone provider?
19       A.   I believe so.
20       Q.   And that your conversations by telephone, as far
21  as you know today, would have been via cell phone.
22       A.   I'm pretty sure.  If I didn't have a house phone
23  at the time.
24       Q.   And if you did have a house phone, who is the
25  provider for your service?  Verizon?

Page 101

1        A.   I believe so.
2        Q.   Okay.  So that they should have records of your
3  telephone conversations in May, June, July, and August,
4  right?
5        A.   Yeah.
6        Q.   And the numbers.  When Deanna Cosby called you in
7  June to tell you about the detention order, the one that you
8  talked about in your letter to [R.] on June 5th, did you
9  expect that telephone call from her?
10       A.   No.
11       Q.   And did you ask her how she knew about the order?
12       A.   I believe so.
13       MR. McNAIR:  We covered this.  For crying out
14       loud.
15       Q.   Did she tell you that Abby Conley gave her the
16  information about the order?
17       MR. McNAIR:  I'm moving to terminate this
18       deposition.
19       MR. JOYAL:  You can move to leave.  You're not
20       terminating my --
21       MR. McNAIR:  I'm going to call the Judge.
22       MR. JOYAL:  You're not terminating my --
23       MR. McNAIR:  I'm going to call the Judge because
24       I've had it with you.  I've had it with you.
25       Q.   Okay.  You can answer my question.

26 (Pages 98 to 101)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 102

1    MR. McNAIR: You're wasting everybody's time.
2    Q.  You can answer my question.
3    A.  She told me, based on who my caseworker was, she
4    had already moved to termination, rather than reunification.
5    Q.  Did she tell you that Abby Conley had told her
6    that there was an order outstanding?
7    A.  No.
8    MR. JOYAL: I have no other questions.
9    MR. LANZILLO: I have just a couple. Are you
10   okay? Do you have a minute? I have about one or
11   two more questions. Are you okay for about four
12   minutes?
13   THE WITNESS: Yeah.
14
15         RECROSS-EXAMINATION
16   BY MR. LANZILLO:
17
18   Q.  You testified in response to Attorney McNair's
19   questions that you witnessed [P.W.] grab your child and
20   treat her roughly. Is that correct?
21   A.  Yes.
22   Q.  All right. And I want to make sure I understand
23   the timing of that. Approximately when did that occur?
24   A.  I think not even two or three weeks after [M.] was
25   born, which was July 6th.

Page 103

1    Q.  Okay. So sometime in July of 2004 is your best
2    recollection.
3    A.  Yes.
4    Q.  Did you record that anywhere? Did you write
5    anything down to memorialize that?
6    A.  I don't believe so.
7    Q.  All right. Let me ask you about something else
8    here, and then I think we'll be done. Perhaps some others
9    will have a couple more questions. You recall, do you not,
10   that DPW investigated the complaint that was made concerning
11   Ms. [W.] allegedly grabbing [D.] by the face?
12   A.  Yes.
13   Q.  All right. You're aware of that?
14   A.  Yes.
15   Q.  All right. Were you aware of the DPW's finding
16   regarding that complaint?
17   A.  That it was unfound.
18   Q.  Unfounded?
19   A.  Yes.
20   Q.  And how did you first learn that it was unfounded?
21   A.  I got it back in a letter.
22   Q.  Okay. And did you discuss that with Abby Conley
23   after you received the letter?
24   A.  I'm not sure. The only one I remember discussing
25   that with was Lisa Kopycinski.

Page 104

1    Q.  You understood, of course, because you had said in
2    the letter earlier that you were happy that Abby Conley had
3    actually filed the complaint, so you knew Abby was the
4    complainant, right?
5    A.  Yes.
6    Q.  All right. And then you later found out that DPW
7    had found Miss Conley's complaint to be unfounded.
8    A.  (Witness nods head.)
9    Q.  It seems logical to me -- and I don't want to put
10   words in your mouth -- that is something that you two
11   would talk about in later conversation. Didn't you talk
12   about that with Ms. Conley?
13   A.  I think later on, yes.
14   Q.  And when you say "later on", it would have been
15   soon after the finding that the complaint was unfounded,
16   wasn't it? Didn't that come up in -- the next time you
17   encountered Miss Conley; the DPW had found her complaint to
18   be unfounded?
19   A.  I'm not sure.
20   Q.  But you did talk about it at some point with
21   Ms. Conley?
22   A.  At some point, yeah.
23   Q.  And what did Ms. Conley say about that?
24   A.  I don't remember. I remember what Lisa Kopycinski
25   said, but I don't remember what Abby said.

Page 105

1    Q.  Ms. Conley was upset about that finding, wasn't
2    she?
3    A.  Yeah. I think I told her about how Lisa told me
4    how it came to be unfounded, and I think I told Abby how it
5    came to be unfounded.
6    Q.  Did Abby tell you that the DPW investigator, when
7    she interviewed her at the conclusion of the proceeding,
8    told Abby that the complaint would be -- had been determined
9    to be unfounded?
10   A.  No.
11   Q.  She didn't tell you that?
12   A.  No. My only impression was they investigated my
13   daughter. They investigated -- or they interrogated [D.].
14   Q.  Did Abby tell you that -- well, who told you that
15   they interrogated your daughter?
16   A.  Lisa Kopycinski.
17   Q.  Do you know if Lisa was there?
18   A.  I don't know. I don't think so.
19   Q.  So what is your understanding as to how Lisa came
20   to believe that your daughter was interrogated by the DPW
21   investigator? Is that from Abby?
22   A.  I have no idea who it was from.
23   Q.  Did Lisa indicate that she ever talked to anyone
24   else other than Abby regarding the investigation of Abby's
25   complaint?

27 (Pages 102 to 105)

cab4bc90-34b6-44ac-a3dc-91c83d36fb82

Page 106

1    A.  I don't remember who Lisa said she talked to.
2    Q.  Did Abby tell you that they spoke with her?
3    A.  Hum-um.
4    Q.  Did Abby tell you anything about what the
5  investigator concluded as far as her credibility and her
6  believability?
7        MR. McNAIR:  Objection.
8    A.  No.
9    Q.  She didn't tell you anything about that?
10    A.  I don't -- not that I remember.
11    Q.  But I think it was Lisa Kopycinski who first told
12  you that the DPW investigator had found Ms. Conley's
13  complaint about [P.W.] to be unfounded.
14    A.  No.  The first thing I got was a letter that said
15  it was unfounded.
16    Q.  Okay.  But other than that letter, you think that
17  the first person to talk to you verbally about this was
18  Miss Kopycinski, as opposed to Miss Conley.  Is that what
19  you're telling me?
20    A.  I think so, but I'm not positive.
21    Q.  Okay.
22    A.  Probably, because I talked to Lisa almost every
23  day.
24    Q.  And Lisa did not identify how she would have come
25  to know the results of that confidential information.

Page 107

1    A.  No.  Not that I recall.
2        MR. LANZILLO:  That's all I have.
3        MR. McNAIR:  I just have a couple.
4
5        RECROSS-EXAMINATION
6  BY MR. McNAIR:
7
8    Q.  This incident that Lisa Babo witnessed, was your
9  daughter injured?
10    A.  No.  Not -- not to where she would have to go to
11  the hospital.
12        MR. LANZILLO:  Objection to foundation.  I'm
13        sorry.  I spoke over the witness.  I just wanted
14        to get my foundation objection on the record.
15    Q.  Did you ever observe your child to be injured
16  after the incident where [P.] grabbed her by the arm and --
17  or grabbed her by the face?  I'm sorry.  The one that Lisa
18  Babo witnessed.
19        MR. LANZILLO:  Objection.  Lack of foundation.
20    A.  My kids had bruises on them all the time.  I never
21  knew exactly where they were from, though.
22    Q.  Was Abby still on your case after [M.] was born?
23    A.  I don't think so.
24        MR. McNAIR:  That's all the questions I have.
25        MR. JOYAL:  I just have two more, Miss [W.],

Page 108

1  because I want to make sure I understand this.
2
3        FURTHER REDIRECT EXAMINATION
4  BY MR. JOYAL:
5
6    Q.  Did Lisa Kopycinski ever tell you that she had
7  spoken to DPW or been interviewed by DPW concerning Abby
8  Conley's complaint?
9    A.  No.
10    Q.  And you don't have a recollection as to how Lisa
11  told you that she even knew about the finding and the
12  complaint; is that right?
13        MR. McNAIR:  Asked and answered.
14    A.  Oh, Lisa Kopycinski?
15    Q.  Yeah.
16    A.  I'm sorry.  I thought you meant Lisa Babo.
17    Q.  Lisa Kopycinski.
18    A.  What was the first question?
19    Q.  Did Lisa Kopycinski ever tell you that she had
20  been interviewed by DPW concerning the complaint?
21    A.  No.
22    Q.  And as you sit here today, is it your testimony
23  that you don't have a recollection as to Lisa telling you
24  even how she knew about the complaint?
25    A.  No.

Page 109

1    Q.  Or the finding.
2    A.  No.
3        MR. JOYAL:  I have nothing else.
4        MS. SCARPITTI:  She'll waive signature.
5
6        (Deposition concluded at 12:17 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

28 (Pages 106 to 109)

**A**

abandonment 28:8
Abby 1:3 5:2 7:10,14
 7:18 11:5 12:12,19
 13:2,7,11 14:3 16:5
 16:23 17:3,4,6,13,20
 21:5,9,19 22:7,20
 23:3,12,15 24:2 29:9
 31:8 32:9,12,18 34:2
 36:2 37:17 38:4,7,10
 38:13 39:1,8,15,25
 40:11,17 41:19,20,22
 43:8,17 44:8,9,13,18
 44:21 45:5,21 46:2,6
 48:1,3,20 50:6 51:17
 54:9,18,22,24 56:11
 59:11,16,25 60:3,10
 60:11,14 61:23,25
 62:2,7 63:24 64:7,19
 65:1,3,20,21 66:1,9
 66:10,13,14,15,17,21
 66:22 67:1,2,8,12
 69:7,24 70:20 71:16
 76:10 79:11 81:2,6,6
 82:7 84:14,14 91:22
 91:22,23 92:4,6,20
 92:22,25 93:18 96:5
 97:3 99:1,20,22
 100:2,11,14 101:15
 102:5 103:22 104:2,3
 104:25 105:4,6,8,14
 105:21,24 106:2,4
 107:22 108:7
Abby's 81:10 105:24
able 6:7,14 36:4
about 5:24 8:3,4,6,11
 9:25 11:10 12:18,21
 12:24 13:2,12,19
 15:10,14 16:7,12
 17:5 18:12 19:1,12
 19:13,16 20:13 21:9
 21:20 22:8,17 23:6,7
 23:7,13,17 24:5 26:7
 26:10,12 27:17 28:15
 29:18 30:17 31:5,8
 31:12 32:17 34:4,13
 35:14,19 41:12,17,24
 42:7,10,14,25 43:2,3
 43:9,13,16,22 44:12
 45:6,21 46:3 47:23
 48:5,9,19 50:18
 53:24 54:8,8,17,19
 55:4,8,15,18 56:11
 56:15 61:23,24 63:11
 67:12,23 76:5,8,13
 76:14,17 77:14,22
 78:16,20 79:1 80:3
 80:13,18,19,25 81:2
 81:9 82:22 84:14,24

abandonment 28:8
86:14,15 87:20,23
 88:13,19 89:18 91:19
 91:22,23 92:2,25
 93:3,4,19,23 94:4,24
 95:1,20 96:6,7,9,9,12
 96:18 97:14 98:15,18
 99:2,9,13,22 100:1,4
 101:7,8,11,16 102:10
 102:11 103:7 104:11
 104:12,20,23 105:1,3
 106:4,9,13,17 108:11
 108:24
absence 74:3
absolutely 27:1 68:8
abuse 32:23 49:6,9
 94:17
accommodate 6:23
accomplish 43:11
account 82:5
accurate 61:1 77:7
 82:24
across 20:11
Action 1:4
actively 8:9,11
actually 21:12 28:4
 30:20 31:22 48:21
 49:16 58:11 71:25
 80:15 91:21 104:3
admire 24:10,19
admissible 68:17
advice 42:2 56:1
advise 88:20
advising 30:7,11
advocate 21:15
affect 6:17
after 7:20 12:23 13:22
 18:8,9 21:11 31:7
 38:6 41:12 44:10
 49:25 51:23 56:14
 64:17 79:21 84:25
 85:1,12 86:3 92:6
 95:15 96:1,2,3,5,12
 96:17 97:18 98:7,8
 98:15,23 99:11 100:6
 102:24 103:23
 104:15 107:16,22
afterwards 11:16 26:13
again 16:9 20:23 22:6
 27:24 41:14 42:1
 61:11 69:5,9 80:23
against 21:20 22:8,10
 23:14,21 32:23 38:10
 45:22,23 47:15 54:18
agency 14:4 25:25 26:7
 26:9 43:14,16 45:7
 47:9,11 75:20,20,25
aggravated 42:8,16
ago 13:16 55:2,2,2
 56:12 89:3
agree 83:12

agreeable 73:13
agreement 98:2
ahead 21:25 22:5,19
aide 7:19 34:2
Alison 5:12 70:3
allegations 47:9
alleged 48:14 95:21
 98:15
allegedly 96:19 103:11
allowed 47:18 89:1,2
allows 68:21
almost 21:13 106:22
alone 47:14
along 19:14
already 11:12 45:5
 102:4
although 5:25
always 19:13 85:13,14
among 70:20
Amy 15:23,25 16:3,7
 16:11 17:4,5 18:8,9
 18:12 19:4,4,5,8,15
 19:23 20:5 36:7
 62:11,20 63:9 65:10
 65:11,13,22 69:8
 70:21 73:11 77:16
 79:14 92:20,21
and/or 16:25
Angelone 2:3 19:20
 20:2 21:22 22:1 25:4
 25:15,17,19,20 26:2
 26:15 27:19 36:16
 40:6 45:8 50:11 56:8
 68:5 80:4,7,12 95:10
Ann 49:20
another 6:3 9:2 10:3
 14:9 22:22 33:20
 47:13 48:22 72:1,8
 74:7
answer 6:7 17:11 24:14
 24:23 32:1,4,25
 40:14 56:5 63:19,21
 65:17 66:19 69:10
 70:4 73:5 101:25
 102:2
answered 19:25 20:3
 40:13 108:13
Answering 89:24
answers 55:21
Anthony 2:3
anticipated 71:22 76:6
anybody 83:17 85:16
 87:23 95:6
anymore 89:20
anyone 24:22 39:20
 48:13 59:25 68:2
 79:18 94:21 95:3
 99:8 105:23
anything 6:22 11:25
 12:3 16:3 19:23 22:2

26:7,10 27:20 33:10
 34:14,16 44:1 54:19
 55:24 68:17 73:7
 76:25 77:9,10 81:2
 88:14 89:3 97:7
 103:5 106:4,9
anytime 47:13
anyway 21:18,19 22:6
 22:7 23:12 32:7
 45:20 66:10
anywhere 103:4
apologize 80:12
appear 7:2 85:9
appearances 6:9
appears 71:10
apply 5:23
approach 98:12
appropriate 78:13
approximately 35:17
 77:18 102:23
April 1:20
argue 25:18,22,23
arguing 20:10
argument 69:17
argumentative 51:11
 51:13 60:16 68:24
arm 49:2,3 85:4,20
 86:4 95:22 107:16
Army 41:20,23
around 48:25 53:2,3
 74:8 91:10
asked 7:1 12:24,24
 18:16,18 19:4 21:6
 25:25 28:22,24 32:7
 40:13 55:11,19,20
 62:10,16 73:2 75:12
 77:20,21 84:7 86:12
 87:20,23 89:24 97:19
 97:25 100:15 108:13
asking 29:17 66:21
 68:1 70:19 80:16
assault 38:4
assaulted 32:10,14,15
assessments 89:9
assigned 100:6
assumed 66:9
assuming 50:17
attempt 28:20
attended 57:22
attending 51:6
attention 43:13 91:5
attorney 6:3 15:21,23
 17:9 22:14 24:1,16
 25:3,4 65:23,23 66:3
 67:20 68:1,12,13
 70:21 71:10,13,18
 74:23 75:7,9,12 76:3
 76:4 77:16 79:8,10
 79:14,18 99:11,12,13
 102:18

attorney's 72:25
attorney/client 11:19
 15:19 16:3,10,14
 17:7 18:15 19:23
 22:15 25:8 36:10
 63:12 65:16 66:18
 67:20 68:5,19,20,23
 69:11 70:5,22 71:1
 72:21
August 101:3
authenticated 25:1
authored 60:8
authorize 83:24
avenues 47:15
avoid 24:24 30:6,15
aware 29:15 47:11 62:3
 103:13,15
a.m 1:21
a/k/a 1:6,12 2:6

**B**

B 1:3 9:7 10:23 15:6
 30:24 33:5,21
Babel 94:5
Babo 79:23 85:18,21
 94:6,7,20,24 95:2,11
 95:11 107:8,18
 108:16
baby 28:5,18,20 30:21
 31:8 51:2,3 52:2,4,7
 52:15 53:3,6,11 61:3
 83:12,21
babysitter 34:3
back 10:14 14:16 20:25
 21:17 27:13 29:22
 31:3 33:18 37:4
 45:14,15 56:16 61:16
 65:6 69:2 70:16
 74:13 83:6 86:12
 89:3 97:7,11 103:21
based 29:13 40:9 45:10
 62:6,7 69:11,15 70:5
 102:3
basically 75:13 87:11
basis 26:15 73:4
battle 41:25 42:1
Baugh 2:13
became 7:20
become 8:9 29:15
before 1:18 11:13 12:6
 12:9,11,16,18 13:1,5
 13:10,13,14,20,22
 14:2 23:2 24:16
 25:20,22 26:10 28:15
 28:20 31:24 32:4,7
 38:9 39:10 46:12
 54:25 56:11 81:11
 83:6 85:12,13 92:4
 98:7,14
beginning 8:5 21:7

**behavior** 99:15
**behind** 72:13
**being** 5:8 9:22,22 23:6
30:17,24 45:1,3,7
46:3 51:6 71:12,17
73:1 79:3,16 80:19
90:9 96:10 97:10,12
97:13 98:23
**belief** 74:22 75:19,19
75:20
**believability** 106:6
**believe** 6:13 7:15,17,25
8:17 10:19 12:10,11
16:22,22 30:24 32:2
33:1,2 34:10 35:25
44:20 45:10,12,18
50:9 55:7 58:17 59:7
59:8 62:9 69:3 72:7
73:17 79:21,23 81:22
81:23 87:2,11,18
88:4,22 89:15 90:7
91:8 92:23 100:19
101:1,12 103:6
105:20
**believes** 6:1
**bent** 25:10,12
**best** 7:25 80:2 103:1
**better** 77:6
**between** 5:2 6:2 56:6
70:20 84:14 90:8
92:20,21 93:4 99:22
100:9
**bickering** 20:10
**Biroscak** 49:20 86:24
87:1,3,9
**birth** 41:12 51:23
60:21 91:11 95:15
96:3 97:18 98:7,16
**bit** 27:3 80:22
**bitch** 93:12
**blank** 24:2
**bonding** 89:9
**born** 4:13 41:10 50:1
51:2,3 52:2,24 85:1
98:23 102:25 107:22
**both** 7:4
**break** 98:13
**bring** 57:19
**brought** 50:24 51:6
53:11 78:16,18,19
**browbeats** 40:8
**bruises** 107:20
**buy** 22:25

―――――――――――――
          **C**
―――――――――――――
**C** 50:9,12 52:19 100:2
100:4
**call** 8:15 28:22,24
29:17,22 49:9 55:4,6
61:11,12 65:2,4,13

65:22,24 66:6,7,8,23
69:14 81:15,18,20,21
82:7 86:12 87:5
98:13,15 101:9,21,23
**Callan** 1:9 2:9 4:24
**called** 28:2,11,15,20
29:11 41:20 55:7
61:15,15 67:13 86:8
86:11,12,14 87:4
93:12 98:17,18 101:6
**calling** 58:7 69:24
**Calls** 39:2
**came** 13:7,7,9 15:21
29:22 34:1 56:22
63:10 79:8,14 84:5
90:11 105:4,5,19
**capacity** 1:8,10,11,14
**car** 35:6
**card** 65:4 66:11
**care** 47:16
**Carolina** 29:7
**carries** 42:5
**cart** 72:12
**CASA** 44:15
**case** 5:6,23,24 6:9 7:19
16:18,23 17:6,17
19:10,11 21:16 25:14
25:15 27:17 34:2
36:22 43:3,22 44:2
45:6 55:8 56:11 57:4
63:3,7 64:22 68:15
69:24 70:10 71:12,25
77:22 79:9,15 88:25
88:25 89:5,14,22
91:5 93:4 96:6 97:20
97:25 98:6 100:5,6
107:22
**cases** 8:10 43:9 70:14
70:14,25
**caseworker** 29:6,13,14
61:18 64:22,23 76:16
87:12 89:15,17,20,25
90:9 91:12 102:3
**cell** 29:7 61:19,20
64:11 81:15,22,24
82:1,5 100:17,21
**Cellular** 82:2
**Center** 2:11
**certain** 8:4 27:17 83:7
**certainly** 44:8
**cetera** 73:1
**chance** 24:16
**change** 72:9 94:23
99:15
**changing** 80:22
**characterization** 25:3
29:20
**characterize** 76:24
**characterized** 44:21
**characterizing** 27:16

**Chatham** 2:11
**child** 1:6,13 2:6 10:24
16:25 27:18 30:4,15
31:21,23,24 32:23
39:20 47:17 48:22,23
49:6,9 59:21 60:20
76:6,7 87:14 92:10
94:17 95:16 96:3
98:7 99:16,18 102:19
107:15
**children** 1:6,12 2:6 7:3
8:18,22 9:20 27:17
32:11,14,15,16 42:11
42:15 53:1 56:16
57:5,11 58:8 75:22
78:4,20 83:24 84:4
85:17 90:14,25 91:16
**Chris** 42:8,10,16
**circumstances** 42:8,16
72:22
**Civil** 1:4
**claiming** 71:14
**clarification** 21:6
**clear** 92:9 97:9
**clearly** 71:20
**clever** 24:9,19
**client** 16:19 17:2 19:1
24:23 25:25 26:14
68:12,22 70:8 73:5
**clients** 5:1
**client's** 68:15
**closes** 70:11,17
**club** 34:23,24,25
**coach** 18:24
**come** 7:18 30:1 31:3
43:17 60:10 67:4
77:11 78:15 91:13
94:1 104:16 106:24
**coming** 72:15 74:18
80:7
**commencing** 1:21
**comment** 89:10
**comments** 76:17
**Commonwealth** 1:20
**communicating** 62:3,4
**communication** 65:20
78:9
**compel** 72:15 73:4
**complainant** 59:25
104:4
**complaint** 38:4,10,14
38:16,18,22 39:16,17
39:25 40:5,12,18
49:4,10,12,19 53:25
54:18 59:17,20 60:4
60:11 87:16 103:10
103:16 104:3,7,15,17
105:8,25 106:13
108:8,12,20,24
**complete** 23:10

**complies** 37:13 40:24
47:1
**concerning** 14:4 54:10
62:2 73:12 75:18
78:8 79:8 94:22
99:21 100:9 103:10
108:7,20
**concerns** 99:2,9
**concluded** 106:5 109:6
**conclusion** 105:7
**conduct** 6:14
**conference** 70:1 98:25
**confidential** 16:17
39:22 40:1 70:13,13
71:14,16 106:25
**confidentiality** 26:1
**confined** 6:8
**confused** 47:18
**Conley** 1:3 5:3 7:10,14
7:18 10:10 12:12,19
13:2,11 14:3,10,18
16:5,24 17:14 23:3
23:15 24:5 26:11
29:16,17 32:10,12
36:2 38:10,13 39:1
39:25 40:4,11 41:22
43:8,17 44:13,18,21
46:2,7 48:1,4,20
51:17 54:9,18,22,24
56:11 59:8,12,25
60:3,10,14 61:23
62:2 63:25 64:7 65:1
65:3,21,21 66:1,21
66:22 68:7,11,14,15
69:8,24 70:12,22,24
71:11,16 74:14,21,22
75:2,10,15 76:12,17
76:19 77:23 78:22
78:25 79:2,10,11,19
79:24 80:3,17,25
82:7,11 92:20,22,25
93:19 94:2 95:10
96:5 97:3 99:1,20,22
100:11,14 101:15
102:5 103:22 104:2
104:12,17,21,23
105:1 106:18
**Conley's** 11:5 43:24
79:8,14 104:7 106:12
108:8
**connection** 70:24
**contact** 55:11,13 63:24
64:13 82:11 88:8
89:16,17 98:12
**contacted** 61:20 100:12
100:15
**contacts** 64:3
**contained** 12:22 13:12
14:4 16:18 27:20
44:1 45:6

**contemplated** 73:14
**content** 93:2
**context** 42:13,18
**continue** 37:24
**conversation** 13:11,19
18:22 31:4,11,17
39:10 41:22 56:15
99:21,25 100:3,4
104:11
**conversations** 12:19
54:22 61:22,24 64:7
97:13 100:8,20 101:3
**conveying** 66:1
**copies** 11:17
**copy** 12:6 22:25 89:5
**correct** 4:16 9:5 17:18
23:18 27:15 29:23
36:23 39:7 41:8 45:7
46:4 47:21 48:12,16
48:18 54:12,14 60:1
60:19,21 62:6 75:7
80:6 81:18 95:18
102:20
**correspondence** 83:25
**Cosby** 7:12 28:10 30:3
31:5 44:13,21 57:1,4
57:22 58:7,10 60:20
60:23 61:22 62:2,8
64:14,17 65:2,13,22
81:20 82:10,22 97:1
98:9 100:12,14 101:6
**Cosby's** 29:22 46:23
81:15
**counsel** 5:9,25 11:23
66:4,5 68:21 69:25
70:16 73:12,24,25
78:3
**County** 1:5,5,6,8,8,10
1:12,13,14 2:6,6,6
4:23 59:5 69:25
98:24
**couple** 11:7 35:18
51:23 56:12 58:1
61:16 73:9 102:9
103:9 107:3
**course** 8:1 13:23 92:24
104:1
**court** 1:1 5:23 11:1
23:1 41:25 42:1,20
58:12 69:17,21 70:7
71:2,8,19 72:11,19
72:20 73:14,16,25
74:2,7 77:20,21 89:8
90:24
**Courthouse** 98:24
**court-appointed** 21:15
**cousin** 52:19
**covered** 101:13
**credibility** 106:5
**criminal** 9:25

Cross-examination 3:5
  3:6 59:1 82:18
cry 85:6
crying 85:7 101:13
custody 52:16,17 83:8
  99:17
cut 32:5
CVS 79:23 85:18 94:8
  94:10,11
C.B 9:15 50:14,22
  52:16 99:2,22 100:9

**D**

D 2:1 3:1 8:21 10:24
  37:18,22 38:11 39:4
  47:8,20 51:20 53:23
  59:12 84:15 91:20
  96:19 103:11 105:13
date 9:9 10:16 13:11
  20:21 38:18,19 49:22
  49:23 53:16,17,18
  60:8 96:19 98:20
dated 46:18 83:6
daughter 9:4,13 47:14
  49:2 83:22 84:15,22
  85:4,7,9 86:4 91:20
  95:22 105:13,15,20
  107:9
day 52:11,15 106:23
days 41:12 51:4,4,5,23
  73:10
deadlines 69:16
Deanna 7:12 28:2,10
  28:15,20,22 29:11,22
  30:3 31:4 38:7 44:9
  44:13,21 46:22 57:1
  57:4,22 58:7,10
  60:19 61:13,22 64:14
  64:17 65:2,3,13,21
  65:24 66:7,25 79:20
  81:15,20 82:10,22
  83:8 88:8 89:14,19
  89:21 91:12 97:1
  98:9 100:12,14 101:6
Deanna's 29:2 61:17
  65:5 66:2
death 62:12,21 63:2,11
  77:11
Debi 4:24
Debra 1:10 2:9
Defendant 2:13
Defendants 1:15 2:9
defense 70:10
definitely 13:4 95:1
Dell 2:14
Demonic 77:4
denied 95:2,3,7
Department 48:13
  59:20
dependency 42:22,23

75:21 98:24
deposition 1:18 6:14
  20:15 27:5 33:13
  36:24 40:20 46:9
  55:15 70:2 72:18
  73:11,15,18,22 75:2
  98:2 101:18 109:6
depositions 10:6
described 85:20
destroying 25:11
details 79:1
detain 28:3 29:12
detained 60:20 61:3,4
detention 31:5 32:7
  52:4,12 72:5 76:5,6
  82:22 83:2,4,21
  101:7
determined 44:9
Deveney 46:19,21
  47:24 49:7,20 54:17
  56:20 86:5 93:4
Deveney's 87:2
difference 73:17,20
Direct 3:4 4:4
directed 14:13
directing 73:5
directly 12:12,13 53:11
  63:5 83:18
Director 1:10,12
disagree 20:8
disagreed 75:24
discuss 92:6 103:22
discussed 12:1 77:18
discussing 14:3 103:24
discussion 12:8 15:2,17
  20:17 37:7 58:22
  69:18,19 74:11 78:7
  78:11 84:14 91:18
dismissed 87:16
DISTRICT 1:1,1
divulge 93:1
divulged 73:2
doctrine 72:24
document 14:9,17
  37:10
documents 10:5,8
  72:25
doing 23:17 25:13 34:8
  36:21 43:17 96:13
  97:6
dollars 34:13,25,25
  35:6
done 43:14 69:15 88:15
  96:18 97:10,12 103:8
down 21:17 37:15 75:9
  98:13 103:5
DPW 38:21 39:18,24
  49:13 59:24 88:4,14
  103:10 104:6,17
  105:6,20 106:12

108:7,7,20
DPW's 103:15
drop 57:5,19 58:20
duly 4:1
during 8:1 13:23 14:2
  57:10,21 61:22 64:5
  67:18 69:7 72:4
  73:11 76:20 77:12
  92:24 98:24 99:10

**E**

E 2:13 3:1
earlier 45:10 80:17
  104:2
Ed 4:23 24:9 36:18
  42:9,24 43:22
Edmund 2:10
effect 30:7 81:5
either 6:2,12 23:2 25:3
  42:9 72:8
Elizabeth 91:8
employed 44:18
encountered 104:17
encourage 66:20
end 41:18 42:4 74:11
ensure 47:12
entire 89:6,7 90:16
Erie 1:5,5,6,8,10,12,13
  1:14,23 2:2,5,6,6,6,8
  4:23 59:5 69:25
  98:24
especially 44:9,9
Esquire 1:14 2:1,3,7,10
  2:13,13
establish 70:12
et 73:1
evaluations 89:9
even 13:21 16:11 21:12
  28:8 32:7 42:7 43:8
  50:15 53:6 64:24
  83:6 85:15 102:24
  108:11,24
event 72:11
eventually 86:9
ever 19:8 31:20 43:21
  43:24 46:11 48:12
  49:12 56:4,8,19,21
  57:1,5,14,21 58:6,10
  64:22 67:8 76:19,24
  81:15 83:18,20,24
  84:21 85:9,16 87:23
  88:14,20 89:5 91:3
  91:19 92:6 94:24
  95:2,6,7,10 99:1,8
  100:11,14 105:23
  107:15 108:6,19
every 58:16 68:24
  106:22
everybody 45:3 74:7
everybody's 102:1

Everything 43:7
evidence 26:9,17 67:25
  94:16
ex 78:8
exact 30:16 56:25
exactly 35:24 67:4 81:8
  107:21
examination 3:4,7,10
  4:4 92:16 108:3
exception 41:23 50:22
exchanged 29:16
excuse 18:23 19:25
Executive 1:8,11
exhibit 3:13,14,15,16
  3:17,18 10:10 14:10
  14:18 20:15,18 27:5
  33:13,15 36:24 37:1
  40:20,23 41:1 45:20
  46:9 59:7,7,8 60:8
EXHIBITS 3:12
expect 101:9
expenses 35:1
explain 71:6 87:7
Explaining 86:18,19
exploded 68:6
explore 30:13
express 75:18
extent 6:1 62:2
extraneous 63:6
e-mail 81:13
e-mails 29:16,21

**F**

face 84:16 85:5,22
  96:20 103:11 107:17
fact 22:1 60:10
facts 56:25
fair 63:7 78:11
fairly 5:14
faith 69:4
familiar 34:22
family 57:16 94:8,10
fantasy 36:1
far 63:10 100:20 106:5
fast 85:5
father 8:25 9:4 18:3
  42:10 47:21
February 90:6,7,8
Federal 5:23,23
feed 53:12
feedback 45:3
feeding 51:20,25 52:20
  53:9
felt 45:1
Ferguson 1:19,24,25
few 58:25 59:4 64:6
  89:19
fight 22:9 23:21 45:23
fighting 30:11
file 16:18 45:6 49:4,6,7

49:8 88:25 89:5,6,7
filed 9:17 32:22 38:4,10
  38:13,22 39:15,17,25
  40:5,12,17 42:16
  49:19,20 54:18 59:17
  60:11 104:3
files 44:2 95:7
finality 48:9
finally 7:7 83:4
find 17:8 73:4
finding 103:15 104:15
  105:1 108:11 109:1
fine 18:18 22:4 25:9
  27:21
finish 31:25
finished 32:4 37:15
fired 26:22
first 4:1 8:20 11:7 19:2
  21:3,4 41:18,19
  44:17 45:15 50:18
  51:17 62:15 74:14
  79:22 82:21 84:13
  86:10 88:12,18 92:1
  92:5,9 93:16,17
  103:20 106:11,14,17
  108:18
folks 57:2
follow 65:19
following 69:19
follows 4:2
follow-up 59:4 92:14
food 35:8,10,11,21
form 19:18 31:16
forth 93:3
forward 36:1
forwarded 66:3
forwarding 73:15
foster 34:22 52:18 57:16
  57:18,23 58:6 61:4,5
  83:9 85:15
found 104:6,7,17
  106:12
foundation 23:9 26:6
  32:24 54:11 77:2
  95:5 97:21,24 107:12
  107:14,19
four 64:9 86:15 102:11
frame 63:23
free 36:22
Friedman 74:1,3
friendly 88:11
from 5:25 8:6 9:10 11:1
  12:12,13,15 13:7,7,9
  15:4,21 17:9,13,20
  17:22,24 18:1,3,4
  20:12 21:7 22:2,11
  23:22 26:2,4 29:5,9
  34:2 39:18,24 43:17
  45:17,24 48:1,3,13
  51:5 52:7,10,24 53:4

57:18 59:24 64:10,11
64:12 71:15 73:15
75:5 78:3 79:19,22
79:23 80:16 81:20,22
82:7,22 85:18 88:4
88:14 90:25 92:11
93:1,16 94:1 101:9
105:21,22 107:21
**fucking** 93:12
**full** 35:13 47:2
**full-time** 35:15
**further** 3:10 27:3 74:23
108:3
**future** 6:4

———————
G
**gave** 12:15 17:6 18:6,8
18:9 19:4 24:4 26:14
26:17 43:18 54:10
55:9 65:4 88:8 98:9
98:14 101:15
**getting** 25:13 56:15
58:14,15 73:14
**give** 8:3 11:9 17:3,4
37:9 47:23 48:8
55:21 66:10 80:2
99:20
**given** 12:3 16:18,24
20:12 36:9 44:2 47:9
47:17 54:9,17 66:4
72:7,22 73:11 95:2
97:13
**giving** 19:15 42:1 43:6
43:16 44:25 45:5
46:2,7 54:16
**glad** 38:4 39:15 40:17
44:6,7 59:16
**go** 11:19 21:17,25 22:5
22:19 27:3 28:8 42:4
44:5 45:14,15 46:18
52:1,11 56:1 59:16
74:13 77:5,25 83:8,9
83:12 107:10
**goal** 72:10
**goes** 16:2,9,13 18:14
19:22 67:19
**going** 5:13,15,22 6:7,8
6:25 7:1,1,2 10:6
11:18 14:9,17 15:3
15:18 16:15 19:7
21:22 22:1,12 23:8
26:3 28:3,19 29:12
30:6,15 31:20 32:6
33:7 37:11 38:6 40:7
41:15,16 42:5 43:2
45:23 56:17 60:20
61:3 63:6 69:9,22
71:19 80:4,22 83:8
94:19 101:21,23
**gone** 68:23

**gonna** 22:9 23:21
**good** 7:22 34:1,6 69:4
75:13,16
**Gornall** 1:22 2:7
**gotten** 12:9 13:1 35:11
**grab** 37:18,22 39:4
49:2 59:12 85:4,22
95:21 102:19
**grabbed** 51:20 84:15
86:4 96:19 107:16,17
**grabbing** 38:11 47:8
53:23 103:11
**grandmother** 18:5,6
50:9,12 51:7 83:8,22
99:9
**granted** 72:20 73:4
**grounds** 15:19 18:17
**guarantee** 68:15
**guess** 39:14 40:15 45:1
54:7 60:25 65:25
97:9,15,16
**guessing** 53:15 85:24

———————
H
**half** 9:10 90:22
**hallway** 5:21
**handle** 87:14
**handled** 84:22
**handling** 85:17 92:10
**handwriting** 10:11,13
14:11,21 20:19 27:8
33:16 37:2 46:14
**hanging** 15:14
**happen** 50:2
**happened** 11:10 33:3
47:17 51:24 53:10
81:11 85:23 95:14
96:1,3,5,15 98:4,7
**happening** 54:6
**happens** 43:7
**happy** 6:22 23:12
37:18,19 80:13 104:2
**hardly** 34:14,16
**harmed** 47:15,16
**having** 4:1 31:11,17
56:10 81:9 95:2
99:24 100:2,4
**head** 4:19 9:12 10:17
14:8 39:6 62:13,25
65:12 88:6 90:5
104:8
**health** 34:23,24,25
**hear** 50:11 58:6 80:15
**heard** 39:18 89:3 92:1
92:9
**hearing** 10:23 11:12,14
12:7,9,11,16,18 13:1
13:5,11,13,14,20,22
42:14,20,22,23 52:12
72:1,9,10 74:20

**77:10,21 91:4,9**
98:24
**hearings** 10:19 45:2
72:5
**heart** 8:1
**held** 12:8 15:2,17 20:17
23:6 37:7 45:7 46:3
58:22 69:18,19 91:18
93:2 96:10 99:21
**help** 19:9,11 40:3 44:22
44:24 46:6 56:15
89:21 97:7,11 100:12
100:15
**helpful** 59:9
**helping** 44:7
**her** 1:11 7:23 8:1 11:20
12:1,2,4,4,13,22,24
13:19,22,23 15:11,11
15:14,21 16:4 17:3,6
17:8,9 18:16,18,21
18:22,24,25 19:1,4
19:14,24 20:5 22:14
22:20,25 24:2,23,23
25:7 28:3,22,24
29:17 30:5,16 31:11
31:12,17,19,20,25,25
33:2 34:2,3,4,5,7
36:9 37:25 38:16
39:25 40:8 41:12
44:10 47:10,15,17
48:5,21,22 49:2,2,3
49:3,3 50:12 51:7,20
51:25 53:11,12 55:6
55:8 56:11,12,15
60:21 61:1,12,15,16
61:19,20,20 63:17,18
63:20 64:4,6,10,11
64:13,21,24 65:4,5
65:16,24 66:6,8,10
66:13,19,22 67:13
68:14,16 69:10,17
70:21 71:6,11 72:4
73:25 74:25 75:2,2,5
76:9,20,21,21,22,24
77:9 79:16,17 80:17
80:18,18,18 81:3,4
81:10,11,16,21 83:22
84:16 85:4,4,5,5,6,22
85:22,22 86:4,8,12
86:12 87:4,7 89:15
89:25 93:12 94:5
95:21 96:24 97:1,3
98:1,12,17,17,18,18
99:10 100:12,15,15
101:9,11,15 60:11
**herself** 19:5 60:11
**Hey** 21:8 34:1
**highlight** 38:5

**highlighted** 15:4 21:2,3
27:24 33:23 37:12
41:14 44:6 59:14
**highlighting** 21:18
37:16
**highly** 51:9,12
**him** 27:17 31:1 33:10
43:2,3,6,16,18 44:3
48:9 54:17 55:15,21
69:14 84:7 88:7,9
98:12
**himself** 15:12,14 16:1
**history** 47:10
**hold** 47:18 69:3
**Holdnack** 1:25
**home** 28:4 57:18,23
61:4,5 64:11 90:11
90:19,20
**Honor** 71:5,9,24 72:17
73:21 74:1,5
**hoping** 37:20,21,22
39:4 43:11,13 59:12
**horse** 72:13
**hospital** 31:12 51:5
52:7,10,24 53:4
107:11
**Hotline** 49:9
**hour** 76:13 90:22
**house** 81:10,23 82:8,13
91:13 100:22,24
**Huh-uh** 78:14
**Hum-um** 58:9 93:7,9
106:3
**hundred** 34:17,25 35:6
**hung** 15:12,25

———————
I
**idea** 18:12 32:21 34:1
36:1 49:23 55:1 65:7
105:22
**identification** 20:16
27:6 33:14 36:25
40:21 46:10
**identified** 40:11 59:25
60:4,6 62:20
**identify** 10:7 44:1
50:14 106:24
**identity** 39:21
**ignored** 49:7
**impact** 5:19 6:4
**important** 70:9,9 86:13
**impression** 30:17 56:21
56:23 67:5 87:15
99:17 105:12
**impressions** 68:2 73:1
**improve** 74:23
**inappropriately** 84:22
85:17
**Inc** 1:25
**incarcerated** 9:7 38:3

**incident** 84:14,19,20,21
85:12,19 86:3 87:21
87:24 88:16,19 91:20
91:23 92:6,10 93:18
93:22 94:22,25 95:1
95:4,8,12,21 96:1,2
96:13 97:18 98:15
107:8,16
**incidents** 47:10 94:16
**indeed** 40:5,11 53:9
**independent** 18:21
25:14 73:3
**independently** 17:16
**indicate** 105:23
**indicated** 91:4
**indicating** 4:22
**indirectly** 76:15
**individual** 14:14
**individually** 1:7,9,11
1:14
**information** 8:4 15:13
15:20 16:17,24 17:13
17:16 18:7 19:15,19
19:21 20:12 24:4
25:13 26:17 29:9,10
29:11 33:5,8,11 42:2
43:6,16 45:5 46:2
47:23 48:1,3,5,8,9,19
54:9,16 60:9,15 61:1
62:20 63:10 66:1
68:3 69:4 70:13,15
70:23 74:22 75:6,10
81:7 82:22,24 83:1,2
88:8 94:23 95:3
97:13 98:10,14 99:21
101:16 106:25
**informed** 47:7 53:22
**initials** 7:2,4
**injured** 107:9,15
**inquire** 68:11
**instead** 21:21 22:9
23:14 45:22
**instruct** 69:10
**instructing** 63:18,20
65:16 66:19
**instruction** 70:4
**instructions** 73:11
**insurance** 35:7
**intention** 70:15
**interacting** 99:10
**interaction** 64:4 99:2
99:23
**interests** 7:25
**interrogated** 105:13,15
105:20
**interrupted** 26:8
**interview** 67:14 72:22
74:15
**interviewed** 71:17
105:7 108:7,20

interviewing 71:11
interviews 71:23
investigated 47:7 49:13
  53:23 103:10 105:12
  105:13
investigation 48:9,10
  88:12,15,21 105:24
investigator 105:6,21
  106:5,12
invoked 70:22
involuntary 42:21 72:3
involve 6:2
involved 8:9,11 17:17
  71:21 72:2 81:3 97:6
involving 91:20 94:22
irrelevant 19:20 25:15
  36:11 78:5
issue 79:6
issued 4:18
issues 5:18
is's 77:2
Italian 34:19

_____ J _____

J 8:21
Janis 1:19,24
January 90:6
job 35:15 44:10
Jockey 34:10,13,22
  35:14
John 1:13 2:13
Jones 15:23,25 16:4,7
  16:11 17:1,17 18:12
  20:12 36:7,21 62:11
  62:20 63:3,9 65:10
  65:11,14,22 68:12,13
  68:18,18 69:8 70:21
  71:10,21 72:4,25
  73:12,23 75:9,11
  78:8,12 79:14,18
  92:20,22 93:1
Joseph 2:11
Joyal 2:10 3:4,7,10 4:5
  4:23,25 11:20,24
  12:2,5 14:18 16:15
  16:21 17:10,12 18:16
  18:18 19:6,25 20:3,8
  21:24 22:4,17 24:8
  24:11,15,18,20 25:6
  25:9,12,16,18,23
  26:4,12,17,21,24
  27:1,3,7,21 32:2
  34:16 36:12,14,17,20
  37:9 41:1,3 45:10,19
  50:12 58:23 62:10,16
  68:9 69:14 84:3,5
  92:14,17 98:1,5
  101:19,22 102:8
  107:25 108:4 109:3
Joyal's 59:6

Jr 2:10
Judge 20:9 52:5 69:1
  69:20,21,23 70:9
  73:8 74:9,10,11 91:4
  91:7 101:21,23
judgment 69:16
July 41:7,11 46:19 51:1
  51:4 54:21 84:25
  101:3 102:25 103:1
June 7:15,16 20:22
  23:2,3 27:11 29:16
  29:23 30:1 38:9,9,22
  39:11 46:3 63:24
  101:3,7,8
jurisdiction 30:4
just 5:14,20 6:18 7:2
  11:9 13:17 14:18
  19:12,25 20:1 22:13
  23:11 24:1 26:5 31:1
  31:14 32:6 40:10
  42:7,22,23 45:1,1,16
  47:24 50:17 51:22
  52:1,23 54:17 55:19
  61:9 64:24 65:18
  66:5 72:12 75:12
  76:20 77:7,21 79:16
  80:7 84:8 86:9 89:8
  92:9 102:9 107:3,13
  107:25
J.H 52:17,20

_____ K _____

Kazmer 49:21 88:1,9
  88:20
Kazmer's 98:10
keep 22:12 49:24
keeps 88:25
Kelly 91:8
kept 61:19 64:24
kids 7:5,19 18:4,6 28:7
  30:9,10,18 34:3,6,7
  50:10,13,23 58:18
  75:14,17 89:16 97:7
  97:11 107:20
kind 36:19 67:14 94:11
knew 8:1 18:19,20 26:7
  26:10,12 28:17,21
  30:8,18 31:12 38:15
  38:16 56:17 60:24
  62:6 67:10 87:13
  99:24 100:2 101:11
  104:3 107:21 108:11
  108:24
know 4:20,21 5:20 6:22
  7:10,12,18 8:11 9:7,9
  10:18 11:12,15 16:7
  16:11 17:5,11 18:11
  22:5,20 24:13,24,25
  25:24 26:13 28:8,15
  28:19 29:15,24 30:15

30:23 33:7 34:1
  35:12,14 38:13,18
  46:21 49:12,17,18
  51:24 53:3,6,21
  60:10,25 61:6,7,10
  63:10 64:5,12,21
  66:25 67:22 68:1
  73:19 76:21 78:9,19
  80:20 84:4 85:16
  86:1,2 87:20,23
  88:23 92:19,21 93:23
  93:25 94:1,3,15,18
  95:2 97:19 98:6
  99:12 100:21 105:17
  105:18 106:25
knowing 40:3
known 7:14 16:7 78:21
knows 5:24 68:25 69:1
Knox 1:22 2:7
Kopycinski 79:22
  91:19 92:11 93:15,18
  103:25 104:24
  105:16 106:11,18
  108:6,14,17,19

_____ L _____

L 1:19,24
Lack 23:9 107:19
Lane 2:14
Lanzillo 2:7 3:5,8 4:18
  4:22 58:24 59:2,4
  63:14,18,22 65:18
  66:20 67:22 68:6,11
  68:21 69:6,11,23,23
  70:8 71:4 72:14,17
  73:8 74:3,5,9,12 77:6
  80:6,10,15,24 82:16
  102:9,16 107:2,12,19
last 20:25 37:11 54:24
  74:13
late 8:6 14:1 24:8
later 7:20 104:6,11,13
  104:14
law 2:11 17:1 39:21,24
  94:15
lawsuit 5:1,2
lawyer 5:24 10:1,3
  11:20 12:1,4,15,15
  13:7,9 17:8 18:22
  24:4 56:6 65:4 66:8
  66:14,15,17,23 67:3
  67:9,13 68:24 74:15
  76:8,12 78:24 79:2,7
  80:18,19 81:9
lawyers 6:8 20:11
lawyer's 5:11 65:4
leaked 70:12
learn 103:20
learned 77:14
least 76:15

leave 6:21 25:25 28:5
  30:4,7,14,20 57:5,19
  83:20 86:10,16
  101:19
left 56:14 64:17,22
  86:9 89:14
legal 5:18 6:4 25:14
  47:14 56:1
Leslie 21:10,13,14
  22:24 24:2
less 30:12
let 5:20 6:22 12:5 23:11
  30:13 31:25 39:3
  42:10 65:18 68:11
  74:13 97:17 98:13,25
  103:7
letter 10:8,12 11:9,13
  14:24 15:4 20:21
  21:3 22:2,14 24:1
  27:10,15,16,20 33:16
  33:20 37:12 38:17,19
  38:23,24 39:3,11,24
  40:10,23 41:15 45:14
  45:15 46:3,11,18
  51:2 53:18 59:11,14
  59:24 60:9 88:18
  93:3 101:8 103:21,23
  104:2 106:14,16
letters 24:25 26:2,4,10
  31:2 59:8 62:21 84:5
  93:13 96:9,17
letting 36:18
let's 8:6 21:7 27:3,4
  28:10 35:18 42:4
  45:14,14 52:1 63:23
  69:14
Liberty 2:4
Liebel 1:11 2:10 4:24
life 16:12 18:13 20:13
lift 85:4
like 14:4,5 22:23 29:24
  34:7,17 35:14 37:17
  41:25 45:1 47:13
  56:19 57:2 64:13,18
  66:22 67:13 73:13
  75:13,14 76:25 77:9
  77:10,21 78:17 80:15
  81:3 87:11,12 88:6
  88:18 89:9 90:22,23
  93:8 95:3 96:24 97:1
  97:3,4
liked 93:10
likely 10:20 11:16
  13:21 73:9 94:3,4
line 44:10 59:21 74:13
Lisa 38:7 44:9,13,15
  79:22,23 85:18,21,23
  86:1 91:19 92:4,5,11
  93:15,17 94:4,7,20
  94:24 95:2,11,11

103:25 104:24 105:3
  105:16,17,19,23
  106:1,11,22,24 107:8
  107:17 108:6,10,14
  108:16,17,19,23
list 31:22
litigation 71:21,22
little 27:3 71:20 80:22
live 4:9 36:4
living 34:8
LLC 2:14
logical 82:13 104:9
long 7:14 9:11 13:15
  76:11 90:18
look 10:11 20:18 33:15
  37:1,10 40:22 46:24
looks 22:23 29:24
loop 70:11,17
losing 30:15
lost 42:17
lot 15:10
loud 15:5,9 47:6 101:14
Loughney 2:14
love 25:20,20 34:2,5
Lovell 50:3 51:6 52:25
  53:11 85:24
lucky 38:1

_____ M _____

M 8:21 9:4,13 28:3
  29:12 41:10 47:12,15
  49:25 50:9,12,23,25
  51:1,5,19,20,25
  52:20 53:9,21 85:1
  91:11 97:18 98:15,23
  99:9,23 102:24
  107:22
mad 21:20 22:8 23:13
  23:17 45:22
made 47:10 60:4 62:11
  65:20 67:24 71:15,15
  89:10 94:20 99:18
  103:10
mail 38:17 81:10
mainly 66:24
make 13:17 34:6 53:13
  53:14 69:17 76:17,19
  85:6 86:7 87:3
  102:22 108:1
makes 34:5,5
making 34:24 35:17,19
mandated 94:16
many 58:14 64:16,18
  86:14 90:2,13
mark 27:4 45:15
marked 10:6,10 14:10
  20:16 27:6 33:14,15
  36:25 40:21,25 41:1
  45:16,18 46:10 59:7
matter 30:5 63:3

**may** 5:19,25 6:16 10:21
11:25 12:25 14:2,3
15:1,4 16:24 31:1
35:10,11 44:2 58:24
63:17,23 65:6 73:8
77:8 101:3
**maybe** 6:3 12:23,23
34:5,17 37:21 53:15
55:3,3 56:15 58:2
64:9,18,19 67:4 71:6
88:4 89:15 90:23
**ma'am** 40:14
**McLaughlin** 1:22 2:7
69:1,20 74:11
**McNair** 2:1 3:6,9 14:17
18:17,23 19:18 20:9
23:9,12 24:9,12,16
24:19 25:3,22 26:6,9
26:19,23,25 27:1,2
29:20 31:16,25 32:3
32:24 34:15 36:13,18
37:9 39:2 40:7,13,25
41:2 45:12 51:11,13
54:11,13 55:11,13,23
55:24 56:1,4 58:24
60:16 68:8 73:19
77:2,5,7 78:5 79:10
80:13 82:19 92:13
95:5,10,19 96:2 97:8
97:21,24 99:4 101:13
101:17,21,23 102:1
106:7 107:3,6,24
108:13
**McNair's** 55:9 102:18
**mean** 11:1 29:24 30:19
35:13 42:19 53:19
60:6,13 62:3 65:20
75:2 78:19 89:13
100:2
**means** 26:21 42:18
53:24 74:6
**meant** 108:16
**medication** 6:13
**medications** 6:16
**meet** 56:8 79:18
**meeting** 21:19 22:7
23:13 45:21 56:11
67:18 69:7 70:19
75:1 76:11,20 77:12
77:17 78:2,13 92:19
92:24
**meetings** 23:6 45:6
46:3 92:21 93:2,3
96:9
**memorialize** 103:5
**memory** 6:17
**memos** 68:2
**mental** 68:2 72:25
**mention** 30:19 43:24
78:7

**messy** 22:13 24:1
**met** 13:23 79:21,22,23
**Michael** 49:21
**Michelle** 100:7,9
**middle** 41:19 72:3
**might** 6:4,5,5,13 53:15
56:4 64:23 75:6
**Mike** 88:1 98:9
**mind** 60:13
**minute** 65:18 68:6
102:10
**minutes** 76:13 77:17
90:23 92:25 102:12
**mirror** 58:3,5
**mischaracterization**
45:9
**mischaracterizing** 80:5
**Misleads** 54:13
**miss** 5:14,20 9:23 10:1
15:3 17:1 18:19,25
20:8,12 25:12 26:10
28:7 29:17 36:15,21
43:24 58:24 68:7,14
68:15,17,18 69:17
71:11,15 72:14,25
73:20,23 76:17 78:25
82:11,16 85:10,14
86:5 87:9 94:2 95:10
104:7,17 106:18,18
107:25
**misstatement** 23:10
**mistaken** 82:9
**mom** 28:4
**month** 35:3,6,8 55:2
58:12 91:17
**months** 89:3
**more** 8:9,11,12,13
11:16 30:12 34:4,5,6
71:20 88:11 91:4
97:9 102:11 103:9
107:25
**Moser** 2:14
**most** 7:21 10:20 22:10
23:8,22 45:24 94:4
**mother** 9:14 18:1 58:6
83:10,13 85:15
**motion** 72:15,19,20
73:4,9
**mouth** 104:10
**move** 101:19
**moved** 29:6 61:18
79:21 102:4
**moving** 101:17
**much** 8:5 9:11 31:2,19
63:5 77:19 79:1
88:11
**must** 11:15 61:9 84:7,8
**mutual** 98:2
**myself** 65:5

| N |
|---|
**N** 3:1
**name** 4:7,23 5:11 7:11
22:22 40:1 43:24
59:4 82:5 94:5
**named** 10:9,9 44:13
**names** 8:20
**necessary** 75:20
**necessitated** 71:22,23
**need** 6:21 24:20 69:15
**needed** 36:4 42:2
**needs** 74:8
**negative** 19:16 45:4
**neither** 98:3
**nerve** 15:10
**nervous** 42:7
**never** 28:17,21 31:2
86:8 87:13 89:3
90:17 93:10 96:7
99:24 100:2 107:20
**new** 29:14 64:22 89:14
**newborn** 99:3
**newspaper** 43:21
**next** 38:5,6 40:23 42:6
44:5 52:11,15 72:1
99:15 104:16
**nice** 37:17 38:7 44:11
**nice-sized** 41:20,23
**nine** 41:12
**nods** 4:19 9:12 10:17
39:6 62:13,25 65:12
90:5 104:8
**normally** 53:1
**North** 29:6
**Notary** 1:19
**note** 49:24 95:6
**noted** 21:24
**notes** 72:25
**nothing** 54:4 97:16
109:3
**notice** 88:18
**number** 29:3,7 55:10
61:17,19 64:13 65:5
65:6,8,9,10 66:2,4,13
72:21,23 82:10
**numbers** 101:6
**nutshell** 70:9

| O |
|---|
**object** 6:1,7 15:18
18:17 19:18 20:2
21:22 22:1 24:17
25:2 36:11,17,18
69:9 80:4 99:4
**objecting** 36:13,16
**objection** 11:18 16:2,9
16:13 18:14 19:22
21:24 22:15 23:9
24:7 26:3,16 27:19

29:20 31:16 32:24
36:10 39:2 40:6,13
45:8 51:11,13 54:11
63:12 65:15 66:18
67:19 70:4 74:4 77:2
78:5 80:21 84:3 95:5
97:8,21 106:7 107:12
107:14,19
**objectionable** 24:13
**objections** 5:25 73:10
73:18 80:11
**objectives** 75:19
**observe** 90:14 91:15
107:15
**obtain** 75:5
**obviously** 73:23
**occasions** 64:16 90:13
**occur** 19:8 53:1 102:23
**occurred** 95:15 97:18
**OCY** 5:3 16:18,25
44:19 46:4 47:15
56:14 58:2,7 64:10
64:17 70:8,25 72:2
79:4,19,24 80:19
83:17 88:25 95:7
96:6,13
**OCY's** 75:18
**off** 12:8 15:2,17 20:17
21:13 37:7 57:5,19
58:20,22 69:2,18
91:18 97:19,25 98:6
**offer** 14:17
**office** 1:6,12 2:6,11
58:2 64:10 78:3,20
83:24 84:4 90:25
**offices** 1:21
**often** 63:23,24 64:7,16
91:13,15
**oh** 12:25 13:9 20:8
43:15 50:16 52:18
79:22 91:21 93:21
99:19 108:14
**okay** 5:8 6:23,24 7:4,6
7:7,9,10,22 8:6 9:2,4
9:11 10:8,14 11:17
12:25 13:6,10,17
14:9,13,21 15:1,1,9
16:15 20:3 21:2,3,7
21:11,25 22:12 23:2
23:20 24:4 25:1,6,9
26:24 27:2 28:10,22
29:22 31:18 32:4
34:8 35:5 37:1,6,22
37:24 38:22 39:20
40:1,17,22 41:5 42:4
43:15,19 44:5,12
45:14,14,19 46:24
47:20 48:8 49:4,17
50:16 52:1,9 58:6
59:23 61:11 62:6,10

76:2 83:15,20 84:11
84:18,24 85:3 86:16
87:13 88:5,7,14 89:5
89:10,21 90:2,8,11
90:16 91:3,12,15,23
92:1,24 95:14 96:12
97:3 98:9 99:19
100:4,17 101:2,25
102:10,11 103:1,22
106:16,21
**old** 4:11
**once** 64:19 90:22,22
91:14,17
**one** 5:16 7:7 8:25 9:2
10:8 11:4 14:10
25:24 27:4 32:10,14
32:15,16 41:18 45:16
46:6 53:25 58:12,17
59:8 60:13 62:21
67:10 72:21 74:4
81:4,6 82:2 83:18
85:17 88:18,19 91:22
92:5 93:12 96:8 98:3
101:7 102:10 103:24
107:17
**one-way** 58:3
**ongoing** 55:24 71:25
**only** 17:4 30:6,14 37:25
39:5,12 48:18 51:16
51:18 59:13 83:18
88:19 94:1 95:24
96:14 103:24 105:12
**Onorato** 1:13 2:13
**opportunity** 37:9
**opposed** 45:3 106:18
**opposing** 70:16
**orally** 26:18
**order** 19:9,11 24:24
28:16,17 31:5,9,12
31:23 32:7 52:4
57:14 58:12 68:14
82:22 83:2,4,21
101:7,11,16 102:6
**orders** 72:5
**organization** 88:6
94:11
**original** 53:25
**originally** 61:15
**other** 5:19 6:6,8 10:6
10:24 30:9,10,18
42:11 47:10 50:10,13
50:22 51:16,18 52:25
58:3,23 60:3,3,9,11
60:13 64:4 70:14
74:6 79:19,24,24
88:19 89:19 92:19,21
102:8 105:24 106:16
**others** 103:8
**out** 5:21 15:5,9 17:8
47:6 56:22 64:25

67:4 101:13 104:6
Outside 64:3
outstanding 102:6
over 22:6 38:6 42:6
  44:10 77:25 79:12,20
  107:13

## P

P 15:10,14 17:22 21:19
  22:7,10 23:12,21
  28:7 34:2,5 37:18,22
  39:4 45:21,24 47:7
  47:12,13,16 50:4
  53:22 59:12 83:15,18
  107:16
PA 2:2,5,8,12,15
page 3:13,14,15,16,17
  3:18 14:16 20:25
  33:24 37:11 42:4,6
  46:25 47:3
pages 11:7
paid 36:2 91:5
Palattella 42:9,25
  43:22
Pam 86:23 87:1,3
paper 72:19 73:9
paragraph 41:19 47:2
parent 52:18 83:9
parental 9:18
part 21:4 38:5,6 48:3
  62:15 75:1 89:7
parte 78:8
parties 67:24 70:1,15
  70:16
party 5:2,4,5 36:12
  68:22 71:3
paternal 18:5,6 99:9
Patty 34:6
pay 34:4 35:2
paying 36:7,21
PC 1:22 2:7
pending 70:14,25
Penn 2:14
Pennsylvania 1:1,9,20
  1:23
people 44:7,12 97:5
per 58:12
perhaps 73:16 103:8
period 14:2 57:10,21
  72:7 89:20
permanency 72:5,8
  74:20
permissible 78:12
permission 78:3
perpetrator 18:14,19
person 47:13 48:18
  50:18 51:16,17,18
  60:4,7 94:15 96:14
  106:17
personal 16:12 18:13

20:13 47:10 83:25
personnel 1:10 79:24
Pete 4:24
Peter 1:9 2:9
petitions 9:17
Phil 74:1
phone 29:3,7 55:9
  61:19,20 64:6,8,11
  65:6,8 79:20 81:15
  81:22,23,24 82:7,8
  82:14 100:18,21,22
  100:24
phoned 65:5
phrased 80:21
pick 49:2 58:18
picked 57:18
picking 58:8
picture 31:17
Pittsburgh 2:12,15
place 2:14 10:24 11:13
  50:3 51:6 52:25
  53:11 78:13 83:21
  85:25 95:4
placing 6:1
Plaintiff 1:3 2:1 5:5
  70:20
plan 29:18 58:7
planned 96:13
plans 14:5 96:6,7
please 4:7 5:16 6:22 7:8
  15:1 18:24 31:25
  33:25 60:18 86:12
point 25:24 31:7 53:7
  71:4 104:20,22
policy 16:25
portion 21:2 59:14
portions 27:24 41:15
posed 5:15
position 47:18 69:2
  71:1,7,8,9 74:23
positive 39:19 45:2
  50:15 74:20 75:16
  85:24,25 106:20
possession 84:5
possible 13:4
Possibly 43:10,11
potential 71:12
precise 73:10
pregnancy 6:21
pregnant 6:19
preparation 63:3 74:17
  77:21
prepare 68:14 75:2
preparing 72:8,9
presence 80:18
present 47:13 67:16
  69:8 70:1 74:5 92:20
  92:22
press 69:2
presumably 66:2

presume 17:22 74:4
presuming 39:7
pretty 77:19 100:22
prevent 83:7
previous 15:21,22
  33:21
previously 10:6
prior 46:2
prison 9:11
privacy 7:4,5
privilege 6:2,3 11:19
  11:24 15:20 16:3,10
  16:14 17:7 18:15
  19:23 20:1,4,7 22:16
  25:8 36:11,13 63:13
  65:16 66:19 67:20,23
  68:4,5,19,23 69:12
  70:6,23 71:1 72:21
privileged 19:24 56:5
probably 12:20 13:19
  22:10 23:22 33:6
  34:4 35:6 45:24 51:8
  52:8 64:2,18 66:9
  74:20 76:13,15 79:16
  106:22
problem 79:3 80:10
procedural 72:12
Procedure 5:23
procedures 72:3
proceed 75:21
proceeding 5:19 105:7
proceedings 6:4 9:23
  9:25 26:8 42:19
  75:21
product 67:21,23,25
  68:4,20 71:13 72:23
prognostic 31:5
Project 44:17 50:18
  51:17 79:22 93:16,17
protect 7:4 25:7
protected 70:25
Protective 16:25 39:21
proven 47:9
provided 60:14 75:10
provider 100:18,25
providing 70:24
psychological 89:8
public 1:19 19:19,21
  43:13 48:13 59:20
purports 10:8
pursuant 4:15 94:21
pursue 47:14
put 22:9 23:21 26:3
  28:3 31:2 45:23
  53:15,17,17 61:4,4
  104:9
putting 44:10
p.m 109:6
P.W 15:25 23:8 31:8
  32:10,13,23 38:11

46:22 47:23 48:14
  54:10,18 56:19 60:5
  62:12,22 63:2,11,11
  76:14 83:6 84:15,21
  85:3,16 87:13,20,23
  88:23 89:14 91:20
  92:10 93:4,8,10,19
  94:22 95:15 96:18
  97:14,16,19,24 100:6
  102:19 106:13

## Q

question 6:8 15:19
  17:18 19:7 20:1,3
  54:15 62:15 69:5
  80:23 97:17 98:13
  99:1 101:25 102:2
  108:18
questioning 74:13
questions 5:13,15,16
  7:1,8 24:13 41:16
  55:19 56:5 58:23,25
  59:6 62:10,17,19
  70:5,19 75:12 77:20
  89:24 93:1 102:8,11
  102:19 103:9 107:24
Quit 20:9
quote 23:11 41:23
quoted 11:4
quotes 11:1

## R

R 2:10 10:9 11:10
  17:24 23:25 27:16
  39:3 46:15,16 51:2
  53:15,17,17 54:10,16
  83:10,12 84:1,9,11
  96:17 101:8
raise 73:13 74:6
raised 73:10,18 74:4
raising 72:18
rather 28:4 73:2 102:4
reach 64:13
read 15:5,5,9 21:3 22:2
  27:25 33:24 37:14
  41:16 42:5 45:16,20
  47:6,24
real 34:6 85:5,5
really 24:9 26:4 28:21
  37:17 38:4 39:15
  44:7 55:9 69:1
reason 6:12 28:1,2
  51:19 66:3 72:24
reasons 25:24
recall 31:4 33:2 60:19
  62:14,16,24 65:1
  76:8,18 84:24 86:14
  91:3 103:19 107:1
receive 88:14 90:25
received 59:24 82:21

103:23
recited 59:11 62:21
recognize 10:11 14:11
  33:16 46:14 65:8
recollection 12:14,25
  14:2,7 31:14 32:9
  40:4,9 56:10 80:2
  94:24 100:8 103:2
  108:10,23
reconsider 66:20
record 4:7 12:8 15:2,6
  15:17 20:17 26:3
  33:24 37:7 45:17,20
  54:13 58:22 69:18,19
  91:18 103:4 107:14
records 14:4 101:2
Recross-examination
  3:8,9 102:15 107:5
redirect 3:7,10 92:16
  108:3
reference 15:13
references 7:3 10:18
referring 39:8
refresh 40:3,9
regard 71:11 88:15
regarding 10:24 42:14
  60:5 62:11,12,21
  63:2 70:13 76:20
  78:12 79:15 103:16
  105:24
regards 68:18
relate 63:2,15 70:19
related 83:1
relationship 7:22
relay 33:5
release 9:9
released 51:5 52:7,10
  52:11,12,15,24 53:4
  53:7,10
relevance 20:2 22:3
  36:14,16 40:6 99:4
relevancy 18:17 21:23
  26:16 27:19
religion 76:22
remember 13:15 30:16
  31:11 32:17 33:12
  35:24 38:12,15,24,25
  40:15 43:18,25 50:20
  51:24 53:8 56:24,25
  60:17 61:24 66:24
  76:11 77:9,13,14,15
  77:19 79:1,2,5,6 80:8
  80:9,25 81:2,3,8,8
  87:10 90:10 93:5,6
  98:1,23 99:8 103:24
  104:24,24,25 106:1
  106:10
remembers 80:7
rent 35:2
repeat 54:15

repeatedly 70:12
report 11:9 32:22 86:5
  86:7 87:3 94:16,20
reported 1:24 86:1,23
  91:24 93:19
reporter 21:6 26:8
  39:21 40:11 94:16
Reporting 1:25
reports 77:22
represent 4:23 18:23
  24:21 33:21 55:24
  59:5
representation 63:16
  68:18
represented 5:8 9:22
  9:23 11:22 70:3 72:4
  78:8
representing 69:24
represents 4:22
requested 73:1 89:3
requirement 94:21
requirements 5:18
reserve 16:15
reside 9:13
resides 9:14
resolve 73:16 74:2
respect 75:21
respond 86:21
response 11:6 59:6
  62:19 88:17 93:1
  95:17 102:18
rest 60:25
restaurant 34:19
results 88:20 106:25
retain 55:23
retained 77:16
retainer 36:9
reunification 102:4
Rich 59:4 69:14,23
Richard 1:7 2:7,9
Rick 4:24
right 4:25 11:5,24 13:8
  15:7 17:21 19:13
  20:13 23:19 25:1
  26:12 28:10 30:19
  33:20,21,23 35:3
  36:22 37:8 38:11
  39:13,18 41:14 44:16
  45:25 46:7,19 47:22
  48:20 52:2 53:7,20
  54:2,19,20,21 57:12
  59:19 60:23 63:1,4
  65:21 69:21 72:11,20
  74:8 75:1,5,15 79:25
  80:1 84:25 86:23
  93:8,10,12 95:16
  96:6,22 97:5,7 98:21
  101:4 102:22 103:7
  103:13,15 104:4,6
  108:12

rights 9:18 16:15 42:21
risk 6:6
Robitussin 6:18
room 68:7,22,25 70:1
rough 32:15
roughly 85:5 87:13
  92:10 102:20
RPR 1:24
rude 87:10
Rules 5:23
ruling 72:12
R.B 9:4 14:24 20:23
  23:4 27:10 47:20,23

### S

s 2:11 9:4 15:25 34:2
  46:15,16,22 47:16,20
  50:9,12 52:16,17,19
  54:16 62:1,22 63:2
  63:11 71:18 77:11
  83:10,12 97:18 98:15
salary 34:12
same 14:13 24:11 27:19
  29:7 48:25 61:19
  73:10,12 77:19 81:24
  83:2
Sara 2:13
sat 75:9
satanic 76:24
save 73:9
saw 37:18,22 39:4 49:1
  49:2 53:25 54:19
  59:12 83:5 85:4,21
  85:22 86:3 87:7
  93:18,20 95:15,21
  96:14
saying 17:2 20:4 39:11
  40:8 57:15 70:23
  77:9 80:25 81:2
  88:15
says 21:8,18 22:21
  29:21 37:15 38:21
  39:4 40:16,17 41:19
  44:6 53:22 54:4
scared 85:9,14
Scarpitti 5:12,17,20
  9:23 10:1 11:18,22
  11:25 12:3 15:16,18
  16:2,9,13,16,20 17:2
  18:14,20,25 19:2,22
  20:6,8 22:15 24:7
  25:2,7,10,12 36:10
  36:15 45:18 63:12,17
  63:20 65:15 66:18
  67:19 68:10,13 69:9
  69:13,17 70:3,22
  71:6,8,9,24 72:14
  73:20,21 74:1,10
  109:4
schedule 90:24

scheduled 64:3 72:1
Schenker 1:7 2:9 4:24
Schetter 100:7,9
second 33:23 37:14
  46:24 47:2,3
secret 89:1
see 6:19 15:1 19:15
  23:11 38:2,3 43:15
  46:11 47:3,4 57:14
  59:13 72:21,23 80:10
  85:3 89:1,2,16 93:23
seeing 95:7
seeking 56:1
seem 25:10 97:4
seems 13:21 82:13 94:3
  104:9
seen 13:21 39:12 44:2
  46:11 48:21,22 86:19
  95:12
self-incrimination 6:6
Sennett 1:22 2:7
sense 53:13,14
sent 27:10 84:8
sentence 21:4 37:15
separately 70:2
series 70:5
serious 30:17,25
service 1:7,13 2:6 82:1
  100:25
services 17:1 39:21
  90:25
servicing 64:23 89:11
set 71:19 90:24 93:3
several 86:8,13
shake 49:3 85:22 86:4
shakes 14:8
shaking 47:8 53:23
  85:20
sharing 81:7
She'll 109:4
shield 68:3
shit 38:2,3
shook 84:16
short 5:14
shortly 49:25
show 10:7 14:9 15:3
shown 59:6 84:5
side 58:3
signature 10:14 14:16
  14:22 20:25 27:13
  33:18 37:4 109:4
signed 10:9 32:7 41:5
  52:5
significance 25:14
similar 53:21 55:19,21
simple 72:24
simply 60:13 71:16
  87:18
since 7:15 54:21 64:22
sit 31:15 38:25 39:16

99:19 108:22
sitting 74:15
situation 86:18
six 89:15,18
snoop 83:25
social 16:12 18:13
  20:13 94:13 99:22
Solicitor 1:15
some 5:13,17,18,25 6:1
  6:3 10:5,19 21:2
  27:24 31:7 41:15,16
  43:15 55:19 62:10,16
  82:22 84:14 92:14
  98:24,25 99:2,9
  103:8 104:20,22
somehow 70:25
someone 10:9,9 44:13
something 6:13 15:3,6
  30:5 33:23 38:7
  42:14 44:11 48:21,22
  58:13 77:8 78:16,17
  78:20 81:4,9 87:12
  103:7 104:10
sometime 14:1 39:10
  84:25 103:1
somewhat 13:10 30:25
  32:6
somewhere 81:10
son 15:25 48:5 62:12
  62:22 63:2,11 77:11
soon 68:21 104:15
sorry 21:9 22:12,13,17
  23:25 50:11 79:11
  94:9 107:13,17
  108:16
sort 19:16 94:13
Sounds 41:25
source 60:9 62:20 63:9
  63:17
speak 5:17 55:15 66:14
  66:15,17 71:5
speaking 80:11
special 21:15
specific 43:22 61:24
specifically 13:15
  40:15 43:18 62:12
speculation 39:2
spirituality 76:21
spoke 54:24 67:8 79:20
  83:19 95:11 106:2
  107:13
spoken 13:2 16:11
  56:10 108:7
stage 71:19
stamps 35:10,11,21
start 21:7 22:6,6 37:14
  64:20 79:12 90:6
started 21:17 85:7
starting 13:24
starts 27:25 41:18 47:3

State 2:2 4:7
stated 17:3 47:9 71:17
statement 63:1,7 76:19
statements 62:11 67:24
  71:14,15
STATES 1:1
stating 95:7
status 98:25
statute 94:21
statutory 94:21
stay 90:16,18
steal 34:2 78:21
Step 50:18 51:17 93:16
  93:17
stepped 68:7
still 9:7 29:7 36:4 44:18
  64:1 81:24 89:25
  98:20 107:22
stolen 78:16 79:3 80:3
  80:13,19 81:1,3,4,11
stop 28:10 37:19 40:7
  47:20 90:9
stopped 22:5
stories 43:21
strategy 23:7
Street 1:23 2:2,4,8 4:10
strike 79:11 97:17
  98:25
stuff 28:13 54:17 95:14
  95:19 96:12
subject 52:4
subpoena 4:15 81:10
  81:12
subpoenas 78:17,21
  79:3 80:3,14,19 81:1
  81:3,4
subsequently 68:16
sucks 21:11 23:23
  45:25
Sue 21:19 22:7 23:13
  45:21 46:19,21 47:24
  49:7,20 54:16 56:20
  87:2 93:4
suggest 17:7 18:24
suggested 18:19 19:3,5
  28:5 30:3,20
Suite 2:15
summaries 11:2,4,17
  12:6,16 13:1,3,4,12
  13:20,22 14:5 77:23
  89:8
summarize 59:10
summary 10:23 11:5
  12:22,23 69:16
supervise 94:12 97:20
supervised 7:21,21
  57:11,15 58:13
supervising 64:1
supervision 15:11,11
supervisor 46:22,23

81:11 87:2
supposed 57:11 58:12
  89:2
supposedly 98:21
sure 5:24 11:15 13:6,10
  13:17,21 15:16 18:8
  29:24 35:10 38:12,15
  39:16,18 49:19 60:25
  62:16 64:15 67:10
  73:21 79:17 88:24
  91:2,10 94:3 100:22
  102:22 103:24
  104:19 108:1
surrounding 5:18
  72:22
suspect 47:16
Sweetie 21:8
sworn 4:2

—————————
T
table 20:11 74:8
take 10:10 20:9,18
  28:20 31:21,23 33:15
  37:1 40:22 46:24
  71:1 72:13 87:5
taken 1:18 11:13 36:1
  97:19,25 98:6
taking 6:12 58:8 78:13
talk 5:20 8:3,5,15
  15:10 19:12 31:19
  42:8,24 43:2 55:4,8
  55:18 61:23 64:7,10
  66:25,25 67:2 76:5
  76:14 77:22 80:13
  81:16 84:9 88:7
  104:11,11,20 106:17
talked 8:12,13,16 19:13
  21:5,9,10 43:3 61:16
  64:6,12,21 76:8
  84:11 88:1,23 89:19
  96:9 101:8 105:23
  106:1,22
talking 12:18 18:12
  32:17 41:24 42:13
  44:12 53:24 64:24
  66:10 68:13 79:16
  81:6 95:19 96:18
  100:1
talks 22:17
team 24:22
telephone 8:15 28:11
  66:2 100:20 101:3,9
tell 5:16,22 6:7 7:8 8:20
  10:11 12:21 14:10
  16:5 19:1 23:20
  27:16 28:13,22 29:2
  29:8 31:8,20 32:20
  32:22 37:2 38:14
  40:23 56:4,19 57:1
  58:10 60:23 61:6

63:9 66:22 67:2,8,12
67:15 69:3 75:11,24
76:2 78:2,6,22 85:21
87:9 91:19 92:5
93:20,21 94:4,19
95:6 98:20 99:1,8
100:11,14 101:7,15
102:5 105:6,11,14
106:2,4,9 108:6,19
telling 16:21 22:14,20
  24:2,22 25:4 31:12
  32:10,12 33:3 50:21
  62:7,8 65:1 79:2,6
  106:19 108:23
tells 54:5
terminate 9:18 101:17
terminated 26:11
terminating 101:20,22
termination 42:14,21
  72:3 102:4
terms 16:23 18:25
  76:21
testified 4:2 26:5 45:10
  45:12 68:16 102:18
testimony 3:3 55:16
  60:18 63:15 68:16
  72:15 73:3 74:25
  75:3 80:17,21 99:20
  108:22
Thank 36:18 41:2 74:9
  74:10 82:16
Thanks 58:24
their 8:20 70:16 75:19
  75:19
thing 44:5 67:14
  106:14
things 5:19 6:2,4 8:3,4
  11:2 14:3 23:3 27:17
  31:22 32:8 43:8
  75:14 83:7 89:9 97:6
  97:10,12
think 5:1,17 11:7,18,25
  19:8 21:4,7 24:20
  26:25 27:1 42:3 44:4
  44:6,15 45:8 49:11
  50:20,21 52:22 53:2
  56:21,25 57:13 58:2
  58:11,11 59:10,23
  60:3,7 61:15 64:15
  64:21 66:5,9 68:24
  76:9,9,18 77:8,13,24
  78:23 80:4 81:8 82:2
  82:9 83:18 86:5
  89:10 90:22 91:14
  92:8 97:2 98:1,12
  102:24 103:8 104:13
  105:3,4,18 106:11,16
  106:20 107:23
thinking 67:23
third 67:24 68:21

70:14 71:2,3
though 5:22 13:5 47:8
  51:22 64:24 107:21
thought 13:18,18 31:2
  31:3 80:8 108:16
thousand 34:13,24
threat 47:12
threaten 83:20
three 8:17 34:3 44:11
  44:12 51:4,4 58:2
  64:9 86:15 89:3
  100:1 102:24
three-page 22:14 24:1
through 6:12 13:7 52:1
  59:20 66:1 70:14
  72:4 83:25 86:9 94:8
  94:10
Thursday 1:20
Ties 94:8,10
Tim 24:11,15,18
time 8:1 11:21,23 13:16
  13:23 14:2 20:10
  21:12 25:18 28:9
  31:7 32:9 34:9 44:18
  48:12,25 53:1,3,7
  54:24 57:10,21 62:1
  63:23 64:5,22 66:24
  67:10 71:10,24 72:7
  72:7 74:7 76:16,20
  81:13,23 82:1,9,14
  86:10 91:10 92:1,9
  99:15,20 100:23
  102:1 104:16 107:20
times 61:16 64:6,9,9
  86:8,13,14,15 89:20
  90:2
timing 102:23
Timothy 2:1
today 4:15 5:8,13 6:14
  31:15 39:1,16 54:5
  54:25 69:15 73:23
  74:2 84:6 99:19
  100:21 108:22
together 98:3
told 13:18 15:25 16:4
  19:8,9 20:5 22:25
  23:3,6,7,7,15 24:5
  29:8,13 30:23 31:8
  31:22 37:25 38:10
  39:1,17,20 40:4,10
  40:11 43:8 48:13
  51:22 52:23 59:12
  60:7,20 61:3,9 63:1
  65:3,21 66:21 68:17
  75:11 76:2,4 78:25
  80:18,18 83:6,15,17
  85:15 88:9 91:21,23
  92:4 93:2,18,22
  94:24 95:1,11 96:5,7
  96:8,12 98:17,18

99:13 102:3,5 105:3
  105:3,4,8,14 106:11
  108:11
tonight 21:9
topics 73:12
toward 41:18
town 28:5 30:20 64:25
  83:20
transcript 7:2 23:1
  73:15
transported 7:19
treat 102:20
trial 25:19 74:17,19,24
  75:3
tried 49:7 86:5
trouble 72:19
true 27:22 30:3
trust 47:11
try 24:13 52:1 86:7
  97:6,10
trying 28:3 44:22,24
  56:15,24 65:25 89:21
turn 37:11
twice 20:4 64:2,18,19
  90:3,4,11,15
twins 8:23
two 2:11 6:2 8:22,25
  33:21 42:11,14 50:10
  50:13,22 51:5 52:25
  55:2,3 58:1 72:23
  88:12 99:24 102:11
  102:24 104:10
  107:25
two-way 58:5
Tylenol 6:18
type 42:19 43:6 44:24
  95:3
types 46:6 94:13
T-Mobile 82:2,3
  100:17

—————————
U
ultimately 86:16
Um 7:24
Um-hum 35:16 61:8
unborn 27:18 76:6,7
under 39:20,24 42:18
  94:15,21
underlying 68:3
understand 5:16 6:10
  7:7 13:17 15:20
  16:16 17:18 24:21
  52:23 59:23 60:18
  63:14 65:25 73:22
  74:6,21 79:8,14
  102:22 108:1
understanding 8:22
  15:22 18:21 62:1
  72:6 74:16 79:7,13
  105:19

understood 59:19 67:6
  80:16,20 104:1
unfound 103:17
unfounded 103:18,20
  104:7,15,18 105:4,5
  105:9 106:13,15
UNITED 1:1
unless 51:16 68:15
unlikely 51:9,12
unsupervised 57:7
until 21:13 28:17 40:7
  67:10
upset 105:1
use 28:7 74:23 82:11
useful 75:6
using 30:12
usual 54:13

—————————
V
v 1:4 10:9 19:3 25:7
  54:5 68:19
vacation 35:18
Valerio's 34:11,14,18
value 16:23
Vendetti 2:4,4
verbally 106:17
Verizon 100:25
very 24:19 47:17 63:5
  70:9 75:16 87:10
via 61:20 100:21
views 75:18 76:20 79:8
  79:14
violating 26:1 58:7
violation 16:25 72:23
visit 28:7 51:6 52:25
  58:1 90:2,13,16 99:3
  99:10
visitation 57:7,10
visited 90:11,18 99:16
visiting 90:14
visits 7:20,20 8:16,17
  22:11 23:8,22 45:24
  53:1 57:15,22 64:1
  75:13 94:12 97:20
voicemail 86:9,10,17
V.W 1:18 3:3,13,14,15
  3:16,17,18 4:1,8
  20:15 27:5,8 33:13
  36:24 40:20 46:9
  70:2,7

—————————
W
W 5:14 15:3 17:5 37:1
  40:22 58:24 70:2,17
  70:21,24 71:15,18
  72:2 74:14 76:17,21
  77:11 82:16,21 85:10
  85:14 86:3 89:11
  90:2 92:14 103:11
  107:25

wait 42:8,24 65:18
waitress 34:20 35:1
waive 109:4
waived 20:1,4,6
want 5:16,21 13:17
  15:4,9 17:8 18:25
  21:17 24:23 25:23
  35:13 41:14 46:18
  65:13 68:23 69:1
  71:5 92:14 102:22
  104:9 108:1
wanted 22:25 30:18
  61:6,7,9 65:2,2,3,21
  65:23,23 66:5,10,12
  66:13,14,15,25,25
  91:4 99:17 107:13
wants 40:8
warn 28:2 29:11,17
wasn't 30:11,17 36:21
  37:25 61:1,4 64:23
  74:5 81:7 89:20
  104:16 105:1
wasting 20:10 102:1
Watching 58:4
way 12:5 17:4 19:7
  24:12 26:19,19 30:6
  30:12,14 31:1,7
  37:15 39:3 47:12,16
  47:17 72:15 83:6
  97:17 98:14 99:1,9
week 34:4,13,17,25,25
  36:2 55:2 58:17 64:2
  64:19 72:1 91:14
weekday 58:19,20
weekend 58:16,18
weeks 35:18 55:2,3
  56:12 89:15,18
  102:24
Weimer 2:11
welcome 41:3
Welfare 1:7,13 2:6
  48:13 59:20
well 7:5 8:6 10:1 17:10
  19:2,7,25 25:18 26:5
  27:2,17 29:2 30:1,8
  30:13 31:20 38:13,21
  39:3,24 42:18 50:23
  51:19,22 52:1 57:14
  61:2 64:24 65:18
  66:15 67:13 71:2
  72:11,14,17 73:19
  74:2 80:6 81:6,18
  82:11 84:13 94:19
  96:8 97:10 98:1,13
  98:25 100:1 105:14
well-founded 73:6
went 75:13 76:12
were 4:13 11:20 12:18
  17:10,17 23:6,17
  30:5,14,16 31:20

34:8,20,24 35:1,11
35:17,19,21,23 36:7
36:21 40:17 41:24
42:13 43:2,11,16,21
44:12,24,25 45:7
52:9,20 55:23 56:5
57:15,16,21 58:14
59:16 62:3,3,3,4
67:16 71:17 72:7,9
73:10 77:20 89:17
92:19,21 96:9,14
97:5,10 99:10 103:15
104:2 107:21
weren't 92:22
West 1:22 2:8 4:10
WESTERN 1:1
we'll 6:22 25:22 74:6
  80:13 103:8
we're 6:25 71:14 72:17
  92:9 100:1
while 21:5,10 35:22,23
  47:16 57:22 71:17
  77:15 99:11
whole 43:3 64:21 86:18
William 2:14
willing 67:6
wish 24:11
wished 39:12
witness 4:19 9:12 10:17
  14:8 15:15 21:6
  24:14 26:18 37:13,25
  39:5,6,13 40:24 47:1
  48:22 50:14 56:18
  59:13 62:13,25 63:14
  65:12 70:11,17 71:12
  73:3 80:16 84:18,21
  85:19 90:5 94:2
  102:13 104:8 107:13
witnessed 54:6 84:15
  85:16,18 88:10 91:22
  91:24 95:24 102:19
  107:8,18
witnesses 45:2
worded 31:1
words 30:12,16 104:10
work 21:12 35:13
  67:20,23,24 68:4,20
  71:13 72:23 94:7
  98:3
worked 35:17
worker 19:12,13,16
  44:15,17 57:4 94:13
  99:22 100:5,5
worker's 16:12 18:13
  20:13
working 21:20 22:8
  23:14 34:10 35:23
  45:22 63:4
works 26:20
wouldn't 28:8 39:12

50:23
write 103:4
writing 14:12 22:13
  23:25 33:17 46:3
written 10:9 20:23 41:7
  43:21 96:17
wrong 43:14,17 53:15
  60:19
wrote 11:9,13 14:24
  15:6 22:13 23:4,12
  23:25 24:1 27:16
  39:11 40:23 47:24
  51:2

**X**

X 3:1

**Y**

yanking 85:20
yeah 5:5 6:11 7:24 8:2
  8:8 10:15,22 11:3,8
  12:17 13:9 15:24
  23:5 24:3,6 25:17
  27:12 28:25 30:2,22
  32:19 33:6,17,22
  35:20 38:3 39:14
  40:2,19 43:1 46:5,8
  48:6 53:13 54:3 62:9
  62:18 63:8 67:7,17
  74:25 77:24 78:23
  79:5 80:9,15 82:12
  89:19 90:21 96:11
  101:5 102:13 104:22
  105:3 108:15
year 35:18,19
years 9:10
yell 49:3 85:5
yelled 51:20 84:16
yelling 47:8 53:23
  85:21
yesterday 17:10 41:21
  54:5
Youth 1:6,12 2:6 78:4
  78:20 83:25 84:4
  91:1

**$**

$500 34:4 36:2

**0**

04 84:25
05-76E 1:4

**1**

1 3:13 20:15,18 45:18
  45:20
1:00 53:2,3
10th 1:23 2:8
10-year-old 15:11,14
10:30 21:13

102 3:8
107 3:9
108 3:10
12:17 109:6
120 1:22 2:8
13 10:10
14 9:10
15 14:10,19
15th 41:7
15219 2:12,15
16501 1:23 2:2,8
16509 2:5
179 10:59 59:9
1706 4:10

**2**

2 3:14 27:4,5,8
20 3:13 90:23
2003 7:15,16 8:7 13:24
  14:1
2004 8:7 10:18,20,21
  14:3 15:4 20:22 23:2
  23:3 27:11 38:9,10
  41:7 46:19 54:21
  63:24 65:6 103:1
2006 1:21
21st 10:21 14:2 15:4
  38:22
22nd 38:9,9,23 39:11
24 4:12
250 35:2
27 3:14

**3**

3 3:15 33:13,16
3rd 20:22 23:2,3 46:3
  51:2
33 3:15
350 35:8
36 3:16
3700 2:15
3820 2:4

**4**

4 3:4,16 36:24 37:2
  59:7 60:8
4th 29:16 30:1
40 3:17
45 76:13 77:17 92:25
46 3:18

**5**

5 3:17 40:20 41:1
5th 27:11 29:23 101:8
5/21 10:16
50,000 35:19
525 2:14
59 3:5

**6**

6 1:21 3:18 46:9
6th 41:11 51:3,4 52:2
  52:24 102:25
6/3 45:15,17

**7**

7th 52:8,13,14

**8**

8th 4:10 52:8,9,16,21
  52:25
814-868-8541 65:8
82 3:6
821 2:2

**9**

9th 46:19 51:1 54:21
9/14/81 4:14
9:49 1:21
92 3:7
975 2:11

6-3-04

<u>Bob</u>

Hey sweetie. Sorry about tonight. I talked to Abby for awhile then talked to Leslie, I actually didn't even get to work on time, I didn't get off w/ Leslie till almost 10:30. Sorry, I hope thats what you thought was going on. You better not get mad either because I shouldn't even have to be getting collect calls from you at certain times... You should be sitting right next to me while I talk to these people & always know whats going on... bastard. Anyways, Abby said that Patty & Sue had a meeting about me and that she's real because theyre working against me instead of for me and that theyre gonna put us a fight against me, and that Patty will probably be at most of my visits from now on, so that sucks. Sorry my writing's messy but I just wrote a 3 page letter to my atty, telling her what Abby, Pat & Leslie all said. & I told her I wanted to buy a copy of the court transcript.

DEPOSITION
EXHIBIT

VW #1

Deposition Exhibit
Conley 14
Debi LaGamba, RPR
Wordz R Us

I told Leslie that your driver debt was almost 10 years old & that you paid it. So I'm not in any danger. Thankfully she believes me, that was her main issue. Oh - heres Beth's schedule Sun - 6/16 2pm-8pm Mon 6/17: 11am-5pm Tue 6/18 11am-5pm Thur 6/10: 5pm-1630pm, thats it & goes until the following monday, so if I make it that far, I'll give you the new schedule then.

I should probably call my mom she called me like a week ago & asked me to call her every day until I have the baby because she worries about me. She said she would send some money from her check because she'll probably have to take a cab to St Vincent.

Oh - Leslie said too that sh thinks D & J will be sent to Florida, but she doesn't think it'd take long for me to get them back from him, as long as I stayed out of trouble & did everything right, so thats good.

I'm really surprised Chris didn't get sent to jail today. He was the only one out of

like to that ordeal. Even he got a 12 month sentence but so suspended until he loses his job. Do you know Ed Bruce? He was already in jail & got a 12 month sentence for non-payment of support. & He came in chains & handcuffs.

You know if I'm getting any type of assistance, y'all have to pay support to them right? Chris owes me $3800 but he really owes it to Welfare, so I'll never see it. Hell go to pay back everything they're ever given me for our kids.

I can't wait to have our daughter. I'm getting so antsy. I know it'll be soon, but its so hard being pregnant, & I want to be able to tan, run, exercise etc... & wear my normal clothes. Plus in anxious to see what CC4 does about her.

Oops... its tomorrow & time to go to work, the mail man is coming. Jerry theres no real end to this letter I'll talk to you tonight. Love you
Nola

like dad I was last summer, I was
never like that before. My kids were
just taken about a month before we
met. I dont want to get back into
it - I become an alcoholic pretty easily.
I dont know why... neither of my
parents drink. I'll have too much time
on my hands. Its nice to be able to
work alot but I'm getting bored w/
sitting up in this bitch all day every
day, but sitting home alone alot worse.
Its boring and depressing... Theres
nothing to do here alone. I hate to
plus all of the pictures of you & the
kids depress me. I'm doing good
money-wise but whats the point?
I dont spend any $ on bills, I am
building a nice bank account but it
just is starting to seem like pointless
numbers. If I keep up at this rate,
I'm hoping to have 10-15 g's by the
time I leave. That may seem like
alot of money, but its not enough for
anything significant. Its not really
enough to buy a house. All I'll really
need is about 2 g's for an apartment.
Whats the point of paying the rent?
Hopefully I can find a job over there
making as much as I do here. But
working less. If thats the case & I

Can you smell it?

can keep sending money + help from
you, maybe I can buy a house in
5 or 10 years.... I can look into
land contracts but nothing else seems
to go right for me.

The poster about Cory, I don't know
what to do, stay or leave + I'm
really running out of time. I need
to talk to Amy. I don't know
why I wrote all of this shit
because it'll probably be after
our visit that you get this.
Well.

Hey. I'm in a bad mood, don't
know why. An old friend of mine
was a drunk driver + killed a 6
month old baby, Demi. He's in
the paper. I went to your moms
today, then worked 2-2. Today
was payday. I paid my rent + car
insurance, and I got an extra bill for
Julian's braces. I got your message,
so I guess I'll talk to you in the
Am. Love you
                    Vicki

DEPOSITION EXHIBIT

V.W. #2

Deposition Exhibit
Conley 1
Debi LaGamba, RPR
Wordz R Us



Bob                                                                    6-5-04

Hey Dana.. I wish I would have
told you to call me in the AM one
of these days but I didn't know..
The reason Deanne called me is
to warn me that they're gonna detain
Makkenzie, and they're trying to put her
in a foster home rather than with
your mom. She actually suggested I
leave town and have the baby, but
if I miss a visit w/ my kids, Patty
will use that as abandonment, so I
wouldn't even know where to go, or
how to time it. I want to talk w/
Amy Bob & ask her if she's confident
enough to get her returned to me, or
if I should leave town & what my
Consequences would be. I'm not supposed
to know that, Deanne told me, so I
can't say who told me. I told your
mom & she said just stay here &
continue my fight, but I really don't
want my baby in foster care. Deanne said
too that newborns are harder to get
back because the foster parents often
fight to keep them. Well, Deanne
said that they're doing me wrong &
that she wants to be at my next hearing
& testify for me. She said she'll be in
Erie in July & August, and anyway

She can help me she will. I wish you
were out here, I wouldn't even have
to go through any of this shit. I
swear I can't take much more of
this shit - They're gonna make me fucking
crazy. I've been having some pretty
crazy thoughts too, violent ones. They're
gonna make me lose my mind.

Deanna also gave me the # for
"Western Region", to the top of the
our chain, & the name of the guy to
complain to, so I'll try to call her Monday.
There's just so much shit now... like
it's such a long story I don't even
feel like going through it all.

Oh yeah - Deanna gave me her address
in Charlotte. She wanted to see
all of my court papers, so this
morning I went to Kinkos & copied
everything, then fed-exed them
to her house. She'll get them Monday
morning, I'll call her Tuesday night, after
our visit, & see what she says. She
said she wanted to read everything
& tell me what she thought they were
going to do or trying to do.

I wish I could have a fucking drink.
I don't even want to get back into
it, but I know this whole gonna
happen if I have no kids. You see

Can you smell it?

can keep sending money + help from you, maybe I can buy a house in 5 or 10 years.... I can look into land contracts but nothing ever seems to go right for me

I'm pissed about OCF, I don't know what to do, stay or leave & I'm really running out of time. I need to talk to Amy. & I don't know why I wrote all of this shit because it'll probably be after our visit that you get this.

G-G.

hey. I'm in a bad mood, don't know why. An old friend of mine was a drunk driver & killed a 6 month old baby, Demi. He's in the paper. I went to your moms today, then worked 2-2. Today was payday. I paid my rent & car insurance, and got an extra bill for Julians braces. I got slam message, so I guess I'll talk to you in the am. Love you

Victori

the way I was last summer, I was never like that before. My kids were just taken about a month before we met. I don't want to get back into it - I become an alcoholic pretty easily. I don't know why... neither of my parents drink. I'll have too much time on my hands. Its nice to be able to work alot but I'm getting bored w/ sitting up in this bitch all day every days, but sitting home alone's alot worse. Its boring and depressing... There's nothing to do here alone. I hate to plus all of the pictures of you & the kids depress me. I'm doing good money-wise but what's the point? I don't spend any but on bills, I am building a nice bank account but it just is starting to seem like pointless numbers. If I keep up at this rate, I'm hoping to have 10-15 g's by the time I leave. That may seem like alot of money, but it's not enough for anything significant. Its not really enough to buy a house. All I'll really need is about 2g's for an apartment. What's the point of having the rest? Hopefully I can find a job over there making as much as I do here but working less. If that's the case & I

Ron                                                          6-16

Time to have fun for you tonight! I'm
glad I got a lot of sleep on 2nd. I
got to be efficient at 7. I'll have to get
up at like 7:00. Did I tell you about
how my dad shattered my dreams yesterday?
He said the salary for a paralegal is
26,000/year. I don't think this is
enough for me to be happy with. Thats about
1/2 what I make now, and I feel like
I don't make enough now. Well my goal
was always to make $1000 in a week, and
I'm _____ $15 to go! This made
that this has been my best week in
years and I'm 9 mos pregnant. If
I get 1 more customer, I'll get it.
    I just wrote my lawyer a 2 page
letter. I told her all the updates.
    I gave Des this schedule:
Wed - 3rd, Thur 1st & 3rd, Fri 1st & 3rd,
Sat - any, Sun 1st. She said she
would probably be fine with. I'll have to
give it to your mom too.
    If the baby is delivered, I'll just
continue working 36 hours/wk. I guess
that's a silver lining on
my grey cloud, a very dull silver
lining... and not fun, my other
fun cloud.



V.W. #3

Deposition Exhibit
Conley 16
Debi LaGamba, RPR
Wordz R Us

im still pissed about Patty squeezing
Deshais Face. Thats one shit she
call Children Services about, but you
cant when it is children services,
its fucked up. Me & my crew
may be staking her out this summer.
Im going to tell Chris what she did &
if he doesnt do Omething about it
ill tell him hes a bitch & a pussy.
Hey, I came up w/ a good idea
you know what I'd love to do? –
Steal Patty's case aide (Abby) from
her & have her be my bodyguard.
I f , I had all I need, I could
pay her about 500/wk, thats
probably more than she makes, &
maybe more than Patty makes. I'd
I'd love for her to make more than Patty.
Shes real good w/ kids too, my kids
like her & she likes working for ccy.
Wat do you think? Its just a thought
you dont have any I say anything…
today, they the symbol said "OK"
when you see that? It was clear
as day. I gotta go, bedtime
soon. I'll write to you tomoro nite
I ♡ U

E♡ U♥

6·22

Rob,

You looked nice tonight, you were so sweet too. They better not shut my fucking phone off after I just paid 350 on it this week. At least I'm caught up now, that's alot of stress of my back.

I feel so much better too. Those pills are little miracles, I can't believe a little pill could be so effective. I was sick as hell today until this morning. I've had a shity 1st half of the week at work too — thanks Med Pros. I'm only at 465 for the week. I guess it's not too bad, I still got 2 days left, but I doubt I'll end up over 500. The good thing is that I paid all of my bills for June. I just paid gas & electric today. I have 520 in bills due the 1st week of July, and you know our baby's coming soon, so I'll have to budget a little.

I'm going to try & find time tomorrow to go the bank & talk to someone. They better give me my fucking interest. That 1% would add up nicely. Hey, I can't get audited at whatever can I, by not being on payroll?

DEPOSITION
EXHIBIT

V. W. #4

Deposition Exhibit
Conley 17
Debi LaGamba, RPR
Wordz R Us

OK - make that 735 for the week...
sorry. I'll stop promise. Look - At least
I'm not fucking w/ anyone. Wouldn't that
bother you more? You never see the
positives, Mr. Negativity. & (thats
a period at low self esteem, its under
the line - sorry - that was dumb.

Hey, sometimes when I'm sleeping,
I wake up real quick short of
breath, or my heart will pound like
once, really hard & I'll jump in
my sleep & instantly wake up whats
~~this fine?~~ You don't think I'll
die or something, do you?

& Sorry my job stresses you out
but I'm addicted to money &
have expensive taste. I think its
the way my parents raised me &
its probably too late to change. This
is also the first time ever I've
lived alone & paid 100% of rent &
bills & for being - & I was pregnant,
I'm pretty proud of myself.

And you, my love, have cost
me an awful lot of money since
we've been together, so I'm
hoping you'll pay it back while you're
locked up. You better, cuz I'm
still mad.

I wrote my lawyer a letter too,
I'll drop it off tomorrow. I
really like Abby, she's nice. She
said she was hoping I saw Patty
grab Destini too so she wasn't the
only witness. I told her I'm lucky
I didn't see that shit or I'd
be incarcerated of a assault. I'm
really glad Abby filed a complaint.
After this is all over with, I'm
going to get something nice for Abby,
Deanna & Lisa. I'll have to think
of something appropriate, like gift
certificates or something. Something
nice though, like $100 value each, at
least. they all deserve it.
I can't wait for my next hearing. I
hope it will go real well and Deanna
Abby & Lisa be there for testimony.
OK sweetie - it's 4 am - time
to go home, I'm gonna actually
go to Giant Eagle & get lunch
for the kids tomorrow. I'm
sending Dee's newborn picture &
10 week picture. Send them
back ok? Oh - I'll send the
9 month one too. I'll talk to
you tomorrow. I ♥ you -

♥ Vicki

<u>Rob,</u>                                                                7.15

Oops - sorry your pictures will be a
day late... I was going to send them
out this morning but I was tired... I
slept until 10:15. I'll send ya a money
order on Sun - ya know we been
sitting up in here alot, my checks at
over 500, & I still got 4½ hours left.
I showed Lee Mackenzie's pictures. He
said she's beautiful. He said she looks
like ya. I can't wait to go to court,
I'm nervous that it won't go well, but
I'm also anxious, & I'll have alot going
for me. Abby said I have "a nice sized
army" - She asked me yesterday.
Tia was here yesterday, Kristy told her
when I was having the baby. I guess
she told Kent Williams to tell ya
congratulations on your baby girl.
I sent letters out today to Dr. Stede
& my atty. I don't think they will
get away w/ terminating my rights,
I'm just nervous about it, but they
couldn't even get aggravated circumstances


DEPOSITION EXHIBIT

V.W. #5


Deposition Exhibit
Conley 18
Debi LaGamba, RPR
Wordz R Us

or Chris. I can't wait to talk to
Ed Polcella either.

I got your message, I'm glad
Makenzee will see you Tuesday. Your
mom will probably have to take her.
I'm glad these people are really helping
me, they certainly don't have to do it
but they are. Abby, Dianne & Lisa,
especially, Abby, she's putting her job
on the line. After all this is over I'll
have to do something nice for the 3
of them. Even Lisa from CB, when we
had the group meeting & Patty was being
so negative, she looked shocked at the
way she was acting, but after everyone
left it was just me & her, she
had me sign a release of information
for my lawyer, I think my lawyer
wants to subpoena her too. I hope Patty &
Sue go down for all of this bullshit. Full
with me, I'll take a "maternity leave"
until the kids come home - which they
can't get me for any support while I'm
on maternity leave. I'm entitled to
a year if I want, especially while

in breastfeeding. I'll breastfeed for a
while if I could. how can
I breastress on anything like that if I
gotta pump every 3 hours. I knew
theyre pissed to that I got my
support adjusted from 800 to 350,
now its stopped. I really hope the
Judge sees that theres something wrong
with this picture. Im so glad that
I was able to hire a lawyer, or I'd
be fucked. Mary called me today, she
said that the Judge is going to get tired
of all of these different people coming &
testifying against Dey. I hope Maddenzie
comes home on the 12th. Id like to
have her while shes still a little peanut,
ya know? Buds baby is 16 weeks old &
she is so big already. They grow so
fast. Well gotta go... talk to you soon

                              love ya

                              Lisa

DEPOSITION
EXHIBIT

V. W. #6

RECEIVED
JUL 1 2 2004
Office of Children & Youth
ERIE, PENNSYLVANIA

Deposition Exhibit
Conley 19
Debi LaGamba, RPR
Wordz R Us

Ms. Deveney,                                    9 July 04

I am writing this letter to you with some
questions that I have regarding my daughter,
MaKenzie, and her being detained.

Vicki was informed by you that she would
be allowed to see our daughter on a daily
basis. However, Patti has reduced those visits
to Mondays, Wednesdays, and Fridays. Why was
she able to do that if you, her supervisor, stated
Vicki is allowed to see MaKenzie daily?

I would like you to know that I will be
unable to have MaKenzie visit me here at the
jail until the Commonwealth issues her birth
certificate. The jail's policy is that they need
proof that she is my child, as they would for
any person who is confined here. In the mean-
time, I intend to write letters, draw pictures,
send cards, and send photos to Ms. Wozniak to
give to MaKenzie. I have also informed Patti
of my intention to do this in a letter dated
July 9, 2004.

Ms. Deveney, I am very upset with how my
daughter's detention was handled. Patti informed
Vicki that she would call Vicki when our
daughter was with my cousin. However, Patti
did not call Vicki until the following day.
For over 12 hours we had absolutely no knowl-
edge of where MaKenzie was. Patti did not

have the common courtesy to call Vicki and let her know that our daughter was safe and where she was supposed to be. I hope this is not a reflection of the proffessionalism of OCY as a whole.

I have obtained legal counsel and all correspondence that I send to Patti and to you will be copied and sent to my attorney as well as copied for my own records. Any correspondence sent to me by you, Patti, or OCY will likewise be copied and filed accordingly.

I was also informed that Patti was investigated for grabbing, shaking, and yelling at Destini. Though your agency stated these allegations could not be proven, given her personal history and other incidents I have been made aware of, I trust you and your agency will do all that you can to ensure that Patti is not a threat to Makkenzie in anyway. I would like another person to be present with Patti at anytime that she is alone with my daughter. I will pursue all legal avenues against her, you, and OCY if Makkenzie is harmed in anyway, while in Patti's care, or if I suspect she has been harmed in anyway. Given what happened to her child, I am very confused as to how she is allowed to hold the position that she has now.

Ms. Deveney, I was also informed that Mak-Kenzie was seen by a visiting nurse. I have informed Patti by letter and voicemail that I want to be notified each and every time that MakKenzie is seen by a doctor or receives any medical attention. I also want to know the nature of each visit and what, if anything, is done to MakKenzie at each visit.

At this time, I would like to thank you for reading my letter. Thank you.

Sincerely,

Robert M. Beer

_Bob_                                                    5-21

I hope you're feeling a little better today. I wish our conversation yesterday would have been a little better but we were both in low spirits, but we had right to be. I'm a little worried too. My lawyer said not to be discouraged but it's easier said then done. She seemed fairly confident so I hope she can help me. There is a good point I'm going to bring up to her ... No one really had much negative to say about my ability to care for Destini. If I could get Destini returned to my custody, my dad may take Julian and Mallenzie. I'll ask my atty about that. Another point is that in the court summaries, Pattys is the only one who said all negative things. Abbys was kind of neutral, and Lisa (from 1st step) & Sue (the visiting nurse) were positive. Dr. Von Korff was more negative then positive, but he suggested I just need some therapy and classes, not that I was hopeless like Pattys impression gave. I went through all of the court summaries and highlighted everything that was a lie or that I disagreed with.

Here, I'm going to write you some of the ~~exact~~ words from their court ~~status~~. summaries...

Deposition Exhibit
_Conley 13_
Debi LaGamba, RPR
Wordz R Us

<u>Dr. VanKaff's bonding assessment</u>

- "Concerns in this case centered upon Victoria's ability to "fully understand how her actions have affected her children"

- I used drawing to "dominate the start of the session" - he generally considers it an ill-chosen activity that reflects an attempt to artificially bridge the gap in contact with the children

- Julian was allowed to roam about the playroom more or less unattended

- Victoria was attentive to Julian in the sense that she watched after his safety.

- The examiners reports focused on the apparent impasse in Victoria's relationship with Julian.

- The children's removal aggravated the situation (my bind with Julian)

- (1) present as an emotionally flat, inexperienced and poorly attuned mother of two

- At this point in time, the relationship (with Julian) is in some difficulty. (1) had scant involvement with Julian prior to his placement

- The situation is quite a bit better for Destini, who had a better start with mother and who is currently in the midst of her verbal explosion. This is an ideal child-partner for an emotionally stiff, physically aloof, and hyper-verbal mother. Destini's exuberance is sufficiently high and self-sustaining that (my) sedate and unexpressive manner does not pose an obstacle for her.

- The examiner is not clear whether (I) would be able to satisfy admission requirements. (I) certainly believes that (I) could
- The interpretation of failure to thrive leads (me) to argue that (my) children - like (me) - are simply on the small end of the scale. "In fact, Victoria who is small and, even in her second trimester, quite thin - claimed to be even smaller than Destiny during her own infancy."
- The doctor reportedly did not say anything negative about (my) food diary (for Destiny)
- Despite a reported history of having been deceived, threatened and abused (?) (I) maintained more than the minimal degree of involvement with Mr. Basham
- (I) denied any residual hostility toward Chris. (I) was prepared to see his behavior as a function of his immaturity at the time. (I) seemed unconcerned about his potential for future violence
- (Dr. Unkoff) proposed that (I) might have taken a more strict line with respect to his contacts with the children.
- (my) subsequent intimate relationships show (me) gravitating toward conduct disordered and emotionally troubled young men.
- MMPI-2 indicates noteworthy characterological problems. Test results suggest a

over-controlled, and highly anxious. They ~~depict~~ depict a person who is an uninhibited and verbally facile individual who is willful and reluctant to admit errors; an individual who tends to be perceived by others as unfriendly, aloof, or uninvolved. Results suggesting significant problems with anxiety and physical symptoms were denied. (Mg) interest in the test results was tepid at best. (Mg) manner remained opaque...

(His) attention is most drawn to 2 seemingly interrelated sets of findings. The first is a tendency toward pronounced self-confidence and single mindedness. The second is emotional constriction. For (me), purpose and drive appear to take shape within a particularly insulated system, one in which emotional experience is narrow and attenuated. Lack of emotional investment lends itself to an exaggerated sense of self-assurance, enabling relative calm through times of crisis. Evidence of this type is offset by a lack of empathy and a failure to appreciate emotional nuance. It is very hard to reach or influence this type of individual.

(1) presented as an emotionally remote young woman who accommodated to the demands of the evaluation. (Mg) manner, though obliging, was strongly mechanical. In the kindest of terms, (1) might be described as

- (my) relationship with Julian will probably improve when he arrives at Destiny's age and his own period of intense verbal activity. It would be well to work with (one) in the meanwhile to improve the foundation of the relationship.

## Abby's court summary

- (I) appear to be happy when (I) see my children, (I) often smile, hug and kiss Destiny & Julian when they arrive or depart from visits.

- (I) brought both children an Easter gift & candy at the April visit; (I) have also brought snacks for the children to eat during visits.

- There have been numerous times that Julian will walk off and get into things while (I) am oblivious of his location or predicament.

- During the visit that occured on 5/12, there was a significant difference in (my) conduct and parenting performance. (I) was appropriate, followed both children's cues throughout the entire duration of the visit. (I) also intervened several times in regards to the safety of (my) children, i.e. asking children to sit in the chair vs standing in the chair. The conversion of appropriate parenting in this visit compared to the 8 prior supervised visits was notable.

- (I) need some improvement on (my) parenting skills
- (I) should be encouraged to divide (my) time evenly between the 2 children during visits.
- (I) am without emotion and say very little to children on this side during visits

        Sue Carlonos NCAST assessment
              (visiting nurse)

- As per this assessment (I) am able to read and respond to John's needs without difficulty.
- there are no areas that (I) am grossly deficient in.
- My scores were not more than 1 standard deviation from the mean
        Dr Von Kaff's Psychological Eval.
- It was noted that (my) lifestyle appeared "unstable" at the time of referral. Mr Bosher had been reincarcerated(?), and I appeared to have no clear means for maintaining housing(?)
- (I) am a petite young woman who presented as an emotionally flat and detached manner. (I) had a sterile quality that gave the immediate impression of either an uncommonly remote or calculating individual. . . . (my) tone was deadpan and strangely casual.
- (my) long range goals appeared loosely conceived and possibly unrealistic. They include attending a particular law school in Ft Myers

- (Abby) need to intervene to assure his safety
- (I) have no foresight to potential risk factors and lack parental insight and parenting skills and the ability to interact at their levels. Even with pointers and suggestions (I) seem unable to parent both of these children at the same time.
- On the May 5th visit (I) kept asking "whose birthday is tomorrow?" to Destini. (I) brought no gifts, no cake, or birthday card for her.
- (I) did bring Jello cups, breakfast bars, & airheads for their snack. The visit was from 1030 & 1245. No lunch was provided by (me) for (my) children.
- These visits do not seem mutually beneficial for all involved.
- (I) am to attend the Womens Care Center parenting course. (I) have not begun this as of this date, nor have I completed it.
- (I) kept stating that (I) was leaving for Florida, to go to school, and leaving (my) children here. (I) then stated that (I) was staying here. (I) fluctuate between staying and leaving. I have an unrealistic view of the situation that caused (my) children to be placed and take no responsibility for their placement.

- Recently the referral (Family Tied) was made as (I) agreed to stay in Erie & wait to see if they are returned to (me) or sent to (my) father, prior to relocating to Florida. (I) expect to start school in Florida in the Fall, but (I) have not yet applied to the school.
- ~~the~~ (Patty) has attempted to closely monitor this case due to (my) pregnancy and (four) involvement in bank robbery, however (I) am very closed and guarded with (Patty) this worker.
- (D & J) would not be safe if returned to (me) or (Chris). (Chris) ~~hasn't been involved since the~~ last hearing. (I) am not attuned to (my) children's needs and supervision.
- (My) bond with Julian is poor. (I) tend to ignore him and his actions
- (I) do not seem able to care for these children consistently.
- (I) minimize the criminal involvement of (my) males both (Chris) and (four) were involved in robberies
- (I) repeatedly stated (I) am leaving for Florida with or without my children
- (I) have difficulty engaging and relating to (my) children; Julian more so than Destiny.
- (I) need to learn how to parent and to interact with my children prior to caring for any children

matter-of-fact, no-nonsense, or to-
the-point. However, such descriptors
fail to address the self-limiting nature
of her emotional rigidity.

- (my) remoteness reflects significant
characterological problems that greatly
affect (my) relationships. (I) have difficulty
engaging and relating to (my) children,
Julian more than Destiny. (I) lack attunement
to the children's developmental capacities
and limitations, so (my) ability to play
and nurture is compromised.

- The present testing suggests that these
limitations are closely related to (my)
personality difficulties. In addition to
being emotionally frozen, (I) have a
hardened, impenetrable quality. (I) am
difficult to influence. (I) use minimization,
rationalization and denial as major defensive
maneuvers. (I) have a hard time recognizing
problems that are fairly evident to others.
(My) tone was shockingly dismissive when
(I) discussed such issues as Mr. Baxter's
threatening, violent and criminal behavior.

- Offering recommendations to (my) is problematic.
(I) am a willing and determined parent who
nevertheless fails to recognize some major
problems. Intensive parent-child training
is a necessity in this case, as is
ongoing individual therapy to address (my)

problems with attachment. (I) am apt
to be inwardly resistant and outwardly
compliant with referrals of this
nature. It is the task of the professionals
receiving these referrals to help (me) find
ways to ally (myself) with the treatment
tasks at hand. (My) motivation to regain
custody is strong, and offers a starting
point.

– Individual therapy need not be completed
prior to a return of the children. The
duration of such work is hard to predict, and
should be considered an ongoing effort.

– In (his) opinion, the correct attitude is one
of respect for (me), but lack of respect
for the dysfunctional patterns of parenting.

Patty's court Summary

– a finding of aggravated circumstances
was not made with regard to (me)

– Mr. Bee's mother has contacted the
agency requesting permission to care
for her new granddaughter, once born,
in the event that this agency plans
to detain her.

– (Her) observations of the visitations are
that Julian's needs go unmet by his
mother.

– Julian is totally unsupervised by his
mother

I haven't got a copy of the court summary yet from Project find out, but Lisa told me it was very positive.

Patty is a ~~fucking~~ ~~bitch~~. I can't believe some of the shit she put on my court summary. I will see Amy on monday, I hope she has enough time to go over ~~everything~~. I probably made over 50 notes with a highlighter & pen. Patty got alot of nerve to talk about my supervision. Where was her supervision when her 10 year old hung himself?

Fucking bitch. I don't even know if I can even talk to her on a calm level anymore. Its 5:30 Am Sat. morning. I cant sleep in prison. I'm waiting for about 6:00 so I can call my dad. I've been gone all day & he left me 2 messages, so did my mom & mary.

I'm going to see if my lawyer can maybe get one kid returned to me so i dont. What do you think? I'll probably just get my hopes up like always. Well I'm starting to get tired so I'll get this out. I love you & hopefully I'll talk to you monday night.

♡ Vicki