Appendix Exhibit 34

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ABBY B. CONLEY, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Civil Action No. 05-76E |
| | : | |
| COUNTY OF ERIE, ERIE COUNTY | : | |
| OFFICE OF CHILDREN AND YOUTH, | : | |
| a/k/a ERIE COUNTY CHILD | : | |
| WELFARE SERVICE, RICHARD | : | |
| SCHENKER, individually and | : | |
| in his capacity as County | : | |
| Executive of Erie County, | : | |
| Pennsylvania, PETER CALLAN, | : | |
| individually and in his | : | |
| capacity as Erie County | : | |
| Director of Personnel, DEBRA | : | |
| LIEBEL, individually and in | : | |
| her capacity as Executive | : | |
| Director, Erie County Office | : | |
| of Children and Youth, a/k/a | : | |
| Erie County Child Welfare | : | |
| Service, and JOHN A. ONORATO, | : | |
| ESQUIRE, individually and in | : | |
| his capacity as Erie County | : | |
| Solicitor, | : | |
| Defendants | : | |

Deposition of AMY E. JONES, taken before and

by Janis L. Ferguson, Notary Public in and for the

Commonwealth of Pennsylvania, on Wednesday, April

5, 2006, commencing at 1:30 p.m., at the offices

of Knox McLaughlin Gornall & Sennett, PC, 120 West

10th Street, Erie, Pennsylvania 16501.


Reported by Janis L. Ferguson, RPR
Ferguson & Holdnack Reporting, Inc.

## Page 2

1  For the Plaintiff:
       Timothy D. McNair, Esquire
2      821 State Street
       Erie, PA 16501
3
       Anthony Angelone, Esquire
4      Vendetti & Vendetti
       3820 Liberty Street
5      Erie, PA 16509
6  For the County of Erie, Erie County Office of Children and
   Youth, a/k/a Erie County Child Welfare Service:
7      Richard A. Lanzillo, Esquire
       Knox McLaughlin Gornall & Sennett, PC
8      120 West 10th Street
       Erie, PA 16501
9
   For the Defendants Richard Schenker, Peter Callan, and Debra
10 Liebel:
       Edmund R. Joyal, Jr., Esquire
11     Law Office of Joseph S. Weimer
       975 Two Chatham Center
12     Pittsburgh, PA 15219
13 For the Defendant John A. Onorato, Esquire:
       Sara E. Baugh, Esquire
14     Dell Moser Lane & Loughney, LLC
       525 William Penn Place
15     Suite 3700
       Pittsburgh, PA 15219
16
17
18
19
20
21
22
23
24
25

## Page 3

1         I N D E X
2
3  TESTIMONY OF AMY E. JONES
4      Direct examination by Mr. Lanzillo . . . . . . . . 4
5      Cross-examination by Mr. Joyal . . . . . . . . . . 68
6      Cross-examination by Mr. McNair . . . . . . . . . 97
7      Recross-examination by Mr. Joyal . . . . . . . . . 98
8      Redirect examination by Mr. Lanzillo . . . . . . .101
9      Further recross-examination by Mr. Joyal . . . . .108
10     Further redirect examination by Mr. Lanzillo . . .113
11
12
13 EXHIBITS:
14     Jones Deposition Exhibit 1 - Page 5
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1       A M Y  E.  J O N E S, first having been
2  duly sworn, testified as follows:
3
4            DIRECT EXAMINATION
5  BY MR. LANZILLO:
6
7      Q.  Ms. Jones, my name is Rich Lanzillo.  I introduced
8  myself to you in the lobby a few moments ago.  You are
9  appearing here today for deposition pursuant to my subpoena.
10 Before we get started, would you state your full name for
11 us.
12     A.  Sure.  Amy Elizabeth Jones.
13     Q.  And, Ms. Jones, I know you're an attorney, and,
14 therefore, I assume you're familiar with the basic ground
15 rules for depositions?
16     A.  Yes.
17     Q.  Okay.  I mean, the one that I care most about and
18 that warrants repeating in every deposition is that if there
19 is a question I pose to you that either you do not hear
20 clearly or do not understand, I would ask that you alert me
21 to that fact so I can either repeat or rephrase the
22 question.  Fair enough?
23     A.  That's fine.
24     Q.  Where do you live?  What is your address?
25     A.  My business address is 3820 Liberty Street, 16509.

## Page 5

1      Q.  Is that the Vendetti and Vendetti law office?
2      A.  That's correct.
3      Q.  Just for the record, what is your residential
4  address?
5      A.  522 Colorado Drive, 16505.
6      Q.  That's here in Erie, obviously?
7      A.  Yes.
8         (Jones Deposition Exhibit 1
9         marked for identification.)
10     Q.  Let me show you what I have marked as your
11 Deposition Exhibit 1.  This is a copy of the subpoena that I
12 believe was served upon you on or about March 30th, 2006.
13     A.  That's correct.
14     Q.  As part of the subpoena requesting your appearance
15 here today, there was a duces tecum request for documents.
16 Did you bring any documents responsive to the request for
17 production?
18     A.  I did not.
19     Q.  Are you in possession of any documents responsive
20 to the request for production?
21     A.  No, I'm not.
22     Q.  Let's go over that section of the subpoena.  And I
23 do note that the -- there's a typographical error on the
24 face of the subpoena.  There's a reference to Deanna Crosby.
25 That should be Deanna Cosby.

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 6

1  A. Um-hum.
2  Q. Did you recognize that as a typo when you read
3 this?
4  A. Yes.
5  Q. If that had been spelled correctly as Deanna
6 Cosby, would that have changed your response to me regarding
7 your possession of responsive documents?
8  A. No.
9  Q. All right. I take it from that answer, then, that
10 you do not have possession, custody, or control of any
11 documents provided to you by or on behalf of Abby Conley or
12 Deanna Cosby.
13  A. That's correct.
14  Q. Have you ever been in possession, custody, or
15 control of any such documents?
16  A. I don't think so, but I do not know.
17  Q. The second part of the request refers to any
18 documents constituting, memorializing, or arising out of any
19 correspondence or other communications, whether direct or
20 indirect involving yourself, Abby Conley, and/or Deanna
21 Cosby.
22     I take it you do not have any documents in your
23 possession, custody, or control that would be responsive to
24 that request?
25  A. That's correct. I do not.

Page 7

1  Q. Have you ever had any documents that would have
2 been -- that would be responsive to this request?
3  A. I don't think so.
4  Q. And you are licensed to practice law in
5 Pennsylvania, obviously?
6  A. That's correct.
7  Q. How long have you been licensed to practice in
8 Pennsylvania?
9  A. 10 years.
10  Q. Where did you go to law school?
11  A. Duquesne.
12  Q. And when did you graduate?
13  A. '96.
14  Q. And since graduating from law school, have you
15 worked at any firms or entities other than Vendetti and
16 Vendetti?
17  A. Yes.
18  Q. Why don't you walk me forward from graduation to
19 the present date in terms of your employment background.
20  A. Sure. From graduation in May of '96, I
21 immediately began a clerkship with Stephanie Domitrovich. I
22 clerked for Judge Domitrovich until approximately -- let me
23 think -- December of '97. And then I worked with Attorney
24 Tom Talarico as an associate for approximately nine months.
25 I joined Vendetti in -- I believe it was November of '98.

Page 8

1  Q. Are you an associate at Vendetti and Vendetti?
2  A. I'm a sole practitioner.
3  Q. Sole practitioner. I take it that's an
4 office-share arrangement?
5  A. Yes.
6  Q. Therefore, you're not employed by any of the other
7 lawyers at Vendetti and Vendetti?
8  A. That's correct.
9  Q. And what are your practice areas? Family law?
10  A. Family law.
11  Q. Anything other than family law?
12  A. Some real estate transactions, some estate work.
13 Very minor criminal work. Mostly all in connection with --
14  Q. Family law?
15  A. -- family law matters. Some Workers' Compensation
16 defense.
17  Q. What would your best estimate be as far as the
18 percentage of your practice that is devoted to family law?
19  A. 95 percent.
20  Q. Be fair to say, then, that you're familiar with
21 the Erie County Office of Children and Youth?
22  A. I am.
23  Q. With what frequency does your practice bring you
24 in contact with personnel from OCY?
25  A. From 1999 till, I think, 2004, I had a contract

Page 9

1 with the County of Erie. I represented either fathers,
2 mothers, or children in involuntary termination proceedings.
3 At that time, obviously, I had a lot of contact. Since I
4 gave up the contract -- I did not renew it -- I think
5 January of '05 I did not renew. I don't take many
6 dependency cases, but I do have some involvement, but it's
7 minimal.
8  Q. The contract with the County of Erie that you
9 mentioned, that involved representation of parents as well
10 as children?
11  A. That's correct. At that time it was on a rotating
12 basis.
13  Q. Other than yourself, who else had a similar
14 contract to do that type of work in the time frame that
15 you've described?
16  A. Mike Nies has had a contract, I think, longer than
17 anyone. Jeffrey Misko, Jeffrey Cole, Mary Alfieri Richmond.
18 I think that covers the time frame I was there.
19  Q. Okay. And at any given time between '99 and 2004,
20 roughly, how many cases for -- or involving OCY would you be
21 involved in?
22  A. Several. I did not get a count together. But I
23 probably averaged having an IVT trial two to three times per
24 month. Sometimes more, sometimes less.
25  Q. I take it you have met Ms. Conley prior to today.

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1    A.  Yes.

2    Q.  All right.  When was the first time that you had
3  any contact with Ms. Conley?

4    A.  I don't recall.  I had such a caseload that I
5  would meet many employees from the Office of Children and
6  Youth, but I can't timeline them.

7    Q.  Did you meet Ms. Conley in connection with your
8  contract work for the County?

9    A.  I think I did.

10    Q.  You don't recall which case it was?

11    A.  I don't.  I would get appointed at the end of a
12  case.

13    Q.  When you would get appointed, to what extent would
14  you typically have to interact with someone in Ms. Conley's
15  position at that time, an aide, as opposed to a caseworker?

16    A.  It would depend.  When I was appointed, it was
17  after the termination position was filed.  Therefore, not
18  many of the cases went to trial.  Many of them went to
19  voluntary relinquishment.  In that case, I wouldn't have
20  contact with anybody.  Some were good viable trials.  In
21  that case, I always made a point to contact the caseworker,
22  potentially the case aide, the CASA.  By the time you got to
23  that level, few cases were that viable.  But in the event
24  that they were, I always contacted everybody that was always
25  listed.

1    Q.  By this time -- by the time a case was headed to
2  trial, I take it -- and I think you mentioned that you had
3  two to three involuntary termination trials per month on
4  average.

5    A.  Um-hum.

6    Q.  Yes?

7    A.  Yes.

8    Q.  Okay, sorry.  Janis has to get the answer.  It
9  sounds to me, based on your testimony, that by that time,
10  you had a whole slew of other cases that had fallen by the
11  wayside through -- normally through voluntary relinquishment
12  of rights.

13    A.  By the time I was appointed, the termination
14  petition had already been filed.  So all of the dependency
15  proceedings have closed.  Okay?

16    Q.  Okay.  So what you were getting --

17    A.  There were many -- at that time you can't
18  re-litigate dependency proceedings, at the time of
19  termination, okay, so you inherited the case with
20  whatever -- however it was worked out.

21    Q.  And when you would inherit the case, if I followed
22  your testimony correctly, you would make it a point of
23  contacting the caseworker prior to trial.  Is that correct?

24    A.  Sometimes.  It would depend.  Sometimes I would be
25  appointed to a client who never called me, I never met till

1  the day of trial.  Sometimes my client was incarcerated.
2  Sometimes my client would call and say I'm going to give up.
3  Sometimes I would meet with my client and determine that
4  that would be their best option.  It -- very few -- and I
5  don't -- I don't know what percentage.  Maybe 20 percent,
6  maybe less than that -- were actual viable, defendable cases
7  by that time.

8    Q.  So in most cases, you would have no reason to be
9  contacting the caseworker.  Is that fair?

10    A.  That's correct.

11    Q.  And is it fair to conclude that in the cases you
12  handled, you actually contacted the case aide with even less
13  frequency?

14    A.  Probably.  Depending on how available the
15  caseworker was.

16    Q.  So if the caseworker were unavailable in a given
17  case, you might default to the case aide?

18    A.  Yes.

19    Q.  Do you have a present recollection of interacting
20  with Ms. Conley in connection with your casework?

21    A.  I have a recollection of meeting her.  I have a
22  recollection of seeing her in court.  I have a -- I don't
23  have a recollection of a specific case or a specific time
24  period.

25    Q.  Okay.

1    A.  Oftentimes OCY would also bring in a bunch of
2  people to observe.  I'm not sure in what capacity I came
3  across Miss Conley, but I do know I had interaction with her
4  during the time I had the contract.

5    Q.  How about Deanna Cosby?  Have you ever met Deanna
6  Cosby?

7    A.  Yes.

8    Q.  When did you first meet Ms. Cosby?

9    A.  I don't recall.

10    Q.  Was it prior to the relinquishment of your
11  contract with the County at the end of 2004?

12    A.  No.

13    Q.  So you would not have met Ms. Cosby in connection
14  with your work on behalf of the County under contract.

15    A.  I may have met her, but I don't recall meeting
16  her.  That doesn't mean I didn't come across her and she
17  remembers and I don't.  I don't remember.

18    Q.  And that's fair.  You have no recollection of
19  meeting her prior to the end of 2004.  Is that a fair
20  statement?

21    A.  That's a fair statement.

22    Q.  I take it, then, though, that you do have a
23  recollection of interacting with her after January 1, 2005.

24    A.  Yes.

25    Q.  Do you recall when you had your first --

4 (Pages 10 to 13)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 14

1    A.  Let me -- let me just think of those dates, if I
2  could.
3    Q.  And I may be giving -- I may have confused you,
4  because you may have interacted with her prior to the end of
5  2004 in matters unrelated to your contract work for the
6  County.  And if that's the case, you can tell me that.  In
7  fact, going back to spring or summer of 2004 might be the
8  time frame.
9    A.  Yeah.  I don't have a recollection of ever meeting
10  her prior to January of 2004.  To be safe.
11    Q.  Okay.  What is your first recollection in terms of
12  contact with Ms. Cosby?
13    A.  My first recollection was having phone contact
14  with her.
15    Q.  Can you be any more specific in terms of when that
16  first phone contact occurred?
17    A.  Late spring of '04.  Or '05.  I'm getting my years
18  mixed up.
19    Q.  I have some paperwork I'm going to show you --
20    A.  Might refresh --
21    Q.  -- in a few minutes.  It may refresh your
22  recollection.  Recognizing the year is presently unclear in
23  your mind, does the May, June time frame sound right?
24    A.  Yes.
25    Q.  All right.  And who initiated the telephone

Page 15

1  contact?
2    A.  I believe I did.
3    Q.  And what prompted you to have that telephone
4  contact?
5    A.  In connection with a case that I don't believe I
6  have privilege to speak about.
7    Q.  Would that case -- well, let me back up for a
8  minute.
9        MR. LANZILLO:  For purposes of the deposition, if
10      it's all right with everyone, I'm going to use the
11      names of the individuals involved.  And can we
12      substitute the initials, Janis, if that's not too
13      burdensome?
14    Q.  The case involved an individual named [V.W.]?
15    A.  Again, reviewing the Rules of Professional Conduct
16  this morning, I'm not sure how much I can get into that.
17    Q.  Let me approach it this way:  Because I -- I don't
18  believe the rules would preclude you from identifying.  I
19  mean, you did represent [V.W.]?
20    A.  That's correct.  I was counsel of record for
21  [V.W.].
22    Q.  And the communications I'm asking about were with
23  an individual named Deanna Cosby, correct?
24    A.  That's correct.
25    Q.  She was never your client, was she?

Page 16

1    A.  She was not my client, no.
2    Q.  Can we agree that she's a third party that would
3  not be subject to the attorney/client privilege?
4    A.  Well, no, because my discussions with her
5  furthered my representation of my client, and that's an
6  ongoing case.
7    Q.  Are you invoking attorney/client communications as
8  regards Miss Cosby?
9    A.  Anything having to do with my representation of
10  Miss [W.], including discussions with people that I spoke
11  with regarding her case.
12    Q.  I'm at somewhat of a loss --
13    A.  I'm being overly -- I'm being overly cautious.  I
14  no longer represent -- I was counsel of record.  I don't
15  have a waiver from my former client.  The rule appears to
16  me, reviewing 1.6 and 1.9 of the Rules of Professional
17  Conduct, are fairly broad, and I am taking that to protect
18  myself; approach.
19    Q.  Let me interject, though.  And I know you're not
20  a -- I assume you're not appearing here with counsel today.
21    A.  I'm not.  I have consulted independent counsel.
22    Q.  I am very comfortable that that conversation with
23  the third party is not subject to the attorney/client
24  privilege.  I understand your perspective on this.  So as
25  not to have to reconvene the deposition, it may behoove us

Page 17

1  to contact the Court and review it with the Court.  That
2  would give you, I think, the comfort that you may require to
3  feel --
4        MR. ANGELONE:  You might want to pull out the
5      rules.  Just a suggestion.  If that's what you
6      want to do.
7        MR. McNAIR:  For what it's worth, I think the
8      applicable privilege would be work product.  It's
9      an ongoing case and you represent one of the
10      parties to it.  So --
11        MR. LANZILLO:  I don't know what you're talking
12      about in terms of me representing one of the
13      parties.
14        MR. McNAIR:  You are representing the County of
15      Erie.  That's a case that Ms. [W.] was involved
16      in.  And I think you're asking for information
17      concerning how and who she talked to and what they
18      said and so on in preparing the case for hearing.
19      And I think as -- in those terms, under the
20      Federal Rules, that's work product, and I don't
21      think it's discoverable.
22        MR. LANZILLO:  Well, I --
23        MR. McNAIR:  I'm not saying that -- I'm just
24      trying to cut to the chase here, because I think
25      that's a legitimate privilege.

5 (Pages 14 to 17)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 18

```
 1    MR. JOYAL:  Well, that's a privilege that she
 2  didn't raise.  She raised attorney/client
 3  privilege.  And you don't represent her.  She's
 4  talking about independent counsel.  And I guess
 5  the question is whether or not we go to the Court
 6  or whether you may want to get a lawyer -- I mean,
 7  again, you're talking about asking another lawyer
 8  for an opinion, and maybe representationwise he
 9  can't talk to you.  But I think the idea of
10  Mr. Lanzillo's question, which is who initiated
11  the conversation and what it was about, is not --
12  certainly not work product, because unless you can
13  show us that you generated something from the
14  conversation, so --
15    MR. McNAIR:  Are you kidding me?
16    MR. JOYAL:  You didn't raise that as privilege.
17  Okay?
18    THE WITNESS:  I raised it in the scope of 1.6 and
19  1.9, which contemplates work product, which
20  contemplates attorney/client privilege.
21    MR. JOYAL:  I think you better put the rule into
22  the record.  And, Rich, I think you're right, we
23  better talk to the Judge.
24    MR. LANZILLO:  This is obviously something that's
25  going to recur throughout the deposition.  I'm
```

Page 19

```
 1  going to be asking you many questions about the
 2  communications.
 3    (Discussion held off the record.)
 4    MR. LANZILLO:  Before we call the Court on this
 5  issue, I would like to cover just a couple of
 6  other items.
 7  BY MR. LANZILLO:
 8    Q.  Your discussions with Deanna Cosby, have you
 9  described or related them to any other person or discussed
10  them with any other person?
11    A.  Yes.
12    Q.  Who?
13    A.  It would be in connection with my representation.
14    Q.  Attorney McNair?
15    A.  No.
16    Q.  Attorney Angelone?
17    A.  Potentially other persons in my office.  I am not
18  sure specifically who.  As it's not uncommon.
19    Q.  Have you discussed your interaction with Deanna
20  Cosby with Attorney Angelone?
21    A.  I don't know.  If I would have discussed anything
22  with other members of my firm, it would have been at that
23  time.
24    Q.  Well, you're not a firm, right?
25    A.  We're not a -- well, we're not a firm in the
```

Page 20

```
 1  organized sense.
 2    Q.  You're a sole practitioner?
 3    A.  We're a sole practitioner.  But we, obviously,
 4  have access to other people's cases, and we obviously
 5  discuss our cases with other attorneys in the firm.
 6    Q.  Do you not maintain the confidentiality of your
 7  cases among the other members -- strike that -- among the
 8  other solo practitioners in your office?
 9    A.  I do maintain confidentiality.
10    Q.  Amy, you have talked to Anthony Angelone about
11  your conversations with Deanna Cosby, haven't you?
12    A.  I don't know.  I really -- I don't know.
13    Q.  I don't understand your answer; you don't know.
14    A.  It is not uncommon in preparing for a trial that
15  we talk amongst ourselves in the office.  I may not name
16  people, I may not refer to them, but in trial preparation,
17  it is not uncommon to --
18    Q.  Are you telling me that prior to your deposition
19  today, including between the time that you received notice
20  that you were going to be deposed and today, you have not
21  discussed this matter with Attorney Angelone?
22    A.  When you say "this matter", what do you mean?
23  Discussing --
24    Q.  The Abby Conley -- the Abby Conley case.  Let's
25  start -- let's start with that.
```

Page 21

```
 1    A.  (No response.)
 2    Q.  Have you discussed the Abby Conley case with
 3  Attorney Angelone?
 4    A.  I'm not hedging on purpose.  I'm hedging because
 5  I'm unsure if I can answer that.
 6    THE WITNESS:  And you're looking at the section
 7  that I just wanted to refer to that I looked at
 8  briefly.
 9    MR. JOYAL:  Rich, can I maybe take over for a
10  couple of minutes?
11    MR. LANZILLO:  In a minute.  Let me get to a point
12  where I -- I just want to get a couple of things
13  squared away.
14    Mr. McNair, are you representing this witness
15  here today?  For the record you're --
16    MR. McNAIR:  I'm looking at the Rules of
17  Professional Conduct.  I have --
18    THE WITNESS:  I brought these with me.
19    MR. McNAIR:  I have a curious intellect.  I'd like
20  to know what's going on.  You were talking about
21  rules.  I just want to read the rules.
22    MR. LANZILLO:  There's an interaction here, and I
23  want to make sure it's clear on the record.
24  BY MR. LANZILLO:
25    Q.  Have you sat down with -- in the same room as
```

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1  Attorney Angelone and Attorney McNair and --
2      A.  No.
3      Q.  You have not had any conferences or interaction
4  with Attorney Angelone that you can remember regarding the
5  Abby Conley case?
6      A.  I referred Abby Conley to Attorney Angelone.
7      Q.  When did you do that?
8      A.  I did that as soon as she was fired, after she was
9  fired.
10     Q.  How was it that she came to see you?
11     A.  I knew her.
12     Q.  How long have you known Ms. Conley?
13     A.  Not long.
14     Q.  How long?
15     A.  Prior to her termination?  Maybe a couple of
16  months.
17     Q.  How did you come to meet and get to know
18  Ms. Conley?
19     A.  In connection with my representation, which,
20  again, I'm going to raise the privilege on.
21     Q.  All right.  So you interacted directly with
22  Ms. Conley relative to your representation of [V.W.]; is
23  that right?
24     A.  I represented -- I interacted with everybody
25  involved with the agency on that case.  And she was involved

1  with the agency, so, yes.
2      Q.  Okay.  And did you interact with her in person,
3  face to face?
4      A.  I'm going to raise the privilege again.
5      Q.  I mean, I'm asking you the circumstances.  We're
6  not touching upon anywhere near the conversation yet.  I
7  just want to find out whether you had face-to-face meetings
8  with Ms. Conley.
9      A.  Yes, I did.
10     Q.  How many?
11     A.  One, I believe.
12     Q.  When did that occur?
13     A.  Sometime prior to the continued permanency
14  hearing.  I don't have the date.
15         (Discussion held off the record.)
16  BY MR. LANZILLO:
17     Q.  Attorney Jones, were you previously served with a
18  subpoena relative to your deposition, prior to the one that
19  I served on or about March 30th?
20     A.  Yes.
21     Q.  And do you recall approximately when that was?
22     A.  Oh, gosh.  Several months ago.
23     Q.  Could it have been perhaps September --
24         MR. JOYAL:  August or September.
25     Q.  August or September of 2005?

1      A.  It was sometime in 2005.
2      Q.  After receiving that subpoena, did you discuss
3  this case, the Abby Conley case, or anything relating to
4  this case with Attorney McNair or Attorney Angelone?
5      A.  I'm going to raise the work product privilege.
6      Q.  Who were you representing that -- concerning which
7  you would claim the work product privilege?
8      A.  Within our firm.  I did not have any discussions
9  with Tim McNair.
10     Q.  And Attorney Angelone -- you are not in a firm
11  with Attorney Angelone, correct?
12     A.  We office share, we share expenses, we present
13  ourselves as a firm.  I am myself a little unsure as to
14  where the line is drawn, and, therefore, I'm going to be
15  hypersensitive and raise that.
16     Q.  With all due respect, though, you did tell me that
17  you were solo practitioners, and that you are not a firm, as
18  you understand that term.  Correct?
19     A.  That is correct.  But when I read the definition
20  of firm in the Rules of Professional Conduct, it also does
21  talk about other associations authorized to practice law,
22  again broad.
23     Q.  Well, I'm not going to quibble with you over that.
24  We'll just identify that as one of the issues we'll have to
25  take up with the Court.

1      A.  That will be fine.
2      Q.  But let me ask you this:  Were you and Attorney
3  Angelone representing a common client?
4      A.  We were representing -- I was still, I believe,
5  representing Miss [W.].
6      Q.  Was Attorney Angelone representing Ms. [W.]?
7      A.  No.
8      Q.  Has he ever represented Ms. [W.]?
9      A.  No.
10     Q.  So your communications with Attorney Angelone were
11  with an attorney who was not representing a common client,
12  correct?
13         MR. McNAIR:  Objection.  Argumentative.
14     Q.  Is that correct?
15     A.  Representing --
16         MR. ANGELONE:  I object to the form.
17     Q.  At the time you communicated -- I'll rephrase --
18     A.  We were both representing clients in a common
19  case.
20         MR. JOYAL:  Well, can --
21  BY MR. LANZILLO:
22     Q.  But what is the common case?
23     A.  It would be the [V.W.] case.
24     Q.  Who was Attorney Angelone representing in the
25  [V.W.] case?

Page 26

1    A.  Nobody.  He was representing Miss Conley.
2    Q.  Okay.  And you referred Ms. Conley to Attorney
3  Angelone?
4    A.  That's correct.
5    Q.  And that was after you had had a prior
6  professional relationship with her for a couple of months?
7    A.  That's correct.
8    Q.  All right.  And when you had this prior
9  professional relationship with Ms. Conley, did you have your
10  contact with her by means of first obtaining consent from
11  the County of Erie?
12    A.  No.
13    Q.  So did you contact the solicitor or anyone else on
14  behalf of the County of Erie before you had contact with an
15  OCY case aide regarding a case pending before the Court?
16    A.  I probably had contact with Cathy Allgeier, the
17  solicitor, on that case prior to that contact.
18    Q.  Did you tell her that you were having ex parte
19  communications with Ms. Conley?
20    A.  In my practice with the Office of Children and
21  Youth, I have always freely talked with caseworkers and case
22  aides without receiving any clearance from the solicitor.
23    Q.  Well, that's not responsive to my question.  But
24  let me back up here.  You weren't representing the County of
25  Erie when you were having contact with Miss Conley, were

Page 27

1  you?
2    A.  No.
3    Q.  You were representing a party adverse to the
4  County of Erie, correct?
5    A.  Correct.
6    Q.  And you were having direct ex parte communication
7  with an employee of the County of Erie without prior consent
8  regarding a case pending before the Court.  Is that also
9  correct?
10    A.  I'm going to raise the privilege on my
11  communications with Miss Conley.
12    Q.  I'm not -- I haven't asked you anything about what
13  was said --
14    A.  And my contact with Ms. Conley.
15    MR. McNAIR:  What's your point?  Are you
16    contending that she's a managerial employee --
17    MR. LANZILLO:  I'm asking questions.  And I --
18    MR. McNAIR:  It seems to me, Mr. Lanzillo, you're
19    trying to intimidate the witness with your tone of
20    voice, with the fact that you're hunched over the
21    table, and boring into her with your eyes, and
22    you're asking these questions in a tone that
23    suggests that she did something wrong by talking
24    to a witness in this case.
25    MR. JOYAL:  She may have done something.

Page 28

1    THE WITNESS:  Then I'm done.
2    MR. LANZILLO:  I don't do this.  I ask questions.
3    You can characterize my demeanor any way you want.
4    I'm flattered by the penetrating eyes
5    characterization.
6    MR. McNAIR:  I objected for the foundation.  I
7    object to the question, foundation.
8    MR. LANZILLO:  Whatever the objection is, I have
9    questions, and I'm going to get back to them now.
10  BY MR. LANZILLO:
11    Q.  Did you just invoke the work product privilege to
12  avoid answering the question of whether you had direct
13  contact with Ms. Conley regarding a case pending before the
14  Court where you are representing a party who is adverse to
15  the County?  Let me make sure I understand what you are
16  invoking here.
17    A.  You have asked me the question about four or five
18  different times, is the way I'm interpreting it.  I have
19  already told you that I had contact with Ms. Conley.  Okay?
20  Now you're trying to -- I'm not sure what you're trying to
21  get me to admit.  Whether you want to characterize that as
22  right or wrong, according to the County, that's not for me
23  to answer.  Did I have contact with Miss Conley?  Yes.
24    Q.  Let me break it down.  I'm not asking for any
25  characterizations.  All right.  You had contact with

Page 29

1  Ms. Conley.  You've told me that.
2    A.  Yes.
3    Q.  All right.  That contact occurred at a time when
4  you were representing a party adverse to the County of Erie.
5  Is that also correct?  [V.W.].
6    A.  I understand your question.  At the time -- here
7  is the problem with "adverse to".  At that time during the
8  permanency stages, the Office of Children and Youth is
9  supposed to be working with my client.  There has not been a
10  termination petition, they are not trying to terminate her
11  parental rights.  The goal is reunification.  They are to be
12  working with her.  They are meeting with my client without
13  me several times a week.  I do not characterize their
14  relationship as adverse.  And so I don't agree with that.
15    Q.  All right.  I'll leave the word "adverse" out and
16  we'll let the Court determine whether it was adverse or not.
17  But you were having contact with Ms. Conley regarding a case
18  pending before the Court, one involving your client, [V.W.],
19  and you were having contact with a case aide, Ms. Conley,
20  regarding that case.  Is that correct?
21    A.  That's correct.
22    Q.  All right.
23    MR. McNAIR:  I don't think [V.W.] was a party to
24    the case that was pending before the Court at that
25    time.  I think the petitions are filed in the name

8 (Pages 26 to 29)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 30

1    of the child.
2        MR. LANZILLO: Fine. Okay.
3    Q. A person with an interest in that case.
4    A. Fine.
5    Q. Is that --
6    A. That --
7    Q. And am I also correct that you did not contact the
8    County solicitor or any other attorney representing the
9    County regarding your contact, your conversations with
10   Ms. Conley?
11   A. I don't recall. I had several communications with
12   the solicitor on this case.
13   Q. Okay.
14   A. And I know that we spoke about my contacts with
15   other people in this case.
16   Q. So you spoke to someone in the County about your
17   contacts with Ms. Conley?
18   A. Yes.
19   Q. All right, then. Tell me what was said between
20   you and Ms. Conley.
21   A. I'm going to invoke privilege, because it had --
22   because it had to do with my representation of a client.
23   Q. How can you invoke privilege when you just told me
24   that you discussed it with other representatives in the
25   County?

Page 31

1        MR. McNAIR: Objection. Argumentative.
2    Q. I mean, I don't understand how you're getting
3    there.
4    A. Because it was for settlement negotiations.
5    Q. In what matter? Settlement of what?
6    A. Of my case.
7    Q. And on whose behalf were you negotiating?
8    A. My client.
9    Q. And that person was who?
10   A. Ms. [W.].
11   Q. All right. And you were negotiating with
12   representatives of the County --
13   A. That's correct.
14   Q. -- to settle that case.
15   A. That's correct.
16   Q. And could you identify the representatives of the
17   County with whom you were negotiating.
18   A. Cathy Allgeier.
19   Q. And your communications with Ms. Conley, were they
20   in connection with your negotiations to settle the claims
21   involving Ms. [V.W.]?
22   A. I'm unsure.
23   Q. Where did your communications with Ms. Conley take
24   place?
25   A. I'm going to raise privilege.

Page 32

1    Q. For location?
2    A. Absolutely. I'm very uncomfortable with this line
3    of questioning. If you're going to call Judge McLaughlin,
4    I'd ask that you do it now, so that I can answer these
5    questions or not answer these questions.
6    Q. My intention is to wait to call him. I want to
7    fully define -- so we don't bother the Court with multiple
8    discussions. I would like to --
9    A. I am uncomfortable answering any questions that
10   have to do with my representation of my former client,
11   including who I talked to, where I talked to them, what I
12   talked about, what they looked like when I talked to them,
13   or whatever else. So that is --
14   Q. I mean, let me make sure I'm clear here. You're
15   invoking the work product privilege in terms of the location
16   of the conversation.
17       MR. ANGELONE: She said attorney/client privilege.
18   Q. Whatever. You're invoking a privilege as to --
19   A. I am. I am uncomfortable with this line of
20   questioning, and I am invoking privilege. If Judge
21   McLaughlin wants me to answer these questions, I will. I am
22   uncomfortable at this time, and I am invoking privilege.
23   Q. Let me ask you this question: Did you meet with
24   Miss Conley at your office?
25   A. I am invoking privilege.

Page 33

1        MR. JOYAL: Rich, would you ask her, based upon
2    what you read in that rule, is there any privilege
3    which you see as an example outlined where you can
4    invoke privilege that has nothing to do with the
5    case that you were talking to her about.
6    THE WITNESS: I am invoking privilege.
7    MR. JOYAL: To answer my question?
8    MR. ANGELONE: She answered.
9    MR. JOYAL: Which was invoking privilege.
10   MR. ANGELONE: She invoked privilege. Next
11   question.
12   MR. JOYAL: Did you speak to either Deanna
13   Cosby --
14   MR. McNAIR: Are we going to have round-robin
15   questions?
16   MR. JOYAL: I'm asking questions now.
17   MR. McNAIR: So you're done.
18   MR. JOYAL: What we're trying to do is avoid
19   having to call the Judge, because the Judge is
20   going to want to know what is going on here, and
21   the question is -- he's going to want to know the
22   areas we're talking about. And if she's going to
23   invoke privilege in some blanket form, and she
24   can't even cite an area to me, the area of the
25   disciplinary rule --

9 (Pages 30 to 33)

1    MR. ANGELONE: Don't tell me what the rules are.
2    MR. JOYAL: Tell me the rules, and I'll read them
3    into the record, and then we'll ask you the
4    questions about that. We can do it that way. Is
5    that the way you want to do it? Because we'll do
6    it that way.
7    MR. LANZILLO: Well, here is what we're going to
8    do: We're going to continue the examination. I
9    don't know what other counsel would like to do
10   here, but I'm going to request an expedited copy
11   of the transcript, and either we can take it up
12   initially by telephone today, but it seems to me
13   this is getting involved enough that the Judge is
14   going to need to see the transcript to understand
15   the scope of the dispute we have. And we can talk
16   to Janis after the deposition to see how long it
17   will take to generate a transcript.
18   MR. McNAIR: Let me just tell you where I'm at on
19   that. We have a trial date, May 5th. Discovery
20   is long closed. Discovery was closed -- the
21   deposition of this witness was noticed, but
22   canceled a year ago. And it was not noticed again
23   until after the close of discovery.
24      So I'm going to object to anything that is
25   going to delay this, because I've got a pretrial

1    narrative due in two days. And I don't think I
2    can -- you know, I don't think I should be
3    subjected to you taking depositions of witnesses
4    outside the discovery period after I filed my
5    pretrial narrative.
6    MR. LANZILLO: We're doing this by agreement for
7    you and for us.
8    MR. McNAIR: Huh-uh. I never agreed to this. You
9    served a subpoena and sent a notice, and I'm here.
10   MR. JOYAL: Let me say this about this: Number
11   one, the deposition was never canceled. Subpoenas
12   don't get canceled, okay, so she was under
13   subpoena from August.
14   MR. McNAIR: And you had multiple opportunities to
15   reschedule this.
16   MR. JOYAL: On the record of one of the
17   depositions on a date prior to when discovery
18   closed, we agreed we would do that. If your
19   position is that noticing depositions after the
20   close of discovery, people don't have to attend
21   them, then I would suggest to you that every
22   deposition -- then the depositions scheduled
23   tomorrow and Friday are off. Because you noticed
24   them and re-noticed them after the close of
25   discovery.

1    MR. McNAIR: We rescheduled those by agreement.
2    MR. JOYAL: We scheduled everything by agreement.
3    MR. McNAIR: No, they were scheduled, and we
4    agreed to reschedule them, and that's on the
5    record, and those had already been noticed.
6    MR. JOYAL: Can I make a suggestion?
7    MR. McNAIR: Let's get this done today.
8    MR. JOYAL: Well, I suggest you do your
9    examination, I'll ask whatever questions I wanted
10   to. If she wants to invoke the privilege, that's
11   fine. I don't think this is going to have any
12   bearing on whether we bring it to the Judge
13   tomorrow, next week, or the week after.
14      But I would say that one way or the other
15   these questions are going to be asked, and whether
16   it's here or if this case goes to trial, they are
17   certainly going to be asked at that point in time.
18   And I think as -- I mean, I can understand
19   Ms. Jones' reluctance. But on the other hand,
20   questions such as, you know, things about whether
21   she spoke to somebody during the course of a thing
22   and where she spoke to them as being an
23   attorney/client privilege issue, to me, borders on
24   ludicrous.
25   MR. ANGELONE: It's not ludicrous.

1    MR. JOYAL: Shut up.
2    MR. ANGELONE: No, you shut up.
3    MR. JOYAL: If you have an objection, object.
4    MR. ANGELONE: I object to everything about you.
5    THE WITNESS: What I am relying on, just so that
6    we're clear, is the confidentiality rule. For
7    example, applies not only to matters communicated
8    in confidence by the client, but also to all
9    information relating to the representation,
10   whatever its source. I interpret that, however
11   ludicrous it may sound, as being very broad, and,
12   therefore, I'm invoking the privilege.
13   MR. JOYAL: Well, let me ask this question to you,
14   if it's very broad, Ms. Jones: At what stage of
15   the proceedings was Miss Conley involved?
16   THE WITNESS: I'm invoking privilege. It was --
17   MR. JOYAL: If the Judge asks you that, are you
18   going to tell him, or are you going to invoke
19   privilege at that point?
20   THE WITNESS: If the Court orders me to answer
21   that question --
22   MR. JOYAL: No, if he asks you the question, are
23   you going to invoke privilege? I think what you
24   have to understand is, what we don't want to do is
25   have a situation where the Court is going to ask

10 (Pages 34 to 37)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 38

1    questions, and you're trying to invoke privilege,
2    and he doesn't understand what you're talking
3    about.
4        We're asking you questions about background,
5    and if you think that invoking privilege on this
6    transcript is going to be something that Judge
7    McLaughlin is not going to want to ask about,
8    you're either going to have to answer it or invoke
9    it.
10        Right now you can go ahead and tell us off
11   the record or go ahead and put it on the record.
12   The point is, he's going to want to know.
13       MR. McNAIR: If he's going to want to ask, why
14   don't you let the Judge ask the questions. Do you
15   have to argue with the witness on every question?
16   Don't you understand how this works?
17   BY MR. LANZILLO:
18   Q. Well, I'm going to resume now, and my questions
19   right now are relating to the propriety of the invocation of
20   the privilege here.
21   A. Okay.
22   Q. And in order to test the validity of the
23   privilege, I need to ask you who and when and where and have
24   at least some idea of the subject matter of the
25   conversation. So let me go back and see whether you'll

Page 39

1    answer these questions.
2        MR. JOYAL: For the record, I want it to reflect
3        that Mr. McNair and Ms. Jones were looking at each
4        other, and Mr. McNair was nodding his head no
5        during the course --
6        THE WITNESS: I want it put on the record that I
7        did not look at Mr. McNair.
8        MR. McNAIR: I was looking at Mr. Lanzillo.
9        MR. ANGELONE: I was looking at everybody in the
10       room. Put that down.
11   BY MR. LANZILLO:
12   Q. I'm going to ask you, Attorney Jones --
13       MR. ANGELONE: Did you just give me the finger,
14       Mr. Joyal?
15       MR. JOYAL: No, sir. I was scratching my face.
16       And don't call me a putz again. I don't know who
17       you are or what you're doing.
18       MR. McNAIR: We know who you are.
19       MR. ANGELONE: I didn't call you a putz. Just
20       like you didn't raise your finger.
21       MR. LANZILLO: I'm going to suggest that we take a
22       five-minute break.
23       MR. McNAIR: Do you have cudgels?
24       (Discussion held off the record.)
25       (Recess held from 2:34 p.m. till 2:42 p.m.)

Page 40

1    BY MR. LANZILLO:
2    Q. Attorney Jones, are you aware of the testimony
3    provided by deposition in this case by Deanna Cosby?
4    A. No.
5    Q. Do you have any knowledge of the content of any of
6    the depositions taken in this case?
7    A. No.
8    Q. No one has discussed those with you?
9    A. No one has discussed those with me.
10   Q. When is the last time, prior to my lobby office
11   here today and the conference room we're in right now, when
12   is the last time that you had any contact with Ms. Conley?
13   A. When I referred the case to Attorney Angelone.
14   Q. And that was back in the summer of '04?
15   A. Whenever she was -- right after she was fired.
16   I'm not sure if that was '04 or '05.
17   Q. And between that date and today, you've had no
18   contact at all with Ms. Conley?
19   A. I may have seen her in our lobby if she was
20   meeting with Attorney Angelone, but that would be the only
21   context.
22   Q. Did you have any conversations with her?
23   A. Yeah.
24   Q. What did you talk about?
25   A. Pleasantries. Nothing -- nothing -- small-talk.

Page 41

1    Q. Can you remember anything that you discussed?
2    A. No.
3    Q. The conversations that you had with Ms. Conley
4    during your representation of [V.W.], the time frame of
5    those conversations, as I understand it, would have been, to
6    the best of your recollection, May, June of either '04 or
7    '05?
8    A. That's correct. It would have been in between two
9    permanency hearings. I'm not sure of the exact date.
10   Q. And those would have been permanency hearings
11   relating to the children of [V.W.], correct?
12   A. That's correct.
13   Q. And those conversations, would they have taken
14   place at your office or at a different location? Did they
15   take place at your office?
16       MR. McNAIR: We already covered this.
17       MR. JONES: I think I already invoked the
18       privilege on this.
19   Q. I just want to make sure as to what you're
20   invoking privilege for. Did those conversations relate to
21   or involve information that Ms. Conley had that you utilized
22   in connection with your representation of Ms. [W.]?
23   A. I'll invoke privilege.
24   Q. And just for the record, in order for me to test
25   the sufficiency of the privilege here -- because I haven't

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1  asked you to recite specific comments made between you and
2  Ms. Conley.  I at least need to know the subject matter of
3  the conversation.  Because, obviously, as you indicated
4  through your earlier testimony, if you were talking about
5  pleasantries, you didn't invoke the privilege as to those
6  conversations.
7      A.  Right.
8      Q.  So, again, let me -- with that explanation, let me
9  ask you, did those conversations involve information that
10  you utilized in connection with your representation of
11  [V.W.]?
12     A.  Yes.
13     Q.  And how long did your interaction or meeting with
14  Ms. Conley take?  And I'm just talking, how long was your
15  meeting?
16     A.  I can't recall.
17     Q.  Do you believe it was more than an hour?
18     A.  No.
19     Q.  Did you take any notes during that meeting?
20     A.  I'm not sure.
21     Q.  Did you memorialize your interaction with
22  Ms. Conley in any way?
23     A.  (No response.)
24     Q.  Dictate a memo, handwritten notes?
25     A.  No.  I -- no.  If anything, I would not have

1  dictated a memo.  I may have -- I may have written notes.
2      Q.  That would be your typical practice, wouldn't it?
3      A.  That's correct.
4      Q.  Where are your notes relating to the [V.W.]
5  matter?
6      A.  When the file was turned over, some things I kept,
7  some things I did not.
8      Q.  What -- go ahead.
9      A.  I may -- I may have some, I may not.  I am
10  notorious for writing notes on a note pad and finding that
11  note pad in somebody else's file, so.
12     Q.  If you did not retain the notes in your file,
13  where would they be?  You said when the file was turned
14  over.  I'm trying to understand to who.
15     A.  I wouldn't have turned over any of my notes.  But
16  I may have purged my own file when I was no longer
17  representing my client.
18     Q.  Are you currently representing [V.W.]?
19     A.  No.
20     Q.  When did your representation terminate?
21     A.  I believe it was late summer '05.
22     Q.  You used the phrase "when the file was turned
23  over".  To whom was the file turned over?
24     A.  Her current counsel.
25     Q.  And who is that?

1      A.  (No response.)
2      Q.  Scarpitti?
3      A.  I believe it to be Alison Scarpitti.
4      Q.  Alison Scarpitti?
5      A.  I believe.
6      Q.  You say you may have purged your notes.  Do you
7  have any recollection of purging your notes?
8      A.  I have recollection of going through the file of
9  what I was sending and what I was getting rid of.
10     Q.  When did you send the file to Alison Scarpitti?
11     A.  I'm not sure exactly when.  It was sometime after
12  she was retained, and I received correspondence requesting
13  the file.  It would have been -- it would have been mid.
14  late summer, '05, I believe.
15     Q.  Do you still have the correspondence requesting
16  the turnover of the file?
17     A.  I may.  It may have been correspondence, it may
18  have been a voicemail.
19     Q.  Do you charge your clients on an hourly basis?
20     A.  I try to.
21     Q.  And do you record your time based on activity?
22     A.  In some cases.  In -- in some cases.  In some
23  cases I'll -- I won't.
24     Q.  Did you record or memorialize your meeting or
25  meetings with Ms. Conley on your time sheet, on a time sheet

1  or other record?
2      A.  I don't know.  I don't know that I kept track of
3  my time in that case.  Many cases that I take for low
4  income, I don't keep track.
5      Q.  You would still have the records reflecting your
6  bills to Ms. [W.], I take it?
7      A.  I should.  If I kept a billing on her, I would.
8      Q.  Under what circumstances would you not keep a
9  billing on a client?
10     A.  If a client came to me and said, can you please
11  help me, I have "X" amount of dollars, can you help me out,
12  and I know I'm not going to be paid, I will handle their
13  case.  Sometimes I will do it pro bono, or I am doing it
14  nominally.  I will try and take four or five cases a year on
15  people that I know don't have the money to meet my hourly
16  rate.  There's no use of keeping track of time that I'm not
17  going to get paid for.
18     Q.  Is that the case with Miss [W.]?
19     A.  I'm not sure.  I -- I think it was.  She was not
20  on a regular billing basis.
21     Q.  I would ask that to the extent any billing records
22  or time records exist relative to Ms. [W.] or Ms. Conley,
23  that you retain them during the pendency of this case, at
24  least until we resolve these privilege issues and that no
25  records be purged in the meantime.  Can we agree to that?

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1    A.  Absolutely.
2    Q.  Am I correct that your referral of Abby Conley to
3    Attorney Angelone and his subsequent representation of her
4    arose out of your prior contact with Ms. Conley in
5    connection with your representation of [V.W.]?
6    A.  Um --
7    Q.  It wasn't a coincidence, was it?
8    A.  No.  I mean, I don't know why she -- let me put it
9    this way:  I guess I can't answer that.  I mean, I was
10   contacted.  I didn't handle that.  I referred it.  Why I was
11   contacted?  I don't know.
12        (Brief interruption in proceedings.)
13        (Recess held from 2:47 till 2:59.)
14   BY MR. LANZILLO:
15   Q.  Attorney Joyal, I want to show you a copy of a
16   deposition exhibit that was previously marked in the
17   deposition of Abby Conley.  This was marked as Conley
18   Exhibit 2.  And ask you, have you ever seen that before?
19   A.  No.
20   Q.  Has anyone told you that there were e-mails of
21   this nature exchanged between Abby Conley and Deanna Cosby?
22   A.  Told me that they were exchanging e-mails?
23   Q.  Yeah.  Whether you've seen this or not, have you
24   been made aware by any person that there was an exchange of
25   e-mails between Abby Conley and Deanna Cosby regarding

1    [V.W.]?
2    A.  Yes.
3    Q.  All right.  Who told you that?
4    A.  I'm going to have to raise privilege.
5    Q.  Let me ask you --
6    A.  Because it's in connection with my case.
7    Q.  Let me ask you this --
8    A.  Um-hum.
9    Q.  -- was it Attorney Angelone?
10   A.  Hum-um.  No.
11   Q.  Now, with whom do you reside?
12   A.  With Attorney Angelone.
13   Q.  And how long have you resided together?
14       MR. McNAIR:  Might I ask what relevance this --
15       MR. ANGELONE:  I'm going to object to relevance.
16       MR. JOYAL:  It goes to credibility of the witness,
17       I assume.
18       MR. McNAIR:  This is for impeachment?
19       MR. LANZILLO:  I'm asking the questions --
20       MR. McNAIR:  I object to your comments.  Undue
21       intrusion.
22   Q.  How long have you resided together?
23   A.  I believe it's been 16 months.
24   Q.  Are you telling me that in the 16 months that
25   you've resided with Attorney Angelone, you have not

1    discussed Abby Conley's pending case against the County of
2    Erie and the other Defendants?
3    A.  I am telling you that Attorney Angelone and I have
4    from the very onset discussed not discussing Abby Conley's
5    case.
6    Q.  You referred the case to Attorney Angelone,
7    correct?
8    A.  That's correct.
9    Q.  And so the answer to my question is, in the time
10   that you've resided together, you have not discussed this
11   case.
12   A.  Not substantively.
13   Q.  Okay.  To what extent have you discussed it?
14   A.  What do you have today?  I have a deposition in
15   Abby Conley's case.  What do you have today?
16   Q.  What is your understanding as to whether Attorney
17   Angelone -- whether or not he knew or has known, since you
18   referred the case to him, whether you had prior
19   conversations with Abby Conley regarding the [V.W.] matter?
20   A.  I have no idea what he knew or may have known.
21   Q.  Well, did you tell him that you had had prior
22   interaction with Ms. Conley regarding [V.W.]?
23   A.  When I referred the case?
24   Q.  At any time.
25   A.  I don't recall -- I recall referring him the case,

1    I recall maybe stating the context in which I had met
2    Ms. Conley, but that's all that I recall.
3    Q.  Now, although you decline to tell me what the
4    conversations or the meetings involved, you had
5    conversations with Ms. Conley of a substantive nature
6    relating to the [V.W.] matter.  And what I'm asking you is
7    did you tell Attorney Angelone anything about the substance
8    of those communications?
9        MR. ANGELONE:  I'm going to object.  She already
10       raised the work product privilege as well.
11   A.  Yeah.  I think we're getting into an area that I
12   am not comfortable with.
13       (Proceedings interrupted by the reporter.)
14       MR. McNAIR:  I said, on behalf of Abby Conley, I'm
15       raising a work product objection and privilege.
16       And I would ask the witness to yield her answer to
17       that.
18       MR. LANZILLO:  Is she part of your Plaintiffs --
19       MR. ANGELONE:  No, but she's in my firm, Rich.
20       MR. JOYAL:  Well, there is no firm, she said,
21       Anthony.
22       MR. ANGELONE:  Well, it's a matter of
23       interpretation, I guess.
24       THE WITNESS:  No, I didn't say that there was no
25       firm.  I read from the Rules of Conduct that --

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 50

1      MR. ANGELONE:  I think it's a --
2   (Proceedings interrupted by the reporter.)
3      MR. McNAIR:  One at a time.  Why don't you guys
4   stop bickering for a minute.  What was your
5   question?  You wanted to question me about
6   something; who is on my team?  I think if
7   Mr. Angelone questions -- talks to somebody in
8   connection with this case --
9      MR. LANZILLO:  All right.  I'll withdraw my
10  question to Mr. McNair.
11     MR. McNAIR:  -- it's covered by work product.  I'm
12  raising privilege on that basis.
13     MR. LANZILLO:  Okay.  Hold on.  Let me back up,
14  then.
15  BY MR. LANZILLO:
16     Q.  You won't -- all I'm asking at this point,
17  Attorney Jones, is whether you communicated with Attorney
18  Angelone regarding that subject.  I haven't asked you to
19  tell me what you told him yet.  I don't think there's a
20  privilege, but I need this information to put this before
21  the Court to challenge the invocation of the privilege.
22     A.  Here's -- I'm uncomfortable answering any
23  questions regarding any communications that I had regarding
24  an ongoing case.  And any communications I had with
25  Miss Conley was an ongoing case.

Page 51

1      Q.  I'm asking you about whether you told Attorney
2   Angelone about your conversations with Ms. Conley.
3      A.  I don't recall.
4      Q.  You have no recollection?
5      MR. ANGELONE:  I'm going to raise the same
6      objection.  It's work product.
7      MR. JOYAL:  The subject matter may be.  The
8      question of whether she had them or not is not.
9      MR. LANZILLO:  That's right.
10  BY MR. LANZILLO:
11     Q.  Let me go back to my question.  You can't recall
12  whether you conveyed to Attorney Angelone information
13  relating to your conversations with Ms. Conley?  Is that
14  what you're telling me?
15     A.  I am telling you -- and I'm not sure what you're
16  asking me.  Are you asking me -- when Abby contacted me and
17  I referred her to Attorney Angelone --
18     Q.  Actually, that's not -- that would be encompassed
19  in what I'm asking you, but my question is certainly not
20  limited to that.  I want to know whether at any time you
21  communicated to Mr. Angelone anything regarding your
22  conversations with Ms. Conley that you described earlier.
23  Have you ever had a conversation to that effect?
24     A.  That, I'm going to invoke a work product.
25     Q.  You won't --

Page 52

1      A.  Within our office.
2      Q.  You won't --
3      A.  Whether you want to construe that as a firm or
4   not --
5      Q.  Do you represent Abby Conley?
6      A.  I do not.
7      Q.  Okay.
8      A.  But an attorney in my office does.
9      Q.  All right.  And, for example, in my office right
10  now, while I represent the County of Erie in this case
11  individually, everyone else in my office presumably would be
12  deemed to be representing the County as well.  Are you
13  telling me that you believe every member of the law firm
14  of -- which you have characterized as the firm of Vendetti
15  and Vendetti represents Ms. Conley?
16     A.  Potentially.  Meaning if one of the members of our
17  firm represents a wife in a divorce action, no other member
18  of our firm can represent the Defendant in the divorce
19  action, as it's clearly a conflict, because the firm or the
20  attorney (indicating) already represents the wife.
21     Q.  So in that sense you represent Abby Conley; is
22  that right?
23     A.  In that sense, the entire Vendetti and Vendetti
24  represents Abby Conley.
25     Q.  All right.  So it's your position here today that

Page 53

1   as of today, you continue, as a member of the firm of
2   Vendetti and Vendetti, to represent Abby Conley.  Is that
3   what you're telling me?
4      A.  Under your rationale that you're posing, yes.
5      Q.  I'm not posing any rationale at all.  I'm asking
6   you -- I'm trying to nail down what your position is here as
7   to who represents whom and the basis for your invocation of
8   a privilege.
9         Are you telling me that you're invoking privilege
10  relative to your communications with Attorney Angelone
11  because you are members of the same firm and, therefore,
12  both represent Ms. Conley?
13     A.  Yes.
14     Q.  And, therefore, I take it, it would be your
15  position that Attorney Angelone also represented [V.W.].
16     A.  To an extent that I did, everybody in the firm
17  did.  To the extent.
18     Q.  So that's a yes.
19     A.  I don't want to get caught in semantics here.  I
20  am uncomfortable answering your questions because I'm
21  raising work product.  You want me to get into the dynamics
22  of our firm and how we represent clients --
23     Q.  No, no, no.
24     A.  -- and I -- yes, you are.  And I'm not comfortable
25  doing that.

14  (Pages 50 to 53)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1    Q.  No.  I just want to know what your position is,
2  Attorney Jones, and --
3    A.  My position is every attorney that I speak with in
4  my firm and that they speak with me about cases, there is an
5  implied confidentiality, there is conflicts of laws that
6  arise, and I am not comfortable -- and, again, if Judge
7  McLaughlin wants me to answer the question, I have no
8  problem answering the question.  But at this time I'm going
9  to invoke privilege.  However you want to interpret my
10 interpretation of privilege doesn't matter.
11   Q.  Let me go back to my earlier question.  Were you
12 aware that there was this exchange of e-mails between Abby
13 Conley and Deanna Cosby regarding [V.W.]?
14   A.  Yes.
15   Q.  If you want to take a minute and look at -- well,
16 first, Conley Exhibit 2.  Let me also show you Conley
17 Exhibit 3.  These are also -- and Conley Exhibit 2, for the
18 record, reflects an exchange of e-mails between Deanna Cosby
19 and Abby Conley on May 27th, 2004.  Do you see that?
20   A.  I have that one, yes.
21   Q.  Take a look at the document we have marked Conley
22 Exhibit 3.  Conley Exhibit 3 is easier to interpret if you
23 look at it starting from the back and moving forward.  It
24 begins with an e-mail from Deanna Cosby to Abby Conley on
25 June 4, 2004 at 11:12 a.m.  Do you see that?

1    A.  Um-hum.
2    Q.  The question is asked, "Did you call my cell phone
3  last night?"  Then there's apparently a response from
4  Ms. Conley a little less than an hour later.  Ms. Conley
5  responds, "Yes, I did.  I really wanted to tell you
6  something.  I'll talk to you this weekend.  I don't trust
7  this e-mail system (monitored)."
8        Do you have any knowledge of that exchange of
9  e-mails?
10   A.  No.
11   Q.  If you look on the prior page, you'll see a
12 further exchange of e-mails.  Deanna Cosby writing to Abby
13 Conley on June 4, 2004, at 1:31 p.m.  Do you see that?
14   A.  Um-hum.
15   Q.  All right.  It says, "Do you think I'm wrong for
16 wanting to help [V.W.]?"  I'll represent to you that is
17 [V.W.].  It will show up as V.W. on the transcript,
18 obviously, but so we all know who we are talking about.
19       And the response as given by Abby Conley, "No, I
20 want you to help her.  I am crushed by what is going to
21 happen.  It's just not right, Deanna."
22       And you will see that there are other e-mails
23 exchanged as part of this exhibit.
24       And my question for you, as Abby Conley was
25 communicating with Deanna Cosby, would you consider this to

1  have been a breach of any confidentiality that you had
2  relative to your representation of [V.W.]?
3    A.  I don't understand the question.
4        MR. McNAIR:  I object to the form of the question.
5        I don't know what you're asking.
6    Q.  The information that's being exchanged here, would
7  you consider it confidential relative to your representation
8  of [V.W.]?
9    A.  Rephrase that.
10   Q.  Well, I'll come back to that.  The reference here
11 by, "I'm crushed by what is going to happen.  It's just not
12 right, Deanna," were you aware that a prognostic detention
13 order had been issued relative to [V.W.] and her unborn
14 child?
15   A.  I was aware that in a case such as this, a
16 prognostic detention order would be issued.  I don't have
17 any constructive knowledge that one was issued prior to the
18 birth of this child.
19   Q.  I don't know what you mean by "constructive
20 knowledge".  Did you know that, in fact, a prognostic
21 detention order had been issued relative to [V.W.] and her
22 unborn child prior to the birth of her child?
23   A.  I don't recall.  I'm not being difficult.  I don't
24 recall.  I knew that one was going to be issued, so I never
25 focused on the actual issuance of it, because they are

1  always issued in cases like that.
2    Q.  Did Abby Conley tell you that a prognostic
3  detention order had or would be issued in this case?
4    A.  I'm going to raise privilege.
5    Q.  You see in the e-mail here from Abby Conley to
6  Deanna Cosby, where she talks about, "I want you," speaking
7  to Deanna, "to help her.  I'm crushed by what is going to
8  happen.  It's just not right."
9        Did Ms. Conley express sentiments to that effect
10 to you?
11   A.  I'm going to raise privilege as to any
12 conversations I had with anybody in connection with my
13 representation of [V.W.].
14   Q.  Go to the first page of Exhibit 3 of the Conley
15 exhibit, please.  Do you see the reference there to an
16 e-mail dated June 4, 2004 at 1:59 p.m. from Deanna Cosby to
17 Abby Conley?
18   A.  Um-hum.
19   Q.  Okay.  Says, "There is a new kinship placement
20 policy that was issued in 12/03 that I remember and might
21 still have a copy of to forward it to the attorney.  It
22 states that the CW can do an eyeball --" and CW is
23 caseworker -- "can do a," quote, "eyeball," close quote,
24 "check, rather than the home study, rather than place the
25 baby into foster care.  But I remember when I tried to do

Page 58

1  that and had the documentation to back it up, Sue wouldn't
2  let me, so I'm going to tell [V.W.]'s attorney about that."
3      Did Deanna Cosby communicate that to you, that
4  information to you?
5      A.  I'm going to raise privilege as to any substance
6  of communication I had with any witnesses in my
7  representation of [V.W.].
8      Q.  Right above that, you'll see another e-mail.  This
9  is apparently in response to the last one I read to you.
10  This is also on June 4, 2004.  This is sent from Abby Conley
11  at her Erie County computer at 2:29, again on June 4, 2004.
12  It states, "I just spoke to [V.] last night.  She was not in
13  labor.  Her attorney told [V.] that she has nothing to worry
14  about when it comes to the unborn child.  She told [V.] that
15  we (OCY) cannot detain.  [V.] is taking her attorney's
16  advice.  She is due any day.  Patty has detention letters at
17  all the local hospitals.  [V.] does not see this coming."
18      Let me ask you as a prelude to my next series of
19  questions, do you claim the privilege, the attorney/client
20  privilege or any other privilege relative to things that you
21  told Abby Conley about [V.W.]?
22      A.  Yes.
23      Q.  Did you -- first of all, at the time this e-mail
24  was written, you were representing [V.W.], were you not?
25      A.  That's correct.

Page 59

1      Q.  Did you tell Abby Conley that [V.W.] has nothing
2  to worry about when it comes to the unborn child?
3      A.  I'll raise privilege.
4      Q.  Which privilege are you raising?
5      A.  Attorney/client.
6      MR. McNAIR:  I'll object to the form and the lack
7      of foundation.  You're asking her if she told her
8      client what's reflected there?
9      MR. LANZILLO:  Yeah.
10      MR. McNAIR:  That's absolutely privileged.
11      MR. LANZILLO:  Not if she told Abby Conley.
12      That's what I asked before, and now I'm asking
13      this.
14          I'll tell you, you know, you can take
15      whatever position that you want.  That's up to
16      you.  But --
17      MR. McNAIR:  I'm just trying to figure out what
18      you're talking about.
19  BY MR. LANZILLO:
20      Q.  Well, I'm asking you whether, in fact, you told
21  Abby Conley that you told [V.W.] that she has nothing to
22  worry about.
23      A.  (No response.)
24      Q.  Did you ever communicate that position to her?
25      A.  I can answer it this way:  And I don't know if

Page 60

1  this will be good enough.  Hypothetically, in a case like
2  this, I would never tell anybody that that mother has
3  nothing to worry about.
4      Q.  Let me ask you this:  Would you still invoke the
5  privilege if, in fact, [V.W.] told Abby Conley what you told
6  her?
7      A.  I can't answer a question as to what -- I don't
8  understand your question.  I'm not trying to be difficult,
9  but if [V.W.] told her something, then I don't know what
10  that has to do with me.
11      Q.  Not just something.  If [V.W.] elected to tell a
12  third party, specifically Abby Conley, the substance of
13  comments you made to her, would you still invoke the
14  privilege?
15      MR. ANGELONE:  I object to the form.
16      A.  Unless I have an implied -- or a -- unless I have
17  a signed consent from my client -- obviously, if they want
18  to go outside the scope, they can do it.  I, as an officer
19  of the court, will always invoke privilege, unless I have a
20  waiver from my client.
21      Q.  Or unless --
22      A.  Or a former client.
23      Q.  Or unless ordered by the Court, obviously.
24      A.  Or ordered by the Court.
25      Q.  Did you have any conversations with Abby Conley

Page 61

1  after June 6th, 2004?
2      A.  I don't recall.  My conversations were in between
3  the two permanency hearings.
4      (Discussion held off the record.)
5      A.  I believe there was one in May and one in August.
6      Q.  Thank you.  Did you have any involvement in what
7  we have referred to as the [C.] case?
8      A.  No.
9      Q.  Do you have any knowledge regarding that case?
10      A.  Yes.
11      Q.  And what is the extent of your knowledge?
12      A.  Read about it in the paper.
13      Q.  Anything else?
14      A.  I know the grandparents.
15      Q.  How do you know the grandparents?
16      A.  I know them socially through the Vendettis.
17      Q.  How long have you known the grandparents socially
18  through the Vendettis?
19      A.  Several years.
20      Q.  Did you ever consider accepting representation of
21  the grandparents or any other family members?
22      A.  I was asked briefly and immediately turned it
23  down.
24      Q.  Why is that?  Why did you turn it down?
25      A.  Because I couldn't stand taking cases against the

16 (Pages 58 to 61)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1  agency anymore.
2      Q.  When did this occur?
3      A.  Just -- I'm not sure.  Whenever the children were
4  just detained or their case was just opened.  I never met
5  with the [C's].  I was approached by another member of the
6  firm if I would meet with them, and I said no.
7      Q.  And who was the other member of the firm who
8  approached you?
9      A.  It was Richard Vendetti.
10     Q.  I take it from your comments in response to my
11 prior question -- it was two questions ago -- that as of the
12 date you were offered representation or requested to
13 represent parties to the [C.] case, that you have not since
14 taken any cases against the agency, OCY?
15     A.  That's correct.  I have not taken any dependency
16 cases.  Some custody cases have a OCY area, but I have not
17 taken another case in the juvenile court system, I don't
18 believe.  That I can recall right now.  Let me take that
19 back.  I have been -- every once in a while the court
20 administrator will call me and ask me if I will take a case
21 where they need another outside counsel, and I have done
22 that on maybe two or three occasions.  I currently have one
23 now, but I have not even -- I just got appointed.
24     Q.  Other than those two or three occasions where you
25 have been requested by the court administrator to represent

1  parties in dependency hearings, you have not taken any other
2  such cases against the agency?
3      A.  No.
4      Q.  And what do you mean by "against the agency"?  I
5  just want to understand.
6      A.  Well, in any case where there is a detention
7  order.  Any juvenile court case that's out there.
8      Q.  You would consider that to be against or adverse?
9      A.  I would -- it's not supposed to be against or
10 adverse.  They are supposed to be working for the client,
11 for the parent, for the child.
12     Q.  Let me stop you there, though, for a second.  But
13 in that context that you have just described, though, when
14 you're representing a particular individual -- it might be a
15 child or children, it might be a parent, in that case,
16 though, I mean, your sole concern as counsel is acting on
17 behalf of that client, is it not?
18     A.  That's correct.
19     Q.  All right.  So to the extent that the agency has
20 got other concerns beyond those of just your client, you are
21 adverse, are you not?
22     A.  To an extent.
23     Q.  All right.
24     A.  But if the goal is reunification, it's not
25 intended to be an adversarial forum.

1      Q.  Are there situations where reunification is not
2  appropriate?
3      A.  Of course.
4      Q.  Have you ever had any contact with Attorney Jerry
5  Villella relative to Abby Conley?
6      A.  I don't recall.
7      Q.  Do you know Attorney Villella?
8      A.  Yes.
9      Q.  You don't recall whether you ever had any
10 conversations or telephone conversations with him regarding
11 Abby Conley or information provided by Abby Conley?
12     A.  I don't think I did.  I have had conversations
13 with Attorney Villella.  I don't recall the context.
14     Q.  Did you have any contact with Attorney Villella
15 regarding the [C.] case?
16     A.  I don't recall.  I recall having a conversation
17 with him around that time, but I don't recall the context of
18 our conversation.
19     Q.  When you say "around that time", are you talking
20 at or around the time that there was a hearing regarding the
21 [C.] case?
22     A.  Yes.
23     Q.  At or about the time of the hearing in the [C.]
24 case to which you're referring, were you aware that
25 Ms. Conley was going to provide testimony?

1      A.  No.
2      Q.  When did you first learn that Ms. Conley had
3  provided testimony in that matter?
4      A.  When I read it in the paper.  Or it was after the
5  fact.  I'm not sure how, but it was after the fact.
6      Q.  What did you do to prepare for your deposition
7  today?
8      A.  Read the Rules of Professional Conduct.
9      Q.  Did you review any file materials?
10     A.  Briefly.
11     Q.  What did you review?
12     A.  I reviewed my file for what was asked for in the
13 subpoena.
14     Q.  What file did you review?
15     A.  I reviewed whatever I retained in the [V.W.] file.
16     Q.  What did you retain in the [V.W.] file?
17     A.  Various pleadings.
18     Q.  Anything else?
19     A.  Various pleadings, reports.  I think that's all.
20     Q.  When you say "reports", what are you referring to?
21     A.  Permanency reports.
22     Q.  What pleadings do you recall seeing in your file?
23     A.  I recall seeing the termination of parental rights
24 petition and dependency petition, I believe.
25     Q.  You did not possess a copy of the prognostic

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1  detention order?
2      A. I did not.
3      Q. Have you ever possessed a copy of the prognostic
4  detention order?
5      A. I am unsure. I must have. I don't -- I'm unsure.
6  I don't know.
7      Q. Have you discarded any pleadings from your file?
8      A. I don't think so.
9      Q. So then I take it it's fair to say that your file
10 has not contained at any time a copy of the prognostic
11 detention order?
12     A. No, that's not what I said. I said I don't know.
13 I don't recall.
14     Q. I asked you what -- if you had reviewed the file
15 and what you remember seeing in it, and I asked you whether
16 you saw the prognostic detention order. You said no.
17     A. Correct.
18     Q. And I asked you whether pleadings had been omitted
19 or discarded from your file, and you told me no.
20     A. Correct.
21     Q. Therefore, it seems to follow -- and correct me if
22 I'm wrong -- that your file has not contained a copy of the
23 prognostic detention order.
24     A. You're wrong to the extent that I took about 30
25 seconds to look through the file. I did not look through

1  every piece of paper that I had in the file. I glanced
2  through it. It may be there, and I didn't see it.
3      Q. When you say you glanced through the file, is that
4  true as to your review of the entire file in preparation for
5  responding to today's subpoena?
6      A. (Witness nods head.)
7      Q. You're shaking --
8      A. That's correct. That's correct. I didn't look
9  through many of the pleadings files, because that didn't
10 seem to contain anything that you were asking for here
11 (indicating).
12     Q. The Vendetti and Vendetti letterhead, I don't have
13 it here with me, but I recollect that it recites that you
14 are not a partnership, but you are a group of solo
15 practitioners. Is my recollection correct?
16     A. I believe it says something to that effect.
17     Q. Is that accurate?
18     A. To an extent.
19     Q. To what extent is it not accurate?
20     A. We undertake larger projects in our firm that we
21 all expense and pay for and benefit from. Oftentimes I do
22 have one of the other attorneys in the firm work for me. Or
23 I do work for them.
24     Q. The arrangement you just described whereby members
25 of the firm undertake larger projects and work together, do

1  any of those projects -- do those projects include the
2  [V.W.] matter or the representation of Abby Conley?
3      A. No.
4      MR. LANZILLO: Those are all the questions I have
5      at this time.
6      MR. JOYAL: I have some questions for you, Miss
7      Jones.
8      MR. LANZILLO: Pardon me, Ed. I reserve my right
9      to press for responses to the questions to which
10     privileges were asserted.
11
12             CROSS-EXAMINATION
13 BY MR. JOYAL:
14
15     Q. Mr. Lanzillo was asking you some questions in an
16 attempt to pin you down, in a sense, in terms of what your
17 claims of privilege are. Let me see if I can go over some
18 things that he may not have asked you and see if I can get a
19 little bit better sense of what you are talking about.
20         According to one of the last questions you
21 answered, your letterhead for your firm specifically states
22 that it is not a partnership. Is that correct?
23     A. That is correct.
24     Q. And that's pursuant to the Rules of Professional
25 Conduct under 7.5(d). Is that right?

1      A. That's correct.
2      Q. Now, can you answer a question for me, based upon
3  that, if you take a look at that same rule and look at
4  Explanatory Comment No. 2 under that rule, which states with
5  regard to Paragraph (e), "Lawyers sharing office facilities,
6  but who are not, in fact, associated with each other in a
7  law firm may not denominate themselves as, for example,
8  Smith and Jones, when that title suggests that they are
9  practicing law together in a firm."
10         Now, the firm letterhead says Vendetti and
11 Vendetti on it, does it not?
12     A. Yes, it does.
13     Q. Okay. And in an attempt to avoid violation of
14 7.5(d) with reference to Comment No. 2, the bottom of the
15 letterhead or someplace on the letterhead suggests that it's
16 not a partnership. Correct?
17     A. That would be correct.
18     Q. All right. Now, you talked about round-tabling
19 cases. I'm talking about with other lawyers about cases
20 before you went to trial. And I believe you also talked
21 about situations where there might be an implied
22 confidentiality?
23     A. (Witness nods head.)
24     Q. Before you spoke to any other lawyer in your firm
25 about one of your cases, would you make sure that your

Page 70

1  client didn't have a problem with you talking to another
2  lawyer about that case?
3      A.  Sometimes.
4      Q.  Sometimes.  Well, "sometimes" meaning what?  Would
5  you go to your client and say, you know what, during the
6  course of my representation, I may talk to the guy I live
7  with about your case, give him your name, give him the
8  facts?
9      A.  I would never give anybody my client's names.
10     Q.  So when you were talking about trial, would it be
11 all hypotheticals?
12     A.  Absolutely.
13     Q.  And during the course of time that this matter has
14 been ongoing, since approximately 2004 up to and including
15 the time when Mr. Angelone, on behalf of Miss Conley,
16 withdrew the Civil Service request for a hearing, it's your
17 testimony today that you had not discussed at all with him
18 any of the facts surrounding this case?
19     A.  I'm going to raise a work product privilege.
20     Q.  Whose work product is that?  His or yours?
21     A.  The firm's.
22     Q.  Well, are you now telling me -- so if I were to
23 ask Mr. Vendetti if he agreed with you that there is a firm
24 work product privilege, based upon your testimony today, do
25 you know whether or not he would agree with you?

Page 71

1      A.  No idea what he would say.
2      Q.  Okay.  Are you aware of the fact, or during the
3  course of your discussions with the, quote, independent
4  counsel you spoke to today before you came in here, would
5  you be aware of the fact that your testimony concerning how
6  you participate in firm -- firm business, using your
7  terminology and Mr. Angelone's terminology for firm, that
8  might lead to all members of the firm, whether they were
9  involved in representation or not, being held liable for
10 your or Mr. Angelone's malpractice?
11     A.  Can you rephrase the question.
12     Q.  Do you think that Mr. Vendetti -- if Ms. Conley
13 was upset with Mr. Angelone's representation of her and
14 decided to sue him for malpractice, do you think that all of
15 the other lawyers in the firm might be liable for his
16 malpractice, including you?
17     A.  I don't know.
18     Q.  You don't know.  Who was the person that you
19 consulted?  Did you consult an ethics attorney before you
20 came in here today?
21     A.  I consulted my own private counsel.
22     Q.  Is that a person that has specialty in
23 professional ethics?
24     A.  It's Phil Friedman.
25     Q.  Does he have specialty in professional ethics?

Page 72

1      A.  He has some background in professional ethics,
2  yes, he does.
3      Q.  Are you familiar with the confidentiality policies
4  and confidentiality statutes regarding OCY?
5      A.  No.
6      Q.  You're not?
7      A.  No.
8      Q.  Mr. Lanzillo was asking you some questions about
9  some e-mails.
10     A.  Yes.
11     Q.  I believe one of them he asked you about was an
12 e-mail communication between Abby Conley and Deanna Cosby
13 discussing [V.W.]'s case.  Correct?
14     A.  It appears as such.
15     Q.  Do you believe that Abby Conley was violating your
16 client [V.W.]'s confidentiality, by discussing her case with
17 a third party?
18     A.  I don't know.
19     Q.  Well, you're a lawyer, right?
20         MR. McNAIR:  Objection.  Argumentative.
21     Q.  Right?  Are you an attorney?
22     A.  I am an attorney.
23     Q.  Okay.  Would you think that it would be
24 appropriate for Abby Conley to be talking to people on the
25 street about your client's case concerning matters in her

Page 73

1  case file?
2      A.  It's my understanding that the client holds the
3  privilege.
4      Q.  Well, does your client know the privilege?
5      A.  (Witness indicates.)
6      Q.  That she has a privilege not to have -- strike
7  that.  Let's back it up.  Is it not true, or do you not know
8  whether or not by statute or by OCY policy, that information
9  contained in a client's file is to remain confidential?
10     A.  I don't know.
11     Q.  How long have you been practicing law where you
12 were dealing with OCY?
13     A.  Five years.
14     Q.  And in those five years, did you ever read the OCY
15 confidentiality policy?
16     A.  I did not.
17     Q.  Did you ever read the statutes regarding Child
18 Protective Services Law?
19     A.  Yes, I did.
20     Q.  What do they say about the contents of --
21     A.  I don't recall.
22     Q.  -- family files?
23     A.  I don't recall.
24     Q.  You don't recall?
25     A.  I don't recall.

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1    Q.  Did anyone tell you that if you testified that
2  your conversations with either Abby Conley or Deanna Cosby
3  had anything to do with the prognostic detention order, that
4  it would torpedo their case, or something to that effect?
5    A.  No.
6    Q.  Did anyone ever tell you that one of the areas
7  that were in dispute here is to whether or not Abby Conley
8  violated confidentiality policies by talking to Deanna Cosby
9  about the prognostic detention order?
10    A.  I believe I do know that.
11    Q.  Okay.  And where did you get that information
12  from?
13    A.  I do not know.
14    Q.  Would it have been Mr. Angelone or Mr. McNair?
15    A.  It could have been the Erie Daily Times.  I do not
16  know.
17    Q.  Well, can you cite to me a story, if you know, as
18  to when it was that the Erie Daily Times would have written
19  about Abby Conley's violating confidentiality by talking to
20  one of your clients -- about one of your clients?
21    A.  No, I can't.
22    Q.  Can you also -- you have a recollection that the
23  defense, as set forth in the Erie Times, was that Abby
24  Conley was fired for giving a phone number of a client to
25  Deanna Cosby.

1      MR. McNAIR:  Objection.  Foundation.
2    Q.  Ever read that story?
3    A.  I read the paper every day.
4    Q.  Did you read that story; that that was the
5  defense?
6    A.  Probably.  I imagine.
7    Q.  Okay.  But as you sit here today, do you know
8  whether or not that OCY has ever stated in the newspaper
9  that the reason that Abby Conley was asked to resign was
10  because she had given up information concerning a client's
11  file, not just a telephone number at the request of the
12  client?
13    A.  I don't recall that.
14    Q.  You can't recall it?
15    A.  Hum-um.
16    Q.  Do you have a fee-sharing agreement within your
17  firm or within your association or whatever way you want to
18  put it?
19    A.  Each attorney has -- there is associations within
20  the firm where fees are paid to other attorneys for work
21  done.
22    Q.  Okay.
23    A.  Is there a firm-wide agreement?  Is that the
24  question?
25    Q.  Yeah.  Well, let me ask you this question:  If you

1  get paid for a case -- let's say when you had your OCY
2  contract.  You get paid for the case.  Did you have to share
3  that payment with anyone else in the firm as a matter of
4  course?
5    A.  We shared expenses, so as I got money, that money
6  went back out to benefit the firm.
7    Q.  Well, when you say you shared expenses, in other
8  words, did you have to pay for your --
9      (Discussion held off the record.)
10    Q.  So let me see if I understand this.  Expenses
11  meaning overhead for things that you share, correct?
12    A.  Correct.
13    Q.  In other words, you pay for electricity, heat,
14  secretarial salaries?
15    A.  Receptionist.
16    Q.  Receptionist, copy costs, copy machines, things
17  like that.
18    A.  Lunches, parties, renovations to the office.
19    Q.  Was this as a result of an agreement that you made
20  to be able to have an office in the firm, in the building?
21    A.  Yes.
22    Q.  So you made an agreement that, in effect, you were
23  paying rent and share of the overhead expenses.
24      MR. McNAIR:  Objection.  Argumentative.
25    Q.  Is that true?

1    A.  Yeah.
2    Q.  So at the end of the month, you would write a
3  check for your share of those expenses.
4    A.  Yeah.
5    Q.  Something like that.
6    A.  Somewhat.
7    Q.  Now, if you were -- you said in some cases you
8  might have another attorney do some work on the case with
9  you?
10    A.  Correct.
11    Q.  And you would pay that attorney out of your fee?
12    A.  Correct.
13    Q.  But it was not a normal practice for you to get a
14  fee and then allocate a portion of that outside of the
15  expenses; is that right?
16    A.  That's correct.
17    Q.  You weren't giving up part of your income to the
18  Vendettis or Mr. Angelone; is that correct?
19    A.  That's correct.
20    Q.  And I believe you told Mr. Lanzillo that this Abby
21  Conley case is not a case that all members of the firm are
22  going to benefit from.  Is that right?
23    A.  Well, I don't recall saying that to him.
24    Q.  Well, I believe he asked you the question.  You --
25  I didn't write it down exactly --

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1    MR. McNAIR: Well, then if it's been asked and
2    answered, why are you asking it again?
3    MR. JOYAL: You have your objection.
4    MR. McNAIR: I have -- my objection is that you
5    are wasting our time again.
6    MR. JOYAL: All right, Mr. McNair. I understand
7    that.
8    MR. McNAIR: By going over and over the same
9    things that have already been covered.
10   Q. Is the Abby Conley --
11   MR. McNAIR: I'm probably going to file a motion
12   for sanctions against you for doing that, because
13   I'm just sick and tired of it.
14   Q. Is the Abby Conley case a case in which you will
15   benefit from financially?
16   A. Potentially if -- I guess you can make the
17   argument that if Attorney Angelone and Attorney McNair are
18   successful, and the Vendetti and Vendetti firm name gets
19   placed in the paper, I think everybody in the firm may
20   benefit from referrals.
21   Q. Let me ask this question, then, straight out:
22   When you referred this case to Mr. Angelone, did you set up
23   a referral fee with him?
24   A. No, I did not.
25   Q. So other than the potential publicity in this

1    case -- strike that. Do you know whether or not at any
2    point in time there has been any reference, other than, you
3    know, in the court documents themselves, to the Vendetti and
4    Vendetti Law Firm as having any representation of Abby
5    Conley?
6    A. I don't know.
7    Q. In an OCY case, dependency case, there are four
8    parties sometimes; is that correct? Mother, father,
9    children, and OCY. Correct?
10   A. Correct.
11   Q. And each party has -- each lawyer has a different
12   client, correct?
13   A. Correct.
14   Q. And would you agree with me that in some
15   instances, even though family reunification may be the goal,
16   that there may be a conflict between what the agency wants
17   to see happen and what the parents may want to see happen?
18   In other words, the parents may be asked to do certain
19   things, and they don't agree with it, and it's up to the
20   parents' lawyers to try to argue to the Court that that's
21   not appropriate, correct?
22   A. (Witness nods head.) Generally.
23   Q. Okay. And the child's lawyers -- or the lawyers
24   for the children are there to, in effect, argue on behalf of
25   the children or represent the children's best interests,

1    correct?
2    A. Correct.
3    Q. And in some instances during any dependency
4    proceeding, the interests of the child may be in conflict
5    with that of the parent. Correct?
6    A. Correct.
7    Q. As the interests of the parent may be -- or any
8    party may be in conflict with that of the agency.
9    A. Interest of the child may be that -- in contrary
10   to the agency. All of it.
11   Q. Correct.
12   A. Yep.
13   Q. Correct. And over the course of your career, in
14   the five years you were doing this work for OCY, either
15   under contract or on private payment, how many times do you
16   think that you contacted a worker to talk to a worker
17   without going through the OCY lawyer before you did that?
18   A. If I would have ever contacted a caseworker, I
19   would have never gotten the permission of the solicitor to
20   do that.
21   Q. Okay. What about the lawyer that was not -- I'm
22   not talking about the solicitor. What about Cathy Allgeier
23   or any other lawyer that --
24   MR. McNAIR: She's the solicitor.
25   MR. JOYAL: She's the solicitor?

1    MR. McNAIR: Yeah.
2    Q. So you would not talk to the solicitor about
3    contacting a potential witness that worked for the agency.
4    A. They would -- once we would receive the witness
5    list, if there was a lay witness on their list that I wanted
6    to contact, I would contact them.
7    Q. Okay. Well, then that's -- that's -- taking that
8    as your caveat, once you got their witness list, when did
9    Abby Conley's name appear on the [V.W.] witness list, if you
10   recall?
11   A. That is different. There's only a witness list
12   issued at the time of a termination trial. When I had my
13   contract, I did no dependency work. I did all termination
14   work.
15   Q. Okay. So then let's get away from your contract
16   and let's talk about private paying. Now, as you sit here
17   today, you don't have a recollection as to what your billing
18   was or whether you even charged [V.W.]; is that correct?
19   A. No, I know that I charged her.
20   Q. Okay. And did you know how much money [V.W.] had
21   and what her sources of income were?
22   A. Somewhat.
23   Q. You know [V.W.] was not a poor person. She had
24   money, right? She worked.
25   A. I don't understand -- you know, I don't know what

Page 82

1  you're looking for. An income level?
2      Q. Well, you said, I think, when Mr. Lanzillo asked
3  you about billing records, you said you weren't sure whether
4  or not -- how much you charged her or -- you talked about
5  low-income people and --
6      A. Correct.
7      Q. -- pro bono. [V.W.] was not a pro bono client.
8      A. She was not a pro bono client, but she was not
9  billed hourly.
10     Q. Okay. How was she billed?
11     A. I would have loosely kept track of my time and
12  worked with her with what she could do.
13     Q. Okay. Well, did you have a retainer with her?
14     A. I had an initial retainer.
15     Q. How much was it?
16     A. I don't recall.
17     Q. Were you aware of the fact that one of the issues
18  regarding -- I mean, I'm sure you were. Did you have a
19  recollection that one of the issues for OCY was that [V.W.]
20  may have been involved in drug dealing or prostitution?
21     A. I understood that they were never that blatant
22  about it, but I understood that the agency made the
23  inference.
24     Q. She wasn't on welfare, was she?
25     A. I don't recall.

Page 83

1      Q. Prior to your speaking with Abby Conley did you
2  speak with the attorney that was representing the children?
3      A. I don't recall. Possibly.
4      Q. Would you normally speak with attorneys
5  representing children before you contacted workers?
6      A. No.
7      Q. Under what circumstances would you seek waivers
8  from your clients before you spoke to other people in your
9  firm, even generally, about their cases?
10     A. In what instances?
11     Q. Yes.
12     A. If there was a complex issue of law, I would say
13  to my client, do you mind if I bounce this off my
14  associates.
15     Q. All right. And you said that to [V.W.] at the
16  time that you were talking to members of your firm about her
17  case?
18     A. I don't recall.
19     Q. How many members of the firm, if you can recall
20  back in the time that you were doing work that had to do
21  with OCY, did that same type of work that you did?
22     A. None.
23     Q. None. So would it be fair to say that you would
24  be asking people with less experience than you had in child
25  welfare law or child protective services law --

Page 84

1      A. It would be fair to say that there's attorneys in
2  my firm that practice medical malpractice cases that I've
3  never done and come into my office. I find that we're an
4  intellectual group, and every once in a while we'll discuss
5  theories of law.
6      Q. So what theories of law would you be discussing
7  with Mr. Angelone that had to do with child welfare law that
8  he would have been familiar with?
9      A. I don't recall that I ever did.
10     Q. Okay. How about with Mr. -- with any other person
11  in the firm that didn't know child welfare law? How
12  many times would you --
13     A. I don't recall that I ever discussed child welfare
14  law with any member of my firm.
15     Q. Now, I believe you said that you would have been
16  aware of the likelihood that a prognostic detention order
17  would have been outstanding. Is that right?
18     A. Absolutely.
19     Q. It would be fair to say, wouldn't it, that Judge
20  Kelly would have signed such an order?
21     A. Whomever the Judge was.
22     Q. Whomever the Judge was assigned to the case?
23     A. It would be assumed in hypothetical cases such as
24  that, that a prognostic order would be signed, yes.
25     Q. Okay, hypothetically. And in those situations,

Page 85

1  the Judge did not hold a hearing bringing all parties in.
2  They would take the order, take the -- the agency would come
3  in, make their presentation, the Judge would make a decision
4  as to whether to sign the order, right?
5      A. I'm not sure what the procedure is. It is my
6  understanding. I mean, as counsel for parents, we were
7  never advised -- informed.
8      Q. Would it be fair to say that the reason for that
9  was because it was supposed to be secret?
10     A. For any practitioner in the law, it wasn't a
11  secret.
12     Q. That's not my question.
13     A. I don't know why they do the things they do. I'm
14  not qualified to reach that conclusion.
15     Q. Did you ever tell any of your clients after you --
16  that, you know, that -- strike that. Let me ask it this
17  way: In your experience, over the course of the five years,
18  knowing that they would -- that it was common practice or in
19  your way common knowledge that such orders were issued, did
20  you ever tell your clients that they would issue such an
21  order and advise them to leave the jurisdiction?
22     A. Never.
23     Q. Never. And would you advise your clients against
24  leaving the jurisdiction?
25     A. I would never advise my clients to do anything

22 (Pages 82 to 85)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

1  unlawful.
2      Q.  Okay.  Leaving the jurisdiction, in your mind,
3  would have been unlawful?
4      A.  If they are under the -- if they are under -- if
5  there's an open case, I would never advise anybody to leave
6  the jurisdiction.
7      Q.  Okay.  Were you aware or did anybody ever tell you
8  that after the e-mails of June 4th, that [V.W.] was writing
9  letters to [R.B.] telling him that she thought she might
10  leave to go to Florida or to Canada to have the baby if the
11  agency was going to take it?
12     A.  I'm going to raise privilege as to anything having
13  to do with [V.W.].
14     Q.  So you're not going to answer whether you knew
15  about the letters.
16     A.  No, I am not.
17     Q.  Are you aware that P.W. was told by [V.W.] after
18  the birth of the child that she knew about the order because
19  Deanna Cosby had called her and told her about it at the
20  direction of Abby Conley?
21     A.  No recollection.  Privilege.
22     Q.  Did anyone tell you the other day when [P.W.]
23  testified that she testified to that?
24     A.  I had no conversations about any depositions.
25     Q.  Have you seen any of the documents that were

1  produced by the County during the course of the Civil
2  Service case?
3      A.  No.
4      Q.  If during the course of representation of a parent
5  or a child, whether it be under contract with OCY or in your
6  own private practice, if you had been made aware of the fact
7  that an employee of OCY was telling people about information
8  contained in the file, would you have raised an objection
9  with OCY concerning that?
10     A.  I don't know.
11     Q.  Can you tell me why you don't know?
12     A.  I don't know what they would be saying.
13     Q.  Well, let's say that a worker -- let's say that a
14  worker was going out talking to her neighbors or her friends
15  about [V.W.], saying, you know, [V.W.]'s kids are under the
16  care of OCY, we're trying to get them away, we have
17  information that she's a drug dealer and a prostitute, yada,
18  yada, yada, if that information came to you, would you have
19  raised an objection with OCY and ask that that stop?
20     A.  I don't know.
21     Q.  Why?
22     A.  Because you're asking me to comment on a
23  hypothetical, and I'm not comfortable doing so.
24     Q.  Well, then let's make it into something less than
25  a hypothetical.  Let's make it into the fact that Abby

1  Conley's e-mails and Deanna Cosby's testimony attest to the
2  fact that Abby Conley was talking about one of your
3  clients -- at least one of your clients.  It's not a
4  hypothetical.  If you had known about that, would you have
5  raised that as an issue with OCY?
6      A.  No.
7      Q.  Okay.  And you would not have -- then presumably
8  as well you would not have raised it as an issue with OCY
9  that the information that was being given out would have
10  been adverse to your client's interests, as opposed to being
11  favorable to your client's interests; is that right?
12     A.  I don't know.
13     Q.  At any point in time prior to Abby Conley's
14  termination, did she have a conversation with you regarding
15  her perceived troubles at OCY?
16     MR. McNAIR:  Objection.  Foundation.
17     Q.  Let me rephrase.  You don't understand my
18  question?
19     MR. McNAIR:  I understand your question.  You're
20     just making up facts and throwing them out --
21     MR. LANZILLO:  He's asking a question.
22     MR. JOYAL:  Let me rephrase the question.
23     Q.  Abby Conley resigned her position on
24  September 10th of '04.  Do you know that?
25     A.  I know she was fired.  My understanding.

1      Q.  Your understanding was she was fired.  Did you
2  ever see the resignation letter that she drafted?
3      A.  I don't think so.
4      Q.  So you have never seen the letter --
5      A.  I don't recall that I have or not.
6      Q.  In consideration for her resignation, there was
7  not going to be a -- anyone --
8      MR. McNAIR:  Object to the relevance.  What
9      information does this witness --
10     MR. JOYAL:  I don't know.  I'm trying to find out,
11     Mr. McNair.
12     MR. McNAIR:  What do you think she knows?
13     MR. JOYAL:  Who knows, Mr. McNair.
14     MR. McNAIR:  Well, no, then you're fishing.  Knock
15     it off.
16     MR. JOYAL:  That's fine.  And it's a discovery
17     deposition.
18     MR. McNAIR:  You have to have a reasonable belief
19     that the discovery you are seeking is going to
20     lead to admissible evidence.
21     MR. JOYAL:  Okay.  Thank you for telling me that.
22     Q.  Now, here is my question --
23     MR. McNAIR:  Would you like to read the book?  I
24     have it here.
25     MR. JOYAL:  I know you do.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 90

1    Q.  Did you know that in exchange for her resignation,
2  there was an agreement that she could apply for unemployment
3  and that OCY would not contest that application?
4        MR. McNAIR: Objection. Irrelevant, waste of
5        time.
6    Q.  You can answer the question.
7    A.  I don't know any specifics. I -- my
8  understanding -- and I'm not sure of the source -- my
9  understanding is that there was something that she signed.
10  I don't know the content, I'm not sure of the -- you know, I
11  don't know.
12    Q.  Okay. So the source could be the newspaper,
13  McNair, Angelone, or Conley. Is that right?
14    A.  That's right.
15    Q.  And if it wasn't the newspaper, it would have been
16  one of those three other individuals.
17        MR. ANGELONE: Objection.
18    Q.  Yes or no?
19    A.  Seems to be logical.
20    Q.  Okay.
21    A.  Take one away, three left standing.
22    Q.  Right. Which would have meant that you would have
23  had some sort of conversation with one of those three
24  individuals concerning that. And if it wasn't Miss Conley,
25  it would have been Mr. Angelone or Mr. McNair. Correct?

Page 91

1    A.  (No response.)
2    Q.  Yes?
3    A.  Or the newspaper.
4    Q.  Well, no --
5    A.  You have to bring them back in. Or did you
6  already take them out?
7    Q.  Okay. Did you have a conversation with the
8  newspaper about that?
9    A.  No.
10    Q.  Well, let's take the newspaper out. You don't
11  recall reading it in the newspaper, do you?
12    A.  I may have. I said I didn't know where I learned
13  of it.
14    Q.  Do you think --
15    A.  It could have been the newspaper.
16    Q.  Do you think -- I'm sorry.
17    A.  That's okay.
18    Q.  Do you think the probability would have been that
19  there's a greater probability that it came from one of the
20  three individuals, as opposed to the newspaper?
21    A.  I don't know.
22        (Discussion held off the record.)
23    Q.  Do you know whether or not either Mr. McNair or
24  Mr. Angelone had a waiver from Miss Conley to discuss her
25  case with you?

Page 92

1    A.  I don't know.
2    Q.  Did you withdraw from representation from [V.W.],
3  or did she fire you?
4    A.  I withdrew.
5    Q.  What were the circumstances that led you to call
6  Deanna Cosby concerning [V.W.]?
7    A.  Raising privilege. Work product.
8    Q.  Did you get information that she was a witness
9  that could be useful in testifying concerning facts that she
10  knew after February 4th of 2004?
11    A.  I'm raising privilege. Work product.
12    Q.  Did you get information from Abby Conley that
13  would have indicated that Deanna Cosby had information that
14  was not information that had been obtained while she was
15  [V.W.]'s caseworker?
16    A.  Raising privilege. Work product.
17    Q.  Did you talk to Abby Conley about your
18  conversations with Deanna Cosby?
19    A.  Raising privilege. Work product.
20    Q.  Would you like to tell me, if you disclosed that
21  to Miss Conley, what is your basis for claiming work product
22  privilege? Was she part of your defense team for Ms. [W.]?
23    A.  According to Rule 1.6, I am raising work product,
24  attorney/client privilege.
25    Q.  Right. And I'm asking you to specify for me under

Page 93

1  Rule 1.6, if Abby Conley was not a member of your office or
2  the defense team, can you tell me under what provision of
3  1.6 discussing any conversation that you may have had with
4  Abby Conley concerning Deanna Cosby's conversation with you
5  would be covered under work product privilege.
6    A.  It was an ongoing case, it was a pending case that
7  I was preparing for hearing.
8    Q.  Okay. Well, were you preparing it for hearing by
9  using Deanna Cosby's evidence with Abby Conley?
10    A.  Privilege and work product. Whoever I spoke with
11  and whatever I did preparing for trial, I consider work
12  product and privilege.
13    Q.  Okay. So you consider a conversation that you may
14  have had with someone on the telephone that you then gave to
15  a person outside of your office as privileged.
16        MR. McNAIR: Have we not already covered this?
17        MR. JOYAL: No, we haven't.
18        MR. McNAIR: Do you want to bet me 20 bucks?
19        MR. JOYAL: No.
20        MR. ANGELONE: I'm going to object. It's been
21        asked and answer. Go ahead.
22    Q.  Go ahead.
23        MR. McNAIR: You're just wasting our time. For
24        crying out loud.
25    A.  Yes.

24 (Pages 90 to 93)

Ferguson & Holdnack Reporting, Inc.

1     MR. ANGELONE: She already invoked the privilege.
2     MR. JOYAL: Well, she just answered yes. Will you
3     read back --
4     A. Yes, I -- then that's my -- I'm getting confused
5 with your conversation. I'm invoking privilege and work
6 product.
7     Q. So, in other words, just so we're clear and the
8 record is clear, you do not believe that telling Abby Conley
9 about the conversation between you and Deanna Cosby that you
10 refuse to testify to today is not -- is covered by work
11 product.
12     A. You're assuming facts that I have not testified
13 to.
14     MR. ANGELONE: I'm going to object to lack of
15     foundation.
16     Q. What facts am I assuming that you've haven't
17 testified to?
18     A. That I'm telling anybody anything.
19     Q. Okay. Well, I asked -- okay. Then, again, did
20 you tell Abby Conley about your conversation with Deanna
21 Cosby?
22     MR. McNAIR: Asked and answered.
23     MR. ANGELONE: Asked and answered.
24     A. I'm raising work product, attorney/client
25 privilege.

1     Q. Then I will ask you the question again, if you're
2 raising that --
3     MR. McNAIR: Will you stop asking the same
4     question over and over and over. We have things
5     to do.
6     MR. JOYAL: I'm sure we all do.
7     MR. McNAIR: I know you love to hear yourself
8     talk, but give it a rest, will you?
9     Q. Just for the benefit of Judge McLaughlin, I want
10 to know, when you believe, Attorney Jones, when you believe
11 that privilege attaches to a conversation. Does it attach
12 to a conversation that you have and then you give to a
13 lawyer in your firm? Is that privilege -- is that material
14 privileged?
15     A. I believe it is.
16     Q. Okay. Does it attach to a conversation that you
17 have with a witness that you then talk to another witness
18 about?
19     A. I believe it is.
20     Q. And if that witness is not a person within your
21 firm, you believe that that is privileged; that you have not
22 given that information to an outside party.
23     A. I believe it is.
24     Q. And have you gotten any advice from counsel that
25 would support that position?

1     A. Yes, I have.
2     Q. Okay. And was that today?
3     A. No, it was not.
4     Q. Okay. When was that?
5     MR. McNAIR: What relevance is that to anything?
6     MR. JOYAL: Because this is all making a record
7     for our potential motion --
8     MR. McNAIR: It is all wasting our time.
9     MR. JOYAL: That may be fine, Mr. McNair. I'm
10     sure --
11     MR. McNAIR: These have already been asked.
12     MR. JOYAL: I'm sure that Judge McLaughlin will
13     appreciate you saying that.
14     MR. McNAIR: And I'm sure Judge McLaughlin will
15     have a hearing and ask her himself.
16     MR. JOYAL: Well, he may do that.
17     MR. McNAIR: So --
18     MR. JOYAL: But I think in order to try to help
19     the Court, we're going to try to get as specific
20     as we can, because maybe we'll agree with her
21     position and won't press it.
22     MR. ANGELONE: Yeah, right.
23     MR. McNAIR: Could I just ask -- I've got to
24     leave. I have a hearing tonight. And could I
25     just ask a few questions of this witness? Do you

1     mind?
2     MR. JOYAL: Sure. Go ahead.
3     MR. McNAIR: Thank you.
4
5          CROSS-EXAMINATION
6 BY MR. McNAIR:
7
8     Q. Ms. Jones, if you talk to another attorney in your
9 office, is that for purposes of getting professional advice?
10     A. Yes.
11     Q. In the conduct of your practice of law?
12     A. Yes.
13     Q. And is that done to benefit your client?
14     A. Yes.
15     Q. In what percentage of cases where a mother has one
16 or more children already in placement and becomes pregnant
17 would the Office of Children and Youth seek a prognostic
18 detention order?
19     A. 99 percent.
20     Q. Okay. Was it a secret that these orders were
21 being entered?
22     A. I guess the procedure was a secret, but for any
23 attorney who has represented and been -- represented
24 parents, it is not a secret.
25     Q. And do you know whether or not a client of OCY

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 98

1  such as a mother is able to discuss the facts of her case
2  with whomever she wants?
3      A.  I would assume.
4      MR. McNAIR:  Thank you.  That's all I have.
5
6          RECROSS-EXAMINATION
7  BY MR. JOYAL:
8
9      Q.  Just to finish up my questioning, do you know when
10 Deanna Cosby left the agency?
11     A.  Not specifically.
12     Q.  I'll represent to you that it was either January
13 or February of 2004.
14     A.  Okay.
15     Q.  Mr. McNair just asked you as an attorney whether
16 or not -- representing mothers, whether or not prognostic
17 detention orders would be a secret, I think, and you said,
18 no, not to an attorney.  Correct?
19     A.  Not to an attorney who --
20     Q.  Practices law in that --
21     A.  In that area.
22     Q.  Okay.  But on June 4th, at 2:29:53 p.m., a
23 prognostic detention order would have been a secret to
24 Deanna Cosby, because she was not the caseworker on the case
25 and had not been involved with the agency for some five or

Page 99

1  six months.  Would you agree?
2      MR. ANGELONE:  Objection.  Calls for speculation.
3      Q.  Do you agree?
4      A.  I don't know.
5      Q.  Well --
6      A.  I don't know if she would have expected it to
7  happen --
8      Q.  Why would she have even -- do you know whether she
9  would have even known that the case was going on, on
10 June 4th, but for the fact that Abby Conley e-mailed her and
11 asked her to tell [V.W.] about the order?
12     A.  I don't know.
13     Q.  But you do know that -- and you have seen the
14 e-mails.  You know that Abby Conley --
15     MR. ANGELONE:  Objection.
16     Q.  -- indeed did ask Miss Cosby to call [V.W.] to
17 tell her about the order.
18     MR. ANGELONE:  Objection.
19     Q.  Right?
20     MR. ANGELONE:  She never said that.  She never
21     testified --
22     MR. JOYAL:  Who never did?
23     MR. ANGELONE:  She did.  So you're
24     mischaracterizing the testimony.
25     MR. JOYAL:  All right.  Well, let me show her the

Page 100

1  e-mails.  I thought Rich had shown them to her.
2      MR. ANGELONE:  He did.  It was asked and answered.
3      MR. JOYAL:  Did you show her the e-mails, Rich?
4      MR. LANZILLO:  I did.
5      Q.  Did you read the e-mails, ma'am?
6      MR. ANGELONE:  He read it into the record.  It's
7      part of the record.
8      MR. JOYAL:  All right.
9  BY MR. JOYAL:
10     Q.  And my question was, on June 4th, it is apparent
11 from the e-mails from Deanna Cosby -- between Deanna Cosby
12 and Abby Conley that Abby Conley divulged to Deanna Cosby
13 the fact that that order existed and asked her to tell
14 [V.W.] about it.  Is that not true?
15     MR. ANGELONE:  Objection.  Argumentative, lack of
16     foundation.
17     MR. JOYAL:  Okay, fine.
18     MR. ANGELONE:  Irrelevant.
19     Q.  Yes or no?  If you know.
20     A.  I think that the e-mail speaks for itself.
21     Q.  And you will agree with me that at that point in
22 time, as far as you knew, because you were representing the
23 mother, right, Ms. [W.], Deanna Cosby was not a professional
24 social worker involved in that case.
25     A.  She was involved in that case.

Page 101

1      Q.  As a witness for you.
2      A.  She was involved as the caseworker on that case.
3      Q.  No.  As of June 4th, she had been off that case
4  and [P.W.] or someone else was the caseworker on the case.
5  Is that correct?
6      A.  That's correct.  She was a previous caseworker.
7      Q.  So she wasn't the caseworker on the case at that
8  time, and she had no need for knowledge of that order,
9  because the caseworker knew about it.  Is that right?
10     A.  I don't know.
11     Q.  You don't know?
12     A.  I don't know what she knew or who she talked to or
13 what she did.  I don't know.
14     Q.  Well, did she tell you she knew about it when you
15 talked to her on the phone?
16     A.  I'm not answering that.
17     Q.  Okay.  Well, can we presume, then, that she didn't
18 tell you that she knew about --
19     MR. ANGELONE:  Objection.
20     A.  You can presume whatever you want.  I'm not
21 answering it.
22     MR. JOYAL:  I don't have any more questions.
23     MR. LANZILLO:  A few follow-ups.
24
25          REDIRECT EXAMINATION

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 102

1  BY MR. LANZILLO:
2
3      Q. I want to make sure I'm clear. You did
4  understand, based on your experience with OCY and I assume
5  in your capacity as a solicitor for OCY, that it was OCY's
6  policy not to advise counsel for the parent or parents of
7  the unborn child of a prognostic detention order.
8      A. That's correct.
9      Q. All right. And whatever your instincts or
10 experience told you as a practitioner, you understood as a
11 solicitor for OCY that it was their policy to maintain the
12 confidentiality and secrecy of those orders.
13     A. I'm not a solicitor for OCY.
14     Q. Were you ever?
15     A. No. I was a solicitor for the -- I was contracted
16 by the County to represent parents and children. I never
17 represented the interests of the agency.
18     Q. Okay. Thank you for that clarification. In your
19 experience as an attorney generally, dealing in OCY matters
20 and in connection with your contract retention on behalf of
21 the County, you understood, did you not, that OCY sought to
22 maintain the confidentiality and secrecy of prognostic
23 detention orders because, in the agency's assessment, that
24 was appropriate for the protection of the child?
25     A. I understood that.

Page 103

1      Q. Okay. Did you agree with that policy?
2      A. As a matter of due process, no. I believe
3  everybody has the right to be heard when one of their
4  fundamental rights are being exercised. I don't know what
5  the harm would be to have an open hearing or have a person
6  have their right to defend that order.
7      Q. Isn't the flip side of that coin, though, that
8  when you give someone notice that that is pending, that that
9  may actually prompt them to flee the jurisdiction? Or as
10 explained to us by some other -- by some other well-regarded
11 folks in this area, that there is even a risk that the
12 mother could harm the unborn child? Whether you agree with
13 that rationale or not, you're at least aware that that is
14 what underlies the policy.
15     A. I'm aware that there is a slippery slope argument
16 that can be made. And, you know, I'm aware.
17     Q. Can we agree that whether you agree with the
18 policy or not, OCY had the right to adopt and maintain
19 that policy, in terms of the confidentiality and secrecy of
20 prognostic detention orders?
21     A. I would agree that OCY can follow whatever
22 procedures they feel appropriate to have in place.
23     Q. And you understood that that was one of the
24 policies and procedures that they had in place; specifically
25 the maintenance of the confidentiality and secrecy of

Page 104

1  prognostic detention orders.
2      A. (No response.)
3      Q. Is that true? Is that a correct statement?
4      A. I have never read that before. I have not -- in
5  my practice, I do know that they do issue detention orders
6  based on prognostic evidence and serve them on to hospitals
7  without notice to the natural parents.
8      Q. And --
9      A. So, I mean, I understand that they do that.
10 Whether I think they should -- do I think they should? No.
11 I think everybody has the right to be heard. But --
12     Q. But you --
13     A. Do I understand that that's what they do? I
14 understand that.
15     Q. Okay. And, in fact, you testified earlier that
16 you understood that it is the policy and practice of OCY not
17 to tell counsel for the parents when a prognostic detention
18 order has been issued.
19     A. Yes.
20     Q. And I just want to state this on the record.
21 Because you're not represented by counsel, I want to make my
22 offer of proof to you regarding our questions about your
23 communications with Abby Conley clear.
24        Do you understand that from the defense
25 perspective in this case, that what Ms. Conley said to you

Page 105

1  has independent legal significance -- in other words, we
2  contend, we believe that Ms. Conley repeatedly violated her
3  duties of confidentiality by communicating to third parties,
4  including Deanna Cosby and yourself. And we contend that
5  while she resigned, you know, to the extent she contends
6  that she was terminated, that the grounds for termination
7  were, in fact, based upon that breach of confidentiality,
8  and that's why we're asking you. It's because what she said
9  to you has independent legal significance. We are not
10 seeking to obtain witness statements from you. What we are
11 trying to do is ascertain facts that have independent legal
12 significance to this case. Do you understand that?
13     A. I understand that.
14     Q. Okay. Does that in any way change your position
15 regarding the privilege?
16     A. It doesn't. Because I am still overly cautious in
17 my role as counsel for [V.W.].
18     Q. And just so you understand, we're not trying to
19 investigate what someone told you regarding independent
20 events that may have relevance to the case. What we are
21 asking you about are conversations where you are a material
22 witness to what is a very important part of the defense of
23 this case.
24     A. Um-hum.
25     Q. Do you understand that?

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 106

1    A.  I understand that.
2    Q.  All right.  And at the time that you met with
3  Ms. Conley, was she or was she not your client?
4    A.  Miss Conley?
5    Q.  Yes.
6    A.  Was not.
7    Q.  You met with her in connection with your
8  preparation for the [V.W.] hearing, correct?  I think that's
9  what you just said earlier.
10    A.  I believe so.
11    Q.  Well --
12    A.  Yes.
13    Q.  And I take it that you met with her because you
14  felt that she could provide you with information helpful to
15  the interests of your client, [V.W.].
16        MR. ANGELONE:  I'm going to object.  She never
17        said that.
18    Q.  Is that correct?
19    A.  Well, again, I invoke work product and privilege,
20  in that anything that has to do with my preparation, I think
21  is privileged.  Unless it's waived by the client -- former
22  client.
23    Q.  Well, we know you met --
24    A.  Whether it was helpful or hurtful --
25    Q.  All right.  Let me leave that out.  Let me leave

Page 107

1  that out, then.  I respectfully disagree with your
2  assessment of the privilege, but let me leave out that
3  phrase.
4        I take it that since you were meeting with her in
5  connection with your preparation for the [V.W.] hearing,
6  that you believed Ms. Conley had information relevant to
7  that proceeding, and you were meeting with her to ascertain
8  that information.  Is that correct?
9    A.  Anyone I would have met with would have been
10  someone connected to the case.
11    Q.  With relevant information.
12    A.  With relevant information.
13    Q.  All right.  So the answer to my question is yes.
14    A.  Yes.
15    Q.  When did you call Deanna Cosby?
16    A.  I don't know.
17    Q.  Was it before or after you met with Ms. Conley?
18    A.  I don't know.
19    Q.  Did you call Ms. Cosby from your office?
20    A.  Any calls I have ever made would be from my
21  office.
22    Q.  Did Ms. Cosby ever call you?
23    A.  I don't know.
24        MR. LANZILLO:  Thank you.  That's all I have.
25        MR. JOYAL:  I just want to follow up on some of

Page 108

1  the things you said to me and Mr. Lanzillo.  I
2  just want to make sure I understand.
3
4        FURTHER RECROSS-EXAMINATION
5  BY MR. JOYAL:
6
7    Q.  He was questioning you about the policy of OCY.
8  Now, would you agree with me that this has been a policy
9  that has been, in effect, adopted by the court in Erie
10  County for a number of years?
11        MR. ANGELONE:  Objection.  Calls for speculation.
12        MR. JOYAL:  She's been doing it for five years.
13        She said she --
14    A.  But what you have to understand, in my five years,
15  they were termination hearings, which means everything is
16  already done.  That juvenile case is closed.
17    Q.  Well, then let me stop you there.  Then how would
18  you have known -- if your answer to my question is that you
19  really didn't know that --
20    A.  No.
21    Q.  -- then how would you have known --
22    A.  No, I would have the entire juvenile court file,
23  and if there were kids in placement and there were
24  subsequent women who have given birth who were the natural
25  mothers, which is often, those kids would immediately be

Page 109

1  detained at birth.
2    Q.  Right.  And at what point in time after that
3  detention would the mother have been -- would the Court have
4  been involved in deciding whether that detention order was
5  appropriate and whether it should be maintained pursuant to
6  statute?  In how many days or hours would there have been a
7  court hearing regarding that?
8    A.  72 hours.
9    Q.  Three days.  So the right to due process would
10  have attached to the mother within 72 hours after the birth.
11    A.  Sometimes.  Unless they requested a hearing in
12  front of a Judge, in which case it could take 30 to 45 days.
13    Q.  Well, but there was a due process situation for
14  mothers; is that correct?
15    A.  Quasi.
16    Q.  Okay, quasi.  Let's say -- I mean, I presume that
17  you believe that based upon the fact that you would be
18  representing the parents.  Parents have a right to be heard,
19  correct?
20    A.  Of course, um-hum.
21    Q.  What happens if you were representing the child?
22  Where is the child's due process in this?  Let's say that
23  you came to a conclusion as the lawyer for the child during
24  the course of the proceeding that the child's best interests
25  were not to be with a mother or a father who had a history

28  (Pages 106 to 109)

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 110

1  of child abuse or may not have been able to take care of the
2  child. Would your position on these orders change?
3      A. No.
4      MR. ANGELONE: Are we talking about an unborn
5  child?
6      MR. JOYAL: Absolutely.
7      A. The unborn child would be appointed a guardian ad
8  litem, and that person could be heard.
9      Q. But they would also have a lawyer, right? Right?
10     A. Not if it was an unborn child.
11     Q. Okay. Well, would you agree with me that the
12  unborn child's interests are what are being protected here
13  by these types of orders? Ostensibly.
14     A. Sometimes. On the surface, yes.
15     Q. Okay. On the surface. On the surface.
16       Has anyone told you that [V.W.] is going to be
17  testifying in this case by deposition?
18     A. Yes.
19     Q. Before you came in here -- you know who [V.W.]'s
20  attorney is, right?
21     A. Yes.
22     Q. Did you contact either her attorney or Miss [W.]
23  to ask if Miss [W.] would waive her privilege to allow you
24  to testify?
25     A. No.

Page 111

1      Q. Why not?
2      A. Why would I?
3      Q. Because you were under subpoena here, and you knew
4  that you were going to be asked these types of questions.
5  Don't you think you had an obligation to ask your former
6  client whether or not you should invoke the privilege or
7  whether she would waive it?
8      A. No.
9      Q. Why?
10     A. Because it's your deposition.
11     Q. Well, you're an officer of the court. You
12  understand what's going on. You understand that we may have
13  to bring you in front of the Federal Court to compel you to
14  answer a question that you may have been able to answer had
15  you asked if your client would waive the privilege. Why
16  didn't you do it?
17     A. I didn't know if you had secured a waiver from her
18  or not.
19     Q. How would we have been able to secure a waiver
20  from her --
21     A. I imagine you know who her attorney is too.
22     Q. Well, yes. But, see --
23     A. And you could have called her attorney and secured
24  the waiver yourself.
25     Q. Under what part of the rules would we have been

Page 112

1  able to contact her attorney, under the Rules of
2  Professional Conduct, since you reviewed them? Where would
3  it be --
4      MR. ANGELONE: It's not in the rules. Come on,
5      Ed. All you had to do was call and find out. I
6      mean, what is this?
7      MR. LANZILLO: Well, look --
8      A. I didn't do it. Why didn't I do it? I didn't do
9  it.
10     MR. ANGELONE: This is ridiculous. I mean, it
11     really is.
12     Q. So if before we take this up with Judge
13  McLaughlin --
14     MR. ANGELONE: And we will. We all agree that
15     that's going to happen.
16     MR. JOYAL: Well, no, you didn't listen to my
17     question, Anthony, so maybe you should not --
18     MR. ANGELONE: Okay. I'm sorry.
19     MR. JOYAL: Because I'd like to get out of here
20     too, because I've got to drive two and a half
21     hours home.
22     Q. If during the course of her deposition [V.W.]
23  chooses to waive the privilege, you won't have a problem,
24  then, coming back in here and testifying and answering all
25  the questions you were asked; is that correct?

Page 113

1      A. I wouldn't have any problem answering the
2  questions as to attorney/client privilege. I may have a
3  problem answering questions regarding work product. I am
4  unsure. I would review that probably with independent
5  counsel.
6      Q. Okay. Then let's make sure, based upon that
7  answer, that if we can enumerate which ones are work product
8  and which ones are attorney/client privilege. Which
9  questions do you believe are work product?
10     A. I don't recall. I have been here for three and a
11  half hours.
12     Q. Well, unfortunately, then, Miss Jones, what's
13  going to happen is that we're going to have to bring you
14  back in here, if she does that, because we're going to have
15  to find out which ones are work product and which ones are
16  not, at which point we may have to go back to the Court.
17     MR. ANGELONE: It's on the record.
18     MR. JOYAL: I don't have any other questions.
19     MR. LANZILLO: One last quick question.
20
21       FURTHER REDIRECT EXAMINATION
22  BY MR. LANZILLO:
23
24     Q. Have you discussed this matter or your deposition
25  with Attorney Scarpitti?

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

Page 114

1      A.  No.
2      Q.  You haven't had any contact with her at all
3  regarding --
4      A.  Not in several, several months.  Maybe when I
5  first -- when she first took the case.
6      Q.  Mr. McNair asked you some questions.  Were you
7  given any advance notice as to the nature of the questions
8  Mr. McNair would be asking you?
9      A.  No.
10      Q.  Do you have any understanding that information
11  regarding the substance of your testimony or the testimony
12  that will be given by [V.W.] regarding this case is being
13  passed through Attorney Angelone to anyone else or through
14  Attorney McNair?
15      A.  I don't really understand your question.
16      Q.  Sure.  I guess what I'm wondering is, have you --
17  whether Attorney Angelone has asked you questions about your
18  deposition.  Have you in any way communicated to him the
19  substance of your testimony?
20      A.  We have not.  I have gone to great lengths not to
21  discuss this.
22      MR. LANZILLO:  Thank you.  That's all I have.
23      MR. JOYAL:  Amy, you know you have the right to
24      waive signature or read and sign --
25      THE WITNESS:  Yes, I'll waive signature.

Page 115

1      MR. JOYAL:  Thank you.
2
3      (Deposition concluded at 4:38 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ferguson & Holdnack Reporting, Inc.

d1d003ea-dcc8-4d03-a774-7feb0a8e72d2

**A**

**Abby** 1:3 6:11,20
20:24,24 21:2
22:5,6 24:3 46:2
46:17,21,25 48:1
48:4,15,19 49:14
51:16 52:5,21,24
53:2 54:12,19,24
55:12,19,24 57:2
57:5,17 58:10,21
59:1,11,21 60:5
60:12,25 64:5,11
64:11 68:2 72:12
72:15,24 74:2,7
74:19,23 75:9
77:20 78:10,14
79:4 81:9 83:1
86:20 87:25 88:2
88:13,23 92:12,17
93:1,4,9 94:8,20
99:10,14 100:12
100:12 104:23
**able** 76:20 98:1
110:1 111:14,19
112:1
**absolutely** 32:2
46:1 59:10 70:12
84:18 110:6
**abuse** 110:1
**accepting** 61:20
**access** 20:4
**accurate** 67:17,19
**acting** 63:16
**action** 1:4 52:17,19
**activity** 44:21
**actual** 12:6 56:25
**ad** 110:7
**address** 4:24,25 5:4
**administrator**
62:20,25
**admissible** 89:20
**admit** 28:21
**adopt** 103:18
**adopted** 108:9
**advance** 114:7
**adversarial** 63:25
**adverse** 27:3 28:14

29:4,7,14,15,16
63:8,10,21 88:10
**advice** 58:16 95:24
97:9
**advise** 85:21,23,25
86:5 102:6
**advised** 85:7
**agency** 22:25 23:1
62:1,14 63:2,4,19
79:16 80:8,10
81:3 82:22 85:2
86:11 98:10,25
102:17
**agency's** 102:23
**ago** 4:8 23:22 34:22
62:11
**agree** 16:2 29:14
45:25 70:25 79:14
79:19 96:20 99:1
99:3 100:21 103:1
103:12,17,17,21
108:8 110:11
112:14
**agreed** 35:8,18
36:4 70:23
**agreement** 35:6
36:1,2 75:16,23
76:19,22 90:2
**ahead** 38:10,11
43:8 93:21,22
97:2
**aide** 10:15,22 12:12
12:17 26:15 29:19
**aides** 26:22
**alert** 4:20
**Alfieri** 9:17
**Alison** 44:3,4,10
**Allgeier** 26:16
31:18 80:22
**allocate** 77:14
**allow** 110:23
**amount** 45:11
**Amy** 1:18 3:3 4:12
20:10 114:23
**and/or** 6:20
**Angelone** 2:3 17:4
19:16,20 20:10,21
21:3 22:1,4,6 24:4

24:10,11 25:3,6
25:10,16,24 26:3
32:17 33:8,10
34:1 36:25 37:2,4
39:9,13,19 40:13
40:20 46:3 47:9
47:12,15,25 48:3
48:6,17 49:7,9,19
49:22 50:1,7,18
51:2,5,12,17,21
53:10,15 60:15
70:15 74:14 77:18
78:17,22 84:7
90:13,17,25 91:24
93:20 94:1,14,23
96:22 99:2,15,18
99:20,23 100:2,6
100:15,18 101:19
106:16 108:11
110:4 112:4,10,14
112:18 113:17
114:13,17
**Angelone's** 71:7,10
71:13
**answer** 6:9 11:8
20:13 21:5 28:23
32:4,5,21 33:7
37:20 38:8 39:1
46:9 48:9 49:16
54:7 59:25 60:7
69:2 86:14 90:6
93:21 107:13
108:18 111:14,14
113:7
**answered** 33:8
68:21 78:2 94:2
94:22,23 100:2
**answering** 28:12
32:9 50:22 53:20
54:8 101:16,21
112:24 113:1,3
**Anthony** 2:3 20:10
49:21 112:17
**anybody** 10:20
57:12 60:2 70:9
86:5,7 94:18
**anymore** 62:1
**apparent** 100:10

**apparently** 55:3
58:9
**appear** 81:9
**appearance** 5:14
**appearing** 4:9
16:20
**appears** 16:15
72:14
**applicable** 17:8
**application** 90:3
**applies** 37:7
**apply** 90:2
**appointed** 10:11,13
10:16 11:13,25
62:23 110:7
**appreciate** 96:13
**approach** 15:17
16:18
**approached** 62:5,8
**appropriate** 64:2
72:24 79:21
102:24 103:22
109:5
**approximately**
7:22,24 23:21
70:14
**April** 1:20
**area** 33:24,24
49:11 62:16 98:21
103:11
**areas** 8:9 33:22
74:6
**argue** 38:15 79:20
79:24
**argument** 78:17
103:15
**Argumentative**
25:13 31:1 72:20
76:24 100:15
**arising** 6:18
**arose** 46:4
**arrangement** 8:4
67:24
**ascertain** 105:11
107:7
**asked** 27:12 28:17
36:15,17 42:1
50:18 55:2 59:12

61:22 65:12 66:14
66:15,18 68:18
72:11 75:9 77:24
78:1 79:18 82:2
93:21 94:19,22,23
96:11 98:15 99:11
100:2,13 111:4,15
112:25 114:6,17
**asking** 15:22 17:16
18:7 19:1 23:5
27:17,22 28:24
33:16 38:4 47:19
49:6 50:16 51:1
51:16,16,19 53:5
56:5 59:7,12,20
67:10 68:15 72:8
78:2 83:24 87:22
88:21 92:25 95:3
105:8,21 114:8
**asks** 37:17,22
**asserted** 68:10
**assessment** 102:23
107:2
**assigned** 84:22
**associate** 7:24 8:1
**associated** 69:6
**associates** 83:14
**association** 75:17
**associations** 24:21
75:19
**assume** 4:14 16:20
47:17 98:3 102:4
**assumed** 84:23
**assuming** 94:12,16
**attach** 95:11,16
**attached** 109:10
**attaches** 95:11
**attempt** 68:16
69:13
**attend** 35:20
**attest** 88:1
**attorney** 4:13 7:23
19:14,16,20 20:21
21:3 22:1,1,4,6
23:17 24:4,4,4,10
24:11 25:2,6,10
25:11,24 26:2
30:8 39:12 40:2

40:13,20 46:3,15
47:9,12,25 48:3,6
48:16 49:7 50:17
50:17 51:1,12,17
52:8,20 53:10,15
54:2,3 57:21 58:2
58:13 64:4,7,13
64:14 71:19 72:21
72:22 75:19 77:8
77:11 78:17,17
83:2 95:10 97:8
97:23 98:15,18,19
102:19 110:20,22
111:21,23 112:1
113:25 114:13,14
114:17
**attorneys** 20:5
67:22 75:20 83:4
84:1
**attorney's** 58:15
**attorney/client**
16:3,7,23 18:2,20
32:17 36:23 58:19
59:5 92:24 94:24
113:2,8
**August** 23:24,25
35:13 61:5
**authorized** 24:21
**available** 12:14
**average** 11:4
**averaged** 9:23
**avoid** 28:12 33:18
69:13
**aware** 40:2 46:24
54:12 56:12,15
64:24 71:2,5
82:17 84:16 86:7
86:17 87:6 103:13
103:15,16
**a.m** 54:25
**a/k/a** 1:6,12 2:6

**B**

**B** 1:3
**baby** 57:25 86:10
**back** 14:7 15:7
26:24 28:9 38:25
40:14 50:13 51:11

54:11,23 56:10
58:1 62:19 73:7
76:6 83:20 91:5
94:3 112:24
113:14,16
**background** 7:19
38:4 72:1
**based** 11:9 33:1
44:21 69:2 70:24
102:4 104:6 105:7
109:17 113:6
**basic** 4:14
**basis** 9:12 44:19
45:20 50:12 53:7
92:21
**Baugh** 2:13
**bearing** 36:12
**began** 7:21
**begins** 54:24
**behalf** 6:11 13:14
26:14 31:7 49:14
63:17 70:15 79:24
102:20
**behoove** 16:25
**belief** 89:18
**believe** 5:12 7:25
15:2,5,18 23:11
25:4 42:17 43:21
44:3,5,14 47:23
52:13 61:5 62:18
65:24 67:16 69:20
72:11,15 74:10
77:20,24 84:15
94:8 95:10,10,15
95:19,21,23 103:2
105:2 106:10
109:17 113:9
**believed** 107:6
**benefit** 67:21 76:6
77:22 78:15,20
95:9 97:13
**best** 8:17 12:4 41:6
79:25 109:24
**bet** 93:18
**better** 18:21,23
68:19
**beyond** 63:20
**bickering** 50:4

**billed** 82:9,10
**billing** 45:7,9,20,21
81:17 82:3
**bills** 45:6
**birth** 56:18,22
86:18 108:24
109:1,10
**bit** 68:19
**blanket** 33:23
**blatant** 82:21
**bono** 45:13 82:7,7,8
**book** 89:23
**borders** 36:23
**boring** 27:21
**bother** 32:7
**bottom** 69:14
**bounce** 83:13
**breach** 56:1 105:7
**break** 28:24 39:22
**Brief** 46:12
**briefly** 21:8 61:22
65:10
**bring** 5:16 8:23
13:1 36:12 91:5
111:13 113:13
**bringing** 85:1
**broad** 16:17 24:22
37:11,14
**brought** 21:18
**bucks** 93:18
**building** 76:20
**bunch** 13:1
**burdensome** 15:13
**business** 4:25 71:6

**C**

**C** 61:7 62:13 64:15
64:21,23
**call** 12:2 19:4 32:3
32:6 33:19 39:16
39:19 55:2 62:20
92:5 99:16 107:15
107:19,22 112:5
**Callan** 1:9 2:9
**called** 11:25 86:19
111:23
**calls** 99:2 107:20
108:11

**Canada** 86:10
**canceled** 34:22
35:11,12
**capacity** 1:8,10,11
1:14 13:2 102:5
**care** 4:17 57:25
87:16 110:1
**career** 80:13
**CASA** 10:22
**case** 10:10,12,19,21
10:22 11:1,19,21
12:12,17,17,23
14:6 15:5,7,14
16:6,11 17:9,15
17:18 20:24 21:2
22:5,25 24:3,3,4
25:19,22,23,25
26:15,15,17,21
27:8,24 28:13
29:17,19,20,24
30:3,12,15 31:6
31:14 33:5 36:16
40:3,6,13 45:3,13
45:18,23 47:6
48:1,5,6,11,15,18
48:23,25 50:8,24
50:25 52:10 56:15
57:3 60:1 61:7,9
62:4,13,17,20
63:6,7,15 64:15
64:21,24 70:2,7
70:18 72:13,16,25
73:1 74:4 76:1,2
77:8,21,21 78:14
78:14,22 79:1,7,7
83:17 84:22 86:5
87:2 91:25 93:6,6
98:1,24 99:9
100:24,25 101:2,3
101:4,7 104:25
105:12,20,23
107:10 108:16
109:12 110:17
114:5,12
**caseload** 10:4
**cases** 9:6,20 10:18
10:23 11:10 12:6
12:8,11 20:4,5,7

44:22,22,23 45:3
45:14 54:4 57:1
61:25 62:14,16,16
63:2 69:19,19,25
77:7 83:9 84:2,23
97:15
**casework** 12:20
**caseworker** 10:15
10:21 11:23 12:9
12:15,16 57:23
80:18 92:15 98:24
101:2,4,6,7,9
**caseworkers** 26:21
**Cathy** 26:16 31:18
80:22
**caught** 53:19
**cautious** 16:13
105:16
**caveat** 81:8
**cell** 55:2
**Center** 2:11
**certain** 79:18
**certainly** 18:12
36:17 51:19
**challenge** 50:21
**change** 105:14
110:2
**changed** 6:6
**characterization**
28:5
**characterizations**
28:25
**characterize** 28:3
28:21 29:13
**characterized**
52:14
**charge** 44:19
**charged** 81:18,19
82:4
**chase** 17:24
**Chatham** 2:11
**check** 57:24 77:3
**child** 1:6,13 2:6
30:1 56:14,18,22
56:22 58:14 59:2
63:11,15 73:17
80:4,9 83:24,25
84:7,11,13 86:18

87:5 102:7,24
103:12 109:21,23
110:1,2,5,7,10
**children** 1:6,12 2:6
8:21 9:2,10 10:5
26:20 29:8 41:11
62:3 63:15 79:9
79:24,25 83:2,5
97:16,17 102:16
**children's** 79:25
**child's** 79:23
109:22,24 110:12
**chooses** 112:23
**circumstances** 23:5
45:8 83:7 92:5
**cite** 33:24 74:17
**Civil** 1:4 70:16 87:1
**claim** 24:7 58:19
**claiming** 92:21
**claims** 31:20 68:17
**clarification**
102:18
**clear** 21:23 32:14
37:6 94:7,8 102:3
104:23
**clearance** 26:22
**clearly** 4:20 52:19
**clerked** 7:22
**clerkship** 7:21
**client** 11:25 12:1,2
12:3 15:25 16:1,5
16:15 25:3,11
29:9,12,18 30:22
31:8 32:10 37:8
43:17 45:9,10
59:8 60:17,20,22
63:10,17,20 70:1
70:5 72:16 73:2,4
74:24 75:12 79:12
82:7,8 83:13
97:13,25 106:3,15
106:21,22 111:6
111:15
**clients** 25:18 44:19
53:22 74:20,20
83:8 85:15,20,23
85:25 88:3,3
**client's** 70:9 72:25

73:9 75:10 88:10
88:11
**close** 34:23 35:20
35:24 57:23
**closed** 11:15 34:20
34:20 35:18
108:16
**coin** 103:7
**coincidence** 46:7
**Cole** 9:17
**Colorado** 5:5
**come** 13:16 22:17
56:10 84:3 85:2
112:4
**comes** 58:14 59:2
**comfort** 17:2
**comfortable** 16:22
49:12 53:24 54:6
87:23
**coming** 58:17
112:24
**commencing** 1:21
**comment** 69:4,14
87:22
**comments** 42:1
47:20 60:13 62:10
**common** 25:3,11,18
25:22 85:18,19
**Commonwealth**
1:20
**communicate** 58:3
59:24
**communicated**
25:17 37:7 50:17
51:21 114:18
**communicating**
55:25 105:3
**communication**
27:6 58:6 72:12
**communications**
6:19 15:22 16:7
19:2 25:10 26:19
27:11 30:11 31:19
31:23 49:8 50:23
50:24 53:10
104:23
**compel** 111:13
**Compensation**

8:15
**complex** 83:12
**computer** 58:11
**concern** 63:16
**concerning** 17:17
24:6 71:5 72:25
75:10 87:9 90:24
92:6,9 93:4
**concerns** 63:20
**conclude** 12:11
**concluded** 115:3
**conclusion** 85:14
109:23
**conduct** 15:15
16:17 21:17 24:20
49:25 65:8 68:25
97:11 112:2
**conference** 40:11
**conferences** 22:3
**confidence** 37:8
**confidential** 56:7
73:9
**confidentiality**
20:6,9 37:6 54:5
56:1 69:22 72:3,4
72:16 73:15 74:8
74:19 102:12,22
103:19,25 105:3,7
**conflict** 52:19
79:16 80:4,8
**conflicts** 54:5
**confused** 14:3 94:4
**Conley** 1:3 6:11,20
9:25 10:3,7 12:20
13:3 20:24,24
21:2 22:5,6,12,18
22:22 23:8 24:3
26:1,2,9,19,25
27:11,14 28:13,19
28:23 29:1,17,19
30:10,17,20 31:19
31:23 32:24 37:15
40:12,18 41:3,21
42:2,14,22 44:25
45:22 46:2,4,17
46:17,21,25 48:19
48:22 49:2,5,14
50:25 51:2,13,22

52:5,15,21,24
53:2,12 54:13,16
54:16,17,19,21,22
54:24 55:4,4,13
55:19,24 57:2,5,9
57:14,17 58:10,21
59:1,11,21 60:5
60:12,25 64:5,11
64:11,25 65:2
68:2 70:15 71:12
72:12,15,24 74:2
74:7,24 75:9
77:21 78:10,14
79:5 83:1 86:20
88:2,23 90:13,24
91:24 92:12,17,21
93:1,4,9 94:8,20
99:10,14 100:12
100:12 104:23,25
105:2 106:3,4
107:6,17
**Conley's** 10:14
48:1,4,15 74:19
81:9 88:1,13
**connected** 107:10
**connection** 8:13
10:7 12:20 13:13
15:5 19:13 22:19
31:20 41:22 42:10
46:5 47:6 50:8
57:12 102:20
106:7 107:5
**consent** 26:10 27:7
60:17
**consider** 55:25 56:7
61:20 63:8 93:11
93:13
**consideration** 89:6
**constituting** 6:18
**constructive** 56:17
56:19
**construe** 52:3
**consult** 71:19
**consulted** 16:21
71:19,21
**contact** 8:24 9:3
10:3,20,21 14:12
14:13,16 15:1,4

17:1 26:10,13,14
26:16,17,25 27:14
28:13,19,23,25
29:3,17,19 30:7,9
40:12,18 46:4
64:4,14 81:6,6
110:22 112:1
114:2
**contacted** 10:24
12:12 46:10,11
51:16 80:16,18
83:5
**contacting** 11:23
12:9 81:3
**contacts** 30:14,17
**contain** 67:10
**contained** 66:10,22
73:9 87:8
**contemplates** 18:19
18:20
**contend** 105:2,4
**contending** 27:16
**contends** 105:5
**content** 40:5 90:10
**contents** 73:20
**contest** 90:3
**context** 40:21 49:1
63:13 64:13,17
**continue** 34:8 53:1
**continued** 23:13
**contract** 8:25 9:4,8
9:14,16 10:8 13:4
13:11,14 14:5
76:2 80:15 81:13
81:15 87:5 102:20
**contracted** 102:15
**contrary** 80:9
**control** 6:10,15,23
**conversation** 16:22
18:11,14 23:6
32:16 38:25 42:3
51:23 64:16,18
88:14 90:23 91:7
93:3,4,13 94:5,9
94:20 95:11,12,16
**conversations**
20:11 30:9 40:22
41:3,5,13,20 42:6

42:9 48:19 49:4,5
51:2,13,22 57:12
60:25 61:2 64:10
64:10,12 74:2
86:24 92:18
105:21
**conveyed** 51:12
**copy** 5:11 34:10
46:15 57:21 65:25
66:3,10,22 76:16
76:16
**correct** 5:2,13 6:13
6:25 7:6 8:8 9:11
11:23 12:10 15:20
15:23,24 24:11,18
24:19 25:12,14
26:4,7 27:4,5,9
29:5,20,21 30:7
31:13,15 41:8,11
41:12 43:3 46:2
48:7,8 58:25
62:15 63:18 66:17
66:20,21 67:8,8
67:15 68:22,23
69:1,16,17 72:13
76:11,12 77:10,12
77:16,18,19 79:8
79:9,10,12,13,21
80:1,2,5,6,11,13
81:18 82:6 90:25
98:18 101:5,6
102:8 104:3 106:8
106:18 107:8
109:14,19 112:25
**correctly** 6:5 11:22
**correspondence**
6:19 44:12,15,17
**Cosby** 5:25 6:6,12
6:21 13:5,6,8,13
14:12 15:23 16:8
19:8,20 20:11
33:13 40:3 46:21
46:25 54:13,18,24
55:12,25 57:6,16
58:3 72:12 74:2,8
74:25 86:19 92:6
92:13,18 94:9,21
98:10,24 99:16

100:11,11,12,23
105:4 107:15,19
107:22
**Cosby's** 88:1 93:4,9
**costs** 76:16
**counsel** 15:20
16:14,20,21 18:4
34:9 43:24 62:21
63:16 71:4,21
85:6 95:24 102:6
104:17,21 105:17
113:5
**count** 9:22
**County** 1:5,5,6,8,8
1:10,12,13,14 2:6
2:6,6 8:21 9:1,8
10:8 13:11,14
14:6 17:14 26:11
26:14,24 27:4,7
28:15,22 29:4
30:8,9,16,25
31:12,17 48:1
52:10,12 58:11
87:1 102:16,21
108:10
**couple** 19:5 21:10
21:12 22:15 26:6
**course** 36:21 39:5
64:3 70:6,13 71:3
76:4 80:13 85:17
87:1,4 109:20,24
112:22
**court** 1:1 12:22
17:1,1 18:5 19:4
24:25 26:15 27:8
28:14 29:16,18,24
32:7 37:20,25
50:21 60:19,23,24
62:17,19,25 63:7
79:3,20 96:19
108:9,22 109:3,7
111:11,13 113:16
**cover** 19:5
**covered** 41:16
50:11 78:9 93:5
93:16 94:10
**covers** 9:18
**credibility** 47:16

**criminal** 8:13
**Crosby** 5:24
**Cross-examination**
3:5,6 68:12 97:5
**crushed** 55:20
56:11 57:7
**crying** 93:24
**cudgels** 39:23
**curious** 21:19
**current** 43:24
**currently** 43:18
62:22
**custody** 6:10,14,23
62:16
**cut** 17:24
**CW** 57:22,22
**C's** 62:5

---
**D**
**D** 2:1 3:1
**Daily** 74:15,18
**date** 7:19 23:14
34:19 35:17 40:17
41:9 62:12
**dated** 57:16
**dates** 14:1
**day** 12:1 58:16 75:3
86:22
**days** 35:1 109:6,9
109:12
**dealer** 87:17
**dealing** 73:12 82:20
102:19
**Deanna** 5:24,25 6:5
6:12,20 13:5,5
15:23 19:8,19
20:11 33:12 40:3
46:21,25 54:13,18
54:24 55:12,21,25
56:12 57:6,7,16
58:3 72:12 74:2,8
74:25 86:19 88:1
92:6,13,18 93:4,9
94:9,20 98:10,24
100:11,11,12,23
105:4 107:15
**Debra** 1:10 2:9
**December** 7:23

**decided** 71:14
**deciding** 109:4
**decision** 85:3
**decline** 49:3
**deemed** 52:12
**default** 12:17
**defend** 103:6
**defendable** 12:6
**Defendant** 2:13
52:18
**Defendants** 1:15
2:9 48:2
**defense** 8:16 74:23
75:5 92:22 93:2
104:24 105:22
**define** 32:7
**definition** 24:19
**delay** 34:25
**Dell** 2:14
**demeanor** 28:3
**denominate** 69:7
**depend** 10:16 11:24
**dependency** 9:6
11:14,18 62:15
63:1 65:24 79:7
80:3 81:13
**Depending** 12:14
**deposed** 20:20
**deposition** 1:18
3:14 4:9,18 5:8,11
15:9 16:25 18:25
20:18 23:18 34:16
34:21 35:11,22
40:3 46:16,17
48:14 65:6 89:17
110:17 111:10
112:22 113:24
114:18 115:3
**depositions** 4:15
35:3,17,19,22
40:6 86:24
**described** 9:15 19:9
51:22 63:13 67:24
**detain** 58:15
**detained** 62:4
109:1
**detention** 56:12,16
56:21 57:3 58:16

63:6 66:1,4,11,16
66:23 74:3,9
84:16 97:18 98:17
98:23 102:7,23
103:20 104:1,5,17
109:3,4
**determine** 12:3
29:16
**devoted** 8:18
**Dictate** 42:24
**dictated** 43:1
**different** 28:18
41:14 79:11 81:11
**difficult** 56:23 60:8
**direct** 3:4 4:4 6:19
27:6 28:12
**direction** 86:20
**directly** 22:21
**Director** 1:10,12
**disagree** 107:1
**discarded** 66:7,19
**disciplinary** 33:25
**disclosed** 92:20
**discoverable** 17:21
**discovery** 34:19,20
34:23 35:4,17,20
35:25 89:16,19
**discuss** 20:5 24:2
84:4 91:24 98:1
114:21
**discussed** 19:9,19
19:21 20:21 21:2
30:24 40:8,9 41:1
48:1,4,10,13
70:17 84:13
113:24
**discussing** 20:23
48:4 72:13,16
84:6 93:3
**Discussion** 19:3
23:15 39:24 61:4
76:9 91:22
**discussions** 16:4,10
19:8 24:8 32:8
71:3
**dispute** 34:15 74:7
**DISTRICT** 1:1,1
**divorce** 52:17,18

**divulged** 100:12
**document** 54:21
**documentation**
  58:1
**documents** 5:15,16
  5:19 6:7,11,15,18
  6:22 7:1 79:3
  86:25
**doing** 35:6 39:17
  45:13 53:25 78:12
  80:14 83:20 87:23
  108:12
**dollars** 45:11
**Domitrovich** 7:21
  7:22
**drafted** 89:2
**drawn** 24:14
**drive** 5:5 112:20
**drug** 82:20 87:17
**duces** 5:15
**due** 24:16 35:1
  58:16 103:2 109:9
  109:13,22
**duly** 4:2
**Duquesne** 7:11
**duties** 105:3
**dynamics** 53:21

_____
        **E**
**e** 1:18 2:13 3:1,3
  4:1,1 69:5
**earlier** 42:4 51:22
  54:11 104:15
  106:9
**easier** 54:22
**Ed** 68:8 112:5
**Edmund** 2:10
**effect** 51:23 57:9
  67:16 74:4 76:22
  79:24 108:9
**either** 4:19,21 9:1
  33:12 34:11 38:8
  41:6 74:2 80:14
  91:23 98:12
  110:22
**elected** 60:11
**electricity** 76:13
**Elizabeth** 4:12

**else's** 43:11
**employed** 8:6
**employee** 27:7,16
  87:7
**employees** 10:5
**employment** 7:19
**encompassed** 51:18
**entered** 97:21
**entire** 52:23 67:4
  108:22
**entities** 7:15
**enumerate** 113:7
**Erie** 1:5,5,6,8,10,12
  1:13,14,23 2:2,5,6
  2:6,6,8 5:6 8:21
  9:1,8 17:15 26:11
  26:14,25 27:4,7
  29:4 48:2 52:10
  58:11 74:15,18,23
  108:9
**error** 5:23
**Esquire** 1:14 2:1,3
  2:7,10,13,13
**estate** 8:12,12
**estimate** 8:17
**ethics** 71:19,23,25
  72:1
**event** 10:23
**events** 105:20
**everybody** 10:24
  22:24 39:9 53:16
  78:19 103:3
  104:11
**evidence** 89:20
  93:9 104:6
**ex** 26:18 27:6
**exact** 41:9
**exactly** 44:11 77:25
**examination** 3:4,8
  3:10 4:4 34:8
  36:9 101:25
  113:21
**example** 33:3 37:7
  52:9 69:7
**exchange** 46:24
  54:12,18 55:8,12
  90:1
**exchanged** 46:21

  55:23 56:6
**exchanging** 46:22
**Executive** 1:8,11
**exercised** 103:4
**exhibit** 3:14 5:8,11
  46:16,18 54:16,17
  54:17,22,22 55:23
  57:14,15
**EXHIBITS** 3:13
**exist** 45:22
**existed** 100:13
**expected** 99:6
**expedited** 34:10
**expense** 67:21
**expenses** 24:12
  76:5,7,10,23 77:3
  77:15
**experience** 83:24
  85:17 102:4,10,19
**explained** 103:10
**explanation** 42:8
**Explanatory** 69:4
**express** 57:9
**extent** 10:13 45:21
  48:13 53:16,17
  61:11 63:19,22
  66:24 67:18,19
  105:5
**eyeball** 57:22,23
**eyes** 27:21 28:4
**e-mail** 54:24 55:7
  57:5,16 58:8,23
  72:12 100:20
**e-mailed** 99:10
**e-mails** 46:20,22,25
  54:12,18 55:9,12
  55:22 72:9 86:8
  88:1 99:14 100:1
  100:3,5,11

_____
        **F**
**face** 5:24 23:3,3
  39:15
**face-to-face** 23:7
**facilities** 69:5
**fact** 4:21 14:7
  27:20 56:20 59:20
  60:5 65:5,5 69:6

**71:**2,5 82:17 87:6
  87:25 88:2 99:10
  100:13 104:15
  105:7 109:17
**facts** 70:8,18 88:20
  92:9 94:12,16
  98:1 105:11
**fair** 4:22 8:20 12:9
  12:11 13:18,19,21
  66:9 83:23 84:1
  84:19 85:8
**fairly** 16:17
**fallen** 11:10
**familiar** 4:14 8:20
  72:3 84:8
**family** 8:9,10,11,14
  8:15,18 61:21
  73:22 79:15
**far** 8:17 100:22
**father** 79:8 109:25
**fathers** 9:1
**favorable** 88:11
**February** 92:10
  98:13
**Federal** 17:20
  111:13
**fee** 77:11,14 78:23
**feel** 17:3 103:22
**fees** 75:20
**fee-sharing** 75:16
**felt** 106:14
**Ferguson** 1:19,24
  1:25
**figure** 59:17
**file** 43:6,11,12,13
  43:16,22,23 44:8
  44:10,13,16 65:9
  65:12,14,15,16,22
  66:7,9,14,19,22
  66:25 67:1,3,4
  73:1,9 75:11
  78:11 87:8 108:22
**filed** 10:17 11:14
  29:25 35:4
**files** 67:9 73:22
**financially** 78:15
**find** 23:7 84:3
  89:10 112:5

  113:15
**finding** 43:10
**fine** 4:23 25:1 30:2
  30:4 36:11 89:16
  96:9 100:17
**finger** 39:13,20
**finish** 98:9
**fire** 92:3
**fired** 22:8,9 40:15
  74:24 88:25 89:1
**firm** 19:22,24,25
  20:5 24:8,10,13
  24:17,20 49:19,20
  49:25 52:3,13,14
  52:17,18,19 53:1
  53:11,16,22 54:4
  62:6,7 67:20,22
  67:25 68:21 69:7
  69:9,10,24 70:23
  71:6,6,7,8,15
  75:17,20 76:3,6
  76:20 77:21 78:18
  78:19 79:4 83:9
  83:16,19 84:2,11
  84:14 95:13,21
**firms** 7:15
**firm's** 70:21
**firm-wide** 75:23
**first** 4:1 10:2 13:8
  13:25 14:11,13,16
  26:10 54:16 57:14
  58:23 65:2 114:5
  114:5
**fishing** 89:14
**five** 28:17 45:14
  73:13,14 80:14
  85:17 98:25
  108:12,14
**five-minute** 39:22
**flattered** 28:4
**flee** 103:9
**flip** 103:7
**Florida** 86:10
**focused** 56:25
**folks** 103:11
**follow** 66:21
  103:21 107:25
**followed** 11:21

**follows** 4:2
**follow-ups** 101:23
**form** 25:16 33:23
  56:4 59:6 60:15
**former** 16:15 32:10
  60:22 106:21
  111:5
**forth** 74:23
**forum** 63:25
**forward** 7:18 54:23
  57:21
**foster** 57:25
**foundation** 28:6,7
  59:7 75:1 88:16
  94:15 100:16
**four** 28:17 45:14
  79:7
**frame** 9:14,18 14:8
  14:23 41:4
**freely** 26:21
**frequency** 8:23
  12:13
**Friday** 35:23
**Friedman** 71:24
**friends** 87:14
**front** 109:12
  111:13
**full** 4:10
**fully** 32:7
**fundamental** 103:4
**further** 3:9,10
  55:12 108:4
  113:21
**furthered** 16:5

**G**

**generally** 79:22
  83:9 102:19
**generate** 34:17
**generated** 18:13
**getting** 11:16 14:17
  31:2 34:13 44:9
  49:11 94:4 97:9
**give** 12:2 17:2
  39:13 70:7,7,9
  95:8,12 103:8
**given** 9:19 12:16
  55:19 75:10 88:9

**95:22 108:24**
  114:7,12
**giving** 14:3 74:24
  77:17
**glanced** 67:1,3
**go** 5:22 7:10 18:5
  38:10,11,25 43:8
  51:11 54:11 57:14
  60:18 68:17 70:5
  86:10 93:21,22
  97:2 113:16
**goal** 29:11 63:24
  79:15
**goes** 36:16 47:16
**going** 12:2 14:7,19
  15:10 18:25 19:1
  20:20 21:20 22:20
  23:4 24:5,14,23
  27:10 28:9 30:21
  31:25 32:3 33:14
  33:20,20,21,22
  34:7,8,10,14,24
  34:25 36:11,15,17
  37:18,18,23,25
  38:6,7,8,12,13,18
  39:12,21 44:8
  45:12,17 47:4,15
  49:9 51:5,24 54:8
  55:20 56:11,24
  57:4,7,11 58:2,5
  64:25 70:19 77:22
  78:8,11 80:17
  86:11,12,14 87:14
  89:7,19 93:20
  94:14 96:19 99:9
  106:16 110:16
  111:4,12 112:15
  113:13,13,14
**good** 10:20 60:1
**Gornall** 1:22 2:7
**gosh** 23:22
**gotten** 80:19 95:24
**graduate** 7:12
**graduating** 7:14
**graduation** 7:18,20
**grandparents**
  61:14,15,17,21
**great** 114:20

**greater** 91:19
**ground** 4:14
**grounds** 105:6
**group** 67:14 84:4
**guardian** 110:7
**guess** 18:4 46:9
  49:23 78:16 97:22
  114:16
**guy** 70:6
**guys** 50:3

**H**

**half** 112:20 113:11
**hand** 36:19
**handle** 45:12 46:10
**handled** 12:12
**handwritten** 42:24
**happen** 55:21
  56:11 57:8 79:17
  79:17 99:7 112:15
  113:13
**happens** 109:21
**harm** 103:5,12
**head** 39:4 67:6
  69:23 79:22
**headed** 11:1
**hear** 4:19 95:7
**heard** 103:3 104:11
  109:18 110:8
**hearing** 17:18
  23:14 64:20,23
  70:16 85:1 93:7,8
  96:15,24 103:5
  106:8 107:5 109:7
  109:11
**hearings** 41:9,10
  61:3 63:1 108:15
**heat** 76:13
**hedging** 21:4,4
**held** 19:3 23:15
  39:24,25 46:13
  61:4 71:9 76:9
  91:22
**help** 45:11,11 55:16
  55:20 57:7 96:18
**helpful** 106:14,24
**history** 109:25
**hold** 50:13 85:1

**Holdnack** 1:25
**holds** 73:2
**home** 57:24 112:21
**hospitals** 58:17
  104:6
**hour** 42:17 55:4
**hourly** 44:19 45:15
  82:9
**hours** 109:6,8,10
  112:21 113:11
**Huh-uh** 35:8
**Hum-um** 47:10
  75:15
**hunched** 27:20
**hurtful** 106:24
**hypersensitive**
  24:15
**hypothetical** 84:23
  87:23,25 88:4
**hypothetically** 60:1
  84:25
**hypotheticals**
  70:11

**I**

**idea** 18:9 38:24
  48:20 71:1
**identification** 5:9
**identify** 24:24
  31:16
**identifying** 15:18
**imagine** 75:6
  111:21
**immediately** 7:21
  61:22 108:25
**impeachment**
  47:18
**implied** 54:5 60:16
  69:21
**important** 105:22
**incarcerated** 12:1
**include** 68:1
**including** 16:10
  20:19 32:11 70:14
  71:16 105:4
**income** 45:4 77:17
  81:21 82:1
**independent** 16:21

**18:4 71:3 105:1,9
  105:11,19 113:4
**indicated** 42:3
  92:13
**indicates** 73:5
**indicating** 52:20
  67:11
**indirect** 6:20
**individual** 15:14,23
  63:14
**individually** 1:7,9
  1:11,14 52:11
**individuals** 15:11
  90:16,24 91:20
**inference** 82:23
**information** 17:16
  37:9 41:21 42:9
  50:20 51:12 56:6
  58:4 64:11 73:8
  74:11 75:10 87:7
  87:17,18 88:9
  89:9 92:8,12,13
  92:14 95:22
  106:14 107:6,8,11
  107:12 114:10
**informed** 85:7
**inherit** 11:21
**inherited** 11:19
**initial** 82:14
**initially** 34:12
**initials** 15:12
**initiated** 14:25
  18:10
**instances** 79:15
  80:3 83:10
**instincts** 102:9
**intellect** 21:19
**intellectual** 84:4
**intended** 63:25
**intention** 32:6
**interact** 10:14 23:2
**interacted** 14:4
  22:21,24
**interacting** 12:19
  13:23
**interaction** 13:3
  19:19 21:22 22:3
  42:13,21 48:22

**interest** 30:3 80:9
**interests** 79:25 80:4
  80:7 88:10,11
  102:17 106:15
  109:24 110:12
**interject** 16:19
**interpret** 37:10
  54:9,22
**interpretation**
  49:23 54:10
**interpreting** 28:18
**interrupted** 49:13
  50:2
**interruption** 46:12
**intimidate** 27:19
**introduced** 4:7
**intrusion** 47:21
**investigate** 105:19
**invocation** 38:19
  50:21 53:7
**invoke** 28:11 30:21
  30:23 33:4,23
  36:10 37:18,23
  38:1,8 41:23 42:5
  51:24 54:9 60:4
  60:13,19 106:19
  111:6
**invoked** 33:10
  41:17 94:1
**invoking** 16:7
  28:16 32:15,18,20
  32:22,25 33:6,9
  37:12,16 38:5
  41:20 53:9 94:5
**involuntary** 9:2
  11:3
**involve** 41:21 42:9
**involved** 9:9,21
  15:11,14 17:15
  22:25,25 34:13
  37:15 49:4 71:9
  82:20 98:25
  100:24,25 101:2
  109:4
**involvement** 9:6
  61:6
**involving** 6:20 9:20
  29:18 31:21

**Irrelevant** 90:4
  100:18
**issuance** 56:25
**issue** 19:5 36:23
  83:12 85:20 88:5
  88:8 104:5
**issued** 56:13,16,17
  56:21,24 57:1,3
  57:20 81:12 85:19
  104:18
**issues** 24:24 45:24
  82:17,19
**items** 19:6
**IVT** 9:23

———————

**J**

**J** 4:1
**Janis** 1:19,24 11:8
  15:12 34:16
**January** 9:5 13:23
  14:10 98:12
**Jeffrey** 9:17,17
**Jerry** 64:4
**John** 1:13 2:13
**joined** 7:25
**Jones** 1:18 3:3,14
  4:7,12,13 5:8
  23:17 36:19 37:14
  39:3,12 40:2
  41:17 46:15 50:17
  54:2 68:7 69:8
  95:10 97:8 113:12
**Joseph** 2:11
**Joyal** 2:10 3:5,7,9
  18:1,16,21 21:9
  23:24 25:20 27:25
  33:1,7,9,12,16,18
  34:2 35:10,16
  36:2,6,8 37:1,3,13
  37:17,22 39:2,14
  39:15 47:16 49:20
  51:7 68:6,13 78:3
  78:6 80:25 88:22
  89:10,13,16,21,25
  93:17,19 94:2
  95:6 96:6,9,12,16
  96:18 97:2 98:7
  99:22,25 100:3,8

100:9,17 101:22
  107:25 108:5,12
  110:6 112:16,19
  113:18 114:23
  115:1
**Jr** 2:10
**Judge** 7:22 18:23
  32:3,20 33:19,19
  34:13 36:12 37:17
  38:6,14 54:6
  84:19,21,22 85:1
  85:3 95:9 96:12
  96:14 109:12
  112:12
**June** 14:23 41:6
  54:25 55:13 57:16
  58:10,11 61:1
  86:8 98:22 99:10
  100:10 101:3
**jurisdiction** 85:21
  85:24 86:2,6
  103:9
**juvenile** 62:17 63:7
  108:16,22

———————

**K**

**keep** 45:4,8
**keeping** 45:16
**Kelly** 84:20
**kept** 43:6 45:2,7
  82:11
**kidding** 18:15
**kids** 87:15 108:23
  108:25
**kinship** 57:19
**knew** 22:11 48:17
  48:20 56:24 86:14
  86:18 92:10
  100:22 101:9,12
  101:14,18 111:3
**Knock** 89:14
**know** 4:13 6:16
  12:5 13:3 16:19
  17:11 19:21 20:12
  20:12,13 21:20
  22:17 30:14 33:20
  33:21 34:9 35:2
  36:20 38:12 39:16

39:18 42:2 45:2,2
  45:12,15 46:8,11
  51:20 54:1 55:18
  56:5,19,20 59:14
  59:25 60:9 61:14
  61:15,16 64:7
  66:6,12 70:5,25
  71:17,18 72:18
  73:4,7,10 74:10
  74:13,16,17 75:7
  79:1,3,6 81:19,20
  81:23,25,25 84:11
  85:13,16 87:10,11
  87:12,15,20 88:12
  88:24,25 89:10,25
  90:1,7,10,10,11
  91:12,21,23 92:1
  95:7,10 97:25
  98:9 99:4,6,8,12
  99:13,14 100:19
  101:10,11,12,13
  103:4,16 104:5
  105:5 106:23
  107:16,18,23
  108:19 110:19
  111:17,21 114:23
**knowing** 85:18
**knowledge** 40:5
  55:8 56:17,20
  61:9,11 85:19
  101:8
**known** 22:12 48:17
  48:20 61:17 88:4
  99:9 108:18,21
**knows** 89:12,13
**Knox** 1:22 2:7

———————

**L**

**L** 1:19,24
**labor** 58:13
**lack** 59:6 94:14
  100:15
**Lane** 2:14
**Lanzillo** 2:7 3:4,8
  3:10 4:5,7 15:9
  17:11,22 18:24
  19:4,7 21:11,22
  21:24 23:16 25:21

27:17,18 28:2,8
  28:10 30:2 34:7
  35:6 38:17 39:8
  39:11,21 40:1
  46:14 47:19 49:18
  50:9,13,15 51:9
  51:10 59:9,11,19
  68:4,8,15 72:8
  77:20 82:2 88:21
  100:4 101:23
  102:1 107:24
  108:1 112:7
  113:19,22 114:22
**Lanzillo's** 18:10
**larger** 67:20,25
**late** 14:17 43:21
  44:14
**law** 2:11 5:1 7:4,10
  7:14 8:9,10,11,14
  8:15,18 24:21
  52:13 69:7,9
  73:11,18 79:4
  83:12,25,25 84:5
  84:6,7,11,14
  85:10 97:11 98:20
**laws** 54:5
**lawyer** 18:6,7
  69:24 70:2 72:19
  79:11 80:17,21,23
  95:13 109:23
  110:9
**lawyers** 8:7 69:5,19
  71:15 79:20,23,23
**lay** 81:5
**lead** 71:8 89:20
**learn** 65:2
**learned** 91:12
**leave** 29:15 85:21
  86:5,10 96:24
  106:25,25 107:2
**leaving** 85:24 86:2
**led** 92:5
**left** 90:21 98:10
**legal** 105:1,9,11
**legitimate** 17:25
**lengths** 114:20
**letter** 89:2,4
**letterhead** 67:12

68:21 69:10,15,15
**letters** 58:16 86:9
   86:15
**let's** 5:22 20:24,25
   36:7 73:7 76:1
   81:15,16 87:13,13
   87:24,25 91:10
   109:16,22 113:6
**level** 10:23 82:1
**liable** 71:9,15
**Liberty** 2:4 4:25
**licensed** 7:4,7
**Liebel** 1:11 2:10
**likelihood** 84:16
**limited** 51:20
**line** 24:14 32:2,19
**list** 81:5,5,8,9,11
**listed** 10:25
**listen** 112:16
**litem** 110:8
**little** 24:13 55:4
   68:19
**live** 4:24 70:6
**LLC** 2:14
**lobby** 4:8 40:10,19
**local** 58:17
**location** 32:1,15
   41:14
**logical** 90:19
**long** 7:7 22:12,13
   22:14 34:16,20
   42:13,14 47:13,22
   61:17 73:11
**longer** 9:16 16:14
   43:16
**look** 39:7 54:15,21
   54:23 55:11 66:25
   66:25 67:8 69:3,3
   112:7
**looked** 21:7 32:12
**looking** 21:6,16
   39:3,8,9 82:1
**loosely** 82:11
**loss** 16:12
**lot** 9:3
**loud** 93:24
**Loughney** 2:14
**love** 95:7

**low** 45:3
**low-income** 82:5
**ludicrous** 36:24,25
   37:11
**Lunches** 76:18
_____
**M**
**M** 4:1
**machines** 76:16
**maintain** 20:6,9
   102:11,22 103:18
**maintained** 109:5
**maintenance**
   103:25
**making** 88:20 96:6
**malpractice** 71:10
   71:14,16 84:2
**managerial** 27:16
**March** 5:12 23:19
**marked** 5:9,10
   46:16,17 54:21
**Mary** 9:17
**material** 95:13
   105:21
**materials** 65:9
**matter** 20:21,22
   31:5 38:24 42:2
   43:5 48:19 49:6
   49:22 51:7 54:10
   65:3 68:2 70:13
   76:3 103:2 113:24
**matters** 8:15 14:5
   37:7 72:25 102:19
**ma'am** 100:5
**McLaughlin** 1:22
   2:7 32:3,21 38:7
   54:7 95:9 96:12
   96:14 112:13
**McNair** 2:1 3:6
   17:7,14,23 18:15
   19:14 21:14,16,19
   22:1 24:4,9 25:13
   27:15,18 28:6
   29:23 31:1 33:14
   33:17 34:18 35:8
   35:14 36:1,3,7
   38:13 39:3,4,7,8
   39:18,23 41:16

47:14,18,20 49:14
   50:3,10,11 56:4
   59:6,10,17 72:20
   74:14 75:1 76:24
   78:1,4,6,8,11,17
   80:24 81:1 88:16
   88:19 89:8,11,12
   89:13,14,18,23
   90:4,13,25 91:23
   93:16,18,23 94:22
   95:3,7 96:5,8,9,11
   96:14,17,23 97:3
   97:6 98:4,15
   114:6,8,14
**mean** 4:17 13:16
   15:19 18:6 20:22
   23:5 31:2 32:14
   36:18 46:8,9
   56:19 63:4,16
   82:18 85:6 104:9
   109:16 112:6,10
**meaning** 52:16
   70:4 76:11
**means** 26:10
   108:15
**meant** 90:22
**medical** 84:2
**meet** 10:5,7 12:3
   13:8 22:17 32:23
   45:15 62:6
**meeting** 12:21
   13:15,19 14:9
   29:12 40:20 42:13
   42:15,19 44:24
   107:4,7
**meetings** 23:7
   44:25 49:4
**member** 52:13,17
   53:1 62:5,7 84:14
   93:1
**members** 19:22
   20:7 52:16 53:11
   61:21 67:24 71:8
   77:21 83:16,19
**memo** 42:24 43:1
**memorialize** 42:21
   44:24
**memorializing** 6:18

**mentioned** 9:9 11:2
**met** 9:25 11:25 13:5
   13:13,15 49:1
   62:4 106:2,7,13
   106:23 107:9,17
**mid** 44:13
**Mike** 9:16
**mind** 14:23 83:13
   86:2 97:1
**minimal** 9:7
**minor** 8:13
**minute** 15:8 21:11
   50:4 54:15
**minutes** 14:21
   21:10
**mischaracterizing**
   99:24
**Misko** 9:17
**mixed** 14:18
**moments** 4:8
**money** 45:15 76:5,5
   81:20,24
**monitored** 55:7
**month** 9:24 11:3
   77:2
**months** 7:24 22:16
   23:22 26:6 47:23
   47:24 99:1 114:4
**morning** 15:16
**Moser** 2:14
**mother** 60:2 79:8
   97:15 98:1 100:23
   103:12 109:3,10
   109:25
**mothers** 9:2 98:16
   108:25 109:14
**motion** 78:11 96:7
**moving** 54:23
**multiple** 32:7 35:14
_____
**N**
**N** 3:1 4:1
**nail** 53:6
**name** 4:7,10 20:15
   29:25 70:7 78:18
   81:9
**named** 15:14,23
**names** 15:11 70:9

**narrative** 35:1,5
**natural** 104:7
   108:24
**nature** 46:21 49:5
   114:7
**near** 23:6
**need** 34:14 38:23
   42:2 50:20 62:21
   101:8
**negotiating** 31:7,11
   31:17
**negotiations** 31:4
   31:20
**neighbors** 87:14
**never** 11:25,25
   15:25 35:8,11
   56:24 60:2 62:4
   70:9 80:19 82:21
   84:3 85:7,22,23
   85:25 86:5 89:4
   99:20,20,22
   102:16 104:4
   106:16
**new** 57:19
**newspaper** 75:8
   90:12,15 91:3,8
   91:10,11,15,20
**Nies** 9:16
**night** 55:3 58:12
**nine** 7:24
**nodding** 39:4
**nods** 67:6 69:23
   79:22
**nominally** 45:14
**normal** 77:13
**normally** 11:11
   83:4
**Notary** 1:19
**note** 5:23 43:10,11
**notes** 42:19,24 43:1
   43:4,10,12,15
   44:6,7
**notice** 20:19 35:9
   103:8 104:7 114:7
**noticed** 34:21,22
   35:23 36:5
**noticing** 35:19
**notorious** 43:10

**November** 7:25
**number** 35:10
74:24 75:11
108:10

**O**

**O** 4:1
**object** 25:16 28:7
34:24 37:3,4
47:15,20 49:9
56:4 59:6 60:15
89:8 93:20 94:14
106:16
**objected** 28:6
**objection** 25:13
28:8 31:1 37:3
49:15 51:6 72:20
75:1 76:24 78:3,4
87:8,19 88:16
90:4,17 99:2,15
99:18 100:15
101:19 108:11
**obligation** 111:5
**observe** 13:2
**obtain** 105:10
**obtained** 92:14
**obtaining** 26:10
**obviously** 5:6 7:5
9:3 18:24 20:3,4
42:3 55:18 60:17
60:23
**occasions** 62:22,24
**occur** 23:12 62:2
**occurred** 14:16
29:3
**OCY** 8:24 9:20
13:1 26:15 58:15
62:14,16 72:4
73:8,12,14 75:8
76:1 79:7,9 80:14
80:17 82:19 83:21
87:5,7,9,16,19
88:5,8,15 90:3
97:25 102:4,5,11
102:13,19,21
103:18,21 104:16
108:7
**OCY's** 102:5

**offer** 104:22
**offered** 62:12
**office** 1:6,12 2:6,11
5:1 8:21 10:5
19:17 20:8,15
24:12 26:20 29:8
32:24 40:10 41:14
41:15 52:1,8,9,11
69:5 76:18,20
84:3 93:1,15 97:9
97:17 107:19,21
**officer** 60:18
111:11
**offices** 1:21
**office-share** 8:4
**Oftentimes** 13:1
67:21
**Oh** 23:22
**okay** 4:17 9:19 11:8
11:15,16,19 12:25
14:11 18:17 23:2
26:2 28:19 30:2
30:13 35:12 38:21
48:13 50:13 52:7
57:19 69:13 71:2
72:23 74:11 75:7
75:22 79:23 80:21
81:7,15,20 82:10
82:13 84:10,25
86:2,7 88:7 89:21
90:12,20 91:7,17
93:8,13 94:19,19
95:16 96:2,4
97:20 98:14,22
100:17 101:17
102:18 103:1
104:15 105:14
109:16 110:11,15
112:18 113:6
**omitted** 66:18
**once** 62:19 81:4,8
84:4
**ones** 113:7,8,15,15
**ongoing** 16:6 17:9
50:24,25 70:14
93:6
**Onorato** 1:13 2:13
**onset** 48:4

**open** 86:5 103:5
**opened** 62:4
**opinion** 18:8
**opportunities**
35:14
**opposed** 10:15
88:10 91:20
**option** 12:4
**order** 38:22 41:24
56:13,16,21 57:3
63:7 66:1,4,11,16
66:23 74:3,9
84:16,20,24 85:2
85:4,21 86:18
96:18 97:18 98:23
99:11,17 100:13
101:8 102:7 103:6
104:18 109:4
**ordered** 60:23,24
**orders** 37:20 85:19
97:20 98:17
102:12,23 103:20
104:1,5 110:2,13
**organized** 20:1
**Ostensibly** 110:13
**outlined** 33:3
**outside** 35:4 60:18
62:21 77:14 93:15
95:22
**outstanding** 84:17
**overhead** 76:11,23
**overly** 16:13,13
105:16

**P**

**PA** 2:2,5,8,12,15
**pad** 43:10,11
**page** 3:14 55:11
57:14
**paid** 45:12,17
75:20 76:1,2
**paper** 61:12 65:4
67:1 75:3 78:19
**paperwork** 14:19
**Paragraph** 69:5
**Pardon** 68:8
**parent** 63:11,15
80:5,7 87:4 102:6

**parental** 29:11
65:23
**parents** 9:9 79:17
79:18,20 85:6
97:24 102:6,16
104:7,17 109:18
109:18
**part** 5:14 6:17
49:18 55:23 77:17
92:22 100:7
105:22 111:25
**parte** 26:18 27:6
**participate** 71:6
**particular** 63:14
**parties** 17:10,13
62:13 63:1 76:18
79:8 85:1 105:3
**partnership** 67:14
68:22 69:16
**party** 16:2,23 27:3
28:14 29:4,23
60:12 72:17 79:11
80:8 95:22
**passed** 114:13
**Patty** 58:16
**pay** 67:21 76:8,13
77:11
**paying** 76:23 81:16
**payment** 76:3
80:15
**PC** 1:22 2:7
**pendency** 45:23
**pending** 26:15 27:8
28:13 29:18,24
48:1 93:6 103:8
**penetrating** 28:4
**Penn** 2:14
**Pennsylvania** 1:1,9
1:20,23 7:5,8
**people** 13:2 16:10
20:16 30:15 35:20
45:15 72:24 82:5
83:8,24 87:7
**people's** 20:4
**perceived** 88:15
**percent** 8:19 12:5
97:19
**percentage** 8:18

**12:5** 97:15
**period** 12:24 35:4
**permanency** 23:13
29:8 41:9,10 61:3
65:21
**permission** 80:19
**person** 19:9,10
23:2 30:3 31:9
46:24 71:18,22
81:23 84:10 93:15
95:20 103:5 110:8
**personnel** 1:10
8:24
**persons** 19:17
**perspective** 16:24
104:25
**Peter** 1:9 2:9
**petition** 11:14
29:10 65:24,24
**petitions** 29:25
**Phil** 71:24
**phone** 14:13,16
55:2 74:24 101:15
**phrase** 43:22 107:3
**piece** 67:1
**pin** 68:16
**Pittsburgh** 2:12,15
**place** 2:14 31:24
41:14,15 57:24
103:22,24
**placed** 78:19
**placement** 57:19
97:16 108:23
**Plaintiff** 1:3 2:1
**Plaintiffs** 49:18
**pleadings** 65:17,19
65:22 66:7,18
67:9
**pleasantries** 40:25
42:5
**please** 45:10 57:15
**point** 10:21 11:22
21:11 27:15 36:17
37:19 38:12 50:16
79:2 88:13 100:21
109:2 113:16
**policies** 72:3 74:8
103:24

**policy** 57:20 73:8
  73:15 102:6,11
  103:1,14,18,19
  104:4,16 108:7,8
**poor** 81:23
**portion** 77:14
**pose** 4:19
**posing** 53:4,5
**position** 10:15,17
  35:19 52:25 53:6
  53:15 54:1,3
  59:15,24 88:23
  95:25 96:21
  105:14 110:2
**possess** 65:25
**possessed** 66:3
**possession** 5:19 6:7
  6:10,14,23
**Possibly** 83:3
**potential** 78:25
  81:3 96:7
**potentially** 10:22
  19:17 52:16 78:16
**practice** 7:4,7 8:9
  8:18,23 24:21
  26:20 43:2 77:13
  84:2 85:18 87:6
  97:11 104:5,16
**Practices** 98:20
**practicing** 69:9
  73:11
**practitioner** 8:2,3
  20:2,3 85:10
  102:10
**practitioners** 20:8
  24:17 67:15
**preclude** 15:18
**pregnant** 97:16
**prelude** 58:18
**preparation** 20:16
  67:4 106:8,20
  107:5
**prepare** 65:6
**preparing** 17:18
  20:14 93:7,8,11
**present** 7:19 12:19
  24:12
**presentation** 85:3

**presently** 14:22
**press** 68:9 96:21
**presumably** 52:11
  88:7
**presume** 101:17,20
  109:16
**pretrial** 34:25 35:5
**previous** 101:6
**previously** 23:17
  46:16
**prior** 9:25 11:23
  13:10,19 14:4,10
  20:18 22:15 23:13
  23:18 26:5,8,17
  27:7 35:17 40:10
  46:4 48:18,21
  55:11 56:17,22
  62:11 83:1 88:13
**private** 71:21 80:15
  81:16 87:6
**privilege** 15:6 16:3
  16:24 17:8,25
  18:1,3,16,20
  22:20 23:4 24:5,7
  27:10 28:11 30:21
  30:23 31:25 32:15
  32:17,18,20,22,25
  33:2,4,6,9,10,23
  36:10,23 37:12,16
  37:19,23 38:1,5
  38:20,23 41:18,20
  41:23,25 42:5
  45:24 47:4 49:10
  49:15 50:12,20,21
  53:8,9 54:9,10
  57:4,11 58:5,19
  58:20,20 59:3,4
  60:5,14,19 68:17
  70:19,24 73:3,4,6
  86:12,21 92:7,11
  92:16,19,22,24
  93:5,10,12 94:1,5
  94:25 95:11,13
  105:15 106:19
  107:2 110:23
  111:6,15 112:23
  113:2,8
**privileged** 59:10

93:15 95:14,21
  106:21
**privileges** 68:10
**pro** 45:13 82:7,7,8
**probability** 91:18
  91:19
**probably** 9:23
  12:14 26:16 75:6
  78:11 113:4
**problem** 29:7 54:8
  70:1 112:23 113:1
  113:3
**procedure** 85:5
  97:22
**procedures** 103:22
  103:24
**proceeding** 80:4
  107:7 109:24
**proceedings** 9:2
  11:15,18 37:15
  46:12 49:13 50:2
**process** 103:2
  109:9,13,22
**produced** 87:1
**product** 17:8,20
  18:12,19 24:5,7
  28:11 32:15 49:10
  49:15 50:11 51:6
  51:24 53:21 70:19
  70:20,24 92:7,11
  92:16,19,21,23
  93:5,10,12 94:6
  94:11,24 106:19
  113:3,7,9,15
**production** 5:17,20
**professional** 15:15
  16:16 21:17 24:20
  26:6,9 65:8 68:24
  71:23,25 72:1
  97:9 100:23 112:2
**prognostic** 56:12
  56:16,20 57:2
  65:25 66:3,10,16
  66:23 74:3,9
  84:16,24 97:17
  98:16,23 102:7,22
  103:20 104:1,6,17
**projects** 67:20,25

68:1,1
**prompt** 103:9
**prompted** 15:3
**proof** 104:22
**propriety** 38:19
**prostitute** 87:17
**prostitution** 82:20
**protect** 16:17
**protected** 110:12
**protection** 102:24
**protective** 73:18
  83:25
**provide** 64:25
  106:14
**provided** 6:11 40:3
  64:11 65:3
**provision** 93:2
**Public** 1:19
**publicity** 78:25
**pull** 17:4
**purged** 43:16 44:6
  45:25
**purging** 44:7
**purpose** 21:4
**purposes** 15:9 97:9
**pursuant** 4:9 68:24
  109:5
**put** 18:21 38:11
  39:6,10 46:8
  50:20 75:18
**putz** 39:16,19
**p.m** 1:21 39:25,25
  55:13 57:16 98:22
  115:3
**P.W** 86:17,22 101:4

**Q**

**qualified** 85:14
**quasi** 109:15,16
**question** 4:19,22
  18:5,10 26:23
  28:7,12,17 29:6
  32:23 33:7,11,21
  37:13,21,22 38:15
  48:9 50:5,5,10
  51:8,11,19 54:7,8
  54:11 55:2,24
  56:3,4 60:7,8

62:11 69:2 71:11
  75:24,25 77:24
  78:21 85:12 88:18
  88:19,21,22 89:22
  90:6 95:1,4
  100:10 107:13
  108:18 111:14
  112:17 113:19
  114:15
**questioning** 32:3
  32:20 98:9 108:7
**questions** 19:1
  27:17,22 28:2,9
  32:5,5,9,21 33:15
  33:16 34:4 36:9
  36:15,20 38:1,4
  38:14,18 39:1
  47:19 50:7,23
  53:20 58:19 62:11
  68:4,6,9,15,20
  72:8 96:25 101:22
  104:22 111:4
  112:25 113:2,3,9
  113:18 114:6,7,17
**quibble** 24:23
**quick** 113:19
**quote** 57:23,23
  71:3

**R**

**R** 2:10
**raise** 18:2,16 22:20
  23:4 24:5,15
  27:10 31:25 39:20
  47:4 51:5 57:4,11
  58:5 59:3 70:19
  86:12
**raised** 18:2,18
  49:10 87:8,19
  88:5,8
**raising** 49:15 50:12
  53:21 59:4 92:7
  92:11,16,19,23
  94:24 95:2
**rate** 45:16
**rationale** 53:4,5
  103:13
**reach** 85:14

read 6:2 21:21
  24:19 33:2 34:2
  49:25 58:9 61:12
  65:4,8 73:14,17
  75:2,3,4 89:23
  94:3 100:5,6
  104:4 114:24
reading 91:11
real 8:12
really 20:12 55:5
  108:19 112:11
  114:15
reason 12:8 75:9
  85:8
reasonable 89:18
recall 10:4,10 13:9
  13:15,25 23:21
  30:11 42:16 48:25
  48:25 49:1,2 51:3
  51:11 56:23,24
  61:2 62:18 64:6,9
  64:13,16,16,17
  65:22,23 66:13
  73:21,23,24,25
  75:13,14 77:23
  81:10 82:16,25
  83:3,18,19 84:9
  84:13 89:5 91:11
  113:10
receive 81:4
received 20:19
  44:12
receiving 24:2
  26:22
Receptionist 76:15
  76:16
Recess 39:25 46:13
recite 42:1
recites 67:13
recognize 6:2
Recognizing 14:22
recollect 67:13
recollection 12:19
  12:21,22,23 13:18
  13:23 14:9,11,13
  14:22 41:6 44:7,8
  51:4 67:15 74:22
  81:17 82:19 86:21

reconvene 16:25
record 5:3 15:20
  16:14 18:22 19:3
  21:15,23 23:15
  34:3 35:16 36:5
  38:11,11 39:2,6
  39:24 41:24 44:21
  44:24 45:1 54:18
  61:4 76:9 91:22
  94:8 96:6 100:6,7
  104:20 113:17
records 45:5,21,22
  45:25 82:3
recross-examinat...
  3:7,9 98:6 108:4
recur 18:25
redirect 3:8,10
  101:25 113:21
refer 20:16 21:7
reference 5:24
  56:10 57:15 69:14
  79:2
referral 46:2 78:23
referrals 78:20
referred 22:6 26:2
  40:13 46:10 48:6
  48:18,23 51:17
  61:7 78:22
referring 48:25
  64:24 65:20
refers 6:17
reflect 39:2
reflected 59:8
reflecting 45:5
reflects 54:18
refresh 14:20,21
refuse 94:10
regard 69:5
regarding 6:6
  16:11 22:4 26:15
  27:8 28:13 29:17
  29:20 30:9 46:25
  48:19,22 50:18,23
  50:23 51:21 54:13
  61:9 64:10,15,20
  72:4 73:17 82:18
  88:14 104:22
  105:15,19 109:7

113:3 114:3,11,12
regards 16:8
regular 45:20
relate 41:20
related 19:9
relating 24:3 37:9
  38:19 41:11 43:4
  49:6 51:13
relationship 26:6,9
  29:14
relative 22:22
  23:18 45:22 53:10
  56:2,7,13,21
  58:20 64:5
relevance 47:14,15
  89:8 96:5 105:20
relevant 107:6,11
  107:12
relinquishment
  10:19 11:11 13:10
reluctance 36:19
relying 37:5
remain 73:9
remember 13:17
  22:4 41:1 57:20
  57:25 66:15
remembers 13:17
renew 9:4,5
renovations 76:18
rent 76:23
repeat 4:21
repeatedly 105:2
repeating 4:18
rephrase 4:21
  25:17 56:9 71:11
  88:17,22
Reported 1:24
reporter 49:13 50:2
Reporting 1:25
reports 65:19,20,21
represent 15:19
  16:14 17:9 18:3
  52:5,10,18,21
  53:2,12,22 55:16
  62:13,25 79:25
  98:12 102:16
representation 9:9
  16:5,9 19:13

22:19,22 30:22
  32:10 37:9 41:4
  41:22 42:10 43:20
  46:3,5 56:2,7
  57:13 58:7 61:20
  62:12 68:2 70:6
  71:9,13 79:4 87:4
  92:2
representationwise
  18:8
representatives
  30:24 31:12,16
represented 9:1
  22:24 25:8 53:15
  97:23,23 102:17
  104:21
representing 17:12
  17:14 21:14 24:6
  25:3,4,5,6,11,15
  25:18,24 26:1,24
  27:3 28:14 29:4
  30:8 43:17,18
  52:12 58:24 63:14
  83:2,5 98:16
  100:22 109:18,21
represents 52:15
  52:17,20,24 53:7
request 5:15,16,20
  6:17,24 7:2 34:10
  70:16 75:11
requested 62:12,25
  109:11
requesting 5:14
  44:12,15
require 17:2
reschedule 35:15
  36:4
rescheduled 36:1
reserve 68:8
reside 47:11
resided 47:13,22,25
  48:10
residential 5:3
resign 75:9
resignation 89:2,6
  90:1
resigned 88:23
  105:5

resolve 45:24
respect 24:16
respectfully 107:1
responding 67:5
responds 55:5
response 6:6 21:1
  42:23 44:1 55:3
  55:19 58:9 59:23
  62:10 91:1 104:2
responses 68:9
responsive 5:16,19
  6:7,23 7:2 26:23
rest 95:8
result 76:19
resume 38:18
retain 43:12 45:23
  65:16
retained 44:12
  65:15
retainer 82:13,14
retention 102:20
reunification 29:11
  63:24 64:1 79:15
review 17:1 65:9,11
  65:14 67:4 113:4
reviewed 65:12,15
  66:14 112:2
reviewing 15:15
  16:16
re-litigate 11:18
re-noticed 35:24
Rich 4:7 18:22 21:9
  33:1 49:19 100:1
  100:3
Richard 1:7 2:7,9
  62:9
Richmond 9:17
rid 44:9
ridiculous 112:10
right 6:9 10:2
  14:23,25 15:10
  18:22 19:24 22:21
  22:23 26:8 28:22
  28:25 29:3,15,22
  30:19 31:11 38:10
  38:19 40:11,15
  42:7 47:3 50:9
  51:9 52:9,9,22,25

55:15,21 56:12
57:8 58:8 62:18
63:19,23 68:8,25
69:18 72:19,21
77:15,22 78:6
81:24 83:15 84:17
85:4 88:11 90:13
90:14,22 92:25
96:22 99:19,25
100:8,23 101:9
102:9 103:3,6,18
104:11 106:2,25
107:13 109:2,9,18
110:9,9,20 114:23
**rights** 11:12 29:11
65:23 103:4
**risk** 103:11
**role** 105:17
**room** 21:25 39:10
40:11
**rotating** 9:11
**roughly** 9:20
**round-robin** 33:14
**round-tabling**
69:18
**RPR** 1:24
**rule** 16:15 18:21
33:2,25 37:6 69:3
69:4 92:23 93:1
**rules** 4:15 15:15,18
16:16 17:5,20
21:16,21,21 24:20
34:1,2 49:25 65:8
68:24 111:25
112:1,4
**R.B** 86:9

S

**s** 2:11 4:1 58:2
72:13,16 87:15
92:15 110:19
**safe** 14:10
**salaries** 76:14
**sanctions** 78:12
**Sara** 2:13
**sat** 21:25
**saw** 66:16
**saying** 17:23 77:23

87:12,15 96:13
**says** 55:15 57:19
67:16 69:10
**Scarpitti** 44:2,3,4
44:10 113:25
**scheduled** 35:22
36:2,3
**Schenker** 1:7 2:9
**school** 7:10,14
**scope** 18:18 34:15
60:18
**scratching** 39:15
**second** 61:7 63:12
**seconds** 66:25
**secrecy** 102:12,22
103:19,25
**secret** 85:9,11
97:20,22,24 98:17
98:23
**secretarial** 76:14
**section** 5:22 21:6
**secure** 111:19
**secured** 111:17,23
**see** 22:10 33:3
34:14,16 38:25
54:19,25 55:11,13
55:22 57:5,15
58:8,17 67:2
68:17,18 76:10
79:17,17 89:2
111:22
**seeing** 12:22 65:22
65:23 66:15
**seek** 83:7 97:17
**seeking** 89:19
105:10
**seen** 40:19 46:18,23
86:25 89:4 99:13
**semantics** 53:19
**send** 44:10
**sending** 44:9
**Sennett** 1:22 2:7
**sense** 20:1 52:21,23
68:16,19
**sent** 35:9 58:10
**sentiments** 57:9
**September** 23:23
23:24,25 88:24

**series** 58:18
**serve** 104:6
**served** 5:12 23:17
23:19 35:9
**Service** 1:7,13 2:6
70:16 87:2
**services** 73:18
83:25
**set** 74:23 78:22
**settle** 31:14,20
**settlement** 31:4,5
**shaking** 67:7
**share** 24:12,12 76:2
76:11,23 77:3
**shared** 76:5,7
**sharing** 69:5
**sheet** 44:25,25
**show** 5:10 14:19
18:13 46:15 54:16
55:17 99:25 100:3
**shown** 100:1
**shut** 37:1,2
**sick** 78:13
**side** 103:7
**sign** 85:4 114:24
**signature** 114:24
114:25
**signed** 60:17 84:20
84:24 90:9
**significance** 105:1
105:9,12
**similar** 9:13
**sir** 39:15
**sit** 75:7 81:16
**situation** 37:25
109:13
**situations** 64:1
69:21 84:25
**six** 99:1
**slew** 11:10
**slippery** 103:15
**slope** 103:15
**small-talk** 40:25
**Smith** 69:8
**social** 100:24
**socially** 61:16,17
**sole** 8:2,3 20:2,3
63:16

**solicitor** 1:15 26:13
26:17,22 30:8,12
80:19,22,24,25
81:2 102:5,11,13
102:15
**solo** 20:8 24:17
67:14
**somebody** 36:21
43:11 50:7
**someplace** 69:15
**somewhat** 16:12
77:6 81:22
**soon** 22:8
**sorry** 11:8 91:16
112:18
**sort** 90:23
**sought** 102:21
**sound** 14:23 37:11
**sounds** 11:9
**source** 37:10 90:8
90:12
**sources** 81:21
**speak** 15:6 33:12
54:3,4 83:2,4
**speaking** 57:6 83:1
**speaks** 100:20
**specialty** 71:22,25
**specific** 12:23,23
14:15 42:1 96:19
**specifically** 19:18
60:12 68:21 98:11
103:24
**specifics** 90:7
**specify** 92:25
**speculation** 99:2
108:11
**spelled** 6:5
**spoke** 16:10 30:14
30:16 36:21,22
58:12 69:24 71:4
83:8 93:10
**spring** 14:7,17
**squared** 21:13
**stage** 37:14
**stages** 29:8
**stand** 61:25
**standing** 90:21
**start** 20:25,25

**started** 4:10
**starting** 54:23
**state** 2:2 4:10
104:20
**stated** 75:8
**statement** 13:20,21
104:3
**statements** 105:10
**states** 1:1 57:22
58:12 68:21 69:4
**stating** 49:1
**statute** 73:8 109:6
**statutes** 72:4 73:17
**Stephanie** 7:21
**stop** 50:4 63:12
87:19 95:3 108:17
**story** 74:17 75:2,4
**straight** 78:21
**street** 1:23 2:2,4,8
4:25 72:25
**strike** 20:7 73:6
79:1 85:16
**study** 57:24
**subject** 16:3,23
38:24 42:2 50:18
51:7
**subjected** 35:3
**subpoena** 4:9 5:11
5:14,22,24 23:18
24:2 35:9,13
65:13 67:5 111:3
**Subpoenas** 35:11
**subsequent** 46:3
108:24
**substance** 49:7
58:5 60:12 114:11
114:19
**substantive** 49:5
**substantively** 48:12
**substitute** 15:12
**successful** 78:18
**sue** 58:1 71:14
**sufficiency** 41:25
**suggest** 35:21 36:8
39:21
**suggestion** 17:5
36:6
**suggests** 27:23 69:8

69:15
**Suite** 2:15
**summer** 14:7 40:14
43:21 44:14
**support** 95:25
**supposed** 29:9 63:9
63:10 85:9
**sure** 4:12 7:20 13:2
15:16 19:18 21:23
28:15,20 32:14
40:16 41:9,19
42:20 44:11 45:19
51:15 62:3 65:5
69:25 82:3,18
85:5 90:8,10 95:6
96:10,12,14 97:2
102:3 108:2 113:6
114:16
**surface** 110:14,15
110:15
**surrounding** 70:18
**sworn** 4:2
**system** 55:7 62:17

                    **T**
**table** 27:21
**take** 6:9,22 8:3 9:5
9:25 11:2 13:22
21:9 24:25 31:23
34:11,17 39:21
41:15 42:14,19
45:3,6,14 53:14
54:15,21 59:14
62:10,18,20 66:9
69:3 85:2,2 86:11
90:21 91:6,10
106:13 107:4
109:12 110:1
112:12
**taken** 1:18 40:6
41:13 62:14,15,17
63:1
**Talarico** 7:24
**talk** 18:9,23 20:15
24:21 34:15 40:24
55:6 70:6 80:16
81:2,16 92:17
95:8,17 97:8

**talked** 17:17 20:10
26:21 32:11,11,12
32:12 69:18,20
82:4 101:12,15
**talking** 17:11 18:4
18:7 21:20 27:23
33:5,22 38:2 42:4
42:14 55:18 59:18
64:19 68:19 69:19
70:1,10 72:24
74:8,19 80:22
83:16 87:14 88:2
110:4
**talks** 50:7 57:6
**team** 50:6 92:22
93:2
**tecum** 5:15
**telephone** 14:25
15:3 34:12 64:10
75:11 93:14
**tell** 14:6 24:16
26:18 30:19 34:1
34:2,18 37:18
38:10 48:21 49:3
49:7 50:19 55:5
57:2 58:2 59:1,14
60:2,11 74:1,6
85:15,20 86:7,22
87:11 92:20 93:2
94:20 99:11,17
100:13 101:14,18
104:17
**telling** 20:18 47:24
48:3 51:14,15
52:13 53:3,9
70:22 86:9 87:7
89:21 94:8,18
**term** 24:18
**terminate** 29:10
43:20
**terminated** 105:6
**termination** 9:2
10:17 11:3,13,19
22:15 29:10 65:23
81:12,13 88:14
105:6 108:15
**terminology** 71:7,7
**terms** 7:19 14:11

14:15 17:12,19
32:15 68:16
103:19
**test** 38:22 41:24
**testified** 4:2 74:1
86:23,23 94:12,17
99:21 104:15
**testify** 94:10 110:24
**testifying** 92:9
110:17 112:24
**testimony** 3:3 11:9
11:22 40:2 42:4
64:25 65:3 70:17
70:24 71:5 88:1
99:24 114:11,11
114:19
**Thank** 61:6 89:21
97:3 98:4 102:18
107:24 114:22
115:1
**theories** 84:5,6
**thing** 36:21
**things** 21:12 36:20
43:6,7 58:20
68:18 76:11,16
78:9 79:19 85:13
95:4 108:1
**think** 6:16 7:3,23
8:25 9:4,16,18
10:9 11:2 14:1
17:2,7,16,19,21
17:24 18:9,21,22
29:23,25 35:1,2
36:11,18 37:23
38:5 41:17 45:19
49:11 50:1,6,19
55:15 64:12 65:19
66:8 71:12,14
72:23 78:19 80:16
82:2 89:3,12
91:14,16,18 96:18
98:17 100:20
104:10,10,11
106:8,20 111:5
**third** 16:2,23 60:12
72:17 105:3
**thought** 86:9 100:1
**three** 9:23 11:3

62:22,24 90:16,21
90:23 91:20 109:9
113:10
**throwing** 88:20
**till** 8:25 11:25
39:25 46:13
**Tim** 24:9
**time** 9:3,11,14,18
9:19 10:2,15,22
11:1,1,9,13,17,18
12:7,23 13:4 14:8
14:23 19:23 20:19
25:17 29:3,6,7,25
32:22 36:17 40:10
40:12 41:4 44:21
44:25,25 45:3,16
45:22 48:9,24
50:3 51:20 54:8
58:23 64:17,19,20
64:23 66:10 68:5
70:13,15 78:5
79:2 81:12 82:11
83:16,20 88:13
90:5 93:23 96:8
100:22 101:8
106:2 109:2
**timeline** 10:6
**times** 9:23 28:18
29:13 74:15,18,23
80:15 84:12
**Timothy** 2:1
**tired** 78:13
**title** 69:8
**today** 4:9 5:15 9:25
16:20 20:19,20
21:15 34:12 36:7
40:11,17 48:14,15
52:25 53:1 65:7
70:17,24 71:4,20
75:7 81:17 94:10
96:2
**today's** 67:5
**told** 28:19 29:1
30:23 46:20,22
47:3 50:19 51:1
58:13,14,21 59:7
59:11,20,21 60:5
60:5,9 66:19

77:20 86:17,19
102:10 105:19
110:16
**Tom** 7:24
**tomorrow** 35:23
36:13
**tone** 27:19,22
**tonight** 96:24
**torpedo** 74:4
**touching** 23:6
**track** 45:2,4,16
82:11
**transactions** 8:12
**transcript** 34:11,14
34:17 38:6 55:17
**trial** 9:23 10:18
11:2,23 12:1
20:14,16 34:19
36:16 69:20 70:10
81:12 93:11
**trials** 10:20 11:3
**tried** 57:25
**troubles** 88:15
**true** 67:4 73:7
76:25 100:14
104:3
**trust** 55:6
**try** 44:20 45:14
79:20 96:18,19
**trying** 17:24 27:19
28:20,20 29:10
33:18 38:1 43:14
53:6 59:17 60:8
87:16 89:10
105:11,18
**turn** 61:24
**turned** 43:6,13,15
43:22,23 61:22
**turnover** 44:16
**two** 2:11 9:23 11:3
35:1 41:8 61:3
62:11,22,24
112:20
**type** 9:14 83:21
**types** 110:13 111:4
**typical** 43:2
**typically** 10:14
**typo** 6:2

typographical 5:23

**U**

Um 46:6
um-hum 6:1 11:5
  47:8 55:1,14
  57:18 105:24
  109:20
unavailable 12:16
unborn 56:13,22
  58:14 59:2 102:7
  103:12 110:4,7,10
  110:12
unclear 14:22
uncomfortable
  32:2,9,19,22
  50:22 53:20
uncommon 19:18
  20:14,17
underlies 103:14
understand 4:20
  16:24 20:13 24:18
  28:15 29:6 31:2
  34:14 36:18 37:24
  38:2,16 41:5
  43:14 56:3 60:8
  63:5 76:10 78:6
  81:25 88:17,19
  102:4 104:9,13,14
  104:24 105:12,13
  105:18,25 106:1
  108:2,14 111:12
  111:12 114:15
understanding
  48:16 73:2 85:6
  88:25 89:1 90:8,9
  114:10
understood 82:21
  82:22 102:10,21
  102:25 103:23
  104:16
undertake 67:20,25
Undue 47:20
unemployment
  90:2
unfortunately
  113:12
UNITED 1:1

unlawful 86:1,3
unrelated 14:5
unsure 21:5 24:13
  31:22 66:5,5
  113:4
upset 71:13
use 15:10 45:16
useful 92:9
utilized 41:21
  42:10

**V**

v 1:4 58:12,13,14
  58:15,17
validity 38:22
Various 65:17,19
Vendetti 2:4,4 5:1
  5:1 7:15,16,25 8:1
  8:1,7,7 52:14,15
  52:23,23 53:2,2
  62:9 67:12,12
  69:10,11 70:23
  71:12 78:18,18
  79:3,4
Vendettis 61:16,18
  77:18
viable 10:20,23
  12:6
Villella 64:5,7,13
  64:14
violated 74:8 105:2
violating 72:15
  74:19
violation 69:13
voice 27:20
voicemail 44:18
voluntary 10:19
  11:11
V.W 15:14,19,21
  22:22 25:23,25
  29:5,18,23 31:21
  41:4,11 42:11
  43:4,18 46:5 47:1
  48:19,22 49:6
  53:15 54:13 55:16
  55:17,17 56:2,8
  56:13,21 57:13
  58:2,7,21,24 59:1

59:21 60:5,9,11
  65:15,16 68:2
  72:13,16 81:9,18
  81:20,23 82:7,19
  83:15 86:8,13,17
  87:15,15 92:2,6
  92:15 99:11,16
  100:14 105:17
  106:8,15 107:5
  110:16,19 112:22
  114:12

**W**

W 16:10 17:15 25:5
  25:6,8 31:10
  41:22 45:6,18,22
  92:22 100:23
  110:22,23
wait 32:6
waive 110:23 111:7
  111:15 112:23
  114:24,25
waived 106:21
waiver 16:15 60:20
  91:24 111:17,19
  111:24
waivers 83:7
walk 7:18
want 17:4,6 18:6
  21:12,21,23 23:7
  28:3,21 32:6
  33:20,21 34:5
  37:24 38:7,12,13
  39:2,6 41:19
  46:15 51:20 52:3
  53:19,21 54:1,9
  54:15 55:20 57:6
  59:15 60:17 63:5
  75:17 79:17 93:18
  95:9 101:20 102:3
  104:20,21 107:25
  108:2
wanted 21:7 36:9
  50:5 55:5 81:5
wanting 55:16
wants 32:21 36:10
  54:7 79:16 98:2
warrants 4:18

wasn't 46:7 82:24
  85:10 90:15,24
  101:7
waste 90:4
wasting 78:5 93:23
  96:8
way 15:17 28:3,18
  34:4,5,6 36:14
  42:22 46:9 59:25
  75:17 85:17,19
  105:14 114:18
wayside 11:11
Wednesday 1:20
week 29:13 36:13
  36:13
weekend 55:6
Weimer 2:11
welfare 1:7,13 2:6
  82:24 83:25 84:7
  84:11,13
well-regarded
  103:10
went 10:18,18
  69:20 76:6
weren't 26:24
  77:17 82:3
West 1:22 2:8
WESTERN 1:1
we'll 24:24,24
  29:16 34:3,5 84:4
  96:20
we're 19:25,25 20:3
  23:5 33:18,22
  34:7,8 35:6 37:6
  38:4 40:11 49:11
  84:3 87:16 94:7
  96:19 105:8,18
  113:13,14
wife 52:17,20
William 2:14
withdraw 50:9
  92:2
withdrew 70:16
  92:4
witness 18:18 21:6
  21:14,18 27:19,24
  28:1 33:6 34:21
  37:5,16,20 38:15

39:6 47:16 49:16
  49:24 67:6 69:23
  73:5 79:22 81:3,4
  81:5,8,9,11 89:9
  92:8 95:17,17,20
  96:25 101:1
  105:10,22 114:25
witnesses 35:3 58:6
women 108:24
wondering 114:16
word 29:15
words 76:8,13
  79:18 94:7 105:1
work 8:12,13 9:14
  10:8 13:14 14:5
  17:8,20 18:12,19
  24:5,7 28:11
  32:15 49:10,15
  50:11 51:6,24
  53:21 67:22,23,25
  70:19,20,24 75:20
  77:8 80:14 81:13
  81:14 83:20,21
  92:7,11,16,19,21
  92:23 93:5,10,11
  94:5,10,24 106:19
  113:3,7,9,15
worked 7:15,23
  11:20 81:3,24
  82:12
worker 80:16,16
  87:13,14 100:24
workers 8:15 83:5
working 29:9,12
  63:10
works 38:16
worry 58:13 59:2
  59:22 60:3
worth 17:7
wouldn't 10:19
  43:2,15 58:1
  84:19 113:1
write 77:2,25
writing 43:10 55:12
  86:8
written 43:1 58:24
  74:18
wrong 27:23 28:22

55:15 66:22,24

**X**

**X** 3:1 45:11

**Y**

**Y** 4:1
**yada** 87:17,18,18
**Yeah** 14:9 40:23
    46:23 49:11 59:9
    75:25 77:1,4 81:1
    96:22
**year** 14:22 34:22
    45:14
**years** 7:9 14:17
    61:19 73:13,14
    80:14 85:17
    108:10,12,14
**Yep** 80:12
**yield** 49:16
**Youth** 1:6,12 2:6
    8:21 10:6 26:21
    29:8 97:17

**0**

**04** 14:17 40:14,16
    41:6 88:24
**05** 9:5 14:17 40:16
    41:7 43:21 44:14
**05-76E** 1:4

**1**

**1** 3:14 5:8,11 13:23
**1.6** 16:16 18:18
    92:23 93:1,3
**1.9** 16:16 18:19
**1:30** 1:21
**1:31** 55:13
**1:59** 57:16
**10** 7:9
**10th** 1:23 2:8 88:24
**101** 3:8
**108** 3:9
**11:12** 54:25
**113** 3:10
**12/03** 57:20
**120** 1:22 2:8
**15219** 2:12,15

**16** 47:23,24
**16501** 1:23 2:2,8
**16505** 5:5
**16509** 2:5 4:25
**1999** 8:25

**2**

**2** 46:18 54:16,17
    69:4,14
**2:29** 58:11
**2:29:53** 98:22
**2:34** 39:25
**2:42** 39:25
**2:47** 46:13
**2:59** 46:13
**20** 12:5 93:18
**2004** 8:25 9:19
    13:11,19 14:5,7
    14:10 54:19,25
    55:13 57:16 58:10
    58:11 61:1 70:14
    92:10 98:13
**2005** 13:23 23:25
    24:1
**2006** 1:21 5:12
**27th** 54:19

**3**

**3** 54:17,22,22 57:14
**30** 66:24 109:12
**30th** 5:12 23:19
**3700** 2:15
**3820** 2:4 4:25

**4**

**4** 3:4 54:25 55:13
    57:16 58:10,11
**4th** 86:8 92:10
    98:22 99:10
    100:10 101:3
**4:38** 115:3
**45** 109:12

**5**

**5** 1:21 3:14
**5th** 34:19
**522** 5:5
**525** 2:14

**6**

**6th** 61:1
**68** 3:5

**7**

**7.5(d)** 68:25 69:14
**72** 109:8,10

**8**

**821** 2:2

**9**

**95** 8:19
**96** 7:13,20
**97** 3:6 7:23
**975** 2:11
**98** 3:7 7:25
**99** 9:19 97:19

# United States District Court

WESTERN _____ DISTRICT OF _____ PENNSYLVANIA

ABBY B. CONLEY,

              Plaintiff

      v.

COUNTY OF ERIE, ERIE COUNTY OFFICE OF CHILDREN
AND YOUTH a/k/a ERIE COUNTY CHILD WELFARE
SERVICE, RICHARD SCHENKER, PETER CALLAN,
DEBRA LIEBEL, JOHN A. ONORATO, ESQ.

## SUBPOENA IN A CIVIL CASE

CASE NUMBER:   05-CV-76E

Judge Sean J. McLaughlin

TO: AMY E. JONES, ESQUIRE
    Vendetti & Vendetti
    3820 Liberty St.
    Erie, PA 16509

YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

X   YOU ARE COMMANDED to appear at the place, date and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Knox McLaughlin Gornall & Sennett<br>120 West 10th Street<br>Erie, PA 16501 | **WEDNESDAY, APRIL 5, 2006**<br>**1:30 P.M.** |

X   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

  1.  All documents provided to you by or on behalf of Abby Conley or Deanna Crosby.

  2.  Any documents constituting, memorializing, or arising out of any correspondence, or other communications, whether direct or indirect, involving yourself, Abby Conley, and/or Deanna Crosby.

| PLACE | DATE AND TIME |
|---|---|
| | |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *(signature)* | March 24, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Richard A. Lanzillo, Esquire
120 West 10th Street,
Erie, PA 16501      814-459-2800

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

# 663470

DEPOSITION EXHIBIT

Jones #1

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 3/30/06 | Vendetti Law Firm 3820 Liberty St |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Erin Waldo | Personal |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Bill Sibbald | Runner |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on 3/30/06
DATE

SIGNATURE OF SERVER

120 W. 10th
ADDRESS OF SERVER

ERIE, PA 16501

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

3(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person

resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applied, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 mile to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.