Appendix Exhibit 35

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 2 of 71

Conley v. County of Erie, et al.                                   John Onorato

1 (Pages 1 to 4)

**1**

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABBY B. CONLEY,                 :
        Plaintiff               :
                                :
    v.                          :  Civil Action No. 05-76E
                                :
COUNTY OF ERIE, ERIE COUNTY     :
OFFICE OF CHILDREN AND YOUTH,   :
a/k/a ERIE COUNTY CHILD         :
WELFARE SERVICE, RICHARD        :
SCHENKER, individually and      :
in his capacity as County       :
Executive of Erie County,       :
Pennsylvania, PETER CALLAN,     :
individually and in his         :
capacity as Erie County         :
Director of Personnel, DEBRA    :
LIEBEL, individually and in     :
her capacity as Executive       :
Director, Erie County Office    :
of Children and Youth, a/k/a    :
Erie County Child Welfare       :
Service, and JOHN A. ONORATO,   :
ESQUIRE, individually and in    :
his capacity as Erie County     :
Solicitor,                      :
        Defendants              :


       Deposition of JOHN ONORATO, taken before and
    by Carol A. Holdnack, Notary Public in and for the
    Commonwealth of Pennsylvania, on Monday, April
    3, 2006, commencing at 9:43 a.m., at the offices
    of Timothy D. McNair, Esquire, 821 State Street,
    Erie, Pennsylvania 16501.

             Reported by Carol A. Holdnack, RPR
             Ferguson & Holdnack Reporting, Inc.
```

**2**

```
 1  For the Plaintiff:
 2      Timothy D. McNair, Esquire
        821 State Street
 3      Erie, PA 16501
 4      Anthony Angelone, Esquire
        Vendetti & Vendetti
 5      3820 Liberty Street
        Erie, PA 16509
 6
    For the County of Erie, Erie County Office of Children and
 7  Youth, a/k/a Erie County Child Welfare Service:
        Neal R. Devlin, Esquire
 8      Knox McLaughlin Gornall & Sennett, PC
        120 West 10th Street
 9      Erie, PA 16501
10  For the Defendants Richard Schenker, Peter Callan, and Debra
    Liebel:
11      Edmund R. Joyal, Jr., Esquire
        Law Office of Joseph S. Weimer
12      975 Two Chatham Center
        Pittsburgh, PA 15219
13
14  For the Defendant John A. Onorato, Esquire:
        Mark R. Lane, Esquire
15      Dell Moser Lane & Loughney, LLC
        525 William Penn Place
16      Suite 3700
        Pittsburgh, PA 15219
17
18  Also Present:
        Wallace J. Knox, Esquire
19      Solicitor, County of Erie
20
21
22
23
24
25
```

**3**

```
 1                 I N D E X
 2
 3  TESTIMONY OF JOHN ONORATO
 4      Direct Examination by Mr. McNair . . . . .    4
 5      Cross-Examination by Mr. Joyal . . . . . .  117
 6      Redirect Examination by Mr. McNair . . . .  137
 7
 8
 9  EXHIBITS:
10      Onorato Deposition Exhibit 1 . . . . . . .   71
11      Onorato Deposition Exhibit 2 . . . . . . .   98
12      Onorato Deposition Exhibit 3 . . . . . . .  104
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1          J O H N  O N O R A T O, first having
 2      been duly sworn, testified as follows:
 3
 4              DIRECT EXAMINATION
 5  BY MR. McNAIR:
 6
 7      Q.  Good morning, Mr. Onorato.  My name is Tim McNair.
 8  I'm an attorney.  I represent Abby Conley in a case that
 9  she's filed against the County of Erie arising out of the
10  termination of her employment with Erie County's Office of
11  Children and Youth.
12          You've been named as a Defendant in this case for
13  a couple different reasons.  Number one is your
14  participation in the decision to terminate her employment.
15  And number two is statements which Ms. Conley feels were
16  libelous that you made concerning her in the newspaper
17  article.  So I'm going to be asking you a number of
18  questions today about both of those issues and some other
19  issues having to do with the case.
20          I just ask that before we start, you would agree
21  with me that if at any time my question is not clear, if you
22  don't understand it, just that you would stop me at that
23  point and tell me to -- ask me to repeat, rephrase or
24  clarify the question.  I'll be glad to do that for you.  Is
25  that agreeable with you?
```

5

1    A.  It is.
2    Q.  And you understand that if you don't do that, that
3  the answer you give is the answer that you intended to give,
4  and that you understood the question.
5    A.  Okay.  I understand.
6    Q.  Okay.  Would you state your full name and address,
7  please.
8    A.  John Anthony Onorato.  711 West Tenth Street,
9  Erie, Pennsylvania 16502.  And that's my home address.
10   Q.  How old are you, Mr. Onorato?
11   A.  I'm 40.
12   Q.  40 years old.  And I would like to ask you a
13  little about your educational background.  Where did you go
14  to high school?
15   A.  Mercyhurst Preparatory School.
16   Q.  When did you graduate?
17   A.  1983.
18   Q.  What did you do after that?
19   A.  I attended Gannon University.
20   Q.  Okay.  And did you graduate from Gannon?
21   A.  Yes.
22   Q.  When was that?
23   A.  1987.
24   Q.  And what degree did you receive from Gannon?
25   A.  Bachelor of arts.

6

1    Q.  Did you have a major?
2    A.  Yes.
3    Q.  What was that?
4    A.  Political science.
5    Q.  Okay.  What did you do after you graduated from
6  Gannon?
7    A.  I attended Dickinson -- the Dickinson School of
8  Law.
9    Q.  Okay.  Did you graduate from there?
10   A.  Yes.
11   Q.  And when was that?
12   A.  1990.
13   Q.  Did you receive any honors or awards while you
14  were at Dickinson?
15   A.  Yes.
16   Q.  What were those?
17   A.  I was selected to Who's Who of American Law
18  Students.  I was also an editor for the Dickinson Journal of
19  International Law.
20   Q.  Okay.  And what did you do after you graduated?
21   A.  One moment.  I also received an award, the ABA
22  Award for State and Local Government Law.
23   Q.  And did you take the Pennsylvania bar exam?
24   A.  Yes.
25   Q.  When did you do that?

7

1    A.  The summer after graduating.
2    Q.  Okay.
3    A.  August of 1990.
4    Q.  You passed on the first attempt?
5    A.  Yes.
6    Q.  Okay.  What did you do after that?
7    A.  In what way?
8    Q.  After you graduated from law school, did you seek
9  employment, or did you go to more school, or did you take a
10  vacation?
11   A.  I was employed both prior to taking the bar exam
12  and after taking the bar exam.
13   Q.  And where were you employed?
14   A.  With the law firm of Griffith Strickler Lerman
15  Solymos & Calkins.
16   Q.  Where are they?
17   A.  York, Pennsylvania.
18   Q.  What type of work did you do there?
19   A.  I was an associate, primarily engaged in insurance
20  defense work.
21   Q.  When did you start working there?  1990?
22   A.  In what capacity?
23   Q.  In any capacity.
24   A.  I began there as a law clerk between my second and
25  third year of law school.

8

1    Q.  And you continued your employment; became an
2  associate once you passed the bar?
3    A.  That's correct.
4    Q.  Okay.  And how long were you employed at the
5  Griffith firm?
6    A.  From my time as an -- from my time as a --
7    Q.  From the time you passed the bar.
8    A.  Say 1990 to maybe December of 1992.
9    Q.  Where did you go in December of 1992?
10   A.  Returned to Erie.
11   Q.  And were you employed in Erie?
12   A.  I began my education at Gannon University for an
13  MBA.
14   Q.  Did you complete your MBA?
15   A.  Yes.
16   Q.  When was that?
17   A.  Let's see.  It took 18 months.  I began in January
18  of 2003.  So May of 2005.  Is that 18 months?
19   Q.  Sounds like --
20   A.  It was 18 months.
21   Q.  It would have been May of '04.
22   A.  '04, yes.  That's correct.
23   Q.  And were you employed during that period of time?
24   A.  Yes.
25   Q.  Where?

**9**

```
1        A.   In several capacities.
2        Q.   Okay.  What were they?
3        A.   Graduate assistant at Gannon University.
4        Q.   Okay.
5        A.   And self-employed in the practice of law.
6        Q.   Did you have an office or did you work out of an
7   office?
8        A.   Primarily out of the place where I was residing.
9        Q.   Okay.  Worked out of home?
10       A.   Yes.
11       Q.   What type of work were you involved in as a
12  self-employed attorney?
13       A.   Preparing discovery requests and various contract
14  work with other attorneys.
15       Q.   You were subcontracting with other attorneys?
16       A.   Yes.
17       Q.   And who were some of those attorneys that you were
18  working for?
19       A.   Various firms.  Ron Susmarski, primarily.  But
20  other attorneys.
21       Q.   You don't recall them?
22       A.   It's been a while.
23       Q.   Now, when you said you did your MBA, you said that
24  was January of '03.  Was that actually January of '93?
25       A.   It would have been '93, excuse me.  January '93 to
```

**10**

```
1   --
2        Q.   May of '94.
3        A.   Yes, that's correct.
4        Q.   I lost it back there.
5        A.   So did I.
6        Q.   Okay.
7        A.   It would be -- I don't know where it went.
8        Q.   So then in -- during that period of time, up to
9   May '94, you were in school and practicing law?
10       A.   Yes.  I was engaged in 12 or more graduate credits
11  and also had responsibilities as a graduate assistant.
12       Q.   What department was that?
13       A.   The Dahlkemper School of Business.
14       Q.   And then once you got your MBA degree in May of
15  '94, what did you do?
16       A.   I initiated a job search.
17       Q.   Okay.  Did you find employment?
18       A.   No.  Eventually, yes, but not initially.
19       Q.   Okay.  How did you support yourself during that
20  period of time?
21       A.   Contract work.
22       Q.   When did you find employment after May of '94?
23       A.   I began -- I continued self-employed, doing the
24  contract work.  And then became employed by the State
25  Republican Campaign Committee.  State Republican Senatorial
```

**11**

```
1   Campaign Committee.
2        Q.   Okay.  And were you involved in any particular
3   campaign?
4        A.   Campaign of State Senator Jane Earll.  Prior to
5   that, I was involved in her district attorney race.  But
6   that was not -- that was as a volunteer.
7        Q.   But you had a paid position with the Earll --
8   Jane's --
9        A.   Second campaign.
10       Q.   Second campaign or senate campaign?
11       A.   Her senate campaign, yes, that's correct.
12       Q.   Now, that was her initial one, then, in --
13       A.   No, she ran for district attorney before she ran
14  for senate.
15       Q.   Right.  Okay.  But it was her first campaign for
16  senate.
17       A.   Yes.
18       Q.   All right.  When was that?
19       A.   When was what?
20       Q.   The election.
21       A.   What election?
22       Q.   Where Jane Earll won the senate seat.
23       A.   That was 2004.  No, 1996.  I'm sorry.
24       Q.   Okay.  All right.  And then after that election,
25  did you find other employment or did you continue --
```

**12**

```
1        A.   Yes.  In 1996 -- upon her election in 1996,
2   Senator Earll extended to me an offer to become her chief of
3   staff.
4        Q.   And where were you based in that job?
5        A.   Erie, with direct oversight of her office in
6   Pittsburgh as well -- or, excuse me, Harrisburg as well.
7        Q.   Okay.  You were chief of staff for both the Erie
8   office and the Harrisburg office.
9        A.   That's correct.
10       Q.   How long did you continue in that position?
11       A.   I would say till March of 2000.
12       Q.   What did you do there?
13       A.   I accepted a position with PNC Bank.
14       Q.   Doing what?
15       A.   Municipal bond underwriting.
16       Q.   And how long did you work for PNC?
17       A.   Approximately two years.
18       Q.   During the time you were working for the State
19  Republican Senatorial Campaign Committee or as Jane Earll's
20  chief of staff or in the PNC position, did any of your
21  duties involve the practice of law?
22       A.   I remained an active member of the bar.
23       Q.   Okay.  But in the course of you performing your
24  duties in those positions.
25       A.   I would say yes, in the -- for the Senator, I
```

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 5 of 71

Conley v. County of Erie, et al.                                    John Onorato

4 (Pages 13 to 16)

---

### 13

1  would be involved in drafting of legislation and amendments
2  to bills, resolutions.
3      Q.   Okay.
4      A.   I consider that to be the practice of law.
5      Q.   All right.
6      A.   With PNC Bank, I would be involved in the drafting
7  of municipal bond documents.
8      Q.   And where was that -- where were you located in
9  that position with PNC?
10     A.   901 State Street.
11     Q.   When you left PNC, what was your next employment?
12     A.   Gannon University.
13     Q.   What did you do there?
14     A.   I had been an adjunct professor at Gannon
15 University.  And a position opened up for me as a full-time
16 instructor.  Excuse me, associate professor is the term.
17     Q.   What did you teach?
18     A.   Business law.
19     Q.   That's all?
20     A.   I taught a various number of courses, including
21 human resource management, which is something I taught since
22 1998 at the University.  Some areas of employment law.
23     Q.   How long were you at Gannon?
24     A.   I began as an adjunct professor in 1998.  I took
25 the position in August of 2001 as a full-time instructor.

### 14

1      Q.   And when did you leave PNC?
2      A.   I stayed on at PNC as a part-time attorney till --
3  or part-time employee, until 2002.
4      Q.   All right.  Do you continue to be an associate
5  professor at Gannon?
6      A.   Yes.
7      Q.   How many credit hours do you teach?
8      A.   12 per semester.
9      Q.   Do you have any other -- did you have any other
10 employment after you left PNC in '02?
11     A.   Aside from Gannon?
12     Q.   Right.
13     A.   Occasional private clients.
14     Q.   And do you still maintain a practice of law?
15     A.   Yes.
16     Q.   And do you maintain a separate office for the
17 practice of law?
18     A.   I am currently the vice president and general
19 counsel of the Manufacturers Association of Northwest
20 Pennsylvania.
21     Q.   When did you take that position?
22     A.   January of this year.
23     Q.   Okay.  And between '02 and January of '06, did you
24 have employment other than as an associate professor at
25 Gannon and as a private practitioner?

### 15

1      A.   Yes.
2      Q.   Where was that?
3      A.   The County of Erie.
4      Q.   When did you begin there?
5      A.   January of '02.
6      Q.   What was your position?
7      A.   County Solicitor.
8      Q.   And who was your supervisor?
9      A.   I would not characterize a supervisor.  I am an
10 appointed -- the County Solicitor is an appointed position,
11 appointed by the County Executive.  I was appointed by Rick
12 Schenker in January of '02 to be his County Solicitor.
13     Q.   Did you participate in Mr. Schenker's campaign?
14     A.   Yes.
15     Q.   What was your role?
16     A.   I facilitated statistical work, assisted in the
17 drafting of policy or position papers, and advised the
18 candidate.
19     Q.   Did you have a position on his committee?
20     A.   Define position.
21     Q.   A position that would be reported on a campaign
22 report.
23     A.   I don't believe so.
24     Q.   As a member of the committee.  Okay.
25     A.   If you're asking was I the chair or treasurer, the

### 16

1  answer is no.
2      Q.   Who was the chair of that campaign?
3      A.   I don't recall.
4      Q.   Do you recall who the treasurer was?
5      A.   No, I don't recall.
6      Q.   And aside from the Earll campaign and the Schenker
7  campaign, have you participated in any other political
8  campaigns?
9      A.   Yes.
10     Q.   What other campaigns?
11     A.   George Bush, Rick Santorum, Phil English, Michael
12 Joyce.  I'm going to ask in what capacity, because we all
13 participate in the sense that we vote, or some of us do
14 perhaps.
15     Q.   I would say something more than that.  Where you
16 were recognized as part of the campaign.
17     A.   Recognized by whom?
18     Q.   By the candidate.
19     A.   By the candidate.  Well, then, we'll cross off
20 George Bush from that list.
21     Q.   Or his staff.  Or his appointed staff or paid
22 staff, as somebody that was involved in the campaign.
23     A.   Michael Dunlavey.  You might want to add to that
24 list.  I would say -- it would be fair to say that I
25 participated in the election efforts of many Republicans.

**17**

1    Q.   Okay.  Pretty much every year you would be
2  involved in one campaign or another?  I do it too.
3    A.   That would be fair to say.
4    Q.   All right.
5    A.   I've not seen you at any of our meetings.
6    Q.   I don't tend to participate in Republican
7  campaigns for some reason.  What were your duties as the
8  City Solicitor -- or the County Solicitor?  Excuse me.
9    A.   They are set forth in the County Charter.
10   Q.   Okay.  Could you just summarize those for me.
11   A.   The County Solicitor is the chief legal officer of
12  the County of Erie.
13   Q.   Okay.
14   A.   All the duties attended thereto.  Representing the
15  County in various legal matters.
16   Q.   All right.  And did you represent the County in
17  court cases?
18   A.   On occasion.
19   Q.   How many times did you do that?
20   A.   I have no idea.
21   Q.   Where you formally entered an appearance on behalf
22  of the County with the court.
23   A.   I've done that, yes.
24   Q.   Okay.  You don't recall how many times?
25   A.   Over the course of four years, all that I could

**18**

1  give you would be a guess, and I don't want to guess.
2    Q.   Okay.  You can't estimate it?
3    A.   No.
4    Q.   More than ten or less than ten?
5    A.   I would say perhaps more than ten.  Again, what --
6  how do you define a court case?  Is it a --
7    Q.   Litigation filed in a court.
8    A.   Well, then, Court of Common Pleas, the
9  Pennsylvania Human Relations Commission, Workers'
10  Compensation, Unemployment Compensation.
11   Q.   All right.  Did you represent the County in those
12  administrative tribunes that you just mentioned?
13   A.   Yes.
14   Q.   And on how many occasions did you do that?
15   A.   Numerous.  Scores.
16   Q.   What is your involvement on a day-to-day basis
17  with the Office of Children and Youth?  How often did you
18  have contact with the Office of Children and Youth in the
19  course of your duties as County Solicitor?
20   A.   Define Office of Children and Youth.
21   Q.   The Office of Children and Youth.
22   A.   How do you have contact with an office?  Tell me
23  the individual, and I'll tell you the contact.
24   Q.   I don't know all the individuals who worked there
25  who would have contacted you.

**19**

1    A.   Well, then.
2    Q.   How often were you contacted by employees of the
3  Office of Children and Youth in the course of your duties,
4  or how often did you have contact with employees of the
5  Office of Children and Youth in the course of your duties?
6    A.   Could you repeat the question.
7    Q.   How frequently did you have contact with employees
8  of the Erie County Office of Children and Youth in the
9  course of your duties as County Solicitor for Erie County?
10   A.   As they require.  If they sought the input of the
11  County Solicitor's Office, I would be contacted.  If I
12  believed that there was something of which they should be
13  aware, I would contact them.
14   Q.   Okay.  And the question is, how frequently did
15  that happen?
16   A.   Again, it's as a doctor would prescribe a
17  medication PRN.  It would be as if -- think of it this way;
18  how often do you take aspirin?  You take it when you have a
19  need.
20   Q.   Right.
21   A.   How often would --
22   Q.   The question is, how often did the need arise?
23  Was it weekly, monthly, annually?  Was it twice in the time
24  that you worked there?  Was it every day?
25   A.   It was not every day.

**20**

1    Q.   Okay.
2    A.   And it was more than twice.  Somewhere in there.
3    Q.   Okay.  That's really not very responsive to my
4  question.  I don't think the question is that difficult.  So
5  I'm going --
6    A.   I'm not trying --
7    Q.   -- to ask it again and give you another chance to
8  answer it.
9    A.   I'm not trying to be difficult.
10   Q.   I'm sure.  How often would you have contact with
11  employees of the Office of Children and Youth in the course
12  of performing your duties as Erie County Solicitor?
13   A.   Sometimes it would be daily.  Sometimes there
14  would be -- it would be less than once a month.  Again, it
15  depended upon the circumstances at the time.
16   Q.   In 2004, how frequently were you contacted -- or
17  how frequently were you involved with the Office of Children
18  and Youth?
19   A.   I don't recall.  I don't have my -- I don't
20  recall.
21   Q.   Was your contact more frequent after the death of
22  Brittany Legler came to light?
23   A.   I would not say so.
24   Q.   So they didn't seek your advice or involvement in
25  handling any of the difficulties that arose out of that

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 7 of 71

Conley v. County of Erie, et al.                                    John Onorato

6 (Pages 21 to 24)

21

1    event?
2        A.   What would happen -- what happened is during
3    meetings with Deb Liebel, the subject of the child death
4    review would be discussed.  And the fact that the District
5    Attorney had asked not to conduct that until the criminal
6    matter was disposed of.
7        Q.   Okay.  So you were consulted on that -- holding
8    off on the death review committee?
9        A.   Yes.
10       Q.   Aside from those issues that arose in connection
11   with Brittany Legler's death, how often would you meet with
12   Deb Liebel?
13       A.   During what time?
14       Q.   During the time you were County Solicitor.
15       A.   Initially, Deb Liebel -- I did not meet with her.
16   She was not the director.  She had been appointed director
17   after Mr. Petulla left.
18       Q.   Okay.  And so you didn't meet with her before she
19   was appointed director.
20       A.   I may meet with -- I may have met with her on
21   occasion with Mr. Petulla or as part of administrative staff
22   meetings that were called by the then -- the then director
23   of administration, Susan Breon.
24       Q.   On how many occasions were you contacted by the
25   Office of Children and Youth regarding employment law

22

1    issues?
2        A.   Frequently.  If there were an issue regarding
3    employment law, they would contact me.
4        Q.   And who would contact you from OCY?
5        A.   Either the director or Michael Cauley.  Let me go
6    back.  When I say frequently, I meant frequently when they
7    would have -- if they would have an issue, I would be their
8    point of contact, not that they had many issues.  There were
9    departments that had more issues.
10       Q.   All right.  How many issues do you recall being
11   involved in during the four years you were County Solicitor?
12       A.   What type of issues?
13       Q.   Employment issues with the Office of Children and
14   Youth.
15       A.   I'm going to say that there's attorney/client
16   privilege on that.  I will answer questions regarding your
17   client.  I'm not sure it's -- I should be speaking of
18   matters involving other clients.
19       Q.   I'm not asking for any specifics.  I'm not asking
20   you to identify anything.  I'm not asking you for any
21   statements made by your client.  I'm asking you to tell me
22   the number of times you were involved in an employment of
23   law issue with the Erie County Office of Children and Youth.
24       A.   Every civil service case which I handled.  I
25   handled all the civil service cases for the County of Erie

23

1    with the exception of one, the one involving your client,
2    which was withdrawn when we provided the information that
3    showed that she had released confidential information.
4        Q.   And how many were those involving OCY in that four
5    years?
6        A.   All of them.
7        Q.   How many is all?
8        A.   Well, I don't recall the number, because, again --
9        Q.   Was it more than ten?
10       A.   OCY was the only civil service entity under the
11   County.
12       Q.   Okay.
13       A.   So every civil service case, including the one
14   which I believe you had a client -- do you remember the
15   matter?
16       Q.   Um-hum.  Okay.  And I'm just asking you about how
17   many there were?
18       A.   Maybe -- maybe 10 or 12.  I don't recall, truly.
19   I'm not trying to --
20       Q.   10 or 12 civil service commission cases.
21       A.   Yes.
22       Q.   Okay.
23       A.   Again, I'm not trying to be anything but
24   responsive.
25       Q.   Okay.

24

1        A.   So those would be employee matters which I would
2    be -- in which I would be involved.
3        Q.   Okay.  So over four years you handled 10 to 12
4    cases for OCY in the -- before the Pennsylvania Civil
5    Service Commission; is that a fair statement?
6        A.   Yes.
7        Q.   Were you involved in any employment litigation in
8    the Courts; either the Court of Common Pleas or the District
9    Court, involving Office of Children and Youth employees in
10   that four-year period?  By "involved," I mean did you enter
11   an appearance?
12       A.   No.
13       Q.   So you never went to court for the County in an
14   employment case involving the Office of Children and Youth.
15       A.   That's correct.  We have a fine insurance company.
16       Q.   On how many occasions did you enter an appearance
17   on behalf of the County before the Pennsylvania Human
18   Relations Commission or the Federal Equal Employment
19   Opportunity Commission in matters involving employees of the
20   Office of Children and Youth?
21       A.   Zero.
22       Q.   Who handled those on behalf of the County?
23       A.   There's an assumption in your question that there
24   was.
25       Q.   I know that there were.  Dave Dowes (phonetic) had

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 8 of 71

Conley v. County of Erie, et al.                        John Onorato

7 (Pages 25 to 28)

**25**

1  one, didn't he?
2      A.  An appearance was never entered.  Your question
3  was how many times was an appearance entered.  The answer is
4  zero.
5      Q.  So there were no PHRC cases or EEOC cases filed
6  against the County in that four year --
7          MR. JOYAL:  Involving OCY.
8          MR. McNAIR:  Involving OCY.
9      A.  That's a different question.
10     Q.  Okay.  Well, then, get an answer to that one.
11     A.  One.
12     Q.  One.  And who was involved in that?
13     A.  The County of Erie and David Dowes.
14     Q.  And how many unemployment compensation cases
15  involving the Office of Children and Youth were you involved
16  in?
17         MR. LANE:  Objection to form.
18     Q.  In the four years you were County Solicitor.
19         MR. LANE:  Same objection.
20         MR. McNAIR:  What's the matter with the form?
21         MR. LANE:  "Involved in" is a little broad.
22     Q.  Did you participate in as an attorney.
23     A.  I don't recall any for that office.
24     Q.  How many court cases involving employment law were
25  filed against the County involving the Office of Children

**26**

1  and Youth during the four years that you were County
2  Solicitor?
3      A.  When you say Court cases, do you include --
4      Q.  I mean Common Pleas or Federal District Court.
5      A.  I believe your client was the only one.
6      Q.  And aside from the case that we're here about,
7  during those four years, how many times did you participate
8  or supervise an investigation of allegations of wrongdoing
9  against an employee of the Office of Children and Youth?
10         MR. LANE:  Object to the form of the question.
11         MR. McNAIR:  What's wrong with the form of the
12         question?
13         MR. LANE:  "Allegation of wrongdoing" is overly
14         broad and ambiguous.  Could you read the question
15         back again.
16     (Record read by reporter.)
17         MR. LANE:  "Wrongdoing" also requires a legal
18         conclusion to, in the event that you're --
19         MR. McNAIR:  I said allegations of wrongdoing.
20         MR. LANE:  Still requires a legal conclusion.
21         Also "investigation" is overly broad.
22         MR. McNAIR:  Okay.  Would you please answer the
23         question.
24     A.  To the best of my recollection, two, including
25  your client.  So one other than your client.

**27**

1      Q.  Okay.  And in general terms, how was that
2  investigation conducted?
3          MR. LANE:  Objection to form.
4      A.  Would you define for me "general terms".
5      Q.  What was the procedure that was followed in
6  conducting that investigation?
7          MR. LANE:  Which investigation; Abby Conley's or
8          the other?
9      Q.  My question excluded this case, so it would be the
10  other one.  We're following the same line.
11     A.  A concern was raised.  The matter was looked into
12  and resolved.
13     Q.  Okay.
14     A.  In general terms, that's how the investigation was
15  conducted.
16     Q.  And how was the concern brought to your attention
17  in that case?
18     A.  I believe it was the director who raised the
19  matter to me.
20     Q.  Okay.  And who conducted the investigation?
21     A.  I asked the director what he was doing to look
22  into it.  He provided me an answer.  And I was satisfied.
23  The director at the time was John Petulla.
24     Q.  Was any action taken as a result of the findings
25  of that investigation?

**28**

1      A.  I don't believe so.
2      Q.  Do you know if Mr. Petulla interviewed any
3  witnesses or people with knowledge of the facts of the
4  allegations involved in that investigation?
5      A.  I was satisfied that Mr. Petulla had done his due
6  diligence and that the department had done.
7      Q.  And did you independently investigate any of the
8  allegations?
9      A.  No.
10     Q.  Did you speak to any of the witnesses or the
11  employee involved?
12     A.  No.
13     Q.  Did you speak to the supervisor of the employee
14  involved or anyone other than the director?
15     A.  No.
16     Q.  Do you know my client, Abby Conley?
17     A.  The first time I met her was the day of her
18  resignation.
19     Q.  Were you aware of who she was, who she is?
20     A.  Yes.
21     Q.  How did you become aware of who she is?
22     A.  I remember her as the individual who -- from
23  various -- I was aware of her as her membership -- or,
24  rather, her holding the position of Erie City School
25  District Director.  I remember well her trademark, ABC

## 29

1  blocks for -- what was the motto for her election. I also
2  know that she was the individual who collected in excess
3  of -- or coordinated the collection of in excess of well
4  over 10,000 signatures, I believe, to not have the library
5  placed on the Bayfront. And I believe I also knew that -- I
6  was aware of the name.
7     Q.  Okay. In 2003 or 2004, to your knowledge, was
8  Ms. Conley involved in any petition drives or running for
9  any public office?
10    A.  No, not that I'm aware.
11    Q.  And prior to September 10, 2004, are you aware
12 that Ms. Conley made any effort to be involved in any debate
13 over issues affecting the general public?
14    A.  Not that I recall.
15    Q.  During that period of time, are you aware of any
16 efforts that Ms. Conley made to seek publicity for herself
17 for any purpose?
18    A.  Not that I'm aware.
19    Q.  Did you know what political party Ms. Conley is
20 affiliated with?
21    A.  Could you rephrase your question. When, I guess
22 is the -- I knew that she was a Democrat when she was a
23 member of the School District -- the School Board. I was
24 not aware of her political party affiliation, you know,
25 aside from that. I don't know if she's changed parties or

## 30

1  not.
2     Q.  And your first knowledge that Ms. Conley worked at
3  the Office of Children and Youth was when?
4     A.  When Michael Cauley told me that he had an
5  occurrence with her as a witness in a case.
6     Q.  When was that, in relation to that hearing? If it
7  refreshes your recollection, that hearing was on Friday
8  July 28th, 2004.
9     A.  I would say it was, if not that day, then the
10 Monday. I would believe, actually, it was the Monday.
11    Q.  How did Mr. Cauley approach you about this issue?
12    A.  It was the -- I remember it being the summer.
13 What date did you say it was, again?
14    Q.  The hearing was July 28th.
15    A.  So I remember Mr. -- I remember it being the
16 summer, because when Gannon was on summer break, I was at
17 the County 8:30 to 4:30. And he came into my office and
18 told me what happened.
19    Q.  What did he tell you had happened?
20    A.  He outlined for me what happened to Ms. Conley
21 while she was on the stand.
22    Q.  Okay. Was there any other motivation for him
23 approaching you other than the events of that hearing of
24 July 28th?
25    A.  You'd have to talk to him.

## 31

1     Q.  Okay. Did he advise you of any other motivation
2  other than his concern over Ms. Conley's testimony in that
3  hearing of July 28th?
4     A.  His concerns were Abby's testimony and the
5  credibility of the department.
6     Q.  Okay. What was his concern regarding Ms. Conley's
7  testimony?
8     A.  That she had provided Attorney Villella a draft
9  copy of a document.
10    Q.  Okay.
11    A.  Prior to her testimony.
12    Q.  Do you know whether or not that allegation is
13 true?
14    A.  I read the transcript and a draft copy of the
15 document which was provided to Attorney Villella. I do not
16 know who provided it.
17    Q.  You couldn't determine that by reading the
18 transcript?
19    A.  The transcript speaks for itself.
20    Q.  I know. And you couldn't determine whether or not
21 Mr. Villella possessed that document prior to the hearing by
22 reading the transcript?
23    A.  If you show me the transcript, we could work
24 through the testimony provided and come to the conclusion
25 based upon what is written there.

## 32

1     Q.  Okay. Is that an exercise that you previously
2  performed?
3     A.  I've read the transcript.
4     Q.  Okay. Did you read the transcript with a view
5  toward determining whether or not it gave an indication that
6  Ms. Conley provided a draft of a document to Mr. Villella
7  prior to the commencement of the hearing of July 28, 2004?
8     A.  I read the transcript to ascertain what happened
9  in the courtroom on that date. I was not reading
10 specifically to find an occurrence or a nonoccurence of an
11 event, but rather to come to an understanding of what
12 occurred in that courtroom on that date.
13    Q.  When did you read that transcript for the first
14 time?
15    A.  I do not recall. But it was prior to the
16 resignation of your client from employment with the County
17 of Erie.
18    Q.  So it was sometime between that Monday, would have
19 been August 31st, and September 10th.
20    A.  That's correct.
21    Q.  All right. Was Mr. Cauley concerned that
22 Ms. Conley had given testimony that was not truthful?
23    A.  Mr. Cauley's concern was that Ms. Conley had acted
24 inappropriately. And the larger overreaching concern was
25 for the credibility of the department in the eyes of Judge

33

1 Kelly.
2    Q.  Okay.  In what way did Mr. Cauley -- aside from
3 allegedly giving this document to Mr. Villella, in what way
4 did Ms. Conley act inappropriately, according to Mr. Cauley?
5    A.  Your question set aside from, I believe that that
6 is in and of itself enough, if that, indeed, is what
7 occurred.
8    Q.  Okay.  And aside from that, or was that the only
9 concern?
10    A.  I don't recall any other concerns.
11    Q.  So if I understand correctly, your testimony is
12 that on that Monday Mr. Cauley approached you in your office
13 with a concern regarding Abby Conley's testimony at the
14 July 28th hearing alleging that she had provided a document
15 to Jerry Villella, and that this impacted the credibility of
16 the agency with Judge Kelly.  Is that a fair --
17    A.  Yes.
18    Q.  -- summary of your testimony?
19    A.  I believe so.  That is a fair -- yes.
20    Q.  Okay.  Did Mr. Cauley express any concerns to you
21 that he or others at the agency believed that Ms. Conley was
22 leaking other information?
23    A.  I don't recall anything, other than the concern
24 for the draft of the report going to Attorney Villella.  Or
25 rather Attorney Villella obtaining a copy inappropriately of

34

1 that draft, and the credibility of the department.
2    Q.  Did Mr. Cauley tell you whether or not he had
3 discussed this issue with Mr. Villella, to find out if or
4 where he had gotten the document in question?
5    A.  At what time?
6    Q.  Any time.
7    A.  I know that --
8    Q.  Specifically in this meeting, I guess this Monday,
9 August 31st meeting?
10    MR. LANE:  Is it August 31st or July 31st?
11    MR. McNAIR:  Or July 31st, excuse me.  Thank you.
12    MR. LANE:  Because I think you used August 31st
13       before too.
14    MR. McNAIR:  Yeah.  I meant July 31st.
15    THE WITNESS:  I'm terrible with dates.
16    Q.  I'm making it up as I go along, obviously.
17    A.  It's okay.  I'm not surprised.
18    Q.  Thanks.  Did he tell you in that meeting on
19 July 31st if he spoke to Mr. Villella and asked him where he
20 got that document?
21    A.  I don't recall.
22    Q.  Would that have been an appropriate manner of
23 investigating this allegation?
24    A.  I don't know what you mean by "appropriate".
25    Q.  Well, you're a professor and you teach employment

35

1 law, correct?
2    A.  Yes.
3    Q.  And you teach employment personnel issues,
4 correct?
5    A.  That's correct, yes.
6    Q.  And you would agree with me, would you not, that
7 if you're going to undertake an investigation to determine
8 whether or not an employee should be subjected to
9 discipline, that investigation should be objective and
10 unbiased?  Would you agree with me?
11    MR. JOYAL:  I'm going to object to the form.
12       That's presuming that there was an investigation
13       he was conducting on July 31st.
14    MR. LANE:  I'm going to join in that and also
15       object to the form.
16    A.  I would not say that we began an investigation.
17 Mike spoke to me.  He had a concern.  I responded.  I
18 listened to the concern.  And we discussed what to do with
19 the concern.  The main concern which he had was the fact
20 that Judge Kelly heard many of these cases, and making sure
21 that Judge Kelly held the department in proper esteem.
22    Q.  Okay.  Was there a discussion of requiring OCY
23 employees to testify to the party line, whatever the
24 decision was that OCY management had made in a particular
25 case?

36

1    A.  Attorney Cauley -- I would not characterize
2 testimony as party line.  All that we ever ask of any County
3 employee to do when they're on the stand is tell the truth.
4    Q.  Okay.  And do you know whether or not Ms. Conley
5 told the truth on July 28th?
6    A.  You would have to ask her.
7    Q.  I'm asking you whether or not you know whether she
8 did or not.
9    MR. JOYAL:  I'm going to object to the form.
10       Again, it asks for him to decide for himself what
11       Abby Conley said during the course of her
12       testimony in all instances was true or false.
13    MR. McNAIR:  I'm aware of the question.
14    A.  I do not believe that I'm in a position to judge
15 the veracity of Ms. Conley's statements on that day.
16    Q.  So as you sit here today, you can't tell us
17 whether or not Abby Conley's testimony on July 28th, 2004
18 was truthful or not.
19    MR. LANE:  Objection to form.
20    A.  It was what it was.  Whether it's true or not, I
21 cannot make that determination.
22    Q.  So you're not alleging that Ms. Conley made any
23 untruthful statement in the course of that testimony.
24    A.  I cannot state that her testimony was either true
25 or untrue.  I can only state that it was.

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 11 of 71

Conley v. County of Erie, et al.                                    John Onorato

10 (Pages 37 to 40)

37

1    Q.  Did you, yourself, undertake -- or take any
2 efforts to find out how Mr. Villella obtained this document
3 or if he did?
4    A.  If he did.  The transcript shows, I believe, that
5 he had possession of it.  So he did have it.  I believe.
6 Did I undertake; no.
7    Q.  Okay.  And your interpretation of the transcript
8 is that Mr. Villella had possession of that document prior
9 to the beginning of the hearing.
10    A.  I don't have the transcript.  If you have the
11 transcript -- the transcript will speak for itself.  I don't
12 know if he had it before the hearing, during the hearing, or
13 at what time.  However, at one point he had possession
14 because he approached Ms. Conley on the stand with the
15 document.
16    Q.  All right.  Well, the question was whether or not
17 you did anything yourself to investigate Mr. Cauley's
18 allegation.
19    A.  I suggested to Mike that we check the e-mails of
20 Ms. Conley.
21    Q.  Okay.  And you were the person that first brought
22 up the subject of checking her e-mails?
23    A.  I believe Mike came to me.  And as a result of
24 that meeting, I knew what our computer-use policy was, and
25 that we would be able to do this.  So I believe I suggested

38

1 it to Mike.
2    Q.  Okay.  So that suggestion came from you.  That
3 wasn't something that OCY asked you for.
4    A.  I think that -- I'm not sure that -- I wanted to
5 assist Mike in understanding his concern.  And, certainly,
6 if an individual was submitting information, privileged
7 information, to third parties, we wanted to know about it.
8    Q.  Okay.  And you had assumed that she had done this
9 via e-mail.  That she would have e-mailed this to
10 Mr. Villella?
11    A.  There was no assumption of that sort.  Rather,
12 this was the first place to look.
13    Q.  Okay.  What made you believe that looking at
14 Abby's e-mails would lead to evidence concerning
15 Mr. Cauley's allegation that she gave a document to Mr.
16 Villella?
17    A.  The document, as my understanding, was created
18 or -- created or maintained on Abby's system, computer.  And
19 at some point it ended up in Mr. Villella's possession.  If
20 through a check of her e-mail, it could be determined that
21 he -- it was e-mailed to him.
22    Q.  Okay.  So that's why you restricted the search for
23 e-mails from Abby to Jerry Villella.
24    A.  No.
25       MR. LANE:  Objection to form.

39

1    A.  The look was at all of the e-mail.
2    Q.  Why did you feel the need to look at all of the
3 e-mails to investigate a specific allegation concerning
4 Jerry Villella?
5    A.  Because oftentimes information does not go
6 directly to the recipient, but could perhaps go to a third
7 party.  The question here was whether or not this individual
8 had released information to third parties.
9    Q.  Was there any discussion of the contents of
10 Ms. Conley's personnel file in the course of this meeting
11 with Mr. Cauley?
12    A.  No.  I have not -- I had not -- no.  I don't
13 believe I ever saw Ms. Conley's personnel file.
14    Q.  How long did this meeting last?
15    A.  I don't recall.  I don't believe it took more than
16 20 minutes.
17    Q.  And at the conclusion of this meeting, what was
18 the resolution?  What did you instruct Mr. Cauley to do, if
19 anything?
20    A.  I suggested -- I don't believe I instructed
21 Michael to do anything.  Rather, it was discussed that we
22 had the right to look at any e-mail, County e-mails.  This
23 is County property.  Under our policies, we have the ability
24 to do that.  I suggested that he contact individuals at BAC
25 Computer to facilitate this.

40

1    Q.  Were you involved in any subsequent meetings
2 concerning this issue, prior to September 10th?
3    A.  Yes.
4    Q.  Okay.  What was the next time you were -- met with
5 anybody from OCY concerning this -- concerning Abby Conley?
6    A.  Shortly after I authorized -- or shortly after I
7 spoke with Michael about the review of Ms. Conley's e-mail,
8 I met with Mike to discuss the contents of what he had
9 found.
10    Q.  Did you ever meet with anyone from OCY other than
11 Mr. Cauley?
12    A.  Yes.
13    Q.  Who was that?
14    A.  The director.
15    Q.  And who is the director?
16    A.  Deb Liebel.
17    Q.  When did you meet with Deb Liebel?
18    A.  I don't recall.
19    Q.  Do you recall where you met with her?
20    A.  I would say in the courthouse.
21    Q.  Do you have any recollection of that meeting?
22    A.  Yes.
23    Q.  Okay.  Who was present?
24    A.  Perhaps -- certainly, Deb, myself, Michael.  At
25 some point, Pete Callan was engaged.

Case 1:05-cv-00076-SJM     Document 70-10     Filed 04/12/2006     Page 12 of 71

Conley v. County of Erie, et al.                                    John Onorato

11 (Pages 41 to 44)

41

1    Q.   And do you recall when this meeting took place?
2    A.   No.
3    Q.   Was anyone else present besides the people you've
4  named?
5    A.   I believe Ann Bloxdorf may or may not have been
6  present.  I know that she would have been informed.
7    Q.   And from OCY, were Mr. Cauley and Ms. Liebel the
8  only participants?
9    A.   Yes.
10   Q.   How long did this meeting last?
11   A.   It was -- we met -- I met with Mike initially
12 to -- when he told me the content of the e-mails that he had
13 found, then there was a greater meeting that was established
14 with those participants.
15   Q.   Okay.  And, again, do you recall when that was?
16   A.   No.
17   Q.   Was it about a week?
18   A.   If you're looking for the chronology, Mike met
19 with me.  I suggested to Mike the e-mails should be looked
20 at.  Make sure you talk to Deb about it, and tell Deb that
21 that's what we're doing.  The e-mails were reviewed.  Mike
22 told me some of what he found.  I said, we better get
23 everybody -- we should get everyone together, and we did.
24   Q.   So that meeting that you're talking about occurred
25 after Mr. Cauley had reviewed these e-mails.

42

1    A.   Yes.  That's my recollection.
2    Q.   And what was the topic of discussion at that
3  meeting?
4    A.   The result of what had been found.
5    Q.   What were you told had been found?
6    A.   That your client had dispensed information to a
7  former caseworker, a resident of North Carolina, regarding
8  an order of court that a child should be taken from its
9  birth mother upon the birth of the child.  And that this
10 revelation was done with intent that the mother should
11 receive it and act upon it.
12   Q.   And can you explain to me how or if that ties into
13 an allegation that Ms. Conley provided Mr. Villella with a
14 document prior to the July 28th hearing.  Was there any
15 discussion of that document in this e-mail?
16       MR. LANE:  Objection to form.
17       MR. JOYAL:  Objection to form.  You keep talking
18       about an investigation about a document.  And I
19       don't think he's ever, again --
20       MR. McNAIR:  Well, look, his testimony speaks for
21       itself.  Mr. Joyal, stop with the lectures.  I
22       don't have time.  This witness doesn't have time.
23       You're just lengthening this.  I have depositions
24       with page after page of you going on.  I
25       understand you object to the question.  Your

43

1  rights are preserved.  That's all you need to do.
2  You don't need to suggest an answer to the
3  witness.  You don't need to give an explanation.
4  You may simply object, and your rights are
5  preserved.  Thank you.
6       MR. JOYAL:  Mr. McNair, this is Federal Court, Mr.
7       McNair.  Don't lecture me.  Don't even try.  He's
8       never classified it as an investigation that he
9       participated in.
10      MR. McNAIR:  I have.  Let's go off the record.
11      I'm not going to pay for this.
12      MR. JOYAL:  You haven't paid for anything yet,
13      Tim.  That's my objection, as to form of the
14      question.
15      MR. McNAIR:  This is off the record.  I'm not
16      putting --
17      MR. JOYAL:  You can't stop something from going on
18      the record.
19      THE REPORTER:  If you're going to go off, I would
20      like you all to agree to go off.
21      MR. McNAIR:  If I tell you we're off, we're off.
22      MR. JOYAL:  I don't believe so, Mr. McNair.  The
23      record is the record.  You can't unilaterally go
24      off the record.
25      MR. McNAIR:  Look, I'm sick and tired of listening

44

1  to your speeches.  Please cut it out.  Act
2  professional.  Make an objection.  Your rights are
3  preserved.  If I need an explanation, I'll ask for
4  an explanation.
5       MR. JOYAL:  Mr. McNair, learn the rules.
6       MR. McNAIR:  Don't lecture me on the rules.
7       MR. JOYAL:  The objection is on the record,
8       according to the rules of civil procedure and the
9       rules of court.
10      MR. McNAIR:  The record's on the objection [sic]
11      according to the rules of Ed Joyal.  Okay.  Can
12      you read back my question, please.
13      MR. JOYAL:  We're done, Mr. McNair.  If you had
14      not decided to go for four minutes about talking
15      about my objection, we would be done.
16      MR. McNAIR:  Would you read back the question,
17      please.
18      (Record read by reporter.)
19      MR. LANE:  Objection to form.
20      MR. McNAIR:  You've already made it.
21   A.  I don't understand the question.
22   Q.  Was there any connection between this e-mail that
23 you've described, to this former caseworker, and
24 Mr. Cauley's allegation that Ms. Conley had improperly
25 provided Mr. Villella with a draft document?

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 13 of 71

Conley v. County of Erie, et al.                                                    John Onorato

12 (Pages 45 to 48)

---

**45**

1  A. My understanding of the e-mails that were reviewed
2  unearthed something far more disturbing than what happened
3  in that courtroom. It showed that your client had --
4  Q. This is not responsive to the question. Okay.
5  A. If you don't like the response, that's your issue.
6  Q. It's not responsive to the question.
7  A. I believe I'm responding to the question.
8      MR. LANE: You can finish your answer. Finish
9      your answer.
10     MR. McNAIR: Make your speech.
11  Q. I'll ask the question again. And we'll do this --
12  and if you have to come back, we'll do it again.
13  A. What was found was something very disturbing.
14  Q. That you would agree with me, however disturbing
15  it was, it was completely unrelated to the issue that
16  Mr. Cauley approached you with on Monday, July 31st.
17  A. Was it related? What was found was what was
18  found. What was found was that your client had told a third
19  party that a child would be taken from its mother at birth,
20  something that mother should not have been aware of, with
21  intent that that mother be informed.
22  Q. What makes you think the mother wasn't aware of
23  this?
24  A. It's something that of which the mother -- the
25  court does not inform the person. I do not practice in this

---

**46**

1  area of law. Michael Cauley, who has spent the better part
2  of his professional life in this area, informed me that it
3  is the general rule that these orders are issued, given to
4  the area hospitals. And the mother is not informed because
5  of fear of flight of the mother or that the mother would
6  injure the baby.
7  Q. Okay. I understand that. Did you review the OCY
8  file in that case?
9  A. No.
10  Q. Do you know whether or not that file indicates
11  that the mother was fully aware of the existence of that
12  order?
13  A. That's not relevant. What is relevant is that a
14  third party was informed of a matter, and that is
15  unacceptable.
16  Q. Whether it was relevant or not, are you aware of
17  whether or not that mother had knowledge that such an order
18  would be entered?
19  A. You would have to speak to that mother. I don't
20  know whether she was aware or not.
21  Q. And you didn't do that.
22  A. It was not warranted. We found that your client
23  had told a third party of a matter involving a client.
24  Q. And there was a different client, and it was a
25  different case. And you would agree with me, it was

---

**47**

1  somewhat remote in time, wouldn't you?
2      MR. LANE: Objection to form.
3  A. What is remote?
4  Q. May. You were doing this investigation in August.
5  A. It was unacceptable behavior and a breach of
6  confidentiality.
7  Q. Do you know whether or not the employee was
8  previously counseled about such behavior prior to
9  Mr. Cauley's investigation?
10  A. I do not know.
11  Q. Would that have made any difference to you?
12  A. I only know -- it would not -- the County of
13  Erie -- as County Solicitor, I cannot tolerate behavior of
14  Ms. Conley's type. So it would not have made any
15  difference.
16  Q. Okay. So the fact that she was told not to do it,
17  and thereafter didn't do it, did not make any difference to
18  you in this matter.
19      MR. LANE: Objection to form.
20  A. What do you mean by -- I don't understand the
21  question.
22  Q. Okay. There was an e-mail. Subsequently, there
23  was a counseling, in violation of the union contract, but
24  counseling nonetheless, where Ms. Conley was told to not
25  disclose or e-mail information concerning the agency. And

---

**48**

1  that thereafter there's no evidence that she did. Now,
2  would that initial e-mail still, in your mind, constitute
3  grounds for termination even after it's been dealt with by
4  the employee's supervisor?
5      MR. LANE: Objection to form.
6  A. I believe that what she did constituted grounds
7  for termination.
8  Q. Regardless of the fact that she had been warned
9  and heeded the warning.
10     MR. LANE: Objection to form. Lack of foundation.
11     MR. McNAIR: Come on.
12     MR. LANE: Come on what?
13     MR. McNAIR: There's foundation.
14     MR. LANE: She is warned about that particular
15     instance of conduct; is that what you're saying?
16     That's a misrepresentation.
17     MR. JOYAL: It's an outright lie, as a matter of
18     fact.
19  A. What she did was grounds for termination. She
20  informed a third party of the existence of a detention
21  order.
22  Q. And what makes you think that Ms. Conley -- how
23  would Ms. Conley know about that detention order?
24  A. You would have to ask her.
25  Q. I'm asking you.

---

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 14 of 71

Conley v. County of Erie, et al.                                      John Onorato

13 (Pages 49 to 52)

49

1      A.  I don't know the operations of that department.  I
2   have no basis upon which to answer your question.
3      Q.  All right.  Was this particular e-mail something
4   that you were specifically looking for in your investigation
5   of Ms. Conley's allegedly providing a document to
6   Mr. Villella?
7          MR. LANE:  Objection to form.
8      A.  I was not looking for anything.  When you say
9   her -- I suggested that her e-mails should be reviewed.
10     Q.  Okay.  And all of her e-mails, not just ones that
11  were relevant to the allegation.
12     A.  Yes.
13     Q.  And was that done in the hopes that something
14  would turn up that would provide grounds for discipline,
15  aside from what Mr. Cauley alleged?
16         MR. LANE:  Objection to form.
17     A.  No one hopes to discipline anyone.  It was to come
18  to an understanding of the actions of this employee.
19     Q.  So this wasn't done with a view toward
20  disciplinary action.
21     A.  It was done with an understanding -- to come to an
22  understanding of the actions of the employee while acting
23  within the course and scope of her employment.
24     Q.  And did the review of those e-mails enhance your
25  understanding of whether or not Abby provided any document

50

1   to Mr. Villella?
2      A.  It did not resolve the issue.  It is unknown how
3   it got from Abby to Attorney Villella.
4      Q.  Were you concerned at all about Mr. Cauley's
5   objectivity in this investigation?
6      A.  No.
7      Q.  Why not?
8      A.  Mike Cauley has been an assistant public defender
9   and member of the bar and the solicitor for the Office of
10  Children and Youth in either a contract capacity or as an
11  employment -- employment capacity.  He replaced, I believe,
12  Beveridge -- not Beveridge.  I forget the attorney who --
13     Q.  I think it was Jim Blackwood.
14     A.  Blackwood.  In addition, I believe Michael Cauley
15  to be an honorable man and able to conduct this review.
16     Q.  Okay.  Did Mr. Cauley express any anger to you in
17  that meeting about what had happened at that hearing of
18  July 28th?
19     A.  His presentation to me was factual.
20     Q.  Okay.  So you never thought that Mr. Cauley might
21  be looking for retribution against Ms. Conley for
22  frustrating the department's goal in that particular
23  dependency case?
24     A.  No.  In fact, I think his presentation to me was
25  factual and void of emotion.

51

1      Q.  Now, just so I'm very clear on this.  The idea of
2   snooping through Abby's e-mails was raised by you rather
3   than anybody at OCY?
4          MR. LANE:  Objection to form.
5          MR. JOYAL:  Objection to form.
6          MR. DEVLIN:  Objection to form.
7      A.  First of all, those are County e-mails.  They are
8   our property.  We have a right to inspect our property at
9   any time.  Snooping is an inappropriate characterization of
10  the activities which we conducted.  Second, I believe that I
11  raised -- I suggested it as the appropriate way to
12  understand the actions of this employee.
13     Q.  Okay.  And the question was, was it your idea or
14  somebody else's idea?
15         MR. LANE:  Objection to form, and lack of
16         foundation.
17     A.  I believe it was -- I believe that I suggested --
18  or if I did not suggest, then I certainly agreed with the
19  idea of looking through --
20     Q.  So you don't know whose idea it was.
21     A.  I believe it was -- I believe it was mine, but I
22  cannot state entirely.
23     Q.  Okay.
24     A.  If you're asking me, did Michael Cauley, frothing
25  from the mouth, come to me and say I want to look through

52

1   this woman's e-mails, I don't believe that was it.
2      Q.  I'm not asking you that.
3      A.  Okay.
4      Q.  Okay.  And no effort was made to narrow the scope
5   of the search to make it relevant to the specific issue that
6   Mr. Cauley raised.
7          MR. DEVLIN:  Objection to form.
8          MR. LANE:  Objection to form.
9      A.  The idea was to come to an understanding of the
10  actions of the employee.  One achieves that by looking at
11  all of the actions.
12     Q.  So the answer to my question is that it is true
13  that no effort was made to narrow the scope of the search to
14  relate only to the issue that Mr. Cauley was concerned
15  about.
16         MR. LANE:  Objection to form.
17     A.  I'm sorry.
18     Q.  Would you answer the question.
19     A.  We reviewed her e-mails to come to an
20  understanding of how this document may have gotten to
21  Attorney Villella.  When the e-mails were reviewed,
22  something far more disturbing was found.
23     Q.  Strictly by accident; is that what you're trying
24  to tell us?
25     A.  What do you mean, "strictly by accident"?  It

53

1   happened to be on her e-mails. I'm sure it was accidental,
2   and that she probably wishes she had removed it.
3       Q.  Okay.  But that's not something you were looking
4   for.
5       A.  No, it's not what we were looking for.
6       Q.  But it sure came in handy.
7           MR. JOYAL:  Objection to form.
8           MR. LANE:  Objection to form.  That's not a
9           question.  Don't answer, because it's not a
10          question.
11      Q.  Would you regard it as fortunate that that e-mail
12  was found?
13      A.  I consider it very unfortunate.
14      Q.  Unfortunate.
15      A.  Yes.  It's unfortunate when a County employee does
16  something like Ms. Conley does.  It's also unfortunate to
17  have to terminate someone.
18      Q.  Was there any discussion in either of these
19  meetings, either the one with Mr. Cauley or the one with
20  Ms. Liebel, of an allegation that Abby had filed a report of
21  suspected child abuse against an OCY caseworker?
22      A.  I believe the matter may have been discussed.
23  However, I suggested to Mike that he formalize his concerns
24  in a report to me.
25      Q.  When did you suggest that?

54

1       A.  I don't recall.
2       Q.  At the first meeting or the second meeting or was
3   there another meeting?
4       A.  I would say it was after the first meeting and in
5   preparation for the second meeting.  In addition, there were
6   meetings of that because we needed to inform the County
7   Executive.
8       Q.  Okay.  And what were you told about this incident,
9   the allegation that Ms. Conley made concerning the
10  caseworker?
11      A.  PW?
12      Q.  Yes.
13      A.  Is that --
14      Q.  That would be the one.
15      A.  That it occurred and that it was judged to be -- I
16  forget the term.  I want to say baseless, but that's --
17  whenever term they used to say that it was unsupported or
18  un --
19      Q.  Unfounded.
20      A.  Unfounded.  That may have been the term.
21      Q.  Okay.  Do you know whether or not Ms. W had
22  previously been disciplined for similar incidents?
23      A.  No.
24      Q.  Do you know whether or not other individuals had
25  made similar allegations against Ms. W?

55

1       A.  No.
2       Q.  Is there any policy or are there any standards
3   governing when the County will review an employee's e-mails,
4   as was done with Ms. Conley?
5       A.  We have a computer use policy, which I believe
6   we've supplied.
7       Q.  Right.  And the computer use policy says that you
8   can do it.  It doesn't set forth any standards about when
9   that will be done.  Is there any standard, or is that
10  something that is done in the unbridled discretion of the
11  County Solicitor?
12          MR. LANE:  Objection to form.
13      A.  I only know of this occurrence, being the only
14  time at which an individual's e-mails have been looked at.
15      Q.  Okay.
16      A.  My concern with using BAC was that they were an
17  independent contractor who had provided service to the
18  County.  And I believe that if we needed to account for how
19  we did this, I would rather we do it through someone who was
20  not a County employee.
21      Q.  Okay.
22      A.  And had the technical expertise.
23      Q.  And so there was no policy, no internal policy in
24  place in the administration of the County that gave any
25  standards for when such an effort and expenditure of County

56

1   funds would be appropriate.  It was done solely at your
2   discretion.
3           MR. LANE:  Objection to form.
4       A.  The request was made, and I -- rather, we talked
5   about it.  I suggested that we do that.  But I don't know if
6   there was -- I don't know of any policy.  I wouldn't
7   characterize that as a policy.  It's our right to inspect
8   County e-mail, just as it's our right to inspect any other
9   County property.  The question was -- the issue was brought
10  to my attention.  And I suggested that as a means to
11  evaluate what participation, if any, Ms. Conley had in
12  supplying Attorney Villella the document.
13      Q.  Okay.  Did you ever think to ask Mr. Cauley before
14  you expended County funds on this e-mail search, did you
15  ever think of asking Mr. Cauley to ask Ms. Conley whether or
16  not she had done this?
17      A.  No.
18      Q.  Why not?
19      A.  Why does one not think of a thing.  I don't know
20  why one does not think of a thing.  I'm not thinking about
21  something right now, and I don't know why I'm not thinking
22  about that thing that I'm not thinking about.
23      Q.  Okay.  So you're saying that as an attorney, with
24  an MBA, who is a professor, who teaches employment law, that
25  it didn't occur to you when an employee is accused of

**57**

1 wrongdoing, as Ms. Conley was, to call the employee in on
2 the carpet and ask them whether or not they did it. It
3 never occurred to you to do that.
4     A.  She was not accused of wrongdoing at that moment.
5     Q.  She was accused of providing a document to
6 Mr. Villella that was -- you said was inappropriate. Is
7 inappropriate not wrong?
8     A.  What was going on was that the document had gotten
9 into the hands of Attorney Villella. It was not clear how
10 it had gotten into that. We were trying to come to an
11 understanding of that. It doesn't matter what that issue
12 was -- that issue became irrelevant. Because, quite
13 frankly, what was found in her e-mail was something which
14 was not tolerable.
15     Q.  Okay. And I'm sorry, but that really isn't
16 responsive to my question.
17     A.  Well, it's the facts of the matter.
18     Q.  My question is, is it your testimony that when
19 Mr. Cauley came to you and said, in effect, Abby Conley gave
20 a document to Jerry Villella that she shouldn't have, or at
21 least I think she did, and we should do something about
22 this, only he never had asked Ms. Conley if or how
23 Mr. Villella got such a document, it never occurred to you
24 to ask her.
25         MR. LANE:  Objection to form. Argumentative.

**58**

1     A.  That is a mischaracterization. Rather, Michael
2 came to me and spoke of what happened in the courtroom. The
3 main concern that he had was the credibility of the
4 department. He also had concerns about how this document
5 may have ended up there.
6         I suggested that he pull the e-mails and review
7 it. The e-mails were reviewed. He provided -- supplied me
8 with copies of the e-mail. It became quite clear that
9 Ms. Conley had done something completely inappropriate, in
10 violation of all standards within the department, and
11 perhaps in violation of the --
12     Q.  And, again, that's not responsive.
13     A.  How is that not responsive?
14     Q.  The question is, why wasn't Abby asked in the
15 course of this investigation what she had or had not done.
16     A.  Because that matter was not the reason why she was
17 terminated, or why she was asked to resign. That matter
18 became no longer relevant.
19     Q.  And it was not relevant because you choose to
20 expend County funds to search through 2000 e-mails. And my
21 question to you is, why was Abby never asked.
22         MR. LANE:  Objection to form.
23         MR. JOYAL:  Objection to form.
24         MR. LANE:  And asked and answered.
25         MR. JOYAL:  Relevance.

**59**

1     A.  My answer is, Abby was never asked because what we
2 found was far more egregious.
3     Q.  Okay. And why wasn't she asked before you went
4 off on this search?
5         MR. LANE:  Objection to form.
6     A.  I don't think that that would -- the idea was to
7 try to determine what happened. And one way we did this was
8 to look at her County e-mails. Those are County e-mails.
9 We have every right to look at them. We looked at them.
10         Let's say a car has a speeding -- a parking ticket
11 and it's also involved -- you find something else. You
12 don't worry about the parking ticket when you see evidence
13 that it had gone through many red lights. The issue -- it's
14 no longer relevant.
15     Q.  Okay. So you knew that you would find something
16 else in the e-mails that would make it not worth your while
17 talking to Abby.
18         MR. LANE:  Objection to form.
19     A.  We knew no such thing.
20     Q.  Then can you tell me why the first step in the
21 investigation wasn't to talk to Abby.
22     A.  We wanted to come to an understanding of how it
23 may have ended up -- we knew it was on Abby's computer
24 system. We knew that it ended up with Attorney Villella.
25 The first place to look would be to check on the computer.

**60**

1     Q.  How did you know it was on her system? Did Cauley
2 tell you that?
3     A.  Yes.
4     Q.  He said he had already checked her computer, and
5 it was on there?
6     A.  No. He told me that she would have been the
7 drafter. And I believe that it would be drafted on a
8 computer, so. In addition, I think not only did I suggest
9 her e-mail be looked at, but that the whole of her computer.
10     Q.  Okay. So, again, the question is, why isn't the
11 first thing you did to have somebody ask Abby what happened?
12     A.  We chose the action because we thought this was
13 appropriate.
14     Q.  And when did you receive Mr. Cauley's report?
15     A.  I believe it was dated. I don't remember the
16 date.
17     Q.  I'm going to give you a copy of what's been marked
18 as Cauley Deposition Exhibit No. 1. It appears to be a
19 letter to you dated August 20, 2004. I believe it's signed
20 by Mr. Cauley. Is that the report that you were speaking
21 of?
22     A.  There are --
23     Q.  Or are there other reports?
24     A.  This is the report. However, there are
25 handwritten notes on this. So this is not a true and

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 17 of 71

Conley v. County of Erie, et al.                                    John Onorato

16 (Pages 61 to 64)

**61**

1  accurate copy. It says Cauley's Depo. Exhibit No. 1. And I
2  believe that --
3      Q. Let me just switch, okay. And that's also marked
4  Cauley No. 1. Okay. And it didn't come to you marked that
5  way, did it?
6      A. Pardon? No.
7      Q. Okay.
8      A. No, it did not.
9      Q. All right. And it's dated August 20th. Is that
10 the date day that you first saw it?
11     A. I believe so, yes.
12     Q. Did you review it with any other administration
13 officials or employees?
14     A. Mr. Cauley hand brought this to me, is my
15 recollection. So when you say other, do you mean other than
16 the author?
17     Q. Yeah.
18     A. I believe I shared it with the personnel director.
19 I believe I -- Mr. Callan. I believe that I also asked if
20 Ms. Liebel had reviewed this or had knowledge of its
21 contents.
22     Q. Okay. And she is noted as having received a copy,
23 right? CC Debbie Liebel, at the end underneath Mr. Cauley's
24 signature.
25     A. Yes, that's correct.

**62**

1      Q. Did you discuss it with Ms. Bloxdorf, or did she
2  review it?
3      A. I believe I may have briefed -- I believe that I
4  orally briefed Ms. Bloxdorf. I do not believe that she read
5  it.
6      Q. Okay. But Mr. Callan read the report and the
7  attachments?
8      A. Yes.
9      Q. What about Rich Schenker?
10     A. I do not believe I provided Mr. Schenker a copy of
11 this. However --
12     Q. Do you know if he's subsequently seen this
13 document?
14     A. You would have to ask him.
15     Q. I will. I just want to find out if you know. I'm
16 anxious.
17     A. Your anticipation will have to wait.
18     Q. So you didn't sit down and review this with Mr.
19 Schenker.
20     A. That's not true. You're asking me if he reviewed
21 it. And my answer to that is no. However, I did brief him,
22 yes.
23     Q. When was that?
24     A. I would say shortly before the day Ms. Conley
25 resigned.

**63**

1      Q. What was Mr. Schenker's first knowledge of the
2  pendency of this issue or any issue involving Ms. Conley, to
3  your knowledge?
4      A. That meeting.
5      Q. Okay. He just came into the meeting on
6  September 10th?
7      A. No. There was one meeting which was -- it was --
8  I forget when it was scheduled. However, a meeting was
9  scheduled with Mr. Schenker, myself, Peter Callan, I believe
10 Deb Liebel, and Ann Bloxdorf.
11     Q. When was that meeting?
12     A. Early September. I don't recall the date.
13     Q. Okay. At what point was a decision made that
14 Ms. Conley's employment would be terminated?
15     A. Prior to the meeting with Mr. Schenker.
16     Q. Okay.
17     A. I don't recall.
18     Q. That gives us pretty much from the beginning of
19 the world to September 10th. Could you narrow it down a
20 little bit.
21     A. Between August 20th and September 10th.
22     Q. Who made that decision?
23     A. I would say it was a collective decision.
24     Q. Okay. Who was ultimately responsible for that
25 decision?

**64**

1      MR. JOYAL: Objection to form.
2      A. The termination is -- I would say there was a
3  collective decision. I would say that it's the department's
4  employee.
5      Q. So you can't tell me who was ultimately
6  responsible for the decision.
7      MR. LANE: Objection to form.
8      A. I would say the department head.
9      Q. Okay. So the decision to terminate Abby was made
10 by Debi Liebel.
11     A. I would say that it was a decision we -- it was
12 quite clear that we could not tolerate an employee
13 performing in the manner in which Ms. Conley had.
14     Q. Going into court and testifying the way she did;
15 is that what you mean?
16     A. No. Rather, dispensing information to third
17 parties.
18     Q. Okay. So it was Liebel's decision?
19     A. You know, if you would ask who made the decision,
20 we all went into a room, and a decision was made. And,
21 quite frankly, it was all supported -- it was a collective
22 decision.
23     Q. Who was the ranking official in the group of
24 people that made the decision?
25     A. I guess I was.

65

1    Q.   Okay.  Would it be fair to say that that decision
2  would not have been made without your agreement?
3       MR. LANE:  Objection to form.
4    A.   Would you answer -- would you state the question
5  again.  If your question is if I disagreed with that
6  decision.
7    Q.   No, that's not the question.
8    A.   Okay.
9    Q.   The question is, would a decision to terminate
10 Ms. Conley have gone forward if you had disagreed with it?
11   A.   Probably not.
12   Q.   When was this September 10th meeting actually
13 planned?
14   A.   I don't recall.  However, I do know that it had to
15 be rescheduled on at lease one occasion due to
16 Mr. Schenker's schedule.
17   Q.   All right.  So it had been planned.  It doesn't
18 really answer the question.
19   A.   Sometime subsequent to August 20th there was a
20 meeting that was scheduled, which had to be rescheduled on
21 at least one occasion.  But it took place, I believe, the
22 day before the -- your client's resignation.  I'm not very
23 good with dates, so.
24   Q.   So you don't remember how long before
25 September 10th this meeting was initially planned.

66

1    A.   No.
2    Q.   When was Mr. Schenker first informed that such a
3  meeting would be held?
4    A.   I'm not sure he was ever informed that a meeting
5  would be held.  Rather, the schedule was informed of a need
6  to have a meeting, and that it involved a personnel matter.
7    Q.   I thought you met with Mr. Schenker and briefed
8  him on Mr. Cauley's report and reviewed the documents with
9  him and got his concurrence in the decision.
10   A.   That was at that meeting.
11   Q.   That was before Ms. Conley showed up?
12   A.   No.  We met with -- we met with Mr. Schenker
13 before the termination date, before the date of --
14   Q.   Right.
15   A.   And he never -- we didn't meet with -- it was at
16 that meeting.
17   Q.   And when was that?
18   A.   Again, I'm not very good with dates, so.
19   Q.   Would you have a calendar?  Would it be on your
20 calendar?
21   A.   I had a calendar when I was at the County, which
22 was run on my Outlook, and I don't know where it is.
23   Q.   There's no hard copy of that?
24   A.   No.
25   Q.   So there was -- you only met with Mr. Schenker one

67

1  time about Mrs. Conley, and that was the actual meeting of
2  September 10th.
3    A.   My recollection is that your client was -- final
4  day with the County was on a Friday.  I believe we met with
5  Mr. Schenker on the Thursday before that.
6    Q.   The day before or week before?
7    A.   Day before.  And it would have been -- that would
8  have been the meeting at which I informed him of the
9  contents of this document, and in a very generic form, and
10 also the decision to terminate.
11   Q.   Okay.  When was the option of terminating
12 Ms. Conley's employment first raised, to your knowledge?
13   A.   A meeting prior to that with Mr. Schenker.
14   Q.   Okay.  So nobody had suggested terminating Abby's
15 employment until you met with Mr. Schenker?
16   A.   No, no, no.  At a meeting prior to that --
17   Q.   What meeting?
18   A.   Let's be clear.  I mean, there --
19   Q.   I'm trying to.
20   A.   Of course.  I asked Mike Cauley to prepare a
21 document outlining what he had found.  He did that.  We got
22 together.  I would say "we" meaning Peter Callan, myself,
23 Deb Liebel, Mike Cauley.  We discussed -- and Ann Bloxdorf.
24 We discussed the nature of the contents.  And a decision was
25 made.  We decided to inform the County Executive of what we

68

1  had found and the basis of what we had -- what decision we
2  had made.  Basically, we were informing Mr. Schenker of a
3  heads-up.  Mr. Schenker would not be involved in a matter of
4  this nature.
5    Q.   And who in that meeting --
6    A.   What meeting?
7    Q.   The one you just described with Ms. Liebel,
8  Mr. Cauley, all those people, where the decision was made to
9  terminate Abby's employment.  Who in that meeting was the
10 first person to mention termination as an option?
11   A.   I don't recall that.  However, what do you do when
12 you have somebody who releases information of this nature to
13 a third person.
14   Q.   I'm not here to answer your questions, sir.
15   A.   Okay.
16   Q.   All right.  So you don't recall who first raised
17 the idea of terminating Abby's employment.
18   A.   No.
19   Q.   Do you recall on September 10th that you and
20 Mr. Schenker made a visit to the Erie Times-News?
21   A.   Yes.
22   Q.   What was your purpose of going up there?
23   A.   Let's go back to -- well.
24   Q.   Let's not.  Let's answer my question.
25   A.   To have a conversation with the editors of the

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 19 of 71

Conley v. County of Erie, et al.                                    John Onorato

18 (Pages 69 to 72)

69

1  paper.
2      Q.  About what?
3      A.  My understanding was that we were going to talk
4  about MTR.
5      Q.  Okay.  Who did you meet with up there?
6      A.  Jim Dible and Pat Howard.
7      Q.  What time was that meeting?
8      A.  1:00 p.m.
9      Q.  And how long did you meet with Mr. Dible and
10  Mr. Howard?
11      A.  I don't recall.
12      Q.  Was it a lengthy meeting or was it a brief
13  meeting?
14      A.  Relatively brief meeting.
15      Q.  Okay.  And what topics were discussed at that
16  meeting?
17      A.  Mr. Schenker began to talk about the fact that an
18  employment action was going to be taken against your client.
19      Q.  He brought the subject up?
20      A.  Yes.
21      Q.  Do you know why?
22      A.  You have to ask him.
23      Q.  Okay.  Did he tell the newspaper that Ms. Conley
24  was going to be terminated?
25      A.  I don't believe he used that term.

70

1      Q.  Fired.
2      A.  I don't believe he used that term.
3      Q.  Was there any discussion by either you or
4  Mr. Schenker with Ed Palatella?
5      A.  No.
6      Q.  Regarding Abby Conley on September 10th.
7      A.  No.
8      Q.  In what context did that topic arise?
9      A.  What topic?
10      Q.  The topic of employment action against Ms. Conley.
11  How did that topic come up?
12      A.  Mr. Schenker was concerned because Mr. Palatella
13  had been in the courtroom during the case involving Attorney
14  Villella.  And he wanted the paper to know that that was not
15  the reason for the termination.  Or the employment action, I
16  should say.
17      Q.  So he brought it up without anybody asking him?
18      A.  Right.
19      Q.  Okay.  Had there been any discussion of the Office
20  of Children and Youth prior to that?
21      A.  No.
22      Q.  Were there any other topics discussed beside MTR
23  and Abby Conley?
24      A.  I may have talked about the update regarding the
25  prison cells.

71

1      Q.  Was there any discussion of any involvement of the
2  District Attorney in the Abby Conley matter?
3      A.  No.
4      Q.  With the newspaper.  Okay.  Did you discuss the
5  personnel action with anybody from the newspaper?
6      A.  Yes.
7      Q.  On September 10th?
8      A.  Yes.
9      Q.  Who did you discuss it with?
10      A.  Jim Dible and Pat Howard.
11      Q.  What did you tell them?
12      A.  Mr. Schenker began to talk about this issue.  And
13  then he said, well, John will be telling you more about it.
14      Q.  Okay.  And what did you tell them?
15      A.  I was surprised, so I didn't say much beyond what
16  Mr. Schenker had already said.
17      Q.  Which was that there would be an employment
18  action.
19      A.  Yes.
20      Q.  Not specifying what it was.
21      A.  That's correct.
22          (Onorato Deposition Exhibit 1 marked for
23          identification.)
24      Q.  I'm showing you what we've marked as Onorato
25  Deposition Exhibit No. 1, which is a reprint of an article

72

1  published September 12th, 2004 in the Erie Times-News.  Do
2  you recognize that as such?
3      A.  I'm sorry, I was -- could you repeat the question.
4  I was reading.
5      Q.  Do you recognize this as a copy of an article that
6  appeared in the newspaper?
7      A.  If you say it is, yes.
8      Q.  Okay.  The article says that you acknowledged that
9  Mr. Schenker told the Erie Times-News that he had planned to
10  terminate Conley from her position.
11      A.  Onorato said he -- what was what?
12      Q.  Fifth paragraph.  Or sixth paragraph, I'm sorry.
13      A.  Go ahead.  What was it?
14      Q.  Okay.  Did you tell Mr. Palattella that
15  Mr. Schenker said -- had told the Erie Times-News that he
16  planned to terminate Ms. Conley?
17      A.  Did I say that Schenker said?
18      Q.  Right.  You were quoted as saying, "Onorato said
19  he and Schenker are comfortable with the decision.  He said
20  Conley ultimately resigned, though he acknowledged Schenker
21  told the Erie Times-News that Schenker had planned to
22  terminate Conley from her position."  Is that an accurate
23  quote from you, or not?
24          MR. LANE:  I'm going to object.
25          MR. JOYAL:  Object to form because it's not a

Case 1:05-cv-00076-SJM     Document 70-10     Filed 04/12/2006     Page 20 of 71

Conley v. County of Erie, et al.                                          John Onorato

19 (Pages 73 to 76)

---

**73**

1        quote.
2        Q.  Does that accurately state what you told Mr.
3   Palattella?
4        A.  Prior to seeing this, I did not even remember
5   speaking with Palattella.
6        Q.  Is that accurate, or not?
7        A.  I don't recall.
8        Q.  Do you recall whether or not you read this article
9   at about the time it was published?
10       A.  Yes, I do recall reading the article.
11       Q.  Did you object to the accuracy of the article at
12  that time?
13       A.  No.
14       Q.  Did you contact the newspaper and tell them that
15  your views were inaccurately quoted or inaccurately stated
16  in that article?
17       A.  No.  I remember briefly speaking with Ed
18  Palattella perhaps on the 11th.
19       Q.  Okay.  Do you recall who, if anyone, used the term
20  "whistleblower" in that conversation of September 10th with
21  Mr. Dible and Mr. Howard?
22       A.  Yes.
23       Q.  Who?
24       A.  Mr. Schenker.
25       Q.  All right.  And do you recall exactly what

**74**

1   Mr. Schenker said?
2        A.  That she is not.
3        Q.  She is not a whistleblower?
4        A.  Mr. Schenker said we are taking -- my recollection
5   is that Mr. Schenker wanted to inform the paper of this
6   because he did not want it characterized as a whistleblower
7   being let go.  And he said as much in the meeting.
8        Q.  Okay.  He said, I don't want you to think this is
9   because she's a whistleblower.
10       A.  Right.  But, rather, it's for some other reason
11  which we cannot tell you about.  This some other reason
12  being the prognostic detention order which she related to
13  Deanna Cosby.
14       Q.  As County Solicitor you're familiar with the terms
15  of the collective bargaining agreement governing Office of
16  Children and Youth employees, correct?
17       A.  Yes.
18       Q.  And did you make efforts to ensure that the
19  confrontation that occurred on September 10th with
20  Ms. Conley occurred in compliance with the terms of that
21  agreement?
22            MR. JOYAL:  I object to the form, the word
23            "confrontation".
24            MR. LANE:  I join in that.
25       A.  I remember Peter Callan making sure that Abby was

**75**

1   informed of her right to receive -- or to have a union
2   member steward participate.
3        Q.  Okay.  When did you arrive at this meeting, on
4   September 10th?
5        A.  I believe upon my return from the newspaper, I
6   spoke with Mr. Callan.
7        Q.  And then where did this meeting take place?
8        A.  Mr. Callan's office.
9        Q.  So you went from the newspaper to Mr. Callan's
10  office.
11       A.  That's correct.
12       Q.  Who else was there when you got there?
13       A.  Myself and Mr. Callan.
14       Q.  Did anybody else come?
15       A.  Yes.
16       Q.  Who came next?
17       A.  Ms. Liebel.
18       Q.  All right.  And about what time did Ms. Liebel get
19  there, if you recall?
20       A.  Perhaps between 2:30 and 3:00.
21       Q.  Okay.  And who -- did anybody else come?
22       A.  Yes.
23       Q.  Who else?
24       A.  Ms. Conley.
25       Q.  Okay.  So the meeting was you, Callan, Liebel, and

**76**

1   Abby?
2        A.  That's correct.
3        Q.  Okay.  Was Mr. Schenker present for this meeting
4   at all?
5        A.  No.
6            (Recess held from 12:35 p.m. to 12:47 p.m.)
7        Q.  When we took a break, we were talking about the
8   meeting of September 10th.  And when we left off, you,
9   Mr. Callan and Ms. Liebel were in Mr. Callan's office.  Who
10  was the next person to arrive; Ms. Conley?
11       A.  That's correct.
12       Q.  Okay.  Did Ms. Bloxdorf attend this meeting at
13  all?
14       A.  No.
15       Q.  So it was just the four of you?
16       A.  And a representative of the union.
17       Q.  When did the representative of the union arrive?
18       A.  Shortly after the beginning of the meeting.
19       Q.  Who notified Ms. Conley to come to the meeting, if
20  you know?
21       A.  I don't know.
22       Q.  Who instructed that Ms. Conley be notified of the
23  meeting?  Who said, get Abby?
24       A.  I don't know.
25       Q.  Was there any discussion of advising Ms. Conley to

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 21 of 71

Conley v. County of Erie, et al.                                    John Onorato

20 (Pages 77 to 80)

77

1   have a union representative when she arrived at the meeting?
2       A.   Yes.
3       Q.   Before she arrived at the meeting.
4       A.   No.
5       Q.   Was she told that this was a personnel meeting,
6   and that she was entitled to union representation before she
7   arrived?
8       A.   I don't know what she was told, because I was not
9   the one who told her.
10      Q.   Okay.
11      A.   Nor was I the one -- I don't know what she was
12  told.
13      Q.   All right.  And was anything discussed with
14  Ms. Conley before the union representative arrived?
15      A.   Introductions were made.  This was the first time
16  in which I had met Ms. Conley.  I believe it may have well
17  been the first time Mr. Callan met Ms. Conley.  Mr. Callan
18  sat behind his desk, informed Ms. Conley that we are here to
19  discuss an employment matter, and that she had a right to a
20  union representative.  I do not recall anything of a
21  substantive nature being discussed prior to the union
22  representative being there.
23      Q.   Was the Item 1 in Mr. Cauley's memo the e-mail
24  to -- involving VW discussed prior to the union
25  representative arriving?

78

1       A.   I would consider that a substantive matter, and I
2   do not recall that being discussed prior to the arrival of
3   the union representative.
4       Q.   Did anybody else discuss that matter with her
5   before the union rep got there?
6       A.   I don't recall it being discussed.
7       Q.   Was the union representative then present for all
8   substantive discussions that occurred?
9       A.   That's my understanding.  My recollection.
10      Q.   Was the issue of this e-mail about this detention
11  order discussed at any point during this meeting?
12      A.   Yes.
13      Q.   Who brought that up?
14      A.   I would say each of us in our own turn.
15      Q.   So all three of you discussed that with Abby and
16  the union rep.
17      A.   I would say that Ms. Liebel initially began to
18  discuss the matter.  Mr. Callan -- Ms. Conley tried to talk
19  about other things.  Mr. Callan tried to talk about the
20  matter.  Ms. Conley tried to talk about other things.  And
21  then I brought up this issue.
22      Q.   Okay.  And you brought that up in the presence of
23  the union representative.
24      A.   Yes.  In fact, I remember specifically talking
25  directly to the union representative, explaining the nature

79

1   of what a prognostic detention order was and why it was so
2   important what we had found, and why it was such an
3   egregious violation of the confidentiality of the
4   department.
5       Q.   All right.  Did you explain to the union
6   representative that that was not what you were looking for
7   when you began to search Ms. Conley's e-mails?
8       A.   I don't believe I mentioned anything other than we
9   had reviewed Ms. Conley's e-mails and found this.  I do not
10  believe I informed the union representative -- there was no
11  discussion as to why the e-mails were looked at.
12      Q.   Okay.  So you didn't tell the union rep that the
13  e-mails review arose out of Ms. Conley's July 28th
14  testimony?
15      A.   No.
16      Q.   Did Ms. Conley talk about the July 28th testimony
17  as being a motivation for her termination?
18      A.   It was clear that despite Ms. Liebel, Mr. Callan
19  and -- trying to direct her attention to the release --
20      Q.   The question is, sir.  I'm sorry, I didn't mean to
21  cut you off.  But you're really making this a lot longer
22  than it has to be.  The question is, did Abby bring up the
23  July 28th testimony in this meeting?
24      A.   Yes.
25      Q.   Okay.  In what context did she raise that?

80

1       A.   She was informed by first Ms. Liebel, then
2   Mr. Callan and myself, that she had released information to
3   third parties.  She kept talking about the testimony, not
4   acknowledging, understanding or recalling the e-mail to
5   Deanna Cosby.  And we kept trying to get her to focus on the
6   matter which was the cause of her termination, which was
7   that she released the information to Deanna Cosby regarding
8   the prognostic detention order.
9       Q.   Okay.  Did Ms. Conley state that she was being
10  terminated as a result of her July 28th testimony?
11      A.   Pardon?
12      Q.   Did she make that statement, that the termination
13  was motivated by her July 28th testimony?
14      A.   She -- I don't know what she -- I don't understand
15  the question.
16      Q.   Did she say, you guys are firing me because I
17  testified on July 28th, not because of any e-mail?  Did she
18  tell you that?
19      A.   She tried to couch our rationale for the
20  employment action in those terms.  We, however, maintained
21  that it was due to her --
22      Q.   I know what you maintain.  I'm asking --
23      MR. LANE:  Let him answer.  Don't interrupt.  I
24  let you get away with it like five times now.
25      MR. McNAIR:  I'm tired of listening --

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 22 of 71

Conley v. County of Erie, et al.                                John Onorato

21 (Pages 81 to 84)

### 81

1    This deposition is taking four times as long as it
2    should.
3    MR. LANE:  Don't ask the questions.
4    MR. McNAIR:  Because this guy won't answer a
5    question without making some speech reiterating
6    your defense.  By the way, I know what your
7    defense is.
8    MR. LANE:  Don't ask the question if you don't
9    want an answer.
10   MR. McNAIR:  I want an answer to the question.  I
11   don't want a speech that's irrelevant to the
12   question.
13   MR. LANE:  Just don't interrupt him.
14   Q.  Did you have a copy of the transcript of that July
15   28th hearing at the meeting?
16   MR. JOYAL:  Mark, let him finish the question that
17   he wanted to in his answer.
18   A.  What was your question?
19   MR. LANE:  I don't even remember what it was.
20   Q.  Did you have a copy of transcript of the July 28th
21   hearing at that meeting in Mr. Callan's office on
22   September 10th?
23   A.  No.
24   Q.  Did Ms. Conley tell you in the course of this
25   meeting that Judge Kelly had opined that the actions of OCY

### 82

1    in altering a court summary after she had signed off on it
2    could constitute obstruction of justice and lead to criminal
3    penalties?
4    MR. LANE:  Objection to form.
5    A.  No.
6    Q.  She never brought up obstruction of justice?
7    A.  She mentioned that she had reported the matter to
8    the District Attorney.  She had mentioned the District
9    Attorney's County detective.  And she had referred a matter
10   to Mr. Dombrowski.  And that it related her -- her
11   conversation indicated there was the matter involving
12   Attorney Villella.
13   Q.  Okay.  Did she -- so you don't recall her saying
14   that Judge Kelly thought it was obstruction of justice, or
15   words to that effect.
16   A.  No.
17   Q.  Did you discuss with Ms. Conley that the District
18   Attorney might be involved or become involved in the matter
19   involving the e-mail to Deanna Cosby?
20   A.  I mentioned -- when Abby Conley mentioned that she
21   had spoken to the District Attorney, I said, well, we could
22   also be speaking to the District Attorney, but we haven't --
23   we could resolve this matter here.
24   Q.  Okay.  Was there any other mention of possible
25   criminal sanctions arising out of Ms. Conley's conduct that

### 83

1    was mentioned in this meeting?
2    A.  I wouldn't suggest that I said that there were
3    possible criminal sanctions.  I just said that we could
4    discuss this matter in front of the District Attorney.
5    Q.  What did you expect her to think when you said
6    we'll discuss it with the District Attorney?
7    A.  I believe that she was trying to use the District
8    Attorney to say that she thought there was wrongdoing within
9    our department.  And I said, well, we could all be talking
10   to the District Attorney, here's the issue, the fact is you
11   released information to a third party regarding the
12   detention of an infant that was to be born, in that's a
13   violation of the confidentiality of this -- of this
14   organization.
15   Q.  Which statute did that violate?  Was there some
16   criminal statute that was violated, in your opinion, or to
17   your knowledge?
18   A.  There are various statutes which affect
19   confidentiality.
20   Q.  Which one applied to that particular
21   communication?
22   A.  I know that this is information which was to be --
23   it was represented to me by attorneys that worked for the
24   department, that this is information which should be
25   confidential.

### 84

1    Q.  By statute?
2    A.  It was represented to me by the attorneys that
3    this is information which should be confidential.
4    Q.  Did the attorneys represent that there was a
5    statutory violation involved in this e-mail?
6    A.  I don't recall if they specifically said it was a
7    statute.  I know that there's the Child Protective
8    Services -- I forget the actual title of the statutes.
9    Q.  Did anybody ever tell you that the conduct in
10   sending that e-mail to Deanna Cosby was a violation of any
11   particular statute, or identify any statute?
12   A.  No one said statute, section so-and-so dot
13   so-and-so, or anything of that nature.
14   Q.  Did anybody say law?
15   A.  Yes.
16   Q.  It violates the CPSL?
17   A.  Yes.
18   Q.  You were told it violated the CPSL.
19   A.  Yes.
20   Q.  By who?
21   A.  Attorney Michael Cauley.
22   Q.  He said that disclosure of a so-called prognostic
23   detention order was a violation of the Child Protective
24   Services Law.
25   A.  In his opinion, yes.

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 23 of 71

Conley v. County of Erie, et al.                                                    John Onorato

22 (Pages 85 to 88)

85

1    Q.   And did Mr. Cauley give you an opinion that there
2  would be criminal sanctions associated with such a
3  disclosure?
4    A.   Not that I recall.  Again, the District Attorney's
5  office was mentioned because your client was so far removed
6  from the reality of what was going on, that she was bringing
7  up the District Attorney.  And I said, look, you know, we
8  can all be before the District Attorney, but the issue is
9  this.
10   Q.   Okay.  I understand that.  The only reason I'm
11 asking all these questions is because one of your lawyers
12 has been spouting for months that this is a criminal
13 violation, and I'm still trying to figure out what criminal
14 law was violated.  And I think the answer to that question
15 is you don't know what specific criminal law was violated,
16 if any.
17   A.   If this is a violation of the Child Protective
18 Services Law, I believe that there are criminal violations
19 that are attended to that.
20   Q.   Okay.
21   A.   It's my understanding that -- I mean, I remember
22 having to look at that act for a different matter, and I
23 knew the violations of that.
24   Q.   Okay.  So that's the criminal provision that was
25 violated, the one in the CPSL?

86

1          MR. LANE:  Objection.  Lack of foundation.
2          MR. McNAIR:  His testimony.
3          MR. LANE:  He told you that somebody else told
4      him.  He didn't say he looked at it to determine
5      whether it -- whether this particular act was a
6      violation of the law.  But you can tell him again
7      whether you have an understanding or not.
8    A.   It's clear to me that your client violated the
9  confidentiality rules under which the department operates.
10   Q.   And where are those rules set forth?  What rule?
11 Where would I look if I wanted to see what the rule was?
12   A.   The department requires that its employees keep
13 matters involving the cases it handles confidential.  And
14 those are -- I'm sure that those are -- I do not work for
15 the department.  And I'm not familiar with the operations in
16 terms of specific policies.  However, I do know that to be
17 the case.  It would be intolerable for the County to have
18 employees telling third parties --
19   Q.   In addition to being a criminal violation -- I
20 know what you're going to say.
21          MR. LANE:  Hang on.  Just let him --
22   A.   How do you know what I'm going to say?
23   Q.   Because you've said it about 56 times.  I don't
24 need to have you say it again.
25          MR. LANE:  You do, because he's answering a

87

1  question.  Don't interrupt him.  Just finish your
2  answer.  It wasn't going to be that much longer.
3    A.   It wasn't going to be.  It's just intolerable.
4    Q.   I understand that.  It's intolerable.
5          MR. LANE:  Stop interrupting him.
6          MR. McNAIR:  I'm asking about the policy.  I'm not
7      asking about whether it's tolerable or
8      intolerable.
9          MR. LANE:  Ask that as your next question.
10         MR. McNAIR:  You're wasting my time here.  Don't
11     appreciate it.
12         MR. LANE:  You're wasting my time right now.  And
13     you keep it up, and this thing is going to be
14     over.  Just go ahead and answer the question the
15     way you wanted to answer it, and then let him ask
16     his next question.
17         MR. McNAIR:  Why don't you answer the question in
18     a manner that's responsive to the question.  Can
19     we do that.
20         MR. LANE:  Absolutely.  He is being responsive.
21     Do you remember what you were going to say now?
22         MR. McNAIR:  I didn't ask about tolerability.  I
23     asked him what policy was violated.
24         MR. LANE:  Do you remember what you were going to
25     say now?

88

1          THE WITNESS:  No, actually, I don't.
2          MR. LANE:  You forget what you were going to say?
3          THE WITNESS:  Yes.
4          MR. LANE:  You successfully obstructed his
5      testimony.  Way to go.
6          MR. McNAIR:  Thank you.
7  BY MR. McNAIR:
8    Q.   Okay.  So was this violation of policy in addition
9  to the criminal violation?
10   A.   Listen.  Your client told a third party the
11 nature --
12   Q.   This is not responsive.  I'm aware of that.
13   A.   The prognostic detention order was in place.  With
14 intent that it get back to the mother.  The County could not
15 tolerate that of its employees.
16   Q.   Okay.  I move to strike that as not responsive to
17 the question.  I'm asking you about policy.
18         MR. JOYAL:  The two of you don't have a brain
19     between you.
20   A.   Go ahead.  What about it?
21         MR. McNAIR:  Mr. Joyal, did you just tell
22     Mr. Angelone that we don't have a brain between
23     us?
24         MR. JOYAL:  Absolutely, Mr. McNair.  You've been
25     going with this deposition for almost three hours,

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 24 of 71

Conley v. County of Erie, et al.                                    John Onorato

23 (Pages 89 to 92)

89

1      and still being disrespectful to the witnesses and
2      everyone else around. Okay. So try showing some
3      respect to somebody.
4          MR. McNAIR: I don't think I'm going to start with
5      you.
6          MR. ANGELONE: Thanks for lumping me in there too.
7          MR. JOYAL: You're helping him.
8          MR. ANGELONE: Is that right?
9   BY MR. McNAIR:
10      Q. And I'm asking you if you know what policy was
11   violated.
12      A. The County's policies.
13      Q. Which policy? What is the name of the policy?
14      A. I'm not sure the policies have a name. And I'm
15   sure that if you've asked for them, the County has supplied
16   you the documentation.
17          MR. JOYAL: Give him the policies, Mark.
18      A. Do you have a document you can share with me?
19      Q. I don't know.
20      A. You don't know if you have a document?
21      Q. I'm trying to find out what document you're
22   referring to. That's why I'm asking you.
23          MR. McNAIR: Let the record reflect that Mr. Lane
24          is coaching the witness during the deposition by
25          handing him a document.

90

1          MR. LANE: You lied to him by saying you didn't
2      know what he was referring to.
3          MR. McNAIR: I don't know what he's referring to.
4          MR. LANE: That's nonsense. You don't know -- the
5      policy is in the letter that's in front of you
6      right now. And if you turn that page, it's
7      sitting right behind there. You're lying to me,
8      you're lying to the witness. So stop lying.
9      Don't tell the witness you don't know what policy
10     exists on confidentiality.
11          MR. McNAIR: I didn't tell him --
12          MR. LANE: Is it sitting right in front of you?
13          MR. McNAIR: You're misstating what I said.
14          MR. LANE: Is it sitting right in front of you,
15     Mr. McNair? Don't tell the witness you don't know
16     what it is when it's in front of your nose and
17     you're touching it with your fingers right now.
18          MR. McNAIR: Are you done?
19          MR. LANE: Now I am.
20  BY MR. McNAIR:
21      Q. Okay. Is this the policy that you're referring
22   to?
23      A. Attached to Michael Cauley's memo to me of August
24   the 20th are a series of policies. One of which is the
25   policy on confidentiality. It was represented to me that

91

1      your client's actions by informing a third party of the
2      existence of a prenatal detention order with intent that the
3      mother be informed of that is, indeed, a violation of this
4      policy.
5          Q. Okay. And can you designate which part of that
6      policy that violates.
7          A. Let me read the policy, then, for the record, and
8      I believe it will speak for itself. "Confidentiality of
9      client information is a most important requirement to be
10     followed by all agency staff. Staff members must maintain
11     written confidentiality under agency policy, Department of
12     Public Welfare Regulations and the Child Protective Services
13     Law, Act 124.
14          Our clients have the right to expect that
15     information about them will be kept in strict confidence.
16     Due to the importance of maintaining confidentiality and to
17     protect staff from liability, staff members are to adhere to
18     the following practices. Whenever specific questions arise,
19     consult with your supervisor.
20          No. 1. Assure that all appropriate release forms
21     are signed prior to releasing client information.
22          No. 2. Information from other agencies or
23     professionals should be released only with the approval of
24     the agency or professional involved in the proper release
25     forms.

92

1          No. 3. The Child Protective Services, Act 124 law
2      and regulations have specific requirements which staff must
3      review prior to the release of information for those cases.
4          No. 4. All client information is to be secured at
5      the end of each workday.
6          No. 5. Information discussed within the agency is
7      to be handled in the most discrete manner possible, and
8      discussion of any case is for professional purposes
9      only.
10          No. 6. A staff member who has knowledge that a
11     friend or relative is involved with the agency is to have no
12     contact with the case record. Unless the staff member is
13     reporting information or officially involved, the case is
14     not to be discussed with staff handling the case. If this
15     causes a conflict, discuss this with your supervisor.
16          No. 7. Information on clients is confidential and
17     is not to be discussed with friends or others outside the
18     agency."
19          That is the confidentiality policy that I believe
20     was in effect when your client informed a third party of the
21     existence of a prenatal detention order with intent that it
22     go back to the mother.
23      Q. Okay.
24      A. Was that responsive?
25      Q. No. You would agree with me, she didn't violate

93

1  Paragraph 1.
2      A.  "All appropriate release forms are signed prior to
3  releasing client information."  She released information
4  about the client -- about --
5      Q.  What release form was not signed?
6      A.  I don't know if there -- I don't know whether a
7  releases form was or was not signed.  But I do believe
8  that --
9      Q.  So you can't tell me that she violated that
10  provision.
11      A.  I cannot say whether or not she adhered to that --
12      Q.  Information from other agencies or professionals.
13  Did she release information from any other agency or
14  professional?
15      A.  I believe that it was an order of court which was
16  released.
17      Q.  Is that another agency?
18      A.  I believe that the courts are a separate body of
19  the government, and that perhaps could be construed as
20  a separate agency, yes.
21      Q.  Court orders are public, aren't they?
22      A.  I do not know whether this was a public order or
23  not.
24      Q.  Are they in the Constitution of Pennsylvania?
25      A.  There are times when court orders are under seal.

94

1  I'm not sure whether this order was under seal or not.
2      Q.  I can tell you, it wasn't.  Okay.  So you consider
3  the Court of Common Pleas another agency that provided
4  information that shouldn't have been disclosed.
5      A.  I do not know whether her actions violated number
6  two or not.
7      Q.  Okay.  And I think we've already established that
8  you can't identify the provision of the Child Protective
9  Services Law that was violated.
10      A.  Perhaps -- will you provide me the law, and I'll
11  read it into the record, and then we can have a discussion
12  about that as well.
13      Q.  I'm just asking you if, as you sit there, you can
14  identify the provision.
15      A.  As I sit here, I do not have the provisions in
16  front of me, so I cannot.
17      Q.  Thank you.  Okay.  And that -- No. 6.  You would
18  agree that Abby wasn't a relative or friend that was
19  involved in this particular case.
20      A.  She may well have been a friend of individuals
21  involved in this case.  I do not know.
22      Q.  So you don't know.
23      A.  I don't know whether --
24      Q.  You would be speculating if you said she might be,
25  right?

95

1      A.  That's correct.
2      Q.  Okay.  And information on clients is confidential
3  and is not to be discussed with friends or others outside
4  the agency.  And is it your opinion that that provision was
5  violated?
6      A.  In this case the client is the yet-to-be-born
7  child, so I believe that this could be construed as a
8  violation of this policy.  A child was to be born of someone
9  whose children have been taken from her.  The nature of this
10  order was to protect that child.  I believe that the child
11  could well have been considered a client of the department.
12      Q.  In his initial meeting with you, did Mr. Cauley
13  bring up the allegation that's set forth in Item No. 5 of
14  his letter to you of August 20th where he states the
15  employee -- "As you are aware, the employee has made
16  baseless and untrue allocations [sic] to the Department of
17  Public Welfare against caseworker PW."
18      A.  I'm sorry.  What was your question?
19      Q.  My question was, was that discussed with you at
20  your initial meeting with Mr. Cauley where you decided to go
21  forward with the e-mail snoop?
22      MR. LANE:  Objection to form.
23      A.  Again, I would not characterize it as a snoop of
24  e-mail, but, rather, a review --
25      Q.  When you decided to go through with the e-mail

96

1  review.
2      A.  Yes.
3      Q.  Was that discussed, in that initial meeting?
4      A.  Mr. Cauley mentioned to me its occurrence.
5  However, he suggested that I speak with Attorney Allgeier
6  for more information about that.
7      Q.  Did you ever speak to Ms. Allgeier?
8      A.  Yes.
9      Q.  And what did she tell you?
10      A.  I don't recall because, quite frankly -- I don't
11  recall much, expect that allegations were made by
12  Ms. Conley, which were not supported by an investigation by
13  the state.  I was here when the individual from the state
14  testified, and I believe her testimony when she called Ms. W
15  demonic and what-have-you.  You are probably fully aware of
16  that.
17      Q.  Okay.  Did that allegation have any impact or
18  carry any weight in the decision to take action against
19  Ms. Conley?
20      A.  No.  Ms. Conley had done the most --
21      Q.  I just asked -- you've answered the question.
22  Thank you.  Now, if I understand correctly, this e-mail
23  review that was undertaken in Ms. Conley's case was the only
24  time that ever happened during the period of time you were
25  Erie County Solicitor.

Case 1:05-cv-00076-SJM     Document 70-10     Filed 04/12/2006     Page 26 of 71

Conley v. County of Erie, et al.                                    John Onorato

25 (Pages 97 to 100)

**97**

1  A. The only time of which I was aware, yes.
2  Q. Okay. It might have happened other times and you
3  wouldn't know about it.
4  A. If it happened other times and which I didn't know
5  about it, then I didn't know about it, and it would have
6  happened, so.
7  Q. Okay. So it wasn't something that needed your
8  approval to do that.
9  MR. LANE: Objection to form.
10  A. There was no policy. We talked about the policy
11  under which e-mail reviews were conducted. There was only
12  one, to my knowledge, which ever was conducted. It was
13  conducted, I would believe -- I recall it was at my
14  suggestion or in concurrence.
15  Q. Okay. But, still, it's the only one that you're
16  aware of.
17  A. That is correct.
18  Q. Did you ask Ms. Conley to resign her employment on
19  September 10th?
20  A. Yes, I did.
21  Q. Why did you ask her to do that, instead of just
22  terminating her?
23  A. We actually wanted to be kind to Ms. Conley. In
24  retrospect, we should have just terminated her. However,
25  the agreement was if she were to resign, we would not, among

**98**

1  other things, contest the unemployment compensation.
2  Q. Okay.
3  A. And when she agreed to this, I went to my office,
4  drafted, rather hurriedly, a document which memorialized
5  this. Returned. Asked her to execute. We noticed that
6  there was a typo. I believe I had spelled Ms. Conley's name
7  with two Ns, or maybe it was two Ls, I've forgotten which.
8  I amended it. Returned.
9      (Onorato Deposition Exhibit 2 marked for
10      identification.)
11  Q. And we've given you what's been marked as Onorato
12  Deposition Exhibit 2. Is that the letter that you just
13  referred to?
14  A. Yes.
15  Q. Okay. Down at the bottom is a paragraph that
16  said, "We hereby accept your voluntary resignation and the
17  terms thereof. And on behalf of County, I/we promise that
18  we will not disclose, disseminate, publicize, comment or
19  speculate on the nature or cause of your termination." Is
20  that language that you put in there?
21  A. Yes.
22  Q. Did you take that as an undertaking on the part of
23  the entire County, that the County would not speculate or
24  comment on the reasons for Ms. Conley's termination?
25  A. Yes.

**99**

1  Q. Okay. Despite the fact it's only signed by Debra
2  Liebel and Peter Callan.
3  A. Yes.
4  Q. Was Ms. Conley told what would be the outcome if
5  she did not sign the resignation?
6  A. I told her that we were progressing in steps.
7  This was the first option that she had, to resign. In which
8  case she would -- we would not contest unemployment
9  compensation. And we would also, if I recall correctly,
10  promise that we would only confirm dates of employment with
11  the County. We would not give negative feedback when
12  requested for potential prior employers.
13  Q. Okay. Did you tell her that if she didn't resign,
14  her employment would be terminated anyway?
15  A. If I didn't say that, I certainly implied it.
16  That, certainly, she was not going to leave that day as a
17  member of County government, employee of County government.
18  Q. Okay. So you would agree with me that she knew
19  that if she didn't sign this, that her employment was going
20  to be terminated.
21  A. I believe that -- yes.
22  Q. Okay. Now, I think we discussed that part of your
23  job was to defend civil service appeals.
24  A. That's correct.
25  Q. And you're aware Ms. Conley filed a civil service

**100**

1  appeal in this case.
2  A. That's correct.
3  Q. And what was the reason that you chose to have an
4  outside law firm handle that rather than handling it
5  in-house?
6  A. Because I believe, due to my nature and
7  involvement in this termination, that I would be a witness.
8  And that both myself and by extension my assistant
9  solicitors would be tainted. Therefore, I asked --
10  therefore, I sought outside representation of the County in
11  this matter.
12  Q. Okay. And in the dozen or so civil service cases
13  that you handled -- you said there were about a dozen?
14  A. Actually, I thought about it. There may have
15  been -- I can only recall six, now that we mention it.
16  Q. Half dozen cases that you handled. How much time
17  would you typically spend preparing for the hearing?
18  A. It depended upon the case.
19  Q. What was the range, in your experience?
20  A. I don't recall.
21  Q. Was it customary for you to spend 286.4 hours
22  preparing for a civil service hearing?
23  A. There was a civil service audit that was conducted
24  of the County in which I prepared a considerable amount of
25  time.

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 27 of 71

Conley v. County of Erie, et al.                                    John Onorato

26 (Pages 101 to 104)

**101**

1    Q.   I said civil service hearing.
2    A.   Okay.
3    Q.   Would you typically spend that amount of time
4  preparing for a civil service hearing?
5    A.   This audit was a hearing.
6    Q.   I'm not asking about an audit. I'm asking about a
7  hearing filed by an employee against whom action had been
8  taken.
9    A.   Okay.
10   Q.   I am not asking about an audit. That's got
11 nothing to do with it.
12   A.   Well, you said hearing, and an audit is a hearing
13 of type.
14   Q.   I tried to clarify my question.
15   A.   I was trying to be responsive.
16   Q.   I'm sure you were.
17   A.   What was your question?
18   Q.   Would you typically spend 286.4 hours preparing
19 for a civil service appeal filed by an employee against whom
20 an employment action had been taken?
21   A.   Because I was the County Solicitor and more
22 familiar with the civil service code, there are economies of
23 scale of me preparing for those type of hearings. If you
24 only do one intermittently, it may take -- it may take more
25 hours in which to prepare.

**102**

1    Q.   I'm sure that's true. But the question was, is
2  that the amount of time that you would typically spend.
3    A.   I don't recall how many hours I would spend. As
4  the County Solicitor I did not keep time slips. I was a
5  salaried employee.
6    Q.   Was there --
7    A.   I would spend as much time as required for me to
8  be acquainted with the case, understand the testimony of
9  witnesses, familiar with the exhibits, understand the law,
10 and present the County's position in court.
11   Q.   Okay. And would that normally take 286.4 hours,
12 or not?
13   A.   Again, I was not in the position where I would
14 record time, so I don't know how many hours it took for the
15 cases which I presented.
16   Q.   So it might have been that much. That might be a
17 typical amount of time that you would spend.
18   A.   It might have been more. It might have been less.
19 If one does not know, one does not know, and I do not know.
20   Q.   Why did you choose to hire the MacDonald Illig
21 firm?
22        MR. JOYAL:   Objection. What relevance does this
23        have to her termination? Talk about wasting time.
24   Q.   You can answer the question.
25   A.   Attorney Roger Taft had represented the County in

**103**

1  labor contract negotiations and was a former assistant
2  solicitor for the County of Erie. He is a partner with the
3  MacDonald Illig firm.
4    Q.   So that's how you chose the MacDonald Illig firm,
5  or you chose Roger Taft?
6    A.   To me, there was no distinction.
7    Q.   Okay. Did Taft represent to you that he had
8  experience in doing civil service appeals?
9        MR. LANE:   Objection, relevance.
10   A.   I don't recall.
11   Q.   Okay. Do you recall receiving a bill from the
12 MacDonald Illig firm for $56,000 that was charged for
13 preparing for the civil service hearing?
14   A.   Yes. I recall receiving the bill.
15   Q.   Okay. Did you review that bill?
16   A.   Yes.
17   Q.   Okay. And did the expenditures of time on that
18 bill and the activities undertaken to you appear to be
19 reasonable and within the scope of the retainer?
20   A.   Yes.
21   Q.   Do you recall that that payment became public
22 knowledge in an article published in the newspaper on
23 January 17th, 2005?
24   A.   Yes.
25   Q.   Do you recall discussing that bill with

**104**

1  Mr. Palattella?
2    A.   If he was the reporter. Do you have a copy of the
3  article?
4    Q.   Yes, I do.
5        (Onorato Deposition Exhibit 3 marked for
6        identification.)
7    Q.   You've been given a copy of what's been marked as
8  Onorato Deposition Exhibit No. 3, which is a reprint of an
9  article of January 17, 2005 from the Erie Times-News. Do
10 you recall that article being in the newspaper?
11   A.   Yes.
12   Q.   Okay. Do you recall speaking to Mr. Palattella in
13 connection with that article?
14   A.   Yes.
15   Q.   Okay. On the third page of that document, in the
16 sixth paragraph, you're quoted as saying, "In essence,
17 Onorato said of the $56,371 fee was being spent in the
18 defense of children."
19   A.   That's correct.
20   Q.   Is that an accurate quotation?
21   A.   Yes. Both in words and content.
22   Q.   Did you have any concern over how such a statement
23 would be interpreted?
24   A.   No.
25   Q.   So, to you, Ms. Conley's e-mail constituted a

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 28 of 71

Conley v. County of Erie, et al.                          John Onorato

27 (Pages 105 to 108)

## 105

1  threat to children.
2      A.  I believe that her release of information to a
3  third party -- that the County could not tolerate having
4  employees release information to third parties about OCY
5  cases, and that that -- that was the reason for my
6  statement.
7      Q.  Okay.  Not that she presented a threat to
8  children; she represented a threat to the security of
9  information to OCY.
10     A.  And look at the reason -- why is that -- then you
11 must ask yourself, why is that information to be kept
12 secure.
13     Q.  Could you answer the question first.
14     A.  What question?
15     Q.  The question that I asked you.
16     A.  What is the question?
17         MR. McNAIR:  Could you read back the question,
18 please.
19     A.  There was a rationale why that information is to
20 be kept confidential.  That rationale is so that the
21 department can fulfill its obligation to protect children.
22     Q.  Okay.  Can you explain to me how that constituted
23 a threat to children.
24         MR. LANE:  Objection to form.
25     A.  Ms. Conley informed third parties of the nature of

## 106

1  a prognostic detention order.  That constituted a threat to
2  that child.
3      Q.  Okay.  So to defend that child, you terminated
4  Ms. Conley's employment.
5      A.  No, not just that.  It's -- listen, she did
6  something which was contrary to the policy, which was --
7  policies which have been provided.  That's why she was
8  terminated.  This was a --
9      Q.  I'm asking you how that was threatening to the
10 children that you speak of.
11     A.  If she does not do her job properly, children are
12 at risk.  If she acts if inappropriately, children are at
13 risk.
14     Q.  You would agree with me that you're not aware of
15 any evidence that Ms. Conley has ever physically or sexually
16 abused a child, are you?
17     A.  No.
18     Q.  Are you aware of any evidence that Ms. Conley has
19 ever neglected to care for a child in her charge, that she
20 was responsible for?
21     A.  I know that she has not fulfilled her job function
22 as required.
23     Q.  That's not the question.  The question is, did she
24 ever neglect to care for a child she was responsible for?
25     A.  When she fails to fulfill her job as required, she

## 107

1  lets down those --
2      Q.  No, a child that she was caring for.  A child in
3  her custody.
4      A.  My understanding is when she fails to -- I'm here
5  to answer your questions, not to argue with you.
6          MR. LANE:  Just let him answer the question.
7          MR. McNAIR:  It's not responsive to the question.
8  Just asked it again.  Go ahead.  It's your day.
9      A.  I'm here to answer your questions, not to argue
10 with you.
11     Q.  You're here to waste my time, but go on.
12         MR. LANE:  Well, if you think it's being wasted,
13 then just conclude the deposition.
14         MR. McNAIR:  I'm just trying to get an answer to a
15 simple question.
16         MR. LANE:  He's trying to answer your question.
17     A.  Just because you do not like the answer does not
18 mean you've not been afforded an answer.
19     Q.  I don't like the answer because it's not
20 responsive to the question.
21     A.  You do not like the answer because it's the truth.
22         MR. JOYAL:  I'm going to object to both of this
23 and ask, if the question you're asking concerning
24 custody, are you talking about her own child?
25         MR. McNAIR:  I'm talking about any child.

## 108

1          MR. JOYAL:  Any child in her custody.  He doesn't
2  know whether she had any kids.
3          MR. ANGELONE:  That's what we're asking.  He won't
4  say I don't know.
5          MR. McNAIR:  We're just asking him to say he
6  doesn't know.  That's all.  Haven't you ever taken
7  a deposition before?  Don't you know that
8  sometimes you want the witness to admit that they
9  don't know certain things?  I'm just trying to get
10 him to say he doesn't know, or that he's not aware
11 of any such evidence.  Is it that hard?  He didn't
12 want to do that.  We're going to be here a long
13 time, because he's going to wind up saying that.
14     A.  It's not that I don't want to say what I don't
15 know.  Rather, I would like to say what I do know.  And what
16 I do know is that your client --
17     Q.  I'm not interested --
18         MR. LANE:  Let him answer the question.
19         MR. McNAIR:  I have 150, 200 pages of what he does
20 know.  I'm asking him whether he knows whether or
21 not Ms. Conley has ever been accused of neglecting
22 to care for a child in her charge.  Not
23 work-related.
24         MR. LANE:  That's a different question.
25         MR. McNAIR:  Aside from work.  I'm trying to

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 29 of 71

Conley v. County of Erie, et al.                                    John Onorato

28 (Pages 109 to 112)

109

1       reword it. I'm trying to get an answer.
2           MR. LANE: Accused. Has she ever been accused.
3       Do you know whether she's ever been accused.
4           MR. McNAIR: Of neglecting a child within the
5       meaning of the Child Protective Services Law.
6       A.   No.
7       Q.   Okay. Are you aware of any instance other than
8   this e-mail in which any action taken by Abby Conley has
9   ever threatened the well-being of a child?
10      A.   Other than this e-mail, I do not know.
11      Q.   Okay. So your statement that 57, $56,000 of
12  County money was spent to defend children was spend to
13  defend children from an e-mail.
14          MR. JOYAL: Objection to form.
15      A.   No. The point is, is that had we lost this
16  hearing, there was potential that this employee would be
17  ordered to return to work. That, to me, would be
18  intolerable. It is not -- it would -- it is not acceptable
19  to have the County have under its employment an individual
20  who releases confidential information to a third party.
21  That, in my mind, frustrates the efforts of the department
22  and poses a threat to children.
23      Q.   Okay. How do you know this order was
24  confidential? What's your legal basis for stating that it
25  was confidential? Or is that just what you were told?

110

1       A.   The issue is this. She reported to a third party
2   ongoing matters regarding a case. This third party had no
3   reason to know about this. This was a violation of the
4   confidentiality policy which I read into the record.
5       Q.   Okay.
6       A.   Whether the order --
7       Q.   The question was --
8       A.   Whether the order was --
9       Q.   The answer is, then, you don't know whether or not
10  that order was confidential.
11      A.   It's not relevant. The fact is she told --
12      Q.   Look. It's not for you to determine what's
13  relevant. Do you know whether or not the order was
14  confidential, or not?
15          MR. LANE: Objection.
16      A.   In my mind, it was not relevant because what she
17  did by telling a third party about it constituted just cause
18  for termination. She spoke of a case to someone who had no
19  reason, professional or otherwise, to know about it. She
20  did it through e-mail with intent that the person involved
21  in the case find out about a matter of which they were
22  unaware.
23      Q.   Okay.
24      A.   She acted appropriately, improperly.
25          MR. McNAIR: This is not responsive to the

111

1       question. I'm really -- Mr. Lane, I would ask you
2   to direct your client to answer the question
3   that's asked, rather than repeating a speech.
4           MR. LANE: He did.
5           MR. McNAIR: It's going to be great on the stand,
6       I'm sure.
7           MR. LANE: He did.
8       Q.   Your answer to the question, just so that I
9   understand, is you don't know whether or not the order of
10  which Ms. Conley spoke was confidential or not.
11          MR. LANE: Objection to form.
12      A.   The order is what it is. I did not know whether
13  the order was under seal or not. I was informed by -- I
14  believe I was informed by Mr. Cauley that these matters are
15  generally not known by the mother.
16      Q.   Okay. But as far as you know, it wasn't under
17  seal.
18      A.   I don't recall.
19      Q.   So as you sit here today, as far as you know, it
20  was not under seal.
21      A.   I don't know whether it was, or is, or was. I
22  don't know if it was or was not.
23      Q.   Okay. So you don't know if it was. Thank you.
24  And you don't know whether the order was confidential under
25  the terms of the Child Protective Services Law.

112

1           MR. LANE: Objection to form.
2       A.   I know that Attorney Cauley and Ms. Liebel
3   characterized this as confidential information.
4       Q.   Okay. I'm sure they did. I don't doubt you on
5   that. I'm asking you for your own independent judgment.
6   Did you judge that this was confidential information or did
7   you strictly rely on the word of Mr. Cauley and Ms. Liebel?
8       A.   These are seasoned, respected individuals. I had
9   no reason to doubt what they were telling me.
10      Q.   So that's yes?
11      A.   Yes, I relied upon what they told me.
12      Q.   Did you perform any independent investigation of
13  any of the facts set forth in Mr. Cauley's September -- or
14  August 20th letter?
15      A.   I reviewed the e-mails which he appended, and
16  asked that all the e-mails be provided to me.
17      Q.   Did you review all the e-mails?
18      A.   I reviewed a substantial number of them. I'm not
19  sure if I reviewed them all. However, I certainly reviewed
20  the ones which were appended.
21      Q.   Okay. So you reviewed what Mr. Cauley gave you.
22      A.   In addition -- when you say gave me, do you mean
23  as attachments or --
24      Q.   Yeah, he attached them to his letter and gave them
25  to you.

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 30 of 71

Conley v. County of Erie, et al.                                    John Onorato

29 (Pages 113 to 116)

113

1    A.  Well, there were others that he also gave me.
2    Q.  Okay.
3    A.  And I reviewed some of those as well.
4    Q.  Did you talk to any of the people involved?
5    A.  No.
6    Q.  And I think we can agree you didn't review any of
7  the statutes to determine whether what they were telling you
8  was true or not.
9    A.  I reviewed the documents which were attached.
10   Q.  Okay.  So you didn't review any statutes.
11   A.  I reviewed the documents which were attached.
12   Q.  So did you review any statutes, or not?
13       MR. LANE:  If you recall.
14   A.  I don't recall.
15       MR. LANE:  By the way, the letter, you marked it
16       Cauley's Deposition, the August 20th letter, you
17       had indicated -- and I forget what exactly it was,
18       that some of the documents weren't included with
19       that.
20       MR. McNAIR:  The Word documents that were on her
21       computer are the ones that were attached.  All
22       the e-mails, everything but that, was attached.
23       There were just two lengthy Word documents that
24       have nothing to do --
25       MR. LANE:  I just didn't recall what they were.

114

1    Q.  Would it be fair to say that in making your
2  decision -- in making the decision to terminate Ms. Conley's
3  employment, you relied on the information provided by
4  Mr. Cauley and Ms. Liebel and Ms. Allgeier.
5       MR. LANE:  Objection to form.
6    A.  That information was provided.  The decision was
7  made, as I said, in a collective manner.  I would not
8  classify it directly as my decision, however, it was a
9  decision of which I completely agreed.  I mean, what else do
10 you do when an individual releases information to a third
11 party which they shouldn't.
12   Q.  I'm not asking you about that.
13   A.  It is --
14   Q.  I'm asking you about the sources of information
15 that you had when a decision was made.  And the only sources
16 of information that you had at the time the decision to
17 terminate Abby was made was based on what you had been told
18 by Mr. Cauley, Ms. Liebel and Ms. Allgeier, correct?
19   A.  That's correct.
20   Q.  And you had no other source of information.
21   A.  That's correct.
22   Q.  And you sought no other source of information.
23   A.  The evidence was damning and overwhelming.
24   Q.  And you did not direct any further investigation.
25   A.  There was no necessity to.

115

1    Q.  Okay.  If I could draw your attention back to
2  Exhibit No. 3.
3    A.  Which one is -- is that the January 27th article?
4    Q.  No.  Excuse me.
5       MR. LANE:  January 17th.
6    Q.  Yeah, let's go back to the September 12th article.
7    A.  I do.
8    Q.  Okay.  All right.  On the fourth page of that
9  article, in the second paragraph from the bottom -- the
10 fourth page.  Second paragraph from the bottom.  It says,
11 "Onorato, the County Solicitor, said he reviewed a
12 transcript of the hearing and said the County found no
13 problems with how Deveney and other supervisors handled the
14 case."  Is this an accurate statement of what you told the
15 reporter?
16   A.  I believe so, yes.
17   Q.  Okay.  All right.  So you found Deveney's actions
18 in that case, that's referred to above in the article, to be
19 appropriate?
20   A.  I would say that it went beyond just a review of
21 the transcript, but an understanding of how the document in
22 question is formed and its use.
23   Q.  Okay.  So you found that Deveney's actions were
24 appropriate.
25   A.  I found that they were in keeping with the

116

1  standard operating procedures of the department.
2    Q.  Do you know whether those standard procedures have
3  been changed since then?
4    A.  I do not know.
5    Q.  The bottom paragraph said -- you said you
6  disagreed with Conley's testimony about the alteration of a
7  court summary.  And what basis did you have to say that?
8  First of all, did you say that?
9    A.  I believe that -- I believe that she
10 characterized -- what she characterized as an alteration is
11 not.  But, rather, it is the -- part of the editing and
12 formatting process of the department.
13   Q.  Okay.
14   A.  She characterized something as being wrong, when,
15 in fact, it was acceptable.
16   Q.  Okay.  So you don't question the fact that
17 Ms. Deveney changed the court summary that Ms. Conley
18 submitted.
19   A.  I do not believe that the change was -- I believe
20 it was in accord with the practices that the department was
21 following at the time.
22       MR. LANE:  He asked you whether she changed it or
23       not.
24   A.  Okay.  I say that -- it was not the same
25 document -- it was not -- did not contain the same verbiage

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 31 of 71

Conley v. County of Erie, et al.                                John Onorato

30 (Pages 117 to 120)

---

117

1  that Ms. Conley had used.
2  Q.  Okay.  So it had been changed by Ms. Deveney.
3  A.  I don't know by whom.
4  Q.  Okay.
5  A.  I know that the initial iteration Ms. Conley
6  claims was hers.
7  MR. McNAIR:  That's all the questions I have.
8
9  CROSS-EXAMINATION
10  BY MR. JOYAL:
11
12  Q.  I have some questions.  You have -- the first
13  thing I want to ask you, is while Mr. McNair was talking
14  about statutes, I want you to go back into, if you would --
15  I'm going to give you a copy of 23 P.A. CSA Section 6339 and
16  6340.  This is part of the Child Protective Services Act.
17  A.  Yes.
18  Q.  Before you review those -- one is titled, I
19  believe, Reports 3339 and 3340.  40, I believe, deals with
20  people who can get information.
21  A.  33 --
22  Q.  6339 talks about confidentiality of reports.
23  A.  Yes, that's correct.
24  Q.  6340 talks about the people who are entitled to
25  information contained in the reports?

118

1  A.  It's titled release of information in confidential
2  reports.
3  Q.  Go back, if you would, to the -- I know Mr. McNair
4  wanted to focus on the testimony in court.  But go back, if
5  you would, to Mr. Cauley's report to you.
6  A.  Yes.
7  Q.  How many areas did he point out to you as areas of
8  concern?
9  A.  There was Item 1, breach of confidentiality.  Item
10  2, breach of confidentiality.  Item 3, improper disclosure
11  of County work product, violation of computer use policy.
12  Item 4, violations of County computer use policy.  Item 5,
13  violations of employee work and conduct responsibility.
14  Q.  Okay.
15  A.  So five.
16  Q.  Five.  Take look at No. 5.
17  A.  Yes.
18  Q.  If you would.  Refresh your recollection by
19  looking at it.  By the way, Mr. Cauley has well put in what
20  you thought the violations of the County personnel code
21  were, right?
22  A.  Yes.
23  Q.  Take a look, if you would, at the second paragraph
24  there which starts on August 4th, and read into the record
25  what Mr. Cauley said he discovered --

119

1  A.  "On August" --
2  Q.  -- prior to submitting that report to you.
3  A.  Yes.  "On August 4th, 2004 I interviewed Kim
4  Peebles, a supervisor of the clerical department of the
5  Office of Children and Youth.  She related being approached
6  by the employee on August 2nd, 2004 with complaints about
7  Supervisor Deveney and Caseworker W.  According to Peebles,
8  the employee reiterated the untrue allegations against
9  caseworker W and discussed the particulars of that case in
10  Ms. Peebles.  This particular breach of confidentiality was
11  done clearly to impune Caseworker W."
12  Q.  Now, you understood at that point in time, did you
13  not, that this had to do with the report of child abuse that
14  Abby Conley had filed --
15  A.  That is correct.
16  Q.  -- against Ms. W, correct?
17  A.  That is correct.
18  Q.  All right.  Take a look at 6339, if you would.
19  A.  Yes.
20  Q.  Does that section of the statute not deal with
21  reports of child abuse?
22  A.  It does.
23  Q.  Does it say that those reports are confidential?
24  A.  It does.
25  Q.  Now, take a look, if you would, at the next

120

1  section.  And skim it for me, and tell me if in that section
2  of the statute regarding confidentiality, whether or not a
3  supervisor of the clerical department at OCY would be a
4  person, in your legal opinion, who would be entitled to
5  release of that information?
6  MR. McNAIR:  Objection.  Argumentative.  Calls for
7  a legal conclusion.
8  MR. JOYAL:  No, it's not.  It's a question.  He's
9  a lawyer.  You asked him questions all the time
10  about that, Mr. McNair.
11  Q.  Take a look and see if --
12  MR. McNAIR:  I'm going to object.
13  Q.  -- there's somebody there that she should have
14  given that information about that unfounded report to you on
15  August 4th.
16  A.  I'm checking the pocket part as well on that.
17  Q.  Well, the pocket part, I think, went into effect
18  in 2005.
19  A.  No, she is not --
20  Q.  She is not.  So the totality of the circumstances
21  on September 10th, between August 20th and September 10th
22  would have indicated that at least concerning that report
23  and that paragraph, there had been a violation -- or
24  apparent violation of 23 P.A. CSA Section 6339 and 6340.
25  MR. McNAIR:  Objection, argumentative.

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 32 of 71

Conley v. County of Erie, et al.                                    John Onorato

31 (Pages 121 to 124)

121

```
1      Q.  Would you agree?
2      A.  I would agree with that characterization.
3      Q.  Take a look, if you would as well -- now, you were
4   aware, I believe during your conversations, that the report
5   against Ms. W was filed sometime in June, June 21st?
6      A.  That's correct.
7      Q.  Okay.  If you take a look at the attachments
8   there, there's an e-mail, January 28th of '04, from Abby
9   Conley to Deanna Cosby.
10     A.  June 28th.
11     Q.  June 28th, '04.
12     A.  I'm sorry.  When is it?  June --
13     Q.  June 28th, '04?
14     A.  The pages are not -- the e-mails are now --
15     Q.  They're not in order.
16     A.  -- in order.  I believe this is it.
17     Q.  Yeah, that's the one.  Is that the one that asks
18   about -- June 28th, is that the e-mail that asks about
19   whether Ms. Cosby has any information concerning PW's former
20   husband?
21     A.  Yes.
22     Q.  Former clients?
23     A.  Yes.
24     Q.  Correct?
25     A.  Yes.
```

122

```
1      Q.  As to whether she would be willing to testify
2   about SD and PW to the Department of Public Welfare?
3      A.  Yes.
4      Q.  And, again, about another family that allegedly
5   Ms. PW was maligning.
6      A.  Yes.
7      Q.  Now, you were aware at that point in time, on
8   August 20th, as well as September 10th, that that had to do
9   with the report of child abuse; is that right?
10     A.  That's correct.
11     Q.  As a lawyer, in your opinion, would that be
12   another factor in terms of a violation of confidentiality,
13   concerning not only PW in that report but other clients of
14   the department -- for the Office of Children and Youth?
15     A.  Certainly.
16     Q.  Totality of the circumstances showed what to you?
17     A.  That this was an individual who could not keep
18   matters confidential regarding cases.  And, in fact, could
19   not perform her job as a result.
20     Q.  Okay.  And then just if you would too, there's a
21   few pages after that.  There's an e-mail from July 9th which
22   is from Sue Deveney --
23     A.  Yes.
24     Q.  -- to Abby Conley.  And this talks about
25   confirmation about a meeting that was had regarding
```

123

```
1   confidentiality.  And what's the second sentence that starts
2   with, "It is expected?"
3      A.  "It is expected that confidentiality will be
4   maintained regarding the recent incident in our unit."
5      Q.  Okay.  Now, let's just stop for a second.  Let me
6   stop there.  Were you aware -- did you at that point in time
7   have any understanding of what that "recent incident" meant?
8      A.  When you say recent incident, do you mean
9   July 9th?
10     Q.  Well, the e-mail is July 9th.
11     A.  Right.
12     Q.  Reference is a recent incident in our unit.  And
13   it then says, "It is not to be discussed with professionals
14   from other agencies, nor with the parents, foster parent,"
15   et cetera.
16        MR. LANE:  Are you asking whether he knew what
17        that meant in August?
18     Q.  Yeah.  Do you know what that meant in August, what
19   incident it was talking about?
20     A.  I don't recall.
21     Q.  Okay.  Now, that's July 9th.
22     A.  Right.
23     Q.  The PW report was July -- June 21.
24     A.  Yes.
25     Q.  My understanding is that it was around June 30
```

124

```
1   that the DPW investigator had come out to investigate.
2      A.  That's correct.
3      Q.  Had anyone told you that, or did you come to a
4   conclusion that what that was talking about was a directive
5   to Ms. Conley, as well as others in the unit, not to be
6   discussing that particular incident?
7      A.  That was my understanding.
8      Q.  Again, another indication that she been warned
9   about this stuff.
10     A.  Exactly.
11     Q.  Now, let's go back.  There are some other e-mails
12   in there too.  But let's talk about the report that
13   allegedly was altered, which was the subject matter of the
14   July 28th testimony from Ms. Conley.  Did not Mr. Cauley
15   when he wrote about the -- I think it's No. 3.
16     A.  Yes.
17     Q.  Improper disclosure of County work product.  In
18   this stack of e-mails, there is an e-mail from Ms. Conley to
19   Ms. Deveney, her supervisor.  I believe it's dated April 19,
20   which has an attachment to Ms. Deveney -- it's got Exhibit C
21   on it here.
22     A.  Yes.
23     Q.  Okay.  See, it's a -- at the bottom -- really,
24   what it is, is there is an e-mail dated May 4, 2004 to
25   Abby@ilovejesus.net from Abby Conley.
```

Case 1:05-cv-00076-SJM     Document 70-10     Filed 04/12/2006     Page 33 of 71

Conley v. County of Erie, et al.                                                   John Onorato

32 (Pages 125 to 128)

125

1    A.  Yes.
2    Q.  Have you come to find out that that's Abby
3  Conley's home computer address?
4    A.  Yes.
5    Q.  Below that, there look likes it's the forwarding
6  of an e-mail that was sent from Abby Conley to Sue Deveney
7  dated April 19th, 2004.
8    A.  Yes.
9    Q.  And you can see that if you look at the bottom of
10  these, one is 11:41, one is at 11:42.  The one at 11:41 says
11  SH, court summary.
12    A.  Um-hum.  Yes.
13    Q.  Dated April 19th going to Sue Deveney and Michele
14  Schetter.  And the one above it says CSH, which has 4
15  kilobytes more of stuff.
16    A.  Yes.
17    Q.  Again dated April 19th, 10 minutes later, 11:01.
18    A.  Um-hum.  Yes.
19    Q.  Did you come to find out that that was the
20  document that came into Mr. Villella's possession?
21    MR. McNAIR:  Objection.  There's no foundation for
22    that.  In fact, you know for a fact that's not
23    true, because you talked to Mr. Villella.
24    MR. JOYAL:  I know I did.
25    MR. McNAIR:  Because he told me you did.  Unless

126

1    you're accusing him of being a liar too.
2    MR. JOYAL:  No, I'm not.  He has a different
3    recollection than Mr. Cauley does, I believe.  I
4    bet he also told you that your client called him
5    to tell him about it.
6    Q.  Does that appear to you -- is there any -- Mr.
7  Cauley pointed out to you that there does not seem to be a
8  reason on May 4th for Ms. Conley to be e-mailing a document
9  from the County to her home.
10    A.  Right.
11    Q.  Would it be fair to say that reasonable persons
12  might think that that was the way that Ms. Conley got the
13  document?
14    A.  It's highly --
15    Q.  -- to whoever that third party was?
16    A.  It's highly suspicious.
17    MR. McNAIR:  Objection.  Argumentative.
18    Q.  Highly suspicious.
19    A.  Yes.
20    MR. McNAIR:  Objection.  Argumentative.
21    A.  It's positive that it was sent to her home.  And
22  from home, eventually to Mr. Villella.
23    Q.  Or to Mr. Villella's knowledge.
24    A.  Yes.
25    Q.  It could have come from Mr. Villella's client to

127

1  Mr. Villella.
2    A.  Exactly.  But forwarded again in that direction.
3    Q.  Again, easy way to get the document from one place
4  to another.  E-mail it home, print it out on your home
5  computer.
6    A.  Yes.
7    Q.  And either deliver it or mail it.
8    A.  Either way.  But the point is, is that it was
9  directed out of the unit and directed -- and eventually came
10  in possession of Attorney Villella.
11    MR. McNAIR:  Objection.  There's no foundation for
12    that.
13    Q.  Did you ever find out whether or not Mr. Villella
14  had knowledge of the document, if not actual, physical
15  possession of the document, prior to the July 28th --
16    MR. McNAIR:  Objection, foundation.  He's
17    testified he never spoke to Mr. Villella.
18    A.  No, I didn't.
19    Q.  You read the transcript?
20    A.  Yes.
21    Q.  Did not the transcript indicate to you that
22  Mr. Villella had knowledge of the document even if he didn't
23  have possession of it?
24    A.  Yes, I meant aside from the transcript.  I did
25  read the transcript, and it's clear he had knowledge of the

128

1  item before he approached the witness.  Because it was in
2  his hand.
3    Q.  Or at least he had the knowledge of it as being in
4  her possession.
5    A.  Yes.
6    Q.  Do you remember also seeing other e-mails in --
7  prior to June 4th when you were reading -- reviewing these,
8  that would have indicated that Abby Conley had some sense
9  that someone was monitoring at least the computer screen of
10  her e-mails?
11    A.  Yes.
12    Q.  She had told that to --
13    A.  She referenced being paranoid, or someone
14  referenced -- asked her if she was being paranoid.
15    Q.  And this was going to Deanna Cosby, I believe; is
16  that right?
17    A.  I believe that to be so.  That's my recollection.
18    Q.  Now, Abby Conley and all employees of Erie County
19  were aware of what the computer policy was; is that right?
20    A.  Yes.
21    Q.  And is it fair to say too that part of that
22  computer policy makes it plain -- and employees sign that
23  they have read it.
24    A.  Yes.
25    Q.  And is it fair to say that that policy states that

Case 1:05-cv-00076-SJM     Document 70-10     Filed 04/12/2006     Page 34 of 71

Conley v. County of Erie, et al.                                    John Onorato

33 (Pages 129 to 132)

129

1   documents or e-mails or anything involving the County's
2   computer are subject to being looked at by the County?
3       A.   That's my recollection, yes.
4       Q.   Do you read the New York Times?
5       A.   On occasion, yes.
6       Q.   Did you read it that past Sunday when they
7   interviewed Michael Chertoff?
8       A.   No, I didn't.
9       Q.   Mr. Chertoff said he doesn't use e-mail because
10  they never go away.
11          MR. McNAIR:   What does this have to do with the
12          case?
13          MR. JOYAL:   Well, probably about as much as the
14          stuff you were asking about the County bill.
15      Q.   Mr. McNair asked you if you knew if anybody asked
16  Ms. Conley whether she gave the document to Mr. Villella.
17  Do you recall that?
18      A.   Yes.
19      Q.   10 minutes, 15 minutes worth of it.  If Ms. Conley
20  had said to you, I did not inform Mr. Villella, I didn't
21  give the document to Mr. Villella, I didn't give the
22  document to Mr. Villella's client, would that have stopped
23  the concern that was -- as to how that document got into
24  Mr. Villella's hands?
25      A.   No.

130

1           MR. McNAIR:   Objection.  Argumentative and
2           speculative.
3       Q.   Because you might not believe what Ms. Conley had
4   to say.
5       A.   Correct.
6       Q.   Did Ms. Conley during the September 10th meeting
7   ever deny that she sent any of the e-mails?
8       A.   No.
9       Q.   Did she ever address any of the e-mails?
10      A.   No.  We kept trying to get her to focus on the
11  fact that she had released the information to a third party,
12  and she just wouldn't acknowledge or direct.  We showed
13  her -- I informed her that we had reviewed her e-mail and
14  read them all, and we know exactly what she had done, and
15  that this was why this action was being taken.
16      Q.   She didn't want to address the issues of the
17  e-mails, did she?
18      A.   No.
19      Q.   She wanted to address her testimony.
20      A.   Correct.
21      Q.   And did you see anywhere in the transcript of the
22  hearing, or did you get contacted, or did anyone contact you
23  from the court to suggest to you, whether it be the Judge or
24  the District Attorney's Office, that there was any thought
25  by the Court of filing charges against Sue Deveney for

131

1   obstruction of justice?
2       A.   No.
3       Q.   Now, go back to Mr. Cauley's report to you.  And
4   we'll go back to No. 5, and the last paragraph on there.
5   And would you read that into the record, if you would.
6       A.   "Ms. Peebles" -- or the last paragraph on No. 5?
7       Q.   Right.  On that page that goes over into the next
8   page.
9       A.   "Ms. Peebles also related that during this same
10  conversation the employee similarly impuned Supervisor Sue
11  Deveney.  She said that Ms. Deveney was going to be
12  criminally charged with obstruction of justice.  There would
13  be a newspaper article to that effect on Friday, August 6,
14  2004, and that she was going to be fired, and that she would
15  face jail time.  She accused Supervisor Deveney of
16  improprieties in editing/correcting court summaries or
17  documents that she herself had prepared."
18      Q.   Now, during the course of the examination of
19  Ms. Conley on July 28th, do you recall during the transcript
20  that Ms. Conley admitted that she did not have the ability
21  to make any opinions regarding parenting skills?
22      A.   Yes.
23      Q.   She said that under oath in court; is that right?
24      A.   That's correct.
25      Q.   She also testified that that was common practice,

132

1   did she not?
2       A.   Yes, she did.
3       Q.   And that Ms. Deveney would suggest corrections or
4   make corrections, and it was up to Ms. Conley to change
5   those.
6       A.   That's correct.
7       Q.   And during the course of time that she was in
8   court that day, she had the opportunity, and did, as a
9   matter of fact, testify as to what her own observations and
10  opinions were; isn't that right?
11      A.   Yes, she did.
12      Q.   No one stopped her from doing that, as far as you
13  saw on the transcript?
14      A.   No, not at all.
15      Q.   You didn't see any objections made by Mr. Cauley
16  to ask the Court not to allow her to testify.
17      A.   No.
18      Q.   Did you see anything or hear anything about anyone
19  moving to quash a subpoena on Ms. Conley, to try to keep her
20  from testifying in that court proceeding as to her opinions?
21      A.   No, that did not occur.  As the County Solicitor,
22  I would have certainly been aware of that, if that had been
23  attempted.
24      Q.   Your alleged quote to the newspapers --
25          MR. McNAIR:   It's not alleged.  It's admitted.

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 35 of 71

Conley v. County of Erie, et al.                                         John Onorato

34 (Pages 133 to 136)

133

1    Q.   About being a threat to children.
2    A.   Yes.
3    Q.   Do you remember, Mr. McNair started asking you
4  questions about whether or not you knew whether Ms. Conley
5  had ever been accused of neglect or anything with her own
6  children, or children under her care?
7    A.   Yes.
8    Q.   Do you know whether or not Ms. Conley has any
9  children?
10   A.   I do not know.
11   Q.   Do you know, if she does, whether or not -- what
12 her relationship is with her children?
13       MR. McNAIR:  Objection.  Irrelevant.
14       MR. JOYAL:  You asked the question.  You opened
15       the door, Mr. McNair.  You asked about her ability
16       to parent her children.  You opened the door.
17   Q.   There have been situations both during your
18 time -- strike that.  Let me ask it this way.  You've been a
19 resident of this County for how long?
20   A.   With the exception of the time in which I was in
21 law school and when I practiced in York County,
22 Pennsylvania, the whole of my life.
23   Q.   And you've read stories prior to your being
24 Solicitor about unfortunate incidents involving children,
25 some of whom were in the care and custody of OCY.

134

1    A.   Certainly, yes.
2    Q.   And those had to do with either parents or foster
3  parents neglecting or abusing their children.
4    A.   Yes.
5    Q.   And you've also -- have you also heard it of
6  parents absconding with children and having bad things
7  happen to the children after they did that?
8    A.   Yes.
9    Q.   The fact that someone would tell a mother who had
10 two children in care that there was an order that had been
11 issued by a judge to take the child that was being born
12 would be a serious matter, as far as you're concerned.
13       MR. McNAIR:  Objection.  Argumentative.
14       MR. JOYAL:  I'm not arguing with him.
15   A.   It's a very serious matter, one which the County
16 could not tolerate.
17   Q.   And if this child had been injured because the
18 mother took the child out of the jurisdiction to either have
19 it or -- maybe even out of the country, would subject --
20 well, first, might be injurious to the child and a threat.
21   A.   Yes.
22   Q.   And, certainly, would be a threat if social
23 workers who disagreed with or made their own -- strike
24 that -- or social service aides who do not have social work
25 degrees had made judgments that their opinion was better

135

1  than either that of a Court or a licensed social worker,
2  that could not be tolerated, right?
3        MR. McNAIR:  Objection.  Argumentative.
4    A.   Certainly.  In essence, she substituted her
5  judgment for that of the department and the Courts.
6    Q.   Well, isn't it true, then, when the -- and this
7  was an order signed by a judge.
8    A.   That's correct.
9    Q.   And would it not strike you as being odd that if
10 it were not to be a confidential order, that the judge would
11 sign an ex parte order without calling in the parties to
12 have a hearing as to whether or not the child that was going
13 to be born should be detained?
14   A.   Yes.
15   Q.   And in this situation, there was no such hearing;
16 is that --
17   A.   That's my knowledge.
18   Q.   So for a reasonable person, would that not
19 indicate that the Court believed that the order should be
20 confidential and not be divulged to the parent?
21   A.   Yes.
22       MR. McNAIR:  Objection.  Argumentative.
23   Q.   Correct?
24   A.   That's correct.
25   Q.   There are very few -- let me ask a question this

136

1  way.  As an attorney, how many times have you been involved
2  in any situation where a court would issue an order ex
3  parte?
4    A.   It is the rarest of circumstances.  When it was
5  either an exigent circumstance or one which the matter had
6  to be kept in a confidential --
7    Q.   I presume that Judge Kelly is not one by
8  reputation who allows the rights of litigants to be trampled
9  on by one party coming in looking for an order unless she
10 has the ability to issue the order; is that correct?
11   A.   That's correct.
12   Q.   Unless she believes that it's in the best interest
13 of the child to have that order issued.
14   A.   That's correct.
15   Q.   There was nothing stopping Judge Kelly when OCY
16 came in with the petition to say, I'm not issuing this
17 order, I'm going to have a hearing.
18   A.   That's correct.
19   Q.   At the time that you and Mr. Schenker went to the
20 Erie Times for that meeting --
21   A.   Yes.
22   Q.   -- in your mind, had it been determined that the
23 possible and probable termination of Abby Conley was based
24 solely upon her actions regarding her release of
25 confidential information both concerning the detention order

137

1    and PW?
2        MR. McNAIR: Objection, argumentative.
3        A. Yes. And, primarily, the detention order.
4        Q. And if you had given that information to
5    Mr. Schenker, then any statement that he made that we are
6    not firing her because she was a quote/unquote whistleblower
7    would have been a true statement.
8        A. That's correct.
9        Q. That was the County's position.
10       A. It is. It still is.
11           MR. JOYAL: I don't have anything else.
12           MR. DEVLIN: I have no questions.
13
14           REDIRECT EXAMINATION
15   BY MR. McNAIR:
16
17       Q. Mr. Onorato, you said that you were aware of
18   instances where people had absconded with children and harm
19   later came to them. Would you please identify each such
20   instance that you are aware of.
21       A. I've read about it and heard about this occurring
22   both on a -- on a national level. I don't know of any
23   specific instance where that has occurred.
24       Q. Are you aware of any instance where any parent has
25   absconded or taken a child out of the jurisdiction as a

138

1    result of the disclosure of a prenatal detention order?
2        A. I know that that's a legitimate fear of the
3    department.
4        Q. I am asking you if you are aware --
5            MR. LANE: Hang on. Don't yell at the witness.
6        The reason these depositions get out of control is
7        that you yell at the witness.
8            MR. McNAIR: I'm not yelling at the witness. He
9        apparently can't hear me --
10           MR. LANE: You're yelling at me. Now you're
11       yelling at me.
12           MR. McNAIR: -- because he's not answering the
13       question.
14           MR. LANE: Stop questioning. Show some respect to
15       somebody in the world, Mr. McNair.
16           MR. McNAIR: With all due respect --
17           MR. LANE: Stop questioning. Okay.
18           MR. McNAIR: Fine.
19       Q. Are you aware of any instance where that has ever
20   happened?
21       A. No. I cannot specify an instance. However, it is
22   a foreseeable occurrence, one which should be protected
23   against.
24       Q. Move to strike as not responsive.
25       A. How is that nonresponsive?

139

1        Q. It is your legal opinion that those two sections
2    that Mr. Joyal was kind enough to provide you with prohibit
3    somebody who has observed a child being ill treated by
4    another adult, if they report that, they are not permitted
5    to talk to somebody about that.
6            MR. LANE: Objection to form.
7        Q. Is that your interpretation?
8        A. I think that that code is applicable to
9    individuals within the department talking about matters
10   which are being investigated. And that's, I believe,
11   what --
12       Q. You would agree with me that the investigation was
13   over in -- August 6th.
14       A. Then all the more reason why she should not be
15   talking about it.
16       Q. Okay. Now, Mr. Joyal asked you if Ms. Conley
17   should substitute her judgment for the caseworker. And I
18   think you said that, of course not, she shouldn't. What if
19   the caseworker hadn't seen the child or the mother in four
20   months, and Ms. Conley had seen them twice a week? Who
21   would be in a better position to give information to the
22   Court about the relationship between the mother and the
23   children?
24           MR. JOYAL: Objection. Lack of foundation.
25           MR. LANE: Objection. Lack of foundation.

140

1            Requires speculation.
2        A. Let me answer it this way. Nurses do not diagnose
3    illnesses; doctors do.
4        Q. Nurses record observations, right?
5        A. I believe that's the role of a nurse. I think
6    that this function -- she has a function, the caseworker has
7    a function. Her -- she went beyond the scope of her
8    function.
9        Q. Okay. If you have a caseworker who hasn't seen --
10   hasn't performed her duties for four months.
11       A. How do you know she hasn't performed her duties?
12       Q. And is recommending to the Court that the Court
13   terminate a parent's rights with respect to her children, is
14   that not something that anybody would -- should be concerned
15   about?
16           MR. DEVLIN: Objection to form.
17       A. I don't know that that was the case in this
18   matter.
19       Q. I'm sure you don't.
20           MR. JOYAL: Neither do you, Mr. McNair.
21       Q. Assuming it was.
22           MR. LANE: Objection to form. Lack of foundation.
23       Requires speculation. Overly broad. You can
24       answer, if you can.
25       A. I don't know that that was the circumstance here.

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 37 of 71

Conley v. County of Erie, et al.                                         John Onorato

36 (Pages 141 to 143)

141

1   And I cannot -- I don't choose to speculate.
2       Q.   And it's your opinion -- I'm not asking you to
3   speculate. I'm asking a hypothetical question.
4           MR. LANE:  It requires speculation.
5           MR. McNAIR:  I provided the facts.
6           MR. LANE:  It's not --
7           MR. McNAIR:  It's a hypothetical question.  I
8       provided the facts.
9           MR. LANE:  You didn't provide all the facts.  It's
10      way too broad.  It would require speculation.  You
11      know that.  Come on.
12      Q.   And you're saying you need to be a degreed social
13  worker in order to determine whether someone is displaying
14  appropriate parenting skills.
15          MR. JOYAL:  Objection.  Overly broad.
16      A.   We all can have opinions.  However, the opinions
17  that her -- what she was doing was exercising her judgment
18  for that of clinical judgment of professionals.
19      Q.   I'm asking you whether or not a person who does
20  not have a degree in social work is capable of commenting on
21  the parenting skills of another person.
22      A.   It depends on the person.
23      Q.   Okay.  Well, you know Abby is not capable of that
24  for what reason?
25      A.   I don't know Abby at all, so I don't know whether

142

1   or not she is or not.  I only know her -- as a matter of
2   fact, this meeting and the September -- and the depositions.
3       Q.   Speaking of the September 10th meeting.  The union
4   representative asked you to see the e-mails that you were
5   talking about, didn't she?  Do you recall that?
6       A.   I don't recall that.  I know we had them there.
7   And I think we may have -- I know we had them.  I had the
8   packet of information which Mr. Cauley provided for us.  I
9   literally went through Item 1 and really stuck with Item 1.
10  And advised of the e-mails.  And I showed Abby the e-mails.
11  I said, isn't this true that you sent this, isn't it true,
12  Abby, that you sent this to Deanna Cosby, isn't it true that
13  you sent it to her with intent that she knows what's going
14  on.
15      Q.   You're telling me that you made those
16  statements -- you made those statements in the presence of
17  the union representative.
18      A.   I believe I did.
19      Q.   You believe that?
20      A.   Um-hum.
21      Q.   What do you mean you believe it?  Either you did
22  or you didn't.  Under oath, did you or not?
23      A.   I think I did.
24      Q.   You think you did.
25      A.   My recollection of that is that I did that, yes.

143

1       Q.   Okay.  But you're not sure?
2       A.   It's my recollection, so.
3           MR. McNAIR:  That's it.
4           MR. LANE:  We'll read.
5
6           (Deposition concluded at 2:15 p.m.)

Conley v. County of Erie, et al.

John Onorato
Page 1

---

**A**

**ABA** 6:21
**Abby** 1:3 4:8
  27:7 28:16
  33:13 36:11,17
  38:23 40:5
  49:25 50:3
  53:20 57:19
  58:14,21 59:1
  59:17,21 60:11
  64:9 70:6,23
  71:2 74:25
  76:1,23 78:15
  79:22 82:20
  94:18 109:8
  114:17 119:14
  121:8 122:24
  124:25 125:2,6
  128:8,18
  136:23 141:23
  141:25 142:10
  142:12
**Abby's** 31:4
  38:14,18 51:2
  59:23 67:14
  68:9,17
**Abby@iloveje...**
  124:25
**ABC** 28:25
**ability** 39:23
  131:20 133:15
  136:10
**able** 37:25 50:15
**absconded**
  137:18,25
**absconding**
  134:6
**Absolutely**
  87:20 88:24
**abuse** 53:21
  119:13,21
  122:9
**abused** 106:16
**abusing** 134:3
**accept** 98:16
**acceptable**

109:18 116:15
**accepted** 12:13
**accident** 52:23
  52:25
**accidental** 53:1
**accord** 116:20
**account** 55:18
**accuracy** 73:11
**accurate** 61:1
  72:22 73:6
  104:20 115:14
**accurately** 73:2
**accused** 56:25
  57:4,5 108:21
  109:2,2,3
  131:15 133:5
**accusing** 126:1
**achieves** 52:10
**acknowledge**
  130:12
**acknowledged**
  72:8,20
**acknowledging**
  80:4
**acquainted**
  102:8
**act** 33:4 42:11
  44:1 85:22
  86:5 91:13
  92:1 117:16
**acted** 32:23
  110:24
**acting** 49:22
**action** 1:4 27:24
  49:20 60:12
  69:18 70:10,15
  71:5,18 80:20
  96:18 101:7,20
  109:8 130:15
**actions** 49:18,22
  51:12 52:10,11
  81:25 91:1
  94:5 115:17,23
  136:24
**active** 12:22
**activities** 51:10

103:18
**acts** 106:12
**actual** 67:1 84:8
  127:14
**add** 16:23
**addition** 50:14
  54:5 60:8
  86:19 88:8
  112:22
**address** 5:6,9
  125:3 130:9,16
  130:19
**adhere** 91:17
**adhered** 93:11
**adjunct** 13:14
  13:24
**administration**
  21:23 55:24
  61:12
**administrative**
  18:12 21:21
**admit** 108:8
**admitted** 131:20
  132:25
**adult** 139:4
**advice** 20:24
**advise** 31:1
**advised** 15:17
  142:10
**advising** 76:25
**affect** 83:18
**affiliated** 29:20
**affiliation** 29:24
**afforded** 107:18
**agencies** 91:22
  93:12 123:14
**agency** 33:16,21
  47:25 91:10,11
  91:24 92:6,11
  92:18 93:13,17
  93:20 94:3
  95:4
**agree** 4:20 35:6
  35:10 43:20
  45:14 46:25
  92:25 94:18

99:18 106:14
  113:6 121:1,2
  139:12
**agreeable** 4:25
**agreed** 51:18
  98:3 114:9
**agreement** 65:2
  74:15,21 97:25
**ahead** 72:13
  87:14 88:20
  107:8
**aides** 134:24
**allegation** 26:13
  31:12 34:23
  37:18 38:15
  39:3 42:13
  44:24 49:11
  53:20 54:9
  95:13 96:17
**allegations** 26:8
  26:19 28:4,8
  54:25 96:11
  119:8
**alleged** 49:15
  132:24,25
**allegedly** 33:3
  49:5 122:4
  124:13
**alleging** 33:14
  36:22
**Allgeier** 96:5,7
  114:4,18
**allocations**
  95:16
**allow** 132:16
**allows** 136:8
**alteration** 116:6
  116:10
**altered** 124:13
**altering** 82:1
**ambiguous**
  26:14
**amended** 98:8
**amendments**
  13:1
**American** 6:17

**amount** 100:24
  101:3 102:2,17
**Angelone** 2:4
  88:22 89:6,8
  108:3
**anger** 50:16
**Ann** 41:5 63:10
  67:23
**annually** 19:23
**answer** 5:3,3
  16:1 20:8
  22:16 25:3,10
  26:22 27:22
  43:2 45:8,9
  49:2 52:12,18
  53:9 59:1
  62:21 65:4,18
  68:14,24 80:23
  81:4,9,10,17
  85:14 87:2,14
  87:15,17
  102:24 105:13
  107:5,6,9,14
  107:16,17,18
  107:19,21
  108:18 109:1
  110:9 111:2,8
  140:2,24
**answered** 58:24
  96:21
**answering** 86:25
  138:12
**Anthony** 2:4 5:8
**anticipation**
  62:17
**anxious** 62:16
**anybody** 40:5
  51:3 70:17
  71:5 75:14,21
  78:4 84:9,14
  129:15 140:14
**anyway** 99:14
**apparent** 120:24
**apparently**
  138:9
**appeal** 100:1

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 39 of 71
Conley v. County of Erie, et al.

John Onorato
Page 2

101:19
**appeals** 99:23
103:8
**appear** 103:18
126:6
**appearance**
17:21 24:11,16
25:2,3
**appeared** 72:6
**appears** 60:18
**appended**
112:15,20
**applicable** 139:8
**applied** 83:20
**appointed** 15:10
15:10,11,11
16:21 21:16,19
**appreciate** 87:11
**approach** 30:11
**approached**
33:12 37:14
45:16 119:5
128:1
**approaching**
30:23
**appropriate**
34:22,24 51:11
56:1 60:13
91:20 93:2
115:19,24
141:14
**appropriately**
110:24
**approval** 91:23
97:8
**Approximately**
12:17
**April** 1:20
124:19 125:7
125:13,17
**area** 46:1,2,4
**areas** 13:22
118:7,7
**argue** 107:5,9
**arguing** 134:14
**argumentative**

57:25 120:6,25
126:17,20
130:1 134:13
135:3,22 137:2
**arising** 4:9 82:25
**arose** 20:25
21:10 79:13
**arrival** 78:2
**arrive** 75:3
76:10,17
**arrived** 77:1,3,7
77:14
**arriving** 77:25
**article** 4:17
71:25 72:5,8
73:8,10,11,16
103:22 104:3,9
104:10,13
115:3,6,9,18
131:13
**arts** 5:25
**ascertain** 32:8
**aside** 14:11 16:6
21:10 26:6
29:25 33:2,5,8
49:15 108:25
127:24
**asked** 21:5 27:21
34:19 38:3
57:22 58:14,17
58:21,24 59:1
59:3 61:19
67:20 87:23
89:15 96:21
98:5 100:9
105:15 107:8
111:3 112:16
116:22 120:9
128:14 129:15
129:15 133:14
133:15 139:16
142:4
**asking** 4:17
15:25 22:19,19
22:20,21 23:16
36:7 48:25

51:24 52:2
56:15 62:20
70:17 80:22
85:11 87:6,7
88:17 89:10,22
94:13 101:6,6
101:10 106:9
107:23 108:3,5
108:20 112:5
114:12,14
123:16 129:14
133:3 138:4
141:2,3,19
**asks** 36:10
121:17,18
**aspirin** 19:18
**assist** 38:5
**assistant** 9:3
10:11 50:8
100:8 103:1
**assisted** 15:16
**associate** 7:19
8:2 13:16 14:4
14:24
**associated** 85:2
**Association**
14:19
**assumed** 38:8
**Assuming**
140:21
**assumption**
24:23 38:11
**Assure** 91:20
**attached** 90:23
112:24 113:9
113:11,21,22
**attachment**
124:20
**attachments**
62:7 112:23
121:7
**attempt** 7:4
**attempted**
132:23
**attend** 76:12
**attended** 5:19

6:7 17:14
85:19
**attention** 27:16
56:10 79:19
115:1
**attorney** 4:8
9:12 11:5,13
14:2 21:5
25:22 31:8,15
33:24,25 36:1
50:3,12 52:21
56:12,23 57:9
59:24 70:13
71:2 82:8,12
82:18,21,22
83:4,6,8,10
84:21 85:7,8
96:5 102:25
112:2 127:10
136:1
**attorneys** 9:14
9:15,17,20
83:23 84:2,4
**Attorney's** 82:9
85:4 130:24
**attorney/client**
22:15
**audit** 100:23
101:5,6,10,12
**August** 7:3
13:25 32:19
34:9,10,12
47:4 60:19
61:9 63:21
65:19 90:23
95:14 112:14
113:16 118:24
119:1,3,6
120:15,21
122:8 123:17
123:18 131:13
139:13
**author** 61:16
**authorized** 40:6
**award** 6:21,22
**awards** 6:13

**aware** 19:13
28:19,21,23
29:6,10,11,15
29:18,24 36:13
45:20,22 46:11
46:16,20 88:12
95:15 96:15
97:1,16 99:25
106:14,18
108:10 109:7
121:4 122:7
123:6 128:19
132:22 137:17
137:20,24
138:4,19
**a.m** 1:21
**a/k/a** 1:6,12 2:7

_____
**B**

**B** 1:3
**baby** 46:6
**BAC** 39:24
55:16
**Bachelor** 5:25
**back** 10:4 22:6
26:15 44:12,16
45:12 68:23
88:14 92:22
105:17 115:1,6
117:14 118:3,4
124:11 131:3,4
**background**
5:13
**bad** 134:6
**Bank** 12:13 13:6
**bar** 6:23 7:11,12
8:2,7 12:22
50:9
**bargaining**
74:15
**based** 12:4 31:25
114:17 136:23
**baseless** 54:16
95:16
**Basically** 68:2
**basis** 18:16 49:2

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 40 of 71
Conley v. County of Erie, et al.                        John Onorato
                                                            Page 3

68:1 109:24
116:7
**Bayfront** 29:5
**began** 7:24 8:12
8:17 10:23
13:24 35:16
69:17 71:12
78:17 79:7
**beginning** 37:9
63:18 76:18
**behalf** 17:21
24:17,22 98:17
**behavior** 47:5,8
47:13
**believe** 15:23
23:14 26:5
27:18 28:1
29:4,5 30:10
33:5,19 36:14
37:4,5,23,25
38:13 39:13,15
39:20 41:5
43:22 45:7
48:6 50:11,14
51:10,17,17,21
51:21 52:1
53:22 55:5,18
60:7,15,19
61:2,11,18,19
61:19 62:3,3,4
62:10 63:9
65:21 67:4
69:25 70:2
75:5 77:16
79:8,10 83:7
85:18 91:8
92:19 93:7,15
93:18 95:7,10
96:14 97:13
98:6 99:21
100:6 105:2
111:14 115:16
116:9,9,19,19
117:19,19
121:4,16
124:19 126:3

128:15,17
130:3 139:10
140:5 142:18
142:19,21
**believed** 19:12
33:21 135:19
**believes** 136:12
**best** 26:24
136:12
**bet** 126:4
**better** 41:22
46:1 134:25
139:21
**Beveridge** 50:12
50:12
**beyond** 71:15
115:20 140:7
**bill** 103:11,14,15
103:18,25
129:14
**bills** 13:2
**birth** 42:9,9
45:19
**bit** 63:20
**Blackwood**
50:13,14
**blocks** 29:1
**Bloxdorf** 41:5
62:1,4 63:10
67:23 76:12
**Board** 29:23
**body** 93:18
**bond** 12:15 13:7
**born** 83:12 95:8
134:11 135:13
**bottom** 98:15
115:9,10 116:5
124:23 125:9
**brain** 88:18,22
**breach** 47:5
118:9,10
119:10
**break** 30:16
76:7
**Breon** 21:23
**brief** 62:21

69:12,14
**briefed** 62:3,4
66:7
**briefly** 73:17
**bring** 79:22
95:13
**bringing** 85:6
**Brittany** 20:22
21:11
**broad** 25:21
26:14,21
140:23 141:10
141:15
**brought** 27:16
37:21 56:9
61:14 69:19
70:17 78:13,21
78:22 82:6
**Bush** 16:11,20
**Business** 10:13
13:18

_____
## C
C 124:20
**calendar** 66:19
66:20,21
**Calkins** 7:15
**call** 57:1
**Callan** 1:9 2:10
40:25 61:19
62:6 63:9
67:22 74:25
75:6,13,25
76:9 77:17,17
78:18,19 79:18
80:2 99:2
**Callan's** 75:8,9
76:9 81:21
**called** 21:22
96:14 126:4
**calling** 135:11
**Calls** 120:6
**campaign** 10:25
11:1,3,4,9,10
11:10,11,15
12:19 15:13,21

16:2,6,7,16,22
17:2
**campaigns** 16:8
16:10 17:7
**candidate** 15:18
16:18,19
**capable** 141:20
141:23
**capacities** 9:1
**capacity** 1:8,10
1:11,14 7:22
7:23 16:12
50:10,11
**car** 59:10
**care** 106:19,24
108:22 133:6
133:25 134:10
**caring** 107:2
**Carol** 1:19,24
**Carolina** 42:7
**carpet** 57:2
**carry** 96:18
**case** 4:8,12,19
18:6 22:24
23:13 24:14
26:6 27:9,17
30:5 35:25
46:8,25 50:23
70:13 86:17
92:8,12,13,14
94:19,21 95:6
96:23 99:8
100:1,18 102:8
110:2,18,21
115:14,18
119:9 129:12
140:17
**cases** 17:17
22:25 23:20
24:4 25:5,5,14
25:24 26:3
35:20 86:13
92:3 100:12,16
102:15 105:5
122:18
**caseworker** 42:7

44:23 53:21
54:10 95:17
119:7,9,11
139:17,19
140:6,9
**Cauley** 22:5
30:4,11 32:21
33:2,4,12,20
34:2 36:1
39:11,18 40:11
41:7,25 45:16
46:1 49:15
50:8,14,16,20
51:24 52:6,14
53:19 56:13,15
57:19 60:1,18
60:20 61:4,14
67:20,23 68:8
84:21 85:1
95:12,20 96:4
111:14 112:2,7
112:21 114:4
114:18 118:19
118:25 124:14
126:3,7 132:15
142:8
**Cauley's** 32:23
37:17 38:15
44:24 47:9
50:4 60:14
61:1,23 66:8
77:23 90:23
112:13 113:16
118:5 131:3
**cause** 80:6 98:19
110:17
**causes** 92:15
**CC** 61:23
**cells** 70:25
**Center** 2:12
**certain** 108:9
**certainly** 38:5
40:24 51:18
99:15,16
112:19 122:15
132:22 134:1

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 41 of 71

Conley v. County of Erie, et al.                                    John Onorato
                                                                   Page 4

134:22 135:4
**cetera** 123:15
**chair** 15:25 16:2
**chance** 20:7
**change** 116:19
    132:4
**changed** 29:25
    116:3,17,22
    117:2
**characterizati...**
    51:9 121:2
**characterize**
    15:9 36:1 56:7
    95:23
**characterized**
    74:6 112:3
    116:10,10,14
**charge** 106:19
    108:22
**charged** 103:12
    131:12
**charges** 130:25
**Charter** 17:9
**Chatham** 2:12
**check** 37:19
    38:20 59:25
**checked** 60:4
**checking** 37:22
    120:16
**Chertoff** 129:7,9
**chief** 12:2,7,20
    17:11
**child** 1:6,13 2:7
    21:3 42:8,9
    45:19 53:21
    84:7,23 85:17
    91:12 92:1
    94:8 95:7,8,10
    95:10 106:2,3
    106:16,19,24
    107:2,2,24,25
    108:1,22 109:4
    109:5,9 111:25
    117:16 119:13
    119:21 122:9
    134:11,17,18

134:20 135:12
    136:13 137:25
    139:3,19
**children** 1:6,12
    2:6 4:11 18:17
    18:18,20,21
    19:3,5,8 20:11
    20:17 21:25
    22:13,23 24:9
    24:14,20 25:15
    25:25 26:9
    30:3 50:10
    70:20 74:16
    95:9 104:18
    105:1,8,21,23
    106:10,11,12
    109:12,13,22
    119:5 122:14
    133:1,6,6,9,12
    133:16,24
    134:3,6,7,10
    137:18 139:23
    140:13
**choose** 58:19
    102:20 141:1
**chose** 60:12
    100:3 103:4,5
**chronology**
    41:18
**circumstance**
    136:5 140:25
**circumstances**
    20:15 120:20
    122:16 136:4
**City** 17:8 28:24
**civil** 1:4 22:24
    22:25 23:10,13
    23:20 24:4
    44:8 99:23,25
    100:12,22,23
    101:1,4,19,22
    103:8,13
**claims** 117:6
**clarify** 4:24
    101:14
**classified** 43:8

**classify** 114:8
**clear** 4:21 51:1
    57:9 58:8
    64:12 67:18
    79:18 86:8
    127:25
**clearly** 119:11
**clerical** 119:4
    120:3
**clerk** 7:24
**client** 22:17,21
    23:1,14 26:5
    26:25,25 28:16
    32:16 42:6
    45:3,18 46:22
    46:23,24 67:3
    69:18 85:5
    86:8 88:10
    91:9,21 92:4
    92:20 93:3,4
    95:6,11 108:16
    111:2 126:4,25
    129:22
**clients** 14:13
    22:18 91:14
    92:16 95:2
    121:22 122:13
**client's** 65:22
    91:1
**clinical** 141:18
**coaching** 89:24
**code** 101:22
    118:20 139:8
**collected** 29:2
**collection** 29:3
**collective** 63:23
    64:3,21 74:15
    114:7
**come** 31:24
    32:11 45:12
    48:11,12 49:17
    49:21 51:25
    52:9,19 57:10
    59:22 61:4
    70:11 75:14,21
    76:19 124:1,3

125:2,19
    126:25 141:11
**comfortable**
    72:19
**coming** 136:9
**commencement**
    32:7
**commencing**
    1:21
**comment** 98:18
    98:24
**commenting**
    141:20
**commission** 18:9
    23:20 24:5,18
    24:19
**committee** 10:25
    11:1 12:19
    15:19,24 21:8
**common** 18:8
    24:8 26:4 94:3
    131:25
**Commonwealth**
    1:20
**communication**
    83:21
**company** 24:15
**compensation**
    18:10,10 25:14
    98:1 99:9
**complaints**
    119:6
**complete** 8:14
**completely**
    45:15 58:9
    114:9
**compliance**
    74:20
**computer** 38:18
    39:25 55:5,7
    59:23,25 60:4
    60:8,9 113:21
    118:11,12
    125:3 127:5
    128:9,19,22
    129:2

**computer-use**
    37:24
**concern** 27:11
    27:16 31:2,6
    32:23,24 33:9
    33:13,23 35:17
    35:18,19,19
    38:5 55:16
    58:3 104:22
    118:8 129:23
**concerned** 32:21
    50:4 52:14
    70:12 134:12
    140:14
**concerning** 4:16
    38:14 39:3
    40:2,5,5 47:25
    54:9 107:23
    120:22 121:19
    122:13 136:25
**concerns** 31:4
    33:10,20 53:23
    58:4
**conclude** 107:13
**concluded** 143:6
**conclusion**
    26:18,20 31:24
    39:17 120:7
    124:4
**concurrence**
    66:9 97:14
**conduct** 21:5
    48:15 50:15
    82:25 84:9
    118:13
**conducted** 27:2
    27:15,20 51:10
    97:11,12,13
    100:23
**conducting** 27:6
    35:13
**confidence**
    91:15
**confidential**
    23:3 83:25
    84:3 86:13

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 42 of 71

Conley v. County of Erie, et al.                                        John Onorato
                                                                       Page 5

92:16 95:2
105:20 109:20
109:24,25
110:10,14
111:10,24
112:3,6 118:1
119:23 122:18
135:10,20
136:6,25
**confidentiality**
47:6 79:3
83:13,19 86:9
90:10,25 91:8
91:11,16 92:19
110:4 117:22
118:9,10
119:10 120:2
122:12 123:1,3
**confirm** 99:10
**confirmation**
122:25
**conflict** 92:15
**confrontation**
74:19,23
**Conley** 1:3 4:8
4:15 28:16
29:8,12,16,19
30:2,20 32:6
32:22,23 33:4
33:21 36:4,11
36:22 37:14,20
40:5 42:13
44:24 47:24
48:22,23 50:21
53:16 54:9
55:4 56:11,15
57:1,19,22
58:9 62:24
63:2 64:13
65:10 66:11
67:1 69:23
70:6,10,23
71:2 72:10,16
72:20,22 74:20
75:24 76:10,19
76:22,25 77:14

77:16,17,18
78:18,20 79:16
80:9 81:24
82:17,20 96:12
96:19,20 97:18
97:23 99:4,25
105:25 106:15
106:18 108:21
109:8 111:10
116:17 117:1,5
119:14 121:9
122:24 124:5
124:14,18,25
125:6 126:8,12
128:8,18
129:16,19
130:3,6 131:19
131:20 132:4
132:19 133:4,8
136:23 139:16
139:20
**Conley's** 27:7
31:2,6 33:13
36:15,17 39:10
39:13 40:7
47:14 49:5
63:14 67:12
79:7,9,13
82:25 96:23
98:6,24 104:25
106:4 114:2
116:6 125:3
**connection**
21:10 44:22
104:13
**consider** 13:4
53:13 78:1
94:2
**considerable**
100:24
**considered**
95:11
**constitute** 48:2
82:2
**constituted** 48:6
104:25 105:22

106:1 110:17
**Constitution**
93:24
**construed** 93:19
95:7
**consult** 91:19
**consulted** 21:7
**contact** 18:18,22
18:23 19:4,7
19:13 20:10,21
22:3,4,8 39:24
73:14 92:12
130:22
**contacted** 18:25
19:2,11 20:16
21:24 130:22
**contain** 116:25
**contained**
117:25
**content** 41:12
104:21
**contents** 39:9
40:8 61:21
67:9,24
**contest** 98:1
99:8
**context** 70:8
79:25
**continue** 11:25
12:10 14:4
**continued** 8:1
10:23
**contract** 9:13
10:21,24 47:23
50:10 103:1
**contractor** 55:17
**contrary** 106:6
**control** 138:6
**conversation**
68:25 73:20
82:11 131:10
**conversations**
121:4
**coordinated**
29:3
**copies** 58:8

**copy** 31:9,14
33:25 60:17
61:1,22 62:10
66:23 72:5
81:14,20 104:2
104:7 117:15
**correct** 8:3,22
10:3 11:11
12:9 24:15
32:20 35:1,4,5
61:25 71:21
74:16 75:11
76:2,11 95:1
97:17 99:24
100:2 104:19
114:18,19,21
117:23 119:15
119:16,17
121:6,24
122:10 124:2
130:5,20
131:24 132:6
135:8,23,24
136:10,11,14
136:18 137:8
**corrections**
132:3,4
**correctly** 33:11
96:22 99:9
**Cosby** 74:13
80:5,7 82:19
84:10 121:9,19
128:15 142:12
**couch** 80:19
**counsel** 14:19
**counseled** 47:8
**counseling**
47:23,24
**country** 134:19
**County** 1:5,5,6,8
1:8,10,12,13
1:14 2:6,6,7,19
4:9 15:3,7,10
15:11,12 17:8
17:9,11,12,15
17:16,22 18:11

18:19 19:8,9,9
19:11 20:12
21:14 22:11,23
22:25 23:11
24:13,17,22
25:6,13,18,25
26:1 30:17
32:16 36:2
39:22,23 47:12
47:13 51:7
53:15 54:6
55:3,11,18,20
55:24,25 56:8
56:9,14 58:20
59:8,8 66:21
67:4,25 74:14
82:9 86:17
88:14 89:15
96:25 98:17,23
98:23 99:11,17
99:17 100:10
100:24 101:21
102:4,25 103:2
105:3 109:12
109:19 115:11
115:12 118:11
118:12,20
124:17 126:9
128:18 129:2
129:14 132:21
133:19,21
134:15
**County's** 4:10
89:12 102:10
129:1 137:9
**couple** 4:13
**course** 12:23
17:25 18:19
19:3,5,9 20:11
36:11,23 39:10
49:23 58:15
67:20 81:24
131:18 132:7
139:18
**courses** 13:20
**court** 1:1 17:17

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 43 of 71
Conley v. County of Erie, et al.                John Onorato
                                                Page 6

17:22 18:6,7,8
24:8,9,13
25:24 26:3,4
42:8 43:6 44:9
45:25 64:14
82:1 93:15,21
93:25 94:3
102:10 116:7
116:17 118:4
125:11 130:23
130:25 131:16
131:23 132:8
132:16,20
135:1,19 136:2
139:22 140:12
140:12
**courthouse**
40:20
**courtroom** 32:9
32:12 45:3
58:2 70:13
**courts** 24:8
93:18 135:5
**CPSL** 84:16,18
85:25
**created** 38:17,18
**credibility** 31:5
32:25 33:15
34:1 58:3
**credit** 14:7
**credits** 10:10
**criminal** 21:5
82:2,25 83:3
83:16 85:2,12
85:13,15,18,24
86:19 88:9
**criminally**
131:12
**cross** 16:19
**Cross-Examin...**
3:5 117:9
**CSA** 117:15
120:24
**CSH** 125:14
**currently** 14:18
**custody** 107:3

107:24 108:1
133:25
**customary**
100:21
**cut** 44:1 79:21

----

**D**

**D** 1:22 2:2 3:1
**Dahlkemper**
10:13
**daily** 20:13
**damning** 114:23
**date** 30:13 32:9
32:12 60:16
61:10 63:12
66:13,13
**dated** 60:15,19
61:9 124:19,24
125:7,13,17
**dates** 34:15
65:23 66:18
99:10
**Dave** 24:25
**David** 25:13
**day** 19:24,25
28:17 30:9
36:15 61:10
62:24 65:22
67:4,6,7 99:16
107:8 132:8
**day-to-day**
18:16
**deal** 119:20
**deals** 117:19
**dealt** 48:3
**Deanna** 74:13
80:5,7 82:19
84:10 121:9
128:15 142:12
**death** 20:21 21:3
21:8,11
**Deb** 21:3,12,15
40:16,17,24
41:20,20 63:10
67:23
**debate** 29:12

**Debbie** 61:23
**Debi** 64:10
**Debra** 1:10 2:10
99:1
**December** 8:8,9
**decide** 36:10
**decided** 44:14
67:25 95:20,25
**decision** 4:14
35:24 63:13,22
63:23,25 64:3
64:6,9,11,18
64:19,20,22,24
65:1,6,9 66:9
67:10,24 68:1
68:8 72:19
96:18 114:2,2
114:6,8,9,15
114:16
**defend** 99:23
106:3 109:12
109:13
**Defendant** 2:14
4:12
**Defendants** 1:15
2:10
**defender** 50:8
**defense** 7:20
81:6,7 104:18
**define** 15:20
18:6,20 27:4
**degree** 5:24
10:14 141:20
**degreed** 141:12
**degrees** 134:25
**deliver** 127:7
**Dell** 2:15
**Democrat** 29:22
**demonic** 96:15
**deny** 130:7
**department**
10:12 28:6
31:5 32:25
34:1 35:21
49:1 58:4,10
64:8 79:4 83:9

83:24 86:9,12
86:15 91:11
95:11,16
105:21 109:21
116:1,12,20
119:4 120:3
122:2,14 135:5
138:3 139:9
**departments**
22:9
**department's**
50:22 64:3
**depended** 20:15
100:18
**dependency**
50:23
**depends** 141:22
**Depo** 61:1
**deposition** 1:18
3:10,11,12
60:18 71:22,25
81:1 88:25
89:24 98:9,12
104:5,8 107:13
108:7 113:16
143:6
**depositions**
42:23 138:6
142:2
**described** 44:23
68:7
**designate** 91:5
**desk** 77:18
**despite** 79:18
99:1
**detained** 135:13
**detective** 82:9
**detention** 48:20
48:23 74:12
78:10 79:1
80:8 83:12
84:23 88:13
91:2 92:21
106:1 136:25
137:3 138:1
**determination**

36:21
**determine** 31:17
31:20 35:7
59:7 86:4
110:12 113:7
141:13
**determined**
38:20 136:22
**determining**
32:5
**Deveney** 115:13
116:17 117:2
119:7 122:22
124:19,20
125:6,13
130:25 131:11
131:11,15
132:3
**Deveney's**
115:17,23
**Devlin** 2:7 51:6
52:7 137:12
140:16
**diagnose** 140:2
**Dible** 69:6,9
71:10 73:21
**Dickinson** 6:7,7
6:14,18
**difference** 47:11
47:15,17
**different** 4:13
25:9 46:24,25
85:22 108:24
126:2
**difficult** 20:4,9
**difficulties**
20:25
**diligence** 28:6
**direct** 3:4 4:4
12:5 79:19
111:2 114:24
130:12
**directed** 127:9,9
**direction** 127:2
**directive** 124:4
**directly** 39:6

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 44 of 71

Conley v. County of Erie, et al.                    John Onorato
                                                    Page 7

78:25 114:8
**director** 1:10,12
  21:16,16,19,22
  22:5 27:18,21
  27:23 28:14,25
  40:14,15 61:18
**disagreed** 65:5
  65:10 116:6
  134:23
**disciplinary**
  49:20
**discipline** 35:9
  49:14,17
**disciplined**
  54:22
**disclose** 47:25
  98:18
**disclosed** 94:4
**disclosure** 84:22
  85:3 118:10
  124:17 138:1
**discovered**
  118:25
**discovery** 9:13
**discrete** 92:7
**discretion** 55:10
  56:2
**discuss** 40:8
  62:1 71:4,9
  77:19 78:4,18
  82:17 83:4,6
  92:15
**discussed** 21:4
  34:3 35:18
  39:21 53:22
  67:23,24 69:15
  70:22 77:13,21
  77:24 78:2,6
  78:11,15 92:6
  92:14,17 95:3
  95:19 96:3
  99:22 119:9
  123:13
**discussing**
  103:25 124:6
**discussion** 35:22

39:9 42:2,15
  53:18 70:3,19
  71:1 76:25
  79:11 92:8
  94:11
**discussions** 78:8
**dispensed** 42:6
**dispensing**
  64:16
**displaying**
  141:13
**disposed** 21:6
**disrespectful**
  89:1
**disseminate**
  98:18
**distinction**
  103:6
**district** 1:1,1
  11:5,13 21:4
  24:8 26:4
  28:25 29:23
  71:2 82:8,8,17
  82:21,22 83:4
  83:6,7,10 85:4
  85:7,8 130:24
**disturbing** 45:2
  45:13,14 52:22
**divulged** 135:20
**doctor** 19:16
**doctors** 140:3
**document** 31:9
  31:15,21 32:6
  33:3,14 34:4
  34:20 37:2,8
  37:15 38:15,17
  42:14,15,18
  44:25 49:5,25
  52:20 56:12
  57:5,8,20,23
  58:4 62:13
  67:9,21 89:18
  89:20,21,25
  98:4 104:15
  115:21 116:25
  125:20 126:8

126:13 127:3
  127:14,15,22
  129:16,21,22
  129:23
**documentation**
  89:16
**documents** 13:7
  66:8 113:9,11
  113:18,20,23
  129:1 131:17
**doing** 10:23
  12:14 27:21
  41:21 47:4
  103:8 132:12
  141:17
**Dombrowski**
  82:10
**door** 133:15,16
**dot** 84:12
**doubt** 112:4,9
**Dowes** 24:25
  25:13
**dozen** 100:12,13
  100:16
**DPW** 124:1
**draft** 31:8,14
  32:6 33:24
  34:1 44:25
**drafted** 60:7
  98:4
**drafter** 60:7
**drafting** 13:1,6
  15:17
**draw** 115:1
**drives** 29:8
**due** 28:5 65:15
  80:21 91:16
  100:6 138:16
**duly** 4:2
**Dunlavey** 16:23
**duties** 12:21,24
  17:7,14 18:19
  19:3,5,9 20:12
  140:10,11

———— **E** ————

**E** 3:1
**Earll** 11:4,7,22
  12:2 16:6
**Earll's** 12:19
**Early** 63:12
**easy** 127:3
**economies**
  101:22
**Ed** 44:11 70:4
  73:17
**editing** 116:11
**editing/correc...**
  131:16
**editor** 6:18
**editors** 68:25
**Edmund** 2:11
**education** 8:12
**educational** 5:13
**EEOC** 25:5
**effect** 57:19
  82:15 92:20
  120:17 131:13
**effort** 29:12 52:4
  52:13 55:25
**efforts** 16:25
  29:16 37:2
  74:18 109:21
**egregious** 59:2
  79:3
**either** 22:5 24:8
  36:24 50:10
  53:18,19 70:3
  127:7,8 134:2
  134:18 135:1
  136:5 142:21
**election** 11:20
  11:21,24 12:1
  16:25 29:1
**else's** 51:14
**emotion** 50:25
**employed** 7:11
  7:13 8:4,11,23
  10:24
**employee** 14:3
  24:1 26:9
  28:11,13 35:8

36:3 47:7
  49:18,22 51:12
  52:10 53:15
  55:20 56:25
  57:1 64:4,12
  95:15,15 99:17
  101:7,19 102:5
  109:16 118:13
  119:6,8 131:10
**employees** 19:2
  19:4,7 20:11
  24:9,19 35:23
  61:13 74:16
  86:12,18 88:15
  105:4 128:18
  128:22
**employee's** 48:4
  55:3
**employers** 99:12
**employment**
  4:10,14 7:9 8:1
  10:17,22 11:25
  13:11,22 14:10
  14:24 21:25
  22:3,13,22
  24:7,14,18
  25:24 32:16
  34:25 35:3
  49:23 50:11,11
  56:24 63:14
  67:12,15 68:9
  68:17 69:18
  70:10,15 71:17
  77:19 80:20
  97:18 99:10,14
  99:19 101:20
  106:4 109:19
  114:3
**ended** 38:19
  58:5 59:23,24
**engaged** 7:19
  10:10 40:25
**English** 16:11
**enhance** 49:24
**ensure** 74:18
**enter** 24:10,16

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 45 of 71
Conley v. County of Erie, et al.                                John Onorato
                                                                    Page 8

entered 17:21
  25:2,3 46:18
entire 98:23
entirely 51:22
entitled 77:6
  117:24 120:4
entity 23:10
Equal 24:18
Erie 1:5,5,6,8,10
  1:12,13,14,23
  2:3,5,6,6,7,9
  2:19 4:9,10 5:9
  8:10,11 12:5,7
  15:3 17:12
  19:8,9 20:12
  22:23,25 25:13
  28:24 32:17
  47:13 68:20
  72:1,9,15,21
  96:25 103:2
  104:9 128:18
  136:20
Esquire 1:14,22
  2:2,4,7,11,14
  2:14,18
essence 104:16
  135:4
established
  41:13 94:7
esteem 35:21
estimate 18:2
et 123:15
evaluate 56:11
event 21:1 26:18
  32:11
events 30:23
eventually 10:18
  126:22 127:9
everybody 41:23
evidence 38:14
  48:1 59:12
  106:15,18
  108:11 114:23
ex 135:11 136:2
exactly 73:25
  113:17 124:10

127:2 130:14
exam 6:23 7:11
  7:12
examination 3:4
  3:6 4:4 131:18
  137:14
exception 23:1
  133:20
excess 29:2,3
excluded 27:9
excuse 9:25 12:6
  13:16 17:8
  34:11 115:4
execute 98:5
Executive 1:8,11
  15:11 54:7
  67:25
exercise 32:1
exercising
  141:17
Exhibit 3:10,11
  3:12 60:18
  61:1 71:22,25
  98:9,12 104:5
  104:8 115:2
  124:20
exhibits 3:9
  102:9
exigent 136:5
existence 46:11
  48:20 91:2
  92:21
exists 90:10
expect 83:5
  91:14 96:11
expected 123:2,3
expend 58:20
expended 56:14
expenditure
  55:25
expenditures
  103:17
experience
  100:19 103:8
expertise 55:22
explain 42:12

79:5 105:22
explaining 78:25
explanation
  43:3 44:3,4
express 33:20
  50:16
extended 12:2
extension 100:8
eyes 32:25
e-mail 38:9,20
  39:1,22 40:7
  42:15 44:22
  47:22,25 48:2
  49:3 53:11
  56:8,14 57:13
  58:8 60:9
  77:23 78:10
  80:4,17 82:19
  84:5,10 95:21
  95:24,25 96:22
  97:11 104:25
  109:8,10,13
  110:20 121:8
  121:18 122:21
  123:10 124:18
  124:24 125:6
  127:4 129:9
  130:13
e-mailed 38:9,21
e-mailing 126:8
e-mails 37:19,22
  38:14,23 39:3
  39:22 41:12,19
  41:21,25 45:1
  49:9,10,24
  51:2,7 52:1,19
  52:21 53:1
  55:3,14 58:6,7
  58:20 59:8,8
  59:16 79:7,9
  79:11,13
  112:15,16,17
  113:22 121:14
  124:11,18
  128:6,10 129:1
  130:7,9,17

142:4,10,10
————————
F
face 131:15
facilitate 39:25
facilitated 15:16
fact 21:4 35:19
  47:16 48:8,18
  50:24 69:17
  78:24 83:10
  99:1 110:11
  116:15,16
  122:18 125:22
  125:22 130:11
  132:9 134:9
  142:2
factor 122:12
facts 28:3 57:17
  112:13 141:5,8
  141:9
factual 50:19,25
fails 106:25
  107:4
fair 16:24 17:3
  24:5 33:16,19
  65:1 114:1
  126:11 128:21
  128:25
false 36:12
familiar 74:14
  86:15 101:22
  102:9
family 122:4
far 45:2 52:22
  59:2 85:5
  111:16,19
  132:12 134:12
fear 46:5 138:2
Federal 24:18
  26:4 43:6
fee 104:21
feedback 99:11
feel 39:2
feels 4:15
Ferguson 1:25
Fifth 72:12

figure 85:13
file 39:10,13
  46:8,10
filed 4:9 18:7
  25:5,25 53:20
  99:25 101:7,19
  119:14 121:5
filing 130:25
final 67:3
find 10:17,22
  11:25 32:10
  34:3 37:2
  59:11,15 62:15
  89:21 110:21
  125:2,19
  127:13
findings 27:24
fine 24:15
  138:18
fingers 90:17
finish 45:8,8
  81:16 87:1
fired 70:1
  131:14
firing 80:16
  137:6
firm 7:14 8:5
  100:4 102:21
  103:3,4,12
firms 9:19
first 4:1 7:4
  11:15 28:17
  30:2 32:13
  37:21 38:12
  51:7 54:2,4
  59:20,25 60:11
  61:10 63:1
  66:2 67:12
  68:10,16 77:15
  77:17 80:1
  99:7 105:13
  116:8 117:12
  134:20
five 80:24
  118:15,16
flight 46:5

Conley v. County of Erie, et al.

John Onorato
Page 9

**focus** 80:5 118:4
130:10
**followed** 27:5
91:10
**following** 27:10
91:18 116:21
**follows** 4:2
**foreseeable**
138:22
**forget** 50:12
54:16 63:8
84:8 88:2
113:17
**forgotten** 98:7
**form** 25:17,20
26:10,11 27:3
35:11,15 36:9
36:19 38:25
42:16,17 43:13
44:19 47:2,19
48:5,10 49:7
49:16 51:4,5,6
51:15 52:7,8
52:16 53:7,8
55:12 56:3
57:25 58:22,23
59:5,18 64:1,7
65:3 67:9
72:25 74:22
82:4 93:5,7
95:22 97:9
105:24 109:14
111:11 112:1
114:5 139:6
140:16,22
**formalize** 53:23
**formally** 17:21
**formatting**
116:12
**formed** 115:22
**former** 42:7
44:23 103:1
121:19,22
**forms** 91:20,25
93:2
**forth** 17:9 55:8

**86:10** 95:13
112:13
**fortunate** 53:11
**forward** 65:10
95:21
**forwarded**
127:2
**forwarding**
125:5
**foster** 123:14
134:2
**found** 40:9
41:13,22 42:4
42:5 45:13,17
45:18,18 46:22
52:22 53:12
57:13 59:2
67:21 68:1
79:2,9 115:12
115:17,23,25
**foundation**
48:10,13 51:16
86:1 125:21
127:11,16
139:24,25
140:22
**four** 17:25 22:11
23:4 24:3 25:6
25:18 26:1,7
44:14 76:15
81:1 139:19
140:10
**fourth** 115:8,10
**four-year** 24:10
**frankly** 57:13
64:21 96:10
**frequent** 20:21
**frequently** 19:7
19:14 20:16,17
22:2,6,6
**Friday** 30:7 67:4
131:13
**friend** 92:11
94:18,20
**friends** 92:17
95:3

**front** 83:4 90:5
90:12,14,16
94:16
**frothing** 51:24
**frustrates**
109:21
**frustrating**
50:22
**fulfill** 105:21
106:25
**fulfilled** 106:21
**full** 5:6
**fully** 46:11 96:15
**full-time** 13:15
13:25
**function** 106:21
140:6,6,7,8
**funds** 56:1,14
58:20
**further** 114:24

─────────
**G**
─────────

**Gannon** 5:19,20
5:24 6:6 8:12
9:3 13:12,14
13:23 14:5,11
14:25 30:16
**general** 14:18
27:1,4,14
29:13 46:3
**generally** 111:15
**generic** 67:9
**George** 16:11,20
**give** 5:3,3 18:1
20:7 43:3
60:17 85:1
89:17 99:11
117:15 129:21
129:21 139:21
**given** 32:22 46:3
98:11 104:7
120:14 137:4
**gives** 63:18
**giving** 33:3
**glad** 4:24
**go** 5:13 7:9 8:9

**22:5** 34:16
39:5,6 43:10
43:19,20,23
44:14 68:23
72:13 74:7
87:14 88:5,20
92:22 95:20,25
107:8,11 115:6
117:14 118:3,4
124:11 129:10
131:3,4
**goal** 50:22
**goes** 131:7
**going** 4:17 16:12
20:5 22:15
33:24 35:7,11
35:14 36:9
42:24 43:11,17
43:19 57:8
60:17 64:14
68:22 69:3,18
69:24 72:24
85:6 86:20,22
87:2,3,13,21
87:24 88:2,25
89:4 99:16,19
107:22 108:12
108:13 111:5
117:15 120:12
125:13 128:15
131:11,14
135:12 136:17
142:13
**good** 4:7 65:23
66:18
**Gornall** 2:8
**gotten** 34:4
52:20 57:8,10
**governing** 55:3
74:15
**government**
6:22 93:19
99:17,17
**graduate** 5:16
5:20 6:9 9:3
10:10,11

**graduated** 6:5
6:20 7:8
**graduating** 7:1
**great** 111:5
**greater** 41:13
**Griffith** 7:14 8:5
**grounds** 48:3,6
48:19 49:14
**group** 64:23
**guess** 18:1,1
29:21 34:8
64:25
**guy** 81:4
**guys** 80:16

─────────
**H**
─────────

**H** 4:1
**Half** 100:16
**hand** 61:14
128:2
**handing** 89:25
**handle** 100:4
**handled** 22:24
22:25 24:3,22
92:7 100:13,16
115:13
**handles** 86:13
**handling** 20:25
92:14 100:4
**hands** 57:9
129:24
**handwritten**
60:25
**handy** 53:6
**Hang** 86:21
138:5
**happen** 19:15
21:2 134:7
**happened** 21:2
30:18,19,20
32:8 45:2
50:17 53:1
58:2 59:7
60:11 96:24
97:2,4,6
138:20

Conley v. County of Erie, et al.

**hard** 66:23
108:11
**harm** 137:18
**Harrisburg** 12:6
12:8
**head** 64:8
**heads-up** 68:3
**hear** 132:18
138:9
**heard** 35:20
134:5 137:21
**hearing** 30:6,7
30:14,23 31:3
31:21 32:7
33:14 37:9,12
37:12 42:14
50:17 81:15,21
100:17,22
101:1,4,5,7,12
101:12 103:13
109:16 115:12
130:22 135:12
135:15 136:17
**hearings** 101:23
**heeded** 48:9
**held** 35:21 66:3
66:5 76:6
**helping** 89:7
**high** 5:14
**highly** 126:14,16
126:18
**hire** 102:20
**holding** 21:7
28:24
**Holdnack** 1:19
1:24,25
**home** 5:9 9:9
125:3 126:9,21
126:22 127:4,4
**honorable** 50:15
**honors** 6:13
**hopes** 49:13,17
**hospitals** 46:4
**hours** 14:7 88:25
100:21 101:18
101:25 102:3

102:11,14
**Howard** 69:6,10
71:10 73:21
**human** 13:21
18:9 24:17
**hurriedly** 98:4
**husband** 121:20
**hypothetical**
141:3,7

———————
**I**
**idea** 17:20 51:1
51:13,14,19,20
52:9 59:6
68:17
**identification**
71:23 98:10
104:6
**identify** 22:20
84:11 94:8,14
137:19
**ill** 139:3
**Illig** 102:20
103:3,4,12
**illnesses** 140:3
**impact** 96:17
**impacted** 33:15
**implied** 99:15
**importance**
91:16
**important** 79:2
91:9
**improper**
118:10 124:17
**improperly**
44:24 110:24
**improprieties**
131:16
**impune** 119:11
**impuned** 131:10
**inaccurately**
73:15,15
**inappropriate**
51:9 57:6,7
58:9
**inappropriately**

32:24 33:4,25
106:12
**incident** 54:8
123:4,7,8,12
123:19 124:6
**incidents** 54:22
133:24
**include** 26:3
**included** 113:18
**including** 13:20
23:13 26:24
**independent**
55:17 112:5,12
**independently**
28:7
**indicate** 127:21
135:19
**indicated** 82:11
113:17 120:22
128:8
**indicates** 46:10
**indication** 32:5
124:8
**individual** 18:23
28:22 29:2
38:6 39:7
96:13 109:19
114:10 122:17
**individually** 1:7
1:9,11,14
**individuals**
18:24 39:24
54:24 94:20
112:8 139:9
**individual's**
55:14
**infant** 83:12
**inform** 45:25
54:6 67:25
74:5 129:20
**information**
23:2,3 33:22
38:6,7 39:5,8
42:6 47:25
64:16 68:12
80:2,7 83:11

83:22,24 84:3
91:9,15,21,22
92:3,4,6,13,16
93:3,3,12,13
94:4 95:2 96:6
105:2,4,9,11
105:19 109:20
112:3,6 114:3
114:6,10,14,16
114:20,22
117:20,25
118:1 120:5,14
121:19 130:11
136:25 137:4
139:21 142:8
**informed** 41:6
45:21 46:2,4
46:14 48:20
66:2,4,5 67:8
75:1 77:18
79:10 80:1
91:3 92:20
105:25 111:13
111:14 130:13
**informing** 68:2
91:1
**initial** 11:12
48:2 95:12,20
96:3 117:5
**initially** 10:18
21:15 41:11
65:25 78:17
**initiated** 10:16
**injure** 46:6
**injured** 134:17
**injurious** 134:20
**input** 19:10
**inspect** 51:8
56:7,8
**instance** 48:15
109:7 137:20
137:23,24
138:19,21
**instances** 36:12
137:18
**instruct** 39:18

**instructed** 39:20
76:22
**instructor** 13:16
13:25
**insurance** 7:19
24:15
**intended** 5:3
**intent** 42:10
45:21 88:14
91:2 92:21
110:20 142:13
**interest** 136:12
**interested**
108:17
**intermittently**
101:24
**internal** 55:23
**International**
6:19
**interpretation**
37:7 139:7
**interpreted**
104:23
**interrupt** 80:23
81:13 87:1
**interrupting**
87:5
**interviewed** 28:2
119:3 129:7
**intolerable**
86:17 87:3,4,8
109:18
**Introductions**
77:15
**investigate** 28:7
37:17 39:3
124:1
**investigated**
139:10
**investigating**
34:23
**investigation**
26:8,21 27:2,6
27:7,14,20,25
28:4 35:7,9,12
35:16 42:18

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 48 of 71

Conley v. County of Erie, et al.                    John Onorato
                                                    Page 11

43:8 47:4,9
49:4 50:5
58:15 59:21
96:12 112:12
114:24 139:12
**investigator**
124:1
**involve** 12:21
**involved** 9:11
11:2,5 13:1,6
16:22 17:2
20:17 22:11,22
24:2,7,10
25:12,15,21
28:4,11,14
29:8,12 40:1
59:11 66:6
68:3 82:18,18
84:5 91:24
92:11,13 94:19
94:21 110:20
113:4 136:1
**involvement**
18:16 20:24
71:1 100:7
**involving** 22:18
23:1,4 24:9,14
24:19 25:7,8
25:15,24,25
46:23 63:2
70:13 77:24
82:11,19 86:13
129:1 133:24
**in-house** 100:5
**irrelevant** 57:12
81:11 133:13
**issue** 22:2,7,23
30:11 34:3
40:2 45:5,15
50:2 52:5,14
56:9 57:11,12
59:13 63:2,2
71:12 78:10,21
83:10 85:8
110:1 136:2,10
**issued** 46:3

134:11 136:13
**issues** 4:18,19
21:10 22:1,8,9
22:10,12,13
29:13 35:3
130:16
**issuing** 136:16
**item** 77:23 95:13
118:9,9,10,12
118:12 128:1
142:9,9
**iteration** 117:5
**I/we** 98:17

_____
         **J**
**J** 2:18 4:1
**jail** 131:15
**Jane** 11:4,22
12:19
**Jane's** 11:8
**January** 8:17
9:24,24,25
14:22,23 15:5
15:12 103:23
104:9 115:3,5
121:8
**Jerry** 33:15
38:23 39:4
57:20
**Jim** 50:13 69:6
71:10
**job** 10:16 12:4
99:23 106:11
106:21,25
122:19
**John** 1:13,18
2:14 3:3 5:8
27:23 71:13
**join** 35:14 74:24
**Joseph** 2:11
**Journal** 6:18
**Joyal** 2:11 3:5
25:7 35:11
36:9 42:17,21
43:6,12,17,22
44:5,7,11,13

48:17 51:5
53:7 58:23,25
64:1 72:25
74:22 81:16
88:18,21,24
89:7,17 102:22
107:22 108:1
109:14 117:10
120:8 125:24
126:2 129:13
133:14 134:14
137:11 139:2
139:16,24
140:20 141:15
**Joyce** 16:12
**Jr** 2:11
**judge** 32:25
33:16 35:20,21
36:14 81:25
82:14 112:6
130:23 134:11
135:7,10 136:7
136:15
**judged** 54:15
**judgment** 112:5
135:5 139:17
141:17,18
**judgments**
134:25
**July** 30:8,14,24
31:3 32:7
33:14 34:10,11
34:14,19 35:13
36:5,17 42:14
45:16 50:18
79:13,16,23
80:10,13,17
81:14,20
122:21 123:9
123:10,21,23
124:14 127:15
131:19
**June** 121:5,5,10
121:11,12,13
121:18 123:23
123:25 128:7

**jurisdiction**
134:18 137:25
**justice** 82:2,6,14
131:1,12

_____
         **K**
**keep** 42:17
86:12 87:13
102:4 122:17
132:19
**keeping** 115:25
**Kelly** 33:1,16
35:20,21 81:25
82:14 136:7,15
**kept** 80:3,5
91:15 105:11
105:20 130:10
136:6
**kids** 108:2
**kilobytes** 125:15
**Kim** 119:3
**kind** 97:23 139:2
**knew** 29:5,22
37:24 59:15,19
59:23,24 85:23
99:18 123:16
129:15 133:4
**know** 10:7 18:24
24:25 28:2,16
29:2,19,24,25
34:7,24 36:4,7
37:12 38:7
41:6 46:10,20
47:7,10,12
48:23 49:1
51:20 54:21,24
55:13 56:5,6
56:19,21 60:1
62:12,15 64:19
65:14 66:22
69:21 70:14
76:20,21,24
77:8,11 80:14
80:22 81:6
83:22 84:7

85:7,15 86:16
86:20,22 89:10
89:19,20 90:2
90:3,4,9,15
93:6,6,22 94:5
94:21,22,23
97:3,4,5
102:14,19,19
102:19 106:21
108:2,4,6,7,9
108:10,15,15
108:16,20
109:3,10,23
110:3,9,13,19
111:9,12,16,19
111:21,22,23
111:24 112:2
116:2,4 117:3
117:5 118:3
123:18 125:22
125:24 130:14
133:8,10,11
137:22 138:2
140:11,17,25
141:11,23,25
141:25 142:1,6
142:7
**knowledge** 28:3
29:7 30:2
46:17 61:20
63:1,3 67:12
83:17 92:10
97:12 103:22
126:23 127:14
127:22,25
128:3 135:17
**known** 111:15
**knows** 108:20
142:13
**Knox** 2:8,18

_____
         **L**
**labor** 103:1
**lack** 48:10 51:15
86:1 139:24,25
140:22

Conley v. County of Erie, et al.

**Lane** 2:14,15 25:17,19,21 26:10,13,17,20 27:3,7 34:10 34:12 35:14 36:19 38:25 42:16 44:19 45:8 47:2,19 48:5,10,12,14 49:7,16 51:4 51:15 52:8,16 53:8 55:12 56:3 57:25 58:22,24 59:5 59:18 64:7 65:3 72:24 74:24 80:23 81:3,8,13,19 82:4 86:1,3,21 86:25 87:5,9 87:12,20,24 88:2,4 89:23 90:1,4,12,14 90:19 95:22 97:9 103:9 105:24 107:6 107:12,16 108:18,24 109:2 110:15 111:1,4,7,11 112:1 113:13 113:15,25 114:5 115:5 116:22 123:16 138:5,10,14,17 139:6,25 140:22 141:4,6 141:9 143:4
**language** 98:20
**larger** 32:24
**law** 2:11 6:8,17 6:19,22 7:8,14 7:24,25 9:5 10:9 12:21 13:4,18,22 14:14,17 21:25

22:3,23 25:24 35:1 46:1 56:24 84:14,24 85:14,15,18 86:6 91:13 92:1 94:9,10 100:4 102:9 109:5 111:25 133:21
**lawyer** 120:9 122:11
**lawyers** 85:11
**lead** 38:14 82:2
**leaking** 33:22
**learn** 44:5
**lease** 65:15
**leave** 14:1 99:16
**lecture** 43:7 44:6
**lectures** 42:21
**left** 13:11 14:10 21:17 76:8
**legal** 17:11,15 26:17,20 109:24 120:4,7 139:1
**legislation** 13:1
**legitimate** 138:2
**Legler** 20:22
**Legler's** 21:11
**lengthening** 42:23
**lengthy** 69:12 113:23
**Lerman** 7:14
**letter** 60:19 90:5 95:14 98:12 112:14,24 113:15,16
**let's** 8:17 43:10 59:10 67:18 68:23,24,24 115:6 123:5 124:11,12
**level** 137:22
**liability** 91:17
**liar** 126:1

**libelous** 4:16
**Liberty** 2:5
**library** 29:4
**licensed** 135:1
**lie** 48:17
**Liebel** 1:11 2:10 21:3,12,15 40:16,17 41:7 53:20 61:20,23 63:10 64:10 67:23 68:7 75:17,18,25 76:9 78:17 79:18 80:1 99:2 112:2,7 114:4,18
**Liebel's** 64:18
**lied** 90:1
**life** 46:2 133:22
**light** 20:22
**lights** 59:13
**likes** 125:5
**line** 27:10 35:23 36:2
**list** 16:20,24
**listen** 88:10 106:5
**listened** 35:18
**listening** 43:25 80:25
**literally** 142:9
**litigants** 136:8
**litigation** 18:7 24:7
**little** 5:13 25:21 63:20
**LLC** 2:15
**Local** 6:22
**located** 13:8
**long** 8:4 12:10 12:16 13:23 39:14 41:10 65:24 69:9 81:1 108:12 133:19
**longer** 58:18

59:14 79:21 87:2
**look** 27:21 38:12 39:1,2,22 42:20 43:25 51:25 59:8,9 59:25 85:7,22 86:11 105:10 110:12 118:16 118:23 119:18 119:25 120:11 121:3,7 125:5 125:9
**looked** 27:11 41:19 55:14 59:9 60:9 79:11 86:4 129:2
**looking** 38:13 41:18 49:4,8 50:21 51:19 52:10 53:3,5 79:6 118:19 136:9
**lost** 10:4 109:15
**lot** 79:21
**Loughney** 2:15
**Ls** 98:7
**lumping** 89:6
**lying** 90:7,8,8

──────────
**M**
**MacDonald** 102:20 103:3,4 103:12
**mail** 127:7
**main** 35:19 58:3
**maintain** 14:14 14:16 80:22 91:10
**maintained** 38:18 80:20 123:4
**maintaining** 91:16
**major** 6:1

**making** 34:16 35:20 74:25 79:21 81:5 114:1,2
**maligning** 122:5
**man** 50:15
**management** 13:21 35:24
**manner** 34:22 64:13 87:18 92:7 114:7
**Manufacturers** 14:19
**March** 12:11
**Mark** 2:14 81:16 89:17
**marked** 60:17 61:3,4 71:22 71:24 98:9,11 104:5,7 113:15
**matter** 21:6 23:15 25:20 27:11,19 46:14 46:23 47:18 48:17 53:22 57:11,17 58:16 58:17 66:6 68:3 71:2 77:19 78:1,4 78:18,20 80:6 82:7,9,11,18 82:23 83:4 85:22 100:11 110:21 124:13 132:9 134:12 134:15 136:5 140:18 142:1
**matters** 17:15 22:18 24:1,19 86:13 110:2 111:14 122:18 139:9
**MBA** 8:13,14 9:23 10:14 56:24
**McLaughlin** 2:8

Conley v. County of Erie, et al.

John Onorato
Page 13

**McNair** 1:22 2:2
3:4,6 4:5,7
25:8,20 26:11
26:19,22 34:11
34:14 36:13
42:20 43:6,7
43:10,15,21,22
43:25 44:5,6
44:10,13,16,20
45:10 48:11,13
80:25 81:4,10
86:2 87:6,10
87:17,22 88:6
88:7,21,24
89:4,9,23 90:3
90:11,13,15,18
90:20 105:17
107:7,14,25
108:5,19,25
109:4 110:25
111:5 113:20
117:7,13 118:3
120:6,10,12,25
125:21,25
126:17,20
127:11,16
129:11,15
130:1 132:25
133:3,13,15
134:13 135:3
135:22 137:2
137:15 138:8
138:12,15,16
138:18 140:20
141:5,7 143:3
**mean** 24:10 26:4
34:24 47:20
52:25 61:15
64:15 67:18
79:20 85:21
107:18 112:22
114:9 123:8
142:21
**meaning** 67:22
109:5
**means** 56:10

**meant** 22:6
34:14 123:7,17
123:18 127:24
**medication**
19:17
**meet** 21:11,15
21:18,20 40:10
40:17 66:15
69:5,9
**meeting** 34:8,9
34:18 37:24
39:10,14,17
40:21 41:1,10
41:13,24 42:3
50:17 54:2,2,3
54:4,5 63:4,5,7
63:8,11,15
65:12,20,25
66:3,4,6,10,16
67:1,8,13,16
67:17 68:5,6,9
69:7,12,13,14
69:16 74:7
75:3,7,25 76:3
76:8,12,18,19
76:23 77:1,3,5
78:11 79:23
81:15,21,25
83:1 95:12,20
96:3 122:25
130:6 136:20
142:2,3
**meetings** 17:5
21:3,22 40:1
53:19 54:6
**member** 12:22
15:24 29:23
50:9 75:2
92:10,12 99:17
**members** 91:10
91:17
**membership**
28:23
**memo** 77:23
90:23
**memorialized**

98:4
**mention** 68:10
82:24 100:15
**mentioned** 18:12
79:8 82:7,8,20
82:20 83:1
85:5 96:4
**Mercyhurst**
5:15
**met** 21:20 28:17
40:4,8,19
41:11,11,18
66:7,12,12,25
67:4,15 77:16
77:17
**Michael** 16:11
16:23 22:5
30:4 39:21
40:7,24 46:1
50:14 51:24
58:1 84:21
90:23 129:7
**Michele** 125:13
**Mike** 35:17
37:19,23 38:1
38:5 40:8
41:11,18,19,21
50:8 53:23
67:20,23
**mind** 48:2
109:21 110:16
136:22
**mine** 51:21
**minutes** 39:16
44:14 125:17
129:19,19
**mischaracteri...**
58:1
**misrepresenta...**
48:16
**misstating** 90:13
**moment** 6:21
57:4
**Monday** 1:20
30:10,10 32:18
33:12 34:8

45:16
**money** 109:12
**monitoring**
128:9
**month** 20:14
**monthly** 19:23
**months** 8:17,18
8:20 85:12
139:20 140:10
**morning** 4:7
**Moser** 2:15
**mother** 42:9,10
45:19,20,21,22
45:24 46:4,5,5
46:11,17,19
88:14 91:3
92:22 111:15
134:9,18
139:19,22
**motivated** 80:13
**motivation**
30:22 31:1
79:17
**motto** 29:1
**mouth** 51:25
**move** 88:16
138:24
**moving** 132:19
**MTR** 69:4 70:22
**municipal** 12:15
13:7

———————
**N**
**N** 3:1 4:1,1
**name** 4:7 5:6
29:6 89:13,14
98:6
**named** 4:12 41:4
**narrow** 52:4,13
63:19
**national** 137:22
**nature** 67:24
68:4,12 77:21
78:25 84:13
88:11 95:9
98:19 100:6

105:25
**Neal** 2:7
**necessity** 114:25
**need** 19:19,22
39:2 43:1,2,3
44:3 66:5
86:24 141:12
**needed** 54:6
55:18 97:7
**negative** 99:11
**neglect** 106:24
133:5
**neglected** 106:19
**neglecting**
108:21 109:4
134:3
**negotiations**
103:1
**Neither** 140:20
**never** 24:13 25:2
43:8 50:20
57:3,22,23
58:21 59:1
66:15 82:6
127:17 129:10
**New** 129:4
**newspaper** 4:16
69:23 71:4,5
72:6 73:22
75:5,9 103:22
104:10 131:13
**newspapers**
132:24
**nonoccurence**
32:10
**nonresponsive**
138:25
**nonsense** 90:4
**normally** 102:11
**North** 42:7
**Northwest** 14:19
**nose** 90:16
**Notary** 1:19
**noted** 61:22
**notes** 60:25
**noticed** 98:5

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 51 of 71

Conley v. County of Erie, et al.                    John Onorato
                                                    Page 14

notified 76:19
76:22
Ns 98:7
number 4:13,15
4:17 13:20
22:22 23:8
94:5 112:18
Numerous 18:15
nurse 140:5
Nurses 140:2,4

**O**

O 4:1,1,1
oath 131:23
142:22
object 26:10
35:11,15 36:9
42:25 43:4
72:24,25 73:11
74:22 107:22
120:12
objection 25:17
25:19 27:3
36:19 38:25
42:16,17 43:13
44:2,7,10,15
44:19 47:2,19
48:5,10 49:7
49:16 51:4,5,6
51:15 52:7,8
52:16 53:7,8
55:12 56:3
57:25 58:22,23
59:5,18 64:1,7
65:3 82:4 86:1
95:22 97:9
102:22 103:9
105:24 109:14
110:15 111:11
112:1 114:5
120:6,25
125:21 126:17
126:20 127:11
127:16 130:1
133:13 134:13
135:3,22 137:2

139:6,24,25
140:16,22
141:15
objections
132:15
objective 35:9
objectivity 50:5
obligation
105:21
observations
132:9 140:4
observed 139:3
obstructed 88:4
obstruction 82:2
82:6,14 131:1
131:12
obtained 37:2
obtaining 33:25
obviously 34:16
occasion 17:18
21:21 65:15,21
129:5
Occasional
14:13
occasions 18:14
21:24 24:16
occur 56:25
132:21
occurred 32:12
33:7 41:24
54:15 57:3,23
74:19,20 78:8
137:23
occurrence 30:5
32:10 55:13
96:4 138:22
occurring
137:21
OCY 22:4 23:4
23:10 24:4
25:7,8 35:22
35:24 38:3
40:5,10 41:7
46:7 51:3
53:21 81:25
105:4,9 120:3

133:25 136:15
odd 135:9
offer 12:2
office 1:6,12 2:6
2:11 4:10 9:6,7
12:5,8,8 14:16
18:17,18,20,21
18:22 19:3,5,8
19:11 20:11,17
21:25 22:13,23
24:9,14,20
25:15,23,25
26:9 29:9 30:3
30:17 33:12
50:9 70:19
74:15 75:8,10
76:9 81:21
85:5 98:3
119:5 122:14
130:24
officer 17:11
offices 1:21
official 64:23
officially 92:13
officials 61:13
oftentimes 39:5
okay 5:5,6,20
6:5,9,20 7:2,6
8:4 9:2,4,9
10:6,17,19
11:2,15,24
12:7,23 13:3
14:23 15:24
17:1,10,13,24
18:2 19:14
20:1,3 21:7,18
23:12,16,22,25
24:3 25:10
26:22 27:1,13
27:20 29:7
30:22 31:1,6
31:10 32:1,4
33:2,8,20
34:17 35:22
36:4 37:7,21
38:2,8,13,22

40:4,23 41:15
44:11 45:4
46:7 47:16,22
49:10 50:16,20
51:13,23 52:3
52:4 53:3 54:8
54:21 55:15,21
56:13,23 57:15
59:3,15 60:10
61:3,4,7,22
62:6 63:5,13
63:16,24 64:9
64:18 65:1,8
67:11,14 68:15
69:5,15,23
70:19 71:4,14
72:8,14 73:19
74:8 75:3,21
75:25 76:3,12
77:10 78:22
79:12,25 80:9
82:13,24 85:10
85:20,24 88:8
88:16 89:2
90:21 91:5
92:23 94:2,7
94:17 95:2
96:17 97:2,7
97:15 98:2,15
99:1,13,18,22
100:12 101:2,9
102:11 103:7
103:11,15,17
104:12,15
105:7,22 106:3
109:7,11,23
110:5,23
111:16,23
112:4,21 113:2
113:10 115:1,8
115:17,23
116:13,16,24
117:2,4 118:14
121:7 122:20
123:5,21
124:23 138:17

139:16 140:9
141:23 143:1
old 5:10,12
once 8:2 10:14
20:14
ones 49:10
112:20 113:21
ongoing 110:2
Onorato 1:13,18
2:14 3:3,10,11
3:12 4:7 5:8,10
71:22,24 72:11
72:18 98:9,11
104:5,8,17
115:11 137:17
opened 13:15
133:14,16
operates 86:9
operating 116:1
operations 49:1
86:15
opined 81:25
opinion 83:16
84:25 85:1
95:4 120:4
122:11 134:25
139:1 141:2
opinions 131:21
132:10,20
141:16,16
opportunity
24:19 132:8
option 67:11
68:10 99:7
orally 62:4
order 42:8 46:12
46:17 48:21,23
74:12 78:11
79:1 80:8
84:23 88:13
91:2 92:21
93:15,22 94:1
95:10 106:1
109:23 110:6,8
110:10,13
111:9,12,13,24

Conley v. County of Erie, et al.

121:15,16
134:10 135:7
135:10,11,19
136:2,9,10,13
136:17,25
137:3 138:1
141:13
**ordered** 109:17
**orders** 46:3
93:21,25
**organization** 83:14
**outcome** 99:4
**outlined** 30:20
**outlining** 67:21
**Outlook** 66:22
**outright** 48:17
**outside** 92:17
95:3 100:4,10
**overly** 26:13,21
140:23 141:15
**overreaching** 32:24
**oversight** 12:5
**overwhelming** 114:23

**P**

**PA** 2:3,5,9,12,16
**packet** 142:8
**page** 42:24,24
90:6 104:15
115:8,10 131:7
131:8
**pages** 108:19
121:14 122:21
**paid** 11:7 16:21
43:12
**Palatella** 70:4,12
**Palattella** 72:14
73:3,5,18
104:1,12
**paper** 69:1
70:14 74:5
**papers** 15:17
**paragraph**

72:12,12 93:1
98:15 104:16
115:9,10 116:5
118:23 120:23
131:4,6
**paranoid** 128:13
128:14
**Pardon** 61:6
80:11
**parent** 123:14
133:16 135:20
137:24
**parenting** 131:21 141:14
141:21
**parents** 123:14
134:2,3,6
**parent's** 140:13
**parking** 59:10
59:12
**part** 16:16 21:21
46:1 91:5
98:22 99:22
116:11 117:16
120:16,17
128:21
**parte** 135:11
136:3
**participants** 41:8,14
**participate**
15:13 16:13
17:6 25:22
26:7 75:2
**participated**
16:7,25 43:9
**participation**
4:14 56:11
**particular** 11:2
35:24 48:14
49:3 50:22
83:20 84:11
86:5 94:19
119:10 124:6
**particulars** 119:9

**parties** 29:25
38:7 39:8
64:17 80:3
86:18 105:4,25
135:11
**partner** 103:2
**party** 29:19,24
35:23 36:2
39:7 45:19
46:14,23 48:20
83:11 88:10
91:1 92:20
105:3 109:20
110:1,2,17
114:11 126:15
130:11 136:9
**part-time** 14:2,3
**passed** 7:4 8:2,7
**Pat** 69:6 71:10
**pay** 43:11
**payment** 103:21
**PC** 2:8
**Peebles** 119:4,7
119:10 131:6,9
**penalties** 82:3
**pendency** 63:2
**Penn** 2:15
**Pennsylvania**
1:1,9,20,23 5:9
6:23 7:17
14:20 18:9
24:4,17 93:24
133:22
**people** 28:3 41:3
64:24 68:8
113:4 117:20
117:24 137:18
**perform** 112:12
122:19
**performed** 32:2
140:10,11
**performing**
12:23 20:12
64:13
**period** 8:23 10:8
10:20 24:10

29:15 96:24
**permitted** 139:4
**person** 37:21
45:25 68:10,13
76:10 110:20
120:4 135:18
141:19,21,22
**personnel** 1:10
35:3 39:10,13
61:18 66:6
71:5 77:5
118:20
**persons** 126:11
**Pete** 40:25
**Peter** 1:9 2:10
63:9 67:22
74:25 99:2
**petition** 29:8
136:16
**Petulla** 21:17,21
27:23 28:2,5
**Phil** 16:11
**phonetic** 24:25
**PHRC** 25:5
**physical** 127:14
**physically**
106:15
**Pittsburgh** 2:12
2:16 12:6
**place** 2:15 9:8
38:12 41:1
55:24 59:25
65:21 75:7
88:13 127:3
**placed** 29:5
**plain** 128:22
**Plaintiff** 1:3 2:1
**planned** 65:13
65:17,25 72:9
72:16,21
**Pleas** 18:8 24:8
26:4 94:3
**please** 5:7 26:22
44:1,12,17
105:18 137:19
**PNC** 12:13,16

12:20 13:6,9
13:11 14:1,2
14:10
**pocket** 120:16
120:17
**point** 4:23 22:8
37:13 38:19
40:25 63:13
78:11 109:15
118:7 119:12
122:7 123:6
127:8
**pointed** 126:7
**policies** 39:23
86:16 89:12,14
89:17 90:24
106:7
**policy** 15:17
37:24 55:2,5,7
55:23,23 56:6
56:7 87:6,23
88:8,17 89:10
89:13,13 90:5
90:9,21,25
91:4,6,7,11
92:19 95:8
97:10,10 106:6
110:4 118:11
118:12 128:19
128:22,25
**political** 6:4 16:7
29:19,24
**poses** 109:22
**position** 11:7
12:10,13,20
13:9,15,25
14:21 15:6,10
15:17,19,20,21
28:24 36:14
72:10,22
102:10,13
137:9 139:21
**positions** 12:24
**positive** 126:21
**possessed** 31:21
**possession** 37:5

Conley v. County of Erie, et al.

37:8,13 38:19
125:20 127:10
127:15,23
128:4
**possible** 82:24
83:3 92:7
136:23
**potential** 99:12
109:16
**practice** 9:5
12:21 13:4
14:14,17 45:25
131:25
**practiced** 133:21
**practices** 91:18
116:20
**practicing** 10:9
**practitioner**
14:25
**prenatal** 91:2
92:21 138:1
**preparation**
54:5
**Preparatory**
5:15
**prepare** 67:20
101:25
**prepared** 100:24
131:17
**preparing** 9:13
100:17,22
101:4,18,23
103:13
**prescribe** 19:16
**presence** 78:22
142:16
**present** 2:18
40:23 41:3,6
76:3 78:7
102:10
**presentation**
50:19,24
**presented**
102:15 105:7
**preserved** 43:1,5
44:3

**president** 14:18
**presume** 136:7
**presuming**
35:12
**pretty** 17:1
63:18
**previously** 32:1
47:8 54:22
**primarily** 7:19
9:8,19 137:3
**print** 127:4
**prior** 7:11 11:4
29:11 31:11,21
32:7,15 37:8
40:2 42:14
47:8 63:15
67:13,16 70:20
73:4 77:21,24
78:2 91:21
92:3 93:2
99:12 119:2
127:15 128:7
133:23
**prison** 70:25
**private** 14:13,25
**privilege** 22:16
**privileged** 38:6
**PRN** 19:17
**probable** 136:23
**probably** 53:2
65:11 96:15
129:13
**problems** 115:13
**procedure** 27:5
44:8
**procedures**
116:1,2
**proceeding**
132:20
**process** 116:12
**product** 118:11
124:17
**professional**
44:2 46:2
91:24 92:8
93:14 110:19

**professionals**
91:23 93:12
123:13 141:18
**professor** 13:14
13:16,24 14:5
14:24 34:25
56:24
**prognostic** 74:12
79:1 80:8
84:22 88:13
106:1
**progressing** 99:6
**prohibit** 139:2
**promise** 98:17
99:10
**proper** 35:21
91:24
**properly** 106:11
**property** 39:23
51:8,8 56:9
**protect** 91:17
95:10 105:21
**protected**
138:22
**Protective** 84:7
84:23 85:17
91:12 92:1
94:8 109:5
111:25 117:16
**provide** 49:14
94:10 139:2
141:9
**provided** 23:2
27:22 31:8,15
31:16,24 32:6
33:14 42:13
44:25 49:25
55:17 58:7
62:10 94:3
106:7 112:16
114:3,6 141:5
141:8 142:8
**providing** 49:5
57:5
**provision** 85:24
93:10 94:8,14

95:4
**provisions** 94:15
**public** 1:19 29:9
29:13 50:8
91:12 93:21,22
95:17 103:21
122:2
**publicity** 29:16
**publicize** 98:18
**published** 72:1
73:9 103:22
**pull** 58:6
**purpose** 29:17
68:22
**purposes** 92:8
**put** 98:20 118:19
**putting** 43:16
**PW** 54:11 95:17
122:2,5,13
123:23 137:1
**PW's** 121:19
**P.A** 117:15
120:24
**p.m** 69:8 76:6,6
143:6

_____
**Q**
**quash** 132:19
**question** 4:21,24
5:4 19:6,14,22
20:4,4 24:23
25:2,9 26:10
26:12,14,23
27:9 29:21
33:5 34:4
36:13 37:16
39:7 42:25
43:14 44:12,16
44:21 45:4,6,7
45:11 47:21
49:2 51:13
52:12,18 53:9
53:10 56:9
57:16,18 58:14
58:21 60:10
65:4,5,7,9,18

68:24 72:3
79:20,22 80:15
81:5,8,10,12
81:16,18 85:14
87:1,9,14,16
87:17,18 88:17
95:18,19 96:21
101:14,17
102:1,24
105:13,14,15
105:16,17
106:23,23
107:6,7,15,16
107:20,23
108:18,24
110:7 111:1,2
111:8 115:22
116:16 120:8
133:14 135:25
138:13 141:3,7
**questioning**
138:14,17
**questions** 4:18
22:16 68:14
81:3 85:11
91:18 107:5,9
117:7,12 120:9
133:4 137:12
**quite** 57:12 58:8
64:12,21 96:10
**quotation**
104:20
**quote** 72:23 73:1
132:24
**quoted** 72:18
73:15 104:16
**quote/unquote**
137:6

_____
**R**
**R** 2:7,11,14 4:1
**race** 11:5
**raise** 79:25
**raised** 27:11,18
51:2,11 52:6
67:12 68:16

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 54 of 71

Conley v. County of Erie, et al.                          John Onorato
                                                          Page 17

ran 11:13,13
range 100:19
ranking 64:23
rarest 136:4
rationale 80:19
  105:19,20
read 26:14,16
  31:14 32:3,4,8
  32:13 44:12,16
  44:18 62:4,6
  73:8 91:7
  94:11 105:17
  110:4 118:24
  127:19,25
  128:23 129:4,6
  130:14 131:5
  133:23 137:21
  143:4
reading 31:17
  31:22 32:9
  72:4 73:10
  128:7
reality 85:6
really 20:3 57:15
  65:18 79:21
  111:1 124:23
  142:9
reason 17:7
  58:16 70:15
  74:10,11 85:10
  100:3 105:5,10
  110:3,19 112:9
  126:8 138:6
  139:14 141:24
reasonable
  103:19 126:11
  135:18
reasons 4:13
  98:24
recall 9:21 16:3
  16:4,5 17:24
  20:19,20 22:10
  23:8,18 25:23
  29:14 32:15
  33:10,23 34:21
  39:15 40:18,19

41:1,15 54:1
63:12,17 65:14
68:11,16,19
69:11 73:7,8
73:10,19,25
75:19 77:20
78:2,6 82:13
84:6 85:4
96:10,11 97:13
99:9 100:15,20
102:3 103:10
103:11,14,21
103:25 104:10
104:12 111:18
113:13,14,25
123:20 129:17
131:19 142:5,6
recalling 80:4
receive 5:24
  6:13 42:11
  60:14 75:1
received 6:21
  61:22
receiving 103:11
  103:14
Recess 76:6
recipient 39:6
recognize 72:2,5
recognized
  16:16,17
recollection
  26:24 30:7
  40:21 42:1
  61:15 67:3
  74:4 78:9
  118:18 126:3
  128:17 129:3
  142:25 143:2
recommending
  140:12
record 26:16
  43:10,15,18,23
  43:23,24 44:7
  44:18 89:23
  91:7 92:12
  94:11 102:14

110:4 118:24
131:5 140:4
record's 44:10
red 59:13
Redirect 3:6
  137:14
Reference
  123:12
referenced
  128:13,14
referred 82:9
  98:13 115:18
referring 89:22
  90:2,3,21
reflect 89:23
Refresh 118:18
refreshes 30:7
regard 53:11
regarding 21:25
  22:2,16 31:6
  33:13 42:7
  70:6,24 80:7
  83:11 110:2
  120:2 122:18
  122:25 123:4
  131:21 136:24
Regardless 48:8
regulations
  91:12 92:2
reiterated 119:8
reiterating 81:5
relate 52:14
related 45:17
  74:12 82:10
  119:5 131:9
relation 30:6
Relations 18:9
  24:18
relationship
  133:12 139:22
relative 92:11
  94:18
Relatively 69:14
release 79:19
  91:20,24 92:3
  93:2,5,13

105:2,4 118:1
120:5 136:24
released 23:3
  39:8 80:2,7
  83:11 91:23
  93:3,16 130:11
releases 68:12
  93:7 109:20
  114:10
releasing 91:21
  93:3
relevance 58:25
  102:22 103:9
relevant 46:13
  46:13,16 49:11
  52:5 58:18,19
  59:14 110:11
  110:13,16
relied 112:11
  114:3
rely 112:7
remained 12:22
remember 23:14
  28:22,25 30:12
  30:15,15 60:15
  65:24 73:4,17
  74:25 78:24
  81:19 85:21
  87:21,24 128:6
  133:3
remote 47:1,3
removed 53:2
  85:5
rep 78:5,16
  79:12
repeat 4:23 19:6
  72:3
repeating 111:3
rephrase 4:23
  29:21
replaced 50:11
report 15:22
  33:24 53:20,24
  60:14,20,24
  62:6 66:8
  118:5 119:2,13

120:14,22
121:4 122:9,13
123:23 124:12
131:3 139:4
reported 1:24
  15:21 82:7
  110:1
reporter 26:16
  43:19 44:18
  104:2 115:15
reporting 1:25
  92:13
reports 60:23
  117:19,22,25
  118:2 119:21
  119:23
represent 4:8
  17:16 18:11
  84:4 103:7
representation
  77:6 100:10
representative
  76:16,17 77:1
  77:14,20,22,25
  78:3,7,23,25
  79:6,10 142:4
  142:17
represented
  83:23 84:2
  90:25 102:25
  105:8
Representing
  17:14
reprint 71:25
  104:8
Republican
  10:25,25 12:19
  17:6
Republicans
  16:25
reputation 136:8
request 56:4
requested 99:12
requests 9:13
require 19:10
  141:10

required 102:7
106:22,25
requirement
91:9
requirements
92:2
requires 26:17
26:20 86:12
140:1,23 141:4
requiring 35:22
rescheduled
65:15,20
resident 42:7
133:19
residing 9:8
resign 58:17
97:18,25 99:7
99:13
resignation
28:18 32:16
65:22 98:16
99:5
resigned 62:25
72:20
resolution 39:18
resolutions 13:2
resolve 50:2
82:23
resolved 27:12
resource 13:21
respect 89:3
138:14,16
140:13
respected 112:8
responded 35:17
responding 45:7
response 45:5
responsibilities
10:11
responsibility
118:13
responsible
63:24 64:6
106:20,24
responsive 20:3
23:24 45:4,6

57:16 58:12,13
87:18,20 88:12
88:16 92:24
101:15 107:7
107:20 110:25
138:24
restricted 38:22
result 27:24
37:23 42:4
80:10 122:19
138:1
retainer 103:19
retribution
50:21
retrospect 97:24
return 75:5
109:17
Returned 8:10
98:5,8
revelation 42:10
review 21:4,8
40:7 46:7
49:24 50:15
55:3 58:6
61:12 62:2,18
79:13 92:3
95:24 96:1,23
103:15 112:17
113:6,10,12
115:20 117:18
reviewed 41:21
41:25 45:1
49:9 52:19,21
58:7 61:20
62:20 66:8
79:9 112:15,18
112:19,19,21
113:3,9,11
115:11 130:13
reviewing 128:7
reviews 97:11
reword 109:1
Rich 62:9
Richard 1:7
2:10
Rick 15:11

16:11
right 11:15,18
11:24 13:5
14:4,12 17:4
17:16 18:11
19:20 22:10
32:21 37:16
39:22 49:3
51:8 55:7 56:7
56:8,21 59:9
61:9,23 65:17
66:14 68:16
70:18 72:18
73:25 74:10
75:1,18 77:13
77:19 79:5
87:12 89:8
90:6,7,12,14
90:17 91:14
94:25 115:8,17
118:21 119:18
122:9 123:11
123:22 126:10
128:16,19
131:7,23
132:10 135:2
140:4
rights 43:1,4
44:2 136:8
140:13
risk 106:12,13
Roger 102:25
103:5
role 15:15 140:5
Ron 9:19
room 64:20
RPR 1:24
rule 46:3 86:10
86:11
rules 44:5,6,8,9
44:11 86:9,10
run 66:22
running 29:8

_____
            S
_____

S 2:11

salaried 102:5
sanctions 82:25
83:3 85:2
Santorum 16:11
sat 77:18
satisfied 27:22
28:5
saw 39:13 61:10
132:13
saying 48:15
56:23 72:18
82:13 90:1
104:16 108:13
141:12
says 55:7 61:1
72:8 115:10
123:13 125:10
125:14
scale 101:23
schedule 65:16
66:5
scheduled 63:8,9
65:20
Schenker 1:7
2:10 15:12
16:6 62:9,10
62:19 63:9,15
66:2,7,12,25
67:5,13,15
68:2,3,20
69:17 70:4,12
71:12,16 72:9
72:15,17,19,20
72:21 73:24
74:1,4,5 76:3
136:19 137:5
Schenker's
15:13 63:1
65:16
Schetter 125:14
school 5:14,15
6:7 7:8,9,25
10:9,13 28:24
29:23,23
133:21
science 6:4

scope 49:23 52:4
52:13 103:19
140:7
Scores 18:15
screen 128:9
SD 122:2
seal 93:25 94:1
111:13,17,20
search 10:16
38:22 52:5,13
56:14 58:20
59:4 79:7
seasoned 112:8
seat 11:22
second 7:24 11:9
11:10 51:10
54:2,5 115:9
115:10 118:23
123:1,5
section 84:12
117:15 119:20
120:1,1,24
sections 139:1
secure 105:12
secured 92:4
security 105:8
see 8:17 59:12
86:11 120:11
124:23 125:9
130:21 132:15
132:18 142:4
seeing 73:4
128:6
seek 7:8 20:24
29:16
seen 17:5 62:12
139:19,20
140:9
selected 6:17
self-employed
9:5,12 10:23
semester 14:8
senate 11:10,11
11:14,16,22
Senator 11:4
12:2,25

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 56 of 71

Conley v. County of Erie, et al.                    John Onorato
                                                    Page 19

**Senatorial** 10:25
  12:19
**sending** 84:10
**Sennett** 2:8
**sense** 16:13
  128:8
**sent** 125:6
  126:21 130:7
  142:11,12,13
**sentence** 123:1
**separate** 14:16
  93:18,20
**September**
  29:11 32:19
  40:2 63:6,12
  63:19,21 65:12
  65:25 67:2
  68:19 70:6
  71:7 72:1
  73:20 74:19
  75:4 76:8
  81:22 97:19
  112:13 115:6
  120:21,21
  122:8 130:6
  142:2,3
**series** 90:24
**serious** 134:12
  134:15
**service** 1:7,13
  2:7 22:24,25
  23:10,13,20
  24:5 55:17
  99:23,25
  100:12,22,23
  101:1,4,19,22
  103:8,13
  134:24
**Services** 84:8,24
  85:18 91:12
  92:1 94:9
  109:5 111:25
  117:16
**set** 17:9 33:5
  55:8 86:10
  95:13 112:13

**sexually** 106:15
**SH** 125:11
**share** 89:18
**shared** 61:18
**shortly** 40:6,6
  62:24 76:18
**show** 31:23
  138:14
**showed** 23:3
  45:3 66:11
  122:16 130:12
  142:10
**showing** 71:24
  89:2
**shows** 37:4
**sic** 44:10 95:16
**sick** 43:25
**sign** 99:5,19
  128:22 135:11
**signature** 61:24
**signatures** 29:4
**signed** 60:19
  82:1 91:21
  93:2,5,7 99:1
  135:7
**similar** 54:22,25
**similarly** 131:10
**simple** 107:15
**simply** 43:4
**sir** 68:14 79:20
**sit** 36:16 62:18
  94:13,15
  111:19
**sitting** 90:7,12
  90:14
**situation** 135:15
  136:2
**situations**
  133:17
**six** 100:15
**sixth** 72:12
  104:16
**skills** 131:21
  141:14,21
**skim** 120:1
**slips** 102:4

**snoop** 95:21,23
**snooping** 51:2,9
**social** 134:22,24
  134:24 135:1
  141:1,20
**solely** 56:1
  136:24
**solicitor** 1:15
  2:19 15:7,10
  15:12 17:8,8
  17:11 18:19
  19:9 20:12
  21:14 22:11
  25:18 26:2
  47:13 50:9
  55:11 74:14
  96:25 101:21
  102:4 103:2
  115:11 132:21
  133:24
**solicitors** 100:9
**Solicitor's** 19:11
**Solymos** 7:15
**somebody** 16:22
  51:14 60:11
  68:12 86:3
  89:3 120:13
  138:15 139:3,5
**somewhat** 47:1
**sorry** 11:23
  52:17 57:15
  72:3,12 79:20
  95:18 121:12
**sort** 38:11
**sought** 19:10
  100:10 114:22
**Sounds** 8:19
**source** 114:20
  114:22
**sources** 114:14
  114:15
**so-and-so** 84:12
  84:13
**so-called** 84:22
**speak** 28:10,13
  37:11 46:19

91:8 96:5,7
  106:10
**speaking** 22:17
  60:20 73:5,17
  82:22 104:12
  142:3
**speaks** 31:19
  42:20
**specific** 39:3
  52:5 85:15
  86:16 91:18
  92:2 137:23
**specifically**
  32:10 34:8
  49:4 78:24
  84:6
**specifics** 22:19
**specify** 138:21
**specifying** 71:20
**speculate** 98:19
  98:23 141:1,3
**speculating**
  94:24
**speculation**
  140:1,23 141:4
  141:10
**speculative**
  130:2
**speech** 45:10
  81:5,11 111:3
**speeches** 44:1
**speeding** 59:10
**spelled** 98:6
**spend** 100:17,21
  101:3,18 102:2
  102:3,7,17
  109:12
**spent** 46:1
  104:17 109:12
**spoke** 34:19
  35:17 40:7
  58:2 75:6
  110:18 111:10
  127:17
**spoken** 82:21
**spouting** 85:12

**stack** 124:18
**staff** 12:3,7,20
  16:21,21,22
  21:21 91:10,10
  91:17,17 92:2
  92:10,12,14
**stand** 30:21 36:3
  37:14 111:5
**standard** 55:9
  116:1,2
**standards** 55:2,8
  55:25 58:10
**start** 4:20 7:21
  89:4
**started** 133:3
**starts** 118:24
  123:1
**state** 1:22 2:2
  5:6 6:22 10:24
  10:25 11:4
  12:18 13:10
  36:24,25 51:22
  65:4 73:2 80:9
  96:13,13
**stated** 73:15
**statement** 24:5
  36:23 80:12
  104:22 105:6
  109:11 115:14
  137:5,7
**statements** 4:15
  22:21 36:15
  142:16,16
**states** 1:1 95:14
  128:25
**stating** 109:24
**statistical** 15:16
**statute** 83:15,16
  84:1,7,11,11
  84:12 119:20
  120:2
**statutes** 83:18
  84:8 113:7,10
  113:12 117:14
**statutory** 84:5
**stayed** 14:2

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 57 of 71
Conley v. County of Erie, et al.                                   John Onorato
                                                                       Page 20

step 59:20
steps 99:6
steward 75:2
stop 4:22 42:21
   43:17 87:5
   90:8 123:5,6
   138:14,17
stopped 129:22
   132:12
stopping 136:15
stories 133:23
Street 1:22 2:2,5
   2:8 5:8 13:10
Strickler 7:14
strict 91:15
strictly 52:23,25
   112:7
strike 88:16
   133:18 134:23
   135:9 138:24
stuck 142:9
Students 6:18
stuff 124:9
   125:15 129:14
subcontracting
   9:15
subject 21:3
   37:22 69:19
   124:13 129:2
   134:19
subjected 35:8
submitted
   116:18
submitting 38:6
   119:2
subpoena
   132:19
subsequent 40:1
   65:19
subsequently
   47:22 62:12
substantial
   112:18
substantive
   77:21 78:1,8
substitute

139:17
substituted
   135:4
successfully
   88:4
Sue 122:22
   125:6,13
   130:25 131:10
suggest 43:2
   51:18 53:25
   60:8 83:2
   130:23 132:3
suggested 37:19
   37:25 39:20,24
   41:19 49:9
   51:11,17 53:23
   56:5,10 58:6
   67:14 96:5
suggestion 38:2
   97:14
Suite 2:16
summaries
   131:16
summarize
   17:10
summary 33:18
   82:1 116:7,17
   125:11
summer 7:1
   30:12,16,16
Sunday 129:6
supervise 26:8
supervisor 15:8
   15:9 28:13
   48:4 91:19
   92:15 119:4,7
   120:3 124:19
   131:10,15
supervisors
   115:13
supplied 55:6
   58:7 89:15
supplying 56:12
support 10:19
supported 64:21
   96:12

sure 20:10 22:17
   35:20 38:4
   41:20 53:1,6
   66:4 74:25
   86:14 89:14,15
   94:1 101:16
   102:1 111:6
   112:4,19
   140:19 143:1
surprised 34:17
   71:15
Susan 21:23
Susmarski 9:19
suspected 53:21
suspicious
   126:16,18
switch 61:3
sworn 4:2
system 38:18
   59:24 60:1

-----

## T

T 4:1
Taft 102:25
   103:5,7
tainted 100:9
take 6:23 7:9
   14:21 19:18,18
   37:1 75:7
   96:18 98:22
   101:24,24
   102:11 118:16
   118:23 119:18
   119:25 120:11
   121:3,7 134:11
taken 1:18 27:24
   42:8 45:19
   69:18 95:9
   101:8,20 108:6
   109:8 130:15
   137:25
talk 30:25 41:20
   59:21 69:3,17
   71:12 78:18,19
   78:20 79:16
   102:23 113:4

124:12 139:5
talked 56:4
   70:24 97:10
   125:23
talking 41:24
   42:17 44:14
   59:17 76:7
   78:24 80:3
   83:9 107:24,25
   117:13 123:19
   124:4 139:9,15
   142:5
talks 117:22,24
   122:24
taught 13:20,21
teach 13:17 14:7
   34:25 35:3
teaches 56:24
technical 55:22
tell 4:23 18:22
   18:23 22:21
   30:19 34:2,18
   36:3,16 41:20
   43:21 52:24
   59:20 60:2
   64:5 69:23
   71:11,14 72:14
   73:14 74:11
   79:12 80:18
   81:24 84:9
   86:6 88:21
   90:9,11,15
   93:9 94:2 96:9
   99:13 120:1
   126:5 134:9
telling 71:13
   86:18 110:17
   112:9 113:7
   142:15
ten 18:4,4,5 23:9
tend 17:6
Tenth 5:8
term 13:16
   54:16,17,20
   69:25 70:2
   73:19

terminate 4:14
   53:17 64:9
   65:9 67:10
   68:9 72:10,16
   72:22 114:2,17
   140:13
terminated
   58:17 63:14
   69:24 80:10
   97:24 99:14,20
   106:3,8
terminating
   67:11,14 68:17
   97:22
termination
   4:10 48:3,7,19
   64:2 66:13
   68:10 70:15
   79:17 80:6,12
   98:19,24 100:7
   102:23 110:18
   136:23
terms 27:1,4,14
   74:14,20 80:20
   86:16 98:17
   111:25 122:12
terrible 34:15
testified 4:2
   80:17 96:14
   127:17 131:25
testify 35:23
   122:1 132:9,16
testifying 64:14
   132:20
testimony 3:3
   31:2,4,7,11,24
   32:22 33:11,13
   33:18 36:2,12
   36:17,23,24
   42:20 57:18
   79:14,16,23
   80:3,10,13
   86:2 88:5
   96:14 102:8
   116:6 118:4
   124:14 130:19

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 58 of 71

Conley v. County of Erie, et al.                    John Onorato
                                                    Page 21

**Thank** 34:11
43:5 88:6
94:17 96:22
111:23
**Thanks** 34:18
89:6
**thereof** 98:17
**thereto** 17:14
**thing** 56:19,20
56:22 59:19
60:11 87:13
117:13
**things** 78:19,20
98:1 108:9
134:6
**think** 19:17 20:4
34:12 38:4
42:19 45:22
48:22 50:13,24
56:13,15,19,20
57:21 59:6
60:8 74:8 83:5
85:14 89:4
94:7 99:22
107:12 113:6
120:17 124:15
126:12 139:8
139:18 140:5
142:7,23,24
**thinking** 56:20
56:21,22
**third** 7:25 38:7
39:6,8 45:18
46:14,23 48:20
64:16 68:13
80:3 83:11
86:18 88:10
91:1 92:20
104:15 105:3,4
105:25 109:20
110:1,2,17
114:10 126:15
130:11
**thought** 50:20
60:12 66:7
82:14 83:8

100:14 118:20
130:24
**threat** 105:1,7,8
105:23 106:1
109:22 133:1
134:20,22
**threatened**
109:9
**threatening**
106:9
**three** 78:15
88:25
**Thursday** 67:5
**ticket** 59:10,12
**ties** 42:12
**till** 12:11 14:2
**Tim** 4:7 43:13
**time** 4:21 8:6,6,7
8:23 10:8,20
12:18 19:23
20:15 21:13,14
27:23 28:17
29:15 32:14
34:5,6 37:13
40:4 42:22,22
47:1 51:9
55:14 67:1
69:7 73:9,12
75:18 77:15,17
87:10,12 96:24
96:24 97:1
100:16,25
101:3 102:2,4
102:7,14,17,23
103:17 107:11
108:13 114:16
116:21 119:12
120:9 122:7
123:6 131:15
132:7 133:18
133:20 136:19
**times** 17:19,24
22:22 25:3
26:7 80:24
81:1 86:23
93:25 97:2,4

129:4 136:1,20
**Times-News**
68:20 72:1,9
72:15,21 104:9
**Timothy** 1:22
2:2
**tired** 43:25
80:25
**title** 84:8
**titled** 117:18
118:1
**today** 4:18 36:16
111:19
**told** 30:4,18 36:5
41:12,22 42:5
45:18 46:23
47:16,24 54:8
60:6 72:9,15
72:21 73:2
77:5,8,9,12
84:18 86:3,3
88:10 99:4,6
109:25 110:11
112:11 114:17
115:14 124:3
125:25 126:4
128:12
**tolerability**
87:22
**tolerable** 57:14
87:7
**tolerate** 47:13
64:12 88:15
105:3 134:16
**tolerated** 135:2
**topic** 42:2 70:8,9
70:10,11
**topics** 69:15
70:22
**totality** 120:20
122:16
**touching** 90:17
**trademark**
28:25
**trampled** 136:8
**transcript** 31:14

31:18,19,22,23
32:3,4,8,13
37:4,7,10,11
37:11 81:14,20
115:12,21
127:19,21,24
127:25 130:21
131:19 132:13
**treasurer** 15:25
16:4
**treated** 139:3
**tribunes** 18:12
**tried** 78:18,19
78:20 80:19
101:14
**true** 31:13 36:12
36:20,24 52:12
60:25 62:20
102:1 113:8
125:23 135:6
137:7 142:11
142:11,12
**truly** 23:18
**truth** 36:3,5
107:21
**truthful** 32:22
36:18
**try** 43:7 59:7
89:2 132:19
**trying** 20:6,9
23:19,23 52:23
57:10 67:19
79:19 80:5
83:7 85:13
89:21 101:15
107:14,16
108:9,25 109:1
130:10
**turn** 49:14 78:14
90:6
**twice** 19:23 20:2
139:20
**two** 2:12 4:15
12:17 26:24
88:18 94:6
98:7,7 113:23

134:10 139:1
**type** 7:18 9:11
22:12 47:14
101:13,23
**typical** 102:17
**typically** 100:17
101:3,18 102:2
**typo** 98:6

**U**

**ultimately** 63:24
64:5 72:20
**Um-hum** 23:16
125:12,18
142:20
**un** 54:18
**unacceptable**
46:15 47:5
**unaware** 110:22
**unbiased** 35:10
**unbridled** 55:10
**underneath**
61:23
**understand** 4:22
5:2,5 33:11
42:25 44:21
46:7 47:20
51:12 80:14
85:10 87:4
96:22 102:8,9
111:9
**understanding**
32:11 38:5,17
45:1 49:18,21
49:22,25 52:9
52:20 57:11
59:22 69:3
78:9 80:4
85:21 86:7
107:4 115:21
123:7,25 124:7
**understood** 5:4
119:12
**undertake** 35:7
37:1,6
**undertaken**

Case 1:05-cv-00076-SJM    Document 70-10    Filed 04/12/2006    Page 59 of 71
Conley v. County of Erie, et al.                                    John Onorato
                                                                      Page 22

96:23 103:18
**undertaking**
98:22
**underwriting**
12:15
**unearthed** 45:2
**unemployment**
18:10 25:14
98:1 99:8
**unfortunate**
53:13,14,15,16
133:24
**unfounded**
54:19,20
120:14
**unilaterally**
43:23
**union** 47:23 75:1
76:16,17 77:1
77:6,14,20,21
77:24 78:3,5,7
78:16,23,25
79:5,10,12
142:3,17
**unit** 123:4,12
124:5 127:9
**UNITED** 1:1
**University** 5:19
8:12 9:3 13:12
13:15,22
**unknown** 50:2
**unrelated** 45:15
**unsupported**
54:17
**untrue** 36:25
95:16 119:8
**untruthful**
36:23
**update** 70:24
**use** 55:5,7 83:7
115:22 118:11
118:12 129:9

---
**V**

**v** 1:4
**vacation** 7:10

**various** 9:13,19
13:20 17:15
28:23 83:18
**Vendetti** 2:4,4
**veracity** 36:15
**verbiage** 116:25
**vice** 14:18
**view** 32:4 49:19
**views** 73:15
**Villella** 31:8,15
31:21 32:6
33:3,15,24,25
34:3,19 37:2,8
38:10,16,23
39:4 42:13
44:25 49:6
50:1,3 52:21
56:12 57:6,9
57:20,23 59:24
70:14 82:12
125:23 126:22
127:1,10,13,17
127:22 129:16
129:20,21
**Villella's** 38:19
125:20 126:23
126:25 129:22
129:24
**violate** 83:15
92:25
**violated** 83:16
84:18 85:14,15
85:25 86:8
87:23 89:11
93:9 94:5,9
95:5
**violates** 84:16
91:6
**violation** 47:23
58:10,11 79:3
83:13 84:5,10
84:23 85:13,17
86:6,19 88:8,9
91:3 95:8
110:3 118:11
120:23,24

122:12
**violations** 85:18
85:23 118:12
118:13,20
**visit** 68:20
**void** 50:25
**voluntary** 98:16
**volunteer** 11:6
**vote** 16:13
**VW** 77:24

---
**W**

**W** 54:21,25
96:14 119:7,9
119:11,16
121:5
**wait** 62:17
**Wallace** 2:18
**want** 16:23 18:1
51:25 54:16
62:15 74:6,8
81:9,10,11
108:8,12,14
117:13,14
130:16
**wanted** 38:4,7
59:22 70:14
74:5 81:17
86:11 87:15
97:23 118:4
130:19
**warned** 48:8,14
124:8
**warning** 48:9
**warranted** 46:22
**wasn't** 38:3
45:22 49:19
58:14 59:3,21
87:2,3 94:2,18
97:7 111:16
**waste** 107:11
**wasted** 107:12
**wasting** 87:10
87:12 102:23
**way** 7:7 19:17
33:2,3 51:11

59:7 61:5
64:14 81:6
87:15 88:5
113:15 118:19
126:12 127:3,8
133:18 136:1
140:2 141:10
**week** 41:17 67:6
139:20
**weekly** 19:23
**weight** 96:18
**Weimer** 2:11
**Welfare** 1:7,13
2:7 91:12
95:17 122:2
**well-being** 109:9
**went** 10:7 24:13
59:3 64:20
75:9 98:3
115:20 120:17
136:19 140:7
142:9
**weren't** 113:18
**West** 2:8 5:8
**WESTERN** 1:1
**we'll** 16:19
45:11,12 83:6
131:4 143:4
**we're** 26:6 27:10
41:21 43:21,21
44:13 108:3,5
108:12
**we've** 55:6 71:24
94:7 98:11
**what-have-you**
96:15
**whistleblower**
73:20 74:3,6,9
137:6
**William** 2:15
**willing** 122:1
**wind** 108:13
**wishes** 53:2
**withdrawn** 23:2
**witness** 30:5
34:15 42:22

43:3 88:1,3
89:24 90:8,9
90:15 100:7
108:8 128:1
138:5,7,8
**witnesses** 28:3
28:10 89:1
102:9
**woman's** 52:1
**won** 11:22
**word** 74:22
112:7 113:20
113:23
**words** 82:15
104:21
**work** 7:18,20
9:6,11,14
10:21,24 12:16
15:16 31:23
86:14 108:25
109:17 118:11
118:13 124:17
134:24 141:20
**workday** 92:5
**worked** 9:9
18:24 19:24
30:2 83:23
**worker** 135:1
141:13
**workers** 18:9
134:23
**working** 7:21
9:18 12:18
**work-related**
108:23
**world** 63:19
138:15
**worry** 59:12
**worth** 59:16
129:19
**wouldn't** 47:1
56:6 83:2 97:3
130:12
**written** 31:25
91:11
**wrong** 26:11

Conley v. County of Erie, et al.

John Onorato
Page 23

**wrongdoing**
26:8,13,17,19
57:1,4 83:8
**wrote** 124:15

---
**X**
---
**X** 3:1

---
**Y**
---
**Yeah** 34:14
61:17 112:24
115:6 121:17
123:18
**year** 7:25 14:22
17:1 25:6
**years** 5:12 12:17
17:25 22:11
23:5 24:3
25:18 26:1,7
**yell** 138:5,7
**yelling** 138:8,10
138:11
**yet-to-be-born**
95:6
**York** 7:17 129:4
133:21
**Youth** 1:6,12 2:7
4:11 18:17,18
18:20,21 19:3
19:5,8 20:11
20:18 21:25
22:14,23 24:9
24:14,20 25:15
26:1,9 30:3
50:10 70:20
74:16 119:5
122:14

---
**Z**
---
**zero** 24:21 25:4

---
**$**
---
**$56,000** 103:12
109:11
**$56,371** 104:17

---
**0**
---

**0** 4:1
**02** 14:10,23 15:5
15:12
**03** 9:24
**04** 8:21,22 121:8
121:11,13
**05-76E** 1:4
**06** 14:23

---
**1**
---
**1** 3:10 60:18
61:1,4 71:22
71:25 77:23
91:20 93:1
118:9 142:9,9
**1:00** 69:8
**10** 23:18,20 24:3
29:11 125:17
129:19
**10th** 2:8 32:19
40:2 63:6,19
63:21 65:12,25
67:2 68:19
70:6 71:7
73:20 74:19
75:4 76:8
81:22 97:19
120:21,21
122:8 130:6
142:3
**10,000** 29:4
**104** 3:12
**11th** 73:18
**11:01** 125:17
**11:41** 125:10,10
**11:42** 125:10
**117** 3:5
**12** 10:10 14:8
23:18,20 24:3
**12th** 72:1 115:6
**12:35** 76:6
**12:47** 76:6
**120** 2:8
**124** 91:13 92:1
**137** 3:6
**15** 129:19

**150** 108:19
**15219** 2:12,16
**16501** 1:23 2:3,9
**16502** 5:9
**16509** 2:5
**17** 104:9
**17th** 103:23
115:5
**18** 8:17,18,20
**19** 124:19
**19th** 125:7,13,17
**1983** 5:17
**1987** 5:23
**1990** 6:12 7:3,21
8:8
**1992** 8:8,9
**1996** 11:23 12:1
12:1
**1998** 13:22,24

---
**2**
---
**2** 3:11 91:22
98:9,12 118:10
**2nd** 119:6
**2:15** 143:6
**2:30** 75:20
**20** 39:16 60:19
**20th** 61:9 63:21
65:19 90:24
95:14 112:14
113:16 120:21
122:8
**200** 108:19
**2000** 12:11
58:20
**2001** 13:25
**2002** 14:3
**2003** 8:18 29:7
**2004** 11:23
20:16 29:7,11
30:8 32:7
36:17 60:19
72:1 119:3,6
124:24 125:7
131:14
**2005** 8:18

103:23 104:9
120:18
**2006** 1:21
**21** 123:23
**21st** 121:5
**23** 117:15
120:24
**27th** 115:3
**28** 32:7
**28th** 30:8,14,24
31:3 33:14
36:5,17 42:14
50:18 79:13,16
79:23 80:10,13
80:17 81:15,20
121:8,10,11,13
121:18 124:14
127:15 131:19
**286.4** 100:21
101:18 102:11

---
**3**
---
**3** 1:21 3:12 92:1
104:5,8 115:2
118:10 124:15
**3:00** 75:20
**30** 123:25
**31st** 32:19 34:9
34:10,10,11,12
34:14,19 35:13
45:16
**33** 117:21
**3339** 117:19
**3340** 117:19
**3700** 2:16
**3820** 2:5

---
**4**
---
**4** 3:4 92:4
118:12 124:24
125:14
**4th** 118:24 119:3
120:15 126:8
128:7
**4:30** 30:17
**40** 5:11,12

**117**:19

---
**5**
---
**5** 92:6 95:13
118:12,16
131:4,6
**525** 2:15
**56** 86:23
**57** 109:11

---
**6**
---
**6** 92:10 94:17
131:13
**6th** 139:13
**6339** 117:15,22
119:18 120:24
**6340** 117:16,24
120:24

---
**7**
---
**7** 92:16
**71** 3:10
**711** 5:8

---
**8**
---
**8:30** 30:17
**821** 1:22 2:2

---
**9**
---
**9th** 122:21 123:9
123:10,21
**9:43** 1:21
**901** 13:10
**93** 9:24,25,25
**94** 10:2,9,15,22
**975** 2:12
**98** 3:11



YOUR source for local
news, information
and fun!

This is a printer friendly version of an article from **www.goerie.com**
To print this article open the file menu and choose Print.

Back to: http://www.goerie.com/apps/pbcs.dll/article?AID=/20040912/FRONTPAGE/109120499&SearchID=73200835690532

Article published Sep 12, 2004

# Whistleblower ousted

## County aide had testified supervisor altered document in child-welfare case The disputed changes County backs supervisor

Read More Local News

By Ed Palattella
ed.palattella@timesnews.com

At a court hearing in late July, an aide in the Erie County Office of Children and Youth testified that her supervisor altered a court document, a practice the aide called "not appropriate."

The aide is now out of a job.

Erie County Executive Rick Schenker on Friday arranged for the dismissal of the employee, Abby Conley, who had worked with troubled families for four years as an OCY social-service aide.

Schenker and his top legal adviser, county Solicitor John Onorato, declined to comment on the reasons behind the dismissal, saying county personnel rules prohibit them from discussing the case in detail.

Schenker and Onorato, however, did tell the Erie Times-News that Schenker was not letting Conley go because she was a "whistleblower" or because she testified against OCY.

Onorato said he and Schenker are comfortable with the decision. He said Conley ultimately resigned, though he acknowledged Schenker told the Erie Times-News that Schenker had planned to terminate Conley from her position.

Conley declined comment. She had worked for Erie County government for 13 years, including the four years with OCY. Conley is a former candidate for Erie City Council, and was vice chairwoman of the city of Erie's Human Relations Commission, which became the Erie County Human Relations Commission.

The court hearing at which Conley testified was July 28 before Erie County



Onorato #1

Judge Elizabeth Kelly. The hearing concerned the case of 2-year-old twin girls whom OCY had removed from their parents.

Conley, the aide on the case, was critical of her superior at OCY and provided testimony that was damaging to OCY's position. OCY came into court opposing reunification of the twins with their parents. Kelly ended up ruling against the agency.

Conley testified about the problems she had with OCY's handling of the case. At one point she said she was concerned about testifying, and she started to cry.

"What are you concerned about?" Kelly asked Conley, according to a transcript of the hearing.

"That I'm going to get into trouble," Conley replied.

"What kind of trouble?" Kelly said.

"I'm going to lose my job," Conley said.

"Why are you afraid of that?" Kelly said.

"Because some of the things they've done (are) not appropriate, and I don't want to lie," Conley said.

"You don't need to be afraid," Kelly replied. "And you are to never lie in this courtroom, and you are not going to lose your job based on anything that occurred in this courtroom today."

"OK," Conley said.

Conley also testified that, at that point, no one at OCY had threatened to fire her over what she might say in court. Without going into detail, Conley also said she had other professional difficulties with her superiors at OCY.


The dismissal of Conley and the events leading up to it come at a sensitive time for OCY, which investigates allegations of child abuse and neglect and places dependent children in foster homes or with adoptive parents.

The agency is the subject of an internal probe and a state investigation into its handling of the case of 15-year-old Brittany Legler, who died May 9 after collapsing at the home of her adoptive mother, Lisa M. Iarussi.

Iarussi is awaiting trial on the felonies of aggravated assault and endangering the

welfare of a child and the misdemeanor of recklessly endangering another person.

Police allege she caused more than 200 bruises and other injuries to Legler, whom she adopted in 2001.

According to the arrest warrant for Iarussi and other information in the case, the Millcreek Township School District repeatedly complained of the suspected abuse to OCY, though the office did not forward the complaints to the police.

Conley was not involved in the Iarussi case, and she did not mention that case during her testimony at the hearing about the twins.

The lawyer for the mother of the twins called Conley as a witness at that hearing. The mother and father asked to be reunited with the twins, while OCY, claiming suspected abuse, wanted to terminate the parents' rights and have the children put up for adoption.

The parents' lawyers argued the abuse claims lacked substantiation. The children were in foster care at the time of the hearing, though the parents had met with them in supervised visits.

As the aide on the case, Conley observed how the parents interacted with the children and wrote summaries for presentation in court. She testified that her supervisor on the case, Sue Deveney, altered Conley's evaluation of the mother to make it less favorable.

Reading from documents submitted as evidence, Conley said she originally wrote: "This social-service aide has no concerns or recommendations when it comes to parenting needs in the current or the future when it pertains to (the mother). She clearly excels in her parenting abilities."

Conley said Deveney changed that section to read: "(The mother) displays appropriate parenting skills during supervised visitations at the agency."

In another section of the summary, Conley testified, she wrote that the mother "does exceptionally well parenting and interacting with her children during visits. She is consistently involved with both her twin daughters and equally divides herself between the two of them."

Deveney, Conley testified, changed her summary by taking out the word "exceptionally."

Judge Kelly commented on the changes while Conley was on the witness stand. The differences in the summaries, Kelly said, "are very clear to me."

Conley went on to testify that she realized Deveney, as the supervisor on the case, had "the right to correct my court summaries." But Conley testified that professional disagreements with Deveney prompted her to ask to be taken off the twins' case and out of Deveney's unit. Conley said OCY granted those requests.

"I didn't share the opinion of my supervisor" on the twins' case, Conley testified. "And it was apparent that my opinion (and) professional involvement was different than her professional opinion."

Gerald Villella, the lawyer for the twins' mother, asked Conley if she had ever written negative reports about parents during her career at OCY. Conley said she had.

"Ever stopped from doing that?" Villella said.

"No, no," Conley testified.

"Ever been corrected by your supervisor for doing that?" Villella asked.

"My punctuation has always been corrected because I make mistakes," Conley said.

"No one ever told you couldn't render an opinion on that, did they?" Villella said.

"No," Conley replied.


After hearing Conley's testimony, as well as the testimony of the twins' parents, Kelly issued her ruling. In a setback to OCY's pursuit of termination of parental rights, Kelly ruled that the goal of the case is for the twins to be reunified with their parents, and that OCY "is directed to continue to work actively with these parents towards that goal.

"At this point in time we need to move cautiously to be sure that we ensure the best interests of these children," Kelly said.

Deveney, Conley's super-visor, did not testify at the hearing.

Onorato, the county solicitor, said he reviewed a transcript of the hearing, and said the county found no problems with how Deveney and other supervisors handled the case.

He said he disagreed with Conley's testimony about the alteration of the court summary.

"I am not aware that is what actually occurred," Onorato said.

He also said, "I am confident that after reviewing the transcript and checking into the matter that the Office of Children and Youth acted in a manner that is consistent with the policies and procedures of the office."

ED PALATTELLA, can be reached at 870-1813 or by e-mail.

Last changed: Sep 11, 2004

See this story as it was printed in Erie Times-News' electronic edition. **Click here for a FREE trial**.

This content provided by GoErie.com/Erie Times-News is copyrighted material and all rights are reserved. You may not reproduce this or distribute it electronically, in print or otherwise without **written permission**.

Friday, September 10, 2004

Debra Liebel,
Director
Office of Children and Youth
154 West 9th Street
Erie, PA 16501

Re:        My Resignation

Dear Ms. Liebel:

Please accept this as my voluntary resignation from my position with the Office of Children and Youth. I am voluntarily relinquishing my name badge, and any and all County property within my control or in my position.

I am also, by affixing my signature, releasing the County of Erie and The Office of Children and Youth, from any and all claims arising out of my employment with the County.

In turn I am requesting that should I apply for Unemployment Compensation, said application will not be challenged by the County.

I am also requesting that any and all communication with any and all potential employers be limited to confirming the dates worked and the positions held by the Respondent.

Finally, I promise that I will not disclose, disseminate ,publicize, comment or speculate on the nature or cause of my termination or any other confidential information.

Sincerely,

*Abby B Conley*
Abby Conley

We hereby accept your voluntary resignation and the terms thereof, and on behalf of the County, , IWe promise that we will not disclose, disseminate ,publicize, comment or speculate on the nature or cause of my termination.

*Debra Liebel*        9/10/04
Debra Liebel,

*P.C. Callan*        9/10/04

Peter J. Callan

DEPOSITION
EXHIBIT

Onorato #2

 YOUR source for local news, information and fun!

*Erie Times-News*



Onorato #3

This is a printer friendly version of an article from **www.goerie.com**
To print this article open the file menu and choose Print.

Back to: http://www.goerie.com/apps/pbcs.dll/article?AID=/20050117/FRONTPAGE/101170438&SearchID=73200835690532

Article published Jan 17, 2005

# County's legal bills mount

Read More Local News

By Ed Palattella
ed.palattella@timesnews.com

**Schenker administration pays $56,000 to law firm in ouster of OCY aide**
Erie County government has spent $56,000 to defend the ouster of a child-welfare aide, and the amount is likely to grow as the dispute goes on.

The administration of County Executive Rick Schenker paid the money to an Erie law firm in the case of Abby Conley, who resigned from her $27,437-a-year job with the county Office of Children and Youth on Sept. 10.

Conley claimed she was wrongfully forced out after she tried to expose wrongdoing at OCY, and in late September she asked the state Civil Service Commission to reinstate her. Conley withdrew the appeal the day before the commission was to hear it in late November.

The law firm the county hired, MacDonald, Illig, Jones & Britton, spent seven weeks preparing for the appeal and received $56,371 for its work, according to county billing records.

Despite the withdrawal of the Civil Service action, the labor union for OCY, Local 2666 of the American Federation of State, County and Municipal Employees, is pursuing a grievance over Conley's ouster. MacDonald, Illig is expected to handle that case as well, said John Onorato, the solicitor for the Schenker administration.

The county has a staff of in-house lawyers on retainer. The Schenker administration hired MacDonald, Illig to handle Conley's case because of the firm's expertise in labor law and because of the unique circumstances of the Conley case, Onorato said.

Onorato said he and some of the county's other in-house lawyers, including those at OCY, were involved in the personnel action against Conley and were set to be witnesses in a case over Conley's ouster. Defending the county in a case

while being called as a witness would be "difficult and almost impossible," Onorato said. He said he was subpoenaed to testify at the hearing.

The county's liability insurance for legal claims provides no coverage unless Conley were to sue in court, Onorato said. But he said he believes the state government will reimburse the county for part of the bill.

The $56,371 bill has become a concern of County Councilman Fiore Leone, a frequent critic of the Schenker administration and OCY.

"If it is their practice to go outside when something like this happens, then why do we have a solicitor's staff?" Leone said.

Onorato's retainer is $31,000 a year, and the county's four assistant solicitors each have annual retainers of $25,000, according to county records. OCY has a full-time solicitor paid a salary of $71,620 a year as well as three other lawyers on retainers ranging from $82 to $71.75 an hour, according to OCY records. Those lawyers typically deal with child-welfare issues for OCY, which handles cases of abused and neglected children.

The lawyers at MacDonald, Illig charged the county at a rate of $175 to $165 an hour in the Conley case, according to the bill. The case's lead lawyer, Roger Taft, worked 163 hours at an hourly rate of $175 for an individual bill of $28,525. The rest of the overall bill covered the work of the other lawyers and expenses.

The accuracy of the bill is not in dispute. Onorato said he is satisfied with the work of MacDonald, Illig, which the Schenker administration three years ago hired to negotiate the county's labor contracts. Taft has been the lead lawyer on those cases.

Taft said he aggressively pursued the Conley case because, at the time, Conley was threatening to take action against the county before the Civil Service Commission and through a union grievance.

"We were ready to go," he said of the Civil Service case. "We were ready to win the case and I am convinced we would have won if it had gone forward."

Conley withdrew her claim because the proceeding was "not in her best interest," according to a letter on file with the Civil Service Commission. Conley last week said her lawyers have told her not to comment on her case.

The $56,371 spent on the Conley case is the second large expenditure the Schenker administration has paid over OCY personnel issues in the past year. In August, in an agreement the administration initially tried to keep secret, the county paid a $100,000 settlement to fired OCY caseworker David A. Dows.

Conley, 43, had worked for the county for 13 years, including the past four years at OCY, when she resigned Sept. 10.

Conley claimed the Schenker administration forced her to resign to get back at her for being a whistleblower. Conley's ouster came about a month and a half after she testified in court against her supervisor at OCY, whom Conley said altered court records. The Schenker administration has disputed that claim.

In her Civil Service appeal, Conley said county officials told her the day of her resignation that she had violated OCY rules by using her office e-mail to disclose the telephone number of an OCY client to the client's former caseworker. Conley said she did nothing wrong.

The Schenker administration disagrees. The county's personnel director, Peter Callan, said in an October memo that Conley disclosed a confidential OCY court order "with the intent of alerting" the pregnant mother who was the subject of it.

Onorato, in an interview last week, said the county has "mounted a vigorous defense" against Conley because of her "egregious breach of confidentiality" regarding the court order. He said the county does not want Conley to return to OCY.

"In essence," Onorato said of the $56,371 legal bill, "the fee was being spent in the defense of children."

**Update**

BACKGROUND: Abby Conley, an aide with the Erie County Office of Children and Youth, or OCY, resigned under pressure Sept 10. Conley claims the county wrongfully forced her out because she had tried to expose wrongdoing at OCY. Erie County Executive Rick Schenker's administration claims Conley was asked to resign because she violated OCY confidentiality rules.

THE LATEST: The Schenker administration paid the Erie law firm of MacDonald, Illig, Jones & Britton $56,371 to defend the county against a Civil Service appeal Conley filed to try to get her job back. Conley withdrew the appeal the day before the Civil Service Commission was to hear it in November.

COMING UP: The labor union for OCY, Local 2666 of the American Federation of State, County and Municipal Employees, is pursuing a grievance against the county over Conley's ouster. In addition, County Councilman Fiore Leone said he is preparing to move ahead with his investigation into OCY, which he has said will include an examination of Conley's ouster.

**County has paid firm $334,000**

The Erie law firm of MacDonald, Illig, Jones & Britton's representation in the Abby Conley case is but one part of the work it has done for Erie County government

since County Executive Rick Schenker took office in January 2002.

Including the $56,000 bill in the Conley case, the county had paid MacDonald, Illig $334,255 through the end of December, according to county finance records. Of that amount, $182,450 was payment for the work the firm has done negotiating county government's eight labor contracts.

The rest of the work ranges from environmental-law concerns to individual labor issues, such as Conley's contested ouster from the Erie County Office of Children and Youth, said John Onorato, the solicitor for the Schenker administration.

Onorato is on a $31,000 retainer, his four assistant solicitors get retainers of $25,000 each. Onorato said the Schenker administration has turned to the MacDonald, Illig firm because of its expertise. He called hiring the firm for certain issues "a cost of doing business" and in the best interest of Erie County government, which has an annual budget of $240 million and 1,300 employees.

"MacDonald, Illig has provided representation for the county in matters where the county Solicitor's Office has not been able to provide support," Onorato said. "You have to use a little bit of perspective here. We negotiate eight labor contracts and we need a labor attorney."

The MacDonald, Illig firm has done work for the county in the past, including for the administration of County Executive Judy Lynch, a Democrat, who preceded Schenker, a Republican. The firm has political ties to the Schenker administration: John Mizner, a partner in the firm, is chairman of the Erie County Republican Party and was one of Schenker's biggest supporters during the 2001 campaign for county executive.

Mizner was out of the office and unavailable for comment. Onorato cited MacDonald, Illig's previous work for the county and said the firm long has been a legal resource for county government, no matter what the politics of the administration.

The Lynch administration used MacDonald, Illig for individual labor issues, but Lynch's staff negotiated the county's labor contracts on its own. That changed in early 2002, when Schenker hired the firm to handle labor contracts. County Council urged the move, citing intricacies of the labor contracts that made hiring outside counsel necessary.

The firm's lead labor lawyer on the contracts, Roger Taft, also handled the Conley case.

"I represented the Lynch administration on several matters," Taft said of his experience in county government. "I have always felt that when someone asked

for my services, it was because of my expertise, not because I was 'connected' with any political party or administration. That is not the way I do things."

ED PALATTELLA, can be reached at 870-1813 or by e-mail.

Last changed: Jan 17, 2005

See this story as it was printed in Erie Times-News' electronic edition. **Click here for a FREE trial**.

This content provided by GoErie.com/Erie Times-News is copyrighted material and all rights are reserved. You may not reproduce this or distribute it electronically, in print or otherwise without **written permission**.