Appendix Exhibit 36

Conley v. County of Erie, et al.                    Richard Schenker

Page 1

                IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ABBY B. CONLEY,                    :
            Plaintiff             :
                                  :
        v.                        :    Civil Action No. 05-76E
                                  :
COUNTY OF ERIE, ERIE COUNTY       :
OFFICE OF CHILDREN AND YOUTH,     :
a/k/a ERIE COUNTY CHILD           :
WELFARE SERVICE, RICHARD          :
SCHENKER, individually and        :
in his capacity as County         :
Executive of Erie County,         :
Pennsylvania, PETER CALLAN,       :
individually and in his           :
capacity as Erie County           :
Director of Personnel, DEBRA      :
LIEBEL, individually and in       :
her capacity as Executive         :
Director, Erie County Office      :
of Children and Youth, a/k/a      :
Erie County Child Welfare         :
Service, and JOHN A. ONORATO,     :
ESQUIRE, individually and in      :
his capacity as Erie County       :
Solicitor,                        :
            Defendants            :


        Deposition of RICHARD SCHENKER, taken before and

    by Carol A. Holdnack, Notary Public in and for the

    Commonwealth of Pennsylvania, on Friday, April

    7, 2006, commencing at 1:50 p.m., at the offices

    of Timothy D. McNair, Esquire, 821 State Street,

    Erie, Pennsylvania 16501.


            Reported by Carol A. Holdnack, RPR
            Ferguson & Holdnack Reporting, Inc.

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Case 1:05-cv-00076-SJM    Document 70-11    Filed 04/12/2006    Page 3 of 22

Conley v. County of Erie, et al.                                    Richard Schenker

Page 2

```
1   For the Plaintiff:
2       Timothy D. McNair, Esquire
        821 State Street
3       Erie, PA 16501
4       Anthony Angelone, Esquire
        Vendetti & Vendetti
5       3820 Liberty Street
        Erie, PA 16509
6
    For the County of Erie, Erie County Office of Children and
7   Youth, a/k/a Erie County Child Welfare Service:
        Richard A. Lanzillo, Esquire
8       Knox McLaughlin Gornall & Sennett, PC
        120 West 10th Street
9       Erie, PA 16501
10  For the Defendants Richard Schenker, Peter Callan, and Debra
    Liebel:
11      Edmund R. Joyal, Jr., Esquire
        Law Office of Joseph S. Weimer
12      975 Two Chatham Center
        Pittsburgh, PA 15219
13
14  For the Defendant John A. Onorato, Esquire:
        Sara E. Baugh, Esquire
15      Dell Moser Lane & Loughney, LLC
        525 William Penn Place
16      Suite 3700
        Pittsburgh, PA 15219
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
                INDEX
2
3
    TESTIMONY OF RICHARD SCHENKER
4
        Direct Examination by Mr. McNair . . . . .   4
5
        Cross-Examination by Mr. Joyal . . . . . .  27
6
        Redirect Examination by Mr. McNair . . . .  30
7
        Recross-Examination by Mr. Joyal . . . . . .  32
8
9
10  EXHIBITS:
11      Schenker Deposition Exhibit 1  . . . . . . .  34
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TESTIMONY OF RICHARD SCHENKER

Direct Examination by Mr. McNair . . . . .   4

Cross-Examination by Mr. Joyal . . . . . .  27

Redirect Examination by Mr. McNair . . . .  30

Recross-Examination by Mr. Joyal . . . . . .  32

EXHIBITS:
Schenker Deposition Exhibit 1  . . . . . . .  34

Page 4

```
1       RICHARD SCHENKER, first having
2   been duly sworn, testified as follows:
3
4               DIRECT EXAMINATION
5   BY MR. McNAIR:
6
7   Q.  Mr. Schenker, I'm Tim McNair.  We've met before.
8   A.  Yes.
9   Q.  And, as you know, I'm an attorney.  I'm
10  representing Abby Conley in a case she filed against the
11  County of Erie arising out of her termination which occurred
12  while you were serving as County Executive.
13      And we've asked you to come here today so we can
14  ask you a few questions about the case and find out what you
15  know about it, and develop the case for -- you know, prepare
16  for trial.
17      So I'm going to be asking you a number of
18  questions.  And I just ask that you would agree that if you
19  don't understand my question or if it's not clear,
20  ambiguous, or whatever, that you would stop me at that time,
21  ask me to repeat, rephrase or clarify the question.  I'll be
22  glad to do that.  If you don't do that, then we'll have to
23  assume that you understood the question and that you
24  answered it the way you intended to.  Is that agreeable with
25  you?
```

Page 5

```
1   A.  Um-hum.
2   Q.  Would you please state your full name.
3   A.  It's Richard Robert Schenker.
4   Q.  Okay.  Where do you reside?
5   A.  At 5531 Gardner Drive in Millcreek.
6   Q.  Are you currently employed?
7   A.  I am self-employed.
8   Q.  In what line of business?
9   A.  I'm a consultant.
10  Q.  All right.  Prior to that, what employment were
11  you engaged in?
12  A.  I was the County Executive.
13  Q.  Okay.  When were you the County Executive?
14  A.  From January of 2002 until January of 2006.
15  Q.  Could you -- well, let me just back up here.  I
16  want to ask you a little bit about your educational
17  background.  Where did you go to high school?
18  A.  I went to McDowell, 1975 graduate.
19  Q.  And what education did you have after that?
20  A.  I attended Penn State-Behrend for a little while
21  with some education in various liberal arts, political
22  science, communications.  I finished my degree at Central
23  Bible College in Springfield, Missouri.  It's a theology
24  degree.  And did graduate work at Regent University.
25  Q.  Okay.  Did you --
```

Ferguson & Holdnack Reporting, Inc.
814-452-4556

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                    Richard Schenker

---

Page 6

1    A.  Graduate work was in public policy.
2    Q.  Okay.  Did you get a degree from --
3    A.  No, never finished the master's degree.
4    Q.  Okay.  And I wanted to ask you a little bit about
5  your employment background.  Where did you work when you
6  stopped going to school?  Did you go to school continuously
7  for that period of time or did you take some time off and do
8  other things?
9    A.  Well, I was in and out of school.  I mean, before
10  I went to college, I owned Westlake Pizza Shop for a number
11  of years.  After college, I went to graduate school, took
12  some time off, and went back to graduate school, you know,
13  doing various work in some education, some political work.
14  And then after I left graduate school, I went into some
15  corporate work, corporate sales.
16        Decided to, after I had been married -- married a
17  girl from Erie.  We were living in Virginia Beach.  We
18  decided to move back to Erie.  Got involved back in
19  political work with the Pennsylvania Christian Coalition.
20  Went from there to PennDOT.  And from there to a short, very
21  short term at Allegheny Institute for Public Policy.  And
22  from there to run for County Executive and become County
23  Executive.
24    Q.  Okay.
25    A.  I started a consulting company probably somewhere

Page 7

1  within that time frame, you know, that PennDOT/Allegheny
2  Institute time frame.
3    Q.  What was your position with the Christian
4  Coalition?
5    A.  Executive director for Pennsylvania.
6    Q.  How long were you in that job?
7    A.  From 1992 until 1996.
8    Q.  And then you went to PennDOT?
9    A.  Um-hum.
10    Q.  What was your job at PennDOT?
11    A.  I was the community relations coordinator.
12    Q.  And, here, I always thought you were the
13  spokesman.
14    A.  Yes, it's the same thing.
15    Q.  You were the guy that goes on TV and explains why
16  the roads are torn up.
17    A.  The technical word was community relations
18  coordinator.
19    Q.  And what's the Allegheny Institute for Public
20  Policy?
21    A.  It's a think tank dealing with state and local
22  public policy.
23    Q.  Where is that located?
24    A.  In Pittsburgh.
25    Q.  Did you live in Pittsburgh at that time?

Page 8

1    A.  No, I lived up here.  Did most of my work up here.
2  Traveled down there as I was needed.
3    Q.  All right.  And what type of consulting are you
4  engaged in now?
5    A.  Dealing with government contracts.  Procurement of
6  grants, things like that.
7    Q.  Now, what generally are the duties of the County
8  Executive?
9    A.  The County Executive is the chief administrator of
10  the County.  The entire budget and various departments
11  report -- the County Executive is responsible for making the
12  overall budget and presenting it to Council.  And also for
13  the oversight of the personnel within various departments.
14  And the development of -- what is it called -- initiatives
15  that are new initiatives, that would have to be taken to
16  County Council for approval.
17    Q.  Okay.
18    A.  Very vague.  In general, but that's basically it.
19    Q.  When you were County Executive, did you have any
20  direct role in personnel matters such as hiring and
21  termination?
22    A.  Only at my top staff level.  My director of
23  finance, personnel administration, my attorney, my executive
24  assistant or what was called the program director.  And the
25  director who became the director of economic development and

Page 9

1  planning.
2    Q.  Okay.  And those were the positions that you had
3  direct supervisory control over?
4    A.  Those were the ones I had report directly to me.
5    Q.  Okay.  And those were all at-will positions?
6    A.  Um-hum.
7    Q.  Did you have routine involvement in personnel
8  issues regarding the rank and file of the County workers and
9  the bargaining unit employees?
10    A.  Direct involvement?  Maybe you could define.
11    Q.  Well, on a regular basis were you consulted or --
12    A.  No.
13    Q.  -- did you give direction in day-to-day personnel
14  decisions such as --
15    A.  No.
16    Q.  -- hiring, discipline, that type of thing?
17    A.  No.  Perhaps at a department head level.  Director
18  of health, director of human services, warden.
19    Q.  You would have -- you would be involved in those
20  decisions.
21    A.  Yes.
22    Q.  Okay.  Did you participate directly in any union
23  grievance proceedings?
24    A.  Never.
25    Q.  Did you participate directly in any civil service

3 (Pages 6 to 9)

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                    Richard Schenker

---

Page 10

1  proceedings other than as a witness?
2      A.  Never, and never as a witness.
3      Q.  Okay.  Do you know Abby Conley?
4      A.  I assume this is Abby Conley sitting next to you.
5      Q.  Yes.  All right.  Have you --
6      A.  This is the first time --
7      Q.  -- met her before?
8      A.  No.
9      Q.  Do you recall that Abby was employed by the Office
10 of Children and Youth?
11     A.  Yes.
12     Q.  Did you have any contact with her during that
13 time?
14     A.  No.
15     Q.  Did you ever have any contact with Abby or meet
16 her in any political doings or events?
17     A.  Not that I'm aware of.
18     Q.  When is the first time that you heard of Abby
19 Conley?
20     A.  The Sunday after her termination or resignation.
21     Q.  How did you learn about her?
22     A.  I read her name in the newspaper.
23     Q.  Were you involved in the decision-making process
24 leading up to her termination?
25     A.  No.

---

Page 11

1      Q.  Were you aware that there was a process under way?
2      A.  Yes.
3      Q.  To what extent were you aware?
4      A.  My staff asked for a meeting to inform me of an
5  employee situation that they were going to deal with.  And
6  said that they thought that the employee who had violated a
7  confidentiality issue was the same person who testified in a
8  case, it could be construed that her testimony in the
9  case was the reason for any disciplinary action.
10         And so they wanted to make me aware of it.
11 Because they considered the events that go on at the
12 County -- you know, events that would affect me from a
13 political and public relations point of view.  So they were
14 making me aware of, you know, their process of evaluating
15 e-mails and coming to a determination that there was a
16 confidentiality violation.
17     Q.  Who was in this meeting?
18     A.  I believe it was John Onorato, Pete Callan, Debi
19 Liebel.  And that's all I can remember.
20     Q.  Okay.  Was Mike Cauley involved?
21     A.  I don't remember.
22     Q.  And do you recall about when that meeting took
23 place in relation to that Sunday that you saw the article in
24 the paper?
25     A.  It was the week prior to the Sunday.  I don't know

---

Page 12

1  which day.
2      Q.  Okay.  The week immediately preceding?
3      A.  Right.
4      Q.  Would it have been Friday, or?
5      A.  It was more likely Wednesday or Thursday, but I
6  don't recall.
7      Q.  Okay.  Had you ever had a similar meeting
8  regarding the termination of any other rank-and-file
9  employee of the County?
10     A.  I don't recall meetings like this except that
11 there was something at the beginning of my administration
12 where a gentleman who was a campaign supporter of mine was
13 being terminated for some kind of fraud or insurance -- what
14 is it -- expense report violation.  And I think in that
15 case, because he was a gentleman who worked on my campaign
16 committee, they wanted to inform me what they were doing.
17     Q.  All right.  So that and this were the only
18 two times that you were involved in a meeting --
19     A.  It's the only times I recall.
20     Q.  -- that you recall.  Okay.
21     A.  At this point.
22     Q.  All right.  Did you review any documents at this
23 meeting?
24     A.  No, I did not.  At least not from what I remember.
25     Q.  Okay.  Was the term "whistleblower" brought up at

---

Page 13

1  that meeting?
2      A.  The term "whistleblower," I believe, was brought
3  up at that meeting.  In the context that it was thought that
4  a newspaper reporter could construe that action taken
5  against this employee was due to testimony in some court
6  case.  And so whether the word "whistleblower" was actually
7  used or whether that was a -- you know, indicated with that
8  type of terminology, I can't tell you for sure.
9      Q.  How long did that meeting last?
10     A.  Probably 15 minutes.
11     Q.  Who explained to you the overall situation?
12     A.  I think the majority of it was coming from John
13 Onorato, and potentially some from Debi Liebel.  But I would
14 say probably the majority of it from John Onorato.
15     Q.  Was Mr. Callan conversant with the facts of the
16 situation?  As you recall.
17     A.  I think he may have said some things concerning
18 the personnel code or something, but I don't recall him
19 saying much.
20     Q.  Okay.  Who brought up that a newspaper reporter
21 would have an interest in this case?
22     A.  I believe John Onorato.  He had actually offered
23 me some transcripts from a case, and I declined.
24     Q.  Okay.  Was that the hearing that was discussed --
25     A.  Yeah.  Transcripts of --

Ferguson & Holdnack Reporting, Inc.
814-452-4556

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                              Richard Schenker

Page 14

1    Q.  -- that Abby testified at?
2    A.  Yes.
3    Q.  And you didn't look at them?
4    A.  No.
5    Q.  Did you do anything to independently review or
6  investigate this situation?
7    A.  No.
8    Q.  And did you review the overall investigation that
9  had been done?
10   A.  No.
11   Q.  Did you review a document prepared by Mike Cauley,
12 which was a letter to John Onorato dated August 20th?
13   A.  I don't believe so.  I could have, but I don't
14 think so.
15   Q.  All right.  So in your participation in this
16 process, would it be fair to say that you relied exclusively
17 on the efforts of your subordinates?
18   A.  Yes.
19   Q.  Do you recall whether or not you and Mr. Onorato
20 went up to the Times-News on Friday, September 10th, 2004?
21   A.  I know Mr. Onorato and I went to the Times-News.
22 Whether that was the date right now, I don't know.  I would
23 have to look at the calendar and the newspaper articles and
24 verify that time frame, but I assume that's correct.
25   Q.  What was your purpose in going up there?

Page 15

1    A.  To inform the Times-News that there was going to
2  be an action taken, and the action had nothing to do with a
3  prior case that one of the reporters had sat in and taken
4  information on.
5    Q.  Why would somebody think that?
6    A.  That was the purpose of the meeting that
7  Mr. Onorato, Debi Liebel and Pete Callan at least, maybe
8  Mike Cauley, I don't know, had with me.  Was because they
9  believed that any action against this employee could be
10 construed as dealing with that case when, in fact, it had to
11 do with a violation of confidentiality issue.
12       And I suggested that maybe we should just go to
13 the Times-News and tell them that.  Now, we didn't
14 necessarily tell them what the -- why an action would be
15 taken against an employee.  We said that there was a
16 personnel -- we had to be confidential about that because it
17 was a personnel matter.
18   Q.  Okay.  So you didn't say why it was, but you did
19 say it was not because of Abby's testimony at a hearing.
20   A.  Yes.  I believe we said -- we said it had nothing
21 to do with a previous case.
22   Q.  Okay.  How were you aware that a reporter sat in
23 on the case?
24   A.  In the meeting that I had with those folks that
25 you alluded to, it -- they brought that up and offered me

Page 16

1  copies of a transcript.
2    Q.  Okay.  So the fact that a reporter was present at
3  a hearing was brought to your attention in this meeting that
4  we talked about.
5    A.  Um-hum.
6    Q.  The week that the termination occurred.
7    A.  Um-hum.
8    Q.  What was the concern about the reporter being
9  present at the trial?
10   A.  That an --
11   Q.  Or at the County.
12   A.  -- action against the employee might be construed
13 as related to that rather than the issue that they were
14 dealing with.
15   Q.  Okay.  Did anyone express a belief that Ms. Conley
16 had something to do with the reporter being at that hearing?
17   A.  I don't believe so.
18   Q.  Did something happen at the hearing that was
19 problematic for the agency?
20   A.  I don't know the case.
21   Q.  Okay.  You don't know what happened at the
22 hearing, just that there was a hearing?
23   A.  Yes.  That's all I know, is that there was a -- I
24 don't remember what that case was.
25   Q.  When you went to the Times, who did you speak to?

Page 17

1    A.  Pat Howard and Rick Sayers.
2    Q.  Did you speak to Mr. Palattella?
3    A.  No.
4    Q.  Who is Rick Sayers?
5    A.  He's an editor in chief.
6    Q.  Okay.  All right.  Did you tell them that
7  Mr. Palattella was interested in this story, or that he had
8  been at that hearing?
9    A.  I believe maybe -- we told them that there was a
10 reporter at the story (sic).  Whether we mentioned it was Ed
11 Palattella or not, I don't know.
12   Q.  Did you know it was Ed Palattella?
13   A.  I don't know if I knew then.  Maybe.
14       (Schenker Deposition Exhibit 1 marked for
15        identification.)
16   Q.  Mr. Schenker, I'm handing you what's been marked
17 as Exhibit 1.
18   A.  Um-hum.
19   Q.  Which is a reprint of an article from the Sunday,
20 September 12th, 2004 issue of the Times-News.  Is that the
21 article that you referred to at the beginning of your
22 testimony?
23   A.  The Sunday article when I saw Abby Conley's name
24 for the first time, yes.
25   Q.  Have you reviewed this article recently?

5 (Pages 14 to 17)

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                    Richard Schenker

---

Page 18

1    A.  No.
2    Q.  Okay.  At the time you read it, did you believe
3  that the article accurately represented the facts?
4         MR. LANZILLO:  Objection.  Overly broad -- which
5         facts?
6         MR. McNAIR:  The facts set forth in the article.
7         MR. JOYAL:  Well, which facts are you talking
8         about?  That he arranged for her --
9    Q.  Do you need some glasses?
10   A.  Oh, yeah.  That would be helpful.
11        MR. LANZILLO:  I'm just going to -- to the extent
12        that you answer that question, I would certainly
13        encourage you to read the article in its entirety
14        and address each paragraph.
15        MR. JOYAL:  Each paragraph.
16   A.  Okay.
17   Q.  Yeah, I would concur with that.  Would you mind
18  taking a look at that.
19   A.  Let me start with the headline.  The headline is
20  what bothered me.  I did not think that was accurate.  I
21  thought it was unfair.  And I also believed that the
22  Times-News had done a disservice to the community.
23        I told the editors in my meeting with them that --
24  and I don't know who mentioned the word "whistleblower"
25  first.  But I said this administration encourages

---

Page 19

1  whistleblowers, and we do not want to do anything to
2  discourage whistleblowers.  So if, in fact, you know,
3  that -- actually, I think that's all I said about that.
4    Q.  Okay.  Were you disappointed that that sentiment
5  wasn't set forth in the article, or was it?
6    A.  As far as I know, it was not.
7         MR. JOYAL:  Rick, read the whole article.
8         THE WITNESS:  Okay.
9         MR. JOYAL:  Don't talk about it until you read it.
10        (Witness reviews document.)
11   A.  Well, I would like to, before I read the whole
12  thing, just comment on this first part of it.  I believe the
13  Times-News did not accurately display, you know, an action
14  against an employee that was, you know, in a bureau, under a
15  department, under a director of administration, you know,
16  and their situation.  I believe it made it look like, you
17  know, this was Rick Schenker's decision and, you know, he
18  was -- you know, he planned to terminate.  And I had -- you
19  know, this is not something that I did in my administration.
20        So do I believe it's accurate; no.
21   Q.  Okay.
22   A.  But it's the typical way the Times-News publishes
23  things.  You know, many times they'll say it in different
24  ways, like the Schenker administration you know.  And then
25  who can argue with that.

---

Page 20

1    Q.  All right.  Well, they're attributing that
2  statement to Mr. Onorato.
3    A.  I understand.  But I'm just telling you that
4  that's the way they depict it.  The stuff concerning Judge
5  Kelly and so forth, I had no knowledge of.  And most of this
6  has to do with that.  And, again, I have -- I didn't make a
7  determination -- let's see.  Yeah, I think -- could you
8  repeat your initial question?  Do I agree?
9    Q.  Well, I guess the question was probably poorly
10  worded.
11   A.  Okay.
12   Q.  Let me just go through a couple of points, and
13  we'll see if we can do it that way.  I think Mr. Lanzillo
14  had the better idea.
15        The fifth paragraph there on the first page, it
16  began, "Schenker and Onorato, however, did tell the Erie
17  Times-News that Schenker was not letting Conley go because
18  she was a whistleblower or because she testified against
19  OCY".  Is that factually accurate?
20   A.  I would say that is a -- I would say they
21  construed that based on what I said.
22   Q.  Okay.  That's not a direct quote?
23   A.  No.
24   Q.  And that's -- is that -- that's put together from
25  various different things that you said.

---

Page 21

1    A.  I would say.
2    Q.  Do you know whether Mr. Onorato made the comments
3  that are attributed to him in the next paragraph?
4    A.  No, I do not.
5    Q.  Did you ever talk to him about that?
6    A.  No.  In case you need those (indicating).
7    Q.  Yeah, I probably will before it's all said and
8  done.  I'm done with the -- were you ever informed that the
9  Office of Children and Youth had requested the permission of
10  your administration to read all of Ms. Conley's e-mails back
11  to the beginning of the year?
12        MR. LANZILLO:  Objection to form.  You can answer.
13   A.  No, I was not informed.  I think I was told in the
14  meeting that they had done an investigation including
15  e-mails.
16   Q.  Okay.  Nobody told you ahead of time or sought
17  your approval --
18   A.  No.
19   Q.  -- for that?
20   A.  No, they would not have done that.
21   Q.  Did you make any review of Abby's personnel file
22  in this meeting?
23   A.  Never.
24   Q.  Did you -- you never reviewed her performance
25  evaluations, then?

Ferguson & Holdnack Reporting, Inc.
814-452-4556

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                      Richard Schenker

---

Page 22

1    A.  Never.
2    Q.  Was there any discussion of her personnel file or
3  her past performance in her 13 years of employment?
4    A.  No.
5    Q.  In this meeting was there any consideration given
6  to any sanction other than terminating her employment?
7    A.  I don't know.  I only remember listening to them,
8  being more concerned about my administration and it seemed
9  political future.  And I told them what I tell everybody, is
10  do the right thing.
11    Q.  So you don't recall that there was any discussion
12  of perhaps some lesser sanction or --
13    A.  I don't recall.
14    Q.  Okay.
15    A.  I don't believe so, but I don't recall.
16    Q.  Did you participate in any other personnel actions
17  at the Office of Children and Youth --
18    MR. LANZILLO:  Objection to form.
19    Q.  -- in 2004?
20    MR. McNAIR:  What's the matter with that?
21    MR. LANZILLO:  It assumes that he participated in
22    a personnel action.  I think he's testified that
23    it was an information meeting.  He was advised
24    concerning actions to be taken out of concern out
25    of political impact.  So the other is

Page 23

1    objectionable.
2    Q.  Did you approve the action that was proposed by
3  the people in that meeting?
4    A.  My only comment was, just do the right thing.
5    Q.  Okay.  So you made no determination as to whether
6  or not what they were going to do was the right thing or
7  not?
8    A.  No.  That was entirely up to them.
9    Q.  Were you involved in any -- well, I guess I'll
10  have to say any other personnel actions that were taken
11  regarding OCY employees after that?
12    MR. LANZILLO:  Same objection.
13    MR. McNAIR:  I think we can agree it was a
14    personnel action here.
15    MR. LANZILLO:  I understand -- and I understand
16    your --
17    MR. McNAIR:  It's a little ambiguous.  I don't
18    know how --
19    MR. LANZILLO:  It could be construed as
20    objectionable or nonobjectionable, so I put a
21    precautionary objection on the record.
22    MR. McNAIR:  I'm not asking him to admit.
23    MR. LANZILLO:  I got you.
24    A.  I only asked for investigations of issues relating
25  to Brittany Legler and another case where a child almost

Page 24

1  drowned in West County.  And I asked for those
2  investigations so that they could make solid personnel
3  decisions.  I asked for that from the director of human
4  services, not from the director of OCY, because I wanted to
5  get a higher-level view of those things.
6    Q.  Okay.
7    A.  The only other personnel decision that I made was
8  with the final selection of the new director of OCY.
9    Q.  Mr. Lucht.
10    A.  Yes.
11    Q.  All right.  Was there any investigation of
12  Ms. Liebel's -- I'll say stewardship of OCY during the time
13  that she was the director?
14    MR. JOYAL:  Objection, relevance.  You can answer.
15    A.  Only that which was done either by the director of
16  human services concerning those issues of personnel
17  internally concerning those two young girls.  I believe they
18  were both young girls; Brittany Legler and the other one out
19  in the West County.
20    Q.  Okay.
21    A.  And everything else was probably a -- it wasn't
22  personnel-related.  It was, you know, the larger view of, do
23  we have the right people in positions.  And I would
24  continuously ask my staff to review that.
25    Q.  Okay.  The director of human services at this time

Page 25

1  was who?
2    A.  There were actually two.  One was Steve Suroviec,
3  and the second was Charlie Barber.
4    Q.  And who was the director of Human Services at the
5  time Ms. Liebel left OCY?
6    A.  Charlie Barber.
7    Q.  Do you know whether or not he recommended to
8  Ms. Liebel that she find her life's work elsewhere, or?
9    MR. JOYAL:  Objection, relevance.
10    Q.  You don't know?
11    A.  I don't know.
12    Q.  Was there any discussion of Ms. Liebel's departure
13  with you prior to the event?
14    MR. JOYAL:  Same objection.
15    MR. LANZILLO:  You can answer.
16    A.  The only one who discussed that with me was John
17  Onorato, who said that he had a talk with Ms. Liebel and
18  that she was going to resign.  And she was going to retire,
19  I think he said.
20    Q.  Right.  I believe she said she retired.
21    A.  Right.
22    Q.  Do you know a County employee named PW?
23    A.  I can only say the name sounds familiar.  That's
24  all I can tell you.
25    Q.  Do you know whether any complaints or issues

Ferguson & Holdnack Reporting, Inc.
814-452-4556

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                    Richard Schenker

Page 26

1 relating to Ms. W were brought to your attention during your
2 administration?
3    A. Not that I recall.
4    Q. Was it your understanding that Mr. Onorato had the
5 actual transcripts of the hearing that was discussed in that
6 meeting?
7    A. I didn't have the understanding he had the
8 transcripts. I think I had the understanding that he could
9 get them.
10    Q. Okay. So he didn't put them in front of you at
11 that meeting?
12    A. No.
13    Q. Okay. Did your administration undertake any
14 investigation of the manner in which the personnel action
15 against Ms. Conley was carried out?
16    A. That would be a question for Mr. Callan. I do not
17 have the answer to that.
18    Q. Okay. Do you know whether or not anyone took a
19 look at it to see whether or not it was done in accordance
20 with appropriate procedures, or?
21    A. I do not know. I would have left that to
22 Mr. Callan.
23    Q. When did you first become aware that Ms. Conley
24 was claiming that -- actually making the claim that her
25 termination was motivated by her testimony at a hearing?

Page 27

1    A. I don't recall when I found that out. There had
2 to be some kind of public document or public issue, maybe
3 something concerning civil -- a civil service hearing,
4 perhaps, at that point.
5    MR. McNAIR: That's all the questions I have for
6    you right now.
7
8         CROSS-EXAMINATION
9 BY MR. JOYAL:
10
11    Q. Rick, I just have a couple questions. And I just
12 want to have you look at Exhibit No. 1.
13    A. Okay.
14    Q. You testified earlier that this was an
15 informational meeting to you. And that during the course of
16 this original informational meeting, you said that people
17 expressed some concerns that a reporter or the newspaper
18 might misconstrue or construe the termination of the
19 personnel action of this unnamed employee to be related to
20 her testimony at the trial.
21    A. Um-hum.
22    Q. Do you remember that?
23    A. Yes.
24    Q. What's the headline of that story say?
25    A. Whistleblower Ousted.

Page 28

1    Q. Was that not somewhat of a fulfilled prophecy,
2 based upon the meeting that you had earlier?
3    A. Yes.
4    Q. They were, indeed, prophetic that if the word of
5 this termination was given to the newspapers, it would be
6 construed by the newspapers or written by the newspapers as
7 something that it was not, that is, that a whistleblower had
8 been fired for giving testimony at a court hearing.
9    A. Correct.
10    Q. And this story that was printed out -- obviously,
11 it was off the Internet version. But, primarily, this is a
12 story about -- well, could one construe this as another
13 OCY-bashing story?
14    A. That's the way I would have construed it. And
15 with the sensational headlines that don't match the article.
16    Q. Well, they certainly don't match what you told
17 them allegedly.
18    A. Right.
19    Q. Do they match the reasons that you understood were
20 being given by OCY and, in effect, the County for her
21 requested termination?
22       MR. McNAIR: Objection, foundation.
23    Q. You can answer.
24    A. Well, they don't match the reason that we -- that
25 I was told there was going to be a termination based on a

Page 29

1 breach of confidentiality. Was that your question?
2    Q. Yes, that's my question. And let me ask this.
3 Presuming, for the purposes of the question, that the
4 termination took place in the afternoon of September 10th,
5 2004, did you authorize a press release or a phone call to
6 the newspapers to inform them that Ms. Conley had been
7 separated from her employment with the County?
8    A. A press release or a phone call?
9    Q. Yeah. Did you call -- did you authorize someone
10 to call the newspaper and say, we just fired Abby Conley?
11    A. No.
12    Q. Your comments to the two editors in paragraph --
13 which were attributed to you in Paragraph 4, which is,
14 "Schenker and his top legal adviser declined to comment on
15 the reasons behind the dismissal, saying County personnel
16 rules prohibit them from discussing the case in detail", as
17 something that you did say, correct?
18    A. That's right. We said we could not discuss it
19 because it was a personnel issue.
20    Q. So the only people that -- and I would presume
21 that you would not have directed Pete Callan or Debi Liebel
22 or John Onorato to call the newspapers --
23    A. No.
24    Q. -- between September 9th and September -- I
25 presume the close of the time that the Erie Times goes to

8 (Pages 26 to 29)

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                                    Richard Schenker

Page 30

1  press on September 11th for its Sunday edition, to inform
2  them so that they could write this story?
3      A.  No, I didn't direct.
4      Q.  So, presumably, it came from someone associated
5  with Ms. Conley.
6          MR. McNAIR:  Objection.  Argumentative.  Lack of
7          foundation.
8      Q.  Would you believe that?
9          MR. McNAIR:  Untrue.
10     A.  You know, I couldn't say.  I don't know.  I guess.
11     Q.  Well, let's go logically here.  There was a
12  Saturday in between Friday and Sunday.
13     A.  Um-hum.  Obviously, they had talked to Ms. Conley.
14  They --
15     Q.  I believe it says in the article she declined
16  comment.
17     A.  Right.
18     Q.  One doesn't know what she declined comment about
19  though; is that right?
20     A.  Um-hum.
21         MR. JOYAL:  I have no other questions.
22
23          REDIRECT EXAMINATION
24  BY MR. McNAIR:
25

Page 31

1      Q.  As I read this article, you didn't state that
2  there was another reason, just that there -- that the reason
3  was not because Abby was a whistleblower; is that correct?
4          MR. LANZILLO:  Objection to form.
5      A.  I think that we said there was a reason, but we
6  couldn't talk about it.
7      Q.  Okay.  Now, when Mr. Joyal tells you that the
8  Times learned of Abby's termination from Abby or people
9  associated with her, you would agree with me that that's
10 mere speculation on your part.
11         MR. JOYAL:  Well, I'm going to object to the
12         characterization.  I didn't tell him anything.  I
13         asked him a question.
14     A.  I don't -- you know, all I know is what's written
15  in here.  And it says they talked to her.  And they refer to
16  the comment that John Onorato and I made.  And I assume that
17  that was at their offices when we went there.  So I don't
18  know --
19     Q.  Okay.  Well, Onorato's comment, obviously, was
20  after the termination, correct?  He said Conley ultimately
21  resigned.
22     A.  It must have been after, then.
23     Q.  Okay.  So it might have been Mr. Onorato that
24  called the newspaper to tell them that the deed was done.
25     A.  It could very well be.  Or they called him.

Page 32

1          MR. McNAIR:  That's all I have.
2
3          RECROSS-EXAMINATION
4  BY MR. JOYAL:
5
6      Q.  Let's just follow up here, logically speaking,
7  Rick.  You go to the newspaper.
8      A.  Um-hum.
9      Q.  You tell them something so that there's no
10 misconstruction of what happened, on a Friday.
11     A.  Um-hum.
12     Q.  On a Sunday a story appears talking about what
13  happened with a headline talking about a whistleblower and
14  all sorts of quotes from a transcript of a trial.
15     A.  Um-hum.
16     Q.  Many of which talk about Abby Conley saying she
17  was afraid to lose her job.
18     A.  Um-hum.
19     Q.  Does logic indicate that John Onorato is going to
20  call the newspaper to say, in Mr. McNair's words, "the deed
21  is done"?
22         MR. McNAIR:  Objection.  Argumentative.
23     A.  Knowing John Onorato, I don't believe that he made
24  a phone call to the newspaper.  Was he -- now, again, and I
25  do want to mention this.  I was talking to Rick Sayers and

Page 33

1  Pat Howard.  This article is written by Ed Palattella.  Ed
2  Palattella was not in the room.  That's all I want to point
3  out.
4      Q.  We understand that.  And the County and OCY for a
5  number of years had the stuffings kicked out of it by Ed
6  Palattella in the Erie Times; is that right?
7          MR. McNAIR:  Objection.  Argumentative.  Lack of
8          foundation.  To the extent you make it sound like
9          it was unjustified.
10         MR. JOYAL:  Well, I've read some of the stories,
11         Mr. McNair.  I don't see two sides to many of
12         them.
13     A.  Ed Palattella does do that, yes.
14     Q.  Okay.  Would the County, John Onorato, or anybody
15  associated with OCY and the County call Ed Palattella --
16     A.  No.
17     Q.  -- to have another story -- negative story written
18  about it?
19     A.  I can't -- no, I can't imagine that happening.
20         MR. JOYAL:  I don't have any questions.
21         MR. McNAIR:  That's it.
22         MR. JOYAL:  Rick, you have a right to read or
23         waive signature on the transcript.  By and large,
24         your only role in reading and signing it would be
25         to correct typographical errors.  I would suggest

                                    9 (Pages 30 to 33)

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.                    Richard Schenker

Page 34

```
1        you waive.
2        THE WITNESS:  I'll waive.
3
4        (Deposition concluded at 2:40 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

10 (Page 34)

03666df6-af6c-4a6c-a0a1-372d4cdbf3e5

Conley v. County of Erie, et al.

Richard Schenker
Page 1

## A

**Abby** 1:3 4:10 10:3
10:4,9,15,18 14:1
17:23 29:10 31:3
31:8 32:16
**Abby's** 15:19 21:21
31:8
**accurate** 18:20
19:20 20:19
**accurately** 18:3
19:13
**action** 1:4 11:9
13:4 15:2,2,9,14
16:12 19:13 22:22
23:2,14 26:14
27:19
**actions** 22:16,24
23:10
**actual** 26:5
**address** 18:14
**administration**
8:23 12:11 18:25
19:15,19,24 21:10
22:8 26:2,13
**administrator** 8:9
**admit** 23:22
**advised** 22:23
**adviser** 29:14
**affect** 11:12
**afraid** 32:17
**afternoon** 29:4
**agency** 16:19
**agree** 4:18 20:8
23:13 31:9
**agreeable** 4:24
**ahead** 21:16
**allegedly** 28:17
**Allegheny** 6:21
7:19
**alluded** 15:25
**ambiguous** 4:20
23:17
**Angelone** 2:4
**answer** 18:12 21:12
24:14 25:15 26:17
28:23

**answered** 4:24
**Anthony** 2:4
**anybody** 33:14
**appears** 32:12
**appropriate** 26:20
**approval** 8:16
21:17
**approve** 23:2
**April** 1:20
**argue** 19:25
**Argumentative**
30:6 32:22 33:7
**arising** 4:11
**arranged** 18:8
**article** 11:23 17:19
17:21,23,25 18:3
18:6,13 19:5,7
28:15 30:15 31:1
33:1
**articles** 14:23
**arts** 5:21
**asked** 4:13 11:4
23:24 24:1,3
31:13
**asking** 4:17 23:22
**assistant** 8:24
**associated** 30:4
31:9 33:15
**assume** 4:23 10:4
14:24 31:16
**assumes** 22:21
**attended** 5:20
**attention** 16:3 26:1
**attorney** 4:9 8:23
**attributed** 21:3
29:13
**attributing** 20:1
**at-will** 9:5
**August** 14:12
**authorize** 29:5,9
**aware** 10:17 11:1,3
11:10,14 15:22
26:23
**a/k/a** 1:6,12 2:7

## B

**B** 1:3

**back** 5:15 6:12,18
6:18 21:10
**background** 5:17
6:5
**Barber** 25:3,6
**bargaining** 9:9
**based** 20:21 28:2
28:25
**basically** 8:18
**basis** 9:11
**Baugh** 2:14
**Beach** 6:17
**began** 20:16
**beginning** 12:11
17:21 21:11
**belief** 16:15
**believe** 11:18 13:2
13:22 14:13 15:20
16:17 17:9 18:2
19:12,16,20 22:15
24:17 25:20 30:8
30:15 32:23
**believed** 15:9 18:21
**better** 20:14
**Bible** 5:23
**bit** 5:16 6:4
**bothered** 18:20
**breach** 29:1
**Brittany** 23:25
24:18
**broad** 18:4
**brought** 12:25 13:2
13:20 15:25 16:3
26:1
**budget** 8:10,12
**bureau** 19:14
**business** 5:8

## C

**C** 4:1,1
**calendar** 14:23
**call** 29:5,8,9,10,22
32:20,24 33:15
**Callan** 1:9 2:10
11:18 13:15 15:7
26:16,22 29:21
**called** 8:14,24

31:24,25
**campaign** 12:12,15
**capacity** 1:8,10,11
1:14
**Carol** 1:19,24
**carried** 26:15
**case** 4:10,14,15
11:8,9 12:15 13:6
13:21,23 15:3,10
15:21,23 16:20,24
21:6 23:25 29:16
**Cauley** 11:20 14:11
15:8
**Center** 2:12
**Central** 5:22
**certainly** 18:12
28:16
**characterization**
31:12
**Charlie** 25:3,6
**Chatham** 2:12
**chief** 8:9 17:5
**child** 1:6,13 2:7
23:25
**Children** 1:6,12 2:6
10:10 21:9 22:17
**Christian** 6:19 7:3
**civil** 1:4 9:25 27:3,3
**claim** 26:24
**claiming** 26:24
**clarify** 4:21
**clear** 4:19
**close** 29:25
**Coalition** 6:19 7:4
**code** 13:18
**college** 5:23 6:10
6:11
**come** 4:13
**coming** 11:15 13:12
**commencing** 1:21
**comment** 19:12
23:4 29:14 30:16
30:18 31:16,19
**comments** 21:2
29:12
**committee** 12:16

**Commonwealth**
1:20
**communications**
5:22
**community** 7:11,17
18:22
**company** 6:25
**complaints** 25:25
**concern** 16:8 22:24
**concerned** 22:8
**concerning** 13:17
20:4 22:24 24:16
24:17 27:3
**concerns** 27:17
**concluded** 34:4
**concur** 18:17
**confidential** 15:16
**confidentiality**
11:7,16 15:11
29:1
**Conley** 1:3 4:10
10:3,4,19 16:15
20:17 26:15,23
29:6,10 30:5,13
31:20 32:16
**Conley's** 17:23
21:10
**consideration** 22:5
**considered** 11:11
**construe** 13:4
27:18 28:12
**construed** 11:8
15:10 16:12 20:21
23:19 28:6,14
**consultant** 5:9
**consulted** 9:11
**consulting** 6:25 8:3
**contact** 10:12,15
**context** 13:3
**continuously** 6:6
24:24
**contracts** 8:5
**control** 9:3
**conversant** 13:15
**coordinator** 7:11
7:18

Conley v. County of Erie, et al.

Richard Schenker
Page 2

copies 16:1
corporate 6:15,15
correct 14:24 28:9
    29:17 31:3,20
    33:25
Council 8:12,16
County 1:5,5,6,8,8
    1:10,12,13,14 2:6
    2:6,7 4:11,12 5:12
    5:13 6:22,22 8:7,9
    8:10,11,16,19 9:8
    11:12 12:9 16:11
    24:1,19 25:22
    28:20 29:7,15
    33:4,14,15
couple 20:12 27:11
course 27:15
court 1:1 13:5 28:8
Cross-Examinati...
    3:5 27:8
currently 5:6

**D**

D 1:22 2:2 3:1 4:1
date 14:22
dated 14:12
day 12:1
day-to-day 9:13
deal 11:5
dealing 7:21 8:5
    15:10 16:14
Debi 11:18 13:13
    15:7 29:21
Debra 1:10 2:10
decided 6:16,18
decision 19:17 24:7
decisions 9:14,20
    24:3
decision-making
    10:23
declined 13:23
    29:14 30:15,18
deed 31:24 32:20
Defendant 2:14
Defendants 1:15
    2:10
define 9:10

degree 5:22,24 6:2
    6:3
Dell 2:15
department 9:17
    19:15
departments 8:10
    8:13
departure 25:12
depict 20:4
Deposition 1:18
    3:11 17:14 34:4
detail 29:16
determination
    11:15 20:7 23:5
develop 4:15
development 8:14
    8:25
different 19:23
    20:25
direct 3:4 4:4 8:20
    9:3,10 20:22 30:3
directed 29:21
direction 9:13
directly 9:4,22,25
director 1:10,12
    7:5 8:22,24,25,25
    9:17,18 19:15
    24:3,4,8,13,15,25
    25:4
disappointed 19:4
disciplinary 11:9
discipline 9:16
discourage 19:2
discuss 29:18
discussed 13:24
    25:16 26:5
discussing 29:16
discussion 22:2,11
    25:12
dismissal 29:15
display 19:13
disservice 18:22
DISTRICT 1:1,1
document 14:11
    19:10 27:2
documents 12:22

doing 6:13 12:16
doings 10:16
Drive 5:5
drowned 24:1
due 13:5
duly 4:2
duties 8:7

**E**

E 2:14 3:1 4:1,1
earlier 27:14 28:2
economic 8:25
Ed 17:10,12 33:1,1
    33:5,13,15
edition 30:1
editor 17:5
editors 18:23 29:12
Edmund 2:11
education 5:19,21
    6:13
educational 5:16
effect 28:20
efforts 14:17
either 24:15
employed 5:6 10:9
employee 11:5,6
    12:9 13:5 15:9,15
    16:12 19:14 25:22
    27:19
employees 9:9
    23:11
employment 5:10
    6:5 22:3,6 29:7
encourage 18:13
encourages 18:25
engaged 5:11 8:4
entire 8:10
entirely 23:8
entirety 18:13
Erie 1:5,5,6,8,10,12
    1:13,14,23 2:3,5,6
    2:6,7,9 4:11 6:17
    6:18 20:16 29:25
    33:6
errors 33:25
Esquire 1:14,22 2:2
    2:4,7,11,14,14

evaluating 11:14
evaluations 21:25
event 25:13
events 10:16 11:11
    11:12
everybody 22:9
Examination 3:4,6
    4:4 30:23
exclusively 14:16
executive 1:8,11
    4:12 5:12,13 6:22
    6:23 7:5 8:8,9,11
    8:19,23
Exhibit 3:11 17:14
    17:17 27:12
EXHIBITS 3:10
expense 12:14
explained 13:11
explains 7:15
express 16:15
expressed 27:17
extent 11:3 18:11
    33:8
e-mails 11:15 21:10
    21:15

**F**

fact 15:10 16:2
    19:2
facts 13:15 18:3,5,6
    18:7
factually 20:19
fair 14:16
familiar 25:23
far 19:6
Ferguson 1:25
fifth 20:15
file 9:8 21:21 22:2
filed 4:10
final 24:8
finance 8:23
find 4:14 25:8
finished 5:22 6:3
fired 28:9 29:10
first 4:1 10:6,18
    17:24 18:25 19:12
    20:15 26:23

folks 15:24
follow 32:6
follows 4:2
form 21:12 22:18
    31:4
forth 18:6 19:5
    20:5
found 27:1
foundation 28:22
    30:7 33:8
frame 7:1,2 14:24
fraud 12:13
Friday 1:20 12:4
    14:20 30:12 32:10
front 26:10
fulfilled 28:1
full 5:2
future 22:9

**G**

Gardner 5:5
general 8:18
generally 8:7
gentleman 12:12
    12:15
girl 6:17
girls 24:17,18
give 9:13
given 22:5 28:5,20
giving 28:8
glad 4:22
glasses 18:9
go 5:17 6:6 11:11
    15:12 20:12,17
    30:11 32:7
goes 7:15 29:25
going 4:17 6:6 11:5
    14:25 15:1 18:11
    23:6 25:18,18
    28:25 31:11 32:19
Gornall 2:8
government 8:5
graduate 5:18,24
    6:1,11,12,14
grants 8:6
grievance 9:23
guess 20:9 23:9

Conley v. County of Erie, et al.

30:10
guy 7:15

**H**

H 4:1,1
handing 17:16
happen 16:18
happened 16:21
   32:10,13
happening 33:19
head 9:17
headline 18:19,19
   27:24 32:13
headlines 28:15
health 9:18
heard 10:18
hearing 13:24
   15:19 16:3,16,18
   16:22,22 17:8
   26:5,25 27:3 28:8
helpful 18:10
high 5:17
higher-level 24:5
hiring 8:20 9:16
Holdnack 1:19,24
   1:25
Howard 17:1 33:1
human 9:18 24:3
   24:16,25 25:4

**I**

idea 20:14
identification
   17:15
imagine 33:19
immediately 12:2
impact 22:25
including 21:14
independently 14:5
indicate 32:19
indicated 13:7
indicating 21:6
individually 1:7,9
   1:11,14
inform 11:4 12:16
   15:1 29:6 30:1
information 15:4

22:23
informational
   27:15,16
informed 21:8,13
initial 20:8
initiatives 8:14,15
Institute 6:21 7:2
   7:19
insurance 12:13
intended 4:24
interest 13:21
interested 17:7
internally 24:17
Internet 28:11
investigate 14:6
investigation 14:8
   21:14 24:11 26:14
investigations
   23:24 24:2
involved 6:18 9:19
   10:23 11:20 12:18
   23:9
involvement 9:7,10
issue 11:7 15:11
   16:13 17:20 27:2
   29:19
issues 9:8 23:24
   24:16 25:25

**J**

January 5:14,14
job 7:6,10 32:17
John 1:13 2:14
   11:18 13:12,14,22
   14:12 25:16 29:22
   31:16 32:19,23
   33:14
Joseph 2:11
Joyal 2:11 3:5,7
   18:7,15 19:7,9
   24:14 25:9,14
   27:9 30:21 31:7
   31:11 32:4 33:10
   33:20,22
Jr 2:11
Judge 20:4

**K**

K 4:1
Kelly 20:5
kicked 33:5
kind 5:8 12:13 27:2
knew 17:13
know 4:9,15,15
   6:12 7:1 10:3
   11:12,14,25 13:7
   14:21,22 15:8
   16:20,21,23 17:11
   17:12,13 18:24
   19:2,6,13,14,15
   19:17,17,18,19,23
   19:24 21:2 22:7
   23:18 24:22 25:7
   25:10,11,22,25
   26:18,21 30:10,10
   30:18 31:14,14,18
Knowing 32:23
knowledge 20:5
Knox 2:8

**L**

Lack 30:6 33:7
Lane 2:15
Lanzillo 2:7 18:4
   18:11 20:13 21:12
   22:18,21 23:12,15
   23:19,23 25:15
   31:4
large 33:23
larger 24:22
Law 2:11
leading 10:24
learn 10:21
learned 31:8
left 6:14 25:5 26:21
legal 29:14
Legler 23:25 24:18
lesser 22:12
letter 14:12
letting 20:17
let's 20:7 30:11
   32:6
level 8:22 9:17

liberal 5:21
Liberty 2:5
Liebel 1:11 2:10
   11:19 13:13 15:7
   25:5,8,17 29:21
Liebel's 24:12
   25:12
life's 25:8
listening 22:7
little 5:16,20 6:4
   23:17
live 7:25
lived 8:1
living 6:17
LLC 2:15
local 7:21
located 7:23
logic 32:19
logically 30:11 32:6
long 7:6 13:9
look 14:3,23 18:18
   19:16 26:19 27:12
lose 32:17
Loughney 2:15
Lucht 24:9

**M**

majority 13:12,14
making 8:11 11:14
   26:24
manner 26:14
marked 17:14,16
married 6:16,16
master's 6:3
match 28:15,16,19
   28:24
matter 15:17 22:20
matters 8:20
McDowell 5:18
McLaughlin 2:8
McNair 1:22 2:2
   3:4,6 4:5,7 18:6
   22:20 23:13,17,22
   27:5 28:22 30:6,9
   30:24 32:1,22
   33:7,11,21
McNair's 32:20

mean 6:9
meet 10:15
meeting 11:4,17,22
   12:7,18,23 13:1,3
   13:9 15:6,24 16:3
   18:23 21:14,22
   22:5,23 23:3 26:6
   26:11 27:15,16
   28:2
meetings 12:10
mention 32:25
mentioned 17:10
   18:24
mere 31:10
met 4:7 10:7
Mike 11:20 14:11
   15:8
Millcreek 5:5
mind 18:17
mine 12:12
minutes 13:10
misconstruction
   32:10
misconstrue 27:18
Missouri 5:23
Moser 2:15
motivated 26:25
move 6:18

**N**

N 3:1 4:1
name 5:2 10:22
   17:23 25:23
named 25:22
necessarily 15:14
need 18:9 21:6
needed 8:2
negative 33:17
never 6:3 9:24 10:2
   10:2 21:23,24
   22:1
new 8:15 24:8
newspaper 10:22
   13:4,20 14:23
   27:17 29:10 31:24
   32:7,20,24
newspapers 28:5,6

Conley v. County of Erie, et al.

Richard Schenker
Page 4

28:6 29:6,22
**nonobjectionable**
23:20
**Notary** 1:19
**number** 4:17 6:10
33:5

**O**

**object** 31:11
**objection** 18:4
21:12 22:18 23:12
23:21 24:14 25:9
25:14 28:22 30:6
31:4 32:22 33:7
**objectionable** 23:1
23:20
**obviously** 28:10
30:13 31:19
**occurred** 4:11 16:6
**OCY** 20:19 23:11
24:4,8,12 25:5
28:20 33:4,15
**OCY-bashing**
28:13
**offered** 13:22 15:25
**Office** 1:6,12 2:6,11
10:9 21:9 22:17
**offices** 1:21 31:17
**Oh** 18:10
**Okay** 5:4,13,25 6:2
6:4,24 8:17 9:2,5
9:22 10:3 11:20
12:2,7,17,20,25
13:20,24 15:18,22
16:2,15,21 17:6
18:2,16 19:4,8,21
20:11,22 21:16
22:14 23:5 24:6
24:20,25 26:10,13
26:18 27:13 31:7
31:19,23 33:14
**ones** 9:4
**Onorato** 1:13 2:14
11:18 13:13,14,22
14:12,19,21 15:7
20:2,16 21:2
25:17 26:4 29:22

31:16,23 32:19,23
33:14
**Onorato's** 31:19
**original** 27:16
**Ousted** 27:25
**overall** 8:12 13:11
14:8
**Overly** 18:4
**oversight** 8:13
**owned** 6:10

**P**

**PA** 2:3,5,9,12,16
**page** 20:15
**Palattella** 17:2,7,11
17:12 33:1,2,6,13
33:15
**paper** 11:24
**paragraph** 18:14
18:15 20:15 21:3
29:12,13
**part** 19:12 31:10
**participate** 9:22,25
22:16
**participated** 22:21
**participation** 14:15
**Pat** 17:1 33:1
**PC** 2:8
**Penn** 2:15 5:20
**PennDOT** 6:20 7:8
7:10
**PennDOT/Alleg...**
7:1
**Pennsylvania** 1:1,9
1:20,23 6:19 7:5
**people** 23:3 24:23
27:16 29:20 31:8
**performance** 21:24
22:3
**period** 6:7
**permission** 21:9
**person** 11:7
**personnel** 1:10
8:13,20,23 9:7,13
13:18 15:16,17
21:21 22:2,16,22
23:10,14 24:2,7

24:16 26:14 27:19
29:15,19
**personnel-related**
24:22
**Pete** 11:18 15:7
29:21
**Peter** 1:9 2:10
**phone** 29:5,8 32:24
**Pittsburgh** 2:12,16
7:24,25
**Pizza** 6:10
**place** 2:15 11:23
29:4
**Plaintiff** 1:3 2:1
**planned** 19:18
**planning** 9:1
**please** 5:2
**point** 11:13 12:21
27:4 33:2
**points** 20:12
**policy** 6:1,21 7:20
7:22
**political** 5:21 6:13
6:19 10:16 11:13
22:9,25
**poorly** 20:9
**position** 7:3
**positions** 9:2,5
24:23
**potentially** 13:13
**precautionary**
23:21
**preceding** 12:2
**prepare** 4:15
**prepared** 14:11
**present** 16:2,9
**presenting** 8:12
**press** 29:5,8 30:1
**presumably** 30:4
**presume** 29:20,25
**Presuming** 29:3
**previous** 15:21
**primarily** 28:11
**printed** 28:10
**prior** 5:10 11:25
15:3 25:13

**probably** 6:25
13:10,14 20:9
21:7 24:21
**problematic** 16:19
**procedures** 26:20
**proceedings** 9:23
10:1
**process** 10:23 11:1
11:14 14:16
**Procurement** 8:5
**program** 8:24
**prohibit** 29:16
**prophecy** 28:1
**prophetic** 28:4
**proposed** 23:2
**public** 1:19 6:1,21
7:19,22 11:13
27:2,2
**publishes** 19:22
**purpose** 14:25 15:6
**purposes** 29:3
**put** 20:24 23:20
26:10
**PW** 25:22
**p.m** 1:21 34:4

**Q**

**question** 4:19,21,23
18:12 20:8,9
26:16 29:1,2,3
31:13
**questions** 4:14,18
27:5,11 30:21
33:20
**quote** 20:22
**quotes** 32:14

**R**

**R** 2:11 4:1,1,1
**rank** 9:8
**rank-and-file** 12:8
**read** 10:22 18:2,13
19:7,9,11 21:10
31:1 33:10,22
**reading** 33:24
**reason** 11:9 28:24
31:2,2,5

**reasons** 28:19
29:15
**recall** 10:9 11:22
12:6,10,19,20
13:16,18 14:19
22:11,13,15 26:3
27:1
**recommended** 25:7
**record** 23:21
**Recross-Examin...**
3:7 32:3
**Redirect** 3:6 30:23
**refer** 31:15
**referred** 17:21
**regarding** 9:8 12:8
23:11
**Regent** 5:24
**regular** 9:11
**related** 16:13 27:19
**relating** 23:24 26:1
**relation** 11:23
**relations** 7:11,17
11:13
**release** 29:5,8
**relevance** 24:14
25:9
**relied** 14:16
**remember** 11:19
11:21 12:24 16:24
22:7 27:22
**repeat** 4:21 20:8
**rephrase** 4:21
**report** 8:11 9:4
12:14
**Reported** 1:24
**reporter** 13:4,20
15:22 16:2,8,16
17:10 27:17
**reporters** 15:3
**Reporting** 1:25
**represented** 18:3
**representing** 4:10
**reprint** 17:19
**requested** 21:9
28:21
**reside** 5:4

Conley v. County of Erie, et al.

Richard Schenker
Page 5

**resign** 25:18
**resignation** 10:20
**resigned** 31:21
**responsible** 8:11
**retire** 25:18
**retired** 25:20
**review** 12:22 14:5,8
  14:11 21:21 24:24
**reviewed** 17:25
  21:24
**reviews** 19:10
**Richard** 1:7,18 2:7
  2:10 3:3 5:3
**Rick** 17:1,4 19:7,17
  27:11 32:7,25
  33:22
**right** 5:10 8:3 10:5
  12:3,17,22 14:15
  14:22 17:6 20:1
  22:10 23:4,6
  24:11,23 25:20,21
  27:6 28:18 29:18
  30:17,19 33:6,22
**roads** 7:16
**Robert** 5:3
**role** 8:20 33:24
**room** 33:2
**routine** 9:7
**RPR** 1:24
**rules** 29:16
**run** 6:22

**S**

**S** 2:11 4:1
**sales** 6:15
**sanction** 22:6,12
**Sara** 2:14
**sat** 15:3,22
**Saturday** 30:12
**saw** 11:23 17:23
**Sayers** 17:1,4 32:25
**saying** 13:19 29:15
  32:16
**says** 30:15 31:15
**Schenker** 1:7,18
  2:10 3:3,11 4:7
  5:3 17:14,16

19:24 20:16,17
  29:14
**Schenker's** 19:17
**school** 5:17 6:6,6,9
  6:11,12,14
**science** 5:22
**second** 25:3
**see** 20:7,13 26:19
  33:11
**selection** 24:8
**self-employed** 5:7
**Sennett** 2:8
**sensational** 28:15
**sentiment** 19:4
**separated** 29:7
**September** 14:20
  17:20 29:4,24,24
  30:1
**service** 1:7,13 2:7
  9:25 27:3
**services** 9:18 24:4
  24:16,25 25:4
**serving** 4:12
**set** 18:6 19:5
**Shop** 6:10
**short** 6:20,21
**sic** 17:10
**sides** 33:11
**signature** 33:23
**signing** 33:24
**similar** 12:7
**sitting** 10:4
**situation** 11:5
  13:11,16 14:6
  19:16
**Solicitor** 1:15
**solid** 24:2
**somebody** 15:5
**somewhat** 28:1
**sorts** 32:14
**sought** 21:16
**sound** 33:8
**sounds** 25:23
**speak** 16:25 17:2
**speaking** 32:6
**speculation** 31:10

**spokesman** 7:13
**Springfield** 5:23
**staff** 8:22 11:4
  24:24
**start** 18:19
**started** 6:25
**state** 1:22 2:2 5:2
  7:21 31:1
**statement** 20:2
**STATES** 1:1
**State-Behrend**
  5:20
**Steve** 25:2
**stewardship** 24:12
**stop** 4:20
**stopped** 6:6
**stories** 33:10
**story** 17:7,10 27:24
  28:10,12,13 30:2
  32:12 33:17,17
**Street** 1:22 2:2,5,8
**stuff** 20:4
**stuffings** 33:5
**subordinates** 14:17
**suggest** 33:25
**suggested** 15:12
**Suite** 2:16
**Sunday** 10:20
  11:23,25 17:19,23
  30:1,12 32:12
**supervisory** 9:3
**supporter** 12:12
**sure** 13:8
**Suroviec** 25:2
**sworn** 4:2

**T**

**take** 6:7
**taken** 1:18 8:15
  13:4 15:2,3,15
  22:24 23:10
**talk** 19:9 21:5
  25:17 31:6 32:16
**talked** 16:4 30:13
  31:15
**talking** 18:7 32:12
  32:13,25

**tank** 7:21
**technical** 7:17
**tell** 13:8 15:13,14
  17:6 20:16 22:9
  25:24 31:12,24
  32:9
**telling** 20:3
**tells** 31:7
**term** 6:21 12:25
  13:2
**terminate** 19:18
**terminated** 12:13
**terminating** 22:6
**termination** 4:11
  8:21 10:20,24
  12:8 16:6 26:25
  27:18 28:5,21,25
  29:4 31:8,20
**terminology** 13:8
**testified** 4:2 11:7
  14:1 20:18 22:22
  27:14
**testimony** 3:3 11:8
  13:5 15:19 17:22
  26:25 27:20 28:8
**theology** 5:23
**thing** 7:14 9:16
  19:12 22:10 23:4
  23:6
**things** 6:8 8:6
  13:17 19:23 20:25
  24:5
**think** 7:21 12:14
  13:12,17 14:14
  15:5 18:20 19:3
  20:7,13 21:13
  22:22 23:13 25:19
  26:8 31:5
**thought** 7:12 11:6
  13:3 18:21
**Thursday** 12:5
**Tim** 4:7
**time** 4:20 6:7,7,12
  7:1,2,25 10:6,13
  10:18 14:24 17:24
  18:2 21:16 24:12

24:25 25:5 29:25
**times** 12:18,19
  16:25 19:23 29:25
  31:8 33:6
**Times-News** 14:20
  14:21 15:1,13
  17:20 18:22 19:13
  19:22 20:17
**Timothy** 1:22 2:2
**today** 4:13
**told** 17:9 18:23
  21:13,16 22:9
  28:16,25
**top** 8:22 29:14
**torn** 7:16
**transcript** 16:1
  32:14 33:23
**transcripts** 13:23
  13:25 26:5,8
**Traveled** 8:2
**trial** 4:16 16:9
  27:20 32:14
**TV** 7:15
**two** 2:12 12:18
  24:17 25:2 29:12
  33:11
**type** 8:3 9:16 13:8
**typical** 19:22
**typographical**
  33:25

**U**

**ultimately** 31:20
**Um-hum** 5:1 7:9
  9:6 16:5,7 17:18
  27:21 30:13,20
  32:8,11,15,18
**understand** 4:19
  20:3 23:15,15
  33:4
**understanding**
  26:4,7,8
**understood** 4:23
  28:19
**undertake** 26:13
**unfair** 18:21
**union** 9:22

Conley v. County of Erie, et al.

unit 9:9
UNITED 1:1
University 5:24
unjustified 33:9
unnamed 27:19
Untrue 30:9

**V**

v 1:4
vague 8:18
various 5:21 6:13
  8:10,13 20:25
Vendetti 2:4,4
verify 14:24
version 28:11
view 11:13 24:5,22
violated 11:6
violation 11:16
  12:14 15:11
Virginia 6:17

**W**

W 26:1
waive 33:23 34:1,2
want 5:16 19:1
  27:12 32:25 33:2
wanted 6:4 11:10
  12:16 24:4
warden 9:18
wasn't 19:5 24:21
way 4:24 11:1
  19:22 20:4,13
  28:14
ways 19:24
Wednesday 12:5
week 11:25 12:2
  16:6
Weimer 2:11
Welfare 1:7,13 2:7
went 5:18 6:10,11
  6:12,14,20 7:8
  14:20,21 16:25
  31:17
West 2:8 24:1,19
WESTERN 1:1
Westlake 6:10
we'll 4:22 20:13

we've 4:7,13
whistleblower
  12:25 13:2,6
  18:24 20:18 27:25
  28:7 31:3 32:13
whistleblowers
  19:1,2
William 2:15
witness 10:1,2 19:8
  19:10 34:2
word 7:17 13:6
  18:24 28:4
worded 20:10
words 32:20
work 5:24 6:1,5,13
  6:13,15,19 8:1
  25:8
worked 12:15
workers 9:8
write 30:2
written 28:6 31:14
  33:1,17

**X**

X 3:1

**Y**

yeah 13:25 18:10
  18:17 20:7 21:7
  29:9
year 21:11
years 6:11 22:3
  33:5
young 24:17,18
Youth 1:6,12 2:7
  10:10 21:9 22:17

**0**

05-76E 1:4

**1**

1 3:11 17:14,17
  27:12
1:50 1:21
10th 2:8 14:20 29:4
11th 30:1
12th 17:20

120 2:8
13 22:3
15 13:10
15219 2:12,16
16501 1:23 2:3,9
16509 2:5
1975 5:18
1992 7:7
1996 7:7

**2**

2:40 34:4
20th 14:12
2002 5:14
2004 14:20 17:20
  22:19 29:5
2006 1:21 5:14
27 3:5

**3**

30 3:6
32 3:7
34 3:11
3700 2:16
3820 2:5

**4**

4 3:4 29:13

**5**

525 2:15
5531 5:5

**7**

7 1:21

**8**

821 1:22 2:2

**9**

9th 29:24
975 2:12



YOUR source for local
news, information
and fun!

*Erie Times-News*

This is a printer friendly version of an article from **www.goerie.com**
To print this article open the file menu and choose Print.

Back to: http://www.goerie.com/apps/pbcs.dll/article?AID=/20040912/FRONTPAGE/109120499&SearchID=73200835690532

Article published Sep 12, 2004

# Whistleblower ousted

## County aide had testified supervisor altered document in child-welfare case The disputed changes County backs supervisor

Read More Local News

By Ed Palattella
ed.palattella@timesnews.com

At a court hearing in late July, an aide in the Erie County Office of Children and Youth testified that her supervisor altered a court document, a practice the aide called "not appropriate."

The aide is now out of a job.

Erie County Executive Rick Schenker on Friday arranged for the dismissal of the employee, Abby Conley, who had worked with troubled families for four years as an OCY social-service aide.

Schenker and his top legal adviser, county Solicitor John Onorato, declined to comment on the reasons behind the dismissal, saying county personnel rules prohibit them from discussing the case in detail.

Schenker and Onorato, however, did tell the Erie Times-News that Schenker was not letting Conley go because she was a "whistleblower" or because she testified against OCY.

Onorato said he and Schenker are comfortable with the decision. He said Conley ultimately resigned, though he acknowledged Schenker told the Erie Times-News that Schenker had planned to terminate Conley from her position.

Conley declined comment. She had worked for Erie County government for 13 years, including the four years with OCY. Conley is a former candidate for Erie City Council, and was vice chairwoman of the city of Erie's Human Relations Commission, which became the Erie County Human Relations Commission.

The court hearing at which Conley testified was July 28 before Erie County



Schenker #1

Judge Elizabeth Kelly. The hearing concerned the case of 2-year-old twin girls whom OCY had removed from their parents.

Conley, the aide on the case, was critical of her superior at OCY and provided testimony that was damaging to OCY's position. OCY came into court opposing reunification of the twins with their parents. Kelly ended up ruling against the agency.

Conley testified about the problems she had with OCY's handling of the case. At one point she said she was concerned about testifying, and she started to cry.

"What are you concerned about?" Kelly asked Conley, according to a transcript of the hearing.

"That I'm going to get into trouble," Conley replied.

"What kind of trouble?" Kelly said.

"I'm going to lose my job," Conley said.

"Why are you afraid of that?" Kelly said.

"Because some of the things they've done (are) not appropriate, and I don't want to lie," Conley said.

"You don't need to be afraid," Kelly replied. "And you are to never lie in this courtroom, and you are not going to lose your job based on anything that occurred in this courtroom today."

"OK," Conley said.

Conley also testified that, at that point, no one at OCY had threatened to fire her over what she might say in court. Without going into detail, Conley also said she had other professional difficulties with her superiors at OCY.

The dismissal of Conley and the events leading up to it come at a sensitive time for OCY, which investigates allegations of child abuse and neglect and places dependent children in foster homes or with adoptive parents.

The agency is the subject of an internal probe and a state investigation into its handling of the case of 15-year-old Brittany Legler, who died May 9 after collapsing at the home of her adoptive mother, Lisa M. Iarussi.

Iarussi is awaiting trial on the felonies of aggravated assault and endangering the

welfare of a child and the misdemeanor of recklessly endangering another person.

Police allege she caused more than 200 bruises and other injuries to Legler, whom she adopted in 2001.

According to the arrest warrant for Iarussi and other information in the case, the Millcreek Township School District repeatedly complained of the suspected abuse to OCY, though the office did not forward the complaints to the police.

Conley was not involved in the Iarussi case, and she did not mention that case during her testimony at the hearing about the twins.

The lawyer for the mother of the twins called Conley as a witness at that hearing. The mother and father asked to be reunited with the twins, while OCY, claiming suspected abuse, wanted to terminate the parents' rights and have the children put up for adoption.

The parents' lawyers argued the abuse claims lacked substantiation. The children were in foster care at the time of the hearing, though the parents had met with them in supervised visits.

As the aide on the case, Conley observed how the parents interacted with the children and wrote summaries for presentation in court. She testified that her supervisor on the case, Sue Deveney, altered Conley's evaluation of the mother to make it less favorable.

Reading from documents submitted as evidence, Conley said she originally wrote: "This social-service aide has no concerns or recommendations when it comes to parenting needs in the current or the future when it pertains to (the mother). She clearly excels in her parenting abilities."

Conley said Deveney changed that section to read: "(The mother) displays appropriate parenting skills during supervised visitations at the agency."

In another section of the summary, Conley testified, she wrote that the mother "does exceptionally well parenting and interacting with her children during visits. She is consistently involved with both her twin daughters and equally divides herself between the two of them."

Deveney, Conley testified, changed her summary by taking out the word "exceptionally."

Judge Kelly commented on the changes while Conley was on the witness stand. The differences in the summaries, Kelly said, "are very clear to me."

Conley went on to testify that she realized Deveney, as the supervisor on the case, had "the right to correct my court summaries." But Conley testified that professional disagreements with Deveney prompted her to ask to be taken off the twins' case and out of Deveney's unit. Conley said OCY granted those requests.

"I didn't share the opinion of my supervisor" on the twins' case, Conley testified. "And it was apparent that my opinion (and) professional involvement was different than her professional opinion."

Gerald Villella, the lawyer for the twins' mother, asked Conley if she had ever written negative reports about parents during her career at OCY. Conley said she had.

"Ever stopped from doing that?" Villella said.

"No, no," Conley testified.

"Ever been corrected by your supervisor for doing that?" Villella asked.

"My punctuation has always been corrected because I make mistakes," Conley said.

"No one ever told you couldn't render an opinion on that, did they?" Villella said.

"No," Conley replied.


After hearing Conley's testimony, as well as the testimony of the twins' parents, Kelly issued her ruling. In a setback to OCY's pursuit of termination of parental rights, Kelly ruled that the goal of the case is for the twins to be reunified with their parents, and that OCY "is directed to continue to work actively with these parents towards that goal.

"At this point in time we need to move cautiously to be sure that we ensure the best interests of these children," Kelly said.

Deveney, Conley's super-visor, did not testify at the hearing.

Onorato, the county solicitor, said he reviewed a transcript of the hearing, and said the county found no problems with how Deveney and other supervisors handled the case.

He said he disagreed with Conley's testimony about the alteration of the court summary.

"I am not aware that is what actually occurred," Onorato said.

He also said, "I am confident that after reviewing the transcript and checking into the matter that the Office of Children and Youth acted in a manner that is consistent with the policies and procedures of the office."

ED PALATTELLA, can be reached at 870-1813 or by e-mail.

Last changed: Sep 11, 2004

See this story as it was printed in Erie Times-News' electronic edition. **Click here for a FREE trial**.

This content provided by GoErie.com/Erie Times-News is copyrighted material and all rights are reserved. You may not reproduce this or distribute it electronically, in print or otherwise without **written permission**.